**EMERGENCY MOTION UNDER CIRCUIT RULE 27-3**
**ACTION NEEDED BY 11:59 P.M. ON JULY 14, 2023**

**NO. 23-15992**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
_____

FEDERAL TRADE COMMISSION,
*Plaintiff-Appellant,*

v.

MICROSOFT CORP., and
ACTIVISION BLIZZARD, INC.,
*Defendants-Appellees.*
_____

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-cv-2880
(Hon. Jacqueline Scott Corley, U.S. Distr. J.)
_____

## MOTION FOR AN INJUNCTION PENDING APPEAL
## OF THE FEDERAL TRADE COMMISSION
_____

HOLLY VEDOVA
*Director*

JOHN NEWMAN
*Deputy Director*

SHAOUL SUSSMAN
*Associate Director for Litigation*

JAMES H. WEINGARTEN
PEGGY BAYER FEMENELLA
JAMES ABELL
*Attorneys*

BUREAU OF COMPETITION

[MORE ON SIGNATURE PAGE]

ANISHA S. DASGUPTA
*General Counsel*

MARIEL GOETZ
*Acting Director of Litigation*

IMAD D. ABYAD
*Attorney*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-3579
iabyad@ftc.gov

## CIRCUIT RULE 27-3 CERTIFICATE

The undersigned counsel certifies the following:

### (i) Counsel Contact Information

*Counsel for Microsoft Corp.*:

Beth Wilkinson
Rakesh N. Kilaru
Kieran Gostin
Grace Hill
Anastasia M. Pastan
Jenna Pavelec
Alysha Bohanon
WILKINSON STEKLOFF LLP
2001 M Street, N.W., 10th Floor
Washington, DC 20036
(202) 847-4000
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
kgostin@wilkinsonstekloff.com
ghill@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
jpavelec@wilkinsonstekloff.com
abohanon@wilkinsonstekloff.com

Jonathan E. Nuechterlein
C. Frederick Beckner III
William R. Levi
Daniel J. Hay
SIDLEY AUSTIN LLP
150 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
jnuechterlein@sidley.com
rbeckner@sidley.com
william.levi@sidley.com
dhay@sidley.com

Bambo Obaro (Bar No. 267683)
WEIL, GOTSHAL & MANGES
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
bambo.obaro@weil.com

Michael Moiseyev
Megan A. Granger
WEIL, GOTSHAL & MANGES
2001 M Street, N.W., Suite 600
Washington, DC 20036
(202) 682-7000
michael.moiseyev@weil.com
megan.granger@weil.com

*Counsel for Activision Blizzard, Inc.*:

Jack DiCanio
Caroline Van Ness
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
(650) 470-4500
jack.dicanio@skadden.com
caroline.vanness@skadden.com

Steven C. Sunshine
Julia K. York
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
(202) 371-7000
steven.sunshine@skadden.com
julia.york@skadden.com

Maria Raptis
Matthew M. Martino
Michael J. Sheerin
Evan R. Kreiner
Bradley J. Pierson
Jessica R. Watters
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1 Manhattan West
New York, NY 10001
(212) 735-3000
maria.raptis@skadden.com
matthew.martino@skadden.com
michael.sheerin@skadden.com
evan.kreiner@skadden.com
bradley.pierson@skadden.com
jessica.watters@skadden.com

## (ii) Facts Showing Existence and Nature of Emergency

The district court refused to issue a preliminary injunction to halt a proposed acquisition by Microsoft Corp. of Activision Blizzard, Inc., pending an administrative determination by the Federal Trade Commission of whether the proposed merger violates the antitrust laws. Absent action by this Court, the merging parties may close their deal any time after 11:59 p.m. on July 14, 2023—when the district court's modified TRO expires. Op. 53.

Consummation of the proposed deal would irreversibly alter the status quo and, if done before the merits of the FTC's appeal are heard, would irreparably harm the FTC's ability to order effective relief for the public should the deal prove to be in violation of the antitrust laws.

The FTC brings this emergency motion for a temporary pause on consummation of the deal to allow the Court time to consider whether the FTC's appeal is meritorious and a preliminary injunction should issue.

### (iii) Why the Motion Could Not Be Filed Earlier

The district court denied the preliminary injunction in a decision dated July 10, 2023, and docketed on July 11, 2023. The FTC filed its notice of appeal on July 12, 2023, and moved in the district court for a stay pending appeal on July 13, 2023. Because of the impending expiration of the TRO, the FTC is filing this motion as soon as practicable thereafter.

### (iv) When and How Counsel Was Notified

Counsel for the FTC notified defendants' counsel, and this Court's emergency motions unit, by email on July 12, 2023, of the FTC's intent to file this motion. Service of the motion will be effected via both email

and the Court's CM/ECF system. Counsel for the defendants has indicated that defendants plan to respond to this motion.

## (v) Relief in District Court

The FTC requested a stay pending appeal from the district court on July 13, 2023, which the district court denied on the same day. Because of the imminent expiration of the TRO, the FTC now seeks emergency relief in this Court.

July 13, 2023

/s/ Imad Abyad
IMAD D. ABYAD
   *Attorney*
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
(202) 326-3579
iabyad@ftc.gov

iv

# TABLE OF CONTENTS

Circuit Rule 27-3 Certificate ........................................................................i

Motion for Injunction Pending Appeal ...................................................... 1

Background ................................................................................................... 2

    1.   The Proposed Acquisition ................................................... 2

    2.   The Gaming Industry, Technology, and
         Participants ........................................................................... 3

    3.   The District Court's Order ................................................. 5

Argument ..................................................................................................... 6

I.    The FTC's Appeal Raises Serious Legal Questions and
     Has a Fair Prospect of Success ........................................................... 7

    A.   The FTC Has Marshalled Compelling Evidence of
        Substantial Lessening of Competition ........................................ 8

    B.   The District Court Applied the Wrong Legal
        Standard in Weighing the Grounds for Relief .......................... 12

    C.   The District Court's Finding of Foreclosure in the
        Multi-Game Content Subscription Services Market
        Suffices to Support Preliminary Relief ...................................... 14

    D.   The District Court Erroneously Considered the
        Parties' Own Proposed Remedies As Part of the
        Government's Likelihood of Success .......................................... 15

II.   The FTC Will Be Irreparably Harmed Absent an
     Injunction Pending Appeal and the Public Interest
     Strongly Favors an Injunction ........................................................... 17

Conclusion ................................................................................................. 20

## MOTION FOR INJUNCTION PENDING APPEAL

The Federal Trade Commission asks the Court to enjoin pending appeal a $69 billion acquisition of Activision Blizzard, Inc., by Microsoft Corp. Below, the FTC sought a preliminary injunction under Section 13(b) of the FTC Act to pause the deal pending the FTC's upcoming administrative determination of whether it violates the antitrust laws. The FTC presented compelling evidence that the acquisition poses a reasonable probability of lessening competition in multiple markets— more than meeting the Section 13(b) standard, which merely requires the FTC to raise serious, substantial questions on the antitrust merits. But the district court denied preliminary relief, applying the wrong legal standard: the court effectively required the FTC to prove its full case on the merits with the court as arbiter of the merger's legality. That violates Section 13(b) and Circuit precedent, and wrongly usurps the Commission's adjudicative role.

This case is about more than a single video game and the console hardware to play it. It is about the future of the gaming industry. At stake is how future gamers will play and whether the emerging subscription and cloud markets will calcify into concentrated, walled

gardens or evolve into open, competitive landscapes—where games are platform-agnostic, new platform offerings can emerge to challenge the established incumbents, and consumers are free to choose where and how to access their favorite games.

Based on the district court's fundamental errors, the Commission has a strong likelihood of success on appeal. But without an injunction pausing the merger now, the deal will be consummated, irreversibly altering the status quo and irreparably harming the FTC's ability to order effective relief should the deal be found unlawful. Absent action by this Court, defendants may consummate their deal any time after 11:59 p.m. on July 14, 2023. With so much at stake, the FTC urges the Court to grant a temporary injunction to protect competition and the public while the Court considers this appeal.

## BACKGROUND

### 1. The Proposed Acquisition

In January 2022, Microsoft and Activision announced a planned merger that would constitute the largest ever deal in the gaming industry and in Microsoft's history. ECF_1 ¶1. In December 2022, the Commission commenced administrative proceedings to determine if the merger may substantially lessen competition in violation of Section 7 of

the Clayton Act and Section 5 of the FTC Act, 15 U.S.C. §§ 18, 45. The FTC hearing on the merits is set for August 2, 2023. ECF_1 ¶16.

Meanwhile, on April 26, 2023, the U.K. Competition & Markets Authority (UKCMA) found that the merger violated UK competition law because it was likely to substantially lessen competition in Cloud Gaming—one of the antitrust markets alleged in the FTC's complaint. ECF_10-7. The UKCMA issued a proposed final order barring defendants' merger for ten years. *Id*. Defendants appealed and press reports indicated that defendants were considering the extraordinary step of consummating their proposed merger despite the UKCMA orders. *Microsoft is Exploring Options to Close Activision Deal Despite UK Block*, MLEX (June 1, 2023). Accordingly, on June 12, 2023, the FTC sought the preliminary relief denied below. *See* ECF_1 at 2-3.

## 2. The Gaming Industry, Technology, and Participants

The gaming industry today has over 3 billion players worldwide. "AAA" video games require hundreds of millions of dollars, hundreds of personnel, and years to make—with uncertain prospects of when or if they will ever be ready to market. Video games are played on special consoles, PCs, and mobile devices. Computationally demanding games

3

require advanced-hardware consoles or gaming PCs. Currently, the two high-performance consoles are Microsoft's Xbox X/S and Sony's PlayStation5, with Nintendo's Switch a generation behind. Console makers generate revenue from the sale of hardware and accessories, and from a share of the revenue of game publishers like Activision. Consumers and industry participants agree that content drives sales of both the games and the hardware required to play them.

Importantly, in addition to the traditional buy-to-play model, gamers can now play via subscriptions to either Multi-Game Content Services (accessing a library of games) or Cloud Gaming Services (streaming without the need for downloading the game and using local computing power). Microsoft's "Xbox Game Pass" is the most popular Multi-Game Content Library Service. Sony's "PlayStation Plus" service is second but well behind. Amazon, Electronic Arts, and Ubisoft also provide similar services, albeit to far fewer users currently.

Cloud Gaming, a nascent but rapidly growing segment, allows games to be run on remote servers; this permits the playing of computationally demanding games on less powerful devices, including consoles, PCs, mobile devices, and even some smart TVs. Microsoft's

"xCloud" is the dominant leader in this market. Amazon, Nvidia, and Sony are also in the market. Google exited it recently, however, citing the cost and difficulty of securing gaming content.

### 3. The District Court's Order

The district court denied preliminary relief despite agreeing with the FTC on the key elements for such relief. The court agreed that the U.S. is the relevant geographic market for high-performance consoles, and it assumed that for the subscription and cloud markets. Op. 28-30. It assumed for purposes of its ruling that High-Performance Consoles (Xbox and PlayStation), Multi-Game Content Library Services, and Cloud Gaming Services are relevant product markets for antitrust analysis. Op. 23-28. It also agreed that "the combined firm would have the ability to foreclose" its rivals. Op. 33.

For the Library Services market, the court found that the merged firm is likely to offer Activision titles like *Call of Duty* exclusively on Microsoft's Game Pass, and *not* on rival subscription services. Op. 47. Nonetheless, the district court denied relief principally because it viewed Microsoft as lacking the incentive to foreclose rivals post-merger in *other markets*—Consoles and Cloud Gaming—relying primarily on

Microsoft executives' self-interested testimony and Microsoft's post-complaint attempts, via side deals and even mere offers, to remedy the merger's impact on competition. Op. 33-40, 49-50.

The district court acknowledged that the record contains at least conflicting evidence of anticompetitive effects, but nevertheless found that the equities do not support preliminary relief. Op. 51-52.

## ARGUMENT

In actions by the Government, an injunction pending appeal is warranted if the movant shows: 1) a substantial case on the merits; 2) irreparable harm absent an injunction; and 3) public interest favoring an injunction. *Leiva-Perez v. Holder*, 640 F.3d 962, 967-970 (9th Cir. 2011) (*per curiam*) (applying *Nken v. Holder*, 556 U.S. 418 (2009)). The first two factors "are the most critical." *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012) (quoting *Nken*, 556 U.S. at 434). The FTC "need not demonstrate that it is more likely than not that [it] will win on the merits." *Leiva-Perez*, 640 F.3d at 966; *accord Lair*, 697 F.3d at 1204. It need only show that the appeal raises "serious legal questions" or has a "fair prospect of success." *Leiva-Perez*, 640 F.3d at 971. This standard is easily satisfied here.

6

## I.  THE FTC'S APPEAL RAISES SERIOUS LEGAL QUESTIONS AND HAS A FAIR PROSPECT OF SUCCESS

The FTC brought this action pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b),[1] which was enacted to preserve the FTC's ability to order relief upon completion of its administrative proceedings. H.R. Rep. 93-624, at 31 (1973), *reprinted in* 1973 U.S.C.C.A.N. 2523, 2533. When seeking preliminary relief under Section 13(b), the FTC shows a "likelihood of success" if it "raise[s] questions going to the [antitrust] merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance."[2] *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984). This analysis does not call for resolving "conflicting evidence," which is the Commission's province. *Id.* at 1162. Aside from raising "serious questions," the FTC

---

[1] That provision states: "Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest … a preliminary injunction may be granted." 15 U.S.C. § 53(b).

[2] The core merits showing is a "reasonable probability" the merger will substantially lessen competition in any line of commerce. *Brown Shoe Co. v. United States*, 370 U. S. 294, 325 (1962); *see also FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967) (same standard applies to all mergers whether "horizontal, vertical, conglomerate, or other").

need only show that the "equities" favor relief. *Id.* at 1165; *accord FTC v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999). In weighing the equities, moreover, "public equities receive far greater weight." *Warner Commc'ns*, 742 F.2d at 1165. These include effective enforcement of the antitrust laws and preserving the FTC's ability to order meaningful relief upon deciding the merits. *Id.*

"Section 13(b) places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard." *Id.* at 1159. Here, the FTC easily meets "this more lenient standard." *Affordable Media*, 179 F.3d at 1233.

## A. The FTC Has Marshalled Compelling Evidence of Substantial Lessening of Competition

The FTC showed that the proposed merger would fundamentally restructure the gaming industry. Activision, one of the "big four" independent publishers, will be owned by Microsoft, one of the largest platform providers. Activision now is "platform-agnostic." It designs its games to be on as many platforms as possible. That likely will change after the merger, when the combined firm's incentives regarding Activision content will change in competitively significant ways.

