No. 23-15992

# United States Court of Appeals
# for the Ninth Circuit

———————

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellant,*

v.

MICROSOFT CORP. AND ACTIVISION BLIZZARD, INC.,

*Defendants-Appellees.*

———————

Appeal from an Order of the
U.S. District Court for the Northern District of California
No. 3:23-cv-02880-JSC, Hon. Jacqueline Scott Corley

———————

## OPPOSITION TO FTC'S MOTION FOR AN INJUNCTION PENDING APPEAL

———————

Jonathan E. Nuechterlein
C. Frederick Beckner III
William R. Levi
Daniel J. Hay
Lucas W.E. Croslow
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
william.levi@sidley.com

Beth Wilkinson
Rakesh N. Kilaru
Anastasia M. Pastan
WILKINSON STEKLOFF LLP
2001 M Street, N.W., 10th Floor
Washington, D.C. 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com

*Counsel for Defendant-Appellee Microsoft Corp.*

[Additional Counsel Listed on Inside Cover]

Steven C. Sunshine
Julia K. York
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
Telephone: (202) 371-7000
Facsimile: (202) 393-5760
steven.sunshine@skadden.com

Grant Dixton
ACTIVISION BLIZZARD, INC.
2701 Olympic Blvd Bldg B
Santa Monica, CA 90404
Telephone: 310-255-2000
Grant.Dixton@activision.com

*Counsel for Defendant-Appellee
Activision Blizzard, Inc.*

Adam B. Banks
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8419
adam.banks@weil.com

*Counsel for Defendant-Appellee
Microsoft Corp.*

## <u>RESPONSE TO RULE 27-3 CERTIFICATE</u>

Defendants-Appellees Microsoft Corporation ("Microsoft") and Activision-Blizzard, Inc. ("Activision") provide the following additional facts omitted from Plaintiff Federal Trade Commission's ("FTC") Rule 27-3 Certificate. *See* Mot. *i.*

*First*, the FTC fails to disclose until the final paragraph of its brief, Mot. 20, that the merger has a termination date of **July 18, 2023** (four days from now) and omits entirely the provision of the merger agreement requiring Microsoft to pay a $3 billion termination fee if the merger does not close due to, *inter alia*, regulatory obstacles. These factors are certainly relevant to when and how the Court rules on the motion; indeed, the district court found "the potential skuttling of the merger" to be "a separate, independent reason" to deny the FTC's request for an injunction. Op.52.

*Second*, the FTC's claimed emergency is entirely of its own creation. Microsoft and Activision first notified the FTC of the merger on February 1, 2022. Op.19. The Commission filed an administrative complaint challenging the merger on December 8, 2022. Op.20. Breaking from its stand-

ard practice in merger cases, the FTC did not file a federal court complaint seeking a preliminary injunction at that time. On the contrary, it set its administrative hearing for August 2, 2023—*after* the merger agreement's termination date. Thus, the FTC acted for the better part of a year and a half as though this case was *not* an emergency necessitating federal court intervention. The parties and the Court face a time crunch because—and only because—"the FTC did not file this action to preliminarily enjoin the merger until June 12, 2023—less than six weeks before the termination date." Op.20.

*Finally*, it is hard to comprehend the FTC's arguments for "why the motion could not be filed earlier," Mot. *iii*. The district court sent the parties a copy of its ruling on the evening of Monday, July 10 (six working days after the close of evidence), giving the FTC more than four days to seek emergency relief before the expiration of the TRO at 11:59 PM on Friday, July 14. For reasons unknown and unexplained, the FTC did not file any emergency motion until Thursday, July 13, and did not file its motion in this Court until well after the close of business on that date,

seeking an order granting extraordinary relief within 28.5 hours.[1] The Court should not mistake the FTC's litigation gamesmanship for an emergency meriting this Court's deviation from the ordinary appellate process.

---

[1] In fact, in its district court motion filed at 11:49 a.m. PDT, the FTC represented that it was filing this motion "contemporaneously." Dkt.313. It did not actually file this motion until 7:37 p.m. PDT. In the intervening nearly eight hours, Microsoft and Activision responded to the FTC's district court motion (Dkt.315) and the district court denied (Dkt.317) the FTC's motion.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Under Federal Rule of Appellate Procedure 26.1, Defendants-Appellees state as follows:

Defendant-Appellee Microsoft Corp. ("Microsoft") is a publicly held company that has no parent corporation, and no publicly held corporation owns 10% or more of more of its stock.

Defendant-Appellee Activision Blizzard, Inc. ("Activision") is a publicly held company that has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

July 14, 2023

/s/ Beth Wilkinson
*Counsel for Microsoft Corp.*


/s/ Steven C. Sunshine
*Counsel for Activision Blizzard Inc.*

# TABLE OF CONTENTS

RESPONSE TO RULE 27-3 CERTIFICATE.............................i

CORPORATE DISCLOSURE STATEMENT..........................iv

TABLE OF AUTHORITIES....................................vii

INTRODUCTION...........................................1

JURISDICTIONAL STATEMENT .............................. 4

BACKGROUND .......................................... 4

ARGUMENT ............................................ 7

I.      The Government Will Not Prevail on Appeal................. 8

    A.      The District Court Correctly Applied Well-Settled Precedent. ................................................ 8

    B.      The District Court Properly Found the FTC Had Not Shown Likely Competitive Harm to the Console Market. 12

    C.      The District Court Properly Found that the FTC Did Not Show Likely Competitive Harm to the Putative Content-Library or Cloud-Gaming Markets..................... 15

