No. 23-15992

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

FEDERAL TRADE COMMISSION,
*Plaintiff-Appellant,*

v.

MICROSOFT CORP., and
ACTIVISION BLIZZARD, INC.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-cv-2880
(Hon. Jacqueline Scott Corley, U.S. Distr. J.)

# EXCERPTS OF RECORD
## OF THE FEDERAL TRADE COMMISSION
### VOLUME 1

HOLLY VEDOVA
*Director*

JOHN NEWMAN
*Deputy Director*

SHAOUL SUSSMAN
*Associate Director for Litigation*

JAMES H. WEINGARTEN
PEGGY BAYER FEMENELLA
JAMES ABELL
CEM AKLEMAN
MEREDITH R. LEVERT
JENNIFER FLEURY
*Attorneys*

BUREAU OF COMPETITION

ANISHA S. DASGUPTA
*General Counsel*

MARIEL GOETZ
*Acting Director of Litigation*

IMAD D. ABYAD
*Attorney*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-3579
iabyad@ftc.gov

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 23-cv-02880-JSC |
| Plaintiff, | |
| v. | **PRELIMINARY INJUNCTION OPINION** |
| MICROSOFT CORPORATION, et al., | **FINAL REDACTED VERSION** |
| Defendants. | |

In December 2022, the FTC initiated an administrative action to block Microsoft's proposed acquisition of Activision—publisher of the first-person shooter video-game franchise *Call of Duty*, among other popular video games. The gist of the FTC's complaint is *Call of Duty* is so popular, and such an important supply for any video game platform, that the combined firm is probably going to foreclose it from its rivals for its own economic benefit to consumers' detriment. Discovery in the administrative action has closed, and trial before an FTC judge is scheduled to commence on August 2, 2023.

Four weeks ago, the FTC filed this action to preliminarily enjoin the merger pending completion of the FTC administrative action. Because the merger has a July 18 termination date, expedited proceedings were commenced. After considering the parties' voluminous pre-and-post hearing writing submissions, and having held a five-day evidentiary hearing, the Court DENIES the motion for preliminary injunction. The FTC has not shown it is likely to succeed on its assertion the combined firm will probably pull *Call of Duty* from Sony PlayStation, or that its ownership of Activision content will substantially lessen competition in the video game library subscription and cloud gaming markets.

## BACKGROUND

The video gaming industry represents the fastest growing form of media and entertainment with revenues larger than the film, music, and print industries. The industry consists of several components. The three billion worldwide gamers. The videogame developers who create the games. The videogame publishers who release the games. And the companies that make the devices on which gamers play the games. This action involves a merger between Activision—the developer of the *Call of Duty* video game franchise—and Microsoft—a game developer, publisher, and the manufacturer of the Xbox game console.

### A. The Parties

Microsoft made $198 billion in revenue in 2022. (PX9050-043.[1]) Gaming is part of Microsoft's More Personal Computing division. (PX9050-014.) Its gaming business includes Xbox, Xbox Game Pass (a gaming subscription service), and Xbox Cloud Gaming. (PX9050-014.) Microsoft publishes video games through Xbox Game Studios, comprising 23 game development studios, including nine studios that were included in Microsoft's acquisition of ZeniMax Media Inc., announced in September 2020 and finalized in March 2021. (Dkt. No. 226-2, Lee Decl. at ¶ 14; PX0003 at 086-087 (detailing Microsoft acquisitions of gaming studios); PX1527-002.)

Activision, a publicly traded corporation, earned $7.5 billion in revenue in 2022. (PX9388-040 (Activision 10-K 2022).) "Activision develops and publishes video games for consoles, PCs and mobile devices. Microsoft often refers to Activision, along with EA [Electronic Arts], Take-Two Interactive Software, Inc., and Ubisoft, as one of the 'Big 4' independent video game publishers." (Dkt. No. 226-2, Lee Decl. at ¶ 19.) "Activision's most successful video game franchise is *Call of Duty*, a first-person shooter video game series playable on video game consoles and PCs. "Activision also produces other popular video games for consoles, including games from the *Diablo*, *Overwatch*, *Crash Bandicoot*, and *Tony Hawk* franchises, as well as video

---

[1] Exhibit citations are to the exhibit number and the page number associated with the exhibit number. For hearing testimony, the Court has endeavored to include citations to the associated docket number. Other record citations are to material in the Electronic Case File ("ECF") with pinpoint citations to the ECF-generated page numbers at the top of the documents.

games for other devices, including games from the *Candy Crush* (for mobile devices) and *Warcraft* (for PC) franchises." (Dkt. No. 226-2, Lee Decl. at ¶ 21.)

## B.   The Proposed Merger

On January 18, 2022, Microsoft announced an agreement to acquire Activision for $68.7 billion—one of the largest, if not the largest, tech industry mergers. The agreement provides, among other things, either party may terminate the merger agreement if the transaction has not closed by July 18, 2023. (PX0083-088.) If the agreement is terminated because it has not closed, Microsoft may have to pay Activision a $3 billion termination fee. (PX0083-091, Sec. 8(c).) Following the merger, "[Activision Blizzard] will continue as the surviving corporation of the Merger and a Subsidiary of Parent [Microsoft]." (PX00083-024; *see also* RX5058 (Hood Decl.) at ¶ 6 (discussing Microsoft's plan to maintain Activision as a limited-integration studio).

## C.   The Video Game Industry

Video gaming generates hundreds of billions of dollars of revenue a year and is projected to grow substantially in the future. (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 404:12–16; Dkt. No. 285, 6/28/23 Tr. (Kotick) at 710:16–17 ("[T]he business has evolved to be what's today probably a $130 billion-a-year industry.").) Gaming grew to record high levels during the global pandemic, with people seeking at-home entertainment options more than ever before. (RX3136; Dkt. No. 285, 6/28/23 Tr. (Bailey) at 789:16–22.)

### 1.   Gaming Platforms

Video games are available to play across a wide range of platforms, including mobile, PC, and console. (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 404:6–405:3 (discussing RX3166-003); *see also* Dkt. No. 284, 6/27/23 Tr. (Bailey) at 661:3–23.) Games can be played on general purpose PCs or gaming PCs, but gaming PCs typically have more advanced hardware to allow them to play more computationally demanding games. (PX8001 (Ryan Decl.) at ¶ 15.) Conversely, games played on mobile have lower graphics and are less sophisticated than games played on consoles or gaming PCs. (PX0003-073.) The three primary console makers are Microsoft (Xbox Series X|S), Sony (PlayStation 5), and Nintendo (Switch). (PX1777-008; Dkt. No. 226-2, Lee Decl. at ¶ 13.)

United States District Court
Northern District of California

3

### a.    Console Gaming

Video game consoles are consumer devices designed for, and whose primary use is, to play video games.  (PX8001 (Ryan Decl.) at ¶ 10.)  Consumers purchase video game consoles based on the hardware features of the consoles as well as the availability of game content on the console.  (PX8001 (Ryan Decl.) at ¶¶ 4, 11; PX7053 (Ryan Dep. Tr. Vol. I) at 21:1-5.)  Console manufacturers earn revenues from several sources: sales of consoles and accessories like game controllers, headsets, supplemental storage, cables, and power supplies (*i.e.*, hardware) and revenue shares or royalties from sales of video game titles (*i.e.*, software) and accessories for the console.  (PX8001 (Ryan Decl.) ¶ 4; PX0003-016.)  Console manufacturers can also earn revenue from post-sale monetization.  For example, console manufacturers may split royalties with publishers and developers on the sale of add-on content or in-game purchases.  (PX1110-012; PX1065-003.)

Microsoft entered the gaming industry in 2001 with the launch of its first Xbox video game console, competing with the established incumbents Sony and Nintendo.  (RX5055-100.)  With every succeeding generation, Sony, Nintendo, and Xbox have remained the three major console producers, and have been engaged in what some refer to as the "console wars."  (PX7054 (Ryan Dep. Tr. Vol. II) at 25:22–26:8 (reporting since the release of PlayStation 5 and Xbox Series X|S, Xbox outsold PlayStation "about three months"); Dkt. No. 283, 6/23/23 Tr. (Spencer) at 294:23-295:6; Dkt. No. 285, 6/28/23 Tr. (Nadella) at 850:4 (describing the console market as "us and Sony and Nintendo").)

Each console generation represents an opportunity to "win" the console generation by shifting the distribution of gamers onto their respective consoles.  (PX8001 (Ryan Decl.) at ¶ 11.)  In the United States, Microsoft won Generation 7 with the Xbox 360 pitted against the PlayStation 3.  (*Id*.)  However, Sony won Generation 8 with the PlayStation 4.  (*Id*.)  In this current generation—the ninth generation—the Xbox Series X and PlayStation 5 both launched with a price of $499 in November 2020 in direct competition.  (RX5055-076, Ex. 42; PX0003-050; *see also* Dkt. No. 282, 6/22/23 Tr. (Booty) at 57:21-58:2, 58:25-59:4.)  Microsoft released the Xbox Series S at the same time as the Series X, and at the same price point ($299) as the Nintendo

4

1   Switch which had been released three years earlier.  (PX7059 (Prata Dep.) at 19:24-20:1; PX8002

2   (Prata Decl.) at ¶ 2; *see* Dkt. No. 285, 6/28/23 Tr. (Bailey) at 783:11–19; RX5055-076, Ex. 42;

3   PX0003-050.)

4        In recent years, Xbox's console has consistently ranked third (of three) behind PlayStation

5   and Nintendo in sales.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 129:3-4; Dkt. No. 283, 6/23/23 Tr.

6   (Spencer) at 295:2–6, 9-10; RX5046.)  In 2021, Xbox had a ▮▮▮ share of the console market,

7   while Nintendo and PlayStation had a ▮▮▮ and ▮▮▮ share, respectively. For console revenues and

8   share of consoles currently in use by gamers ("installed base"), Xbox trails with ▮▮▮ while

9   PlayStation and Nintendo have shares of ▮▮▮ and ▮▮▮, respectively.

10       While consoles were once the predominant form of home gaming, they now represent a

11  smaller share of video game revenue than either mobile or PC.  (Dkt. No. 282, 6/22/23 Tr. (Bond)

12  at 127:16-128:1; RX3166-003.)

13               **b.**    **Mobile Gaming**

14       Most gamers today play on mobile devices, which is also the fastest growing segment as

15  the technical capabilities of mobile devices increase.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at

16  127:24–128:1; Dkt. No. 283, 6/23/23 Tr. (Spencer) at 392:5–6, 392:10–12, 404:11, 404:21-22;

17  Dkt. No. 285, 6/28/23 Tr. (Kotick) at 712:1-12, 732:4-20; *id.* at 712:8-9 ("And so today the bulk

18  of games are played on phones . . . ."); Dkt. No. 284, 6/27/23 Tr. (Bailey) at 661:6–23; *see also*

19  RX5058 (Hood Decl.) at ¶ 14 ("$113 billion of the game industry's total revenues of $210 billion

20  came from mobile gaming in 2020").)  Growth in mobile gaming is expected to continue, as

21  microprocessors equivalent to those used in past video game consoles are increasingly becoming

22  more powerful and incorporated into phones.  (*See, e.g.*, Dkt. No. 285, 6/28/23 Tr. (Kotick) at

23  720:7-11 (explaining mobile is "the biggest part of the market").)

24               **c.**    **PC Gaming**

25       After mobile, PC gaming is the next largest source of video game revenue.  (Dkt. No. 284,

26  6/27/23 Tr. (Bailey) at 661:11-12.)  Jim Ryan, Sony Interactive Entertainment's CEO, referred to

27  PC gaming as "a very direct competitor to the PlayStation platform." (PX7053 (Ryan Dep. Tr.

28  Vol. I) at 112:17-22.)  In fact, "Sony delays the launch of their games on PC because they're

trying to drive people to buy a PlayStation." (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 363:20-22; *see also* RX5055 at ¶ 91; Dkt. No. 285, 6/28/23 Tr. (Bailey) at 786:13-787:4.)  Games can be played on general purpose PCs or gaming PCs, but gaming PCs typically have more advanced hardware to allow them to play more computationally demanding games. (PX8001 (Ryan Decl.) at ¶ 15.)

### d.    Cross-Platform Play

Games can be single-player or multi-player. Single-player games are normally story-driven, and other characters in the game are computations in the game rather than real people.  In multiplayer games, players are matched with other people of similar skill level, and players interact in real time.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 134:5-19.)  Gamers can now play certain multiplayer games across platforms.  For example, a gamer on PlayStation can now play many games with other gamers playing on another platform, like Nintendo or Xbox or PC.  That mode of play is referred to as "cross-platform" gaming or "cross-play."  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 135:7-17.)  In most multiplayer games, a gamer selects multiplayer game mode, the game matches the gamer with other gamers, and the gamers are then placed in a lobby and either enter the game or are placed in teams.  (*See* Dkt. No. 282, 6/22/23 Tr. (Bond), at 134:5-19; Dkt. No. 284, 6/27/23 Tr. (Bailey) at 669:24-670:4, 672:2-7.)  Cross-play makes games more valuable to consumers because they can play the game with friends and access larger lobbies of players. (*See, e.g.*, Dkt. No. 284, 6/27/23 Tr. (Bailey) at 669:22-670:4; Dkt. No. 285, 6/28/23 Tr. (Kotick), at 716:5–8; *see also id.* at 713:23-714:10 ("[T]he big evolution of the industry has been this transformation to the social experience."), 715:18-24.)  Many of the most popular multiplayer titles (*e.g.*, *Fortnite, PUBG*, *Call of Duty*, and *Minecraft*) allow gamers to cross-play between at least PC and console.  (*See, e.g.*, Dkt. No. 282, 6/22/23 Tr. (Bond) at 152:18-153:2 (*Call of Duty*).)

### 2.    Gaming Content

A game publisher brings games to market and sometimes provides funding to the game developer to do so.  (PX7014 (Booty Investigational Hearing "IH" Tr. at 28:5-15.)  A developer creates the assets for a game, including writing the code and designing the art.  (Dkt. No. 282, 6/22/23 Tr. (Booty) at 50:14-19; PX7014 (Booty IH Tr.) at 28:5-15.)  First-party content is created

1    and developed by a console manufacturer at an in-house studio.  (Dkt. No. 282, 6/22/23 Tr.

2    (Booty) at 50:25-51:2; Dkt. No. 226-2, Lee Decl. at ¶ 15; PX7014 (Booty IH Tr.) at 58:20–59:9.)

3    Microsoft's first-party content is created at Xbox Game Studios. (PX9050-015; PX0003-016.)

4    Some of Microsoft's first-party franchises include *DOOM*, *Forza*, *Gears of War*, *Halo*, *Minecraft*,

5    and *The Elder Scrolls*. (PX9252-001.)

