No. 23-15992

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

FEDERAL TRADE COMMISSION,
*Plaintiff-Appellant,*

v.

MICROSOFT CORP., and
ACTIVISION BLIZZARD, INC.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-cv-2880
(Hon. Jacqueline Scott Corley, U.S. Distr. J.)

## EXCERPTS OF RECORD
## OF THE FEDERAL TRADE COMMISSION
## VOLUME 2

HOLLY VEDOVA
*Director*

JOHN NEWMAN
*Deputy Director*

SHAOUL SUSSMAN
*Associate Director for Litigation*

JAMES H. WEINGARTEN
PEGGY BAYER FEMENELLA
JAMES ABELL
CEM AKLEMAN
MEREDITH R. LEVERT
JENNIFER FLEURY
*Attorneys*

BUREAU OF COMPETITION

ANISHA S. DASGUPTA
*General Counsel*

MARIEL GOETZ
*Acting Director of Litigation*

IMAD D. ABYAD
*Attorney*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-3579
iabyad@ftc.gov

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS:**   **Lina M. Khan, Chair**
**Rebecca Kelly Slaughter**
**Alvaro M. Bedoya**

| | |
|---|---|
| **In the Matter of** | |
| **Microsoft Corp.,** | |
| **a corporation,** | |
| **and** | **DOCKET NO. 9412** |
| **Activision Blizzard, Inc.,** | |
| **a corporation.** | |

**ORDER WITHDRAWING MATTER FROM ADJUDICATION**
**PURSUANT TO RULE 3.26(c) OF THE COMMISSION RULES OF PRACTICE**

On July 18, 2023, counsel for Respondents in this proceeding filed a Motion to Withdraw Proceeding from Adjudication. Complaint Counsel has not registered any objection to Respondent's Motion. Accordingly,

**IT IS ORDERED**, pursuant to Rule 3.26(c) of the Commission Rules of Practice, 16 C.F.R. § 3.26(c) (2022), that this matter in its entirety be and it hereby is withdrawn from adjudication, and that all proceedings before the Administrative Law Judge be and they hereby are stayed.

By the Commission.

April J. Tabor
Secretary

SEAL:
ISSUED: July 20, 2023

**Volume 5**

**Pages 918 - 1175**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | )   **NO. C 23-02880 JSC** |
| | )  **SEALED PAGES 923 to 928** |
| MICROSOFT CORPORATION, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

San Francisco, California
Thursday, June 29, 2023

**TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

        FEDERAL TRADE COMMISSION
        600 Pennsylvania Avenue, NW
        Washington, D.C. 20580
    BY:  **JAMES H. WEINGARTEN, ATTORNEY AT LAW**
        **JAMES ABELL, ATTORNEY AT LAW**
        **JENNIFER FLEURY, ATTORNEY AT LAW**
        **PEGGY FEMENELLA, ATTORNEY AT LAW**
        **CEM AKLEMAN, ATTORNEY AT LAW**
        **ALEX ANSALDO, ATTORNEY AT LAW**
        **NICOLE CALLAN, ATTORNEY AT LAW**
        **MARIA CIRINCIONE, ATTORNEY AT LAW**
        **MICHAEL FRANCHAK, ATTORNEY AT LAW**
        **MEREDITH LEVERT, ATTORNEY AT LAW**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
           United States District Court - Official Reporter

**STUART - DIRECT / WEINGARTEN**

1   A.   That's right.

2   Q.   Now, you are responsible for modeling of the Activision

3   deal value and financials as part of this proposed acquisition

4   that brings us all here; correct?

5   A.   Yes, me and my team.

6   Q.   And you own the output of the model of the financials and

7   the synergies; correct?

8   A.   That's correct.

9   Q.   And the code word for that model was Denali; right?

10   A.   That's correct.

11   Q.   D-E-N-A-L-I?

12   A.   Yes.

13   Q.   That's like the mountain?

14   A.   It is.

15   Q.   Okay.  And you also sponsor and own the output for the

16   deal model that was created for the ZeniMax acquisition; right?

17   A.   That's correct.

18   Q.   Now, before we jump into those models, I want to ask you a

19   few questions about some agreements that we've heard about in

20   court.

21       You are not aware of any analysis of the profit and loss

22   impact to Microsoft from Microsoft having executed an agreement

23   with Nintendo about Call of Duty; correct?

24   A.   That's correct.

25   Q.   You and your team -- strike that.

**STUART - DIRECT / WEINGARTEN**

1    Neither you nor your team has done any analysis of the

2  effect of entering into a listing agreement with Nvidia on the

3  Denali commitments or model; correct?

4  **A.**   That's correct.

5  **Q.**   And neither you nor your team has done any analysis of the

6  financial implications for Microsoft Gaming that could arise

7  from having entered into an agreement with Boosteroid; right?

8  **A.**   Correct.

9  **Q.**   And the same thing with respect to any agreement Microsoft

10  entered with Ubitus; correct?

11  **A.**   Correct.

12  **Q.**   And so on for EE, the cloud provider?

13  **A.**   Correct.

14  **Q.**   And for Nware, the cloud provider?

15  **A.**   Correct.

16  **Q.**   Okay.  And you and your team have not done any financial

17  analysis of the effects on Microsoft Gaming's business if any

18  of Microsoft's proposals to Sony were actually agreed and

19  executed; right?

20  **A.**   That's correct.

21  **Q.**   I want to ask you about some information that you shared

22  at the GLT with Mr. Spencer.

23    Now, Microsoft Gaming has something called a close review;

24  is that right?

25  **A.**   That's right.

1  that's right.

2  **Q.**   Okay.  And you were on a Q and A panel or interview on

3  a -- for an audience; right?

4  **A.**   It was an investor conference, that's right.

5  **Q.**   You were on a stage and you were asked questions?

6  **A.**   I don't recall if it was virtual or on stage, but I'm

7  asked questions.

8  **Q.**   Okay.  And when asked about ZeniMax content, you told the

9  audience that Microsoft Gaming did not have any intention of

10  just pulling all of the ZeniMax content off of Sony, Nintendo,

11  or otherwise; right?

12  **A.**   That's right.

13  **Q.**   And sometimes, just so the record's clear, people use the

14  word "ZeniMax" or they use the word "Bethesda" interchangeably

15  to refer to that company; right?

16  **A.**   That's right.

17  **Q.**   Because Bethesda is, I guess, technically the studio that

18  makes the content?

19  **A.**   One of the studios but the biggest one, yeah.

20  **Q.**   Okay.  If we use ZeniMax and Bethesda interchangeably, you

21  understand what we mean?

22  **A.**   Yes.

23  **Q.**   Okay.  And then you told the audience after you had told

24  them Microsoft was not going to be pulling any content away,

25  you said (as read):

STUART - DIRECT / WEINGARTEN

1              "But what we want is we want that content in the long

2         run to be either first or better or best or pick your

3         differentiated experience on our platforms."

4         Do you remember telling the audience that?

5    **A.**   Can I just look at the transcript?  You said "any" and I

6    refer -- I think I said "all."  I just want to make sure I was

7    clear what you asked me.

8    **Q.**   Yeah, no.  Let's take a look.

9         So if you look in your binder at PX9192, that's the

10   transcript.

11   **A.**   (Witness examines document.)

12           **THE COURT:**  The last one.

13           **THE WITNESS:**  Sorry.  Just give me a second.

14           **MR. WEINGARTEN:**  It always is.

15                   (Pause in proceedings.)

16           **THE WITNESS:**  Thank you, Your Honor.

17        (Witness examines document.)  Okay.  I'm here.

18   **BY MR. WEINGARTEN:**

19   **Q.**   Okay.  So PX9192 is a transcript of a Microsoft

20   Corporation management presentation at a Jefferies Interactive

21   Entertainment Virtual Conference.  Do you see that?

22   **A.**   Yes.

23   **Q.**   And the transcript is of a conference event held on

24   November 12th, 2020, and you are listed as the company

25   participant; right?

STUART - DIRECT / WEINGARTEN

1    **A.**    Correct.

2    **Q.**    Okay.  And you have no reason to doubt the accuracy of

3    this transcript; right?

4    **A.**    That's right.

5    **Q.**    Okay.

6          **MR. WEINGARTEN:**  Move to admit PX9192, Your Honor.

7          **THE COURT:**  Admitted.

8    (Trial Exhibit 9192 received in evidence.)

9    **BY MR. WEINGARTEN:**

10   **Q.**    Okay.  Let's take a look at page 014, please.

11   **A.**    (Witness examines document.)  Okay.

12   **Q.**    And if you look at the second paragraph, there's that

13   sentence about "In the long run is we don't have intentions of

14   just pulling all of Bethesda content" -- does that say off of?

15   **A.**    Out of.

16   **Q.**    -- "out of Sony or Nintendo or otherwise."

17   **A.**    Yes.  I said "all" there.  I think you said "any" when you

18   asked me the question.

19   **Q.**    I'm sorry.

20        Okay.  And then the next line was (as read):

21           "But what we want is we want that content in the long

22        run to be either first or better or best or pick your

23        differentiated experience on our platforms.  We want" --

24        "We will want Bethesda content to show up the best as on

25        our platforms."

STUART - DIRECT / WEINGARTEN

1          Do you see that?

2    **A.**    I do.

3    **Q.**    And that's what you told the participants from the public

4    at the investor conference; right?

5    **A.**    That's right.

6    **Q.**    And I just want to ask you a couple of questions about

7    that.

8          So "first" could mean showing up first on a Microsoft

9    platform as compared to another platform; right?

10   **A.**    It could be, like what we've done with Starfield, that's

11   right.

12   **Q.**    And "better" could mean, for example, that the game has

13   better resolution on a Microsoft platform as opposed to a

14   non-Microsoft platform; right?

15   **A.**    I didn't mean that in this scenario, no.  I was looking

16   through the consumer lens of what "better" or "best" would

17   mean.

18   **Q.**    Well, having better resolution is better from a consumer

19   perspective when playing a game; right?

20   **A.**    Resolution is one thing.  Frame rate's another thing.

21   There are many things you can use the word "best" for.  I was

22   being pretty vague in my answers here pretty specifically.  We

23   hadn't had plans at this point.

24   **Q.**    Okay.  Let me -- "first" or "better" or "best" could also

25   refer to other characteristics or features of the content that

STUART - DIRECT / WEINGARTEN

1  would be better on the Microsoft platform as opposed to the

2  non-Microsoft platform; right?

3  **A.**  I didn't define it when I was talking here.  Again, I was

4  being specifically vague at this point.  We had just closed the

5  acquisition and I was talking about experiences we -- things we

6  can do with ZeniMax.  I wasn't being specific one way or the

7  other.

8  **Q.**  I understand you didn't make specifics at the conference;

9  but as you understand it, when you used terms like "first,"

10  "better," or "best," some of that could be referring to timing

11  of when the content is released; right?

12  **A.**  Yeah.  If you're a consumer it could mean a lot of things.

13  It could mean resolution.  It could be timing.  It could be

14  some notion of downloadable content.  I wasn't referring to any

15  of those in this -- this conversation here.

16  **Q.**  You weren't referring to them explicitly, but that is the

17  meaning that you agree is implied in "first," "better," and

18  "best"; right?

19  **A.**  I think a consumer could read that in any way.  When I was

20  referencing it here, it's things like Starfield, how we're

21  bringing that to our platform or showing up in Game Pass is a

22  great experience for consumers.

23  **Q.**  Let me ask you, please, to look in your deposition at

24  page 257.

25  **A.**  Is it 7040?

STUART - DIRECT / WEINGARTEN

1    **Q.**   Yes, sir?

2    **A.**   Okay.

3         (Witness examines document.)  Yes, I'm here.

4    **Q.**   Okay.  And if you look at page 257, starting at line 15

5    (as read):

6         "**QUESTION:**  Yeah.  When you say 'first on our platforms,'

7         that necessarily means first on our platforms as compared

8         to other platforms; right?

9         "**ANSWER:**  As a vague example, it could be, that's right.

10        Again, it's title by title.  So when I say 'first tier,'

11        it could be timing.  It could be at a certain place.

12        'Better' could be showing up in resolution, safety,

13        security.

14             "Again, I'm giving some very vague examples here of

15        what that could look like."

16        That was your testimony; right?

17   **A.**   That's right.

18   **Q.**   That was truthful and accurate; right?

19   **A.**   That's right.

20   **Q.**   Okay.  So "first," "better," "best" could include lots of

21   different kinds of features or timing or other things; right?

22   **A.**   Yes.  It could be many things as defined by whoever's

23   reading "first," "better," or "best."

24   **Q.**   Okay.  And then you said in your transcript of the

25   Jefferies conference (as read):

**STUART - DIRECT / WEINGARTEN**

1          "Yes, that's not a point about being exclusive.

2     That's not a point about where being adjusting time and

3     content or road map; but if you think about something like

4     GP, if it shows up best in Game Pass, that's where we want

5     to see and we want to drive our Game Pass subscriber base

6     through that Bethesda pipeline."

7     Do you remember saying that?

8  **A.**   Yes.

9  **Q.**   And you also said at the conference to the public (as

10 read):

11          "So, again, I'm not announcing pulling content from

12    platforms one way or the other, but I suspect you'll

13    continue to see us shift towards a first or better or best

14    approach on our platforms."

15    Do you see that?

16 **A.**   I can go back.  I believe you, yes.

17 **Q.**   Do you remember saying that?

18 **A.**   Yes.

19 **Q.**   Okay.  And do you still believe that to be true as a

20 statement?

21 **A.**   I believe showing up in things like Game Pass, like I

22 said, is a great experience for customers.  It could be one of

23 the best if that's how they play.

24    Again, things like Starfield and Redfall did show up first

25 on Xbox so we're following through on the things I said there.

1   It could also be brand, customer enjoyments, many things that

2   go into the ecosystem, safety, security.

3   **Q.**   You didn't model it, but when you're telling the board and

4   the board is told that another strategic benefit is the Xbox

5   console ecosystem, that includes a shift among console revenues

6   for Activision; right?

7   **A.**   We didn't lay it out specifically to the board, no.

8   **Q.**   So let's take a look in your deposition, please, at

9   page 93.  I think that's PX7040, deposition page 93.

10  **A.**   Just a second.

11  **Q.**   Sorry.  I know it's a big binder.

12  **A.**   (Witness examines document.)  Okay.  I'm here.

13  **Q.**   So look on page 93 of the transcript at page 17 --

14  line 17, please (as read):

15      **"QUESTION:**  Does a strategic benefit to the Xbox console

16      ecosystem include any shift among console revenue mix?

17      **"ANSWER:**  By definition that is the console ecosystem.  So

18      I'm going to agree with your definition that that could be

19      one example."

20      Do you see that.

21  **A.**   I do.

22  **Q.**   That testimony was truthful and accurate when you gave it;

23  right?

24  **A.**   Correct.

25  **Q.**   And I also asked you (as read):

STUART - DIRECT - WEINGARTEN

1    **"QUESTION:** Does the strategic benefit of the deal to the

2    Xbox" -- it says "conceal" but I think we can agree it

3    means "console" -- "ecosystem include a shift in the mix

4    in terms of how many Xbox consoles are sold versus

5    non-Xbox consoles sold?

6    **"ANSWER:** If you're asking about the console ecosystem,

7    there's a lot of things that go into that.  The console

8    ecosystem includes share.  In the model, we don't include

9    any assumptions around shift.  But if you're asking about

10   the Xbox console ecosystem and what is included in that,

11   it's share, yes."

12   That testimony was truthful and accurate; right?

13   **A.**   That's right.

14   **Q.**   Okay.  Now, let's take a look at the actual numbers that

15   were modeled.  I understand the console piece was not, but

16   let's look at this next page, PX4341-025.

17   **A.**   (Witness examines document.)  Okay.  I'm here.

18   **Q.**   That page discuss -- calculates all the values to

19   Microsoft that you modeled for the deal; right?

20   **A.**   That's correct.

21   **Q.**   Please do not say any of these numbers out loud, but the

22   first row is, again, that existing business row; right?

23   **A.**   Right.

24   **Q.**   And that is the continued sale of Activision Blizzard

25   portfolio on all the platforms:  Console, PC, mobile; right?

STUART - DIRECT - WEINGARTEN

1   Q.   Okay.  Well, let's -- let's do it this way:  Do you recall

2   that there was a meeting in early January to do final prep for

3   the board presentation; right?

4   A.   I have no reason to doubt that.  I'm just not recalling a

5   specific meeting back then.

6   Q.   And you do recall that coming out of that meeting, there

7   was an ask for some analysis related to Activision revenues;

8   right?

9   A.   Yes.

10  Q.   Okay.  And the particular ask for you and your team was to

11  do an outline of what would happen if there were a change in

12  the revenues that Activision earns on Sony; right?

13  A.   Correct.

14  Q.   So I'm not going to read the numbers out loud, but if you

15  look at page 200 of the transcript, lines 12 to 16, do you see

16  the change that's discussed in those lines there?

17  A.   I do.

18  Q.   And yes or no, that is the change that you were asked to

19  investigate and model; right?

20  A.   I believe that's right, yes.

21  Q.   Okay.  And so you were asked to take a look at and model

22  what would it mean if the revenue that Activision titles earned

23  on Sony PlayStation's declined in that way; right?

24  A.   I believe that's right, yes.

25  Q.   Okay.  And that presents a type of revenue risk to the

**STUART - DIRECT - WEINGARTEN**

1    model; right?

2    **A.**    That's correct.

3    **Q.**    And it's a revenue risk because if Activision's share of

4    money it gets from games played on PlayStation goes down, all

5    else equal, Activision revenues go down?

6    **A.**    All else equal, that's right.

7    **Q.**    Okay.  And so this exercise that you were asked to do was

8    about assuming Activision revenues from PlayStation decrease?

9    Yes?

10    **A.**    I believe it was an ask on a scenario to be prepared for

11    an eventuality if we had a question from the board.

12    **Q.**    Okay.  So you were wondering if some -- let me start over.

13        So the idea was the board might be interested in knowing

14    what would happen if revenue on Sony that Activision earns went

15    down, and the goal was let's outline and prepare and see the

16    answer; right?

17    **A.**    Yes, among other things.  We want to be prepared when we

18    go talk to the board about questions they may ask.

19    **Q.**    Okay.  And this work to investigate what happens if

20    Activision's revenues on Sony decrease, that's not part of the

21    Denali model; right?

22    **A.**    Correct.  This was an ask for a prep for the board.

23    **Q.**    So outside of the model process, there was a separate ask

24    and a separate modeling process to look at what would happen if

25    Activision revenue on Sony went down?

1    **A.**    I see the ask.  I don't recall the model output from that;

2    but, yes, that's correct.

3    **Q.**    We'll get there.

4    Could you please open your binder to PX1190?

5    **A.**    (Witness examines document.)  Yes, I'm here.

6    **Q.**    Okay.  So this is a chat transcript between you and

7    Ms. Lawver; right?

8    **A.**    That's correct.

9    **Q.**    It's dated January 15th, 2022; right?

10   **A.**    Correct.

11           **MR. WEINGARTEN:**  Move to admit PX1190, please.

12           **THE COURT:**  Admitted.

13    (Trial Exhibit 1190 received in evidence.)

14   **BY MR. WEINGARTEN:**

15   **Q.**    Ms. Lawver starts the chat with something about she will

16   check tonight, and then you inform her about two asks from the

17   Satya/Amy review just now, and you wrote (as read):

18           "Denali has sent over a new forecast based on lower

19           expectations.  Will need to put it into our FY and compare

20           against both their prior management forecast and our

21           current final model.  Will need a slide for the board

22           review on Sunday."

23    Do you see that ask?

24   **A.**    I do.

25   **Q.**    That actually relates to something you and I discussed, I

**STUART - DIRECT - WEINGARTEN**

1    dollars?

2    **A.**    That's correct.

3    **Q.**    And so what that's saying is:  If we assume the revenues

4    earned on Activision -- strike that -- if we assume the

5    Activision royalty revenues on PlayStation go down because of

6    that revenue split changing, it will hurt the model by that

7    much per year; right?

8    **A.**    That's right.

9    **Q.**    And if it hurts the model by that much per year, we

10   calculate that a mix shift to more Game Pass subscribers of

11   blank or a blank point mix shift towards Xbox and likely a

12   combination of the two would make up for it; right?

13   **A.**    That's correct.

14   **Q.**    And you write that both of those figures are reasonable;

15   right?

16   **A.**    That's right.  And in this context, I can believe the

17   outcome of that.  Whether it's likely or not or realistic is

18   different.  I'm saying they're within the range that I would

19   expect.

20   **Q.**    And you understood when you wrote "reasonable,"

21   "reasonable" means achievable?

22   **A.**    It means I could believe that as an outcome, my choices

23   would be unreasonable or reasonable and I chose reasonable.

24   **Q.**    But you understood "reasonable" to mean achievable in that

25   e-mail; right?

STUART - CROSS / GOSTAN

1    **A.**    Yes.  They're in the realm of achievability.

2            **MR. WEINGARTEN:**  Okay.  I have nothing further at this

3    time, Your Honor.

4            **THE COURT:**  Okay.

5            **MR. WEINGARTEN:**  I'm very sorry about that slip.

6                        **CROSS-EXAMINATION**

7    **BY MR. GOSTAN:**

8    **Q.**    Good morning, Mr. Stuart.

9    **A.**    Good morning.

10   **Q.**    How long have you worked at Xbox for?

11   **A.**    21 years.

12   **Q.**    Is that most of your career?

13   **A.**    That is the entirety of my adult working career.

14   **Q.**    And you're the Xbox CFO; correct?

15   **A.**    That's correct.

16   **Q.**    How long have you been in that role for?

17   **A.**    About nine years.

18   **Q.**    And I think you testified to this, but you report

19   ultimately to Amy Hood and not to Phil Spencer?

20   **A.**    That's correct.

21   **Q.**    And why is that?

22   **A.**    Yeah, Microsoft we have a fiduciary responsibility as the

23   finance team to represent shareholders, represent the business,

24   and the finance team does not work for the business leader of

25   the various divisions.

1    if you tried to explain to Ms. Hood that it made financial

2    sense to take Call of Duty exclusive, how do you think she

3    would react to that?

4    **A.**    She would say probably that doesn't make sense and you

5    need to keep the existing business model running.

6            **MR. GOSTAN:**  No further questions.

7            **THE COURT:**  I have a couple questions.

8        You said the Nintendo, if Call of Duty goes there, that

9    will make some money; but I believe from earlier testimony, you

10   didn't run a model on that.

11           **THE WITNESS:**  No.  We did not run a financial model

12   specifically, no.

13           **THE COURT:**  Why not?

14           **THE WITNESS:**   In this example what we think about is

15   some of the Switch users that are there are brand new

16   customers, customers that wouldn't be on Xbox or PlayStation

17   but it represents an opportunity for us.  We didn't run it

18   specifically because it just wasn't one of the scenarios that

19   we looked at.

20                    (Pause in proceedings.)

21           **THE COURT:**  We didn't run it because we didn't look at

22   that scenario.  Okay.  So you didn't run it?

23           **THE WITNESS:**  We didn't run it, that's right.  We

24   didn't run that model, that's correct.

25           **THE COURT:**  So there isn't any -- you can't quantify

1    it because you didn't look at it?

2         THE WITNESS:  That's correct, yeah.

3         THE COURT:  And then with respect to X Pass [sic], the

4    day and date, what is the policy?  Like, what games go on

5    there?  What games go on X Pass [sic]?

6         THE WITNESS:  So Xbox Game Pass, when we say "day and

7    date," is usually our first-party games, so games that are in,

8    you know, the Xbox umbrella.  When they launch to the public,

9    they'll launch at retail.  So think Best Buy, Wal-Mart, Target.

10   We'll launch them in our digital stores for sale 60 or $70, and

11   we'll also put them on that same day in the Game Pass

12   subscription service.

13       So a customer can decide if they want to buy if for 60 or

14   $70; or if they're a subscriber to Game Pass, they can play the

15   game that way on the same day it's released.

16        THE COURT:  And do you do that with all first-party

17   games?

18        THE WITNESS:  We do, that's correct, yeah.

19        THE COURT:  Okay.

20        MR. GOSTAN:  Nothing further.  Thank you.

21        THE COURT:  Mr. Weingarten?

22        MR. WEINGARTEN:  Nothing further, Your Honor.  Thank

23   you.

24        THE COURT:  Okay.  Thank you.  You are excused.

25                  (Witness excused.)

**CLOSING ARGUMENTS**

 1   tread on the Court's province anyway, to complain why these are

 2   not guarantees.

 3       Now, that seems to me a burden that's properly on the

 4   defense to show why they are, in Dr. Carlton's word, a, quote,

 5   "guarantee."  They have not done that.  The evidence is just

 6   not in the record at all.

 7       **MR. SUNSHINE:**  Your Honor, where I part from my

 8   colleague from the FTC, in the talk about a complete

 9   divestiture, if this was a horizontal deal where we were

10   worried about direct competition between two products, I

11   understand the argument about a divestiture.

12       This is a vertical case where the harm that's alleged is

13   denial of access to Call of Duty, and so the remedy that's

14   being proposed, granted there are kind of factual questions

15   that you could argue about some of these terms, but at core,

16   it's a question about access to Call of Duty and that

17   completely solves the problems in this market as alleged by the

18   FTC.

19       **MR. WEINGARTEN:**  I'm just going to take issue once

20   more with the words "completely solves," "guarantee."  We saw

21   what happened.  Dr. Carlton came and said "guarantee" and could

22   not --

23       **THE COURT:**  Dr. -- I agreed with the cross was very

24   good.  It's stricken.  It has no -- no evidentiary value in

25   terms of whether it's guaranteed.  I agree, the agreements are

1  there and we have the testimony from the third parties and from

2  Microsoft.

3      **MR. WEINGARTEN:**  And I think that, Your Honor, it is

4  not appropriate, I don't mean that in any sort of bad way, but

5  for the defense to foist the agreements on the Court and say:

6  Here are these very complicated agreements.  Take our word for

7  it, they're guarantees.  And you at one point, Your Honor,

8  said:  That's really a question for me about a legal issue of

9  the agreements.

10     But this case does not require and should not require

11 Your Honor to parse all the agreements, figure out what the

12 loopholes are, figure out if they're still worth doing.  That,

13 with respect, should have come in the form of a full-remedy

14 proposal to the Commission and could have been evaluated and

15 worked on, et cetera.

16     **THE COURT:**  Well, that's a different matter.  If you

17 guys want to sit down and do that, more power to you.

18     **MR. WEINGARTEN:**  I also want to add the issue here is

19 not just about Call of Duty comes to Nintendo or, you know,

20 we've reached agreements.  It's about the quality of the

21 access.  I think we've made that point in spades with the

22 Nintendo agreement.

23     **THE COURT:**  Well, okay.

24     **MS. WILKINSON:**  Can I address the partial foreclosure,

25 which I think is what he's talking about?

**Volume 4**

**Pages 689 - 917**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

```
FEDERAL TRADE COMMISSION,       )
                                )
            Plaintiff,          )
                                )
   VS.                          )    NO. C 23-02880 JSC
                                )   SEALED PAGES 693-707 and
MICROSOFT CORPORATION, et al., )         902-916
                                )
            Defendants.         )
_____)
```

San Francisco, California
Wednesday, June 28, 2023

**TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, D.C.  20580
BY: **JAMES H. WEINGARTEN, ATTORNEY AT LAW**
**JAMES ABELL, ATTORNEY AT LAW**
**JENNIFER FLEURY, ATTORNEY AT LAW**
**PEGGY FEMENELLA, ATTORNEY AT LAW**
**CEM AKLEMAN, ATTORNEY AT LAW**
**NICOLE CALLAN, ATTORNEY AT LAW**
**MARIA CIRINCIONE, ATTORNEY AT LAW**
**ALEX ANSALDO, ATTORNEY AT LAW**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter

**KOTICK - DIRECT / WILKINSON**

1    deliver the best experiences that they can.

2    **Q.**   Have you ever heard of developers developing a subpar game

3    for one platform versus another?

4    **A.**   You mean intentionally doing it?

5    **Q.**   Yes.

6    **A.**   No.

7    **Q.**   Are there different features that are available on

8    different devices?

9    **A.**   Yes.

10   **Q.**   And sometimes have there been in the past different maps

11   or weapons or things that you could buy on one platform versus

12   another for Call of Duty?

13   **A.**   Sure.

14   **Q.**   But you don't consider that degrading the experience for

15   one player on a platform versus another, do you?

16   **A.**   No.  That's more --

17   **Q.**   Why not?

18   **A.**   It's just more marketing, more promotional kinds of ideas.

19   **Q.**   Okay.  I want to talk about the two other topics that have

20   come up in this case, which are putting games into subscription

21   services for content library and streaming.

22        You have strong views on both of those ideas, do you not?

23   **A.**   I'm generally considered a strong-view person when it

24   comes to that.

25   **Q.**   Okay.  Well, let's start with how you've looked at over

 1   the Call of Duty franchise; right?

 2   A.   Yes.

 3   Q.   Call of Duty Modern Warfare 2 made a billion dollars

 4   within ten days of launching; right?

 5   A.   It did.

 6   Q.   If you could, Mr. Kotick, take a look at a document marked

 7   as PX9165.

 8                    (Pause in proceedings.)

 9   BY MS. CIRINCIONE:

10   Q.   This is Activision's press release following Call of Duty

11   Modern Warfare 2's launch, and it was released on November 7,

12   2022; right?

13   A.   I don't see that document.

14   Q.   It should be behind a tab marked PX9165.

15   A.   (Witness examines document.)   Okay.

16           MS. CIRINCIONE:   Your Honor, I move to admit PX9165

17   into evidence, please.

18           THE COURT:   Admitted.

19       (Trial Exhibit 9165 received in evidence.)

20   BY MS. CIRINCIONE:

21   Q.   And Call of Duty Modern Warfare 2 didn't just break the

22   20-year franchise record, it was also the highest grossing

23   entertainment opening of the year; right?

24   A.   Yes.

25   Q.   And when we say "highest entertainment opening," that

1    includes games, TV, and movies; right?

2    **A.**    I think we've -- it's more comparable to like the box

3    office, but it would probably include television.  It would be

4    hard to figure out how to calculate that.

5    **Q.**    Can you turn, Mr. Kotick, to PX7035 in your binder?  This

6    is your deposition transcript.

7    **A.**    (Witness examines document.)  Yes.

8    **Q.**    And when you testified at your deposition, Mr. Kotick, you

9    testified under oath; correct?

10   **A.**    Yes.

11           **MS. WILKINSON:**  Excuse me, Counsel.  Could you give us

12   the page?

13           **MS. CIRINCIONE:**  Yes.  I'm getting there.

14   **BY MS. CIRINCIONE:**

15   **Q.**    If you could turn to page 26, please.

16   **A.**    (Witness examines document.)

17   **Q.**    And line 8 -- I'm sorry, line 7, you were asked a question

18   (as read):

19           **"QUESTION:**  What does that mean, of all entertainment

20           types?"

21           And you answered (as read):

22           **"ANSWER:**  The way we think about is compared to the

23           opening of a film, that will probably be the principal

24           thing where you would be able to have an apples-to-apples

25           comparison or the dollar value, I guess, of the television

1      program.

2      "**QUESTION:**  Anything else within that phrase,

3      'entertainment sites,' besides film and television?

4      "**ANSWER:**  That's how I think of it.  There may be a way

5      that -- there may be something else in the definition, but

6      I think typically that's what we would need."

7      And your testimony here, Mr. Kotick, was truthful and

8  accurate?

9  **A.**   Yes.

10  **Q.**   Call of Duty Modern Warfare 2 beat the day one record of

11  any title on the PlayStation; correct?

12  **A.**   I believe so.

13  **Q.**   You're not aware -- I'm sorry?

14  **A.**   For that year?

15  **Q.**   Yes, for that year.

16  **A.**   Yes.

17  **Q.**   You're not aware of any other console games with a more

18  successful launch; correct?

19  **A.**   I'm not sure about Grand Theft Auto, but I think we

20  generally have always been the most successful of the -- of

21  those types of games.

22  **Q.**   We've talked about now how Call of Duty has been the

23  number one franchise for the last now 14 years, including 2022.

24  The 2021 Call of Duty title was Vanguard; right?

25  **A.**   Yes.

**KOTICK - CROSS / CIRINCIONE**

1    **A.**    It's just on the idea that when you aggregate all of this

2    type of content into a single service, that's not the best way

3    to provide player investment opportunities or returns to your

4    shareholders.

5    **Q.**    I'll ask again my specific question.  Your aversion isn't

6    based on any specific metrics?

7    **A.**    No.

8    **Q.**    And your aversion isn't based necessarily on

9    cannibalization; right?

10   **A.**    Not necessarily, but cannibalization would play a role in

11   that.

12   **Q.**    Your aversion to subscription -- your philosophical

13   aversion to subscription services is based on your own personal

14   view about the best way to create financial opportunity for

15   games; right?

16   **A.**    And the best way to provide flexibility for players to

17   invest in those games.

18   **Q.**    You would agree that subscription services can play a role

19   in creating the best financial opportunity for your games;

20   right?

21   **A.**    No, not when -- as a multigame subscription service, no, I

22   don't.

23   **Q.**    If you could, Mr. Kotick, turn again to your deposition

24   transcript, please.  It's PX7035.

25   **A.**    (Witness examines document.)

KOTICK - CROSS / CIRINCIONE

1    **Q.**    And specifically to page 135, please.

2    **A.**    7035, to which page?

3    **Q.**    Page 135, line 19.

4    **A.**    (Witness examines document.)

5    **Q.**    Okay.  Here you were asked a question (as read):

6           ▪**QUESTION:**  So you mentioned your aversion is more

7           philosophical.  Just to be clear, it's not based on any

8           specific analysis?

9           ▪**ANSWER:**  Well, I answered your question.  It's high

10          level.  What is the -- my personal view, the best way to

11          create financial opportunity for games.  That's not to say

12          that subscription can't play a role in those

13          opportunities.  They may and can."

14          And you your testimony, Mr. Kotick, was truthful and

15   accurate when you gave it?

16   **A.**    Yeah.  So World of Warcraft is a good example.  That's a

17   subscription game, we charge a monthly subscription, but it's a

18   singular game subscription.  So that was a truthful answer,

19   yes.

20   **Q.**    And when you gave your answer at your deposition, you

21   didn't include that distinction?

22   **A.**    Well, you didn't ask that specific question.  You just

23   said, "Does subscription play a role?"

24   **Q.**    No.  I asked a different question.  That was just your

25   answer.

**KOTICK - CROSS / CIRINCIONE**

1    **A.**   Well, you said (as read):

2             "So you mentioned your aversion is more

3         philosophical.  Just to be clear, it's not based on any

4         specific analysis."

5    **Q.**   Lots of people at the company disagree with your aversion

6    to subscription; correct?

7    **A.**   I would say a lot of people do, yes.

8    **Q.**   Activision hasn't made a formal decision against offering

9    its games on subscription; correct?

10   **A.**   I'm not sure I understand that question.

11   **Q.**   Activision hasn't taken a formal decision not to offer its

12   games on a subscription service; correct?

13   **A.**   No.  In fact, I think we've from time to time experimented

14   with it; but, generally speaking, I think it's not the right

15   way for us to deliver the most value to our shareholders or to

16   provide the most flexibility to our players.

17   **Q.**   Let me just ask one more time.  Activision hasn't made a

18   formal decision against offering its games on subscription?

19   **A.**   A formal one, no, but I would say it's just not something

20   that we do have any plans to do or have ever done in a

21   multigame subscription service.

22   **Q.**   Activision would evaluate an opportunity to offer its

23   consent on a subscription service; right?

24   **A.**   Yeah, we would be -- yeah, that would be the responsible

25   thing to evaluate.

1    Q.   And Activision, as you mentioned earlier, has made

2    judgments to support these services before; right?

3    A.   Mainly they're in experiments or for a promotional purpose

4    or in the service of trying to have a more expansive

5    opportunity with whomever the -- the other party was.  But,

6    generally speaking, we don't believe that -- I don't believe

7    and the management doesn't believe that a multigame

8    subscription service for games is the best way to enable

9    players to make their investments or to provide the superior

10   shareholder returns that we have for 30 years.

11   Q.   Activision hasn't decided against putting its content on

12   Sony subscription service; right?

13   A.   Yes, we have.

14   Q.   If you could turn again to your deposition transcript,

15   Mr. Kotick.

16   A.   (Witness examines document.)

17   Q.   Just to make sure you understood my question, I asked:

18   Activision hasn't decided against putting its content on Sony

19   subscription service?

20   A.   You mean in the past?

21   Q.   In the past or going forward.

22   A.   I would tell you sitting here today that we have no plans

23   to provide our games to the Sony multigame subscription service

24   in anything other than a test or something promotional but not

25   as a business that would generate any significant revenues.

1    Q.   Let's take a look at your transcript from your deposition

2    again, Mr. Kotick, page 131, please.

3    A.   (Witness examines document.)  Which tab are you referring

4    to?

5    Q.   PX7035.

6    A.   Which page?

7    Q.   131, please, line 24.

8    A.   (Witness examines document.)

9    Q.   You were asked a question here (as read):

10       "QUESTION:  Has there been a formal decision never to

11       offer Activision content on Sony subscription service?

12       "ANSWER:  No.  As I told you, I think we offer games on

13       Sony subscription service."

14       And your testimony at your deposition, Mr. Kotick, was

15    truthful and accurate?

16   A.   Yeah, and consistent with what I just shared with you.

17   Q.   And, in fact, Activision has put its games on Sony

18   subscription service before?

19   A.   Like I said, we've done it in a limited, either

20   experimental or promotional, basis to either see what it was

21   like or to -- as part of a bigger negotiation but, yes.

22   Q.   Activision hasn't formally decided against offering its

23   content on Nintendo subscription services; right?

24   A.   I wasn't aware that Nintendo had a subscription service.

25   Q.   You're close to where I'm going to direct you in your

1    deposition I think right now, to page 132, line 5.

2    **A.**    132, line 5.

3         (Witness examines document.)  Okay.

4    **Q.**    You were asked a question (as read):

5         **"QUESTION:**  Has there been a decision never to offer

6         Activision content on Nintendo's subscription service?

7         **"ANSWER:**  No."

8         And your testimony was truthful and accurate when you gave

9    it, Mr. Kotick?

10   **A.**    Yes.

11   **Q.**    Before making a decision, you'd evaluate the commercial

12   terms for a subscription opportunity; right?

13   **A.**    Do I personally?  Usually it will get elevated to me.

14   **Q.**    Activision -- before making a decision, Activision would

15   evaluate the commercial terms for a subscription opportunity;

16   right?

17   **A.**    Sure.

18   **Q.**    You agree there could be strategic reasons for Activision

19   to offer content on a subscription service; right?

20   **A.**    So for a small duration of time or for a promotional

21   purpose, but not as something that would be a sustainable

22   long-term business.

23   **Q.**    There could be a greater commercial context for offering

24   Activision's games on subscription; right?

25   **A.**    Could you give me an example?

1   **Q.**   I'm just using your words from the deposition on page 197.

2   And I apologize.  From your investigational hearing.  It's

3   PX7006.

4   **A.**   Yeah.  I think if -- if you're talking about if a

5   subscription opportunity is offered, would Activision consider

6   it?  That's what you're asking?

7   **Q.**   Yes.  And specifically one of the strategic reasons that

8   you testified to for why Activision would consider it would be

9   a greater commercial context; correct?

10  **A.**   So like a promotion, a marketing, some, you know, moment

11  where we might, as we have in the past, used a very old catalog

12  title for a short period of time.  Those are the types of

13  things where we would consider those opportunities.

14  **Q.**   Strategic reasons include learning about a new device;

15  correct?

16  **A.**   Sure.

17  **Q.**   Strategic reasons include learning about a new market

18  opportunity; right?

19  **A.**   Yes.

20  **Q.**   Strategic reasons include bundling software with hardware;

21  correct?

22  **A.**   Could be, sure.

23  **Q.**   Strategic reasons could also include sponsorships for your

24  professional gaming leagues; right?

25  **A.**   Yes.

**KOTICK - CROSS / CIRINCIONE**

1  Q.   In 2020, Activision considered putting its games on

2  Game Pass when negotiating with Microsoft for their latest

3  licensing agreement; correct?

4  A.   I think we considered it, yes.

5  Q.   And no decision has been taken against offering Activision

6  games on Microsoft's Game Pass; right?

7  A.   Yes, we made a decision not to include our games on

8  Game Pass' subscription service.

9  Q.   Please turn back to PX7035 in your binder.

10  A.   (Witness examines document.)  Yes.

11  Q.   Page 20 -- I'm sorry, page 131.

12  A.   Yes.

13  Q.   Here at line 17 you were asked a question (as read):

14      "QUESTION:  Has there been a company decision never to

15      offer its games on Game Pass?

16      "ANSWER:  There's not a specific mandate that we would

17      never do so, but thus far we haven't."

18      And your testimony was truthful and accurate, Mr. Kotick?

19  A.   Yeah, and that's consistent with what I believe today.

20  Q.   It's consistent with thus far you haven't; right?

21  A.   Yes.

22  Q.   The principal reasons for why Activision doesn't offer its

23  games on Microsoft Game Pass have been commercial; right?

24  A.   I think there are probably some technical reasons also,

25  but I would say it's -- for me it's principally commercial.

**KOTICK - CROSS / CIRINCIONE**

1   **Q.**   If Microsoft offered Activision attractive commercial

2   terms, it's possible Activision would put its games on

3   Game Pass; right?

4   **A.**   We would have to evaluate commercial terms, but I don't

5   think that there is a circumstance where a company could ever

6   offer us a commercial arrangement where that would make sense.

7   When you look at what's happened in Hollywood and you see the

8   devaluation of these businesses, I just -- I can't imagine that

9   there would be any company that would be willing to make the

10  type of commercial commitment that would be required to avoid

11  the destruction of value.

12  **Q.**   Before flipping back to your investigational hearing

13  transcript, I'll ask my specific question one more time.

14      If Microsoft offered Activision attractive commercial

15  terms, it's possible Activision would put its games on

16  Game Pass; right?

17  **A.**   Like I said, it's possible, but I can't imagine anyone

18  ever offering the kind of commercial terms that we would

19  require.  It just wouldn't be likely.

20          **THE COURT:**  Can I ask you?  You know it's Microsoft's

21  express purpose to put Activision content on its Game Pass if

22  the merger goes forward.  You knew that when you agreed to the

23  merger, so why did you agree to that if you think it doesn't

24  make commercial sense?

25          **THE WITNESS:**  Well, I -- I can have a philosophical

KOTICK - CROSS / CIRINCIONE

1   disagreement with the way that Microsoft approaches its

2   business, but the premium that they offered to the company's

3   shareholders was the sole consideration that I needed to make

4   in determining to sell the company.  I don't agree with the

5   idea of a multigame subscription service as a business

6   proposition for games going forward, but we can agree to

7   disagree on that.

8          **THE COURT:**  Thank you.

9   **BY MS. CIRINCIONE:**

10  **Q.**   Activision hasn't taken a formal decision against putting

11  its games on Nvidia's GeForce NOW cloud streaming service;

12  correct?

13  **A.**   I can't say we've taken a formal decision.  We tried it in

14  the beta test, and then we took the games off after the beta

15  test.

16  **Q.**   Can you look at PX7035, page 132, please?

17  **A.**   (Witness examines document.)  Okay.  Which page?

18  **Q.**   Page 132, please, line 9.  You were asked a question here

19  (as read):

20         "**QUESTION:**  Has there been a decision at the company never

21         to put Activision's content on GeForce NOW?

22         "**ANSWER:**  Never?  No, but I don't -- I don't think we

23         support it now."

24         And your testimony was truthful and accurate, Mr. Kotick?

25  **A.**   Yes.

1   **Q.**   And, in fact, Activision's games have been on Nvidia's

2   GeForce NOW; correct?

3   **A.**   Yeah.  Like I said, we put it on in their beta test; but

4   then when they launched the service commercially, we removed

5   our titles.

6   **Q.**   Okay.  I want to take a look at PX2133, please.  And we'll

7   be careful here because parts of this have been marked as

8   confidential, but I don't think we need to read out loud the

9   parts that are.

10  **A.**   Okay.

11  **Q.**   This is an e-mail from Activision's CFO Armin Zerza sent

12  to you on February 7th, 2020.  Its titled "GeForce NOW Update";

13  correct?

14  **A.**   Yes, but I think at the time Armin was the chief

15  commercial officer not the chief financial officer.

16  **Q.**   Okay.

17         **MS. CIRINCIONE:**  Your Honor, I'd like to move to admit

18  PX2133.

19         **THE COURT:**  Admitted.

20      (Trial Exhibit 2133 received in evidence.)

21         **MS. CIRINCIONE:**  Thank you.

22  **BY MS. CIRINCIONE:**

23  **Q.**   Mr. Kotick, here where the e-mail in the subject line

24  references "GFN," that means Nvidia's GeForce NOW; correct?

25  **A.**   Yes.

1  Q.   Mr. Zerza's e-mail to you includes talking points for your

2  call with Jensen the following day; right?

3  A.   That's what it says.

4  Q.   Jensen is Jensen Huang, Nvidia's CEO; right?

5  A.   Yes.

6  Q.   The first of your talking points indicates that both

7  Activision and Nvidia have appreciated their long-standing

8  partnership; correct?

9  A.   These are the proposed talking points from Armin, our

10  chief commercial officer, yes.

11  Q.   And talking point one indicates that both Activision and

12  Nvidia have appreciated their historical partnership; right?

13  A.   That's what it says.

14  Q.   Your second point talking point states that you instructed

15  your team that Activision requires a commercial deal to have

16  its content support commercialization of GeForce NOW; right?

17  A.   That's what it says.

18  Q.   And here is where we shouldn't read anything out loud,

19  Mr. Kotick, but your fourth talking point includes principles

20  of a potential commercial arrangement to put Activision's

21  contents back on GeForce NOW; correct?

22  A.   That's what it says.

23  Q.   And that's what you said also when you testified at your

24  investigational hearing; correct?

25  A.   I think so.

1  **Q.**  And these terms in talking point four were reasonable;

2  right?

3  **A.**  They might have been reasonable, but they weren't talking

4  points that I actually ever used.  They were just suggested,

5  but I didn't use them.

6  **Q.**  These were talking points that Armin Zerza sent to you for

7  the call that you would have with Jensen Huang the following

8  day; correct?

9  **A.**  Yes.

10  **Q.**  And I don't know if you answered my question specifically.

11  If you did, you can let me know.  But these terms in talking

12  point four were reasonable; right?

13  **A.**  I think in Armin's mind they were considered reasonable.

14  **Q.**  If you look at PX7006 on page 175, please, line 2 you were

15  asked --

16  **A.**  One second.  7006.

17       (Witness examines document.)  Okay.

18  **Q.**  "Were the terms" --

19  **A.**  I apologize.  Which page?

20  **Q.**  I'm sorry.  At page 175, line 2, please.

21  **A.**  (Witness examines document.)

22  **Q.**  You were asked (as read):

23       **"QUESTION:**  Were the terms -- let me be clear.  I'm going

24       back now to what we were discussing before.  So not the

25       question I just asked on subscription, but the

1      conversation we were just having about cloud streaming.

2            "Were the terms that are listed in Mr. Zerza's

3      talking points for you for your call with Nvidia, are

4      those economic terms unreasonable?

5      **ANSWER:**  No, I don't think they're unreasonable."

6      And you testified truthfully and accurately at your

7   investigational hearing, Mr. Kotick?

8   **A.**    Yeah.  That's not inconsistent with what I just said.

9   **Q.**    You're not aware of Activision being dissatisfied with the

10  technical capability of the GeForce NOW service; correct?

11  **A.**    I don't really think -- I don't really know that we were

12  dissatisfied with it.  I just think that it was not an

13  opportunity we thought made sense.

14  **Q.**    The talking points that Armin Zerza prepared for your

15  discussion with Nvidia don't mention at all being dissatisfied

16  with the quality of Activision's games while being streamed on

17  GeForce NOW; right?

18  **A.**    Should I go back to them?

19  **Q.**    You can if you need to.

20  **A.**    Can you tell me where they are?

21  **Q.**    It's PX2133.

22  **A.**    (Witness examines document.)  I don't see anything that

23  says we were dissatisfied with the -- how did you phrase it?

24  **Q.**    The quality of Activision games while being streamed on

25  GeForce NOW.

KOTICK - CROSS / CIRINCIONE

1   Q.   The reason Tencent made Call of Duty Mobile for Activision

2   was because Activision couldn't make that game on its own;

3   right?

4   A.   It would have been very difficult for us to make that game

5   on our own.

6   Q.   The reason Tencent made Call of Duty Mobile for Activision

7   was because Activision couldn't make that game on its own?

8   A.   Like I said, it would have been very difficult for us to

9   have made that game, especially in that timeframe, on our own.

10  Q.   I want to flip to your investigational hearing transcript,

11  Mr. Kotick, because this language is very important.  It's

12  PX7006, page 73.  It's starting at line 8.

13  A.   Page 73?

14  Q.   Yes.

15  A.   (Witness examines document.)  Okay.

16  Q.   Let me get there myself.  Just one second.

17                  (Pause in proceedings.)

18  BY MS. CIRINCIONE:

19  Q.   You were asked a question at line 2 (as read):

20      "QUESTION:  Do you have any other partnerships or joint

21      ventures that are similar in nature, in other words, where

22      Activision works with a third party to develop a game

23      because Activision's lacking the technical capability to

24      do so?

25      "ANSWER:  Yes.  So Tencent, who they're of the world's

1          largest -- excuse me -- world's biggest game company, they

2          made Call of Duty Mobile for us, and we couldn't make that

3          game on our own at the time so we entered a joint venture.

4          We worked with them."

5          Your testimony was truthful and accurate at the time,

6     Mr. Kotick?

7     **A.**    Yes.

8     **Q.**    The Diablo franchise also has a mobile game that was

9     released relatively recently; right?

10    **A.**    Yes.  Probably a little more than a year ago.

11    **Q.**    It's called Diablo Immortal; right?

12    **A.**    Yes.

13    **Q.**    Activision didn't make that game either; right?

14    **A.**    It was principally made by another Chinese company, also

15    one of the largest game companies in the world, called NetEase.

16    **Q.**    Activision evaluates how best to optimize its content for

17    every device; right?

18    **A.**    Yeah, generally speaking.

19    **Q.**    "Optimize" means take the steps and do the work needed to

20    ensure a good player experience on a particular device; right?

21    **A.**    Yeah.

22    **Q.**    The Switch is Nintendo's current gaming device; right?

23    **A.**    It is.

24    **Q.**    If I wanted to know how to optimize Call of Duty for the

25    Switch, I'd have to ask Activision's game teams; right?

1  close to a decade.  It will take more than a decade.  But, yes,

2  the feedback to date is that it's just not good enough, you

3  know, definitely as a substitute to any of the current

4  platforms.  But, you know, it can break through at some point

5  on something new, but it's not yet happened both on the

6  economics as well as the content side.

7  **Q.**   And you provide updates on Microsoft's cloud gaming

8  business as part of Microsoft earnings calls; correct?

9  **A.**   I do.

10  **Q.**   And the cloud is one of the pillars that makes up the core

11  of Microsoft's gaming strategy; correct?

12  **A.**   Yes, it is.

13  **Q.**   And you have highlighted that fact to Microsoft's

14  investors; correct?

15  **A.**   Yeah.  And just to make sure it's clear, whenever I think

16  about the cloud in the context of the Xbox pillars of content

17  cloud and community, to me Xbox Live is part of the cloud.  So

18  even when you're thinking about a console or a PC, the cloud is

19  actually very integral to the experience.  So it's not

20  streaming alone when I think about the cloud.

21  **Q.**   And streaming is still part of that overall cloud?

22  **A.**   It's a minor part of that cloud really because if I look

23  at the metrics that you were pointing me to earlier, we measure

24  monthly active users of xCloud.  That's a pretty important

25  thing for Phil and team to track.

**NADELLA - DIRECT / ABELL**

1   **Q.**   And you've described the cloud as one of the big bets that

2   is paying off for Microsoft's gaming business in an earnings

3   call to investors last year; is that right?

4   **A.**   Yeah, I'm sure I may have done so.

5   **Q.**   I'm going to show you a document which has been premarked

6   as PX9102.  If you can please turn to that.

7   **A.**   (Witness examines document.)

8            **MR. ABELL:**  Your Honor, I'd like to move PX9102 be

9   admitted into evidence.

10           **THE COURT:**  Admitted.

11       (Trial Exhibit 9102 received in evidence.)

12   **BY MR. ABELL:**

13   **Q.**   And if you could, Mr. Nadella, please turn the page to

14   page 009 of PX9012.

15   **A.**   Okay.

16   **Q.**   You see where you state (as read):

17           "Now on to gaming.  The big bets we have made across

18       content, community, and cloud over the past years are

19       paying off.  We saw record engagement as well as revenue

20       this quarter"?

21       Do you see that?

22   **A.**   Yes, I do.

23   **Q.**   And, Mr. Nadella, that was an accurate and true statement

24   when you made it to the Microsoft investment community;

25   correct?

NADELLA - DIRECT / ABELL

1   **A.**   That's correct.

2   **Q.**   And right below that, Mr. Nadella, you also highlight that

3   Microsoft's Game Pass had achieved more than 25 million

4   subscribers across PC and console; correct?

5   **A.**   That's correct.

6   **Q.**   And that was a true and accurate statement when you made

7   it to the Microsoft investment community?

8   **A.**   That's correct.

9   **Q.**   And at the very bottom of that paragraph, Mr. Nadella, do

10  you see where you highlight "and more than 20 million have

11  played Halo Infinite making it the biggest Halo launch in

12  history"?  Do you see that?

13  **A.**   I do.

14  **Q.**   And that was a true and accurate statement when you made

15  it to Microsoft's investment community?

16  **A.**   Yes.

17  **Q.**   You represented to investors that Microsoft continues to

18  lead the fast-growing cloud gaming market in an investor call;

19  correct?

20  **A.**   I may have, but are you referring to that particular --

21  **Q.**   I'll go ahead and direct your attention, Mr. Nadella, to

22  page -- to PX9012 again.

23  **A.**   9012?

24  **Q.**   Yes.

25  **A.**   (Witness examines document.)

NADELLA - DIRECT / ABELL

 1  **Q.**   I'll direct your attention to page 006 of 9012.

 2  **A.**   Okay.

 3          **MR. ABELL:**  And, Your Honor, at this time I'd like

 4  move for PX9012 to be admitted.

 5          **THE COURT:**  Admitted.

 6      (Trial Exhibit 9012 received in evidence.)

 7  **BY MR. ABELL:**

 8  **Q.**   Do you see at the very bottom, Mr. Nadella, where you

 9  state (as read):

10          "We continue to lead in the fast-growing gaming" --

11      "cloud gaming market with last month" -- "just last month

12      we made Xbox cloud gaming available on PCs as well as

13      Apple phones and Tablets via the browser in 22 countries

14      with more to come"?

15      Do you see that?

16  **A.**   Yes, I do.

17  **Q.**   Mr. Nadella, xCloud is Microsoft's cloud gaming app; is

18  that right?

19  **A.**   That's correct.  Cloud streaming app.

20  **Q.**   Cloud streaming app.  Thank you.

21      And, again, Mr. Nadella, when you made this statement to

22  Microsoft's investors, that was a true and accurate statement?

23  **A.**   Yes.

24  **Q.**   Okay.  Microsoft today wants to ensure that it can stream

25  its content to any platform; is that a fair statement,

NADELLA - DIRECT / ABELL

1   Mr. Nadella?

2   **A.**    Yes.

3   **Q.**    And you've described a future state of gaming as the North

4   Star vision; is that right?

5   **A.**    Yeah.  I mean, to me, as we've done and, quite frankly, as

6   a software company I always think software first, which is I

7   want to be able to work on all platforms.

8   **Q.**    And you've discussed this North Star vision with

9   Mr. Spencer; is that right?

10  **A.**    That's correct.

11  **Q.**    I'm going to show you PX1751, which is in confidential,

12  Mr. Nadella.  So I'm not going to get into any details, but if

13  you can please turn to that in your binder?

14  **A.**    It's --

15  **Q.**    1751.

16  **A.**    (Witness examines document.)  Okay.

17       **MR. ABELL:**  And, Your Honor, at this time I'd like to

18  move for PX1751 to be admitted?

19       **THE COURT:**  Admitted.

20       (Trial Exhibit 1751 received in evidence.)

21  **BY MR. ABELL:**

22  **Q.**    Again without going into any details, Mr. Nadella, does

23  this e-mail capture the exchange you had between you and --

24  yourself and Mr. Spencer about the North Star vision for cloud

25  gaming?

NADELLA - DIRECT / ABELL

1    **A.**   It seems like it.  I don't recall it, but I see it.

2    **Q.**   Okay.  Mr. Nadella, I'm going to go ahead and show you

3    what's been premarked as PX4066 in your binder.

4    **A.**   PX?

5    **Q.**   4066.

6    **A.**   Okay.

7    **Q.**   Are you there, sir?

8    **A.**   Yes, I do.

9    **Q.**   And this is an e-mail from Ms. Bond to Mr. Spencer,

10   Ms. Wright, and Ms. McKissick.  The title here is "Meta Quest

11   Event."  Do you see that?

12   **A.**   I do.

13        **MR. ABELL:**  Your Honor, at this time I'd like to move

14   PX4066 to be admitted into evidence.

15        **THE COURT:**  Admitted.

16        (Trial Exhibit 4066 received in evidence.)

17   **BY MR. ABELL:**

18   **Q.**   And at the very bottom, Mr. Nadella, there's a part of the

19   chain where you write (as read):

20        "I want this to be like, say, Samsung TV like socket

21        for us when your schedule allows and they have the

22        volume."

23        Mr. Nadella, when you refer to the "Samsung TV like

24   socket," can you explain what you're referring to when you use

25   the term "socket"?

**NADELLA - DIRECT / ABELL**

1    **A.**   Just a device endpoint.

2    **Q.**   And the Meta Quest event here, Mr. Nadella, that relates

3    to the launch of a device by Meta; is that correct?

4    **A.**   That's correct.

5    **Q.**   And they requested a demonstration of the xCloud app as

6    part of the launch; is that right?

7    **A.**   Yeah.  We were part of the launch and we showed many

8    different pieces of our software from product really to gaming,

9    yeah.

10   **Q.**   And if I could actually turn the page and direct your

11   attention to the top of page 002 of PX466 [sic].  Do you see

12   that, Mr. Nadella?

13   **A.**   Yeah.

14   **Q.**   Okay.  And you write (as read):

15          "I want to make it clear to the world that Microsoft

16          is focused on cloud first approaches, Teams, WIN365,

17          xCloud as the future of their end-use sockets."

18          Do you see that?

19   **A.**   Yes, I do.

20   **Q.**   And, Mr. Nadella, "WIN365" is Windows 365?

21   **A.**   That's correct.

22   **Q.**   You also write (as read):

23          "But want to basically use every opportunity to make

24          cloud streaming more mainstream.  The better it is for us

25          in the long run for all the strategic reasons we talk

1        about."

2            Do you see that, sir?

3    **A.**   I do.

4    **Q.**   And, Mr. Nadella, did Microsoft debut the xCloud app as

5    part of the Meta Quest launch?

6    **A.**   I'm actually not sure.  I think we tried to or at least we

7    intended to by this e-mail.  I'm not particularly sure whether

8    we did or not.

9    **Q.**   All right, Mr. Nadella, are you familiar with the LK --

10   LKG memos at Microsoft?

11   **A.**   Yes, I am.

12   **Q.**   And just broadly speaking, Mr. Nadella, what is an LKG

13   memo?

14   **A.**   In Windows there's this concept of the last-known good so

15   I brought it to our strategy.

16   **Q.**   If I could direct your attention to page 1746 -- sorry --

17   Exhibit PX1746 in your binder, Mr. Nadella.

18   **A.**   Yes.

19           **MR. ABELL:**  Your Honor, I'd like to move PX1746 into

20   evidence.

21           **THE COURT:**  Admitted.

22       (Trial Exhibit 1746 received in evidence.)

23   **BY MR. ABELL:**

24   **Q.**   Again, Mr. Nadella, this is confidential so we're going to

25   talk around this so we don't reveal any confidential

**NADELLA - DIRECT / ABELL**

1    information here.

2        But broadly speaking, LKG memo set out Microsoft's overall

3    corporate strategy for the board of directors; correct?

4    **A.**   Yeah.  It's a living document that we use as a way to

5    discuss topics.

6    **Q.**   And if I could direct your attention to page 009 of

7    PX1746.  Let me know when you're there.

8    **A.**   Yes, I am.

9    **Q.**   Okay.  And broadly speaking, Mr. Nadella, PX009 describes

10   how Microsoft is generally organized; is that a fair

11   assessment?

12   **A.**   Yeah, it is.

13   **Q.**   And if I could direct your attention to the second

14   paragraph.  Do you see the first sentence that starts with the

15   words "For each"?

16   **A.**   Yes, I do.

17   **Q.**   This section sets out some priorities for the various

18   components of the Microsoft business units; is that right,

19   Mr. Nadella?

20   **A.**   That's correct.

21   **Q.**   And do you see at the bottom, Mr. Nadella, there's a

22   footnote that defines how these priorities are -- are captured

23   within this document?  Do you see that footnote?

24   **A.**   I do.

25   **Q.**   Okay.  If I could have you flip to page 018 of PX1746.

**NADELLA - DIRECT / ABELL**

1   **A.**   (Witness examines document.)   Yes.

2   **Q.**   Again, discussing those priorities as explained with that

3   previous footnote, Mr. Nadella, the series of bullets, the very

4   top middle column, they list the priorities for the Microsoft

5   gaming business; is that correct?

6   **A.**   Yes, they do.

7   **Q.**   Okay.   All right.   Mr. Nadella, you can set that document

8   aside.

9        You discussed Microsoft's cloud streaming competitors with

10  Mr. Spencer; correct?

11  **A.**   Yes, I do.

12  **Q.**   Okay.   I'd like to show you PX1750, if we can.   If you can

13  please turn to that in your binder.

14  **A.**   (Witness examines document.)   Okay.

15       **MR. ABELL:**   Okay.   At this time, Your Honor, I'd like

16  to move PX1750 into evidence.

17       **THE COURT:**   Admitted.

18       (Trial Exhibit 1750 received in evidence.)

19  **BY MR. ABELL:**

20  **Q.**   Again, Mr. Nadella, I want to be careful there's

21  confidential information here.   Could I direct your attention

22  to the middle of the page of the e-mail.   Do you see where it

23  begins "I thought"?   Do you see that?

24  **A.**   I do.

25  **Q.**   And you refer to one of Microsoft's cloud gaming

**NADELLA - DIRECT / ABELL**

1    competitors right here; is that correct, Mr. Nadella?

2    **A.**    I do.

3    **Q.**    Okay.  I'm going to direct your attention to the top of

4    the page.  Mr. Spencer responds with his views about that same

5    cloud gaming competitor; correct?

6    **A.**    Yes.

7    **Q.**    Now, don't read the information out loud, Mr. Nadella, but

8    in the sentence that starts with "That's right," Mr. Spencer is

9    agreeing with the point that you raised previously; correct?

10   **A.**    Yeah.

11   **Q.**    You can set that document aside.

12        Mr. Nadella, you're familiar with the gaming CSA SLT

13   strategy review; correct?

14   **A.**    Yes.

15   **Q.**    And that's where the senior leadership team sits down with

16   the leaders of the gaming business to discuss strategy; right?

17   **A.**    That's correct.

18   **Q.**    I'm going to direct your attention to PX1777.

19   **A.**    (Witness examines document.)  Okay.

20        **MR. ABELL:**  Your Honor, at this time I'd like to move

21   PX1777 into evidence.

22        **THE COURT:**  Admitted.

23        (Trial Exhibit 1777 received in evidence.)

24   **BY MR. ABELL:**

25   **Q.**   Mr. Nadella, the Court has heard some testimony about

**NADELLA - DIRECT / ABELL**

1    Microsoft's xCloud app and the way it works today on consoles.

2    　　　But consumers can access xCloud in other ways; is that

3    correct?

4    **A.**　　Yeah.　They can access it from any platform, yeah.

5    **Q.**　　And, Mr. Nadella, Microsoft has a partnership with Samsung

6    to put the xCloud app on smart TVs; correct?

7    **A.**　　I believe so.　I'm not into the details on it, but I

8    believe so.

9    **Q.**　　And that means that Samsung TV owners have access to the

10   xCloud app and can stream games on their smart TVs?

11   **A.**　　That's correct.

12   **Q.**　　So no console is required for that; right?

13   **A.**　　That's correct.

14   **Q.**　　Okay.　No mobile phone is required for that; correct?

15   **A.**　　Correct.

16   **Q.**　　Now, playing games on a Samsung smart TV does require

17   cloud streaming on the back end; is that right?

18   **A.**　　That's correct.

19   **Q.**　　I'd like to direct your attention to page 003 of page --

20   of PX1777.

21   **A.**　　Yes.

22   **Q.**　　Now, just generally speaking, Mr. Nadella, I don't want to

23   go into any specifics, these are notes related to the CSA SLT

24   strategy review that reflect the discussion that the leadership

25   team, including you, had at this meeting; correct?

**Volume 2**

**Pages 212 - 490**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. C 23-02880 JSC** |
| | ) | **SEALED PAGES 216-225, 228-266** |
| MICROSOFT CORPORATION, et al. | ) | **and 369-389** |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Francisco, California
Friday, June 23, 2023

**TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
BY: **JAMES H. WEINGARTEN, ATTORNEY AT LAW**
**JAMES ABELL, ATTORNEY AT LAW**
**JENNIFER FLEURY, ATTORNEY AT LAW**
**PEGGY FEMENELLA, ATTORNEY AT LAW**
**CEM AKLEMAN, ATTORNEY AT LAW**
**ETHAN GURWITZ, ATTORNEY AT LAW**

REPORTED BY: Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter

SPENCER - DIRECT / WEINGARTEN

1   **A.**   Yes.

2   **Q.**   And a game built to showcase Generation 9 hardware can

3   showcase Generation 9 hardware on an Xbox X; right?

4   **A.**   Xbox Series X, yes.

5   **Q.**   Okay.  And it can do that on an Xbox Series S as well;

6   right?

7   **A.**   S is a lower specced machine than Series X.  Its price is

8   lower so the features are not the same as they are with

9   Series -- the Xbox Series X.  So there is a functional

10  difference between games running on Series X and running on the

11  lower priced Series S.

12  **Q.**   You refer to X and S together as the Xbox series consoles;

13  right?

14  **A.**   Yes.

15  **Q.**   Okay.  And I want you to turn in PX7011, that's your IH

16  transcript, and I want to you look at little number 345.

17  **A.**   Little number 345?

18  **Q.**   Yeah, page 345 of the transcript, please.

19  **A.**   (Witness examines document.)  Yeah.

20  **Q.**   If you look at line 17, the question was (as read):

21          "Putting aside cross gen, game built for Gen 9

22      hardware can showcase Gen 9 hardware on either a

23      PlayStation 5 or an Xbox series; right?"

24      And your answer was:  "Yes."

25  **A.**   Yeah.  I'm making the distinction that the two consoles

1    are not functionally equivalent.

2    **Q.**   You're making that distinction now, but my question is

3    about your testimony then.  That was your testimony then;

4    right?

5              **THE CLERK:**  Mr. Weingarten, I'm sorry.  Would you

6    please slow down for the reporter?

7              **MR. WEINGARTEN:**  Yes, ma'am.

8    **BY MR. WEINGARTEN:**

9    **Q.**   I'm asking -- I don't mean to interrupt you, sir, but I'm

10   trying to ask you about that testimony.

11        That was truthful and accurate when you gave it; right?

12   **A.**   My answer here was "Yes."

13   **Q.**   Thank you.

14        Now, you don't know whether a game built for Generation 9

15   hardware can or cannot showcase Generation 9 hardware

16   capabilities on a Switch; right?

17   **A.**   Switch is differently designed device, yes.

18   **Q.**   Okay.  And in terms of processing power of GPU, the

19   graphics processor, and the CPU Switch is more akin to a

20   Generation 8 than a Generation 9; right?

21   **A.**   No, I wouldn't agree with that.  The Switch was designed

22   for people to take on the go.  I mean, an obvious difference

23   when you look at all of them is the Switch has a screen.  It

24   has a battery.  It's a mobile platform.  People can take it

25   with them.  Whereas, the Gen 8 consoles require that they're

**SPENCER - DIRECT / WEINGARTEN**

1  plugged into the wall and don't have a screen.  It's --

2  Nintendo built a different platform.

3  **Q.**  Okay.  I just want -- on that question I asked you, sir,

4  please look at little page 168 in your sworn testimony.

5  **A.**  Little page 168?

6  **Q.**  Little page 168, transcript page 168, line 21.  Let me

7  know when you're there.

8  **A.**  (Witness examines document.)  I'm there.

9  **Q.**  (as read):

10      **"QUESTION:**  Well, let me ask you two questions then.  In

11      terms of processing power, meaning CPU and GPU, is the

12      Switch more akin to a Gen 8 device or a Gen 9 device?"

13      Your answer (as read):

14          "In terms of CPU and GPU, it would be more akin to a

15      Gen 8 device."

16      That was your testimony?

17  **A.**  That was.

18  **Q.**  And it was truthful and accurate when you gave it?

19  **A.**  That was, yes.

20  **Q.**  Okay.  Now, the Nintendo Switch cannot support the highest

21  level of resolution that the Xbox Series X can support; right?

22  **A.**  That's correct.

23  **Q.**  The maximum advertised Xbox X resolution is 4K HD; right?

24  **A.**  That's correct.

25  **Q.**  And even the Series S can upscale and also support 4K HD;

1    don't -- I don't have a specific conversation in mind.

2    **Q.**   Okay.  And there was a period of time when Nintendo was

3    not included in the share metrics because the PlayStation 5 and

4    the Xbox Series X and S all launched on the same effective

5    date; right?

6    **A.**   We are -- there are different views we have of our share.

7    Some of those shared metrics include both Sony and Nintendo,

8    others do not.  When we talk about the current generation of

9    consoles, we're usually talking about all three that are

10   available in the market when a consumer walks in the store,

11   which are the three or four in front of you today.

12        And -- but you're right, that PlayStation 5, Xbox Series X

13   and S launched at similar timeframe.  So many times on launched

14   alignment views we will show just those two.

15   **Q.**   Well, the biggest driver in your view, sir, of why

16   Nintendo would not be included in Gen 9 share is because the

17   Xbox series consoles and the PlayStation 5 launched on the same

18   date and those consoles are at the same place in their life

19   cycle and the Nintendo is not; right?

20   **A.**   That is a consideration definitely when we're looking at

21   the sales of PlayStation versus Xbox is they launched at

22   similar time.

23   **Q.**   And I appreciate it's a consideration.  My question is:

24   That's the reason or part of the reason why Nintendo was not

25   included in Gen 9 console share by the GLT, the Gaming

**SPENCER - DIRECT / WEINGARTEN**

1  leadership team; right?

2  **A.**   I honestly am not trying to be difficult.  I just want to

3  be sure.

4      I get a weekly report on share that shows Nintendo, Sony,

5  and Xbox run rate, say, in the U.S.  So that's a view I see all

6  the time.  If there's a specific view that you want me to look

7  at to say why are we not including Nintendo in that view, I'm

8  happy to create, like, a positive assertion for your point.

9  **Q.**   Sure.  Let's look in your deposition, please, your

10  deposition transcript, not the investigational hearing.

11  **A.**   Yeah.

12  **Q.**   And it's page -- little page 158.  So transcript page 158.

13  **A.**   That's the little number?

14  **Q.**   Yeah.  The transcripts binder.  It says "Previous

15  Testimony" on the cover that -- you got it.

16  **A.**   Yeah.  And the little number 158?

17  **Q.**   The little number 158.

18  **A.**   Thank you.

19  **Q.**   Are you there, sir?

20  **A.**   I am.

21  **Q.**   Okay.  And look at line 16 (as read):

22      ▪**QUESTION:**  Okay.  Do you remember any discussion amongst

23      GLT members about whether to include Nintendo in metrics

24      regarding console share?

25      ▪**ANSWER:**  We have had those discussions.

**SPENCER - DIRECT / WEINGARTEN**

1      **QUESTION:** Was there a period of time when Nintendo was

2      not included in Gen 9 share metrics, like how we saw it

3      was not included?

4      **ANSWER:** Yes.

5      **QUESTION:** Okay. Why was that?

6      **ANSWER:** My belief is the biggest drivers because

7      PlayStation 5 and Xbox Series X and S all launched on the

8      same effective date.

9      **QUESTION:** Why would that lead you and the GLT to not

10     include Nintendo in calculations of share for console?

11     **ANSWER:** Because PlayStation 5 and Xbox Series X are at

12     the same place in their life cycle in the consumer

13     market."

14  **A.** That's correct.

15  **Q.** That was your testimony; correct?

16  **A.** Yes.

17  **Q.** And it was truthful and accurate?

18  **A.** It was.

19  **Q.** Okay. Thank you.

20     Now, you mentioned a minute ago in your testimony that

21  there are times when you include PlayStation 5, the Xbox series

22  consoles, and Switch in the share metrics; right?

23  **A.** That's correct.

24  **Q.** And you do that and you include all three and not just the

25  Xbox series and the PlayStation 5 when you're trying to show a

**SPENCER - DIRECT / WEINGARTEN**

1  global perspective of Xbox's relevance; right?

2  **A.**   That's not right.

3  **Q.**   Okay.  Could you please turn, the same page actually,

4  little number 161?

5  **A.**   (Witness examines document.)  Yes.

6  **Q.**   If you look at line 6 (as read):

7         ▪**QUESTION:**  Did there come a time where Nintendo was added

8         back into the share calculation for console along side X,

9         S, and PS5?

10        ▪**ANSWER:**  There are times when we show all three and

11        there's times when we show two.

12        ▪**QUESTION:**  Any overall factors you can tell us as to when

13        you show all three versus showing just Xbox and

14        PlayStation 5?

15        ▪**ANSWER:**  When we're trying to show an accurate global

16        perspective of our relevance, we would show all three."

17        That testimony was truthful and accurate when you gave it?

18 **A.**   Yes.

19 **Q.**   Okay.  Would you agree that in the United States Xbox's

20 market share versus Sony has traditionally been more

21 competitive than in Europe?

22 **A.**   We've been behind Sony the whole time in the U.S.

23 **Q.**   Would you agree, sir, in the United States Xbox's market

24 share versus Sony has traditionally been more competitive than

25 in Europe?

**SPENCER - DIRECT / WEINGARTEN**

1  joining Game Pass with their games is accretive to standalone

2  game sales; right?

3  **A.**   We have said that in the past.

4  **Q.**   That's a message that Microsoft Gaming says to developers

5  whom it wants to put their games on Game Pass; right?

6  **A.**   It is a message we've used in the past when we're

7  describing Game Pass to developers.  Now our message is more

8  around the financial investment that we can make in their

9  creative to help support them doing innovative things with

10  their games.

11  **Q.**   Okay.  And you would agree that fundamentally Game Pass is

12  a reach bet to get off of console fueled by console users as an

13  early catalyst?

14  **A.**   Game Pass is a business model that we think has more reach

15  capability than $70 retail games, yeah.

16  **Q.**   And it's a bet to get off of console; right?

17  **A.**   It is definitely a bet to get to every endpoint where

18  somebody wants to play.

19  **Q.**   To do that you have to get off console with Game Pass;

20  right?

21  **A.**   We would include console.  We see console as part of our

22  future so I would -- I would talk about it more as expanding

23  beyond just console; but off console kind of presumes that we

24  would leave console, which isn't our goal with Game Pass.

25  **Q.**   Okay.  Can you please turn in your deposition transcript

**SPENCER - DIRECT / WEINGARTEN**

1  to the little page 225, transcript page 225.  And I'm going to

2  look at line 8, please, on little page 225.

3  **A.**  (Witness examines document.)

4  **Q.**  Let me know when you're there.  Sorry.

5  **A.**  Yeah.  Sorry.

6  **Q.**  Take your time.

7  **A.**  (Witness examines document.)  I'm on 225.

8  **Q.**  Okay.  Look at little -- look at line 8, please.  That's

9  me asking you a question (as read):

10        "You write 'Fundamentally GP is a reach bet off of

11        console fueled by console users as an early catalyst.'

12        Still agree with that?"

13        And your answer was "Yes."

14        Was that truthful and accurate testimony when you gave it?

15  **A.**  Yes.

16  **Q.**  Okay.  And "GP" there means Game Pass?

17  **A.**  It does.

18  **Q.**  Game Pass is a reach bet off of console?

19  **A.**  I would include console.  Game Pass is available on

20  console.  So it -- Game Pass is available on console PC, so

21  it's inclusive of all of those.

22  **Q.**  Okay.  Let's talk about the role of content in

23  subscription services like Game Pass.

24        It is your view that Microsoft needs a predictable cadence

25  of AAA launches in its products and services; right?

**SPENCER - DIRECT / WEINGARTEN**

1   **A.**   For our customers I think having games that our customers

2   are anticipating that they know the ship dates for, that they

3   can see into the future, is an important part of their

4   investment in our platform.

5   **Q.**   So is the answer to my question "Yes"?

6   **A.**   I think I affirmed your question, yes.

7   **Q.**   And it is your view that Microsoft needs AAA content to

8   drive acquisition of users across its services?

9   **A.**   We need AAA content, yes.

10  **Q.**   You need AAA content to drive acquisition of users?

11  **A.**   Acquisition and retention.

12  **Q.**   Of users?

13  **A.**   Of users.

14  **Q.**   Of the products and services that Microsoft offers?

15  **A.**   Products and services that Microsoft offers, yes.

16  **Q.**   Thank you.

17       And adding more content to Game Pass subscription service

18  is one of the things that you believe will increase the number

19  of subscribers across many different devices for Game Pass;

20  right?

21  **A.**   As users are making their bet on Game Pass and subscribing

22  and choosing to stay subscribed, great content coming to the

23  subscription we believe is important for that.

24  **Q.**   So adding more content to a subscription service like

25  Game Pass increases the number of subscribers; right?

**SPENCER - DIRECT / WEINGARTEN**

1  **A.**   That's our goal.

2  **Q.**   And subscriber scale, meaning the number of subscribers,

3  is imperative for a successful subscription service in gaming;

4  right?

5  **A.**   Having a large number of subscribers is important to our

6  subscription success, yes.

7  **Q.**   In fact, having scale and subscribers is imperative, in

8  your view, to success in gaming subscription; right?

9  **A.**   Yes.

10  **Q.**   Have you ever expressed the view that you want to make it

11  clear to Google, Amazon, and others that they will not catch up

12  to Microsoft in gaming at all, not just in subscriber numbers?

13  **A.**   For us gaming is a capability that Microsoft has where we

14  want to continue to extend our capability and show leadership

15  relative to potential competitors or today's competitors.

16  **Q.**   And I appreciate that, but my question was:  Have you ever

17  said that you want to make it clear to Google and Amazon that

18  they will not catch up to Microsoft in gaming all in, not just

19  in terms of subscribers even?

20  **A.**   Yeah, I believe I've said that.

21  **Q.**   Okay.  And have you also -- do you also believe that

22  content is part of the differentiator for Microsoft versus

23  Google and Amazon in subscription?

24  **A.**   Gaming content is today, yes.

25  **Q.**   So I'll make it more clear.  I thank you for the

SPENCER - DIRECT / WEINGARTEN

1    correction.

2         Gaming content is a differentiator for Microsoft versus

3    Google and Amazon in video game subscription services; right?

4    **A.**    It is today, yes.

5    **Q.**    Just briefly on -- we've heard a lot of testimony, you've

6    been here for it, about AAA games; right's.

7         There are relatively few AAA titles released in a year

8    relative to the total number of titles released in gaming in a

9    year; right?

10   **A.**    Yeah.  Given -- yes.  Given the number of independent

11   titles that are developed in the market, the number of -- I

12   think you can equate maybe Blockbuster that is used in movies

13   with AAA games -- that AAA games are a small part of the

14   overall game releases in a given year.

15   **Q.**    There may be 10 to 20 AAA games out of 300 or 400 total

16   console game titles that are released?

17   **A.**    I don't have those exact numbers in my head, but there are

18   a lot more independent and smaller games than there are AAA

19   games developed in a year.

20   **Q.**    Okay.  Let's take a look, please, at your investigational

21   hearing transcript page 38.  It's the little 38.  So

22   PX7011-011.  Those are the big numbers at the bottom.  And then

23   it's investigational hearing transcript page 38.

24   **A.**    (Witness examines document.)  I'm on that page.

25   **Q.**    And the question I'm interested in starts at line 22 (as

**SPENCER - DIRECT / WEINGARTEN**

1    read):

2         ▪**QUESTION:**  How many AAA games do you think come out in a

3         year -- in a given year in your experience?

4         ▪**ANSWER:**  I would say there's -- there are probably 10 to

5         20 AAA games in a given year -- calendar year.

6         ▪**QUESTION:**  And how many games -- let's say, console --

7         how many console games do you think launch -- titles

8         launch in a given year, give or take?

9         ▪**ANSWER:**  300 to 400."

10        Those are the estimates you gave under oath; right?

11   **A.**   In October of '22, yes.

12   **Q.**   Okay.  And that was truthful and accurate when you gave

13   it?

14   **A.**   That was the best of my guess in October of '22, yes.

15   **Q.**   Okay.  Let's talk a little bit more about content.

16        Every year the Gaming leadership team publishes to the

17   gaming organization a strategy document; right?

18   **A.**   We try to.  I think there's some years we've missed but,

19   yes, we try to.

20   **Q.**   And the annual strategy document presents the annual

21   strategy and shows a view on the long-term trends in the

22   business; right?

23   **A.**   Yeah.  It's the document we try to use to align the team

24   behind the strategy.

25   **Q.**   Please turn in your binder to PX1065.

SPENCER - DIRECT / WEINGARTEN

1    other request, yes.

2    **Q.**   Do you see number 2 there, "Expanding Beyond Console"?

3    **A.**   I do.

4    **Q.**   Do you see how it says "PC and cloud dramatically expand

5    our market opportunity"?

6    **A.**   Yes, I see that.

7    **Q.**   So PC gaming and cloud gaming will dramatically expand the

8    opportunity for Microsoft beyond its traditional areas like

9    console; right?

10   **A.**   This is in a subsection talking about Game Pass, so

11   talking about where Game Pass can find new users.

12   **Q.**   And then the next point, number 3, is "Limited content

13   supply," and it says (as read):

14          "Different than other entertainment markets, the

15          supply of attractive games is structurally limited."

16          Do you see that?

17   **A.**   I do see that.

18   **Q.**   Okay.  You told that point to Ms. Hood and Mr. Nadella in

19   this document also; right?

20   **A.**   Yeah.  It's in the same document, yes.

21   **Q.**   You can put that aside, please.

22   **A.**   Okay.

23   **Q.**   I want to talk to you a little bit about Activision

24   content.

25          Activision is a publisher of AAA games?

**SPENCER - DIRECT / WEINGARTEN**

1    inartful, but I meant it to be more simple.

2        Another benefit of owning content in gaming from your

3    perspective is that it enables Microsoft to be the decision

4    maker about what platforms that content appears on; right?

5    **A.**   That's one of the benefits, yes, it is.

6    **Q.**   Okay.  And in your entire time -- how long have you been

7    at Xbox?

8    **A.**   I started at Xbox in 2001.

9    **Q.**   Okay.  In the entire time that you've been at Xbox,

10   there's always been discussions about the role of exclusives

11   and the impact of exclusives on Xbox platform sales; right?

12   **A.**   It is -- it's been a topic, yes, over the two decades that

13   Xbox has been in the business.

14   **Q.**   And you've had discussions in your role in Xbox about the

15   financial implications of not shipping on other platforms,

16   including not shipping on PlayStation; right?

17   **A.**   The discussion's a little more complete than just not

18   shipping on Xbox.  A decision we make with all of our games is

19   to ship on Xbox and Windows PCs, and there's a financial upside

20   when we ship on Windows PCs.  It has an impact on potentially

21   somebody buying an Xbox because obviously you can play the game

22   on PC.  So we have complete discussions about where content

23   will show up in the overall return to us.

24   **Q.**   Well, you've had conversations and participated in

25   conversations, at either the senior leadership team for all of

**SPENCER - DIRECT / WEINGARTEN**

1  with other titles inclusive of Fallout 76 as listed here.

2  **Q.**   Not with Minecraft?

3  **A.**   I don't -- I'm not aware of an offer that Sony had made to

4  us so it -- the way it reads makes it seem like it's our

5  elective to put a game into PlayStation's content subscription.

6  That's not true; that Sony is the acquirer of content for their

7  subscription, and I don't remember us declining an offer from

8  Sony to put Minecraft in their content subscription.

9  **Q.**   So it's Sony's fault that Microsoft Gaming has not allowed

10  Minecraft to support PlayStation Now?

11  **A.**   I don't remember an offer from Sony to include Minecraft

12  in PlayStation what I'll call Plus Now, which is their consent

13  subscription.

14  **Q.**   Okay.  Let's talk just briefly about Nintendo for a second

15  here.

16      I want to talk to you about Call of Duty and I want to

17  talk to you about Call of Duty in relation to the Switch.

18      Let's talk about Call of Duty and its relationship to the

19  Switch, please.

20      If Call of Duty launches on the Switch, it's not going to

21  look the same to a player as if that player were playing it on

22  an Xbox X; correct?

23  **A.**   Our goal if we launch Call of Duty on the Switch is that

24  it would be an equal or better quality as other Switch games.

25  **Q.**   Can you please turn in your deposition transcript to

**SPENCER - DIRECT / WEINGARTEN**

1   page 188?

2   **A.**   Is this the first deposition?

3   **Q.**   It is --

4   **A.**   The 7011?

5   **Q.**   No.  I believe it's the other one.  It would say on the

6   cover page.  I don't know the exact -- I don't know the number.

7   I apologize.  It would say "Videotaped Deposition" on the cover

8   page instead of "Investigational Hearing."

9           **THE COURT:**  7028.

10          **MR. WEINGARTEN:**  70 -- thank you, Your Honor.

11          **THE WITNESS:**  28?

12          **THE COURT:**  The first volume in there.

13          **THE WITNESS:**  Oh, okay.  Thank you.

14      (Witness examines document.)  Sorry.  What was the page

15   number again.

16   **BY MR. WEINGARTEN:**

17   **Q.**   Yeah, I appreciate that.

18      It's little page 191 of the transcript.  So in your

19   deposition transcript page 191 and it starts at line 16, and I

20   asked you (as read):

21      **"QUESTION:**  Do you anticipate that Call of Duty, if it

22      launches on Switch, will look the same as it looks for a

23      player who plays that title on Xbox X?

24      **"ANSWER:**  I think it will play as a great" --

25          **MS. WILKINSON:**  Excuse me.  This is redacted.

SPENCER - DIRECT / WEINGARTEN

1          MR. WEINGARTEN:  Oh.  I apologize.

2          THE COURT:  Well, this seems fine.

3          MS. WILKINSON:  It's in response and explains what he

4   said so --

5          MR. WEINGARTEN:  Okay.

6          MS. WILKINSON:  -- this portion is fine.

7          MR. WEINGARTEN:  I'm sorry.  I did not know that.  I

8   don't think we received redacted transcripts from you guys.

9          THE COURT:  It's okay.  I don't think it is

10   confidential.  Go ahead.

11          MR. WEINGARTEN:  Okay.

12   BY MR. WEINGARTEN:

13   Q.  So let's start again.  Page 191, question on line 16 (as

14   read):

15          "Do you anticipate that Call of Duty, if it launches

16      on Switch, will look the same as it looks for a player who

17      plays that title on Xbox X?"

18      And your answer (as read):

19      "ANSWER:  I think it will play as a great Switch game.

20      "QUESTION:  My question -- respectfully it was not the

21      question.  The question was:  Do you anticipate that Call

22      of Duty, if it launches on Switch, will look the same to a

23      player as if that player were playing on Xbox X?

24      "ANSWER:  It will not look the same."

25      That was your testimony?

**SPENCER - DIRECT / WEINGARTEN**

1  **A.**   It was.

2  **Q.**   And it was truthful and accurate when you gave it?

3  **A.**   Yes.

4  **Q.**   You're aware that Microsoft and Nintendo have entered into

5  an agreement with respect to Call of Duty if this deal that

6  we're all here talking about is completed; right?

7  **A.**   I am.

8  **Q.**   You're not aware of anyone at Microsoft doing any kind of

9  economic analysis of entering into that agreement, right, with

10  Nintendo?

11  **A.**   You mean prior to the deal being done?

12  **Q.**   Yeah.

13  **A.**   No.  We have experience shipping on Switch.  We've shipped

14  games on the Switch before so we do have an understanding of

15  how our games can perform.

16  **Q.**   Oh, I'm sorry.  I was asking about the economics.

17      So you're not aware of anyone at Microsoft doing any

18  analysis of the economic effect of entering into an agreement

19  with Switch or Nintendo for Call of Duty; right?

20  **A.**   No.

21  **Q.**   Okay.  And you're not aware of any analysis at Microsoft

22  about how entering into an agreement with Nintendo to bring

23  Call of Duty to Switch will affect Microsoft Gaming's profit

24  and loss?

25  **A.**   Not directly.

SPENCER - DIRECT / WEINGARTEN

1  they both have significantly higher number of exclusive games

2  on their platform than Xbox does.  It's talked about as a

3  weakness of our platform when people are making a decision

4  between the three platforms and what -- which ones they're

5  going to buy.

6  **Q.**  So you don't remember in November of 2021 talking with

7  other executives about exclusivity and ZeniMax; but outside of

8  that timeframe, you do remember that you had some conversations

9  about exclusivity and ZeniMax titles?

10 **A.**  Exclusivity in the console business is a topic

11 continuously inclusive of talking about ZeniMax titles.

12 **Q.**  Some of those conversations were about whether a Zeni

13 game -- strike that.

14      But you don't remember any other conversations or any

15 other details about conversations with Microsoft executives

16 about ZeniMax titles and exclusivity?

17 **A.**  There have been so many discussions in general about

18 exclusivity of titles on Xbox, I don't remember one specific in

19 fall of 2021; but exclusivity among console titles is just a

20 general topic in the console business so it is a constant

21 conversation when you run the Xbox business.

22 **Q.**  You don't remember any conversations with Mr. Leder about

23 taking ZeniMax titles exclusive?

24 **A.**  I've had many conversations with Jamie Leder about his

25 titles at ZeniMax and what platforms they ship on.

SPENCER - DIRECT / WEINGARTEN

1          THE COURT:  Do you want to admit 1852?

2          MR. WEINGARTEN:  Yes, please, Your Honor.

3          THE COURT:  Admitted.

4      (Trial Exhibit 1852 received in evidence.)

5          MR. WEINGARTEN:  I will improve one day.

6  BY MR. WEINGARTEN:

7  Q.   Let's take a look at page 44 of your deposition, please.

8  Page 44, line 16, of the deposition.

9  A.   (Witness examines document.)  I'm on there.

10 Q.   Okay.  Question -- I told you you could put a document

11 aside, but the question was (as read):

12          "In fall of 2021 do you remember if you had

13      conversations with Jamie Leder about exclusivity of

14      ZeniMax titles?"

15      And your answer was (as read):

16          "Then I do not."

17      And the question was (as read):

18          "Do you remember telling Mr. Leder in the fall of

19      2021 that all ZeniMax content going forward would be

20      exclusive to Xbox and PC?"

21      And your answer was "I do not."

22      That was truthful and accurate testimony when you gave it?

23 A.   It was.

24 Q.   Okay.  Do you remember talking with Mr. Leder about future

25 ZeniMax titles and that there would be a presumption about what

**SPENCER - DIRECT / WEINGARTEN**

1    platforms ZeniMax titles would be available on?

2    **A.**    In talking to Jamie about the development teams at ZeniMax

3    and trying to align on our production schedules, I wanted to

4    make it clear to the team that their games they're building

5    would at least be shipping on Xbox and PlayStation -- Xbox and

6    PC.

7        So I wanted to make -- so I had a discussion with Jamie

8    about ensuring that we were focused on at least supporting

9    those two platforms.

10   **Q.**    So the presumption that was shared between you and

11   Mr. Leder was that ZeniMax titles would be available on PC,

12   Xbox console, and xCloud; right?

13   **A.**    Yes.

14   **Q.**    But you just don't remember if you talked to Mr. Leder

15   about whether future ZeniMax titles would just be exclusive to

16   Xbox, PC, and xCloud; right?

17   **A.**    When we announced the ZeniMax deal, I made the statement

18   that we would make the decision on exclusivity on a

19   case-by-case basis.  So I know that the ZeniMax titles will at

20   least be shipping on Xbox and PC.  And we would leave the

21   decisions that we would make for other platforms to a later

22   date as we had kind of more clarity on our relationship with

23   those platforms.

24   **Q.**    So you have an understanding, as the head of Gaming at

25   Microsoft, of what platforms ZeniMax games are going to ship

1   on; right?

2   **A.**   What I would say is in running our business, I understand

3   that the games that ZeniMax is building, absent the mobile

4   games, ZeniMax also launches some mobile games, but that there

5   are -- their core games would be launching on PC and Xbox.

6   **Q.**   I guess my question was -- again, I'm sorry for being

7   inartful -- my question was:  You have an understanding in your

8   head of what platforms ZeniMax games will ship on; right?

9   **A.**   I know that at least they will ship on Xbox and PC, and I

10  think the other -- the platforms that we choose to support with

11  our content would be on a case-by-case basis, which is what --

12  the statement I've made publicly and what we've adhered to.

13  **Q.**   Well, if that's your general understanding, did you

14  express that to Mr. Leder?

15  **A.**   When you're asking me about the dates, you keep circling

16  in on the fall of 2021.  So I just want to make sure.  I don't

17  know if I said that in the winter of 2022.

18      In general, the first-party teams, both Xbox Game Studios

19  and ZeniMax, understand that the games they're going to build

20  will be shipping on Xbox and PC and other platforms we would

21  decide in most cases at a later date.

22  **Q.**   Can you please turn in your deposition transcript to

23  page 51 of the deposition?

24  **A.**   (Witness examines document.)  I'm on it.

25  **Q.**   Please look at line 14.  The question on page 51, line 14

 1    was (as read):

 2              "And do you recall a general discussion on that point

 3         with Mr. Leder?"

 4         And your answer was (as read):

 5         **ANSWER:**  In general, I have an understanding of what

 6         platforms the games will ship on."

 7         And then I asked a bad question and hopefully got better

 8    (as read):

 9              "Did you express that general understanding to

10         Mr. Leder?"

11         **ANSWER:**  No."

12         So you had an understanding -- that testimony was truthful

13    and accurate when you gave it; right?

14    **A.**    No, I would say that's an inaccurate statement.  I would

15    say Jamie understands that the games that ZeniMax is building

16    in line with the conversation we just had will be shipping on

17    Xbox and PC.

18    **Q.**    Well, so you're saying that this sworn testimony was

19    incorrect when you gave it?

20    **A.**    I think I might have, in the context of the flow of the

21    conversation here, been in a different space.  I wasn't trying

22    to mislead anybody.

23         I'm saying that the content that we build at Xbox, we've

24    made public statements about that content being on Xbox and PC;

25    and the studios in general understand that the content that we

SPENCER - DIRECT / WEINGARTEN

1   wield, absent mobile content, will be available at least on

2   those two platforms, and that's the public statement we've made

3   to our fans.

4   **Q.**   Well, and I'll -- you've had many conversations with

5   Mr. Leder about Microsoft's titles being on Sony's platform?

6   **A.**   I wouldn't say I've had many conversations on that topic,

7   but we have had conversations on that topic.

8   **Q.**   Okay.  But you don't recall any conversation in which you

9   talked with Mr. Leder about a plan that ZeniMax titles would

10  launch day-date on the Xbox platforms but not Sony?

11  **A.**   As I said, we make the decision on a case-by-case basis.

12  There are games that we have shipped from ZeniMax on

13  PlayStation only and not day and date on Xbox.  There have been

14  games that we have shipped on Xbox day and date and not on

15  PlayStation, and we've done releases on day and date on both

16  Xbox and PlayStation.

17      So in general, Jamie running ZeniMax and me as his

18  manager, we would have discussions about his content and what

19  platforms they would show up on.

20  **Q.**   My question was just:  Did you ever talk to Mr. Leder

21  about a plan that ZeniMax titles would launch on day one on the

22  Xbox platforms but not Sony?

23  **A.**   There are titles that we have from ZeniMax that ship day

24  one on Xbox and PC and not Sony, so I would obviously have had

25  discussions with him on those titles.

**SPENCER - DIRECT / WEINGARTEN**

1  **A.**   Starfield hasn't launched yet.

2  **Q.**   When it does, it will skip PlayStation?

3  **A.**   We do not have plan for a PlayStation game, yes.

4  **Q.**   Elder Scrolls 6, many moons away but no plan yet to launch

5  that on PlayStation; right?

6  **A.**   As I said, with Elder Scrolls 6, it's so far out, it's

7  hard to understand what the platforms will even be at this

8  point.  It's the same team that's finishing Starfield, which

9  comes out this September.  So we're talking about a game that's

10  likely five-plus years away.

11  **Q.**   You haven't committed an announcement publicly that it

12  would launch on Sony; right?

13  **A.**   I have not.

14  **Q.**   You're the decision maker with respect to all of those

15  titles we've just been discussing?

16  **A.**   I am.

17  **Q.**   And I think on Elder Scrolls 6 you said you've been

18  ambiguous or it hasn't been publicly clear what platforms it

19  will launch on; is that right?

20  **A.**   That's what's in my head.  I don't have every piece of PR

21  that we've talked about.  As I stated, the game's so far away,

22  that I think making a definitive statement on what platforms

23  it's going to launch on at this point, inclusive, frankly, of

24  our own platforms, would be getting ahead of ourselves a bit.

25  **Q.**   Okay.  With that in mind, can you please look at your

**SPENCER - DIRECT / WEINGARTEN**

1  investigational hearing transcript page PX -- strike that.

2  It's PX7012-009 and it's transcript page 426.

3  **A.**  Sorry.  Was this 7012?

4  **Q.**  Yes, sir.

5  **A.**  You said 4 --

6  **Q.**  Little page 426.  PX page is 009.

7  **A.**  (Witness examines document.)  Got it.

8  **Q.**  Okay.  Line 7 (as read):

9     **"QUESTION:**  Have you talked to anyone about whether

10    Elder Scrolls 6 will skip PlayStation?

11    **"ANSWER:**  I have made public estimates that

12    Elder Scrolls 6 will be exclusive to Xbox and PC."

13    Was that testimony truthful and accurate when you gave it.

14 **A.**  I don't -- I don't know.  I don't know that I've made a

15 public statement saying that.

16 **Q.**  So you don't know whether that was accurate testimony at

17 that time?

18 **A.**  When I said it, I believed it was; but if you ask me

19 today, I can't recall a public statement where I've said that.

20 **Q.**  Okay.  Let's talk about Indiana Jones.

21    Disney owns the intellectual property for Indiana Jones?

22 **A.**  Disney does, yes.

23 **Q.**  ZeniMax was developing an Indiana Jones game for multiple

24 platforms when Microsoft acquired ZeniMax; right?

25 **A.**  They were.

ZIMRING - DIRECT / AKLEMAN

1  **A.**   13 years.

2  **Q.**   And what's your current position?

3  **A.**   I'm a product director in core, which is an internal team

4  within Google.

5  **Q.**   And how long have you worked in the tech industry?

6  **A.**   Over 25 years now.

7  **Q.**   Prior to your current position, what was your position at

8  Google?

9  **A.**   For roughly the last decade I worked on Stadia.  I was the

10  first employee on Stadia, and I was there from the very

11  beginning to the very end.

12  **Q.**   And what was the title that you held in January of 2023?

13  **A.**   I was the product director for Stadia.

14  **Q.**   Have you ever worked on Google's mobile store application

15  called Play?

16  **A.**   No.

17  **Q.**   What was Stadia?

18  **A.**   Stadia was a cloud gaming service developed by Google.

19  **Q.**   What's a cloud gaming service?

20  **A.**   So cloud gaming is intended to offer consumers the ability

21  to enjoy entertainment, interactive entertainment, without the

22  need for physical devices.  So enabling game play on any

23  connected screen.

24  **Q.**   Can you describe some more of the features of a cloud

25  gaming service?

ZIMRING - DIRECT / AKLEMAN

1   **A.**   Certainly.  The -- at least with respect to Stadia, the

2   intention was to provide access to the best games that existed

3   in the market, and over time games that could not be built on

4   legacy console or PC architectures.  So games that could take

5   advantage of the data center as sort of the creative canvas for

6   the game developers.

7        Features included just the ability to click to play so you

8   wouldn't need to wait for long downloads or have physical

9   media, or anything like that, and associate that with any

10  particular screen.  So similar to the way we enjoy music and

11  movies today, the ability to enjoy content that is interactive

12  on any connected screen.

13  **Q.**   Okay.  So a gamer wouldn't need to download a game?  They

14  can play it instantly, is that --

15  **A.**   Correct.

16  **Q.**   What are some of the devices that a cloud gaming service

17  can stream to?

18  **A.**   Ideally any device that is capable of playing back video

19  should be eligible for enjoying cloud gaming.  So any type of

20  connected screen, be it a TV, a mobile device, a tablet, PC.

21  **Q.**   A gaming console?

22  **A.**   Certainly could, yes.

23  **Q.**   I have a few questions about how the cloud gaming servers

24  work.

25       Where -- it may be helpful to explain sort of how the data

ZIMRING - DIRECT / AKLEMAN

1    the space might only want to have a single data center for the

2    whole planet, but the corresponding experience that consumers

3    would have would really be degraded relative to what they could

4    have if -- if the servers were much closer.

5    **Q.**    And that's for the latency reason you just described?

6    **A.**    That's correct.

7    **Q.**    Let's go back to Stadia.  When was Stadia launched?

8    **A.**    So there was a -- what we thought of as our public beta

9    was towards the end of 2018, what we called Project Stream.  We

10   announced the broader version for Stadia at the Game Developer

11   Conference in March of 2019, and Stadia was introduced as an

12   actual service in November of 2019.

13   **Q.**    And is Stadia still operating?

14   **A.**    No.

15   **Q.**    When did Stadia shut down?

16   **A.**    January 18th, 2023.

17   **Q.**    Were there any significant factors that led to --

18   contributed to Stadia's lack of success?

19   **A.**    I believe so.  In my opinion, the primary factor was our

20   ability to have sufficient content breadth.  So the number of

21   games that were on the platform as well as depth.  The

22   Blockbusters.

23        You know, at a certain time I think that was part and

24   parcel to us being able to have a healthy two-sided market that

25   would have enough players interested and enough publishers

1    interested to have a long-term viable product.

2    **Q.**   Okay.  We'll come back to content, but I want to ask a

3    couple questions about sort of the technical makeup of Stadia.

4         Was the -- from a technical standpoint, was the cloud

5    gaming service that Google created, Stadia, was that a success?

6    **A.**   We believe so, yes.

7    **Q.**   Why?

8    **A.**   The -- I think there's different ways to answer that.  So

9    in my opinion, one factor is all of the qualitative testing

10   that we did.  So bringing -- bringing players into lab

11   environments and doing comparative testing of the experience

12   that they would have over, you know, something streamed from a

13   data center over a network versus the experience they would

14   have on a console or PC.

15        In establishing the -- the place where the experience was

16   console comparable, where they couldn't tell the difference,

17   what we would describe internally as the Pepsi challenge, in

18   most cases we succeeded with that.

19        As well, I think, there was lots of feedback from players

20   and publishers that we'd done a very good job on the tech, and

21   it was not a limiting factor in the experience.

22   **Q.**   How would you rate the technical capabilities of Stadia as

23   a cloud gaming service compared to other cloud gaming services

24   before Stadia shut down?

25   **A.**   To my knowledge, we had the best technology in the market.

**Volume 1**

**Pages 1 - 211**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

FEDERAL TRADE COMMISSION,   )
                                   )
          Plaintiff,     )
                                   )
  VS.                     )   **NO. C 23-02880 JSC**
                                 )   **SEALED PAGES 5-14**
MICROSOFT CORPORATION, et al., )
                                 )
         Defendants.    )
_____)

San Francisco, California
Thursday, June 22, 2023

**TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                   FEDERAL TRADE COMMISSION
                   600 Pennsylvania Avenue, NW
                   Washington, D.C.  20580
        BY:  **JAMES H. WEINGARTEN, ATTORNEY AT LAW**
            **JENNIFER FLEURY, ATTORNEY AT LAW**
            **PEGGY FEMENELLA, ATTORNEY AT LAW**

For Defendant Microsoft:
                   WILKINSON STEKLOFF LLP
                   2001 M Street, NW - 10th Floor
                   Washington, D.C.  20036
        BY:  **BETH WILKINSON, ATTORNEY AT LAW**
            **RAKESH N. KILARU, ATTORNEY AT LAW**
            **KIERAN GOSTIN, ATTORNEY AT LAW**
            **GRACE HILL, ATTORNEY AT LAW**
            **SARAH NEUMAN, ATTORNEY AT LAW**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

**BOOTY - DIRECT / CALLAN**

1    **A.**    That's right.

2    **Q.**    And Halo Infinite is also available on PCs; correct?

3    **A.**    That's correct.

4    **Q.**    And Halo Infinite is available on Xbox Game Pass?

5    **A.**    Yes.

6    **Q.**    But Halo Infinite is not available on PlayStation

7    consoles; correct?

8    **A.**    That's correct.

9    **Q.**    And Halo Infinite is an example of a game that you would

10   call an exclusive to Xbox; correct?

11   **A.**    To Xbox consoles as well as PC Windows, yes.

12   **Q.**    So you sometimes use the term "exclusive" to mean that a

13   game would be available on Xbox consoles, Xbox Game Pass, and

14   PC; correct?

15   **A.**    That's correct.

16   **Q.**    You also sometimes use the term "timed exclusive"?

17   **A.**    Sometimes, yes.

18   **Q.**    And a timed exclusive can mean Microsoft launches the game

19   on Xbox first and then some period of time later you would

20   bring the game to PlayStation; correct?

21   **A.**    Or other platforms.

22   **Q.**    And in your role as the head of Xbox Game Studios, you

23   make recommendations on whether games should be exclusive;

24   correct?

25   **A.**    I have input into those recommendations.  I don't have the

**BOOTY - DIRECT / CALLAN**

1    experience as much as possible.

2    **Q.**   But you would be essentially creating a different game;

3    correct?

4    **A.**   We would try to keep it as true to the original as

5    possible.  I would expect there would be significant

6    differences, yeah.

7    **Q.**   I'd like to turn to the topic of cloud gaming.

8         Cloud gaming allows you to stream a game from the cloud to

9    a local device; correct?

10   **A.**   Yes.

11   **Q.**   Microsoft offers cloud gaming?

12   **A.**   Yes.

13   **Q.**   And that's sometimes referred to as xCloud?

14   **A.**   Correct.

15   **Q.**   And Nvidia also offers cloud gaming; correct?

16   **A.**   That's correct.

17   **Q.**   And that service is called GeForce NOW?

18   **A.**   That's right.

19   **Q.**   I'd like you to turn to PX4351 in your binder.

20   **A.**   (Witness examines document.)

21   **Q.**   That is an e-mail chain dated March 26th, 2021, with the

22   subject line "Bethesda Titles on Nvidia GeForce NOW"; correct?

23   **A.**   That's correct.

24   **Q.**   And you are an author and recipient of the e-mails

25   contained in PX4351?

**BOOTY - DIRECT / CALLAN**

1  A.    That's right.

2  Q.    Please look at your e-mail on PX4351-002.  You will see

3  those numbers marked on the bottom right-hand corner of the

4  page.

5  A.    I see it.

6  Q.    You sent this e-mail to the CEO of Microsoft Gaming among

7  others; correct?

8  A.    Correct.

9  Q.    And you provide truthful and accurate information to

10  Mr. Spencer?

11  A.    Yes.

12  Q.    And you wrote, quote (as read):

13          "We have pulled all XGS titles from GeForce NOW so as

14      not to compete with xCloud."

15      Right?

16  A.    I did.

17  Q.    And "XGS" means Xbox Game Studios?

18  A.    That's right.

19  Q.    You went on to write (as read):

20          "I would recommend that in the absence of any other

21      plans that we do the same for Bethesda titles."

22      Right?

23  A.    That's right.

24  Q.    And this was in March 2021; correct?

25  A.    That's correct.

**BOOTY - DIRECT / CALLAN**

1  Q.   And this was after Microsoft acquired the Bethesda titles

2  that same month; correct?

3  A.   Yes.  I believe the exact day and date, but it was that

4  month, that's correct, yeah.

5  Q.   Please turn to your e-mail on the page ending 001 in the

6  middle of the page.

7  A.   Okay.

8  Q.   The third line you wrote, quote (as read):

9         "We are not putting our first-party IP on competing

10        streaming or subscription services."

11  Correct?

12  A.   I see that.

13  Q.   You wrote that?

14  A.   I did.

15  Q.   And "first-party IP" here means first-party games; right?

16  A.   That's right.

17  Q.   And at the end of this e-mail you wrote "No effing way";

18  correct?

19  A.   I did.

20        **MS. CALLAN:**  Your Honor, I move to admit PX4351 into

21  evidence?

22        **THE COURT:**  4351 admitted.

23     (Trial Exhibit 4351 received in evidence.)

24  **BY MS. CALLAN:**

25  Q.   You can set that document aside.

**BOOTY - DIRECT / CALLAN**

1          Tim Stuart is the president of Xbox; correct?

2     **A.**    That's correct.

3     **Q.**    And you give Mr. Stuart truthful and accurate information?

4     **A.**    I do.

5     **Q.**    I'd like you to turn to PX1442.

6     **A.**    (Witness examines document.)

7     **Q.**    PX1442 is an e-mail chain dated October 15th, 2019, with

8     the subject line, quote, "Preview for Friday 3 PPP Content

9     Investments"; is that right?

10    **A.**    That's right.

11    **Q.**    And you are the author of the e-mail at the top of PX1442?

12    **A.**    Yes.

13    **Q.**    And in the third line from the bottom of your e-mail you

14    wrote that "Netflix lost money for years chewing through

15    startup funding"; right?

16    **A.**    It does say that.

17    **Q.**    You wrote that?

18    **A.**    I did.

19    **Q.**    And then the next sentence is redacted for the public but

20    it starts with "Game."  Do you see that?

21    **A.**    I do.

22    **Q.**    And you wrote that sentence; correct?

23    **A.**    Yes.

24    **Q.**    And then the last sentence you wrote (as read):

25          "But I think the idea is to create a moat that nobody

1          else can attack."

2          Correct?

3    **A.**   That's what it says, yes.

4    **Q.**   And you wrote that?

5    **A.**   Yes.

6          **MS. CALLAN:**  Your Honor, I move to admit PX1442 into

7    evidence.

8          **THE COURT:**  1442 admitted.

9          (Trial Exhibit 1442 received in evidence.)

10   **BY MS. CALLAN:**

11   **Q.**   Mr. Booty, I'd like you to turn to PX4352.

12   **A.**   (Witness examines document.)

13   **Q.**   PX4352 is an e-mail chain dated December 17, 2019, with

14   the subject line "GP ARPU"; correct?

15   **A.**   That's right.

16   **Q.**   You are the author of the e-mail at the top of PX4352?

17   **A.**   Yes.

18   **Q.**   And this is an e-mail to Xbox CFO Tim Stuart; correct?

19   **A.**   That's right.

20   **Q.**   And "GP" here means Game Pass?

21   **A.**   Yes.

22   **Q.**   And "ARPU" means average revenue per user?

23   **A.**   Yes.

24   **Q.**   In the second-to-last-sentence of the first full paragraph

25   on 001, you wrote (as read):

HINES - DIRECT / FLEURY

1   A.   Yes.

2   Q.   Before it was acquired by Microsoft, ZeniMax had an

3   incentive to distribute its games on more than one platform;

4   would you agree?

5   A.   Yes.

6   Q.   Over the ten-year period before the Microsoft acquisition,

7   ZeniMax games were, by and large, released on more than one

8   platform; correct?

9   A.   Correct.

10  Q.   In fact, before the Microsoft acquisition, ZeniMax had

11  never released a game for just one console; correct?

12  A.   Um, in general that -- I mean, I can explain, but in

13  general, yes, that's correct.

14  Q.   At the time the ZeniMax deal was announced, the

15  acquisition of ZeniMax by Microsoft, it was considered a

16  massive and historic deal; is that correct?

17  A.   Correct.

18  Q.   You thought it was the biggest deal in the gaming industry

19  since the Activision-Vivendi deal in 2008; is that correct?

20  A.   Correct.

21  Q.   And the purchase price for the ZeniMax deal was

22  7.5 billion; correct?

23  A.   Correct.

24  Q.   Before ZeniMax was acquired by Microsoft, there were some

25  games that ZeniMax had already contractually committed to put

1  that access.

2  **Q.**   Okay.  So if I'm a gamer and I have a game I love and I

3  want to purchase it, how do I purchase it from Xbox so I can

4  play it on my Xbox?

5  **A.**   So when you go into the Xbox, there's a tab called "Store"

6  and you click in there, you can search for the game and

7  purchase it.  Alternatively, if you had Game Pass, you could

8  just play the game in Game Pass.  So people can choose.

9  There's sort of substitutes depending on what you prefer.

10 **Q.**   So when you guy buy the game, it's software that you're

11 downloading onto your Xbox?

12 **A.**   Yes.

13 **Q.**   In the old days people like us used to go to Best Buy and

14 buy the disk; right?  It's the same thing?  You laugh

15 because --

16 **A.**   Yeah, you can actually still buy disks today, but most --

17 **Q.**   Most regular people don't do that, do they?

18 **A.**   Yeah.

19 **Q.**   Or most gamers don't do that anymore, do they?

20 **A.**   No.

21 **Q.**   All right.  So I have my game I want to play and I can buy

22 it for that, but if I go to Game Pass, do I own any of those

23 games?

24 **A.**   As long as the game is in the subscription and you are

25 subscribed, you can play the games, yes.

BOND - DIRECT / WILKINSON

1  BY MS. WILKINSON:

2  Q.   Is this also a cloud gaming license agreement?

3  A.   It is.

4  Q.   With whom?

5  A.   This is with Ubitus KK.

6  Q.   Where is Ubitus located, if you know?

7  A.   You know what?  I don't remember its location.

8  Q.   Okay.  And what is the term of this agreement?

9  A.   Ten years.

10 Q.   Are there people on your team who also participated in

11 negotiating these agreements?

12 A.   Yes.

13 Q.   Is one of them coming to court next week to talk about

14 these agreements?

15 A.   Yes.

16 Q.   Look at the signature there.  Who signed it on behalf of

17 Microsoft?  It's on page 9 -- excuse me -- 8.

18 A.   Lori Wright.

19 Q.   Does Ms. Wright work for you?

20 A.   She does.

21 Q.   What is her job?

22 A.   Ms. Wright leads all commercial and business development

23 for Xbox.

24 Q.   Take a look at Exhibit A, which is page 9.

25 A.   Yes.

**BOND - CROSS / FLEURY**

1    **Q.**   Let me know when you're there.

2    **A.**   (Witness examines document.)  I'm here.

3    **Q.**   This clause is called "Unanticipated and Unforeseeable

4    Future Events."  Do you see that?

5    **A.**   I do.

6    **Q.**   It says (as read):

7              "The parties acknowledge that the gaming industry is

8         rapidly evolving and that unanticipated and unforeseeable

9         future events beyond the control of the parties during the

10        ten-year term of this agreement may render performance of

11        the agreement impractical, unduly onerous, or uneconomic

12        for either party."

13        Do you see that?

14   **A.**   I do.

15   **Q.**   So I'm going to specifically ask you about that last part

16   of the clause, and I'm only going to ask you about your

17   commercial understanding of the term.

18        In your view, if either party, Nvidia or Microsoft, does

19   not realize more success because of this agreement at any

20   point, the parties can renegotiate; correct?

21   **A.**   I'm just going to read the language again.

22        (Witness examines document.)  That's what this says, yes.

23   **Q.**   And now I'd like you to turn back in the agreement to 2.3.

24   This is on page RX1211-005.

25   **A.**   I'm here.

Case: 23-15992, 08/09/2023, ID: 12771608, DktEntry: 35-3, Page 100 of 215

3/14/23, 1:27 PM          Microsoft Corporation (MSFT) Management Presents at Jefferies Interactive Entertainment Virtual Conference (Transcript) _ Seek…



Technology        Transcripts



# Microsoft Corporation (MSFT) Management Presents at Jefferies Interactive Entertainment Virtual Conference (Transcript)

Nov. 13, 2020 8:45 AM ET | **Microsoft Corporation (MSFT)** | 3 Likes



**SA Transcripts**
135.29K Followers

Play Earnings Call

Microsoft Corporation (NASDAQ:MSFT) Jefferies Interactive Entertainment Virtual Conference
November 12, 2020 1:00 PM ET

## Company Participants

Tim Stuart - CFO, Xbox

## Conference Call Participants

Brent Thill - Jefferies

Alex Giaimo - Jefferies

## Brent Thill

Welcome, everyone. My name is Brent Thill. I run the software group at Jefferies. I'm joined by Alex, my partner, who runs the gaming segment for us.

We want to welcome you and bring in Tim Stuart from Microsoft. Tim's the CFO and runs a lot of other things related to the gaming business inside Microsoft. He's been there a short 18 years and 6 months, and he has phenomenal experience. We know the Masters is kicking off on ESPN on the other side of this, so Tim is very confident we'll hold a higher court than Tiger Woods. Tim, thanks for joining.

## Question-and-Answer Session

### Q - Brent Thill

We're obviously riding the launch here. Maybe just bring us up to speed on the strategy this cycle, what you're seeing so far. You won't take my money right now. So everyone's asking, when are we actually going to be able to get these?

### Tim Stuart

Yes, I wish I had some handouts for the show here. No, I think that it's a very unique time in gaming in general, as we know, with the pandemic going on and other things. But also, as you look over the last 4 or 5 years, just a very big change in gaming. We think about subscriptions, when you think about digital, when you think about new consoles. I love where we're at in terms of how we got here.

So your point is exactly right. 2 days ago, we launched Xbox Series X and Xbox Series S. It's our biggest launch we've ever done in terms of units and geographies and our overall footprint and activations. So super excited about where we're at. And I love the price points, I love the SKU profile we picked: $499 on the top end for Xbox Series X, the world's most powerful console; and then we have Xbox Series S, I like to call it the world's best value in gaming, really to bring forward a lot of those purchasers that would normally wait for price points to come down. We feel like we want to remove some of that friction, bring forward a lot of those users, bring forward a lot of those people that would come late in the generation. And maybe that contributes a little bit to your inability to find a console now. But really, out of the gate, launched with the right price point, the right power profile and the right content offerings that differentiate us.

So I like where we're at. I like the launch and I love how it sets up -- and we can talk about this later. I love how it sets up Game Pass and game streaming and really kind of starting where our strategy will go for Microsoft in the future.

**Brent Thill**

Many ask what makes this round different? You are a lover of golf, it seems like. You're going into this round versus last round. What is different about this round that you've tried I to work on going into this?

**Tim Stuart**

Yes. We always look for technological shifts to launch new consoles. And when you look at these consoles, it's things like fast load times. I have an Xbox Series S right here next to my PC. I won't play it right now. When we think about getting into games almost instantaneously. When you think about raytracing, you think about RDNA, you think about running a game at 120 frames a second and 4K. It's the technology around these boxes that really is magical.

And unleashes, really, creatives and content creators to really reach new things we haven't seen before in terms of fidelity, in terms of how things look and how things play, number of players you can put on a screen, a number of things you can load much quicker. So, a, I love the technology that we're ushering in; b, it's the experiences. It's things like we have Xbox All Access, which is the ability for us to combine Game Pass plus a hardware purchase into a $24.99 a month, a $34.99 a month subscription. So you can get hardware plus services together, which is something unlike we haven't had in the past.

And so now we can sell through new distribution, we can sell through Telstra in Australia. We can sell through mobile operators here in the U.S. So I love that pricing differentiation.

And then lastly is Game Pass, something we haven't had in the past. With Game Pass, you can get in for $9.99 a month. And if you're new to the console player, you can get hundreds of great games out of the gate with the console that you've purchased, which is something we haven't had in the past. So the ability for someone to get into a console to play games that you -- look amazing and have never been seen like this before and have access to a content catalog that is bigger than we've ever had, I think, is going to be kind of the 1, 2, 3 punch of why this console's going to be very different than the past.

**Brent Thill**

There's obviously incredible demand. You had a sold-out of all the preorders. And I think everyone's kind of asking how you think about the ongoing supply that you can bring to the market. Can you just give us a high level -- I know you're not going to give specifics, but just high level, how you're meeting this incredible demand from your side?

### Tim Stuart

Yes. It's something we look at all the time. You wish you had supply to meet the huge demand. I think what we've seen over the last generation and then heading into now is -- and part of this demand profile is, frankly, gaming is just exploding. It's a $200 billion a year industry. And so kids, adults, male, female, young, old, whatever it is, are games. And so that drives that demand profile, which we love to see.

From a supply perspective, you're absolutely right. For Q2, we gave guidance at our last earnings call of a zone that we'll be in. And we'll, frankly, be within that zone because we know the supply profile that we're having. I think we'll continue to see supply shortages as we head into the post-holiday quarter, so Microsoft's Q3, calendar Q1. And then when we get to Q4, all of our supply chain continuing to go full speed heading into kind of the pre-summer months.

And that's where I start to -- I expect to see a little bit of the demand -- the supply profile, meeting the demand profile. You'll be outside of a holiday window. We'll have supply cranking over the next, what, 4, 5, 6 months. And that's when I expect to see really that demand profile start to be met, which will be really, really great. And really, what that's going to do is, once we get into that world of a great high end, call it, a great high-powered console, plus that lower-end SKU for value, I think we're going to start to see some real velocity kick up, which I'm really excited to see.

### Brent Thill

You got a lot of help with the rest of Microsoft. When you think about the impact that Azure and the rest of the stack is giving you, one of the questions we continue to get is the impact of the cloud and how the cloud is going to play into the future of gaming and in what your parent is doing to enable you to get to where you want.

Can you just talk about where we're at today with the cloud? And where do you think we're at 3 to 5 years out, how impactful is cloud gaming going to be?

## Tim Stuart

Yes. Yes. I think -- so number one on the -- I'll say on the Microsoft side, having an Azure cloud, having a first-party cloud is going to give us something that's uniquely differentiated versus anybody else in this space. Kind of the combination of our content pipeline plus Game Pass, plus the cloud, which gives us the ability to stream games to, I'll say, any end points that can take a signal is going to be massively differentiated versus others in the industry. So I love that perspective. And I love having kind of that Microsoft drive with our geographic footprint with Azure. So I think point one is going to be, that's going to be so great.

Azure also gives us the ability to reach something like 80% of the gamers in the world will be within an Azure-served zone. It allows us to go into Africas and Indias and stream games into places that are not console-first and maybe not even PC-first, but they're for sure mobile-first. And that's going to be a very, very unique place to be, which Microsoft gives us the ability to go do.

I'll say in addition to that -- I'm going to kind of jump your question a little bit. Is 5G. 5G, combined with Azure in those regions, will be a huge bonus for us, which is we can now hit those markets with low-latency gaming with compute that's happening pretty close to those gamers with that Azure data center. And that will usher in new distribution models, but more importantly, it will give us that ability to go drive a mobile-first customer or a mobile kind of main customer.

If you think about console market being 200 million or 300 million players; the PC markets, 200 million or 300 million players; that mobile market is billions plus. And Brent, to your question, how important is that audience? I think Microsoft's scale, our ability to go from -- we're 15 million Game Pass subscribers today to 25 million, 50 million, 100 million is going to require that mobile audience to be achieved by us. And that's where we're going to have to have a content pipeline that supports that amount of users. But to your question, having that cloud streaming ability will be needed to go reach customers at that scale for sure.

## Brent Thill

Another question just around kind of the content. And you -- your division got the largest acquisition of the year, $7.5 billion, obviously, a key component. Can you just talk to us about what's happening in the content industry? And what you think is happening?

Some of the larger players have said they're going to raise prices. Any thought around just content and then the ability to actually raise prices given all the dynamics that seem right for that type of backdrop to do that?

**Tim Stuart**

Yes. It's -- from a content perspective, it's a great time to be a content owner, for sure. And you can look at valuations as one example of these companies. But more importantly, it's the -- two things are happening: Number one is gaming has never seen this many players as it does today, okay. So just from an engagement standpoint, it's a great place to be.

Number two is, I like to say in the old days -- which ends up being like 3 years ago. But in the old days, it was us and Sony or Nintendo walking to these content creators and talking about deals or future content pipeline. And now you're in a world with Google and Facebook and Amazon and Tencent, Sony, Nintendo, Microsoft, you're in a world where there's much more demand for content pipeline and which from a -- I'll say, from a publisher perspective, is great when you think about the economics that they can drive. And that's on the point about economics on our side, but it's just ability for us for them to go chase high demand from platform owners.

From a consumer standpoint, if you're a game creator, games are getting more expensive to create. They're driving revenue growth as well, and they're looking for opportunities to go create more monetization for the support of that content creation. And that's when you see a little bit of the game pricing going up. So your example is $60 going to $70 on some games. But also, when we think about Game Pass on our side, it's another outlet for our content creators to go find new users, to find a way to monetize those users that may not have played their games.

So the example I give here is for Grand Theft Auto, which has been in Game Pass. You sell the game for $60. There are users that wouldn't have paid $60 for that game. But now that it's in Game Pass, they are finding new users that otherwise wouldn't have played that game.

And these games are excellent at post-sale monetization, right? They're selling maps and skins and weapons and missions and things like that. They have the ability to find new users. They have an ability to find great monetization models for those new users, and that's driving revenue upside for them as well. So they're expanding their sort of top of funnel through Game Pass offerings.

But Brent, to your point, exactly, I think that they're seeing high demand, high engagement. Content is such a cornerstone of what gaming is, right? We all want to play the games. And they're finding unique opportunities to either raise price or find monetization opportunities as well. The kind of the side joke I'll give is, the last time there was a price increase was, what, 7 or 8 years ago or something. So time value of money says, says it's about time anyway. But that's kind of a side point.

## Brent Thill

That's great. I guess last question for you, and I'll turn it over to Alex. Just at a high level, what is, from your perspective, living on the inside, what are the things that you see and feel that we can't feel? Like what is kind of the most exciting thing from your perspective that you would bring?

We get to watch a lot of these great companies like yourself, but we really don't get a sense of what it's like to be at the 12th hole at Augusta, if you will. What's it like? What are you most excited about? And then I'll turn it to Alex.

## Tim Stuart

Yes. I think the thing that I'm most excited about from a -- I'll say, from a -- from an Xbox or Microsoft landscape, is our ability to have an offering that can move off console to chase new customers. In the past, where we had just a console lens, the console space, again, you're kind of locked into that console market, if you will.

Game streaming and ability to serve up a AAA-quality game to an Android device, to a PC without a GPU, to a smart screen is going to be, I think, an unlock for gamers unlike what we've seen in the past. The ability for a user who wasn't going to buy a console can now participate in the AAA-console-quality game market I think it's going to be a really, really unique experience.

It's going to create a lot of new gamers, too, that may have been used to playing Candy Crush or something on their phone. They can now play AAA-quality games on their device with a controller just bound to it or whatnot.

So I think from the inside, I see usage happening through our game streaming. Just -- we've only just launched it effectively. But I see users playing more, buying more, playing on the go. And I think that's going to be an awesome experience that will unlock a lot for Microsoft and for our Game Pass subscriber base.

**Brent Thill**

Great job, Tim. Good luck with the rest of this. And thanks for your time. I'll turn it to the better half of the presentation with Alex.

**Alex Giaimo**

Yes. Thanks, Brent, and thanks again, Tim, for joining. And to the folks on the line, if you do have a question for Tim, you could ask it directly through the Zoom portal, and we'll make sure to get it relayed. But Tim, I want to go back to your comments on Game Pass, right? You keep expanding the amount of games in the bundle. You have this partnership with EA Play now. So just curious if you're seeing a larger opportunity on the subscription side now than you've had in the past and the processes to lean into that.

**Tim Stuart**

Yes, that's a great question. Game Pass is our North Star strategy. It's the, how do you get customers in a subscription model? And then how do you have a content pipeline that supports all the games that they want to play? Now of course, we love supporting games outside of Game Pass as well. That's still the Xbox business model.

But we see unique opportunity here. You, probably like me, have 5 or 6 consumer subscriptions, whether it's Hulu or Netflix or Spotify or whatever it is. And we see that to be a world now where consumers are used to and more than happy to pay and play in those kind of examples.

So unlike the past decade, I think we see a world where consumers are ready to go down that business model approach. I don't think we were in a world 10 years ago to really see that. So I think that's number one uniquely important about the time that we live in.

Number two is the partnership that we have with our partners across the industry, inclusive of EA Play. I love EA Play coming into Game Pass, and users get it for free. They get to be able to participate in EA Play as we build out our content pipeline.

And this is going to be a little bit of a bridge to the acquisition that -- with Bethesda. But my point here is, we will need to have a content pipeline that supports future success state. If Netflix, of course, they assume success in Netflix, but if they looked at content pricing or content pipeline today, should or could or would they have been more acquisitive on the first-party side to bring content in sooner from a first-party landscape? But as we see success growing in Game Pass, we're going to need to have a content pipeline, both through a rent, we partner with partners in the industry; and through a buy. We'll need to have first-party content that we can launch day and date, not unlike Orange is the New Black or Stranger Things and House of Cards, boom, boom, boom. We want to have that from our first-party landscape as well. So that's one of the places that we're being a little bit more active in, as you've seen with Bethesda and some of the acquisitions we've done over the last couple of years.

### Alex Giaimo

Yes. And how do you balance that mix, right? So on the first-party publishing side, you have a lot of fantastic content. Obviously, Halo, everyone is highly anticipating that launch next year. You've been doing acquisitions. But then you also -- you're also a distribution platform for the third-party publishers out there. So kind of how do you balance the mix between priorities and the shift that dynamic?

### Tim Stuart

Yes, that's a great question and something we balance a lot because as a platform -- and this is Microsoft DNA as well, for us to be successful, our partners have to be successful. And so we want to be in a world where something like Game Pass can live alongside stand-alone games or live alongside -- if customers want to buy a $60 or $70 game in that post-sale monetization, that's great. We want our partners to be successful on the platform.

And so it's something we think about a lot. And our conversations in the industry is, do you find more consumers in a Game Pass-type example? And if so, and you can monetize those users better through a deal specifically with us, maybe that's the right windowing opportunity. You have a $60 or $70 launch, and then you window into Game Pass to go hit another revenue stream downstream. Or for first party, we want to have first-party content be a driver of why people want to subscribe to Game Pass. And again, if I can get someone into a $9.99 a month or $14.99 a month subscription and first-party content is the reason they did that, I can monetize the consumer a lot higher. The -- as you say, the economics are better if they're on a subscription for a long-term as opposed to maybe buying a game once a year or otherwise.

And that we share that revenue. I'm not making a point about business model here or our deals. But Game Pass creates a revenue stream from which we can go create a content pipeline through deals or otherwise through our content creators.

But I think the specific answer to your question is, we need the Activisions, the Ubisofts, the EAS, the Take-Twos, the Epics, all the way down to indie creators to be successful on the platform. So we want Game Pass to be net additive to them. And if they choose not to be in Game Pass, we want to create a platform that finds the maximum number of users that can spend the maximum number of dollars for them. And we want Activision, EA, Take-Two, Ubi to be highly successful on the platform regardless of the direction they choose to go.

### Alex Giaimo

And even before the Bethesda acquisition, you had been acquiring a handful of smaller, independent studios. Just curious, are you still looking at more studios? What do you look for when you approach these teams? And just what's the overall maybe M&A priority right now?

### Tim Stuart

Yes. I think the short answer to still looking is we will continue to be acquisitive. We'll continue to look around the industry to find who has the great IP, who are great leaders, who has great product development, who can we rely on and say, we need a AAA game launching in FY '24 Q1 for Game Pass. Let's line that -- let's line the road map up to go land that -- plan that perspective.

So we'll continue to look at. In the past, Bethesda was a little bit of a different lens to what we've done in the past, whether it's Ninja Theory or Obsidian or inXile, some of the smaller studios that had great IP. Bethesda gave us a great sort of launch with -- I'll say, launch into a big, let's call it, group of content, a big catalog of content that we can use for Game Pass.

And we said this as part of the announcement. When we think about Bethesda, it's going to be the continuing to allow -- I'll say allow, but continue to sell their games on the platforms that they exist today, and we'll determine what that looks over time and will change over time. I'm not making any announcements about exclusivity or something like that. But that model will change.

But really, it's about how do you take that content and put it into a service like Game Pass to drive that subscription of the North Star metric? So I think the long -- the short answer to your question is we'll continue to look at content, we will continue to look at bolstering our first-party studios. And as always, if the right value is there with the right content creators with the right IP, we'll continue to look at opportunities like that.

### Alex Giaimo

That's helpful. And then we touched on this earlier, but with the news that some of the third-party publishers are going to be raising pricing on their AAA titles, maybe all titles, does Microsoft follow suit in terms of your first-party published content? How do you think about pricing compared to where it was? I think the last time prices went up was actually 2 console refreshes ago. But what are your thoughts there?

### Tim Stuart

Yes. I think we're not making specific announcements on first-party pricing yet. So we'll do that sort of in due time. But again, if -- I think if publishers can find a price point that works for their audience, defines a price point that works for the maximization of, I'll say users and revenue, because you want to drive engagement. I talk about engagement equals currency a lot. Engagement is the ability for you to drive wholesale monetization, to drive activation of your content, to drive sort of hours in your service. Because these games are becoming, as we all know, they're becoming ecosystems under their own -- or onto their own. Call of Duty wants to keep a Call of Duty player and monetize them down the road. FIFA wants to keep a FIFA player in their ecosystem and monetize down the road.

So I think we'll look at publishers to make the right decision for their content. If they can drive a premium price point or a higher price point, I think that's warranted. And I'd say, your point is exactly right. Prices have not gone up in -- what, for a couple of generations now, so it's not unheard of to see things like this going on.

And to the point earlier, content creation costs go up. And these publishers and content creators, including ourselves, want to make sure you're driving the right gross margin profiles, the right earnings profiles of what it takes to build these new, awesome, amazing games. And you want to make sure you have a good top line to support that.

### Alex Giaimo

Right. And one of the questions we're getting from the audience is, do you think the future of video games will be 100% cloud gaming? And obviously, you just released a piece of hardware, so that's certainly been your focus. But is there a time frame or a specific amount of years in which you think cloud gaming can really become mainstream? And maybe what are the limitations right now that's preventing that?

### Tim Stuart

My joke here is, I think I've said this is the last console generation for 15 years or so, and it always makes sense from an economics and a technology standpoint to launch one. I think it's a question we think about a lot. One of the things that we go through when we're developing a new console is, does the technology makes sense to launch something new? Does the market demand or want something new? So you think about the new ones we've launched just this week, raytracing, RDNA, near instant load times, those kind of things are all ushered in now with the silicon develop -- the silicon that enables that to happen. So we think that it's the right time to launch based on the price points and based on the tech now.

I think as you look forward a decade, cloud streaming will become more mainstream. It will become more about how users play. And this is why I love the connection we have to Azure. It's our ability to go chase that opportunity, to go chase that market as users shift from console-first to, let's call it, we call it mobile-first, but really what I mean is console-unlocked-first. I think that's going to be a more active way that people play.

Now that being said, if there's an opportunity for another console to have local compute under a TV, and that's the best way to play on your 65-inch OLED at 120 frames a second, we will continue to look at that. And if that is still the right and best way for high-value gamers to play or users that want to play with the top fidelity, we'll continue to look at that, of course.

But as I look at the next decade, and this is more of a longer term play, I believe it's going to shift more into a cloud streaming world. When I look at latency now, it's in a place where it makes games fun, you can play.

And I'll make a little bit of a bridge point back to 5G. 5G rollout here allows, I think, game streaming to hit 2 things: One of which is geographic expansion. When you think about going into Africa and India, Southeast Asia, 5G allows that technology stream from the cloud to really be exciting and a great user experience.

And number two is latency. You can play games at a far faster clip. You can have much lower latency with 5G. And partners that we see in the mobile industry, the mobile operator side, are looking for that differentiated experience. They're looking for the things they can upsell to their unlimited data plans or their 5G data plans.

Some of the first calls we got, as I mentioned, were from mobile operators in the world, looking to partner with us on our game streaming tech with Project xCloud to deliver game streaming over their networks. They need that differentiation. Much like YouTube or Netflix ushered in kind of 4G and LTE, I think game streaming is going to usher in that 5G landscape.

So I'm kind of bouncing your question a little bit, but I think the 5G ecosystem is -- presuming success, which I do, is going to usher in a world where the console market will not be as needed to play the games you want to play.

### Alex Giaimo

That's helpful. And another question we're getting from the line here is with the acquisition of Bethesda, is the plan to make certain Bethesda franchises, like Fallout and DOOM, exclusive to Xbox? Or will you still support cross-platform play?

### Tim Stuart

Yes. The goal here is, we're -- I'll say it from a cross-platform perspective. Microsoft is a platform. We're one of the first to really support Minecraft, Roadblock, Fortnite across platforms. So we highly encourage cross-platform play, simply from this landscape of, if it's good for the gaming ecosystem, it's good for us, classic rising tide lifts all boats.

What we'll do in the long run is we don't have intentions of just pulling all of Bethesda content out of Sony or Nintendo or otherwise. But what we want is we want that content, in the long run, to be either first or better or best or pick your differentiated experience, on our platforms. We will want Bethesda content to show up the best as -- on our platforms.

Yes. That's not a point about being exclusive. That's not a point about we're being -- adjusting timing or content or road map. But if you think about something like Game Pass, if it shows up best in Game Pass, that's what we want to see, and we want to drive our Game Pass subscriber base through that Bethesda pipeline.

So again, I'm not announcing pulling content from platforms one way or the other. But I suspect you'll continue to see us shift towards a first or better or best approach on our platforms.

### Alex Giaimo

That helps. And then one question we're getting a lot, and maybe you can just answer from a high level. But folks are just curious how the economics work behind some of these partnerships, right? So a company like EA that you guys put on Game Pass, are they compensated based on usage? Is it sort of a flat fee based on subs. Maybe just from a high level, if you can touch on that a bit.

### Tim Stuart

Yes. There's a couple of lenses on this question, which are interesting. I'd day the first is as Xbox, we have revenue streams with these companies across the board. So think about third-party store or advertising or Game Pass, we have ways to monetize our consumers in broader ways than just doing Game Pass relationships.

So the deals will all be different across our partners. Because you could say -- and this isn't me talking about EA specifically, come into Game Pass and you'll get a different rev share or something on the digital transaction side. Or come into Game Pass, and we'll have just a direct payment relationship. Or come into Game Pass, and you'll have the ability to go acquire new customers that you haven't seen before and drive post-sale monetization with those customers.

So there's going to be unique differences between the partner that we're working with and what they want to see out of the relationship. But we do have a -- Game Pass does drive a brand-new revenue stream. Our job as a platform is to create a world where those revenue streams create revenue-sharing opportunities for our publishers, for our developers and for us.

And so while I won't highlight EA or somebody specifically, we do have a world where we create revenue streams. As they're successful, we're successful and vice versa, and we'll continue to go build out higher revenue profiles that we can make sure we participate and share with our publishing partners.

### Alex Giaimo

And you have this financing option now for the first time, right? So kind of lowering the upfront cost to acquire one of these consoles. Is there any early observation by maybe the uptick you're seeing there? Is this going to create a situation in which maybe the installed base scales more quickly than previous cycles, just given the fact that it's a bit more affordable?

### Tim Stuart

Yes. I think that's a great question. So when you think about -- what you're talking about is Xbox All Access. And so for the audience, that is the ability to buy a piece of hardware plus Xbox Game Pass Ultimate sort of subscription service for a monthly price. So $24.99 a month in the U.S. for Xbox Series S or $34.99 for Xbox Series X.

And what I love about this is a couple of things. Number one is, it differentiates ourselves versus competition. So it's not something that Playstation has in a very material way. Game Pass gives us the ability to provide a content bundle that can be paid off over time. And it's not a financing deal. It's more of a -- thinking about it like a hardware subscription. So I love that perspective from a differentiation lens.

I love the ability for a customer who may not have wanted to spend $500 or $300, or whatever the price point is, to come in and join Xbox for a low monthly rate. So I think we're removing the barriers to entry. We're taking some friction out of the ecosystem there.

And lastly is distribution. We're seeing great uptake from something like Telstra in Australia is a great example. So they're world-class, as many global operators are, about selling hardware plus service bundles. But clearly, they do this with mobile phones plus their subscription service, so their data plans.

So we are going into a much broader footprint from a distribution landscape with these audiences. And so someone that walks into a Telstra or a T-Mobile, a Verizon or AT&T, they can now buy a sort of hardware plus services plan unlike anything they've seen before versus that kind of big outlay upfront.

So excitement's there. I think we're seeing some uptake there, which is great. A little bit of a short-term lens of, if you're someone looking to demand -- or supply is tight right now, demand is high. So you're going to get a lot of people just click and buy, buy, buy. But I think in the long run, this Xbox All Access, hardware plus services bundle is going to be a great opportunity for us to go reach new customers and continue to differentiate versus competition in this space.

### Alex Giaimo

Another question we're getting is for an update with the strategic partnership you signed with Sony on the cloud. Maybe just what's the opportunity there?

### Tim Stuart

Yes. I think -- and I won't comment specifically about Sony, not to get on a-- not to make the -- not to deflect the question. But what I would say is Microsoft as a platform provider, that's our DNA. If Sony or I'll say Nintendo or EA or I'll pick anybody, frankly, that doesn't have a first-party cloud sees the future of where the business is going -- and I'll call it cloud streaming. You're going to have to have a cloud provider that serves up to those customers.

Again, Microsoft invested billions of dollars in this space to have an some awesome Azure landscape and Azure geo footprint. And if there's something like -- a partner without that, I think you're going to need a cloud to go reach those audiences. Especially if you're -- in this example, like Sony, you're a hardware operator, which doesn't have a cloud and the ability of where the markets -- or where the market is going, I think you're going to need a cloud provider to do that.

So we, as a cloud provider, would happily take publishers or developers or hardware ecosystems into the -- into our ecosystem and serve to our customers. Clearly, Microsoft has heritage in the video game space, so we know what that partnership looks like. Phil Spencer and Scott Guthrie have a great partnership internally at Microsoft between the 2. And I think it's a good place to be. But we can sell -- sell our cloud opportunities for partners that may want to look for that opportunity as well.

### Alex Giaimo

That's helpful. And we do have about 5 minutes left, so I'll try to get to the remaining questions I'm seeing. But one question is around the relevance of Game Pass as free to play rises in popularity, right. And obviously, you make money through free-to-play games in other ways. But just curious, does that impact the uptick or the take rate, so to speak, that folks are willing to pay on the subscription side and just the balance between engagement and how that might impact the subscription model?

### Tim Stuart

It's a good question. One of the things that's up to us is to make it so Game Pass can coexist in the world of free to play as well. And I would say, interestingly, free to play is more of a -- it's a game mechanic as well. Games are designed to be free to play from the beginning. It's not like, generally speaking, you should take a game that's been designed for an upfront purchase with PSM and just turn it into free to play. The games that work the best are designed that way from the beginning.

What I would say though is, interestingly, many players in Fortnite or other free-to-play games, Rocket League or Roadblocks, et cetera, many of them spend actually more dollars overall than they would have if they bought the game for $30 or $40 or $50 just because of the way they play. And I think free to play is an interesting game mechanic. It's less about playing the game for free. It's just more about how they increase top of funnel.

So it's up to us as a platform and the owners of Game Pass to create a reason where maybe we put a free-to-play game in Game Pass. Maybe you get a certain amount of in-game currency. You get a unique skin or a differentiated experience by being a Game Pass subscriber.

So I think what you'll see from us is the sort of the cohesiveness between a free-to-play world and a Game Pass world, where actually, I want to be a Game Pass subscriber and still play the free-to-play games because I get something that's unique or I get value or I get some in-game currency or whatever. So I think that you'll see from us a world where they exist together, and I think you'll see a net additive place across the platform.

### Alex Giaimo

Maybe one last question, but now that the consoles are out, how does your job change or what priorities changed? Where do you shift your focus over the next couple of years as you're sort of in the early stages of the console refresh here?

### Tim Stuart

Yes. For us, it's all about growth. It's all about how do you go find new customers. I like to talk about Microsoft-level relevance, and of course, we're relevant today. But it's the going from what is a console ecosystem to expanding into that billions of gamers around the world ecosystem. That's the growth opportunity that we see at Xbox within Microsoft.

And so of course, we're going to play to win in console. Of course, we're going to drive that place. Of course, we're going to make it the best place to place to play for consumers and the best place to monetize for our publishers and partners.

But our job as Xbox and gaming at Microsoft is to look for those growth opportunities. How do you go sell Game Pass to 100 million players? How do you sell it into India and Africa? How do you sell it to mobile-first consumers? That's really how my job changes. Are we getting a content pipeline that can support that? Are we getting an Azure footprint that can support that? Are we getting a go-to-market model, a strategy, price points that can support that.

So I think from us, that's what you should expect is, as we grow to that non-console audience, how do you go chase that -- those hundreds of millions of new gamers that we haven't seen in the past. And that's what gets me most excited. That's what gets me out of bed each morning. That's what I love coming in to work to do is growing the business and finding those consumers that we've never seen before. And how do we partner with players in the industry to go do that.

That's Microsoft's core DNA. That's how we win as a platform. And I think that's really the sort of North Star that we're chasing.

### Alex Giaimo

Very good. I think we'll -- we can wrap there. We want to thank Tim for joining. This has been super informative, and we appreciate it for joining the dialogue. And thanks, everyone on the line, for listening.

### Tim Stuart

Great. Thanks, Brent. Thanks, Alex, for having me. This is great. I wish we had done this in person, but it's great to talk to your audience here today.

### Alex Giaimo

Sounds good. Take care, everyone.

### Tim Stuart

Thanks.

Read more current MSFT analysis and news

View all earnings call transcripts

# Recommended For You

 First Republic Bank: Blood On The Street

 The SVB Financial Group Debacle And Schwab: Time To Buy May Be Nigh

 VICI Properties: Doubling Down

 Charles Schwab Hasn't Been Swimming Naked

 Citigroup: Indiscriminately Sold Off

# Comments

Sort by  Newest ▼      ⋮

To report an error in this transcript, click here. Contact us to add your company to our coverage or use transcripts in your business. Learn more about Seeking Alpha transcripts here. Your feedback matters to us!

## Microsoft FY23 First Quarter Earnings Conference Call

Brett Iversen, Satya Nadella, Amy Hood

Tuesday, October 25, 2022

**BRETT IVERSEN:**

Good afternoon and thank you for joining us today. On the call with me are Satya Nadella, chairman and chief executive officer, Amy Hood, chief financial officer, Alice Jolla, chief accounting officer, and Keith Dolliver, deputy general counsel.

On the Microsoft Investor Relations website, you can find our earnings press release and financial summary slide deck, which is intended to supplement our prepared remarks during today's call and provides the reconciliation of differences between GAAP and non-GAAP financial measures.

On this call we will discuss certain non-GAAP items. The non-GAAP financial measures provided should not be considered as a substitute for or superior to the measures of financial performance prepared in accordance with GAAP. They are included as additional clarifying items to aid investors in further understanding the company's first quarter performance in addition to the impact these items and events have on the financial results.

PX9171-001

And, with Promote IQ, we offer an omnichannel media platform for retailers like Otto Group looking to generate additional revenue, while maintaining ownership of their own data and customer relationships.

Now, on to gaming.

We're adding new gamers to our ecosystem, as we execute on our ambition to reach players wherever and whenever they want, on any device.

We saw usage growth across all platforms, driven by strength off-console.

PC Game Pass subscriptions increased 159 percent year over year. And with Cloud Gaming, we're transforming how games are distributed, played, and viewed.

More than 20 million people have used the service to stream games to date.

And we're adding support for new devices, like handhelds from Logitech and Razer, as well as Meta Quest.

PX9171-017

  Microsoft | XBOX  Xbox Wire Sites ⌄

Consoles     Games     Official Xbox Podcast     Xbox Game Pass

## PLAY OVER 100 XBOX GAMES ON ANDROID MOBILE WITH XBOX GAME PASS ULTIMATE

Download the Xbox Game Pass mobile app and play.

   





**XBOX GAME PASS**

# Cloud Gaming with Xbox Game Pass Ultimate Launches with More Than 150 Games

by Kareem Choudhry, Corporate Vice President, Cloud Gaming, Microsoft   •   Sep 14, 2020 @ 6:00am

      

Today, I'm pleased to share the initial launch line-up of more than 150 **games that Xbox Game Pass Ultimate members can play via the cloud in 22 countries starting September 15 at no additional cost**. You will find a fantastic, curated selection of games available in the Xbox Game Pass library, including popular Xbox Game Studios titles such as *Tell Me Why*, *Grounded, Forza Horizon 4*, and *Battletoads*, along with favorites from our content partners like *Spiritfarer*, *Untitled Goose Game*, and *Destiny 2*. Similar to Xbox Game Pass for Console and PC, you can expect the library to evolve over time based on members' feedback, with new games added all the time.

As Xbox Game Pass Ultimate members, you can discover the freedom and flexibility the cloud brings to your gaming experience. One of the key benefits of cloud gaming is that it gives you more choices in how to play. Because your Xbox profile resides in the cloud, you can easily continue your *Wasteland 3* play through that you began on your living-room Xbox console on your Android phone or tablet. It's perfect for those times when you want to get in a gaming

PX9091-001

session while away from home or when your shared TV or console is occupied. With the cloud, a game like *Sea of Thieves* can transform into a great couch co-op experience with multiple people playing across console, PC, and mobile devices in the same room.

Additionally, cloud gaming as part of Xbox Game Pass Ultimate now opens up the world of Xbox to those who may not own a console at all. With an Xbox Game Pass Ultimate membership, gamers need only an Android phone or tablet and a supported controller to join in on the fun of Xbox gaming while enjoying the full benefits of the Xbox ecosystem. This includes friends, achievements, parties and voice chat, cloud saves and the ability to enjoy multiplayer with other gamers, irrespective of whether they are playing on console or via the cloud. You can also play with PC players in games where cross-play with Xbox One consoles is supported, such as *Forza Horizon 4*, *Gears 5* and more.

Finally, **cloud gaming with Xbox Game Pass Ultimate makes it easier than ever before to play games with your friends**. Because members have access to a common library, members immediately have dozens of multiplayer games at their disposal that they can play together. And best of all, if you're all playing together via the cloud, the games are all ready to go, so you and your friends can all jump in and start playing in seconds. Whether you're playing with friends on an Xbox One, or if you're playing with someone experiencing Xbox for the first time through cloud gaming on a mobile device, Xbox Game Pass Ultimate brings you together and makes for the best gaming experience.

New members **can join Xbox Game Pass Ultimate today for $1 for the first month, then $14.99 per month after that**, which is a great way to ensure you're ready to take advantage of cloud gaming next week. To play games on your phone or tablet, download the Xbox Game Pass app from the Samsung Galaxy Store (which includes a complete, full-featured experience with in-app purchase capabilities), or the Google Play Store. And if you want to enhance your cloud gaming experience, you can order a new Samsung Galaxy device and select the Gaming Bundle at purchase, which includes three months of Xbox Game Pass Ultimate and the all-new Power A MOGA XP5-X Plus Bluetooth Controller with an attachable phone clip. We'll launch cloud gaming in beta for Xbox Game Pass Ultimate members in 22 countries to ensure stability as we scale the feature to millions of gamers globally. And this holiday, some of the best EA Play games will be available for Xbox Game Pass Ultimate members to play on Android devices via the cloud at no additional charge.

This is a pivotal step on our journey to put the player at the center of their experience and empower gamers to play the games they want, with the people they want, anywhere they want. What you'll see on day one is just the beginning. Over time we'll continue to innovate and add more games that you want. Stay tuned to Xbox Wire and @XboxGamePass on Twitter for more cloud gaming updates.

**Cloud gaming launch titles**:

- *A Plague Tale: Innocence*
- *Absolver*
- *Afterparty*
- *Age of Wonders: Planetfall*
- *ARK: Survival Evolved*
- *Astroneer*

PX9091-002

- *Batman: Arkham Knight*
- *Battletoads*
- *Battle Chasers: Nightwar*
- *Black Desert*
- *Blair Witch*
- *Bleeding Edge*
- *Bloodstained: Ritual of the Night*
- *Bridge Constructor Portal*
- *Carrion*
- *Children of Morta*
- *ClusterTruck*
- *Crackdown 3: Campaign*
- *Crosscode*
- *Darksiders Genesis*
- *Darksiders III*
- *DayZ*
- *de Blob*
- *Dead by Daylight*
- *Dead Cells*
- *Dead Island Definitive Edition*
- *Death Squared*
- *Deliver us the moon*
- *Demon's Tilt*
- *Descenders*
- *Destiny 2: Shadowkeep & Forsaken expansion (September 22)*
- *DiRT 4*
- *Don't Starve*
- *Double Kick Heroes*
- *Drake Hollow*
- *Dungeon of the Endless*
- *Enter The Gungeon*
- *F1 2019*
- *Fallout 76*
- *Farming Simulator 17*
- *Felix the Reaper*
- *Fishing Sim World: Pro Tour*
- *For the King*
- *Forager*
- *Forza Horizon 4*
- *Fractured Minds*
- *Frostpunk: Console Edition*
- *Gato Roboto*
- *Gears of War 1: Ultimate Edition*
- *Gears of War 4*
- *Gears of War 5*

PX9091-003

- *Goat Simulator*
- *Golf with Your Friends*
- *Grounded*
- *Guacamelee! 2*
- *Halo 5: Guardians*
- *Halo Wars 1: Definitive Edition*
- *Halo Wars 2*
- *Halo: The Master Chief Collection*
- *Halo: Spartan Assault*
- *Hellblade: Senua's Sacrifice*
- *Hello Neighbor*
- *Hollow Knight (Renewal)*
- *Hot Shot Racing*
- *Human Fall Flat*
- *Hyperdot*
- *Hypnospace Outlaw*
- *Indivisible*
- *Journey to the Savage Planet*
- *Katana ZERO (Coming soon)*
- *Killer Instinct DE*
- *Kona*
- *Levelhead*
- *Lonely Mountains: Downhill*
- *Marvel vs. Capcom: Infinite*
- *Metro 2033 Redux*
- *Middle Earth: Shadow of War*
- *Minecraft: Dungeons*
- *MINIT*
- *Momodora: Reverie Under the Moonlight*
- *Moonlighter*
- *Mortal Kombat X (Not available in Korea)*
- *Mount & Blade: Warband*
- *Moving Out*
- *Mudrunner*
- *Munchkin: Quacked Quest*
- *Mutant Year Zero: Road to Eden*
- *My Time At Portia*
- *Neon Abyss*
- *New Super Lucky's Tale*
- *NieR:Automata*
- *Night Call*
- *Night in the Woods (Coming soon)*
- *No Man's Sky*
- *Nowhere Prophet*
- *Observation*

PX9091-004

- *Ori and the Blind Forest: Definitive Edition*
- *Ori and the Will of the Wisps*
- *Overcooked! 2*
- *Oxenfree*
- *Pathologic 2*
- *Pikuniku*
- *Pillars of Eternity: Complete Edition*
- *Power Rangers: Battle for the Grid*
- *ReCore: Definitive Edition*
- *Remnant: From the Ashes*
- *Resident Evil 7 Biohazard*
- *Rise & Shine*
- *River City Girls (Coming soon)*
- *Sea of Thieves: Anniversary Edition*
- *Sea Salt*
- *Secret Neighbor*
- *Shadow Warrior 2*
- *Slay the Spire*
- *Sniper Elite 4*
- *Spiritfarer*
- *State of Decay 2: Juggernaut Edition*
- *Stellaris*
- *Stranger Things 3: The Game*
- *Streets of Rage 4*
- *Streets of Rogue*
- *Subnautica*
- *Surviving Mars*
- *Tacoma*
- *Tell Me Why Episode 1 – 3*
- *Terraria*
- *The Bard's Tale IV: Directors Cut*
- *The Bard's Tale Remastered and Resnarkled*
- *The Bard's Tale Trilogy*
- *The Dark Crystal: Age of Resistance Tactics*
- *The Elder Scrolls Online*
- *The Gardens Between*
- *The Jackbox Party Pack 4*
- *The Long Dark*
- *The Lord of the Rings: Adventure Card Game*
- *The Messenger*
- *The Outer Worlds*
- *The Surge 2*
- *The Touryst*
- *The Witcher 3: Wild Hunt*
- *The Escapists 2*

PX9091-005

- *The Talos Principle*
- *The Turing Test*
- *The Walking Dead: A New Frontier – Episode 1 through 5*
- *The Walking Dead: Michonne – Episode 1 – 3*
- *The Walking Dead: Season Two*
- *theHunter: Call of the Wild*
- *Thronebreaker: The Witcher Tales*
- *Totally Accurate Battle Simulator*
- *Totally Reliable Delivery Service*
- *Touhou Luna Nights*
- *Tracks – The Train Set Game*
- *Trailmakers*
- *Train Sim World 2020*
- *Two Point Hospital*
- *Undermine*
- *Untitled Goose Game*
- *Void Bastards*
- *Wandersong*
- *Warhammer Vermintide 2 (Coming soon)*
- *Wasteland Remastered*
- *Wasteland 2: Director's Cut*
- *Wasteland 3*
- *We Happy Few*
- *West of Dead*
- *Wizard of Legend*
- *World War Z*
- *Worms W.M.D*
- *Xeno Crisis*
- *Yakuza 0*
- *Yakuza Kiwami*
- *Yakuza Kiwami 2*

## Recommended for you

**CLOUD GAMING**

Cloud Gaming Comes to
Xbox Series X|S and
Xbox One Consoles

Aug 24, 2021 @ 10:34am



**XBOX GAME PASS**

Xbox Game Pass
Ultimate Members Get
EA Play on November 10



PX9091-006

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Fiscal Year Ended June 30, 2022**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Transition Period From            to**

**Commission File Number 001-37845**

# MICROSOFT CORPORATION

| | |
|---|---|
| **WASHINGTON** | **91-1144442** |
| **(STATE OF INCORPORATION)** | **(I.R.S. ID)** |

**ONE MICROSOFT WAY, REDMOND, WASHINGTON 98052-6399**
**(425) 882-8080**
**www.microsoft.com/investor**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of exchange on which registered |
|---|---|---|
| **Common stock, $0.00000625 par value per share** | **MSFT** | **NASDAQ** |
| **3.125% Notes due 2028** | **MSFT** | **NASDAQ** |
| **2.625% Notes due 2033** | **MSFT** | **NASDAQ** |

Securities registered pursuant to Section 12(g) of the Act:

**NONE**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large Accelerated Filer ☒ | Accelerated Filer ☐ |
| Non-accelerated Filer ☐ | Smaller Reporting Company ☐ |
| | Emerging Growth Company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.   ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.   ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

As of December 31, 2021, the aggregate market value of the registrant's common stock held by non-affiliates of the registrant was $2.5 trillion based on the closing sale price as reported on the NASDAQ National Market System. As of July 25, 2022, there were 7,457,891,872 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the definitive Proxy Statement to be delivered to shareholders in connection with the Annual Meeting of Shareholders to be held on December 13, 2022 are incorporated by reference into Part III.

PX9050-001

Windows Commercial revenue, which includes volume licensing of the Windows operating system and Windows cloud services such as Microsoft Defender for Endpoint, is affected mainly by the demand from commercial customers for volume licensing and Software Assurance ("SA"), as well as advanced security offerings. Windows Commercial revenue often reflects the number of information workers in a licensed enterprise and is relatively independent of the number of PCs sold in a given year.

Patent licensing includes our programs to license patents we own for use across a broad array of technology areas, including mobile devices and cloud offerings.

Windows IoT extends the power of Windows and the cloud to intelligent systems by delivering specialized operating systems, tools, and services for use in embedded devices.

### Devices

We design and sell devices, including Surface and PC accessories. Our devices are designed to enable people and organizations to connect to the people and content that matter most using Windows and integrated Microsoft products and services. Surface is designed to help organizations, students, and consumers be more productive. Growth in Devices is dependent on total PC shipments, the ability to attract new customers, our product roadmap, and expanding into new categories.

### Gaming

Our gaming platform is designed to provide a variety of entertainment through a unique combination of content, community, and cloud. Our exclusive game content is created through Xbox Game Studios, a collection of first-party studios creating iconic and differentiated gaming experiences. We continue to invest in new gaming studios and content to expand our IP roadmap and leverage new content creators. These unique gaming experiences are the cornerstone of Xbox Game Pass, a subscription service and gaming community with access to a curated library of over 100 first- and third-party console and PC titles.

The gamer remains at the heart of the Xbox ecosystem. We continue to open new opportunities for gamers to engage both on- and off-console with both the launch of Xbox Cloud Gaming, our game streaming service, and continued investment in gaming hardware. Xbox Cloud Gaming utilizes Microsoft's Azure cloud technology to allow direct and on-demand streaming of games to PCs, consoles, and mobile devices, enabling gamers to take their favorite games with them and play on the device most convenient to them.

Xbox enables people to connect and share online gaming experiences that are accessible on Xbox consoles, Windows-enabled devices, and other devices. Xbox is designed to benefit users by providing access to a network of certified applications and services and to benefit our developer and partner ecosystems by providing access to a large customer base. Xbox revenue is mainly affected by subscriptions and sales of first- and third-party content, as well as advertising. Growth of our Gaming business is determined by the overall active user base through Xbox enabled content, availability of games, providing exclusive game content that gamers seek, the computational power and reliability of the devices used to access our content and services, and the ability to create new experiences through first-party content creators.

### Search and News Advertising

Our Search and news advertising business is designed to deliver relevant search, native, and display advertising to a global audience. We have several partnerships with other companies, including Yahoo, through which we provide and monetize search queries. Growth depends on our ability to attract new users, understand intent, and match intent with relevant content and advertiser offerings.

On June 6, 2022, we acquired Xandr, Inc., a technology platform with tools to accelerate the delivery of our digital advertising solutions.

### Competition

Windows faces competition from various software products and from alternative platforms and devices, mainly from Apple and Google. We believe Windows competes effectively by giving customers choice, value, flexibility, security, an easy-to-use interface, and compatibility with a broad range of hardware and software applications, including those that enable productivity.

15

PX9050-015

RISKS RELATING TO THE EVOLUTION OF OUR BUSINESS

**We make significant investments in products and services that may not achieve expected returns.** We will continue to make significant investments in research, development, and marketing for existing products, services, and technologies, including the Windows operating system, Microsoft 365, Office, Bing, SQL Server, Windows Server, Azure, Office 365, Xbox, LinkedIn, and other products and services. We also invest in the development and acquisition of a variety of hardware for productivity, communication, and entertainment including PCs, tablets, gaming devices, and HoloLens. Investments in new technology are speculative. Commercial success depends on many factors, including innovativeness, developer support, and effective distribution and marketing. If customers do not perceive our latest offerings as providing significant new functionality or other value, they may reduce their purchases of new software and hardware products or upgrades, unfavorably affecting revenue. We may not achieve significant revenue from new product, service, and distribution channel investments for several years, if at all. New products and services may not be profitable, and even if they are profitable, operating margins for some new products and businesses will not be as high as the margins we have experienced historically. We may not get engagement in certain features, like Edge and Bing, that drive post-sale monetization opportunities. Our data handling practices across our products and services will continue to be under scrutiny and perceptions of mismanagement, driven by regulatory activity or negative public reaction to our practices or product experiences, could negatively impact product and feature adoption, product design, and product quality.

Developing new technologies is complex. It can require long development and testing periods. Significant delays in new releases or significant problems in creating new products or services could adversely affect our revenue.

**Acquisitions, joint ventures, and strategic alliances may have an adverse effect on our business.** We expect to continue making acquisitions and entering into joint ventures and strategic alliances as part of our long-term business strategy. For example, in March 2021 we completed our acquisition of ZeniMax Media Inc. for $8.1 billion, and in March 2022 we completed our acquisition of Nuance Communications, Inc. for $18.8 billion. In January 2022 we announced a definitive agreement to acquire Activision Blizzard, Inc. for $68.7 billion. These acquisitions and other transactions and arrangements involve significant challenges and risks, including that they do not advance our business strategy, that we get an unsatisfactory return on our investment, that they raise new compliance-related obligations and challenges, that we have difficulty integrating and retaining new employees, business systems, and technology, that they distract management from our other businesses, or that announced transactions may not be completed. If an arrangement fails to adequately anticipate changing circumstances and interests of a party, it may result in early termination or renegotiation of the arrangement. The success of these transactions and arrangements will depend in part on our ability to leverage them to enhance our existing products and services or develop compelling new ones, as well as acquired companies' ability to meet our policies and processes in areas such as data governance, privacy, and cybersecurity. It may take longer than expected to realize the full benefits from these transactions and arrangements such as increased revenue or enhanced efficiencies, or the benefits may ultimately be smaller than we expected. These events could adversely affect our consolidated financial statements.

**If our goodwill or amortizable intangible assets become impaired, we may be required to record a significant charge to earnings.** We acquire other companies and intangible assets and may not realize all the economic benefit from those acquisitions, which could cause an impairment of goodwill or intangibles. We review our amortizable intangible assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. We test goodwill for impairment at least annually. Factors that may be a change in circumstances, indicating that the carrying value of our goodwill or amortizable intangible assets may not be recoverable, include a decline in our stock price and market capitalization, reduced future cash flow estimates, and slower growth rates in industry segments in which we participate. We have in the past recorded, and may in the future be required to record, a significant charge in our consolidated financial statements during the period in which any impairment of our goodwill or amortizable intangible assets is determined, negatively affecting our results of operations.

25

PX9050-025

## Q4 2021 Microsoft Corp Earnings Call - Final

FD (Fair Disclosure) Wire

July 27, 2021 Tuesday

Copyright 2021 ASC Services II Media, LLC

All Rights Reserved

Copyright 2021 CCBN, Inc.

**Length:** 9026 words

# Body

Corporate Participants

* Amy E. Hood

Microsoft Corporation - Executive VP & CFO

* Brett Iversen

Microsoft Corporation - General Manager of IR

* Satya Nadella

Microsoft Corporation - Chairman & CEO

Conference Call Participants

* Aleksandr J. Zukin

Wolfe Research, LLC - MD & Head of the Software Group

* Brent Alan Bracelin

Piper Sandler & Co., Research Division - MD & Senior Research Analyst

* Brent John Thill

Jefferies LLC, Research Division - Equity Analyst

* Karl Emil Keirstead

UBS Investment Bank, Research Division - Analyst

Q4 2021 Microsoft Corp Earnings Call - Final

seat growth in every segment, from frontline and small business to enterprise. Leading companies like Bayer, Siemens, Vodafone all chose our premium [EFI] offerings for advanced security, compliance, voice and analytics.

Now on to employee experience cloud. Having a digital employee experience platform is critical for every organization. With Microsoft Viva, we are creating an entirely new category, bringing together communications, learning, well-being and knowledge directly into the flow of work. New capabilities empower leaders to build human capital, nurture well-being and focus on employee results. We are seeing strong interest and early adoption in every industry from American Express and Barclays to AT&T and Mars. Humana chose Viva to help 26,000 employees make the shift to hybrid work, gaining insights on everything from collaboration trends to manager effectiveness.

Now on to Windows. Windows 11 is the biggest update to our operating system in a decade. We are reimagining everything from the Windows platform to the Store to help people and organizations be more productive and secure and build a more open ecosystem for developers and creators. We are delighted by early feedback. More people have downloaded our early builds than any other Windows release or update in the history of our Insider Program. And along with our OEM ecosystem, we are excited to bring Windows 11 to new PCs beginning this holiday.

And with Windows 365, we are creating a new category, the Cloud PC. Just like applications move to the cloud with SaaS, we are now bringing the operating system to the cloud, enabling organizations to stream the full Windows experience to any employee's personal or corporate device.

Now on to security. With the cybersecurity landscape more complex than ever, it's never been clearer that every organization will need to deploy and maintain a zero trust security architecture. This is driving accelerated demand for our integrated end-to-end solutions spanning identity, security, compliance and device management across all clouds and all platforms.

No other vendor is recognized by analysts as the leader in as many categories. This is reflected in our share gains with nearly 600,000 organizations, including FedEx, Nestlé, NTT and Volkswagen using our security offerings across Azure and Microsoft 365. We saw a 70% increase in the number of small and medium business customers. And it's reflected in our sales growth, with annual revenue continuing to increase 40% year-over-year. We're going further to protect organizations and our recent acquisitions of CloudKnox, ReFirm Labs and RiskIQ bolster our security capabilities in key areas, including identity management, IoT and threat intelligence.

Now on to gaming. Gaming is the largest category in the entertainment industry, and we are expanding our opportunity to reach the world's 3 billion gamers wherever and whenever they play. We are all in on games. At E3 last month, we unveiled our biggest games lineup ever, announcing 27 new titles which will all be available to Game Pass subscribers. Game Pass is growing rapidly and it's transforming how people discover, connect and play games. Subscribers play approximately 40% more games and spend 50% more than nonmembers.

We continue to lead in the fast-growing cloud gaming market with last month -- just last month, we made Xbox Cloud Gaming available on PCs as well as Apple phones and tablets via the browser in 22 countries with more to come. Millions have already streamed games to their desktops, tablets and phones. And the Xbox Series S and X are our fastest-selling consoles ever, with more consoles sold live to date than any previous generation.

Pages 1 - 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

FEDERAL TRADE COMMISSION,      )
                               )
            Plaintiff,         )
                               )
  VS.                          )      NO. C 23-02880 JSC
                               )
MICROSOFT CORPORATION, et al., )
                               )
            Defendants.        )
_____)
                         San Francisco, California
                         Wednesday, June 21, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    FEDERAL TRADE COMMISSION
                    600 Pennsylvania Avenue, NW
                    Washington, D.C.  20580
            BY:  **JAMES H. WEINGARTEN, ATTORNEY AT LAW**
                 **JAMES ABELL, ATTORNEY AT LAW**
                 **JENNIFER FLEURY, ATTORNEY AT LAW**
                 **PEGGY FEMENELLA, ATTORNEY AT LAW**
                 **CEM AKLEMAN, ATTORNEY AT LAW**
                 **NICOLE CALLAN, ATTORNEY AT LAW**


For Defendant Microsoft:
                    WILKINSON STEKLOFF LLP
                    2001 M Street, NW - 10th Floor
                    Washington, D.C.  20036
            BY:  **BETH WILKINSON, ATTORNEY AT LAW**
                 **RAKESH N. KILARU, ATTORNEY AT LAW**
                 **KIERAN GOSTIN, ATTORNEY AT LAW**
                 **GRACE HILL, ATTORNEY AT LAW**
                 **SARAH NEUMAN, ATTORNEY AT LAW**


        **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

1   we can discuss it.

2          **THE COURT:**  So maybe before you spend the time writing

3   your brief, see if you need to do it.

4          **MS. FLEURY:**  And this is your proposed because it's a

5   listed topic for one of their witnesses that they are calling

6   out of order in our case in chief tomorrow, so...

7          **THE COURT:**  I see.  I see.

8          **MS. WILKINSON:**  The issue will come up tomorrow, so

9   she will testify about the contracts themselves.  It is pretty

10  straightforward.

11      And if counsel wants to ask "did you do a financial

12  analysis before you signed the contract," I will not object.

13         **THE COURT:**  Yeah, just ask.  I mean, that will help

14  you with your brief.  You will lay your foundation.  Then it

15  will be in context and I will see how any invocation of

16  privilege is affecting your questioning because I will see it

17  live that way.

18         **MS. FLEURY:**  Understood.  And I think where the rubber

19  is going to hit the road is if they start to testify about the

20  effects of those agreements, about the competitive effects,

21  about the impact, about the impact on subscribers or lack

22  thereof, that's where I think it's been -- it would be

23  impossible for us to be able to interrogate those claims

24  without having underlying evidence.

25      As I said, if they say all of that was done at the

 1    direction of attorney-client privilege, we are not contesting

 2    the privilege.

 3        What we are saying is they need to be -- they either need

 4    to show their work or not testify about the effects of those

 5    side agreements.

 6        **THE COURT:**  Or testify and I can strike it and not

 7    consider it after the fact, if you are correct about that.

 8        **MS. FLEURY:**  Understood, Your Honor.

 9        **THE COURT:**  All right.

10        **MS. WILKINSON:**  Just to clarify, Your Honor, they

11    didn't do the work.  So I don't know this part is separate from

12    the --

13        **THE COURT:**  I don't know.  See, this is why I can't

14    rule on --

15        **MS. WILKINSON:**  Understood.

16        **THE COURT:**  I don't know.  You can file whatever you

17    want whenever you want, however long you want.  Just file one

18    at a time.  And they will respond quickly because they have an

19    army of lawyers --

20                        (Laughter)

21        **THE COURT:**  -- over there, because I have seen it on

22    the docket as well.

23        But thanks for raising that all.  I will keep that in

24    mind.  Again, it is just a bench, not a jury, so we have a

25    little but more flexibility.

# Ryan Judge designations on 6-27-23

Designation List Report

**Ryan, James**                    **2023-04-06**
**RYAN, JAMES**                    **2023-04-07**

| | |
|---|---|
| Defendants' designations | 00:44:32 |
| Plaintiff's designations | 00:43:48 |
| Defendant's counter counter designations | 00:00:47 |
| Plaintiff's counter designations | 00:14:20 |
| Defendants' counter designations | 00:05:25 |
| **TOTAL RUN TIME** | **01:48:51** |

Documents linked to video:

PX3106

PX3109

PX3110

PX8001

RX70

RX75

RX79

RX1162

RX2059

RX5000



ID: RyanAllJudge10

PX3378-001

**RyanAllJudge10 - Ryan Judge designations on 6-27-23**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 34:01 - 34:24 | ██████████ | ████ | ███████ |
| | ████████████████ | | █ |
| | ██████████████ | | |
| | █████████████ | | |
| | ██████████ | | |

🔗 PX8001.16.1

34:05   Q.   If you look at the next sentence of the
34:06       very last sentence on the page, that reads:  This
34:07       partnership would be lost.  And it goes on to the
34:08       next page, it continues:  Once Microsoft acquired
34:09       Activision and SIE could no longer share
34:10       confidential details about its next console in
34:11       development.  Do you see that language?
34:12   A.   I do.
34:13   Q.   Why could SIE no longer share confidential
34:14       details about its next console and development once
34:15       Microsoft acquired Activision?
34:16   A.   We simply could not run the risk of a
34:17       company that was owned by our direct competitor having
34:18       access to that information.
34:19   Q.   What would be the risk of your direct
34:20       competitor having access to that information?
34:21   A.   That information could leak into other
34:22       parts of Microsoft and potentially allow them to be
34:23       able to develop similar features to the ones that we
34:24       would argue that we invented.

| 35:09 - 35:17 | **Ryan, James 2023-04-06** | 00:00:29 | RyanAllJudge10.2 |
| | | | 4 |

🔗 PX8001.16.2

35:09   Q.   Looking at the next sentence that reads:
35:10       Even if some Activision games remained on
35:11       PlayStation, SIE could not share in-development
35:12       console features with a Microsoft controlled
35:13       Activision and Activision would have less of an
35:14       incentive to develop its games to take advantage of
35:15       unique PlayStation features or help SIE develop
35:16       better consoles.  Do you see that language?
35:17   A.   I do.

| 36:01 - 36:06 | **Ryan, James 2023-04-06** | 00:00:20 | RyanAllJudge10.2 |
| | | | 5 |

36:01   Q.   Why do you think that a Microsoft owned
36:02       Activision would not be incentivized to do that?
36:03   A.   I believe that their incentives -- their
36:04       primary incentive will, post-acquisition, would

**Defendants' designations**    **Plaintiff's designations**    **Defendant's counter counter designations**    **9 / 55**
**Plaintiff's counter designations**    **Defendants' counter designations**

PX3378-009

2-ER-191

**RyanAllJudge10 - Ryan Judge designations on 6-27-23**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 36:05    be to optimize its overall Xbox business, not the<br>36:06    business of Activision. | | |
| 36:07 - 36:13<br>⌧ Clear | **Ryan, James 2023-04-06**<br>36:07   Q.   What, in your view, is Activision's<br>36:08       primary incentive right now, as an independent<br>36:09       company?<br>36:10   A.   As an independent company, Activision is<br>36:11       incentivized to make great games on all platforms.<br>36:12   Q.   Is that what they do?<br>36:13   A.   That's what they do. | 00:00:18 | RyanAllJudge10.2<br>6 |
| 37:03 - 37:14 | **Ryan, James 2023-04-06**<br>37:03   Q.   When Microsoft acquired Mojang, did Sony<br>37:04       have a pre-existing agreement with Mojang for<br>37:05       Minecraft to be on PlayStation?<br>37:06   A.   Yes, we did. | 00:00:40 | RyanAllJudge10.2<br>7 |
| 37:15 - 37:18 | **Ryan, James 2023-04-06**<br>37:15   Q.   Does that go back to your concern about<br>37:16       your direct competitor having access to your<br>37:17       information about consoles in development?<br>37:18   A.   It does. | 00:00:12 | RyanAllJudge10.2<br>8 |
| 38:01 - 38:19<br>⌧ Clear | **Ryan, James 2023-04-06**<br>38:01   Q.   Does a game studio need a development kit<br>38:02       in order to make a game work on a given console?<br>38:03   A.   Yes.<br>38:04   Q.   So a game developer would need a<br>38:05       development kit to make a game that runs on<br>38:06       PlayStation 5?<br>38:07   A.   They would.<br>38:08   Q.   Are development kits sometimes called dev<br>38:09       kits?<br>38:10   A.   I believe so. | 00:01:01 | RyanAllJudge10.2<br>9 |

**Defendants' designations**    **Plaintiff's designations**    **Defendant's counter counter designations**    10 / 55<br>
**Plaintiff's counter designations**    **Defendants' counter designations**

PX3378-010

2-ER-192

**RyanAllJudge10 - Ryan Judge designations on 6-27-23**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 38:11   Q.   Do you know if Sony provides development | | |
| | 38:12       kits to Microsoft owned studios later than it does | | |
| | 38:13       to other studios? | | |
| | 38:14   A.   We do. | | |
| | 38:15   Q.   Why is that? | | |
| | 38:16   A.   For the reasons already discussed, that | | |
| | 38:17       the development kits allow people, allow developers, | | |
| | 38:18       to have visibility and to work on the feature set | | |
| | 38:19       that our new console will deploy. | | |
| 38:20 - 38:24 | **Ryan, James 2023-04-06** | 00:00:29 | RyanAllJudge10.3 0 |
| | 38:20   Q.   What impact does providing development | | |
| | 38:21       kits later have? | | |
| | 38:22   A.   It will typically mean that the developer | | |
| | 38:23       may bring its content to the new platform later than | | |
| | 38:24       would otherwise be the case. | | |
| 38:25 - 39:01 | **Ryan, James 2023-04-06** | 00:00:07 | RyanAllJudge10.3 1 |
| | 38:25   Q.   Is that detrimental to Sony's gamers? | | |
| | 39:01   A.   I believe so. | | |
| 39:09 - 39:15 | **Ryan, James 2023-04-06** | 00:00:28 | RyanAllJudge10.3 2 |
| | 39:09   Q.   Why can't the decrease in collaboration be | | |
| | 39:10       prevented contractually? | | |
| | 39:11   A.   Because the risks -- the commercial risks | | |
| | 39:12       associated with this knowledge of these feature sets | | |
| | 39:13       leaking to our principal competitor is not something | | |
| | 39:14       that we would choose to rely on any contract to | | |
| | 39:15       enforce. | | |
| 42:12 - 42:20 <br> 🔗 PX3109.1.1 | **Ryan, James 2023-04-06** | 00:00:44 | RyanAllJudge10.3 3 |
| | 42:12   Q.   For the record, PX 3109 is an e-mail from | | |
| | 42:13       Microsoft's Phil Spencer to Jim Ryan dated 1/31, | | |
| | 42:14       2022, with the subject, Microsoft's commitment to | | |
| | 42:15       Activision games on PlayStation post merger. And | | |
| | 42:16       there are two attachments. One entitled | | |
| | 42:17       scan_20220131 and the other entitled Sony letter | | |
| | 42:18       agreement. Do you recall receiving this e-mail and | | |
| | 42:19       attachments from Phil Spencer? | | |
| | 42:20   A.   Yes. | | |
| 43:08 - 43:11 | **Ryan, James 2023-04-06** | 00:00:15 | RyanAllJudge10.3 4 |
| | 43:08   Q.   Had you expressed to Mr. Spencer concerns | | |
| | 43:09       about the availability of Activision content on | | |

**RyanAllJudge10 - Ryan Judge designations on 6-27-23**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

**234:03 - 234:11**     **Ryan, James 2023-04-06**     00:00:25     RyanAllJudge10.1
49

234:03   Q.   So you weren't trying to tell Mr. Deering
234:04     here that your view was that SIE would be more than
234:05     okay if Call of Duty was no longer available on
234:06     PlayStation?
234:07   A.   No.
234:08   Q.   And you weren't trying to tell him that
234:09     SIE would be more than okay if Activision games, in
234:10     general, were not available on PlayStation?
234:11   A.   No.

**236:02 - 236:17**     **Ryan, James 2023-04-06**     00:00:52     RyanAllJudge10.1
50

236:02   Q.   I believe you said earlier that Activision
236:03     games have been offered on PlayStation Plus; is that
236:04     correct?
236:05   A.   Yes, catalog games for relatively short
236:06     periods of time.
236:07   Q.   That includes versions of Call of Duty?
236:08   A.   It does.

██████████████████████
███ ████████████████████
███ ████████████████████
██ ████
████████████████████████
█ ████████████████████████
█ ████████████████████████
█ ██████████████████

**237:09 - 237:12**     **Ryan, James 2023-04-06**     00:00:08     RyanAllJudge10.1
51

237:09   Q.   This meeting with Fidelity was about a
237:10     month after the proposed transaction was announced,
237:11     correct?
237:12   A.   Correct.

**237:13 - 237:21**     **Ryan, James 2023-04-06**     00:00:25     RyanAllJudge10.1
52

237:13   Q.   Are you extremely confident now that Call
237:14     of Duty and other Activision games will continue to
237:15     be published on PlayStation post-transaction?
237:16   A.   No.
237:17   Q.   Are you confident of that at all?
237:18   A.   I have significant concerns.

Defendants' designations    Plaintiff's designations    Defendant's counter counter designations    **40 / 55**
Plaintiff's counter designations    Defendants' counter designations

PX3378-040

2-ER-194

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

COMMISSIONERS:　　　**Lina M. Khan, Chair**
　　　　　　　　　　　**Rebecca Kelly Slaughter**
　　　　　　　　　　　**Christine S. Wilson**
　　　　　　　　　　　**Alvaro M. Bedoya**

|  |  |
|---|---|
| **In the Matter of**<br><br>**Microsoft Corp.,**<br><br>　　　a corporation,<br><br>　　　and<br><br>**Activision Blizzard, Inc.,**<br><br>　　　a corporation. | **Docket No. 9412**<br><br>**REDACTED PUBLIC VERSION** |

## <u>COMPLAINT</u>

Pursuant to the provisions of the Federal Trade Commission Act ("FTC Act"), and by virtue of the authority vested in it by the FTC Act, the Federal Trade Commission ("Commission"), having reason to believe that Respondents Microsoft Corp. ("Microsoft"), and Activision Blizzard, Inc. ("Activision") have executed a merger agreement in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, which if consummated would violate Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues its complaint pursuant to Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), and Section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), stating its charges as follows:

## NATURE OF THE CASE

1.     Microsoft and Sony control the market for high-performance video game consoles. The number of independent companies capable of developing standout video games for those consoles has contracted, with only a small group of firms commanding that space today. Microsoft now proposes to acquire Activision, one of the most valuable of those developers, in a vertical merger valued at nearly $70 billion (the "Proposed Acquisition") that will increase Microsoft's already considerable power in video games. If consummated, the Proposed Acquisition would be the largest in the history of the video game industry and the largest in Microsoft's history. The Proposed Acquisition would continue Microsoft's pattern of taking control of valuable gaming content. With control of Activision's content, Microsoft would have the ability and increased incentive to withhold or degrade Activision's content in ways that substantially lessen competition—including competition on product quality, price, and innovation. This loss of competition would likely result in significant harm to consumers in multiple markets at a pivotal time for the industry.

2.     Microsoft, one of only two manufacturers of high-performance video game consoles, develops and sells Xbox gaming consoles. Microsoft is vertically integrated: through its in-house game studios, it develops and publishes popular video game titles such as *Halo*. Such in-house games are known as "first-party" titles in the industry. Microsoft also offers a leading video game subscription service, Xbox Game Pass, for which customers pay a monthly fee to access a library of hundreds of first- and third-party video games for console or personal computer ("PC"). The top tier of Xbox Game Pass, called Xbox Game Pass Ultimate, includes "cloud gaming" functionality that enables subscribers to stream certain games, as opposed to downloading games locally, and then to play those games across a variety of devices including consoles, PCs, tablets, and mobile phones.

3.     Activision develops and publishes high-quality video games for multiple devices, including video game consoles, PCs, and mobile devices. Activision's games include high-quality games that are commonly referred to in the industry as "AAA" titles. AAA games are costly to produce because of the creative talent, budgets, and time required for development. Gamers highly anticipate the release of AAA games.

4.     Activision produces some of the most iconic video game titles, including several leading AAA franchises. For example, Activision develops the popular franchises *Diablo* and *Overwatch* and the marquee franchise *Call of Duty.*

5.     The *Diablo* and *Overwatch* AAA franchises are among several Activision franchises that have individually earned more than ████████ in lifetime revenues. *Overwatch* just released a successful new title, *Overwatch 2,* available for play on multiple gaming consoles and PCs. *Diablo,* a long-running franchise first introduced in the 1990s, has a highly anticipated new title, *Diablo IV,* slated for release in early 2023.

2

6.    Activision and industry participants recognize *Call of Duty* as Activision's "key product franchise." *Call of Duty* was originally launched in 2003, and Activision releases new titles for the franchise on an annual basis. Activision allocates substantial resources to the franchise. As many as ▮ primary development studios are devoted to it at any one time and its budget is significantly larger than other AAA titles.

7.    By any measure, *Call of Duty* is a leading AAA franchise. It is one of the most successful console-game franchises ever. From its launch in 2003 up through 2020, it generated $27 billion in revenues. *Call of Duty* also has a massive following, with ▮ million monthly active users ("MAU") in 2020, according to an Activision strategy document. Its loyal fanbase and enduring appeal have made it particularly valuable, influencing gamer engagement and gaming product adoption. The franchise has achieved sustained dominance over the past decade, with *Call of Duty* titles comprising 10 of the top 15 console games sold between 2010–2019. No other franchise had more than one title in the top 15. *Call of Duty* has continued to top the charts in 2020 and 2021, and its latest installment, *Modern Warfare II*, amassed more than $1 billion in sales within just ten days of its release and is on track to outsell all other games this year despite not having been released until late October 2022. The previous franchise record was held by *Call of Duty: Black Ops II*, which took 15 days to hit the $1 billion mark.

8.    Activision's content is extremely important for, and drives adoption of, video game consoles. Given their immense popularity, Activision's titles are of particular importance to console makers, including Microsoft's competition.

9.    Microsoft produces its own first-party video game titles. Microsoft has acquired over ten third-party studios and their titles in recent years to expand its offerings. Microsoft has frequently made those acquired titles exclusive to its own consoles and/or subscription services, eliminating the opportunity for consumers to play those titles on rival products or services. By taking games exclusive, Microsoft strengthens the position of its console and subscription service products relative to competitors.

10.    The Proposed Acquisition is reasonably likely to substantially lessen competition or tend to create a monopoly in multiple markets because it will create a combined firm with the ability and increased incentive to use its control of Activision titles to disadvantage Microsoft's competitors. The Proposed Acquisition also may accelerate an ongoing trend towards vertical integration and consolidation in, and raise barriers to entering, the relevant markets.

11.    Microsoft's ownership of Activision would provide Microsoft with the ability to withhold or degrade Activision content through various means, including manipulating Activision's pricing, degrading game quality or player experience on rival offerings, changing the terms and timing of access to Activision's content, or withholding content from competitors entirely.

3

12.     Microsoft's past conduct provides a preview of the combined firm's likely plans if it consummates the Proposed Acquisition, despite any assurances the company may offer regarding its plans. In March 2021, Microsoft acquired ZeniMax Media Inc. ("ZeniMax"), the parent company of the well-known game developer and publisher Bethesda Softworks LLC ("Bethesda"). Microsoft assured the European Commission ("EC") during its antitrust review of the ZeniMax purchase that Microsoft would not have the incentive to withhold ZeniMax titles from rival consoles. But, shortly after the EC cleared the transaction, Microsoft made public its decision to make several of the newly acquired ZeniMax titles, including *Starfield*, *Redfall*, and *Elder Scrolls VI*, Microsoft exclusives.

13.     Today, Activision touts that it is ▮▮▮▮▮▮▮▮▮▮▮ and seeks to offer its games wherever gamers want to be playing them. It has an incentive to offer its titles broadly. Microsoft's ownership of Activision's content would alter that dynamic. As Microsoft seeks to increase its profits from the lucrative video game industry, the Proposed Acquisition will increase Microsoft's incentive to withhold Activision content from, or degrade Activision content on, consoles and subscription services that compete with Xbox consoles and Xbox Game Pass. Such conduct would be reasonably likely to substantially lessen competition and harm gamers in the United States.

14.     These effects are likely to be felt throughout the video gaming industry. The Proposed Acquisition is reasonably likely to substantially lessen competition and/or tend to create a monopoly in both well-developed and new, burgeoning markets, including high-performance consoles, multi-game content library subscription services, and cloud gaming subscription services.

## JURISDICTION

15.     Respondents Microsoft and Activision are each "corporations" as defined in Section 4 of the Federal Trade Commission Act, 15 U.S.C. § 44, and in Section 1 of the Clayton Act, 15 U.S.C. § 12.

16.     Respondents are engaged in activities in or affecting "commerce" as defined in Section 4 of the Federal Trade Commission Act, 15 U.S.C. § 44, and in Section 1 of the Clayton Act, 15 U.S.C. § 12.

17.     The Proposed Acquisition constitutes a merger subject to Section 7 of the Clayton Act, 15 U.S.C. § 18.

## RESPONDENTS AND THE PROPOSED ACQUISITION

18.     Respondent Microsoft is a publicly traded technology company incorporated in the State of Washington with headquarters in Redmond, Washington. Microsoft sells software, services, and devices across the technology industry and is among the most valuable companies in the world. Microsoft's gaming division produces Xbox hardware and Xbox content and services. Its total gaming revenues in FY2022 were over $16 billion. Microsoft's total revenues in FY2022 were over $198 billion.

4

19.     Respondent Activision is a publicly traded company, incorporated in the State of Delaware with headquarters in Santa Monica, California. Activision develops and publishes video games for consoles, PCs, and mobile devices. Activision's revenues in FY2021, its most recently reported fiscal year, were $8.8 billion.

20.     Microsoft entered into an Agreement and Plan of Merger with Activision on January 18, 2022, for an all-cash purchase price of $95 per Activision share and a total estimated value of $68.7 billion.

## BACKGROUND

21.     Activision's gaming content is extremely important in a gaming industry where content availability shapes gamers' decisions about which video game consoles and services to purchase. If the Proposed Acquisition is allowed to proceed, Microsoft would gain control of Activision's content and have the ability and increased incentive to withhold or degrade Activision's content, which is reasonably likely to reduce competition and cause a number of harmful outcomes, including dampened innovation, diminished consumer choice, higher prices and/or lower quality products, and harm to the millions of Americans who benefit from competition in video game consoles and subscription services.

22.     Today, gaming is the largest category in the entertainment industry, with revenues that far exceed those of both the film and music industries. This year, the gaming industry is expected to be worth more than $170 billion in global revenues, five times greater than global movie box office revenues.

23.     Gaming's unrivaled popularity among consumers is expected to continue. Microsoft projects global gaming revenues to grow to ▮▮ billion in annual sales by ▮▮. Microsoft also expects the number of gamers worldwide to increase significantly, expanding by another ▮ billion players and reaching ▮▮ of the global population over the next ▮▮ years.

24.     Video game content and services are generally available on a variety of devices, including video game consoles that are predominantly used for playing video games; PCs, including general purpose PCs as well as high-performance gaming PCs configured to play computationally demanding games; and mobile devices.

25.     Consumers purchase consoles based on the technological capability of the console, the price, and the games available for that specific console, among other factors.

I.     Consoles

26.     For gamers who play games on gaming consoles today, the most popular options, Microsoft's Xbox, Sony's PlayStation, and Nintendo's Switch, come from the same trio of companies that have been manufacturing consoles for decades with no meaningful new competition.

27.     Since the 1970s, competing video game console makers have periodically released consoles featuring the latest technological advances, with a new generation of consoles released approximately every five to ten years. Within the video game industry, competition for sales and technological supremacy is commonly referred to as "the console wars."

28.     Of these three console makers, PlayStation and Xbox compete in a high-performance segment that includes only the most technologically advanced and capable consoles. In November 2020, both Microsoft and Sony launched their current generation of consoles, the Xbox Series X and Series S consoles (collectively, "Xbox Series X|S") and the PlayStation 5 and PlayStation 5 Digital Edition consoles (collectively, "PS5"), respectively. Xbox Series X|S and PS5 consoles are the only high-performance consoles available today, and are considered to be in the ninth generation of gaming consoles. In contrast, Nintendo's most recent console—the Nintendo Switch—is not a ninth-generation gaming console. The Nintendo Switch was released in 2017, in the latter half of the eighth generation of gaming consoles, which had begun in approximately 2013. The Nintendo Switch ("Switch") also has lower computational performance, more in line with Microsoft's and Sony's eighth generation consoles.

29.     The Xbox Series X|S are two ninth-generation Xbox consoles offered by Microsoft. The Series X is a more powerful console while the Series S is more affordable. Together, these consoles provide Microsoft's ███████████████████████

30.     Microsoft closely tracks the performance of its Xbox consoles relative to Sony's PlayStation consoles. For example, in FY2022, the first full year that Xbox Series X|S consoles were available, one of Microsoft's key metrics for evaluating success was ███████████ ███████████████████████████ In internal communications, Microsoft executives regularly discuss ███████████████████████████.

31.     Xbox Series X|S consoles have been a commercial success. In a July 26, 2022 earnings call, Microsoft CEO Satya Nadella announced that the company "ha[d] been the market leader in North America for three quarters in a row among next gen consoles."

32.     The Xbox Series X|S and PS5 consoles are ███████████████████ from a broad consumer perspective, in a number of technical specifications, including offering similar graphics, user experiences, and hardware features. In addition, the Xbox Series X and PlayStation 5 are sold at the same price, while the Series S offers lower performance and is sold at a lower price.

33.     Other consoles lack the high performance of the Xbox Series X|S and PS5 consoles. For example, the Nintendo Switch, which is designed to allow portable, handheld use, necessarily sacrifices computing power, which leaves it unable to play certain games that require more advanced graphic processing. Retailing at $299.99, the Nintendo Switch is also less expensive than the Xbox Series X and PlayStation 5 consoles, both priced at $499.99. While the Xbox Series S had the same retail price at launch as the Nintendo Switch, the graphical and processing capabilities of the Series S are much more aligned with the Xbox Series X and PS5 consoles. The Xbox Series S enables gamers to play the same video games as the Xbox Series X, both of which offer more graphically advanced gameplay than on the Nintendo Switch.

6

II.     Gaming Content

A.   Multi-Game Content Library Subscription Services

34.     For the last several decades, gamers have purchased games through a "buy-to-play" model: either purchasing physical copies of games or, more prevalent today, purchasing digital copies of individual games that gamers download to their gaming console, PC, or other device.

35.     Recent years, however, have seen the expansion of a subscription model. Multi-game content library subscription services allow gamers to access a library of games for a fixed monthly or yearly fee. Microsoft's multi-game content library subscription service, Xbox Game Pass, launched in 2017, rapidly grew to 10 million subscribers by 2020 and in 2022 announced it had grown to 25 million subscribers.

36.     Xbox Game Pass provides subscribers with unlimited access to a library of over 300 first- and third-party games at no additional cost. The service is priced at $9.99 per month for gamers who seek to download games to play solely on an Xbox console or solely on a PC. The higher tiered service, Xbox Game Pass Ultimate, priced at $14.99 per month, allows gamers to download games for play on either an Xbox console or a PC, and additionally enables gamers to stream games from an off-site server to any web-enabled local device that can access Game Pass (*e.g.*, an Xbox console, PC, mobile device, or smart TV).

37.     Sony also offers a multi-game content library subscription service, PlayStation Plus, which at certain tiers is comparable to Xbox Game Pass. The lower comparable tier, PlayStation Plus Extra, priced at $14.99 per month, provides access to a library of hundreds of games that can be played on PlayStation consoles as well as online multiplayer access, discounts on other games, and cloud storage. The higher comparable tier, PlayStation Plus Premium, priced at $17.99 per month, provides access to an even larger library of games that can be played on PlayStation, along with cloud streaming.

38.     In addition to Sony's PlayStation Plus Extra and Premium, other multi-game content library subscription services include EA Play and Ubisoft+. EA Play, starting at $4.99 per month, and Ubisoft+, starting at $14.99 per month, each offer access only to content from the respective publishers, Electronic Arts Inc. ("EA") and Ubisoft Entertainment SA ("Ubisoft").

B.   Cloud Gaming Subscription Services

39.     Today, video game software typically runs locally on the player's gaming device. Recently, however, cloud gaming subscription services have been introduced that allow players to stream games that run on remote hardware without downloading the game locally. The primary processing for the game occurs in off-site datacenters and a live feed of the game is streamed to the player's device.

7

40. Microsoft touts numerous benefits of cloud gaming to customers. Cloud gaming enables gamers to begin playing a game in seconds, rather than waiting for games to download or update, and streaming rather than downloading avoids burdening the storage limits on a gaming device. Cloud gaming also broadens access to gaming by expanding the universe of devices that can play games. Today, cloud gaming subscription services are available on consoles, Windows PC, Mac PC, Chromebook PC, tablet, mobile phones, and some smart TVs, with device compatibility varying by service. This permits gamers to play computationally demanding games on less powerful devices that otherwise lack the computing power or storage to support the games.

41. In September 2020, Microsoft added cloud gaming to its top-tier multi-game content library subscription service offering, Xbox Game Pass Ultimate. To date, more than 20 million gamers have used the service to stream games from the cloud. Microsoft has stated that cloud gaming subscription services are integral to its goal of expanding gaming to 3 billion gamers worldwide and enabling gamers "to play the games you want, with the people you want, anywhere you want."

42. Other cloud gaming subscription services include Amazon Luna, Nvidia GeForce NOW, and Google Stadia, although Alphabet Inc. has announced that it is discontinuing Stadia in January 2023. Amazon's Luna+ (a tier of Amazon Luna), priced at $9.99 per month with additional options available for further purchases, provides streaming access to a library of over 100 third-party games. Nvidia GeForce NOW, priced at $49.99 for six months for the Priority tier or $99.99 for six months for the RTX 3080 tier, allows gamers to stream game titles that they already own, with the streaming hosted on Nvidia Corporation ("Nvidia") datacenters. Although it will soon be discontinued, Stadia Pro, priced at $9.99 per month with additional options for further purchases, allows gamers to stream games from a library of hundreds of third-party games.

### C. Importance of AAA Games

43. AAA games are particularly important within the gaming industry. The term "AAA" is frequently used by industry participants to refer to highly anticipated games bearing similar characteristics: high development costs, superior graphical quality, and expectations of high unit sales and revenue, typically from a studio with large development and publishing teams, supported by extensive marketing and promotion. AAA content can act as ███████ content, where, as a consultant to Microsoft explained, it ████████████████████████████████████████████████████████████



44. In the words of one Microsoft executive, AAA games are ████████████ They are also not numerous. Phil Spencer, CEO of Microsoft Gaming, estimates there are ████████████████████████████████████████████

45. Production budgets for AAA games frequently exceed ███ million, if not ███ million, and development teams can include thousands of developers working over several years. The high cost of AAA game development is driven by many factors such as long development cycles and the scarcity of AAA-capable studios and talent.

8

46. The gaming industry recognizes a limited top tier of independent game publishers, sometimes referred to as the "Big 4" or simply the AAA publishers: Activision, Electronic Arts, Take-Two, and Ubisoft. These publishers reliably produce AAA games for high-performance consoles and collectively own a significant portion of the most valuable IP in the gaming industry. These high-profile franchises include, for example, *Call of Duty* (Activision), *FIFA* (EA), *Grand Theft Auto* (Take-Two), and *Assassin's Creed* (Ubisoft).

47. Only a few other studios are typically credited with releasing AAA games. Epic Games, maker of *Fortnite*, a free-to-play game that is currently one of the most popular games in the United States, is sometimes viewed within the industry as a AAA-level publisher, such that industry participants will sometimes refer to the "Big 4 + Epic."

48. Internally, Microsoft recognizes that ███████████████████████████████ ███████████████████████████ Despite significant growth in the gaming industry, the head of Xbox Game Studios has noted ████████ ██████████████████████████████████ Creating a studio with the capability to produce AAA games requires scarce talent and is a capital-intensive endeavor.

49. Microsoft and Sony also produce AAA games. The *Elder Scrolls*, *Halo*, and *Forza* franchises are AAA games from Microsoft, while the *God of War*, *MLB The Show*, and *Spider-Man* franchises are AAA games from Sony.

50. Microsoft's own experience with releasing AAA games reflects the cost and time to develop such content. *Halo Infinite*, a recent title from the Microsoft's first-party *Halo* franchise, was in production for ██████████ years, and cost almost $██ million. Other AAA games may take even longer to develop. For instance, according to one Microsoft executive, ███████████ a forthcoming title from the ███████████ franchise, may take a ██████ to develop.

51. Access to AAA content is crucial for Microsoft, and the company strives to ensure that new AAA content is available on its console and subscription services on a regular basis. In May 2022, Mr. Spencer of Microsoft ████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████

9

52. AAA content has particularly important downstream effects because it generates player interest, develops a base of users, and drives monetization opportunities. As Microsoft's CEO has explained, ███████████████████████████████████████████████████████ ███████████████████████████████████████████ As an internal Microsoft document explained, ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ An internal strategy document on scaling Xbox Game Pass ████████████████████████████████ ███████████████████████████████████████████████████████████

53. To differentiate their products from rivals, console manufacturers and subscription service providers may seek to make certain titles exclusive to their products and unavailable on rivals' products, including by obtaining exclusive licenses from third-party game publishers. An internal Microsoft analysis estimates ███████████████████████████████ ████████████████████████████████ Typically, exclusivity in this context does not prevent a game from being available for PC or other non-console devices.

54. A diverse array of AAA content that increases adoption and engagement gives a console or subscription service greater leverage in attracting additional content. The console or subscription service can tout the size of its player base in negotiations with publishers and developers seeking to increase the discoverability and engagement of their content. As an internal Microsoft strategy document notes, ██████████████████████████████████████████ ██████████████████████ The result of these dynamics is to generate competition among console manufacturers and subscription service providers for AAA content.

55. Microsoft Xbox's Chief Marketing Officer has emphasized the importance of such content, noting: █████████████████████████████████████████████████████ █████████████████████████████████████████████████████████

56. Microsoft expects that Activision's AAA content ██████████████████████ ████████████████████████████████████████████████████████████ . As Mr. Spencer explained to Microsoft investors, "[a]s our platform becomes more attractive, the flywheel of content creators and players accelerates. As the creative range on our platform continues to expand, more players are attracted to the service, and the growing scale of the customer base makes the platform more attractive for additional publishers, and so on."

57. Activision content is especially valuable to any gaming console or subscription service due to the ability of Activision games to drive sales and engagement. Activision's CEO Bobby Kotick testified that Activision's games are "████████" and "████████" Microsoft, in presentations to its Board of Directors regarding this Proposed Acquisition, called Activision's content ███████████████████████████████████████████████████████

10

58. Activision currently has a combined ██ million MAU globally across its console and PC games and the company expects this number to grow to over ██ million MAU by 2024. Activision's statements reflect its ability to influence video game product purchase decisions.

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

59. Even among AAA games, Activision's most well-known franchise, *Call of Duty*, is particularly strong. First released nearly twenty years ago in 2003, *Call of Duty* is, in Activision's own words, "***one of the most successful entertainment franchises of all time***." In 2021, *Call of Duty*: *Vanguard* topped the revenue charts as the best-selling game in the United States, with *Call of Duty: Black Ops Cold War* coming in second. And in 2022, *Call of Duty: Modern Warfare II* took in $1 billion globally *in the first ten days following its launch*. By comparison, the highest grossing film of the year so far, *Top Gun: Maverick*, took one month to reach the $1 billion threshold.

## RELEVANT MARKETS

60. The Proposed Acquisition will result in a combined firm with the ability and increased incentive to withhold or degrade Activision's valuable gaming content to undermine its competitors in multiple Relevant Markets. This anticompetitive behavior is reasonably likely to lead to reduced consumer choice, higher prices and/or lower quality products, and less innovation, and the Proposed Acquisition will not produce cognizable procompetitive effects sufficient to offset such harms.

61. The Proposed Acquisition is likely to harm innovation, for instance, by decreasing the combined firm's incentive to optimize Activision's content for gameplay on rival hardware, thereby reducing the quality of consumer gaming experiences on competing products.

62. The Proposed Acquisition is reasonably likely to substantially lessen competition or tend to create a monopoly in the Relevant Markets for High-Performance Consoles, Multi-Game Content Library Subscription Services, and Cloud Gaming Subscription Services. The Proposed Acquisition is therefore reasonably likely to result in harm to both competition and consumers.

### I. High-Performance Consoles are a Relevant Product Market

63. High-Performance Consoles are a Relevant Market for evaluating the likely competitive effects of the Proposed Acquisition.

64. The only High-Performance Consoles offered for sale today are the most recent generation of Microsoft Xbox and Sony PlayStation consoles—the Xbox Series X|S and the PS5. The Xbox Series X|S and PS5 are therefore included within the Relevant Market.

65. The third major gaming console available today, the Nintendo Switch, is highly differentiated from the Xbox and PlayStation consoles in significant ways. The Nintendo Switch, therefore, is not included in the Relevant Market.

11

66.     Microsoft's Xbox Series X|S and Sony's PS5 consoles are characterized by greater computational power, different content portfolios, different form factors and technical specifications, generally higher prices, and different release cadences than the Nintendo Switch and other handheld consoles.

a.   Superior computational power enables faster processing that shapes the kind of content that can run on High-Performance Consoles, enabling higher resolution, more realistic graphics, and cutting-edge performance. Both Xbox Series X|S and PS5 consoles have similar hardware, and Microsoft and Sony compete closely on hardware innovation, including over graphics and performance. Conversely, Nintendo pursues a different strategy of integrating its lower performance, portable hardware with its own distinctive first-party games to appeal to player nostalgia for Nintendo's unique gaming experience over high resolution, life-like graphics, and performance speed. While Microsoft's Xbox Series X|S and Sony's PS5 consoles incorporate semi-custom systems-on-a-chip ("SoC") designed by AMD, Nintendo's Switch runs on a non-AMD SoC that is more closely related to a mobile device processor found in higher-end mobile phones and tablets.

b.   Microsoft and Sony compete closely for high-quality, resource-intensive AAA console games. They compete over genre coverage, portfolio size and quality, and multiplayer game availability, and they routinely benchmark their ███████████ against each other. A substantial share of High-Performance Console content is available on both Xbox and PlayStation consoles. By contrast, although Nintendo offers third-party content on the Switch, Nintendo's main strategy centers on ███████ ███████████████████████████████████████████████████████.

c.   Xbox Series X|S and PS5 consoles provide a technologically advanced gaming experience from a stationary endpoint. The Xbox Series X|S and PS5 consoles are plug-in devices that draw electrical power to support advanced computations and are connected to an external display like a television. In contrast, the Nintendo Switch is a portable battery-operated device with a built-in display screen, and it can optionally be connected to an external display. Nintendo's Switch also has detachable controllers that can be used for motion-based game play that is not available on the Xbox or PlayStation consoles. Microsoft and Sony commonly benchmark against each other on ██████.

d.   The PlayStation 5 and the Xbox Series X, the companies' latest flagship consoles, retail for $499.99. By contrast, the Nintendo Switch retails for $200 less at $299.99.

e.   Since the 2000s, Microsoft and Sony have released new console generations largely contemporaneously—most recently in 2020. The prior generation (Generation 8) Xbox One and PlayStation 4 were released in 2013, and the current generation (Generation 9) Xbox Series X|S and PS5 consoles were released in November 2020. By contrast, the Nintendo Switch launched in March 2017, nearly five years after the beginning of the eighth generation.

12

67.    Microsoft's own ordinary course documents regularly ██████████ ██████████ ██████████ ██████████ Respondents conceded in a regulatory filing that ██████████ ██████████ ██████████.

68.    Due to their distinct offerings, Microsoft and Sony consoles appeal to different gaming audiences than the Nintendo Switch. While Xbox Series X|S and PS5 consoles offer more mature content for more serious gaming, Nintendo's hardware and content tends to be used more for casual and family gaming.

69.    Indeed, "dual console owners" are more likely to own one High-Performance Console and a Nintendo Switch than two High-Performance Consoles. NPD Group, a trusted source for video game industry data, shows that as of 2020, nearly 40 percent of PlayStation and Xbox owners also owned a Switch, while only ██ percent of PlayStation console owners owned an Xbox and only ██ percent of Xbox console owners own a PlayStation.

70.    Other video gaming devices available today are not commercially reasonable alternatives to High-Performance Consoles and are therefore not included in the Relevant Market. These include gaming PCs, and mobile devices.

71.    Gaming PCs are distinct from High-Performance Consoles due to differences in price, hardware, performance, and functionality (*i.e.*, where and when a game can be played), among other factors. Gaming PCs are therefore not included in the Relevant Market. Mobile devices are distinct from High-Performance Consoles due to differences in complexity and quality of game performance, content offerings, monetization approach, gameplay and interface, and audience, among other factors. Microsoft recently confirmed this factual distinction in testimony during the trial of *Epic Games, Inc. v. Apple Inc.,* 559 F.Supp.3d 898, 981 (N.D. Cal. 2021). Mobile gaming devices are therefore not included in the Relevant Market.

72.    High-Performance Consoles are a relevant antitrust market. However, although the Nintendo Switch is highly differentiated from the Xbox Series X|S and PS5 consoles, it shares many of the same characteristics that make High-Performance Consoles distinct from PCs, and mobile devices. Accordingly, the anticompetitive effects of the Proposed Acquisition alleged in this Complaint are also reasonably likely to occur in a broader market for gaming consoles that includes High-Performance Consoles and the highly differentiated Nintendo Switch.

## II.  Multi-Game Content Library Subscription Services are a Relevant Product Market

73.    Multi-Game Content Library Subscription Services are a relevant product market for evaluating the competitive effects of the Proposed Acquisition.

74.    The Relevant Market for Multi-Game Content Library Subscription Services includes services that offer unlimited access to a library of video games that are predominantly played on non-mobile devices and are available to play at zero additional cost beyond the subscription fee, either via download or cloud streaming.

13

75.    Microsoft is already a significant player in this market through its Xbox Game Pass offerings and continues to expand rapidly in this market. Microsoft offers three tiers of Game Pass, each of which provide unlimited access to hundreds of games, with Game Pass Ultimate also providing access to Xbox Cloud Gaming. Microsoft is already the market leader with an announced 25 million Game Pass subscribers.

76.    Each service competes aggressively to offer the best, most exciting titles to attract users to its service, with each attempting to provide access to a compelling library of high-end, AAA games. Services offer a range of incentives to developers and publishers including attractive revenue splits or co-marketing arrangements in order to ensure games are available on their services.

77.    Multi-Game Content Library Subscription Services rely on distinct pricing compared to the traditional "buy to play" model, where gamers purchase individual games for up to $70 per title, or more. Multi-Game Content Library Subscription Services seek to offer a new method of accessing games by offering access to an entire library of games for a periodic fee, rather than a single title for a fixed cost.

78.    Subscription services in the Relevant Market ████████████████████ ████████████████████████████████ Microsoft's ordinary course documents show that ████████████████████████████████████████████████████████████████ For example, Xbox CFO Tim Stuart sent an email ████████████████████████████████████████████████████████████████████████████████ ████ Mr. Stuart went on to report: ████████████████████████████████████████ ████████████████████████████████████████████████

79.    Buy-to-play games are not commercially reasonable alternatives and therefore are not included in the Relevant Market. Multi-Game Content Library Subscription Services provide immediate access to hundreds of game titles for a monthly fee, facilitating content discovery. The pricing of individual games does not dictate Microsoft's pricing decisions for its Xbox Game Pass subscriptions. Additionally, when speaking with third-party game developers, Microsoft's executives tout Game Pass as ████████████████████████████████ ████████████████ Microsoft further showcases the additive nature of Game Pass through public statements that report Game Pass subscribers invest more time and money in gaming than their fellow gamers without a subscription.

80.    Subscription services that focus on enabling online multiplayer gaming, such as Xbox Live Gold and PlayStation Plus Essential, are not commercially reasonable alternatives and therefore are not included in the Relevant Market. Xbox Live Gold and PlayStation Plus Essential, as currently structured, award a limited number of free games as "bonus content." These services do not provide access to the same breadth and diversity of content as Multi-Game Content Library Subscription Services and do not facilitate the same level of game discoverability.

14

81.     Subscription services that do not offer a library of video games that are predominantly played on non-mobile devices are also not commercially reasonable alternatives and therefore are not included in the Relevant Market. Mobile-native games are distinct from games accessed natively on a console and from the most performant games accessed natively on a PC, due to differences in complexity and quality of game performance, monetization approach, gameplay and interface, and audience, among other factors.

82.     Multi-Game Content Library Subscription Services comprise a Relevant Market. The anticompetitive effects of the Proposed Acquisition also are reasonably likely to occur in any relevant antitrust market that contains Multi-Game Content Library Subscription Services, including a combined Multi-Game Content Library and Cloud Gaming Subscription Services market.

**III. Cloud Gaming Subscription Services are a Relevant Market**

83.     Cloud Gaming Subscription Services are a relevant product market for evaluating the competitive effects of the Proposed Acquisition.

84.     The Relevant Market for Cloud Gaming Subscription Services includes services that offer the ability to play predominantly non-mobile video games via cloud streaming.

85.     The Relevant Market includes Multi-Game Content Library Subscription Services that offer access to games via cloud streaming as well as any services that offer streaming via a "Bring Your Own Game" ("BYOG") approach where users play games they own in their own personal library by streaming those games through their Cloud Gaming Subscription Service. In all cases, users pay a periodic fee, either monthly or yearly, to access the Cloud Gaming Subscription Service.

86.     Cloud Gaming Subscription Services provide a way to play games that is distinct from running them locally on the player's gaming device. Such subscription services make predominantly non-mobile video games available instantly on a wide variety of devices, reducing the need for gamers to make large investments in expensive hardware, such as a High-Performance Console or a gaming PC, and eliminating download time.

87.     Cloud Gaming Subscription Services are designed to reach a different set of consumers than other forms of game distribution. These subscription services enable gaming on devices that do not meet the minimum specifications for large and technologically complex games, such as older and less expensive PCs, MacBooks, Chromebooks, tablets, mobile devices, and smart TVs. They also enable gamers to play games that were developed for other devices and/or operating systems. Microsoft has estimated that the total addressable market for cloud gaming is approximately 3 billion users, compared to ██████ console users.

88.     Microsoft's executives recognize the expanded opportunity Cloud Gaming Subscription Services offer. For example, Microsoft executives have explained that xCloud (now referred to as Xbox Cloud Gaming) offers ████████████████████████████ and that ████████████████

15

89.     Microsoft's documents show that ████████████████████████████
████████████████████████████. In a recap of insights and learnings from
FY2022, the Xbox Cloud Gaming team reported that "████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████

90.     Cloud Gaming Subscription Services also require specialized inputs. Cloud
Gaming Subscription Services operate on cloud infrastructure, either by deploying their own
dedicated infrastructure or by contracting with a third party. For example, Microsoft built Xbox
Cloud Gaming by deploying racks of dedicated Xbox console hardware in Microsoft data
centers, investing ███████████████████████. Microsoft has plans to support ████████
████████ on its ██████████████ in the future and expects to spend over ██████████ on Xbox
Cloud Gaming infrastructure in the next several years.

91.     Cloud Gaming Subscription Services are a Relevant Market. The anticompetitive
effects of the Proposed Acquisition alleged in this complaint are also likely to occur in any
relevant antitrust market that contains Cloud Gaming Subscription Services, including a
combined Multi-Game Content Library and Cloud Gaming Subscription Services market.

**IV. The Relevant Geographic Market is the United States**

92.     The relevant geographic market in which to assess the Proposed Acquisition's
effects is the United States.

93.      In each of the Relevant Markets, consumer preferences and gaming behavior
differ across countries. Internal research from both Microsoft and Activision also finds
significant variation among countries on metrics like ████████████████████████████ For
its most recent Generation 9 consoles, Microsoft differentiated its ████████████████████████
████████████████████████████████████ Given its large installed base
of Generation 8 consoles, Microsoft placed the United States into a ████████████████████
████████████████████████████████████████ along with only ████ other
countries. Microsoft has identified the United States as a ████████████████, ████████████████
████████████████████.

94.     Microsoft is a leader in the United States in the Multi-Game Content Library
Subscription Services market. As of the ████████████████████████████████████
████████████████████████ Microsoft offers Game Pass at different price
points outside the United States.

95.     Microsoft and other Cloud Gaming Subscription Service providers have similarly
focused on the United States ████████████████████████████████. Microsoft launched
Game Pass Ultimate first in the United States and Canada, with Nvidia's GeForce NOW and
Amazon Luna undertaking a similar strategy. Cloud Gaming Subscription Service providers also
note that the proximity of cloud servers to gamers is important in light of the technological
demands of cloud gaming.

16

## ANTICOMPETITIVE EFFECTS

96.     The Proposed Acquisition is reasonably likely to substantially lessen competition or tend to create a monopoly in the Relevant Markets by creating a combined firm with the ability and increased incentive to withhold Activision's valuable gaming content from, or degrade Activision's content for, Microsoft's rivals. The combined firm would have the ability to exclude Microsoft's rivals from access to some or all of Activision's content in the Relevant Markets. Microsoft would have the power to decide if, when, and to what extent Activision content will be available on competing products. The Proposed Acquisition is likely to increase entry barriers, thereby dampening beneficial rivalry and innovation. If permitted to make Activision a captive supplier, Microsoft would have a substantially increased incentive to engage in strategies to that would likely lead to reduced consumer choice, higher prices or lower quality products, and less innovation.

**I.   As the Owner of Activision's Gaming Content, Microsoft Would Have the Ability to Disadvantage Rivals by Withholding or Degrading Activision Content in the Relevant Markets**

97.     AAA gaming content is a substantially important input for High-Performance Consoles, Multi-Game Content Library Subscription Services and Cloud Gaming Subscription Services, as these products use AAA content to attract and retain users and drive adoption. AAA content is difficult to produce given the intense resources and specialized competency required to develop these valuable games.

98.     Activision is a leader amongst an already limited number of developers able to produce such content through its cherished gaming franchises, including *Call of Duty*, *Diablo*, and *Overwatch*. As the owner of Activision's gaming content, Microsoft would have the ability to disadvantage rivals by withholding or degrading Activision content in the Relevant Markets.

### A.  AAA Content is a Substantially Important Input for Products in the Relevant Markets

99.     As discussed above, AAA gaming content is an important input for consoles and gaming subscription services. AAA games typically represent an outsized portion of revenue on these products and drive greater engagement and adoption.

100.    Microsoft's own executives repeatedly emphasize ███████████████████████████. In a 2019 internal email, Xbox's then-Chief Marketing Officer told Microsoft's Mr. Nadella that  In a June 2020 conversation between other Microsoft executives about Game Pass growth drivers, one aptly points out, "████████████."

101.     Similarly, Microsoft echoes the importance of AAA content on its High-Performance Consoles. As one direct report to Mr. Spencer relayed to him, the ██████████ ████████████ ██████████ ████████████ █████████████████████ ██████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████ ██████████ ████ ██████ ” During negotiations with top third-party publishers for inclusion of their games on Xbox Series X|S, Microsoft internally noted that Activision "██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████ ██████████ █████████ " entitled to "██████████ ██████████ ██████████████ ."

102.     Activision's powerful influence on gaming product adoption is also borne out by its revenue share negotiations with ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████ In one Microsoft executive's words, Activision's share on *Call of Duty* is "██████████ " and is the ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████

**B.   As the Owner of the Activision Content, Microsoft Would Have the Ability to Withhold Activision's Content from, or Degrade Activision Content on, Rival Consoles and Subscription Services**

103.     The Proposed Acquisition would give Microsoft total control over Activision's content, thereby giving Microsoft the ability to fully withhold Activision content from rivals, raise rivals' costs, change the terms and timing of access to Activision content, or degrade the quality of Activision content available for rival consoles and subscription services.

104.     The Proposed Acquisition would give Microsoft the ability to engage in several strategies to degrade access to Activision content on rival consoles and subscription services, including timed exclusivity, exclusive downloadable content available only on Microsoft's products, and a variety of other means across the Relevant Markets.

105.     Microsoft also would gain the ability to engage in tactics to degrade the quality of Activision content on competing consoles and subscription services and create a less desirable player experience for users choosing to play anywhere other than on Microsoft's products.

106.     The Proposed Acquisition also would give Microsoft the ability to reduce efforts to optimize Activision content for rival products. Currently, Activision collaborates closely with gaming hardware manufacturers to ensure an optimal experience for gamers. For example, Activision collaborated with ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ ██████████ █████ Should the Proposed Acquisition close, the combined firm will have the ability to reduce such collaboration in the High-Performance Console Market.

18

107.     Activision also works to optimize its games, including *Call of Duty*, to work on ███████████. A GPU (or Graphics Processing Unit) is a hardware component that renders graphics for video games. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ The Proposed Acquisition would give Microsoft the ability to reduce efforts to optimize Activision content for hardware used by rival Cloud Gaming Subscription Services.

## II. The Proposed Acquisition Would Increase Microsoft's Incentive to Disadvantage Rivals by Withholding or Degrading Activision Content in the Relevant Markets.

108.     If permitted to take control of Activision, Microsoft would have an incentive to disadvantage rivals by withholding or degrading Activision content. Gaming is a growing and lucrative market opportunity and one in which Microsoft is already well-positioned. Microsoft already has a built-in incentive to promote its own products wherever possible, and it fully understands the competitive power that owning Activision's leading gaming content would yield.

109.     Prior to the Proposed Acquisition, Activision sought to maximize its profits from sales of its video game titles. The Proposed Acquisition would change Activision's incentives, because Microsoft stands to gain significant profits from additional gamers purchasing Xbox consoles or Xbox Game Pass. Hence, the combined firm will be incentivized to disadvantage Microsoft rivals by withholding Activision content from, or degrading Activision content on, rival consoles and subscription services to promote sales of Microsoft's products.

110.     While AAA content in general is important to competitors in the Relevant Markets, Activision content is especially important because of its ability to drive gaming product adoption and engagement by users.

111.     Activision's own documents point out the significant role Activision content plays in consumers' choice of gaming products. In a 2019 presentation to █████, Activision highlighted consumer survey data showing that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

112.     The Proposed Acquisition would reduce Microsoft's incentive to optimize Activision content for rival products, including via collaboration with Microsoft's rivals. Given the competition between Microsoft and Sony, the combined firm will have less incentive to collaborate with Sony to ████████████████████████████████████. In addition, because Microsoft's Game Pass Ultimate competes ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

19

**III. Microsoft's Statements and Past Actions Indicate that It Will Likely Act on Its Incentives to Disadvantage Rivals by Withholding or Degrading Activision Content.**

113.    Microsoft stated earlier this year that it ███████████████████████████████ ███████████████. Microsoft subsequently has wavered in its representations as to ███████████████████████████████████████████████████████████

114.    Moreover, Microsoft's past conduct is telling. Despite statements by Microsoft to European regulators disavowing the incentive to make ZeniMax content exclusive post-close, after the EC cleared the transaction, Microsoft plans for three of the newly acquired titles to become exclusive to Microsoft's Xbox consoles and Xbox Game Pass subscription services. For example, although previous titles in ZeniMax's ████████████ franchise were released on PlayStation, Microsoft has confirmed that the upcoming ████████████ will be available only on Xbox consoles, Windows PCs, and Xbox Game Pass subscription services. Microsoft has also stated that *Starfield* and *Redfall*, two of the highly anticipated new games in development at the time of Microsoft's purchase of ZeniMax, will also become Xbox console and Xbox Game Pass exclusives upon release.

115.    Microsoft's previous representations to the EC about its incentives after its purchase of ZeniMax were not borne out by Microsoft's own post-merger behavior. Instead, Microsoft put its true post-merger incentives on full display when it decided to deny rivals its newly acquired future releases and thwart consumers who would choose to play them on a competing product. Microsoft's past behavior should also cast more suspicion on its non-binding public commitments to keep *Call of Duty* available on PlayStation consoles through the end of Activision's existing agreement with Sony (*i.e.*, through ████).

116.    Microsoft is eager to further build upon its already significant strength in gaming, with Mr. Nadella declaring publicly, "Microsoft's ***all-in on gaming***." Looking to reap the financial opportunity available in the gaming industry, Microsoft would be incentivized to withhold Activision content from, or degrade content on, rival products in order to disadvantage its rivals, thereby weakening competition and increasing its profits.

117.    Moreover, as Microsoft internally recognizes, acquisitions in this industry ████ ███████████████████████████████████████. This Proposed Acquisition—the largest ever announced in the gaming industry—poses a reasonable probability of further accelerating this trend.

**IV. Withholding Activision Content From, or Degrading Activision Content On, Microsoft's Rival Products Will Harm Competition and Consumers in the Relevant Markets**

118.    Withholding Activision content from, or degrading Activision content on, Microsoft's rivals' products is reasonably likely to substantially lessen competition in the Relevant Markets.

119.    This lessening of competition will result in harm to consumers, including reduced consumer choice, reduced product quality, higher prices, and less innovation.

20

## ABSENCE OF COUNTERVAILING FACTORS

120.    Respondents cannot demonstrate that entry or expansion in the Relevant Markets would be timely, likely, or sufficient to reverse the anticompetitive effects of the Proposed Acquisition.

121.    Respondents cannot demonstrate that the Proposed Acquisition would likely generate verifiable, cognizable, merger-specific efficiencies that would reverse the likely competitive harm from the Proposed Acquisition.

## VIOLATION

### COUNT I – ILLEGAL ACQUISITION

122.    The allegations above in paragraphs 1 to 121 are incorporated by reference as though fully set forth.

123.    The Proposed Acquisition, if consummated, may lessen competition substantially or tend to create a monopoly in interstate trade and commerce in the Relevant Markets throughout the country, including as a result of the combined firm's ability and incentive to withhold or degrade content from downstream rivals in the Relevant Markets

124.    The Proposed Acquisition violates Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18 and is an unfair method of competition that violates Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

21

**NOTICE**

Notice is hereby given to the Respondents that the second day of August, 2023, at 10:00 a.m., is hereby fixed as the time, and the Federal Trade Commission offices at 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580, as the place, when and where an evidentiary hearing will be had before an Administrative Law Judge of the Federal Trade Commission, on the charges set forth in this complaint, at which time and place you will have the right under the Federal Trade Commission Act and the Clayton Act to appear and show cause why an order should not be entered requiring you to cease and desist from the violations of law charged in the complaint.

You are notified that the opportunity is afforded you to file with the Commission an answer to this complaint on or before the fourteenth (14th) day after service of it upon you. An answer in which the allegations of the complaint are contested shall contain a concise statement of the facts constituting each ground of defense; and specific admission, denial, or explanation of each fact alleged in the complaint or, if you are without knowledge thereof, a statement to that effect. Allegations of the complaint not thus answered shall be deemed to have been admitted.

If you elect not to contest the allegations of fact set forth in the complaint, the answer shall consist of a statement that you admit all of the material facts to be true. Such an answer shall constitute a waiver of hearings as to the facts alleged in the complaint and, together with the complaint, will provide a record basis on which the Commission shall issue a final decision containing appropriate findings and conclusions and a final order disposing of the proceeding. In such answer, you may, however, reserve the right to submit proposed findings and conclusions under Rule 3.46 of the Commission's Rules of Practice for Adjudicative Proceedings.

Failure to file an answer within the time above provided shall be deemed to constitute a waiver of your right to appear and to contest the allegations of the complaint and shall authorize the Commission, without further notice to you, to find the facts to be as alleged in the complaint and to enter a final decision containing appropriate findings and conclusions, and a final order disposing of the proceeding.

The Administrative Law Judge shall hold a prehearing scheduling conference not later than ten (10) days after the Respondents file their answers. Unless otherwise directed by the Administrative Law Judge, the scheduling conference and further proceedings will take place at the Federal Trade Commission, 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580. Rule 3.21(a) requires a meeting of the parties' counsel as early as practicable before the pre-hearing scheduling conference (but in any event no later than five (5) days after the Respondents file their answers). Rule 3.31(b) obligates counsel for each party, within five (5) days of receiving the Respondents' answers, to make certain initial disclosures without awaiting a discovery request.

## NOTICE OF CONTEMPLATED RELIEF

Should the Commission conclude from the record developed in any adjudicative proceedings in this matter that the Acquisition challenged in this proceeding violates Section 5 of the Federal Trade Commission Act, as amended, and/or Section 7 of the Clayton Act, as amended, the Commission may order such relief against Respondents as is supported by the record and is necessary and appropriate, including, but not limited to:

1. A prohibition against any transaction between Microsoft and Activision that combines their businesses, except as may be approved by the Commission.

2. If the Acquisition is consummated, divestiture or reconstitution of all associated and necessary assets, in a manner that restores two or more distinct and separate, businesses, with the ability to offer such products and services as Microsoft and Activision were offering and planning to offer prior to the Acquisition.

3. A requirement that, for a period of time, Microsoft and Activision shall not, without giving provide prior notice to and obtaining the prior approval of the Commission, acquire, merge with, consolidate, or combine their businesses with any other company engaged in business activity in the relevant markets and, if necessary, in related business activity and markets.

4. A requirement to file periodic compliance reports with the Commission.

5. Requiring that Respondents' compliance with the order may be monitored at Respondents' expense by an independent monitor, for a term to be determined by the Commission.

6. Any other relief appropriate to correct or remedy the anticompetitive effects of the Acquisition or to restore Arm as an independent business.

**IN WITNESS WHEREOF**, the Federal Trade Commission has caused this complaint to be signed by its Secretary and its official seal to be hereto affixed, at Washington, D.C., this eighth day of December, 2022.

By the Commission, Commissioner Wilson dissenting.


April J. Tabor
Secretary


SEAL:

23

James H. Weingarten, DC Bar No. 985070
Peggy Bayer Femenella, DC Bar No. 472770
James Abell, DC Bar No. 990773
Cem Akleman, FL Bar No. 107666
Meredith R. Levert, DC Bar No. 498245
Jennifer Fleury, NY Bar No. 5053178
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-3570
*jweingarten@ftc.gov; pbayer@ftc.gov;*
*jabell@ftc.gov; cakleman@ftc.gov;*
*jfleury@ftc.gov; mlevert@ftc.gov*

Erika Wodinsky, CA Bar No. 091700
90 7th Street, Suite 14-300
San Francisco, CA 94103
Tel: (415) 848-5190
ewodinsky@ftc.gov

[Additional counsel identified on signature page in accordance with Local Rule 3-4(a)(1)]

Attorneys for Plaintiff Federal Trade Commission

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | Case No. 3:23-cv-02880-JSC |
| Plaintiff, | **PLAINTIFF'S NOTICE OF APPEAL** |
| v. | Honorable Jacqueline Scott Corley |
| **MICROSOFT CORP.** | |
| and | |
| **ACTIVISION BLIZZARD, INC.,** | |
| Defendants. | |

Notice is hereby given that Plaintiff Federal Trade Commission ("FTC") appeals to the United States Court of Appeals for the Ninth Circuit from this Court's Opinion dated July 10, 2023 and entered on the Court's docket on July 11, 2023 at ECF Docket Number 305 denying the FTC's request for a preliminary injunction pursuant to Federal Trade Commission Act § 13(b), 15 U.S.C. 53(b).

Dated: July 12, 2023                          Respectfully Submitted,

                                              /s/ James H. Weingarten
                                              James H. Weingarten
                                              Peggy Bayer Femenella
                                              James Abell
                                              Cem Akleman
                                              J. Alexander Ansaldo
                                              Michael T. Blevins
                                              Amanda L. Butler
                                              Nicole Callan
                                              Maria Cirincione
                                              Kassandra DiPietro
                                              Jennifer Fleury
                                              Michael A. Franchak
                                              James Gossmann
                                              Ethan Gurwitz
                                              Meredith R. Levert
                                              David E. Morris
                                              Merrick Pastore
                                              Stephen Santulli
                                              Edmund Saw

                                              Federal Trade Commission
                                              600 Pennsylvania Avenue, NW
                                              Washington, DC 20580
                                              Tel: (202) 326-3570

                                              Erika Wodinsky
                                              90 7th Street, Suite 14-300
                                              San Francisco, CA 94103
                                              Tel: (415) 848-5190

                                              *Counsel for Plaintiff Federal Trade Commission*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 1. Notice of Appeal from a Judgment or Order of a
### United States District Court

Name of U.S. District Court: | Northern District of California

U.S. District Court case number: | 3:23-cv-02880-JSC

Date case was first filed in U.S. District Court: | 06/12/2023

Date of judgment or order you are appealing: | 07/10/2023

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

○ Yes   ◉ No   ○ IFP was granted by U.S. District Court

**List all Appellants** *(List **each** party filing the appeal. Do not use "et al." or other abbreviations.)*

Federal Trade Commission

Is this a cross-appeal?  ○ Yes   ◉ No

If Yes, what is the first appeal case number?

Was there a previous appeal in this case?   ○ Yes   ◉ No

If Yes, what is the prior appeal case number?

Your mailing address:

600 Pennsylvania Avenue NW

City: Washington   State: DC   Zip Code: 20580

Prisoner Inmate or A Number (if applicable):

**Signature**  /s/ James H. Weingarten    **Date** Jul 12, 2023

*Complete and file with the attached representation statement in the U.S. District Court*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 1**                                                          *Rev. 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

Federal Trade Commission

Name(s) of counsel (if any):

Imad Dean Abyad

Address: 600 Pennsylvania Avenue NW, Washington, DC 20580

Telephone number(s): 202-326-3579

Email(s): iabyad@ftc.gov

Is counsel registered for Electronic Filing in the 9th Circuit?  ⦿ Yes  ◯ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

Microsoft Corporation

Name(s) of counsel (if any):

Beth A. Wilkinson, Rakesh N. Kilaru
WILKINSON STEKLOFF LLP

Address: 2001 M Street NW, 10th Floor, Washington, DC 20036

Telephone number(s): 202-847-4000

Email(s): bwilkinson@wilkinsonstekloff.com; rkilaru@wilkinsonstekloff.com

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**    *1*    *Rev. 12/01/2018*
**2-ER-221**

Continued list of parties and counsel: *(attach additional pages as necessary)*

**Appellants**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit?   ○ Yes   ○ No

**Appellees**

Name(s) of party/parties:

Activision Blizzard, Inc.

Name(s) of counsel (if any):

Steven C. Sunshine, Julia K. York
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

Address: 1440 New York Avenue NW, Washington, DC 20005

Telephone number(s): 202-371-7000

Email(s): steven.sunshine@skadden.com; julia.york@skadden.com

Name(s) of party/parties:

Microsoft Corporation

Name(s) of counsel (if any):

Michael Moiseyev; Megan A. Granger
WEIL, GOTSHAL & MANGES LLP

Address: 2001 M Street NW, Ste. 600, Washington, DC 20036

Telephone number(s): 202-682-7000

Email(s): michael.moiseyev@weil.com; megan.granger@weil.com

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

Form 6          *2*          *Rev. 12/01/2018*
**2-ER-222**

Query     Reports     Utilities     Help     Log Out

ADRMOP,APPEAL,RELATE

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:23-cv-02880-JSC

Federal Trade Commission v. Microsoft Corporation et al          Date Filed: 06/12/2023
Assigned to: Judge Jacqueline Scott Corley                       Jury Demand: None
Relate Case Case: 3:22-cv-08991-JSC                              Nature of Suit: 410 Anti-Trust
Case in other court: 23-15992                                    Jurisdiction: U.S. Government Plaintiff
Cause: 15:0053 Federal Trade Commission Act

**Plaintiff**

**Federal Trade Commission**                    represented by    **James Harris Weingarten**
                                                                  Federal Trade Commission
                                                                  400 7th Street SW
                                                                  Washington, DC 20024
                                                                  202-326-3570
                                                                  Email: jweingarten@ftc.gov
                                                                  *LEAD ATTORNEY*
                                                                  *PRO HAC VICE*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Amanda Leigh Butler**
                                                                  Federal Trade Commission
                                                                  Bureau of Competition
                                                                  600 Pennsylvania Avenue NW
                                                                  Washington, DC 20580
                                                                  202-326-2251
                                                                  Email: abutler2@ftc.gov
                                                                  *PRO HAC VICE*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Cem Akleman**
                                                                  Federal Trade Commission
                                                                  Bureau of Competition
                                                                  400 7th Street SW
                                                                  Washington, DC 20024
                                                                  202-326-2397
                                                                  Email: cakleman@ftc.gov
                                                                  *PRO HAC VICE*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **David Morris**
                                                                  Federal Trade Commission
                                                                  600 Pennsylvania Ave, NW
                                                                  Washington, DC 20580
                                                                  202-326-3156
                                                                  Email: dmorris1@ftc.gov

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edmund Saw**
Federal Trade Commission
600 Pennsylvania Ave, NW
Washington, DC 20580
202-326-2174
Email: esaw@ftc.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Erika Ruth Wodinsky**
Federal Trade Commission
Western Region
901 Market St., Suite 570
San Francisco, CA 94103
415-848-5190
Fax: 415-848-5184
Email: ewodinsky@ftc.gov
*ATTORNEY TO BE NOTICED*

**Ethan Gurwitz**
Federal Trade Commission
4 University Rd
Cambridge, MA 02138
774-239-1943
Email: egurwitz@ftc.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J. Alexander Ansaldo**
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
202-326-3695
Email: jansaldo@ftc.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Abell**
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
202-326-2289
Email: jabell@ftc.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Gossmann**
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
202-326-3064

Email: jgossmann@ftc.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Fleury**
Federal Trade Commission
600 Pennsylvania Ave NW
Washington, DC 20580
202-326-3805
Email: jfleury@ftc.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kassandra DiPietro**
Federal Trade Commission
600 Pennsylvania Ave, NW
Washington, DC 20580
202-326-3772
Email: kdipietro@ftc.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Maria Cirincione**
Federal Trade Commission
400 7th St SW
Washington, DC 20024
202-326-3486
Email: mcirincione@ftc.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Meredith Levert**
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
202-326-2881
Email: mlevert@ftc.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Merrick Pastore**
Federal Trade Commission
600 Pennsylvania Ave, NW
Washington, DC 20580
202-326-2244
Email: mpastore@ftc.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Blevins**
Federal Trade Commission
600 Pennsylvania Ave, NW
Washington, DC 20580
202-326-2153

Email: mblevins@ftc.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Anthony Franchak**
Federal Trade Commission
400 7th Street, SW
Washington, DC 20024
202-326-3406
Email: mfranchak@ftc.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicole Callan**
Federal Trade Commission
600 Pennsylvania Ave, NW
Washington, DC 20580
202-326-2234
Email: ncallan@ftc.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Peggy Femenella**
Federal Trade Commission
400 7th St SW
Washington, DC 20024
202-326-3086
Email: pbayer@ftc.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen Santulli**
Federal Trade Commission
Bureau of Competition
400 7th Street SW
Ste 7534
Washington, DC 20024
202-326-3408
Email: ssantulli@ftc.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Microsoft Corporation**                    represented by **Bambo Obaro**
Weil, Gotshal & Manges
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3083
Fax: (650) 802-3100
Email: bambo.obaro@weil.com
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aaron Haviland**
Sidley Austin LLP
1501 K Street N.W.
Washington, DC 20005
202-736-8064
Email: ahaviland@sidley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alysha Bohanon**
Wilkinson Stekloff LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
202-847-4029
Email: abohanon@wilkinsonstekloff.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anastasia McLetchie Pastan**
Wilkinson Stekloff LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
202-804-4239
Fax: 202-847-4005
Email: apastan@wilkinsonstekloff.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Beth A. Wilkinson**
WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
202-847-4010
Fax: 202-847-4005
Email: bwilkinson@wilkinsonstekloff.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**C. Frederick Beckner , III**
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
202-736-8874
Email: rbeckner@sidley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel John Hay**
Sidley Austin LLP
1501 K Street NW
Washington, DC 20005

202-736-8084
Fax: 202-736-8711
Email: dhay@sidley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Grace Lee Hill**
Wilkinson Stekloff LLP
2001 M Street, N.W., 10th Floor
Washington, DC 20036
202-847-4044
Email: ghill@wilkinsonstekloff.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James M. Rosenthal**
WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
202-847-4011
Fax: 202-847-4005
Email: jrosenthal@wilkinsonstekloff.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Pavelec**
Wilkinson Stekloff LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
202-991-5276
Email: jpavelec@wilkinsonstekloff.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan E. Nuechterlein**
Sidley Austin LLP
1501 K Street N.W.
Washington, DC 20005
202-736-8000
Email: jnuechterlein@sidley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kieran Gavin Gostin**
WILKINSON STEKLOFF LLP
2001 M Street, NW, 10th Floor
Washington, DC 20036
202-847-4031
Fax: 202-847-4005
Email: kgostin@wilkinsonstekloff.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lucas Croslow**

Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
202-736-8643
Email: lcroslow@sidley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Manuel Valle**
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
269-275-0607
Email: manuel.valle@sidley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Megan A. Granger**
Weil, Gotshal & Manges LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
202-682-7000
Fax: 202-857-0940
Email: megan.granger@weil.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Moiseyev**
Weil, Gotshal & Manges
2001 M Street NW, Suite 600
Washington, DC 20036
202-682-7235
Email: michael.moiseyev@weil.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rakesh Kilaru**
Wilkinson Stekloff LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
(202) 847-4046
Fax: (202) 847-4005
Email: rkilaru@wilkinsonstekloff.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Elizabeth Neuman**
WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
202-804-4238
Fax: 202-847-4005
Email: sneuman@wilkinsonstekloff.com
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**William R Levi**
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
202-736-8756
Fax: 202-736-8711
Email: william.levi@sidley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Activision Blizzard, Inc.**                represented by **Caroline W Van Ness**
SKADDEN ARPS SLATE MEAGHER and
FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, CA 94301
(650) 470-4500
Fax: (650) 470.4570
Email: caroline.vanness@skadden.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jack Patrick DiCanio**
Skadden Arps Slate Meagher & Flom LLP
525 University Avenue
Palo Alto, CA 94301
650-470-4500
Fax: 650-470-4570
Email: jdicanio@skadden.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven C. Sunshine**
Skadden Arps Slate Meagher and Flom LLP
1440 New York Ave., NW
Washington, DC 20005
202-371-7860
Fax: 202-661-0560
Email: Steven.Sunshine@skadden.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Beth A. Wilkinson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bradley James Pierson**
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001

212-735-3000
Email: bradley.pierson@skadden.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Evan R Kreiner**
Skadden Arps Slate Meagher & Flom LLP
Four Times Square
New York, NY 10036
212-735-2491
Email: evan.kreiner@skadden.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Watters**
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue NW
Washington, DC 20005
202-371-7093
Email: jessica.watters@skadden.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julia K. York**
Skadden Arps Slate Meagher & Flom LLP
1440 New York Avenue
Washington, DC 20005
212-735-3000
Email: julia.york@skadden.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Maria Raptis**
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001-8602
212-735-2425
Email: maria.raptis@skadden.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew M. Martino , I**
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001-8602
212-735-3000
Email: matthew.martino@skadden.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Joseph Sheerin**
Skadden, Arps, Slate, Meagher & Flom LLP
1 Manhattan West
New York, NY 10001

212-735-3583
Email: michael.sheerin@skadden.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**3rd party defendant**

**Amazon.com, Inc.**                           represented by   **Leigh Oliver**
Clifford Chance US LLP
2001 K Street NW, 9th Floor
Washington, DC 20006
301-806-7887
Email: leigh.oliver@cliffordchance.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey Michael Davidson**
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
(415) 591-6000
Fax: (415) 591-6091
Email: jdavidson@cov.com
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Dante Demartini**                           represented by   **David H. Seidel**
Joseph Saveri Law Firm, Inc.
601 California, Suite 1000
San Francisco, CA 94108
(415) 500-6800
Email: dseidel@saverilawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph R. Saveri**
Joseph Saveri Law Firm, LLP
601 California Street, Suite 1000
San Francisco, CA 94108
(415) 500-6800
Fax: (415) 395-9940
Email: jsaveri@saverilawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Noel Williams**
Joseph Saveri Law Firm, LLP
601 California Street, Suite 1000
San Francisco, CA 94108
(415) 500-6800
Fax: (415) 395-9940
Email: swilliams@saverilawfirm.com
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Joseph M Alioto , Sr**
Alioto Law Firm
One Sansome Street, 35th Floor
San Francisco, CA 94104
(415) 434-8900
Fax: (415) 434-9200
Email: jmalioto@aliotolaw.com
*ATTORNEY TO BE NOTICED*

**Kathleen Jordan McMahon**
Joseph Saveri Law Firm, Inc.
601 California
Ste 1000
San Francisco, CA 94108
415-500-6800
Email: kmcmahon@saverilawfirm.com
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Curtis Burns, Jr.**                    represented by    **David H. Seidel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph R. Saveri**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Noel Williams**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M Alioto , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathleen Jordan McMahon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Nicholas Elden**                    represented by    **David H. Seidel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph R. Saveri**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Noel Williams**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M Alioto , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathleen Jordan McMahon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Jessie Galvan**                          represented by **David H. Seidel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph R. Saveri**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Noel Williams**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M Alioto , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathleen Jordan McMahon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Christopher Giddings- LaFaye**           represented by **David H. Seidel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph R. Saveri**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Noel Williams**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M Alioto , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathleen Jordan McMahon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Steve Herrera**        represented by   **David H. Seidel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph R. Saveri**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Noel Williams**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M Alioto , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathleen Jordan McMahon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Hunter Joseph Jakupko**        represented by   **David H. Seidel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph R. Saveri**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Noel Williams**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M Alioto , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathleen Jordan McMahon**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Daniel Loftus**                    represented by    **David H. Seidel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph R. Saveri**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Noel Williams**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M Alioto , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathleen Jordan McMahon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Beowulf Edward Owen**              represented by    **David H. Seidel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph R. Saveri**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Noel Williams**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M Alioto , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathleen Jordan McMahon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Ivan Calvo-Perez**

represented by **David H. Seidel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph R. Saveri**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Noel Williams**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M Alioto , Sr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathleen Jordan McMahon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Sony Interactive Entertainment LLC**

represented by **Carl Lawrence Malm**
Cleary Gottlieb Steen and Hamilton LLP
2112 Pennsylvania Avenue, NW
Suite 1000
Washington, DC 20037
(202) 974-1500
Fax: (202) 974-1999
Email: lmalm@cgsh.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elsbeth Bennett**
Cleary Gottlieb Steen & Hamilton LLP
2112 Pennsylvania Ave., NW, Suite 1000
Washington, DC 20037
202-974-1911
Email: ebennett@cgsh.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary G. Tschida**
Cleary Gottlieb Steen & Hamilton LLP
1841 Page Mill Road
Palo Alto, CA 94304
650-815-4113
Fax: 650-815-4199
Email: ztschida@cgsh.com
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Nintendo of America Inc.**                    represented by **Steven Edward Swaney**
Venable LLP
101 California Street, Suite 3800
San Francisco, CA 94111
415-653-3722
Fax: 415-653-3755
Email: seswaney@venable.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin P Argyle**
Venable LLP
151 W. 42nd Street
Ste 49th Floor
New York, NY 10036
212-307-5500
Email: bpargyle@venable.com
*ATTORNEY TO BE NOTICED*

**Leonard L. Gordon**
Venable LLP
151 West 42nd Street
New York, NY 10036
(212) 370-6252
Email: llgordon@venable.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**NVIDIA Corporation**                    represented by **Michael Domenic Bonanno**
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
(202) 538-8225
Fax: (202) 538-8100
Email: mikebonanno@quinnemanuel.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ognjen Zivojnovic**
Quinn Emanuel Urquhart Sullivan LLP
50 California Street
22nd Floor
San Francisco, CA 94111
United Sta
415-875-6600
Fax: 415-875-6700
Email: ogizivojnovic@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Google LLC**                    represented by **Dylan Ian Ballard**
Vinson & Elkins
555 Mission Street

Suite 2000
San Francisco, CA 94105
415-979-6955
Email: dballard@velaw.com
*ATTORNEY TO BE NOTICED*

**Evan Miller**
Vinson & Elkins
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, DC 20037
202-639-6605
Email: emiller@velaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Valve Corporation**                represented by **Meeghan Tirtasaputra**
Fox Rothschild LLP
Litigation
10250 Constellation Boulevard
Suite 900
Los Angeles, CA 90067
323-919-6480
Email: mtirtasaputra@foxrothschild.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/12/2023 | 1 | COMPLAINT *For a Temporary Restraining Order and Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act* against Activision Blizzard, Inc., Microsoft Corporation. Filed byFederal Trade Commission. (Attachments: # 1 Civil Cover Sheet)(Weingarten, James) (Filed on 6/12/2023) (Entered: 06/12/2023) |
| 06/12/2023 | 2 | Proposed Summons. (Weingarten, James) (Filed on 6/12/2023) (Entered: 06/12/2023) |
| 06/12/2023 | 3 | Proposed Summons. (Weingarten, James) (Filed on 6/12/2023) (Entered: 06/12/2023) |
| 06/12/2023 | 4 | Case assigned to Magistrate Judge Sallie Kim. Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 6/26/2023. (as, COURT STAFF) (Filed on 6/12/2023) (Entered: 06/12/2023) |
| 06/12/2023 | 5 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 9/4/2023. Initial Case Management Conference set for 9/11/2023 at 1:30 PM in San Francisco, Courtroom C, 15th Floor. (wsn, COURT STAFF) (Filed on 6/12/2023) (Entered: 06/12/2023)** |

| 06/12/2023 | 6 | Summons Issued as to Activision Blizzard, Inc., Microsoft Corporation. (wsn, COURT STAFF) (Filed on 6/12/2023) (Entered: 06/12/2023) |
|---|---|---|
| 06/12/2023 | 7 | Emergency MOTION for Temporary Restraining Order *Pursuant to Federal Trade Commission Act Section 13(b)* filed by Federal Trade Commission. (Weingarten, James) (Filed on 6/12/2023) (Entered: 06/12/2023) |
| 06/12/2023 | 8 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned.<br><br>ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED.<br><br>*This is a text only docket entry; there is no document associated with this notice.* (mkl, COURT STAFF) (Filed on 6/12/2023) (Entered: 06/12/2023) |
| 06/12/2023 | 9 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Vince Chhabria for all further proceedings. Magistrate Judge Sallie Kim no longer assigned to case, Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras.. Signed by Clerk on 6/12/23. (Attachments: # 1 Notice of Eligibility for Video Recording)(as, COURT STAFF) (Filed on 6/12/2023) (Entered: 06/12/2023)** |
| 06/12/2023 | 10 | Declaration of Jennifer Fleury in Support of 7 Emergency MOTION for Temporary Restraining Order *Pursuant to Federal Trade Commission Act Section 13(b)* filed by Federal Trade Commission. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit AB, # 29 Exhibit AC, # 30 Exhibit AD, # 31 Proposed Order)(Related document(s) 7 ) (Weingarten, James) (Filed on 6/12/2023) (Entered: 06/12/2023) |
| 06/12/2023 | 11 | Administrative Motion to File Under Seal *Plaintiff's Complaint for a Temporary Restraining Order* filed by Federal Trade Commission. (Attachments: # 1 Exhibit, # 2 Proposed Order)(Weingarten, James) (Filed on 6/12/2023) (Entered: 06/12/2023) |
| 06/12/2023 | 12 | Administrative Motion to File Under Seal *Plaintiff's Emergency Motion for a Temporary Restraining Order* filed by Federal Trade Commission. (Attachments: # 1 Declaration, # 2 Proposed Order, # 3 Unredacted Notice of Motion and Emergency Motion for Temporary Restraining Order Pursuant to FTC Act Section 13(b), # 4 Exhibit A, # 5 Exhibit AA, # 6 Exhibit AB, # 7 Exhibit AC, # 8 Exhibit I, # 9 Exhibit J, # 10 Exhibit K, # 11 Exhibit M, # 12 Exhibit N, # 13 Exhibit O, # 14 Exhibit P, # 15 Exhibit Q, # 16 Exhibit R, # 17 Exhibit S, # 18 Exhibit T, # 19 Exhibit U, # 20 Exhibit V, # 21 Exhibit Y, # 22 Exhibit Z, # 23 Exhibit AD, # 24 Exhibit B, # 25 Exhibit C)(Weingarten, James) (Filed on 6/12/2023) (Entered: 06/12/2023) |
| 06/12/2023 | 13 | CERTIFICATE OF SERVICE by Federal Trade Commission (Weingarten, James) (Filed on 6/12/2023) (Entered: 06/12/2023) |

| 06/12/2023 | 14 | NOTICE of Appearance by Bambo Obaro (Obaro, Bambo) (Filed on 6/12/2023) (Entered: 06/12/2023) |
| --- | --- | --- |
| 06/12/2023 | 15 | MOTION for leave to appear in Pro Hac Vice *Beth Wilkinson* ( Filing fee $ 317, receipt number ACANDC-18353074.) filed by Microsoft Corporation. (Wilkinson, Beth) (Filed on 6/12/2023) (Entered: 06/12/2023) |
| 06/12/2023 | 16 | MOTION for leave to appear in Pro Hac Vice *Rakesh Kilaru* ( Filing fee $ 317, receipt number ACANDC-18353079.) filed by Microsoft Corporation. (Kilaru, Rakesh) (Filed on 6/12/2023) (Entered: 06/12/2023) |
| 06/12/2023 | 17 | MOTION for leave to appear in Pro Hac Vice *Kieran Gostin* ( Filing fee $ 317, receipt number ACANDC-18353092.) filed by Microsoft Corporation. (Gostin, Kieran) (Filed on 6/12/2023) (Entered: 06/12/2023) |
| 06/12/2023 | 18 | MOTION for leave to appear in Pro Hac Vice *Grace Hill* ( Filing fee $ 317, receipt number ACANDC-18353103.) filed by Microsoft Corporation. (Hill, Grace) (Filed on 6/12/2023) (Entered: 06/12/2023) |
| 06/12/2023 | 19 | MOTION for leave to appear in Pro Hac Vice *Anastasia Pastan* ( Filing fee $ 317, receipt number ACANDC-18353114.) filed by Microsoft Corporation. (Pastan, Anastasia) (Filed on 6/12/2023) (Entered: 06/12/2023) |
| 06/13/2023 | 20 | **REFERRAL FOR PURPOSE OF DETERMINING RELATIONSHIP. Signed by Judge Vince Chhabria on 6/13/2023. (vclc1, COURT STAFF) (Filed on 6/13/2023) (Entered: 06/13/2023)** |
| 06/13/2023 | 21 | **ORDER RELATING CASE. Signed by Judge Jacqueline Scott Corley on 6/13/2023. 23-cv-2880 is related to 22-cv-8991. (ahm, COURT STAFF) (Filed on 6/13/2023) (Entered: 06/13/2023)** |
| 06/13/2023 | 22 | **ORDER REASSIGNING CASE. Case reassigned to Judge Jacqueline Scott Corley for all further proceedings. Judge Vince Chhabria no longer assigned to case, Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras.. Signed by Clerk on 6/13/2023. (Attachments: # 1 Notice of Eligibility for Video Recording)(ark, COURT STAFF) (Filed on 6/13/2023) (Entered: 06/13/2023)** |
| 06/13/2023 | 23 | EXHIBITS re 10 Declaration in Support - *Exhibit D* filed by Federal Trade Commission. (Related document(s) 10 ) (Fleury, Jennifer) (Filed on 6/13/2023) (Entered: 06/13/2023) |
| 06/13/2023 | 24 | EXHIBITS re 10 Declaration in Support - *Exhibit L* filed by Federal Trade Commission. (Related document(s) 10 ) (Fleury, Jennifer) (Filed on 6/13/2023) (Entered: 06/13/2023) |
| 06/13/2023 | 25 | NOTICE of Appearance by Jack Patrick DiCanio (DiCanio, Jack) (Filed on 6/13/2023) (Entered: 06/13/2023) |
| 06/13/2023 | 26 | NOTICE of Appearance by Caroline W Van Ness (Van Ness, Caroline) (Filed on 6/13/2023) (Entered: 06/13/2023) |
| 06/13/2023 | 27 | EXHIBITS re 10 Declaration in Support - *Exhibit W* filed by Federal Trade Commission. (Related document(s) 10 ) (Fleury, Jennifer) (Filed on 6/13/2023) (Entered: 06/13/2023) |
| 06/13/2023 | 28 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18354883.) filed by Activision Blizzard, Inc.. (Attachments: # 1 Certificate of Good Standing)(Sunshine, Steven) (Filed on 6/13/2023) (Entered: 06/13/2023) |
| 06/13/2023 | 29 | EXHIBITS re 10 Declaration in Support - *Exhibit X* filed by Federal Trade Commission. (Related document(s) 10 ) (Fleury, Jennifer) (Filed on 6/13/2023) (Entered: 06/13/2023) |

| | | |
|---|---|---|
| 06/13/2023 | 30 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18354971.) filed by Activision Blizzard, Inc.. (Attachments: # 1 Certificate of Good Standing)(York, Julia) (Filed on 6/13/2023) (Entered: 06/13/2023) |
| 06/13/2023 | 31 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18355113.) filed by Activision Blizzard, Inc.. (Attachments: # 1 Certificate of Good Standing)(Martino, Matthew) (Filed on 6/13/2023) (Entered: 06/13/2023) |
| 06/13/2023 | 32 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18355197.) filed by Activision Blizzard, Inc.. (Attachments: # 1 Certificate of Good Standing)(Kreiner, Evan) (Filed on 6/13/2023) (Entered: 06/13/2023) |
| 06/13/2023 | 33 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18355801.) filed by Activision Blizzard, Inc.. (Attachments: # 1 Certificate of Good Standing)(Sheerin, Michael) (Filed on 6/13/2023) (Entered: 06/13/2023) |
| 06/13/2023 | 34 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *CORRECTION OF DOCKET #11* filed by Federal Trade Commission. (Weingarten, James) (Filed on 6/13/2023) (Entered: 06/13/2023) |
| 06/13/2023 | 35 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *CORRECTION OF DOCKET #12* filed by Federal Trade Commission. (Attachments: # 1 Declaration Corrected Dkt. #12-1)(Weingarten, James) (Filed on 6/13/2023) (Entered: 06/13/2023) |
| 06/13/2023 | 36 | MOTION for leave to appear in Pro Hac Vice *Megan Granger* ( Filing fee $ 317, receipt number ACANDC-18356381.) filed by Microsoft Corporation. (Attachments: # 1 Certificate of Good Standing - Megan Granger)(Granger, Megan) (Filed on 6/13/2023) (Entered: 06/13/2023) |
| 06/13/2023 | 37 | **ORDER RE: TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION 7 . Signed by Edward J. Davila on June 13, 2023.** Evidentiary Hearing set for June 22, 2023 & June 23, 2023 at 9:00 a.m. in San Francisco, Courtroom 08, 19th Floor before Judge Jacqueline Scott Corley. (ahm, COURT STAFF) (Filed on 6/13/2023) (Entered: 06/13/2023) |
| 06/14/2023 | 38 | MOTION for leave to appear in Pro Hac Vice *Michael Moiseyev* ( Filing fee $ 317, receipt number ACANDC-18358382.) filed by Microsoft Corporation. (Attachments: # 1 Certificate of Good Standing - Michael Moiseyev)(Moiseyev, Michael) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 39 | **ORDER by Judge Jacqueline Scott Corley granting 15 Motion for Pro Hac Vice as to Beth Wilkinson. (ahm, COURT STAFF) (Filed on 6/14/2023) (Entered: 06/14/2023)** |
| 06/14/2023 | 40 | **ORDER by Judge Jacqueline Scott Corley granting 16 Motion for Pro Hac Vice as to Rakesh Kilaru. (ahm, COURT STAFF) (Filed on 6/14/2023) (Entered: 06/14/2023)** |
| 06/14/2023 | 41 | **ORDER by Judge Jacqueline Scott Corley granting 17 Motion for Pro Hac Vice as to Kieran Gostin. (ahm, COURT STAFF) (Filed on 6/14/2023) (Entered: 06/14/2023)** |
| 06/14/2023 | 42 | **ORDER by Judge Jacqueline Scott Corley granting 18 Motion for Pro Hac Vice as to Grace Hill. (ahm, COURT STAFF) (Filed on 6/14/2023) (Entered: 06/14/2023)** |
| 06/14/2023 | 43 | **ORDER by Judge Jacqueline Scott Corley granting 19 Motion for Pro Hac Vice as to Anastasia Pastan. (ahm, COURT STAFF) (Filed on 6/14/2023) (Entered: 06/14/2023)** |

| 06/14/2023 | 44 | ORDER by Judge Jacqueline Scott Corley granting 28 Motion for Pro Hac Vice as to Steven Sunshine. (ahm, COURT STAFF) (Filed on 6/14/2023) (Entered: 06/14/2023) |
|---|---|---|
| 06/14/2023 | 45 | ORDER by Judge Jacqueline Scott Corley granting 30 Motion for Pro Hac Vice as to Julia York. (ahm, COURT STAFF) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 46 | ORDER by Judge Jacqueline Scott Corley granting 31 Motion for Pro Hac Vice as to Matthew Martino. (ahm, COURT STAFF) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 47 | ORDER by Judge Jacqueline Scott Corley granting 32 Motion for Pro Hac Vice as to Evan Kreiner. (ahm, COURT STAFF) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 48 | ORDER by Judge Jacqueline Scott Corley granting 33 Motion for Pro Hac Vice as to Michael Sheerin. (ahm, COURT STAFF) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 49 | ORDER by Judge Jacqueline Scott Corley granting 36 Motion for Pro Hac Vice as to Megan Granger. (ahm, COURT STAFF) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 50 | ORDER by Judge Jacqueline Scott Corley granting 38 Motion for Pro Hac Vice as to Michael Moiseyev. (ahm, COURT STAFF) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 51 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18358735.) filed by Activision Blizzard, Inc.. (Attachments: # 1 Certificate of Good Standing)(Raptis, Maria) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 52 | FED. R. CIV. P. 7.1 CORPORATE DISCLOSURE STATEMENT AND CIV. L.R. 3-15 CERTIFICATION OF CONFLICTS AND INTERESTED ENTITIES OR PERSONS filed by Activision Blizzard, Inc. (Van Ness, Caroline) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 53 | RULE 3-15 CERTIFICATION OF INTERESTED ENTITITES OR PERSONS [Civil L.R. 3-15] filed by Microsoft Corporation (Wilkinson, Beth) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 54 | CORPORATE DISCLOSURE STATEMENT OF DEFENDANT MICROSOFT CORP. [Fed. R. Civ. P. 7.1] filed by Microsoft Corporation (Wilkinson, Beth) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 55 | Clerks Notice re Evidentiary Hearing Deadline for Daily Transcript and/or Realtime Reporting:<br><br>The deadline to request daily transcripts or Realtime reporting for counsel during the evidentiary hearing is 6/15/2023, by 10 a.m., see General Order 23.<br><br>More details regarding daily transcripts or Realtime during trial/evidentiary hearings are available on the Transcripts/Court Reporters webpage (see section III) at https://www.cand.uscourts.gov/about/clerks-office/transcripts-court-reporters/<br><br>Contact Court Reporter Supervisor Kristen Melen with questions at kristen_melen@cand.uscourts.gov by the deadline above.<br><br>(knm, COURT STAFF) (Filed on 6/14/2023) (Entered: 06/14/2023) |

| | | |
|---|---|---|
| 06/14/2023 | 56 | MOTION to Expedite *Case Management Conference* filed by Activision Blizzard, Inc., Microsoft Corporation. (Wilkinson, Beth) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 57 | **ORDER by Judge Jacqueline Scott Corley granting 51 Motion for Pro Hac Vice as to Maria Raptis. (ahm, COURT STAFF) (Filed on 6/14/2023) (Entered: 06/14/2023)** |
| 06/14/2023 | 58 | NOTICE of Appearance by Edmund Saw (Saw, Edmund) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 59 | NOTICE of Appearance by Nicole Callan (Callan, Nicole) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 60 | NOTICE of Appearance by Merrick Pastore (Pastore, Merrick) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 61 | NOTICE of Appearance by Amanda Leigh Butler (Butler, Amanda) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 62 | MOTION for leave to appear in Pro Hac Vice *for Attorney Sarah E. Neuman* ( Filing fee $ 317, receipt number ACANDC-18360233.) filed by Microsoft Corporation. (Neuman, Sarah) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 63 | NOTICE of Appearance by Michael Anthony Franchak (Franchak, Michael) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 64 | NOTICE of Appearance by David Morris (Morris, David) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 65 | NOTICE of Appearance by Stephen Santulli (Santulli, Stephen) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 66 | MOTION for leave to appear in Pro Hac Vice *for Attorney Jenna Pavelec* ( Filing fee $ 317, receipt number ACANDC-18360254.) filed by Microsoft Corporation. (Pavelec, Jennifer) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 67 | NOTICE of Appearance by Ethan Gurwitz (Gurwitz, Ethan) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 68 | MOTION for leave to appear in Pro Hac Vice *for Attorney Alysha Bohanon* ( Filing fee $ 317, receipt number ACANDC-18360275.) filed by Microsoft Corporation. (Bohanon, Alysha) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 69 | NOTICE of Appearance by Michael Blevins (Blevins, Michael) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 70 | NOTICE of Appearance by J. Alexander Ansaldo (Ansaldo, J.) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 71 | NOTICE of Appearance by Maria Cirincione (Cirincione, Maria) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 72 | NOTICE of Appearance by Kassandra DiPietro (DiPietro, Kassandra) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 73 | NOTICE OF INTENT TO OPPOSE DEFENDANTS' MOTION FOR EXPEDITED CASE MANAGEMENT CONFERENCE filed by Federal Trade Commission re 56 MOTION to Expedite *Case Management Conference* (Attachments: # 1 Declaration, # 2 Exhibit, # 3 Exhibit)(Weingarten, James) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 74 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts by Federal Trade |

| | | |
|---|---|---|
| | | Commission. (Weingarten, James) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 75 | Administrative Motion to File Under Seal *Exhibits A and B to Plaintiff's Notice of Intent to Oppose Defendants' Motion for Expedited Case Management Conference* filed by Federal Trade Commission. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Proposed Order) (Weingarten, James) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 76 | **ORDER RE: EVIDENTIARY HEARING ON PRELIMINARY INJUNCTION MOTION. Signed by Judge Jacqueline Scott Corley on 6/14/2023.**<br><br>Pre-evidentiary hearing/Status Conference set for 6/21/2023 at 2:00 p.m. in San Francisco, Courtroom 08, 19th Floor before Judge Jacqueline Scott Corley.<br><br>Evidentiary Hearing reset for 6/22/2023, 6/23/2023, 6/27/2023, and 6/29/2023 at 8:30 a.m. in San Francisco, Courtroom 08, 19th Floor before Judge Jacqueline Scott Corley.<br><br>Evidentiary Hearing set for 6/28/2023 at 1:30 p.m. in San Francisco, Courtroom 08, 19th Floor before Judge Jacqueline Scott Corley.<br><br>*Please note that the hearings will **not** be broadcast by Zoom or AT&T Teleconference.*<br><br>(ahm, COURT STAFF) (Filed on 6/14/2023) Modified on 6/14/2023 (ahm, COURT STAFF). (Entered: 06/14/2023) |
| 06/14/2023 | 77 | **ORDER by Judge Jacqueline Scott Corley granting 62 Motion for Pro Hac Vice as to Sarah E. Neuman. (ahm, COURT STAFF) (Filed on 6/14/2023) (Entered: 06/14/2023)** |
| 06/14/2023 | 78 | **ORDER by Judge Jacqueline Scott Corley granting 66 Motion for Pro Hac Vice as to Jenna Pavelec. (ahm, COURT STAFF) (Filed on 6/14/2023) (Entered: 06/14/2023)** |
| 06/14/2023 | 79 | **ORDER by Judge Jacqueline Scott Corley granting 68 Motion for Pro Hac Vice as to Alysha Bohanon. (ahm, COURT STAFF) (Filed on 6/14/2023) (Entered: 06/14/2023)** |
| 06/14/2023 | 80 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts by Microsoft Corporation. (Wilkinson, Beth) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/14/2023 | 81 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts by Activision Blizzard, Inc.. (Van Ness, Caroline) (Filed on 6/14/2023) (Entered: 06/14/2023) |
| 06/15/2023 | 82 | NOTICE of Appearance by Erika Ruth Wodinsky *on behalf of Federal Trade Commission* (Wodinsky, Erika) (Filed on 6/15/2023) (Entered: 06/15/2023) |
| 06/15/2023 | 83 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts, ordered by Jennifer Rie. (knm, COURT STAFF) (Filed on 6/15/2023) (Entered: 06/15/2023) |
| 06/15/2023 | 84 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts, ordered by Robert Greebel. (knm, COURT STAFF) (Filed on 6/15/2023) (Entered: 06/15/2023) |
| 06/15/2023 | 85 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts, ordered by Alexandra Wilts. (knm, COURT STAFF) (Filed on 6/15/2023) (Entered: 06/15/2023) |
| 06/15/2023 | 86 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts, ordered by Tom Belles. (knm, COURT STAFF) (Filed on 6/15/2023) (Entered: 06/15/2023) |
| 06/15/2023 | 87 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts, ordered by Nick Rodelli. (knm, COURT STAFF) (Filed on 6/15/2023) (Entered: 06/15/2023) |

| | | |
|---|---|---|
| 06/15/2023 | 88 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18366796.) filed by Activision Blizzard, Inc.. (Attachments: # 1 Certificate of Good Standing)(Watters, Jessica) (Filed on 6/15/2023) (Entered: 06/15/2023) |
| 06/16/2023 | 89 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18367591.) filed by Activision Blizzard, Inc.. (Attachments: # 1 Certificate of Good Standing)(Pierson, Bradley) (Filed on 6/16/2023) (Entered: 06/16/2023) |
| 06/16/2023 | 90 | **ORDER by Judge Jacqueline Scott Corley granting 88 Motion for Pro Hac Vice as to Jessica Watters. (ahm, COURT STAFF) (Filed on 6/16/2023) (Entered: 06/16/2023)** |
| 06/16/2023 | 91 | **ORDER by Judge Jacqueline Scott Corley granting 89 Motion for Pro Hac Vice as to Bradley J. Pierson. (ahm, COURT STAFF) (Filed on 6/16/2023) (Entered: 06/16/2023)** |
| 06/16/2023 | 92 | MOTION for leave to appear in Pro Hac Vice *of Jonathan E. Nuechterlein* ( Filing fee $ 317, receipt number ACANDC-18367903.) filed by Microsoft Corporation. (Nuechterlein, Jonathan) (Filed on 6/16/2023) (Entered: 06/16/2023) |
| 06/16/2023 | 93 | NOTICE of Appearance by Joseph R. Saveri *in the related matter, Demartini et al v. Microsoft Corporation* (Saveri, Joseph) (Filed on 6/16/2023) (Entered: 06/16/2023) |
| 06/16/2023 | 94 | MOTION for leave to appear in Pro Hac Vice *of C. Frederick Beckner III* ( Filing fee $ 317, receipt number ACANDC-18368039.) filed by Microsoft Corporation. (Beckner, C.) (Filed on 6/16/2023) (Entered: 06/16/2023) |
| 06/16/2023 | 95 | NOTICE of Appearance by Steven Noel Williams *in the related matter, Demartini et al v. Microsoft Corporation* (Williams, Steven) (Filed on 6/16/2023) (Entered: 06/16/2023) |
| 06/16/2023 | 96 | NOTICE of Appearance by David H. Seidel *in the related matter, Demartini et al v. Microsoft Corporation* (Seidel, David) (Filed on 6/16/2023) (Entered: 06/16/2023) |
| 06/16/2023 | 97 | MOTION for leave to appear in Pro Hac Vice *of William R. Levi* ( Filing fee $ 317, receipt number ACANDC-18368082.) filed by Microsoft Corporation. (Levi, William) (Filed on 6/16/2023) (Entered: 06/16/2023) |
| 06/16/2023 | 98 | MOTION for leave to appear in Pro Hac Vice *of Daniel J. Hay* ( Filing fee $ 317, receipt number ACANDC-18368110.) filed by Microsoft Corporation. (Hay, Daniel) (Filed on 6/16/2023) (Entered: 06/16/2023) |
| 06/16/2023 | 99 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts, ordered by Julia Kleinbrodt. (knm, COURT STAFF) (Filed on 6/16/2023) (Entered: 06/16/2023) |
| 06/16/2023 | 100 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts, ordered by Aram Sethian. (knm, COURT STAFF) (Filed on 6/16/2023) (Entered: 06/16/2023) |
| 06/16/2023 | 101 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts by Curtis Burns, Jr, Ivan Calvo-Perez, Dante Demartini, Nicholas Elden, Jessie Galvan, Christopher Giddings-LaFaye, Steve Herrera, Hunter Joseph Jakupko, Daniel Loftus, Beowulf Edward Owen. (Seidel, David) (Filed on 6/16/2023) (Entered: 06/16/2023) |
| 06/16/2023 | 102 | **ORDER by Judge Jacqueline Scott Corley granting 94 Motion for Pro Hac Vice as to C. Frederick Beckner III. (ahm, COURT STAFF) (Filed on 6/16/2023) (Entered: 06/16/2023)** |
| 06/16/2023 | 103 | **ORDER by Judge Jacqueline Scott Corley granting 92 Motion for Pro Hac Vice as to Jonathan E. Nuechterlein. (ahm, COURT STAFF) (Filed on 6/16/2023) (Entered: 06/16/2023)** |

| 06/16/2023 | [104] | **ORDER by Judge Jacqueline Scott Corley granting [97] Motion for Pro Hac Vice as to William R. Levi. (ahm, COURT STAFF) (Filed on 6/16/2023) (Entered: 06/16/2023)** |
| 06/16/2023 | [105] | **ORDER by Judge Jacqueline Scott Corley granting [98] Motion for Pro Hac Vice as to Daniel J. Hay. (ahm, COURT STAFF) (Filed on 6/16/2023) (Entered: 06/16/2023)** |
| 06/16/2023 | [106] | Administrative Motion to File Under Seal *Opposition to Motion for Preliminary Injunction* filed by Microsoft Corporation. (Attachments: # [1] Proposed Order, # [2] Declaration, # [3] Exhibit)(Wilkinson, Beth) (Filed on 6/16/2023) (Entered: 06/16/2023) |
| 06/16/2023 | [107] | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Opposition to Motion for Preliminary Injunction* filed by Activision Blizzard, Inc., Microsoft Corporation. (Attachments: # [1] Proposed Order)(Wilkinson, Beth) (Filed on 6/16/2023) (Entered: 06/16/2023) |
| 06/16/2023 | [108] | OPPOSITION/RESPONSE (re [12] Administrative Motion to File Under Seal *Plaintiff's Emergency Motion for a Temporary Restraining Order* ) filed byActivision Blizzard, Inc., Microsoft Corporation. (Attachments: # [1] Declaration, # [2] Exhibit, # [3] Exhibit, # [4] Exhibit, # [5] Exhibit, # [6] Exhibit, # [7] Exhibit, # [8] Exhibit, # [9] Exhibit, # [10] Exhibit, # [11] Exhibit, # [12] Exhibit, # [13] Exhibit, # [14] Exhibit, # [15] Exhibit, # [16] Exhibit, # [17] Exhibit, # [18] Exhibit, # [19] Exhibit, # [20] Exhibit, # [21] Exhibit, # [22] Exhibit, # [23] Exhibit, # [24] Exhibit, # [25] Exhibit, # [26] Exhibit, # [27] Exhibit, # [28] Exhibit, # [29] Exhibit, # [30] Exhibit, # [31] Exhibit, # [32] Exhibit, # [33] Exhibit, # [34] Exhibit, # [35] Exhibit, # [36] Exhibit, # [37] Exhibit, # [38] Exhibit, # [39] Exhibit, # [40] Exhibit, # [41] Exhibit, # [42] Exhibit, # [43] Exhibit, # [44] Exhibit, # [45] Exhibit, # [46] Exhibit, # [47] Exhibit, # [48] Exhibit, # [49] Exhibit, # [50] Exhibit, # [51] Exhibit, # [52] Exhibit, # [53] Exhibit, # [54] Exhibit, # [55] Exhibit, # [56] Exhibit, # [57] Exhibit, # [58] Exhibit, # [59] Exhibit, # [60] Exhibit, # [61] Exhibit, # [62] Exhibit, # [63] Exhibit, # [64] Exhibit, # [65] Exhibit, # [66] Exhibit)(Wilkinson, Beth) (Filed on 6/16/2023) (Entered: 06/17/2023) |
| 06/17/2023 | [109] | Administrative Motion to File Under Seal *Opposition to Motion for Preliminary Injunction* filed by Activision Blizzard, Inc., Microsoft Corporation. (Attachments: # [1] Proposed Order, # [2] Declaration, # [3] Exhibit A, # [4] Exhibit B, # [5] Exhibit 2, # [6] Exhibit 3, # [7] Exhibit 7, # [8] Exhibit 8, # [9] Exhibit 9, # [10] Exhibit 11, # [11] Exhibit 12, # [12] Exhibit 15, # [13] Exhibit 24, # [14] Exhibit 25, # [15] Exhibit 27, # [16] Exhibit 28, # [17] Exhibit 29, # [18] Exhibit 30, # [19] Exhibit 31, # [20] Exhibit 32, # [21] Exhibit 33, # [22] Exhibit 34, # [23] Exhibit 37, # [24] Exhibit 38, # [25] Exhibit 39, # [26] Exhibit 40, # [27] Exhibit 41, # [28] Exhibit 42, # [29] Exhibit 43, # [30] Exhibit 44, # [31] Exhibit 48, # [32] Exhibit 53, # [33] Exhibit 54, # [34] Exhibit 55, # [35] Exhibit 58, # [36] Exhibit 60, # [37] Exhibit 63, # [38] Exhibit 68, # [39] Exhibit 69, # [40] Exhibit 70, # [41] Exhibit 71, # [42] Exhibit 72)(Wilkinson, Beth) (Filed on 6/17/2023) (Entered: 06/17/2023) |
| 06/17/2023 | [110] | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Opposition to Motion for Preliminary Injunction* filed by Activision Blizzard, Inc., Microsoft Corporation. (Attachments: # [1] Proposed Order, # [2] Declaration, # [3] Exhibit, # [4] Exhibit 1, # [5] Exhibit 10, # [6] Exhibit 13, # [7] Exhibit 14, # [8] Exhibit 17, # [9] Exhibit 18, # [10] Exhibit 19, # [11] Exhibit 20, # [12] Exhibit 21, # [13] Exhibit 22, # [14] Exhibit 23, # [15] Exhibit 46, # [16] Exhibit 47, # [17] Exhibit 57)(Wilkinson, Beth) (Filed on 6/17/2023) (Entered: 06/17/2023) |
| 06/17/2023 | [111] | OPPOSITION/RESPONSE (re [12] Administrative Motion to File Under Seal *Plaintiff's Emergency Motion for a Temporary Restraining Order* ) filed byActivision Blizzard, Inc., Microsoft Corporation. (Attachments: # [1] Declaration, # [2] Exhibit 1, # [3] Exhibit 2, # [4] Exhibit 3, # [5] Exhibit 5, # [6] Exhibit 6, # [7] Exhibit 7, # [8] Exhibit 8, # [9] Exhibit 9, # [10] Exhibit 10, # [11] Exhibit 11, # [12] Exhibit 12, # [13] Exhibit 13, # [14] Exhibit 14, # [15] |

2-ER-247

Exhibit 15, # [16] Exhibit 16, # [17] Exhibit 17, # [18] Exhibit 18, # [19] Exhibit 19, # [20]
Exhibit 20, # [21] Exhibit 21, # [22] Exhibit 22, # [23] Exhibit 23, # [24] Exhibit 24, # [25]
Exhibit 25, # [26] Exhibit 28, # [27] Exhibit 29, # [28] Exhibit 30, # [29] Exhibit 32, # [30]
Exhibit 34, # [31] Exhibit 35, # [32] Exhibit 36, # [33] Exhibit 37, # [34] Exhibit 38, # [35]
Exhibit 39, # [36] Exhibit 40, # [37] Exhibit 41, # [38] Exhibit 42, # [39] Exhibit 43, # [40]
Exhibit 44, # [41] Exhibit 45, # [42] Exhibit 46, # [43] Exhibit 47, # [44] Exhibit 48, # [45]
Exhibit 49, # [46] Exhibit 50, # [47] Exhibit 51, # [48] Exhibit 53, # [49] Exhibit 54, # [50]
Exhibit 55, # [51] Exhibit 56, # [52] Exhibit 57, # [53] Exhibit 58, # [54] Exhibit 59, # [55]
Exhibit 60, # [56] Exhibit 61, # [57] Exhibit 62, # [58] Exhibit 63, # [59] Exhibit 64, # [60]
Exhibit 65, # [61] Exhibit 66, # [62] Exhibit 67, # [63] Exhibit 68, # [64] Exhibit 69, # [65]
Exhibit 70, # [66] Exhibit 71, # [67] Exhibit 72)(Wilkinson, Beth) (Filed on 6/17/2023)
(Entered: 06/17/2023)

| 06/17/2023 | [112] | MOTION for Protective Order filed by Federal Trade Commission. Responses due by 7/3/2023. Replies due by 7/10/2023. (Attachments: # [1] Proposed Order Text of Proposed Order, # [2] Exhibit A, # [3] Exhibit B)(Saw, Edmund) (Filed on 6/17/2023) (Entered: 06/17/2023) |
| --- | --- | --- |
| 06/17/2023 | [113] | MOTION to Remove Incorrectly Filed Document filed by Activision Blizzard, Inc., Microsoft Corporation. (Attachments: # [1] Proposed Order)(Wilkinson, Beth) (Filed on 6/17/2023) (Entered: 06/17/2023) |
| 06/18/2023 | [114] | MOTION for leave to appear in Pro Hac Vice *for Attorney James Rosenthal* ( Filing fee $ 317, receipt number ACANDC-18371272.) filed by Microsoft Corporation. (Rosenthal, James) (Filed on 6/18/2023) (Entered: 06/18/2023) |
| 06/19/2023 | [115] | OPPOSITION/RESPONSE (re [112] MOTION for Protective Order ) filed byActivision Blizzard, Inc., Microsoft Corporation. (Attachments: # [1] Proposed Order, # [2] Exhibit B, # [3] Exhibit C, # [4] Exhibit D, # [5] Exhibit E, # [6] Exhibit F)(Wilkinson, Beth) (Filed on 6/19/2023) (Entered: 06/19/2023) |
| 06/20/2023 | [116] | MOTION for leave to appear in Pro Hac Vice *of Lucas Croslow* ( Filing fee $ 317, receipt number ACANDC-18372236.) filed by Microsoft Corporation. (Croslow, Lucas) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [117] | NOTICE of Appearance by Zachary G. Tschida (Tschida, Zachary) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [118] | MOTION for leave to appear in Pro Hac Vice *of J. Manuel Valle* ( Filing fee $ 317, receipt number ACANDC-18372278.) filed by Microsoft Corporation. (Valle, Manuel) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [119] | MOTION for leave to appear in Pro Hac Vice *of Aaron P. Haviland* ( Filing fee $ 317, receipt number ACANDC-18372332.) filed by Microsoft Corporation. (Haviland, Aaron) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [120] | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18372310.) filed by Sony Interactive Entertainment LLC. (Bennett, Elsbeth) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [121] | TRANSCRIPT ORDER for Future Trial with Daily Transcripts, ordered by Frank Lamancusa. (knm, COURT STAFF) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [122] | MOTION for Clarification re [76] Order on Motion to Expedite filed by Sony Interactive Entertainment LLC. Responses due by 7/5/2023. Replies due by 7/12/2023. (Attachments: # [1] Proposed Order)(Bennett, Elsbeth) (Filed on 6/20/2023) (Entered: 06/20/2023) |

| | | |
|---|---|---|
| 06/20/2023 | [123](#) | **ORDER by Judge Jacqueline Scott Corley granting [114](#) Motion for Pro Hac Vice as to James Rosenthal. (ahm, COURT STAFF) (Filed on 6/20/2023) (Entered: 06/20/2023)** |
| 06/20/2023 | [124](#) | **ORDER by Judge Jacqueline Scott Corley granting [116](#) Motion for Pro Hac Vice as to Lucas Croslow. (ahm, COURT STAFF) (Filed on 6/20/2023) (Entered: 06/20/2023)** |
| 06/20/2023 | [125](#) | **ORDER by Judge Jacqueline Scott Corley granting [118](#) Motion for Pro Hac Vice as to J. Manuel Valle. (ahm, COURT STAFF) (Filed on 6/20/2023) (Entered: 06/20/2023)** |
| 06/20/2023 | [126](#) | **ORDER by Judge Jacqueline Scott Corley granting [119](#) Motion for Pro Hac Vice as to Aaron P. Haviland. (ahm, COURT STAFF) (Filed on 6/20/2023) (Entered: 06/20/2023)** |
| 06/20/2023 | [127](#) | **ORDER by Judge Jacqueline Scott Corley granting [120](#) Motion for Pro Hac Vice as to Elsbeth Bennett. (ahm, COURT STAFF) (Filed on 6/20/2023) (Entered: 06/20/2023)** |
| 06/20/2023 | [128](#) | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Federal Trade Commission. (Attachments: # [1](#) Proposed Order, # [2](#) Exhibit A (Unredacted Version))(Fleury, Jennifer) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [129](#) | *JOINT STATEMENT REGARDING EVIDENCE FOR PRE-HEARING CONFERENCE* by Federal Trade Commission. (Attachments: # [1](#) Exhibit A (Redacted Version))(Fleury, Jennifer) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | 130 | **CLERK'S NOTICE PROVIDING ZOOM ACCESS INFORMATION.** For the upcoming evidentiary hearing, there is limited capacity in Courtroom 8, but there is overflow seating in the Federal Bar Association Media Center, 1st Floor Lobby, North East corner, 450 Golden Gate Ave. San Francisco.<br><br>In addition, there is a remote public audio feed available via Zoom:<br><br>https://cand-uscourts.zoomgov.com/j/1613661817?pwd=Z0tnSzBvKzJMN25SRFB3M1B6dFBadz09<br><br>**Webinar ID:** 161 366 1817<br>**Password:** 924619<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>(This is a text-only entry generated by the court. There is no document associated with this entry.)<br><br>(ahm, COURT STAFF) (Filed on 6/20/2023) Modified on 6/20/2023 (ahm, COURT STAFF). (Entered: 06/20/2023) |
| 06/20/2023 | [131](#) | Brief re [108](#) Opposition/Response to Motion - *Federal Trade Commission's Reply to Defendants' Opposition to Preliminary Injunction Motion* filed by Federal Trade Commission. (Attachments: # [1](#) Exhibit Index)(Related document(s) [108](#) ) (Weingarten, James) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [132](#) | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Federal Trade Commission. (Attachments: # [1](#) Proposed Order, # [2](#) Under Seal |

| | | Reply Brief)(Weingarten, James) (Filed on 6/20/2023) (Entered: 06/20/2023) |
|---|---|---|
| 06/20/2023 | [133](#) | TRANSCRIPT ORDER for Future Trial with Daily Transcripts, ordered by Gregory Heltzer. (knm, COURT STAFF) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [134](#) | STATEMENT IN SUPPORT OF SEALING CERTAIN CONFIDENTIAL BUSINESS MATERIAL re [35](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *CORRECTION OF DOCKET #12*, [34](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *CORRECTION OF DOCKET #11* by Sony Interactive Entertainment LLC. (Attachments: # [1](#) Declaration of Christian Svensson in Support, # [2](#) Exhibit 2 - Proposed Redactions to Document Filed Under Seal at ECF No. 10-17, # [3](#) Exhibit 3 - Proposed Redactions of Document Filed Under Seal at ECF No. 10-20)(Bennett, Elsbeth) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [135](#) | NOTICE by Activision Blizzard, Inc. re *Notice of Lodging [Proposed] Order Permitting Microsoft Corporation And Activision Blizzard, Inc. To Bring Outside Equipment Into Courthouse For Hearing* (Attachments: # [1](#) Proposed Order)(Van Ness, Caroline) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [136](#) | *NON-PARTY NINTENDO OF AMERICA INC. UNOPPOSED MOTION FOR ORDER CHANGING TIME* filed by Nintendo of America Inc.. (Attachments: # [1](#) Declaration of Leonard L. Gordon ISO Motion, # [2](#) Proposed Order)(Swaney, Steven) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [137](#) | NOTICE by Activision Blizzard, Inc., Microsoft Corporation - *Notice of Filing of Defendants' Redacted Exhibit List* (Attachments: # [1](#) Exhibit A - Defendants' Exhibit List (Redacted))(Wilkinson, Beth) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [138](#) | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Activision Blizzard, Inc., Microsoft Corporation. (Attachments: # [1](#) Exhibit A - Defendants' Exhibit List (Sealed, Unredacted Version), # [2](#) Proposed Order)(Wilkinson, Beth) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [139](#) | **ORDER granting as modified [135](#) Microsoft Corporation And Activision Blizzard, Inc.'s Request to Bring Outside Equipment Into Courthouse For Hearing. Signed by Judge Jacqueline Scott Corley on 6/20/2023. (ahm, COURT STAFF) (Filed on 6/20/2023) (Entered: 06/20/2023)** |
| 06/20/2023 | [140](#) | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18376666.) filed by Sony Interactive Entertainment LLC. (Malm, Carl) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [141](#) | Statement re [112](#) MOTION for Protective Order *Statement in Support of Plaintiff's Motion for Protective Order* by Sony Interactive Entertainment LLC. (Malm, Carl) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [142](#) | NOTICE of Appearance by Ognjen Zivojnovic *for Non-Party NVIDIA Corporation* (Zivojnovic, Ognjen) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [143](#) | Certificate of Interested Entities by NVIDIA Corporation (Zivojnovic, Ognjen) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [144](#) | Corporate Disclosure Statement by NVIDIA Corporation (Zivojnovic, Ognjen) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | [145](#) | Statement re [35](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *CORRECTION OF DOCKET #12*, [34](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *CORRECTION OF* |

2-ER-250

| | | |
|---|---|---|
| | | *DOCKET #11* by NVIDIA Corporation. (Attachments: # 1 Declaration of Aashish Patel, # 2 Exhibit Attachment 1, # 3 Exhibit Attachment 2, # 4 Exhibit Attachment 3, # 5 Exhibit Attachment 4, # 6 Exhibit Attachment 5, # 7 Proposed Order)(Zivojnovic, Ognjen) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | 146 | Statement re 34 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *CORRECTION OF DOCKET #11* by Activision Blizzard, Inc.. (Attachments: # 1 Declaration of Page Robinson, # 2 Proposed Order)(Van Ness, Caroline) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | 147 | Statement re 35 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *CORRECTION OF DOCKET #12* by Activision Blizzard, Inc.. (Attachments: # 1 Declaration of Page Robinson, # 2 Proposed Order)(Van Ness, Caroline) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | 148 | ADMINISTRATIVE MOTION Seeking In Camera Treatment of Certain Exhibits filed by Activision Blizzard, Inc.. Responses due by 6/26/2023. (Attachments: # 1 Declaration of Page Robinson, # 2 Proposed Order)(Van Ness, Caroline) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | 149 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts by Federal Trade Commission. (Weingarten, James) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/20/2023 | 150 | ADMINISTRATIVE MOTION Seeking In Camera Treatment of Certain Exhibits Pursuant to Civil L.R. 7-11 and 79-5 filed by Microsoft Corporation. Responses due by 6/26/2023. (Attachments: # 1 Declaration Of Leigh Ann Lucero, # 2 Proposed Order) (Wilkinson, Beth) (Filed on 6/20/2023) (Entered: 06/20/2023) |
| 06/21/2023 | 151 | Statement re 34 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed - *CORRECTION OF DOCKET #11* by Microsoft Corporation. (Attachments: # 1 Proposed Order)(Wilkinson, Beth) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | 152 | Statement re 35 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *CORRECTION OF DOCKET #12* by Microsoft Corporation. (Attachments: # 1 Proposed Order)(Wilkinson, Beth) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | 153 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts, ordered by Linda Varoli. (knm, COURT STAFF) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | 154 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts, ordered by Nick Wetzler. (knm, COURT STAFF) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | 155 | Statement re 128 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed , 138 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Non-Party Google LLC's Statement in support of Sealing Certain Confidential Business Materials in Parties' Preliminary Injunction Hearing Exhibits* by Google LLC. (Attachments: # 1 Declaration of Scott Gerwin)(Ballard, Dylan) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | 156 | Statement re 112 MOTION for Protective Order *NON-PARTY NINTENDO OF AMERICA INC. STATEMENT IN SUPPORT OF PLAINTIFFS MOTION FOR PROTECTIVE ORDER* by Nintendo of America Inc.. (Swaney, Steven) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | 157 | NOTICE of Appearance by Joseph M Alioto, Sr *In the related matter, Demartini et al.v. Microsoft Corporation* (Alioto, Joseph) (Filed on 6/21/2023) (Entered: 06/21/2023) |

| 06/21/2023 | [158](#) | TRANSCRIPT ORDER for Future Trial with Daily Transcripts, ordered by Noelle Wills. (knm, COURT STAFF) (Filed on 6/21/2023) (Entered: 06/21/2023) |
|---|---|---|
| 06/21/2023 | [159](#) | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18378894.) filed by Google LLC. (Miller, Evan) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | [160](#) | OPPOSITION/RESPONSE (re [148](#) ADMINISTRATIVE MOTION Seeking In Camera Treatment of Certain Exhibits , [150](#) ADMINISTRATIVE MOTION Seeking In Camera Treatment of Certain Exhibits Pursuant to Civil L.R. 7-11 and 79-5 ) filed byCurtis Burns, Jr, Ivan Calvo-Perez, Dante Demartini, Nicholas Elden, Jessie Galvan, Christopher Giddings- LaFaye, Steve Herrera, Hunter Joseph Jakupko, Daniel Loftus, Beowulf Edward Owen. (Seidel, David) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | [161](#) | Statement re [128](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed , [138](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by NVIDIA Corporation. (Attachments: # [1](#) Declaration of Aashish Patel, # [2](#) Exhibit 1, # [3](#) Exhibit 2, # [4](#) Exhibit 3, # [5](#) Exhibit 4, # [6](#) Exhibit 5, # [7](#) Exhibit 6, # [8](#) Proposed Order)(Zivojnovic, Ognjen) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | **[162](#)** | **ORDER by Judge Jacqueline Scott Corley granting [159](#) Motion for Pro Hac Vice as to Evan Miller. (ahm, COURT STAFF) (Filed on 6/21/2023) (Entered: 06/21/2023)** |
| 06/21/2023 | **[163](#)** | **ORDER by Judge Jacqueline Scott Corley granting [140](#) Motion for Pro Hac Vice as to Carl Malm. (ahm, COURT STAFF) (Filed on 6/21/2023) (Entered: 06/21/2023)** |
| 06/21/2023 | [164](#) | Statement re [112](#) MOTION for Protective Order *Non-Party Google LLC's Statement in support of Plaintiff's Motion for Protective Order* by Google LLC. (Ballard, Dylan) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | [165](#) | NOTICE of Appearance by Meeghan Tirtasaputra (Tirtasaputra, Meeghan) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | [166](#) | Declaration of Christopher Schenck in Support of [128](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed byValve Corporation. (Related document(s) [128](#) ) (Tirtasaputra, Meeghan) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | [167](#) | NOTICE of Appearance by Kathleen Jordan McMahon *in the related matter, Demartini et al v. Microsoft Corporation* (McMahon, Kathleen) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | [168](#) | Statement *NON-PARTY NINTENDO OF AMERICA INC. STATEMENT PURSUANT TO LOCAL RULE 79-5(f) AS TO WHY ITS CONFIDENTIAL INFORMATION SHOULD BE FILED UNDER SEAL* by Nintendo of America Inc.. (Attachments: # [1](#) Proposed Order, # [2](#) Declaration of Steven Singer ISO Nintendo America Inc Statement)(Swaney, Steven) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | 169 | **Minute Entry for proceedings held before Judge Jacqueline Scott Corley: Status Conference held on 6/21/2023. The Court will issue an order to confirm the matters discussed this date. (Court Reporter: Marla Knox by Zoom)(Time 00:34)**<br><br>Attorneys for Plaintiff FTC: James Weingarten/Jenny Fleury/Peggy Femenella/Jim Abell/Cem Akleman/Nicole Callan<br><br>Attorneys for Defendant Microsoft: Beth Wilkinson/Rakesh Kilaru/ Kieran Gostin/Grace Hill/Sarah Neuman |

| | | Attorneys for Defendant Activision Blizzard: Steven Sunshine/Caroline Van Ness/Julia York<br><br>**(This is a text-only entry generated by the court. There is no document associated with this entry.)**<br><br>(ahm, COURT STAFF) (Date Filed: 6/21/2023) (Entered: 06/21/2023) |
|---|---|---|
| 06/21/2023 | [170](#) | **ORDER FOLLOWING JUNE 21, 2023 STATUS CONFERENCE. Signed by Judge Jacqueline Scott Corley on June 21, 2023.**(ahm, COURT STAFF) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | 171 | **CLERK'S NOTICE REGARDING ZOOM & AUDIO FEED INFORMATION.** For the upcoming evidentiary hearing (June 22 to June 29), there is limited capacity in Courtroom 8, but there is overflow seating in the **Federal Bar Association Media Center, 1st Floor Lobby, North East corner, 450 Golden Gate Ave, San Francisco.**<br><br>In addition, there is a remote public audio feed available via Zoom:<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/jsc<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>(This is a text-only entry generated by the court. There is no document associated with this entry.)<br><br>(ahm, COURT STAFF) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | [172](#) | ADMINISTRATIVE MOTION Seeking in Camera Treatment *of Certain Exhibits* filed by Sony Interactive Entertainment LLC. Responses due by 6/26/2023. (Attachments: # [1](#) Declaration of Christian Svensson, # [2](#) Proposed Order)(Bennett, Elsbeth) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | [173](#) | Amended ADMINISTRATIVE MOTION Seeking In Camera Treatment of Certain Exhibits Pursuant to Civil LR 7-11 and 79-5 filed by Activision Blizzard, Inc.. Responses due by 6/26/2023. (Attachments: # [1](#) Declaration of Page Robinson, # [2](#) Proposed Order) (Van Ness, Caroline) (Filed on 6/21/2023) (Entered: 06/21/2023) |
| 06/21/2023 | [174](#) | Statement *of Witnesses and Evidence for June 22, 2023, Pursuant to Court Order (ECF NO. 170)* by Activision Blizzard, Inc., Microsoft Corporation. (Wilkinson, Beth) (Filed on 6/21/2023) (Entered: 06/22/2023) |
| 06/22/2023 | [175](#) | Proposed Findings of Fact by Federal Trade Commission *REDACTED VERSION*. (Weingarten, James) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | [176](#) | Statement *of Witnesses and Evidence for June 22, 2023, Pursuant to Court Order (ECF NO. 170)* by Federal Trade Commission. (Weingarten, James) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | [177](#) | Proposed Findings of Fact by Activision Blizzard, Inc., Microsoft Corporation *REDACTED VERSION*. (Wilkinson, Beth) (Filed on 6/22/2023) (Entered: 06/22/2023) |

| 06/22/2023 | [178](#) | Administrative Motion to File Under Seal *Portions of Defendants' Proposed Findings of Fact and Conclusions of Law* filed by Activision Blizzard, Inc., Microsoft Corporation. (Attachments: # [1](#) Exhibit A - Declaration, # [2](#) Exhibit B - Unredacted Proposed Findings of Fact, # [3](#) Proposed Order)(Wilkinson, Beth) (Filed on 6/22/2023) (Entered: 06/22/2023) |
|---|---|---|
| 06/22/2023 | [179](#) | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Activision Blizzard, Inc., Microsoft Corporation. (Attachments: # [1](#) Proposed Order)(Wilkinson, Beth) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | [180](#) | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Federal Trade Commission. (Attachments: # [1](#) Proposed Order, # [2](#) PLAINTIFF'S BENCH BRIEF REGARDING DEFENDANTS PROFFERED TESTIMONY (Unredacted Version), # [3](#) Exhibit A (Unredacted Version))(Weingarten, James) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | [181](#) | TRIAL BRIEF *PLAINTIFF FEDERAL TRADE COMMISSIONS BENCH BRIEF REGARDING DEFENDANTS PROFFERED TESTIMONY REGARDING MICROSOFTS AGREEMENTS* by Federal Trade Commission. (Attachments: # [1](#) Exhibit A (Redacted Version), # [2](#) Declaration of James Abell)(Weingarten, James) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | [182](#) | Exhibit List by Federal Trade Commission.. (Attachments: # [1](#) Exhibit A (Redacted Version))(Fleury, Jennifer) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | [183](#) | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Federal Trade Commission. (Attachments: # [1](#) Exhibit A (Unredacted Version), # [2](#) Proposed Order)(Fleury, Jennifer) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | | The Evidentiary Hearing set for June 28, 2023 before Judge Jacqueline Scott Corley is advanced to 8:30 a.m. in Courtroom 8 in San Francisco. **Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/jsc **General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. **Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/. (ahm, COURT STAFF) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | [184](#) | ***Filed in Error - Pls. Refer to Docket [185](#) *** - Administrative Motion to File Under Seal *Defendant's First Amended Statement of Witnesses and Evidence For June 22, 2023, Pursuant To Court Order (ECF NO. 170)* filed by Activision Blizzard, Inc., Microsoft Corporation. (Wilkinson, Beth) (Filed on 6/22/2023) Modified on 6/22/2023 (tn, COURT STAFF). (Entered: 06/22/2023) |
| 06/22/2023 | [185](#) | Statement - *Defendants' First Amended Statement of Witnesses and Evidence For June 22, 2023, Pursuant To Court Order (ECF NO. 170)* by Activision Blizzard, Inc., Microsoft Corporation. (Wilkinson, Beth) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | [186](#) | NOTICE of Appearance by Jeffrey Michael Davidson (Davidson, Jeffrey) (Filed on 6/22/2023) (Entered: 06/22/2023) |

| 06/22/2023 | [187](#) | **ORDER RE: SUBMISSION OF ADMITTED EXHIBITS. Signed by Judge Jacqueline Scott Corley on 6/22/2023. (ahm, COURT STAFF) (Filed on 6/22/2023) (Entered: 06/22/2023)** |
|---|---|---|
| 06/22/2023 | [188](#) | MOTION for Extension of Time to File *NON-PARTY NINTENDO OF AMERICA INC. UNOPPOSED MOTION FOR ORDER CHANGING TIME* filed by Nintendo of America Inc.. (Attachments: # [1](#) Declaration OF BENJAMIN P. ARGYLE IN SUPPORT OF NON-PARTY NINTENDO OF AMERICA INC. UNOPPOSED MOTION FOR ORDER CHANGING TIME, # [2](#) Proposed Order)(Swaney, Steven) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | [189](#) | Amended ADMINISTRATIVE MOTION Seeking In Camera Treatment of Certain Exhibits Pursuant to Civil L.R. 7-11 and 79-5 filed by Microsoft Corporation. Responses due by 6/26/2023. (Attachments: # [1](#) Declaration, # [2](#) Proposed Order)(Wilkinson, Beth) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | [190](#) | **ORDER by Judge Jacqueline Scott Corley granting [188](#) Motion for Extension of Time to File extension for NOA to file its Civil L.R. 79-5(f) statement and/or declaration related toDefendants' Memorandum of Law in Opposition to Motion for Preliminary Injunction. (ahm, COURT STAFF) (Filed on 6/22/2023) (Entered: 06/22/2023)** |
| 06/22/2023 | [191](#) | MOTION for leave to appear in Pro Hac Vice *for Leonard Gordon on behalf of Non-party Nintendo of America, Inc.* ( Filing fee $ 317, receipt number ACANDC-18385448.) filed by Nintendo of America Inc.. (Gordon, Leonard) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | [192](#) | Statement *of Witnesses and Evidence For June 23, 2023, Pursuant To Court Order (ECF NO. 170)* by Activision Blizzard, Inc., Microsoft Corporation. (Wilkinson, Beth) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | [193](#) | Statement *of Witnesses and Evidence For June 23, 2023, Pursuant To Court Order (ECF NO. 170)* by Federal Trade Commission. (Weingarten, James) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | [194](#) | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18385774.) filed by Amazon.com, Inc.. (Oliver, Leigh) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | [195](#) | Second ADMINISTRATIVE MOTION For Sealing and In Camera Treatment filed by Sony Interactive Entertainment LLC. Responses due by 6/27/2023. (Attachments: # [1](#) Exhibit 1 - Declaration of Christian Svensson, # [2](#) Proposed Order)(Bennett, Elsbeth) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | [196](#) | TRANSCRIPT ORDER for Future Trial with Daily Transcripts by Federal Trade Commission. (Weingarten, James) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | [209](#) | **Minute Entry for proceedings held before Judge Jacqueline Scott Corley: Evidentiary Hearing (Day 1) held on 6/22/2023. (Court Reporter: Marla Knox) (Time 6:03)** (Attachments: # [1](#) Trial Log)(ahm, COURT STAFF) (Date Filed: 6/22/2023) (Entered: 06/24/2023) |
| 06/23/2023 | [197](#) | Second ADMINISTRATIVE MOTION Seeking In Camera Treatment Of Certain Exhibits Pursuant To Civil L.R. 7-11 And 79-5 re [173](#) Amended ADMINISTRATIVE MOTION Seeking In Camera Treatment of Certain Exhibits Pursuant to Civil LR 7-11 and 79-5 , [76](#) Order on Motion to Expedite,,, filed by Activision Blizzard, Inc.. Responses due by 6/27/2023. (Attachments: # [1](#) Declaration of Page Robinson, # [2](#) Proposed Order) (Van Ness, Caroline) (Filed on 6/23/2023) (Entered: 06/23/2023) |

| 06/23/2023 | 198 | Exhibit List *PLAINTIFF'S FIRST SUPPLEMENT TO ITS EXHIBIT LIST* by Federal Trade Commission.. (Attachments: # 1 Exhibit A (Redacted Version))(Fleury, Jennifer) (Filed on 6/23/2023) (Entered: 06/23/2023) |
|---|---|---|
| 06/23/2023 | 199 | ADMINISTRATIVE MOTION Seeking in Camera Treatment of Certain Exhibits Pursuant to Civil L.R. 7-11 and 79-5 filed by Microsoft Corporation. Responses due by 6/27/2023. (Attachments: # 1 Proposed Order)(Wilkinson, Beth) (Filed on 6/23/2023) (Entered: 06/23/2023) |
| 06/23/2023 | 200 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Federal Trade Commission. (Attachments: # 1 Exhibit A (Unredacted Version), # 2 Proposed Order)(Fleury, Jennifer) (Filed on 6/23/2023) (Entered: 06/23/2023) |
| 06/23/2023 | 201 | ADMINISTRATIVE MOTION Seeking In Camera Treatment of Certain Exhibits Pursuant to Civil L.R. 7-11 and 79-5 filed by Microsoft Corporation. Responses due by 6/27/2023. (Wilkinson, Beth) (Filed on 6/23/2023) (Entered: 06/23/2023) |
| 06/23/2023 | 202 | TRANSCRIPT ORDER for proceedings held on 6/22, 6/23, 6/27, 6/28 before Judge Jacqueline Scott Corley by Marketwatch for Court Reporter Marla Knox. (notewarel, COURT STAFF) (Filed on 6/23/2023) (Entered: 06/23/2023) |
| 06/23/2023 | 203 | **ORDER by Judge Jacqueline Scott Corley granting 191 Motion for Pro Hac Vice as to Leonard Gordon. (ahm, COURT STAFF) (Filed on 6/23/2023) (Entered: 06/23/2023)** |
| 06/23/2023 | 204 | **ORDER by Judge Jacqueline Scott Corley granting 194 Motion for Pro Hac Vice as to Leigh Oliver. (ahm, COURT STAFF) (Filed on 6/23/2023) (Entered: 06/23/2023)** |
| 06/23/2023 | 205 | Third ADMINISTRATIVE MOTION For Seeking In Camera Treatment of Certain Exhibits Pursuant To Civil L.R. 7-11 And 79-5 filed by Activision Blizzard, Inc.. Responses due by 6/27/2023. (Attachments: # 1 Declaration of Page Robinson, # 2 Proposed Order)(Van Ness, Caroline) (Filed on 6/23/2023) (Entered: 06/23/2023) |
| 06/23/2023 | 206 | MOTION for leave to appear in Pro Hac Vice *for Benjamin Argyle on behalf of Non-Party Nintendo of America, Inc.* ( Filing fee $ 317, receipt number ACANDC-18388333.) filed by Nintendo of America Inc.. (Argyle, Benjamin) (Filed on 6/23/2023) (Entered: 06/23/2023) |
| 06/23/2023 | 207 | MOTION for Extension of Time to File *Certain Statements in Support of Sealing Under Civil Local Rule 79-5(f)* filed by Sony Interactive Entertainment LLC. (Attachments: # 1 Declaration - Carl Lawrence Malm, # 2 Proposed Order)(Malm, Carl) (Filed on 6/23/2023) (Entered: 06/23/2023) |
| 06/23/2023 | 208 | **ORDER by Judge Jacqueline Scott Corley granting 206 Motion for Pro Hac Vice as to Benjamin Argyle. (ahm, COURT STAFF) (Filed on 6/23/2023) (Entered: 06/23/2023)** |
| 06/23/2023 | 210 | **Minute Entry for proceedings held before Judge Jacqueline Scott Corley: Evidentiary Hearing (Day 2) held on 6/23/2023. (Court Reporter: Marla Knox) (Time 7:15)** (Attachments: # 1 Trial Log)(ahm, COURT STAFF) (Date Filed: 6/23/2023) (Entered: 06/24/2023) |
| 06/25/2023 | 211 | NOTICE by Activision Blizzard, Inc., Microsoft Corporation re 75 Administrative Motion to File Under Seal *Exhibits A and B to Plaintiff's Notice of Intent to Oppose Defendants' Motion for Expedited Case Management Conference - Defendants' Notice of Non-Opposition* (Wilkinson, Beth) (Filed on 6/25/2023) (Entered: 06/25/2023) |
| 06/26/2023 | 212 | Exhibit List *PLAINTIFF'S SECOND SUPPLEMENT TO ITS EXHIBIT LIST* by Federal Trade Commission.. (Attachments: # 1 Exhibit A (Redacted Version))(Fleury, Jennifer) |

| | | (Filed on 6/26/2023) (Entered: 06/26/2023) |
|---|---|---|
| 06/26/2023 | 213 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Federal Trade Commission. (Attachments: # 1 Exhibit A (Unredacted Version), # 2 Proposed Order)(Fleury, Jennifer) (Filed on 6/26/2023) (Entered: 06/26/2023) |
| 06/26/2023 | 214 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-18391622.) filed by NVIDIA Corporation. (Bonanno, Michael) (Filed on 6/26/2023) (Entered: 06/26/2023) |
| 06/26/2023 | 215 | MOTION to Appear by Telephone filed by NVIDIA Corporation. (Attachments: # 1 Proposed Order for Motion to Appear Telephonically)(Zivojnovic, Ognjen) (Filed on 6/26/2023) (Entered: 06/26/2023) |
| 06/26/2023 | 216 | TRANSCRIPT ORDER for proceedings held on 6/23/34 before Judge Jacqueline Scott Corley for RockcreekDC for Court Reporter Marla Knox. (notewarel, COURT STAFF) (Filed on 6/26/2023) (Entered: 06/26/2023) |
| 06/26/2023 | 217 | Statement *in Support of Sealing Regarding the Direct Testimony of Robin S. Lee, PhD* by NVIDIA Corporation. (Attachments: # 1 Declaration in Support, # 2 Proposed Order re: Sealing)(Zivojnovic, Ognjen) (Filed on 6/26/2023) (Entered: 06/26/2023) |
| 06/26/2023 | 218 | **ORDER by Judge Jacqueline Scott Corley granting 215 NVIDIA's Motion to Appear by Telephone.** Counsel shall email their telephone number to the courtroom deputy at jsccrd@cand.uscourts.gov. <br><br> (This is a text-only entry generated by the court. There is no document associated with this entry.) <br><br> (ahm, COURT STAFF) (Filed on 6/26/2023) (Entered: 06/26/2023) |
| 06/26/2023 | 219 | Statement re 76 Order on Motion to Expedite - *NON-PARTY NINTENDO OF AMERICA INC. STATEMENT PURSUANT TO LOCAL RULE 79-5(f) AS TO WHY PX7059 AND PX7065 SHOULD REMAIN UNDER SEAL* by Nintendo of America Inc.. (Attachments: # 1 Proposed Order)(Swaney, Steven) (Filed on 6/26/2023) (Entered: 06/26/2023) |
| 06/26/2023 | 220 | Statement *NON-PARTY NINTENDO OF AMERICA INC. STATEMENT PURSUANT TO LOCAL RULE 79-5(f) AS TO WHY ANY PORTIONS OF VIDEORECORDED TESTIMONY FROM PX7065 SHOULD BE KEPT UNDER SEAL AND IN CAMERA* by Nintendo of America Inc.. (Attachments: # 1 Proposed Order)(Swaney, Steven) (Filed on 6/26/2023) (Entered: 06/26/2023) |
| 06/26/2023 | 221 | Statement *NON-PARTY NINTENDO OF AMERICA INC. STATEMENT PURSUANT TO LOCAL RULE 79-5(f) AS TO WHY PX3224 SHOULD REMAIN UNDER SEAL* by Nintendo of America Inc.. (Attachments: # 1 Proposed Order)(Swaney, Steven) (Filed on 6/26/2023) (Entered: 06/26/2023) |
| 06/26/2023 | 222 | Statement *of Witnesses and Evidence for June 27, 2023, Pursuant to Court Order (ECF NO. 170)* by Federal Trade Commission. (Weingarten, James) (Filed on 6/26/2023) (Entered: 06/26/2023) |
| 06/26/2023 | 223 | Statement *of Witnesses and Evidence For June 27, 2023, Pursuant To Court Order (ECF NO. 170)* by Activision Blizzard, Inc., Microsoft Corporation. (Wilkinson, Beth) (Filed on 6/26/2023) (Entered: 06/26/2023) |
| 06/26/2023 | 224 | REDACTION *of the Direct Testimony of Dr. Robin S. Lee* by Federal Trade Commission. (Weingarten, James) (Filed on 6/26/2023) (Entered: 06/26/2023) |

| | | |
|---|---|---|
| 06/26/2023 | [225](#) | ADMINISTRATIVE MOTION Seeking In Camera Treatment of Exhibit Pursuant to Civil L.R. 7-11 and 79-5 filed by Microsoft Corporation. Responses due by 6/27/2023. (Attachments: # [1](#) Proposed Order)(Wilkinson, Beth) (Filed on 6/26/2023) (Entered: 06/26/2023) |
| 06/26/2023 | [226](#) | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Federal Trade Commission. (Attachments: # [1](#) Proposed Order, # [2](#) UNREDACTED Version of the Direct Testimony of Dr. Robin S. Lee)(Fleury, Jennifer) (Filed on 6/26/2023) (Entered: 06/26/2023) |
| 06/26/2023 | [227](#) | Third ADMINISTRATIVE MOTION For Sealing and In Camera Treatment filed by Sony Interactive Entertainment LLC. Responses due by 6/30/2023. (Attachments: # [1](#) Exhibit 1 - Declaration of Christian Svensson, # [2](#) Proposed Order)(Bennett, Elsbeth) (Filed on 6/26/2023) (Entered: 06/26/2023) |
| 06/26/2023 | [228](#) | JOINT STIPULATION AND [PROPOSED] ORDER filed by Federal Trade Commission. (Weingarten, James) (Filed on 6/26/2023) (Entered: 06/26/2023) |
| 06/27/2023 | [229](#) | Statement re [222](#) Statement *of Witnesses and Evidence For June 27, 2023, Pursuant To Court Order (ECF NO. 170) - CORRECTED* by Federal Trade Commission. (Weingarten, James) (Filed on 6/27/2023) (Entered: 06/27/2023) |
| 06/27/2023 | [230](#) | Fourth ADMINISTRATIVE MOTION Seeking In Camera Treatment of Certain Exhibits Pursuant to Civil L.R. 7-11 and 79-5 filed by Activision Blizzard, Inc.. Responses due by 7/3/2023. (Attachments: # [1](#) Declaration of Page Robinson, # [2](#) Proposed Order)(Van Ness, Caroline) (Filed on 6/27/2023) (Entered: 06/27/2023) |
| 06/27/2023 | [231](#) | Statement re [223](#) Statement *of Witnesses and Evidence For June 27, 2023, Pursuant To Court Order (ECF NO. 170) AMENDED* by Activision Blizzard, Inc., Microsoft Corporation. (Wilkinson, Beth) (Filed on 6/27/2023) (Entered: 06/27/2023) |
| 06/27/2023 | [232](#) | ADMINISTRATIVE MOTION Seeking In Camera Treatment of Certain Exhibits Pursuant to Civil L.R. 7-11 and 79-5 filed by Microsoft Corporation. Responses due by 6/30/2023. (Attachments: # [1](#) Proposed Order)(Wilkinson, Beth) (Filed on 6/27/2023) (Entered: 06/27/2023) |
| 06/27/2023 | [233](#) | Joint ADMINISTRATIVE MOTION Regarding In Camera Treatment of Certain Exhibits Pursuant to Civil L.R. 7-11 and 79-5 - *Omnibus Motion* filed by Activision Blizzard, Inc., Microsoft Corporation. Responses due by 6/30/2023. (Attachments: # [1](#) Proposed Order) (Wilkinson, Beth) (Filed on 6/27/2023) (Entered: 06/27/2023) |
| 06/27/2023 | [234](#) | Statement re [132](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed , [183](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by NVIDIA Corporation. (Attachments: # [1](#) Declaration in Support, # [2](#) Proposed Order re: Sealing)(Zivojnovic, Ognjen) (Filed on 6/27/2023) (Entered: 06/27/2023) |
| 06/27/2023 | [235](#) | TRANSCRIPT ORDER for Future Trial with Daily Transcripts, ordered by Brian Lomdardi. (knm, COURT STAFF) (Filed on 6/27/2023) (Entered: 06/27/2023) |
| 06/27/2023 | [236](#) | **ORDER by Judge Jacqueline Scott Corley granting [214](#) Motion for Pro Hac Vice as to Michael Bonanno. (ahm, COURT STAFF) (Filed on 6/27/2023) (Entered: 06/27/2023)** |
| 06/27/2023 | [237](#) | Fourth ADMINISTRATIVE MOTION Seeking in Camera Treatment filed by Sony Interactive Entertainment LLC. Responses due by 7/3/2023. (Attachments: # [1](#) Declaration of Christian Svensson, # [2](#) Proposed Order)(Bennett, Elsbeth) (Filed on 6/27/2023) (Entered: 06/27/2023) |

| 06/27/2023 | 238 | Statement re 111 Opposition/Response to Motion - *NON-PARTY NINTENDO OF AMERICA INC. STATEMENT PURSUANT TO LOCAL RULE 79-5(f) AS TO WHY ITS CONFIDENTIAL INFORMATION IN DKT. NOS. 111 AND 111-43 (DEFENDANTS MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION) SHOULD BE FILED UNDER SEAL* by Nintendo of America Inc.. (Attachments: # 1 Proposed Order)(Swaney, Steven) (Filed on 6/27/2023) (Entered: 06/27/2023) |
|---|---|---|
| 06/27/2023 | 239 | Statement re 131 Brief, *NON-PARTY NINTENDO OF AMERICA INC. STATEMENT PURSUANT TO LOCAL RULE 79-5(f) AS TO WHY ITS CONFIDENTIAL INFORMATION IN DKT. NO. 131 (PLAINTIFFS REPLY TO DEFENDANTS OPPOSITION TO PRELIMINARY INJUNCTION MOTION) SHOULD BE FILED UNDER SEAL* by Nintendo of America Inc.. (Attachments: # 1 Proposed Order)(Swaney, Steven) (Filed on 6/27/2023) (Entered: 06/27/2023) |
| 06/27/2023 | 240 | Declaration of Andrew Watts in Support of 128 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed byAmazon.com, Inc.. (Attachments: # 1 Proposed Order)(Related document(s) 128 ) (Oliver, Leigh) (Filed on 6/27/2023) (Entered: 06/27/2023) |
| 06/27/2023 | 241 | Statement *of Witnesses and Evidence For June 28, 2023, Pursuant To Court Order (ECF NO. 170)* by Activision Blizzard, Inc., Microsoft Corporation. (Wilkinson, Beth) (Filed on 6/27/2023) (Entered: 06/27/2023) |
| 06/27/2023 | 242 | Statement *of Witnesses and Evidence For June 28, 2023, Pursuant To Court Order (ECF NO. 170)* by Federal Trade Commission. (Weingarten, James) (Filed on 6/27/2023) (Entered: 06/27/2023) |
| 06/27/2023 | 243 | Statement re 132 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by Activision Blizzard, Inc.. (Attachments: # 1 Declaration of Page Robinson, # 2 Proposed Order)(Van Ness, Caroline) (Filed on 6/27/2023) (Entered: 06/27/2023) |
| 06/27/2023 | 244 | Statement re 128 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed , 183 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed , 213 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed , 200 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by Activision Blizzard, Inc.. (Attachments: # 1 Declaration of Page Robinson, # 2 Proposed Order)(Van Ness, Caroline) (Filed on 6/27/2023) (Entered: 06/27/2023) |
| 06/27/2023 | 245 | Statement re 128 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed , 183 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed , 213 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed , 200 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by Microsoft Corporation. (Attachments: # 1 Declaration of Alysha Bohanon, # 2 Proposed Order)(Wilkinson, Beth) (Filed on 6/27/2023) (Entered: 06/27/2023) |
| 06/27/2023 | 246 | Statement re 131 Brief, 132 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by Microsoft Corporation. (Attachments: # 1 Declaration of Alysha Bohanon, # 2 Proposed Order)(Wilkinson, Beth) (Filed on 6/27/2023) (Entered: 06/27/2023) |
| 06/27/2023 | 247 | REDACTION *of the Direct Testimony of Dennis W. Carlton* by Microsoft Corporation, Activision Blizzard, Inc.. (Wilkinson, Beth) (Filed on 6/27/2023) (Entered: 06/27/2023) |

| | | |
|---|---|---|
| 06/27/2023 | 248 | Fifth ADMINISTRATIVE MOTION Seeking In Camera Treatment of Certain Exhibits Pursuant to Civil L.R. 7-11 and 79-5 filed by Activision Blizzard, Inc.. Responses due by 7/3/2023. (Attachments: # 1 Declaration of Page Robinson, # 2 Proposed Order)(Van Ness, Caroline) (Filed on 6/27/2023) (Entered: 06/27/2023) |
| 06/27/2023 | 252 | **Minute Entry for proceedings held before Judge Jacqueline Scott Corley: Evidentiary Hearing (Day 3) held on 6/27/2023. (Court Reporter: Marla Knox) (Time 6:58) (Attachments: # 1 Trial Log)**(ahm, COURT STAFF) (Date Filed: 6/27/2023) (Entered: 06/28/2023) |
| 06/28/2023 | 249 | Statement re 242 Statement *of Witnesses and Evidence For June 28, 2023, Pursuant To Court Order (ECF NO. 170) CORRECTED* by Federal Trade Commission. (Weingarten, James) (Filed on 6/28/2023) (Entered: 06/28/2023) |
| 06/28/2023 | 250 | Exhibit List *PLAINTIFF'S THIRD SUPPLEMENT TO ITS EXHIBIT LIST* by Federal Trade Commission.. (Attachments: # 1 Exhibit A (Redacted Version))(Fleury, Jennifer) (Filed on 6/28/2023) (Entered: 06/28/2023) |
| 06/28/2023 | 251 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Federal Trade Commission. (Attachments: # 1 Exhibit A (Unredacted Version), # 2 Proposed Order)(Fleury, Jennifer) (Filed on 6/28/2023) (Entered: 06/28/2023) |
| 06/28/2023 | 253 | REDACTION *of the Direct Testimony of Amy Hood* by Microsoft Corporation, Activision Blizzard, Inc.. (Wilkinson, Beth) (Filed on 6/28/2023) (Entered: 06/28/2023) |
| 06/28/2023 | 254 | Administrative Motion to File Under Seal *Portions of Declaration of Amy Hood* filed by Activision Blizzard, Inc., Microsoft Corporation. (Attachments: # 1 Declaration of Alysha Bohanon, # 2 Exhibit Unredacted Version, # 3 Proposed Order)(Wilkinson, Beth) (Filed on 6/28/2023) (Entered: 06/28/2023) |
| 06/28/2023 | 255 | Administrative Motion to File Under Seal *Certain Exhibits Cited in Declaration of Amy Hood* filed by Activision Blizzard, Inc., Microsoft Corporation. (Attachments: # 1 Declaration of Alysha Bohanon, # 2 Proposed Order)(Wilkinson, Beth) (Filed on 6/28/2023) (Entered: 06/28/2023) |
| 06/28/2023 | 256 | Statement *of Witnesses and Evidence For June 29, 2023, Pursuant To Court Order (ECF NO. 170)* by Activision Blizzard, Inc., Microsoft Corporation. (Wilkinson, Beth) (Filed on 6/28/2023) (Entered: 06/28/2023) |
| 06/28/2023 | 257 | Statement *of Witnesses and Evidence For June 29, 2023, Pursuant To Court Order (ECF NO. 170)* by Federal Trade Commission. (Weingarten, James) (Filed on 6/28/2023) (Entered: 06/28/2023) |
| 06/28/2023 | 264 | **Minute Entry for proceedings held before Judge Jacqueline Scott Corley: Evidentiary Hearing (Day 4) held on 6/28/2023. (Court Reporter: Marla Knox) (Time 7:32) (Attachments: # 1 Trial Log)**(ahm, COURT STAFF) (Date Filed: 6/28/2023) (Entered: 06/29/2023) |
| 06/29/2023 | 258 | ANSWER to Complaint *(Redacted Version)* byActivision Blizzard, Inc., Microsoft Corporation. (Wilkinson, Beth) (Filed on 6/29/2023) (Entered: 06/29/2023) |
| 06/29/2023 | 259 | ANSWER to Complaint *(Redacted Version)* byMicrosoft Corporation. (Wilkinson, Beth) (Filed on 6/29/2023) (Entered: 06/29/2023) |
| 06/29/2023 | 260 | ANSWER to Complaint *(Redacted Version) - CORRECTION OF DOCKET #* 258 , 259 byMicrosoft Corporation. (Wilkinson, Beth) (Filed on 6/29/2023) (Entered: 06/29/2023) |
| 06/29/2023 | 261 | Administrative Motion to File Under Seal *Certain Exhibits pursuant to Civil L.R. 7-11 and 79-5* filed by Microsoft Corporation. (Attachments: # 1 Declaration, # 2 Proposed |

| | | Order)(Bohanan, Alysha) (Filed on 6/29/2023) (Entered: 06/29/2023) |
|---|---|---|
| 06/29/2023 | 262 | Exhibit List *PLAINTIFF'S FOURTH SUPPLEMENT TO ITS EXHIBIT LIST* by Federal Trade Commission.. (Attachments: # 1 Exhibit A (Redacted))(Fleury, Jennifer) (Filed on 6/29/2023) (Entered: 06/29/2023) |
| 06/29/2023 | 263 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Federal Trade Commission. (Attachments: # 1 Exhibit A (Unredacted Version), # 2 Proposed Order)(Fleury, Jennifer) (Filed on 6/29/2023) (Entered: 06/29/2023) |
| 06/29/2023 | 265 | Letter from Canadian Competition Bureau dated June 28, 2023. (ahm, COURT STAFF) (Filed on 6/29/2023) (Entered: 06/29/2023) |
| 06/29/2023 | 266 | MOTION for Protective Order *NON-PARTY NINTENDO OF AMERICA INC. MOTION FOR A PROTECTIVE ORDER RE DKT. NO. 175 (PLAINTIFFS PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW)* filed by Nintendo of America Inc.. Responses due by 7/13/2023. Replies due by 7/20/2023. (Attachments: # 1 Proposed Order)(Swaney, Steven) (Filed on 6/29/2023) (Entered: 06/29/2023) |
| 06/29/2023 | 267 | MOTION for Protective Order *NON-PARTY NINTENDO OF AMERICA INC. MOTION FOR A PROTECTIVE ORDER RE DKT. NO. 181 (BENCH BRIEF REGARDING DEFENDANTS PROFFERED TESTIMONY REGARDING MICROSOFTS AGREEMENTS)* filed by Nintendo of America Inc.. Responses due by 7/13/2023. Replies due by 7/20/2023. (Attachments: # 1 Proposed Order)(Swaney, Steven) (Filed on 6/29/2023) (Entered: 06/29/2023) |
| 06/29/2023 | 268 | MOTION for Protective Order *NON-PARTY NINTENDO OF AMERICA INC. MOTION FOR A PROTECTIVE ORDER RE DKT. NO. 177 (DEFENDANTS PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW)* filed by Nintendo of America Inc.. Responses due by 7/13/2023. Replies due by 7/20/2023. (Attachments: # 1 Proposed Order)(Swaney, Steven) (Filed on 6/29/2023) (Entered: 06/29/2023) |
| 06/29/2023 | 269 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts, ordered by Russell Bittmann. (knm, COURT STAFF) (Filed on 6/29/2023) (Entered: 06/29/2023) |
| 06/29/2023 | 270 | TRANSCRIPT ORDER for Future Trial with Daily Transcripts, ordered by Steven Lane. (knm, COURT STAFF) (Filed on 6/29/2023) (Entered: 06/29/2023) |
| 06/29/2023 | 271 | Statement re 110 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Opposition to Motion for Preliminary Injunction*, 179 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed , 132 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Statement in Support of Sealing Certain Confidential Business Material* by Sony Interactive Entertainment LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F - Declaration of Christian Svensson, # 7 Exhibit G - Proposed Order)(Bennett, Elsbeth) (Filed on 6/29/2023) (Entered: 06/29/2023) |
| 06/29/2023 | 272 | **Minute Entry for proceedings held before Judge Jacqueline Scott Corley: Evidentiary Hearing (Day 5) held and completed on 6/29/2023. (Court Reporter: Marla Knox)(Time 5:51) (Attachments: # 1 Trial Log)**(ahm, COURT STAFF) (Date Filed: 6/29/2023) (Entered: 06/30/2023) |
| 06/30/2023 | 273 | ANSWER to Complaint filed by Activision Blizzard, Inc.. (Van Ness, Caroline) (Filed on 6/30/2023) (Entered: 06/30/2023) |
| 06/30/2023 | 274 | Administrative Motion to File Under Seal *Portions of Its Answer and Defenses* filed by Activision Blizzard, Inc.. (Attachments: # 1 Exhibit A (Unredacted Answer), # 2 Exhibit |

| | | |
|---|---|---|
| | | B (Redacted Answer), # 3 Declaration of Page Robinson, # 4 Proposed Order)(Van Ness, Caroline) (Filed on 6/30/2023) (Entered: 06/30/2023) |
| 06/30/2023 | 275 | Sealed Transcript of Evidentiary Hearing Proceedings held on June 22, 2023, before Judge Jacqueline S. Corley. Court Reporter, Marla F. Knox, RPR, CRR, RMR, Telephone number (602) 391-6990/email marla_knox@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy,any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (mfk, COURT STAFF) (Filed on 6/30/2023) (Entered: 06/30/2023) |
| 06/30/2023 | 276 | Transcript of Proceedings held on June 21, 2023, before Judge Jacqueline S. Corley. Court Reporter, Marla F. Knox, RPR, CRR, RMR, telephone number (602) 391-6990/email marla_knox@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 74 Transcript Order - Future Trial with Daily Transcripts, 80 Transcript Order - Future Trial with Daily Transcripts, 81 Transcript Order - Future Trial with Daily Transcripts ) Release of Transcript Restriction set for 9/28/2023. (Related documents(s) 74 , 80 , 81 ) (mfk, COURT STAFF) (Filed on 6/30/2023) (Entered: 06/30/2023) |
| 06/30/2023 | 277 | Sealed Transcript of Evidentiary Hearing Proceedings held on June 23, 2023, before Judge Jacqueline S. Corley. Court Reporter, Marla F. Knox, RPR, CRR, RMR, Telephone number (602) 391-6990/email marla_knox@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy,any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (mfk, COURT STAFF) (Filed on 6/30/2023) (Entered: 06/30/2023) |
| 06/30/2023 | 278 | Sealed Transcript of Evidentiary Hearing Proceedings held on June 27, 2023, before Judge Jacqueline S. Corley. Court Reporter, Marla F. Knox, RPR, CRR, RMR, Telephone number (602) 391-6990/email marla_knox@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy,any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (mfk, COURT STAFF) (Filed on 6/30/2023) (Entered: 06/30/2023) |
| 06/30/2023 | 279 | Sealed Transcript of Evidentiary Hearing Proceedings held on June 28, 2023, before Judge Jacqueline S. Corley. Court Reporter, Marla F. Knox, RPR, CRR, RMR, Telephone number (602) 391-6990/email marla_knox@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy,any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (mfk, COURT STAFF) (Filed on 6/30/2023) (Entered: 06/30/2023) |
| 06/30/2023 | 280 | Sealed Transcript of Evidentiary Hearing Proceedings held on June 29, 2023, before Judge Jacqueline S. Corley. Court Reporter, Marla F. Knox, RPR, CRR, RMR, Telephone number (602) 391-6990/email marla_knox@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy,any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (mfk, COURT STAFF) (Filed on 6/30/2023) (Entered: 06/30/2023) |
| 06/30/2023 | 281 | Master Index of Transcripts of Evidentiary Hearing Proceedings held on June 22, 2023 to June 29, 2023, before Judge Jacqueline S. Corley. Court Reporter, Marla F. Knox, RPR, CRR, RMR, telephone number (602) 391-6990/email marla_knox@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After |

| | | that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re [74](#) Transcript Order - Future Trial with Daily Transcripts, [80](#) Transcript Order - Future Trial with Daily Transcripts, [81](#) Transcript Order - Future Trial with Daily Transcripts ) Release of Transcript Restriction set for 9/28/2023. (Related documents(s) [74](#) , [80](#) , [81](#) ) (mfk, COURT STAFF) (Filed on 6/30/2023) (Entered: 06/30/2023) |
|---|---|---|
| 06/30/2023 | [282](#) | Transcript of Evidentiary Hearing Proceedings, Volume 1, held on June 22, 2023, before Judge Jacqueline S. Corley. Court Reporter, Marla F. Knox, RPR, CRR, RMR, telephone number (602) 391-6990/email marla_knox@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re [74](#) Transcript Order - Future Trial with Daily Transcripts, [80](#) Transcript Order - Future Trial with Daily Transcripts, [81](#) Transcript Order - Future Trial with Daily Transcripts ) Release of Transcript Restriction set for 9/28/2023. (Related documents(s) [74](#) , [80](#) , [81](#) ) (mfk, COURT STAFF) (Filed on 6/30/2023) (Entered: 06/30/2023) |
| 07/02/2023 | [283](#) | Transcript of Evidentiary Hearing Proceedings, Volume 2, held on June 23, 2023, before Judge Jacqueline S. Corley. Court Reporter, Marla F. Knox, RPR, CRR, RMR, telephone number (602) 391-6990/email marla_knox@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re [74](#) Transcript Order - Future Trial with Daily Transcripts, [80](#) Transcript Order - Future Trial with Daily Transcripts, [81](#) Transcript Order - Future Trial with Daily Transcripts ) Release of Transcript Restriction set for 10/2/2023. (Related documents(s) [74](#) , [80](#) , [81](#) ) (mfk, COURT STAFF) (Filed on 7/2/2023) (Entered: 07/02/2023) |
| 07/02/2023 | [284](#) | Transcript of Evidentiary Hearing Proceedings, Volume 3, held on June 27, 2023, before Judge Jacqueline S. Corley. Court Reporter, Marla F. Knox, RPR, CRR, RMR, telephone number (602) 391-6990/email marla_knox@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re [74](#) Transcript Order - Future Trial with Daily Transcripts, [80](#) Transcript Order - Future Trial with Daily Transcripts, [81](#) Transcript Order - Future Trial with Daily Transcripts ) Release of Transcript Restriction set for 10/2/2023. (Related documents(s) [74](#) , [80](#) , [81](#) ) (mfk, COURT STAFF) (Filed on 7/2/2023) (Entered: 07/02/2023) |
| 07/02/2023 | [285](#) | Transcript of Evidentiary Hearing Proceedings, Volume 4, held on June 28, 2023, before Judge Jacqueline S. Corley. Court Reporter, Marla F. Knox, RPR, CRR, RMR, telephone number (602) 391-6990/email marla_knox@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re [74](#) Transcript Order - Future Trial with Daily Transcripts, [80](#) Transcript Order - Future Trial with Daily Transcripts, [81](#) Transcript Order - Future Trial with Daily Transcripts ) Release of Transcript Restriction set for |

|            |     |     |
|------------|-----|-----|
|            |     | 10/2/2023. (Related documents(s) <u>74</u> , <u>80</u> , <u>81</u> ) (mfk, COURT STAFF) (Filed on 7/2/2023) (Entered: 07/02/2023) |
| 07/02/2023 | <u>286</u> | Transcript of Evidentiary Hearing Proceedings, Volume 5, held on June 29, 2023, before Judge Jacqueline S. Corley. Court Reporter, Marla F. Knox, RPR, CRR, RMR, telephone number (602) 391-6990/email marla_knox@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re <u>74</u> Transcript Order - Future Trial with Daily Transcripts, <u>80</u> Transcript Order - Future Trial with Daily Transcripts, <u>81</u> Transcript Order - Future Trial with Daily Transcripts ) Release of Transcript Restriction set for 10/2/2023. (Related documents(s) <u>74</u> , <u>80</u> , <u>81</u> ) (mfk, COURT STAFF) (Filed on 7/2/2023) (Entered: 07/02/2023) |
| 07/03/2023 | <u>287</u> | Administrative Motion to File Under Seal *Portions of Microsoft's Answer* filed by Microsoft Corporation. (Attachments: # <u>1</u> Declaration of Alysha Bohanon, # <u>2</u> Exhibit Unredacted Version, # <u>3</u> Proposed Order)(Wilkinson, Beth) (Filed on 7/3/2023) (Entered: 07/03/2023) |
| 07/03/2023 | <u>288</u> | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *In Connection with Microsoft's Answer (Civil L.R. 79-5(f))* filed by Microsoft Corporation. (Attachments: # <u>1</u> Proposed Order)(Wilkinson, Beth) (Filed on 7/3/2023) (Entered: 07/03/2023) |
| 07/03/2023 | <u>289</u> | Statement re <u>180</u> Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by Microsoft Corporation. (Attachments: # <u>1</u> Declaration of Alysha Bohanon, # <u>2</u> Proposed Order)(Wilkinson, Beth) (Filed on 7/3/2023) (Entered: 07/03/2023) |
| 07/03/2023 | <u>290</u> | NOTICE by Federal Trade Commission *Regarding the Filing of Sealed Materials* (Fleury, Jennifer) (Filed on 7/3/2023) (Entered: 07/03/2023) |
| 07/03/2023 | <u>291</u> | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Federal Trade Commission. (Attachments: # <u>1</u> Proposed Order, # <u>2</u> UNREDACTED Version of Plaintiff Federal Trade Commission's Final Proposed Findings of Fact and Conclusions of Law)(Fleury, Jennifer) (Filed on 7/3/2023) (Entered: 07/03/2023) |
| 07/03/2023 | <u>292</u> | Administrative Motion to File Under Seal *Portions of Defendants'' Final Proposed Findings of Fact and Conclusions of Law* filed by Activision Blizzard, Inc., Microsoft Corporation. (Attachments: # <u>1</u> Exhibit A - Declaration of Alysha Bohanon, # <u>2</u> Exhibit B - Unredacted Version of Defendants' Final Proposed Findings of Fact and Conclusions of Law)(Wilkinson, Beth) (Filed on 7/3/2023) (Entered: 07/03/2023) |
| 07/03/2023 | <u>293</u> | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *Re: Portions of Defendants' Final Proposed Findings of Fact and Conclusions of Law* filed by Activision Blizzard, Inc., Microsoft Corporation. (Wilkinson, Beth) (Filed on 7/3/2023) (Entered: 07/03/2023) |
| 07/03/2023 | <u>294</u> | Administrative Motion to File Under Seal *Portions of Declaration of Dennis W. Carlton* filed by Activision Blizzard, Inc., Microsoft Corporation. (Attachments: # <u>1</u> Declaration of Alysha Bohanon, # <u>2</u> Exhibit - Redacted Version, # <u>3</u> Exhibit - Unredacted Version, # <u>4</u> Proposed Order)(Wilkinson, Beth) (Filed on 7/3/2023) (Entered: 07/03/2023) |
| 07/03/2023 | <u>295</u> | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *In Connection with the Declaration of Dennis W. Carlton (Civil L.R. 79-5(f))* filed by |

| | | |
|---|---|---|
| | | Activision Blizzard, Inc., Microsoft Corporation. (Attachments: # 1 Proposed Order) (Wilkinson, Beth) (Filed on 7/3/2023) (Entered: 07/03/2023) |
| 07/03/2023 | 296 | Statement re 226 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by Activision Blizzard, Inc.. (Attachments: # 1 Declaration of Page Robinson, # 2 Proposed Order)(Van Ness, Caroline) (Filed on 7/3/2023) (Entered: 07/03/2023) |
| 07/05/2023 | 297 | Statement re 263 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed , 262 Exhibit List *NON-PARTY NINTENDO OF AMERICA INC. STATEMENT PURSUANT TO LOCAL RULE 79-5(f) AS TO WHY PX3218, PX3225, PX3233 AND PX3234 SHOULD REMAIN UNDER SEAL* by Nintendo of America Inc.. (Attachments: # 1 Proposed Order)(Swaney, Steven) (Filed on 7/5/2023) (Entered: 07/05/2023) |
| 07/05/2023 | 298 | Statement re 263 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed , 251 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by Activision Blizzard, Inc.. (Attachments: # 1 Declaration of Page Robinson, # 2 Proposed Order)(Van Ness, Caroline) (Filed on 7/5/2023) (Entered: 07/05/2023) |
| 07/06/2023 | 299 | Statement re 226 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by Microsoft Corporation. (Attachments: # 1 Declaration of Alysha Bohanon, # 2 Proposed Order)(Wilkinson, Beth) (Filed on 7/6/2023) (Entered: 07/06/2023) |
| 07/06/2023 | 300 | Statement re 263 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed , 251 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by Microsoft Corporation. (Wilkinson, Beth) (Filed on 7/6/2023) (Entered: 07/06/2023) |
| 07/06/2023 | 301 | TRANSCRIPT ORDER for proceedings held on 6/28/2023, before Judge Jacqueline Scott Corley, for Court Reporter Marla Knox, requested by Christine Chappelear. (knm, COURT STAFF) (Filed on 7/6/2023) (Entered: 07/06/2023) |
| 07/06/2023 | 302 | TRANSCRIPT ORDER for proceedings held on 6/29/2023, before Judge Jacqueline Scott Corley, for Court Reporter Marla Knox, ordered by Michael Cutini. (knm, COURT STAFF) (Filed on 7/6/2023) (Entered: 07/06/2023) |
| 07/10/2023 | 303 | Statement in Support of Sealing Certain Confidential Business Material re 288 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *In Connection with Microsoft's Answer (Civil L.R. 79-5(f))*, re 295 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *In Connection with the Declaration of Dennis W. Carlton (Civil L.R. 79-5(f))* filed by Sony Interactive Entertainment LLC. (Attachments: # 1 Exhibit A - Declaration of Christian Svensson, # 2 Proposed Order)(Bennett, Elsbeth) (Filed on 7/10/2023) (Entered: 07/10/2023) |
| 07/10/2023 | 304 | STATEMENT IN RESPONSE TO DEFENDANT MICROSOFT CORP.S ADMINISTRATIVE MOTION TO CONSIDER WHETHER ANOTHER PARTYS MATERIAL SHOULD BE SEALED (Civil L.R. 79-5(f)) [ECF NO. 288] - re 288 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *In Connection with Microsoft's Answer (Civil L.R. 79-5(f))* filed by Activision Blizzard, Inc.. (Attachments: # 1 Declaration of Page Robinson, # 2 Proposed Order)(Van Ness, Caroline) (Filed on 7/10/2023) (Entered: 07/10/2023) |
| 07/10/2023 | 305 | **PRELIMINARY INJUNCTION OPINION *(Redacted)*. Signed by Judge Jacqueline Scott Corley on 7/10/2023. (ahm, COURT STAFF) (Filed on 7/10/2023) (Entered: 07/11/2023)** |

| 07/12/2023 | 306 | ***Please disregard, filed in error. This docket will remain locked from the public. Please see Dkt. No. 310.*** <br><br> Proposed Findings of Fact by Activision Blizzard, Inc., Microsoft Corporation - *Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law (Redacted)*. (Wilkinson, Beth) (Filed on 7/12/2023) Modified on 7/12/2023 (tn, COURT STAFF). Modified on 7/13/2023 (ahm, COURT STAFF). (Entered: 07/12/2023) |
|---|---|---|
| 07/12/2023 | 307 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Federal Trade Commission. Appeal of Memorandum & Opinion 305 (Appeal fee FEE WAIVED) (Attachments: # 1 Ninth Circuit Forms re Notice of Appeal)(Weingarten, James) (Filed on 7/12/2023) **(USCA Case No. 23-15992**) Modified on 7/13/2023 (slh, COURT STAFF). (Entered: 07/12/2023) |
| 07/12/2023 | 308 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Federal Trade Commission. (Attachments: # 1 Proposed Order, # 2 Unredacted Version of PLAINTIFF'S FINAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW)(Weingarten, James) (Filed on 7/12/2023) (Entered: 07/12/2023) |
| 07/12/2023 | 309 | Proposed Findings of Fact by Federal Trade Commission *PLAINTIFF'S FINAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW*. (Weingarten, James) (Filed on 7/12/2023) (Entered: 07/12/2023) |
| 07/13/2023 | 310 | Proposed Findings of Fact by Activision Blizzard, Inc., Microsoft Corporation - *Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law (Redacted) CORRECTION OF DOCKET # 306*. (Wilkinson, Beth) (Filed on 7/13/2023) (Entered: 07/13/2023) |
| 07/13/2023 | 311 | Administrative Motion to File Under Seal *Portions of Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law* filed by Activision Blizzard, Inc., Microsoft Corporation. (Attachments: # 1 Declaration of Alysha Bohanon, # 2 Exhibit Unredacted Version of Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law, # 3 Proposed Order)(Wilkinson, Beth) (Filed on 7/13/2023) (Entered: 07/13/2023) |
| 07/13/2023 | 312 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *in Connection with Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law (Civil L.R. 79-5(f))* filed by Activision Blizzard, Inc., Microsoft Corporation. (Attachments: # 1 Proposed Order)(Wilkinson, Beth) (Filed on 7/13/2023) (Entered: 07/13/2023) |
| 07/13/2023 | 313 | MOTION for Injunction Pending Appeal re 305 Memorandum & Opinion filed by Federal Trade Commission. Responses due by 7/27/2023. Replies due by 8/3/2023. (Attachments: # 1 Proposed Order)(Weingarten, James) (Filed on 7/13/2023) Modified on 7/13/2023 (slh, COURT STAFF). (Entered: 07/13/2023) |
| 07/13/2023 | 314 | USCA Case Number 23-15992 for 307 Notice of Appeal to the Ninth Circuit filed by Federal Trade Commission. (slh, COURT STAFF) (Filed on 7/13/2023) (Entered: 07/13/2023) |
| 07/13/2023 | 315 | OPPOSITION/RESPONSE (re 313 MOTION to Stay re 305 Memorandum & Opinion ) filed byActivision Blizzard, Inc., Microsoft Corporation. (Wilkinson, Beth) (Filed on 7/13/2023) (Entered: 07/13/2023) |
| 07/13/2023 | 316 | ORDER of USCA as to 307 Notice of Appeal to the Ninth Circuit **No. 23-15992**, filed by Federal Trade Commission. (wsn, COURT STAFF) (Filed on 7/13/2023). (Entered: 07/13/2023) |

| 07/13/2023 | [317](#) | **ORDER by Judge Jacqueline Scott Corley denying [313](#) Motion for Injunction Pending Appeal. (ahm, COURT STAFF) (Filed on 7/13/2023) (Entered: 07/13/2023)** |
| 07/14/2023 | [318](#) | ORDER of USCA as to [307](#) Notice of Appeal to the Ninth Circuit filed by Federal Trade Commission (tn, COURT STAFF) (Filed on 7/14/2023) (Entered: 07/14/2023) |
| 07/18/2023 | [319](#) | Declaration of Christopher Schenck in Support of [308](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed byValve Corporation. (Related document(s) [308](#) ) (Tirtasaputra, Meeghan) (Filed on 7/18/2023) (Entered: 07/18/2023) |
| 07/18/2023 | [320](#) | TRANSCRIPT ORDER before Judge Jacqueline Scott Corley by Federal Trade Commission, for Court Reporter Marla Knox. (Weingarten, James) (Filed on 7/18/2023) (Entered: 07/18/2023) |
| 07/18/2023 | [321](#) | **ORDER by Judge Jacqueline Scott Corley granting [113](#) Motion to Remove Incorrectly Filed Document. The documents located at ECF Nos. 106, 107, and 108 shall be removed from the publicly available docket for these proceedings. (ahm, COURT STAFF) (Filed on 7/18/2023) (Entered: 07/18/2023)** |
| 07/19/2023 | [322](#) | Statement re [312](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *in Connection with Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law (Civil L.R. 79-5(f))*, [308](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by NVIDIA Corporation. (Attachments: # [1](#) Declaration of Azadeh Morrison in support of Statement, # [2](#) Proposed Order re: Sealing)(Zivojnovic, Ognjen) (Filed on 7/19/2023) (Entered: 07/19/2023) |
| 07/19/2023 | [323](#) | Statement re [308](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by Activision Blizzard, Inc.. (Attachments: # [1](#) Declaration of Page Robinson, # [2](#) Proposed Order)(Van Ness, Caroline) (Filed on 7/19/2023) (Entered: 07/19/2023) |
| 07/19/2023 | [324](#) | TRANSCRIPT ORDER before Judge Jacqueline Scott Corley by Federal Trade Commission, for Court Reporter Marla Knox. (Weingarten, James) (Filed on 7/19/2023) (Entered: 07/19/2023) |
| 07/19/2023 | [325](#) | TRANSCRIPT ORDER before Judge Jacqueline Scott Corley by Federal Trade Commission, for Court Reporter Marla Knox. ***CORRECTIONS TO DOCKET #320 & #324*** (Weingarten, James) (Filed on 7/19/2023) Modified on 7/19/2023 (tn, COURT STAFF). (Entered: 07/19/2023) |
| 07/19/2023 | [326](#) | MOTION to Remove Incorrectly Filed Document filed by Federal Trade Commission. (Attachments: # [1](#) Proposed Order)(Weingarten, James) (Filed on 7/19/2023) (Entered: 07/19/2023) |
| 07/19/2023 | [327](#) | **PRELIMINARY INJUNCTION OPINION *(Final Redacted Version)*. Signed by Judge Jacqueline Scott Corley on 7/10/2023. (ahm, COURT STAFF) (Filed on 7/19/2023) (Entered: 07/19/2023)** |
| 07/19/2023 | [328](#) | Statement re [309](#) Proposed Findings of Fact *NON-PARTY NINTENDO OF AMERICA INC. STATEMENT PURSUANT TO LOCAL RULE 79-5(f) AS TO WHY ITS CONFIDENTIAL INFORMATION IN DKT. NO. 309 (FEDERAL TRADE COMMISSION FINAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW) SHOULD REMAIN UNDER SEAL* by Nintendo of America Inc.. (Attachments: # [1](#) Proposed Order)(Swaney, Steven) (Filed on 7/19/2023) (Entered: 07/19/2023) |
| 07/19/2023 | [329](#) | Statement re [310](#) Proposed Findings of Fact *NON-PARTY NINTENDO OF AMERICA INC. STATEMENT PURSUANT TO LOCAL RULE 79-5(f) AS TO WHY ITS CONFIDENTIAL INFORMATION IN DKT. NO. 310 (DEFENDANTS PROPOSED* |

|  |  | *POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW) SHOULD REMAIN UNDER SEAL* by Nintendo of America Inc.. (Attachments: # [1](#) Proposed Order)(Swaney, Steven) (Filed on 7/19/2023) (Entered: 07/19/2023) |
|---|---|---|
| 07/19/2023 | [330](#) | Statement re [312](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *in Connection with Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law (Civil L.R. 79-5(f))*, [308](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by Sony Interactive Entertainment LLC. (Attachments: # [1](#) Exhibit A - Declaration of Christian Svensson, # [2](#) Proposed Order)(Bennett, Elsbeth) (Filed on 7/19/2023) (Entered: 07/19/2023) |
| 07/19/2023 | [331](#) | Statement re [308](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by Microsoft Corporation. (Attachments: # [1](#) Declaration of Alysha Bohanon, # [2](#) Proposed Order)(Wilkinson, Beth) (Filed on 7/19/2023) (Entered: 07/19/2023) |
| 07/24/2023 | [332](#) | **ORDER RE NON-PARTY NINTENDO'S MOTIONS FOR PROTECTIVE ORDERS. Signed by Judge Jacqueline Scott Corley on July 24, 2023. (ahm, COURT STAFF) (Filed on 7/24/2023) (Entered: 07/24/2023)** |
| 07/24/2023 | [333](#) | **ORDER RE: NINTENDO'S MOTION FOR A PROTECTIVE ORDER AND FTC'S PROPOSED FINDINGS. Signed by Judge Jacqueline Scott Corley on July 24, 2023. (ahm, COURT STAFF) (Filed on 7/24/2023) (Entered: 07/24/2023)** |
| 07/26/2023 | [335](#) | **ORDER RE MOTIONS TO SEAL AND MOTIONS FOR IN CAMERA REVIEW REGARDING TRIAL EXHIBITS. Signed by Judge Jacqueline Scott Corley on 7/26/2023. (ahm, COURT STAFF) (Filed on 7/26/2023) (Entered: 07/26/2023)** |
| 07/31/2023 | [336](#) | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Federal Trade Commission. (Attachments: # [1](#) Proposed Order, # [2](#) Unredacted Version of Plaintiff's Initial Proposed Findings of Fact and Conclusions of Law) (Weingarten, James) (Filed on 7/31/2023) (Entered: 07/31/2023) |
| 07/31/2023 | [337](#) | TRANSCRIPT ORDER for proceedings held on 6/23/2023 before Judge Jacqueline Scott Corley by Google LLC, for Court Reporter Marla Knox. (Miller, Evan) (Filed on 7/31/2023) (Entered: 07/31/2023) |
| 08/02/2023 | [338](#) | Declaration of Christopher Schenck in Support of [336](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed byValve Corporation. (Related document(s) [336](#) ) (Tirtasaputra, Meeghan) (Filed on 8/2/2023) (Entered: 08/02/2023) |
| 08/03/2023 | [339](#) | TRANSCRIPT ORDER for proceedings held on 6/21 - 6/29/2023, before Judge Jacqueline Scott Corley, for Court Reporter Marla Knox, ordered by Rachel Bard. (knm, COURT STAFF) (Filed on 8/3/2023) (Entered: 08/03/2023) |
| 08/07/2023 | [340](#) | Statement re [336](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by NVIDIA Corporation. (Attachments: # [1](#) Declaration of Azadeh Morrison in support of Statement, # [2](#) Proposed Order re: Sealing)(Zivojnovic, Ognjen) (Filed on 8/7/2023) (Entered: 08/07/2023) |
| 08/07/2023 | [341](#) | Statement re [336](#) Administrative Motion to Consider Whether Another Party's Material Should Be Sealed - *Defendant Activision Blizzard, Inc.'s Statement In Response To Plaintiff Federal Trade Commissions Administrative Motion To Consider Whether Another Partys Material Should Be Sealed (Civil L.R. 79-5(F)) [ECF No. 336]* by Activision Blizzard, Inc.. (Attachments: # [1](#) Declaration of Page Robinson, # [2](#) Proposed Order)(Van Ness, Caroline) (Filed on 8/7/2023) (Entered: 08/07/2023) |
| 08/07/2023 | [342](#) | Statement re [175](#) Proposed Findings of Fact *NON-PARTY NINTENDO OF AMERICA INC. STATEMENT PURSUANT TO LOCAL RULE 79-5(f) AS TO WHY ITS* |

| | | |
|---|---|---|
| | | *CONFIDENTIAL INFORMATION IN DKT. NO. 175 (FEDERAL TRADE COMMISSION INITIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW) SHOULD REMAIN UNDER SEAL* by Nintendo of America Inc.. (Attachments: # 1 Proposed Order)(Swaney, Steven) (Filed on 8/7/2023) (Entered: 08/07/2023) |
| 08/07/2023 | 343 | Statement re 177 Proposed Findings of Fact *NON-PARTY NINTENDO OF AMERICA INC. STATEMENT PURSUANT TO LOCAL RULE 79-5(f) AS TO WHY ITS CONFIDENTIAL INFORMATION IN DKT. NO. 177 (DEFENDANTS PROPOSED PRETRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW) SHOULD REMAIN UNDER SEAL* by Nintendo of America Inc.. (Attachments: # 1 Proposed Order)(Swaney, Steven) (Filed on 8/7/2023) (Entered: 08/07/2023) |
| 08/07/2023 | 344 | Statement re 181 Trial Brief, *NON-PARTY NINTENDO OF AMERICA INC. STATEMENT PURSUANT TO LOCAL RULE 79-5(f) AS TO WHY ITS CONFIDENTIAL INFORMATION IN DKT. NO. 181 (FEDERAL TRADE COMMISSION BENCH BRIEF) SHOULD REMAIN UNDER SEAL* by Nintendo of America Inc.. (Attachments: # 1 Proposed Order)(Swaney, Steven) (Filed on 8/7/2023) (Entered: 08/07/2023) |
| 08/07/2023 | 345 | NON-PARTY SONY INTERACTIVE ENTERTAINMENT LLCS STATEMENT IN SUPPORT OF SEALING CERTAIN CONFIDENTIAL BUSINESS MATERIAL-Statement re 336 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by Sony Interactive Entertainment LLC. (Attachments: # 1 Exhibit A - Declaration of Christian Svensson, # 2 Proposed Order)(Bennett, Elsbeth) (Filed on 8/7/2023) Modified on 8/8/2023 (kmg, COURT STAFF). (Entered: 08/07/2023) |
| 08/07/2023 | 346 | Statement re 336 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by Microsoft Corporation. (Attachments: # 1 Declaration of Alysha Bohanon, # 2 Proposed Order)(Wilkinson, Beth) (Filed on 8/7/2023) (Entered: 08/07/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/09/2023 13:37:50 | | | |
| **PACER Login:** | ftc56789 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:23-cv-02880-JSC |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |