**Case No. 23-15992**

# In the United States Court of Appeals for the Ninth Circuit

FEDERAL TRADE COMMISSION,

*Appellant*,

v.

MICROSOFT CORPORATION, et al.,

*Appellee*.

On Appeal from
The United States District Court
For the Northern District of California
Case No. 23-cv-02880-JSC
The Honorable Judge Jacqueline Scott Corley

## *AMICI CURIAE* BRIEF OF LAW PROFESSORS IN SUPPORT OF APPELLANT

> JENNIFER E. STURIALE
> Delaware Law School, Widener University
> 4601 Concord Pike
> Wilmington, DE 19803
> 646-660-1834
> *Counsel for Amici Curiae*

# **TABLE OF CONTENTS**

**TABLE OF CONTENTS**……………………………………………………… i

**TABLE OF AUTHORITIES**……………………………………………….… ii

**INTEREST OF *AMICUS CURIAE***…………………………………………. 1

**SUMMARY OF ARGUMENT**……………………………………………... 1

**ARGUMENT**………………………………………………………………... 2

    **THE DISTRICT COURT ERRONEOUSLY CONCLUDED THE MERGED FIRM'S INCENTIVES TO TOTALLY AND PARTIALLY FORECLOSE RIVALS ARE THE SAME**

    **A. Partial Foreclosure Is Generally More Profitable than Total Foreclosure** …………………………………………………….... 2

    **B. The District Court Wrongly Equated the Merged Firm's Incentives to Totally Foreclose with Its Incentives to Partially Foreclose**………………………………………………………… 6

    **CONCLUSION**…………………………………………………………….. 9

# TABLE OF AUTHORITIES

**CASES**

*FTC v. Microsoft Corp.*, Case No. 3:23-cv-2880-JSC,
  2023 WL 4443412 (N.D. Cal. July 10, 2023). .............................................. *passim*

*United States v. Sybron Corp.*, 329 F. Supp. 919 (E.D. Pa. 1971). ...........................5

**OTHER AUTHORITIES**

Carl Shapiro, *Vertical Mergers and Input Foreclosure Lessons from the AT&T/Time Warner Case*, 59 Rev. Indus. Org. 303 (2021)....................................5

Serge Moresi & Steven C. Salop, *vGuppi: Scoring Unilateral Pricing Incentives in Vertical Mergers*, 79 Antitrust L.J. 185 (2013)..................................................4, 5

Steven C. Salop & Jennifer E. Sturiale, *Fixing 'Litigating the Fix'*, 85 Antitrust L.J. _ (2023) (forthcoming) ...............................................................................4

Steven C. Salop, *The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test*, 81 Antitrust L.J. 371 (2017). ...............................................................................................................2

Steven Salop, *Invigorating Vertical Merger Enforcement,* 127 Yale L.J. 1962 (2017)..............................................................................................................2

Thomas Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 Yale L.J. 209 (1986)....................3

## INTEREST OF *AMICUS CURIAE*

*Amici*, identified in the Appendix,[1] are professors at law schools throughout the United States who teach and write about antitrust law.[2] We have no personal interest in the outcome of this case. We share an academic interest in guiding the development of antitrust law in a manner that protects consumers and the competitive process, while also encouraging innovation.

## SUMMARY OF ARGUMENT

Partial input foreclosure is harmful to competition. It enables a supplier to raise the costs or reduce the quality of inputs provided to its rivals in the downstream market, making it difficult for rivals to compete. But because the supplier does not totally cut off its rivals, the supplier can continue to profit from supplying those rivals with inputs in the upstream market. In short, the supplier can have its cake and eat it too. Consequently, a partial foreclosure strategy is generally more profitable than a total foreclosure strategy and the incentives are accordingly different. But the district court failed to appreciate this difference. And thus it concluded—wrongly—that just because the merged firm would have

---

[1] Institutional affiliations are provided only for purposes of identification.
[2] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person other than *amici* contributed money that was intended to fund the preparation or submission of this brief. The parties have consented to the filing of this brief.

