No. 23-15992

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FEDERAL TRADE COMMISSION,
*Plaintiff-Appellant,*

v.

MICROSOFT CORP., and
ACTIVISION BLIZZARD, INC.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-cv-2880
(Hon. Jacqueline Scott Corley, U.S. Distr. J.)

# OPENING BRIEF
# OF THE FEDERAL TRADE COMMISSION
# [REDACTED]

HOLLY VEDOVA
*Director*

JOHN NEWMAN
*Deputy Director*

SHAOUL SUSSMAN
*Associate Director for Litigation*

JAMES H. WEINGARTEN
PEGGY BAYER FEMENELLA
JAMES ABELL
CEM AKLEMAN
MEREDITH R. LEVERT
JENNIFER FLEURY
*Attorneys*

BUREAU OF COMPETITION

ANISHA S. DASGUPTA
*General Counsel*

MARIEL GOETZ
*Acting Director of Litigation*

IMAD D. ABYAD
*Attorney*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-3579
iabyad@ftc.gov

# TABLE OF CONTENTS

Table of Authorities .................................................................................iii

Introduction ........................................................................................... 1

Circuit Rule 28-2 Statement of Jurisdiction ........................................... 3

Statement of the Issues Presented ......................................................... 3

Statement of the Case ............................................................................ 5

A. Statutory Framework ...................................................................... 5

B. The Proposed Acquisition ............................................................... 7

C. The Gaming Industry ...................................................................... 8

    1. Multi-Game Library Subscription Services .......................... 9
    2. Cloud Gaming ....................................................................... 10
    3. Console Gaming .................................................................... 12

D. Enforcement Proceedings ............................................................... 12

E. The District Court Proceedings and Order on Review ..................... 14

Summary of Argument ............................................................................ 17

Standard of Review ................................................................................. 22

Argument ................................................................................................ 22

I. The District Court Misapplied The Standard For
Preliminary Relief That Section 13(b) Of The FTC Act
Sets Forth For FTC Cases ................................................................ 23

    A. The District Court Erroneously Conflated Section
    13(b)'s Preliminary Injunction Standard With the
    Clayton Act's Ultimate Merits Standard .................................. 23

    B. The FTC Has Marshalled Compelling Evidence That
    the Merger May Substantially Lessen Competition ................. 28

1.    Microsoft's incentives to foreclose ....................................... 29
2.    Lessening of competition in the multi-game subscription market ............................................... 31
3.    Lessening of competition in cloud gaming ......................... 33
4.    Lessening of competition in the console market ............... 34

C.   The District Court Erred in Ruling That a Purported Efficiency Negates the Foreclosure in the Market for Multi-Game Subscription Services ............................................. 36

D.   The District Court Impermissibly Relied on Defendants' Proposed Remedies to Deny Relief ....................... 45

1.    The district court relied on Microsoft's side deals to find no likelihood of success ............................................. 46
2.    Proposed remedies cannot be considered at the preliminary relief stage of merger analysis ........................ 48
3.    The district court should have deferred to the FTC's expertise in antitrust remedies rather than evaluating the side deals itself .................................. 55

II.   The District Court Erred in Dismissing the Supreme Court's *Brown Shoe* Liability Framework ....................................... 58

III.  The District Court Committed Other Reversible Errors ................. 62

A.   Microsoft's Incentives to Foreclose Cannot Be Negated by Its Executives' Stated Intent Not to Do So .......................................................................................................... 62

B.   Partial Foreclosure Is Likely Even Absent the Incentives for Full Foreclosure .................................................. 65

IV.  The District Court Erred in According No Weight to the Public Equities that Favor Relief ....................................................... 68

Conclusion .................................................................................................... 74

Statement of Related Cases .................................................................... 74

# TABLE OF AUTHORITIES

**CASES**                                               **PAGE**

*Ash Grove Cement Co. v. FTC*,
    577 F.2d 1368 (9th Cir. 1978) ........................................................ 37, 44

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ................................................................................. 63

*Atl. Refining Co. v. FTC*,
    381 U.S. 357 (1965) ................................................................................. 56

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ................................................................... passim

*Cal. Dental Ass'n v. FTC*,
    224 F.3d 942 (9th Cir. 2000) ................................................................ 63

*Chicago Bd. of Trade v. United States*,
    246 U.S. 231 (1918) ................................................................................. 63

*Chicago Bridge & Iron Co. N.V. v. FTC*,
    534 F.3d 410 (5th Cir. 2008) ........................................................ 56, 64

*Crown Zellerbach Corp. v. FTC*,
    296 F.2d 800 (9th Cir. 1961) ......................................................... 5, 37

*Filtrol Corp. v. Slick Corp.*,
    No. 69-607, 1969 WL 219 (C.D. Cal. Dec. 29, 1969) .......................... 72

*Ford Motor Co. v. United States*,
    405 U.S. 562 (1972) ........................................................................ 44, 59

*Fruehauf Corp. v. FTC*,
    603 F.2d 345 (2nd Cir. 1979) .............................................................. 59

CASES (CONT'D)                                                                    PAGE

*FTC v. Affordable Media, LLC,*
    179 F.3d 1228 (9th Cir. 1999)..................................................... 6, 23, 69

*FTC v. Cement Institute,*
    333 U.S. 683 (1948) ........................................................................ 56

*FTC v. Consumer Def., LLC,*
    926 F.3d 1208 (9th Cir. 2019) .......................................................... 22

*FTC v. Elders Grain, Inc.,*
    868 F.2d 901 (7th Cir. 1989)................................................... 24, 43, 70

*FTC v. Enforma Nat. Prods.,*
    362 F.3d 1204 (9th Cir. 2004) .......................................................... 22

*FTC. v. Food Town Stores, Inc.,*
    539 F.2d 1339 (4th Cir. 1976)............................................ 6, 27, 49, 73

*FTC v. Hackensack Meridian Health, Inc.,*
    30 F.4th 160 (3d Cir. 2022) ......................................................... 40, 42

*FTC v. H.J. Heinz Co.,*
    246 F.3d 708 (D.C. Cir. 2001) .................................................. passim

*FTC v. Ind. Fed'n of Dentists,*
    476 U.S. 447 (1986) .......................................................................... 5

*FTC v. Meta Platforms Inc.,*
    No. 22-4325, 2022 WL 16637996 (N.D. Cal. Nov. 2, 2022) ................. 7

*FTC v. Nat'l Lead Co.,*
    352 U.S. 419 (1957) .................................................................. 56, 57

*FTC v. Penn St. Hershey Med. Ctr.,*
    838 F.3d 327 (3rd Cir. 2016)..................................................... passim

CASES (CONT'D)                                                PAGE

*FTC v. Procter & Gamble Co.,*
   386 U.S. 568 (1967) ...................................................... 24, 38

*FTC v. Univ. Health, Inc.,*
   938 F.2d 1206 (11th Cir. 1991) ........................................ 73

*FTC v. Warner Commc'ns Inc.,*
   742 F.2d 1156 (9th Cir. 1984) .................................... passim

*FTC v. Weyerhaeuser Co.,*
   665 F.2d 1072 (D.C. Cir. 1981) ....................................... 69

*FTC v. Whole Foods Mkt. Inc.,*
   548 F.3d 1028 (D.C. Cir. 2008) ................................... passim

*Hospital Corp. of Am. v. FTC,*
   807 F.2d 1381 (7th Cir. 1986) .................................. 45, 57, 64

*Jacob Siegel Co. v. FTC,*
   327 U.S. 608 (1946) ...................................................... 57

*L.G. Balfour Co. v. FTC,*
   442 F.2d 1 (7th Cir. 1971) ............................................. 56

*Miss. River Corp. v. FTC,*
   454 F.2d 1083 (8th Cir. 1972) ..................................... 62, 63

*Olin Corp. v. FTC,*
   986 F.2d 1295 (9th Cir. 1993) ........................................ 56

*ProMedica Health Sys., Inc. v. FTC,*
   749 F.3d 559 (6th Cir. 2014) ......................................... 56

*Standard Oil Co. of Cal. v. United States,*
   337 U.S. 293 (1949) ...................................................... 37

CASES (CONT'D)                                                    PAGE

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
  988 F.3d 690 (4th Cir. 2021) ............................................................ 24

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys. Ltd.*,
  778 F.3d 775 (9th Cir. 2015) ...................................................... passim

*United States v. Aetna Inc.*,
  240 F. Supp. 3d 1 (D.D.C. 2017) .................................................. 52, 64

*United States v. Am. Cyanamid Co.*,
  719 F.2d 558 (2nd Cir. 1983) .................................................. 58, 59, 61

*United States v. Anthem*,
  855 F.3d 345 (D.C. Cir. 2017) ........................................................ 39

*United States v. AT&T, Inc.*,
  916 F.3d 1029 (D.C. Cir. 2019) .............................................. 26, 49, 64

*United States v. E.I. du Pont de Nemours & Co.*,
  353 U.S. 586 (1957) .............................................................. 23, 62, 67

*United States v. E. I. du Pont de Nemours & Co.*,
  366 U.S. 316 (1961) .................................................................... 49, 52

*United States v. General Dynamics Corp.*,
  415 U.S. 486 (1974) ...................................................................... 44

*United States v. Greater Buffalo Press, Inc.*,
  402 U.S. 549 (1971) ...................................................................... 48

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) .................................................. 44, 48, 63

*United States v. Philadelphia Nat'l Bank*,
  374 U.S. 321 (1963) ...................................................................... 23

CASES (CONT'D)                                                          PAGE

*United States v. Sybron Corp.*,
    329 F. Supp. 919 (E.D. Pa. 1971) ......................................... 67

## STATUTES, RULES, & REGULATIONS

15 U.S.C. § 18 ................................................................. 5, 23
    § 21(a) .................................................................. 5
    § 21(b) ............................................................. 5, 56
    § 21(c) .................................................................. 6
    § 45(a) .................................................................. 5
    § 45(a)(1) ............................................................... 5
    § 45(b) .................................................................. 5
    § 45(c) .................................................................. 6
    § 47 ................................................................... 57
    § 53(b) ....................................................... 6, 14, 22, 69

28 U.S.C. § 1292(a)(1) ........................................................ 3
    § 1331 .................................................................. 3
    § 1337(a) ............................................................... 3
    § 1345 .................................................................. 3

Fed. R. App. P. 4(a)(1)(B)(ii) ................................................ 3

## MISCELLANEOUS

H.R. Rep. 93-624 (1973),
    *reprinted in* 1973 U.S.C.C.A.N. 2417. .......................................... 22, 23

Steven Salop & Jennifer Sturiale,
    *Vertical Merger Enforcement in the Draft Merger Guidelines*,
    PROMARKET (July 28, 2023) ............................................... 67

**MISCELLANEOUS (CONT'D)**  **PAGE**

Tom Warren,
*Is Microsoft Getting Ready to Add PC Games to
Xbox Cloud Gaming*, THE VERGE (Apr. 11, 2023) ............................54

## INTRODUCTION

Microsoft Corp. has proposed to acquire Activision Blizzard, Inc. for $69 billion, in a vertical merger that would restructure the 3 billion-user gaming industry. In what would be the largest ever deal in that industry, the merger would combine the owner of one of the principal playing platforms, Microsoft, with one of the "Big 4" independent game publishers, Activision.

The Federal Trade Commission (FTC or Commission) filed an administrative complaint to determine whether the proposed acquisition violates antitrust law. If the merger is consummated and reaches its potential for harm, it would enable Microsoft—at a key inflection point in a massive and growing industry—to foreclose platform rivals from a leading input provider: Activision, which produces some of the industry's most popular games. At stake, therefore, is whether the emerging subscription and cloud gaming markets will calcify into oligopolistic walled gardens or evolve into open, competitive landscapes, where games are platform-agnostic, new platforms can emerge to challenge established incumbents, and consumers are free to choose where and how to access their games.

