No. 23-15992

# United States Court of Appeals
# for the Ninth Circuit

———————

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellant,*

v.

MICROSOFT CORP. AND ACTIVISION BLIZZARD, INC.,

*Defendants-Appellees.*

———————

Appeal from an Order of the
U.S. District Court for the Northern District of California
No. 3:23-cv-02880-JSC, Hon. Jacqueline Scott Corley

———————

**DEFENDANTS'-APPELLEES' ANSWERING BRIEF
[REDACTED]**

———————

Jonathan E. Nuechterlein
C. Frederick Beckner III
William R. Levi
Daniel J. Hay
Lucas Croslow
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
william.levi@sidley.com

Beth Wilkinson
Rakesh N. Kilaru
   *Counsel of Record*
Anastasia M. Pastan
Jenna H. Pavelec
WILKINSON STEKLOFF LLP
2001 M Street, N.W., 10th Floor
Washington, D.C. 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
rkilaru@wilkinsonstekloff.com

*Counsel for Defendant-Appellee Microsoft Corp.*
[Additional Counsel Listed on Inside Cover]

Steven C. Sunshine
Julia K. York
Evan Kreiner
Michael Sheerin
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
Telephone: (202) 371-7000
Facsimile: (202) 393-5760
steven.sunshine@skadden.com

Grant Dixton
ACTIVISION BLIZZARD, INC.
2701 Olympic Blvd Bldg B
Santa Monica, CA 90404
Telephone: 310-255-2000
Grant.Dixton@activision.com

*Counsel for Defendant-Appellee
Activision Blizzard, Inc.*

Adam B. Banks
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8419
adam.banks@weil.com

*Counsel for Defendant-Appellee
Microsoft Corp.*

## **CORPORATE DISCLOSURE STATEMENT**

Under Federal Rule of Appellate Procedure 26.1, Defendants-Appellees state as follows:

Defendant-Appellee Microsoft Corp. ("Microsoft") is a publicly held company that has no parent corporation, and no publicly held corporation owns 10% or more of more of its stock.

Defendant-Appellee Activision Blizzard, Inc. ("Activision") is a publicly held company that has no parent corporation, and no publicly held corporation owns 10% or more of its stock.


September 6, 2023 /s/ Rakesh N. Kilaru
*Counsel for Microsoft Corp.*


/s/ Steven C. Sunshine
*Counsel for Activision Blizzard Inc.*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. ii

TABLE OF AUTHORITIES ..................................................... vi

JURISDICTIONAL STATEMENT ................................................ 1

INTRODUCTION ........................................................... 1

ISSUE PRESENTED ........................................................ 6

STATEMENT OF THE CASE .................................................. 6

I.     Factual Background .................................................. 6

     A.    The Gaming Industry ........................................... 6

     B.    Xbox's Position ................................................. 8

     C.    This Merger ................................................... 14

II.    Procedural History ................................................. 16

     A.    Nature of the Case ............................................. 16

     B.    The District Court's Opinion .................................... 19

     C.    Post-Decision Developments .................................... 23

SUMMARY OF ARGUMENT ................................................ 25

STANDARD OF REVIEW .................................................. 31

ARGUMENT ............................................................. 31

I.    The District Court Correctly Applied the Controlling Legal
     Standard. .......................................................... 31

II.    The District Court Correctly Found No Plausible Claim of
     Competitive Harm in the Putative Subscription and Cloud-
     Gaming Markets. .................................................. 37

A.   The FTC's Claims About Both Markets Rest on a False Premise About Standalone Activision's Plans .................... 38

B.   The District Court Did Not "Find Foreclosure" in Multi-Game Subscription Services or Credit an "Efficiencies Defense." ......................................... 40

III.  The District Court Correctly Found No Serious Question of Competitive Harm in the Console Market. ................... 44

A.   The FTC Failed to Establish that Microsoft Has Any Incentive to Withhold *Call of Duty* from Sony. ................... 45

1.   The FTC Fails to Show Clear Error in the District Court's Fact-Bound Conclusions .............................. 45

2.   The FTC Does Not Seriously Contest the District Court's Rejection of the Economic Testimony that Was the "Lynchpin" of Its Case. ............................... 48

B.   The FTC Failed to Show that Withholding *Call of Duty* from Sony Would Likely Harm Competition. ..................... 51

C.   The FTC Cannot Save Its Case with a Later-Added Partial Foreclosure Theory. .................................. 54

IV.  The District Court Correctly Considered Microsoft's Binding Contracts with Competitor Platforms. .......................... 56

V.   The District Court Did Not Abuse Its Discretion by Rejecting the FTC's *Brown Shoe* Theory. ..................................... 61

VI.  The District Court Correctly Found that the Equities Provided an Independent Reason to Deny the Motion ................ 64

A.   The FTC Has Forfeited Any Argument the Merger Could Not Be Unwound. ...................................... 65

B.   The Balance of Equities Overwhelmingly Favor Microsoft. ..................................................... 67

CONCLUSION ...................................................... 70

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Axon Enter., Inc. v. FTC,*
  986 F.3d 1173 (9th Cir. 2021), *rev'd on other grounds*, 598
  U.S. 175 (2023) .................................................................... 17

*Beech Aircraft Corp. v. United States,*
  51 F.3d 834 (9th Cir. 1995) ................................................... 39

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962) ........................................................ 29, 62

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) .............................................................. 43

*Cascadia Wildlands v. Thrailkill,*
  806 F.3d 1234 (9th Cir. 2015) ............................................... 31

*Craftsmen Limousine, Inc. v. Ford Motor Co.,*
  363 F.3d 761 (8th Cir. 2004) ................................................. 50

*Disabled Rights Action Comm. v. Las Vegas Events, Inc.,*
  375 F.3d 861 (9th Cir. 2004) ................................................. 25

*Epic Games, Inc. v. Apple Inc.,*
  67 F.4th 946 (9th Cir. 2023) ................................................. 61

*Fruehauf Corp. v. FTC,*
  603 F.2d 345 (2d Cir. 1979) ...................................... 43, 62, 63

*FTC v. Arch Coal, Inc.,*
  329 F. Supp. 2d 109 (D.D.C. 2004) ....................... 33, 57, 65

*FTC v. Atl. Richfield Co.,*
  549 F.2d 289 (4th Cir. 1977) ................................................. 32

*FTC v. Dean Foods Co.,*
  384 U.S. 597 (1966) .............................................................. 65

*FTC v. Exxon Corp.*,
636 F.2d 1336 (D.C. Cir. 1980) .......................................................... 32

*FTC v. Foster*,
2007 WL 1827098 (D.N.M. May 30, 2007) ........................................ 17

*FTC v. Great Lakes Chem. Corp.*,
528 F. Supp. 84 (N.D. Ill. 1981) ......................................................... 66

*FTC v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) ...................................................... 35, 65

*FTC v. Lab'y Corp. of Am.*,
2011 WL 3100372 (C.D. Cal. Mar. 11, 2011) ............................... 33, 66

*FTC v. Libbey, Inc.*,
211 F. Supp. 2d 34 (D.D.C. 2002) ...................................................... 57

*FTC v. Meta Platforms Inc.*,
2023 WL 2346238 (N.D. Cal. Feb. 3, 2023) ........................... 32, 33, 35

*FTC v. Pharmtech Rsch., Inc.*,
576 F. Supp. 294 (D.D.C. 1983) ......................................................... 67

*FTC v. RAG-Stiftung*,
436 F. Supp. 3d 278 (D.D.C. 2020) ........................................ 33, 35, 57

*FTC v. Steris Corp.*,
133 F. Supp. 3d 962 (N.D. Ohio 2015) ................................................ 33

*FTC v. Sysco Corp.*,
113 F. Supp. 3d 1 (D.D.C. 2015) .............................................. 32, 57, 66

*FTC v. Thomas Jefferson Univ.*,
505 F. Supp. 3d 522 (E.D. Pa. 2020) ............................................ 33, 35

*FTC v. Univ. Health, Inc.*,
938 F.2d 1206 (11th Cir. 1991) .......................................................... 35

*FTC v. Warner Commc'ns Inc.*,
742 F.2d 1156 (9th Cir. 1984) ........................... 3, 25, 31, 32, 34, 35, 67

*FTC v. Weyerhaeuser Co.,*
665 F.2d 1072 (D.C. Cir. 1981) .................................................. 16, 69

*FTC v. Whole Foods Mkt., Inc.,*
548 F.3d 1028 (D.C. Cir. 2008) ......................................................... 33

*Husain v. Olympic Airways,*
316 F.3d 829 (9th Cir. 2002) ............................................................ 47

*Lektro-Vend Corp. v. Vendo Co.,*
660 F.2d 255 (7th Cir. 1981) ............................................................ 57

*McWane, Inc. v. FTC,*
783 F.3d 814 (11th Cir. 2015) .......................................................... 51

*In re Mercury Interactive Corp. Sec. Litig.,*
618 F.3d 988 (9th Cir. 2010) ...................................................... 43, 67

*Paddock Publ'ns, Inc. v. Chi. Trib. Co.,*
103 F.3d 42 (7th Cir. 1996) ........................................................ 52, 53

*Pierce v. Cnty. of Orange,*
526 F.3d 1190 (9th Cir. 2008) .......................................................... 31

*Rothenberg v. Sec. Mgmt. Co.,*
667 F.2d 958 (11th Cir. 1982) .......................................................... 25

*Saucillo v. Peck,*
25 F.4th 1118 (9th Cir. 2022) .......................................................... 37

*Tillamook Country Smoker, Inc. v. Tillamook Cnty.*
*Creamery Ass'n,*
465 F.3d 1102 (9th Cir. 2006) .......................................................... 65

*United States v. Anthem, Inc.,*
855 F.3d 345 (D.C. Cir. 2017) .......................................................... 42

*United States v. AT&T, Inc.,*
916 F.3d 1029 (D.C. Cir. 2019) .............................................. 56, 57, 64

*United States v. Burnette,*
698 F.2d 1038 (9th Cir. 1983) .......................................................... 44

*United States v. E.I. du Pont de Nemours & Co.*,
    366 U.S. 316 (1961) ................................................................. 58

*United States v. Greater Buffalo Press, Inc.*,
    402 U.S. 549 (1971) ................................................................. 58

*United States v. UnitedHealth Grp. Inc.*,
    630 F. Supp. 3d 118 (D.D.C. 2022) ........................... 46, 57, 64

*Wilbur v. Locke*,
    423 F.3d 1101 (9th Cir. 2005) ............................................... 25

## Statutes

15 U.S.C. § 53(b) ............................................................... 2, 16

15 U.S.C. § 53(b)(2) ................................................. 4, 25, 31, 35

## Other Authorities

Current Report (Form 8-K), Activision Blizzard, Inc. (July
    19, 2023), http://tinyurl.com/ynz9ccjv ............................... 24

Comm'ns Workers of Am, CWA Supports Microsoft's
    Proposed Acquisition of Activision-Blizzard (June 30,
    2022), https://cwa-union.org/news/releases/cwa-supports-
    microsofts-proposed-acquisition-of-activision-blizzard ..................... 69

EU Commission Press Release, *Mergers: Commission Clears
    Acquisition of Activision Blizzard by Microsoft, Subject to
    Conditions* (May 15, 2023),
    https://ec.europa.eu/commission/presscorner/detail/en/ip_2
    3_2705 .................................................................................. 60

Prepared Statement of the FTC Before the U.S. Sen. Comm.
    On the Judiciary (Oct. 7. 2015) ................................... 16, 36

## JURISDICTIONAL STATEMENT

Appellees concur in the FTC's jurisdictional statement. Br.3.