Microsoft's recent acquisitions of game developers paint a stark

8

picture of rival foreclosure. For studios acquired in 2018-2019, company executives planned to focus on Microsoft's own console, with no plans to publish games for other consoles. PX1949 at 2; *accord* PX1950 at 1; *see* FTC Final Proposed Findings of Fact & Conclusions of Law (FOF), ECF_309, ¶¶554-560. Microsoft likewise foreclosed rivals from access to titles from ZeniMax Media, the owner of several game studios that Microsoft acquired in 2021, despite its pre-transaction representations it had no reason to do so. *See* FOF ¶¶561-599; PX1651 at 125-29; PX7048 at 8; PX7042 at 257-58; PX7012 at 406, 412, 426. Of the 24 games released by the eight studios Microsoft has acquired since 2018, only six have been released on Sony's PlayStation. PX0027 at 2-4. As Microsoft's Gaming CEO has conceded, "the best" way to assess Microsoft's likely future conduct here is by looking at "the actions that we've taken as a publisher." PX7068 at 359-360.

Post-merger, Microsoft likely will have the ability and incentives to partially or totally foreclose its rivals, to the detriment of consumers who prefer another platform. Microsoft's control of Activision, a leading publisher for consoles, PX4341 at 27, would confer on the Xbox console a unique advantage by limiting, degrading, or restricting rivals' access to

Activision's games. Indeed, Microsoft has already modeled how revenue losses arising from Activision's reduced business with Sony would be offset through a revenue boost from Microsoft's own Xbox console and Game Pass businesses. *See* FOF ¶¶529-535.

The FTC also showed the merger likely will have a deleterious effect on innovation. *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1045 (D.C. Cir. 2019). Subscription-service providers and console makers compete for periodic deals from game developers, to help differentiate their products or services. Consumers can benefit from this collaboration, which enables advances in games and console hardware. FOF ¶¶536-538. For example, Sony and Activision collaborated to develop innovative PlayStation features for a more realistic gaming experience. PX7053 at 30:5-35:5. Proprietary information often must be shared for such collaboration to succeed, or even be feasible. *See* PX8001 ¶40. That would no longer be possible if Activision were to become a part of Microsoft. A combined firm would have access to rivals' confidential information, thereby hindering innovation and harming consumers. *See Filtrol Corp. v. Slick Corp.*, No. 69-607, 1969 WL 219, at *8 (C.D. Cal. Dec. 29, 1969), aff'd, 428 F.2d 826 (9th Cir. 1970).

Competitors already have indicated they likely would cease such data sharing with the merged entity. PX3378 at 11. *See also* FOF ¶¶541-544.

Lastly, although not the FTC's burden to do so in a preliminary Section 13(b) proceeding, *see, e.g., Warner Commc'ns*, 742 F.2d at 1162, the FTC showed that defendants' remedial proposals—proffered third-party deals that purported to promise Activision content to those parties—could not replace the competition lost as a result of the merger; were not merger-specific and thus could not be "counted" as efficiencies; and were of uncertain import anyway.[3] *See* FOF ¶¶743-786, 797-801.

Microsoft offered no evidence of how these deals would even be read or enforced, and it appears not to have conducted even a basic loss/profit analysis of those deals. PX7072 at 934, 1046-47. Nor did defendants present any analysis of the supposed procompetitive benefits of these deals. Defendants' only testimony about the deals' purported ameliorative effects was stricken as having "no evidentiary value" because the deals are not "guaranteed." Trial Tr. 1115:19-1116:2.

---

[3] Those third parties expressed concerns about whether the Activision content would be made available on their subscription services, the vagueness of the deal terms, and Microsoft's refusal to license Activision titles other than *Call of Duty*. FoF ¶¶747, 756-761, 771-773, 787-796.

### B. The District Court Applied the Wrong Legal Standard in Weighing the Grounds for Relief

Despite the FTC's strong showing below, the district court denied relief. But a fundamental legal error infected its entire analysis: the court effectively required the FTC to prove the ultimate merits, rather than—as established precedent holds—simply raise serious questions as to the merits. In considering preliminary injunctions under § 13(b), courts should "make only a preliminary assessment of the merger's impact on competition." *Warner Commc'ns*, 742 F.2d at 1162. Such relief is "meant to be readily available to preserve the status quo while the FTC develops its ultimate case." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008); *accord FTC v. Penn St. Hershey Med. Ctr.*, 838 F.3d 327, 352 (3rd Cir. 2016). The court at first cited *Warner Communications*, but then inexplicably applied an entirely different standard—relying on cases for *permanent* injunctions that decided the antitrust *merits*, where no administrative proceeding exists. *See* Op. 30-31, 46. The court thus reached the antitrust merits under Section 7 of the Clayton Act—and even then it erroneously converted that statute's "may … substantially" standard, 15 U.S.C. § 18, into the far stricter "will probably substantially" lessen competition. *E.g.* Op. 33, 47, 49.

12

The court further erred in failing to recognize that any conflicts in the evidence regarding the merger's anticompetitive effects—for example, the effects of purported post-complaint deals—were to be resolved in the FTC's administrative proceeding. E.g., Op. 49. As the court acknowledged, Microsoft's deals were "not guaranteed." Trial Tr. 1115:19-1116:2. Nonetheless, the court still relied on those deals to counter the FTC's foreclosure evidence. In so doing, the district court directly contravened this Court's directive to "make only a preliminary assessment" of the merits and to "not resolve the conflicts in the evidence." *Warner Commc'ns*, 742 F.2d at 1162, 1164. Moreover, the court repeatedly resolved doubts in the evidentiary record against the Government when the law calls for "any 'doubts … to be resolved against the transaction'," *Hershey*, 838 F.3d at 337 (quoting *FTC v. Elders Grain*, 868 F.2d 903, 906 (7th Cir. 1989) (Posner, J.)); *see, e.g.*, Op. 44, 47-48, 52. "[Q]uestions going to the merits" ought to have been left for "determination by the FTC in the first instance." *Warner Commc'ns*, 742 F.2d at 1162. The court's misapplication of the applicable legal standard is a reversible error and warrants an injunction pending fuller consideration of this issue on appeal.

### C. The District Court's Finding of Foreclosure in the Multi-Game Content Subscription Services Market Suffices to Support Preliminary Relief

A stark—and dispositive—example of the court's misapplication of the Section 13(b) standard is its refusal of relief despite its finding that, in the Multi-Game Content Library Subscription Services market, the merger will likely lead to Microsoft foreclosing rivals from Activision gaming content. Op. 47. "The primary vice of a vertical merger," the Supreme Court held, "is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a clog on competition." *Brown Shoe*, 370 U.S. at 323–24 (cleaned up). Section 7 prohibits "vertical … mergers whose effect may tend to lessen competition in any line of commerce." *Id*. at 317. Rather than heeding this guidance, the court simply discounted the evidence that Microsoft would immediately place Activision content on its own GamePass platform. Op. 47. The court acknowledged that defendants offered "no analysis" of how the addition to GamePass would impact the relevant market, Op. 48, but it nonetheless concluded that the merger would have a "procompetitive effect," Op. 47, without offering any empirical support for that that conclusion.

14

The task of weighing the foreclosure of rivals against any purported efficiencies is not suitable for a preliminary injunction hearing being conducted on an expedited time frame and a limited record. That task is statutorily entrusted to the FTC "in the first instance." *Warner Commc'ns*, 742 F.2d at 1162. The court's legal error warrants a reversal and justifies an injunction pending appeal.

### D. The District Court Erroneously Considered the Parties' Own Proposed Remedies As Part of the Government's Likelihood of Success

In yet another reversible error, the district court repeatedly relied on Microsoft's post-complaint side deals when analyzing the FTC's likelihood of success. These deals, which Microsoft presented as alleviating concerns about post-merger foreclosure of rivals, Op. 18-19, were never vetted by the FTC or subjected to any market analysis by Microsoft itself, PX7072 at 934, 1046-1047. Moreover, as the district court recognized, they were "not guaranteed." Trial Tr. 1115:19-1116:2. The court nonetheless cited the deals as proof that Microsoft had no incentive to foreclose rivals. Op. 33-34, 38-40. It took them as "procompetitive" efficiencies that outweighed the acknowledged foreclosure in the Multi-Game Content Library market. Op. 49. And it

cited them as *the principal* reason to deny preliminary relief. Op. 52.

The Supreme Court has explained that proposed remedies should be considered only after a finding of liability, at the subsequent remedy stage of a merits proceeding. *See generally United States v. Greater Buffalo Press, Inc.*, 402 U.S. 549, 556 (1971). Because a Section 13(b) preliminary proceeding cannot reach even the determination of liability, the court plainly cannot resolve what the appropriate remedy would be if the Commission were ultimately to find a violation. *Id*. And the crafting of antitrust remedies is at the heart of the FTC's expertise.[4] The district court here usurped that core power.

Moreover, in crediting proposed efficiencies absent any analysis of their actual market impact, the district court failed to heed this Circuit's observation that "[t]he Supreme Court has never expressly approved an efficiencies defense to a § 7 claim." *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys. Ltd*, 778 F.3d 775, 788-89 (9th

---

[4] *See, e.g.*, 15 U.S.C. § 21(b) (granting the Commission the power to order antitrust relief "in the manner and within the time fixed by said order"); *Atl. Refining Co. v. FTC*, 381 U.S. 357, 376 (1965) (Commission has "wide discretion in its choice of a remedy"); *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1345 (4th Cir. 1976) (FTC entitled to Section 13(b) relief regardless of what the "ultimate remedy" in administrative adjudication might be).

Cir. 2015). Indeed, the Court has repeatedly "cast doubt" on such a defense. *Id.* And this Circuit "remain[s] skeptical about the efficiencies defense in general and about its scope in particular." *Id.* at 790.

The district court's reversible error warrants an injunction pending a full briefing of the issue.

## II. THE FTC AND THE PUBLIC WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION PENDING APPEAL AND THE PUBLIC INTEREST STRONGLY FAVORS AN INJUNCTION

1. This merger will fundamentally restructure the gaming industry, calcifying what could be an open, platform-agnostic market for content into a series of walled gardens. If it is allowed to close now, the Government and the public will likely suffer irreparable harm because ordering an effective divestiture after the parties have combined operations can be "exceedingly difficult" or even impossible. *See*, *e.g.*, *Warner Commc'ns*, 742 F.2d at 1165; *Whole Foods*, 548 F.3d at 1033-34. This Court has granted relief where "fundamental business changes" would occur in the interim that "cannot be easily undone" on reversal. *FTC v. Qualcomm Inc.*, 935 F.3d 752, 755-57 (9th Cir. 2019). Notably, the *Qualcomm* Court found relief warranted even though the movant's likelihood of success on appeal was deemed uncertain. *Id.* at 756-57.

17

Absent relief from this Court, the merging parties here can immediately begin sharing confidential information, including strategic and long-term plans, that will be near impossible to undo. Competitors have indicated that, due to the risk of Microsoft's gaining access to their data, they are likely to cease data sharing with Activision if the merger closes. PX3378 at 11. Microsoft's access to confidential data of its rivals that is now in the possession of Activision cannot be undone if the merger proves unlawful.

The merged firm, moreover, can immediately start making exclusivity plans and announcements akin to Microsoft's post-merger conduct following the ZeniMax deal. For example, the court found "it is likely *Call of Duty* will be offered exclusively on Game Pass, and not offered on rival subscription services." Op. 47. The harm in the market for multi-game subscription services will thus begin immediately upon consummation of the merger, as Microsoft begins operationalizing that full foreclosure. And even if the FTC ultimately prevails in its merits trial, Microsoft could effect foreclosure of rivals during the pendency of the litigation and the appeal process—causing ongoing harm that will be difficult to remedy after the litigation process runs its course.

2.  Granting an injunction pending appeal promotes the strong public interest in effective enforcement of antitrust law. Absent such relief, the competitive effects of the proposed acquisition would evade a determination on the merits. Courts "must place great weight on the public interest in blocking a possibly anticompetitive merger before it is complete." *Whole Foods*, 548 F.3d at 1050 (Tatel, J., concurring). That is why courts frequently grant injunctions pending appeal in FTC merger cases.[5] The rare instances where such injunctions have been denied serve as cautionary tales. In *Whole Foods*, for example, the D.C. Circuit initially declined to grant an injunction pending appeal, but ultimately ruled in the FTC's favor. In the interim, however, the parties merged, making it difficult to restore competition and severely undermining the effectiveness of the ultimate remedy.

Defendants, on the other hand, will have to endure a brief delay in the consummation of a deal that has been years in the making. While

---

[5] *See, e.g., Warner Commc'ns*, 742 F.2d at 1159; May 24, 2016 Order, Case No. 16-2365, *FTC v. Hershey Penn St. Med. Ctr.* (2016); *FTC v. Advocate Health Care Network*, 841 F.3d 460, 464 (7th Cir. 2016); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001); *FTC v. Hosp. Bd. of Dirs.*, 38 F.3d 1184, 1187 (11th Cir. 1994); *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1345-46 (4th Cir. 1976).

the parties can choose to walk away from the deal if not closed by July 18, 2023,[6] they can also choose to continue to pursue the deal, as merging parties routinely do when regulatory or judicial review takes longer than initially expected. There is no compelling reason why, "if the merger makes economic sense now," it will not be "equally sensible" after this Court decides this appeal. *Hershey*, 838 F.3d at 353; *accord Heinz*, 246 F.3d at 726-27. Any effect of such short delay on defendants' business plans is the fair cost of law enforcement, and pales in comparison to the harm to the public that would result from the potential reduction in competition in the relevant markets if the deal closes. While delay costs are not irrelevant, courts "must afford such concerns little weight" to effectuate Section 13(b)'s purpose of protecting "the 'public-at-large, rather than individual private competitors.'" *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1226 (11th Cir. 1991) (quoting *FTC v. Nat'l Tea Co.*, 603 F.2d 694, 697 n.4 (8th Cir. 1979)).

## CONCLUSION

The Court should grant an injunction pending appeal.

---

[6] The Court can extend the district court's TRO as needed by issuing an administrative stay, to allow it more time to consider the motion.

Respectfully submitted,

HOLLY VEDOVA
*Director*

JOHN NEWMAN
*Deputy Director*

SHAOUL SUSSMAN
*Associate Director for Litigation*

JAMES H. WEINGARTEN
PEGGY BAYER FEMENELLA
JAMES ABELL
CEM AKLEMAN
MEREDITH R. LEVERT
JENNIFER FLEURY
JAMES GOSSMAN
*Attorneys*

BUREAU OF COMPETITION

ANISHA S. DASGUPTA
*General Counsel*

MARIEL GOETZ
*Acting Director of Litigation*

/s/ Imad Abyad
IMAD D. ABYAD
*Attorney*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-3579
iabyad@ftc.gov

*Counsel for*
*Federal Trade Commission*

21

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing motion complies with the length limits and format requirements in Fed. R. App. P. 27(d) and Circuit Rule 27-1, because it does not exceed 20 pages, and has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook font.

/s/ Imad Abyad
IMAD D. ABYAD
Date: July 13, 2023          *Attorney*
FEDERAL TRADE COMMISSION

## CERTIFICATE OF SERVICE

I certify that on July 13, 2023, I filed the foregoing motion with the Court's appellate CM/ECF system. Counsel for defendants-appellees are registered users of, and will be served by, the Court's appellate CM/ECF system. I further certify that an electronic copy of the foregoing was emailed to counsel for defendants-appellees at their email addresses listed in the accompanying Circuit Rule 27-3 Certificate.