        1.      The Expansion of Activision Games to New Platforms Is Not Anti-Competitive............................. 16

        2.      The District Court Properly Considered the Post-Merger World, Including Microsoft's Contracts......... 19

    D.      Withholding *Call of Duty* Would Not Be Anticompetitive In Any Event. ....................................... 21

II.     The FTC Has Failed to Show a Risk of Irreparable Harm, and the Balance of Equities Militates Against an Injunction Pending Appeal. .......................................... 23

A.     Denial of an Injunction Pending Appeal Will Not Harm the FTC or the Public.............................................................. 23

B.     An Injunction Would Substantially Harm the Public and Defendants. ........................................................................... 25

CONCLUSION ........................................................................................ 28

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beech Aircraft Corp. v. United States*,
    51 F.3d 834 (9th Cir. 1995) ............................................................ 18

*Bhd. of Ry. & S.S. Clerks v. Nat'l Mediation Bd.*,
    374 F.2d 269 (D.C. Cir. 1966) ........................................................ 9

*Brown Shoe v. United States*,
    370 U.S. 294 (1962) ................................................................ 20, 21

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ................................................................ 29, 30

*Cascadia Wildlands v. Thrailkill*,
    806 F.3d 1234 (9th Cir. 2015) ........................................................ 9

*Doe v. San Diego Unif. Sch. Dist.*,
    19 F.4th 1173 (9th Cir. 2021) ........................................................ 9

*FTC v. Arch Coal, Inc.*,
    329 F. Supp. 2d 109 (D.D.C. 2004) ............................................. 15, 30

*FTC v. Exxon Corp.*,
    636 F.2d 1336 (D.C. Cir. 1980) ..................................................... 12

*FTC v. Foster*,
    2007 WL 1827098 (D.N.M. May 30, 2007) ................................... 36

*FTC v. H.J. Heinz Co.*,
    164 F. Supp. 2d 659 (D.D.C. 2001) ............................................... 36

*FTC v. H.J. Heinz Co.*,
    246 F.3d 709 (D.C. Cir. 2001) .................................................. 34, 36

*FTC v. LabCorp. of Am.*,
    2011 WL 3100372 (C.D. Cal. Mar. 11, 2011) ............................. 14, 35

*FTC v. Meta Platforms Inc.*,
   2023 WL 2346238 (N.D. Cal. Feb. 3, 2023) ............................ 12, 13

*FTC v. Pharmtech Rsch., Inc.*,
   576 F. Supp. 294 (D.D.C. 1983) ..................................................... 35

*FTC v. RAG-Stiftung*,
   436 F. Supp. 3d 278 (D.D.C. 2020) .................................. 14, 16, 30

*FTC v. Steris Corp.*,
   133 F. Supp. 3d 962 (N.D. Oh. 2015) ........................................... 14

*FTC v. Thomas Jefferson Univ.*,
   505 F. Supp. 3d 522 (E.D. Pa. 2020) ............................................ 13

*FTC v. Warner Commc'ns Inc.*,
   742 F.2d 1156 (9th Cir. 1984) .................................... 12, 16, 17, 35

*FTC v. Weyerhaeuser Co.*,
   665 F.2d 1072 (D.C. Cir. 1981) ........................................ 13, 34, 35

*Int'l Shoe Co. v FTC*,
   280 U.S. 291 (1930) ....................................................................... 11

*Martinez v. Clark*,
   68 F.4th 1195 (9th Cir. 2023) ....................................................... 10

*McWane, Inc. v. FTC*,
   783 F.3d 814 (11th Cir. 2015) ....................................................... 25

*Mo. Portland Cement Co. v. Cargill Inc.*,
   498 F.2d 851 (2nd Cir. 1974) ........................................................ 34

*Paddock Pubs., Inc. v. Chi. Tribune Co.*,
   10 F.3d 42 (7th Cir. 1996) ............................................................. 24

*Tenet Health Care*,
   186 F.3d 1045 (8th Cir. 1999) ...................................................... 31

*United States v. AT&T, Inc.*,
   310 F. Supp. 3d 161 (D.D.C. 2018) ................................................. 5

*United States v. AT&T, Inc.,*
  916 F.3d 1029 (D.C. Cir. 2019)...................................... 1, 10, 27, 30

*United States v. Greater Buffalo Press, Inc.,*
  402 U.S. 549 (1971) ...................................................................31

*United States v. Marine Bancorporation, Inc.,*
  418 U.S. 602 (1974) ...................................................................32

*United States v. Microsoft Corp.,*
  253 F.3d 34 (D.C. Cir. 2001) .................................................23, 25

*United States v. UnitedHealth Group,*
  2022 WL 4365867 (D.D.C. Sept. 21, 2022) ..........................5, 19, 30

*Va. Petroleum Jobbers Ass'n v. FERC,*
  259 F.2d 921 (D.C. Cir. 1958)...........................................................8

## Statutes

15 U.S.C. §29(a) .............................................................................4

15 U.S.C. § 18 ...............................................................................10

28 U.S.C. §1291 .............................................................................4

# **INTRODUCTION**

This merger involves the acquisition by Microsoft, manufacturer of the lowest-selling videogame console, of Activision, one of many developers of videogames. As the district court found, in a careful and thorough opinion, this merger will make the gaming industry more competitive. Activision's popular video game franchises, including *Call of Duty*, will remain available to consumers everywhere they are today. But the transaction will also increase access to Activision's games by allowing consumers to access them in new ways, on new platforms, and at lower prices.