6           Third-party content refers to games independently developed and published by a third-

7    party publisher.  (Dkt. No. 282, 6/22/23 Tr. (Booty) at 51:6-8; Dkt. No. 226-2, Lee Decl. at ¶ 15;

8    PX8001 (Ryan Decl.) at ¶ 5; PX0003-016.)  Occasionally, console manufacturers will publish

9    titles developed by a third-party development studio, known as second-party games.  (PX8001

10   (Ryan Decl.) at ¶ 5; PX7003 (Bond IH Tr.) at 152:2-10; PX0003-016.)  Console manufacturers

11   typically negotiate publisher license agreements with game publishers setting the terms for any

12   titles the console manufacturer ships from the publisher.  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at

13   420:11-421:2.)  For second- or third- party developers, console manufacturers create development

14   kits for those second- or -third- party developers to use to ensure the game will run on the console.

15   (Dkt. No. 282, 6/22/23 Tr. (Bond) at 156:7-17.)

16          Both consumers and industry participants acknowledge content drives sales.  As a 2021

17   Microsoft document states: "In the business of gaming, content remains king."  (Dkt. No. 226-2,

18   Lee Decl. at ¶ 22 (citing PX1070-003); *see also* PX1538-005; PX1087-001 ("well said, content is

19   king"); PX9102-009 ("The big bets we have made across content, community, and cloud over the

20   past few years are paying off … Our differentiated content is driving the service's growth.").)

21          The gaming industry recognizes four independent publishers, collectively known as the

22   "Big 4": Activision, Entertainment Arts, Take-Two, and Ubisoft. (PX1019 (Microsoft) at 004

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24                    **a.    AAA Content**

25          "AAA" content is an industry term and can be synonymous with "a tentpole title, a

26   marquee title, a big blockbuster title" that has a high development budget and high expectations

27   for sales.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 147:20-148:2 ("[AAA] tends to imply a game of a

28   certain size and scope, a certain level of investment put into the game"); PX7046 (Leder Dep.) at

United States District Court
Northern District of California

7

97:1-11; PX7011 (Spencer IH Tr. Vol. 1) at 36:22-37:3 ("I wouldn't say there's an industry definition for what AAA actually means. I think the notion of a AAA game is a game with a high development budget with presumably a high expectation for -- for sales and kind of splash when it launches."); PX8001 (Ryan Decl.) at ¶ 20 ("AAA games often feature cinematic storytelling, immersive environments, and detailed graphics.").) AAA games are "immersive," "major blockbuster titles" that tend to include "thoughtful, long storyline[s]" with significant "compute power" and "graphic fidelity." (Dkt. 228 (Joint Stip. and [Proposed] Order) at 4.) AAA games are particularly important in the gaming industry. (PX8001 (Ryan Decl.) at ¶¶ 18-23; Dkt. No. 282, 6/22/23 Tr. (Booty) at. 51:20-52:8.) Phil Eisler, Vice President and General Manager of Nvidia GeForce NOW, testified "Access to AAA titles, which are the latest, most-popular gaming franchises, is critical to the success of any gaming platform." (PX8000 (Eisler Decl.) at ¶ 30.)

Eisler explained the challenge: "[t]oday's AAA video games . . . require tens of millions of dollars (in some cases over $100 million) and years to produce." (*Id.* at ¶ 31.) Developing games has become more expensive in the last five to ten years, with games on average taking longer to develop and experiencing delays in development. (Dkt. No. 282, 6/22/23 Tr. (Booty) at 53:10-21.) The immense costs to develop quality games has limited the number of publishers with a proven track record of making AAA titles. ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ (PX1063-003.) Activision CEO Bobby Kotick concluded sustaining AAA games requires broad and deep capabilities, and even then, a AAA title is not guaranteed (though Mr. Kotick admits Activision has the capability to release a AAA game every single year). (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 43:14-22.)

### b. Exclusive Content

Each of the three major console companies is also a vertically integrated first-party game developer and publisher. And while each has a collection of platform-exclusive titles, "the Nintendo Switch, the PlayStation, they both have significantly higher number of exclusive games on their platform than Xbox does." (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 346:25–347:2; *see*

8

1 *also id.*, 6/23/23 Tr. (Spencer) at 440:24-441:4 (exclusives are "an established part of the console

2 business, the video game business, and Sony and Nintendo are very strong with their exclusive

3 games.").)

4       As a game publisher, Sony's PlayStation Studios, is responsible for blockbuster hits like

5 *God of War*, *The Last of Us*, and *Spider-Man*, the vast majority of which can be played only on

6 PlayStation. (*See* PX7053 (Ryan Dep. Tr. Vol. I) at 20:16–20:23; RX5055 at 015–016.) And as a

7 purchaser of third-party games, █████████████████████████████████████

8 ██████████████████████████████████████████████████████████

9 ████████████████████ (PX7054 (Ryan Dep. Tr. Vol. II) at 107:10–18.; Dkt. No. 283,

10 6/23/23 Tr. (Spencer) at 357:12–16.)

11       Sony views exclusive content as crucial to PlayStation's continued success and to

12 "differentiate [their] platform." (PX7053 (Ryan Dep. Tr. Vol. I) at 212:19–23; RX0079.) As a

13 result, Sony offers far more exclusive first- and third- party titles than Xbox. (PX7053 (Ryan Dep.

14 Tr.) at 169:24–170:2; Dkt. No. 283, 6/23/23 Tr. (Spencer) at 362:17–23.) Sony also enjoys "an

15 enormous competitive advantage" because it can draw on the intellectual property of "Sony

16 Music, Sony TV, and Sony's film library" for its game development. (Dkt. No. 285, 6/28/23 Tr.

17 (Kotick) at 723:13-16.) The number of exclusive games available on PlayStation dwarfs the

18 number available on Xbox, with eight exclusive games on PlayStation for every one on Xbox.

19 (RX2098-001 ("Overall, for every 1 exclusive Microsoft game, PlayStation has 8 of them."); *see*

20 Dkt. No. 284, 6/27/23 Tr. (Bailey) at 684:3–25; RX5055 at 018–019, Exs. 11A, 11B; Dkt. No. 285,

21 6/28/23 Tr. (Nadella) at 849:1–8 ("The dominant player [*i.e.*, Sony] there has defined market

22 competition using exclusives and so that's the world we live in.").)

23       Sony has often paid third-party studios to "skip" Xbox—either entirely or to delay a title's

24 release on Xbox. (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 313:4–8.) For example, on June 22,

25 2023, while this trial was happening, Square Enix released *Final Fantasy XVI*, the latest release in

26 the iconic *Final Fantasy* franchise, exclusive to PlayStation 5. Previous versions of *Final Fantasy*

27 shipped on Xbox, but the reason *Final Fantasy XVI* is a PlayStation exclusive is because Sony

28 "pa[id] to exclude Xbox." (*Id.* at 312:20–313:8, 441:18–443:1.) ZeniMax, too, was paid by Sony

United States District Court
Northern District of California

9

United States District Court
Northern District of California

1    not to ship *Deathloop* or *Ghostwire* for Xbox, and one of the reasons Microsoft bought ZeniMax

2    was concern Sony would also arrange for *Starfield* to go exclusive and skip Xbox. (*Id.* at 314:16–

3    24.)

4         In addition to exclusivity, Sony also uses its market power to extract other preferential

5    treatment from third-party game developers, including earlier release dates, exclusive marketing

6    agreements, and exclusive in-game content.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 162:1–4, 186:5–

7    8.) ███████████████████████████████████████████████████████

8    ██████████████████████████████████████████████

9    ████████████████████████████████████████████████

10   █████████████████████████████████████

11   ██████████████████████████████████████████

12   ████████████████████████████████████████████

13   ████████████████████████████████████████

14        Nintendo is also a significant first-party publisher with some of the most popular exclusive

15   game franchises in the world, including *Mario*, *Zelda* and *Pokémon*.  (RX5055 at 026–032, Exs.

16   15–19.)

17                      c.    **Activision Content**

18        Activision generates 80% of its annual revenue—which totaled $8.5 billion in fiscal year

19   2022—from three video game franchises.  These core video game franchises are *Call of Duty*,

20   which is developed by Activision; *World of Warcraft* ("*WoW*"), a PC-only game, which is

21   developed by Blizzard; and *Candy Crush*, a mobile game, which is developed by King.  (RX3166

22   at 010; RX5058 (Hood Decl.) at ¶15.)  Activision's CEO Bobby Kotick testified Activision's

23   games are "iconic" and "beloved" because of the "duration, the popularity, the joy, and the fun

24   people experience" with Activision games.   (PX7006 (Kotick IH Tr.) at 74:23-76:4; Dkt. No. 285,

25   Tr. (Kotick) at 736:1-9.)

26                      i.    **Call of Duty**

27        The *Call of Duty* games are first-person shooter games based on "military conflict through

28   history."  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 712:21-713:9; Dkt. No. 282, 6/22/23 Tr. (Bond) at

152:18-23; Dkt. No. 282, 6/22/23 Tr. (Hines) at 112:10-20.)  *Call of Duty* has a massive following, with ███████ monthly active users in 2020, according to an Activision strategy document.  (PX2094-007.)  Since its first release in 2003, *Call of Duty* has become one of the most successful video game franchises in history, earning approximately ███████ in sales revenue annually.  (PX9005-004.)  *Call of Duty* has been the best-selling game in the United States every single year for the past 13 years and the 2022 release of *Call of Duty: Modern Warfare* was the best-selling *Call of Duty* title of all time and the highest grossing entertainment opening of the year, making $2 billion dollars in the first ten days of its release.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 736:19-737:5.)

     *Call of Duty* games have been continuously available on both PlayStation and Xbox consoles since 2003.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 714:12-715:12, 720:1-6.)  Activision typically releases a new buy-to-play *Call of Duty* game every year.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 736:12-18 (*Call of Duty* released every year); Dkt. No. 282, Tr. (Bond) at 128:23-25 (games cost $70).)  This annual release cycle is unique among AAA games, with the exception of sports games, because games of this caliber often require immense time and resources that take years in between releases.  (PX8001 (Ryan Decl.) at ¶ 25.)  Activision uses four separate studios and several support studios to complete the development work necessary to launch an annual release.  (PX8001 (Ryan Decl.) at ¶ 25; PX3378-015 (Ryan Hr'g Testimony) at 52:1-19 ("[Activision has] been able to organize themselves to release basically new [*Call of Duty*] games every single year. And the games are different, unique games. There's nothing like it in the industry.").)

     The latest annual *Call of Duty* titles are playable across platforms via a cross-play feature.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 152:18-153:2.)  The introduction of cross-play to *Call of Duty* has significantly improved players' experience; the game's online multiplayer functionality thrives on a large and active player base, and cross-play has increased the number of available players.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 716:5-8 (explaining cross-play "expands the market and also makes you -- let's say you have a group of friends, not everybody's going to have the same device so it gives you the opportunity to be able to play with your friends").)

United States District Court
Northern District of California

1    Activision also develops and publishes free-to-play versions of *Call of Duty* called *Call of*

2    *Duty: Warzone*—available on PlayStation, Xbox, and Windows PC—and *Call of Duty: Mobile*

3    ("*COD: Mobile*")—available on iOS and Android mobile devices—which it monetizes through

4    optional in-game microtransactions.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 153:3-15; *see also* Dkt.

5    No. 285, 6/28/23 Tr. (Kotick) at 720:3-11.)  "Half of [the *Call of Duty* franchise's] monthly active

6    players play on phones."  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 716:17-21; *see also id.* at 719:2-6

7    ("[T]he bulk of players [in the *Call of Duty* franchise] are playing on phones.").)  Recently, *COD:*

8    *Mobile* reached 150 million monthly annual users.  (Dkt. No. 286, 6/29/23 Tr. (Stuart) at 1033:3-

9    6.)  Cross-play also exists in the free-to-play *Call of Duty: Warzone*.  (*See* Dkt. No. 285, 6/28/23

10   Tr. (Kotick) at 719:7-720:2 (noting the free-to-play Warzone is playable on PlayStation, PC, and

11   Xbox).)  *Call of Duty: Warzone* will be available on mobile this fall, and like the console and PC

12   versions, it will be available as a multiplayer game across mobile devices.  (*See* Dkt. No. 285,

13   6/28/23 Tr. (Kotick) at 720:1-10; 721:9-13.)

14        *Call of Duty* is not currently available on the Nintendo Switch.  (Dkt. No. 285, 6/28/23 Tr.

15   (Kotick) at 768:8-13.)  It is also not currently available on any cloud gaming services or

16   multigame game subscription libraries upon release.  (Dkt. No. 285, 6/28/23, Tr. (Kotick) at

17   734:2-5, 731:12-14.)

18                          **ii.    Other Activision Content**

19        King's *Candy Crush* franchise consists of casual, free-to-play puzzle games made for

20   mobile devices.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 725:25-726:6.)  *Candy Crush* generated

21   approximately ███████ in revenue in fiscal year 2022—roughly ███ of Activision's overall

22   annual revenue.  King primarily monetizes *Candy Crush* through optional in-game

23   microtransactions, and also generates revenue through in-game advertising placements.  (Dkt. No.

24   285, 6/28/23 Tr. (Kotick) at 726:24-727:4.)

25        Blizzard's popular *World of Warcraft* franchise principally consists of a massively-

26   multiplayer-online fantasy role-playing game, and related expansions and content released over

27   the course of the past 20 years.  (*See* Dkt. No. 285, 6/28/23 Tr. (Kotick) at 730:1-18.)  Blizzard

28   makes *World of Warcraft* available for PCs on a subscription-based model.  (*See, e.g.*, Dkt. No.

United States District Court
Northern District of California

285, 6/28/23 Tr. (Kotick) at 730:1-7.) The *Warcraft* franchise also includes the free-to-play mobile game, *Hearthstone*. (RX3166-010.)

Activision also develops and publishes other games, including *Diablo* and *Overwatch*, both of which are developed and published by Blizzard. Blizzard's *Diablo* franchise and *Overwatch 2* generated approximately ███████ and ███████████ in revenue in fiscal year 2022, respectively. *Diablo* is a fantasy role-playing franchise available on gaming consoles, PCs, and mobile devices. While most *Diablo* titles are available for sale on a buy-to-play basis, the mobile entry in the *Diablo* franchise, *Diablo Immortal*, is free to play. *Overwatch* is a free-to-play, multiplayer team-based shooter franchise (which was previously buy-to-play) available on gaming consoles and PCs, which Blizzard monetizes through optional in-game microtransactions. (RX3166-010.)

Indeed, the only Activision titles made available on multigame subscription services have been back-catalog games offered for a limited period of time, often for promotional purposes, rather than new games made available day and date. (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 774:9-24; *see also* Dkt. No. 285, 6/28/23 Tr. (Kotick) at 747:3-10, 750:10-13 (acknowledging occasional placement of "a very old catalog title for a short period of time" on subscription services).)