1

an incentive to continue to supply *Call of Duty* to its competitors, it would have no incentive to engage in a partial foreclosure strategy.

## ARGUMENT

## THE DISTRICT COURT ERRONEOUSLY CONCLUDED THE MERGED FIRM'S INCENTIVES TO TOTALLY AND PARTIALLY FORECLOSE RIVALS ARE THE SAME.

### A. Partial Foreclosure Is Generally More Profitable than Total Foreclosure.

Foreclosure by a supplier may be total[3] or partial. Total foreclosure is the process by which a supplier denies firms that are its "downstream" competitors access to "upstream" inputs that are critical for those rivals to compete in the downstream market. Such total foreclosure can raise the rivals' costs (or reduce their product quality) and make it difficult for them to compete in the relevant market. Steven Salop, *Invigorating Vertical Merger Enforcement,* 127 Yale L.J. 1962, 1975 (2017).

Partial input foreclosure, in comparison, involves not an outright denial of access to an input, but rather some more limited action or denial of the input on the

---

[3] The District Court characterized the two foreclosure strategies as "full foreclosure" and "partial foreclosure." *See, e.g.*, *FTC v. Microsoft Corp.*, Case No. 3:23-cv-2880-JSC, 2023 WL 4443412, at *18 (N.D. Cal. July 10, 2023). We use the phrase "total foreclosure," which accords with the literature on the topic. *See, e.g.*, Steven C. Salop, *The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test*, 81 Antitrust L.J. 371, 388 (2017).

same terms the supplier offers its downstream partners. The supplier can effectively engage in a form of price discrimination—i.e., increasing the prices charged to competitors for some inputs or worsening the terms on which it provides access to other inputs. Alternatively, the supplier can degrade the quality of the input provided to competitors by, for example, excluding some features or content but not cutting off the competitors entirely. Another possibility is that the supplier can delay the availability of the input to customers who are its rivals. *See, e.g.*, Thomas Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 Yale L.J. 209 (1986). For example, in this case, the merged firm could introduce additional content, such as new story lines, characters, or character accessories (e.g., weapons) on the version of *Call of Duty* available on its own Xbox platform before introducing such content on other platforms or excluding such content from other versions altogether. The merged firm could also raise the licensing fees paid to make *Call of Duty* available on PlayStation and Nintendo. Or the merged firm might continue to give competitors access to *Call of Duty* but provide access to other games in the merged firm's library that are presently owned by Activision on more costly or otherwise less favorable terms.

Both total and partial foreclosure can be conceptualized as an effective increase in price to competitors for inputs. But the profitability of each is different. When

a supplier engages in total foreclosure, entirely withholding an input, the price increase is technically infinite and practically prohibitive; no price the prospective customer (and competitor) can pay will ultimately secure the input. All customers would consequently need to shift to a different supplier. In comparison, when a supplier engages in partial foreclosure, the effective price increase is non-prohibitive. As a result, some of the supplier's customers will not switch to another input provider (nor provide it themselves) but will instead continue to purchase from the merged firm at the higher price. *See* Serge Moresi & Steven C. Salop, *vGuppi: Scoring Unilateral Pricing Incentives in Vertical Mergers*, 79 Antitrust L.J. 185, 210 (2013).

Total foreclosure can be profitable for a firm with market power.[4] *Id.* at 118. It might make it impossible for a rival to compete. Or it may raise rivals' costs of acquiring inputs, placing the input supplier (i.e., the merged entity) at a cost