To aid its administrative proceedings, the FTC sought a preliminary injunction under Section 13(b) of the FTC Act to pause the merger pending a merits determination. Section 13(b) authorizes such relief whenever the FTC raises serious, substantial questions on the antitrust merits and the equities favor granting relief. Here, the FTC presented compelling evidence that the merger is reasonably likely to substantially lessen competition in multiple relevant markets—more than meeting the statutory standard.

The district court nonetheless erroneously denied preliminary relief based on reasoning containing multiple errors. Throughout its decision, the court effectively applied the ultimate merits standard rather than Section 13(b)'s preliminary injunction standard. For one market, the court identified a foreclosure of rivals that was sufficient to raise a serious question about the legality of the merger, yet disregarded that foreclosure after erroneously crediting a supposed efficiency that was not cognizable, verifiable, or merger-specific. For two other markets, the court impermissibly gave dispositive weight to the merging parties' proposed remedies although the scope of the merger's harm has yet to be finally determined, making it impossible for the

court to evaluate whether the proposed remedies would sufficiently address that harm. The district court thus usurped the Commission's role in determining the antitrust merits and did so on an admittedly limited record. The district court also misapplied the Supreme Court's traditional liability framework for vertical mergers, and failed to follow established precedent concerning the role of intent in antitrust analysis, the viability of partial foreclosure theory, and the balance of equities under Section 13(b).

## CIRCUIT RULE 28-2 STATEMENT OF JURISDICTION

(a)  The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

(b)  The decision on review denied a preliminary injunction, and is thus appealable under 28 U.S.C. § 1292(a)(1), pursuant to which this Court has jurisdiction.

(c)  The district court's decision was dated July 10, 2023, and docketed on July 11, 2023. Appellant, a United States agency, timely filed its notice of appeal on July 12, 2023. Fed. R. App. P. 4(a)(1)(B)(ii).

## STATEMENT OF THE ISSUES PRESENTED

1.  Whether the district court erred when it rejected the FTC's showing of a likelihood of success on the antitrust merits based on:

3

    a. application of an incorrect legal standard for relief;

    b. a premature and improper determination that the harm from Microsoft's foreclosure of rivals in the market for multi-game subscription services is outweighed by Microsoft's offering some Activision content on only Microsoft's own service in that market;

    c. an impermissible reliance on the merging parties' proffered remedies at the preliminary injunction stage.

    2. Whether the district court erred in failing to properly apply the functional liability framework set forth in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962).

    3. Whether the district court erred in:

    a. ruling that Microsoft's post-merger incentives to foreclose are negated by its executives' stated intent to forgo doing so; and

    b. holding that partial foreclosure is not possible without the incentives for full foreclosure.

    4. Whether the district court erred in according no weight to the public equities favoring preliminary relief.

## STATEMENT OF THE CASE

### A. Statutory Framework

Section 7 of the Clayton Act prohibits mergers "the effect of" which "may be substantially to lessen competition" in "any line of commerce." 15 U.S.C. § 18. "In the statutory phrase 'in any line of commerce', the word entitled to emphasis is 'any'." *Crown Zellerbach Corp. v. FTC*, 296 F.2d 800, 812 (9th Cir. 1961).

Section 5 of the FTC Act, in turn, proscribes "[u]nfair methods of competition in or affecting commerce." 15 U.S.C. § 45(a)(1). An acquisition that violates Section 7 of the Clayton Act, by definition, also violates Section 5 of the FTC Act. *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986).

Congress "empowered and directed" the FTC to enforce Section 5 of the FTC Act, and "vested" in the agency the power to enforce Section 7 of the Clayton Act. 15 U.S.C. §§ 45(a), 21(a).

The FTC may enforce these statutory mandates by issuing an administrative complaint, holding an adjudicatory hearing to determine the antitrust merits, and, if law violations are found, issuing a cease and desist order with appropriate remedies, including blocking the merger and divestiture. *See* 15 U.S.C. §§ 21(b), 45(b). The cease and

desist order is subject to review in an appropriate court of appeals. *Id.* §§ 21(c), 45(c).

To aid the FTC's administrative adjudication, Section 13(b) of the FTC Act authorizes the FTC to seek preliminary relief to prevent consummation of a merger until the Commission has the opportunity to determine the merger's legality in its administrative proceeding. 15 U.S.C. § 53(b); *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir. 1999).

Section 13(b) preliminary injunctions "are meant to be readily available to preserve the status quo while the FTC develops its ultimate case." *FTC v. Whole Foods Mkt. Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008); *see FTC v. Penn St. Hershey Med. Ctr.*, 838 F.3d 327, 352 (3rd Cir. 2016) (purpose of Section 13(b) "is to preserve the status quo and allow the FTC to adjudicate the anticompetitive effects of the proposed merger in the first instance"); *FTC. v. Food Town Stores, Inc.*, 539 F.2d 1339, 1342 (4th Cir. 1976) ("The only purpose of a proceeding under § 13 is to preserve the status quo until FTC can perform its function.").

Accordingly, the scope of court proceedings under Section 13(b) is "narrow." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir.

1984) (per curiam); *accord FTC v. Meta Platforms Inc.*, No. 22-4325, 2022 WL 16637996, at *5 (N.D. Cal. Nov. 2, 2022) (scope is "necessarily limited and narrow"). The court "is not to make a final determination on whether the proposed merger violates Section 7." *Warner Commc'ns*, 742 F.2d at 1162. "That adjudicatory function is vested in the FTC in the first instance." *Whole Foods*, 548 F.3d at 1042 (Tatel, J., concurring). The court's task is "rather to make only a preliminary assessment of the merger's impact on competition." *Warner Commc'ns*, 742 F.2d at 1162.

## B.   The Proposed Acquisition

In January 2022, Microsoft and Activision announced a planned $68.7 billion merger, the largest ever deal in the gaming industry and in Microsoft's history. PX9050 at 25 [2-ER-184]. Microsoft's video gaming business includes multiple playing platforms: Xbox GamePass, a multi-game library subscription service; Xbox Cloud Gaming (or xCloud), a games streaming service; and the Xbox specialized gaming console. PX9050 at 15 [2-ER-183]. Microsoft also publishes games through its Xbox Game Studios, comprising 24 separate game development studios. PX0003 at 16 [3-ER-469].

Activision develops video games, and is easily one of the largest independent game publishers. Its current titles include *Diablo*, *Overwatch*, *Candy Crush* (for mobile devices), *World of Warcraft* (for PCs), and *Call of Duty*—the most successful video game franchise in the industry's history, earning approximately ███████ in sales annually. ECF_226-2 at 7 [3-ER-292].

## C.   The Gaming Industry

The gaming industry has over 3 billion players worldwide, with revenues exceeding those of the film, music, and print entertainment industries. PX1777 at 32-33 [3-ER-429-30]. It is the fastest-growing entertainment medium, expected to reach 4.5 billion consumers by 2030. PX1785 at 9 [3-ER-422].

Video games can be played on general-purpose or gaming PCs, consoles, and mobile devices. PX1777 at 33 [3-ER-430]. Gaming PCs typically have more advanced hardware, allowing users to play computationally more demanding games. PX8001 ¶15 [3-ER-230-31]. Conversely, games played on mobile devices have lower-quality graphics and typically are less sophisticated. PX0003 at 73 [3-ER-476].

Consumers and industry participants agree that gaming content drives the sales of both the games and the platforms required to play them. *See* PX1087 at 1 [3-ER-453] ("content is king"). "AAA" video games (those requiring the most resources to develop and to play, and that command the broadest appeal for gamers) require hundreds of millions of dollars, hundreds of personnel, and years to make. PX4671 at 1 [3-ER-380]; PX8001 ¶¶20-23 [3-ER-302-303]. These games are particularly important in the gaming industry; platforms employ AAA titles to attract users, build their gaming ecosystems, and gain a competitive advantage over rivals. PX8001 ¶¶18-23 [3-ER-302-303].

## 1. Multi-Game Library Subscription Services

The gaming industry is experiencing rapid change. Today, gamers can play via a subscription to a multi-game library service, with tiered access to hundreds of games for a recurring fee. Hr'g Tr. 138:2-9 [2-ER-151]; PX0003 at 18 [3-ER-471]; PX0006 at 13-14 [3-ER-465-66]. This differs markedly from the traditional buy-to-play model in which gamers purchased outright the games they played on their personal hardware devices.

Microsoft's Xbox GamePass, launched in 2017, is already far and away the dominant multi-game subscription service. PX0006 at 13 [3-ER-465]; PX1516 at 39 [3-ER-443]; PX8001 ¶9 [3-ER-297-98]. Sony's PlayStationPlus ranks second but well behind. PX7053 at 17-19 [3-ER-341]; PX8001 ¶9 [3-ER-297-98]. Other firms, like Amazon (via Prime Gaming and Luna+), Electronic Arts (via EA Play), and Ubisoft (via Ubisoft+) provide similar services, albeit to far fewer users currently. PX3206 at 4 [3-ER-409]; PX0003 at 18-19 [3-ER-471-72]; PX0006 at 80 [3-ER-467].

### 2. Cloud Gaming

Cloud gaming—which Microsoft views as "the future of gaming"—is another nascent but rapidly growing segment of the industry. PX3381 at 6 [3-ER-399]. It lets gamers stream the game's video content without downloading the code onto the gamer's device, be that consoles, PCs, mobile devices, or (in the case of Microsoft's xCloud) smart TVs. PX8000 ¶¶6-7, 50 [3-ER-313, 323]; PX0003 at 77 [3-ER-477]; Hr'g Tr. 846:9-13 [2-ER-110]. Cloud gaming services run games on remote servers so that the primary processing occurs in separate datacenters and only live video feeds of the games are streamed to the player's device. PX0003 at

10

95 [3-ER-478]; PX8000 ¶7 [3-ER-313]; PX3381 at 2-3 [3-ER-397-98].
This enables playing computationally demanding games on less
powerful devices. PX8000 ¶7 [3-ER-313]; PX0003 at 77 [3-ER-477]; Hr'g
Tr. 64:8-10, 467:24-468:22 [2-ER-145, 139-40]; PX3381 at 2 [3-ER-397].
Cloud gaming "has helped AAA gaming reach users in lower
socioeconomic groups who otherwise would not be able to purchase, or
could not afford, their own video game system or gaming PC." PX8000
¶10 [3-ER-314].

Microsoft's xCloud is already the dominant leader in this market,
and is a core pillar of Microsoft's gaming business strategy. Hr'g Tr.
835-844 [2-ER-99-108]. Microsoft introduced xCloud in late 2020.
PX9091 at 1-6 [2-ER-176-81]. Millions of gamers already have used
xCloud, PX9171 at 17 [2-ER-175], and internal Microsoft documents
predict that cloud gaming will "dramatically expand [Microsoft's]
market opportunity." Hr'g Tr. 308:4-11 [2-ER-125]; PX1065 at 17 [3-ER-
456].

Other participants in the cloud gaming market include Amazon,
Nvidia, and Sony. PX0003 at 68 [3-ER-475]; PX8001 ¶9 [3-ER-297-98].
The ability for new entrants to access gaming content is critical; Google

11

exited that market in January 2023, citing the high cost and difficulty of securing gaming content for its service. Hr'g Tr. 470-471 [2-ER-141-42].

### 3. Console Gaming

Gaming consoles are consumer devices designed especially for playing video games. PX8001 ¶10 [3-ER-298]. Consumers purchase consoles based on hardware features as well as the availability of game content on the particular device. PX8001 ¶¶4, 11 [3-ER-295-96, 298].

Currently, the two high-performance consoles are Microsoft's Xbox Series X/S and Sony's PlayStation5, both in their ninth design iteration (or generation). PX0003 at 60, 105 [3-ER-474, 479]; PX2421 at 8-9 [3-ER-415-16]. Console makers generate revenue from sales of their hardware and accessories (like controllers, headsets, and storage drives), and from having a share of the revenue of publishers like Activision from game sales, add-on content sales, and in-game purchases. PX0003 at 16 [3-ER-469]; PX1110 at 12 [3-ER-452]; PX8001 ¶¶4-5 [3-ER-295-96].