## INTRODUCTION

As this case comes to the Court, it involves a vertical merger between Microsoft and Activision—two companies that do not compete. The U.S. antitrust agencies have rarely sought to enjoin vertical mergers and have lost every recent case in which they tried. That is because vertical mergers are generally understood to be procompetitive and benefit consumers.

This merger is no exception. From the day it was announced, Microsoft made clear that it would make Activision's popular videogames more broadly accessible. This approach is good business for Microsoft: Its gaming console, Xbox, has been lagging in third place for decades, so its gaming division must distribute on many different platforms to have sustainable economic success. This approach is also good for consumers, who—in the FTC's own words—benefit from a more "open, competitive landscape[]" where "consumers are free to choose where and how to access their games." Br.1.

1

Despite these obvious benefits, the FTC sued to enjoin the merger under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). Over a five-day bench trial, Judge Corley heard testimony from 16 witnesses and considered every document the FTC selected from the millions it received during its fourteen-month investigation and six months of administrative litigation. After weighing all this evidence, Judge Corley denied a preliminary injunction in an exhaustive 53-page opinion.

The FTC's primary theory until appeal has been that Xbox would harm competition by withholding the videogame *Call of Duty* from Sony's PlayStation gaming console. Judge Corley rejected that argument on nine independent factual grounds. Now, the FTC has pivoted to focus on alleged harm in "the emerging subscription and cloud gaming markets . . . ." Br.1. But the FTC failed to introduce even basic evidence supporting these alternate theories, and Judge Corley rejected them on multiple independent factual grounds as well. She found (among other things) that Activision likely would not make *Call of Duty* available in those alleged markets absent this merger, such that the merger could only *increase* competition. These factual findings are

reviewed only for clear error, and should be the end of the matter, particularly since the FTC barely addresses them.

The FTC tries without success to transform its failures of fact into errors of law. Contra the FTC's suggestion, the district court properly applied Section 13(b) of the FTC Act. This Court's cases required the district court to consider whether the FTC has raised "questions going to the merits so serious, substantial, difficult and doubtful" as to portend likely success. *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984) (per curiam) (emphasis added). The court did just that, finding that "the FTC has not raised *serious questions* regarding whether the proposed merger is likely to substantially lessen competition in the console, library subscription services, or cloud gaming markets." 1-ER-52 (emphasis added).

In attacking the court's straightforward application of the law, the FTC reveals that its true purpose is to change the law to allow it to obtain a preliminary injunction essentially whenever it wants. The FTC faults the district court for citing cases that addressed antitrust challenges on the merits, rather than just Section 13(b) cases. But every court to consider a Section 13(b) case, including this Court, has done the

same thing, because the statute requires consideration of "the Commission's likelihood of ultimate success . . . ." 15 U.S.C. § 53(b)(2).

Similarly, the FTC claims that it was improper for the district court to consider all manner of relevant and probative evidence, including the likely real-world consequences of the merger, methodological shortcomings in the FTC's expert analysis, and the sworn testimony of senior company executives. No case suggests that Article III judges are rubber stamps for the FTC, duty-bound to ignore any evidence that harms the FTC's case.

The FTC likewise misses the mark in challenging the district court's consideration of the commercial contracts Microsoft has entered with its rivals to guarantee them access to *Call of Duty* for the coming decade. Those include agreements ensuring that new versions of *Call of Duty* will appear on Nintendo's platforms (which have not had it for a decade) as well as five cloud streaming services (which have never had it). To begin with, the district court's decision did not turn on those contracts; Judge Corley provided distinct reasons for her ruling that serve as adequate and independent grounds for affirmance. But there was also nothing wrong with considering this evidence, which

powerfully rebutted the FTC's foreclosure case. The law is clear that courts should compare the real world with a merger to the "but-for" world without it. No principle of law or logic requires courts instead to evaluate an artificial post-merger world where signed, binding contracts vanish. There is nothing sensible—or legally justified—about requiring courts to address imaginary problems and discouraging parties from reaching real-world, pro-competitive solutions.

Finally, the district court properly balanced the equities. The court found that a preliminary injunction would likely have "skuttl[ed]" this transaction, thereby depriving consumers of its benefits. 1-ER-52. By contrast, all the evidence at the hearing showed that the FTC could obtain effective post-consummation relief, including divestiture, in the unlikely event it ultimately prevails on the merits, 1-ER-52-53—facts the FTC failed to rebut in the district court and ignores on appeal.

No court has ever preliminarily enjoined a vertical merger under Section 13(b). The district court correctly declined to break new ground in this case, applying settled law to factual findings that the FTC does not meaningfully challenge. The Court should affirm.

## ISSUE PRESENTED

Whether the district court abused its discretion by denying the FTC's motion for a preliminary injunction.

## STATEMENT OF THE CASE

## I.     Factual Background

### A.     The Gaming Industry

Gaming is one of the fastest-growing industries in the world. *E.g.*, 1-ER-3, 6. Gaming is often associated with dedicated game-playing devices known as consoles; today, Sony's PlayStation 5 and Nintendo's Switch are the industry leaders, with Microsoft's Xbox console in third place. 1-ER-6. But console gaming now represents the smallest share of video game revenue, and that share is shrinking year-over-year. Gamers are instead shifting to play on personal computers (PCs) and, increasingly, mobile devices. 1-ER-5-6, 36. Mobile gaming is the fastest-growing industry segment, encompassing ▮ of gameplay today and ▮ projected by 2030. 1-ER-6; 3-SER-528-529.

Hundreds if not thousands of game studios develop games for these different platforms, and there is no one recipe for success. Hit games can come from anywhere; many popular games were unexpected

breakout successes by small studios, whereas many highly anticipated and well-funded games are busts. 1-SER-21; 1-SER-30; 1-SER-40.

Activision is one of dozens of game studios that publish video games for consoles and PCs, including *Call of Duty*, its flagship franchise. *See* 1-ER-11-14. *Call of Duty* games "are first-person shooter games based on military conflict through history." 1-ER-11 (quotation marks omitted). Since its first installment in 2003, "*Call of Duty* games have been continuously available on both PlayStation and Xbox . . . ." 1-ER-12. Despite *Call of Duty*'s success, Activision is not the biggest or most successful game publisher. In console gaming, Activision accounts for only 7.4% of videogame publishing revenues globally and ███ in the United States. 1-SER-169; 3-SER-544-548.

*Call of Duty* has "multiplayer" functionality: Different gamers can play the same game with one another via the internet or a local network connection. *Call of Duty* also permits "cross-play" between platforms. 1-ER-7. For example, an Xbox gamer, a PlayStation gamer, and a PC gamer can play *Call of Duty* with each other using their respective devices. These features play a major role in the game's popularity and commercial success—it has a broad community that transcends any

single gaming platform. *Id.*; *see* 1-ER-37 ("*Call of Duty*'s cross-platform play is critical to its financial success.").

Activision's portfolio is not limited to buy-to-play console games. For example, Activision offers free-to-play console versions of *Call of Duty* that gamers can play without paying anything up front. Activision also offers several popular mobile games. One is *Candy Crush*, which accounts for a substantial portion of Activision's total revenue. 1-ER-13. Another is *Call of Duty: Mobile*, which has more than 150 million monthly users. Both of these games can be downloaded for free.

## B. Xbox's Position

Xbox operates financially as a standalone business. But since its launch in 2001, Xbox has struggled to compete in all aspects of the industry. 1-ER-6. Xbox's console sales have always lagged its competitors, and its most recent console "has consistently ranked third (of three)" behind the Sony PlayStation and Nintendo Switch. *Id.*; 3-SER-530-533. Xbox also develops and publishes its own ("first party") games, but its game sales lag behind those of Nintendo, Sony, and Activision. *See* 1-ER-10-11.

Because Xbox has a smaller user base relative to its console rivals, it has to adopt different business strategies. For example, Sony's PlayStation has been the leading console both worldwide and in the U.S. for over two decades and through five console generations. 1-SER-184. Sony has leveraged that dominant position by developing a series of first-party, proprietary hits that can be played only on PlayStation—such as *God of War*, *The Last of Us*, and *Spider-Man*. 1-ER-10. It also provides generous incentives to third-party game developers to make their games either fully or partially exclusive to PlayStation. 1-ER-10-11.

Xbox's smaller share precludes it from following PlayStation's exclusivity strategy. Doing so would result in the loss of significant first-party game sales to PlayStation's much larger user base, and require crippling up-front payments to third-party developers to try to offset the substantial losses they would incur from foregoing that user base.[1] 1-SER-118-19. This approach would also stand at odds with

---

[1] To put the companies' different exclusivity strategies in context: "[t]he number of exclusive games available on PlayStation dwarfs the number available on Xbox, with *eight* exclusive games on PlayStation for every *one* on Xbox." 1-ER-10 (emphasis added).

Microsoft's multi-platform approach to software distribution. 1-SER-215-16.

As a result, when Microsoft has acquired studios that make games for multiple platforms, it has kept those games on multiple platforms. *See* 1-SER-21-22; 2-SER-310-311. The best example is *Minecraft*, which was available on multiple platforms (including PlayStation) when Microsoft acquired Mojang in 2014. 1-ER-38-39. At that time, *Minecraft*, like *Call of Duty*, was "an established multiplayer, multi-platform game with cross-play." *Id.* Post-acquisition, Microsoft not only maintained access to *Minecraft* on all existing platforms, but expanded access to new platforms (like Nintendo). *Id. Minecraft* is now "Microsoft's largest game by revenue." *Id.*

Xbox has also tried to innovate in game distribution models. In 2017, Xbox launched a subscription gaming service called "Game Pass," which allows subscribers to access a rotating collection of games for a single monthly fee as low as $9.99 rather than buying individual titles for as much as $70 each. 1-ER-15. Others have followed suit, including Sony, Nintendo, Electronic Arts, and Ubisoft. 1-ER-15-16. Many game publishers, particularly smaller independent publishers, value the

exposure that Game Pass affords—they are more likely to gain followers as part of a broad catalog than if people have to pay up front to play their game. *See, e.g.*, 1-SER-37-38 (140:15-141:16).

In an effort to make Game Pass more attractive, Xbox includes all of its new first-party games on the service from the moment of release. 1-ER-15. That is a unique approach in the industry. 1-ER-16. Most larger game publishers elect not to include their newest titles in subscription services—either close to their release date, or in many circumstances at all—because they are concerned about "significant cannibalization of buy-to-play revenues . . . ." 1-ER-16-17. For example, Sony never simultaneously releases its new first-party games on its subscription service, PlayStation Plus, because it makes more money by selling those games individually. 1-ER-15-16; *see* 1-SER-110.

Sharing Sony's view, "Activision does not allow, and has no plans to allow, its games in multigame subscription libraries upon release." 1-ER-17. To the extent Activision games have appeared on subscription services, it has only been old versions of their games, for limited windows of time, rather than the new versions most exciting to gamers.