/s/ Imad Abyad
IMAD D. ABYAD
Date: July 13, 2023            *Attorney*
FEDERAL TRADE COMMISSION

# EXHIBIT A

(THE DISTRICT COURT'S UNREDACTED DECISION ON REVIEW)

FILED SEPARATELY UNDER SEAL

# EXHIBIT B

(THE DISTRICT COURT'S REDACTED DECISION ON REVIEW)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>   Plaintiff,<br><br> v.<br><br>MICROSOFT CORPORATION, et al.,<br><br>   Defendants. | Case No. 23-cv-02880-JSC<br><br>**PRELIMINARY INJUNCTION<br>OPINION**<br><br>**REDACTED VERSION** |

   In December 2022, the FTC initiated an administrative action to block Microsoft's proposed acquisition of Activision—publisher of the first-person shooter video-game franchise *Call of Duty*, among other popular video games. The gist of the FTC's complaint is *Call of Duty* is so popular, and such an important supply for any video game platform, that the combined firm is probably going to foreclose it from its rivals for its own economic benefit to consumers' detriment. Discovery in the administrative action has closed, and trial before an FTC judge is scheduled to commence on August 2, 2023.

   Four weeks ago, the FTC filed this action to preliminarily enjoin the merger pending completion of the FTC administrative action. Because the merger has a July 18 termination date, expedited proceedings were commenced. After considering the parties' voluminous pre-and-post hearing writing submissions, and having held a five-day evidentiary hearing, the Court DENIES the motion for preliminary injunction. The FTC has not shown it is likely to succeed on its assertion the combined firm will probably pull *Call of Duty* from Sony PlayStation, or that its ownership of Activision content will substantially lessen competition in the video game library subscription and cloud gaming markets.

# BACKGROUND

The video gaming industry represents the fastest growing form of media and entertainment with revenues larger than the film, music, and print industries.  The industry consists of several components.  The three billion worldwide gamers.  The videogame developers who create the games.  The videogame publishers who release the games.  And the companies that make the devices on which gamers play the games.  This action involves a merger between Activision—the developer of the *Call of Duty* video game franchise—and Microsoft—a game developer, publisher, and the manufacturer of the Xbox game console.

## A.    The Parties

Microsoft made $198 billion in revenue in 2022.  (PX9050-043.[1])  Gaming is part of Microsoft's More Personal Computing division.  (PX9050-014.)  Its gaming business includes Xbox, Xbox Game Pass (a gaming subscription service), and Xbox Cloud Gaming.  (PX9050-014.)  Microsoft publishes video games through Xbox Game Studios, comprising 23 game development studios, including nine studios that were included in Microsoft's acquisition of ZeniMax Media Inc., announced in September 2020 and finalized in March 2021.  (Dkt. No. 226-2, Lee Decl. at ¶ 14; PX0003 at 086-087 (detailing Microsoft acquisitions of gaming studios); PX1527-002.)

Activision, a publicly traded corporation, earned $7.5 billion in revenue in 2022.  (PX9388-040 (Activision 10-K 2022).)  "Activision develops and publishes video games for consoles, PCs and mobile devices.  Microsoft often refers to Activision, along with EA [Electronic Arts], Take-Two Interactive Software, Inc., and Ubisoft, as one of the 'Big 4' independent video game publishers."  (Dkt. No. 226-2, Lee Decl. at ¶ 19.)  "Activision's most successful video game franchise is *Call of Duty*, a first-person shooter video game series playable on video game consoles and PCs.  "Activision also produces other popular video games for consoles, including games from the *Diablo*, *Overwatch*, *Crash Bandicoot*, and *Tony Hawk* franchises, as well as video

---

[1] Exhibit citations are to the exhibit number and the page number associated with the exhibit number.  For hearing testimony, the Court has endeavored to include citations to the associated docket number. Other record citations are to material in the Electronic Case File ("ECF") with pinpoint citations to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

games for other devices, including games from the *Candy Crush* (for mobile devices) and *Warcraft* (for PC) franchises." (Dkt. No. 226-2, Lee Decl. at ¶ 21.)

### B. The Proposed Merger

On January 18, 2022, Microsoft announced an agreement to acquire Activision for $68.7 billion—one of the largest, if not the largest, tech industry mergers. The agreement provides, among other things, either party may terminate the merger agreement if the transaction has not closed by July 18, 2023. (PX0083-088.) If the agreement is terminated because it has not closed, Microsoft may have to pay Activision a $3 billion termination fee. (PX0083-091, Sec. 8(c).) Following the merger, "[Activision Blizzard] will continue as the surviving corporation of the Merger and a Subsidiary of Parent [Microsoft]." (PX00083-024; *see also* RX5058 (Hood Decl.) at ¶ 6 (discussing Microsoft's plan to maintain Activision as a limited-integration studio).

### C. The Video Game Industry

Video gaming generates hundreds of billions of dollars of revenue a year and is projected to grow substantially in the future. (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 404:12–16; Dkt. No. 285, 6/28/23 Tr. (Kotick) at 710:16–17 ("[T]he business has evolved to be what's today probably a $130 billion-a-year industry.").) Gaming grew to record high levels during the global pandemic, with people seeking at-home entertainment options more than ever before. (RX3136; Dkt. No. 285, 6/28/23 Tr. (Bailey) at 789:16–22.)

#### 1. Gaming Platforms

Video games are available to play across a wide range of platforms, including mobile, PC, and console. (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 404:6–405:3 (discussing RX3166-003); *see also* Dkt. No. 284, 6/27/23 Tr. (Bailey) at 661:3–23.) Games can be played on general purpose PCs or gaming PCs, but gaming PCs typically have more advanced hardware to allow them to play more computationally demanding games. (PX8001 (Ryan Decl.) at ¶ 15.) Conversely, games played on mobile have lower graphics and are less sophisticated than games played on consoles or gaming PCs. (PX0003-073.) The three primary console makers are Microsoft (Xbox Series X|S), Sony (PlayStation 5), and Nintendo (Switch). (PX1777-008; Dkt. No. 226-2, Lee Decl. at ¶ 13.)

United States District Court
Northern District of California

3

### a.     Console Gaming

Video game consoles are consumer devices designed for, and whose primary use is, to play video games.  (PX8001 (Ryan Decl.) at ¶ 10.)

4



While consoles were once the predominant form of home gaming, they now represent a smaller share of video game revenue than either mobile or PC. (Dkt. No. 282, 6/22/23 Tr. (Bond) at 127:16-128:1; RX3166-003.)

### b. Mobile Gaming

Most gamers today play on mobile devices, which is also the fastest growing segment as the technical capabilities of mobile devices increase. (Dkt. No. 282, 6/22/23 Tr. (Bond) at 127:24–128:1; Dkt. No. 283, 6/23/23 Tr. (Spencer) at 392:5–6, 392:10–12, 404:11, 404:21-22; Dkt. No. 285, 6/28/23 Tr. (Kotick) at 712:1-12, 732:4-20; *id.* at 712:8-9 ("And so today the bulk of games are played on phones . . . ."); Dkt. No. 284, 6/27/23 Tr. (Bailey) at 661:6–23; *see also* RX5058 (Hood Decl.) at ¶ 14 ("$113 billion of the game industry's total revenues of $210 billion came from mobile gaming in 2020").) Growth in mobile gaming is expected to continue, as microprocessors equivalent to those used in past video game consoles are increasingly becoming more powerful and incorporated into phones. (*See, e.g.*, Dkt. No. 285, 6/28/23 Tr. (Kotick) at 720:7-11 (explaining mobile is "the biggest part of the market").)

### c. PC Gaming

After mobile, PC gaming is the next largest source of video game revenue. (Dkt. No. 284, 6/27/23 Tr. (Bailey) at 661:11-12.)

**████████████████████████████**

**████████████████████████████**

**████████████████████████████**

**████████████████████████████**

**████**

### d. Cross-Platform Play

Games can be single-player or multi-player. Single-player games are normally story-driven, and other characters in the game are computations in the game rather than real people. In multiplayer games, players are matched with other people of similar skill level, and players interact in real time. (Dkt. No. 282, 6/22/23 Tr. (Bond) at 134:5-19.) Gamers can now play certain multiplayer games across platforms. For example, a gamer on PlayStation can now play many games with other gamers playing on another platform, like Nintendo or Xbox or PC. That mode of play is referred to as "cross-platform" gaming or "cross-play." (Dkt. No. 282, 6/22/23 Tr. (Bond) at 135:7-17.) In most multiplayer games, a gamer selects multiplayer game mode, the game matches the gamer with other gamers, and the gamers are then placed in a lobby and either enter the game or are placed in teams. (*See* Dkt. No. 282, 6/22/23 Tr. (Bond), at 134:5-19; Dkt. No. 284, 6/27/23 Tr. (Bailey) at 669:24-670:4, 672:2-7.) Cross-play makes games more valuable to consumers because they can play the game with friends and access larger lobbies of players. (*See, e.g.*, Dkt. No. 284, 6/27/23 Tr. (Bailey) at 669:22-670:4; Dkt. No. 285, 6/28/23 Tr. (Kotick), at 716:5–8; *see also id.* at 713:23-714:10 ("[T]he big evolution of the industry has been this transformation to the social experience."), 715:18-24.) Many of the most popular multiplayer titles (*e.g.*, *Fortnite, PUBG*, *Call of Duty*, and *Minecraft*) allow gamers to cross-play between at least PC and console. (*See, e.g.*, Dkt. No. 282, 6/22/23 Tr. (Bond) at 152:18-153:2 (*Call of Duty*).)

### 2. Gaming Content

A game publisher brings games to market and sometimes provides funding to the game developer to do so. (PX7014 (Booty Investigational Hearing "IH" Tr. at 28:5-15.) A developer creates the assets for a game, including writing the code and designing the art. (Dkt. No. 282, 6/22/23 Tr. (Booty) at 50:14-19; PX7014 (Booty IH Tr.) at 28:5-15.) First-party content is created

6

and developed by a console manufacturer at an in-house studio. (Dkt. No. 282, 6/22/23 Tr. (Booty) at 50:25-51:2; Dkt. No. 226-2, Lee Decl. at ¶ 15; PX7014 (Booty IH Tr.) at 58:20–59:9.) Microsoft's first-party content is created at Xbox Game Studios. (PX9050-015; PX0003-016.) Some of Microsoft's first-party franchises include *DOOM*, *Forza*, *Gears of War*, *Halo*, *Minecraft*, and *The Elder Scrolls*. (PX9252-001.)

Third-party content refers to games independently developed and published by a third-party publisher. (Dkt. No. 282, 6/22/23 Tr. (Booty) at 51:6-8; Dkt. No. 226-2, Lee Decl. at ¶ 15; PX8001 (Ryan Decl.) at ¶ 5; PX0003-016.) Occasionally, console manufacturers will publish titles developed by a third-party development studio, known as second-party games. (PX8001 (Ryan Decl.) at ¶ 5; PX7003 (Bond IH Tr.) at 152:2-10; PX0003-016.) Console manufacturers typically negotiate publisher license agreements with game publishers setting the terms for any titles the console manufacturer ships from the publisher. (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 420:11-421:2.) For second- or third- party developers, console manufacturers create development kits for those second- or -third- party developers to use to ensure the game will run on the console. (Dkt. No. 282, 6/22/23 Tr. (Bond) at 156:7-17.)

Both consumers and industry participants acknowledge content drives sales. ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

#### a. AAA Content

"AAA" content is an industry term and can be synonymous with "a tentpole title, a marquee title, a big blockbuster title" that has a high development budget and high expectations for sales. (Dkt. No. 282, 6/22/23 Tr. (Bond) at 147:20-148:2 ("[AAA] tends to imply a game of a certain size and scope, a certain level of investment put into the game"); ████████████████

United States District Court
Northern District of California

United States District Court
Northern District of California

1 ████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ███████████████████████████████████████

5 █████████████████████████████████████

6 ████████████████████████████████████████

7 █████████████████████████████████████████████

8 ███████████████████████████████████████████

9 ███████████████████████████████████████████

10 ██████████████████████████████████████

11 ██████████████████████████████████████████

12 ████████████████████████████████████████

13 ██████████████████████████████████████████

14 ████████████████████████████████████████

15 █████████████████████████████████████████

16 ██████████████████████████████████████████

17 ████████████████████████████████████████

18 ██████████████████████████████████████████████

19 ████████████████████████████████████████

20 ████████████████████████████████████ Activision CEO Bobby

21 Kotick concluded sustaining AAA games requires broad and deep capabilities, and even then, a

22 AAA title is not guaranteed (though Mr. Kotick admits Activision has the capability to release a

23 AAA game every single year).  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 43:14-22.)

24                **b.**      **Exclusive Content**

25       Each of the three major console companies is also a vertically integrated first-party game

26 developer and publisher.  And while each has a collection of platform-exclusive titles, "the

27 Nintendo Switch, the PlayStation, they both have significantly higher number of exclusive games

28 on their platform than Xbox does."  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 346:25–347:2; *see*

*also id.*, 6/23/23 Tr. (Spencer) at 440:24-441:4 (exclusives are "an established part of the console business, the video game business, and Sony and Nintendo are very strong with their exclusive games.").)

In addition to exclusivity, Sony also uses its market power to extract other preferential treatment from third-party game developers, including earlier release dates, exclusive marketing agreements, and exclusive in-game content. (Dkt. No. 282, 6/22/23 Tr. (Bond) at 162:1–4, 186:5–8.)

### c. Activision Content

### i. Call of Duty

The *Call of Duty* games are first-person shooter games based on "military conflict through history." (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 712:21-713:9; Dkt. No. 282, 6/22/23 Tr. (Bond) at

10

152:18-23; Dkt. No. 282, 6/22/23 Tr. (Hines) at 112:10-20.) 

Call of Duty games have been continuously available on both PlayStation and Xbox consoles since 2003.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 714:12-715:12, 720:1-6.)  Activision typically releases a new buy-to-play *Call of Duty* game every year.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 736:12-18 (*Call of Duty* released every year); Dkt. No. 282, Tr. (Bond) at 128:23-25 (games cost $70).)

The latest annual *Call of Duty* titles are playable across platforms via a cross-play feature. (Dkt. No. 282, 6/22/23 Tr. (Bond) at 152:18-153:2.)  The introduction of cross-play to *Call of Duty* has significantly improved players' experience; the game's online multiplayer functionality thrives on a large and active player base, and cross-play has increased the number of available players.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 716:5-8 (explaining cross-play "expands the market and also makes you -- let's say you have a group of friends, not everybody's going to have the same device so it gives you the opportunity to be able to play with your friends").).