The FTC's challenge to this procompetitive merger has been extraordinary from the start. On the merits, the FTC asked the district court to be the first in decades to find a vertical merger unlawful—and the first in history to enjoin a vertical merger under Section 13(b). The lack of precedent for the FTC's case is unsurprising: Unlike horizontal mergers, vertical mergers do not involve any presumption of harm because they do not eliminate a competitor from the marketplace and are widely recognized to be procompetitive. *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019). The U.S. antitrust agencies have rarely sought to enjoin vertical mergers and have lost every recent case

when they tried. And this case is an exceptionally poor vehicle for a change of direction because the acquirer is a weaker competitor who has committed to expanding access to the content it is acquiring.

Procedurally, the "emergency" here is of the FTC's own making. Although the FTC has long known that the defendants' merger agreement has a **July 18, 2023**, termination date, it departed from its usual approach and waited until June 12 to sue in federal court. The agency sought to kill the transaction by asking the district court to enjoin the merger pending resolution of the FTC's underlying administrative proceedings—a multi-year process that no unconsummated merger has ever survived.

The district court, however, put the FTC's unprecedented case to the test on an expedited schedule. Just ten days after the complaint was filed, the district court held a five-day evidentiary hearing featuring hundreds of exhibits and the testimony of 16 witnesses. And as the district court found in its meticulously detailed 53-page opinion, Dkt.305, ("Op."), the FTC's case collapsed at trial. Indeed, the district court repeatedly found "no evidence" to support the FTC's claims of harm in any of its

alleged markets under governing law. The court further found, as an independent ground for denying the FTC's motion, that a preliminary injunction (1) would harm consumers by "skuttling the merger," given the FTC's long process and the July 18 termination date, and (2) is unnecessary because Microsoft could readily divest Activision if the FTC's administrative process ultimately produces a judicially affirmed order requiring that outcome. Op.51-52.

The FTC now asks this Court to take a still more extraordinary step: Having failed to convince the district court to enjoin the transaction, and having delayed several days in seeking relief, the FTC now requests that this Court issue its own injunction to likely destroy this major, pro-competitive transaction on 28.5 hours' notice. The FTC identifies no plausible basis for that request. On the merits, the FTC misrepresents the standards that should apply in vertical merger cases like this one—standards that the district court faithfully applied. The government's suggestion that its burden of proof should be close to the floor is belied by decades of precedent and the long (and growing) list of unsuccessful vertical merger challenges. The FTC also curiously focuses its attention on its claim involving "foreclosure in the multi-game content subscription

services market," Mot. 14-15 (cleaned up), even though it presented virtually no evidence about that market at trial, and the evidence showed that the transaction will make that market *more competitive*. As to the equities, the FTC offers no real responses to the district court's considered findings and the reality that the merger could be unwound in the unlikely event the FTC were to prevail at a second trial.

The FTC may want the law to be different than it is, but this case is not the place to start. The motion for injunction pending appeal should be denied.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 15 U.S.C. § 29(a) and 28 U.S.C. § 1291.

## BACKGROUND

The background of this matter is set forth in detail in the district court's opinion. Op.2-21. Defendants emphasize the following points.

*First,* this is a vertical merger—not a horizontal merger—and it will not increase concentration in any market alleged by the FTC. Op.50-51. Because such mergers are often procompetitive, *see United States v. AT&T, Inc.*, 310 F. Supp. 3d 161, 197 (D.D.C. 2018), *aff'd*, 916 F.3d 1029

(D.C. Cir. 2019), U.S. antitrust agencies have rarely even tried to challenge them, Op.21 n.4, and their recent efforts to block them have all failed. *E.g.*, *AT&T*, 310 F. Supp. 3d 161; *United States v. UnitedHealth Grp., Inc.*, 630 F. Supp. 3d 118 (D.D.C. 2022).

*Second*, Microsoft and Activision lack market power. Microsoft's Xbox is a distant third-place manufacturer of gaming consoles. Op.5. Similarly, Activision is neither the biggest nor the most successful game publisher: Its share of the console publishing market is only 7.4 percent by global revenue and 12.1 percent in the United States. Dkt.306 (Defs.' FOF) ¶136.

*Third*, contrary to its suggestions to this Court, the FTC's evidence at trial heavily focused on an implausible concern that Microsoft could "foreclose" market-leading Sony by refusing to make Activision games, and specifically a single game, *Call of Duty*, available on the PlayStation console. Op.31-32. But the undisputed evidence at trial showed that it would be economically disastrous for Microsoft to do so, hollowing out much of the value Microsoft accounted for in its purchase price and alienating gamers. Op.44. Indeed, Microsoft has offered Sony a 10-year deal for access to *Call of Duty* on terms the district court addressed in its

ruling. Op.38-39. Sony has so far rejected that offer. Op.39-40. But PlayStation's own CEO admitted that the merger "[i]s not an xbox exclusivity play at all," and predicted that Sony "will continue to see [*Call of Duty*] on PS for many years to come." Op.34.

*Finally*, the evidence at trial showed that the merger will expand choice for gamers and developers in several ways. The transaction will make Activision games available on Microsoft's Game Pass subscription service for the first time. The plain facts established at trial are that (1) Game Pass benefits consumers, because the gamers can get a wide variety of content for a single monthly price; (2) Activision does not believe in the subscription business model, does not put new games into *any* subscription services, and would not do so absent the merger; and (3) Microsoft will take that step post-transaction. The FTC was unable to contradict this straightforward, procompetitive factual reality at trial, and spent little time doing so, even though it newly focuses on this aspect of the case for purposes of its Motion to this Court.