### 3. Access to Gaming Content

Gamers can access games through a growing variety of payment and distribution models. The diversity of payment and distribution models has increased the accessibility of games and expanded gamer choice. (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 392:24-393:10.) Most gamers obtain entitlements to access and play console games via the "buy-to-play" model of purchasing the games in the form of a cartridge, DVD or Blu-Ray disc, or digital download for an upfront price (*e.g.*, $70) and adding them to their own libraries. (Dkt. No. 282, 6/22/23 Tr. (Bond) at 128:23-25, 138:2-20.) Sony and Xbox also offer users the option of accessing games through subscriptions. (Dkt. No. 282, 6/22/23 Tr. (Bond) at 146:17-24, 192:25-193:3; Dkt. No. 283, 6/23/23 Tr. (Spencer) at 421:21-23; PX7053 (Ryan Dep. Tr. Vol. I) at 260:6-21.)

### a. Multi-Game Content Subscription Services

1    With multigame subscription offerings, gamers pay a flat monthly fee to access a library of

2    games.  In the case of most subscription offerings, subscribers download the games they want to

3    play to their devices (just as they would a buy-to-play game), and then play them using those

4    devices.  With some services, gamers can stream games while waiting for the game to download

5    or try out a game before downloading.  (Dkt. No. 282, 6/22/23 Tr. (Hines) at 92:23-93:5; Dkt. No.

6    282, 6/22/23 Tr. (Bond) at 145:12-146:7; *see also* Dkt. No. 285, 6/28/23 Tr. (Bailey) at 790:21-

7    791:9 (telemetry data show xCloud is "largely [used to] play[] one game they never played before

8    and not playing it ever again," which is "exactly consistent with" gamers using xCloud while the

9    game downloads)).

10    In 2017, Xbox launched Game Pass, one of the first multigame subscription offerings.

11    (Dkt. No. 282, 6/22/23 Tr. (Bond) at 140:15-23.)  Subscribers can access a broad catalog of games

12    for a set monthly fee of $9.99 (or $14.99 for the Game Pass Ultimate tier) instead of purchasing

13    the games outright (for $70 per game).  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 137:23-138:1;

14    RX5044-001.)  Approximately ███ of Game Pass subscribers subscribe to Game Pass Ultimate.

15    (PX0003-018.)  To make Game Pass more attractive, Xbox includes all games developed by its

16    studios (first-party games) in Game Pass the day of release ("day-and-date").  (Dkt. No. 286,

17    6/29/23 Tr. (Stuart) at 1047:6-15; Dkt. No. 282, 6/22/23 Tr. (Bond) at 139:6-7; RX5056 (Carlton

18    Report) at ¶ 16 n.10 ("Microsoft has a policy of putting all of its first-party games on Xbox Game

19    Pass on the game's launch date.").)  Microsoft CEO Satya Nadella has described Game Pass as

20    "Netflix for Games."  (PX7010 (Nadella IH Tr.) at 78:17-20; PX1283-008.)  Xbox Game Pass had

21    over 25 million total subscribers by the beginning of 2022.  (PX1516-039; PX9003- 003.)

22    Aside from Game Pass, Microsoft also offers Xbox Live Gold, which provides subscribers

23    with access to online, multiplayer games and a limited selection of downloadable games each

24    month among other benefits, such as audio and visual communications and certain discounts.

25    (PX0003-018; Dkt. No. 282, 6/22/23 Tr. (Bond) at 136:18-24.)  Xbox Live Gold does not provide

26    subscribers with access to the vast library of games subscribers of Xbox Game Pass for PC or

27    Console and Game Pass Ultimate receive.  (PX0003-018.)

28

United States District Court
Northern District of California

14

Sony has the second most popular content subscription service, called PlayStation Plus. PlayStation Plus has three tiers. The highest two tiers—PlayStation Plus Extra and PlayStation Plus Premium—are content subscription services. (PX7053 (Ryan Dep. Tr. Vol. I) at 17:9-14.) Those two tiers provide similar features that correspond to Microsoft's Xbox Game Pass for PC or Console and Game Pass Ultimate. (*Id.* at 17:9-22.) By subscribing to PlayStation Plus Extra, subscribers gain access to up to 400 games within PlayStation's library. (PX8001 (Ryan Decl.) at ¶ 9.) Those who subscribe to PlayStation Plus Premium receive access to a library of up to 740 games and cloud gaming services for certain games. (*Id.* at ¶ 9.) Unlike Xbox, Sony does not add any of its new first-party content to its subscription service day-and-date. (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 428:4-20; *see also* PX7053 (Ryan Dep. Tr. Vol. I) at 205:06-25.) As of July 2022, PlayStation Plus Extra had approximately ███████ subscribers and PlayStation Plus Premium had approximately ██████ subscribers. (PX7053 (Ryan Dep. Tr. Vol. I) at 17:23-18:4.)

Like Microsoft's Xbox Live Gold, the lowest tier of PlayStation Plus—PlayStation Plus Essential—offers subscribers access to online, multiplayer games and two monthly downloadable games alongside discounts on other games and cloud storage. (PX8001 (Ryan Decl.) at ¶ 9.) PlayStation Plus Essential does not provide subscribers access to the vast libraries available to subscribers of PlayStation Plus Extra and PlayStation Plus Premium. (*Id.* at ¶ 9.)

Amazon, Electronic Arts, and Ubisoft also provide content subscription services. Amazon has two tiers: (1) Prime Gaming, which is included with an Amazon Prime subscription, and (2) Luna+ which offers subscribers access to a library of games for $9.99 per month. Ubisoft likewise has two tiers: (1) PC Access for $14.99/month, and (2) Multi Access for $17.99/month. Both tiers allow subscribers to play over 100 Ubisoft games on PC (through Ubisoft Connect or Steam), including new releases available at launch, premium editions, and select third-party indie games. (PX0006-080.) Finally, Electronic Arts's EA Play can also be accessed through a subscription to Microsoft's Game Pass Ultimate. (PX7011 (Spencer IH Tr. Vol. I) at 260:3-15.)

Publishers of popular games that generate significant buy-to-play revenues are reluctant to allow their games to be included in subscription services upon release because of the significant

15

cannibalization of buy-to-play revenues that can occur. (*See* PX7053 (Ryan Dep. Tr. Vol. I) at 258:10-258:14.) For example, Activision does not allow, and has no plans to allow, its games in multigame subscription libraries upon release. (*See* Dkt. No. 285, 6/28/23 Tr. (Kotick), at 731:12-14 ("In our current long-range plan, we don't have any revenues that are being generated from a multigame subscription service"); Dkt. No. 285, 6/28/23 Tr. (Kotick) at 746:19-21 ("I would say it's just not something that we do have any plans to do or have ever done . . . .").) This "philosophical aversion" to subscription services arises from concerns that multigame subscriptions would "degrade the economics" of Activision's buy-to-play business model, are "inconsistent with the idea of starting out with free-to-play as the way that you build game universes and franchises," and possibly could lead to substantial cannibalization. (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 729:3-16, 743:22-24; *see also id.* at 744:8-11 (explaining "cannibalization would play a role" in a decision not to place games in a multigame subscription).)

Activision only rarely allows even its older back-catalog titles to be included in subscription services for brief periods of time. (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 747:3-10, 750:10-13 (acknowledging occasional placement of "a very old catalog title for a short period of time" on subscription services); *see also* PX7054 (Ryan Dep. Tr. Vol. II) at 8:7-16 (Q: "And you then said that you never asked Activision to put the current *Call of Duty* games in day and date because you thought – you knew Mr. Kotick would never agree to that right?" . . . A: "I don't know, but I don't believe he would have agreed to it."); PX7053 (Ryan Dep. Tr. Vol. I) at 258:20-24 (Q: "You have no reason to believe that Mr. Kotick and Activision would put *Call of Duty* on a subscription service like Game Pass for any length of time or day and date if this transaction is not completed, right?" . . . A: "Correct.").)

### b. Cloud Gaming Subscription Services

Cloud gaming (also known as cloud game "streaming") is a potential alternative delivery mechanism to downloading native games for play onto hardware. (Dkt. No. 282, 6/22/23 Tr. (Bond) at 131:20-132:5; PX7060 (Eisler Dep. Tr.) at 29:12-19.) Cloud gaming is a catchall term for technology that runs games on remote servers gamers can access using consoles, PCs, mobile devices, or TVs. (Dkt. No. 283, 6/23/23 Tr. (Zimring) at 468:16-469:13.) Cloud gaming can

allow gamers to play games on less highly-powered and more affordable devices. (PX7060 (Eisler Dep. Tr.) at 35:08-36:17, 45:05-08, 46:10-47:09.) It enables gamers to begin playing a game in seconds, rather than waiting for games to download or update, and streaming rather than downloading avoids burdening the storage limits on a gaming device. (https://support.xbox.com/en-US/help/games-apps/cloud-gaming/playing-console-game-from-cloud-versus-installing ("You can start playing a game in seconds. There's no waiting for games to finish installing or updating . . . download times or storage limits aren't a factor."); PX8000 (Eisler Decl.) at ¶ 17.) However, the technology and economics of cloud gaming remain challenging, particularly for latency-sensitive multiplayer games. Due to those latency issues, users sometimes experience a stuttering effect or lags in gameplay. (Dkt. No. 282, 6/22/23 Tr. (Bond) at 145:6-11; Dkt. No. 283, 6/23/23 Tr. (Spencer) at 395:10-16; PX7060 (Eisler Dep. Tr.) at 47:05-47:23.) Cloud gaming is also limited in its ability to replicate controller functions for console games streamed to mobile devices. (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 395:23-396:7; Dkt. No. 285, 6/28/23 Tr. (Kotick) at 733:15-21.)

In 2020, Microsoft added cloud gaming to its top-tier multi-game content library subscription service offering, Xbox Game Pass Ultimate. (PX9091 at 001-006.) Xbox Cloud Gaming (also referred to as xCloud) enables Xbox Game Pass Ultimate subscribers to stream certain games, as opposed to downloading games locally, and then to play those games on the device most convenient to them, including consoles, Windows PCs, tablets, and mobile phones. (PX0003 at 018.) Microsoft also offers free access to Xbox Cloud Gaming for Epic Games' *Fortnite*. (PX0003 at 019.) *Fortnite* on Xbox Cloud Gaming is separate from Game Pass Ultimate (*i.e.*, no subscription is required to play *Fortnite*), ████████████████████ ████████████████████ (PX0003-019.)

As Microsoft Gaming CEO Phil Spencer testified, Microsoft's xCloud strategy is to allow those who want to play Microsoft games on their mobile phones to "have access to those through streaming," allowing Microsoft to "find a significant number of customers given the installed base of people playing games on mobile phones." (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 393:16-394:6.) However, as a result of technical limitations, a large majority of Xbox Cloud Gaming

17

users report relying on the service primarily to play a game while it is being downloaded to play natively on Xbox. (Dkt. No. 282, 6/22/23 Tr. (Bond) at 145:12-146:7; Dkt. No. 283, 6/23/23 Tr. (Spencer) at 394:23-396:7; *see also* Dkt. No. 285, 6/28/23 Tr. (Bailey) at 790:4-791:9 (telemetry data show xCloud is "largely [used to] play[] one game they never played before and not playing it ever again," which is "exactly consistent with" gamers using xCloud while the game downloads).)

Other companies have cloud gaming, including Amazon, Nvidia, and Google. (PX0003 at 068.) Sony also has cloud gaming available on the highest tier of its PlayStation Plus subscription service, "PlayStation Plus Premium," ███████████████████████████ (PX8001 (Ryan Decl.) at ¶ 9; PX3080 at 075.) Sony's Jim Ryan acknowledged it is "quite difficult" to provide a cloud platform that "pleases customers," and he acknowledged neither he, nor "anybody in the world," can know when cloud gaming "will become a meaningful component of how gamers access games." (PX7054 (Ryan Dep. Tr. Vol. II) at 60:12-15, 64:9-20.) ██████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████ (PX3378-052 (Ryan Hr'g Testimony) at 97:14-25, 98:04-06.)

**D.      Microsoft's Post-Complaint Agreements**

Two months after the FTC filed its complaint, Xbox and Nintendo entered a ten-year agreement to bring future *Call of Duty* titles to Switch (and any successor Nintendo consoles) after the merger closes. (RX3019 (Letter of Intent); RX1212 (Agreement).) The agreement commits Xbox to releasing new *Call of Duty* titles on Nintendo simultaneously with their launch on other platforms. ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████ Dkt. No. 285, 6/28/23 Tr. (Kotick) at 776:6-16 (agreeing developers from Activision and Xbox will be able to make "a good [*Call of Duty*] game for the Switch").)

18

In the two months following Microsoft's agreement with Nintendo, Microsoft also entered into separate ten-year agreements with cloud gaming providers Boosteroid, Nvidia GeForce NOW, NWare, and Ubitus to bring Activision content to their platforms. (RX1211 (Nvidia, signed 2/20/23); RX3024 (Boosteroid, signed 3/9/23); RX3025 (Ubitus, signed 3/11/23); RX1245 (Nware, signed 4/27/23).) It has entered into a similar letter of intent with EE Limited, a subsidiary of British Telecommunications. (RX3027 (EE Limited, signed 4/7/23).) None of these companies could stream *Call of Duty* prior to the acquisition's announcement. (Dkt. No. 282, 6/22/23 Tr. (Bond) at 176:15-17; ███████████████████████████████

██████████████████████████████████████████████████████████

██████████████

Finally, while Microsoft has made repeated offers to keep *Call of Duty* on PlayStation consoles, Sony has consistently rejected these offers, including Microsoft's most recent offer to agree to keep *Call of Duty* games on PlayStation for at least 10 years. (*See* PX7054 (Ryan Dep. Tr. Vol. II) at 28:15-25, 30:11-32:19; RX5056 (Carlton Report) at ¶ 24 (noting "Sony refuses to sign a contract that Microsoft offered to guarantee PlayStation access to [*Call of Duty*]"—an offer that includes a ten-year term."); Dkt. No. 283, 6/23/23 Tr. (Spencer) at 443:23-25.) Microsoft executives have nonetheless committed publicly and under oath in court to continue to sell *Call of Duty* to Sony. (Dkt. No. 285, 6/28/23 Tr. (Nadella) at 853:9-11 (Q: "Let me ask you here today, Mr. Nadella, will you commit to continuing to ship *Call of Duty* on the Sony PlayStation?" . . . A: "A hundred percent."); Dkt. No. 283, 6/23/23 Tr. (Spencer) at 367:18-24, 368:4-10, 429:21-22, 429:25-430:1 ("my commitment is and my testimony is, to use that word, that we will continue to ship Call of -- future versions of *Call of Duty* on Sony's PlayStation platform").)

## PROCEDURAL HISTORY

On February 1, 2022, Microsoft reported the planned merger to the FTC, as required by the Hart-Scott-Rodino Antitrust Improvements Act ("HSR Act"). The FTC thereafter commenced an 11-month investigation, requiring Microsoft and Activision to produce nearly 3 million documents and sit for 15 investigational hearings. The waiting period under the HSR Act which prevents the parties from closing the transaction was extended by agreement with the FTC until November 21,

19

1      2022, and the parties thereafter agreed voluntarily to delay closing until December 12, 2022.