---

[4] In this case, the District Court concluded that total foreclosure would not be profitable. *See Microsoft*, 2023 WL 4443412, at *18. In reaching this conclusion, it credited evidence offered by Microsoft, post-complaint, that withholding *Call of Duty* would be at odds with the merged firm's financial interests. *See id.* at *14, *18-19. This finding importantly hinges on a conclusion that such evidence is relevant at the liability phase of the litigation. *See* Appellant Br. at 45-55; *see also* Steven C. Salop & Jennifer E. Sturiale, *Fixing 'Litigating the Fix'*, 85 Antitrust L.J. _ (2023) (forthcoming) (arguing that if such post-complaint evidence is to be considered by the district court, the burden of proof should remain on the merging parties). In addition, the District Court's conclusion hinges on the terms of the agreements Microsoft entered with its competitors. For example, is the merged firm bound to provide access to *Call of Duty* only for a limited time? If so, for how long? Is it obligated to provide access to new games within the *Call of Duty* series? As we are not privy to the terms of these agreements, we cannot evaluate the District Court's conclusion. We therefore leave evaluation of this conclusion to the FTC. *See* Appellant Br. at 46-55.

advantage and making it more difficult for the rivals to compete in the relevant downstream market. As a result, the merged firm can attract more downstream customers and earn greater profits in the downstream market.

Partial foreclosure is similarly profitable. Indeed, it is generally more profitable than total input foreclosure. *See* Serge Moresi & Steven C. Salop, *vGuppi*, *supra*, at 208-212. By partially foreclosing rivals, the input supplier can gain a competitive advantage, thereby attracting more downstream customers and increasing sales and profits. At the same time, for any downstream customers the supplier is unable to attract away, the input supplier can continue to earn a profit from the sale of inputs to these rivals. In general, the merged firm's profits from increased sales in the downstream market, together with continuing sales in the upstream input market, exceed any increased profits the merged firm could earn if it relied instead on total input foreclosure strategy. *See id*; *see generally* Carl Shapiro, *Vertical Mergers and Input Foreclosure Lessons from the AT&T/Time Warner Case*, 59 Rev. Indus. Org. 303 (2021); *see also United States v. Sybron Corp.*, 329 F. Supp. 919, 928-29 (E.D. Pa. 1971) ("[A]bsolute foreclosure . . . would not be a profitable course for an integrated [firm] . . . . Yet, there are many more subtle avenues available to an integrated firm to increase its manufacturing sales, without risking retail sales.").

For example, by engaging in a partial foreclosure strategy of introducing additional content earlier or only on the Xbox version of *Call of Duty*, the merged entity can attract gamers to the Xbox platform. But not all customers will necessarily purchase an Xbox rather than a competitor console. Some may purchase or continue to use a PlayStation or Nintendo instead. For these gamers, the merged entity will continue to earn a profit through licensing fees paid by the developers of those games. The merged firm's profits from increased Xbox sales plus licensing fees for *Call of Duty* from this strategy of partial foreclosure are not the same as its profits from increased sales of Xboxes from a simple strategy of completely depriving Nintendo and PlayStation of access to *Call of Duty*. Indeed, the profits from the partial foreclosure strategy are very likely greater.

### B. The District Court Wrongly Equated the Merged Firm's Incentives to Totally Foreclose with Its Incentives to Partially Foreclose.

The District Court, however, erroneously concluded that the merged firm's incentives to engage in both foreclosure strategies were the same. *See Microsoft*, 2023 WL 4443412, at *18. One of the rationales the Court offered for rejecting the government's theory of partial foreclosure was that, because the government's theories of harm under total and partial input foreclosure are the same, the justifications for dismissing the theories must be the same. After concluding that the FTC had not provided evidence that the merged firm would have the incentive

6

to engage in a total foreclosure strategy—a conclusion that the FTC challenges, *see* Appellant Br. at 29-31, 62-65—the Court stated,

> Anyway, under the FTC's theory, the goals of full and partial foreclosure are the same: move enough PlayStation users to Xbox such that the benefits to the combined firm outweigh the costs. If the FTC has not shown a financial incentive to engage in full disclosure, then it has not shown a financial incentive to engage in partial foreclosure.

*Microsoft*, 2023 WL 4443412, at *18.

But the Court's logic is flawed for at least two reasons. First, the Court failed to appreciate that the merged firm's partial foreclosure strategy is constituted of two sources of profits and, therefore, somewhat different incentives: (1) the profits from increased sales of Xbox game consoles and (2) the profits from any continuing licensing fees for access to the merged firm's games, such as *Call of Duty*, by developers who will develop games for the PlayStation and Nintendo platforms. The Court erroneously focused only on the first. *See id.* ("move enough PlayStation users to Xbox").