### D.  Enforcement Proceedings

In December 2022, the Commission commenced administrative proceedings to determine if the proposed merger violates Section 7 of

the Clayton Act and Section 5 of the FTC Act. *See* Complaint, *In the Matter of Microsoft Corp. et al.*, FTC Dkt. 9412 (Dec. 8, 2022) (*Admin. Cmplt*.), at 1. The administrative complaint alleged that the merger, if consummated, "would continue Microsoft's pattern of taking control of valuable gaming content," increase barriers to entry, and give Microsoft "the ability and increased incentive to withhold or degrade Activision's content in ways that substantially lessen competition" in quality, price, and innovation. *Admin. Cmplt.* ¶1. The complaint alleged a lessening of competition was reasonably likely in at least three distinct U.S. markets (*id.* ¶¶92-95): (1) high-performance consoles, *id.* ¶¶63-72; (2) multi-game subscription services, *id.* ¶¶73-82; and (3) cloud gaming services, *id.* ¶¶83-91.

An administrative hearing on the merits was set for August 2, 2023, ECF_1 ¶16 [3-ER-553], but later put on hold. Order Withdrawing Matter from Adjudication, *In the Matter of Microsoft Corp. et al.*, FTC Dkt. 9412 (July 20, 2023).

Meanwhile, on April 26, 2023, the U.K. Competition & Markets Authority (UKCMA), following its own investigation, issued a finding that the merger violated UK competition law because it was likely to

13

substantially lessen competition in the market for cloud gaming—one of the product markets in the FTC's complaint. ECF_10-7. In May 2023, the UKCMA issued an interim injunction and a proposed final order to prohibit the merger for ten years. *Id*.

## E.    The District Court Proceedings and Order on Review

In light of Microsoft's representations to the district court in a parallel, private challenge to the merger about the merging parties' consummation timeline—and UKCMA's later interim order, ECF_10-7—the FTC initially focused on its administrative adjudication. Defendants later represented to the FTC, however, that they might close their deal well before the August 2 administrative merits hearing. ECF_1 at 2-3 [3-ER-548-49]. Thus, on June 12, 2023, the FTC filed this action for a preliminary injunction pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). *See* ECF_1 at 2-3 [3-ER-548-49].

The district court ordered an expedited hearing based on defendants' representations that a merger termination deadline of July 18, 2023, was looming. Op. 20 [1-ER-21]. Shortly after the district court issued its opinion, however, the merging parties negotiated an

extension of that termination deadline until October 18, 2023.

Activision Blizzard, Inc. Current Report (SEC Form 8-K), July 19, 2023.

Following the hearing, the district court denied preliminary relief, ruling the FTC "has not shown it is likely to succeed on its assertion the combined firm will probably pull *Call of Duty* from Sony PlayStation, or that its ownership of Activision content will substantially lessen competition in the video game library subscription and cloud gaming markets." Op. 1 [1-ER-2].

The district court agreed with the FTC that key elements for such relief are present. The court accepted that the United States is the relevant geographic market. Op. 28-30 [1-ER-29-31]. It also accepted that multi-game subscription services, cloud gaming services, and high-performance consoles (comprising only Xbox and PlayStation) are relevant product markets for antitrust analysis. Op. 23-28 [1-ER-24-29]. And it held that "the combined firm would have the ability to foreclose" its rivals in all three markets. Op. 33 [1-ER-34]. Additionally, in the multi-game subscription market, the court accepted that the merged firm is in fact likely to offer Activision titles exclusively on Microsoft's GamePass, and *not* on rival subscription services. Op. 47 [1-ER-48].

Nonetheless, the district court denied relief, because it determined that Microsoft lacked incentives post-merger to foreclose rivals in the cloud gaming and console markets. The court relied on Microsoft's post-complaint third-party deals (and mere offers) that purported to remedy the merger's harmful impact on competition, and on self-interested testimony and out-of-court statements of Microsoft executives. Op. 33-44, 49-50 [1-ER-34-45, 50-51]. As for the multi-game subscription services market, the court concluded that, despite Microsoft's likely foreclosure of rivals, Microsoft's strategy of offering *Call of Duty* on its own GamePass service (and no other rival service) was sufficient to render the merger procompetitive. Op. 47-49 [1-ER-48-50].

The district court acknowledged that its analysis was hurried by the merging parties' then-impending (but, as it turned out, artificial) termination deadline, and that it did not address all of the FTC's arguments. Op. 53 [1-ER-54]. It also acknowledged that the record contained "conflicting evidence on the anticompetitive effects of the merger"; nevertheless, it held that the equities involved did not support preliminary relief. Op. 51-52 [1-ER-52-53].

This appeal followed. On July 14, 2023, the Court denied the FTC's emergency motion for an injunction pending appeal.

## SUMMARY OF ARGUMENT

The district court's rushed denial of preliminary relief was riddled with errors and should be reversed.

1.a.  In a proceeding for a preliminary injunction under Section 13(b) of the FTC Act, this Court has long held that the FTC need only raise serious and substantial questions on the antitrust merits, not establish the merits themselves. The district court, however, repeatedly held the FTC to the ultimate merits standard of showing a probability that the merger will substantially lessen competition. This legal error infected the district court's analysis in multiple respects and improperly led the court to deny preliminary relief.

b.  The FTC met its burden to raise serious questions on the merits by proffering significant evidence that Microsoft's merger with Activision may lessen competition in relevant antitrust markets. Activision is currently a platform-agnostic provider of key input for the gaming industry. The FTC showed that post-merger, the merged firm likely would deny, degrade, or delay access to Activision's content by

17

Microsoft's rivals—enhancing Microsoft's already dominant position in the subscription and cloud markets, and lessening competition among console suppliers. This is exactly what happened after recent Microsoft acquisitions of similar firms. The evidence also showed that the merger will likely preclude further collaboration between Activision and other platform providers, impeding innovations that so far have led to significant consumer benefits.

c. The district court misapplied the law when, concerning the market for multi-game subscription services, the court accepted as a countervailing efficiency that Microsoft will offer *Call of Duty* only on its GamePass service, to the exclusion of its rivals. No court before has held that proffered efficiencies precluded preliminary relief under Section 13(b). To the extent efficiencies are even a valid defense to Section 7 violations—a doubtful proposition according to the Supreme Court and this Court—their consideration should be left to the merits proceedings, when the actual harm is determined and can then be weighed against such efficiencies.

In addition, the court failed to evaluate whether Microsoft's proffered efficiency was cognizable, verifiable, and merger-specific.

Even cursory analysis shows that Microsoft's expressed plan to make some Activision content available on *only* its own GamePass service may not qualify as procompetitive.

d. The district court further erred by relying on the merging parties' proffered remedies to negate the FTC's showing of a likelihood of success. The record, including expert economic reasoning, documentary evidence, hearing testimony, and Microsoft's history of acquisitions, shows a probability that the merged firm will have the ability and incentive to fully or partially foreclose its rivals from Activision's content in at least three relevant markets.

The court's reliance on Microsoft's post-complaint side deals as a remedy in the cloud gaming and console markets was doubly wrong. First, proceedings for a preliminary injunction under Section 13(b) are not designed to reach even the question of liability, much less determine the ultimate nature and quantum of the competitive harm. A court hearing a request for a preliminary injunction under Section 13(b) thus lacks a basis to decide whether proposed remedies are appropriate and sufficient to undo that harm.

Second, because the FTC was seeking preliminary relief in aid of an administrative adjudication, the merits in this case were to be decided in the first instance by the FTC, an expert government body that Congress specifically entrusted with the task of fashioning appropriate remedies for antitrust violations. The court's ruling on defendants' proffered remedies usurped the Commission's special authority.

2.  The court likewise committed reversible error in its treatment of the FTC's alternate theory of liability, which was based on the framework for analyzing vertical mergers that the Supreme Court articulated in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962). The court skipped over the *Brown Shoe* functional factors in a perfunctory, single-paragraph analysis that failed to engage with the FTC's evidence and arguments, which raised sufficiently serious and substantial questions to merit relief.

3.a.  The court committed additional reversible errors too. First, the court failed to follow established precedent providing that the merging parties' self-interested statements of intent cannot negate a regulator's evidence of anticompetitive effects. Instead, the court relied

on testimony and out-of-court statements by Microsoft's executives concerning the company's "intent"; and it mistakenly treated those statements as evidence that the firm lacked economic incentives to foreclose its rivals. The court also erred by ignoring the clear unreliability of that evidence.

b. Second, the court erroneously held that the FTC cannot show partial foreclosure of rivals if the incentives for full foreclosure are not present. As the Supreme Court has recognized, there are advantages to partial foreclosure such that even a firm lacking incentives for full foreclosure may still engage in strategies designed to degrade rivals' products and services. And Microsoft's past conduct shows that partial foreclosure is distinctly likely here.

4. Finally, the district court erred in according no weight to the public equities favoring relief. The court ignored the public equities of effective enforcement of the antitrust laws and preserving the FTC's ability to order meaningful relief, when those were Congress's specific goals in enacting Section 13(b)'s provision for preliminary relief.

## STANDARD OF REVIEW

The Court reviews the grant or denial of a preliminary injunction for abuse of discretion. *FTC v. Enforma Nat. Prods.*, 362 F.3d 1204, 1211 (9th Cir. 2004); *Warner Commc'ns*, 742 F.2d at 1160. Accordingly, the Court reviews legal conclusions *de novo*, and factual findings for clear error. *FTC v. Consumer Def., LLC*, 926 F.3d 1208, 1211-12 (9th Cir. 2019).

Where the district court has "applied an incorrect legal standard," the Court's review is *de novo. Warner Commc'ns*, 742 F.2d at 1159.

## ARGUMENT

The FTC requests a preliminary injunction pursuant to Section 13(b) of the FTC Act,[1] which Congress enacted to preserve the FTC's ability to order meaningful relief upon completion of an administrative proceeding on the merits of an alleged violation of law. *See* H.R. Rep. 93-624, at 31 (1973) (Conf. Rep.), *reprinted in* 1973 U.S.C.C.A.N. 2417, 2533. "Section 13(b) places a lighter burden on the Commission than

---

[1] Section 13(b) provides that "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest … a preliminary injunction may be granted." 15 U.S.C. § 53(b).

that imposed on private litigants by the traditional equity standard."
*Warner Commc'ns*, 742 F.2d at 1159-60 (citing H.R. Rep. 93-624, 1973
U.S.C.C.A.N. 2533); *accord Affordable Media*, 179 F.3d at 1233 (Section
13(b) is a "more lenient standard.").

The district court misapplied this standard in a rushed decision
spurred by defendants' representations that a ruling after their
impending merger-termination deadline could scupper their deal. Just
days after the court's ruling, however, defendants negotiated an
extension of the deadline to October 18, 2023.

I. **THE DISTRICT COURT MISAPPLIED THE STANDARD FOR
PRELIMINARY RELIEF THAT SECTION 13(B) OF THE FTC
ACT SETS FORTH FOR FTC CASES**

A. **The District Court Erroneously Conflated
Section 13(b)'s Preliminary Injunction Standard
With the Clayton Act's Ultimate Merits Standard**

The core antitrust inquiry here is well settled. Section 7 of the
Clayton Act prohibits mergers "the effect of" which "may be
substantially to lessen competition." 15 U.S.C. § 18; *United States v.
Philadelphia Nat'l Bank,* 374 U.S. 321, 355 (1963). The goal of the
statutory prohibition is to arrest the anticipated anticompetitive effects
of mergers "in their incipiency." *United States v. E.I. du Pont de
Nemours & Co.,* 353 U.S. 586, 589, 597 (1957); *Warner Commc'ns*, 742

F.2d at 1160. The statutory language evinces Congress's concern with "probabilities, not certainties," and Congress's determination that the government need only show a "reasonable likelihood" of a substantial lessening of competition in a relevant market. *Brown Shoe Co. v. United States,* 370 U.S. 294, 323, 362 (1962); *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys. Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015).