1-SER-191, 197; *see* 1-SER-189-190 (explaining Activision's concerns about cannibalization).

Xbox also tried to innovate in game distribution by launching a cloud-gaming feature, xCloud, as part of the highest subscription tier of Game Pass (called Game Pass Ultimate). 1-ER-18. Cloud gaming, or game streaming, involves running games on remote hardware that gamers can access over the internet on a variety of different devices— similar to how video streaming services like Netflix operate. 1-ER-17.

In theory, cloud gaming allows gamers to play "on less highly-powered and more affordable devices," such as mobile devices or smart televisions. 1-ER-18. In practice, however, Xbox has not found a way to make this model profitable. 1-SER-263. Nor has it been able to solve the technical challenges unique to cloud gaming. Unlike watching videos, playing games is highly interactive. A gamer who pushes a button needs a consistent instantaneous response, particularly in competitive multiplayer settings. Xbox's cloud gaming feature, however, often subjects gamers to lags (or "latency") in transmission between their individual device and cloud hardware. 1-SER-39. As a result, Xbox's cloud gaming feature has had limited uptake, 1-ER-18-19, and a "large

majority" of users employ the feature only to stream a game while it is downloading onto their Xbox console, at which point they play natively. *Id.*

Other companies have experimented with cloud gaming, and some have had moderate success. For example, Nvidia, which manufactures high-end graphics chips for PCs and is one of the most valuable companies globally, has been able to leverage its hardware advantage to create a cloud streaming service for PC games, known as GeForce NOW. But many established industry players are skeptical. PlayStation's CEO "acknowledged [that] it is 'quite difficult' to provide a cloud platform that 'pleases customers,'" and "neither he, nor 'anybody in the world,' can know when cloud gaming 'will become a meaningful component of how gamers access games.'" 1-ER-19.

Activision has a similar view. Its "content is not currently on any cloud-streaming service," and "it is not likely to be available absent the merger." 1-ER-51. Activision fears that the poor user experience inherent in cloud gaming would harm its brand. 1-SER-124; 1-SER-185-86, 192.

**C.     This Merger**

Against this backdrop, on January 18, 2022, Microsoft announced an agreement to purchase Activision for $68.7 billion. 1-ER-4. Microsoft's motivations are simple. Xbox has little presence in the fast-growing mobile gaming segment. Activision does, and employs engineers who know how to develop and monetize popular mobile content. *See* 1-ER-13; 1-SER-185. Even post-merger, Microsoft would represent less than ▮ of this highly fragmented segment. 3-SER-541.

Microsoft also wants to acquire Activision's popular franchises, including *Call of Duty*, to ensure a reliable annual revenue source. 1-ER-35-36. Unlike most of Xbox's game franchises, there is a new *Call of Duty* released every year, and the game typically generates large sales across multiple different platforms, including PlayStation and PC. 1-ER-35-37. Microsoft counted on these revenue streams in getting approval from its Board of Directors for the acquisition—Activision's existing business constituted the majority of the deal value. Xbox also plans to bring *Call of Duty* to Game Pass for the first time, further expanding access to the game and hopefully improving Game Pass's attractiveness to consumers. 1-ER-48.

14

The merger agreement provided that either party could terminate it if the transaction had not closed by July 18, 2023 (the "termination date"). 1-ER-21. In that event, Microsoft would have been obligated to pay Activision a termination fee of $3 billion. *Id.*

In the nineteen months since the transaction was announced, regulators around the world have been closely reviewing it. And Microsoft has tried to accommodate any concerns—however speculative they might be. It was always Xbox's plan to increase access to *Call of Duty*, but normally, companies do not make deals involving an acquisition's assets until after the merger is completed. *See* 1-SER-45. Microsoft departed from that practice here to underscore its intent to turn its words into tangible post-closing action.

Accordingly, well before the trial, Microsoft signed a ten-year agreement to bring *Call of Duty* to the Switch for the first time ever (and to a Nintendo console for the first time since 2013). 1-ER-19. Microsoft also entered five separate ten-year agreements with cloud gaming providers—including Nvidia's GeForce Now service—to ensure that their customers can access all Xbox games, including Activision games. 1-ER-20. Microsoft also made an offer to keep *Call of Duty* on

Sony for a similar ten-year term, which Sony refused to sign until after trial. *See infra* pp.24-25.

## II.    Procedural History

### A.    Nature of the Case

Shortly after Microsoft announced the merger, the FTC opened an investigation. The investigative phase lasted a year and involved the production of nearly 3 million documents and 15 investigational hearings of senior company leadership. 1-ER-20-21.

The FTC's normal practice in challenging an unconsummated merger is to bring two actions simultaneously: an administrative "Part 3 proceeding," and a separate preliminary injunction proceeding in federal court to try to stop the merger until the Part 3 proceeding concludes. *See* 15 U.S.C. § 53(b). The federal court proceedings are almost invariably outcome determinative. A loss for the FTC in federal court normally causes it to abandon its Part 3 case.[2] By the same token, an FTC win typically "kill[s], rather than suspend[s], a proposed transaction," *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1087 (D.C. Cir.

---

[2] Prepared Statement of the FTC Before the U.S. Sen. Comm. On the Judiciary 14 (Oct. 7. 2015) ("FTC Statement").

1981). Part 3 proceedings are extremely lengthy, and "[i]t is often difficult or impossible for businesses to wait fourteen plus months while the FTC determines whether a merger is anti-competitive." *FTC v. Foster*, 2007 WL 1827098, at \*6 (D.N.M. May 30, 2007). The delay also comes with a dim prospect of success: The FTC Commissioners who issue a complaint historically side with themselves when adjudicating that complaint.[3] Because of the stakes, federal courts scrutinize the strength of the FTC's underlying antitrust claims. *See infra* Section I.

Had the FTC followed its traditional process, the district court would have had ample time to hold a preliminary injunction hearing ahead of the termination date. But the FTC did not. On December 8, 2022, the FTC filed only an administrative complaint. 2-ER-195. It waited to file this case until June 12, 2023, six months after its administrative complaint and just five weeks before the agreement's July 18th termination date. 1-ER-21; 3-ER-547.

---

[3] *See Axon Enter., Inc. v. FTC*, 986 F.3d 1173, 1187 (9th Cir. 2021) ("[The] FTC has not lost a single [administrative] case in the past quarter-century. Even the 1972 Miami Dolphins would envy that type of record."), *rev'd on other grounds*, 598 U.S. 175 (2023).

The FTC's strategic delay, however, did not impair the trial. The parties had agreed upon an expedited discovery schedule in the administrative proceeding, such that the case was trial-ready by June 2023. 1-ER-20-21. So just ten days after the complaint was filed, the district court commenced a five-day evidentiary hearing featuring hundreds of exhibits and 16 witnesses. While now characterizing the hearing as "rushed" (at 17, 23, 46, 57, 73), the FTC does not identify a single witness it could not call or document it could not introduce, nor did it raise any objection below to the timing or length of the hearing. *See* 3-ER-540 (asking for a hearing "[a]s soon as the matter may be heard"); *see also* 3-SER-473 (asking for a TRO no later than "June 15, 2023"). In fact, the parties left nearly a full day of trial time on the table. 1-SER-2.

At trial, the FTC focused almost exclusively on a putative "high-performance console" market consisting of Xbox and PlayStation (not Nintendo). It alleged that after the merger, Microsoft would withhold *Call of Duty* from PlayStation. 1-ER-2. The FTC largely ignored its other two putative markets—content-library subscription services and cloud-gaming services, 1-ER-25-26—presenting no meaningful economic

evidence with respect to either. Indeed, while the FTC's expert witness, Professor Robin Lee, had months to prepare his expert reports, he conducted no quantitative analysis of these services. 1-ER-48-51.

Trial testimony also made clear that the merger agreement would have collapsed had the district court issued the requested preliminary injunction, which would have lasted for the potentially multi-year duration of the FTC's administrative proceeding. In particular, Bobby Kotick, Activision's CEO, testified: "My board's view is that if the preliminary injunction is granted, that they don't see how the deal would continue." *See* 1-SER-187.

## B. The District Court's Opinion

On July 10, 2023, the district court denied a preliminary injunction. 1-ER-2. In its 53-page opinion, the district court found that no evidence supported, and overwhelming evidence refuted, the FTC's claims of likely harm to competition.

The court first addressed the FTC's principal claim that the post-merger company would likely withhold *Call of Duty* from PlayStation.[4]

---

[4] The court expressed doubts about, but assumed *arguendo* the validity of, the FTC's proposed market definitions. 1-ER-26-29.

*See* 1-ER-47 (finding the FTC "did not offer evidence" about "other Activision titles"). The court found, on the basis of eight independent factors, that Microsoft had no incentive to, and would not, pursue that strategy. 1-ER-34-41; *see* 1-ER-41 (describing "overwhelming" evidence). Among other considerations, the district court relied on:

- Microsoft's valuation model for the acquisition, which showed it would make no financial sense to pull *Call of Duty* from PlayStation, its largest and most profitable console customer base;

- Undisputed testimony that taking *Call of Duty* off PlayStation would cause Microsoft "irreparable reputational harm" and make the game less valuable for even Xbox gamers by dramatically shrinking the multiplayer community;

- Sworn testimony from Microsoft witnesses, including CEO Satya Nadella and Gaming CEO Phil Spencer, that "there are no plans to make *Call of Duty* exclusive to the Xbox";

- Microsoft's track record of acquiring *Minecraft*—a similarly popular cross-platform multiplayer franchise—and then expanding the game to new platforms;

- The absence of "any instance in which an established multiplayer, multiplatform game with cross-play, that is, a game that shares *Call of Duty*'s characteristics, has been withdrawn from millions of gamers and made exclusive"; and

- a candid admission by PlayStation's CEO that the acquisition is "not an xbox exclusivity play at all," and that Sony "will continue to see COD on PS for many years to come."

1-ER-34-37.

In addition to those factual findings, the court noted that Microsoft had contractually offered to make *Call of Duty* available to Sony, with "the same content, feature, and technical parity" to Xbox, for ten years on the same terms that Sony enjoyed pre-merger. 1-ER-39.[5] The court stressed, however, that this ninth factor was "not necessary to the Court's finding." *Id.*

The court also comprehensively reviewed the economic evidence. "The lynchpin" of the FTC's case was "the expert opinion of Professor Robin Lee . . . ." 1-ER-41. But that opinion was sorely lacking. As the court found, Dr. Lee's quantitative analysis of the merged firm's foreclosure incentives was based on a completely unsupported assumption. In his written direct, his cross-examination, and his re-direct, Dr. Lee did "[n]othing" to address this and other critiques identified by defendants' expert, Dr. Dennis Carlton. 1-ER-41-45. Likewise, "Prof. Lee did not engage in any quantitative analysis of partial foreclosure." 1-ER-46.

---

[5] ███████████████████████████████████████████████████████ *See infra* pp.24-25; 3-SER-501-518.