United States District Court
Northern District of California

Activision also develops and publishes free-to-play versions of *Call of Duty* called *Call of Duty: Warzone*—available on PlayStation, Xbox, and Windows PC—and *Call of Duty: Mobile* ("*COD: Mobile*")—available on iOS and Android mobile devices—which it monetizes through optional in-game microtransactions.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 153:3-15; *see also* Dkt. No. 285, 6/28/23 Tr. (Kotick) at 720:3-11.)  "Half of [the *Call of Duty* franchise's] monthly active players play on phones."  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 716:17-21; *see also id.* at 719:2-6 ("[T]he bulk of players [in the *Call of Duty* franchise] are playing on phones.").)  Recently, *COD: Mobile* reached 150 million monthly annual users.  (Dkt. No. 286, 6/29/23 Tr. (Stuart) at 1033:3-6.)  Cross-play also exists in the free-to-play *Call of Duty: Warzone*.  (*See* Dkt. No. 285, 6/28/23 Tr. (Kotick) at 719:7-720:2 (noting the free-to-play Warzone is playable on PlayStation, PC, and Xbox).)  *Call of Duty: Warzone* will be available on mobile this fall, and like the console and PC versions, it will be available as a multiplayer game across mobile devices.  (*See* Dkt. No. 285, 6/28/23 Tr. (Kotick) at 720:1-10; 721:9-13.)

*Call of Duty* is not currently available on the Nintendo Switch.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 768:8-13.)  It is also not currently available on any cloud gaming services or multigame game subscription libraries upon release.  (Dkt. No. 285, 6/28/23, Tr. (Kotick) at 734:2-5, 731:12-14.)

### ii.    Other Activision Content

King's *Candy Crush* franchise consists of casual, free-to-play puzzle games made for mobile devices.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 725:25-726:6.)  ████████████████ ████████████████████████████████████████████████████████████ ████████████  King primarily monetizes *Candy Crush* through optional in-game microtransactions, and also generates revenue through in-game advertising placements.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 726:24-727:4.)

Blizzard's popular *World of Warcraft* franchise principally consists of a massively-multiplayer-online fantasy role-playing game, and related expansions and content released over the course of the past 20 years.  (*See* Dkt. No. 285, 6/28/23 Tr. (Kotick) at 730:1-18.)  Blizzard makes *World of Warcraft* available for PCs on a subscription-based model.  (*See, e.g.*, Dkt. No.

285, 6/28/23 Tr. (Kotick) at 730:1-7.) 

Indeed, the only Activision titles made available on multigame subscription services have been back-catalog games offered for a limited period of time, often for promotional purposes, rather than new games made available day and date. (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 774:9-24; *see also* Dkt. No. 285, 6/28/23 Tr. (Kotick) at 747:3-10, 750:10-13 (acknowledging occasional placement of "a very old catalog title for a short period of time" on subscription services).)

### 3. Access to Gaming Content

Gamers can access games through a growing variety of payment and distribution models. The diversity of payment and distribution models has increased the accessibility of games and expanded gamer choice. (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 392:24-393:10.) Most gamers obtain entitlements to access and play console games via the "buy-to-play" model of purchasing the games in the form of a cartridge, DVD or Blu-Ray disc, or digital download for an upfront price (*e.g.*, $70) and adding them to their own libraries. (Dkt. No. 282, 6/22/23 Tr. (Bond) at 128:23-25, 138:2-20.)

#### a. Multi-Game Content Subscription Services

1   With multigame subscription offerings, gamers pay a flat monthly fee to access a library of

2   games.  In the case of most subscription offerings, subscribers download the games they want to

3   play to their devices (just as they would a buy-to-play game), and then play them using those

4   devices.  With some services, gamers can stream games while waiting for the game to download

5   or try out a game before downloading.  (Dkt. No. 282, 6/22/23 Tr. (Hines) at 92:23-93:5; Dkt. No.

6   282, 6/22/23 Tr. (Bond) at 145:12-146:7; *see also* Dkt. No. 285, 6/28/23 Tr. (Bailey) at 790:21-

7   791:9 (telemetry data show xCloud is "largely [used to] play[] one game they never played before

8   and not playing it ever again," which is "exactly consistent with" gamers using xCloud while the

9   game downloads).)

10  In 2017, Xbox launched Game Pass, one of the first multigame subscription offerings.

11  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 140:15-23.) Subscribers can access a broad catalog of games

12  for a set monthly fee of $9.99 (or $14.99 for the Game Pass Ultimate tier) instead of purchasing

13  the games outright (for $70 per game).  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 137:23-138:1;

14  RX5044-001.) ████████████████████████████████████████████████

15  ███████████████ To make Game Pass more attractive, Xbox includes all games developed by its

16  studios (first-party games) in Game Pass the day of release ("day-and-date").  (Dkt. No. 286,

17  6/29/23 Tr. (Stuart) at 1047:6-15; Dkt. No. 282, 6/22/23 Tr. (Bond) at 139:6-7; ██████████

18  ████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████

22  Aside from Game Pass, Microsoft also offers Xbox Live Gold, which provides subscribers

23  with access to online, multiplayer games and a limited selection of downloadable games each

24  month among other benefits, such as audio and visual communications and certain discounts.

25  (PX0003-018; Dkt. No. 282, 6/22/23 Tr. (Bond) at 136:18-24.)  Xbox Live Gold does not provide

26  subscribers with access to the vast library of games subscribers of Xbox Game Pass for PC or

27  Console and Game Pass Ultimate receive.  (PX0003-018.)

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

1 ████████████████████████████████████████████████████████

2 ██████████████ For example, Activision does not allow, and has no plans to allow, its games in

3 multigame subscription libraries upon release. (*See* Dkt. No. 285, 6/28/23 Tr. (Kotick), at 731:12-

4 14 ("In our current long-range plan, we don't have any revenues that are being generated from a

5 multigame subscription service"); Dkt. No. 285, 6/28/23 Tr. (Kotick) at 746:19-21 ("I would say

6 it's just not something that we do have any plans to do or have ever done . . . ."). This

7 "philosophical aversion" to subscription services arises from concerns that multigame

8 subscriptions would "degrade the economics" of Activision's buy-to-play business model, are

9 "inconsistent with the idea of starting out with free-to-play as the way that you build game

10 universes and franchises," and possibly could lead to substantial cannibalization. (Dkt. No. 285,

11 6/28/23 Tr. (Kotick) at 729:3-16, 743:22-24; *see also id.* at 744:8-11 (explaining "cannibalization

12 would play a role" in a decision not to place games in a multigame subscription).)

13 Activision only rarely allows even its older back-catalog titles to be included in

14 subscription services for brief periods of time. (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 747:3-10,

15 750:10-13 (acknowledging occasional placement of "a very old catalog title for a short period of

16 time" on subscription services); ████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ██████████████████████████████████████████████████████

20 ██████████████████████████████████████████████████████

21 ██████████████████████████████████████████████████████

22 ██████████████████████████

23 **b.    Cloud Gaming Subscription Services**

24 Cloud gaming (also known as cloud game "streaming") is a potential alternative delivery

25 mechanism to downloading native games for play onto hardware. (Dkt. No. 282, 6/22/23 Tr.

26 (Bond) at 131:20-132:5; PX7060 (Eisler Dep. Tr.) at 29:12-19.) ████████████████

27 ██████████████████████████████████████████████████████

28 ████████████████████████████████    ████████████████

16

█████████████████████████████████████████████████

████████████████████████████████████ It enables gamers to begin playing a game in seconds, rather than waiting for games to download or update, and streaming rather than downloading avoids burdening the storage limits on a gaming device. (https://support.xbox.com/en-US/help/games-apps/cloud-gaming/playing-console-game-from-cloud-versus-installing ("You can start playing a game in seconds. There's no waiting for games to finish installing or updating . . . download times or storage limits aren't a factor."); PX8000 (Eisler Decl.) at ¶ 17.) However, the technology and economics of cloud gaming remain challenging, particularly for latency-sensitive multiplayer games. Due to those latency issues, users sometimes experience a stuttering effect or lags in gameplay. (Dkt. No. 282, 6/22/23 Tr. (Bond) at 145:6-11; Dkt. No. 283, 6/23/23 Tr. (Spencer) at 395:10-16; PX7060 (Eisler Dep. Tr.) at 47:05-47:23.) Cloud gaming is also limited in its ability to replicate controller functions for console games streamed to mobile devices. (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 395:23-396:7; Dkt. No. 285, 6/28/23 Tr. (Kotick) at 733:15-21.)

In 2020, Microsoft added cloud gaming to its top-tier multi-game content library subscription service offering, Xbox Game Pass Ultimate. (PX9091 at 001-006.) Xbox Cloud Gaming (also referred to as xCloud) enables Xbox Game Pass Ultimate subscribers to stream certain games, as opposed to downloading games locally, and then to play those games on the device most convenient to them, including consoles, Windows PCs, tablets, and mobile phones. (PX0003 at 018.) Microsoft also offers free access to Xbox Cloud Gaming for Epic Games' *Fortnite*. (PX0003 at 019.) ████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

As Microsoft Gaming CEO Phil Spencer testified, Microsoft's xCloud strategy is to allow those who want to play Microsoft games on their mobile phones to "have access to those through streaming," allowing Microsoft to "find a significant number of customers given the installed base of people playing games on mobile phones." (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 393:16-394:6.) However, as a result of technical limitations, a large majority of Xbox Cloud Gaming

United States District Court
Northern District of California

United States District Court
Northern District of California

users report relying on the service primarily to play a game while it is being downloaded to play natively on Xbox. (Dkt. No. 282, 6/22/23 Tr. (Bond) at 145:12-146:7; Dkt. No. 283, 6/23/23 Tr. (Spencer) at 394:23-396:7; *see also* Dkt. No. 285, 6/28/23 Tr. (Bailey) at 790:4-791:9 (telemetry data show xCloud is "largely [used to] play[] one game they never played before and not playing it ever again," which is "exactly consistent with" gamers using xCloud while the game downloads).)

████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
███████████████████████████████████████████████████

### D. Microsoft's Post-Complaint Agreements

Two months after the FTC filed its complaint, Xbox and Nintendo entered a ten-year agreement to bring future *Call of Duty* titles to Switch (and any successor Nintendo consoles) after the merger closes. ██████████████████████████████████████████

██████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
█████████████████████

[REDACTED] Microsoft
executives have nonetheless committed publicly and under oath in court to continue to sell *Call of Duty* to Sony. (Dkt. No. 285, 6/28/23 Tr. (Nadella) at 853:9-11 (Q: "Let me ask you here today, Mr. Nadella, will you commit to continuing to ship *Call of Duty* on the Sony PlayStation?" . . . A: "A hundred percent."); Dkt. No. 283, 6/23/23 Tr. (Spencer) at 367:18-24, 368:4-10, 429:21-22, 429:25-430:1 ("my commitment is and my testimony is, to use that word, that we will continue to ship Call of -- future versions of *Call of Duty* on Sony's PlayStation platform").)

## PROCEDURAL HISTORY

On February 1, 2022, Microsoft reported the planned merger to the FTC, as required by the Hart-Scott-Rodino Antitrust Improvements Act ("HSR Act"). The FTC thereafter commenced an 11-month investigation, requiring Microsoft and Activision to produce nearly 3 million documents and sit for 15 investigational hearings. The waiting period under the HSR Act which prevents the parties from closing the transaction was extended by agreement with the FTC until November 21,

United States District Court
Northern District of California

2022, and the parties thereafter agreed voluntarily to delay closing until December 12, 2022.

On December 8, 2022, the FTC filed an administrative complaint against the merger, alleging it violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45. *See* Part 3 Complaint, In the Matter of Microsoft/Activision, No. 9412 (F.T.C. Dec. 8, 2022). Fact discovery in the FTC administrative proceeding, which included production of nearly 1 million documents and 30 depositions, closed on April 7, 2023, followed by expert discovery. An evidentiary hearing before an administrative law judge (ALJ) is scheduled to begin on August 2, 2023. (Dkt. No. 1, Complaint at ¶ 16.)

Although the Agreement allows either party to terminate the merger agreement if the transaction has not closed by July 18, 2023, and appears to obligate Microsoft to pay Activision a termination fee of $3 billion, the FTC did not file this action to preliminarily enjoin the merger until June 12, 2023—less than six weeks before the termination date.[2] (Dkt. Nos. 1, 7; PX0083091, Sec. 8(c).) The Court related this action to a pending private antitrust action seeking to stop the merger. (Dkt. No. 21; *see Demartini et al. v. Microsoft Corp.*, No. 22-08991-JSC.[3]) The FTC filed an emergency motion for a temporary restraining order (TRO) with their Complaint, arguing Microsoft intended to proceed with the merger as soon as June 16, 2023, and would not stipulate to a TRO unless the FTC filed in the United States District Court for the District of Columbia, rather than the Northern District of California where the FTC indicated it intended to file because this Court was already overseeing the *Demartini* action. (Dkt. No. 12-3 at 10-11.) The Court granted the FTC's motion for a temporary restraining order and set an evidentiary hearing on the preliminary injunction motion to commence the following week. (Dkt. No. 37.) The five-day evidentiary hearing commenced on June 22, 2023 and was completed on June 29, 2023. The action proceeded on an expedited basis given the Agreement's impending

---

[3] Shortly after the FTC filed its administrative complaint, a group of *Call of Duty* players filed their own action in this Court to stop the merger pursuant to Clayton Act, Sections 7 and 16. *Demartini et al. v. Microsoft Corp.*, No. 22-08991-JSC. In that action, Microsoft stipulated on the record that the acquisition would not close before May 22, 2023. (Dkt. No. 193 at 87:2-12.)

1    termination date. *See FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984)

2    (ordering expedited proceedings "[b]ecause undue delay could force the parties to abandon the

3    proposed merger").

**LEGAL FRAMEWORK**

5        Section 7 of the Clayton Act prohibits mergers and acquisitions "where in any line of

6    commerce or in any activity affecting commerce in any section of the country, the effect of such

7    acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C.

8    § 18. "Because § 7 of the Clayton Act bars mergers whose effect 'may be substantially to lessen

9    competition, or to tend to create a monopoly,' 15 U.S.C. § 18, judicial analysis necessarily focuses

10   on 'probabilities, not certainties. This 'requires not merely an appraisal of the immediate impact of

11   the merger upon competition, but a prediction of its impact upon competitive conditions in the

12   future; this is what is meant when it is said that the amended § 7 was intended to arrest

13   anticompetitive tendencies in their incipiency.'" *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St.

14   Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (citations omitted). Thus, "[i]t is well

15   established that a section 7 violation is proven upon a showing of reasonable probability of

16   anticompetitive effect." *Warner*, 742 F.2d at 1160.

17       Section 7 claims challenging horizontal mergers are generally analyzed under a "'burden-

18   shifting framework.' The plaintiff must first establish a prima facie case that a merger is

19   anticompetitive. The burden then shifts to the defendant to rebut the prima facie case." *Saint

20   Alphonsus*, 778 F.3d at 783 (citations omitted). The Ninth Circuit Court of Appeals has not

21   addressed whether this burden shifting framework applies in vertical merger cases such as this.