Consistent with Microsoft's goal of expanding access, the transaction will also bring Activision games to cloud streaming services (for the

first time), Op.47-49, and *Call of Duty* to rival Nintendo (for the first time in a decade), Op.34. All these steps will increase consumer choice.

## ARGUMENT

Because an injunction pending appeal is an "intrusion into the ordinary processes of ... judicial review," *Va. Petroleum Jobbers Ass'n v. FERC*, 259 F.2d 921, 925 (D.C. Cir. 1958), it "is always an extraordinary remedy," *Bhd. of Ry. & S.S. Clerks v. Nat'l Mediation Bd.*, 374 F.2d 269, 275 (D.C. Cir. 1966). The movant must show (1) it is "likely to succeed on the merits"; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." *Doe v. San Diego Unif. Sch. Dist.*, 19 F.4th 1173, 1176-77 (9th Cir. 2021) (citation omitted). In determining whether the movant has shown a likelihood of success in the appeal, the Court further considers the "limited and deferential" review accorded to orders denying motions for a preliminary injunction, *Cascadia Wildlands v. Thrailkill*, 806 F.3d 1234, 1240 (9th Cir. 2015), and the "deferential, clearly erroneous standard" applicable to findings of fact. *Martinez v. Clark*, 68 F.4th 1195, 1199 (9th Cir. 2023).

## I. The Government Will Not Prevail on Appeal.

### A. The District Court Correctly Applied Well-Settled Precedent.

**1.** Under Section 7 of the Clayton Act, 15 U.S.C. § 18, the FTC bears the burden of demonstrating that this merger "is likely to substantially lessen competition in the relevant market." *AT&T, Inc.*, 916 F.3d at 1032; *accord, e.g.*, *Int'l Shoe Co. v FTC*, 280 U.S. 291, 298 (1930) (government must prove a challenged merger "probably will result in lessening competition to a substantial degree.").

In turn, Section 13(b) of the FTC Act authorizes a district court to issue a preliminary injunction only if the FTC makes, in the Commission's own words, "a robust evidentiary and legal showing"[2] that the transaction violates the underlying Section 7 standard. In other words, the FTC's evidence must "raise questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984) (per curiam).

---

[2] Prepared Statement of the FTC Before the S. Comm. on the Judiciary 13 (Oct. 7, 2015), https://bit.ly/3NQ354T.

8

This standard demands "more than mere questions or speculations supporting" allegations of anticompetitive conduct. *FTC v. Meta Platforms Inc.*, 2023 WL 2346238, at *8 (N.D. Cal. Feb. 3, 2023), and requires the court to consider the evidence in order to make a "preliminary assessment of the merger's impact on competition," *Warner*, 742 F.2d at 1162.

Courts have uniformly insisted on a robust showing of likely competitive harm not only because a preliminary injunction blocking a merger is an "extraordinary and drastic remedy," *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980) (citation omitted), but also because such injunctions typically "kill, rather than suspend, a proposed transaction," *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1087 (D.C. Cir. 1981). Courts have thus often rejected FTC requests for such deal-killing preliminary injunctions. *See*, *e.g.*, *Meta*, 2023 WL 2346238; *FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522 (E.D. Pa. 2020); *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020); *FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015); *FTC v. LabCorp. of Am.*, 2011 WL 3100372 (C.D. Cal. Mar. 11, 2011); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004).

**2.** Contrary to the FTC's suggestion, the district court quoted and faithfully applied this Court's precedent. *See* Op.22-23 (applying

9

*Warner*). And the Court repeatedly made clear that it was not stepping into the shoes of the FTC. It assumed the FTC was correct on numerous disputed issues and even accepted positions the court found dubious. *See, e.g.*, Op.27 ("If the Court was the final decisionmaker ….").

   **3.**   The FTC's claim (Mot.12-13) that the district court subjected its claims to too much scrutiny seeks to invent a legal error where none exists.

   The FTC faults the district court for citing "cases for permanent injunctions that decided the antitrust merits" rather than just cases applying 13(b). Mot.12 (emphases omitted). But the district court properly cited Section 7 merits cases in assessing what the FTC would ultimately have to find to prevail in its administrative challenge: a probability of substantially lessened competition. *See* Op.30-31; Mot.1 (acknowledging this standard). The court then denied the preliminary injunction because it found that the FTC had provided no evidentiary basis for meeting that Section 7 standard in the administrative proceedings. This is exactly the same approach that other courts have taken when considering FTC motions for preliminary injunctions under Section 13(b). *Compare* Op.21-23, 51 (separately delineating the Section 7 and 13(b) standards) *with*

*Warner*, 742 F.2d at 1160, 1162 (same); *RAG-Stiftung*, 436 F. Supp. 3d at 290-91 (same). It is, after all, impossible to "determine the likelihood that the Commission will ultimately succeed on the merits," *Warner*, 742 F.2d at 1160, without considering what the FTC will be required to show.

Regardless, any quibbles about the precise phrasing of the legal standard are irrelevant because the district court repeatedly found that the FTC had *no evidence* to support its claims of harm, meaning that they would have failed under *any* plausible standard. *See, e.g.*, Op.33-38 (explaining why, for *eight* different reasons plus an additional reason "not necessary to the Court's finding," the "evidence points to no incentive to foreclose [Sony]"); Op.40 ("overwhelming evidence of the combined firm's lack of incentive to pull *Call of Duty* from PlayStation"); Op.41 (FTC's expert's opinions "not based on evidence"); Op.49 (lack of "explanation, let alone evidence" why Activision would put its game on subscription services); Op.50 (similar, as to cloud). It is telling that the FTC's incomplete and revisionist narrative does not contain *a single citation* to the district court's factual findings, which "may not be set aside unless they are clearly erroneous." *Beech Aircraft Corp. v. United States*, 51 F.3d 834, 838 (9th Cir. 1995).