2          On December 8, 2022, the FTC filed an administrative complaint against the merger,

3      alleging it violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15

4      U.S.C. § 45. *See* Part 3 Complaint, In the Matter of Microsoft/Activision, No. 9412 (F.T.C. Dec.

5      8, 2022). Fact discovery in the FTC administrative proceeding, which included production of

6      nearly 1 million documents and 30 depositions, closed on April 7, 2023, followed by expert

7      discovery. An evidentiary hearing before an administrative law judge (ALJ) is scheduled to begin

8      on August 2, 2023. (Dkt. No. 1, Complaint at ¶ 16.)

9          Although the Agreement allows either party to terminate the merger agreement if the

10      transaction has not closed by July 18, 2023, and appears to obligate Microsoft to pay Activision a

11      termination fee of $3 billion, the FTC did not file this action to preliminarily enjoin the merger

12      until June 12, 2023—less than six weeks before the termination date.[2] (Dkt. Nos. 1, 7;

13      PX0083091, Sec. 8(c).) The Court related this action to a pending private antitrust action seeking

14      to stop the merger. (Dkt. No. 21; *see Demartini et al. v. Microsoft Corp.*, No. 22-08991-JSC.[3])

15      The FTC filed an emergency motion for a temporary restraining order (TRO) with their

16      Complaint, arguing Microsoft intended to proceed with the merger as soon as June 16, 2023, and

17      would not stipulate to a TRO unless the FTC filed in the United States District Court for the

18      District of Columbia, rather than the Northern District of California where the FTC indicated it

19      intended to file because this Court was already overseeing the *Demartini* action. (Dkt. No. 12-3 at

20      10-11.) The Court granted the FTC's motion for a temporary restraining order and set an

21      evidentiary hearing on the preliminary injunction motion to commence the following week. (Dkt.

22      No. 37.) The five-day evidentiary hearing commenced on June 22, 2023 and was completed on

23      June 29, 2023. The action proceeded on an expedited basis given the Agreement's impending

24

25     _____

26      [3] Shortly after the FTC filed its administrative complaint, a group of *Call of Duty* players filed
     their own action in this Court to stop the merger pursuant to Clayton Act, Sections 7 and 16.

27      *Demartini et al. v. Microsoft Corp.*, No. 22-08991-JSC. In that action, Microsoft stipulated on the
     record that the acquisition would not close before May 22, 2023. (Dkt. No. 193 at 87:2-12.)

28

United States District Court
Northern District of California

termination date.  *See FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984) (ordering expedited proceedings "[b]ecause undue delay could force the parties to abandon the proposed merger").

**LEGAL FRAMEWORK**

Section 7 of the Clayton Act prohibits mergers and acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.  "Because § 7 of the Clayton Act bars mergers whose effect 'may be substantially to lessen competition, or to tend to create a monopoly,' 15 U.S.C. § 18, judicial analysis necessarily focuses on 'probabilities, not certainties. This 'requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future; this is what is meant when it is said that the amended § 7 was intended to arrest anticompetitive tendencies in their incipiency.'" *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (citations omitted). Thus, "[i]t is well established that a section 7 violation is proven upon a showing of reasonable probability of anticompetitive effect." *Warner*, 742 F.2d at 1160.

Section 7 claims challenging horizonal mergers are generally analyzed under a "'burden-shifting framework.'  The plaintiff must first establish a prima facie case that a merger is anticompetitive. The burden then shifts to the defendant to rebut the prima facie case." *Saint Alphonsus*, 778 F.3d at 783 (citations omitted).  The Ninth Circuit Court of Appeals has not addressed whether this burden shifting framework applies in vertical merger cases such as this. Indeed, "[t]here is a dearth of modern judicial precedent on vertical mergers and a multiplicity of contemporary viewpoints about how they might optimally be adjudicated and enforced.[4]" *United States v. AT&T, Inc.*, 916 F.3d 1029, 1037 (D.C. Cir. 2019).  In *AT&T*, the only court of appeals decision addressing a vertical merger in decades, the court found the burden-shifting framework

---

[4]"[A] dearth of authority that is unsurprising, considering that the Antitrust Division apparently has not tried a vertical merger case to decision in *four* decades!" *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 193–94 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) (emphasis in original).

21

United States District Court
Northern District of California

United States District Court
Northern District of California

applied, but "unlike horizontal mergers, the government cannot use a short cut to establish a presumption of anticompetitive effect through statistics about the change in market concentration, because vertical mergers produce no immediate change in the relevant market share." *Id*. at 1032. In vertical merger cases, "the government must make a fact-specific showing that the proposed merger is likely to be anticompetitive. Once the prima facie case is established, the burden shifts to the defendant to present evidence that the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition, or to sufficiently discredit the evidence underlying the prima facie case." *Id*. (cleaned up).

## PRELIMINARY INJUNCTION

Section 13(b) of the Federal Trade Commission Act provides "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest . . . a preliminary injunction may be granted . . . ." 15 U.S.C. § 53(b). "In determining whether to grant a preliminary injunction under section 13(b), a court must 1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities." *Warner*, 742 F.2d at 1160 (citing *FTC v. Simeon Management Corp*., 532 F.2d 708, 713–14 (9th Cir. 1976)).

To satisfy the first prong, the FTC must "raise questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *Warner*, 742 F.2d at 1162 (citations omitted). In evaluating likelihood of success on the merits, the court must exercise its "'independent judgment' and evaluat[e] the FTC's case and evidence on the merits." *See FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2022 WL 16637996, at *5 (N.D. Cal. Nov. 2, 2022). Courts require such a rigorous analysis because "the issuance of a preliminary injunction prior to a full trial on the merits is an extraordinary and drastic remedy. This is particularly true in the acquisition and merger context, because, as a result of the short life-span of most tender offers, the issuance of a preliminary injunction blocking an acquisition or merger may prevent the transaction from ever being consummated." *FTC v. Exxon Corp*., 636 F.2d 1336, 1343 (D.C. Cir. 1980) (cleaned up); *see also Warner*, 742 F.2d at 1165 (9th

22

1    Cir. 1984) (ordering expedited proceedings "[b]ecause undue delay could force the parties to

2    abandon the proposed merger.").  However, the Court does not resolve conflicts in the evidence—

3    the question is simply whether the FTC "has met its burden of showing a likelihood of success on

4    the merits." *Warner*, 742 F.2d at 1164.

5         The parties sharply dispute in which forum "the Commission's likelihood of ultimate

6    success," 15 U.S.C. § 53(b), should be measured.  This question appears not to have been squarely

7    addressed by any court other than in *Meta*, 2022 WL 16637996, at *4-6.  In *Meta*, the court held

8    "Section 13(b)'s 'likelihood of ultimate success' inquiry to mean the likelihood of the FTC's

9    success on the merits in the underlying administrative proceedings, as opposed to success

10   following a Commission hearing, the development of an administrative record, and appeal before

11   an unspecified Court of Appeals."  *Id*. at *6.  The Court is persuaded by the *Meta* court's analysis

12   of this issue and adopts it here—the relevant forum for the question of likelihood of success is

13   before the ALJ in the administrative proceedings.

14                                      **ANALYSIS**

15   **I.    RELEVANT MARKET**

16        The first step in analyzing a Section 7 merger challenge is to determine the relevant

17   market. *United States v. Marine Bancorporation, Inc*., 418 U.S. 602, 619 (1974) (citing *United

18   States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957)); *see also FTC v. Qualcomm

19   Inc*., 969 F.3d 974, 992 (9th Cir. 2020) ("A threshold step in any antitrust case is to accurately

20   define the relevant market, which refers to 'the area of effective competition.'"). The relevant

21   market for antitrust purposes is determined by (1) the relevant product market and (2) the relevant

22   geographic market.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).

23        **A.    Product Market**

24        "The outer boundaries of a product market are determined by the reasonable

25   interchangeability of use or the cross-elasticity of demand between the product itself and

26   substitutes for it." *Id.* at 325.  That is, "when one product is a reasonable substitute for the other, it

27   is to be included in the same relevant product market even though the products themselves are not

28   the same. A product is construed to be a 'reasonable substitute' for another when the demand for it

United States District Court
Northern District of California

23

increases in response to an increase in the price for the other." *FTC v. Cardinal Health, Inc*., 12 F. Supp. 2d 34, 46 (D.D.C. 1998); *see also Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). The definition of the relevant market is "basically a fact question dependent upon the special characteristics of the industry involved." *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982). The overarching goal of market definition is to "recognize competition where, in fact, competition exists." *Brown Shoe*, 370 U.S. at 326; *see also Cardinal Health*, 12 F. Supp. 2d at 46 ("Because the ability of customers to turn to other suppliers restrains a firm from raising prices above the competitive level, the definition of the "relevant market" rests on a determination of available substitutes."). "The FTC bears the burden of proof and persuasion in defining the relevant market." *FTC v. Arch Coal, Inc*., 329 F. Supp. 2d 109, 119 (D.D.C. 2004), *appeal dismissed*, No. 04-5291, 2004 WL 2066879 (D.C. Cir. Sept. 15, 2004).

There is "no requirement to use any specific methodology in defining the relevant market." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd*., 20 F.4th 466, 482 (9th Cir. 2021). "[C]ourts have determined relevant antitrust markets using, for example, only the *Brown Shoe* factors, or a combination of the *Brown Shoe* factors and the HMT.[5]" *Meta*, 2023 WL 2346238, at *9 (collecting cases). *Brown Shoe* factors are "practical indicia [such] as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325.

The FTC contends the *Brown Shoe* factors establish four relevant antitrust markets: (1) high performance consoles (Xbox and Sony PlayStation); (2) multigame content library

---

[5] The HMT is a common quantitative metric used by parties and courts to determine relevant markets. *See* U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines ("2010 Merger Guidelines") § 4 (2010); *see also United States v. H & R Block, Inc*., 833 F. Supp. 2d 36, 51 (D.D.C. 2011) ("An analytical method often used by courts to define a relevant market is to ask hypothetically whether it would be profitable to have a monopoly over a given set of substitutable products. If so, those products may constitute a relevant market."). Defendants insist the HMT does not apply to vertical mergers. The Court need not decide this issue as it accepts, without deciding, the FTC's definition of the relevant markets here.

subscription services; (3) cloud gaming; and (4) a combined library subscription services and cloud gaming market.

### 1.  The Console Market

The FTC's primary market is the "high-performance console market" which it defines as Xbox and PlayStation Generation 9 (Gen 9) consoles.

#### a.  The Console Market and Nintendo Switch

The FTC seeks to limit the console market to Gen 9 consoles Xbox X|S and the PlayStation 5, and exclude the Nintendo Switch.  To be sure, the industry views Xbox and PlayStation as fierce competitors within the console market and this opinion is shared by executives for both companies.  (PX0006 at 064-65; PX1275-001; PX8001 (Ryan (Sony) Decl.) ¶¶ at 12, 14.)  However, Nintendo is likewise viewed by the industry and the public as a competitor in the console market.  The Nintendo Switch is the second most popular and fastest growing console among the three major developers.  (RX5055-012 (Bailey Report) at ¶ 13, Ex. 4; PX5000-108 (Lee Report) at ¶ 266.)  Indeed, regardless "which metric is used – console units sold, console revenues, or installed base – Xbox's console is now, and has almost always been, the third-place console."  (RX5055-012 (Bailey Report) at ¶ 13.)  Sony, Nintendo, and Microsoft all view each other as competitors within the console market.  (PX7065 (Singer Dep. Tr.) at 224:14-225:20 (confirming Xbox and PlayStation are both competitors to the Nintendo Switch); Dkt. No. 285, 6/28/23 Tr. (Nadella) at 850:4 (describing the console market as "us and Sony and Nintendo"); RX0020 at 001-002; *see* PX7053 (Ryan Dep. Tr. Vol. I) at 108:09-24.)

Further, as Microsoft's expert Dr. Bailey explained, the data suggests customers view the Switch as a gaming substitute for the PlayStation and Xbox.  Xbox and Sony data illustrate the release of the Switch in March 2017 led to a decline in the number of weekly users and hours spent per week playing Xbox and PlayStation.  (Dkt. No. 285, 6/28/23 Tr. (Bailey) at 779:2-780:21; *see* RX5055 (Bailey Report) at ¶¶ 85-87, Exs. 38-41.)  As Dr. Bailey notes, this data is powerful evidence of substitution because "[n]ot only did [Switch users] play on it and purchase it, but more *specifically Xbox gamers and PlayStation gamers switched.  They switched entirely their gaming behavior and they switched in part their gaming behavior.*"  (Dkt. No. 285, 6/28/23

United States District Court
Northern District of California

Tr. (Bailey) at 781:19-25.)  That is, existing Xbox and PlayStation users decided to spend their time and money on a different console.  (Dkt. No. 285, 6/28/23 Tr. (Bailey) at 782:5-10.)  In addition, many of the most highly played games on Sony's PlayStation and Xbox consoles are also available on the Nintendo console.  (RX5055-074 (Bailey Report) at ¶ 88.)

Certainly, some internal Microsoft and Sony documents measure performance against each other, but many include Nintendo as well.  Sarah Bond, Vice President of Xbox creator experience and ecosystem, explained this is because they measure the success of a console at least in part based on the success of other consoles launched at the same time.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 159:25-160:3.)  However, Mr. Spencer, testified his weekly reports on unit volume and share of Gen 9 hardware include the Nintendo Switch.  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 432:22-24.)  Xbox CFO Tim Stuart was questioned about how they report information regarding the console market to the Gaming Leadership Team.  (Dkt. No. 286, 6/29/23 Tr. (Stuart) at 936:4-939:3.)  While the "Console Market Size/Share" includes a break down by Gen 9 Consoles which include the Xbox X|S and PS5, it also features a break down for "Console Market" which evaluates Microsoft, Sony, *and Nintendo*.  (PX1240-019.)

The FTC insists the Nintendo Switch's pricing, performance, and content make it an improper substitute at least for purposes of its preliminary injunction motion.  As to pricing, yes, the Xbox Series X and PlayStation 5 are priced the same and a couple of hundred dollars higher than the Switch; however, Xbox set the price of its entry-level Series S to compete with the Switch.  (Dkt. No. 286, 6/29/23 Tr. (Stuart) at 1030:5-1031:5 (Q. "And do you look at Switch pricing when you're considering the pricing of Xbox Series S?" A. "Yes." Q. "And is that one of the reasons you set the price where you guys did?" A. "Yes.").)

And, there are functionality differences between the Switch and the PlayStation and Xbox consoles—the Switch is portable, and it has its own screen and less powerful hardware.  However, neither the FTC nor its expert consider the extent to which the Switch's differentiated features including its price, portability, and battery are factors the customer balances when deciding which console to purchase.  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 436:6-437:4 (describing how Nintendo made "technical decisions to enable an experience that they thought their customers

26

would want to have, and it's the best selling console right now in the market. So when I—when people try to tell me it's not competition—competitive, for any number of reasons, I don't believe that because I just look at what's selling.").)