Second, the Court assumed that the merged firm's partial foreclosure strategy would fail for the same reasons the Court concluded its total foreclosure strategy would fail. *See id.* ("If the FTC has not shown a financial incentive to engage in full disclosure, then it has not shown a financial incentive to engage in partial foreclosure.") But the Court's rationale for concluding the merged firm

7

would have no incentive to engage in a strategy of total foreclosure does not pertain to a strategy of partial disclosure. The Court found the government's theory of total foreclosure unconvincing because of evidence Microsoft offered that it planned to continue to provide its competitors access to *Call of Duty* and that such access was critical to the merged firm's financial success. *See FTC*, 2023 WL 4443412, at *13-14. Thus, the Court concluded, Microsoft would have no incentive to withhold *Call of Duty*.

Although Microsoft's evidence may be in tension with a theory of total foreclosure, it is *not* automatically at odds with a theory of partial foreclosure. Indeed, it is entirely consistent with it. The merged firm can give competitors access to *Call of Duty*, but simply degrade the game's quality; delay the availability of content, such as updates or special features; or increase the licensing fees it charges competitors. The government's theory of partial foreclosure is therefore *consistent with* the evidence offered by Microsoft and credited by the District Court.

8

## CONCLUSION

For the reasons explained above, we recommend that this Court overturn the District Court's conclusion that the FTC has not shown that the merged firm would have the financial incentive to engage in a strategy of partial foreclosure.

Respectfully submitted,

/s/ Jennifer E. Sturiale

Delaware Law School, Widener University
4601 Concord Pike
Wilmington, DE 19803
646-660-1834
*Counsel for Amici Curiae*

Dated August 16, 2023

# APPENDIX

*Institutional affiliations are provided only for purposes of identification.*

Christine P. Bartholomew
Professor of Law, University of Buffalo School of Law


Darren Bush, Leonard B. Rosenberg Professor of Law
University of Houston Law Center


Peter C. Carstensen, Fred W. & Vi Miller Chair in Law Emeritus
University of Wisconsin School of Law


Josh Davis, Research Professor in Residence
UC Law San Francisco


Gregory Day, Associate Professor
University of Georgia Terry-College of Business


Harry First, Charles L. Denison Professor of Law
NYU School of Law


Eleanor Fox, Walter J. Derenberg Professor of Trade Regulation Emerita
NYU School of Law


Nikolas Guggenberger, Assistant Professor of Law
University of Houston Law Center

Max Huffman, Vice Dean
Indiana University-McKinney School of Law

John B. Kirkwood, Professor of Law
Seattle University School of Law

Mark A. Lemley, William H. Neukom Professor
Stanford Law School

Christopher R. Leslie, Chancellor's Professor of Law
University of California - Irvine, School of Law

Sanjutka Paul, Professor of Law
University of Michigan-Michigan Law

Theodosia Stavroulaki, Assistant Professor of Law
Gonzaga University School of Law

Jennifer E. Sturiale, Assistant Professor of Law
Delaware Law School, Widener University

Sean Sullivan, Professor of Law
University of Iowa College of Law

Spencer Weber Waller, John Paul Stevens Chair in Competition Law
Loyola University Chicago School of Law

Sam Weinstein, Professor of Law
Cardozo School of Law

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7), which provide that an amicus brief may be one half the maximum length authorized for a party's principal brief (i.e., 6,500 words), because the brief contains 2,268 words, excluding the parts exempted by Rule 32(f), as determined by the word processing system used to prepare the brief.

Pursuant to Rule 32(a)(5) and (a)(6), I hereby certify that this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Respectfully submitted,

/s/ Jennifer E. Sturiale

Delaware Law School, Widener University
4601 Concord Pike
Wilmington, DE 19803
646-660-1834
*Counsel for Amici Curiae*