Section 7's standard applies to all mergers, "horizontal, vertical, conglomerate, or other." *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967). In a vertical merger, the "primary vice" is foreclosure of competitors from segments of the market otherwise open to them. *Brown Shoe*, 370 U.S. at 323; *accord Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 720 (4th Cir. 2021). Because Section 7 requires only "a prediction" about a merger's impact, "doubts are to be resolved against the transaction." *FTC v. Elders Grain, Inc.,* 868 F.2d 901, 906 (7th Cir. 1989).

In FTC actions for preliminary relief under Section 13(b) of the FTC Act, the question before the court is much narrower: The FTC need only show some likelihood of success in the administrative proceeding (where the Section 7 standard will apply), and that the equities favor

24

relief. *Warner Commc'ns* , 742 F.2d at 1159. This Court has long held that the FTC meets the statute's "likelihood of success" prong by "rais[ing] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance." *Warner Commc'ns*, 742 F.2d at 1162.

Here, the district court erred by conflating Section 13(b)'s standard for a preliminary injunction with the permanent injunction standard under Section 7 of the Clayton Act. The court recited the proper Section 13(b) standard, Op. at 22-23 [1-ER-23-24], but when it turned to deciding whether the FTC had made a sufficient showing of likelihood of success, the district court inexplicably deviated from this Court's requirement that the FTC show only "serious questions" going to the merits, *Warner Commc'ns*, 742 F.2d at 1162.

For example, the court stated that "to establish a likelihood of success … the FTC must show … competition *would probably be substantially lessened*." Op. 33 [1-ER-34] (emphasis added). In other words, the court required the FTC to prove the likely effects of the merger—not just to raise serious questions about those effects. That is

incorrect: "At this stage, '[t]he FTC is not required to establish that the proposed merger would in fact violate section 7 of the Clayton Act'." *Penn St. Hershey*, 838 F.3d at 337 (quoting *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001) (alteration original)); *accord Whole Foods*, 548 F.3d at 1035 ("district court must not require the FTC to prove the merits"). Likewise, the court held that the outcome here "'turn[s] on whether, notwithstanding the proposed merger's conceded procompetitive effects, the [g]overnment has met its burden of establishing, through 'case-specific evidence,' that the merger of [Microsoft] and [Activision], at this time and in this remarkably dynamic industry, is likely to substantially lessen competition in the manner it predicts'." Op. at 31 [1-ER-32] (quoting *United States v. AT&T, Inc.*, 916 F.3d 1029, 1037 (D.C. Cir. 2019)) (alterations original). Yet *AT&T* involved not a preliminary injunction but a permanent injunction with the attendant higher standard of proof.

The same error infected other aspects of the district court's analysis. *See, e.g.*, Op. at 30 [1-ER-31] (relying on *AT&T* and other non-Section 13(b) cases); Op. 31 [1-ER-32] ("court must engage in a comprehensive inquiry") (quoting *AT&T*, 310 F. Supp. 3d at 190); Op.

26

46 [1-ER-47] (applying the *AT&T* merits standard). In short, the district court erroneously reached the antitrust merits under Section 7 of the Clayton Act. That is not the standard of proof in this Section 13(b) proceeding. Because the court "applied an incorrect legal standard," *Warner Commc'ns*, 742 F.2d at 1160, its decision should be reversed.

*Warner Communications*, the Court's seminal decision on the scope of judicial inquiry under Section 13(b), illustrates the proper approach and offers a telling contrast to the district court's flawed analysis. In that case, after concluding that the district court applied the wrong standard, 742 F.2d at 1160-62, this Court undertook its own analysis of whether preliminary relief was warranted. The Court acknowledged that the parties "presented conflicting evidence" on "the merger's probable effect on competition." *Id.* at 1162. It emphasized, however, that its "present task is not to make a final determination" but "only a preliminary assessment" of the merits. *Id.* (citing *Food Town*, 539 F.2d at 1344). After reviewing the record below, the Court concluded that the Commission had made "a tenable showing" of the merits; specifically, the Commission "met [the] burden of demonstrating a likelihood of success" under Section 13(b) by raising "serious

27

questions." *Id.* at 1164. The Court stressed it "d[id] not ignore" defendants' contrary evidence, but it reiterated that the inquiry on a request for preliminary relief under Section 13(b) is "a narrow one," intended to neither "resolve the conflicts in the evidence" nor "undertake an extensive analysis of the antitrust issues." *Id.* at 1164.

Here, the district court found there was "conflicting evidence on the anticompetitive effects of the merger." Op. 52 [1-ER-53]. Under *Warner*, that finding was sufficient to show that the FTC met its burden of showing the requisite likelihood of success. The court's contrary holding was reversible error.

### B. The FTC Has Marshalled Compelling Evidence That the Merger May Substantially Lessen Competition

The FTC presented ample evidence to show that the merger likely would fundamentally restructure the gaming industry and may result in substantial lessening of competition in multiple relevant antitrust markets, including the United States markets for multi-game subscription services, cloud gaming services, and high-performance consoles. That evidence was enough to meet the Commission's burden here.

## 1. Microsoft's incentives to foreclose

The record contains considerable evidence pointing to Microsoft's economic incentives, post-merger, to foreclose its rivals. Microsoft's past conduct following similar acquisitions—like its 2021 purchase of ZeniMax, another major independent publisher of games—plainly demonstrates Microsoft's inclination, after acquiring gaming content, to make that content exclusive to Microsoft's platforms. ZeniMax's games, like Activision's, were platform-agnostic. Hr'g Tr. 91:2-13 [2-ER-150]. And as with Activision, ███████████████████████████

████████████████████████████████████████████████████

██████████. Hr'g Tr. 235:9-16 [3-ER-285]. Microsoft also argued to antitrust regulators, just as it did here, that its interests were in offering ZeniMax's games across multiple platforms. PX9036 at 22 [3-ER-294]; PX1651 at 125-29 [3-ER-434-38]; PX0070 at 7 [3-ER-459]. Nevertheless, after the deal closed, Microsoft made future ZeniMax content—including AAA titles like *Starfield, Redfall*, and *Elder Scrolls VI*— exclusive to its platforms. PX4334 at 1 [3-ER-389]; PX4309 at 1 [3-ER-393]; Hr'g Tr. 243:12-244:3, 240:11-25 [3-ER-286, 289-90]; PX7012 at 426:7-20 [3-ER-361]; PX0027 at 4 [3-ER-463]. In doing so, Microsoft

prioritized ██████████████████████████████ PX1471 at 19

[3-ER-450]. As Microsoft Gaming's CFO testified, ████████████

████████████████████████████████████████████

██████████████████████ PX7007 at 167:25-168:5 [3-ER-363-

64]. Of 24 games released by the studios that Microsoft acquired since

2018, only six were released on other platforms (four due to preexisting

commitments and two released before the relevant acquisition was

final). PX0027 at 2-4 [3-ER-461-63]; PX7053 at 29:8-21 [3-ER-342];

PX7031 52:1-53:13, 66:24-67:15 [3-ER-352].

Microsoft's strategy of acquiring content and making that content

exclusive to its platforms has been particularly pronounced in the cloud

gaming market, where Microsoft has a "first mover" advantage and

"continue[s] to lead in the fast-growing cloud gaming market." Hr'g. Tr.

838:10-23 [2-ER-102]. Microsoft has refused to put its content, whether

acquired or developed in-house, on rival cloud gaming services. Hr'g Tr.

66:8-19 [2-ER-147]; PX4351 at 1 [3-ER-386] (Head of Xbox Game

Studios on such a possibility: "[N]o effing way."). Consistent with that

strategy, ████████████████████████████████████████

████████████████████████████████████████████

██████████, PX8000 at 12 [3-ER-324], ████████████████████

████████ PX4351 at 2 [3-ER-387]. Foreclosure of rivals is a core

Microsoft strategy to maintain its already-dominant position atop this

nascent, paradigm-shifting digital market.

Microsoft's incentives to foreclose is undergirded by its ability to

recoup losses on Activision's revenue after the merger. In January 2022,

Microsoft conducted an internal analysis to determine whether the

combined firm could recoup the potential loss of Activision's revenue

from games sold on Sony's PlayStation. Microsoft concluded that it

could—via a combination of increased GamePass subscriber growth and

a shift of Activision sales from PlayStation to Xbox. PX4359 at 1-3 [3-

ER-382-84]; Hr'g Tr. 1008:6-1010:2, 1017:8-19, 1024:8-1026:12 [3-ER-

70-72]. Microsoft Gaming's CFO testified that such recoupment options

would be both "reasonable" and "achievable." Hr'g Tr. 1028-29 [3-ER-73-

74]; PX4472 at 1 [3-ER-381].

### 2. Lessening of competition in the multi-game subscription market

Activision has made some of its content available on multi-game

subscription services, such as older *Call of Duty* titles on Sony's service,

PlayStationPlus. Hr'g Tr. 748:17-21 [2-ER-87]; PX3378 at 40 [2-ER-

194]. Activision's CEO also testified that Activision could offer its games on other subscription services going forward. Hr'g Tr. 749:18-750:25 [2-ER-88-89]. In 2020, for example, Activision held discussions with Microsoft to add Activision content to GamePass, but commercial terms were not agreed upon. Hr'g Tr. 751 [2-ER-90].

Microsoft's gaining control of Activision likely would extinguish any chance that Activision titles will be offered on subscription services other than Microsoft's already dominant GamePass. As Microsoft conceded, Microsoft's strategy for GamePass is "to create a moat that nobody else can attack." Hr'g Tr. 67:19-68:5 [2-ER-148-49]. And as market participants testified, Microsoft's control of Activision's content would allow Microsoft ███████████████████████████████████ ████████████████████████████████████████ ██████████████████████████. PX8001 ¶41 [3-ER-310]. The FTC's expert, Dr. Lee, explained that content foreclosure would enhance Microsoft's market power in a segment where Microsoft already is the market leader, resulting in higher prices, lower quality, reduced product variety, and reduced innovation. PX5000 at 235-236 [3-ER-378-79].

32

### 3. Lessening of competition in cloud gaming

Microsoft is the runaway dominant provider in the rapidly growing cloud gaming market—a sector that Microsoft and others view as the "future of gaming." PX9012 at 6 [2-ER-186]; *see* PX8000 at ¶12 [3-ER-314]. Gaining control of Activision's content likely will entrench its dominant position and lead to a substantial lessening of competition at a critical juncture in this nascent market's development.

Absent the merger, an independent Activision likely would publish its content on multiple cloud gaming services. It has already made some content, including thirteen *Call of Duty* titles, available on Nvidia's service, GeForceNow, during beta testing between 2017-2020; and it was in discussions to make *Call of Duty* titles available on the commercialized version of GeForceNow just before the merger was announced. Hr'g Tr. 754:1-5, 755:18-25 [2-ER-93-94]; PX8000 ¶¶41, 43 [3-ER-320-22]; PX3104 at 18-20 [3-ER-411-13]. ████████████

████████████████████████████████████████

███. *Id.*; PX8000 ¶44 [3-ER-322]. ████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████. *Id*. ¶¶45-46 [3-ER-322].

Gaining consumer traction and scale is critical to competing effectively in the cloud gaming market. But that is difficult without premium (AAA) content—as Google's exiting the market has demonstrated, *see supra* 11-12. PX7035 at 154:18-155:5 [3-ER-350]. Thus, as Dr. Lee testified, Microsoft's foreclosure of rival cloud gaming providers from Activision's content likely will lead to consumer harm in the form of higher prices, lower quality, less product variety, and reduced innovation. PX5000 at 235-236 [3-ER-378-79].