The court also rejected the FTC's barely-presented claims of likely harm to the putative subscription and cloud-gaming "markets." 1-ER-47-51. In both cases, the court found that Activision had not made its games available for either subscription or cloud-gaming services and was very unlikely to change that policy in the future as a standalone company. *See* 1-ER-50-51. That finding by itself refuted any claim of competitive harm: The merger will not deprive anyone of content otherwise available to them. But the court also found that "the record evidence points to *more* consumer access to *Call of Duty* and other Activision content," because Microsoft intends to place *Call of Duty* on Game Pass, and signed agreements to make *Call of Duty* available on Nintendo's Switch and five rival cloud-gaming platforms. 1-ER-39-40, 50, 54. In short, the world with the merger would feature much broader access to Activision content than the world without it.

The court thus concluded that the FTC had not "raised serious questions regarding whether the proposed merger is likely to substantially lessen competition," and thus "has not demonstrated a likelihood of ultimate success as to its Section 7 claim . . . ." 1-ER-52.

Although the court did not "need [to] proceed to the balance of equities question," it did so anyway and concluded that the equities weighed in favor of allowing the merger rather than "potential[ly] skuttling" it altogether by delaying consummation until the end of the lengthy administrative process. *Id.* The court noted that this "is a vertical acquisition," in which "Microsoft and Activision will act as parent and subsidiary," and thus does not raise the egg-scrambling concerns that often justify a preliminary injunction against horizontal mergers. 1-ER-53. Indeed, Microsoft plans to operate Activision as a limited-integration studio, as it has done with other previously-acquired studios. *Id.*; 2-SER-314; 1-SER-263.

## C.    Post-Decision Developments

The district court temporarily restrained Microsoft and Activision from closing the merger through July 14, 2023, to allow the FTC to seek appellate relief. 1-ER-54. Late on July 13, the FTC moved for injunctions pending appeal in the district court and then in this Court. Both motions were denied. 2-SER-299; Dkt.25.

Once these decisions eliminated a significant potential block to the transaction, Microsoft and Activision negotiated a three-month

extension on July 18, 2023, to accommodate remaining foreign regulatory review. Among other valuable concessions, Microsoft agreed to pay Activision shareholders a cash dividend of $0.99 per share and to increase its termination fee by up to 50% ($4.5 billion), and it waived its right to collect up to $500 million in revenue sharing from Activision if the deal is terminated. Current Report (Form 8-K), Activision Blizzard, Inc. (July 19, 2023), http://tinyurl.com/ynz9ccjv.

On July 20, 2023, the FTC suspended the underlying administrative proceedings for a determination of whether continuing them serves the public interest. 2-ER-56. To date, the FTC has taken no further action in the administrative proceeding.

Sony had been the principal complainant against this transaction and the primary alleged victim in the FTC's foreclosure theory. But after the FTC's court losses, Sony accepted Microsoft's █████ contract for *Call of Duty*. █████████████████████████████ ████████████████████████████████████████████ 3-SER-501-518. ████████████████████████████████ ██████████████████████████████████ ████ ████████████████████████████████████

24

██████████████████████ *Id.* ████████████████████

██ ██████████ ██████████████████████████████████████

████████████████████████████████████████████ *Id.*[6]

## SUMMARY OF ARGUMENT

1. To obtain a preliminary injunction under Section 13(b), the FTC
must demonstrate (among other things) its "likelihood of ultimate
success" on the merits. 15 U.S.C. § 53(b)(2). The district court faithfully
applied that standard, giving the FTC the benefit of the doubt on
multiple disputed issues and ultimately concluding that the FTC did
not "demonstrate[] a likelihood of ultimate success" because it failed to
"raise[] serious questions regarding whether the proposed merger is
likely to substantially lessen competition . . . ." 1-ER-52. That is
precisely what Section 13(b) requires. *See Warner*, 742 F.2d at 1162.

The FTC incorrectly claims that it was legal error for the district
court to look to the reasoning of Section 7 merits cases. The district

---

[6] The Court may take notice of the later-signed Sony contract to
affirm the decision below. *See, e.g.*, *Wilbur v. Locke*, 423 F.3d 1101, 1112
(9th Cir. 2005); *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*,
375 F.3d 861, 866 n.1 (9th Cir. 2004); *see also, e.g.*, *Rothenberg v. Sec.
Mgmt. Co.*, 667 F.2d 958, 961 n.8 (11th Cir. 1982) ("We are, however,
free to take judicial notice of subsequent developments in cases that are
a matter of public record and are relevant to the appeal.").

court simply followed the same path as the courts in all other Section 13(b) cases, citing Section 7 cases to help evaluate whether the FTC had shown a likelihood of ultimate success on the Section 7 merits. The FTC never explains how a court can make that necessary determination without considering what the FTC must ultimately prove. The FTC similarly departs from precedent in advancing the implausible suggestion that district courts must ignore any evidence that cuts against the FTC's case.

2.      The FTC's makeweight arguments about the legal standard underscore that its true complaint is with the district court's findings of fact. But the FTC identifies no error in those findings, much less clear error; indeed, the FTC conspicuously ignores most of the court's robust findings. *See, e.g.*, Br.7-14 (summary of facts without a single citation of the opinion); Br.28-36 (summary of purported evidence again without a single citation to findings below).

For example, the FTC did little at trial to support its theories regarding subscription and cloud-gaming services, theories the FTC stresses for the first time on appeal. The court found, as a matter of fact, that absent this merger, Activision would not make its games

26

available on such services, consistent with its longstanding historical practice. That fact precludes any foreclosure claim as to these services: it is meaningless to assert that a merger "forecloses" third parties by denying access to an input that they could not have obtained anyway.

The district court further found, again as a matter of fact, that the merger will expand output and enhance competition because the merged company *will* make Activision content available to at least one content-library subscription service (Game Pass) as well as multiple new cloud-streaming platforms. That outcome will benefit consumers by increasing access and enabling them, for the first time, to play new *Call of Duty* and other Activision games without buying them outright.

The FTC fails to turn these factual virtues into a legal vice. The FTC's claims that the district court found foreclosure and improperly accepted an "efficiencies defense" are untethered from reality. The district court simply compared its factual assessment of the world *with* the merger to its factual assessment of the world *without* the merger. That ordinary-course antitrust analysis established that the merger will cause *no competitive harm at all* and will in fact benefit consumers.

27

3.     The FTC makes no serious effort to show an abuse of discretion in the district court's rejection of its claims about the console market. 1-ER-6. At most, the FTC quibbles with some of the district court's factual findings, such as the weight it gave to testimony from Microsoft executives. But those are classic credibility determinations evaluated for clear error, and in any event provide no basis for setting aside the court's other, independently sufficient adverse findings of fact.

The FTC fares no better when challenging the district court's rejection of its late-raised "partial foreclosure" theory. As the court found, the FTC provided "no expert testimony to support" it and no evidence that any partial exclusivity policy would drive "enough PlayStation users to Xbox such that the benefits to the combined firm outweigh the costs." 1-ER-46.

Beyond these flaws, the FTC never showed—and still has not shown—potential harm to *competition*. Even if Xbox were to make *Call of Duty* fully or partially exclusive (against all the evidence), that would at most allow it to narrow (but not close) Sony's two-to-one lead in the console market. 1-ER-9. As the district court aptly found, the merger,

28

while "[p]erhaps bad for Sony," is "good for *Call of Duty* gamers and future gamers." 1-ER-40.

4.  The FTC ignores the law, the record, and common sense in assigning error to the district court's consideration of Microsoft's binding commitments to make *Call of Duty* available on Nintendo Switch and five rival cloud-gaming platforms, as well as the then-pending offer to sell *Call of Duty* on PlayStation for another decade. As the court made clear, its conclusions rested on independent and adequate factual grounds, so the FTC's complaint is irrelevant.

In any event, reliance on these agreements is legally sound. Courts have long treated a firm's contractual obligations to third parties as real-world constraints relevant to the question of liability, not mere "remedies" for (non-existent) legal violations. The FTC does not cite a single case obligating a court to ignore the real world and base its decision on a fictional reality more favorable to the FTC.

5.  There is also no basis for the FTC's complaints about the district court's application of *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962). As the court correctly recognized, "the FTC made no reference to this theory in its opening statement or closing argument.

29

Nor is it discussed by Dr. Lee's expert report; he addressed only Microsoft's ability and incentive to foreclose." 1-ER-51. Moreover, the court correctly rejected the FTC's argument on the merits. Under any doctrinal framework, the FTC's case presupposed that Microsoft would harm competition by withholding Activision content from rivals that would otherwise obtain it. The FTC completely failed to substantiate that premise *with evidence*. 1-ER-51-52.

6. Finally, the district court correctly found that the balance of the equities supplies "a separate, independent reason the FTC's motion must be denied." 1-ER-52-53. As the FTC recognizes, "[t]he *only* purpose of a proceeding under § 13 is to preserve the status quo" pending the administrative case if doing so is necessary to preserve the possibility of effective relief if the FTC ultimately prevails. Br.6 (emphasis added) (citation omitted). The district court found that rationale inapplicable because the FTC had identified nothing about this vertical merger that "would make it difficult to order an effective divestiture." 1-ER-53.

On appeal, the FTC does not challenge that factual finding, which is reason enough to affirm. At the same time, the court correctly found that a preliminary injunction pending the FTC's lengthy administrative

case could harm both the parties and consumers by "skuttling" this pro-competitive transaction altogether, 1-ER-52, as Section 13(b) injunctions invariably do for mergers. In short, the balance of equities points to only one path: the one the district court took.

## STANDARD OF REVIEW

The denial of a motion for a preliminary injunction under Section 13(b) is reviewed for abuse of discretion. *Warner*, 742 F.2d at 1160. This Court's review in such cases is "limited and deferential," and requires the appellant to show the district court "committed an abuse of discretion, or an error of law, or made a clearly erroneous factual finding." *Cascadia Wildlands v. Thrailkill*, 806 F.3d 1234, 1240 (9th Cir. 2015). Even where an appellant makes the substantial showing required under the abuse-of-discretion standard, the judgment will be affirmed "unless prejudice is shown." *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1201 (9th Cir. 2008) (cleaned up).

## ARGUMENT

## I.   The District Court Correctly Applied the Controlling Legal Standard.

To enjoin a merger, the FTC must show, among other things, a "likelihood of ultimate success" on the merits. 15 U.S.C. § 53(b)(2). That

showing is critical because "the issuance of a preliminary injunction prior to a full trial on the merits is an extraordinary and drastic remedy" and "may prevent the transaction from ever being consummated" even if it is lawful and pro-competitive. *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980) (cleaned up).

To meet that standard, the FTC must "raise[] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *Warner*, 742 F.2d at 1162; *cf. FTC v. Atl. Richfield Co.*, 549 F.2d 289, 298 (4th Cir. 1977) (denying preliminary injunction under Section 13(b) where "there was not a substantial likelihood that FTC would be able to establish a violation of § 7"). It is not enough for the FTC to raise "mere questions or speculations supporting" allegations of anticompetitive conduct. *FTC v. Meta Platforms Inc.*, 2023 WL 2346238, at *8 (N.D. Cal. Feb. 3, 2023). Instead, Section 13(b) "demands rigorous proof," *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 23 (D.D.C. 2015), and a court must "exercise independent judgment" after carefully assessing "all the evidence before it, from the defendants as

well as from the FTC," *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1035 (D.C. Cir. 2008).[7]

The district court correctly identified and faithfully applied that standard. *See, e.g.*, 1-ER-23-24, 52 (following *Warner*). The court repeatedly made clear that it was not finally resolving the merits; rather, it assumed the FTC was correct on numerous disputed issues. *See, e.g.*, 1-ER-25 n.5 ("accept[ing], without deciding, the FTC's definition of the relevant markets here"); 1-ER-28 (court would "likely find Nintendo Switch part of the" console market if it "was the final decisonmaker on the merits," but concluding otherwise for purpose of the decision); 1-ER-29, 31 (assuming "multigame content library subscription services and cloud gaming" are "each their own product market"); 1-ER-34 ("accept[ing]" ability to foreclose); 1-ER-48 (assuming *Call of Duty* exclusivity for subscription services).