22   Indeed, "[t]here is a dearth of modern judicial precedent on vertical mergers and a multiplicity of

23   contemporary viewpoints about how they might optimally be adjudicated and enforced.[4]" *United

24   States v. AT&T, Inc.*, 916 F.3d 1029, 1037 (D.C. Cir. 2019). In *AT&T*, the only court of appeals

25   decision addressing a vertical merger in decades, the court found the burden-shifting framework

26

_____

27   [4]"[A] dearth of authority that is unsurprising, considering that the Antitrust Division apparently
     has not tried a vertical merger case to decision in *four* decades!" *United States v. AT&T Inc.*,
28   310 F. Supp. 3d 161, 193–94 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) (emphasis in
     original).

United States District Court
Northern District of California

1    applied, but "unlike horizontal mergers, the government cannot use a short cut to establish a

2    presumption of anticompetitive effect through statistics about the change in market concentration,

3    because vertical mergers produce no immediate change in the relevant market share." *Id*. at 1032.

4    In vertical merger cases, "the government must make a fact-specific showing that the proposed

5    merger is likely to be anticompetitive. Once the prima facie case is established, the burden shifts to

6    the defendant to present evidence that the prima facie case inaccurately predicts the relevant

7    transaction's probable effect on future competition, or to sufficiently discredit the evidence

8    underlying the prima facie case." *Id*. (cleaned up).

9                                   **PRELIMINARY INJUNCTION**

10           Section 13(b) of the Federal Trade Commission Act provides "[u]pon a proper showing

11   that, weighing the equities and considering the Commission's likelihood of ultimate success, such

12   action would be in the public interest . . . a preliminary injunction may be granted . . . ." 15 U.S.C.

13   § 53(b).  "In determining whether to grant a preliminary injunction under section 13(b), a court

14   must 1) determine the likelihood that the Commission will ultimately succeed on the merits and

15   2) balance the equities." *Warner*, 742 F.2d at 1160 (citing *FTC v. Simeon Management Corp*.,

16   532 F.2d 708, 713–14 (9th Cir. 1976)).

17           To satisfy the first prong, the FTC must "raise questions going to the merits so serious,

18   substantial, difficult and doubtful as to make them fair ground for thorough investigation, study,

19   deliberation and determination by the FTC in the first instance and ultimately by the Court of

20   Appeals." *Warner*, 742 F.2d at 1162 (citations omitted).  In evaluating likelihood of success on the

21   merits, the court must exercise its "'independent judgment' and evaluat[e] the FTC's case and

22   evidence on the merits." *See FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2022 WL

23   16637996, at *5 (N.D. Cal. Nov. 2, 2022).  Courts require such a rigorous analysis because "the

24   issuance of a preliminary injunction prior to a full trial on the merits is an extraordinary and

25   drastic remedy.  This is particularly true in the acquisition and merger context, because, as a result

26   of the short life-span of most tender offers, the issuance of a preliminary injunction blocking an

27   acquisition or merger may prevent the transaction from ever being consummated." *FTC v. Exxon

28   Corp*., 636 F.2d 1336, 1343 (D.C. Cir. 1980) (cleaned up); *see also Warner*, 742 F.2d at 1165 (9th

*United States District Court*
*Northern District of California*

1    Cir. 1984) (ordering expedited proceedings "[b]ecause undue delay could force the parties to

2    abandon the proposed merger.").  However, the Court does not resolve conflicts in the evidence—

3    the question is simply whether the FTC "has met its burden of showing a likelihood of success on

4    the merits." *Warner*, 742 F.2d at 1164.

5        The parties sharply dispute in which forum "the Commission's likelihood of ultimate

6    success," 15 U.S.C. § 53(b), should be measured.  This question appears not to have been squarely

7    addressed by any court other than in *Meta*, 2022 WL 16637996, at *4-6.  In *Meta*, the court held

8    "Section 13(b)'s 'likelihood of ultimate success' inquiry to mean the likelihood of the FTC's

9    success on the merits in the underlying administrative proceedings, as opposed to success

10   following a Commission hearing, the development of an administrative record, and appeal before

11   an unspecified Court of Appeals." *Id*. at *6.  The Court is persuaded by the *Meta* court's analysis

12   of this issue and adopts it here—the relevant forum for the question of likelihood of success is

13   before the ALJ in the administrative proceedings.

14                                    **ANALYSIS**

15   **I.    RELEVANT MARKET**

16       The first step in analyzing a Section 7 merger challenge is to determine the relevant

17   market. *United States v. Marine Bancorporation, Inc*., 418 U.S. 602, 619 (1974) (citing *United

18   States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957)); *see also FTC v. Qualcomm

19   Inc*., 969 F.3d 974, 992 (9th Cir. 2020) ("A threshold step in any antitrust case is to accurately

20   define the relevant market, which refers to 'the area of effective competition.'"). The relevant

21   market for antitrust purposes is determined by (1) the relevant product market and (2) the relevant

22   geographic market.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).

23       **A.    Product Market**

24       "The outer boundaries of a product market are determined by the reasonable

25   interchangeability of use or the cross-elasticity of demand between the product itself and

26   substitutes for it." *Id.* at 325.  That is, "when one product is a reasonable substitute for the other, it

27   is to be included in the same relevant product market even though the products themselves are not

28   the same. A product is construed to be a 'reasonable substitute' for another when the demand for it

United States District Court
Northern District of California

23

increases in response to an increase in the price for the other." *FTC v. Cardinal Health, Inc*., 12 F. Supp. 2d 34, 46 (D.D.C. 1998); *see also Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). The definition of the relevant market is "basically a fact question dependent upon the special characteristics of the industry involved." *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982). The overarching goal of market definition is to "recognize competition where, in fact, competition exists." *Brown Shoe*, 370 U.S. at 326; *see also Cardinal Health*, 12 F. Supp. 2d at 46 ("Because the ability of customers to turn to other suppliers restrains a firm from raising prices above the competitive level, the definition of the "relevant market" rests on a determination of available substitutes."). "The FTC bears the burden of proof and persuasion in defining the relevant market." *FTC v. Arch Coal, Inc*., 329 F. Supp. 2d 109, 119 (D.D.C. 2004), *appeal dismissed*, No. 04-5291, 2004 WL 2066879 (D.C. Cir. Sept. 15, 2004).

There is "no requirement to use any specific methodology in defining the relevant market." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd*., 20 F.4th 466, 482 (9th Cir. 2021). "[C]ourts have determined relevant antitrust markets using, for example, only the *Brown Shoe* factors, or a combination of the *Brown Shoe* factors and the HMT.[5]" *Meta*, 2023 WL 2346238, at *9 (collecting cases). *Brown Shoe* factors are "practical indicia [such] as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325.

The FTC contends the *Brown Shoe* factors establish four relevant antitrust markets: (1) high performance consoles (Xbox and Sony PlayStation); (2) multigame content library

---

[5] The HMT is a common quantitative metric used by parties and courts to determine relevant markets. *See* U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines ("2010 Merger Guidelines") § 4 (2010); *see also United States v. H & R Block, Inc*., 833 F. Supp. 2d 36, 51 (D.D.C. 2011) ("An analytical method often used by courts to define a relevant market is to ask hypothetically whether it would be profitable to have a monopoly over a given set of substitutable products. If so, those products may constitute a relevant market."). Defendants insist the HMT does not apply to vertical mergers. The Court need not decide this issue as it accepts, without deciding, the FTC's definition of the relevant markets here.

United States District Court
Northern District of California

subscription services; (3) cloud gaming; and (4) a combined library subscription services and cloud gaming market.

### 1.  The Console Market

The FTC's primary market is the "high-performance console market" which it defines as Xbox and PlayStation Generation 9 (Gen 9) consoles.

#### a.  The Console Market and Nintendo Switch

The FTC seeks to limit the console market to Gen 9 consoles Xbox X|S and the PlayStation 5, and exclude the Nintendo Switch. ███████████████

████████████████████████████████████████████████████████████

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16    The FTC insists the Nintendo Switch's pricing, performance, and content make it an

17 improper substitute at least for purposes of its preliminary injunction motion.  As to pricing, yes,

18 the Xbox Series X and PlayStation 5 are priced the same and a couple of hundred dollars higher

19 than the Switch; however, Xbox set the price of its entry-level Series S to compete with the

20 Switch.  (Dkt. No. 286, 6/29/23 Tr. (Stuart) at 1030:5-1031:5 (Q. "And do you look at Switch

21 pricing when you're considering the pricing of Xbox Series S?" A. "Yes." Q. "And is that one of

22 the reasons you set the price where you guys did?" A. "Yes.").)

23    And, there are functionality differences between the Switch and the PlayStation and Xbox

24 consoles—the Switch is portable, and it has its own screen and less powerful hardware.  However,

25 neither the FTC nor its expert consider the extent to which the Switch's differentiated features

26 including its price, portability, and battery are factors the customer balances when deciding which

27 console to purchase.  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 436:6-437:4 (describing how

28 Nintendo made "technical decisions to enable an experience that they thought their customers

United States District Court
Northern District of California

1  would want to have, and it's the best selling console right now in the market.  So when I—when

2  people try to tell me it's not competition—competitive, for any number of reasons, I don't believe

3  that because I just look at what's selling.").)

4       Finally, yes, there are content differences between the Switch and PlayStation, but many of

5  the most popular games on PlayStation and Xbox consoles are also available on the Switch,

6  including *Fortnite*, *Minecraft*, *Rocket League*, *Lego Star Wars*, *Fall Guys*, and the *FIFA*, *MLB The*

7  *Show*, and *NBA 2K franchises*.  (Dkt. No. 285, 6/28/23 Tr. (Bailey) at 782:5-783:10; *see* RX5055-

8  074 (Bailey Report) at ¶ 88.)  Although some popular Xbox and PlayStation games are not

9  available on the Switch, many of those titles are platform exclusives ███████████████

10 ████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████

12 █████████████

13      "It doesn't matter whether [Nintendo's] products are fully interchangeable with those of its

14 competitors because perfect fungibility isn't required."  *Gorlick Distrib. Ctrs., LLC v. Car Sound*

15 *Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013) (citing *United States v. E.I. du Pont de*

16 *Nemours & Co.*, 351 U.S. 377, 394 (1956)).  If this were the requirement, "only physically

17 identical products would be a part of the market."  *E.I. du Pont*, 351 U.S. at 394.  "Instead,

18 products must be reasonably interchangeable, such that there is cross-elasticity of demand."

19 *Gorlick*, 723 F.3d at 1025 (citing *Brown Shoe*, 370 U.S. at 325).  "The goal of market definition

20 here is to define the boundaries of the competition within which foreclosure or disadvantaging of a

21 participant is likely to reduce innovation, delay rivals' entry, and raise price or reduce variety or

22 quality of the ensuing goods. The relevant market will encompass those firms whose presence

23 drives this competition and whose foreclosure or disadvantaging may thwart it."  In the Matter of

24 Illumina, Inc. and Grail, Inc., No. 9401, 2023 WL 2823393, at *20 (F.T.C. Mar. 31, 2023).

25      If the Court was the final decisionmaker on the merits, it would likely find Nintendo

26 Switch part of the relevant market.  But it is not.  Instead, on a 13(b) preliminary injunction, the

27 FTC need only make a "tenable showing that the relevant market" is Gen 9 consoles.  *See Warner*,

28 742 F.2d at 1164.  Given the plethora of internal industry documents and the acknowledged

differences, the FTC has met its preliminary injunction burden to show the Switch is not included in the relevant market.

### b.    The Console Market does not include PCs

The FTC insists, and the Court agrees, the console market does not include PCs. ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████ That customers may "cross-shop" between consoles and PCs does not demonstrate "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1040, 1043 (D.C. Cir. 2008).

### 2.    Multigame Content Library Subscription Services and Cloud Gaming Markets

As to the FTC's additional markets of the multigame content library subscription services and cloud gaming, while the Court questions whether—as Defendants posit—these are simply alternative ways of playing console, PC, and mobile games, the Court assumes without deciding they are each their own product market when considered singly or in combination.

### B.    Geographic Market

The product market, the relevant geographic market must "correspond to the commercial realities of the industry and be economically significant." *Brown Shoe*, 370 U.S. at 336.  The geographic market encompasses the "area to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." *FTC v. Cardinal Health, Inc.*, 12 F.Supp.2d 34, 49 (D.D.C. 1998).

### 1.    The Console Market

The FTC, relying largely on Dr. Lee's analysis, insists the relevant market is the United States because (1) game prices and releases vary country-by-country; and (2) gamer preferences

United States District Court
Northern District of California

1    and behavior vary country-by-country and inform market participants' strategic decision. ■

2    ███████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████

4    ██████████████████████████████████████████████████████

5    █████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    █████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   █████████████████████████████████████████████████████████

11   █████████████████████████████████████████████████████████

12   ████████████████████    Cumulatively, this evidence suggests the relevant market for competition

13   is the United States.

14        Defendants' arguments in favor of a geographic market beyond the United States are

15   unpersuasive. ██████████████████████████████████████████

16   █████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████

18   █████████████████████████████████████████████████████████

19   ███████████████████████████████████████████████████████████

20   ██████████████████████████████████████████████████████████

21   ██████████████████████████████████████████████████████

22   █████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ██████████████████████████████████████████████████████

25   ███████████████████████████████████████████████████████

26   ████████████████████  ████████████████████████████████████

27   ███████████████████████████████████████████████████████████

28        The geographic market is both the area "in which the seller operates, *and* to which the

purchaser can practically turn for supplies." *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 308 (D.D.C. 2020) (emphasis added). While there is no dispute consoles are sold in markets outside the United States, there is no evidence to suggest US consumers seeking to purchase a console would look outside the United States to do so.

### 1. Multigame Content Library Subscription Services and Cloud Gaming Markets

The market for multigame content library subscription services and cloud gaming is a closer question; however, the Court will assume without deciding the geographic market is the United States for these markets as well.

## II. EFFECT ON COMPETITION

Section 7 vests courts with the "uncertain task" of making a prediction about the future. *See United States v. Baker Hughes, Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990). For this reason, the "allocation of the burdens of proof" assumes particular importance. *Id.* In a horizontal merger case, "the government can establish its prima facie case simply by showing that the merger would produce a firm controlling an undue percentage share of the relevant market, and would result in a significant increase in the concentration of firms in that market," typically "by presenting market-share statistics," *United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 130 (D.D.C. 2022), *appeal dismissed*, No. 22-5301, 2023 WL 2717667 (D.C. Cir. Mar. 27, 2023) (cleaned up), which "triggers a presumption that the merger will substantially lessen competition," *AT&T*, 310 F. Supp. 3d at 192 (cleaned up). For a vertical merger, such as the Microsoft/Activision merger, "there is no short-cut way to establish anticompetitive effects, as there is with horizontal mergers." *Id.* at 192 (cleaned up). This is in part because "many vertical mergers create vertical integration efficiencies between purchasers and sellers." *Id.* at 193; *see also Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 840 (D.C. Cir. 2006) ("vertical integration creates efficiencies for consumers"); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 755c (online ed. May 2023) ("Vertical integration is ubiquitous in our economy and virtually never poses a threat to competition when undertaken unilaterally and in competitive markets."); Dkt. No. 226-2, Lee Decl. at ¶ 58 ("Unlike in an

1    analysis of a horizontal merger, there is no established screen or presumption of harm based on

2    market shares or concentration for the purposes of evaluating the competitive effects of a vertical

3    merger.").