**B.**   **The District Court Properly Found the FTC Had Not Shown Likely Competitive Harm to the Console Market.**

The FTC now seeks to minimize the claim that occupied the vast majority of trial—the FTC's assertion that Microsoft would withhold *Call of Duty* from the PlayStation console. But the district court's analysis of that claim demonstrates that it correctly applied the law to the facts. For that reason, Defendants briefly recap the key evidence and findings from the trial court's ruling on that issue before moving to the peripheral claims the FTC now emphasizes.

**1.**   The trial evidence confirmed that Microsoft would not withhold *Call of Duty* from PlayStation. Numerous witnesses testified without contradiction that removing *Call of Duty* from PlayStation (the largest and most profitable platform for that game) would inflict severe and irreparable economic harm on Microsoft. Op.35-36. And depriving PlayStation gamers of this long-established multiplayer, multiplatform game would do irreparable damage to Microsoft's brand and devalue *Call of Duty* even for Xbox gamers by destroying the game's multiplayer community. Op.36-37. The district court properly found this evidence, and the FTC's lack of response, persuasive.

12

In addition, the CEOs of Microsoft and Xbox committed under oath to continue selling *Call of Duty* on PlayStation if Sony permits it—testimony the FTC did not rebut in any way, despite access to millions of internal company documents. Op.35-36. The district court reasonably relied on these statements as strong evidence that Microsoft would not withhold *Call of Duty* from Sony. *See UnitedHealth*, 630 F. Supp. 3d at 154-55 (holding similar pledges by executives were more "probative of post-merger behavior than [the government expert's] weighing of costs and benefits"); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 329 n.48 (1962) ("[E]vidence indicating the purpose of the merging parties, where available, is an aid in predicting the probable future conduct of the parties and thus the probable effects of the merger.").

The district court also correctly relied on real-world evidence that Microsoft will not make *Call of Duty* exclusive to Xbox. Op.35-38. As the district court found, the FTC's claims about some of Microsoft's past gaming acquisitions, Mot. 8-9, are inapposite, *see* Op.44-45. The FTC could not identify *any* instance where "an established multiplayer, multiplatform game with cross-play, that is, a game that shares *Call of Duty*'s characteristics, has been withdrawn from millions of gamers and made

13

exclusive." Op.37. Rather, the district court found Microsoft's 2014 acquisition of Mojang (maker of *Minecraft*) "exempl[ary of] how a console seller (and Microsoft in particular) behaves when acquiring a hugely popular multiplayer cross-platform game." *Id*. After Microsoft acquired Mojang, "it continued to ship *Minecraft* on all those same platforms post-acquisition and made subsequent games in the franchise (*e.g.*, *Minecraft: Dungeons* and *Minecraft: Legends*) available for Nintendo consoles and even Sony's subscription service, PlayStation Plus." *Id*.

**2.** The FTC's case predicting foreclosure fell apart at trial. Despite being the "lynchpin" of the FTC's case as to consoles, the FTC's economic expert, Professor Lee, "[did] not dispute the evidence of Microsoft's lack of an economic incentive." Op.40. His analyses, the district court found, reasoned backwards from the numbers necessary to "make exclusivity profitable," rested on manufactured inputs, and ignored a variety of relevant factors. Op.41-44.

The FTC offers not a word in defense of its expert. It does not even argue that the district court's dismantling of his opinions was erroneous, much less clearly erroneous. Therefore, the district court's conclusion that the FTC's evidence "[did] not show the combined firm will probably

have an economic incentive to withhold *Call of Duty* from PlayStation" stands unchallenged. Op.44.

* * *

In short, the district court's consideration of the FTC's primary claim at trial shows that the court did not misapply the law. Mot.12-13. Following the approach of many others, the district court evaluated the evidence to form a "preliminary assessment of the merger's impact on acquisition," and concluded that the FTC had failed to raise "serious, substantial, difficult, and doubtful" questions meriting further investigation. *Warner*, 742 F.2d at 1162; Op.22, 32.[3] That is precisely what the law required.

### C. The District Court Properly Found that the FTC Did Not Show Likely Competitive Harm to the Putative Content-Library or Cloud-Gaming Markets.

Unable to assail the district court's findings in the console market, the FTC now urges the Court to focus on alleged harm in the putative

---

[3] While adverting to the possibility of "partial[] … foreclosure" whereby Microsoft could "limit[], degrad[e], or restrict[] rivals' access to Activision games," Mot.9-10, the FTC does not challenge the district court's finding that there was no evidence either that Microsoft would engage in partial foreclosure or that such a strategy would be anticompetitive. Op.45-46.

content-library market. Mot. 14-15. This late pivot is unpersuasive. As the district court correctly found, the FTC's case as to this market and the purported cloud-gaming market[4] failed on both the law and the facts.

### 1. The Expansion of Activision Games to New Platforms Is Not Anti-Competitive.

Content-library services and cloud gaming were barely featured in the FTC's case. For good reason. The evidence was overwhelming that, but for this merger, Activision would continue withholding its content from these putative markets—as it has long done—and that Activision's content would become available in these putative markets only if this merger is consummated. It makes no sense to speak of Microsoft "foreclosing" competitors from content they would not have without the merger.