Finally, yes, there are content differences between the Switch and PlayStation, but many of the most popular games on PlayStation and Xbox consoles are also available on the Switch, including *Fortnite*, *Minecraft*, *Rocket League*, *Lego Star Wars*, *Fall Guys*, and the *FIFA*, *MLB The Show*, and *NBA 2K franchises*. (Dkt. No. 285, 6/28/23 Tr. (Bailey) at 782:5-783:10; *see* RX5055-074 (Bailey Report) at ¶ 88.) Although some popular Xbox and PlayStation games are not available on the Switch, many of those titles are platform exclusives (*e.g.*, the *Halo* (Xbox) or *Last of Us* (PlayStation) franchises); are coming to the Switch in the near future (*e.g.*, *Hogwarts: Legacy*); or, in the case of the *Call of Duty* franchise, will become available on the Switch if the merger proceeds.

"It doesn't matter whether [Nintendo's] products are fully interchangeable with those of its competitors because perfect fungibility isn't required." *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013) (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956)). If this were the requirement, "only physically identical products would be a part of the market." *E.I. du Pont*, 351 U.S. at 394. "Instead, products must be reasonably interchangeable, such that there is cross-elasticity of demand." *Gorlick*, 723 F.3d at 1025 (citing *Brown Shoe*, 370 U.S. at 325). "The goal of market definition here is to define the boundaries of the competition within which foreclosure or disadvantaging of a participant is likely to reduce innovation, delay rivals' entry, and raise price or reduce variety or quality of the ensuing goods. The relevant market will encompass those firms whose presence drives this competition and whose foreclosure or disadvantaging may thwart it." In the Matter of Illumina, Inc. and Grail, Inc., No. 9401, 2023 WL 2823393, at *20 (F.T.C. Mar. 31, 2023).

If the Court was the final decisionmaker on the merits, it would likely find Nintendo Switch part of the relevant market. But it is not. Instead, on a 13(b) preliminary injunction, the FTC need only make a "tenable showing that the relevant market" is Gen 9 consoles. *See Warner*, 742 F.2d at 1164. Given the plethora of internal industry documents and the acknowledged

27

United States District Court
Northern District of California

differences, the FTC has met its preliminary injunction burden to show the Switch is not included in the relevant market.

**b.    The Console Market does not include PCs**

The FTC insists, and the Court agrees, the console market does not include PCs.  "While PCs are general purpose, there are also specialized gaming PCs with parts selected for high performance while running video games."  (PX8001 (Ryan Decl.) at ¶ 15.) These specialized gaming PCs are more expensive—typically costing between $800-$1500—and require a greater "technical competency" for the user.  (*Id*.)  Although some games can be played on regular PCs, there are some games "that cannot be played on low-powered PCs."  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 143:23-144:2.)  That customers may "cross-shop" between consoles and PCs does not demonstrate "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *FTC v. Whole Foods Mkt., Inc*., 548 F.3d 1028, 1040, 1043 (D.C. Cir. 2008).

**2.    Multigame Content Library Subscription Services and Cloud Gaming Markets**

As to the FTC's additional markets of the multigame content library subscription services and cloud gaming, while the Court questions whether—as Defendants posit—these are simply alternative ways of playing console, PC, and mobile games, the Court assumes without deciding they are each their own product market when considered singly or in combination.

**B.    Geographic Market**

The product market, the relevant geographic market must "correspond to the commercial realities of the industry and be economically significant." *Brown Shoe*, 370 U.S. at 336.  The geographic market encompasses the "area to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." *FTC v. Cardinal Health, Inc.*, 12 F.Supp.2d 34, 49 (D.D.C. 1998).

**1.    The Console Market**

The FTC, relying largely on Dr. Lee's analysis, insists the relevant market is the United States because (1) game prices and releases vary country-by-country; and (2) gamer preferences

United States District Court
Northern District of California

and behavior vary country-by-country and inform market participants' strategic decision. In support of his opinion, Dr. Lee cites to examples of Sony raising prices in certain countries including Canada, but not the United States, and Xbox raising prices in India and Japan, but not elsewhere. (PX5000 (Lee Report) at ¶ 259.) In addition, he notes introductory pricing for the consoles in November 2020 varied widely by country and provides examples. (*Id.*) Dr. Lee also identifies evidence Microsoft and Sony both analyze competition on a country-by-country basis and consider the United States as its own—and largest share of the business, in the case of Microsoft. (*Id.* at ¶¶ 260-261.) Finally, Dr. Lee offered evidence video game sales and exclusivity arrangements—as a corollary to console sales—varied country-by-country. For example, in a ██████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████ (PX2167-023.) Cumulatively, this evidence suggests the relevant market for competition is the United States.

Defendants' arguments in favor of a geographic market beyond the United States are unpersuasive. That Xbox gamers and *Call of Duty* gamers in the United States fall within the same age brackets as gamers in other countries, and have similar gametimes as gamers in other countries, is untethered to the question of the geographic market for *purchases* of consoles. (RX5055 (Bailey Report) at ¶¶ 120-124.) Likewise, that ██ of the top ██ game franchises are the same for Xbox gamers in the United States as for gamers in other countries, says nothing about the market for competition to *purchase* the consoles on which the games are played. (*Id.* at ¶ 125; *id.* at ¶ 126 (similar figures for PlayStation gamers).) The same is true as to the undisputed fact gamers cross-play games with gamers from other countries. (*Id.* at ¶¶ 114-116.) Dr. Bailey opines, contrary to Dr. Lee's assessment, release dates for consoles and console games are similar between the United States and other countries; however, absent evidence consumers travel to different countries to purchase games based on their availability, this similarity is not probative. (*Id.* at ¶¶ 118-119.) Finally, that console manufacturers do not distinguish between █████████ ███████ in co-marketing agreements, again does not address the relevant question. (*Id.* at ¶ 128.)

The geographic market is both the area "in which the seller operates, *and* to which the

United States District Court
Northern District of California

1    purchaser can practically turn for supplies." *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 308

2    (D.D.C. 2020) (emphasis added). While there is no dispute consoles are sold in markets outside

3    the United States, there is no evidence to suggest US consumers seeking to purchase a console

4    would look outside the United States to do so.

1.      **Multigame Content Library Subscription Services and Cloud Gaming Markets**

5    The market for multigame content library subscription services and cloud gaming is a

6    closer question; however, the Court will assume without deciding the geographic market is the

7    United States for these markets as well.

## II.      EFFECT ON COMPETITION

8    Section 7 vests courts with the "uncertain task" of making a prediction about the future.

9    *See United States v. Baker Hughes, Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990). For this reason, the

10   "allocation of the burdens of proof" assumes particular importance. *Id.* In a horizontal merger

11   case, "the government can establish its prima facie case simply by showing that the merger would

12   produce a firm controlling an undue percentage share of the relevant market, and would result in a

13   significant increase in the concentration of firms in that market," typically "by presenting market-

14   share statistics," *United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 130 (D.D.C. 2022),

15   *appeal dismissed*, No. 22-5301, 2023 WL 2717667 (D.C. Cir. Mar. 27, 2023) (cleaned up), which

16   "triggers a presumption that the merger will substantially lessen competition," *AT&T*, 310 F.

17   Supp. 3d at 192 (cleaned up). For a vertical merger, such as the Microsoft/Activision merger,

18   "there is no short-cut way to establish anticompetitive effects, as there is with horizontal mergers."

19   *Id.* at 192 (cleaned up). This is in part because "many vertical mergers create vertical integration

20   efficiencies between purchasers and sellers." *Id.* at 193; *see also Nat'l Fuel Gas Supply Corp. v.*

21   *FERC*, 468 F.3d 831, 840 (D.C. Cir. 2006) ("vertical integration creates efficiencies for

22   consumers"); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust*

23   *Principles and Their Application*, ¶ 755c (online ed. May 2023) ("Vertical integration is

24   ubiquitous in our economy and virtually never poses a threat to competition when undertaken

25   unilaterally and in competitive markets."); Dkt. No. 226-2, Lee Decl. at ¶ 58 ("Unlike in an

United States District Court
Northern District of California

United States District Court
Northern District of California

1    analysis of a horizontal merger, there is no established screen or presumption of harm based on

2    market shares or concentration for the purposes of evaluating the competitive effects of a vertical

3    merger.").

4         So, with this proposed vertical merger, the outcome "turn[s] on whether, notwithstanding

5    the proposed merger's conceded procompetitive effects, the [g]overnment has met its burden of

6    establishing, through 'case-specific evidence,' that the merger of [Microsoft] and [Activision], at

7    this time and in this remarkably dynamic industry, is likely to substantially lessen competition in

8    the manner it predicts." *See AT&T*, 916 F.3d at 1037. "Once the prima facie case is established,

9    the burden shifts to the defendant to present evidence that the prima facie case inaccurately

10   predicts the relevant transaction's probable effect on future competition, or to sufficiently discredit

11   the evidence underlying the prima facie case. Upon such rebuttal, the burden of producing

12   additional evidence of anticompetitive effects shifts to the government, and merges with the

13   ultimate burden of persuasion, which remains with the government at all times." *Id.* at 1032

14   (cleaned up). "In assessing the Government's Section 7 case, the court must engage in a

15   comprehensive inquiry into the 'future competitive conditions in a given market, keeping in mind

16   that the Clayton Act protects competition, rather than any particular competitor." *AT&T*, 310 F.

17   Supp. 3d at 190 (cleaned up) (citation omitted).

18        **A.    The FTC's Theory**

19        "The primary vice of a vertical merger or other arrangement tying a customer to a supplier

20   is that, by foreclosing the competitors of either party from a segment of the market otherwise open

21   to them, the arrangement may act as a 'clog on competition which deprives rivals of a fair

22   opportunity to compete.'" *Brown Shoe*, 370 U.S. at 323-24. The FTC insists the combined firm

23   may deprive rivals—primarily Sony—of a fair opportunity to compete in the above-defined

24   markets by foreclosing an essential supply—*Call of Duty*. In other words, *Call of Duty* is so

25   popular, and has such a loyal and dedicated following, competition will be substantially lessened

26   in the console, content library subscription, and cloud gaming markets unless Microsoft's rivals

27   have at least equal access to this particular video game.

28        The FTC argues it can establish this potential anticompetitive effect of the merger through

31

two alternative, but overlapping tests.  First, by showing the transaction is likely to give the merged firm the ability and incentive to foreclose *Call of Duty* from its rivals.  (Dkt. No. 291-2, FTC's Final Proposed Findings of Fact and Conclusions of Law (FTC's Findings and Conclusions) at p. 180 ¶ 87.)  Second, through examining the *Brown Shoe* factors, such as share of the market foreclosed, the nature and purpose of the transaction, barriers to entry, whether the merger will eliminate potential competition by one of the merging parties, and the degree of market power that would be possessed by the merged enterprise as shown by the number and strength of competing suppliers and purchasers.  (*Id.* at ¶ 88 (quoting *Brown Shoe*, 370 U.S. at 328-34); *see Illumina*, 2023 WL 2823393, at *32.)

### B.     Ability and Incentive to Foreclose

As a threshold matter, the FTC contends it need only show the transaction is "likely to increase the ability and/or incentive of the merged firm to foreclose rivals." (Dkt. No. 291-2, FTC's Findings and Conclusions at p. 181 ¶ 90.)  For support, it cites its own March 2023 decision in *Illumina*, 2023 WL 2823393, at *33.  *Illumina* reasons:

> [t]o harm competition, a merger need only create or augment either the combined firm's ability or its incentive to harm competition. ***It need not do both.*** Requiring a plaintiff to show an increase to both the ability and the incentive to foreclose would per se exempt from the Clayton Act's purview any transaction that involves the acquisition of a monopoly provider of inputs to adjacent markets.

2023 WL 2823393, at *38 (cleaned up) (emphasis added).  *Illumina*, however, provides no authority for this proposition, nor could it.  Under Section 7, the government must show a "reasonable *probability* of anticompetitive effect."  *Warner*, 742 F.2d at 1160 (emphasis added).  If there is no incentive to foreclose, then there is no probability of foreclosure and the alleged concomitant anticompetitive effect.  Likewise, if there is no ability, then a party's incentive to foreclose is irrelevant.  Indeed, the FTC's expert, Dr. Lee, analyzed the anticompetitive effects of the merger based on ability *and* incentive.  (Dkt. No. 226-2, Lee Decl. at ¶ 87 ("I evaluate whether the Merged Entity would have the *ability* and *economic incentive* to foreclose Microsoft's rivals from Activision content in the two Consoles Markets").

32

United States District Court
Northern District of California

The FTC also appears to contend it need only show the combined firm would have a greater ability and incentive to foreclose *Call of Duty* from its rivals than an independent Activision. (Dkt. No. 291-2, FTC's Findings and Conclusions at p. 181 ¶ 90.) This assertion, however, ignores the text of Section 7 which forbids mergers which may "substantially . . . lessen competition." 15 U.S.C. § 18. It is not enough that a merger might lessen competition—the FTC must show the merger will probably *substantially* lessen competition. That the combined firm has more of an incentive than an independent Activision says nothing about whether the combination will "substantially" lessen competition. *See UnitedHealth Grp.*, 630 F. Supp. 3d at 133 ("By requiring that [the defendant] prove that the divestiture would preserve exactly the same level of competition that existed before the merger, the Government's proposed standard would effectively erase the word 'substantially' from Section 7").

Thus, to establish a likelihood of success on its ability and incentive foreclosure theory, the FTC must show the combined firm (1) has the ability to withhold *Call of Duty*, (2) has the incentive to withhold *Call of Duty* from its rivals, and (3) competition would probably be substantially lessened as a result of the withholding.

### 1. Ability to Foreclose

The Court accepts the combined firm would have the ability to foreclose because it would own the *Call of Duty* franchise.

### 2. Incentive to Foreclose and the Resulting Lessening of Competition

#### a. High Performance Console Market

The Court finds the FTC has not shown a likelihood of success on its claim the combined firm would have an incentive to, and thus probably would, foreclose *Call of Duty* from Sony PlayStation.

#### i. No Incentive to Foreclose *Call of Duty*

*First*, immediately upon the merger's announcement, Microsoft committed to maintain *Call of Duty* on its existing platforms and even expand its availability. The day after the merger announcement, Microsoft's Satya Nadella and Phil Spencer spoke with Sony CEO Kenichiro Yoshida to emphasize Microsoft's commitment to enter a new agreement to extend Activision's

33

United States District Court
Northern District of California

1  obligation to ship *Call of Duty* at parity on PlayStation.  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at

2  418:16-419:16, 443:18-20; RX2172; Dkt. No. 285, 6/28/23 Tr. (Nadella) at 852:23-853:8.)  The

3  next day, Sony PlayStation CEO Jim Ryan wrote his mentor about the proposed merger: "It's not

4  an xbox exclusivity play at all.  they're thinking bigger than that, and they have the cash to make

5  moves like this.  I've spent a fair bit of time with both Phil and Bobby over the past day.  I'm

6  pretty sure we will continue to see COD on PS for many years to come."  (RX2064-001.)  Two

7  weeks later, Microsoft sent Sony a written proposal.  (PX3109.)  After reading the proposal, Ryan

8  had no concerns Microsoft was going to make *Call of Duty* exclusive.  (PX7053 (Ryan Depo. Tr.