### 4. Lessening of competition in the console market

Microsoft's full or partial foreclosure of Activision's content would leave consumers with fewer or worse options in the console market than would prevail absent the merger. Consumers who now play Activision's games on PlayStation would be forced to choose between buying an Xbox console or forgoing Activision titles (or, in the case of partial foreclosure, playing an inferior or delayed version of those titles). The FTC's economic expert, Dr. Lee, quantified some of that harm, showing that making Activision's content exclusive to Microsoft's Xbox would

████████████████████████████████████████████████

████████████████████████. PX5000 at 232 [3-ER-375].

The merger is also likely to harm innovation in the console market. Hardware manufacturers now collaborate with Activision to ensure a high-quality gaming experience for consumers. PX8001 ¶40 [3-ER-309-10]. Such collaboration requires the sharing of competitively sensitive information. PX8001 ¶40 [3-ER-309-10]; PX7053 at 34-35 [3-ER-343]; PX7006 at 135-137 [3-ER-366-68]. Post-acquisition, the prospect that such information could be used to benefit Microsoft's own products likely will reduce, if not eliminate, the incentives of rival platforms to collaborate with Activision—resulting in consumer harm. PX1486 at 2 [3-ER-446]; PX7014 at 175-78 [3-ER-358-59]; PX7053 at 34 [3-ER-343]. Indeed, competitors have indicated they likely would cease such information sharing with the merged entity. PX3378 at 9-11 [2-ER-191-93].

*     *     *

The FTC's robust evidentiary and legal showing should have been sufficient to establish a likelihood of success on the merits, given Congress's determination that preliminary relief must be "readily

available to preserve the status quo while the FTC develops its ultimate case." *Whole Foods*, 548 F.3d at 1036; *accord Penn St. Hershey*, 838 F.3d at 352. Instead, the district court concluded the FTC had not shown the requisite likelihood of success because the court believed that in the market for multi-game subscription services, a purported efficiency outweighed any harm to competition, and in the other two markets, Microsoft's proffered side-deals would remedy the merged firm's foreclosure of rivals. As we explain below, both conclusions rested on legal errors and deviated from the Section 13(b) standard.

### C. The District Court Erred in Ruling That a Purported Efficiency Negates the Foreclosure in the Market for Multi-Game Subscription Services

The district court committed reversible error when it refused relief despite finding that, in the multi-game subscription market, the proposed merger likely will lead to Microsoft's foreclosing rivals from Activision's gaming content.[2] The court "accept[ed] for preliminary injunction purposes it is likely *Call of Duty* will be offered exclusively on

---

[2] Contrary to the district court's assumption (Op. 47 [1-ER-48]), there is a reasonable likelihood that Activision, if it remains independent, will offer its titles on multi-game subscription services in the future. Hr'g Tr. 746:8-16; 748:9-16; 749:4-10; 751:13-21 [2-ER-85, 87-88, 90].

Game Pass, and not offered on rival subscription services." Op. 47 [1-ER-48]. That ruling amounts to finding a sufficient likelihood of lessening of competition, through foreclosure, to support relief. *See Ash Grove Cement Co. v. FTC*, 577 F.2d 1368, 1371 (9th Cir. 1978) (affirming Commission order condemning vertical merger).

"The primary vice of a vertical merger," the Supreme Court has held, "is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a 'clog on competition'." *Brown Shoe*, 370 U.S. at 323-24 (quoting *Standard Oil Co. of Cal. v. United States*, 337 U.S. 293, 314 (1949)). That is why Section 7 prohibits "vertical … mergers whose effect may tend to lessen competition in any line of commerce." *Id*. at 317.

Microsoft's proposed acquisition of Activision thus violates the statute if it may tend to lessen competition in *any* of the relevant markets. *Crown Zellerbach*, 296 F.2d at 812 ("[T]he word entitled to emphasis is 'any'.").

Rather than heeding this guidance and issuing the requested preliminary relief, the district court mistook the import of Microsoft's placing Activision content on *only* its own GamePass platform. The

court concluded, wrongly, that because "*Call of Duty* is not and never has been offered (in any significant sense) on a multigame library subscription service, … the merger has the procompetitive effect of expanding access to *Call of Duty*." Op. 47 [1-ER-48].

The district court's conclusion is erroneous in multiple respects. *First*, to the extent the court viewed Microsoft's offering of *Call of Duty* exclusively on GamePass as a procompetitive efficiency of the merger, the evaluation of such an efficiency should have been, at a minimum, deferred to the merits stage. No court before has held that efficiencies can immunize an otherwise anticompetitive merger from Section 13(b) preliminary relief. And for good reason. For starters, the very existence of such a defense is doubtful.

"The Supreme Court has never expressly approved an efficiencies defense to a § 7 claim" and, to the contrary, has "cast doubt on the defense" on multiple occasions. *St. Alphonsus*, 778 F.3d at 790. Courts thus "are skeptical that such an efficiencies defense even exists." *Penn St. Hershey*, 838 F.3d at 347-48; *accord St. Alphonsus*, 778 F.3d at 790 ("[W]e remain skeptical about the efficiencies defense in general and about its scope in particular."). *See Procter & Gamble*, 386 U.S. at 580

("Possible economies cannot be used as a defense to illegality."); *United States v. Anthem*, 855 F.3d 345, 353 (D.C. Cir. 2017) ("[I]t is not at all clear that [merger efficiencies] offer a viable legal defense to illegality under Section 7."). Leading antitrust scholars likewise have cautioned against recognizing an efficiencies defense. *St. Alphonsus*, 778 F.3d at 790.

Regardless, any consideration of efficiencies must occur after the merger's nature and scope of harm have been determined, because the court must evaluate whether the proffered efficiencies are sufficient to outweigh that harm. But the determination of harm is properly reserved for the merits—not the preliminary injunction—proceedings. *Heinz*, 246 F.3d at 725 (FTC established a likelihood of success for preliminary relief purposes, although at the merits stage the Commission "may accept … [an] efficiencies defense, and permit the merger to proceed").

*Second*, the court should have subjected any proffered efficiencies to a far more rigorous analysis to "ensure that those 'efficiencies' represent more than mere speculation and promises about post-merger behavior." *Heinz*, 246 F.3d at 721. Efficiencies must "create a more

39

efficient combined entity *and thus increase competition*," not simply provide "better service" to defendant's customers or "improve []  operations." *St. Alphonsus*, 778 F.3d at 790, 792; *accord Penn St. Hershey*, 838 F.3d at 349.

Defendants advancing an efficiencies defense thus bear the burden to "clearly demonstrate" that their proffered efficiencies are cognizable, verifiable, merger-specific, and, in the end, sufficient to offset the merger's likely adverse effects. *St. Alphonsus*, 778 F.3d at 790; *accord FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 176 (3d Cir. 2022); *Heinz*, 246 F.3d at 720-21. And courts that recognize the defense may exist apply very close scrutiny to efficiency claims, especially in markets that are already highly concentrated. *St. Alphonus*, 778 F.3d at 790-91; *Penn St. Hershey*, 838 F.3d at 349 (efficiencies require "demanding scrutiny").

Microsoft's proffered efficiency meets none of these conditions. The district court cited as support for its procompetitiveness conclusion the view of Microsoft's expert, Dr. Carlton, that "adding [*Call of Duty*] to Game Pass will result in an increase in the number of Game Pass users," and, "will actually lower costs for many game consumers." Op.

47 [1-ER-48] (citing RX5056 ¶144, 141-142 [3-ER-481-83]). Even assuming *arguendo* that those claims are true, that hardly shows such benefits can enhance competition or can be accomplished *only* via the proposed merger (i.e. be "merger-specific."). As this Court has emphasized, "[i]t is not enough to show that the merger would allow [the merged firm] to better serve [consumers]." *St. Alphonsus*, 778 F.3d at 791. "The Clayton Act focuses on competition, and the claimed efficiencies therefore must show that the prediction of anticompetitive effects from the prima facie case is inaccurate." *Id.*

Here, Activision's CEO testified that Activision has not added its content to Microsoft's GamePass because the parties have yet to agree on the commercial terms, Hr'g Tr. 751:22-25 [2-ER-90], ███████████ ████████████████████████ PX7006 at 204:13-18 [3-ER-370]. The merger, in other words, is not the only way to add Activision's content to Microsoft's platform. The proffered efficiency thus is not merger-specific.

*Third*, the district court had it backwards when it faulted the FTC's expert, Dr. Lee, for not providing a quantitative analysis of "how many" consumers will "subscribe to Game Pass because of *Call of Duty*"

41

and "how it will affect competition with [Microsoft's] Game Pass competitors." Op. 48 [1-ER-49]. The burden to "clearly demonstrate" that proffered efficiencies are valid, verifiable, and sufficient to offset the likely harm is on *the merging parties*—not the FTC. *St. Alphonsus*, 778 F.3d at 790; *Hackensack*, 30 F.4th at 175-76; *Penn St. Hershey*, 838 F.3d at 350; *Heinz*, 246 F.3d at 720-21. The merging parties provided no such analysis, and that should have been an additional reason for rejecting those purported benefits.

*Fourth*, the district court improperly resolved evidentiary conflicts against granting relief when the law calls for the opposite. The court cited to evidence purportedly showing that, absent the merger, Activision will not contract to put its content on subscription services. Op. 48 [1-ER-49]. But the record contained ample contrary evidence that the court simply ignored. The court ignored that Activision's content already had been available on rival subscription services in the past. PX2189 at 15 [3-ER-420]; PX3381 at 7-8 [3-ER-400-01]. Multiple *Call of Duty* titles were available on Nvidia's GeForceNow, for example, from June 2017 to February 2020. PX8000 ¶41 [3-ER-320-21].

███████████████████████████████████████████████████



. PX8000 ¶¶43-45 [3-ER-321-22].

. PX3381 at 9-10 [3-ER-402-403].

. PX2419 at 4 [3-ER-418].

The district court simply ignored this evidence, erroneously ruling that the FTC did not identify *any* evidence on this point. Op. 49 [1-ER-50]. *See Whole Foods*, 548 F.3d at 1035 (The district court must decide motion based on "all the evidence before it, from the defendants as well as from the FTC."). The district court thus effectively "resolve[d] the conflicts in the evidence" against granting preliminary relief—contrary to this Court's guidance in *Warner Communications*, and other courts' holdings that, in FTC merger challenges, doubts in the evidentiary record are "to be resolved against the transaction," *Penn St. Hershey*, 838 F.3d at 337; *Elders Grain*, 868 F.2d at 906.

*Fifth*, the court erroneously deemed granting consumers access to Activision's content via *only* Microsoft's own subscription service as self-evidently procompetitive. Op. 47 [1-ER-48]. As discussed above, Microsoft's GamePass is already the dominant multi-game subscription service, and the addition of Activision's key content to that service is certain to greatly enhance Microsoft's power in that market. There exists a clear risk, therefore, that such "expanded access" will be controlled post-merger by what may effectively become a monopolist in that market,[3] and at the cost of forgoing competitive expansions by other firms absent the merger. *See St. Alphonsus*, 778 F.3d at 790-92. The relevant antitrust comparison is how *competition* may unfold with or without the merger. *See United States v. General Dynamics Corp.*, 415 U.S. 486, 503-04 (1974); *Ash Grove*, 577 F.2d at 1379. Microsoft's purported expansion of consumer access, on only its own GamePass, is anything but certain to be procompetitive. *See Ford Motor Co. v. United States*, 405 U.S. 562, 569-70 (1972) (rejecting consideration of merger's

---

[3] As the D.C. Circuit has cautioned, "it would be inimical to the purpose of the [antitrust laws] to allow monopolists free reign to squash nascent, albeit unproven, competitors at will—particularly in industries marked by rapid technological advance and frequent paradigm shifts." *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001).

"beneficial effect in making [defendant] a more vigorous and effective competitor" when merger "aggravated an already oligopolistic market.").

These multiple errors in the district court's analysis of the multi-game content library market warrant reversal.