---

[7] Contrary to the FTC's suggestions, courts have in fact commonly denied FTC requests for preliminary injunctions in Section 13(b) merger cases—even ones involving horizontal mergers. *See*, *e.g.*, *Meta*, 2023 WL 2346238; *FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522 (E.D. Pa. 2020); *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020); *FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015); *FTC v. Lab'y Corp. of Am.*, 2011 WL 3100372 (C.D. Cal. Mar. 11, 2011); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004).

33

Notably, in the conclusion of its analysis—which the FTC conspicuously omits—the court again returned to the *Warner* standard, finding that "the FTC *has not raised serious questions* regarding whether the proposed merger is likely to substantially lessen competition," and therefore "has not demonstrated a likelihood of ultimate success." 1-ER-52 (emphasis added); *accord, e.g.*, 1-ER-48, 50 (invoking the "serious questions" standard).

Seeking to invent a legal error, the FTC first argues that the district court "conflat[ed] Section 13(b)'s standard for a preliminary injunction with the permanent injunction standard under Section 7." Br.25. Not so. The district court was required, under Section 13(b), to assess whether the FTC had raised serious "questions *going to the merits.*" *Warner*, 742 F.2d at 1162 (emphasis added). In making that assessment, the district court logically looked to the merits standard the FTC would ultimately have to satisfy. *See* 1-ER-22-23. *Warner* took the same approach, looking to the FTC's ultimate Section 7 burdens to assess whether the FTC had shown a likelihood of meeting them. 742 F.2d at 1160, 1164.

It thus makes no sense for the FTC to criticize the district court for "relying on *AT&T* and other non-Section 13(b) cases," which involved permanent injunctions. Br.26. To evaluate the FTC's "likelihood of ultimate success," 15 U.S.C. § 53(b)(2), it was proper—indeed, necessary—for the district court to consider precedents analyzing the ultimate merits standard. Courts routinely analyze merits decisions in assessing a preliminary injunction movant's likelihood of success.[8] That is necessary to coherent judicial decisionmaking, not some kind of legal error.

The FTC is similarly wrong in suggesting that the district court erred by considering all the evidence. Under the FTC's view on appeal, district courts should not be allowed to consider the FTC's ultimate burden on the merits, Br.25-26; or evidence the district court finds more persuasive than the FTC's scant evidence, Br.28; or methodological shortcomings in the FTC's expert analysis, Br.41-42; or the real-world effects of the merger, Br.45-58, including whether the merger is output-

---

[8] *See, e.g., Warner*, 742 F.2d at 1164; *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir. 1991); *Meta*, 2023 WL 2346238, at \*8; *RAG-Stiftung*, 436 F. Supp. 3d at 290; *Thomas Jefferson Univ.*, 505 F. Supp. 3d at 537-38.

35

expanding, Br.38-39; or the sworn testimony of relevant executive decisionmakers, Br.42-43, 60-65; or the hardships a preliminary injunction would pose to the merging entities and to third parties, Br.68-74; or the ability of the FTC to fashion effective relief post-merger, Br.55-58. Nothing in *Warner* or other Section 13(b) precedent so circumscribes a district court's review of the evidence, reduces Article III courts to FTC case managers, or "presumpti[vely]" entitles the FTC to a preliminary injunction just for showing up to trial. *See* Br.69. If that were the law, the outcomes of merger challenges—particularly vertical merger challenges—would be quite different.

Indeed, the FTC *itself* has squarely rejected this very argument. The FTC previously insisted to Congress, in response to proposed legislation to align the FTC's merger-challenge burdens with DOJ's, that the standard that courts actually apply in Section 13(b) cases requires the FTC "to make a *robust evidentiary and legal showing* that the transaction would likely be anticompetitive in order to obtain a preliminary injunction." FTC Statement, *supra*, at 13 (emphases added); *see also id.* ("[A]ny effort to seek a federal court injunction against a proposed merger requires the FTC or [DOJ] to present a

convincing factual and legal basis for competitive concern in order to secure appropriate relief.").

Finally, the FTC's legal arguments—even if accepted—do not justify reversal. The appropriate remedy in such circumstances would be to remand for re-evaluation under a new standard. *See, e.g.*, *Saucillo v. Peck*, 25 F.4th 1118, 1133 (9th Cir. 2022). But remand would be a pointless exercise because, as we next show, the FTC's case fails under any plausible standard.

## II. The District Court Correctly Found No Plausible Claim of Competitive Harm in the Putative Subscription and Cloud-Gaming Markets.

The FTC devoted almost its entire case at trial to the console market. Having watched that case disintegrate, the FTC now shifts its focus to the putative "markets for content-library and cloud-gaming services," which it addressed only in passing below. For multiple independent reasons, the district court properly rejected the FTC's half-baked theories of harm in these two "markets."[9]

---

[9] The district court "assume[d] without deciding" that subscription and cloud-gaming services "are each their own product market." 1-ER-29. They are not. As the district court suggested, they are "simply alternative ways" to buy video games (via subscription rather than

(*continued on next page*)

37

**A. The FTC's Claims About Both Markets Rest on a False Premise About Standalone Activision's Plans.**

As a threshold matter, the FTC's theories of harm fail because they rest on a factual premise that the district court expressly rejected. To substantiate any claim of foreclosure, the FTC needed to show, as an initial matter, that the merged firm will withhold new Activision games from third parties that *could otherwise obtain them*. A company cannot "foreclose" third parties by withholding inputs that would otherwise be unavailable to them.

The district court found—as a matter of fact—that the FTC could not make this showing. The court concluded that a standalone Activision would maintain its "long-held stance" *not* to make new content available to subscription or cloud-gaming services because of profit-cannibalization and game-performance concerns, respectively. 1-ER-48-49 (subscription); 1-ER-49-50 (cloud gaming). In other words, the

---

game-specific sales) or to play them (on the cloud rather than on a console). *Id.*; *see also* 3-SER-378-383. Moreover, Microsoft and Sony do not compete in some freestanding "market" for subscription services: an Xbox gamer cannot use PlayStation Plus on an Xbox, and a PlayStation gamer cannot use Game Pass on a PlayStation. A gamer with one of these consoles therefore cannot switch between these two subscription services without buying the other console (or gaming PC). 1-SER-109.

district court found that, absent the merger, new Activision content would not be available on subscription or cloud-gaming services. That finding is fatal to the FTC's claims about both markets unless the FTC can show clear error. *See Beech Aircraft Corp. v. United States*, 51 F.3d 834, 838 (9th Cir. 1995).[10]

In various passages, the FTC quibbles with the court's finding but does not come close to showing clear error. For example, it asserts that "Activision's CEO also testified that Activision could offer its games on . . . subscription services going forward." Br.32. But the question is not whether a standalone Activision would have the *ability* to do so, but whether it *would* do so. The clear answer, the district court found, is no.

---

[10] The FTC's theory about the putative cloud-gaming "market" fails for other independent reasons. *First*, the FTC failed to show that cloud gaming will develop into a genuine alternative to consoles or performance PCs for multiplayer, fast-twitch, graphics-intensive games. As the district court found, "the technology and economics of cloud gaming remain challenging, particularly for latency-sensitive multiplayer games" like *Call of Duty*. 1-ER-18-19. *Second*, the FTC failed to show that Xbox will be a major player in that future market. In fact, the undisputed evidence confirms that the primary use case for xCloud is to temporarily try games prior to downloading them, not as an alternative to native gameplay. 1-ER-19. There is accordingly no evidence to suggest Xbox is, or will ever be, "the runaway dominant provider," Br.33, of any eventual cloud-gaming market for playing games like *Call of Duty*.

1-ER-49-51. More broadly, sifting witness testimony and making credibility determinations is exactly the kind of finding that district courts are entrusted to make and that parties cannot second-guess on appeal, absent clear error.

The FTC also cannot avoid the clear error standard by grossly mischaracterizing the court's finding as a mere "assumption." Br.36 n.2. The district court based its conclusion on the evidence at trial, including testimony from Activision's CEO and witnesses from Sony and Nvidia. 1-ER-49-51; *see also* 2-ER-85, 88 (Activision's CEO testifying that subscription is not "a sustainable long-term business" and "not something that we do have any plans to do"); 1-ER-49 ( "Sony has never even asked Activision about adding its games to PlayStation Plus because Activision has been so 'public' and 'vocal' about not putting its content on subscription services."); 3-SER-567 (testimony from the head of GeForce Now).

## B.   The District Court Did Not "Find Foreclosure" in Multi-Game Subscription Services or Credit an "Efficiencies Defense."

Rather than attempt to show clear error, the FTC resorts to misdirection, asserting that the district court found "foreclosure" in the

subscription market and then credited a supposed "efficiencies defense." That is wrong. The district court found *no* likelihood of "foreclosure" in any market, and Microsoft did not even raise an "efficiencies" defense because it did not need to do so.

As discussed, the district court found that the merger would *expand* access to *Call of Duty* because at a minimum Xbox will include the game in Game Pass. That outcome will "give[] consumers a new, lower cost way to play the game" the day it is released. 1-ER-48; *see id.* ("[A]dding *Call of Duty*, and Activision content in general, will actually lower costs for many game consumers, and harm none."). The court assumed that *Call of Duty* would be exclusive to Game Pass but found that the FTC had not presented meaningful evidence that such exclusivity could possibly result in competitive harm. To the contrary, the district court concluded that even that world would be better for consumers and competition than the but-for world, where *Call of Duty* will likely appear on zero subscription services. 1-ER-48-50.

Nothing about that ruling is a "finding [of] . . . foreclos[ure]." Br.36. Again, it makes no sense to allege that a merger might "foreclose" rivals by withholding access to an input that they would not

have obtained anyway. Moreover, the district court did *not* find that the post-merger Xbox will withhold *Call of Duty* from other subscription services—it simply assumed that for purposes of the decision. 1-ER-48.

██████████████  ███████  ██████████████████████

████████████████████████  *See supra* pp.24-25.

The district court's reasoning on this score also did not amount to acceptance of an "efficiencies defense." As the name suggests, an "efficiencies defense" is just that—an effort to justify anticompetitive harms based on offsetting efficiencies, generally in some other market. *See*, *e.g.*, *United States v. Anthem, Inc.*, 855 F.3d 345, 378 (D.C. Cir. 2017); Br.38. Instead, the district court properly found *no evidence of anticompetitive harm*, through the requisite comparison of the but-for world without the merger to the real world with the merger. So here too, the FTC's argument runs squarely into the district court's contrary and well-justified finding that *Call of Duty* would not be available on multiple subscription services absent the merger.