4        So, with this proposed vertical merger, the outcome "turn[s] on whether, notwithstanding

5    the proposed merger's conceded procompetitive effects, the [g]overnment has met its burden of

6    establishing, through 'case-specific evidence,' that the merger of [Microsoft] and [Activision], at

7    this time and in this remarkably dynamic industry, is likely to substantially lessen competition in

8    the manner it predicts." *See AT&T*, 916 F.3d at 1037. "Once the prima facie case is established,

9    the burden shifts to the defendant to present evidence that the prima facie case inaccurately

10   predicts the relevant transaction's probable effect on future competition, or to sufficiently discredit

11   the evidence underlying the prima facie case. Upon such rebuttal, the burden of producing

12   additional evidence of anticompetitive effects shifts to the government, and merges with the

13   ultimate burden of persuasion, which remains with the government at all times." *Id*. at 1032

14   (cleaned up). "In assessing the Government's Section 7 case, the court must engage in a

15   comprehensive inquiry into the 'future competitive conditions in a given market, keeping in mind

16   that the Clayton Act protects competition, rather than any particular competitor." *AT&T*, 310 F.

17   Supp. 3d at 190 (cleaned up) (citation omitted).

18       **A.    The FTC's Theory**

19       "The primary vice of a vertical merger or other arrangement tying a customer to a supplier

20   is that, by foreclosing the competitors of either party from a segment of the market otherwise open

21   to them, the arrangement may act as a 'clog on competition which deprives rivals of a fair

22   opportunity to compete.'" *Brown Shoe*, 370 U.S. at 323-24. The FTC insists the combined firm

23   may deprive rivals—primarily Sony—of a fair opportunity to compete in the above-defined

24   markets by foreclosing an essential supply—*Call of Duty*. In other words, *Call of Duty* is so

25   popular, and has such a loyal and dedicated following, competition will be substantially lessened

26   in the console, content library subscription, and cloud gaming markets unless Microsoft's rivals

27   have at least equal access to this particular video game.

28       The FTC argues it can establish this potential anticompetitive effect of the merger through

United States District Court
Northern District of California

31

two alternative, but overlapping tests. First, by showing the transaction is likely to give the merged firm the ability and incentive to foreclose *Call of Duty* from its rivals. (Dkt. No. 291-2, FTC's Final Proposed Findings of Fact and Conclusions of Law (FTC's Findings and Conclusions) at p. 180 ¶ 87.) Second, through examining the *Brown Shoe* factors, such as share of the market foreclosed, the nature and purpose of the transaction, barriers to entry, whether the merger will eliminate potential competition by one of the merging parties, and the degree of market power that would be possessed by the merged enterprise as shown by the number and strength of competing suppliers and purchasers. (*Id.* at ¶ 88 (quoting *Brown Shoe*, 370 U.S. at 328-34); *see Illumina*, 2023 WL 2823393, at *32.)

### B.     Ability and Incentive to Foreclose

As a threshold matter, the FTC contends it need only show the transaction is "likely to increase the ability and/or incentive of the merged firm to foreclose rivals." (Dkt. No. 291-2, FTC's Findings and Conclusions at p. 181 ¶ 90.) For support, it cites its own March 2023 decision in *Illumina*, 2023 WL 2823393, at *33. *Illumina* reasons:

> [t]o harm competition, a merger need only create or augment either the combined firm's ability or its incentive to harm competition. ***It need not do both.*** Requiring a plaintiff to show an increase to both the ability and the incentive to foreclose would per se exempt from the Clayton Act's purview any transaction that involves the acquisition of a monopoly provider of inputs to adjacent markets.

2023 WL 2823393, at *38 (cleaned up) (emphasis added). *Illumina*, however, provides no authority for this proposition, nor could it. Under Section 7, the government must show a "reasonable *probability* of anticompetitive effect." *Warner*, 742 F.2d at 1160 (emphasis added). If there is no incentive to foreclose, then there is no probability of foreclosure and the alleged concomitant anticompetitive effect. Likewise, if there is no ability, then a party's incentive to foreclose is irrelevant. Indeed, the FTC's expert, Dr. Lee, analyzed the anticompetitive effects of the merger based on ability *and* incentive. (Dkt. No. 226-2, Lee Decl. at ¶ 87 ("I evaluate whether the Merged Entity would have the *ability* and *economic incentive* to foreclose Microsoft's rivals from Activision content in the two Consoles Markets").

32

United States District Court
Northern District of California

The FTC also appears to contend it need only show the combined firm would have a greater ability and incentive to foreclose *Call of Duty* from its rivals than an independent Activision. (Dkt. No. 291-2, FTC's Findings and Conclusions at p. 181 ¶ 90.) This assertion, however, ignores the text of Section 7 which forbids mergers which may "substantially . . . lessen competition." 15 U.S.C. § 18. It is not enough that a merger might lessen competition—the FTC must show the merger will probably *substantially* lessen competition. That the combined firm has more of an incentive than an independent Activision says nothing about whether the combination will "substantially" lessen competition. *See UnitedHealth Grp.*, 630 F. Supp. 3d at 133 ("By requiring that [the defendant] prove that the divestiture would preserve exactly the same level of competition that existed before the merger, the Government's proposed standard would effectively erase the word 'substantially' from Section 7").

Thus, to establish a likelihood of success on its ability and incentive foreclosure theory, the FTC must show the combined firm (1) has the ability to withhold *Call of Duty*, (2) has the incentive to withhold *Call of Duty* from its rivals, and (3) competition would probably be substantially lessened as a result of the withholding.

### 1. Ability to Foreclose

The Court accepts the combined firm would have the ability to foreclose because it would own the *Call of Duty* franchise.

### 2. Incentive to Foreclose and the Resulting Lessening of Competition

#### a. High Performance Console Market

The Court finds the FTC has not shown a likelihood of success on its claim the combined firm would have an incentive to, and thus probably would, foreclose *Call of Duty* from Sony PlayStation.

#### i. No Incentive to Foreclose *Call of Duty*

*First*, immediately upon the merger's announcement, Microsoft committed to maintain *Call of Duty* on its existing platforms and even expand its availability. The day after the merger announcement, Microsoft's Satya Nadella and Phil Spencer spoke with Sony CEO Kenichiro Yoshida to emphasize Microsoft's commitment to enter a new agreement to extend Activision's

33

obligation to ship *Call of Duty* at parity on PlayStation.  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 418:16-419:16, 443:18-20; RX2172; Dkt. No. 285, 6/28/23 Tr. (Nadella) at 852:23-853:8.)  The next day, Sony PlayStation CEO Jim Ryan wrote his mentor about the proposed merger: "It's not an xbox exclusivity play at all.  they're thinking bigger than that, and they have the cash to make moves like this.  I've spent a fair bit of time with both Phil and Bobby over the past day.  I'm pretty sure we will continue to see COD on PS for many years to come."  (RX2064-001.)  ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████

Microsoft also contacted its competitor Valve—the company that runs the leading PC game store, Steam.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 172:18-19, 173:16-19.)  Xbox sent Valve a signed letter agreement committing to make *Call of Duty* available on Steam for ten years.  (RX1184.)  Valve did not sign the deal because they "believe strongly that they should earn the business of their—the developers who put on their platform day in and day out, and so they told us that they had had no need to sign that agreement and that they believed us when we said that we would continue to provide [*Call of Duty*] on Steam."  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 175:16-20.)

Microsoft even took steps to expand *Call of Duty* to non-Microsoft platforms. On the day of the merger's announcement, Microsoft called the head of Nintendo North America, Doug Bowser, and Nintendo's lead for partnerships, Steve Singer, to discuss a partnership to bring *Call of Duty* to the Switch.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 167:24-169:18.)  Those discussions led to an inked deal to bring *Call of Duty* to the Switch.  All of this conduct is inconsistent with an intent to foreclose.

***Second***, the deal plan evaluation model presented to the Microsoft Board of Directors to justify the Activision purchase price relies on PlayStation sales and other non-Microsoft platforms post-acquisition.  ██████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

United States District Court
Northern District of California

1  ██████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ██████████████████████████████████████████████████████

4  ███████████████████████████████████████████████

5  ████████████████████████████████████████████████

6  ██████████████████████████████████████████████████████

7  ██████████████████████████████████████████████

8  ████████████████████████████████  This valuation is also inconsistent

9  with an incentive to foreclose.

10  **Third**, the deal plan evaluation model reflects access to mobile content was a critical factor

11  weighing in favor of the deal. ████████████████████████████████

12  ████████████████████████████████████████████████████

13  ███████████████████████████████████████████████

14  ██████████████████████████████████████████████████████

15  ██████████████  ████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ██████████████████████████████████  ████████████████████

18  ████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████████

20  ██████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████

22  ████████████████████████████  Microsoft's keen interest in Activision's mobile

23  content suggests the combined firm is not incentivized to withhold *Call of Duty* merely to aid the

24  shrinking console market.

25  **Fourth**, Microsoft witnesses consistently testified there are no plans to make *Call of Duty*

26  exclusive to the Xbox.  Mr. Nadella testified he would "[a] hundred percent" "commit to

27  continuing to ship *Call of Duty* on the Sony PlayStation."  (Dkt. No. 285, 6/28/23 Tr. (Nadella)

28  853:9-11.)  Mr. Spencer testified "my commitment is and my testimony is, to use that word, that

1   we will continue to ship Call of -- future versions of *Call of Duty* on Sony's PlayStation platform."

2   (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 367:18-24, 368:4-10, 429:21-22, 429:25-430:1.)

3       **Fifth**, there are no internal documents, emails, or chats contradicting Microsoft's stated

4   intent not to make *Call of Duty* exclusive to Xbox consoles.  Despite the completion of extensive

5   discovery in the FTC administrative proceeding, including production of nearly 1 million

6   documents and 30 depositions, the FTC has not identified a single document which contradicts

7   Microsoft's publicly-stated commitment to make *Call of Duty* available on PlayStation (and

8   Nintendo Switch).  (RX5056 (Carlton Report at ¶ 127.)  The public commitment to keep *Call of*

9   *Duty* multiplatform, and the absence of any documents contradicting those words, strongly

10  suggests the combined firm probably will not withhold *Call of Duty* from PlayStation.

11      **Sixth**, *Call of Duty's* cross-platform play is critical to its financial success.  (Dkt. No. 286,

12  6/29/23 Tr. (Stuart) at 1039 ("Q. And is it also profitable for Xbox to continue to have games like

13  *Minecraft* be multiplatform and cross platform? A. Absolutely. The strength of a game like

14  *Minecraft* comes from that cross-network play. If you, you know, removed one of those platforms

15  and one of those big user bases, not only – not only would you have a massive brand impact, you

16  would lose a significant revenue stream that you just couldn't make up for."); Dkt. No. 285,

17  6/28/23 Tr. (Kotick) at 715:18-24 ("Well, if you think about like from a business perspective and

18  from a consumer perspective, one of the most important things is building communities of players,

19  especially now that you have the ability to compete and socialize. And so our view has always

20  been that you want to create your content for as many platforms as possible and build your

21  audiences to be as big as possible.").)  Cross-play thus creates an incentive to leave *Call of Duty*

22  on PlayStation.

23      **Seventh**, Microsoft anticipates irreparable reputational harm if it forecloses *Call of Duty*

24  from PlayStation.  Mr. Spencer testified: "[u]s pulling *Call of Duty* from PlayStation in my view

25  would create irreparable harm to the Xbox brand after me in so many public places, including

26  here, talking about and committing to us not pulling Call of Duty from PlayStation."  (Dkt. No.

27  283, 6/23/23 Tr. (Spencer) at 367:11–15).  Activision CEO Bobby Kotick confirmed Microsoft's

28  concerns are not unfounded: "if we were to remove *Call of Duty* from PlayStation, it would have

1    very serious reputational – it would cause reputational damage to the company." (Dkt. No. 285,

2    6/28/23 Tr. (Kotick), at 725:4-7); *see also id.* at 715:18-24 ("Well, you would alienate" gamers

3    "and you would have a revolt if you were to remove the game from one platform."); *id.* at 727:17-

4    22 (explaining if a degraded *Call of Duty* experience were offered on other platforms "you would

5    have vitriol from gamers that would be well deserved, and . . . that would be very vocal and also

6    cause reputational damage to the company").) "[I]n assessing [Microsoft's] post-merger

7    incentives, the Court must consider the financial and reputational costs to [Microsoft] if it were to

8    breach or water down its firewall policies*." See UnitedHealth Grp.*, 630 F. Supp. 3d 118; *see also*

9    *AT&T*, 916 F.3d at 1040 (D.C. Cir. 2019) ("Turner [Broadcasting] would not be willing to accept

10   the 'catastrophic' affiliate fee and advertising losses associated with a long-term blackout."). Why

11   would Microsoft risk that brand reputational harm? Especially since the video game console

12   market is shrinking—not growing; it is not the future of video gaming. (RX 5055-010.)

13        **Eighth**, the FTC has not identified any instance in which an established multiplayer, multi-

14   platform game with cross-play, that is, a game that shares *Call of Duty's* characteristics, has been

15   withdrawn from millions of gamers and made exclusive. (RX5056 (Carlton Report) at ¶ 15.) To

16   the contrary, Microsoft's 2014 acquisition of Mojang, the developer of the hugely popular

17   *Minecraft* franchise, exemplifies how a console seller (and Microsoft in particular) behaves when

18   acquiring a hugely popular multiplayer cross-platform game. *Minecraft* is one of the most

19   successful games of all time, and is Microsoft's largest game by revenue. (Dkt. No. 283, 6/23/23

20   Tr. (Spencer) at 362:24-25; RX5058-005 (Hood Decl.) at ¶ 11.) It includes a popular multiplayer

21   mode and has produced a large community across platforms. (Dkt. No. 282, 6/22/23 Tr. (Booty)

22   77:23–78:1.) At the time of the Mojang acquisition, *Minecraft* was available on Xbox,

23   PlayStation, and PC. (*Id.* at 78:2–7.) While Microsoft had the ability to make *Minecraft*

24   exclusive, it continued to ship *Minecraft* on all those same platforms post-acquisition and made

25   subsequent games in the franchise (*e.g.*, *Minecraft: Dungeons* and *Minecraft: Legends*) available

26   for Nintendo consoles and even Sony's subscription service, PlayStation Plus. (*Id.* at 78:11-79:4;

27   6/23/2023 (Spencer) at 421:8-423:1; RX3156.) Xbox CFO Tim Stuart explained the decision to

28   ship *Minecraft* on "all platforms" enabled "its mass, mass, mass market" appeal. (Dkt. No. 286,

United States District Court
Northern District of California

6/29/23 Tr. (Stuart) at 976:13-977:5.)  The decision was dictated by the economics and the desire not to break up existing gamer communities.  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 365:13-15 ("[I]f we were to acquire something that has found customer love, users, business on another platform, we want to nurture and grow that for the games that we're building"); *id.* at 362:24-363:5 (*Minecraft* "has reached a financial level of success where it's – it's a significant profit driver for us given that it's shipping on all the platforms. So if you can get a game that's at that level of hit and that level of business, the size of the business, our job is to maintain and grow that."); RX1137.)