Among other evidence, the district court credited the testimony of Activision's CEO that, because of cannibalization and performance concerns, the company will maintain its existing policy against providing content to content-library and cloud-gaming services absent the merger.

---

[4] The district court assumed *arguendo* that these were relevant markets, as opposed to "simply alternative ways of playing console, PC, and mobile games," Op.28.

*See* Op.48-49. The FTC failed to "offer any explanation, let alone evidence, as to why it would be financially beneficial for Activision to change its long-held stance on subscription services," and the court found Activision content was "not likely to be available [on cloud gaming] absent the merger." Op.49-50. Accordingly, this merger will increase output and competition in these putative markets, as the FTC's expert all but admitted. Op.47-50; *see* Dkt.284 (Lee Tr.), at 608:24-609:6, 611:13-612:2; *see also* Op.48 ("The FTC does not identify evidence that disputes these pro-competitive effects.").

As the district court recognized, the FTC's expert did not offer *any* quantitative analysis to support its theories of harm related to content-library and cloud gaming markets. Op.48-50. Nor did the FTC try to show in any way that putative content-library and cloud-gaming markets are "likely" to be substantially less competitive in the world with the merger than in the but-for world without it, as required by the law. *See*, *e.g.*, *AT&T, Inc.*, 916 F.3d at 1032. Their expert explicitly disavowed such a showing, admitting that he could opine only that "an independent Activision" is somewhat "*more* likely" than the combined company would be to "support gaming services offered by Microsoft's rivals." Dkt.224 (Lee

Decl.) ¶ 196 (emphasis omitted); *accord id.* ¶¶ 189-90, 197; Dkt.284 (Lee Tr.), at 635:24-636:6. But to say that a merger makes an outcome "more" likely—for example, by raising a 5% probability to a 10% probability—is not to say that the merger makes that outcome *likely to occur*: a 10% chance of rain does not mean that rain is "likely" (or "reasonably probable").

The FTC now perversely responds that the pro-consumer *benefit* of increasing access to *Call of Duty* is somehow anticompetitive because only one subscription service, Xbox's Game Pass, will have *Call of Duty* post-merger. Mot.14-15. But that is one more subscription service than the FTC's own expert predicted would have *Call of Duty* absent the merger. In characterizing this unambiguously pro-consumer outcome as anticompetitive, the FTC commits the cardinal sin of antitrust: mistaking a competitive disadvantage for a particular *competitor* (namely, the market-dominant Sony) with harm to *competition* and consumers. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977); Op.39 (characterizing post-merger expansion of Activision content to new platforms and delivery mechanisms as "[p]erhaps bad for Sony. But good for *Call of Duty* gamers and future gamers").

### 2. The District Court Properly Considered the Post-Merger World, Including Microsoft's Contracts.

The district court also did not err in considering the binding legal agreements Microsoft has signed to bring *Call of Duty* to Nintendo's console for the first time in a decade and to cloud gaming platforms for the first time ever. Mot.15-17. This "factual reality," Op.50, cannot be ignored on the theory that these contracts are mere "proposed remedies." Mot.15-17. These agreements show both (1) that Microsoft is contractually bound to provide *Call of Duty* and other Activision games to cloud gaming competitors and (2) that it has no intention of foreclosing such competitors in the first place.[5] Such binding contractual obligations are relevant to liability because they obviously affect the probability that a transaction will result in a substantial lessening of competition.

Case after case supports this point:

- *AT&T, Inc.*, 916 F.3d at 1041: Held that the vertically integrated firm's contractual obligations to arbitrate disputes with downstream rivals about access to upstream content

---

[5] The FTC also claims (Mot.11) there is no reason to expect that these agreements will bind Microsoft or benefit the cloud gaming providers. But to suggest that Microsoft has somehow duped these sophisticated technology companies—including Nvidia, "a sophisticated publicly-traded company," Op.49, with a market capitalization of $1 trillion—is not credible. Rather, the companies' willingness to sign these agreements is proof they will be both enforceable and beneficial. *See id.*

made the government's foreclosure-related concerns "largely irrelevant."

- *RAG-Stiftung*, 436 F. Supp. 3d at 304: Relied upon the merging firms' commitment to divest a key plant to a new competitor as a basis for denying the FTC's motion for a preliminary injunction.

- *UnitedHealth,* 630 F. Supp. 3d at 139-51: Considered structural guarantees, including firewalls and customer contracts, that would prevent the disclosure of customers' competitively sensitive information as part of the government's burden to show a substantial lessening of competition.

- *Arch Coal, Inc.*, 329 F. Supp. 2d at 115 n.2: Rejecting the FTC's argument that the court could not consider a post-merger agreement to divest a subsidiary.

The FTC offers no real response. First, *United States v. Greater Buffalo Press, Inc.*, 402 U.S. 549 (1971), did not hold that such agreements can be considered only "at the subsequent remedy stage of a merits proceeding." Mot.16. In that case, "the District Court found no violation of § 7," and thus did not reach whether to order divestiture. 402 U.S. at 556. The decision says nothing about whether or when courts should consider post-merger agreements.

Second, these agreements do not represent an "efficiencies defense." Mot.16-17. The point is *not* that efficiencies justify a merger that lessens competition, but that the contracts are further merger-specific evidence of why the transaction will not lessen competition in the first place. *See*

*FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1054 (8th Cir. 1999) (holding "the district court should nonetheless have considered evidence of enhanced efficiency in the context of the competitive effects of the merger"); Op.39.