9  Vo. I) at 186:18-21.)

10      Microsoft also contacted its competitor Valve—the company that runs the leading PC

11  game store, Steam.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 172:18-19, 173:16-19.)  Xbox sent Valve

12  a signed letter agreement committing to make *Call of Duty* available on Steam for ten years.

13  (RX1184.)  Valve did not sign the deal because they "believe strongly that they should earn the

14  business of their—the developers who put on their platform day in and day out, and so they told us

15  that they had had no need to sign that agreement and that they believed us when we said that we

16  would continue to provide [*Call of Duty*] on Steam."  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 175:16-

17  20.)

18      Microsoft even took steps to expand *Call of Duty* to non-Microsoft platforms. On the day

19  of the merger's announcement, Microsoft called the head of Nintendo North America, Doug

20  Bowser, and Nintendo's lead for partnerships, Steve Singer, to discuss a partnership to bring *Call

21  of Duty* to the Switch.  (Dkt. No. 282, 6/22/23 Tr. (Bond) at 167:24-169:18.)  Those discussions

22  led to an inked deal to bring *Call of Duty* to the Switch.  All of this conduct is inconsistent with an

23  intent to foreclose.

24      ***Second***, the deal plan evaluation model presented to the Microsoft Board of Directors to

25  justify the Activision purchase price relies on PlayStation sales and other non-Microsoft platforms

26  post-acquisition.  (PX4344-012 ███████████████████████████████████████

27  ███████████████████████████████  *see also* RX3166-016 ████████████

28  ████████████████████████████████████████████████████████████

United States District Court
Northern District of California

1    ██████████████████████  RX5058-007 (Hood Decl.) at ¶ 17 ("An essential

2    component of that valuation was the ████████ in forecasted total future sales of Activision's

3    content on all platforms, including continued sales of *Call of Duty* on Sony's PlayStation.").)  The

4    model does not rely on increased sales of Xbox consoles for any reason, let alone caused by

5    foreclosing *Call of Duty* from PlayStation.  Indeed, Microsoft's Chief Financial Officer, Amy

6    Hood, testified "[t]he possibility of making *Call of Duty* exclusive to Xbox was never assessed or

7    discussed with me, nor was it even mentioned in any of the presentations to or discussions with

8    the Board of Directors."  (RX5058-007 (Hood Decl). at ¶ 18.)  This valuation is also inconsistent

9    with an incentive to foreclose.

10         ***Third***, the deal plan evaluation model reflects access to mobile content was a critical factor

11    weighing in favor of the deal.  Of the ████████ valuation Microsoft assigned to Activision,

12    "about ████ relates to mobile."  (Dkt. No. 283, 6/23/23 Tr. (Lawver) at 254:2–256:3; *see also*

13    PX4344-012; RX5058-005 (Hood Decl.) at ¶ 12.)  Microsoft CEO Satya Nadella testified

14    acquiring Activision mobile games was part of the rationale in favor of the deal because "we don't

15    have a footprint at all."  (Dkt. No. 285, 6/28/23 Tr. (Nadella) 851:25-852:4; *see also* RX5058-006

16    (Hood Decl.), ¶ 14 (explaining Microsoft's goal of increasing "revenue from mobile transactions

17    from approximately ██████████████████████ ").)  The FTC attempts to dispute

18    this assertion by emphasizing that growing Microsoft's mobile store is a small percentage of the

19    deal's value.  But that argument ignores the "continued sales of Activision Blizzard's portfolio on

20    all platforms"—██████████████████—includes Activision's mobile content.  (RX5058-007

21    (Hood Decl.) at ¶ 17.)  And mobile is the largest and fasted growing video gaming sector.  (Dkt.

22    No. 283, 6/23/23 Tr. (Spencer) at 404:9-22.)  Microsoft's keen interest in Activision's mobile

23    content suggests the combined firm is not incentivized to withhold *Call of Duty* merely to aid the

24    shrinking console market.

25         ***Fourth***, Microsoft witnesses consistently testified there are no plans to make *Call of Duty*

26    exclusive to the Xbox.  Mr. Nadella testified he would "[a] hundred percent" "commit to

27    continuing to ship *Call of Duty* on the Sony PlayStation."  (Dkt. No. 285, 6/28/23 Tr. (Nadella)

28    853:9-11.)  Mr. Spencer testified "my commitment is and my testimony is, to use that word, that

we will continue to ship Call of -- future versions of *Call of Duty* on Sony's PlayStation platform."

(Dkt. No. 283, 6/23/23 Tr. (Spencer) at 367:18-24, 368:4-10, 429:21-22, 429:25-430:1.)

**Fifth**, there are no internal documents, emails, or chats contradicting Microsoft's stated intent not to make *Call of Duty* exclusive to Xbox consoles. Despite the completion of extensive discovery in the FTC administrative proceeding, including production of nearly 1 million documents and 30 depositions, the FTC has not identified a single document which contradicts Microsoft's publicly-stated commitment to make *Call of Duty* available on PlayStation (and Nintendo Switch). (RX5056 (Carlton Report at ¶ 127.) The public commitment to keep *Call of Duty* multiplatform, and the absence of any documents contradicting those words, strongly suggests the combined firm probably will not withhold *Call of Duty* from PlayStation.

**Sixth**, *Call of Duty's* cross-platform play is critical to its financial success. (Dkt. No. 286, 6/29/23 Tr. (Stuart) at 1039 ("Q. And is it also profitable for Xbox to continue to have games like *Minecraft* be multiplatform and cross platform? A. Absolutely. The strength of a game like *Minecraft* comes from that cross-network play. If you, you know, removed one of those platforms and one of those big user bases, not only – not only would you have a massive brand impact, you would lose a significant revenue stream that you just couldn't make up for."); Dkt. No. 285, 6/28/23 Tr. (Kotick) at 715:18-24 ("Well, if you think about like from a business perspective and from a consumer perspective, one of the most important things is building communities of players, especially now that you have the ability to compete and socialize. And so our view has always been that you want to create your content for as many platforms as possible and build your audiences to be as big as possible.").) Cross-play thus creates an incentive to leave *Call of Duty* on PlayStation.

**Seventh**, Microsoft anticipates irreparable reputational harm if it forecloses *Call of Duty* from PlayStation. Mr. Spencer testified: "[u]s pulling *Call of Duty* from PlayStation in my view would create irreparable harm to the Xbox brand after me in so many public places, including here, talking about and committing to us not pulling Call of Duty from PlayStation." (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 367:11–15). Activision CEO Bobby Kotick confirmed Microsoft's concerns are not unfounded: "if we were to remove *Call of Duty* from PlayStation, it would have

very serious reputational – it would cause reputational damage to the company."  (Dkt. No. 285, 6/28/23 Tr. (Kotick), at 725:4-7); *see also id*. at 715:18-24 ("Well, you would alienate" gamers "and you would have a revolt if you were to remove the game from one platform."); *id*. at 727:17-22 (explaining if a degraded *Call of Duty* experience were offered on other platforms "you would have vitriol from gamers that would be well deserved, and  . . . that would be very vocal and also cause reputational damage to the company").)  "[I]n assessing [Microsoft's] post-merger incentives, the Court must consider the financial and reputational costs to [Microsoft] if it were to breach or water down its firewall policies*." See UnitedHealth Grp.*, 630 F. Supp. 3d 118; *see also AT&T*, 916 F.3d at 1040 (D.C. Cir. 2019) ("Turner [Broadcasting] would not be willing to accept the 'catastrophic' affiliate fee and advertising losses associated with a long-term blackout.").  Why would Microsoft risk that brand reputational harm?  Especially since the video game console market is shrinking—not growing; it is not the future of video gaming.  (RX 5055-010.)

   **Eighth**, the FTC has not identified any instance in which an established multiplayer, multi-platform game with cross-play, that is, a game that shares *Call of Duty's* characteristics, has been withdrawn from millions of gamers and made exclusive.  (RX5056 (Carlton Report) at ¶ 15.)  To the contrary, Microsoft's 2014 acquisition of Mojang, the developer of the hugely popular *Minecraft* franchise, exemplifies how a console seller (and Microsoft in particular) behaves when acquiring a hugely popular multiplayer cross-platform game.  *Minecraft* is one of the most successful games of all time, and is Microsoft's largest game by revenue.  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 362:24-25; RX5058-005 (Hood Decl.) at ¶ 11.)  It includes a popular multiplayer mode and has produced a large community across platforms.  (Dkt. No. 282, 6/22/23 Tr. (Booty) 77:23–78:1.)  At the time of the Mojang acquisition, *Minecraft* was available on Xbox, PlayStation, and PC.  (*Id*. at 78:2–7.)  While Microsoft had the ability to make *Minecraft* exclusive, it continued to ship *Minecraft* on all those same platforms post-acquisition and made subsequent games in the franchise (*e.g.*, *Minecraft: Dungeons* and *Minecraft: Legends*) available for Nintendo consoles and even Sony's subscription service, PlayStation Plus.  (*Id*. at 78:11-79:4; 6/23/2023 (Spencer) at 421:8-423:1; RX3156.)  Xbox CFO Tim Stuart explained the decision to ship *Minecraft* on "all platforms" enabled "its mass, mass, mass market" appeal.  (Dkt. No. 286,

United States District Court
Northern District of California

1    6/29/23 Tr. (Stuart) at 976:13-977:5.)  The decision was dictated by the economics and the desire

2    not to break up existing gamer communities.  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 365:13-15

3    ("[I]f we were to acquire something that has found customer love, users, business on another

4    platform, we want to nurture and grow that for the games that we're building"); *id.* at 362:24-

5    363:5 (*Minecraft* "has reached a financial level of success where it's – it's a significant profit

6    driver for us given that it's shipping on all the platforms. So if you can get a game that's at that

7    level of hit and that level of business, the size of the business, our job is to maintain and grow

8    that."); RX1137.)

9         All of the above evidence points to no incentive to foreclose *Call of Duty*—a 20-year

10   multi-platform franchise—from Sony PlayStation.

11        ***Ninth***, on top of that evidence, although not necessary to the Court's finding, is

12   Microsoft's written offer to Sony to offer PlayStation *Call of Duty* on parity with Microsoft for 10

13   years, including on future PlayStation consoles.  (RX2170- at 002-006.)  ████████████

14   ████████████████████████████████████████████████████

15   ████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████████████████████████████████

18   ██████████████████████████████████████████

19   The offer also guarantees Activision games will be released on the same day on PlayStation and

20   Xbox, and the games will have "the same content, feature, and technical parity" on PlayStation

21   and Xbox.  (RX2170-004, § 3.3 ████████████████████████████

22   ████████████████████████████████████████████

23   ████████████████████████████████████████████

24   ████ *id.*, § 3.4 ████████████████████████████████████

25   ████████████████████████████████████████

26   ████████████████████████████████████████

27   ████████████████████████████████████████████

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The FTC disputes this written offer has any relevance to its *prima facie* burden.  It

2  contends Microsoft's binding offer is a "proposed remedy" that may not be considered until the

3  remedy phase, that is, after a Section 7 liability finding.  As support, it again relies on its own

4  2023 *Illumina* decision.  There, relying on *E.I. du Pont*, 366 U.S. at 334, the Commission held

5  such agreements are "proposed remedies," and that the defendants bear the burden of proving "the

6  offered remedy would actually be effective."  So, the FTC claims it does not have to account for

7  any agreements in its *prima facie* showing.  Illumina, Inc. & Grail, Inc., 2023 WL 2823393, at

8  *49-50.  But *E.I. du Pont* does not support the Commission's holding.  It involved a remedy

9  proposed *after* a finding of a Section 7 violation. The Court held: "once the Government has

10  successfully borne the considerable burden of establishing a violation of law, all doubts as to the

11  remedy are to be resolved in its favor." *E.I. du Pont*, 366 U.S. at 334.  *E.I. du Pont* says nothing

12  about whether the merger-challenging plaintiff must address offered and executed agreements

13  made before any liability trial, let alone liability finding; that is, whether the FTC must address the

14  circumstances surrounding the merger as they actually exist.  The caselaw that directly addresses

15  the issue contradicts the FTC's position.  *See AT&T*, 916 F.3d at 1041; *UnitedHealth Grp.*, 2022

16  WL 4365867 at *15-24; *FTC v. Arch Coal, Inc.*, No. 04-00534, Dkt. No. 67 (D.D.C. July 7, 2004).

17    Next, the FTC insists Microsoft's offer is simply insufficient.  In so arguing, it relies

18  exclusively on PlayStation CEO Ryan's testimony. (Dkt. No. 291-2, FTC's Findings of Fact and

19  Conclusions of Law at pp. 159-160 ¶¶ 787-796.)  The FTC's heavy reliance on Mr. Ryan's

20  testimony is unpersuasive.  Sony opposes the merger; its opposition is understandable.  Before the

21  merger Sony paid Activision for exclusive marketing rights that allowed Sony to market *Call of*

22  *Duty* on PlayStation, but restricted Xbox's ability to do the same.  (Dkt. No. 282, 6/22/23 Tr.

23  (Bond) at 162:19-165:8.)  After the merger, the combined firm presumably will not agree to such

24  restrictions.  Before the merger, a consumer wanting to play a *Call of Duty* console game had to

25  buy a PlayStation or an Xbox.  After the merger, consumers can utilize the cloud to play on the

26  device of choice, including, it is intended, on the Nintendo Switch.  Perhaps bad for Sony.  But

27  good for *Call of Duty* gamers and future gamers.

28

1 ███████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████████

5 ███████████  And when Microsoft purchased ZeniMax, and honored its still-in-effect contracts

6 with Sony, Sony had no issue with the product Microsoft provided.  Mr. Ryan does not identify

7 anything specific about the language that is troubling—it is just that he does not want Microsoft to

8 own Activision.  Again, no surprise, but not a reason to doubt Microsoft's offer to put *Call of Duty*

9 on PlayStation for the next 10 years with parity and day and date.

### ii.    The FTC's Incentive Evidence is Insufficient

11    Notwithstanding the overwhelming evidence of the combined firm's lack of incentive to

12 pull *Call of Duty* from PlayStation, the FTC insists it is probable the combined firm will do so

13 because it is in its financial interests.

### a.    Professor Lee's Opinion

15    The lynchpin of the FTC's argument is the expert opinion of Professor Robin Lee, an

16 economist.  Prof. Lee opines the economic benefits of making *Call of Duty* exclusive to Xbox

17 outweigh the costs.  In particular, he concludes removing *Call of Duty* from PlayStation would

18 result in a 5.5% increase in Xbox's share of the Gen 9 console market. (Dkt. No. 226-2, Lee Decl.