### D. The District Court Impermissibly Relied on Defendants' Proposed Remedies to Deny Relief

The district court also committed a fundamental legal error in its analysis of the markets for cloud gaming services and consoles: It wrongly relied on Microsoft's post-complaint side deals with third parties, which purported to resolve the merger's likely foreclosure of rivals. *See Hospital Corp. of Am. v. FTC,* 807 F.2d 1381, 1384 (7th Cir. 1986) (Posner, J.) (even FTC's *merits* proceeding was "not required to take account of a post-acquisition transaction that may have been made to improve [defendant's] litigating position").

As an initial matter, the merging parties' proffered remedies are relevant only to the question of what relief is appropriate after a merits determination of liability. *See Whole Foods*, 548 F.3d at 1034 (considering the "remedy necessary to undo the effects of the merger" premature where "neither court nor agency has found acquisition

[unlawful]"). Proposed remedies should not be considered at the preliminary injunction stage, where a limited record and truncated schedule preclude the rigorous vetting necessary to ensure that defendants' proposals would actually remedy the adverse competitive effects. *Whole Foods*, 548 F.3d at 1033. Moreover, here, the crafting or acceptance of any remedy should have been left for the merits proceeding before the FTC, an agency designated by Congress to serve as an expert body on the appropriate remedies for antitrust law violations. The court should not have usurped that role, much less on a partial record and while rushing to issue a decision because of an artificially "compressed" timeline, Op. 53 [1-ER-54].[4]

### 1. The district court relied on Microsoft's side deals to find no likelihood of success

The district court expressly relied on Microsoft's side deals when finding that the FTC showed no likelihood of success on the merits in two of the three relevant markets under consideration. *First*, in the

---

[4] The district court's rush to issue its decision because of defendants' artificial "termination date" admittedly deprived it of the time for a rigorous analysis of all the issues presented. *See* Op. 53 [1-ER-54]. *See Whole Foods*, 548 F.3d at 1041 ("the court should have taken whatever time it needed to consider the FTC's evidence fully").

cloud gaming market, the district court held that the FTC's likelihood of success "is foreclosed by Microsoft's post-FTC complaint agreements with five cloud-streaming providers." Op. 49 [1-ER-50]. Relying on these agreements, the court concluded the merger will "enhance, not lessen, competition in the cloud-streaming market." *Id.*

*Second*, in the market for high-performance consoles, the district court's principal reasons for finding that Microsoft had no incentives to foreclose its rivals were the agreements (and even mere offers) that Microsoft made "upon the merger's announcement." Op. 33 [1-ER-34].[5] The court cited Microsoft's *post hoc* deal with Nintendo to bring one Activision game, *Call of Duty*, to the Switch console, Op. 34 [1-ER-35]— although the court earlier found that the console market under consideration did *not* include Nintendo's Switch, Op. 27-28 [1-ER-28-29]. And it cited Microsoft's *post hoc* discussions with Valve (owner of Steam, a PC game store) and Sony, as well as Microsoft's offers to keep

---

[5] The court also cited Microsoft's "deal plan evaluation," Op. 34-35 [1-ER-35-36], which it later found "not dispositive of the incentive question," Op. 44 [1-ER-45]; and self-interested testimony of Microsoft's executives, Op. 35-36 [1-ER-36-37], who were repeatedly impeached on the stand to the point that one needed to retract his prior testimony. *See infra* note 11.

Activision's *Call of Duty* alone on their platforms. Op. 33-34, 38 [1-ER-34-35, 39].

The district court's reliance on Microsoft's proffered remedies was thus central to its denial of preliminary relief—and was clear legal error. *See Warner Commc'ns*, 742 F.2d at 1162 (reliance on improper evidence "not harmless").

> **2.    Proposed remedies cannot be considered at the preliminary relief stage of merger analysis**

As discussed, Section 13(b) proceedings are meant to be preliminary in nature, with "questions going to the merits" left for "determination by the FTC in the first instance." *Warner Commc'ns*, 742 F.2d at 1162. This is doubly true when the merits questions concern a defendant's proposals for remedying a merger's adverse effects.

Proposed remedies should be considered only after a finding of liability, at the remedy stage of the subsequent merits proceeding. *See United States v. Greater Buffalo Press, Inc.*, 402 U.S. 549, 556 (1971) (noting that trial court, having found no liability, "naturally did not reach the question of remedy"); *cf. United States v. Microsoft Corp.*, 253 F.3d 34, 80 (D.C. Cir. 2001) (*en banc*) (*per curiam*) (acknowledging

"Microsoft's concerns over causation," but noting "these queries go to questions of remedy, not liability"). And for good reason: Without a final determination of the nature, scope, and even magnitude of a merger's impact on competition, it would be impossible to properly assess whether any proposed remedies would in fact be appropriate and sufficient to neutralize that adverse impact. Because a Section 13(b) preliminary injunction proceeding cannot even reach the question of liability, much less accurately determine the scope and magnitude of a merger's effects, a court deciding only temporary relief plainly cannot resolve what the appropriate remedy would be if a violation of the law were ultimately found. *See Food Town*, 539 F.2d at 1345 (FTC entitled to Section 13(b) relief regardless of what the "ultimate remedy" in administrative adjudication might be).

The district court erroneously relied on *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961), and *United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019), to reject the FTC's argument that a "proposed remedy" may not be considered until after a liability finding at the merits proceeding. Op. 39 [1-ER-40]. But neither of these cases involved a Section 13(b) proceeding. Both concerned a

49

permanent injunction, where the government had to prove the ultimate merits, and thus consideration of the proposed remedies was appropriate because liability was also determined in the same proceeding.

Moreover, proposed remedies, which by definition concern competitive measures outside the scope of the merger itself, cannot receive less scrutiny than merger-specific efficiencies. Yet that is exactly what the district court did below. As discussed, this Court has "cast doubt" on whether merger-specific efficiencies should factor into even the ultimate determination of a merger's legality. *St. Alphonsus*, 778 F.3d at 788-89; *see supra* at 38-39. If such doubt is applied to efficiencies, even at the merits stage, at least comparable skepticism should be applied to remedial measures that were proffered only after a merger challenge. And as with efficiencies, remedies are best considered at the merits stage of the analysis, when the exact nature and scope of harm is determined—not during proceedings for preliminary relief under Section 13(b).

This case exemplifies why courts should not assess defendants' proposed remedies at a preliminary stage of adjudication. Long after

50

the merger was announced, Microsoft hastily executed contracts with
Nintendo, Nvidia, and three cloud gaming providers to supply
Activision content for their platforms. RX1212 [3-ER-514-17]; RX1211
[3-ER-518-33]; RX1221 [3-ER-507-13]; sRX1222 [3-ER-497-506];
RX1245 [3-ER-488-96].[6] These agreements were expressly negotiated as
part of a strategy to influence the determination of the merger's
legality: ████████████████████████████████████████████
████████████████████████████████████████████. *See, e.g.,*
RX1211 at 1 [3-ER-518]. ████████████████████████████████████
████████████████████████████████████████████████████████
████. ECF_180-3 [3-ER-534-39]; PX7069 at 28:18-29:12 [2-ER-188-89].

Nonetheless, the district court accepted Microsoft's third-party
deals as negating any concerns about Microsoft's foreclosure of rivals.
Op. 18-19 [1-ER-19-20]. But these agreements (and mere offers) were
never vetted by the FTC[7] and never subjected to any analysis even by

---

[6] Microsoft also proffered a mere letter of intent with a fourth firm,
British Telecom's EE Limited, RX3027 [3-ER-484-87].

[7] The FTC was unable to obtain discovery from most of these firms,
and Microsoft's own witnesses were unable to answer even simple
questions about their deal partners, suggesting their current market
significance is minimal or non-existent. *See, e.g.*, PX7028 at 236 [3-ER-

Microsoft. Hr'g Tr. 933:18-934:20, 1046:8-1047:2 [2-ER-55-56, 74-75].

Further, the court acknowledged the side deals were "not guaranteed."

Hr'g Tr. 1115:19-1116:2 [2-ER-76-77]. Under these circumstances, the

agreements could not serve as a basis for denying relief. As the

Supreme Court has recognized, "all doubts as to the remedy are to be

resolved in [the Government's] favor." *DuPont*, 366 U.S. at 334; *see*

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 99 (D.D.C. 2017) (actions

taken "to avoid antitrust scrutiny" have "little weight in predicting" the

combined firm's post-merger conduct).

　　Moreover, even a cursory review of these agreements and offers

shows they do not come close to undoing the lessening of competition

that may result from this merger. First, by their own terms, and as the

district court acknowledged, the agreements do not *guarantee* rivals'

access to Activision's content. They include a complex web of onerous

terms with which counterparties must comply to obtain access to

---

356] ("Q. ████████████████████████████████████████████ A.
████ . Q. ████████████████████████████████ A.
██ ."); PX7050 at 53:2-7 [3-ER-348] (████████████████████████
████████████████), 234:8-14 ████████████████████████████████); *see*
*also* PX7055 at 139:22-140:21, 200:9-14 [3-ER-336, 338]; Hr'g Tr. 182:6-
7 [2-ER-152].

Activision's games. ███████████████████████

███████████████████████████████████████

██████████████████. *See, e.g.*, PX1781 at 4 [3-ER-424]. ████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████ *See,*

*e.g.*, PX1781 at 10 [3-ER-426]; Hr'g Tr. 202:6-22 [2-ER-156]. ████████

███████████████████████████████████████

██████████████████████ PX7060 at 128:19-129:03 [3-ER-333].

Even if they were "guaranteed," it is far from evident these

agreements would constitute a sufficient remedy. The Nintendo deal,

for example, certainly does not; that agreement calls for Microsoft to

release *Call of Duty* on Switch, which is not even in the high-

performance console market the court analyzed, and ████████████

███████████████████████████████████████

████████████████████████████████. PX7065 at

132:2-8, 164:12-168:5 [3-ER-329-31].

The deficiency in the district court's analysis of Microsoft's side

deals is especially pronounced with respect to the cloud gaming market.

Four of Microsoft's five proffered deals are with *out-of-market* foreign providers—as Microsoft's own expert, Dr. Carlton, acknowledged.[8] Accordingly, their access to Activision's content is not likely to reduce— let alone eliminate—the harm to competition in the relevant geographic market here: The United States. Hr'g Tr. 894:17-895:22; PX7055 at 105:6-7, 140:14-21, 162:5-8 [3-ER-335-37]. And all five providers, including in-market Nvidia, operate a "bring-your-own-game" model that limits gamers to streaming only the games they have already purchased. PX8000 ¶28 [3-ER-317].

Tellingly, Microsoft's own expert, Dr. Carlton, neither attempted to quantify the purported benefits from these agreements, nor considered whether they would have any impact in the United States, leading the district court to strike his testimony concerning these agreements as irrelevant. Hr'g Tr. 1115:19-1116:2 [2-ER-76-77]. Nonetheless, the court went on to hold that these agreements cured all anticompetitive concerns in the cloud gaming market. Op. 49 [1-ER-50].

---

[8] Boosteroid is located in Ukraine, Ubitus is in Taiwan, and Nware is in Spain. British Telecom's EE, located in England, appears to not even offer cloud gaming services and has not announced any plans to do so. *See* Tom Warren, *Is Microsoft Getting Ready to Add PC Games to Xbox Cloud Gaming*, THE VERGE (Apr. 11, 2023).

The district court also cited Microsoft's mere offer to Sony (Op. 38 [1-ER-39]), which suffers from the same flaws as the executed deals.



. PX3378 at 17-19 [3-ER-405-07].

*Id*. at 19 [3-ER-407]. And Microsoft's pricing offer for Sony's subscription service was

. PX7053 at 63:16-24, 70:13-23 [3-ER-345-46].

### 3. The district court should have deferred to the FTC's expertise in antitrust remedies rather than evaluating the side deals itself

The district court further erred in granting dispositive weight to Microsoft's proffered remedies because the merits proceedings in this case are to be held before the Commission: The government agency that Congress has designated as the expert body for fashioning appropriate remedies for antitrust violations. Evaluation of the side deals thus should have been left to the Commission.