Even if, contrary to the evidence, a standalone Activision *would* have made *Call of Duty* available to other subscription or cloud-gaming services, that would not make it anticompetitive for the merged

company to withhold *Call of Duty* from such services. The relevant question in vertical foreclosure analysis is not whether a firm would withhold an input from rivals, but whether that withholding would *harm competition*. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977); *Fruehauf Corp. v. FTC*, 603 F.2d 345, 352 n.9 (2d Cir. 1979); *see also infra* Section III.B. The FTC presented no evidence, quantitative or otherwise, suggesting that Sony—or any other rival— would be unable to compete even if *Call of Duty* were exclusive to Game Pass. Indeed, PlayStation's subscription service has roughly twice as many subscribers as Game Pass, even without Sony releasing any of its new first-party games into the service. 3-SER-557. For all these reasons, the FTC's rhetoric (at 44) about the need to prevent Game Pass from "becom[ing] a monopolist" in the alleged subscription market falls flat. In any event, the FTC did not raise this baseless "monopoly" concern below, so it is forfeited. *See In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010).

In sum, the district court properly concluded that this merger will expand the content available to the consumers of at least one subscription service (Game Pass), without depriving consumers of any

other subscription service of content they otherwise would have

obtained. There is nothing anticompetitive about that picture.

## III. The District Court Correctly Found No Serious Question of Competitive Harm in the Console Market.

As explained above, the FTC's primary claim at trial was that

Microsoft will harm competition by withholding *Call of Duty* from the

PlayStation console once the merger is consummated. 1-ER-34; *see* 1-

ER-47 (FTC "did not offer evidence" about "other Activision titles"). On

appeal, the FTC largely retreats from this argument, for good reason—

the district court rejected it based on overwhelming evidence.

As a preliminary matter, the FTC's case is even weaker now than

when the district court issued its opinion. The district court accepted,

for purposes of its decision, that Microsoft would have the ability to

withhold Activision content from Sony. That premise is now incorrect,

in light of the contract that Microsoft and Sony have signed. *See supra*

pp.24-25. That contract thus provides an independent ground for

affirmance, particularly given the FTC's representation that such an

agreement would address its concerns in the console market. 1-SER-

268. *See United States v. Burnette*, 698 F.2d 1038, 1048 (9th Cir. 1983)

(district court may be affirmed "on any basis fairly presented by [the]

record that, as a matter of law, sustains the judgment"); *supra* n.5 (Court may take judicial notice of later developments to affirm).

In any event, the district court properly rejected the FTC's case on the evidence before it. In response, the FTC merely nitpicks at the margins of some of the court's nine grounds for decision, leaving others unchallenged. The FTC shows no error in the findings it does challenge, let alone clear error, and any error would be harmless.

### A.  The FTC Failed to Establish that Microsoft Has Any Incentive to Withhold *Call of Duty* from Sony.

### 1.  The FTC Fails to Show Clear Error in the District Court's Fact-Bound Conclusions.

The district court found the evidence "overwhelming" that Microsoft lacked any incentive to withhold *Call of Duty* from Sony, 1-ER-41. As noted above, the district court based this conclusion on *nine* independent factual findings, even apart from Microsoft's agreements with third parties; for example, it found that withholding would be financially and reputationally ruinous to Microsoft. *See supra* pp.20-21. The district court also credited evidence regarding Microsoft's acquisition of *Minecraft* publisher Mojang, which "exemplifies how a

console seller (and Microsoft in particular) behaves when acquiring a hugely popular multiplayer cross-platform game," 1-ER-38-39.

On appeal, the FTC recites its favored snippets from the record, but does not even attempt to show that the district court's findings were clearly erroneous, as it must. Indeed, the only one of the district court's findings that the FTC meaningfully attempts to address is the district court's crediting of sworn commitments from senior Microsoft executives "to continu[e] to ship *Call of Duty* on the Sony PlayStation." 1-ER-36; *see* Br.62-63. But there was nothing legally improper in the district court's consideration of that evidence as one input among many others. As just one example, similar commitments undermined the government's case in *United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 154-55 (D.D.C. 2022) (sworn commitments are "far more probative of post-merger behavior than [the government expert's] independent weighing of costs and benefits"). The FTC provides no authority for completely discarding such testimony as a matter of law,

and its suggestion that the court gave these statements "dispositive weight" is belied by the court's analysis.[11]

The weakness of the FTC's console case is underscored by its oblique and misleading challenge to the district court's finding that Microsoft's financial models showed no incentive or intent to withhold *Call of Duty* from Sony. The FTC suggests the district court overlooked a 2022 analysis of how Microsoft "could recoup the potential loss of Activision's revenue from games sold on Sony's PlayStation," Br.31. What the FTC fails to mention, however, is the impetus for this analysis—not to plot a withholding strategy, but to address concerns that *Sony* would use its dominant position to demand unfavorable commercial terms from Microsoft. *See* 3-SER-551; 1-SER-257-258. Beyond ignoring that context, the FTC mischaracterizes both the actual scenario Microsoft modeled (a ▮▮ reduction in Microsoft's share of revenues from *Call of Duty*, not withholding from Sony, *id.*); and

---

[11] The FTC's footnote (at 64 n.11) describing these commitments as having been "impeached" is unsupported by the testimony cited, which had nothing to do with the relevant comments by the executives. More importantly, the district court—the ultimate judge of witness credibility here—found these commitments credible and not impeached. *See, e.g.*, *Husain v. Olympic Airways*, 316 F.3d 829, 839 (9th Cir. 2002).

Microsoft's proposed competitive response (selling *Call of Duty* on more rather than fewer platforms), 1-SER-265. Freed from the FTC's revisionist framing, this evidence comports perfectly with the district court's conclusions that Microsoft never modeled an exclusivity strategy; that it consistently valued the deal based on continued sales on PlayStation, *Call of Duty*'s largest and most valuable market; and that it would be "financially impossible" for Microsoft to overcome the loss of *Call of Duty* sales on PlayStation. 1-ER-34-35, 45.

> **2.  The FTC Does Not Seriously Contest the District Court's Rejection of the Economic Testimony that Was the "Lynchpin" of Its Case.**

The FTC similarly provides no basis for disturbing the district court's rejection of the FTC's economic evidence about Microsoft's alleged incentive to foreclose.

The FTC understood that to show the merger would likely lessen competition, it had to establish (among other things) that Microsoft would have the incentive to withhold *Call of Duty*—that is, that Microsoft could increase its console sales enough to offset the enormous cost of closing off *Call of Duty*'s largest and most profitable customer base. The FTC attempted to carry this burden by relying on empirical

48

analyses by its economist, Professor Lee. *See* 1-ER-41 ("The lynchpin of the FTC's argument is the expert opinion of Professor Robin Lee . . . .").

The district court correctly concluded that Professor Lee's economic modeling "[did] not dispute the evidence of Microsoft's lack of an economic incentive." *Id.* While Professor Lee endeavored to show that the benefit of withholding *Call of Duty* from PlayStation exceeded the well-documented costs, his economic models fell apart at trial. The "pivotal" data point in his analyses was a "conversion rate"— the number of PlayStation gamers who "would purchase an Xbox console to play *Call of Duty* 2025 if it was not available on PlayStation." 1-ER-41-44.[12] The district court found that Professor Lee "simply assumed a conversion rate for his model that would make exclusivity profitable . . . ." 1-ER-42-45. This substitution of assumptions for evidence was fatal to Professor Lee's models, which are so sensitive that changing the assumed inputs even "just a bit" reverses his analysis and shows that "it would **not** be profitable to withhold *Call of Duty* from PlayStation." 1-ER-42 (emphasis in original).

---

[12] "*Call of Duty* 2025" refers to the first *Call of Duty* title that will be released after Sony's prior contract expired in 2024. 1-ER-41.

The district court also identified numerous additional weaknesses in Professor's Lee's analysis. As it observed, Professor Lee had *no response* to many of the modeling criticisms advanced by Microsoft's expert that, when corrected, showed no incentive to withhold *Call of Duty*. 1-ER-44 ("[W]hat does Prof. Lee say about Dr. Carlton's criticism? Nothing . . . . The criticism thus stands unscathed—and persuasive."). The district court also found that Professor Lee sought confirmation of his assumed conversion rate from documents that he had not actually considered or that in fact undermined his analyses. 1-ER-42-43; *see also* 1-ER-44-45 (noting "several additional weaknesses," including failure to consider the reputational harm of pulling *Call of Duty*). The FTC does not seriously contest these fatal factual findings. *See Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004) (rejecting expert opinion because it "failed to 'incorporate all aspects of the [market's] economic reality'").

Quite apart from these flaws, Professor Lee himself conceded in response to the district court's questioning that he had no basis for testifying that the post-merger company would likely withhold *Call of Duty*. 1-SER-155-156. By itself, this concession independently

undermines the FTC's principal rationale for enjoining this merger: the notion that the post-merger company would likely "foreclose" the market-dominant Sony by withholding *Call of Duty*.

### B. The FTC Failed to Show that Withholding *Call of Duty* from Sony Would Likely Harm Competition.

Because the FTC failed to show that the combined firm was likely to withhold *Call of Duty*, the district court did not need to determine whether the FTC was likely to prevail on its claim that such withholding was likely to substantially lessen competition. *See, e.g.*, *McWane, Inc. v. FTC*, 783 F.3d 814, 838-39 (11th Cir. 2015) (vertical transactions are generally found to raise antitrust concerns only where they leave rivals "stunted" as competitors and materially impair their ability to discipline the defendants' prices). The FTC cannot make that showing either, providing an alternative ground for affirmance.

The FTC offered no plausible basis at trial for predicting that the withholding of *a single video game* could cause harm to competition. Xbox has lagged PlayStation for decades, such that withholding *Call of Duty* would serve only to make the playing field more level. Even if all of Dr. Lee's conclusions were valid, Xbox would gain only a 5.5% share shift from PlayStation, and PlayStation would still remain the leading

console provider. 3-SER-530-533. Indeed, the undisputed evidence

below was that, even if ██████████████████████████████████

███████████████████████████ ██████████ █████████████

███████████████████████████████████████████

███████████████████████████ 3-SER-533.

The FTC also did not dispute that Sony would have effective

competitive responses to the loss of *Call of Duty. See Paddock Publ'ns,*

*Inc. v. Chi. Trib. Co.*, 103 F.3d 42, 44 (7th Cir. 1996) (explaining that a

competitor who is "deprived of access" to even the "best known" content

can still compete using alternative content); *see also id.* ("[A] newspaper

deprived of access to the *New York Times* crosswords puzzles can find

others, even if the *Times* has the best known one."). Sony's CEO told

investors in the wake of news of Microsoft's acquisition of Activision

that "growing your studios organically successfully is a smart thing to

do" to increase Sony's own value proposition to consumers. 2-SER-306.

Sony could also leverage its vast library of intellectual property to

develop new video game content. 1-SER-184. These market dynamics

are the essence of competition, and fatal to the FTC's case.