All of the above evidence points to no incentive to foreclose *Call of Duty*—a 20-year multi-platform franchise—from Sony PlayStation.

The FTC disputes this written offer has any relevance to its *prima facie* burden.  It contends Microsoft's binding offer is a "proposed remedy" that may not be considered until the remedy phase, that is, after a Section 7 liability finding.  As support, it again relies on its own 2023 *Illumina* decision.  There, relying on *E.I. du Pont*, 366 U.S. at 334, the Commission held such agreements are "proposed remedies," and that the defendants bear the burden of proving "the offered remedy would actually be effective."  So, the FTC claims it does not have to account for any agreements in its *prima facie* showing.  Illumina, Inc. & Grail, Inc., 2023 WL 2823393, at *49-50.  But *E.I. du Pont* does not support the Commission's holding.  It involved a remedy proposed *after* a finding of a Section 7 violation. The Court held: "once the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor." *E.I. du Pont*, 366 U.S. at 334.  *E.I. du Pont* says nothing about whether the merger-challenging plaintiff must address offered and executed agreements made before any liability trial, let alone liability finding; that is, whether the FTC must address the circumstances surrounding the merger as they actually exist.  The caselaw that directly addresses the issue contradicts the FTC's position.  *See AT&T*, 916 F.3d at 1041; *UnitedHealth Grp.*, 2022 WL 4365867 at *15-24; *FTC v. Arch Coal, Inc.*, No. 04-00534, Dkt. No. 67 (D.D.C. July 7, 2004).

Next, the FTC insists Microsoft's offer is simply insufficient.  In so arguing, it relies exclusively on PlayStation CEO Ryan's testimony. (Dkt. No. 291-2, FTC's Findings of Fact and Conclusions of Law at pp. 159-160 ¶¶ 787-796.)  The FTC's heavy reliance on Mr. Ryan's testimony is unpersuasive.  Sony opposes the merger; its opposition is understandable.  Before the merger Sony paid Activision for exclusive marketing rights that allowed Sony to market *Call of Duty* on PlayStation, but restricted Xbox's ability to do the same.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 162:19-165:8.)  After the merger, the combined firm presumably will not agree to such restrictions.  Before the merger, a consumer wanting to play a *Call of Duty* console game had to buy a PlayStation or an Xbox.  After the merger, consumers can utilize the cloud to play on the device of choice, including, it is intended, on the Nintendo Switch.  Perhaps bad for Sony.  But good for *Call of Duty* gamers and future gamers.

39



### ii.     The FTC's Incentive Evidence is Insufficient

Notwithstanding the overwhelming evidence of the combined firm's lack of incentive to pull *Call of Duty* from PlayStation, the FTC insists it is probable the combined firm will do so because it is in its financial interests.

### a.     Professor Lee's Opinion

The lynchpin of the FTC's argument is the expert opinion of Professor Robin Lee, an economist. Prof. Lee opines the economic benefits of making *Call of Duty* exclusive to Xbox outweigh the costs. In particular, he concludes removing *Call of Duty* from PlayStation would result in a 5.5% increase in Xbox's share of the Gen 9 console market. (Dkt. No. 226-2, Lee Decl. ¶ 106.)

Prof. Lee's opinion does not dispute the evidence of Microsoft's lack of an economic incentive. His Vertical Foreclosure model depends on two key quantitative inputs: "the customer lifetime value ('LTV') of purchasers of Xbox consoles and the 'Xbox conversion rate.'" (*Id*. at ¶ 103.) Looking at the conversion rate, Prof. Lee uses projected sales data to calculate the number of expected PlayStation purchasers of *Call of Duty* (2025 version) who would instead choose to play *Call of Duty* 2025 on Xbox consoles if not available on PlayStation. From this number he excludes PlayStation owners (1) who already own an Xbox, or (2) would choose to play *Call of Duty* 2025 on PC if not available on PlayStation. The conversion rate is the fraction of remaining

40

United States District Court
Northern District of California

1   purchasers—"affected users"—that would purchase an Xbox console to play *Call of Duty* 2025 if

2   it was not available on PlayStation. (Dkt. No. 226-2, Lee Decl. at ¶¶ 101, 103, 106.)

3       Prof. Lee's Vertical Foreclosure model *assumes* a conversion rate of 20%. (Dkt. No. 284,

4   6/27/23 Tr. (Lee) at 559:2-14 ("So with that subset of users I'm assuming 20 percent of them

5   would purchase a new Xbox[].");　*id.* at 560:2-4 (agrees the 20% rate was not computed but instead

6   was just inputted into the model).) So, the 20% figure is not based on evidence—it is an assumed

7   input. Accepting Prof. Lee's LTV of 40%, even lowering the conversion rate just a bit, to say

8   17.5%, means Prof. Lee's model estimates it would **not** be profitable to withhold *Call of Duty*

9   from PlayStation; that is, the costs in lost PlayStation *Call of Duty* sales outweigh the benefits of

10  more Xbox console sales. This relationship is reflected in Figure 11 from Prof. Lee's report

11  reproduced below:



21      Prof. Lee attempts to defend the reasonableness of his 20% assumption by identifying

22  evidence he contends supports his model's output—the 5.5% share shift. In other words, the 20%

23  assumption must be correct because other evidence supports the model's result. In his direct

24  testimony Prof. Lee identified two pieces of support: (1) an internal 2019 Microsoft strategy

25  memo regarding a potential acquisition, and (2) his share model output. (Dkt. No. 226-2 ¶ 106.)

26  Neither supports his 20% conversion rate assumption.

27      First, the Microsoft memo states in a parenthetical: "an exclusive AAA release accounts

28  for a 2-4% console share shift in the US and a 1-3% shift worldwide." (PX1136-004). Prof. Lee's

41

United States District Court
Northern District of California

1    reliance on this memo snippet is misplaced.  What—if any—data is behind the statement?  Who

2    came up with those figures?  How were they measuring share shift?  Shift from what console(s) to

3    what console(s)?  And, were those numbers addressing a new first-party game being released

4    exclusively?  Or was the author discussing taking a long-standing multiplatform cross-play game,

5    like *Call of Duty,* exclusive.  Prof. Lee does not know.  Further, only the global share shift matters

6    in Prof. Lee's model.  The memo snippet, for whatever it is worth, posits a 1% to 3% share shift

7    globally.  Prof. Lee testified a 2% share shift would **not** make it economically beneficial to make

8    *Call of Duty* exclusive to Xbox consoles; thus, the slide does not support Prof. Lee's 20%

9    conversion rate input. (Dkt. No. 284, 6/27/23 Tr. (Lee) at 581:1-7.)[6]

10          Second, Prof. Lee points to his share model. (Dkt. No. 226-2, Lee Decl. at ¶ 106.)  He says

11   this model results in an 8.6% share shift; therefore, the more conservative 5.5% share shift output

12   from his Vertical Foreclosure model is reasonable. But the share model output is also flawed.  As

13   a preliminary matter, it is based on Gen 8 console data from only the United States, rather than

14   global Gen 9 data.  But putting that aside, as Dr. Carlton observed, Prof. Lee's share model

15   "ignores the presence of non-exclusive games in influencing console choice" even though Prof.

16   Lee acknowledges non-exclusive games do influence console choice.  (Dkt. No. 294-2, Carlton

17   Decl. at ¶¶ 26-27.)  Prof. Lee's reply report's attempt to fix this error fails because he again

18   accords no value to non-exclusive games in consumer choice.  (*Id.* at ¶¶ 29-30.)  Further, Dr.

19   Carlton also contends Prof. Lee's share model assumes every lost PlayStation 4 results in an

20   additional Xbox sale, even though consumers may choose a different device to play *Call of Duty*

21   (PC, mobile, cloud) or to not play *Call of Duty* on any device at all.  (*Id.* at ¶¶ 32-34.)  When Dr.

22   Carlton corrects for this error, Prof. Lee's share model is between 1% and 54% of what Prof. Lee

23   predicts and thus does not support his critical 20% conversion rate.  (*Id.* at ¶ 35.)

24

25

26   _____

27   [6] Undaunted, Prof. Lee insists even the 2-3% share shift is consistent with his 5.5% estimate
     because *Call of Duty* has such high sales compared to other AAA titles, so *Call of Duty's* share
     shift will be higher.  (Dkt. No.226-2, Lee Decl. at ¶¶ 32, 104; Dkt. No. 291-2, FTC's Findings and
28   Conclusions at pp. 100-101 ¶ 499.)  That circular assertion, however, relies upon his share model
     which, discussed next, is flawed.

1    And what does Prof. Lee say about Dr. Carlton's criticism? Nothing in his direct

2    testimony. (*See* Dkt. No. 262-2, Lee Decl.) At the evidentiary hearing on re-direct? Nothing.

3    (Dkt. No. 284, 6/27/23 Tr. (Lee) at 615:9-651:22.) And when the FTC cross-examined Dr.

4    Carlton on his written direct testimony? Again, nothing. (Dkt. No. 285, 6/28/23 Tr. (Carlton) at

5    855:6-898:1.) The FTC chose not to challenge, or even address, Dr. Carlton's identification of

6    material flaws in Prof. Lee's share model. The criticism thus stands unscathed—and persuasive.

7    So, the share model does not justify Prof. Lee's reliance on the strategy memo snippet reporting

8    console shares move 1% to 3% globally with exclusive AAA content.

9    ████████████████████████████████████████████████████████

10   ██████████████████████████████████████████████████████████

11   ███████████████████████████████████████████████████████████████

12   ███████████████████████████████████████████████████████████████

13   ███████████████████████████████████████████████████████████████

14   ██████████████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████████████

16   █████████████████████████████

17        ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   ██   ████████████████████████████████████████████████████████████

21   ██████████████████████████████████████████████████████

22   ███████████████████████████████ But Prof. Lee's assumption as to what

23   was being measured was wrong. The slide does not support his conversion rate. In any event,

24   before Prof. Lee could persuasively opine the "pivotal" conversion rate is supported by a survey

25   result, he would need to be familiar with the survey and its design. As his testimony showed, he

26   was not.

27        Dr. Lee's opinion suffers from several additional weaknesses. It fails to consider

28   Microsoft's agreement with Nintendo and the cloud streaming services to provide ongoing access

43

to *Call of Duty*—all of which will increase access.  It also fails to consider Microsoft's offer to Sony. Nor did he consider any reputational harm to Microsoft from pulling *Call of Duty* from millions of players.  Regardless, for the reasons explained, his opinion does not show the combined firm will probably have an economic incentive to withhold *Call of Duty* from PlayStation.  He simply assumed a concession rate for his model that would make exclusivity profitable, but there is no evidence to support that assumption.

### b.    ZeniMax

While the FTC asserts Microsoft's 2014 *Minecraft* acquisition is not relevant to how it will treat *Call of Duty*, it insists Microsoft's 2021 acquisition of ZeniMax is predictive of how the combined firm will behave.  Specifically, although Microsoft's deal valuation shared with the Board of Directors contemplated keeping ZeniMax content multiplatform, it later decided to make two new ZeniMax titles—*Starfield* and *Redfall*—exclusive.  Agreed this evidence shows Microsoft's deal valuation for the Activision acquisition is not dispositive of the incentive question.  But it does not dispute the evidence that Microsoft does not have an incentive to withdraw *Call of Duty* from PlayStation. Neither *Starfield* nor *Redfall* are remotely similar to *Call of Duty*. *Starfield* is a role-playing game that has not been released.  *Redfall* is a first-person shooter game that was only released in May 2023.

The question is whether it makes financial sense to wrest *Call of Duty* from PlayStation.

### c.　Effect on Innovation

The FTC also insists the merger will decrease innovation because game developers and publishers will not want to work with Microsoft.  But the only evidence the FTC identifies is Sony's reluctance to share its intellectual property with Microsoft and provide development kits for its consoles.  But this is not merger-specific and it fails to account for all the other developers who might now be incentivized to collaborate with Xbox or one of its studios like Activision or Bethesda.  *Cf. UnitedHealth Grp.*, 650 F. Supp. 3d at 151 ("The Government did not call a single rival payer to offer corporate testimony that it would innovate less or compete less aggressively if the proposed merger goes through. Nor did any of the rival payer employees who did testify support the Government's theory.")  Protecting Sony's decision to delay collaboration with Microsoft and therefore PlayStation users' access to Microsoft's content is not pro-competitive.

### d.　Partial Foreclosure

Finally, in its reply brief in support of its preliminary injunction motion (but not its original moving papers), and throughout the evidentiary hearing, the FTC alluded to the possibility of partial foreclosure.  Partial foreclosure might involve releasing *Call of Duty* later on PlayStation than Xbox, or having a *Call of Duty* Christmas character in the Xbox version, but not the PlayStation version.  (*See* Dkt. No. 286, 6/29/23 Tr. (Closing) at 1100:2-4, 1100:17-23.)  Or it could be technologically degrading the players' experience on one console versus another.  (PX5000-181 (Lee Report) at ¶ 477.)

But the FTC has no expert testimony to support a finding the combined firm would have the incentive to engage in such conduct.  Prof. Lee did not engage in any quantitative analysis of partial foreclosure.  Anyway, under the FTC's theory, the goals of full and partial foreclosure are the same: move enough PlayStation users to Xbox such that the benefits to the combined firm outweigh the costs.  If the FTC has not shown a financial incentive to engage in full foreclosure, then it has not shown a financial incentive to engage in partial foreclosure.

Moreover, Mr. Kotick testified he was unaware of a developer intentionally developing a "subpar game for one platform versus another." (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 728:2–6.)  Such conduct would obviously draw "vitriol from gamers that would be well deserved," and

45

would "cause reputational damage to the company." (*Id.* at 727:20–22.) Consistent with that testimony, the record does not include any evidence Microsoft has engaged in such conduct in the past—even with Sony. ███████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████ The FTC's partial foreclosure theory fails.

\*\*\*

In sum, the FTC has not shown a likelihood of success on its theory the merger may substantially lessen competition in the Gen 9 console market because the combined firm will have the ability and incentive to foreclose *Call of Duty* from PlayStation. While it is possible, *Call of Duty's* long history as a highly popular, multiplatform cross-play game make that result not probable. The Court has focused on *Call of Duty*, rather than other Activision AAA content, because the FTC's evidence focused on this one game. While other games, such as *Diablo*, are certainly popular, the FTC did not offer evidence that if *Call of Duty* remains multiplatform in the console market, making *Diablo* or other Activision titles exclusive to Xbox would probably substantially lessen competition in that market.