## D. Withholding *Call of Duty* Would Not Be Anticompetitive In Any Event.

Because the FTC failed to show that the combined firm was unlikely to withhold *Call of Duty* from rivals, the district court did not need to reach the ultimate question of whether such withholding was likely to "substantially to lessen competition" within the meaning of Section 7. But the FTC offered no plausible basis for predicting any such harm to competition even if Microsoft had the incentive and ability to engage in an exclusivity strategy of withholding *Call of Duty*. For that independent reason, too, the FTC is unlikely to prevail either in this appeal or in its administrative trial. *See United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) (practice has an "anticompetitive effect" only if it "harm[s] the competitive *process* and thereby harm[s] consumers").

At bottom, the FTC's case boils down to the proposition that its postulated shift of 5.5 percent of the market away from the dominant firm,

Sony, to its much smaller rival Microsoft, as a result of potential exclusivity, would somehow "substantially lessen" competition. But the FTC does not even allege that such a shift would enable Microsoft to surpass Sony; it would simply make the market *less* concentrated than it is today and presumptively *more* competitive.

More broadly, exclusivity arrangements—whether formed by a contract or as the result of vertical integration—are ubiquitous throughout the economy (and especially in the gaming industry, Op.8-10) and are generally procompetitive. *See, e.g.*, *Paddock Publ'ns, Inc. v. Chi. Trib. Co.*, 103 F.3d 42, 44 (7th Cir. 1996).[6] Any resulting "foreclosure" of third parties poses antitrust concerns only if it deprives them of efficient scale or otherwise marginalizes them as competitors. *See McWane, Inc. v. FTC*, 783 F.3d 814, 838-39 (11th Cir. 2015); *Microsoft*, 253 F.3d at 71. The FTC cites no evidence supporting such findings because there was none at trial.

---

[6] Indeed, both Sony and Nintendo have entered into a wide range of exclusivity agreements of their own with various game publishers, and each has far more such arrangements than Xbox does. *See* Op. 8.

**II.  The FTC Has Failed to Show a Risk of Irreparable Harm, and the Balance of Equities Militates Against an Injunction Pending Appeal.**

The FTC likewise cannot show irreparable harm and a favorable balance of equities to warrant an injunction pending appeal. *See supra* p.7.  Applying the appropriate legal standard, the district court reached the same conclusion.  Op.51-52.

**A.  Denial of an Injunction Pending Appeal Will Not Harm the FTC or the Public.**

**1.**  There is no plausible risk that consummation of this transaction would cause any harm to consumers or competition while this appeal is pending. As the district court noted, "[b]y pre-existing contract, *Call of Duty* will remain on PlayStation through the end of 2024." Op.52; *see U.S. v. Marine Bancorp*, 418 U.S. 602, 623 n.22 (1974) (alleged harm must be "imminent"). And, as discussed above, adding *Call of Duty* to Game Pass—the first time it will be available on any subscription service—is not a "foreclosure," still less a "harm." *See supra* §I.C.1. Thus, there will be "no foreclosure of *Call of Duty* pending the ALJ's decision." Op.52.

The FTC argues that the merger will cause irreparable, immediate harm due to Microsoft gaining access to unspecified "confidential data" that its rivals share with Activision, as well as from those rivals refusing

23

to share that information with the combined firm in the future. Mot.18. As the district court found, however, "the only evidence the FTC identifie[d] is Sony's reluctance to share its intellectual property with Microsoft and provide development kits for its consoles." Op.45. But that claim was "not merger-specific," *id.*, because Sony already shares such information with Microsoft in connection with the development of Microsoft's existing first-party games for the PlayStation. The FTC also "fails to account for all the other developers who might now be incentivized to collaborate with Xbox or one of its studios like Activision or Bethesda," Op.45, which could more than make up for any hypothetical harms from Sony's alleged future non-cooperation with Xbox.

*Second*, permitting this merger to close also poses no risk to the FTC's ability to impose an appropriate remedy in the unlikely event that it proceeds with and prevails in the administrative proceeding and is upheld on appeal. As the district court found, the post-merger company will be structured and operated in a way that would readily enable Microsoft to divest any or all of the Activision businesses as robust market participants in the unlikely event that such a divestiture is ordered. Op.3, 52; *see* Dkt.286 (Stuart Tr.), at 1035:24-1036:23 (describing plan to operate

Activision as a limited-integration studio); Dkt.253 (Hood Decl.) ¶ 6 (same). The FTC offered no evidence that post-merger remedies, including divestiture, would be ineffective. Op.52 ("What exactly about the merger would make it difficult to order an effective divestiture? The FTC does not say.").

The FTC's citations to the contrary, *see* Mot. 17, are completely off point. *Qualcomm* is not a merger case at all, and *Warner* and *Whole Foods* involved *horizontal* mergers, where the "combin[ing] operations" often means closing stores, factories, and other redundant assets that may be impossible to reconstitute if the merger is later found unlawful. *See, e.g.*, *FTC v. H.J. Heinz Co.*, 246 F.3d 709, 726 (D.C. Cir. 2001) (upholding preliminary injunction "because Beech-Nut's manufacturing facility … [and] distribution channels will be closed"). As just explained, this vertical merger raises none of these concerns.

## B.     An Injunction Would Substantially Harm the Public and Defendants.

On the other side of the equitable balance, an injunction pending appeal would injure defendants and consumers by imperiling this transaction and its competitive benefits. *See Mo. Portland Cement Co. v. Cargill Inc.*, 498 F.2d 851, 870 (2nd Cir. 1974); *Weyerhaeuser Co.*, 665 F.2d

at 1087. Here, the parties' merger agreement has a July 18 termination date, at which time Activision can terminate the deal and seek to collect a $3 billion break-up fee. Op.20.[7] Any injunction that "would force [the parties] to abandon" a merger causes "private injuries entitled to serious consideration" in balancing the equities. *Warner*, 742 F.2d at 1165.