19 ¶ 106.)  According to Prof. Lee, that number, in turn, results in Microsoft making ███████

20 more in profits over five years.  (*Id.* at ¶ 109.)

21    Prof. Lee's opinion does not dispute the evidence of Microsoft's lack of an economic

22 incentive.  His Vertical Foreclosure model depends on two key quantitative inputs: "the customer

23 lifetime value ('LTV') of purchasers of Xbox consoles and the 'Xbox conversion rate.'"  (*Id.* at ¶

24 103.)  Looking at the conversion rate, Prof. Lee uses projected sales data to calculate the number

25 of expected PlayStation purchasers of *Call of Duty* (2025 version) who would instead choose to

26 play *Call of Duty* 2025 on Xbox consoles if not available on PlayStation.  From this number he

27 excludes PlayStation owners (1) who already own an Xbox, or (2) would choose to play *Call of*

28 *Duty* 2025 on PC if not available on PlayStation.  The conversion rate is the fraction of remaining

United States District Court
Northern District of California

1    purchasers—"affected users"—that would purchase an Xbox console to play *Call of Duty* 2025 if

2    it was not available on PlayStation. (Dkt. No. 226-2, Lee Decl. at ¶¶ 101, 103, 106.)

3         Prof. Lee's Vertical Foreclosure model *assumes* a conversion rate of 20%. (Dkt. No. 284,

4    6/27/23 Tr. (Lee) at 559:2-14 ("So with that subset of users I'm assuming 20 percent of them

5    would purchase a new Xbox[]."); *id.* at 560:2-4 (agrees the 20% rate was not computed but instead

6    was just inputted into the model).) So, the 20% figure is not based on evidence—it is an assumed

7    input. Accepting Prof. Lee's LTV of 40%, even lowering the conversion rate just a bit, to say

8    17.5%, means Prof. Lee's model estimates it would **not** be profitable to withhold *Call of Duty*

9    from PlayStation; that is, the costs in lost PlayStation *Call of Duty* sales outweigh the benefits of

10   more Xbox console sales. This relationship is reflected in Figure 11 from Prof. Lee's report

11   reproduced below:



19   (PX5000 (Lee Report) at ¶ 572, Fig. II; Dkt. No. 284, 6/27/23 Tr. (Lee) at 572:2-573:12.) Thus,

20   the "assumed" conversion rate is pivotal.

21        Prof. Lee attempts to defend the reasonableness of his 20% assumption by identifying

22   evidence he contends supports his model's output—the 5.5% share shift. In other words, the 20%

23   assumption must be correct because other evidence supports the model's result. In his direct

24   testimony Prof. Lee identified two pieces of support: (1) an internal 2019 Microsoft strategy

25   memo regarding a potential acquisition, and (2) his share model output. (Dkt. No. 226-2 ¶ 106.)

26   Neither supports his 20% conversion rate assumption.

27        First, the Microsoft memo states in a parenthetical: "an exclusive AAA release accounts

28   for a 2-4% console share shift in the US and a 1-3% shift worldwide." (PX1136-004). Prof. Lee's

41

United States District Court
Northern District of California

1  reliance on this memo snippet is misplaced.  What—if any—data is behind the statement?  Who

2  came up with those figures? How were they measuring share shift?  Shift from what console(s) to

3  what console(s)?  And, were those numbers addressing a new first-party game being released

4  exclusively?  Or was the author discussing taking a long-standing multiplatform cross-play game,

5  like *Call of Duty,* exclusive.  Prof. Lee does not know.  Further, only the global share shift matters

6  in Prof. Lee's model.  The memo snippet, for whatever it is worth, posits a 1% to 3% share shift

7  globally.  Prof. Lee testified a 2% share shift would **not** make it economically beneficial to make

8  *Call of Duty* exclusive to Xbox consoles; thus, the slide does not support Prof. Lee's 20%

9  conversion rate input. (Dkt. No. 284, 6/27/23 Tr. (Lee) at 581:1-7.)[6]

10  Second, Prof. Lee points to his share model. (Dkt. No. 226-2, Lee Decl. at ¶ 106.)  He says

11  this model results in an 8.6% share shift; therefore, the more conservative 5.5% share shift output

12  from his Vertical Foreclosure model is reasonable. But the share model output is also flawed.  As

13  a preliminary matter, it is based on Gen 8 console data from only the United States, rather than

14  global Gen 9 data.  But putting that aside, as Dr. Carlton observed, Prof. Lee's share model

15  "ignores the presence of non-exclusive games in influencing console choice" even though Prof.

16  Lee acknowledges non-exclusive games do influence console choice.  (Dkt. No. 294-2, Carlton

17  Decl. at ¶¶ 26-27.)  Prof. Lee's reply report's attempt to fix this error fails because he again

18  accords no value to non-exclusive games in consumer choice.  (*Id.* at ¶¶ 29-30.)  Further, Dr.

19  Carlton also contends Prof. Lee's share model assumes every lost PlayStation 4 results in an

20  additional Xbox sale, even though consumers may choose a different device to play *Call of Duty*

21  (PC, mobile, cloud) or to not play *Call of Duty* on any device at all.  (*Id.* at ¶¶ 32-34.)  When Dr.

22  Carlton corrects for this error, Prof. Lee's share model is between 1% and 54% of what Prof. Lee

23  predicts and thus does not support his critical 20% conversion rate.  (*Id.* at ¶ 35.)

---

[6] Undaunted, Prof. Lee insists even the 2-3% share shift is consistent with his 5.5% estimate because *Call of Duty* has such high sales compared to other AAA titles, so *Call of Duty's* share shift will be higher.  (Dkt. No.226-2, Lee Decl. at ¶¶ 32, 104; Dkt. No. 291-2, FTC's Findings and Conclusions at pp. 100-101 ¶ 499.)  That circular assertion, however, relies upon his share model which, discussed next, is flawed.

And what does Prof. Lee say about Dr. Carlton's criticism?  Nothing in his direct testimony.  (*See* Dkt. No. 262-2, Lee Decl.)  At the evidentiary hearing on re-direct?  Nothing.  (Dkt. No. 284, 6/27/23 Tr. (Lee) at 615:9-651:22.)  And when the FTC cross-examined Dr. Carlton on his written direct testimony?  Again, nothing.  (Dkt. No. 285, 6/28/23 Tr. (Carlton) at 855:6-898:1.)  The FTC chose not to challenge, or even address, Dr. Carlton's identification of material flaws in Prof. Lee's share model.  The criticism thus stands unscathed—and persuasive.  So, the share model does not justify Prof. Lee's reliance on the strategy memo snippet reporting console shares move 1% to 3% globally with exclusive AAA content.

Finally, Prof. Lee's expert report relies on a third piece of evidence to justify the 20% conversion rate and the resulting 5.5% share shift figure; namely, a couple of slides from a Microsoft presentation to British regulators.  (PX5000-345 (Lee Report) at ¶ 762 & n. 959.)  One slide shows the results of a "YouGov" survey and, according to Prof. Lee, shows "3% of existing PlayStation gamers 'would have purchased an Xbox instead' if *Call of Duty* were not available on PlayStation and that 5% of gamers planning to buy a PlayStation 'will purchase Xbox instead' if *Call of Duty* were not on PlayStation." (RX5000-345 (Lee Report) at ¶ 762; RX5054-012; Dkt. No. 284, 6/27/23 Tr. (Lee) at 591:24-594:7.)

But that is not what the survey says. The survey did not report 5% of *all* future PlayStation purchasers converting; it reported conversion rates of future purchasers whose first or second-most favorite game would not be available on the console the gamers plan on purchasing.  (RX5053-006.)  Prof. Lee opines 5% of all gamers planning to buy a PlayStation (regardless of whether they play *Call of Duty*) converting to Xbox is similar to his 20% of PlayStation "affected users" converting, so the slide supports his 20% conversion rate.  But Prof. Lee's assumption as to what was being measured was wrong.  The slide does not support his conversion rate.  In any event, before Prof. Lee could persuasively opine the "pivotal" conversion rate is supported by a survey result, he would need to be familiar with the survey and its design.  As his testimony showed, he was not.

Dr. Lee's opinion suffers from several additional weaknesses.  It fails to consider Microsoft's agreement with Nintendo and the cloud streaming services to provide ongoing access

43

to *Call of Duty*—all of which will increase access.  It also fails to consider Microsoft's offer to Sony. Nor did he consider any reputational harm to Microsoft from pulling *Call of Duty* from millions of players.  Regardless, for the reasons explained, his opinion does not show the combined firm will probably have an economic incentive to withhold *Call of Duty* from PlayStation.  He simply assumed a concession rate for his model that would make exclusivity profitable, but there is no evidence to support that assumption.

### b.    ZeniMax

While the FTC asserts Microsoft's 2014 *Minecraft* acquisition is not relevant to how it will treat *Call of Duty*, it insists Microsoft's 2021 acquisition of ZeniMax is predictive of how the combined firm will behave.  Specifically, although Microsoft's deal valuation shared with the Board of Directors contemplated keeping ZeniMax content multiplatform, it later decided to make two new ZeniMax titles—*Starfield* and *Redfall*—exclusive.  Agreed this evidence shows Microsoft's deal valuation for the Activision acquisition is not dispositive of the incentive question.  But it does not dispute the evidence that Microsoft does not have an incentive to withdraw *Call of Duty* from PlayStation. Neither *Starfield* nor *Redfall* are remotely similar to *Call of Duty*. *Starfield* is a role-playing game that has not been released.  *Redfall* is a first-person shooter game that was only released in May 2023.

The question is whether it makes financial sense to wrest *Call of Duty* from PlayStation. As Jamie Lawver, head of finance for Xbox Studios explained, taking *Call of Duty* exclusive would be ███████ more costly to Xbox than taking some ZeniMax games Xbox exclusive. (Dkt. No. 277, 6/23/23 Tr. (Lawver) at 261:2-8.)  It would therefore be "financially impossible for us to figure out how we would recover from losing *Call of Duty* on its largest console platform" given "the size of *Call of Duty* [and] the role it plays in the valuation of buying Activision."  (Dkt. No. 283, 6/23/23 Tr. (Spencer) at 366:8-12; *see also,* Dkt. No. 277, 6/23/23 Tr. (Lawver) at 261:9-22 (Q: "[C]ould Xbox plausibly make up the lost PlayStation profits if it took Call of Duty exclusive in your opinion?" . . . A: "I don't think so."); Dkt. No. 285, 6/28/23 Tr. (Nadella) at 852:10-19 (explaining a strategy of "forego[ing] sales of *Call of Duty* on the PlayStation to sell more consoles" "makes no economic sense and no strategic sense").)

44

## c. Effect on Innovation

The FTC also insists the merger will decrease innovation because game developers and publishers will not want to work with Microsoft. But the only evidence the FTC identifies is Sony's reluctance to share its intellectual property with Microsoft and provide development kits for its consoles. But this is not merger-specific and it fails to account for all the other developers who might now be incentivized to collaborate with Xbox or one of its studios like Activision or Bethesda. *Cf. UnitedHealth Grp.*, 650 F. Supp. 3d at 151 ("The Government did not call a single rival payer to offer corporate testimony that it would innovate less or compete less aggressively if the proposed merger goes through. Nor did any of the rival payer employees who did testify support the Government's theory.") Protecting Sony's decision to delay collaboration with Microsoft and therefore PlayStation users' access to Microsoft's content is not pro-competitive.

## d. Partial Foreclosure

Finally, in its reply brief in support of its preliminary injunction motion (but not its original moving papers), and throughout the evidentiary hearing, the FTC alluded to the possibility of partial foreclosure. Partial foreclosure might involve releasing *Call of Duty* later on PlayStation than Xbox, or having a *Call of Duty* Christmas character in the Xbox version, but not the PlayStation version. (*See* Dkt. No. 286, 6/29/23 Tr. (Closing) at 1100:2-4, 1100:17-23.) Or it could be technologically degrading the players' experience on one console versus another. (PX5000-181 (Lee Report) at ¶ 477.)

But the FTC has no expert testimony to support a finding the combined firm would have the incentive to engage in such conduct. Prof. Lee did not engage in any quantitative analysis of partial foreclosure. Anyway, under the FTC's theory, the goals of full and partial foreclosure are the same: move enough PlayStation users to Xbox such that the benefits to the combined firm outweigh the costs. If the FTC has not shown a financial incentive to engage in full foreclosure, then it has not shown a financial incentive to engage in partial foreclosure.

Moreover, Mr. Kotick testified he was unaware of a developer intentionally developing a "subpar game for one platform versus another." (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 728:2–6.) Such conduct would obviously draw "vitriol from gamers that would be well deserved," and

United States District Court
Northern District of California

1   would "cause reputational damage to the company." (*Id.* at 727:20–22.)  Consistent with that

2   testimony, the record does not include any evidence Microsoft has engaged in such conduct in the

3   past—even with Sony. As Sony's Jim Ryan recognized, "publishers have every incentive to

4   provide an equal gaming experience or as good a gaming experience as possible on all platforms."

5   (PX7053 (Ryan Dep. Tr. Vol. I) at 180:23–181:11.)  The FTC's partial foreclosure theory fails.

6                                                    ***

7        In sum, the FTC has not shown a likelihood of success on its theory the merger may

8   substantially lessen competition in the Gen 9 console market because the combined firm will have

9   the ability and incentive to foreclose *Call of Duty* from PlayStation.  While it is possible, *Call of*

10  *Duty's* long history as a highly popular, multiplatform cross-play game make that result not

11  probable.  The Court has focused on *Call of Duty*, rather than other Activision AAA content,

12  because the FTC's evidence focused on this one game.  While other games, such as *Diablo*, are

13  certainly popular, the FTC did not offer evidence that if *Call of Duty* remains multiplatform in the

14  console market, making *Diablo* or other Activision titles exclusive to Xbox would probably

15  substantially lessen competition in that market.

16                          **b.      The Remaining Markets**

17       For purposes of the library subscriptions services market and the cloud streaming market,

18  which Dr. Lee refers to collectively as the "Gaming Services Market," the FTC contends the

19  merger will probably have anticompetitive effects because Microsoft would (1) have a greater

20  economic incentive to engage in foreclosure than an independent Activision; and (2) "would likely

21  have the economic incentive to engage in foreclosure." (Dkt. No. 226-2 at ¶¶ 7, 189).

22       As a threshold matter, the question is not whether Microsoft following the merger is more

23  likely to engage in foreclosure than an independent Activision.  The question is whether "the

24  proposed merger is likely to substantially lessen competition, which encompasses a concept of

25  'reasonable probability.'" *AT&T*, 916 F.3d at 1032.  As Microsoft notes, "a vertically integrated

26  firm's incentives are *always* more complex in that respect than the standalone incentives of its

27  components.  In other words, if this merger could be condemned simply because the combined

28  company would derive *some* economic benefit from withholding, *any* vertical merger could be

                                                    46

condemned on the same ground, despite the indisputable pro-competitive effects of many vertical mergers." (Dkt. No. 292-2, COL at ¶ 152 (emphasis in original).)   Accordingly, to prevail on its preliminary injunction motion, the FTC must demonstrate a likelihood of success on its assertion there is a reasonable probability the proposed merger will substantially lessen competition in the library subscription services market and cloud streaming market.