Section 11 of the Clayton Act grants the Commission the power to order relief for violations of that statute "in the manner and within the

time fixed by said order." 15 U.S.C. § 21(b). Likewise, the Supreme Court has long recognized that under Section 5 of the FTC Act, the Commission is "clothed with wide discretion in determining the type of order that is necessary to bring an end to the unfair practices found to exist." *FTC v. Nat'l Lead Co.*, 352 U.S. 419, 428 (1957); *accord Atl. Refining Co. v. FTC*, 381 U.S. 357, 376 (1965) (FTC has "wide discretion in its choice of a remedy."). *See, e.g.*, *Olin Corp. v. FTC*, 986 F.2d 1295, 1307 (9th Cir. 1993) (divestiture order within FTC's "properly exercised discretion"); *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 573 (6th Cir. 2014) (same); *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 442 (5th Cir. 2008) (same); *L.G. Balfour Co. v. FTC*, 442 F.2d 1, 23 (7th Cir. 1971) (The "choice of the remedial order is committed to the discretion of the Commission.").

The Supreme Court has recognized that Congress "placed the primary responsibility for fashioning [antitrust] orders upon the Commission." *Nat'l Lead*, 352 U.S. at 429. As the Supreme Court has explained, Congress, in passing the FTC Act, "felt that courts needed the assistance of [those] trained to combat monopolistic practices in the framing of judicial decrees in antitrust litigation." *FTC v. Cement*

*Institute*, 333 U.S. 683, 726 (1948); *accord Hospital Corp.*, 807 F.2d at 1386.[9] The Supreme Court thus "named the Commission" as "'the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed'." *Nat'l Lead*, 352 U.S. 428 (quoting *Jacob Siegel Co. v. FTC*, 327 U.S. 608, 612-13 (1946)).

Indeed, the Commission's special role in fashioning antitrust remedies extends even beyond the cases brought by (and before) the agency itself. In Section 7 of the FTC Act, Congress authorized the district courts, in equitable lawsuits brought by the Department of Justice, and upon a finding of liability, to "refer said suit to the Commission, as a master in chancery, to ascertain and report an appropriate form of decree therein." 15 U.S.C. § 47.

The district court usurped that core Commission power. It decided for itself—in preliminary proceedings, on a limited record, and rushing

---

[9] Judge Posner observed that "[o]ne of the main reasons for creating the Federal Trade Commission and giving it concurrent jurisdiction to enforce the Clayton Act was that Congress distrusted judicial determination of antitrust questions. It thought the assistance of an administrative body would be helpful in resolving such questions and indeed expected the FTC to take the leading role in enforcing the Clayton Act." *Hospital Corp.*, 807 F.2d at 1386.

against artificial time constraints—that Microsoft's proposed remedies were sufficient to undo any harm from the merger. Moreover, it did so without the Commission's vetting of those supposed remedies or even a final determination of the nature and extent of that harm. The district court's evaluation of the proposed remedies was reversible legal error.

## II. THE DISTRICT COURT ERRED IN DISMISSING THE SUPREME COURT'S *BROWN SHOE* LIABILITY FRAMEWORK

The district court further erred in failing to properly apply the Supreme Court's *Brown Shoe* framework for assessing vertical merger foreclosure. 370 U.S. at 328-34.[10] *See United States v. Am. Cyanamid Co.*, 719 F.2d 558, 567 (2nd Cir. 1983) (*Brown Shoe* provides the "standard framework of analysis" for vertical mergers.). *Brown Shoe* and its progeny provide an alternative analytical framework to the "ability and incentive to foreclose" analysis which the district court employed, Op. 32-33 [1-ER-33-34]. The Supreme Court in *Brown Shoe* set forth a multifactor analysis for assessing Section 7 liability in the

---

[10] The court faulted the FTC for not referencing *Brown Shoe* in its opening or closing arguments, Op. 50 [1-ER-51], but the FTC relied on this framework throughout the proceeding. *See, e.g.*, ECF_7 (FTC Mo. for TRO) at 17-18 [3-ER-541-42]; ECF_309 (FTC Final Proposed Findings of Fact & Conclusions of Law) at 170-71, 174, 179-83 [3-ER-276-83].

context of vertical mergers, including considerations such as the size of the share of the market foreclosed, the nature and economic purpose of the transaction, any trends toward concentration in the industry, and barriers to entry. 370 U.S. at 328–34. *See, e.g.*, *Ford Motor*, 405 U.S. at 566-70; *Am. Cyanamid*, 719 F.2d at 567. *See also Fruehauf Corp. v. FTC*, 603 F.2d 345, 352 (2nd Cir. 1979) (*Brown Shoe* is "the fountainhead of § 7 analysis of vertical mergers.").

The district court dismissed that theory in a single paragraph, claiming that its ability and incentive analysis had already addressed the FTC's arguments. Op. at 50 [1-ER-51]. That is incorrect.

As an initial matter, the court skipped over whether the potential foreclosure of Activision's AAA content from Microsoft's current and future rivals would be more than *de minimis*—a factor it was required to consider under *Brown Shoe*. 370 U.S. at 328.

The court also failed to adequately address the "nature and purpose" of this vertical merger—which the Supreme Court identified as the "most important … factor to examine." *Brown Shoe*, 370 U. S. at 329. The Supreme Court has explained that if a vertical arrangement resembles "a tying contract" then the arrangement "is inherently

59

anticompetitive" in nature, and "likely substantially to lessen competition although only a relatively small amount of commerce is affected." *Id.* at 330 (internal quotation marks and citations omitted). Here, the district court acknowledged that the merger will likely result in tying the ability to play Activision's games to the use of Microsoft's platforms. The district court recognized that "it is likely *Call of Duty* will be offered exclusively on Game Pass, and not offered on rival subscription services." Op. at 47 [1-ER-48]. Yet it dismissed this "most important" factor to the antitrust analysis, *Brown Shoe*, 370 U. S. at 329, as merely "true in any vertical merger." Op. 51 [1-ER-52]. The court thus erroneously concluded that "the record does not support a finding of a serious question as to whether *Call of Duty* Game Pass exclusivity will probably substantially lessen competition in the subscription services market." Op. at 47 [1-ER-48].

Further, although the district court recognized that the FTC's proffered application of *Brown Shoe* included the acquisition's effect on barriers to entry, Op. 50 [1-ER-51], the court failed to analyze that factor at all. The FTC showed that high entry barriers already exist in all three markets, *see* ECF_309 ¶¶679-701 [3-ER-272-275]; that entry or

growth is difficult without access to AAA gaming content, *e.g.*, PX7035 at 154:18-155:5 [3-ER-350]; and that Microsoft will deny rivals access to Activision's AAA content in the multi-game subscription market. The district court's failure to address entry barriers at all, for *any* of the relevant markets, was reversible error. *E.g.*, *Am. Cyanamid*, 719 F.2d at 566-67 (reversing lower court for failure to apply *Brown Shoe*, including the "barriers to entry" factor).

Lastly, the district court committed legal error regarding the "trend toward concentration" factor. Despite apparently finding that such a trend was present, the court insisted on separate proof that the trend is itself "anticompetitive." Op. 51 [1-ER-52] (FTC "fails to explain how this trend is anticompetitive here."). That is not the law. *Warner Commc'ns*, 742 F.2d at 1162-63 (identifying "industry trends toward concentration" as a "[f]actor[] to consider," without requiring separate showing that trend is itself anticompetitive). The relevant question is whether the challenged acquisition—not the industry trend—is anticompetitive. A trend toward consolidation is a factor that can indicate that a merger may lessen competition; it is evidentiary, not an

additional basis for liability. *E.g.*, *Miss. River Corp.*, 454 F.2d 1083, 1092 (8th Cir. 1972).

## III. THE DISTRICT COURT COMMITTED OTHER REVERSIBLE ERRORS

### A. Microsoft's Incentives to Foreclose Cannot Be Negated by Its Executives' Stated Intent Not to Do So

The district court erroneously discounted the FTC's showing of Microsoft's post-merger incentive to foreclose rivals in the relevant markets, instead improperly relying on testimony and out-of-court statements by Microsoft's executives that they had no intent to foreclose. First, as a matter of law, statements of good intentions do not preclude Section 7 violations. *DuPont*, 353 U.S. at 607. Second, the circumstances in which those statements were made render that evidence unreliable anyway.

As discussed above, *supra* 29-31, the FTC proffered ample evidence showing that Microsoft's post-merger incentives point to a likelihood of foreclosure in all three markets under consideration. The evidence focused on the firm's economic incentives, as the law and common sense require. The central presumption in antitrust law is that firms seek to maximize profits, which is why "good motives will not

validate an otherwise anticompetitive practice." *Cal. Dental Ass'n v. FTC*, 224 F.3d 942, 948 (9th Cir. 2000) (internal quotation marks and citation omitted); *accord Miss. River*, 454 F.2d at 1089 ("Honest intentions, business purposes and economic benefits are not a defense to violations of an antimerger law."). Indeed, unless specific intent is required as an element of the claim, such as for claims of conspiracy or attempts to violate the antitrust laws, evidence of intent is relevant only to the extent it helps illuminate the anticompetitive effects at issue. *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602-03 (1985); *accord Microsoft*, 253 F.3d at 59.

Notwithstanding these principles, the district court erroneously gave dispositive weight to Microsoft's purported intent not to foreclose. The court characterized Microsoft's post-complaint side deals as "inconsistent with an intent to foreclose." Op. at 34 [1-ER-35]. It relied on testimony from Microsoft's executives that "there are no plans to make *Call of Duty* exclusive to Xbox" to support finding a lack of *incentive* to do so. Op. at 35 [1-ER-36]. And it faulted the FTC for (supposedly) not presenting documentary evidence "contradict[ing]

Microsoft's stated intent not to make *Call of Duty* exclusive to Xbox consoles." Op. 36 [1-ER-37]. This focus on legally irrelevant considerations is a reversible error.

The district court's error was amplified by the inherently unreliable nature of the evidence of intent on which the court relied. Statements by the merging parties' executives, whether in- or out-of-court, have "little probative value" when they "involve promises or speculations about the employees' future, post-merger behavior." *AT&T*, 916 F.3d at 1045.[11] "[E]vidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight." *Hospital Corp.*, 807 F.2d at 1384. Indeed, evidence "is deemed of limited value whenever such evidence *could arguably* be subject to manipulation." *Chicago Bridge*, 534 F.3d at 435 (emphasis original); *accord Aetna*, 240

---

[11] Worse yet, the merging parties' executives were repeatedly impeached at the court hearing, and one even recanted his prior testimony. *See, e.g.*, Hr'g Tr. 348:24-352:3 [2-ER-132-36] (Microsoft Gaming CEO recanting deposition testimony); Hr'g Tr. 273:2-274:12, 274:18-275:19, 290:15-292:18, 292:20-293:18, 300:11-301:21, 304:15-305:14, 315:24-317:10, 333:20-336:3, 347:22-348:23, 355:17-356:19 [2-ER-112-20, 123-24, 126-32, 137-38] (Microsoft Gaming CEO impeached); Hr'g Tr. 998:3-999:13 [2-ER-67-68] (Microsoft Gaming CFO impeached); Hr'g Tr. 737:21-739:9, 744:18-745:25, 751:5-751:19, 753:10-25, 756:1-757:8, 761:1-762:7 [2-ER-80-84, 90, 92, 95, 97-98] (Activision CEO impeached).

64

F. Supp. 3d at 80-88 (little weight accorded to post merger business decision because decision was deemed "a strategy to improve [defendant's] litigation position").