That is particularly so because the FTC's expert conceded these market dynamics. Professor Lee acknowledged both that Sony would have competitive responses to any withholding strategy, and that he had not modeled them. 1-SER-152. He also did not dispute that Sony could acquire additional content, as it did when it agreed to purchase Bungie "just days after the Activision Xbox transaction was announced." 1-SER-152. He likewise did not dispute that Sony could protect itself by accepting Xbox's offer to maintain *Call of Duty* on PlayStation, as it has since done. 1-SER-152.

Finally, the FTC's suggestion that *any* withholding harms competition is contradicted by the fact that exclusive games are common in the video game industry. *See* 1-ER-10 (there are "eight exclusive games on PlayStation for every one on Xbox").[13] Sony in particular "uses its market power to extract other preferential treatment from third-party game developers, including earlier release dates, exclusive marketing agreements, and exclusive in-game content," and has also paid for third-party publishers not to release their games

---

[13] More broadly, exclusivity arrangements are ubiquitous throughout the economy and are generally procompetitive. *See, e.g.*, *Paddock Publ'ns*, 103 F.3d at 44.

on Xbox. 1-ER-10-11. The FTC has never explained why it would be anticompetitive for the last-place competitor to do something broadly and routinely done by the long-time market leader.

### C. The FTC Cannot Save Its Case with a Later-Added Partial Foreclosure Theory.

The district court also properly rejected the FTC's theory that Microsoft could harm competition through a strategy of "partial foreclosure." Partial foreclosure, in the context of this case, refers to degrading the quality of games on PlayStation or making them more attractive on Xbox, such as by having an earlier release date or exclusive content on Xbox. 1-ER-46; *see, e.g.*, 1-SER-9 (providing the example of making "a neat player or a tool" available only on Xbox).

As an initial matter, the FTC did not raise this issue until the eve of trial. 1-ER-46 (theory was "not [in] its original moving papers"). It accordingly had "no expert testimony to support a finding the combined firm would have the incentive to engage in such conduct." 1-ER-45.

The FTC did not support this theory with any other evidence. In particular, it supplied no evidence that partial foreclosure would result in "enough PlayStation users [switching] to Xbox such that the benefits to the combined firm outweigh the costs." 1-ER-46. And as the district

court found, based in part on testimony from the FTC's own witness, any form of partial foreclosure that had a material effect on gameplay would harm the game publisher too. 1-ER-46-47; *see also id.* (citing Sony testimony that developing a degraded game would draw "vitriol from gamers that would be well deserved," and "cause reputational damage to the company").

The FTC does not contest these shortcomings. It instead focuses on a theoretical debate regarding a firm's incentives for partial foreclosure. Br.66-67.[14] But that theoretical debate has no relevance because the FTC produced no evidence that "partial foreclosure" was at all likely, let alone that it would harm competition. A "partial foreclosure" strategy would necessarily be less effective in driving consumers to give up their PlayStations than a strategy of withholding *Call of Duty* altogether. And the FTC offered no evidence suggesting that Microsoft would have the incentive to pursue that strategy, or that

---

[14] The lone argument raised in the FTC's lone *amicus* brief is that the district court should have separately analyzed total and partial foreclosure. Dkt.36-1. But the *amici* do not address the FTC's failure to provide evidentiary support for its "partial foreclosure" theory at trial or explain what *evidence* the district court should have, but did not, consider. *Id.*

the strategy would cause gamers to switch to Xbox at all, much less in such numbers that Sony would be left unable to compete. *See supra* p.43-44. The FTC has the burden of demonstrating that the proposed merger "is likely to substantially lessen competition" not just in theory but in fact. *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019). It completely failed to do so.

In all events, Microsoft has no ability to "partially foreclose" rivals. Its contractual obligation to provide *Call of Duty* to Nintendo ▮▮ obligate Microsoft to provide the game ▮▮ with release date, feature, and content parity. 1-ER-39; 3-SER-358; *see also* 1-ER-19 (same with respect to Nintendo).

## IV. The District Court Correctly Considered Microsoft's Binding Contracts with Competitor Platforms.

The FTC contradicts decades of precedent in suggesting (at 45-58) that the district court was required to disregard evidence of arm's-length agreements that guarantee access to *Call of Duty* on competitor platforms for at least the next ten years.

The well-settled practice in litigated merger cases is to compare the but-for world without the merger against a world where the merger is consummated, including the immediate commercial effects of the

merger. *See Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 276 (7th Cir. 1981). A critical part of that analysis is considering the "factual reality" of the post-merger world. 1-ER-51. Nobody is served by rumination on hypothetical problems that will never exist in reality.

Accordingly, in both DOJ and FTC cases, courts have consistently relied upon parties' post-merger agreements as part of their assessment of the FTC's prima facie case. In *FTC v. RAG-Stiftung*, for example, the district court denied a preliminary injunction in part based on a post-merger commitment to divest a plant to a new competitor. 436 F. Supp. 3d 278, 304 (D.D.C. 2020). Similarly, in *Arch Coal*, the court rejected the FTC's argument that the court could not consider a post-merger agreement to divest a subsidiary. 329 F. Supp. 2d at 115 n.2; *see also AT&T*, 916 F.3d at 1041 (holding arbitration agreement rendered foreclosure concerns "largely irrelevant"); *UnitedHealth*, 630 F. Supp. 3d at 72-78 (considering party-created structural guarantees to address competitive concern); *Sysco*, 113 F. Supp. 3d at 72-78 (considering, but finding insufficient, a divestiture agreement in granting the FTC's motion for a preliminary injunction); *FTC v. Libbey, Inc.*, 211 F. Supp.

2d 34, 45-46 (D.D.C. 2002) (same, where parties amended merger agreement to address antitrust concerns).

Disregarding this precedent,[15] including the two most recently litigated vertical merger cases (*AT&T* and *UnitedHealth*), the FTC relies (at 48-49) on a misreading of *United States v. Greater Buffalo Press, Inc*. That case stands for the simple, unrelated proposition that a court need not address remedies when there is no finding of liability. 402 U.S. 549, 556 (1971). *Greater Buffalo* in no way holds that judges must close their eyes to relevant facts or binding legal commitments in determining whether a merger likely violates Section 7.

The FTC also wrongly (at 49) faults the district court for relying on *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961). The court addressed *du Pont* only because the FTC relied on a passage of its *Illumina* decision that, in turn, relied on *du Pont*. 1-ER-40 (citing *In re Illumina, Inc. & Grail, Inc.*, 2023 WL 2823393, at *49-50 (FTC

---

[15] The FTC dismisses certain of these examples as not "involv[ing] a Section 13(b) proceeding," Br.49, but it disregards that several were, including *RAG- Stiftung*, *Arch Coal*, *Sysco*, and *Libbey*. Further, *AT&T* and *UnitedHealth* demonstrate that these agreements are relevant to whether the government has proven a Section 7 violation and thus to the FTC's "likelihood of ultimate success."

Mar. 30, 2023)). As the district court correctly noted, the FTC's argument that post-merger contracts must be labeled "remedies" and therefore disregarded rests on a mistaken view of *du Pont*, which "involved a remedy proposed *after* a finding of a Section 7 violation." *Id.* The court properly concluded that *du Pont* "says nothing about whether . . . the FTC must address the circumstances surrounding the merger *as they actually exist.*" *Id.* (emphasis added). The "caselaw that directly addresses the issue contradicts the FTC's position." *Id.*

In addition to misunderstanding the law, the FTC misunderstands the contracts themselves. The FTC claims that the contracts may contain terms that allow Microsoft to avoid providing content on commercially reasonable terms. But the contracts were negotiated with some of the most sophisticated companies in the world, including Nintendo, a venerable video game company, and Nvidia, which has a *trillion*-dollar market capitalization. There is no reason to suspect that these companies and their lawyers could not understand the contracts' supposed "complex web of onerous terms," Br.52, and that the FTC has more "expertise" to assess what is in these companies' best commercial interest, Br.55-56.

Tellingly, the FTC fails to identify any loopholes that would defeat these agreements' efficacy. For example, the FTC claims that Microsoft has the "unilateral[]" right to "get out of" its contract with Nvidia. Br.53.



3-ER-426 (emphasis added).

*Id.* The language simply does not support the FTC's position, and the district court was entitled to instead credit Nvidia's testimony about the sufficiency of its contract. 3-SER-566; *see also* 1-ER-50.[16]

Last, any error here is harmless because the district court did not, as the FTC claims, "*[r]ely[] on* these agreements." Br.47 (emphasis

---

[16] In addition, Microsoft backed up the binding contracts it entered into during the duration of the European Commission's regulatory process (specifically with Nvidia, Boosteroid, and Ubitus) with binding regulatory commitments to honor them, on pain of massive penalties, and the risk of dissolution of the transaction in case of persistent non-compliance. *See* European Commission Decision of 15 May 2023, Case M.10646 – Microsoft / Activision Blizzard, paras. 881, 884, 898, 903, https://ec.europa.eu/competition/mergers/cases1/202330/M_10646_9311 516_7443_3.pdf.

added). While the district court found these agreements relevant to Microsoft's ability and incentive to foreclose, the district court also found that the FTC was unlikely to prevail based on "independent and sufficient alternative finding[s]." *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 981 (9th Cir. 2023). In the console market, the district court expressly disclaimed any reliance on Microsoft's then-proposed contract with Sony. 1-ER-38.[17] As for the cloud-gaming market, the court separately concluded that the merger could not harm competition because, absent the merger, *no* cloud gaming companies were likely to have Activision games. 1-ER-50-51. The district court's decision would thus stand even if the contracts were excised from its opinion.

## V.  The District Court Did Not Abuse Its Discretion by Rejecting the FTC's *Brown Shoe* Theory.

The FTC likewise mischaracterizes the district court's ruling in claiming (at 58-62) that it incorrectly "dismiss[ed]" the FTC's alternative theory under *Brown Shoe*. As the district court noted, the FTC "made no reference to this [*Brown Shoe*] theory in its opening

---

[17] As noted, Microsoft also has an agreement to make *Call of Duty* available on Nintendo's Switch console. Because the district court accepted *arguendo* the FTC's definition of the console market excluding Switch, that contract played only a limited role in the court's analysis.

statement or closing argument" or in its expert reports. 1-ER-51. The Court nonetheless dedicated a section of its decision to *Brown Shoe* in response to points the FTC buried at the end of its 197-page proposed findings of fact and conclusions of law. 3-ER-280-83.

The district court was right to find that the FTC's late-raised invocation of *Brown Shoe* did "not make any new arguments not considered" under the ability-and-incentive framework. 1-ER-51. For example, the FTC complains that the district court "skipped over [certain] *Brown Shoe* functional factors" regarding foreclosure, such as the "share of the market foreclosed" and the effect of such foreclosure "on barriers to entry." Br.20, 59-60.[18] But that criticism depends on the FTC's discredited premise that the merged company will likely engage in "foreclosure" in the first place by depriving its rivals of Activision content otherwise available to them. Here, the district court properly found that the FTC had provided no basis for concluding that the merged firm will in fact "foreclose" rivals. The FTC's *Brown Shoe*

_____

[18] Contrary to the FTC's suggestion, *Brown Shoe* does not prescribe a "precise formula[]," *Fruehauf Corp.*, 603 F.2d at 353, but rather requires that the merger "be functionally viewed, in the context of its particular industry," *Brown Shoe*, 370 U.S. at 321-22. That is the approach the district court undertook here.

argument is thus just a rehash of its failed challenge to that finding. *See supra* p.63.