### b. The Remaining Markets

For purposes of the library subscriptions services market and the cloud streaming market, which Dr. Lee refers to collectively as the "Gaming Services Market," the FTC contends the merger will probably have anticompetitive effects because Microsoft would (1) have a greater economic incentive to engage in foreclosure than an independent Activision; and (2) "would likely have the economic incentive to engage in foreclosure." (Dkt. No. 226-2 at ¶¶ 7, 189).

As a threshold matter, the question is not whether Microsoft following the merger is more likely to engage in foreclosure than an independent Activision. The question is whether "the proposed merger is likely to substantially lessen competition, which encompasses a concept of 'reasonable probability.'" *AT&T*, 916 F.3d at 1032. As Microsoft notes, "a vertically integrated firm's incentives are *always* more complex in that respect than the standalone incentives of its components. In other words, if this merger could be condemned simply because the combined company would derive *some* economic benefit from withholding, *any* vertical merger could be

46

1  condemned on the same ground, despite the indisputable pro-competitive effects of many vertical

2  mergers." (Dkt. No. 292-2, COL at ¶ 152 (emphasis in original).)   Accordingly, to prevail on its

3  preliminary injunction motion, the FTC must demonstrate a likelihood of success on its assertion

4  there is a reasonable probability the proposed merger will substantially lessen competition in the

5  library subscription services market and cloud streaming market.

6                          **(i)      Library Subscription Services Market**

7       The FTC argues Xbox will include *Call of Duty* in its Game Pass library subscription

8  service, but refuse to include it in rival services.  This exclusion, it contends, will lessen

9  competition in that market and make it likely Xbox will increase the Game Pass price.  (Dkt. No.

10  291-2, FTC's Findings and Conclusions at p. 138 ¶¶ 659, 661.)

11       It is undisputed the combined firm has significant financial incentives to include *Call of

12  Duty* in Game Pass.  (*See* PX1763-013; PX2138-001.)  The Court accepts for preliminary

13  injunction purposes it is likely *Call of Duty* will be offered exclusively on Game Pass, and not

14  offered on rival subscription services.  The countervailing incentives that exist in the console

15  market—longstanding multiplatform availability, cross-play, historically high revenue from games

16  sold—do not apply to the subscription market since *Call of Duty* is not and never has been offered

17  (in any significant sense) on a multigame library subscription service.  (Dkt. No. 285, 6/28/23 Tr.

18  (Kotick) at 731:5-7.)  But the record does not support a finding of a serious question as to whether

19  *Call of Duty* Game Pass exclusivity will probably substantially lessen competition in the

20  subscription services market.

21       First, the merger has the procompetitive effect of expanding access to *Call of Duty*.

22  Adding *Call of Duty* to Game Pass gives consumers a new, lower cost way to play the game day

23  and date. (RX3166-016.)  Further, Dr. Carlton explains how adding *Call of Duty*, and Activision

24  content in general, will actually lower costs for many game consumers and harm none.  (RX5056

25  (Carlton Report) at ¶¶ 141-142.)  Dr. Carlton also opines "the merger can be expected to result in

26  an increased incentive to invest in game development than would occur otherwise" because

27  "adding [*Call of Duty*] to Game Pass will result in an increase in the number of Game Pass users,

28  [and] that increase gives Microsoft more incentive to invest in other games, not just Activision

United States District Court
Northern District of California

games." (*Id* .at ¶ 144); *see Chi. Pro. Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in antitrust is output."); *FTC v. Univ. Health, Inc*., 938 F.2d 1206, 1222 (11th Cir. 1991) ("[W]hether an acquisition would yield significant efficiencies is an important consideration in predicting whether the acquisition would substantially lessen competition.").

Second, the FTC does not identify evidence that disputes these procompetitive effects. Prof. Lee admits "Exclusivity can have both pro and anticompetitive effects." (Dkt. No. 284, 6/27/23 Tr. (Lee) at 603:8; *see* Dkt. No. 226-2, Lee Decl. at ¶¶ 113, 132.) Yet he did not perform any quantitative analysis to estimate whether adding *Call of Duty* to Game Pass, and not other subscription services, will injure competition. Will some people subscribe to Game Pass because of *Call of Duty*? Yes. But there is no analysis of how many, or how it will affect competition with Game Pass competitors such as Amazon, Electronic Arts, Ubisoft and Sony. (Dkt. No. 284, 6/27/23 Tr. (Lee) at 638:11–15 (Lee testifying cloud gaming and content library services are "both relatively nascent and new compared to consoles, and the lack of really good data for these services made it very difficult to perform something that I would view as reliable that's quantitative for those markets."); RX5056 (Carlton Report) at ¶ 138.)

The FTC's primary argument appears to be that even without the merger, Activision will contract to put its content, including *Call of Duty*, on subscription services. The record evidence is to the contrary. Activision believes it is not in its financial interest to do so because it would cannibalize individual sales. (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 744:10-11.) Kotick cannot imagine a subscription service agreeing to the financial terms Activision would require to make it a financial win for Activision. (*Id.* at 752:17-19, 752:8-11.) ██████████████████

████████████████████████████████████████████████████████████

███████████████████████

Consistent with Mr. Kotick's testimony, in 2020 Xbox attempted to negotiate placing certain Activision titles on Game Pass. Activision refused. (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 751:1-8.) ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ And Activision has no plans to put its

48

United States District Court
Northern District of California

1     content on a game library subscription service.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 729:3-7,

2     746:19-21.)  The FTC does not offer any explanation, let alone evidence, as to why it would be

3     financially beneficial for Activision to change its long-held stance on subscription services.

4        In sum, the FTC has not raised serious questions on whether the merger will probably

5     substantially lessen competition in the game library subscription services market.

6                 **(ii)**      **Cloud Streaming Market**

7        The FTC has also failed to show a likelihood of success on its claim the merger will

8     probably lessen competition in the cloud gaming market because the combined firm will foreclose

9     Activision's content, including *Call of Duty*, from cloud-gaming competitors.  This argument is

10    foreclosed by Microsoft's post-FTC complaint agreements with five cloud-streaming providers.

11    Before the merger, there is no access to Activision's content on cloud-streaming services.  After

12    the merger, *several* of Microsoft's cloud-streaming competitors will—for the first time—have

13    access to this content.  The merger will enhance, not lessen, competition in the cloud-streaming

14    market.

15       At trial the FTC argued that the cloud-streaming competitors based outside the United

16    States should not be considered because their servers are likely outside the United States and thus

17    their cloud services are not effective for United States consumers.  But the FTC is merely

18    guessing; Microsoft has offered evidence that "Boosteroid (a Ukrainian company) has gaming

19    servers in Pennsylvania, North Carolina, Texas, Illinois, Florida, Washington."  (Dkt. No. 292-2,

20    Defendants' Findings of Fact and Conclusions of Law (Defs' Findings and Conclusions) p. 138 ¶

21    163.)  ██████████████████████████████████████████████████

22    █████████████████████████████████████████████████████

23    ████████████████████████████████████████████████

24    ███████████████████████████████████████████

25    ████████████████████████████████████████████

26    ███████████████████████████████████████

27       The FTC's response, again, is that an independent Activision would agree to put its content

28    on cloud-gaming services.  But, again, it offers no quantitative evidence to support this bald

1    assertion; Prof. Lee did not model the cloud gaming market. And, the fact is, Activision content is

2    not currently on any cloud-streaming service. And it is not likely to be available absent the

3    merger. (*See* Dkt. No. 285, 6/28/23 Tr. (Kotick) at 731:15–18; *id.* at 753:13–15.) Activision

4    previously pulled *Call of Duty* from GeForce NOW following beta testing. (*Id.* at 754:1-5.) And

5    it has not been on a cloud-streaming service since. The FTC has not shown it is likely an

6    independent Activision would do what Microsoft has agreed to do by contract *See Tenneco, Inc. v.*

7    *FTC*, 689 F.2d 346, 354 (2d Cir. 1982) (rejecting the FTC's "unsupported speculation" "Tenneco

8    would have entered the market . . . absent its acquisition of Monroe"); *Fruehauf Corp. v. FTC*,

9    603 F.2d 345, 355 (2d Cir. 1979) (rejecting the FTC's theory of anticompetitive effects as "based

10   on speculation rather than fact").

11         Finally, the FTC argues the cloud-streaming agreements are irrelevant to its *prima facie*

12   showing as they are mere "proposed remedies." The Court's analysis as to the Sony proposal,

13   *infra* at Section II.B.2.a.i, applies equally to the cloud-streaming agreements. Indeed, it has even

14   more force here where the competitor—Nvidia and others—have actually entered into the

15   agreements. The Court cannot ignore this factual reality. The combined firm will probably not

16   have an incentive to breach these agreements and make Activision content exclusive to xCloud.

### 3.    FTC's *Brown Shoe* Foreclosure Theory

18         Alternatively, the FTC argues that it has established a likelihood of success on its theory

19   that under "the *Brown Shoe* functional liability factors," the proposed merger's "very nature and

20   purpose" is anticompetitive, there is a "trend toward concentration in the industry," and the merger

21   would "increase entry barriers in the Relevant Markets." (Dkt. No. 291-2, FTC's Findings and

22   Conclusions at pp. 181-182 ¶¶ 95-99 (citing *Brown Shoe*, 370 U.S. 294 at 329–30.) As an initial

23   matter, the FTC made no reference to this theory in its opening statement or closing argument.

24   Nor is it discussed by Dr. Lee's expert report; he addressed only Microsoft's ability and incentive

25   to foreclose.

26         As to the theory's merits, the FTC does not make any new arguments not considered

27   above. The FTC maintains the "[p]roposed Acquisition's purpose is to transform an independent,

28   'platform-agnostic' source of supply into a captive one controlled exclusively by Microsoft," (*Id.*

United States District Court
Northern District of California

50

at pp. 181-182 ¶ 95), but this would be true in any vertical merger and does not explain why it demonstrates an anticompetitive purpose. Likewise, while the FTC argues Microsoft's "past conduct following similar transactions also demonstrates its likely anticompetitive nature," presumably referring to the ZeniMax acquisition, this ignores the Mojang/*Minecraft* acquisition. (*Id.*) To the extent the FTC relies on a "trend toward further concentration in the industry" (*Id.* at p. 182 ¶ 96), it fails to explain how this trend is anticompetitive here—Microsoft's investment in game developers and publishers allows for increased innovation in content and Microsoft has prioritized a "content pipeline." (PX1154-001.)

***

In sum, the FTC has not raised serious questions regarding whether the proposed merger is likely to substantially lessen competition in the console, library subscription services, or cloud gaming markets. As such, the FTC has not demonstrated a likelihood of ultimate success as to its Section 7 claim based on a vertical foreclosure theory.

## III. BALANCING OF THE EQUITIES

Because the FTC has not demonstrated a likelihood of ultimate success on the merits, the Court need not proceed to the balance of equities question. *See United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980). The Court finds, however, that even if the FTC had met its burden, the balance of equities do not fall in its favor. The FTC correctly notes private equities, such as the potential skuttling of the merger if it does not close by July 18, "cannot on its own overcome the public equities that favor the FTC." *FTC v. Wilh. Wilheslmsen Holding ASA*, 341 F. Supp. 3d 27, 73-74 (D.D.C. 2018); *see also Warner*, 742 F.2d at 1165 ("When the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities alone does not justify denial of a preliminary injunction").

But the balancing of equities is not a pointless exercise. In *Warner*, for example, the Ninth Circuit observed "public equities may include beneficial economic effects and pro-competitive advantages for consumers." *Id.* at 1165 (cleaned up). Because in that case the record contained "conflicting evidence on the anticompetitive effects of the merger," the Ninth Circuit held it was unclear whether those public equities supported the grant or denial of the preliminary injunction.

51

United States District Court<br>Northern District of California

*Id.* It nonetheless held the public equities outweighed the private because the Commission would be denied effective relief if it ultimately prevailed and ordered divestiture. The court reasoned: "Since the proposed joint venture calls for Polygram to dismantle its distribution operations, it would be exceedingly difficult for Polygram to revive the operations to comply with a divestiture order." *Id.*

Here, at best "the record contains conflicting evidence on the anticompetitive effects of the merger"; thus, the FTC cannot point to beneficial economic effects as a public equity. *Id.* Moreover, the administrative trial before the ALJ commences on August 2, in just a few weeks. By pre-existing contract, *Call of Duty* will remain on PlayStation through the end of 2024. There will be no foreclosure of *Call of Duty* pending the ALJ's decision. Gamers will be able to play just as they always have.

The FTC insists the difficulty in ordering post-acquisition divestiture is the public equity that prevails. (Dkt. No. 291-2, FTC's Findings and Conclusions at p. 194-195 ¶ 153.) But it does not cite anything specific about this merger to support that assertion. It is a vertical acquisition. Microsoft and Activision will act as parent and subsidiary. There is no planned dismantling of operations, as in *Warner.* What exactly about the merger would make it difficult to order an effective divestiture? The FTC does not say. Its argument, at bottom, is the equities always weigh in favor of a preliminary injunction. But that argument ignores the law. So, the balance of equities is a separate, independent reason the FTC's motion must be denied.

## CONCLUSION

Microsoft's acquisition of Activision has been described as the largest in tech history. It deserves scrutiny. That scrutiny has paid off: Microsoft has committed in writing, in public, and in court to keep *Call of Duty* on PlayStation for 10 years on parity with Xbox. It made an agreement with Nintendo to bring *Call of Duty* to Switch. And it entered several agreements to for the first time bring Activision's content to several cloud gaming services.

This Court's responsibility in this case is narrow. It is to decide if, notwithstanding these current circumstances, the merger should be halted—perhaps even terminated—pending resolution of the FTC administrative action. For the reasons explained, the Court finds the FTC has not

United States District Court
Northern District of California

shown a likelihood it will prevail on its claim this particular vertical merger in this specific industry may substantially lessen competition. To the contrary, the record evidence points to more consumer access to *Call of Duty* and other Activision content. The motion for a preliminary injunction is therefore DENIED.

This Opinion constitutes the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52. Given the compressed time the Court had to issue a written opinion in light of the impending termination date, there will likely be errors in the citations. And, for the same reason, the Opinion does not address every argument the FTC makes in its 196-page post-trial submission, nor cite every piece of evidence supporting the Court's findings. Because the decision on the FTC's request for a preliminary injunction "effectively terminate[s] the litigation and constitute[s] a final order," this case is DISMISSED. *See FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 165 n.2 (3d Cir. 2022). The Court **MODIFIES** its temporary restraining order such that the temporary restraining order will **dissolve at 11:59 p.m. on July 14, 2023** unless the FTC obtains a stay pending appeal from the Ninth Circuit Court of Appeals.

This Opinion is filed under seal. At the same time it is filed, the Court will file a redacted version under seal. In an abundance of caution, it is overly redacted. The parties shall meet and confer with the non-parties, and on or before July 18, 2023, submit a new proposed redacted version of this Opinion.

**IT IS SO ORDERED.**

Dated: July 10, 2023

JACQUELINE SCOTT CORLEY