Forcing the parties to abandon *this* merger would further harm the public equities by depriving consumers of its "beneficial economic effects and procompetitive advantages," including making "the future of the gaming industry" more competitive, Mot.1, by ensuring greater dissemination of Activision content across multiple gaming platforms. *See FTC v. Pharmtech Rsch., Inc.*, 576 F. Supp. 294, 299 (D.D.C. 1983) (citing *Weyerhaeuser Co.*, 665 F.2d at 1082-83); *see also Warner*, 742 F.2d at 1165 ("public equities" include procompetitive benefits for consumers). By con-

---

[7] These costs are clearly cognizable in the balance of the equities. *See FTC v. Weyerhaeuser, Co.*, No. 80-3175, 1981 WL 2059, at *10 (D.D.C. Mar. 25, 1981) (weighing harm to one set of shareholders from preliminary injunction); *FTC v. Lab. Corp. of Am.*, 2011 WL 3100372, at *22 (C.D. Cal., March 11, 2011) ("when the government is the plaintiff … the merging parties will not be compensated for their harm during the pendency of the injunction, which renders such harm irreparable"), *injunction pending appeal denied*, No. 11-55293 (9th Cir., March 14, 2011).

26

trast, the FTC's purported "harm in the market for multi-game subscription services" if *Call of Duty* is "offered exclusively on Game Pass," Mot. 18—which is to say, offered on *any* subscription service *for the first time*— or if Microsoft gains access to unidentified "confidential data of its rivals that is now in the possession of Activision," *id.*, is purely speculative and unsupported by the evidentiary record. Op.45, 47-49.

Finally, the FTC is simply wrong to contend that the parties could readily extend their agreement on the theory that "if the merger makes economic sense now" it will make sense after the appeal concludes. *See* Mot.19-20 (citation omitted).[8] "It is often difficult or impossible for businesses to wait fourteen plus months while the FTC determines whether a merger is anti-competitive." *FTC v. Foster*, 2007 WL 1827098, at *6 (D.N.M. May 30, 2007). This Court's appellate process alone could easily take over a year, and at minimum several months. As Activision's CEO testified at trial, if a "preliminary injunction is granted," Activision's

---

[8] The FTC's reliance on *Heinz* for this point is ironic given that the injunction granted in *Heinz* did, in fact, kill the proposed merger. *See FTC v. H.J. Heinz Co.*, 164 F. Supp. 2d 659, 659 (D.D.C. 2001) (noting that the company "announced publicly within hours of the Court of Appeals' decision [granting a preliminary injunction] that it had abandoned its plans to acquire Beech-Nut Foods").

board does not "see how the deal could continue." *See* 6/28/23 Tr. (Kotick), at 739:19-22.

## CONCLUSION

This Court should deny the FTC's motion for an injunction pending appeal.

July 14, 2023                           Respectfully submitted,

                                        /s/ Beth Wilkinson

Jonathan E. Nuechterlein               Beth Wilkinson
C. Frederick Beckner III               Rakesh N. Kilaru
William R. Levi                        Anastasia M. Pastan
Daniel J. Hay                          WILKINSON STEKLOFF LLP
Lucas W.E. Croslow                     2001 M Street, N.W., 10th Floor
SIDLEY AUSTIN LLP                      Washington, D.C. 20036
1501 K Street, N.W.                    Telephone: (202) 847-4000
Washington, D.C. 20005                 Facsimile: (202) 847-4005
Telephone: (202) 736-8000              bwilkinson@wilkinsonstekloff.com
Facsimile: (202) 736-8711
william.levi@sidley.com                Adam B. Banks
                                        WEIL, GOTSHAL & MANGES LLP
*Counsel for Defendant-Appellee*       767 Fifth Avenue
*Microsoft Corp.*                      New York, NY 10153
                                        Telephone: (212) 310-8419
Steven C. Sunshine                     adam.banks@weil.com
Julia K. York
SKADDEN, ARPS, SLATE, MEAGHER          *Counsel for Defendant-Appellee*
& FLOM LLP                             *Microsoft Corp.*
1440 New York Avenue, N.W.
Washington, DC 20005-2111
Telephone: (202) 371-7000
Facsimile: (202) 393-5760
steven.sunshine@skadden.com

28

Grant Dixton
ACTIVISION BLIZZARD, INC.
2701 Olympic Blvd Bldg B
Santa Monica, CA 90404
Telephone: 310-255-2000
Grant.Dixton@activision.com

*Counsel for Defendant-Appellee
Activision Blizzard, Inc.*

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Circuit Rule 28-2.6, Microsoft and Activision state that the Court is currently considering one case that involves the same transaction at issue in this case. In *DeMartini v. Microsoft Corp.*, No. 23-15846, the plaintiffs request that this Court reverse the District Court's denial of a preliminary injunction to enjoin the Microsoft-Activision merger.

/s/ Beth Wilkinson
*Counsel to Microsoft Corp.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This Brief complies with the type-volume limitations of Circuit Rules 27-1(1)(d) and 32-3(2) because it contains 5,331 words, excluding the parts of the brief exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f).

This Brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word 365 word processing system in 14-point Century Schoolbook font.

/s/ Beth Wilkinson
*Counsel to Microsoft Corp.*