<b>(i)      Library Subscription Services Market</b>

The FTC argues Xbox will include *Call of Duty* in its Game Pass library subscription service, but refuse to include it in rival services.  This exclusion, it contends, will lessen competition in that market and make it likely Xbox will increase the Game Pass price.  (Dkt. No. 291-2, FTC's Findings and Conclusions at p. 138 ¶¶ 659, 661.)

It is undisputed the combined firm has significant financial incentives to include *Call of Duty* in Game Pass.  (*See* PX1763-013; PX2138-001.)  The Court accepts for preliminary injunction purposes it is likely *Call of Duty* will be offered exclusively on Game Pass, and not offered on rival subscription services.  The countervailing incentives that exist in the console market—longstanding multiplatform availability, cross-play, historically high revenue from games sold—do not apply to the subscription market since *Call of Duty* is not and never has been offered (in any significant sense) on a multigame library subscription service.  (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 731:5-7.)  But the record does not support a finding of a serious question as to whether *Call of Duty* Game Pass exclusivity will probably substantially lessen competition in the subscription services market.

First, the merger has the procompetitive effect of expanding access to *Call of Duty*. Adding *Call of Duty* to Game Pass gives consumers a new, lower cost way to play the game day and date. (RX3166-016.)  Further, Dr. Carlton explains how adding *Call of Duty*, and Activision content in general, will actually lower costs for many game consumers and harm none.  (RX5056 (Carlton Report) at ¶¶ 141-142.)  Dr. Carlton also opines "the merger can be expected to result in an increased incentive to invest in game development than would occur otherwise" because "adding [*Call of Duty*] to Game Pass will result in an increase in the number of Game Pass users, [and] that increase gives Microsoft more incentive to invest in other games, not just Activision

47

games." (*Id* .at ¶ 144); *see Chi. Pro. Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in antitrust is output."); *FTC v. Univ. Health, Inc*., 938 F.2d 1206, 1222 (11th Cir. 1991) ("[W]hether an acquisition would yield significant efficiencies is an important consideration in predicting whether the acquisition would substantially lessen competition.").

Second, the FTC does not identify evidence that disputes these procompetitive effects. Prof. Lee admits "Exclusivity can have both pro and anticompetitive effects." (Dkt. No. 284, 6/27/23 Tr. (Lee) at 603:8; *see* Dkt. No. 226-2, Lee Decl. at ¶¶ 113, 132.) Yet he did not perform any quantitative analysis to estimate whether adding *Call of Duty* to Game Pass, and not other subscription services, will injure competition. Will some people subscribe to Game Pass because of *Call of Duty*? Yes. But there is no analysis of how many, or how it will affect competition with Game Pass competitors such as Amazon, Electronic Arts, Ubisoft and Sony. (Dkt. No. 284, 6/27/23 Tr. (Lee) at 638:11–15 (Lee testifying cloud gaming and content library services are "both relatively nascent and new compared to consoles, and the lack of really good data for these services made it very difficult to perform something that I would view as reliable that's quantitative for those markets."); RX5056 (Carlton Report) at ¶ 138.)

The FTC's primary argument appears to be that even without the merger, Activision will contract to put its content, including *Call of Duty*, on subscription services. The record evidence is to the contrary. Activision believes it is not in its financial interest to do so because it would cannibalize individual sales. (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 744:10-11.) Kotick cannot imagine a subscription service agreeing to the financial terms Activision would require to make it a financial win for Activision. (*Id.* at 752:17-19, 752:8-11.) ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████

Consistent with Mr. Kotick's testimony, in 2020 Xbox attempted to negotiate placing certain Activision titles on Game Pass. Activision refused. (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 751:1-8.) Sony has never even asked Activision about adding its games to PlayStation Plus because Activision has been so "public" and "vocal" about not putting its content on subscription services. (PX7053 (Ryan Dep. Vol. 1) at 267:11-25.) And Activision has no plans to put its

48

Case 3:23-cv-02880-JSC Document 308, Filed 07/19/23, Page 49 of 54

1    content on a game library subscription service. (Dkt. No. 285, 6/28/23 Tr. (Kotick) at 729:3-7,

2    746:19-21.) The FTC does not offer any explanation, let alone evidence, as to why it would be

3    financially beneficial for Activision to change its long-held stance on subscription services.

4        In sum, the FTC has not raised serious questions on whether the merger will probably

5    substantially lessen competition in the game library subscription services market.

6                        **(ii)    Cloud Streaming Market**

7        The FTC has also failed to show a likelihood of success on its claim the merger will

8    probably lessen competition in the cloud gaming market because the combined firm will foreclose

9    Activision's content, including *Call of Duty*, from cloud-gaming competitors. This argument is

10   foreclosed by Microsoft's post-FTC complaint agreements with five cloud-streaming providers.

11   Before the merger, there is no access to Activision's content on cloud-streaming services. After

12   the merger, *several* of Microsoft's cloud-streaming competitors will—for the first time—have

13   access to this content. The merger will enhance, not lessen, competition in the cloud-streaming

14   market.

15       At trial the FTC argued that the cloud-streaming competitors based outside the United

16   States should not be considered because their servers are likely outside the United States and thus

17   their cloud services are not effective for United States consumers. But the FTC is merely

18   guessing; Microsoft has offered evidence that "Boosteroid (a Ukrainian company) has gaming

19   servers in Pennsylvania, North Carolina, Texas, Illinois, Florida, Washington." (Dkt. No. 292-2,

20   Defendants' Findings of Fact and Conclusions of Law (Defs' Findings and Conclusions) p. 138 ¶

21   163.) In any event, Nvidia is a sophisticated publicly-traded company based in the United States.

22   It believes its agreement with Microsoft, inked in February 2023, "can be a catalyst for the growth

23   of gaming." (PX7060 (Eisler Dep. Tr.) at 153:22-155:10.) ██████████████████████████

24   ████████████████████████████████████████████████ While it had

25   concerns about the merger prior to the agreement, its inked deal with Microsoft resolves all of

26   those concerns ████████████████ This merger-specific agreement is pro-competitive.

27       The FTC's response, again, is that an independent Activision would agree to put its content

28   on cloud-gaming services. But, again, it offers no quantitative evidence to support this bald

United States District Court
Northern District of California

49

United States District Court
Northern District of California

1    assertion; Prof. Lee did not model the cloud gaming market.  And, the fact is, Activision content is

2    not currently on any cloud-streaming service.  And it is not likely to be available absent the

3    merger.  (*See* Dkt. No. 285, 6/28/23 Tr. (Kotick) at 731:15–18; *id.* at 753:13–15.)  Activision

4    previously pulled *Call of Duty* from GeForce NOW following beta testing.  (*Id.* at 754:1-5.)  And

5    it has not been on a cloud-streaming service since.  The FTC has not shown it is likely an

6    independent Activision would do what Microsoft has agreed to do by contract  *See Tenneco, Inc. v.*

7    *FTC*, 689 F.2d 346, 354 (2d Cir. 1982) (rejecting the FTC's "unsupported speculation" "Tenneco

8    would have entered the market . . . absent its acquisition of Monroe"); *Fruehauf Corp. v. FTC*,

9    603 F.2d 345, 355 (2d Cir. 1979) (rejecting the FTC's theory of anticompetitive effects as "based

10   on speculation rather than fact").

11           Finally, the FTC argues the cloud-streaming agreements are irrelevant to its *prima facie*

12   showing as they are mere "proposed remedies."  The Court's analysis as to the Sony proposal,

13   *infra* at Section II.B.2.a.i, applies equally to the cloud-streaming agreements.  Indeed, it has even

14   more force here where the competitor—Nvidia and others—have actually entered into the

15   agreements.  The Court cannot ignore this factual reality.  The combined firm will probably not

16   have an incentive to breach these agreements and make Activision content exclusive to xCloud.

17                      **3.      FTC's *Brown Shoe* Foreclosure Theory**

18           Alternatively, the FTC argues that it has established a likelihood of success on its theory

19   that under "the *Brown Shoe* functional liability factors," the proposed merger's "very nature and

20   purpose" is anticompetitive, there is a "trend toward concentration in the industry," and the merger

21   would "increase entry barriers in the Relevant Markets."  (Dkt. No. 291-2, FTC's Findings and

22   Conclusions at pp. 181-182 ¶¶ 95-99 (citing *Brown Shoe*, 370 U.S. 294 at 329–30.)  As an initial

23   matter, the FTC made no reference to this theory in its opening statement or closing argument.

24   Nor is it discussed by Dr. Lee's expert report; he addressed only Microsoft's ability and incentive

25   to foreclose.

26           As to the theory's merits, the FTC does not make any new arguments not considered

27   above.  The FTC maintains the "[p]roposed Acquisition's purpose is to transform an independent,

28   'platform-agnostic' source of supply into a captive one controlled exclusively by Microsoft," (*Id.*

                                                         50

United States District Court
Northern District of California

at pp. 181-182 ¶ 95), but this would be true in any vertical merger and does not explain why it demonstrates an anticompetitive purpose.  Likewise, while the FTC argues Microsoft's "past conduct following similar transactions also demonstrates its likely anticompetitive nature," presumably referring to the ZeniMax acquisition, this ignores the Mojang/*Minecraft* acquisition.  (*Id*.)  To the extent the FTC relies on a "trend toward further concentration in the industry" (*Id.* at p. 182 ¶ 96), it fails to explain how this trend is anticompetitive here—Microsoft's investment in game developers and publishers allows for increased innovation in content and Microsoft has prioritized a "content pipeline."  (PX1154-001.)

*** 

In sum, the FTC has not raised serious questions regarding whether the proposed merger is likely to substantially lessen competition in the console, library subscription services, or cloud gaming markets.  As such, the FTC has not demonstrated a likelihood of ultimate success as to its Section 7 claim based on a vertical foreclosure theory.

## III.    BALANCING OF THE EQUITIES

Because the FTC has not demonstrated a likelihood of ultimate success on the merits, the Court need not proceed to the balance of equities question.  *See United States v. Siemens Corp*., 621 F.2d 499, 506 (2d Cir. 1980).  The Court finds, however, that even if the FTC had met its burden, the balance of equities do not fall in its favor.  The FTC correctly notes private equities, such as the potential skuttling of the merger if it does not close by July 18, "cannot on its own overcome the public equities that favor the FTC."  *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 73-74 (D.D.C. 2018); *see also Warner*, 742 F.2d at 1165 ("When the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities alone does not justify denial of a preliminary injunction").

But the balancing of equities is not a pointless exercise.  In *Warner*, for example, the Ninth Circuit observed "public equities may include beneficial economic effects and pro-competitive advantages for consumers."  *Id.* at 1165 (cleaned up). Because in that case the record contained "conflicting evidence on the anticompetitive effects of the merger," the Ninth Circuit held it was unclear whether those public equities supported the grant or denial of the preliminary injunction.

51

1    *Id.* It nonetheless held the public equities outweighed the private because the Commission would

2    be denied effective relief if it ultimately prevailed and ordered divestiture. The court reasoned:

3    "Since the proposed joint venture calls for Polygram to dismantle its distribution operations, it

4    would be exceedingly difficult for Polygram to revive the operations to comply with a divestiture

5    order." *Id.*

6         Here, at best "the record contains conflicting evidence on the anticompetitive effects of the

7    merger"; thus, the FTC cannot point to beneficial economic effects as a public equity. *Id.*

8    Moreover, the administrative trial before the ALJ commences on August 2, in just a few weeks.

9    By pre-existing contract, *Call of Duty* will remain on PlayStation through the end of 2024. There

10   will be no foreclosure of *Call of Duty* pending the ALJ's decision. Gamers will be able to play

11   just as they always have.

12        The FTC insists the difficulty in ordering post-acquisition divestiture is the public equity

13   that prevails. (Dkt. No. 291-2, FTC's Findings and Conclusions at p. 194-195 ¶ 153.) But it does

14   not cite anything specific about this merger to support that assertion. It is a vertical acquisition.

15   Microsoft and Activision will act as parent and subsidiary. There is no planned dismantling of

16   operations, as in *Warner.* What exactly about the merger would make it difficult to order an

17   effective divestiture? The FTC does not say. Its argument, at bottom, is the equities always weigh

18   in favor of a preliminary injunction. But that argument ignores the law. So, the balance of

19   equities is a separate, independent reason the FTC's motion must be denied.

20                                    **CONCLUSION**

21        Microsoft's acquisition of Activision has been described as the largest in tech history. It

22   deserves scrutiny. That scrutiny has paid off: Microsoft has committed in writing, in public, and

23   in court to keep *Call of Duty* on PlayStation for 10 years on parity with Xbox. It made an

24   agreement with Nintendo to bring *Call of Duty* to Switch. And it entered several agreements to

25   for the first time bring Activision's content to several cloud gaming services.

26        This Court's responsibility in this case is narrow. It is to decide if, notwithstanding these

27   current circumstances, the merger should be halted—perhaps even terminated—pending resolution

28   of the FTC administrative action. For the reasons explained, the Court finds the FTC has not

*United States District Court*
*Northern District of California*

                                         52

1   shown a likelihood it will prevail on its claim this particular vertical merger in this specific

2   industry may substantially lessen competition.  To the contrary, the record evidence points to more

3   consumer access to *Call of Duty* and other Activision content.  The motion for a preliminary

4   injunction is therefore DENIED.

5       This Opinion constitutes the findings of fact and conclusions of law required by Federal

6   Rule of Civil Procedure 52.  Given the compressed time the Court had to issue a written opinion in

7   light of the impending termination date, there will likely be errors in the citations.  And, for the

8   same reason, the Opinion does not address every argument the FTC makes in its 196-page post-

9   trial submission, nor cite every piece of evidence supporting the Court's findings.  Because the

10  decision on the FTC's request for a preliminary injunction "effectively terminate[s] the litigation

11  and constitute[s] a final order," this case is DISMISSED.  *See FTC v. Hackensack Meridian*

12  *Health, Inc.*, 30 F.4th 160, 165 n.2 (3d Cir. 2022).  The Court **MODIFIES** its temporary

13  restraining order such that the temporary restraining order will **dissolve at 11:59 p.m. on July 14,**

14  **2023** unless the FTC obtains a stay pending appeal from the Ninth Circuit Court of Appeals.

15      This Opinion is filed under seal.  At the same time it is filed, the Court will file a redacted

16  version under seal.  In an abundance of caution, it is overly redacted.  The parties shall meet and

17  confer with the non-parties, and on or before July 18, 2023, submit a new proposed redacted

18  version of this Opinion.

19      **IT IS SO ORDERED.**

20  Dated: July 10, 2023



JACQUELINE SCOTT CORLEY