Here, the evidence showed that the merged firm likely will have structural economic incentives to foreclose. Regardless of the veracity of executive testimony concerning the merged firm's intended plans, current plans can change—as with the ZeniMax deal that was pursued with no publicly stated plans for foreclosure—and executives can leave the firm, with their replacements having different business priorities or strategies. The merged firm's economic incentives, in contrast, remain constantly tied to the market's competitive dynamic. The district court's heavy reliance on unreliable evidence of intent is a reversible error.

**B.    Partial Foreclosure Is Likely Even Absent the Incentives for Full Foreclosure**

The district court failed to properly evaluate the FTC's argument that the merger is likely to lead to partial foreclosure in the relevant markets.[12]

---

[12] The court mistakenly faulted the FTC for omitting that theory from "its original moving papers." Op. 45 [1-ER-46]. In fact, partial foreclosure was part of both the complaint (ECF_1 ¶¶117-125) [3-ER-

Partial foreclosure refers to anticompetitive strategies that are more subtle than outright denial of access. Examples include timed exclusivity, where Microsoft would delay release of Activision content on rival platforms; and content degradation, where Microsoft would degrade the performance, gameplay, or features of Activision games on rival platforms by delaying or failing to make software updates. PX5000 at 181 [3-ER-374]; Hr'g Tr. 54:16-21 [2-ER-144]. Activision's CEO testified that different game features can be made available on one platform but not another, and that these variations can be used for marketing. Hr'g Tr. 728:7-18 [2-ER-79]. Indeed, because of the risk of partial foreclosure, ███████████████████████████████ ███████████████████████████████████████████ ███. PX1015 at 27 [3-ER-457].

The district court rejected the FTC's partial foreclosure theory of harm on the mistaken view that "[i]f the FTC has not shown a financial incentive to engage in full foreclosure, then it has not shown a financial incentive to engage in partial foreclosure." Op. 45 [1-ER-46]. That is

_____

554-56], and the original motion for relief, ECF_7 at 20-22 [3-ER-544-46].

simply incorrect. The Supreme Court has held that a vertical merger may violate Section 7 despite the merged firm being financially incentivized to engage in only partial foreclosure. *DuPont*, 353 U.S. at 605. *See, e.g.*, *United States v. Sybron Corp.*, 329 F. Supp. 919, 928-29 (E.D. Pa. 1971) (same).[13] Even assuming *arguendo* that the FTC failed to show a likelihood of total foreclosure here, partial foreclosure remains likely, and indeed would be less costly for the merged firm, because Microsoft would not be giving up all revenues from the withheld content. *See* Steven Salop & Jennifer Sturiale, *Vertical Merger Enforcement in the Draft Merger Guidelines*, PROMARKET (July 28, 2023) (partial foreclosure is "generally more profitable than total denial").

The district court further erred when it concluded that "the record does not include any evidence Microsoft has engaged in such conduct [involving partial foreclosure] in the past." Op. at 46 [1-ER-47]. In fact, there was ample evidence. Following the ZeniMax acquisition, Microsoft

---

[13] Leading economists agree on this bedrock principle. *E.g.*, Jonathan B. Baker, Nancy L. Rose, Steven C. Salop & Fiona Scott Morton, *Five Principles for Vertical Merger Enforcement*, 33 Antitrust 12, 13 (2019) ("foreclosure" encompasses variety of ways to disadvantage rivals).

Gaming's CFO stated that although Microsoft was not withholding ZeniMax content from rivals (no full foreclosure), Microsoft "want[ed] that content in the long run to be either first or better or best or pick your differentiated experience on our platform." Hr'g Tr. 955-56 [2-ER-60-61] (discussing PX9192); *accord* Hr'g Tr. 957 [2-ER-62]. "First," he added "could mean showing up first on a Microsoft platform as compared to another platform," as it did with ZeniMax's *Starfield*. Hr'g Tr. 958 [2-ER-63]. And "better" could refer to better resolution, safety, security or other features, versus Microsoft's rivals. Hr'g Tr. 960 [2-ER-65]. Microsoft Gaming's CFO confirmed that the ZeniMax titles *Starfield* and *Redfall* were introduced on Microsoft's Xbox first, "so we're following through on the things I said there." Hr'g Tr. 961 [2-ER-66]. This evidence flatly contradicts the district court's finding of no proof that Microsoft had engaged in partial foreclosure strategies.

The district court's failure to address the FTC's arguments and evidence regarding partial foreclosure is reversible error.

## IV. THE DISTRICT COURT ERRED IN ACCORDING NO WEIGHT TO THE PUBLIC EQUITIES THAT FAVOR RELIEF

Under Section 13(b), once the FTC has raised "serious questions" concerning the antitrust merits, it may obtain a preliminary injunction

upon a showing that the balance of equities favors granting such relief.
15 U.S.C. § 53(b); *Affordable Media*, 179 F.3d at 1233; *Warner Commc'ns*, 742 F.2d at 1165. In weighing the equities, "public equities receive far greater weight," and "private equities alone do[] not justify denial of a preliminary injunction." *Id*. Public equities include the effective enforcement of the antitrust laws and preserving the FTC's ability to order meaningful relief in its merits proceedings. *Id*. In this analysis, courts "must place great weight on the public interest in blocking a possibly anticompetitive merger before it is complete." *Whole Foods*, 548 F.3d at 1050-51 (Tatel, J., concurring).

The district court's application of the relevant legal standard (Op. 52 [1-ER-53]) was faulty in multiple respects. First, the court turned the equities inquiry on its head. Once the FTC has demonstrated a sufficient likelihood of ultimate success, that "'creates a presumption in favor of preliminary injunctive relief.'" *Whole Foods*, 548 F.3d at 1035 (quoting *Heinz*, 246 F.3d at 726); *accord*, *Penn St. Hershey*, 838 F.3d at 352. The merging parties then "may rebut that presumption … by showing equities weighing in favor of the merger." *Whole Foods*, 548 F.3d at 1035 (citing *FTC v. Weyerhaeuser Co.,* 665 F.2d 1072, 1087 (D.C.

Cir. 1981)); *accord Heinz,* 246 F.3d at 727; *Elders Grain,* 868 F.2d at 903. The district court thus should have started its analysis of the equities by presuming preliminary relief was warranted. Instead, the court wholly ignored the presumption and faulted the FTC for not, in the court's view, sufficiently proving that the equities favor relief.

At any rate, the district court erred when, in ruling that the balance of equities does not favor preliminary relief, it placed too much weight on the merging parties' private interests in closing the deal before their self-imposed deadline and wholly ignored the strong public equities at stake. "'[T]he public interest in effective enforcement of the antitrust laws' was Congress's specific 'public equity consideration' in enacting [Section 13(b)]." *Whole Foods*, 548 F.3d at 1035 (quoting *Heinz,* 246 F.3d at 726). Yet here, the court gave no weight to this fundamental public interest. *See* Op. 51-52 [1-ER-52-53]. Once the FTC "raise[d] serious" questions about those merits, *Warner Commc'ns*, 742 F.2d at 1164, and the merging parties failed to demonstrate the existence of any public (rather than private pecuniary) interest in allowing the merger to close, the court should have issued a preliminary injunction.

70

Effective enforcement of the antitrust laws is not served by short-changing the FTC's ultimate merits proceeding.

Moreover, contrary to the court's suggestion, Op. 52 [1-ER-53], preserving the FTC's ability to order meaningful relief is not outweighed by a contractual provision keeping *Call of Duty* on PlayStation for another year. The merger's impact goes far beyond one game franchise and one platform competitor. That *Call of Duty* will remain available on PlayStation for a little longer says nothing about Activision's other content or about Microsoft's foreclosure of rivals in other relevant markets, including for multi-game library services and for the cloud subscription services that, according to Microsoft itself, constitute the "future of gaming." In the end, an effective divestiture after the parties have merged can be "exceedingly difficult" or even impossible. *See Warner Commc'ns*, 742 F.2d at 1165; *Whole Foods*, 548 F.3d at 1033-34.

Further, the merger likely will permit Microsoft to take other, practically irreversible actions that harm competition. The merging parties can immediately begin sharing confidential data, including strategic and long-term plans. Microsoft's post-merger ability to access

confidential data of rivals that now is in the possession of Activision cannot be undone if the merger proves unlawful. *See, e.g.*, *Filtrol Corp. v. Slick Corp.*, No. 69-607-ALS, 1969 WL 219, at *8 (C.D. Cal. Dec. 29, 1969), *aff'd*, 428 F.2d 826 (9th Cir. 1970) (preliminarily enjoining vertical merger). That very risk likely will cause competitors to cease sharing confidential information with the merged firm. PX3378 at 11 [2-ER-193]. These concerns are particularly acute in nascent, technology-driven markets like the ones at issue here, where early harm to competition can have an outsized impact on how these markets develop.

Likewise, the merged firm can immediately start exclusivity plans akin to Microsoft's post-merger conduct following the ZeniMax deal. The district court itself found that "it is likely *Call of Duty* will be offered exclusively on Game Pass, and not offered on rival subscription services." Op. 47 [1-ER-48]. The harm in that market will thus begin immediately upon consummation.

On the other hand, the only reason defendants offered for allowing the merger to proceed before the merits are adjudicated was the July 18, 2023, merger termination date. Op. 51 [1-ER-52]. But that proved to

be an artificial deadline, which the merging parties readily extended

days after the court issued its rushed decision. *See supra* at 14-15.

In sum, the court improperly allowed a privately negotiated

contract term to tip the balancing of equities when defendants made no

showing that pausing the merger would deprive *consumers* of any

immediate benefit, or that allowing the merger to close immediately

was critical to any other public equity. As this Court has recognized,

"private equities alone" are not enough to warrant denying relief.

*Warner*, 742 F.2d at 1165. Such private harms "would result if any

merger is enjoined on the eve of its consummation; yet Congress

enacted § 13(b) authorizing injunctive relief," signaling that "it thought

that little weight should be given to them." *Food Town*, 539 F.2d at

1346; *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991)

(cost to parties of delaying the transaction has "little weight" in

balancing of equities); *accord Whole Foods*, 548 F. 3d at 1041-42; *Heinz*,

246 F.3d at 726. In sharp contrast to these cases, here the district court

gave dispositive weight to purely private interests—in an equities-

balancing analysis that is supposed to give primary consideration to

public interests.

The district court's failure to account for these public equities favoring relief warrants a reversal of its denial of relief.

## CONCLUSION

The Court should reverse the decision below and enjoin the proposed acquisition by Microsoft of Activision pending the outcome of the administrative adjudication.

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6(c), the FTC is aware of another case pending in the Court involving the same transaction at issue in this case. *DeMartini et al v. Microsoft Corp.*, No. 23-15846, involves private appellants seeking reversal of the district court's denial of their motion for a preliminary injunction against Microsoft's acquisition of Activision.

Respectfully submitted,

HOLLY VEDOVA
*Director*

JOHN NEWMAN
*Deputy Director*

SHAOUL SUSSMAN
*Associate Director for Litigation*

JAMES H. WEINGARTEN
PEGGY BAYER FEMENELLA
JAMES ABELL
CEM AKLEMAN
MEREDITH R. LEVERT
JENNIFER FLEURY
*Attorneys*

BUREAU OF COMPETITION

ANISHA S. DASGUPTA
*General Counsel*

MARIEL GOETZ
*Acting Director of Litigation*

/s/ Imad Abyad

IMAD D. ABYAD
*Attorney*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-3579
iabyad@ftc.gov

*Counsel for*
*Federal Trade Commission*

75

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 8 – CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

### 9th Cir. Case Number(s) _____23-15992_____

I am the attorney or self-represented party.

**This brief contains 13,860 words,** including -0- words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[**X**] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____/s/ Imad Abyad_____ **Date** _August 9, 2023_
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I certify that on August 28, 2023, I filed the foregoing with the

Court's appellate CM/ECF system. Counsel for defendants-appellees are

registered users of the Court's appellate CM/ECF system.


Date: August 28, 2023

/s/ Imad Abyad
IMAD D. ABYAD
*Attorney*
FEDERAL TRADE COMMISSION