The FTC similarly misses the mark in asserting that the court should have considered its allegation that "Microsoft will deny rivals access to Activision's AAA content in the multi-game subscription market." Br.60-61. The district court *did* consider that allegation but concluded that, in the absence of this merger, *no* subscription service would have access to that content to begin with. The FTC provides no reason why this conclusion is any less fatal to its *Brown Shoe* theory than to the incentive/ability framework the FTC urged the court to apply. *See supra* Section II.A.

Likewise, the FTC's claim that the district court erred by not adequately considering a "trend toward concentration" rings hollow. *See* Br.61. The FTC litigated this case entirely on a vertical "foreclosure" theory.[19] The FTC did *not* bring a horizontal challenge because the

---

[19] The FTC labels foreclosure "[t]he primary vice of a vertical merger . . . ." Br.37 (quoting *Brown Shoe*, 370 U.S. at 323-24). In fact, vertical mergers almost never present this potential "vice" to the extent necessary to produce anticompetitive outcomes. *See Fruehauf*, 603 F.2d at 352 n.9 (discussing *Brown Shoe* and concluding that "we are unwilling to assume that any vertical foreclosure lessens competition").

(*continued on next page*)

merger does not significantly increase "concentration" in any market. To the contrary, if the merger enables Microsoft to reduce the market-share gap that separates it from market-dominant Sony, it can only *reduce* concentration.

Finally, the FTC has waived any suggestion that the merger could somehow trigger a wave of additional vertical mergers. It has never offered facts to substantiate such a prediction, let alone a basis in fact or law for inferring anticompetitive effects. The FTC's claim (at 61) that the district court made a "finding that such a trend was present" misstates the decision below, which merely noted that the FTC "fails to explain how" such a trend, if it existed, would be anticompetitive in this specific commercial context.

## VI. The District Court Correctly Found that the Equities Provided an Independent Reason to Deny the Motion.

Finally, the district court correctly found that the balance of the equities supplies "a separate, independent reason the FTC's motion

---

That is why the government has not brought a successful court challenge to a vertical merger in more than four decades, 1-ER-22 & n.4, and why its recent court challenges to such mergers have all failed, *see AT&T, supra; UnitedHealth Group, supra.*

must be denied." 1-ER-52-53.[20] While the FTC evidently believes the district court should have weighed the equities differently, it neglects even to challenge the most important of the district court's findings, and fails to show clear error. *See Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102, 1111 (9th Cir. 2006) (balance of the equities "generally [left] to the considered judgment of the district court").

## A. The FTC Has Forfeited Any Argument the Merger Could Not Be Unwound.

The "principal" "public equity consideration" served by Section 13(b) is to maintain the pre-merger "status quo." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001); *accord* Br.6 (describing this the "only purpose of a proceeding under § 13"). This consideration is more acutely implicated in horizontal mergers, where competing entities integrate their operations and, in the process, often eliminate redundancies. When that occurs, the FTC's "inability to unscramble merged assets," *FTC v. Dean Foods Co.*, 384 U.S. 597, 606 n.5 (1966), makes it difficult

---

[20] This Court need not even consider the equities to affirm the decision below should it uphold the district court's finding the FTC is not likely to succeed on the merits. *See, e.g.*, *Arch Coal*, 329 F. Supp. 2d at 116 ("[E]quities alone will not justify an injunction.").

for the agency to "restore the parties to their pre-merger state," *Sysco Corp.*, 113 F. Supp. 3d at 87.

Those same concerns are not implicated by Microsoft's *vertical* acquisition of Activision, which Microsoft intends to operate as a limited-integration studio. 1-ER-4; 1-SER-263; 2-SER-314. In particular, the FTC has identified no reason why it could not order divestiture as "an effective ultimate remedy" in the unlikely event that it ultimately finds a Section 7 violation in the Part 3 proceeding and is affirmed on appeal. *FTC v. Great Lakes Chem. Corp.*, 528 F. Supp. 84, 99 (N.D. Ill. 1981); *see FTC v. Lab'y Corp. of Am.*, 2011 WL 3100372, at *23 (C.D. Cal. Mar. 11, 2011) ("Courts have routinely permitted integration of certain assets where such integration would preserve the potential for divestiture in the future.").

When asked by the district court, the FTC had no explanation below as to why it needed an injunction here: "What exactly about the merger would make it difficult to order an effective divestiture? The FTC does not say." 1-ER-53. Nor does it on appeal: Its brief contains no explanation of why this merger could not be unwound after the FTC completes its administrative proceeding. Thus, the FTC has forfeited

66

any argument as to the *principal* public equity consideration. *Mercury Interactive*, 618 F.3d at 992.

## B. The Balance of Equities Overwhelmingly Favor Microsoft.

Other public equities also weigh against the FTC. In particular, the district court found the merger would benefit consumers by bringing *Call of Duty* to more consumers on more platforms and at "lower costs for many game consumers." 1-ER-48-49. These consumer-welfare benefits are public equities that the district court properly considered. *See*, *e.g.*, *Warner*, 742 F.2d at 1165; *FTC v. Pharmtech Rsch., Inc.*, 576 F. Supp. 294, 299 (D.D.C. 1983).

Further, the district court found that, even if the FTC were correct that the merger will harm competition, such harm would not occur for at least a year because Activision's contract guarantees that "*Call of Duty* will remain on PlayStation through the end of 2024." 1-ER-53. So as of the time of the decision, the FTC had a year and a half to complete its administrative proceedings before Microsoft would even be able to engage in foreclosure. *But see supra* pp.24-25 (describing post-opinion contract extending Sony's access to *Call of Duty* for another decade).

While the FTC claims that Sony's continued access to *Call of Duty* "says nothing about Activision's other content," Br.71, the FTC's evidence also "says nothing about Activision's other content," *e.g.*, 1-ER-47 (finding the FTC "did not offer evidence" about "other Activision titles"). The FTC also contends that Sony's access to *Call of Duty* through 2024 does not negate harm in "other relevant markets," Br.71, but the district court found no evidence that Activision titles would ever become available on subscription or cloud-gaming services, 1-ER-48-51, much less that this would occur before the FTC could complete its administrative trial.

In its last-ditch effort to identify a relevant equity in its favor, the FTC speculates that, post-merger, Microsoft could "access confidential data of rivals that now is in the possession of Activision." Br.71-72. But there was no evidence to support such a finding in the record, as the district court correctly concluded. 1-ER-46. The only evidence the FTC now identifies is a self-serving statement from PlayStation's CEO that Sony might in the future delay in providing development kits to a Microsoft-owned Activision. Br.72 (citing 2-ER-191). The district court rightly found this unpersuasive because "[p]rotecting Sony's decision to

delay collaboration with Microsoft . . . is not pro-competitive." 1-ER-46.[21]

The district court also found, and the FTC does not meaningfully dispute, that both private and public equities overwhelmingly tilt in favor of the merger. Allowing the merger to close will benefit consumers without any interference with the FTC's ability to accord effective relief, whereas granting the FTC's motion will "skuttl[e] . . . the merger." 1-ER-52. This is not mere speculation; *every single* merger enjoined pre-consummation under Section 13(b) has fallen through. *See Weyerhaeuser Co.*, 665 F.2d at 1087. That outcome would not only deny Microsoft, Activision, and their employees[22] and shareholders of the benefits of this transaction, but it will cause Microsoft to incur a multi-billion-dollar termination fee. 1-ER-4.

---

[21] The FTC also speculates (at 72) that the combined firm can "immediately start exclusivity plans," but there is no evidence that Microsoft has any plan to take Activision content exclusive, *e.g.*, 1-ER-37, or that such exclusivity would be anticompetitive, *supra* pp.43-45.

[22] *See, e.g.*, Comm'ns Workers of Am, CWA Supports Microsoft's Proposed Acquisition of Activision-Blizzard (June 30, 2022), https://cwa-union.org/news/releases/cwa-supports-microsofts-proposed-acquisition-of-activision-blizzard.

In the face of this history and undisputed evidence, the FTC dismisses the urgency of closing the merger as an "artificial deadline" that Microsoft and Activision could have "readily extended." Br.73. This is misleading. The parties were able to negotiate a three-month extension of the merger deadline because of the district court's favorable decision and the remaining discrete concerns raised by the U.K. competition authority. *Supra* pp.23-24. There is no reason to think such an extension could have been negotiated had the district court ruled the other way at trial. *Id.* Nor is there any reason to believe the parties could similarly "readily extend" the deadline for the yearslong period the FTC seeks here. Indeed, the modest three-month extension agreed to in July required Microsoft to significantly increase the termination fee and make other financial concessions. *See supra* pp.23-24.

## **CONCLUSION**

The district court's order denying the FTC's motion for a preliminary injunction should be affirmed.

September 6, 2023                    Respectfully submitted,

                                                  /s/ Rakesh N. Kilaru
                                              _____

Jonathan E. Nuechterlein
C. Frederick Beckner III
William R. Levi
Daniel J. Hay
Lucas Croslow
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
william.levi@sidley.com

*Counsel for Defendant-Appellee
Microsoft Corp.*

Steven C. Sunshine
Julia K. York
Evan Kreiner
Michael Sheerin
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
Telephone: (202) 371-7000
Facsimile: (202) 393-5760

Grant Dixton
ACTIVISION BLIZZARD, INC.
2701 Olympic Blvd Bldg B
Santa Monica, CA 90404
Telephone: 310-255-2000
Grant.Dixton@activision.com

*Counsel for Defendant-Appellee
Activision Blizzard, Inc.*

Beth Wilkinson
Rakesh N. Kilaru
Anastasia M. Pastan
Jenna H. Pavelec
WILKINSON STEKLOFF LLP
2001 M Street, N.W., 10th Floor
Washington, D.C. 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
rkilaru@wilkinsonstekloff.com

*Counsel for Defendant-Appellee
Microsoft Corp.*

Adam B. Banks
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8419
adam.banks@weil.com

*Counsel for Defendant-Appellee
Microsoft Corp.*

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Circuit Rule 28-2.6, Microsoft and Activision state that the Court is currently considering one case that involves the same transaction at issue in this case. In *DeMartini v. Microsoft Corp.*, No. 23-15846, the plaintiffs request that this Court reverse the District Court's denial of a preliminary injunction to enjoin the Microsoft-Activision merger.

/s/ Rakesh N. Kilaru
*Counsel for Microsoft Corp.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This Brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32-1 because it contains 13,795 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This Brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word 365 word processing system in 14-point Century Schoolbook font.

/s/ Rakesh N. Kilaru
*Counsel for Microsoft Corp.*

## **CERTIFICATE OF SERVICE**

I certify that on September 6, 2023, I filed the foregoing

Defendants'-Appellees' Answering Brief with the Court's appellate

CM/ECF system. Counsel for Plaintiff-Appellant are registered users of

the Court's appellate CM/ECF system. I further certify that an

electronic copy of the foregoing was emailed to counsel for Plaintiff-

Appellant at their registered email addresses.

/s/     Rakesh N. Kilaru
*Counsel for Microsoft Corp.*

Date: September 6, 2023