No. 23-15992

# United States Court of Appeals for the Ninth Circuit

———————

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellant,*

v.

MICROSOFT CORP. AND ACTIVISION BLIZZARD, INC.,

*Defendants-Appellees.*

———————

Appeal from an Order of the
U.S. District Court for the Northern District of California
No. 3:23-cv-02880-JSC, Hon. Jacqueline Scott Corley

———————

**DEFENDANTS'-APPELLEES' SUPPLEMENTAL
EXCERPTS OF RECORD VOLUME I - PUBLIC**

———————

Jonathan E. Nuechterlein
C. Frederick Beckner III
William R. Levi
Daniel J. Hay
Lucas Croslow
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
william.levi@sidley.com

Beth Wilkinson
Rakesh N. Kilaru
   *Counsel of Record*
Anastasia M. Pastan
Jenna Pavelec
WILKINSON STEKLOFF LLP
2001 M Street, N.W., 10th Floor
Washington, D.C. 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
rkilaru@wilkinsonstekloff.com

*Counsel for Defendant-Appellee Microsoft Corp.*
[Additional Counsel Listed on Inside Cover]

Steven C. Sunshine
Julia K. York
Evan Kreiner
Michael Sheerin
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
Telephone: (202) 371-7000
Facsimile: (202) 393-5760
steven.sunshine@skadden.com

Grant Dixton
ACTIVISION BLIZZARD, INC.
2701 Olympic Blvd Bldg B
Santa Monica, CA 90404
Telephone: 310-255-2000
Grant.Dixton@activision.com

*Counsel for Defendant-Appellee
Activision Blizzard, Inc.*

Adam B. Banks
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8419
adam.banks@weil.com

*Counsel for Defendant-Appellee
Microsoft Corp.*

2

Pages 1 - 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

```
FEDERAL TRADE COMMISSION,      )
                               )
          Plaintiff,           )
                               )
     VS.                       )   NO. C 23-02880 JSC
                               )
MICROSOFT CORPORATION, et al., )
                               )
          Defendants.          )
_____)
```

San Francisco, California
Wednesday, June 21, 2023

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
BY: **JAMES H. WEINGARTEN, ATTORNEY AT LAW**
**JAMES ABELL, ATTORNEY AT LAW**
**JENNIFER FLEURY, ATTORNEY AT LAW**
**PEGGY FEMENELLA, ATTORNEY AT LAW**
**CEM AKLEMAN, ATTORNEY AT LAW**
**NICOLE CALLAN, ATTORNEY AT LAW**

For Defendant Microsoft:

WILKINSON STEKLOFF LLP
2001 M Street, NW - 10th Floor
Washington, D.C. 20036
BY: **BETH WILKINSON, ATTORNEY AT LAW**
**RAKESH N. KILARU, ATTORNEY AT LAW**
**KIERAN GOSTIN, ATTORNEY AT LAW**
**GRACE HILL, ATTORNEY AT LAW**
**SARAH NEUMAN, ATTORNEY AT LAW**

(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)

REPORTED BY: Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter

---

APPEARANCES:  (cont'd)

For Plaintiff DeMartini in related case 22-08991:

JOSEPH SAVERI LAW FIRM, INC.
601 California Street - Suite 1000
San Francisco, California 94108
BY: **DAVID H. SEIDEL, ATTORNEY AT LAW**
**CADIO R. ZIRPOLI, ATTORNEY AT LAW**

For Defendant Activision Blizzard, Inc.:

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
BY: **STEVEN C. SUNSHINE, ATTORNEY AT LAW**
**JULIA K. YORK, ATTORNEY AT LAW**

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
BY: **CAROLINE VAN NESS, ATTORNEY AT LAW**

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
BY: **STEVEN C. SUNSHINE, ATTORNEY AT LAW**
**JULIA K. YORK, ATTORNEY AT LAW**

For Sony Interactive:

CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, NW-Suite 1000
Washington, D.C. 20037
BY: **ELSBETH BENNETT, ATTORNEY AT LAW**

---

3

**Wednesday - June 21, 2023**                    **2:00 p.m.**

P R O C E E D I N G S

---oOo---

THE CLERK:  Calling Civil Action C23-2880, FTC versus Microsoft.  Counsel.

MR. WEINGARTEN:  Good morning, Your Honor.

THE COURT:  Good afternoon.

MR. WEINGARTEN:  Good afternoon.  James Weingarten on behalf of the Federal Trade Commission.  I'm joined today by Jenny Fleury, Peggy Femenella, Jim Abell, Nicole Callan, and Cem Akleman.

THE COURT:  Good afternoon.

MS. WILKINSON:  Beth Wilkinson from Microsoft.  And with me is Kieran Gostin, Grace Hill, Rakesh Kilaru, and Sarah Neuman.

THE COURT:  Good afternoon.

MR. SUNSHINE:  Good afternoon, Your Honor.  Steve Sunshine on behalf of Activision.  And I'm joined by my colleagues Julia York and Caroline Van Ness.

THE COURT:  Great.  Good afternoon.

Okay.  First, I want to apologize for not being able to meet you until today.  I was actually out of the country until yesterday.  So anyway, I'm sorry about that.

Again, I want to disclose again -- I'm sure everyone already knows as I disclosed on January 19th in the DeMartini

---

4

action -- that my adult 20-something child works for Microsoft since August, I guess.  Not in video gaming at all, and nothing even related to video gaming.

And I'm sure I have a copy of Call of Duty at my house somewhere.  I don't even know what platform my children use, and I personally never played.

All right.  And obviously this is happening very quickly.  When I received the FTC's motion given the concern about the merger, given the deadline, and given the financial penalty, we need to get this evidentiary hearing in so that I have time to make a reasoned decision although, given the schedule, I'm not going to have the time that some of my colleagues have had, but I want to get it in for that reason, and also to leave time for whoever, whichever, is the aggrieved party to seek someone smarter than me to look at it, if needed.  So that's why we are doing this in such a rush.

Our court reporter will be here in person tomorrow.  She is remote today.  She is flying in tonight or later this afternoon.  So we will have to finish so that she can get on the plane.  But because she is doing it remotely today, when you speak, make sure you speak into the microphone so she can get it down.  But she will be here in person tomorrow.

So let's go through some logistics.  And I'm open to any suggestions any of you have.  And I do want to thank you for working so well together so far to get here today.

9

1  opening or with any other witness. And I think we can continue
2  to do that.
3       And we discussed today a process where we have worked
4  together the night before and tried to see if we can work it
5  out so we won't have much to work out at 8:15.
6       THE COURT: That would be great. As much as possible.
7  And, of course, the guiding principle is to redact and to leave
8  as much publicly available as you can. So there may be figures
9  you redact, but not the headers, those kinds of things.
10      Okay. You mentioned openings. I guess you want to -- I
11 was going to say I don't need it. I have read your preliminary
12 injunction proceedings, but if you want to do them, sure. Did
13 you want to?
14      MR. WEINGARTEN: I think our view, unless Your Honor
15 says you strongly disfavor them, we would like 20 minutes.
16      THE COURT: That's fine. I will give each side 20
17 minutes. And I'm assuming by "side," I'm referring to
18 Microsoft/Activision.
19      MS. WILKINSON: Yes, Your Honor.
20      THE COURT: All right. Okay. Each side 20 minutes,
21 that would be fine.
22      For witnesses, I'm not going to give you a time limit. It
23 is a bench trial, but -- and you -- because I saw your
24 estimates and you clearly are trying to be efficient. If you
25 start to go over the time you estimated, I may nudge you a bit

10

1  and remind you of what your estimate was.
2       MS. WILKINSON: Speaking of that, Your Honor, on your
3  order you said next Thursday was available if we needed it. I
4  think we have both, in our witness estimates, assumed we could
5  be in front of you all day Thursday. And I just wanted to
6  clarify that you are willing to do so.
7       THE COURT: No. I am. I am. And I shouldn't say
8  this. I shouldn't say this. But I'm also available Friday.
9  But again, the less time you leave me to actually get an order
10 out, right, we need to get it -- we need to get it in.
11      Almost every trial I have done -- in jury trials I always
12 give time limits. They come in under. That's why I said "as
13 needed." They come in under. But your time.
14      Let me see. All right. Let's talk now about, oh,
15 exhibits. I don't have any yet. What is the plan?
16      MR. WEINGARTEN: I'm -- so, Your Honor, James
17 Weingarten again. I believe we sent Ms. Means a link.
18      THE COURT: It was a link to the exhibits for the
19 preliminary injunction motion. So what I need are the trial,
20 evidentiary hearing. And I realize there is overlap, but I
21 need it for the evidentiary hearing.
22      It's fine if I don't have them. But I assume tomorrow I
23 will at least have written exhibits; right?
24      MR. WEINGARTEN: We intend to send a link for
25 everything, Your Honor. And we will have binders.

11

1       MS. WILKINSON: Yes, I have one question about that,
2  Your Honor. But first, tomorrow. Thanks to the FTC, we are
3  calling one of our witnesses out of order, Ms. Bond. So we
4  will have that notebook for you for her exhibits.
5       And we did not, in our preliminary findings of facts and
6  conclusions of law, give specific cites because we had looked
7  back at other submissions too. They didn't have them. But the
8  FTC did.
9       If you'd like us to do that sooner rather than later, we
10 can do that. But we will also have all the exhibits a day in
11 advance now that we are -- we know what you would like -- to
12 you. And we will share them with the FTC as well.
13      THE COURT: Well, certainly your final ones need to
14 have those --
15      MS. WILKINSON: Of course.
16      THE COURT: -- citations. And it is up to you if you
17 want to do them in advance.
18      All right. And then I also need, in the Cloud, the
19 exhibits as well, right, to the e-mail that you were given,
20 because that will make it easier for preparing and sharing
21 around with my law clerks.
22      MS. WILKINSON: Yes.
23      THE COURT: So is that how you intend to do it? There
24 will be a binder with each witness?
25      MR. WEINGARTEN: Yes, Your Honor. I think we talked

12

1  to Ms. Means. And obviously whatever the Court prefers, but a
2  binder for Your Honor, a binder for the reporter, if the
3  reporter would like one, and for opposing counsel, what we
4  intend to go through for the witness with that.
5       THE COURT: All right. That would be good. And
6  that's, again, what I will be using on the bench, will be the
7  hard copies.
8       The motion for a protective order. And I know I probably
9  have counsel from some of the nonparties here, and I'm happy to
10 hear from them if they wish.
11      But now that we have Microsoft and Activision's submission
12 in which they have actually identified the in-house counsel who
13 are litigation or regulatory attorneys, not in any way involved
14 in business decision-making, I think, and given that the access
15 would be limited to those documents on the trial exhibit list,
16 nothing else, so that you at least know the universe of
17 potential, I would be inclined to go along with that, subject
18 to -- to the extent FTC or really any nonparty says, well,
19 there is -- this document in particular is sensitive or this
20 should be redacted, I obviously would hear that.
21      MR. WEINGARTEN: Well, Your Honor, I think the FTC has
22 an institutional interest in trying to protect especially
23 third-party information because we rely on their candor in our
24 investigation process as well.
25      So I suspect as to specific objections for third-party

**Volume 1**

**Pages 1 - 211**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

```
FEDERAL TRADE COMMISSION,    )
                             )
          Plaintiff,         )
                             )
VS.                          )   NO. C 23-02880 JSC
                             )   SEALED PAGES 5-14
MICROSOFT CORPORATION, et al.,)
                             )
          Defendants.        )
_____)
```

San Francisco, California
Thursday, June 22, 2023

**TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

    FEDERAL TRADE COMMISSION
    600 Pennsylvania Avenue, NW
    Washington, D.C. 20580
    BY: **JAMES H. WEINGARTEN, ATTORNEY AT LAW**
        **JENNIFER FLEURY, ATTORNEY AT LAW**
        **PEGGY FEMENELLA, ATTORNEY AT LAW**

For Defendant Microsoft:

    WILKINSON STEKLOFF LLP
    2001 M Street, NW - 10th Floor
    Washington, D.C. 20036
    BY: **BETH WILKINSON, ATTORNEY AT LAW**
        **RAKESH N. KILARU, ATTORNEY AT LAW**
        **KIERAN GOSTIN, ATTORNEY AT LAW**
        **GRACE HILL, ATTORNEY AT LAW**
        **SARAH NEUMAN, ATTORNEY AT LAW**

REPORTED BY: Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
          United States District Court - Official Reporter

---

**APPEARANCES:** (cont'd)

For Plaintiff DeMartini in related case 22-08991:

    JOSEPH SAVERI LAW FIRM, INC.
    601 California Street - Suite 1000
    San Francisco, California 94108
    BY: **DAVID H. SEIDEL, ATTORNEY AT LAW**
        **CADIO R. ZIRPOLI, ATTORNEY AT LAW**

For Defendant Activision Blizzard, Inc.:

    SKADDEN ARPS SLATE MEAGHER & FLOM LLP
    1440 New York Avenue, N.W.
    Washington, D.C. 20005
    BY: **STEVEN C. SUNSHINE, ATTORNEY AT LAW**
        **JULIA K. YORK, ATTORNEY AT LAW**

---

**I N D E X**

Wednesday, June 22, 2023 - Volume 1

| | PAGE | VOL. |
|---|---|---|
| Opening Statement by Mr. Weinberger | 15 | 1 |
| Opening Statement by Ms. Wilkinson | 32 | 1 |

| **PLAINTIFF'S WITNESSES** | PAGE | VOL. |
|---|---|---|
| **BOOTY, MATT** | | |
| (SWORN) | 48 | 1 |
| Direct Examination by Ms. Callan | 49 | 1 |
| Cross-Examination by Mr. Kilaru | 69 | 1 |
| Redirect Examination by Ms. Callan | 82 | 1 |
| Recross-Examination by Mr. Kilaru | 86 | 1 |
| **HINES, PETER** | | |
| (SWORN) | 87 | 1 |
| Direct Examination by Ms. Fleury | 88 | 1 |
| Cross-Examination by Ms. Hill | 103 | 1 |
| Redirect Examination by Ms. Fleury | 115 | 1 |
| Recross-Examination by Ms. Hill | 121 | 1 |

| **DEFENDANTS' WITNESSES** | PAGE | VOL. |
|---|---|---|
| **BOND, SARAH** | | |
| (SWORN) | 124 | 1 |
| Direct Examination by Ms. Wilkinson | 125 | 1 |
| Cross-Examination by Ms. Fleury | 186 | 1 |
| Redirect Examination by Ms. Wilkinson | 208 | 1 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1184 | | 176 | 1 |
| 1211 | | 178 | 1 |
| 1212 | | 172 | 1 |
| 1442 | | 68 | 1 |
| 1754 | | 118 | 1 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1784 | | 207 | 1 |
| 3019 | | 171 | 1 |
| 3024 | | 181 | 1 |
| 3025 | | 181 | 1 |
| 3027 | | 183 | 1 |
| 4351 | | 66 | 1 |
| 4352 | | 69 | 1 |
| 4391 | | 120 | 1 |
| 4406 | | 102 | 1 |
| 4408 | | 121 | 1 |
| 5044 | | 136 | 1 |
| 5045 | | 76 | 1 |
| 9186A | | 97 | 1 |
| 9186 | | 106 | 1 |

1  **Wednesday - June 22, 2023**                    **8:15 a.m.**

2                    P R O C E E D I N G S

3                        ---000---

4       (The following pages 5 through 14 were placed under

5       seal by Order of the Court and bound separately:)

6       **THE CLERK:**  All rise.  This court is now in session.

7  The Honorable Jacqueline Scott Corley presiding.

8                    (Pause in proceedings.)

9       **THE CLERK:**  Please be seated.

10      Calling Civil Action C 23-2880, FTC vs. Microsoft.

11      Counsel, please come up to the podium and speak directly

12  into the mic if you want to make your appearances or --

13      **THE COURT:**  Do we need to make appearances?  Yeah.  Do

14  we need to make appearances?

15      **THE CLERK:**  No, they don't need to.

16      **THE COURT:**  Okay.  All right.  Good morning.

17      Thank you so much for your submission.

18      So we are now in closed session.  So look around the

19  courtroom.  If there's someone here that you think shouldn't be

20  here, speak now or -- okay.



13



14

6    **THE COURT:** Okay. All right. We will take a moment
7  and open the courtroom, and then we will begin with our
8  openings.
9            (Recess taken at 8:28 a.m.)
10           (Proceedings resumed at 8:34 a.m.)
11    (The following proceedings were heard in open court:)
12    **THE CLERK:** Remain seated and come to order.
13           (Pause in proceedings.)
14    **THE COURT:** Okay. We don't have to recall the case.
15    One thing about scheduling, I do want to let you know that
16  on Wednesday, June 28th, we can actually commence at 8:30.
17  Ms. Means moved my criminal calendar so we can start at 8:30 on
18  the 28th.
19    Okay. All right. We're now ready to proceed with the
20  evidentiary hearing. We're going to begin with opening
21  statements, and we'll start with the FTC.
22    **MR. WEINGARTEN:** Good morning, Your Honor. James
23  Weingarten. I have a few slides, which I will hand to the
24  deputy, if that's all right, Your Honor.
25    **THE COURT:** Yes.

15

1    **MR. WEINGARTEN:** Some of them contain information
2  that's been marked confidential. Since we're not seeking to
3  admit them, I will talk around them this morning and Your Honor
4  will have them.
5    **THE COURT:** Great.
6           (Pause in proceedings.)
7    **THE COURT:** Okay.
8    OPENING STATEMENT
9    **MR. WEINGARTEN:** Good morning, Your Honor. Again,
10  James Weingarten on behalf of the Federal Trade Commission.
11    Microsoft sells the Xbox video game console and also
12  offers the Game Pass subscription service and the xCloud cloud
13  gaming service.
14    Charles, could you put Slide Number 2 on the screen,
15  please?
16    Activision Blizzard makes some of the most successful
17  video game content in history. If this deal is completed, the
18  combined company will have and is likely to have the ability
19  and incentive to harm competition in various markets relating
20  to consoles, subscription services, and cloud.
21    Now to take a step back to the gaming industry,
22  Your Honor, in the gaming industry AAA video game content,
23  those are the most expensive games to develop. Those are the
24  games that are the most highly anticipated. They're the games
25  that make the most money.

16

1    Activision makes some of the most important AAA video
2  games in the United States. Activision's Call of Duty
3  franchise is one of its most successful video games and one of
4  the most successful video games in the history of video gaming.
5    Now, Activision makes other titles too. This isn't just
6  about Call of Duty. Your Honor is going to hear about Diablo
7  and Overwatch and others.
8    **THE COURT:** Candy Crush.
9           (Laughter)
10    **MR. WEINGARTEN:** But Activision makes games. The
11  bottom line, Your Honor, is Activision makes the games that
12  gamers want to play, and gamers want to play the games where
13  they can find them. They will go to find those games.
14    And Microsoft and its competitors need AAA content for
15  their consoles, for their subscription services, for their
16  cloud gaming. And Microsoft and its competitors, they license
17  Activision content and they pay a premium for it because gamers
18  want to play Activision games.
19    Now, Microsoft's own strategy documents could not be more
20  clear in console, in subscription, in cloud, having
21  differentiated content is critical to selling more consoles,
22  getting more subscribers, and having more users stream the
23  games on your cloud service.
24    And Microsoft has been very clear what they mean by
25  "differentiated." That's on the next slide at Slide 3, which

17

1  we won't put up because it's been marked confidential, but
2  we'll address that, of course, when we move to admit.
3      But if you look at the categories there, Your Honor,
4  "differentiated" has a meaning. And if you look at the three
5  components of being differentiated, if it's not differentiated
6  in those three ways, then it's not going to give gamers a
7  reason to prefer your console, your subscription service, or
8  your cloud service over your competitors' offerings.
9      Now, we're going to talk today about the law, the facts,
10  and the equities, and all of them favor entering the requested
11  injunction.
12      So first, Your Honor, very briefly on the law, I want to
13  touch it because the posture of this case is different than the
14  usual preliminary injunction hearing.
15      Now, this case is not about deciding whether this deal
16  should go forward ultimately. The deal does not automatically
17  terminate after July 18th. That's just the option date for the
18  parties to either renegotiate or walk away, but it does not
19  automatically terminate.
20      Even if the Defendants would abandon the deal if
21  Your Honor ruled and granted the preliminary injunction, that's
22  legally irrelevant. It can't save a flawed deal for the
23  parties to say, "Well, we're going to walk if the injunction is
24  granted."
25      And ultimately, I should note, Your Honor, whether this

18

1  deal goes forward hinges as well on what happens in the
2  United Kingdom where that process is going to play out past
3  July 18th.
4      What this case is about is not whether the deal should
5  ultimately close. This case is about whether the Federal Trade
6  Commission should have its chance in the administrative
7  proceeding that Congress set up to evaluate the antitrust
8  merits.
9      THE COURT: Before the deal closes.
10      MR. WEINGARTEN: Before the deal closes.
11      THE COURT: Right. Because it could still do it even
12  if the deal closes.
13      MR. WEINGARTEN: We could, Your Honor.
14      THE COURT: All right.
15      MR. WEINGARTEN: We could but there is a risk, of
16  course. And one can only imagine the equities arguments that
17  the Defendant would employ if there was an attempt to remedy
18  any illegal deal after it closed and the HR department was
19  consolidated and the strategies had changed, et cetera.
20      The evidence we're going to put forward over the next
21  several days, Your Honor, is but a fraction of the total
22  evidence we've accumulated in the course of the discovery that
23  we've had, and the parties have been working at a breakneck
24  pace to get that ready for the administrative proceeding.
25      But even with just that fraction of the evidence, we're

19

1  going to more than meet our burden to raise the substantial
2  questions about relevant market and about the anticompetitive
3  harms that this deal will cause.
4      So I'll turn to the facts, Your Honor.
5      (Pause in proceedings.)
6      MR. WEINGARTEN: Charles, can you please put up
7  Slide 5?
8      We're going to define for Your Honor relevant antitrust
9  markets. The point of defining a relevant antitrust market is
10  to determine where the competitive effects of this transaction
11  are going to be felt.
12      That's how we're going to analyze whether there's going
13  to be harm because we have to define a locus of competition that
14  this deal is going to affect, and that will enable an analysis
15  of: Okay. Is there going to be harm in that market?
16      And we're going to use all of the methods that are laid
17  out here, including the quantitative, the qualitative that come
18  from the Supreme Court's *Brown Shoe* test to establish multiple
19  relevant antitrust markets.
20      Now, to succeed the FTC only has to prove one, but we have
21  in this case multiple because Xbox Microsoft gaming offers
22  products and services in multiple markets. And you'll see as
23  our economist testifies, he starts with the product in question
24  and expands outward to try and understand where is the locus of
25  competition with respect to that Microsoft product that's going

20

1  to be affected by this deal.
2      Can you put up Slide 6, please?
3      Now, the first market is the high-performance console
4  market. The most advanced video game systems, consoles, on the
5  market are called Generation 9 consoles, and we brought them
6  here.
7      So this is the Xbox Series X (indicating). This is the
8  Xbox Series S (indicating). This is the PlayStation 5
9  (indicating). Those are Generation 9 consoles. They look like
10  what one imagines a video game console looks like. They plug
11  into a TV and you play your games.
12      Those consoles launched in 2020 roughly around the same
13  time. Microsoft and Sony benchmark these consoles against each
14  other in terms of price, in terms of features, in terms of
15  content.
16      Now, the Nintendo Switch is not a console like the others.
17  Nintendo launched the Switch three years before in 2017. It is
18  not considered a Generation 9 console. It's an 8. It's an 8
19  and a half. It's not a 9. It's a different animal and does
20  not have the same technological capabilities and it competes
21  along different axes than the Generation 9 consoles, and you're
22  going to hear testimony and documentary evidence to that
23  effect.
24      To be clear, Your Honor, among the documents you're going
25  to hear is that Microsoft leadership itself routinely looks at

21

1  a Generation 9 console market that excludes the Nintendo Switch
2  expressly.
3     So we're not going to put it on the screen; but if you
4  look at Slide 7, Your Honor, Plaintiff's Exhibit 1240, it's a
5  page taken from a report that goes to the senior gaming
6  leadership. We've called out multiple sections, but this is
7  their dashboard, for lack of a better word. And you'll see,
8  Your Honor, we've highlighted where it talks about Gen 9 core
9  consoles and it talks about the Series X and S and the
10  PlayStation 5; and it views share and information about those
11  three, and then separately it looks at a total console market,
12  which includes the Switch. That's how the leadership thinks
13  about it.
14     If Your Honor turns the page to Slide 8, this is a
15  document that goes to the senior leadership team of all of
16  Microsoft. This document tracks a Generation 9 console share,
17  and they're very thorough. They include footnotes to explain
18  the data so the senior leaders know what's being discussed, and
19  the footnote says Nintendo Switch and Gen 8 consoles are
20  excluded because the locus of competition for the Xbox X and S
21  is the PlayStation 5.
22     Now, even, Your Honor, even if the market is broad enough
23  to include all four of these and it's all the video game
24  consoles that a person can buy, even if that's a relevant
25  market, the FTC still wins on proving a relevant market and on

22

1  showing that there are anticompetitive harms in that market.
2     We're very confident that the high-performance market is
3  the correct way to view this; but to be very clear, even if
4  Switch is included, we still meet our burden.
5     Now, Defendants are going to try to convince the Court
6  that in addition to these four devices here, the market
7  includes high-performance gaming PCs. Those are special-built
8  computers that people spend a lot of money, I gather, to buy to
9  play video games; but the evidence is going to show,
10  Your Honor, that gaming PCs are not in the same market. The
11  price of a gaming PC or the high-end graphics chips that a
12  person buys to put into a PC, that is not an effect on the
13  price of these console -- these devices set in use and they
14  compete on different characteristics.
15     Microsoft's own market analysis has concluded that PC is
16  not a, quote, "real competitor" to Xbox and PlayStation
17  consoles.
18     I want to turn to our next market, Your Honor. Multigame
19  consoles -- strike that -- multigame library subscription
20  services. That's on page 10.
21     Charles, you can put 10 up on the screen, please.
22     Now, these services, multigame content library services,
23  allow gamers to subscribe like Netflix. You pay a monthly fee
24  instead of buying each of your games and you get to download or
25  stream the games that are available in the library.

23

1     Now, needless to say, the value of such a service depends
2  a lot on what's in your library. The service is not going to
3  be a service that gamers are going to want if it doesn't have
4  the games gamers want to play.
5     So that, again, is where content comes in. Microsoft is a
6  significant player in the content library subscription service.
7  Its product is called Game Pass.
8     Now, Defendants are going to argue that subscription
9  services are not a market, that subscription is just another
10  way to buy a traditional individual video game. And they're
11  going to tell us -- they're going to tell the Court that
12  subscription services cannibalize traditional game sales. That
13  gamers sign up for a subscription, then they don't buy games as
14  much and, therefore, that's an indicia that they compete with
15  each other and the market should include traditional games too.
16     Well, that's not what Microsoft executives tell developers
17  when they're trying to get them to sign up for Game Pass and
18  put their games in Game Pass. So Your Honor is going to see
19  documents and testimony about what they tell the developer
20  community. And the answer is not simply that there's
21  cannibalization.
22     In fact, Microsoft touts that Game Pass is additive and
23  they tell game developers: If you put your game on Game Pass,
24  you're going to increase revenues and sales because gamers will
25  be more able to explore and discover your game potentially.

24

1     Now, on the right-hand side of the slide is the market for
2  cloud streaming services.
3     Now, cloud gaming services and cloud streaming services
4  offer gamers the ability to play games via the cloud. So
5  instead of buying the game, you know, in a physical form or
6  even downloading it to your Xbox or your PlayStation 5 and
7  playing it, this one all the processing is done in the cloud in
8  servers and GPUs elsewhere, and it's streamed to you.
9     Now, Microsoft service there is called Game Pass Ultimate,
10  also xCloud, a couple of different names. You're most likely
11  to hear it as xCloud or Xbox Cloud Gaming.
12     Now, what the cloud enables because the processing is
13  taken out of the local situation, you could have a MacBook, you
14  could have a cheaper PC, you could have a tablet and you can
15  stream the game because you don't need that high-end processor
16  in your device. That's being taken care of in the cloud.
17     Now, we expect that Defendants' executives and personnel
18  are going to come to court and tell the Court that cloud is
19  maybe promising but there are lots of technical issues and it
20  doesn't quite work. And there's a thing called latency. You
21  push the button and it has to go through the cloud and come
22  back, and so your character doesn't move as fast as it should.
23  That's called latency.
24     Well, we're going to bring two executives via video
25  deposition from Nvidia. Nvidia is also a major player in cloud

25

1  streaming. Those two executives are going to testify about the
2  promise of cloud gaming, about having overcome technical
3  limitations, and that cloud streaming is the future.
4      What's notable, Your Honor, is Nvidia initially opposed
5  this transaction. They signed one of the side deals that I'm
6  sure Ms. Wilkinson is going to talk to you about. Then they
7  supported the transaction. But even though they support the
8  transaction, their testimony is, Your Honor will find accurate
9  and truthful, that cloud streaming is real; that it is a real
10  product, a real service; that it's nascent, it's early going
11  but that this market is poised to become an important market
12  for gamers and that the technical limitations have been
13  overcome in many ways.
14      Now, finally, Your Honor, these two markets, the library
15  market and the cloud streaming market, they can also be
16  combined into one market. That's yet another relevant market
17  here. The law allows for submarkets, and it makes sense
18  because some of these services offer both aspects. So if you
19  sign up for Microsoft Game Pass, you got a library of games.
20  If you sign up for the Game Pass Ultimate tier, you get the
21  cloud streaming and the library.
22      So Dr. Lee will talk a lot about how those products and
23  services interact and he'll talk about which ones constrain the
24  other.
25      Now, we also have to prove, as part of showing a relevant

26

1  market, the geographic market. Maybe Defendants are planning
2  to tell Your Honor that it's a worldwide market, but we're
3  going to show you, Your Honor, that Microsoft analyzes this
4  market country by country and they focus in particular on the
5  United States.
6      So if you look at Slide 11, Your Honor, same dashboard
7  again, FX1240, you'll see in the bottom right-hand corner we've
8  highlighted "Microsoft analyzes share specifically for the
9  United States."
10      And if you look, Your Honor, at the next slide, FX1752,
11  this is an e-mail from the CEO of Microsoft Satya Nadella to
12  the CFO of all of Microsoft, and you'll see there what
13  Mr. Nadella has to say about the U.S. market.
14      Now, we're going to talk, Your Honor, today and we're
15  going to bring evidence for Your Honor about the ability and
16  incentive of the combined company.
17      On ability, it suffices to say that once Microsoft owns
18  this content, they own it. They will have the ability to
19  withhold it, but they also will have the ability to raise
20  rivals' prices, they can change the terms and conditions of
21  access to Activision content, or they can degrade Activision
22  content on their rivals' products and services.
23      I think Defense Counsel is going to talk to you a lot
24  about pulling games off of services. That's total
25  foreclosure -- right? -- let's take the game away. But that's

27

1  not the only possible harm here. This is also about what's
2  called partial foreclosure, the myriad of strategies that are
3  available to the combined company to affect its rivals.
4      If this game has a neat player or a tool or a thing you
5  can buy, maybe you can only buy it if the game is on Xbox and
6  you can't buy the same thing if you're playing that game on
7  Sony. That's partial foreclosure. Or maybe gamers of course
8  want to play the game right away, so the game is available
9  first on Xbox and maybe it only comes to PlayStation or to a
10  rival cloud service a year later.
11      So those are all forms of foreclosure. So please don't,
12  Your Honor, take the red herring of thinking this case is about
13  whether a game is just going to be completely yanked from a
14  rival. That's not the only possible harm. That's not the only
15  likely harm.
16      Now a word on incentives, Your Honor. Defendants are
17  going to talk a lot about case-by-case decisions, about going
18  exclusive, because they have a lot of exclusives at Microsoft,
19  games that are for the Microsoft Xbox Echo system.
20      Now, every time they talk about case by case, that also
21  means that if the right strategic imperative comes along, they
22  can override and decide: You know, in this case let's go
23  exclusive. So when they present case by case as a defense, we
24  think case by case indicates exactly so; when your incentives
25  align, you'll make a case-by-case determination to hurt your

28

1  rivals.
2      But even more importantly, Your Honor, Microsoft has told
3  this story before about case-by-case decisions, about getting
4  games as widely available as they can, and that's where ZeniMax
5  comes in, Your Honor.
6      In 2020 ZeniMax offered roughly $7 billion -- Microsoft
7  offered roughly $7 billion to acquire ZeniMax, another
8  publisher of AAA games.
9      And if you look at page 13 of the slides, Your Honor, this
10  is what -- a reproduction of a request for admission in this
11  case and Microsoft reproduced a letter that it sent to the
12  Federal Trade Commission when the Federal Trade Commission was
13  reviewing the ZeniMax deal, and you can see what that letter
14  says. It sounds similar to what they're saying now.
15      But what happened, Your Honor, after the deal closed and
16  Microsoft completed its acquisition in 2021, a decision was
17  made that future ZeniMax games would not be decided case by
18  case; that they would be Microsoft Xbox exclusives.
19      Now, you're going to hear that there was a meeting, a
20  series of meetings, and analysis that all led to that decision;
21  and you're going to hear that some people, Microsoft gaming
22  CEO, don't remember a lot about those meetings, but you're
23  going to hear other testimony and other documents that
24  memorialize that decision.
25      And I'll just show Your Honor briefly, if you could look,

29

1  please, at Slide 14, FX4334. This is a chat transcript from
2  November of 2021. This is between Mr. Stuart, Microsoft gaming
3  CFO, and his subordinate in finances Ms. Jamie Lawver. Take a
4  look at the bottom three lines, Your Honor, or the bottom five
5  even, that start with "All."
6     Same thing, Your Honor, on the next page, another chat
7  memorializing this decision.
8              (Pause in proceedings.)
9     MR. WEINGARTEN: Same thing on the next page, an
10 e-mail memorializing this decision.
11    We're going to bring you a lot of evidence, Your Honor,
12 about what happened with ZeniMax because we think it's
13 instructive about the incentives that Microsoft faces once it
14 owns a AAA publisher.
15    Now, Microsoft is going to talk about the model. Before
16 they bought ZeniMax -- sorry. Before they bought Activision,
17 they built the deal model; right? They had their bankers
18 analyze: What is Activision worth to us? What should we pay?
19    I'm not going to get into the numbers but suffice to say,
20 Your Honor, there is a substantial cushion between what
21 Activision is worth to Microsoft and what they paid. So when
22 Microsoft says, "Oh, the deal model, we can't possibly hurt
23 Activision's revenues by taking content away, the deal model
24 won't allow for it. It would be a bad deal," the board was
25 told "There's quite a cushion there for a lot of revenues to

30

1  disappear if the strategic decision makes sense."
2     I should also say, Your Honor, you're going to hear
3  testimony these deal models are not binding, they're not
4  binding on the executives. And there was a deal model just
5  like the one for Activision that was for ZeniMax, and we saw
6  already some evidence about what the decision was with respect
7  to ZeniMax.
8     Now, you're going to hear a ton, Your Honor, I believe,
9  from Defendants about their commitments to foreign regulators
10 and their agreements with various rivals in the market. Now,
11 first, those are legally irrelevant. We've got the citations
12 in our brief. This case is not about deciding the right
13 remedy, if there is one, for this transaction.
14    And, second, even if they were not completely irrelevant,
15 the law is that any proposed remedy needs to dispel any and all
16 doubts about the transaction's legality. And Your Honor's
17 going to see the terms of the agreements, if we get to it, fall
18 far short of dispelling any and all doubts.
19    And, finally, Your Honor, you're going to hear a lot about
20 Mobile, and that that was the rationale. And the evidence is
21 going to show you that the deal model, which they like to tout
22 when it suits them, puts the Mobile synergies and value at a
23 very small percentage of the overall deal.
24    And Your Honor is going to hear other evidence; and even
25 if, Your Honor, even if this deal has great impacts on Mobile,

31

1  that one day Microsoft is able to break the duopoly, as they
2  call it, of Apple and Google and get a store, first of all,
3  that's quite speculative, but even if it did do that and they
4  could promise it, that's legally irrelevant. You can't offset
5  the harm that we're going to demonstrate in all of these other
6  markets with a possible benefit in a different market.
7     That's it, Your Honor. The equities also support us.
8  We're going to be showing you, Your Honor, that the public
9  interest in letting the FTC decide the merits of this
10 transaction outweighs the parties' interest in rushing to
11 complete a deal. And the facts and the law and the evidence we
12 have accumulated, we're going to bring it to Your Honor -- I
13 showed you the highlights -- and we're very certain that at the
14 conclusion of this presentation, you're going to grant the
15 preliminary injunction.
16    Thank you.
17    THE COURT: Thank you.
18    Ms. Wilkinson.
19    MS. WILKINSON: Thank you, Your Honor.
20    I have a slide deck. It's a bit shorter. Like
21 Mr. Weingarten, I have one slide in here that's confidential.
22 It's marked "Confidential." It will not come up on the screen,
23 but it's in your copy and the FTC's copy.
24    THE COURT: Thank you.
25              (Pause in proceedings.)

32

1              OPENING STATEMENT
2     MS. WILKINSON: Your Honor, on January 18th of last
3  year, 2022, the merger of acquisition -- excuse me -- of
4  Activision and Xbox through Microsoft was announced; and on
5  that day, it was all good news for consumers because you are
6  going to be able to see that there was some of the most popular
7  games produced, developed, and published by Activision and a
8  company that had a great strategy for trying to break the
9  status quo.
10    And what do I mean by that? For almost 20 years, Sony has
11 been the leader in the console market no matter how you define
12 it, and they have protected that market and been the dominant
13 player because they have a high profit margin when they sell
14 that game, whoever game it is, whether it's Call of Duty or one
15 of their exclusives, for $70 to a consumer who wants to
16 play their game.
17    And you know they want to protect that market because they
18 refuse to allow any of their games, especially those that are
19 day and date, which is how they describe, you know, launching
20 them on the first day, they allow none of those to be in any
21 subscription service. They don't allow any of those to be
22 streamed on the cloud, and they try to keep as many of their
23 games exclusive as they can.
24    And the reason they do that is because they understand if
25 it goes into a subscription service, which is what Xbox wants

33

1  to do and has already done with many of its games and wants to
2  do with Call of Duty and other Activision games, that the
3  consumer will now have a choice. They can buy the game and an
4  expensive console or they can subscribe to Game Pass and they
5  don't have to pay for Call of Duty. They can play it through
6  the subscription. So it's much more accessible to many more
7  consumers and it's cheaper.
8       But with that comes a threat to Sony because people are
9  going to choose often to play it in the subscription -- through
10  their subscription than they are to buy it, and I think you'll
11  hear from Mr. Phil Spencer, who's the CEO and he's here with us
12  today and he'll be here the entire time, something he says,
13  which is "One person or one company's margin is another
14  person's opportunity."
15      So Sony has a big margin and Xbox is looking for an
16  opportunity. They're looking for an opportunity to move people
17  away from consoles and be able to provide more games on more
18  devices to more people, and that model will allow people after
19  this transaction to be able to play Call of Duty in many more
20  places.
21      So when Counsel says that Xbox can withhold this game,
22  they literally cannot do it. They cannot do it because they
23  have signed agreements, as you will hear, with Nintendo, who
24  has not had access to Call of Duty in years. They are now
25  going to provide Call of Duty to Nintendo. They have also

34

1  signed agreements with Nvidia, one of the cloud gaming
2  services, Boosteroid, YuvaSoft, and others that you'll hear
3  about so that Call of Duty and other Activision games can be
4  streamed.
5       So if you look at the simple, simple question of what is
6  happening before and what is happening after, before COD can be
7  played on only two companies' devices and it's not on Switch.
8       Right now you cannot stream COD anywhere and you cannot
9  find it under any subscription service. After the transaction,
10  you will be able to do all of those things. So by definition,
11  it's good news for the consumer.
12      And everyone believes that, when this transaction was
13  announced, even Sony who has now become the complainer-in-chief
14  in this case and you heard almost nothing about, but they are
15  the ones that are worried about what's going to happen to them.
16      So let's take a look at what the overall global gaming
17  market looks like so you can understand as the witnesses
18  explain to you why they want their strategy and how they think
19  they can effectuate it with the games from ABK and why it would
20  make absolutely no sense to withhold these games from a
21  financial perspective, from a gamer's perspective, from a
22  reputational perspective.
23      So if we could look at Slide Number 1, you will see this
24  is the most recent data we have on the global gaming market and
25  it's huge. There's $210 billion revenues -- of revenues. And

35

1  look at the comparison. Console is the smallest part of the
2  market. It's 283 million. PC's are 337 million and mobile is
3  148 billion.
4       And you'll hear from Sarah Bond today about that move, the
5  evolution of the market. It makes sense, I think to all of us,
6  as we've seen everyone use phones for almost everything.
7  94 percent of gamers game on a mobile phone.
8       So there is no --
9       **THE COURT:** Wait a minute. When you're talking about
10  gamers, you're -- all video games?
11      **MS. WILKINSON:** Yes.
12      **THE COURT:** Solitaire?
13      **MS. WILKINSON:** Exactly, Your Honor.
14      **THE COURT:** Candy Crush?
15      **MS. WILKINSON:** Candy Crush, all kinds of gamers, yes.
16      Again, in this case we're focused on Call of Duty because
17  the FTC is alleging that's going to be what's withheld, but I
18  think you'll hear from our clients that there are so many
19  different kinds of games and they want to provide and do
20  provide many different choices to consumers.
21      But if you look at that console market, that's not going
22  to get bigger by percentage because there's many more potential
23  gamers out in the world. There's supposedly 3 billion gamers
24  and it could be up to 4 by 2030. And those people are moving
25  to mobile. They don't want to pay for a console. They don't

36

1  want to buy a game. Many of those people can't afford it. And
2  the one device they have is their mobile phone. So everyone
3  recognizes in the market that people are moving to mobile.
4       And that's what the folks at Xbox wanted to do, and that
5  is why simply they wanted to buy Activision. They had been
6  looking to move into the mobile market. They had not been
7  successful. You'll hear that they looked at other companies to
8  buy. And when Activision became available, they had the first
9  opportunity to become a presence in the mobile market to get
10  the folks at King, which is the part of Activision that
11  produces Candy Crush and other mobile games, so that they could
12  learn from those folks how to develop native games, which is
13  what it's called when it's played on the phone itself and not
14  from cloud; and, more importantly, how to market those games,
15  how to retain customers.
16      The folks at Candy Crush, I think you know, are incredibly
17  successful at that and that's something that Xbox has not been
18  able to do, and that is just one of the key ways they think
19  they can execute on their strategy.
20      No matter how you look at it in this case, no matter what
21  Counsel says, Xbox is third in a three-console market.
22      If you look at the global shares for 2021, you can see,
23  you can measure it by revenues, you can measure it by the units
24  sold, the actual consoles, or the installed base, which means,
25  you know, the consoles that are already out there plus the new

37

1   consoles that are being sold. And no matter how you look at
2   it, Xbox comes in third.
3        And if you take the FTC's definition of the market and you
4   take out Nintendo Switch, it only gets worse for Xbox.
5        So Mr. Spencer knows that to be successful in the future,
6   he has to be able to move not only into the mobile section but
7   also to spread his games out to as many people as possible.
8   And the most lucrative way to do that and the most important
9   way to do that is to take games that are what's called
10  multiplayer, which means people play against each other and
11  they play on different platforms.
12       And that's what COD does. So if you want to play COD, you
13  can play against your friends if you're all on Xbox; but if you
14  want to play against your friends who have a PlayStation, you
15  can also do that.
16       So why is that great? Obviously it's just more potential
17  people -- right? -- who can play, and so the revenues from
18  that, the potential revenues, are much larger and that's part
19  of the reason COD is so successful. It's a great game. People
20  love to play it, but it also has become successful because
21  it -- the folks at Activision have figured out that if you put
22  that on multiple platforms and you allow people to play across
23  platform and then they sometimes spend in game, which is called
24  in-game monetization, they have developed a very, very
25  lucrative franchise.

38

1        And they have also developed Call of Duty Mobile, so a
2   separate game that is native to mobile that also generates a
3   significant amount of revenues.
4        And what the government is suggesting to you is that
5   somehow Xbox, which is in need of those revenues, in need of
6   that business to try and grow into the other parts of the
7   market would somehow forego those as the smallest player in the
8   market. So when you look at that console share, you can just
9   see, common sense is there's almost two times the number of
10  players of COD on PlayStation as there are on Xbox.
11       So why in the world would Xbox when it then finally owns
12  the content give up those revenues? It's two times the
13  revenues, and the revenues that come -- I'm going to move ahead
14  so I can just show you the mobile presence. Excuse me.
15            (Pause in proceedings.)
16       MS. WILKINSON: Sorry, Your Honor.
17       I want to go backward please. Sorry. There we go.
18       So today with 3 percent -- or .3 percent in mobile, it's
19  not as if tomorrow they are going to have a significant
20  presence in mobile just because of Activision. So they need to
21  still have the revenues from the console sales and the majority
22  of those console shares come from PlayStation.
23       So economically it makes no sense to withhold. It doesn't
24  make sense to upset all those consumers, those gamers who like
25  to play against each other. And if you cut off PlayStation

39

1   players, Xbox players would lose two-thirds of the folks that
2   they play against.
3        It matters for them because one of the great things that
4   happens when you play across platform and you have multiplayers
5   is you have more people to match up against. You'll hear about
6   that. So you'll have more people who can play at your skill
7   level.
8        So maybe if you're people like us who don't play very
9   often or ever, you can play against each other and not feel so
10  badly; and the folks that are really great, can match up and
11  play against each other.
12       That's one of the features that the gamers love about
13  this. And if you cut off a source, a huge source of gamers,
14  the game itself is not as appealing to people so you lose
15  revenue, and that just gets worse and worse because then more
16  gamers are upset.
17       Let alone, as you'll probably have seen from the media
18  coverage, gamers have very strong opinions about what goes on
19  and they make very clear to Xbox that they want to play Call of
20  Duty on all these different consoles.
21       So there's reputational issues, there's monetary issues,
22  revenue issues, and then there is the deal model that you heard
23  about.
24       And generating a model to go to the board of directors to
25  say "Here's how we justify the deal" and a huge portion of it

40

1   is based on existing revenues coming out of Activision, it's
2   not as if they can just disregard that. I think that's a --
3   that's a -- that's a very naive suggestion.
4        And just so you don't have any doubt, we're going to bring
5   in Ms. Amy Hood, who's the CFO; and I think when you meet her,
6   you won't have any doubt that she holds Mr. Spencer and the
7   folks at Xbox to their margin targets and to their P&L, and
8   they have to decide that -- how they're going to meet those
9   numbers. And they have told her and she and Mr. Nadella have
10  told the board that they are going to use those revenues to
11  support this business over the next 10-plus years.
12       So there's absolutely no suggestion in the evidence that
13  they would change and decide to pull Call of Duty because they
14  couldn't -- they couldn't afford it. They couldn't look the
15  board in the eyes and say they did it, and they couldn't face
16  the wrath from the gamers.
17       But in this case, unlike almost any case you might decide,
18  you don't have to worry about would they do it because they've
19  made these contracts to assure you that they will do it. And
20  that's why this is one of the most unusual vertical merger
21  cases.
22       As you know, there's very few that ever get tried.
23  They've never won and there's certainly never been one like
24  this where they're actually protecting the dominant player,
25  Sony, and trying to maintain the status quo when one of the

41

1 smaller players is trying to become more competitive.

2 And they have one economist who's going to try to explain

3 this to you and say that that's what's going to happen. And

4 it's Dr. Lee says that the market is only the two participants

5 that we've been discussing, Xbox and PlayStation, and he says

6 it's only a U.S. market. We don't agree with any of that and

7 we'll talk about that during the trial.

8 But let's for a moment assume that everything he's saying

9 is true; that in the U.S. PlayStation right now has 56 percent

10 of the market and Xbox has 44.

11 So you can see PlayStation is the dominant console player

12 in his market. And he also will come and tell you that he

13 calculates that if Xbox were to withhold all of Call of Duty,

14 that would cause a 5 percent market share.

15 I don't have a Ph.D. in economics but if you do the math,

16 that's what the market looks like. Sony will have 50.5 percent

17 and Xbox will have 49.5 percent. And that's why you can't find

18 a case like this, because there's not a case that the

19 Government has ever brought where the market is getting less

20 concentrated and more competitive.

21 So even if everything bad that the Government says will

22 happen, it only makes the market more competitive. So there's

23 absolutely no basis to enjoin the transaction when everything

24 that the company can do, will do, and the market will do will

25 show that it will only become more competitive and better for

42

1 gamers.

2 Now, everyone knows this, including Mr. Ryan, who is the

3 complainant that you'll hear from tomorrow by video deposition

4 because he's not coming here, even though he came a few weeks

5 ago when I deposed him, he did come to Washington, but he isn't

6 coming here so we're going to play parts of that deposition for

7 you.

8 And when we received the documents from him, we found that

9 right after the transaction, he admitted in a candid e-mail

10 with the former CEO of Sony that he didn't believe this was an

11 exclusivity claim, which is, you know, will Xbox keep it to

12 themselves.

13 And so let's take a look at -- that's the e-mail, and you

14 can see this is Mr. Ryan who is responding to Mr. Deering,

15 who's the former CEO of Sony, and they are discussing the topic

16 we're discussing today: The Microsoft acquisition of

17 Activision.

18 Mr. Ryan is saying, not realizing that other people are

19 going to read this e-mail, and he says (as read):

20 "It is not an exclusivity play at all. They're

21 thinking bigger than that and they have the cash to make

22 moves like this. I've spent a fair bit of time with both

23 Phil and Bobby" -- Bobby is Mr. Kotick, the CEO of

24 Activision. "I've spent a fair amount of time with them

25 over the past day, and I'm pretty sure we will continue to

43

1 see COD on PlayStation for many years to come."

2 Why did he believe that? Because Mr. Spencer had called

3 him, Mr. Nadella had reached out to the CEO of Sony and assured

4 him that that would happen, but he also understands the

5 economics; that for COD to be successful, it needed to be on

6 his platform.

7 And what does he say in terms of the threat to his

8 business or competition? He says "We have some good stuff

9 cooking," which turned out to be he was buying another studio

10 called Bungie and announced it very -- a few days after that

11 (as read):

12 "I'm not complacent and I'd rather this hadn't

13 happened, but we'll be okay. We'll be more than okay."

14 So when he heard about the transaction when he was talking

15 to his mentor, when he was talking to his investors you'll see

16 and his board, he admitted that while this wasn't great news,

17 they would be fine, they would be just fine.

18 But several months later, he realized that that would

19 actually make Xbox more competitive. So what did he do? He

20 and the folks at Sony started traveling around the world to

21 complain to regulators.

22 And to try to assure Sony that they had nothing to worry

23 about, Mr. Spencer had told them from day one that he would

24 provide and guarantee that COD would be on PlayStation after

25 the merger. And not just after because there's already

44

1 contractual obligation for it to be on through 2024, so there's

2 not even a possibility of this withholding until 2025, but he

3 assured him it would be on after that; and as you saw, he

4 believed it.

5 Months later the folks at Xbox actually sent an offer to

6 Mr. Ryan to give him exactly what he wanted, and they've been

7 doing that back and forth. And I'm going to show you just the

8 most simple terms that tell you what Xbox is trying to give

9 Sony.

10 They are willing to give them ten years of content on

11 PlayStation, which is an unheard of length of time. There

12 are -- we haven't found gaming contracts that are ten years or

13 even five years. They are going to give them release date

14 parity. What does that mean? So PlayStation gets to release

15 it on the same day.

16 **THE COURT:** Can you hold on one second?

17 **MS. BENNETT:** I'm very sorry to interrupt. My

18 understanding was that this document has been marked

19 confidential. I can't read the exhibit number from the back,

20 but I believe that this document is confidential.

21 **THE CLERK:** And you are?

22 **MS. BENNETT:** My name's Elsbeth Bennett for Sony

23 Interactive Entertainment.

24 **MS. WILKINSON:** Are you talking about the slide with

25 parity on it?

45

1    **MS. BENNETT:** If I can have a moment, Your Honor.

2    **THE COURT:** Okay.

3    **MS. WILKINSON:** Your Honor, what we can do is just

4    take that down and I can just continue to talk.

5    **THE COURT:** I believe it is down.

6    All right. Let's not talk about the contents anymore.

7    **MS. WILKINSON:** Okay. So the offer allows them to get

8    exactly the same thing that Xbox will get in every way. So

9    when you heard about, well, even if they don't withhold it,

10   they might do what's called partial foreclosure, like somehow

11   make a degraded game that they would give to Sony versus what

12   Xbox would have, they're guaranteeing them they won't.

13   But, again, it doesn't make sense. Think of the movie

14   business. If you make a movie, spend all that money to develop

15   a movie and let's say you own the movie theaters in Omaha and

16   Sony owns the movie theaters in New York, why would you in the

17   smaller market sell your best game and sell a degraded movie in

18   New York in your big market? It doesn't make any sense.

19   Everybody wants to play the best game, and it only

20   reflects poorly on the developer if the game is somehow

21   degraded or, you know, less -- has fewer features or works more

22   slowly, or whatever it is that they claim is partial

23   foreclosure.

24   And we don't know what that is, Your Honor. You're going

25   to see -- Dr. Lee is going to come in. He did no economic

46

1    analysis to say what this partial foreclosure is. The FTC has

2    kind of pivoted on their theory in their last brief, but we

3    have no idea what they are claiming would actually happen if

4    there was partial foreclosure.

5    But despite this offer being held to Sony and them saying

6    at the same time they absolutely need COD, they don't know how

7    to say yes to what they say they really need so they refuse to

8    negotiate and figure out how to get this content and work with

9    us to come to an agreement.

10   At the end of the case after you hear from all of the

11   witnesses, learn a little bit about gaming, you will learn a

12   lot about the economics of it, and I think you will see that

13   every piece of evidence shows that it only makes sense for Xbox

14   to make these Activision games available to as many people on

15   as many platforms as possible, and it's consistent with what

16   they want to do as a company.

17   And if there's any doubt, any doubt, we hope, Your Honor,

18   that you will ask questions of our witnesses. We are only here

19   to present the evidence that you need because you are the

20   decision maker.

21   And as we said in our pleadings, and I want to make clear

22   just one last time, this is going to decide whether the deal

23   goes forward because if we can't close by July 18th and the

24   Court enjoins the transaction to go through the three-year

25   administrative nightmare, nobody could withstand that and we

47

1    certainly can't because it's not just going to administrative

2    hearing on April 2nd; it is -- then it takes Judge Chappell, a

3    long time, as is his right, to make detailed findings. And

4    then all he can do now because the FTC just changed the rules,

5    he doesn't even get to make a decision like you did as a

6    magistrate. He just gets to make a recommendation and they

7    just get to start *de novo* the commission and review it. They

8    can ignore his findings, his credibility findings.

9    And we all know what the result will be because they've

10   never voted against themselves. They're the prosecutor, the

11   jury, and the appeals court. So they will rule in their favor,

12   and then we will have to go to a circuit court, come back to an

13   Article III judge or judges to try to appeal to say they made

14   the wrong decision. That normally takes about three years.

15   If that were what's allowed in these merger cases, I don't

16   think it's just these two companies who couldn't survive,

17   almost no one could survive that, and that's why we come to

18   Federal Court asking you to apply the Federal Rules as you

19   mentioned yesterday and decide that there is no basis to enjoin

20   this transaction.

21   Thank you.

22   **THE COURT:** Thank you.

23   All right. Is the FTC prepared to call your first

24   witness?

25   **MR. WEINGARTEN:** Yes, Your Honor, we are. Our first

48

1    witness will be Mr. Matt Booty, and my colleague Nicole Callan

2    will be conducting the examination. Thank you.

3    (Pause in proceedings.)

4    **THE COURT:** I assume someone went to get Mr. Booty.

5    **MS. WILKINSON:** Excuse me, Your Honor, while we're

6    waiting. We just checked and the Sony offer is not

7    confidential. I'm sure counsel for --

8    **THE COURT:** Yeah. Why don't you just speak with

9    Counsel while we're waiting.

10   (Pause in proceedings.)

11   **THE COURT:** We know Mr. Booty is here?

12   **MR. WEINGARTEN:** We issued a trial subpoena. I'm told

13   he's here in the building.

14   **MR. KILARU:** I guarantee he's here, Your Honor. He's

15   in the elevator. He'll be down.

16   **THE COURT:** Okay.

17   (Pause in proceedings.)

18   MATT BOOTY,

19   called as a witness for the Plaintiff, having been duly sworn,

20   testified as follows:

21   **THE CLERK:** Please state your name for the record.

22   **THE WITNESS:** Matt Booty.

23   **THE CLERK:** Thank you.

24   **THE COURT:** You may be seated.

25   **THE WITNESS:** Thank you, Your Honor.

49

1  **MS. CALLAN:** Your Honor, permission to give the
2  witness a binder.
3  **THE COURT:** Yes.
4  **MS. CALLAN:** And you have a binder as well?
5  **THE COURT:** Yes.
6  **MS. CALLAN:** I'm Nicole Callan for Plaintiff.
7  **THE COURT:** You may go ahead.
8  <u>**DIRECT EXAMINATION**</u>
9  **BY MS. CALLAN:**
10  Q.  Good morning, Mr. Booty.
11      Could you please state your name for the record?
12  A.  Matt Booty.
13  Q.  And your current job is the head of Xbox Game Studios at
14  Microsoft; correct?
15  A.  That's correct.
16  Q.  And you have been the head of Xbox Game Studios since
17  2018; is that right?
18  A.  That's correct.
19  Q.  And you report directly to Microsoft Gaming CEO Phil
20  Spencer; correct?
21  A.  Yes.
22  Q.  And you're a member of Microsoft gaming leadership team?
23  A.  Correct.
24  Q.  The gaming leadership team is made up of Phil Spencer's
25  direct reports; right?

50

1  A.  Yes.
2  Q.  And Xbox Game Studios develops and publishes video games;
3  correct?
4  A.  Yes.
5  Q.  And as head of Xbox Game Studios, you are responsible for
6  overseeing the teams making games for Microsoft internal
7  studios; correct?
8  A.  That's correct.
9  Q.  And you are responsible for Xbox Games Studios strategy;
10  correct?
11  A.  Yes.
12  Q.  Sir, I'd like to go over some industry terms for the
13  benefit of the Court.
14      "Game developer" is a team or studio that creates a video
15  game; correct?
16  A.  Yes, that's right.
17  Q.  Meaning that the game developer is writing the software
18  and creating the art; correct?
19  A.  Yes.
20  Q.  And the game publisher provides the funding and helps take
21  a game to market; right?
22  A.  Yes, that's accurate.
23  Q.  And some games are called first-party games?
24  A.  Yes.
25  Q.  And for Microsoft "first-party games" means games

51

1  developed by studios that Microsoft owns; correct?
2  A.  Yes.
3  Q.  And so an example of a Microsoft first-party game would be
4  Halo; correct?
5  A.  Yes.
6  Q.  And games on Xbox that come from publishers other than
7  Microsoft-owned studios are called third-party games; right?
8  A.  Yes.
9  Q.  So Microsoft Call of Duty is an example of a third-party
10  game; correct?
11  A.  That's right.
12  Q.  And you use the term "content" to refer to games; correct?
13  A.  Sometimes, yes.
14  Q.  And additional purchases and updates associated with games
15  are also content?
16  A.  Yes.
17  Q.  And the term "catalog content" means older, previously
18  released games; right?
19  A.  Often, yes.
20  Q.  And the term "AAA" is used in the gaming industry?
21  A.  In many different contexts, yes.
22  Q.  AAA can sometimes refer to the quality level of the game?
23  A.  Among other things, yes.
24  Q.  And it can sometimes refer to the budget size of the game?
25  A.  That's accurate.

52

1  Q.  And it can sometimes refer to consumer expectations about
2  the game; correct?
3  A.  Yes.
4  Q.  And when someone uses the term "AAA" to describe the
5  quality of a game, they're referring to a high-quality game;
6  right?
7  A.  Within the context of the developer, the team, or the
8  specific franchise, yes.
9  Q.  And the term "tentpole" is also used in the gaming
10  industry?
11  A.  Sometimes, yes.
12  Q.  And tentpole games are games that are well-known or
13  recognizable brands; right?
14  A.  Yes, or play a role in a specific marketing campaign or
15  portfolio line-up.
16  Q.  And consumer expectations can be higher for games with
17  name recognition; correct?
18  A.  Often, yes.
19  Q.  Consumers may expect more complicated technology?
20  A.  Sometimes.
21  Q.  And they may expect longer game play?
22  A.  Sometimes.  Not always.
23  Q.  And they may expect more sophisticated story lines?
24  A.  That varies greatly depending on the genre or the type of
25  games.  Some games have more story lines than others.

53

1  Q.  And meeting consumer expectations for a game like Halo can
2  cost more?
3  A.  Sometimes, yes.
4  Q.  You need more software developers?
5  A.  Yes.
6  Q.  You may need more artists?
7  A.  Yes.
8  Q.  And you may need more time?
9  A.  Sometimes.
10 Q.  And developing games has become more expensive in the last
11 five to ten years; correct?
12 A.  As a general trend, yes.
13 Q.  And games are taking longer on average to develop;
14 correct?
15 A.  On average.
16 Q.  And many games are being delayed and take longer than
17 initially planned; correct?
18 A.  That happens, yes.
19 Q.  And would you agree that developing games is more of an
20 art than a science?
21 A.  I would say it is a mixture of both at times.
22 Q.  I'd like to talk to you about the term "exclusivity"
23 and how it's used at Microsoft.
24     Halo Infinite is an example of a Microsoft first-party
25 game that is available on Xbox consoles; correct?

54

1  A.  That's right.
2  Q.  And Halo Infinite is also available on PCs; correct?
3  A.  That's correct.
4  Q.  And Halo Infinite is available on Xbox Game Pass?
5  A.  Yes.
6  Q.  But Halo Infinite is not available on PlayStation
7  consoles; correct?
8  A.  That's correct.
9  Q.  And Halo Infinite is an example of a game that you would
10 call an exclusive to Xbox; correct?
11 A.  To Xbox consoles as well as PC Windows, yes.
12 Q.  So you sometimes use the term "exclusive" to mean that a
13 game would be available on Xbox consoles, Xbox Game Pass, and
14 PC; correct?
15 A.  That's correct.
16 Q.  You also sometimes use the term "timed exclusive"?
17 A.  Sometimes, yes.
18 Q.  And a timed exclusive can mean Microsoft launches the game
19 on Xbox first and then some period of time later you would
20 bring the game to PlayStation; correct?
21 A.  Or other platforms.
22 Q.  And in your role as the head of Xbox Game Studios, you
23 make recommendations on whether games should be exclusive;
24 correct?
25 A.  I have input into those recommendations.  I don't have the

55

1  final decision-making authority on that.
2  Q.  And Microsoft does not have any policy for making
3  exclusivity decisions; correct?
4  A.  No.
5  Q.  And there's no set form or procedure for determining the
6  platforms that a game is on; is that right?
7  A.  No.  I would say that it is discussed and there are a lot
8  of principles and factors that go into it.  It's discussed but,
9  yeah, it's often discussed.
10 Q.  So your understanding is that Microsoft is making these
11 decisions on a case-by-case basis; correct?
12 A.  Depending on the game and the context, yes.
13 Q.  And you are considering a number of factors; correct?
14 A.  That's right.
15 Q.  And platform decisions are subject to change in the time
16 period leading up to the release of the game; correct?
17 A.  I'm sorry.  Could you repeat the last part?
18 Q.  Platform decisions are subject to change in the time
19 period leading up to the release of the game?
20 A.  That decision needs to be made fairly early on in the
21 development of a game.  Once a team starts on a technology base
22 or making decisions about which hardware to support, it is rare
23 and in my experience very difficult to make that sort of change
24 late in production.
25 Q.  But in your experience, exclusivity decisions are

56

1  revisited; correct?
2  A.  They can be but, again, there's a time window during which
3  that's feasible and then a point of time at which it's not.
4  Q.  And the decision about exclusivity can remain open or
5  unclear up until the final point where a decision needs to be
6  made; correct?
7  A.  Well, I guess the decision would be unclear until the
8  decision is made, that's correct.
9               (Laughter)
10 BY MS. CALLAN:
11 Q.  And a number of people at Microsoft are involved in making
12 exclusivity decisions; is that correct?
13 A.  That's correct.
14 Q.  But Microsoft gaming CEO Phil Spencer has the final say on
15 exclusivity?
16 A.  Yes.
17 Q.  In 2014 Microsoft acquired a game developer called Mojang;
18 is that right?
19 A.  That's right.
20 Q.  And Mojang developed the game Minecraft?
21 A.  Correct.
22 Q.  And then between 2018 and 2020, Xbox Game Studios acquired
23 eight additional game studios; right?
24 A.  That's correct.
25 Q.  And you believed it was noteworthy that Microsoft was

57

1  acquiring studios and that you were acquiring studios at that
2  rate; correct?
3  **A.**  Noteworthy.  We acquired those studios, yeah.
4  **Q.**  And you would agree that that was noteworthy that you were
5  acquiring those studios at that rate?
6  **A.**  Within the industry, yes.
7  **Q.**  And then in 2021 Microsoft acquired a game developer
8  called ZeniMax?
9  **A.**  That's correct.
10 **Q.**  And ZeniMax is also sometimes referred to as Bethesda;
11 correct?
12 **A.**  Bethesda is a part of ZeniMax.
13 **Q.**  So that's because Bethesda is the name of ZeniMax's
14 largest studio; correct?
15 **A.**  That's correct.
16 **Q.**  Microsoft paid roughly $7 billion for ZeniMax?
17 **A.**  That's right.
18 **Q.**  The term "generation" is used to describe certain video
19 game console hardware; correct?
20 **A.**  Yes.
21 **Q.**  And the current generation of consoles is Generation 9?
22 **A.**  That's right.
23 **Q.**  And the Xbox series S and X are Generation 9 consoles;
24 right?
25 **A.**  Yes.

58

1  **Q.**  PlayStation 5 is a Generation 9 console?
2  **A.**  That's correct.
3  **Q.**  The previous generation is Generation 8?
4  **A.**  That's right.
5  **Q.**  And Xbox one is Generation 8?
6  **A.**  That's right.
7  **Q.**  And PlayStation 4 is Generation 8?
8  **A.**  That's how we would refer to it, yes.
9  **Q.**  In general it is more difficult to develop games for each
10 new console generation; correct?
11 **A.**  There is definitely a learning curve as the developers
12 learn the specifics of a new piece of hardware and there is a
13 ramp-up time, yes.
14 **Q.**  And is it also more difficult to develop games for each
15 new console generation because the sophistication and
16 complexity of the hardware increases with each generation?
17 **A.**  As a general trend, I would say the difficulty happens
18 during that initial learning period as the developers become
19 familiar with the new hardware.
20 **Q.**  And the current Nintendo console is the Nintendo Switch;
21 is that right?
22 **A.**  That's right.
23 **Q.**  And you do not consider Nintendo consoles in the same
24 generation taxonomy as Microsoft and Sony consoles; correct?
25 **A.**  In general, although we consider from a platform release

59

1  standpoint the Switch to be one of that same line-up.  A recent
2  game that we launched, a launch day and date on PlayStation
3  Xbox and Switch across all of those platforms simultaneously,
4  so we consider them contemporaneous.
5  **Q.**  You don't, for example, consider the Nintendo Switch to be
6  a Generation 9 console; correct?
7  **A.**  In general it's not referred to as that.
8  **Q.**  And Nintendo's console hardware is generally a generation
9  or two behind Xbox and PlayStation; correct?
10 **A.**  I don't -- I wouldn't necessarily agree with that
11 characterization in terms of full generation behind.
12 **Q.**  Do you see a binder in front of you?
13 **A.**  I do.
14 **Q.**  Could you turn to PX7048?  And PX7048 is a copy of
15 testimony you gave in this matter; correct?
16 **A.**  Give me time to get familiar with the document.  Thank
17 you.
18      (Witness examines document.)  Okay.  I see it, yes.
19 **Q.**  And you were under oath when you gave this testimony?
20 **A.**  That's correct.
21 **Q.**  Please turn to page 136 of the transcript pages so you'll
22 see the transcript pages in the upper right-hand corner of each
23 page.
24      Do you see where you were asked at line 11 (as read):
25      **"QUESTION:** Would that also refer to the Nintendo Switch?"

60

1      And your answer was (as read):
2      **"ANSWER:**  You know, I don't know.  I don't know that most
3  people would say that it does.  Nintendo tends to ship
4  their consoles sort of on their own cycle, which is a bit
5  different from Xbox and PlayStation.  And because their
6  consoles are generally a generation or two behind us in
7  terms of the power of the hardware, hardware complexity,
8  graphical complexity, we don't really think about them in
9  the same evolutions" --
10      And this says "of generalizations."  I believe you said
11 "generations."
12 **A.**  That's correct.
13 **Q.**  That testimony was truthful and accurate when you gave it?
14 **A.**  It was.
15 **Q.**  So the Nintendo Switch is a less technically capable piece
16 of hardware than the current PlayStation and Xbox consoles;
17 correct?
18 **A.**  Yes.
19 **Q.**  In fact, the Nintendo Switch is a radically less powered
20 piece of hardware; correct?
21 **A.**  I would not agree with the characterization "radically."
22 **Q.**  Could you turn to page 131 of your deposition, PX7048?
23 **A.**  (Witness examines document.)  Okay.  I see it.
24 **Q.**  And do you see at line 14 you were asked (as read):
25      **"QUESTION:**  What would be downgraded to beyond Switch?"

61

1  And you answered (as read):
2  **ANSWER:** Well, we would just have to adjust the assets
3  and the graphical complexity to run on the lower -- the
4  lower-powered hardware so that could mean running -- these
5  are just examples. It's not exhaustive or specific. It
6  might mean running at a lower resolution. It might mean
7  creating lower resolution assets in the game. It might
8  mean running at a lower frame rate. It might mean less
9  complexities in the scenes that are presented in the game.
10  It is more of an art than a science on how you would take
11  something to a radically less powerful -- powered piece of
12  hardware."
13  Do you see that?
14  A.  I do.
15  Q.  And that testimony was truthful and accurate when you gave
16  it?
17  A.  It was.
18  Q.  Do you agree that the Nintendo Switch is a radically less
19  powered piece of hardware?
20  A.  It is less powered, less powerful.
21  Q.  And that difference in performance impacts what games can
22  actually run on the Switch; correct?
23  A.  That's correct.
24  Q.  And the Nintendo Switch also has a different customer base
25  than Microsoft's Xbox; correct?

62

1  A.  I'm not entirely familiar with exactly how they would
2  characterize their customer base. We consider there to be an
3  awful lot of overlap between their customer base and ours at
4  times, but I don't have those details.
5  Q.  Do you consider there to be a difference in the customer
6  base between the Nintendo Switch and Microsoft's Xbox?
7  A.  I imagine there are some differences and there is some
8  overlap.
9  Q.  And Nintendo customers tend to skew younger; correct?
10  A.  That is perception but, again, I don't have actual data on
11  that or, you know, know their market demographics.
12  Q.  And Nintendo is known for more family rated games; right?
13  A.  I think in general their portfolio has more of those, yes.
14  Q.  It is not a foregone conclusion that a game that has done
15  well on Xbox would do well on Switch; correct?
16  A.  That's fair to say, yes.
17  Q.  Let's take the example of Halo again. A game like Halo
18  would be almost impossible in its current form to get running
19  on the Switch; correct?
20  A.  It would require material work to get it running on the
21  Switch, yes.
22  Q.  And do you agree that it would be almost impossible to get
23  it running on the Switch in its current form?
24  A.  Yeah. The key there being "in its current form."
25  Q.  You would have to create a whole new version of the game

63

1  to put Halo on Switch; correct?
2  A.  It would be -- it would need significant work and
3  modifications to get it to run, yes.
4  Q.  That would be a pretty large project?
5  A.  I think so, yes.
6  Q.  And if you did create a version of Halo for the Switch, it
7  would be a fairly downgraded version of the game; correct?
8  A.  Compared to the Xbox series S and X, for example, yes.
9  Q.  To bring Halo to the Switch you would have to lower the
10  graphical complexity of the game; right?
11  A.  Among other things, yes.
12  Q.  And that might mean running at a lower frame rate?
13  A.  Possibly. That would be one of the tradeoffs that could
14  be made.
15  Q.  And it might mean running at a lower resolution?
16  A.  Again, possibly there would be a number of tradeoffs
17  between complexity, frame rate, resolution that we would have
18  to make tradeoffs there, yeah.
19  Q.  And it might mean less complex scenes in the game; right?
20  A.  Possibly, yes.
21  Q.  And these downgrades would not be feasible without
22  compromising the experience of the game; right?
23  A.  I think our developers would work hard to preserve the
24  experience of the game play above all else so the tradeoffs
25  would be prioritized to preserve the game play feel and the

64

1  experience as much as possible.
2  Q.  But you would be essentially creating a different game;
3  correct?
4  A.  We would try to keep it as true to the original as
5  possible. I would expect there would be significant
6  differences, yeah.
7  Q.  I'd like to turn to the topic of cloud gaming.
8  Cloud gaming allows you to stream a game from the cloud to
9  a local device; correct?
10  A.  Yes.
11  Q.  Microsoft offers cloud gaming?
12  A.  Yes.
13  Q.  And that's sometimes referred to as xCloud?
14  A.  Correct.
15  Q.  And Nvidia also offers cloud gaming; correct?
16  A.  That's correct.
17  Q.  And that service is called GeForce NOW?
18  A.  That's right.
19  Q.  I'd like you to turn to PX4351 in your binder.
20  A.  (Witness examines document.)
21  Q.  That is an e-mail chain dated March 26th, 2021, with the
22  subject line "Bethesda Titles on Nvidia GeForce NOW"; correct?
23  A.  That's correct.
24  Q.  And you are an author and recipient of the e-mails
25  contained in PX4351?

65

1 **A.** That's right.

2 **Q.** Please look at your e-mail on PX4351-002. You will see

3 those numbers marked on the bottom right-hand corner of the

4 page.

5 **A.** I see it.

6 **Q.** You sent this e-mail to the CEO of Microsoft Gaming among

7 others; correct?

8 **A.** Correct.

9 **Q.** And you provide truthful and accurate information to

10 Mr. Spencer?

11 **A.** Yes.

12 **Q.** And you wrote, quote (as read):

13     "We have pulled all XGS titles from GeForce NOW so as

14 not to compete with xCloud."

15 Right?

16 **A.** I did.

17 **Q.** And "XGS" means Xbox Game Studios?

18 **A.** That's right.

19 **Q.** You went on to write (as read):

20     "I would recommend that in the absence of any other

21 plans that we do the same for Bethesda titles."

22 Right?

23 **A.** That's right.

24 **Q.** And this was in March 2021; correct?

25 **A.** That's correct.

66

1 **Q.** And this was after Microsoft acquired the Bethesda titles

2 that same month; correct?

3 **A.** Yes. I believe the exact day and date, but it was that

4 month, that's correct, yeah.

5 **Q.** Please turn to your e-mail on the page ending 001 in the

6 middle of the page.

7 **A.** Okay.

8 **Q.** The third line you wrote, quote (as read):

9     "We are not putting our first-party IP on competing

10 streaming or subscription services."

11 Correct?

12 **A.** I see that.

13 **Q.** You wrote that?

14 **A.** I did.

15 **Q.** And "first-party IP" here means first-party games; right?

16 **A.** That's right.

17 **Q.** And at the end of this e-mail you wrote "No effing way";

18 correct?

19 **A.** I did.

20     **MS. CALLAN:** Your Honor, I move to admit PX4351 into

21 evidence.

22     **THE COURT:** 4351 admitted.

23     (Trial Exhibit 4351 received in evidence.)

24 **BY MS. CALLAN:**

25 **Q.** You can set that document aside.

67

1 Tim Stuart is the president of Xbox; correct?

2 **A.** That's correct.

3 **Q.** And you give Mr. Stuart truthful and accurate information?

4 **A.** I do.

5 **Q.** I'd like you to turn to PX1442.

6 **A.** (Witness examines document.)

7 **Q.** PX1442 is an e-mail chain dated October 15th, 2019, with

8 the subject line, quote, "Preview for Friday 3 PPP Content

9 Investments"; is that right?

10 **A.** That's right.

11 **Q.** And you are the author of the e-mail at the top of PX1442?

12 **A.** Yes.

13 **Q.** And in the third line from the bottom of your e-mail you

14 wrote that "Netflix lost money for years chewing through

15 startup funding"; right?

16 **A.** It does say that.

17 **Q.** You wrote that?

18 **A.** I did.

19 **Q.** And then the next sentence is redacted for the public but

20 it starts with "Game." Do you see that?

21 **A.** I do.

22 **Q.** And you wrote that sentence; correct?

23 **A.** Yes.

24 **Q.** And then the last sentence you wrote (as read):

25     "But I think the idea is to create a moat that nobody

68

1 else can attack."

2 Correct?

3 **A.** That's what it says, yes.

4 **Q.** And you wrote that?

5 **A.** Yes.

6     **MS. CALLAN:** Your Honor, I move to admit PX1442 into

7 evidence.

8     **THE COURT:** 1442 admitted.

9     (Trial Exhibit 1442 received in evidence.)

10 **BY MS. CALLAN:**

11 **Q.** Mr. Booty, I'd like you to turn to PX4352.

12 **A.** (Witness examines document.)

13 **Q.** PX4352 is an e-mail chain dated December 17, 2019, with

14 the subject line "GP ARPU"; correct?

15 **A.** That's right.

16 **Q.** You are the author of the e-mail at the top of PX4352?

17 **A.** Yes.

18 **Q.** And this is an e-mail to Xbox CFO Tim Stuart; correct?

19 **A.** That's right.

20 **Q.** And "GP" here means Game Pass?

21 **A.** Yes.

22 **Q.** And "ARPU" means average revenue per user?

23 **A.** Yes.

24 **Q.** In the second-to-last-sentence of the first full paragraph

25 on 001, you wrote (as read):

69

1       "Content is the one moat that we have in terms of a
2   catalog that runs on current devices and capability to
3   create new." Correct?
4 **A.**  That's right.
5 **Q.**  And then you wrote (as read):
6       "Sony is really the only other player who could
7   compete with Game Pass and we would have a two-year and
8   10M subs lead."
9   Correct?
10 **A.**  That's right.
11 **Q.**  And "10M" means 10 million; correct?
12 **A.**  Yes.
13       **MS. CALLAN:** Your Honor, I move to admit PX4352 into
14 evidence?
15       **THE COURT:** Admitted.
16       (Trial Exhibit 4352 received in evidence.)
17       **MS. CALLAN:** And I have no further questions at this
18 time.
19       **THE COURT:** Thank you.
20       (Pause in proceedings.)
21       **MR. KILARU:** Rakesh Kilaru for Microsoft, Your Honor.
22       **THE COURT:** Go ahead.
23           **CROSS-EXAMINATION**
24 **BY MR. KILARU:**
25 **Q.**  Good morning, Mr. Booty.

70

1 **A.**  Good morning.
2 **Q.**  I'd like to pick up with the e-mails that you were just
3 asked about.
4       Thank you.
5       Do you recall when those e-mails were from?
6 **A.**  2019.
7 **Q.**  And at the time how were you and Xbox thinking about
8 content in the video game industry?
9 **A.**  We were discussing a lot of options and exploring what
10 would be the best way to go forward as we saw the landscape
11 changing for the role that content plays in our strategy and in
12 our business.
13 **Q.**  And was there an analogy in your mind that you were
14 drawing when you were going through this thought experiment?
15 **A.**  Oftentimes we would look at Netflix as a potential example
16 of video on demand streaming as perhaps models for how things
17 had changed over time for that industry.
18 **Q.**  Was there an idea that Netflix had raced out to a lead at
19 that time?
20 **A.**  We looked at what they were doing with their spend on
21 content and how they were building a content portfolio and
22 seeing if there were things to learn from that.
23 **Q.**  And have those views of 2019 proved to be correct as the
24 industry has evolved over the last three years?
25 **A.**  I would say no, but thinking at the time that content

71

1 would be some sort of durable advantage, I think has not proven
2 true and it has not proven as a barrier to competitors entering
3 the field.
4 **Q.**  And does Xbox have competitors in subscription gaming?
5 **A.**  It does.
6 **Q.**  Who are those competitors?
7 **A.**  The first that comes to mind is Sony with their PS Now
8 subscription.
9 **Q.**  You were also asked about some e-mails from 2019 regarding
10 negotiations with Nvidia. Do you remember that?
11 **A.**  I do.
12 **Q.**  Has anything changed since then in terms of Xbox's
13 relationship with Nvidia?
14 **A.**  Yeah. We've signed a number of deals to bring a large
15 part of our portfolio to their streaming service.
16 **Q.**  Okay. Let's take a step back for a minute and talk more
17 about the game development.
18       Is that the line of work you're in, Mr. Booty?
19 **A.**  That's right.
20 **Q.**  And what is game development?
21 **A.**  The design, software, creation, art, assets, as well as
22 publishing, shipping video games.
23 **Q.**  And how long have you been working in game development?
24 **A.**  For over 30 years.
25 **Q.**  Could you give just a very brief overview of the positions

72

1 you've had?
2 **A.**  I joined Microsoft in 2010. Led a number of individual
3 teams. Worked on games for Windows phone.
4       In 2014 I was one of the leads on the acquisition of
5 Mojang who make Minecraft. Personally led that franchise for
6 four years. Took the role that I'm now in now in 2018.
7       Prior to that, coming out of university, I worked at a
8 place Midway Games in Chicago, worked as a software developer,
9 game designer, eventually ran studios, and ended as the CEO of
10 that company.
11 **Q.**  Do you oversee all of Xbox's studios that they own?
12 **A.**  I oversee roughly half today of the part that we would put
13 under the umbrella of Xbox Game Studios, XGS. That is separate
14 from the ZeniMax Bethesda studios, which do not report directly
15 to me.
16 **Q.**  Who do they report to?
17 **A.**  To Phil Spencer.
18 **Q.**  Does Xbox Game Studios bear the costs of the games that it
19 develops?
20 **A.**  We do.
21 **Q.**  They go on your budget?
22 **A.**  Yes.
23 **Q.**  Just a few questions about the game development process.
24       In your experience, does the size of the budget for a game
25 guarantee its success?

73

1  A.  No.

2  Q.  How about the term "franchise"?  Is that a term that

3  you've used or think about in game development?

4  A.  We do.  Franchise often refers to a game that has had a

5  number of releases and sequels.  It might include different

6  types of games under one banner.  It also could include things

7  like books, movies, cartoons, toys that are part of that

8  franchise.

9  Q.  And does being part of an established franchise ensure

10  that a game is going to keep being successful?

11  A.  No.  I would say that each release in a franchise has --

12  is up against just the same sort of odds of being successful as

13  any previous release.

14  Q.  And last question on this topic.

15      From your perspective as a game developer, are there

16  reasons why you'd want to make a game exclusive that relate to

17  the technical development of the game?

18  A.  In terms of technical development, if a game is built on a

19  proprietary engine, meaning that it was developed in-house for

20  a specific purpose, in general those engines can be more

21  difficult to take to a broader number of platforms compared to

22  if a game is built using a commercial game engine where the

23  creator of that game engine is responsible for doing all the

24  low-level work to make it run on different hardware.

25  Q.  Just to give a little explanation, what is a game engine?

74

1  A.  It's the underlying foundational software that is often

2  used as a starting point to put the actual game play assets on

3  top of.

4  Q.  And why would a proprietary versus a commercial game

5  engine make a difference in exclusivity?

6  A.  Well, again, oftentimes proprietary engines are purpose

7  built for a certain kind of game that has certain kind of

8  demands, for example, a racing game or some first-person

9  shooter games; and once that engine has been optimized for that

10  specific-use case, it can be more difficult to make the changes

11  that are needed for it to run on newer hardware or more

12  complicated hardware.

13  Q.  You were asked some questions about developing games for

14  Nintendo.  Do you remember that?

15  A.  Yes.

16  Q.  Have you developed games that have shipped on Nintendo?

17  A.  Yes.

18  Q.  And have those games been successful?

19  A.  Yes.

20  Q.  Could you give us some examples?

21  A.  We shipped many iterations of the base Minecraft game on

22  the Switch, and we also launched expansions to Minecraft, for

23  example, Minecraft Dungeons and Minecraft Legends.  Minecraft

24  Dungeons has been as successful on Switch as it has been on

25  other platforms.

75

1  Q.  Now I'd like to talk about Sony for a little bit.

2      Is Sony a competitor to Xbox?

3  A.  Yes.

4  Q.  And do you perceive them as having an advantage in the

5  marketplace?

6  A.  Based on financial results, yes.

7  Q.  And do you have a sense of how much Xbox has spent on

8  content, including acquisitions, over the last four years?

9  A.  Well over $10 billion.

10  Q.  And has that been able to cut into Sony's advantage?

11  A.  Not based on current state, no.

12  Q.  Do you also ship games on the Sony platform?

13  A.  Yes, we do.

14  Q.  Do you have a rough sense of how many?

15  A.  If we were to take all of the games that our studios have

16  shipped on PlayStation over time, that would be several dozen.

17  Q.  Can I turn your attention to PX5045?  It's actually in a

18  separate binder.  If I can give that to you.

19                  (Pause in proceedings.)

20  BY MR. KILARU:

21  Q.  What's this document that's in front of you, Mr. Booty?

22  A.  This is a list of the games that I just mentioned.  This

23  is a list of games that have shipped on PlayStation from

24  studios that we've acquired both pre- and post-acquisition.

25  Q.  And did you prepare this list?

76

1  A.  I did.

2  Q.  Do you have personal knowledge of all the games studios

3  and release dates on this document?

4  A.  In particular the games that have been released

5  post-acquisition, but I'm familiar with all of them.

6  Q.  If I asked you to, could we walk through these one by one

7  and establish the title and release date?

8  A.  Probably, yes.

9          MR. KILARU:  Your Honor, we'd offer 5045.

10         THE COURT:  Can you tell me why some are highlighted?

11         MR. KILARU:  We're going to get into that.  I'm happy

12  to do that first if you like.

13         THE COURT:  All right.  5045 admitted.

14      (Trial Exhibit 5045 received in evidence.)

15  BY MR. KILARU:

16  Q.  I see there are two colors on the sheet, Mr. Booty.  Could

17  you explain what the white -- the games labeled in white are?

18  A.  Those are games that shipped on PlayStation by these

19  studios prior to our acquisition of them.

20  Q.  And has Xbox continued to support these games on

21  PlayStation after the acquisition?

22  A.  We have.

23  Q.  Have you ever received any complaints from Sony about the

24  quality of the games?

25  A.  No.

77

1  Q.  Ever receive any complaints that you were keeping content
2  away from them or giving their gamers a worse experience?
3  A.  No.
4  Q.  Now, some of the rows are yellow.  What does that signify?
5  A.  This indicates games that have shipped on PlayStation
6  after we acquired the studio.
7  Q.  And for all of those games, did you ever receive any
8  complaints from Sony about the development process?
9  A.  No.
10 Q.  How about the quality of the game?
11 A.  No.
12 Q.  Ever receive any complaints that you were keeping content
13 away from them or giving their fans a worse experience?
14 A.  No.
15 Q.  We're done with that document for now.
16     Just one last topic.  You were asked about a game called
17 Minecraft.  Could you just explain what Minecraft is?
18 A.  At its core Minecraft is a game that involves building
19 with blocks and exploring worlds that have been built with
20 those blocks.
21 Q.  And when did you start working on Minecraft?
22 A.  In 2014.
23 Q.  Would you call Minecraft a franchise?
24 A.  At this point, yes.
25 Q.  And does it have multiplayer capabilities?

78

1  A.  It does.
2  Q.  When Xbox acquired Minecraft, do you recall -- Mojang,
3  excuse me -- do you recall what platforms Minecraft was on?
4  A.  At that point in time, I believe it was PC and the console
5  version had launched on Xbox.
6  Q.  Was it also available on the PlayStation?
7  A.  I believe so, yes.
8  Q.  In developing Minecraft, do you allow cross play between
9  Xbox and PlayStation consoles?
10 A.  We do.
11 Q.  Okay.  Since acquiring Minecraft, has Xbox increased
12 access to the game or decreased access to the game in terms of
13 platform?
14 A.  I think we've greatly increased.  We've taken it to the
15 Nintendo Switch and have launched it on platforms ranging from
16 the Kindle to Chromebooks.  So quite a number of platforms.
17 Q.  You mentioned that Minecraft is a franchise.  Have you
18 released any new games in that franchise since acquiring
19 Mojang?
20 A.  We have.  In 2020 we launched a game called Minecraft
21 Dungeons, which was a standalone game in that world but a
22 different kind of game play.  And earlier this year we launched
23 Minecraft Legends, also a different kind of game and a
24 standalone game but part of the franchise.
25 Q.  Did you launch both of those games post-acquisition on the

79

1  PlayStation?
2  A.  We did.
3  Q.  And on the Switch as well?
4  A.  Yes.
5  Q.  And have you ever received any complaints or concerns from
6  Sony about the quality of the Minecraft games you're shipping?
7  A.  No.  We have a great working relationship with them as it
8  pertains to Minecraft.
9  Q.  How about any concerns about the development process?
10 A.  No.
11 Q.  Any claims that you are withholding content from them or
12 giving their users a worse experience?
13 A.  No.
14 Q.  How would you characterize your relationship with Sony in
15 terms of working together on game development?
16 A.  I think it's a very cordial and productive relationship.
17 We have a team that are assigned to us as account managers and
18 we meet with them regularly to talk about the road map for
19 Minecraft, and find it a good working relationship.
20 Q.  Have you ever received any praise from Sony for the work
21 you've done together?
22 A.  They generally seem pleased and thankful for the
23 partnership; and as a token of that, when they released a
24 commemorative PlayStation 4 edition for the number of units
25 that they sold they, the then head of third-party sent one to

80

1  me, which was kind of special, saying that they were sending it
2  to -- out of appreciation for the work that we had done with
3  them.
4  Q.  Did he ask you to do anything with that unit?
5  A.  He did include a memo saying I should display it proudly
6  in the hallway.
7            (Laughter)
8       MR. KILARU:  Just one moment, Your Honor.
9            (Pause in proceedings.)
10      MR. KILARU:  Nothing further from us at this time.
11      THE COURT:  Okay.  I just have a couple questions.
12      When you say you can play Xbox and PlayStation, play
13 Minecraft together multiplayers but not with the Switch or the
14 PC?
15      THE WITNESS:  No, we allow multiplayer across all
16 those platforms.
17      THE COURT:  All those platforms.  So one person could
18 be on the Switch and one person could be on the Xbox or
19 PlayStation and still be playing against each other?
20      THE WITNESS:  Yes, Your Honor, that's right.
21      THE COURT:  And then you said that your views from
22 2019 as to content changed.  Why?  Like, what happened?
23      THE WITNESS:  Well, the thinking, as we were thinking
24 through a number of aspects of our strategy, were content, as I
25 mentioned, would be this durable advantage; and since then, I

81

1  think we've seen that while content is absolutely important to
2  a strategy, it is -- it really isn't a durable advantage, that
3  others can enter a field and that others can build content
4  libraries fairly quickly.
5      THE COURT: Why? Can you give me an example of why
6  you came to that conclusion?
7      THE WITNESS: That I come to the conclusion today?
8      THE COURT: Yes.
9      THE WITNESS: Well, within our industry, for example,
10 I would say that Disney has been able to become a competitor to
11 Netflix through acquisition and building a fairly large content
12 library.
13     The other thing is that, as Mr. Kilaru indicated, there's
14 no guarantee of success for a game just because of its existing
15 franchise or catalog. So at any point in time a game that we
16 build could be an outsized hit or it could also fall flat and
17 be a failure.
18     So at its core we are in the entertainment business and
19 there are really no guarantees, which means there are a number
20 of openings and opportunities for other people to launch
21 content that's very successful and that people who have been in
22 the business for a while may find that a long-running franchise
23 suddenly falls flat.
24     THE COURT: All right. Thank you.
25     Any further questions.

82

1      REDIRECT EXAMINATION
2  BY MS. CALLAN:
3  Q.  Mr. Booty, Microsoft's counsel showed you RX5045; right?
4  A.  Yes.
5      MS. CALLAN: And, Your Honor, I just want to be clear
6  that that document is a demonstrative.
7  BY MS. CALLAN:
8  Q.  Mr. Booty when was RX5045 created?
9  A.  I believe this was created within the last several months.
10 Q.  Who created it?
11 A.  The initial data was put together by members of my team,
12 and I created the final document.
13 Q.  Okay. And every game on the first page was released on
14 PlayStation before Microsoft acquired the studio; correct?
15 A.  That's correct.
16 Q.  And the games that are highlighted on the second page are
17 the only games on this list that were released after Microsoft
18 acquired the studio; correct?
19 A.  That's correct.
20 Q.  And of those games, how many were in development at the
21 time of the acquisition?
22 A.  Many of them were but, for example, Minecraft Legends was
23 not. Minecraft Dungeons was not. The others were.
24 Q.  Can you identify any other games that were not in
25 development at the time of the acquisition?

83

1  A.  Of the ones highlighted in yellow, no.
2  Q.  And so Ghostwire Tokyo and Deathloop, for example, were
3  already in development for PlayStation when Microsoft purchased
4  ZeniMax; correct?
5  A.  That's correct.
6  Q.  And ZeniMax actually had a contract to release Ghostwire
7  Tokyo and Deathloop on PlayStation?
8  A.  Yes.
9  Q.  And, for example, Outer Worlds was already in development
10 for PlayStation when Microsoft purchased Obsidian?
11 A.  That's correct.
12 Q.  Obsidian had a preexisting contract to release
13 Outer Worlds on PlayStation; right?
14 A.  Yes.
15 Q.  And Outer Worlds 2 has been announced?
16 A.  Yes.
17 Q.  And Outer Worlds 2 will not be available on PlayStation;
18 correct?
19 A.  I don't know that that decision has been made yet, but
20 that's not an absolute, no. In general, games that have
21 launched on PlayStation and have a community there, a principle
22 of ours is that we will continue to ship it on those platforms.
23 Q.  Obsidian released a game called Pentiment in
24 November 2022; is that correct?
25 A.  That's correct.

84

1  Q.  And Pentiment is not available on PlayStation?
2  A.  Currently, no, that's correct.
3  Q.  And Obsidian released a game called Grounded in September
4  2022; correct?
5  A.  That's correct.
6  Q.  And Grounded is not available on PlayStation?
7  A.  Not currently, no.
8  Q.  And Obsidian is working on a game called Avowed; is that
9  right?
10 A.  That's right.
11 Q.  And Avowed will not be available on PlayStation; right?
12 A.  Not currently, no.
13 Q.  And some of the games on this list are actually expansion
14 packs and not new games; correct?
15 A.  That's correct. Although in the case, for example, of the
16 Elder Scrolls expansions, given the yearly release and the
17 nature of those, they are quite big and considered by the fans
18 to be equivalent to a game release.
19 Q.  But the game itself, Elder Scrolls online, that was
20 already available on PlayStation when Microsoft acquired
21 ZeniMax; correct?
22 A.  That's correct.
23 Q.  You can set that document aside.
24     You mentioned a deal that Microsoft signed with Nvidia to
25 bring games to GeForce NOW; correct?

85

1  **A.**  That's right.

2  **Q.**  That agreement was signed in 2023; right?

3  **A.**  I believe so.  I was not involved in the proceedings or

4  any of the negotiations with that.

5  **Q.**  But it was signed after the FTC sued to block the

6  transaction; correct?

7  **A.**  Again, I wasn't involved, but I think generally that's

8  right.

9  **Q.**  And Microsoft did not enter into any agreements to put its

10  first-party content on Nvidia prior to a few months ago; is

11  that right?

12  **A.**  I don't know that that's -- that there aren't outlying

13  exceptions of one or two titles to that, but I think generally

14  that's accurate.

15  **Q.**  And you had said, "No effing way"; right?

16  **A.**  That was my intention about putting future titles.  I was

17  fairly frustrated with Nvidia at the time, but obviously we've

18  signed deals with them now.

19  **Q.**  And you testified that Microsoft spent roughly $10 billion

20  acquiring content in the last four years; correct?

21  **A.**  That's right.

22  **Q.**  And you testified that that did not affect market share;

23  correct?

24  **A.**  I don't have the exact numbers in hand, but the question

25  was, you know, has it changed Sony's lead position in the

86

1  industry, and I believe it has not.

2  **Q.**  But Microsoft now wants to spend $70 billion to purchase

3  content from Activision; is that right?

4  **A.**  That's right.

5      **MS. CALLAN:**  No further questions.

6      **MR. KILARU:**  A few?

7      **THE COURT:**  Yeah.

8              **RECROSS-EXAMINATION**

9  **BY MR. KILARU:**

10  **Q.**  Mr. Booty, on the topic of Nvidia, could you explain why

11  in 2019 you did not want games to go on the GeForce service?

12  **A.**  I was frustrated with the process.  We did not have clear

13  deals in place with Nvidia for the use of our IP, and they were

14  putting games onto their service in some cases without our

15  permission, which in general we frown on.  And I was frustrated

16  with the lack of clarity and that they were doing this at the

17  time.  Obviously since then the relationship has changed quite

18  a bit.

19  **Q.**  You were also asked about whether several of the games on

20  the chart in front of you were under contract to PlayStation at

21  the time of an acquisition.  Do you remember that?

22  **A.**  Yes.

23  **Q.**  Did Xbox honor those contracts?

24  **A.**  We did.

25      **MR. KILARU:**  Nothing further, Your Honor.

87

1      **THE COURT:**  Okay.  You may step down.

2      So we'll take a 15-minute break and resume with the next

3  witness then.

4              (Recess taken at 10:11 a.m.)

5              (Proceedings resumed at 10:33 a.m.)

6      **THE CLERK:**  Remain seated.  Come to order.

7              (Pause in proceedings.)

8      **THE COURT:**  All right.  Is the FTC prepared to call

9  your next witness?

10      **MR. WEINGARTEN:**  Yes, Your Honor.  The FTC calls

11  Mr. Pete Hines, and the examination will be conducted by my

12  colleague Jenny Fleury.

13      **THE COURT:**  All right.  Good morning, Ms. Fleury.

14      **MS. FLEURY:**  Good morning, Your Honor.  It's actually

15  morning still, I believe.

16      **THE CLERK:**  There is still some morning.

17              (Pause in proceedings.)

18      **THE COURT:**  Mr. Hines, if you can stop right there.

19               **PETER HINES,**

20  called as a witness for the Plaintiff, having been duly sworn,

21  testified as follows:

22      **THE CLERK:**  Can you please state your name for the

23  record?

24      **THE WITNESS:**  Peter Hines.

25      **THE CLERK:**  Thank you.

88

1      **THE COURT:**  You may be seated.

2      **THE WITNESS:**  Thank you.

3               **DIRECT EXAMINATION**

4  **BY MS. FLEURY:**

5  **Q.**  Good morning, Mr. Hines.

6  **A.**  Good morning.

7  **Q.**  You were the head of publishing for Bethesda Softworks?

8  **A.**  That is my current role.

9  **Q.**  Bethesda Softworks is a game publisher that also owns

10  eight development studios; correct?

11  **A.**  Correct.

12  **Q.**  ZeniMax is the parent company of Bethesda?

13  **A.**  Yes.

14  **Q.**  The term "ZeniMax" would include Bethesda, the publisher,

15  as well as all eight development studios; right?

16  **A.**  Okay.

17  **Q.**  You were part of the ZeniMax leadership group?

18  **A.**  Yes.

19  **Q.**  You report to the CEO of ZeniMax Jamie Leder?

20  **A.**  Correct.

21  **Q.**  Microsoft acquired ZeniMax in 2021; correct?

22  **A.**  Yes.

23  **Q.**  Since Microsoft acquired ZeniMax, you now ultimately

24  report up to Phil Spencer, the CEO of Microsoft Gaming?

25  **A.**  Sorry.  You mean ZeniMax does?

89

1  Q. You personally ultimately report up to Phil Spencer?
2  A. I never really thought about it, but...
3       (Laughter)
4       THE WITNESS: I mean we're a limited integration
5  company, so technically I don't even know how that works.
6  BY MS. FLEURY:
7  Q. Could you turn in the book that you have right in front of
8  you --
9  A. Uh-huh.
10 Q. -- to page 65 of your deposition transcript?
11 A. Okay.
12 Q. That will be the first tab.
13 A. (Witness examines document.)
14 Q. And on line 21 it says (as read):
15      "QUESTION: Whether directly or indirectly, does he report
16      to Phil Spencer?
17      "ANSWER: My understanding is that directly or indirectly
18      everybody under Xbox reports in to Phil Spencer
19      eventually."
20      And if you turn the page (as read):
21      "QUESTION: That would include Mr. Leder?
22      "ANSWER: Correct.
23      "QUESTION: That would also include you?
24      "ANSWER: Correct."
25      Do you see that?

90

1  A. I do.
2  Q. And that testimony was truthful and accurate when you gave
3  it?
4  A. Yes.
5  Q. Mr. Hines, you started working for ZeniMax in 1999;
6  correct?
7  A. Yes.
8  Q. You view ZeniMax as the Pixar of gaming; correct?
9  A. I've used that reference more in terms of Bethesda but,
10 yes, in general I consider us as sort of a Pixar of gaming,
11 yes.
12 Q. ZeniMax makes big AAA tentpole games?
13 A. Yes.
14 Q. ZeniMax produces some of the best AAA games in the world
15 in your view?
16 A. I like to think so, yes.
17 Q. And the gaming company that in your view is most like
18 ZeniMax is Blizzard; correct?
19 A. I recall saying that in context specifically to Activision
20 Blizzard King, but I would agree Blizzard is a lot like us,
21 yes.
22 Q. Blizzard is one of the three divisions at Activision?
23 A. Correct, yes, ma'am.
24 Q. And blizzard makes the game franchises Diablo and
25 Overwatch; is that right?

91

1  A. Yes.
2  Q. Before it was acquired by Microsoft, ZeniMax had an
3  incentive to distribute its games on more than one platform;
4  would you agree?
5  A. Yes.
6  Q. Over the ten-year period before the Microsoft acquisition,
7  ZeniMax games were, by and large, released on more than one
8  platform; correct?
9  A. Correct.
10 Q. In fact, before the Microsoft acquisition, ZeniMax had
11 never released a game for just one console; correct?
12 A. Um, in general that -- I mean, I can explain, but in
13 general, yes, that's correct.
14 Q. At the time the ZeniMax deal was announced, the
15 acquisition of ZeniMax by Microsoft, it was considered a
16 massive and historic deal; is that correct?
17 A. Correct.
18 Q. You thought it was the biggest deal in the gaming industry
19 since the Activision-Vivendi deal in 2008; is that correct?
20 A. Correct.
21 Q. And the purchase price for the ZeniMax deal was
22 7.5 billion; correct?
23 A. Correct.
24 Q. Before ZeniMax was acquired by Microsoft, there were some
25 games that ZeniMax had already contractually committed to put

92

1  on PlayStation; correct?
2  A. I'm sorry. Ask that again.
3  Q. Before ZeniMax was acquired by Microsoft, there were some
4  games that ZeniMax had already contractually committed to put
5  on PlayStation --
6  A. Yes.
7  Q. -- correct?
8  A. Yes.
9  Q. ZeniMax had a timed exclusivity agreement with Sony
10 PlayStation for Deathloop and Ghostwire; correct?
11 A. Correct.
12 Q. I'd like to shift gears for a moment, Mr. Hines, and ask
13 you some questions about xCloud.
14 A. Okay.
15 Q. Just a reminder, Microsoft's cloud gaming service is
16 called xCloud; correct?
17 A. Yes.
18 Q. And xCloud will run on nearly any computer; correct?
19 A. Yes.
20 Q. In order to access xCloud through your devices, you have
21 to purchase a Game Pass subscription from Microsoft; correct?
22 A. Yes.
23 Q. In the same way that you can watch Netflix on just about
24 any device, once you're a subscriber, same goes for Game Pass
25 subscriptions; correct?

93

1   A.   Yes.

2   Q.   You can turn on a television that has the Xbox Game Pass

3   app and start playing video games without owning any kind of

4   console; correct?

5   A.   Yes.

6   Q.   And you personally, Mr. Hines, have used xCloud to play

7   games?

8   A.   Yes.

9   Q.   And you continue to do so on a regular basis?

10  A.   Correct.

11  Q.   ZeniMax released games on cloud streaming services before

12  the Microsoft acquisition; correct?

13  A.   Yes.  Yes.

14  Q.   I'd like to ask you about another game not made by

15  ZeniMax.  You are familiar with Minecraft?

16  A.   Yes.

17  Q.   And Minecraft is a Sandbox game; correct?

18  A.   Yes.

19  Q.   So that means players have the freedom to go wherever they

20  want and do whatever they want; right?

21  A.   In a manner of speaking, sure.

22  Q.   ZeniMax doesn't make anything that's like Minecraft;

23  correct?

24       THE COURT:  Can I ask you what mean by "go anywhere"?

25  You mean within the game you go anywhere you want?

94

1        MS. FLEURY:  Mr. Hines might be in a better position

2   to answer this question.  Feel free.

3        THE WITNESS:  It's a -- it's a game that doesn't tell

4   the players what to do.  The players get to decide where they

5   want to go, how they want to play the game as opposed to --

6        THE COURT:  Within the game?

7        THE WITNESS:  Within the game, yes.

8        THE COURT:  Okay.  Not where they're playing the game

9   but within the game?

10       THE WITNESS:  Correct, yeah.

11  BY MS. FLEURY:

12  Q.   So ZeniMax doesn't make anything like that that's like

13  Minecraft; correct?

14  A.   Not in my opinion, no.

15  Q.   In fact, there's really nothing else like Minecraft in

16  that respect; correct?

17  A.   I'm not entirely sure I agree with that, but there have

18  been other companies that have tried to do things similar to

19  Minecraft.  Not us, but...

20  Q.   Are you referring to Roblox?

21  A.   Games like Roblox was one that popped in my head, yes.

22  Q.   Other than with the possible exception of Roblox, there's

23  really nothing else like Minecraft?

24  A.   True.

25  Q.   Now I'd like to ask you about some ZeniMax games.

95

1   A.   Okay.

2   Q.   Redfall is a ZeniMax AAA shooter game; correct?

3   A.   There might be some opinions about the AAA part, but that

4   was certainly our intent, yes.

5   Q.   Redfall is a co-op game; correct?

6   A.   Correct.

7   Q.   Co-op means you can play it with other people if you want

8   to?

9   A.   We specifically use co-op to reference when people are

10  playing together against the game.

11  Q.   Redfall is a cooperative multiplayer game; correct?

12  A.   Yes.

13  Q.   And Redfall was designed so you can play it cross

14  platform; correct?

15  A.   Yes.

16  Q.   In fact, Redfall had a marketing slogan and -- please

17  excuse my language -- "Kick vampire ass with friends"?

18  A.   Yes.

19  Q.   ZeniMax is releasing a AAA game called Starfield later

20  this year; correct?

21  A.   Yes.

22  Q.   Starfield is a Microsoft exclusive; correct?

23  A.   It is for PC and Xbox only, yes.

24  Q.   After the Microsoft acquisition, you announced Starfield

25  as PC and Microsoft -- sorry -- PC and Xbox exclusive; correct?

96

1   A.   Yes.

2   Q.   When Starfield was announced, PlayStation 5 fans were

3   upset about the fact that it would be exclusive; correct?

4   A.   Correct.

5   Q.   And it bothered you, Mr. Hines, that PlayStation fans were

6   upset about Starfield exclusivity?

7   A.   I -- it bothered me that they were upset.

8   Q.   As part of your work for ZeniMax, you appear in YouTube

9   videos?  Interviews?

10  A.   In interviews, yes.

11  Q.   And you tell the truth in your public statements as part

12  of your work for ZeniMax?

13  A.   I do.

14  Q.   You conducted one such YouTube interview with Mr. Hussain

15  of GameSpot on June 16th, 2021; correct?

16  A.   That sounds correct, yes.

17  Q.   And that was regarding Microsoft's acquisition of ZeniMax;

18  correct?

19  A.   Yes.

20       MS. FLEURY:  Charles, would you mind bringing up the

21  screenshot?

22                (Pause in proceedings.)

23  BY MS. FLEURY:

24  Q.   This is -- I'm going to show you what has been marked as

25  PX9186A.

97

1      (Pause in proceedings.)
2    BY MS. FLEURY:
3      Q.   When it comes up, this is a publicly available video from
4    an interview that you did, as we discussed, with Tamoor Hussain
5    of GameSpot on June 16th, 2021; correct?
6      A.      Yes.
7           MS. FLEURY:   Your Honor, we may be having technical
8    difficulty.
9           THE COURT:   Are you going to play it?
10          MS. FLEURY:   I was going to play a small portion of
11   it.
12          THE COURT:   Do you want to admit it?   Is there any
13   objection?
14          MS. HILL:   No objection, Your Honor.
15          THE COURT:   9168A admitted.
16     (Trial Exhibit 9186A received in evidence.)
17          (Video was played but not reported.)
18   BY MS. FLEURY:
19     Q.   That's the interview you conducted with Mr. Hussain;
20   correct?
21     A.      Yes.
22     Q.   I want to pause for a second and ask you, when you release
23   a game, like the games you were discussing with Mr. Hussain, on
24   Game Pass day and date, you might get less revenue from people
25   who aren't buying the game separately; correct?

98

1      A.      Correct.
2      Q.   But actually you get such a crazy number of additional
3    players in Game Pass who you can monetize; correct?
4      A.   Um, you have the -- you have the -- there's a possibility.
5    It's important to note, not all games plan to take advantage of
6    that.   Not all games plan to monetize players the same.
7      Q.   Let's talk about how that monetization would work.
8           Players who are Game Pass subscribers, they can purchase
9    something called bundles; correct?
10     A.   In game items in various configurations, yes.
11     Q.   They can purchase cool outfits?
12     A.   Again, I can't make a general statement because there are
13   some games that do that and some games that don't.
14     Q.   For the games that do that, they can unlock characters?
15     A.   Yes, there are games that offer characters for sale.
16     Q.   And when players do that, when they purchase these -- make
17   these in-game purchases, they are spending money?
18     A.   Yes.
19     Q.   In the game?
20     A.   Yes.
21     Q.   And you could end up making revenue, making up for the
22   lost revenue, off of a bunch more players through those in-game
23   purchases; correct?
24     A.   In theory, yes.
25          MS. FLEURY:   Charles, will you please play the second

99

1    part of the video?
2           (Video was played but not reported.)
3    BY MS. FLEURY:
4      Q.   In this interview you were expressing your empathy to your
5    player base; correct?
6      A.   Yes.  I'm speaking specifically to -- I don't like it when
7    we do -- when our players are upset because of something we do.
8      Q.   And you were letting them know that at least one person at
9    your company understands that they are upset; correct?
10     A.   Correct.
11     Q.   Starfield, the game you reference in the video, is a
12   Microsoft exclusive; correct?
13     A.   Yes.  It's for PC and Xbox only.
14     Q.   There is no plan to make PlayStation 5 -- to make a
15   PlayStation 5 version of Starfield; correct?
16     A.   Correct.
17     Q.   Before the Microsoft acquisition, Disney had a signed
18   agreement with ZeniMax to make an Indiana Jones game for PC and
19   multiple consoles; correct?
20     A.   Yes.
21     Q.   Indiana Jones is a AAA game; correct?
22     A.   We expect it to be, yes.
23     Q.   After the acquisition of ZeniMax by Microsoft was
24   announced, Disney brought up the issue of which platforms it
25   was going to be on; correct?

100

1      A.   They certainly had questions once the deal was announced,
2    yes.
3      Q.   That was despite the fact that they had the signed
4    agreement for multiple consoles with ZeniMax; correct?
5      A.   Correct.
6      Q.   The agreement with Disney was later amended; correct?
7      A.   Yes.
8      Q.   And the contract was transitioned to be Xbox-PC exclusive;
9    correct?
10     A.   Yes.
11     Q.   Indiana Jones will be a Game Pass day one release;
12   correct?
13     A.   Yes.
14     Q.   When the Activision acquisition was announced, you were
15   surprised at the purchase price Microsoft agreed to pay for
16   Activision Blizzard King; correct?
17     A.   It was a lot of money.
18     Q.   It was a lot of billions of dollars; correct?
19     A.   Correct.
20     Q.   When you heard about the acquisition, you had questions
21   about whether Activision titles would be exclusive going
22   forward?
23     A.   I had questions about how Activision was going to be
24   treated going forward and how, if at all, that changed how we
25   were thinking about what we were doing.

101

1 **Q.** I'd like to show you PX4406, which is in your binder.
2 This has not been marked confidential so it will also be up on
3 screen.
4 And this is an e-mail you drafted on February 10th, 2022,
5 with the subject line "Xbox Blog Post"; is that correct?
6 **A.** Yes.
7 **Q.** This draft is directed to three ZeniMax executives;
8 correct?
9 **A.** Yes.
10 **Q.** You say in the draft right at the top, quote (as read):
11 "I'm confused. Is the below not the opposite of what
12 we were told, just asked, told to do with our own titles?
13 What's the difference?"
14 Do you see that?
15 **A.** I do.
16 **Q.** And below that you reproduce a blog post that Xbox
17 released; correct?
18 **A.** An excerpt of it, yes.
19 **Q.** About Microsoft continuing to make Call of Duty and other
20 popular Activision Blizzard titles available on PlayStation
21 through the term of any existing agreement and commitments
22 beyond that; correct?
23 **A.** Correct.
24 **Q.** There's no reason you're aware of that games from
25 Activision Blizzard King should be treated differently than

102

1 ZeniMax games; correct?
2 **A.** I mean, in general no, I don't know why they would be
3 treated differently.
4 **MS. FLEURY:** Your Honor, I move to admit PX4406.
5 **THE COURT:** Admitted.
6 (Trial Exhibit 4406 received in evidence.)
7 BY MS. FLEURY:
8 **Q.** Mr. Hines, you don't know what Microsoft's policy on
9 exclusivity is; correct?
10 **A.** I'm sorry. Are we talking about right now or in reference
11 to this e-mail?
12 **Q.** Let's start in reference to that e-mail.
13 You did not know what Microsoft's policy on exclusivity
14 was; correct?
15 **A.** That is -- that's not -- this e-mail is directed at my boss
16 and two other people, and my boss is the one who gave the
17 information about exclusivity. So I'm going back to him to say
18 "This is different than what you told all of us before, and I
19 don't know how to think about this."
20 **Q.** Microsoft's public announcements on exclusivity are
21 different, in your view, from having an internal policy on
22 exclusivity; correct?
23 **A.** I'm sorry. Can you ask that again? I'm not sure I
24 understood.
25 **Q.** Sure. Microsoft's public announcements on exclusivity are

103

1 different, in your view, from having an internal policy on
2 exclusivity; correct?
3 **A.** I'm sorry. I'm genuinely not sure how to answer that
4 question.
5 **Q.** There's a difference between having a commitment and a
6 policy on exclusivity in your view; correct?
7 **A.** In general, yes, I would agree with that.
8 **Q.** And a policy is an internal thing that says "This is how
9 we operate"; correct?
10 **A.** A formalized one, yes.
11 (Pause in proceedings.)
12 **MS. FLEURY:** Thank you, Mr. Hines.
13 We pass the witness.
14 **THE COURT:** Thank you.
15 **MS. HILL:** Good morning, Grace Hill for Microsoft.
16 **CROSS-EXAMINATION**
17 BY MS. HILL:
18 **Q.** Good morning, Mr. Hines.
19 **A.** Good morning.
20 **Q.** You testified that you are currently the head of
21 publishing for ZeniMax?
22 **A.** That is my current role, yes.
23 **Q.** And how long have you been in that role?
24 **A.** Since late last year. I'm sorry. October-November. It
25 was somewhere in there.

104

1 **Q.** Okay. Late 2022?
2 **A.** Yes, ma'am.
3 **Q.** And what was your job before you became head of
4 publishing?
5 **A.** For the prior 22, whatever, since 1999, I had been in
6 charge of our global marketing and communications teams.
7 **Q.** Okay. So fair to say based on those dates, that you --
8 the bulk of your time at ZeniMax has been in the role of
9 marketing and -- head of marketing and communications?
10 **A.** Correct.
11 **Q.** All right. I want to ask you about the document that
12 counsel just showed you.
13 **MS. HILL:** And if we could bring that up. It is
14 marked PX4406.
15 (Pause in proceedings.)
16 **THE WITNESS:** I have it.
17 BY MS. HILL:
18 **Q.** Okay. Now, this document is dated February of 2022. What
19 was your role at ZeniMax at the time you wrote this draft?
20 **A.** I was the senior vice president of global marketing and
21 communications.
22 **Q.** Okay. And in the first paragraph when you wrote that the
23 blog post seemed like the opposite of what you were asked to do
24 or told to do with your own titles, what was the policy that
25 you understood you were to follow with respect to

105

1 decision-making about the exclusivity of future ZeniMax titles?
2 A. That we were going to evaluate on a case-by-case,
3 title-by-title basis what was the best approach.
4 Q. And has that always been the approach towards
5 decision-making for exclusivity of future ZeniMax titles?
6 A. I think treating games individually on a title-by-title
7 basis and what's best for those games is very much a Bethesda
8 thing. That's part of our ethos.
9 Q. And did that same approach carry forward after ZeniMax was
10 acquired by Microsoft?
11 A. We have continued to -- to obviously talk to Xbox but
12 decide for ourselves how and when we want to put our games out
13 and what we think is best for ourselves, for our teams, and to
14 give us the best chance to succeed.
15 Q. Counsel asked you whether there was any reason to
16 treat ZeniMax games differently from other games, for example,
17 from Activision's games. Do you think that the title-by-title
18 approach that you just described should also be applied to
19 Activision Blizzard games?
20 A. I mean, in fairness, I think it should be applied to every
21 game in this industry. It's not a specific thing to one.
22 Like, it's a good idea to do for everything.
23 Q. Now, you were also shown some clips from an interview that
24 you gave to Tamoor Hussain?
25 A. Uh-huh.

106

1 Q. I am not going to show you clips, but I'd like you to turn
2 to PX9186.
3 A. Okay.
4 Q. Do you recognize that to be a transcript of the same
5 video?
6 A. Yes.
7     MS. HILL: We move to admit PX9186.
8     THE COURT: Any objection?
9         (No response.)
10     THE COURT: 9186 admitted.
11     (Trial Exhibit 9186 received in evidence.)
12     MS. HILL: All right. Let's pull that up, please.
13 BY MS. HILL:
14 Q. And the first clip that you were shown, we can actually
15 find the transcription for that on what's marked at the bottom
16 as 9186-004; but if it is easier for you, it is page 12 if you
17 look at the upper right-hand corners of the little quartered
18 pages.
19 A. Okay.
20 Q. Okay. At the very bottom when you were asked about
21 Starfield exclusivity, you answered how it wasn't a
22 consideration. You go to page 13 and the video clip ended at
23 (as read):
24     "You know, where -- so wherever and however that Xbox
25     ecosystem expands, obviously we're -- you know, we're

107

1     excited about that."
2     Do you see that?
3 A. I do.
4 Q. Okay. So the clip ended there, but I would like you to
5 continue reading the remainder of your answer to that question
6 which begins -- if you begin reading at 14 through line 23.
7 Would you mind reading that out, please?
8 A. Of course (as read):
9     "The flip side, the -- the other thing you asked
10     about is, like, what is the impact on development. Well,
11     I'm here to tell you -- and any dev will tell you this --
12     you go to fewer platforms, your development gets more
13     streamlined. You're not worrying about, well, how does it
14     work on this box versus how does it work on that box.
15     We're not making it on that box. So it just needs to run
16     as well as possible on this one, on a PC. You know,
17     narrow focus always helps."
18 Q. And you go on to give another example of a game called
19 Deathloop, which you've also testified about today. And is
20 that same point you were making about the ability to streamline
21 a game and the benefits to that game true with Deathloop as
22 well?
23 A. It was literally the reason why I suggested doing it in
24 the first place.
25 Q. By "it," you mean making Deathloop exclusive to Sony?

108

1 A. It was the reason why I suggested we consider making
2 Deathloop an exclusive on something to streamline that
3 development.
4 Q. All right. And what platform was Deathloop exclusive to
5 when it first came out?
6 A. When it first came out, it was released on PC and
7 PlayStation 5.
8 Q. Now, did the decisions about Starfield and Deathloop
9 exclusivity have the support of the studios who were actually
10 making those games?
11 A. Yes.
12 Q. Let's talk about Starfield first.
13     Were you, Pete Hines, personally supportive of the
14 decision to make Starfield exclusive?
15 A. Yeah.
16 Q. Why was that?
17 A. Well, it's -- Todd has called it an irresponsibly large
18 game. I think it's a pretty accurate description; and as
19 someone who has been playing it a lot and sees all of the stuff
20 to do, there's no question in my mind that being able to focus
21 on fewer platforms to support, hardware to support has been a
22 big benefit to that team.
23 Q. What kind of benefits do you think the team has seen from
24 the ability to focus?
25 A. I mean, I reference it here in this transcript where I'm

109

1  talking about how does it work on that box; right? When you're
2  trying to figure out how to make a game look as good as it can,
3  play as smoothly as possible, your programmers really need to
4  know: Well, what am I trying to get this to run smoothly on?
5  If the way that this box does graphics is different than that
6  one, if the memory configuration is -- like, there are just so
7  many technical things that, in fairness, are way beyond my
8  expertise, but I talk to them enough to understand how these
9  implications impact the work that we do.
10     I mean, the simplest thing is, if you're going to have QA
11  test the game, the fewer platforms you have them focused on,
12  the more rounds of testing they can do. If you have a hundred
13  people testing two platforms, you can put 50 on each. If you
14  have three, like the math tells you, you have fewer people on
15  those games. It's fewer attention, you're finding fewer
16  problems, you are not going as fast. It's going to take
17  longer. It's going to cost more. There's -- it's just far
18  greater risk in my mind.
19  Q.   And just for a quick clarification, "QA" is?
20  A.   I'm sorry. Quality -- "QA" is quality assurance, the
21  people who play the game before it's released for our devs to
22  find all of the problems and the things that don't work right
23  so we can fix them.
24  Q.   Okay. And I think this is safe to say because it's been
25  publicly announced, but Starfield is coming out relatively

110

1  soon; right?
2  A.   I think it's September 1st.
3  Q.   Okay. In your mind, if the game had continued -- if the
4  game were being developed, if it were coming out on
5  PlayStation, would it be coming out in September of this year?
6  A.   It's -- in my opinion, no. Like, I don't -- we would not
7  be putting this game out in nine weeks if we were supporting an
8  entire additional platform in my opinion.
9  Q.   All right. I'd like to ask you about the other example
10  you gave here, which was Deathloop, which you said was a
11  PlayStation exclusive when it came out.
12     How did that game perform after it was released on
13  PlayStation?
14  A.   It was received really well by players. It got critical
15  accolades. It was nominated for awards. It was -- it was a
16  really good, fun game on release.
17  Q.   You also testified about Ghostwire being the other title
18  that came out on PlayStation?
19  A.   As an exclusive launch.
20  Q.   As an exclusive, right.
21     And those were both because you had preexisting agreements
22  with Sony to do so; correct?
23  A.   Correct.
24  Q.   To your -- how did Ghostwire perform after it was released
25  on PlayStation?

111

1  A.   It did well. I don't -- it didn't do -- it didn't do the
2  same as Deathloop, like, it didn't get the same critical
3  acclaim; but we had a lot of players, people enjoyed it for --
4  you know, if you like that kind of game. People liked it.
5  Q.   To your knowledge did Sony ever raise any concerns or
6  complaints about the quality of either of those games?
7  A.   My recollection is that the comments we got for them were
8  positive and, like, they were excited about the features we
9  were supporting, the quality of the game. They were positive
10  about it.
11  Q.   In your experience in the industry, which is fairly
12  lengthy, does past success guarantee future success in the
13  video game industry?
14  A.   No.
15  Q.   Can you give us any recent examples -- I think you might
16  have mentioned one earlier -- about a ZeniMax game that didn't
17  perform quite as well as hoped?
18  A.   You know, a game like Redfall made by a studio Arcane that
19  is amongst our highest rated studios in terms of how their
20  games have been rated when they've released. They're known for
21  making really great quality stuff. And in the case of Redfall
22  they wanted to try something different that was -- didn't look
23  like -- they were trying to evolve and make something that
24  didn't look like other games that they had made, and it -- it
25  wasn't as polished or as good as other things they had made in

112

1  the past.
2        THE COURT:   Was it released exclusively to a --
3        THE WITNESS:   It was -- sorry. It was PC and Xbox
4  exclusive when we launched it.
5  BY MS. HILL:
6  Q.   Is Redfall a similar title to Call of Duty?
7  A.   No. No.
8  Q.   And in what ways are they different? Let me count the
9  ways?
10  A.   All of them. Like, Call of Duty -- and, again, I -- I've
11  been in this industry a long of time. I am not a Call of Duty
12  expert. It is not a game I play religiously, but they put out
13  a new game in that franchise every year. Like, I don't know
14  what the actual team size is, but I'm pretty sure there are
15  more people working on that game than I have across all of our
16  studios in our company.
17     So the scale at which they operate, the kind of game they
18  make, they focus heavily on multiplayer. We don't really have
19  anything that focuses so heavily on, like, an online,
20  boots-on-the-ground multiplayer shooter.
21     Redfall is just a completely different game. I don't
22  think we have anything that really looks like what Call of Duty
23  offers.
24  Q.   Counsel asked you about Redfall being multiplayer. How
25  many people does Redfall allow to play together?

113

1  **A.**  Right.  Again, you know, as we think about it, we don't
2  think about Redfall as multiplayer because to our audience,
3  "multiplayer" means I get to play against another human being,
4  I get to defeat another person.
5      Our game is co-op, meaning all of you are playing against
6  the game.  You're playing against AI.  There's no humans on the
7  other side doing anything.  That's a dramatically different
8  experience than multiplayer where there are other people making
9  choices over there; right?  You're not relying on artificial
10  intelligence for the challenge.  You're relying on the skill of
11  players.  That's just a wholly different experience.
12  **Q.**  Is that what you meant by the term "cooperative" when you
13  said Redfall is a cooperative game?
14  **A.**  Correct.  Meaning all of you are on one side of the
15  playing field.
16  **Q.**  How many humans can cooperate together?
17  **A.**  You can play the game by yourself or with up to three
18  friends.  So, for example, since release, I've pretty much only
19  ever played Redfall by myself.  Even though I can play with
20  other folks, I've played it solo.  So you can play it by
21  yourself.  You can have friends join you if you want.
22  **Q.**  Safe to say that you can play Call of Duty with many more
23  than four people?
24  **A.**  It is safe to say that.
25  **Q.**  How about Starfield?  Is that game similar to Call of

114

1  Duty?
2  **A.**  No.
3  **Q.**  And in what ways is Starfield different?
4  **A.**  Starfield is a single-player game.  Everything in that
5  game is entirely about you and the choices that you make.  It
6  is -- it is freedom on a galactic scale.  It does systems and
7  things that Call of Duty doesn't.  It's -- they're just wildly
8  different.
9      **MS. HILL:**  Unless the Court has any further questions,
10  I believe I can pass the witness.
11      **THE COURT:**  Can I ask you, other than Deathloop and --
12  well, it was Deathloop --
13      **THE WITNESS:**  Ghostwire.
14      **THE COURT:**  -- and Ghostwire, when you've been at
15  Bethesda since 1999, were there other games that they were
16  exclusive to one platform?
17      **THE WITNESS:**  So we've done lots of exclusivity deals
18  over the years, Your Honor.  Sometimes it's as simple as, you
19  know, it's almost like a co-marketing thing where there's no
20  actual difference in -- in what we're doing.
21      Sometimes it can be like we did a thing with Sony for
22  Skyrim on their virtual reality headset to do like a
23  purpose-built version of a game that we had made just for their
24  VR headset, which goes back to my point about, like, developing
25  specifically for the hardware.

115

1      So we have done any number of things like that over the
2  years.  And then usually, Your Honor, they're -- when we do
3  things, they tend to be -- or, sorry -- when we have done
4  things, they tend to be timed, which is sort of how we think
5  about Deathloop and Ghostwire, which is there's a period of
6  time for which you talk about that game as if it's an exclusive
7  but then we can, in fact, bring it to another platform as we
8  did with those games bringing it to Xbox.
9      **THE COURT:**  So is Starfield a timed exclusive?
10      **THE WITNESS:**  Right now it's just an exclusive on PC
11  and Xbox.
12      **THE COURT:**  And Redfall?
13      **THE WITNESS:**  Same.
14      **THE COURT:**  Thank you.
15      **MS. HILL:**  Thank you.
16      **THE COURT:**  Anything further?
17                **REDIRECT EXAMINATION**
18  BY MS. FLEURY:
19  **Q.**  Mr. Hines, the types of exclusivity provisions you were
20  just talking about -- co-marketing agreements, timed
21  exclusivity -- prior to the acquisition of ZeniMax by
22  Microsoft, platforms would compete to get those kinds of
23  exclusivity arrangements with ZeniMax; correct?
24  **A.**  Inasmuch as it was something we were interested in for
25  that title; but, yes, we would take games and decide, hey, we

116

1  want to go see if somebody would like to work with us on an
2  exclusivity for this game.
3  **Q.**  You also mentioned the difficulty of developing a game for
4  more than one platform.  That would also apply to the
5  Nintendo Switch; correct?
6  **A.**  Yes.
7  **Q.**  Importing a game to Nintendo Switch could take away focus
8  from developing games for Xbox and Sony; correct?
9  **A.**  That's not exactly how that works but in theory, sure, I
10  can see your point.
11  **Q.**  I'd like to clarify one thing that you said just a moment
12  ago about who makes the decisions on exclusivity.
13      Microsoft owns ZeniMax; correct?
14  **A.**  Yes.
15  **Q.**  I'd like you to turn your attention to PX4391.  I'm
16  showing you an e-mail exchange between you and Mr. Spencer on
17  February 10th, 2022.
18  **A.**  (Witness examines document.)
19  **Q.**  And this was around the same timeframe as the e-mail we
20  looked at earlier, the draft e-mail that was to the ZeniMax
21  executives; correct?
22  **A.**  The one that you asked me about that I sent to Jamie and
23  Todd and Todd?
24  **Q.**  Correct.
25  **A.**  I'd need to look at those dates.  I thought that was dated

117

1    in '22, not '21.
2    Q.   I'm sorry.  This document is February 10th, 2022.  Sorry
3    if I misspoke.
4         And this document references the Xbox blog post also;
5    correct?
6    A.   Sorry.  I'm just making sure I'm on the right one.  You
7    said 4391?
8    Q.   I apologize.  I meant PX1754.
9    A.   Ah, that would explain it.
10                        (Laughter)
11   A.   (Witness examines document.)  Yes.  Okay.
12        MS. FLEURY:  I apologize, Your Honor.  We are on
13   PX1754.
14        THE COURT:  Right.
15   BY MS. FLEURY:
16   Q.   So this, I did accurately describe it.
17   A.   Yes.  This is --
18   Q.   Now we're on an e-mail exchange between you and
19   Mr. Spencer dated February 10th, 2022.
20   A.   Yes.
21   Q.   Now can I ask you:  This is around the same timeframe and
22   on the same subject matter as the e-mail you sent to the
23   ZeniMax executives?
24   A.   That we spoke earlier, yes.
25   Q.   And you asked Mr. Spencer directly; correct?

118

1    A.   I did.
2    Q.   And his response was "Great topic.  Probably best for us
3    to get on a call to discuss"; correct?
4    A.   Yes.
5         MS. FLEURY:  Your Honor, I move to admit PX1754 into
6    evidence.
7         THE COURT:  Admitted.
8         (Trial Exhibit 1754 received in evidence.)
9    BY MS. FLEURY:
10   Q.   I'd like you to turn now to PX4391.
11   A.   Okay.
12   Q.   And this is an e-mail exchange between you, Mr. Spencer,
13   Matt Booty, Jerret West, and others at Microsoft; correct?
14   A.   Correct.
15   Q.   And it's dated January 7th, 2021; correct?
16   A.   Yes.
17   Q.   The subject line is "Project Relic Announced."  Do you see
18   that?
19   A.   I do.
20   Q.   And Project Relic was the Indiana Jones game we discussed
21   earlier?
22   A.   Yes.
23   Q.   If you turn to the second page of this document.
24   A.   Okay.
25   Q.   The third paragraph down the second sentence in that

119

1    paragraph, it says (as read):
2             "While it is not in our messaging, I think it's
3         important to highlight that Lucasfilm brought up to me the
4         issue of platforms because we have a signed agreement with
5         them to make the game for PC and multiple consoles."
6         Do you see that?
7    A.   I do.
8    Q.   You say a couple sentences down (as read):
9             "I do understand their concern and want to highlight
10        that.  In their interviews they may say something about
11        multiple consoles."
12        Correct?
13   A.   Yes.
14   Q.   And you address this question about what to do about these
15   questions from Disney to Microsoft executives; correct?
16   A.   I do.
17   Q.   And in response Phil Spencer says, and this is now on the
18   first page of PX4391 in the third paragraph (as read):
19            "The upside here is a game coming from Bethesda that
20        everyone will be excited about.  This is the most
21        important thing.  The downside will be for Xbox a feeling
22        that with Deathloop, Ghostwire, and now an assumption on
23        Project Relic that a large percentage of the output from
24        Bethesda won't directly benefit the Xbox console community
25        in any way."

120

1         Do you see that?
2    A.   I do.
3    Q.   As we discussed earlier, the contract for Indiana Jones
4    was later changed to make it exclusive to Xbox and PC; correct?
5    A.   Correct.
6    Q.   Just one more document, Mr. Hines.
7         THE COURT:  We're admitting that one 43 --
8         MS. FLEURY:  Thank you, Your Honor.
9         THE COURT:  Technically we should probably admit them
10   before we show them just in case there's -- I know the parties
11   have come to an agreement, but just in case there's some
12   unforeseen objection.  Before it's shown and before the
13   substance is discussed, just move to admit.
14        MS. FLEURY:  Happy to, Your Honor.
15        (Trial Exhibit 4391 received in evidence.)
16   BY MS. FLEURY:
17   Q.   Let's take a look at a document in your binder PX4408.
18   A.   Okay.
19   Q.   This is a chat description -- sorry.
20        This is a chat between you and Jamie Leder; correct?
21   A.   Correct.
22   Q.   And Jamie Leder again was the CEO of ZeniMax?
23   A.   Correct.
24   Q.   This is dated February 10th, 2022?
25   A.   Right.

121

1  **MS. FLEURY:** Your Honor, I move to admit PX4408.

2  **THE COURT:** Admitted.

3  (Trial Exhibit 4408 received in evidence.)

4  BY MS. FLEURY:

5  **Q.** And in this chat conversation between you and Mr. Leder

6  you asked Mr. Leder about the same topic that we saw on the

7  other e-mails, the blog post, and the announcement about

8  Activision exclusivity; correct?

9  **A.** Correct.

10  **Q.** And Mr. Leder tells you "Feel free to reach out to get

11  clarity"; correct?

12  **A.** Yes.

13  **MS. FLEURY:** I pass the witness.

14  **THE COURT:** Ms. Hill?

15  ___RECROSS-EXAMINATION___

16  BY MS. HILL:

17  **Q.** Mr. Hines, you were just asked about some documents that

18  showed that you intended to reach out to Phil Spencer to ask

19  about a blog post that he had written?

20  **A.** Right.

21  **Q.** Did you end up having that call with Mr. Spencer?

22  **A.** I did.

23  **Q.** And after that conversation with Mr. Spencer, what was

24  your understanding of the approach that you and your team

25  should be taking with respect to exclusivity of ZeniMax titles?

122

1  **A.** That we were going to continue the approach that we

2  already had, which was look at these on a title-by-title basis

3  and decide what was -- what was best for those games, what was

4  best for us.

5  **MS. HILL:** No further questions.

6  **THE COURT:** So why was Indiana Jones then amended;

7  right? I mean, when you looked at it the first time, you took

8  that approach --

9  **THE WITNESS:** Uh-huh.

10  **THE COURT:** -- right, the case-by-case approach and

11  came up with an agreement that it was not going to be

12  exclusive, I take it?

13  **THE WITNESS:** Yes.

14  **THE COURT:** So why the change?

15  **THE WITNESS:** There's a couple of different reasons

16  but, honestly, the primary one, in my view, is just, in my

17  view, is what I said before about reducing risk and trying to

18  get to a degree of certainty.

19  You're dealing -- you're dealing with a licensor who is

20  going to be very -- who's going to have a ton of feedback on

21  what you're making that is going to add a lot of time to your

22  schedule.

23  These agreements when you do these things have -- you

24  don't get to take as long as you want. You're -- you're

25  required to put down a window of time in which you're going to

123

1  release the game, which means, like, you immediately have a

2  clock that's ticking on you; right?

3  For Starfield I'm not licensing this. I can decide when

4  it's best to put that out based on what we think. You know, if

5  you have a contract that says "by this date," like, you're

6  working with a different set of circumstances.

7  So we were looking for how do we reduce risk and try and

8  get this on a path where we know that this will be a big

9  success. And, truthfully, we also kind of liked the idea of

10  embracing bringing it to Game Pass and how many players that we

11  could -- we could get there.

12  **THE COURT:** Okay. Because when you originally

13  negotiated the contract, all those same considerations were

14  there.

15  **THE WITNESS:** Well, sorry, Your Honor. In that -- in

16  those moments, we are a small independent publisher; right? We

17  are -- we are not somebody who can afford misses or failures;

18  right? We just -- being independent and fighting publishers

19  that are multiple times larger than you, we can't afford to

20  miss. So we try and make sure we're stacking the deck in our

21  favor given the situation that we're in when we sign the deal

22  originally as a small independent publisher, which is very

23  different than being part of Xbox and Microsoft now.

24  **THE COURT:** In other words, Disney would have wanted

25  it to be as broad as possible and so you felt like you sort

124

1  of had to meet that desire at the time?

2  **THE WITNESS:** That. Yes, ma'am.

3  **THE COURT:** Did you have any follow-up?

4  **MS. HILL:** No, Your Honor. Thank you.

5  **THE COURT:** Anything further from the FTC?

6  **MS. FLEURY:** No, Your Honor.

7  **THE COURT:** All right, Mr. Hines, you are excused.

8  **THE WITNESS:** Thank you, ma'am, Your Honor.

9  **THE COURT:** Okay. I think we're now taking a witness

10  out of order.

11  **MS. WILKINSON:** Yes, Your Honor.

12  **THE COURT:** All right. Would the Defendants like to

13  call the next witness?

14  **MS. WILKINSON:** We call Sarah Bond, please.

15  **THE CLERK:** Please raise your right hand.

16  ___SARAH BOND,___

17  called as a witness for the Defendants, having been duly sworn,

18  testified as follows:

19  **THE CLERK:** Can you please state your name for the

20  record?

21  **THE WITNESS:** My name is Sarah Bond.

22  **THE CLERK:** Thank you.

23  **THE COURT:** You may be seated.

24  **THE WITNESS:** Thank you.

25  \\\

125

<u>DIRECT EXAMINATION</u>

BY MS. WILKINSON:

Q.   Good morning, Ms. Bond.

A.   Good morning.

     MS. WILKINSON:  Your Honor, can I ask for a moment what you'd like the schedule to be, when you'd like to take the lunch break so I can just time?  We're doing very well on timing.

     THE COURT:  Yeah.  We usually take it around noon.

     MS. WILKINSON:  Thank you.

BY MS. WILKINSON:

Q.   Ms. Bond, tell Her Honor your current title.

A.   My title is corporate vice president Xbox creator experience and ecosystem.

Q.   Tell her what that means.

A.   My team is responsible for all of the things related to partnering with Xbox and bringing games to Xbox.  So that includes all of our developer tools, all of our publishing services, and all of our commercial partnerships and agreements.

     THE COURT:  When you say "Xbox," do you mean just the console or you mean Xbox including Game Pass?  Are you including PC?

     THE WITNESS:  Yes.

     THE COURT:  Okay.

126

     THE WITNESS:  Whenever I say "Xbox," I do mean the whole thing.

     THE COURT:  Xbox the division?

     THE WITNESS:  Yes.

BY MS. WILKINSON:

Q.   Is -- a part of your responsibility is to bring in third parties to put their games on your various platforms?

A.   Yes, it is.

Q.   When did you start in that role?

A.   I began in that role approximately three years ago.

Q.   Was that your first job at Xbox?

A.   No.

Q.   What was your first job at Xbox?

A.   Prior to that, I was -- I ran business development.  So only the commercial and partnership functions.

Q.   All right.  Let's just give a brief description of your background.  Where did you graduate from college?

A.   Yale University.

Q.   Did you go to business school?

A.   Yes, I did.

Q.   Where?

A.   Harvard Business School.

Q.   Okay.  And what job did you take after you left Harvard Business School?

A.   I worked at McKinsey Consulting.

127

Q.   Did there come a time that you worked at a company called T-Mobile?

A.   Yes, there was.

Q.   What did you do for them?

A.   I was the chief of staff for the CEO.  Then I led strategy and then I led strategy business development and new business ventures.

Q.   When did you come to Microsoft?

A.   2017.

Q.   Since you've been at Microsoft, have you looked at, studied, and participated in the evolution of the gaming industry?

A.   Yes, I have.

Q.   Okay.  That sounds fancy, but can you just give us briefly how you've seen the industry change over time?

A.   Yeah.  Well, in some ways the gaming industry started with arcades 40 years ago.  Then there were the first consoles like Atari.  Then also PC games.  And then with the advent of the smartphone, mobile games became very popular.

Q.   And in that giant marketplace of folks, how many people do you think are out there that you're looking to bring into the gaming world?

A.   There are about 3 billion people globally who play games today.  The vast majority of them are playing on smartphones.  So mobile is over 50 percent of the industry, PC is the next

128

largest, and console is the smallest and slowest growing.

Q.   Okay.  So tell us your strategy at Xbox for reaching those consumers?

A.   Well, for us, we want to have Xbox give all 3 billion gamers a positive gaming experience, that they can come to Xbox and find what they need.  And so that strategy is grounded in us having a very wide and depth and breadth of content and providing ubiquity of access to those games.

Q.   Do you think it's feasible at all if you just put your games on the console that you could reach even, you know, a small percentage of those 3 billion people?

A.   It is in no way feasible.

Q.   Why?

A.   The console is a flagship experience, but it requires people to make a large upfront purchase.  Most people today actually just want to play games on the device they already have.  Most people are playing on mobile, and it's very clear consumers have told us they want us to meet them where they are, not require them to go do something, you know, that isn't necessarily natural for them to go find a game.

Q.   Approximately how much is an Xbox today?

A.   $500.

Q.   And if you buy a game online, how much does that game normally cost?

A.   $70.

129

1  Q. How much success to date, if you look at all the other
2  consoles, has Xbox had in the marketplace?
3  A. Xbox is the third largest console player, the smallest;
4  and console is also the smallest part of the industry.
5  Q. And what other consoles are your competitors?
6  A. PlayStation and Nintendo Switch.
7  Q. We've heard just a little bit about Nintendo Switch and
8  some suggestion that it only has games for youth and younger
9  folks; is that true?
10 A. No, that is not true.
11 Q. Are you aware of other games that are on Xbox that are
12 also on Switch?
13 A. Yes.
14 Q. And are some of those games aimed at more, as you say, a
15 broader consumer base than just youth?
16 A. Yeah. Like Diablo.
17 Q. Tell Her Honor what Diablo is, what kind of game it is.
18    THE COURT: Yeah, I don't know.
19    THE WITNESS: Oh.
20    THE COURT: Not into it.
21    THE WITNESS: It's literally my father's favorite
22 game.
23    The Diablo franchise is built on this idea that you battle
24 an unstoppable evil, which is the devil effectively, and you
25 battle through hell as numerous, perhaps, characters, like a

130

1  necromancer.
2  BY MS. WILKINSON:
3  Q. Aimed at a certain audience, shall we say; right?
4  A. Yes, including my 76-year-old father.
5  Q. Okay. Let's talk about the success in the other ways or
6  the other platforms that you deliver your games.
7     So you said there's a, relatively speaking, small console
8  market; right?
9  A. Uh-huh.
10 Q. And how is Xbox doing in the PC market?
11 A. Xbox has a small proportion of the PC market. We do have
12 PC Game Pass and we do place our games on PC, but we're small.
13 Q. And I said "market." I mean, do you consider PC and these
14 consoles competing with each other? In other words, your games
15 can be put on all of them?
16 A. Yes. We -- it's a device as part of the people choose to
17 play on.
18 Q. Okay. Explain what a PC is and how it is -- provides a
19 different experience than a console.
20 A. Well, a console is -- it's a specialty device really
21 designed to play games versus a PC is a multipurpose device
22 that you can do any number of things on, productivity things,
23 but you could also play games.
24 Q. Is there any difference in experience in terms of speed or
25 power between a PC and an Xbox or a PlayStation console?

131

1  A. Yes, there can be. A PC can have a wide range of specs
2  versus the console specs, we really have two console specs that
3  you have here the series S and the series X.
4  Q. And are you trying to expand Xbox's presence on PCs?
5  A. Yes, we are.
6  Q. Why?
7  A. Because we recognize that console is the smallest and
8  slowest growing part of the market and we see an opportunity to
9  grow our business by being on PC and mobile.
10 Q. Let's talk about mobile. What is the Xbox's current
11 presence on mobile?
12 A. De minimis.
13 Q. Can you explain how mobile works? We heard about, just
14 very briefly, from the FTC what -- the duopoly. Can you
15 explain how people access mobile games on their phone?
16 A. Yes. Mobile is effectively a duopoly, Google and Apple.
17 What customers do is they go to the app store on their
18 phone, and they download the game to play it on their mobile
19 device.
20 Q. And is there a difference between playing on their device
21 itself and streaming the game onto a device?
22 A. Yes, there's a difference.
23 Q. Can you explain that?
24 A. When you're streaming a game to a device, what's happening
25 is all of the computations associated with the game are

132

1  happening in a remote location. And so if you -- say you want
2  to change something that you're doing, you push a button. It
3  has to go all the way to the remote location, a computation
4  happens, and then it's sent back. So there is latency, which
5  is essentially governed by the speed of light.
6  Q. So are games built to be played on mobile itself natively
7  or are all games streamed onto mobile?
8  A. Almost every single game that is being played on a mobile
9  device today is being built to be played natively on that
10 device where the computations happen on the mobile device.
11 Q. Do gamers -- actually, would gamers rather be playing a
12 native game on mobile than streaming it?
13 A. Based off of our experiences, yes, absolutely.
14 Q. Why do you understand that's a better experience?
15 A. Well, the first is it's easier to discover. So today we
16 don't actually have the capability of putting a game that's
17 streamed in the app store so gamers can't even find it.
18 Q. "You" meaning Xbox is not able to do that?
19 A. Yes.
20 Q. Okay.
21 A. Or any streaming company.
22    THE COURT: That's because the app store just doesn't
23 have streaming apps?
24    THE WITNESS: They don't allow them for games --
25    THE COURT: They don't allow them.

133

1    THE WITNESS:  -- in the way that...

2    BY MS. WILKINSON:

3    Q.   Do they allow Netflix streaming apps and movies?

4    A.   They do.  They do.

5    THE COURT:  Just not for games?

6    THE WITNESS:  Just not games.

7    BY MS. WILKINSON:

8    Q.   Do they allow their own games in their apps?

9    A.   They do allow their own games in the app, but they are

10   native games.

11   Q.   So assume the gamer can find your game and download it on

12   mobile, that experience is better than streaming it onto the

13   phone because?

14   A.   It's better because there is no latency in that example;

15   but also if a game is built natively for mobile, like actually

16   designed to be played on that device, it's a better experience

17   for any number of reasons:  The way the text font is, the way

18   the buttons are.

19   Q.   Just like something is different for a big --

20   A.   Yeah.

21   Q.   -- laptop versus a small Surface iPad or something like

22   that?

23   A.   Exactly.

24   Q.   Okay.  Let's talk a little bit about how people -- well,

25   let's go back to mobile because we were talking about that.

134

1    Just explain what Xbox's presence is in mobile today.

2    A.   Today our presence is very small.  Really it's just

3    Minecraft mobile, and we have a service called xCloud or Xbox

4    cloud gaming that streams console games to mobile devices.

5    Q.   And before we discuss how you actually access games and

6    pick those different ways to play games, can you describe

7    generally the difference between a single-player game and a

8    multiplayer game?  And then we'll talk about cross platforms.

9    So start with what it means to play a single-player game.

10   A.   When you play a single-player game, normally the game is a

11   story and it's just you and you play through the game, and any

12   characters or things that you encounter in the game are not

13   actually being played by other people.  It's just the

14   computations of the game.

15        When you play a multiplayer game, what actually happens

16   is -- is you are matched with other people of a similar skill

17   level as you, and so the things you encounter in the game are

18   actually other people playing simultaneous from their own

19   location.

20   Q.   Okay.  Let's keep with Xbox.

21        If I'm on the console and I'm playing this game and I'm

22   playing in a multiplayer game playing against you, I'm playing

23   my game natively on my console; right?

24   A.   Yeah.

25   Q.   And you're playing it natively on your console?

135

1    A.   Yes.

2    Q.   And how does my console -- or how do I know and how does

3    my console communicate with you about your move so that I'm

4    playing against you and not against the game?

5    A.   We have a service called Xbox Live that does all of that

6    work.

7    Q.   Okay.  And now what is a cross-platform game?

8    A.   So cross platform is let's say you are playing on your

9    PlayStation and I am playing on my Xbox, we're playing a

10   multiplayer game but we can still be playing against each other

11   or with each other.

12   Q.   And if Her Honor is on Nintendo, if that game is on all

13   platforms, we can all play against each other?

14   A.   Yes.  Like with Minecraft, yeah.

15   Q.   Now, do you provide that service to Xbox gamers -- all

16   those services to Xbox gamers?

17   A.   Yes.

18   Q.   Let's take a look if we could at 5044.  It's your tab 10.

19   A.   I'm sorry.  The number again?

20   Q.   5044.

21   A.   (Witness examines document.)

22   Q.   Is this a screenshot from an Xbox, you know --

23   A.   Yes.

24   Q.   -- screen on your device?  Yes?

25   A.   Yes.

136

1    MS. WILKINSON:  Your Honor, we would move in RX5044.

2    THE COURT:  Admitted.

3    (Trial Exhibit 5044 received in evidence.)

4    MS. WILKINSON:  And if we could display it, please.

5    BY MS. WILKINSON:

6    Q.   Okay.  Let's walk through briefly, if we could, what we

7    do.

8        I decide to buy an Xbox for my child.

9    A.   Uh-huh.

10   Q.   And what does the first thing my kid have to do to even

11   play a game on Xbox?

12   A.   So the first thing you have to do is you have to register.

13   Q.   Okay.

14   A.   Create an account.

15   Q.   So you know who I am or who the player is with some

16   identification?

17   A.   Yes.

18   Q.   And then if I want to play a multiplayer game, so I don't

19   want to just play by myself but I want to play against you, do

20   I have to pick one of these services listed here below?

21   A.   Yeah.  If you just want to play a multiplayer game, you

22   would purchase Xbox Live Gold for a monthly amount.

23   Q.   So that's a subscription?

24   A.   It is.

25   Q.   Okay.

137

1  A.  And we run the service that we were speaking about earlier
2  in exchange for the subscription.
3  Q.  If I just had a first-person game and I just wanted to
4  play with myself and I owned the game already, it was on -- you
5  know, I purchased it and I wanted to play it, do I need to pay
6  the 9.99 for Xbox Live Gold if I'm only playing against the
7  game?
8  A.  No.
9  Q.  I can use my Xbox that way without paying a monthly
10 subscription fee?
11 A.  That's correct.
12 Q.  And is it your understanding that Sony and the PlayStation
13 has a variance of this but similar service offerings?
14 A.  Yes.
15 Q.  Okay.  So if I've paid for Xbox Live Gold, can I play
16 cross platform?  Like if my friend is on PlayStation and I only
17 have Xbox Live Gold, can I play against them if the game
18 provides it?
19 A.  Yes.
20 Q.  Okay.  Now, if I want to go and receive Game Pass, do I
21 have to subscribe at a different level?
22 A.  Yes.
23 Q.  Okay.  Tell us what Game Pass is.
24 A.  So Game Pass is a subscription.  It gives you access to a
25 portfolio of games and you pay a monthly amount in exchange for

138

1  that access.
2  Q.  Okay.  So if I'm a gamer and I have a game I love and I
3  want to purchase it, how do I purchase it from Xbox so I can
4  play it on my Xbox?
5  A.  So when you go into the Xbox, there's a tab called "Store"
6  and you click in there, you can search for the game and
7  purchase it.  Alternatively, if you had Game Pass, you could
8  just play the game in Game Pass.  So people can choose.
9  There's sort of substitutes depending on what you prefer.
10 Q.  So when you guy buy the game, it's software that you're
11 downloading onto your Xbox?
12 A.  Yes.
13 Q.  In the old days people like us used to go to Best Buy and
14 buy the disk; right?  It's the same thing?  You laugh
15 because --
16 A.  Yeah, you can actually still buy disks today, but most --
17 Q.  Most regular people don't do that, do they?
18 A.  Yeah.
19 Q.  Or most gamers don't do that anymore, do they?
20 A.  No.
21 Q.  All right.  So I have my game I want to play and I can buy
22 it for that, but if I go to Game Pass, do I own any of those
23 games?
24 A.  As long as the game is in the subscription and you are
25 subscribed, you can play the games, yes.

139

1  Q.  So I don't have to pay the $70 for the game that I want to
2  play if it's in Game Pass?
3  A.  That's right.
4  Q.  And what kind of games do you carry in Game Pass?
5  A.  We have a really broad portfolio of games in Game Pass.
6  We look to, you know, bring games that -- all of our
7  first-party studio games are in there, but then we also have
8  games that you otherwise may not have discovered or really
9  unique in there.
10     It's a really, really broad range because there's so many
11 different play styles and things that people actually enjoy and
12 love.
13 Q.  Can you give us an example of a few different kinds of
14 games that aren't, you know, the ones we've been at least
15 hearing about here?
16 A.  Okay.  There's a beautiful one that just launched called
17 Planet of Lana.  You play this character.
18     One of my favorite is a physics puzzle game called
19 Human:Fall Flat.  You have to navigate your character, but it's
20 got real-world physics in it.
21     And then there are games from our first-party studios.
22 Hi-Fi Rush would be a good example.
23 Q.  Are there puzzle-type games?
24 A.  Yeah.  There's puzzle games, sports games, action games,
25 adventure games.  We aim to have the whole breadth and depth of

140

1  both, like, play style but kind of mood and moment, age.
2     We've also worked really hard to span geographically, like
3  different cultures, different languages, to make sure that --
4  you know, because we're trying to make sure that we're creating
5  something that's really broad appeal, that anyone who goes in
6  there will find a set of games that they really love and they
7  want to play.
8  Q.  How long do games remain in Game Pass?
9  A.  It's a range.  The games from our own game studios are
10 always in Game Pass.  The others range from months to years
11 depending on the agreement we come to with the publisher.
12 Q.  Are there times when people play a game in Game Pass and
13 they like it so much they go buy a copy of it?
14 A.  Yes.  Yeah.
15 Q.  So sometimes when developers -- or when you're trying to
16 persuade your third-party developers to put their games into
17 Game Pass, are they concerned about the idea that people can
18 switch and go buy their game there or, you know, use it in
19 Game Pass?
20 A.  Well, when we first started the program, it was new.  This
21 was in 2017.  And that was a concern expressed by publishers,
22 and we do enter into a licensing agreement to make sure that
23 overall that it's beneficial for both sides.
24     But what we found once we launched it is that it actually
25 also generated a lot of discovery of games.  So people are --

141

1  nine of ten people say they play a game they otherwise
2  wouldn't have played.
3      As you said, people are very likely to actually go buy the
4  game so they can permanently have it in their library if they
5  play it.
6      And it will also tend to, you know, introduce them to new
7  types of games. So, like, for example, with the game
8  Human:Fall Flat, 60 percent of people who played it had never
9  played a puzzle game before when it was in Game Pass and
10  40 percent of that 60 percent actually went on and bought
11  another puzzle game outside of Game Pass once they figured out
12  that they loved puzzle games.
13      **THE COURT:** So when you say it's the third-party games
14  that they go out and purchase because those might be removed;
15  right? They're on Game Pass for a limited period of time?
16      **THE WITNESS:** Uh-huh.
17      **THE COURT:** But Xbox first-party games, you said
18  they're always on Game Pass. So why would anyone go buy a $70?
19  They wouldn't; right? Because they can always play it through
20  Game Pass?
21      **THE WITNESS:** You're probably right. I haven't
22  actually pulled that data cut, yeah.
23  **BY MS. WILKINSON:**
24  Q.  Do sometimes gamers find on the third-party games that
25  they like that game so much they go purchase it to keep it in

142

1  their library?
2  A.  Yes, they do.
3  Q.  And do you believe having all this choice for gamers is
4  good for them?
5  A.  I do, yes.
6  Q.  Is it also good for business at Xbox?
7  A.  Yes. It's -- we've gotten very clear feedback that
8  players love it. They love the opportunity to discover games.
9  It gives them access to games they may have otherwise not have
10  been able to or would have thought to have purchased.
11      And then we've also gotten consistent feedback that
12  developers love it because it helps them be discovered. And
13  many of them also tell me that they are more comfortable taking
14  new and creative risks because they know they're going to be
15  able to find an audience in Game Pass, and that's much easier
16  than being discovered in a very broad store.
17  Q.  Based on that success, have you been able to convince more
18  developers to put games into Game Pass?
19  A.  Yes. And we have, like, the super majority of developers
20  who came into Game Pass this last year put a game in actually
21  had done so before so they more want to come and people like
22  coming back and using it again.
23  Q.  Is it important to replenish the supply or add more games
24  to Game Pass?
25  A.  Yes, it is.

143

1  Q.  Why?
2  A.  Well, one, the existing subscribers will play the games
3  and then they want other new ones to play.
4      The second is we continue to want to expand the relevance
5  of Game Pass to more gamers. We actually added 40 -- more than
6  40 new geographies this last year so there's a geographic
7  preference, but also just player style and type of game is
8  really broad when you think about trying to have relevance to
9  3 billion gamers.
10  Q.  Let's finish up here so you can explain the last
11  subscription service available.
12      And that says Xbox Game Pass Ultimate. What does one get
13  for that monthly subscription?
14  A.  Okay. So on the chart there is Game Pass for console,
15  console games.
16  Q.  Why don't you tell her about those before you move on.
17  A.  Yeah. It's inclusive of the answer. That's why I was
18  going to go do that.
19      So that's the portfolio for the console games. And then
20  PC Game Pass is a portfolio games but they're PC games. And
21  then what Ultimate is is it's the combination of all three: PC
22  Game Pass, console Game Pass, and Xbox Live Gold.
23      **THE COURT:** Can the PC be played on any PC or does it
24  have to be a PC with at least maybe for certain games with
25  certain abilities or specifications?

144

1      **THE WITNESS:** Every game does have certain specs. So
2  there's some games that cannot be played on low-powered PCs.
3  **BY MS. WILKINSON:**
4  Q.  What else do you get with Xbox Game Pass Ultimate?
5  A.  Um, the other part that's in ultimate is you have the
6  ability to play your games natively from the cloud so play the
7  games streamed. Xbox Cloud Gaming or xCloud is included in
8  here as well.
9  Q.  And what games currently can you stream if you are a
10  member of this subscription from your Xbox or to some other
11  device that you want to play on?
12  A.  You can stream games in Game Pass where the publisher or
13  the developer of that game has given us the right to do so.
14  Q.  Can you stream games you own, you know, in your separate
15  library versus in Game Pass?
16  A.  No. The game does have to be in Game Pass in order for
17  you to use Xbox Cloud Gaming.
18  Q.  And you can't stream all the games in Game Pass?
19  A.  No.
20  Q.  And have you tested kind of the appeal of cloud streaming
21  to your gamers?
22  A.  Yes, we have.
23  Q.  How have you done that?
24  A.  Well, when we offered it as part of Game Pass Ultimate, we
25  offered it to our gamers and we were able to understand how

145

1  much -- how attractive it was to them.
2  **Q.** And relative to the other features you have in your
3  subscriptions, is it popular?
4  **A.** No.
5  **Q.** Why?
6  **A.** Well, I think some of it is due to, as we talked about
7  earlier, the latency. The other is due to the fact that the
8  games that are being streamed are games built for the console
9  but they're being streamed, again, to a different device. So
10 sometimes it's just not -- most often that's not the best
11 player experience.
12     And so what we found is that it's really being used by our
13 players more as a feature for the console. Because what people
14 can do is when you go in to start playing a new game, instead
15 of waiting to download it, you can start playing it right away
16 while you're streaming through streaming, but -- while it's
17 downloading in the background. And that is the vast actually
18 majority of the usage of Xbox Cloud Gaming today, is it's just
19 a console feature.
20     **THE COURT:** How long does it normally take to download
21 say a AAA game?
22     **THE WITNESS:** It totally depends on the -- your
23 connectivity and the size of the game, but it could be
24 two hours --
25     **THE COURT:** Oh, that's long.

146

1     **THE WITNESS:** -- for a biggie, yeah.
2  **BY MS. WILKINSON:**
3  **Q.** So that's where you're seeing people use it during that
4  two hours when they're eager to play and they don't often stay
5  on or use it via streaming once the game is downloaded?
6  **A.** Yeah. Once the game is downloaded, then you've got that
7  native optimal experience and you move ahead.
8  **Q.** We're going to hear testimony from Mr. Ryan's deposition
9  tomorrow, but do you agree that xCloud or streaming games is
10 not a separate market, you know, not a separate game other than
11 a delivery mechanism for games?
12 **A.** Yeah. It's --
13     **MS. FLEURY:** Objection. Calls for a legal conclusion.
14     **THE COURT:** I'm going to interpret it to not be a
15 legal conclusion.
16 **BY MS. WILKINSON:**
17 **Q.** Of course not. From your business perspective, Ms. Bond?
18 **A.** No, it's a feature. It's a delivery mechanism and most of
19 our usage is exactly that for the console.
20 **Q.** And if we looked here at the Xbox site, there's no way to
21 get streaming as an independent service; right?
22 **A.** No.
23 **Q.** So it is only one of the features of Xbox Ultimate?
24 **A.** Yes.
25 **Q.** Okay. You talked about having a diverse portfolio of

147

1  content --
2  **A.** Uh-huh.
3  **Q.** -- for your business. Is that true not just with regard
4  to Game Pass but with regard to your first-party games and any
5  other games you have offerings?
6  **A.** Yes.
7  **Q.** Why is that so important?
8  **A.** Because we know that people just have so many different
9  preferences. Like, you can't put anyone into one bucket and
10 even the same person actually can want to do a different thing
11 at a different moment in time, and so having that diversity is
12 critical to being able to meet players' needs.
13 **Q.** We've heard a little bit about what's been called AAA
14 games. Are you familiar with that term?
15 **A.** Yes.
16 **Q.** Is that a term of art in your industry?
17 **A.** Yeah, people use that term.
18 **Q.** Do they -- is there a known definition?
19 **A.** There's no set definition.
20 **Q.** What does -- what is your understanding of what a AAA game
21 is?
22 **A.** It tends to imply a game of a certain size and scope, a
23 certain level of investment put into the game.
24 **Q.** And does that mean a larger investment?
25 **A.** Yes.

148

1  **Q.** Okay.
2  **A.** Larger, yeah.
3  **Q.** And so within your portfolio of games, do you have some of
4  those larger, more complicated games?
5  **A.** We do.
6  **Q.** And do you have many others that are also successful that
7  aren't don't qualify as one of those large, well-known
8  franchises or investments?
9  **A.** Yes.
10 **Q.** Okay. And why is that? Why can some of those -- why is
11 it that those games can be successful as well as a big AAA
12 game?
13 **A.** Because not everybody wants the same thing. Not everyone
14 wants the same thing at the same moment. Sometimes you want to
15 do multiplayers. Sometimes you just want to have a beautiful
16 single-player experience. Sometimes it's cool to do a game
17 that you can complete in six hours. Other times people want to
18 get really deep into a game and play it for a hundred hours.
19 **Q.** Is there any game you can think of that's so essential you
20 have to have it?
21 **A.** No.
22 **Q.** And if a game is part of a well-known franchise or has had
23 a big investment, does that mean that it will be successful?
24 **A.** No.
25 **Q.** And what have you seen in the past every year about what

149

1  game becomes successful?  Have you been able to predict which

2  games will be successful?

3  **A.**  No.  One of the things when I came to this team that

4  really struck me is how every year there's a game that becomes

5  wildly successful and popular that comes from a tiny team.

6      I actually think it's really beautiful.  You know, most

7  people forget now, but Fortnite, you know, Epic was a small

8  indy studio and then they had this huge success.

9      Player Unknown Battle Grounds, I mean, we visited that

10 team.  They were, like, you know, a one-room dev team and then

11 it became really big among us, wildly popular.

12      This year Vampire Survivors was another one.  It won a

13 BAFTA award.

14      So there's no ability to predict these things.

15 **Q.**  What is a BAFTA award?

16 **A.**  It's like the British Academy Awards for games.  I don't

17 know what the acronym is.  British Actor Film something.

18 **Q.**  Does Xbox have a specific program to try and encourage

19 independent and small developers to actually not just develop

20 their games but bring them to Xbox?

21 **A.**  We do.  We have a program called ID at Xbox.  "ID" stands

22 for independent developer.

23 **Q.**  How does it work?

24 **A.**  So what -- the way it works is it makes it very easy for a

25 small team to simply self-publish their game on Xbox.  They

150

1  submit a concept and then we give them a dev kit and resources

2  so that they can develop and ship their game on the platform.

3  **Q.**  And are these -- do you invest funds in that program?

4  **A.**  We do.  We support the developers in that program.  And

5  then we also launch something called the Developer Acceleration

6  Program as part of it, which goes a step further for

7  underrepresented creators or teams that are developing games

8  around stories that are underrepresented in the industry and

9  gives them an extra level of support so they can succeed.

10 **Q.**  Can you give an example of one of your favorites that came

11 out of that program?

12 **A.**  Oh, man.  There's one called Soup Pot, which is about

13 making soup.  Like, it was made by some women in Malaysia.

14      There's another one that hasn't shipped yet called She

15 Dreams Elsewhere built by a single African American man in the

16 inner city about his struggle with mental health.

17      There's a lot of them, yeah.

18 **Q.**  When those games are created, are they often put into

19 Game Pass?

20 **A.**  They can be.  It's totally based off of it making good

21 sense for both us and the developer.

22 **Q.**  Okay.  So you don't force those folks to put their games

23 into Game Pass?

24 **A.**  No.

25      **THE COURT:**  What makes good sense for you to put a

151

1  game into Game Pass from Microsoft's point of view?

2      **THE WITNESS:**  We sort of look at creating this

3  balanced portfolio; right?  So you have some games that are a

4  certain size and scope and play style, and then we'll have

5  others and then we think about the timing; right?

6      And then we estimate what we think the value of it is, and

7  then we have that discussion with the publisher.  So it's sort

8  of a -- it's multidimensional.  It's like you're constantly

9  sort of curating this catalog, and so one thing will influence

10 another.

11      **THE COURT:**  Is there a limit?  Like, do you not want

12 the catalog to get too big?

13      **THE WITNESS:**  No, there's no limit.

14      **THE COURT:**  No limit?

15      **THE WITNESS:**  Yeah.

16 BY MS. WILKINSON:

17 **Q.**  Let's turn to Call of Duty.  You're familiar with -- are

18 you familiar with that game?

19      **THE COURT:**  It's noon.  Do you want to -- do you want

20 to -- I'm fine to keep going or we can stop for lunch now.

21      **MS. WILKINSON:**  No, it's a perfect place to stop now.

22      **THE COURT:**  Okay.  We'll take a 45-minute lunch and so

23 we'll resume at 12:45.

24      You can step down.

25      **THE WITNESS:**  Great.

152

1      (Luncheon recess was taken at 12:00 p.m.)

2  **AFTERNOON SESSION**                          **12:47 p.m.**

3      **THE CLERK:**  Remain seated.  Come to order.

4      **THE COURT:**  Before I forget, I'm going to -- about to

5  file an order that advises the parties that by 4:00 p.m. you're

6  to provide Ms. Means electronic copies of the exhibits admitted

7  today except for those that were admitted in camera and the

8  other ones admitted with redactions so that we can post them to

9  the public available website shortly thereafter.

10      Okay.  We can continue with Ms. Bond's direct.

11 BY MS. WILKINSON:

12 **Q.**  Ms. Bond, you're familiar with the game Call of Duty,

13 aren't you?

14 **A.**  I am.

15 **Q.**  And how long has Call of Duty been on Xbox?

16 **A.**  As far as I know, as long as there's been Xbox and Call of

17 Duty.

18 **Q.**  Can you just give a brief description of what the game

19 Call of Duty is?

20 **A.**  Yeah.  It's a game -- it has an annual version of the

21 game, and it's a game about being a savior in a war scenario

22 and then they have different war scenarios -- World War II,

23 modern warfare -- that they have in installments over time.

24 **Q.**  Is it a multiplayer game?

25 **A.**  Yes, it's a multiplayer game.

1   **Q.**   And cross platform?

2   **A.**   And cross platform.

3   **Q.**   Does Call of Duty have a free-to-play version?

4   **A.**   It does.

5   **Q.**   Okay. Can you explain what that is?

6   **A.**   So a free-to-play version of the game, you don't pay

7 anything upfront to play the game. You can play it for free,

8 but then you can buy items in the game -- coins, outfits,

9 materials, maps -- and that is how the developer makes money

10 from the game.

11   **Q.**   Is there a free-to-play version of Call of Duty on

12 console?

13   **A.**   Yes.

14   **Q.**   Is there also a free-to-play Call of Duty on mobile?

15   **A.**   Yes.

16   **Q.**   Are both of those games successful economically?

17   **A.**   Yes.

18   **Q.**   And let's start with today before the transaction. Is

19 Call of Duty on PlayStation?

20   **A.**   Yes.

21   **Q.**   Is it on Xbox?

22   **A.**   Yes.

23   **Q.**   Is it on Nintendo Switch?

24   **A.**   Yes.

25   **Q.**   It is? Call of Duty?

---

1   **A.**   Oh, no. Sorry. I thought you were pointing to the

2 series S.

3   **Q.**   Oh, yes, you're right. Is it available on S?

4   **A.**   Yes.

5   **Q.**   Is it available on series X?

6   **A.**   Yes.

7   **Q.**   Is it available on the Nintendo Switch?

8   **A.**   No, it's not.

9   **Q.**   Is Call of Duty a must-have game?

10   **A.**   No.

11   **Q.**   Have you in the past negotiated with Mr. Kotick and others

12 at Activision to keep Xbox on -- excuse me -- to keep Call of

13 Duty on Xbox?

14   **A.**   Yes.

15   **Q.**   And generally how do those contracts or agreements work in

16 terms of working with a third party to get their game on your

17 platforms?

18   **A.**   So the way it works is the publisher or developer agrees

19 to place their game on the platform and to sell their game or

20 any content related to the game, and we take a percentage of

21 whatever the final retail price is that the game is sold for.

22   **Q.**   If there is monetization in the game, do you also get a

23 percentage of that?

24   **A.**   Yes.

25   **Q.**   What is that called?

---

1   **A.**   It's called in-game monetization or sometimes it's called

2 DLC, which stands for downloadable content.

3   **Q.**   When you refer to the splitting of the revenues with the

4 publisher, is that called a rev share?

5   **A.**   Yes.

6   **Q.**   And do you have a customary rev share that you -- that you

7 use with your developers and your contracts?

8   **A.**   Yes.

9   **Q.**   What is that?

10   **A.**   The majority of publishers and developers the rev share is

11 70/30.

12   **Q.**   Who gets the 70 and who gets the 30?

13   **A.**   The publisher or the developer gets the 70 and Xbox gets

14 the 30.

15   **Q.**   And when you do that rev share, it applies to the in-game

16 monetization as well?

17   **A.**   It does.

18   **Q.**   How are you able to keep track of all of that?

19   **A.**   All of the publishing systems that I spoke about that my

20 team runs, it keeps track of all that.

21   **Q.**   We didn't talk about it earlier, but do you oversee some

22 of the engineers at Xbox?

23   **A.**   I do.

24   **Q.**   What do they do?

25   **A.**   They do two things. They develop the tools that game

---

1 companies use when they want to bring their game to Xbox to

2 make sure it runs optimally on Xbox, and then they run the back

3 end of the store, which we call publishing. So when --

4 everything about when you put the game on and it goes through

5 the pipeline and you set pricing or make adjustments or run a

6 promo, all of that infrastructure is also my team.

7   **Q.**   What is a development kit?

8   **A.**   So when you build a console, it has an operating system

9 and it has a system architecture that is specific to that

10 console.

11       So in order for a developer to ensure that the game runs

12 and is optimal on that console, we send them a development kit

13 which essentially is all of the software, your operating

14 system, but customized so the developer can easily use it.

15 It's a physical thing that we send to them, and then they use

16 it as part of finalizing the development of the game and

17 ensuring that it works on the console.

18   **Q.**   Do developers want to get those dev kits as early as they

19 can?

20   **A.**   Yes.

21   **Q.**   When you're launching a new console, is that especially

22 important?

23   **A.**   It is.

24   **Q.**   Why?

25   **A.**   Because the system, the architecture, the hardware is new,

157

1  it's different. So they will have dev kits for the previous
2  generation, but they are not the right ones to make sure that
3  the games will run on the new generation.
4      So they want to get the kits as soon as possible so they
5  can understand all of those things and start working as soon as
6  possible to make sure that the game runs.
7  Q.  So the 8th generation Xbox is different than the
8  current --
9  A.  Yes.
10 Q.  -- Xbox?
11 A.  Yes.
12 Q.  So when you were going to launch this 9th generation of
13 Xbox, did you have to provide dev kits to your developers?
14 A.  Yes.
15 Q.  And what games did you want to put on or make available on
16 Xbox when you were launching the newest version?
17 A.  I wanted every game that was on the previous generation to
18 be on the new generation.
19 Q.  Okay. And was Call of Duty on the previous generation of
20 Xbox?
21 A.  Yes.
22 Q.  Did you have other large, well-known games on Xbox?
23 A.  Yes.
24 Q.  Can you give a few examples?
25 A.  FIFA, Madden, Fortnite, NBA 2K, Assassin's Creek.

158

1  Q.  Thank you.
2      When was the launch of the newest generation of Xbox?
3  A.  It was December 2020.
4  Q.  Before that happened, as part of your job and your team's
5  job, did you come to agreements with third parties to make sure
6  that their games could be on your new generation of console?
7  A.  Yes.
8  Q.  And were you able to get all of those previous games onto
9  your newest generation of Xbox?
10 A.  Yes.
11 Q.  Was there one company that made it a little more difficult
12 for you to get their game on your newest console?
13 A.  There was.
14 Q.  Was there one company that was probably the last company
15 to finally agree to get on your newest console?
16 A.  There was.
17 Q.  Who was that?
18 A.  Activision.
19 Q.  And did you engage in some lively negotiations with them?
20 A.  We did.
21 Q.  And did you agree ultimately to a different rev share than
22 the customary rev share?
23 A.  We did.
24 Q.  And briefly, without revealing those numbers, can you
25 explain why you did that?

159

1  A.  Well, it was important to us to meet the customer
2  expectation that the games that were on the previous generation
3  were on this generation.
4      It was the last one and we wanted -- the team was not
5  willing to begin working on the dev kits until the agreement
6  was reached, and so we wanted them to do that work so that it
7  would launch at the same time that it launched anywhere else.
8  Q.  Meaning the Call of Duty team wasn't willing to design
9  it --
10 A.  Yes.
11 Q.  -- or adapt it to your console until you had an agreement
12 signed?
13 A.  That's correct.
14 Q.  Okay. Go ahead.
15     And during your discussions with Mr. Kotick and others,
16 did he talk about whether he was going to be on the new
17 PlayStation?
18 A.  He did.
19 Q.  And at the time that you were launching Xbox, was
20 PlayStation already also going to launch its latest generation?
21 A.  It was.
22 Q.  All right. Twitch had already been launched?
23 A.  Switch.
24 Q.  Switch. Sorry. I keep saying "Twitch." Sorry.
25     And when you measure kind of the success of a console, is

160

1  it normal to measure against the console that gets launched at
2  or around the same time yours does?
3  A.  That's normal.
4  Q.  So by the time you were negotiating with Activision to get
5  COD onto Generation 9, did you know whether COD was going to be
6  on the PlayStation console?
7  A.  Yes.
8  Q.  And did Activision use that in their negotiations with
9  you?
10 A.  Yes.
11 Q.  How so?
12 A.  It was clear that Call of Duty would be on the new
13 PlayStation, and they -- that would have been not good for Xbox
14 if it was not also on the Xbox when we were launching at the
15 same time.
16 Q.  Did they suggest to you, without telling you exactly the
17 numbers, that they had a different rev share with
18 PlayStation/Sony than you were offering them originally?
19 A.  They did.
20 Q.  They made that quite clear to you?
21 A.  Very clear.
22 Q.  Okay. And did Mr. Kotick or anybody say anything to you
23 about whether he would ultimately agree to put COD onto the new
24 generation Xbox if you did not pay a similar -- or agree to a
25 similar rev share?

161

1 **A.** He was clear that if we did not move beyond the standard
2 rev share, that he intended to not place Call of Duty on the
3 new Xbox.
4 **Q.** Did you and Mr. Spencer make a decision at that time
5 whether you accede to his --
6 **A.** We did.
7 **Q.** -- demands?
8 And why did you do that at the very end?
9 **A.** Timing was limited. We had players whose expectations we
10 wanted to meet, and so we ultimately made the decision that it
11 was the best thing for the business.
12 **Q.** Do -- do publishers sometimes offer or console makers ask
13 for certain types of exclusivity or marketing rights?
14 **A.** Yes, they do.
15 **Q.** Have you done that in the past?
16 **A.** Um...
17 **Q.** "You" meaning Xbox.
18 **A.** Yes, in the past.
19 **Q.** And at some point did you have a marketing or a
20 co-marketing agreement with Xbox -- with Call of Duty and
21 Activision?
22 **A.** Yes. My understanding is Xbox did before I was at Xbox.
23 **Q.** So that was not in existence when you were negotiating
24 with Activision in 2020?
25 **A.** No, it was not.

162

1 **Q.** And were you aware of whether Sony had some exclusive
2 marketing rights or some timed exclusivity with regard to Call
3 of Duty that you did not?
4 **A.** Yes, we were aware.
5 **Q.** How did you become aware of that?
6 **A.** Um, when the marketing exclusivity agreements expire, then
7 when these things happened, Activision came to us and said,
8 "Would you like to bid for it?"
9 We ultimately didn't, but we understood then the term of
10 the marketing agreement and that Sony received it.
11 **Q.** And why would any company want that kind of limited or
12 special marketing exclusive?
13 **A.** Well, when you build a console, you can't really see the
14 benefits of what's inside the box and -- unless it is
15 manifested in a game. And so those type of marketing
16 agreements give a specific -- a game experience that the
17 company could point to say, "Hey, look it, this is what
18 this -- you know, what PlayStation can do."
19 **Q.** Were you allowed to market the COD being on Xbox during a
20 term when PlayStation 5 had some kind of marketing agreement
21 with Activision?
22 **A.** There were very clear limits to what we could say.
23 **Q.** You weren't made aware of the contract terms?
24 **A.** No.
25 **Q.** But if you wanted to come to them and say, "Day one we

163

1 want to talk about Call of Duty being on PlayStation 5," what
2 was the response?
3 **A.** So we don't know exactly what the terms are, but our team
4 would want to talk about it so we would go to the Activision
5 team and say, "Hey, we'd like to say that the game is coming
6 this year."And then they will tell us that we can't or we can
7 only say it in a certain way or at a certain time.
8 So, for example, a year ago we wanted to show that Call of
9 Duty Vanguard was launching on Xbox, and we were told that we
10 could not say it on YouTube or any other place where customers
11 that were not our own customers could see it and that we had to
12 hold for a period of time based off of the agreements because
13 of that.
14 **Q.** Is that an advantage for PlayStation to have that, you
15 know, right to do it first versus Xbox?
16 **A.** I believe they value it, which is why they asked for it,
17 because it allows for them to make it seem as though the game
18 is not coming to Xbox.
19 **THE COURT:** When you say so you could put it on your
20 website, you could put it on your website or but you
21 couldn't -- or in direct e-mails to your current Xbox customers
22 but you couldn't put it on YouTube or Facebook ad or something?
23 **THE WITNESS:** Yeah. So, again, they wouldn't -- I
24 could never find out exactly what it is. It's almost like I
25 had to, like, ask questions to figure it out.

164

1 But you're right. Our website was fine. Our own Twitter
2 channels are fine. But when we film a showcase, that is people
3 can watch it live on YouTube and other places and then the
4 asset lives afterwards and at the end we wanted to just put up
5 a slate that said, "Here are all the games that are coming in
6 the next year," and we were told that we could not say that
7 Call of Duty was coming in the next year.
8 **THE COURT:** That only applied in the separately
9 negotiated revenue share was just Call of Duty, not all
10 Activision titles?
11 **THE WITNESS:** Are you talking for Sony?
12 **THE COURT:** No. For Xbox you said that you negotiated
13 a different revenue share. Was that just Call of Duty or was
14 that all Activision titles?
15 **THE WITNESS:** They had a very specific agreement
16 towards -- about Call of Duty, and then there were a couple of
17 other specifics around other titles.
18 **THE COURT:** Okay.
19 BY MS. WILKINSON:
20 **Q.** So when you wanted to put all the games that were on Xbox
21 behind you, you could not put on Call of Duty?
22 **A.** Nope.
23 **Q.** Were there any other big games that you had, like FIFA or
24 any of those, that you could not feature?
25 **A.** Another one I recall was Hogwarts Legacy.

165

1   Q.   And who makes and publishes Hogwarts Legacy?

2   A.   Warner Brothers Interactive.

3         THE COURT:   So why did Activision, then, control

4   whether you could put -- you mean that was a separate agreement

5   with Warner?

6         THE WITNESS:   Sony, it's my understanding was, had an

7   agreement with Warner Brothers Interactive that had some

8   similarities.

9   BY MS. WILKINSON:

10  Q.   Let me see if I can clarify.  I don't think I'm being

11  clear so let me try to be clear.

12  A.   All right.

13  Q.   You have an agreement to have COD on your Xbox; right?

14  A.   Yes.

15  Q.   As of 2020?

16  A.   Yes.

17  Q.   Most recently?  And that agreement is still in place?

18  A.   Yes.

19  Q.   Other -- I mean, other console players and the only other

20  one that has COD is PlayStation; right?

21  A.   Yes.

22  Q.   You have not seen their agreement, but you believe they

23  have an agreement that allows them to get special benefits or

24  marketing advantages; right?

25  A.   Correct.

166

1   Q.   One of those might be that they prohibit or they -- and

2   Activision agrees that they won't feature their game on other

3   platforms' advertising?

4   A.   Yes, for some period of time or in some ways.

5   Q.   So when you asked them to say "Can we put it up there,"

6   most people would say "Sure," right, because they want you to

7   advertise their game?  And they say no basically telling you

8   they can't?

9         MS. FLEURY:   Objection to leading, Your Honor.

10  BY MS. WILKINSON:

11  Q.   Is that right?  Well you explain it.

12        THE COURT:   Okay.  Sustained.

13        MS. WILKINSON:   Yes.

14  BY MS. WILKINSON:

15  Q.   Why do they -- what's your understanding of why they're

16  saying no?

17  A.   My understanding of why they say no is that they have

18  entered into an agreement with Sony that stipulates that

19  requirement.

20  Q.   And there's no way today to get Call of Duty on a Switch.

21  A.   That's correct.

22  Q.   Let's turn to about the time when the transaction was

23  announced.

24        Do you recall about when you found out that you, meaning

25  Xbox, were seriously considering acquiring Activision?

167

1   A.   Yes.  It was December 2021.

2   Q.   When was the actual transaction announced to the public,

3   if you recall?

4   A.   The day after Martin Luther King Day, January 2022.

5   Q.   And before the public announcement, did you and others at

6   Xbox make a plan how you were going to communicate to your

7   partners and other folks once the deal was announced publicly?

8   A.   Yeah, we did.

9   Q.   Were you involved with that?

10  A.   I was.

11  Q.   Generally what was the plan?

12  A.   The plan was to reach out to our partners and those we

13  worked within the industry immediately after announced to just

14  emphasize to them our -- that it is business as usual for us,

15  that they're as valuable to us as partners as always, and to

16  remind them that we would remain separate companies, you know,

17  for the upcoming period.

18  Q.   Do you consider PlayStation and Sony a competitor?

19  A.   Yes.

20  Q.   Are they also a partner?

21  A.   Yes.

22  Q.   What about Nintendo Switch?

23  A.   Exactly the same, both a competitor and a partner.

24  Q.   Did you have a plan after the transaction was announced to

25  contact the folks at Sony and the folks at Nintendo to talk

168

1   about what would happen going forward once you acquired

2   Activision?

3   A.   Yes.

4   Q.   Were you involved with the conversations with Sony?

5   A.   No.

6   Q.   Who was?

7   A.   To my understanding, Bobby Kotick spoke to Jim Ryan and

8   Phil Spencer and Satya Nadella speak to the CEO of

9   Sony Corporation.

10  Q.   Were you involved with the conversations with Nintendo?

11  A.   I was.

12  Q.   And what was the purpose of communicating to Nintendo

13  about the acquisition?

14  A.   For us, we believe that that type of transparency and

15  proactive reach -- like, outreach with our partners is

16  important.  We just try and do it as a matter of practice.

17        So the purpose was just to say:  We did announce this.

18  You know, our commitment to our partnership is what it always

19  has been.  And we find that that personal moment in touch is

20  really important.

21  Q.   At that time did Nintendo have any Activision content on

22  its Switch?

23  A.   I believe it did, yes.

24  Q.   When you were -- did you communicate with them shortly

25  after the transaction was announced?

169

1  A.   Yes, we -- we sent an e-mail, I believe, hours after the
2  transaction was announced, and then out of that set up a call
3  with Doug Bowser and Steve Singer.
4  Q.   Who are they?
5  A.   Doug Bowser is the head of Nintendo North America and
6  Steve Singer leads partnerships for him.
7  Q.   During that conversation, did you have any discussions
8  about putting Activision content on the Switch?
9  A.   Yes, we did.
10  Q.   Who initiated that?
11  A.   I believe Phil opened up the call expressing the sentiment
12  that we did to everyone else about our continued commitment.
13  At that point Doug Bowser said that he was, you know, thrilled
14  to hear this announcement and that he has long wished to have
15  Call of Duty be on the Switch.
16       At that point Phil replied that actually we would love to
17  be able to do that, to build on the fantastic partnership that
18  we had with them on Minecraft on the Switch.
19  Q.   At that point, did you come to a written agreement or
20  contract with Nintendo that you would provide Call of Duty?
21  A.   No.
22  Q.   Why didn't you make that agreement back in January?
23  A.   Well, we don't normally do deals for content and assets
24  that we don't own, and so that did not feel like a natural
25  thing to do in that moment.

170

1  Q.   Despite that, did there come a time over the past year
2  when you did come to a written agreement to provide Call of
3  Duty to Nintendo?
4  A.   Yes.
5  Q.   What was the genesis or the purpose of that?
6  A.   Well, as the process progressed, we continued to emphasize
7  our commitment to maintain Call of Duty on all platforms where
8  it currently is and continue to expand it, but it became very
9  clear that we wanted to make our intention -- back it up with
10  actions and so we decided to take the step of entering into a
11  contract with Nintendo in order to emphasize our absolute
12  commitment.
13  Q.   Were you involved with negotiating that agreement?
14  A.   Yes, my team negotiated that agreement.
15  Q.   Okay.  Let's turn to RX3019, which is tab 2.
16       MS. WILKINSON:   And that is a confidential document,
17  Your Honor, so we're just going to discuss it generally.
18       THE COURT:   Sure.
19       THE WITNESS:   Okay.
20  BY MS. WILKINSON:
21  Q.   Take a look at it and, Ms. Bond, do you see on page 2,
22  which is really the one-page agreement, your signature?
23  A.   I do.
24  Q.   And is this a letter dated November 30th, 2022?
25  A.   Mine says November -- December 7th.

171

1  Q.   Oh, sorry.  I'm looking at the wrong one.  Thank you.
2       (Pause in proceedings.)
3  BY MS. WILKINSON:
4  Q.   And to whom is this letter addressed?
5  A.   Shadab Hassan.
6  Q.   Without revealing the detail of the terms, what was the
7  purpose of this letter of intent?
8  A.   The purpose of this letter of intent was to agree on our
9  intention to place future versions of Call of Duty natively on
10  Nintendo platforms.
11  Q.   When you say "natively," what kind of work would that
12  require you to do once you acquire Call of Duty?
13  A.   Very similar work to what I actually described that
14  developers do for the game to run on Xbox.  We would need to
15  work with the Nintendo development kit and tune the game so
16  that it could run on the Nintendo architectural and software
17  stack.
18       MS. WILKINSON:   Your Honor, we'd move in RX3019.
19       THE COURT:   3019 admitted.
20       (Trial Exhibit 3019 received in evidence.)
21  BY MS. WILKINSON:
22  Q.   Did there come a time when you came to a full agreement
23  with Nintendo?
24  A.   Yes.
25  Q.   Let's take a look at tab number 4, which is RX1212?

172

1  A.   Great.
2  Q.   And is that addressed to the same gentleman?
3  A.   It is.
4  Q.   Did you sign this agreement?
5  A.   I did.
6  Q.   What is the term of this agreement?
7  A.   Ten years.
8  Q.   Have you ever signed a ten-year agreement to provide
9  content to another platform?
10  A.   Not before I signed this one, no.
11  Q.   Are you aware of any agreement in your industry where
12  someone agrees for ten years to provide content to a platform?
13  A.   Not before this one, no.
14  Q.   And what will occur because you've signed this agreement
15  once the transaction closes?
16  A.   For the next ten years, all future versions of Call of
17  Duty will be available for Nintendo's platforms.
18  Q.   Did you also make calls to Valve after the transaction was
19  announced?
20       THE COURT:   Do you want to admit 1212?
21       MS. WILKINSON:   Oh, I do.  Thank you, Your Honor.
22       THE COURT:   1212 admitted.
23       (Trial Exhibit 1212 received in evidence.)
24       MS. WILKINSON:   It will help.
25       THE COURT:   This one is not under seal.

173

1    **MS. WILKINSON:** It is.

2    **THE COURT:** It is?

3    **MS. WILKINSON:** Uh-huh.

4    **THE COURT:** Okay. All right.

5    **MS. WILKINSON:** Oh, wait a minute.

6    **THE COURT:** It is not on your list.

7    **MS. WILKINSON:** Yes, 1212 is not under seal.

8    **THE COURT:** Not under seal, okay.

9    BY MS. WILKINSON:

10   Q.   Ms. Bond, I want to go back to tab number 1 --

11   A.   Okay.

12   Q.   -- which that document is RX1184, which is under seal.

13        And after the transaction was announced, did you also

14   reach out to people at Valve?

15   A.   Yes.

16   Q.   Can you say explain what is Valve?

17   A.   Valve runs a PC game store called Steam.

18   Q.   Is that successful?

19   A.   It is. It's the largest PC game store on PC.

20   Q.   How does it operate?

21   A.   Essentially you download an application, it gives you

22   access to the store, and then you can go in there and you can

23   purchase any PC game through that. And also when you kind of

24   launch the game, it runs some of the back-end services

25   associated with the game.

174

1    **THE COURT:** It's fully online?

2    **THE WITNESS:** Um, well, you do download -- you do

3    download the game to your device.

4    **THE COURT:** I mean, it's not like GameStop?

5    **THE WITNESS:** No, it's not like GameStop. It's not a

6    retail store. Yeah, that's right.

7    BY MS. WILKINSON:

8    Q.   Did you have conversations where you offered to them to

9    keep Call of Duty on Valve or in Steam?

10   A.   Yes.

11   Q.   Okay. Do you know whether Call of Duty has always been

12   available in Steam?

13   A.   No, it has not.

14   Q.   So if the transaction doesn't go through or if we look at

15   today, it's not available through Steam?

16   A.   It is available on Steam today, but it has not always been

17   available on Steam.

18   Q.   And do you recall when it started to become available on

19   Steam?

20   A.   I believe that that change -- and I don't know what

21   happened before the recent period happened with the most recent

22   version of Call of Duty -- that it was available on Steam. It

23   might have also been Vanguard, but I don't recall precisely,

24   but it's within the last two years.

25   Q.   And this is an e-mail, right, from you to the folks at

175

1    Valve?

2    A.   Yes.

3    Q.   And it is a letter agreement; correct?

4    A.   It is.

5    Q.   And on page 002 of that, your signature is there?

6    A.   It is.

7    Q.   Their signature is not; right?

8    A.   Correct.

9    Q.   Why is that?

10   A.   Valve believes strongly that content should be on their

11   platform because they build a great platform and experience for

12   players and developers, and they do not want to be seen to be

13   signing contracts that, you know, lock up or drive commitments

14   to content over ten-year periods of time.

15        They don't have any other such agreements, and they

16   believe strongly that they should earn the business of their --

17   the developers who put on their platform day in and day out,

18   and so they told us that they had no need to sign that

19   agreement and that they believed us when we said that we would

20   continue to provide it on Steam.

21        **MS. WILKINSON:** Your Honor, we'd move in RX1184.

22        **THE COURT:** Okay. Admitted.

23        The first page of it is not sealed; right? Just the

24   e-mail?

25        **MS. WILKINSON:** I have it. We marked -- we printed it

176

1    out on yellow pages so I don't usually make a mistake, but it

2    is under seal?

3        **MR. KILARU:** The judge is correct.

4        **MS. WILKINSON:** Okay.

5        **THE COURT:** It should not be under seal?

6        **MS. WILKINSON:** It should not be under seal.

7        **THE COURT:** So the cover e-mail is not under seal, the

8    proposed --

9        **MS. WILKINSON:** Only the proposed agreement --

10       **THE COURT:** -- agreement is.

11       **MS. WILKINSON:** -- which is page 002.

12       **THE COURT:** It will be admitted under those terms.

13   (Trial Exhibit 1184 received in evidence.)

14   BY MS. WILKINSON:

15   Q.   At the time you announced the transaction, could Nvidia

16   cloud stream Call of Duty?

17   A.   No.

18   Q.   Explain what Nvidia is.

19   A.   Nvidia is a chipset manufacturer and provider, and they

20   have a service called GeForce NOW, and what GeForce NOW is is

21   it makes it possible to stream PC games natively from the

22   cloud.

23   Q.   So they do that right now?

24   A.   They do.

25   Q.   Have they been successful?

177

1  A.  Um, you'd have to ask them their view on their level of
2  success.
3  Q.  Okay.  Right now they cannot, though, stream the PC
4  version of COD for their customers?
5  A.  No, they cannot.
6  Q.  When a customer is using Nvidia, do they get the game from
7  GeForce 5 or do they have to bring their own copy?
8  A.  The way it works is a customer goes and they purchase the
9  game, let's say in this case, from Steam.  Then they go to
10  GeForce NOW, and they sign up now for a GeForce NOW
11  subscription and they enter in their account details.
12     That enables GeForce NOW to verify that the customer has
13  the right to be able to play that game because they have
14  purchased it through Steam.
15     Then that game is downloaded, you know, in a remote place
16  in the cloud, and the customer can play it from there and
17  stream it to any device where GeForce NOW works, a low-powered
18  PC, a MacBook, a phone.
19     THE COURT:  So it's not just PC games that you can --
20     THE WITNESS:  It is just PC games.
21     THE COURT:  Just PC games.  But you can stream it to a
22  non-PC?
23     THE WITNESS:  Exactly.
24     THE COURT:  Got it.
25  \\\

178

1  BY MS. WILKINSON:
2  Q.  Let's turn to RX1211, which is tab 5.  Can you take a look
3  at that agreement?
4  A.  (Witness examines document.)
5  Q.  Did there come a time when you and your team negotiated
6  with Nvidia to provide COD so that when the transaction closes they
7  can stream it for their customers?
8  A.  Yes.
9  Q.  Now take a look at the back of that document.  It's -- is
10  that your signature on page 12?
11  A.  Yes.
12     MS. WILKINSON:  Your Honor, we move in RX1211.
13     THE COURT:  Admitted.
14     (Trial Exhibit 1211 received in evidence.)
15  BY MS. WILKINSON:
16  Q.  Why, if you didn't own COD at the time, did you sign an
17  agreement to allow COD to be streamed?
18  A.  Similar to the situation with Nintendo, it became clear to
19  us that we needed to back up our commitments with actions, and
20  so we took the step to sign an agreement to make our commitment
21  absolutely unequivocally clear.
22  Q.  Okay.  Look at the date of this contract.  It's
23  February 20th, 2023?
24  A.  Yes.
25  Q.  And you know that the FTC sued Microsoft in December of

179

1  2022; correct?  Around that time?
2  A.  Yes.
3  Q.  And you're familiar with the allegations which include
4  that you, Xbox, would withhold COD from other competitors;
5  right?
6  A.  I am familiar.
7  Q.  Including PlayStation?
8  A.  Yes.
9  Q.  And other streaming services?
10  A.  Yes.
11  Q.  So when you signed this, was this in part in response to
12  the allegations by the FTC and other regulators that you might
13  not actually do what you said you were going to do?
14  A.  Yes.  We wanted to make it absolutely clear that we would
15  do it and we wanted to make a legally binding commitment to
16  demonstrate that.
17  Q.  And attached to that document is there an actual list of
18  the ABK games that you will provide when the transaction
19  closes?
20  A.  Yes.
21  Q.  And Exhibit B also lists additional games; is that right?
22  A.  Yes.  This lists Microsoft first-party games.
23  Q.  So in this contract did you not only agree to provide
24  Activision games but you agreed to provide games that are
25  first-party games on Xbox?

180

1  A.  Yes.
2  Q.  And will that happen regardless of whether the transaction
3  goes through?
4  A.  Yes.  In fact, we have already launched.
5  Q.  How long a term is this contract with Nvidia?
6  A.  Ten years.
7  Q.  And will it allow them to -- this might be an obvious
8  question, but if someone buys it on the first day the new Call
9  of Duty game is published, they, then, can of course stream it
10  the first day --
11  A.  Yes.
12  Q.  -- correct?
13     So this is just a way to get the game to another device
14  like we've been talking about?
15  A.  Exactly.
16  Q.  And let's look at tab 6, if you could.
17  A.  (Witness examines document.)
18  Q.  Did you also agree and sign other contracts with other
19  cloud streaming services?
20  A.  We did.
21  Q.  Is RX1221 an example of that -- another example of that?
22  A.  I don't have that number here.
23     THE COURT:  It's the other number.  It's the duplicate
24  3024 that's in the binder.
25     THE WITNESS:  That is the number I have, yes.

181

1       MS. WILKINSON:  Sorry.  I have the wrong number.
2    BY MS. WILKINSON:
3    Q.   And is that a cloud game licensing agreement?
4    A.   It is.
5    Q.   Between whom?
6    A.   Between Microsoft and Boosteroid Ukraine.
7    Q.   What is Boosteroid?
8    A.   Boosteroid is a cloud streaming service.
9        MS. WILKINSON:  Your Honor, we'd move that document
10   into evidence.
11       THE COURT:  Okay.  3024, also known as 1221, is
12   admitted and that like 1211 is under seal.
13       MS. WILKINSON:  Yes.
14       (Trial Exhibit 3024 received in evidence.)
15   BY MS. WILKINSON:
16   Q.   What is the term of this agreement?
17   A.   Ten years.
18   Q.   And turn to tab number 7.  And I'm not sure I have the
19   right RX number, so can you tell me what the RX number is there
20   at the bottom?
21   A.   3025.
22       MS. WILKINSON:  Your Honor, we move in RX3025.
23       THE COURT:  All right.  Also known as 1222 admitted
24   also under seal.
25       (Trial Exhibit 3025 received in evidence.)

182

1    BY MS. WILKINSON:
2    Q.   Is this also a cloud gaming license agreement?
3    A.   It is.
4    Q.   With whom?
5    A.   This is with Ubitus KK.
6    Q.   Where is Ubitus located, if you know?
7    A.   You know what?  I don't remember its location.
8    Q.   Okay.  And what is the term of this agreement?
9    A.   Ten years.
10   Q.   Are there people on your team who also participated in
11   negotiating these agreements?
12   A.   Yes.
13   Q.   Is one of them coming to court next week to talk about
14   these agreements?
15   A.   Yes.
16   Q.   Look at the signature there.  Who signed it on behalf of
17   Microsoft?  It's on page 9 -- excuse me -- 8.
18   A.   Lori Wright.
19   Q.   Does Ms. Wright work for you?
20   A.   She does.
21   Q.   What is her job?
22   A.   Ms. Wright leads all commercial and business development
23   for Xbox.
24   Q.   Take a look at Exhibit A, which is page 9.
25   A.   Yes.

183

1    Q.   Without revealing the details, does that list additional
2    games that Ubitus may stream?
3    A.   It does.
4    Q.   And will those games be streamed if the deal does not go
5    through?
6    A.   Yes.
7    Q.   Okay.  Turn to tab 8, please.  I believe that's RX3027.
8    A.   Yes.
9    Q.   What is this?
10   A.   This is a letter of intent with EE Limited.
11   Q.   Is that part of British Telecom?
12   A.   It is.
13       MS. WILKINSON:  Your Honor, we move in RX3027.
14       THE COURT:  Admitted.
15       (Trial Exhibit 3027 received in evidence.)
16   BY MS. WILKINSON:
17   Q.   Is this another cloud gaming agreement?
18   A.   It is.
19   Q.   Was this also signed by Ms. Wright?  It's on page 4.
20   A.   (Witness examines document.)  It is.
21   Q.   If you can turn to page 9, is this another cloud gaming
22   agreement?
23   A.   It is.
24   Q.   With whom?
25   A.   Nware.

184

1    Q.   Has this been signed by Lori Wright on behalf of
2    Microsoft?
3    A.   Yes.
4    Q.   Will it allow EE to stream Call of Duty after the
5    transaction?
6    A.   Yes.
7    Q.   Now, in the agreement with Nvidia, was there also an
8    agreement to provide additional -- an additional license to
9    Nvidia?
10   A.   There was a separate agreement.
11   Q.   Were you involved in negotiating that?
12   A.   No.
13   Q.   After the transaction is completed, will you fulfill your
14   obligations to provide Call of Duty to all the -- your
15   contractual parties?
16   A.   Absolutely, yes.
17   Q.   Do you intend to put Call of Duty into Game Pass when
18   you're allowed to under the previous contract?
19   A.   Yes.
20   Q.   Pursuant to the -- I'm sorry.
21       Pursuant to the existing contract between PlayStation and
22   Activision?
23   A.   Yes.
24   Q.   Is it your understanding that can't happen until January
25   of 2025?

185

1  A.  That is my understanding, but I have been unable to see
2  the agreement.
3      MS. WILKINSON:  Your Honor, that's all the questions
4  we have.
5      Thank you very much, Ms. Bond.
6      THE COURT:  Can I ask you a question?
7      Are you the final decision maker with respect to whether
8  all these agreements are followed?  In other words, you just
9  testified that you will follow them, but are you saying that
10 you are the final decision maker?
11     THE WITNESS:  No.  I would consider Satya Nadella to
12 be the final decision maker as to whether or not Microsoft
13 abides by its legal agreements.
14     THE COURT:  And he is?
15     THE WITNESS:  The CEO of Microsoft.
16 BY MS. WILKINSON:
17 Q.  Does Mr. Spencer also have authority over the contracts?
18 A.  He does and I do, and I believe Microsoft would follow its
19 legal commitments, but I would not consider myself the most
20 senior person around here.
21             (Laughter)
22 BY MS. WILKINSON:
23 Q.  And as you were discussing the transaction announcement
24 and after it was announced, has Mr. Nadella made clear that he
25 agrees with your strategy to provide Call of Duty on as many

186

1  platforms to as many devices as many people as possible?
2  A.  Mr. Nadella has made it absolutely clear he was aware of
3  all of these agreements and supported them being completed, and
4  Microsoft Corporation also does abide by its legal agreements.
5  Q.  And as a last example of that, when you bought ZeniMax,
6  they had a legal agreement with PlayStation to provide
7  exclusive content to them; correct?
8  A.  They did.
9  Q.  And despite the fact that you couldn't get access to it,
10 did you honor your obligation and contract and provide it to
11 PlayStation?
12 A.  Absolutely, yes.
13     MS. WILKINSON:  No further questions, Your Honor.
14     THE COURT:  Any cross?  That was a rhetorical
15 question.
16             (Laughter)
17          CROSS-EXAMINATION
18 BY MS. FLEURY:
19 Q.  Good afternoon, Ms. Bond.
20 A.  Good to see you.
21 Q.  Give me one moment to get you some materials.
22 A.  Thank you.
23     MS. FLEURY:  Your Honor, may I approach?
24     THE COURT:  Yes.
25             (Pause in proceedings.)

187

1      THE COURT:  You may proceed.
2  BY MS. FLEURY:
3  Q.  Ms. Bond, video game content has driven mergers activity
4  for Xbox and its competitors; correct?
5  A.  Yes.
6  Q.  Since 2021, there have been multiple acquisitions of
7  gaming companies by Xbox; correct?
8  A.  Yes.
9  Q.  Over the last five years, Xbox has acquired a number of
10 companies and incorporated them into Xbox Game Studios;
11 correct?
12 A.  I'm not aware of the exact manner of incorporation.
13 Q.  But Xbox has acquired a number of companies?
14 A.  Yes.
15 Q.  With video game content; correct?
16 A.  Correct.
17 Q.  How many?
18 A.  I don't recall the number right now.
19 Q.  ZeniMax was one of those companies; correct?
20 A.  Yes.
21 Q.  And as you testified on direct, when Microsoft signs a
22 contract with a third-party video game publisher for a game, a
23 percentage of the proceeds from that game go to Microsoft and a
24 percentage go to the publisher; correct?
25 A.  Yes.

188

1  Q.  And there is a standard revenue split that I believe you
2  testified to on direct; correct?
3  A.  There's a revenue split that most developers and
4  publishers have.
5  Q.  And you testified that that revenue split is usually
6  70/30; correct?
7  A.  Yes.
8  Q.  So if I buy a game for a hundred dollars, under one of
9  those agreements, $70 goes to the company that created or
10 licensed the game and $30 goes to Microsoft; correct?
11 A.  Yes.
12 Q.  And here is where I may need to vary from the usual
13 procedure based on conversations with opposing counsel about
14 confidentiality, and I will just direct you to the second tab
15 in your document, which is --
16 A.  Okay.
17 Q.  -- your investigational hearing with the FTC.
18 A.  Okay.  So this is the PX7033IH?
19 Q.  That's correct?
20 A.  Okay.
21 Q.  And could you please turn to page 110, line 18?  Let me
22 know when you're there.
23 A.  I see it.
24 Q.  And the question there was (as read):
25     "Are there any examples of current games on Xbox that

189

1      have the current publishers on Scarlet that have the" --

2      "that have a different revenue split?"

3    **A.**    Yep.

4    **Q.**    And do you see the answer that you gave?

5    **A.**    I do.

6    **Q.**    So I will just at this point direct those that have

7      binders to read the answer aloud.

8      Microsoft agrees to that specific revenue split that you

9      just read in situations where it is critical to get that

10      content; correct?

11    **A.**    No.

12    **Q.**    That's not correct?

13    **A.**    On direct I think I described the general situation.

14      There are a number of factors that go into how we determine

15      varying from what the majority of publishers have on revenue

16      split.

17    **Q.**    I'll direct you again to your investigational hearing at

18      page 110. This time line 11. And the question here is (as

19      read):

20          "When would you have this specific revenue split that

21          we've been discussing compared to your standard 70/30

22          revenue split?"

23      And the answer (as read):

24          "The specific revenue split is not our standard

25          revenue split. We would have it in an example in a

190

1      situation where we believe that it was critical to get

2      that content."

3      Do you see that?

4    **A.**    I do.

5    **Q.**    And that testimony was truthful and accurate when you gave

6      it?

7    **A.**    It is. What I was clarifying now is there can be any

8      number of factors around the content.

9    **Q.**    Microsoft does have exclusive games on its platform;

10      correct?

11    **A.**    It does.

12    **Q.**    And that's at least partially because there are gamers who

13      like the idea that because they chose to buy an Xbox, they get

14      something special?

15    **A.**    Yes.

16    **Q.**    And Microsoft negotiates for exclusivity provisions in

17      some instances with third parties as we've been discussing;

18      correct?

19    **A.**    Yeah. At times, yeah.

20    **Q.**    And so, for example, if Microsoft is working with a game

21      developer and agrees to fully finance a game, that's an

22      instance in which you'd agree that that game should be on Xbox

23      but not on other platforms; correct?

24    **A.**    Yes. That's different than the way you -- the reason why

25      I hesitated is that's -- that's really Microsoft building a

191

1      game, yes.

2    **Q.**    And in those instances when Microsoft fully funds a

3      third-party game, in those instances it would just be on Xbox,

4      not on other platforms; correct?

5    **A.**    Well, in that instance it is not a third-party game if we

6      fully finance it. It is a first-party game.

7    **Q.**    Even if the entity that you are financing, even if that

8      entity is not owned by Microsoft; correct?

9    **A.**    We would call that a first-party game, that's correct.

10    **Q.**    And first-party games are generally on Xbox exclusively,

11      not on other platforms; correct?

12    **A.**    No.

13    **Q.**    After ZeniMax was acquired, you were part of the

14      decision-making process that resulted in Starfield being

15      exclusive? I believe you testified to that; correct?

16    **A.**    I was in meetings where the topic was discussed.

17    **Q.**    And I also believe you testified that Phil Spencer made

18      the final call on that decision; correct?

19    **A.**    He did.

20    **Q.**    And Phil Spencer is responsible for the other decisions

21      about exclusivity; correct?

22    **A.**    He is.

23    **Q.**    Exclusivity is something you might market for a given

24      game; correct?

25    **A.**    You could.

192

1    **Q.**    And Xbox does, in fact, market exclusivity for specific

2      games; correct?

3    **A.**    We do communicate that to our users when that is the case,

4      yes.

5    **Q.**    I want to ask you a little bit more about Game Pass and

6      xCloud.

7      So, first, I think you explained players who stream games

8      to their phone via Game Pass Ultimate are using the Xbox

9      platform; correct?

10    **A.**    What do you mean by "Xbox platform"?

11    **Q.**    Those users are part of the Xbox ecosystem; correct?

12    **A.**    Yes.

13    **Q.**    And streaming to mobile devices is a strategic initiative

14      for Xbox; correct?

15    **A.**    It's an initiative.

16    **Q.**    And that involves leveraging xCloud technology; correct?

17    **A.**    Yes.

18    **Q.**    Before Google Stadia folded, it was a platform people

19      could play games on; correct?

20    **A.**    Yes.

21    **Q.**    It was a platform just like Microsoft Xbox is a platform?

22    **A.**    I don't think it's just like Xbox, no.

23    **Q.**    It was a competitor to Xbox?

24    **A.**    Perhaps.

25    **Q.**    If a player wants to stream an Xbox game on xCloud, today

1 they need to pay for Xbox Game Ultimate. I believe you
2 testified to that; correct?
3 **A.** Yes.
4 **Q.** Microsoft has been evaluating a way to offer an
5 alternative way of accessing xCloud; is that correct?
6 **A.** To what do you refer specifically?
7 **Q.** Why don't we pull back up, if you still have your RX
8 binder --
9 **A.** Yeah.
10 **Q.** -- RX5044 again.
11 **A.** All right. Oh, this one (indicating)?
12 **Q.** Yes. That is, I believe it is the last tab, 10.
13 **A.** Got it.
14 **Q.** So you explained on direct that the four options you see
15 here are all alternatives that consumers can choose?
16 **A.** Yes.
17 **Q.** Are they individual SKUs, S-K-U?
18 **A.** Yeah, that's a good way to talk about them.
19 **Q.** And a SKU -- so Xbox Game Pass Ultimate is a SKU right
20 now; correct?
21 **A.** It is.
22 **Q.** And Xbox Live Gold is a SKU; correct?
23 **A.** Correct.
24 **Q.** A SKU is a distinct thing that a consumer can choose?
25 **A.** Yes.

1 **Q.** And Xbox would very much like to release a dedicated
2 xCloud SKU; correct?
3 **A.** Not to my knowledge.
4 **Q.** Would you keep open the other binder --
5 **A.** Yeah.
6 **Q.** -- and turn to your investigational hearing at page 70?
7 **A.** Yep. 70 in the same one?
8 **Q.** In tab 2, correct.
9 **A.** (Witness examines document.)
10 **Q.** Start at line I believe it's 22.
11 **A.** I see it.
12 **Q.** (as read:)
13 "**QUESTION:** Are there any concrete plans to release a
14 dedicated SKU to this product in the future?
15 **ANSWER:** I don't know the precise status of our plans
16 right now.
17 **QUESTION:** But there's still -- Xbox is still planning to
18 do this; correct?
19 **ANSWER:** Xbox would very much like to do it, yes."
20 And that was truthful -- did you -- are you with me?
21 **A.** I'm with you.
22 **Q.** That was truthful and accurate testimony when you gave it?
23 **A.** Yes. This was September 2022. The answer I just gave is
24 relative to now.
25 **Q.** What has changed since September 2022?

195

1 **A.** We've continued to get more data about the success and the
2 popularity of xCloud. We've gotten more clear on the costs
3 related to it, and we have signed partners -- partnerships with
4 others who provide those services.
5 **Q.** And also since that time the FTC brought suit against the
6 transaction; correct?
7 **A.** I think that was before this time actually because it was
8 my IH.
9 **Q.** During your investigational hearing; correct?
10 **A.** Yeah.
11 **Q.** I want to ask you a question about Game Pass.
12 Game Pass -- and looking back at this same document that
13 you have in front of you, RX5044, I just want to clarify one
14 thing. I'm sorry I'm going back and forth.
15 **A.** No, it's okay. I got it.
16 **Q.** The Xbox Live Gold option all the way on the right-hand
17 corner, in this option you don't get a content library;
18 correct? If you are a consumer choosing the Xbox Live Gold
19 option, you get two free games a month, but unlike the other
20 options no content library?
21 **A.** That's right.
22 **Q.** PlayStation has a comparable service to this level;
23 correct?
24 **A.** I believe so, but I'm not super close to what their
25 line-up is.

196

1 **Q.** For the PlayStation offerings that have content libraries
2 as compared to the Xbox offerings that have content libraries,
3 how many subscribers, roughly, what is the comparison between
4 PlayStation and Xbox?
5 **A.** I don't have access to PlayStation's confidential
6 information.
7 **Q.** Would you agree that Game Pass is the market leader when
8 it comes to subscriptions with content libraries?
9 **A.** I don't know what PlayStation's latest numbers are, and
10 they did recently launch.
11 **Q.** Do you agree that Game Pass has significantly more
12 subscribers for content libraries with content libraries than
13 PlayStation?
14 **A.** I can't know for sure without seeing their data.
15 **Q.** I'd like you to turn to your deposition, page -- that's
16 tab 1, page 219.
17 **A.** Yeah.
18 **Q.** Tab 1. Okay.
19 **A.** (Witness examines document.) Okay.
20 **Q.** Line 11 -- sorry -- line 14 you were asked (as read):
21 "**QUESTION:** That bar graph shows that Microsoft has
22 26 million content subscribers; correct?"
23 Your answer (as read):
24 "**ANSWER:** It does.
25 **QUESTION:** And Sony has 3 million content subscribers;

197

1  correct?
2  **ANSWER:** That's what the bar graph says."
3  (Pause in proceedings.)
4  **THE WITNESS:** Yes, but I don't know what that bar
5  graph was of, um, and what it was dated. So I just want to be
6  careful in how I'm answering because things change over time,
7  which is why I don't know what this data was showing or what is
8  happening with Sony today.
9  **BY MS. FLEURY:**
10 **Q.** Understood.
11 Fair to say that at the time you gave this testimony and
12 the document you were reviewing, Microsoft had significantly
13 more subscribers for content than PlayStation?
14 **A.** Yes, but I wonder what the comparison was. Like, of the
15 SKUs, what was being compared to what? That's what I'm not
16 sure on actually.
17 **Q.** I want to switch gears and ask you about the agreements
18 that Ms. Wilkinson, Microsoft's counsel, asked you about. I
19 want to start with the Ubitus agreement?
20 **A.** Okay.
21 **Q.** Ubitus is located outside of the U.S.; correct?
22 **A.** Yes.
23 **Q.** It has a small presence in the United States?
24 **A.** I don't know the details of Ubitus' footprint.
25 **Q.** You don't know whether they have any footprint in the

198

1  United States?
2  **A.** I just don't know for sure. If you say that you've looked
3  into it, I believe you.
4  **Q.** And you testified on direct, I believe, that you normally
5  don't do deals for content you don't own; correct?
6  **A.** Yes.
7  **Q.** So this flurry of side agreements was an unusual situation
8  for Microsoft; correct?
9  **A.** It was.
10 **Q.** I want to turn to the Nintendo agreement. And so
11 I believe this was not under seal, so if it's possible to pull
12 it up. I think it was tab 4.
13 **A.** In my other binder?
14 **Q.** Yes. Apologies.
15 (Pause in proceedings.)
16 **MS. FLEURY:** The exhibit number is RX1212.
17 **BY MS. FLEURY:**
18 **Q.** I want to direct your attention in this agreement to the
19 bottom paragraph on the first page?
20 **A.** Okay.
21 **MS. WILKINSON:** I'm sorry, Your Honor. We just
22 learned from our co-counsel that this should have been sealed.
23 So if I can just ask either to refer to it generally or have
24 just a short closed session. I apologize that I made the
25 mistake.

199

1  **THE COURT:** Okay. You said it wasn't sealed.
2  **MS. WILKINSON:** I did. I apologize, Your Honor.
3  **THE COURT:** All right. Well, can you direct her
4  attention? I can read it and she can read it.
5  **MS. FLEURY:** Understood. I will do my best.
6  **BY MS. FLEURY:**
7  **Q.** So if you turn to the second Roman numeral where it says
8  "The publishing period," immediately after that it says -- and
9  I think this is --
10 **A.** Okay.
11 **Q.** -- where I will direct you to read starting with the words
12 "Content provider."
13 **THE COURT:** Read to yourself.
14 **BY MS. FLEURY:**
15 **Q.** Read to yourself.
16 **A.** I am.
17 **Q.** Ending at the end of that sentence with "Nintendo
18 platforms."
19 **A.** So it's third paragraph down, number 2? Is that what
20 you're asking me to look at?
21 **Q.** That's right?
22 **A.** Okay.
23 (Witness examines document.) Okay.
24 **Q.** Is that contractual language consistent with Microsoft's
25 other contracts for content?

200

1  **A.** I don't know if it's precisely the same language. I'd
2  have to -- we just have a lot of contracts, and so I don't know
3  if it's precisely the same.
4  **Q.** Let's turn now to tab 5, which is RX1211.
5  **A.** Okay.
6  **Q.** This is the GeForce NOW Nvidia listing agreement.
7  **A.** I'm here. Is there a section you want me to focus on?
8  **Q.** I'll start by just clarifying.
9  I think you testified on direct you signed this agreement
10 with Nvidia on behalf of Microsoft; correct?
11 **A.** I did.
12 **Q.** But you didn't personally negotiate the agreement with
13 Nvidia; correct?
14 **A.** No.
15 **Q.** You didn't speak with anyone from Nvidia during the
16 negotiation?
17 **A.** No.
18 **Q.** You did have input on the agreement's terms; correct?
19 **A.** Yes, I consulted with the team.
20 **Q.** Microsoft hasn't reached out to any other companies to
21 offer Microsoft's first-party content on similar terms to the
22 Nvidia agreement, has it?
23 **A.** We have some other companies here.
24 **Q.** For those agreements Microsoft's first-party, content the
25 content that it owns separate and apart from the Activision,

201

1  has Microsoft offered that content to other companies? That's
2  my question.
3  A.   Yeah, and my understanding is, yes, but there's so many
4  different little nuances. Let me just double-check something.
5        (Witness examines document.)  Yes we did.  We did.
6  Q.   And in that particular agreement was it contingent upon
7  the Activision closing?
8  A.   No.
9  Q.   In this particular agreement with Nvidia, this is an
10 agreement you could have entered at any time to offer
11 Microsoft's content to Nvidia?  There's nothing particular
12 tying it to the Activision acquisition; correct?
13 A.   No.
14 Q.   That's not correct?
15 A.   Sorry. Ask me the question again. I want to -- it's like
16 a double negative. I'm sorry. I'm trying to make sure I
17 understand.
18 Q.   Understood. I'll reword.
19 A.   Yeah.
20 Q.   Microsoft could have offered its first-party content, the
21 content that it owns separate and apart from Activision, to
22 Nvidia at any time; correct?
23 A.   It could have, yes.
24 Q.   I'd like you to turn to paragraph 7.4 of RX1211.
25 A.   7.4.

202

1  Q.   Let me know when you're there.
2  A.   (Witness examines document.) I'm here.
3  Q.   This clause is called "Unanticipated and Unforeseeable
4  Future Events." Do you see that?
5  A.   I do.
6  Q.   It says (as read):
7        "The parties acknowledge that the gaming industry is
8        rapidly evolving and that unanticipated and unforeseeable
9        future events beyond the control of the parties during the
10       ten-year term of this agreement may render performance of
11       the agreement impractical, unduly onerous, or uneconomic
12       for either party."
13       Do you see that?
14 A.   I do.
15 Q.   So I'm going to specifically ask you about that last part
16 of the clause, and I'm only going to ask you about your
17 commercial understanding of the term.
18       In your view, if either party, Nvidia or Microsoft, does
19 not realize more success because of this agreement at any
20 point, the parties can renegotiate; correct?
21 A.   I'm just going to read the language again.
22       (Witness examines document.) That's what this says, yes.
23 Q.   And now I'd like you to turn back in the agreement to 2.3.
24 This is on page RX1211-005.
25 A.   I'm here.

203

1  Q.   And this is entitled "Joint Commitments." It says (as
2  read):
3        "The parties will issue a joint press release
4        announcing an agreement to allow" --
5        MS. WILKINSON:  I have an objection. I need to speak
6  to my co-counsel for a second.
7        (Pause in proceedings.)
8        MS. WILKINSON:  Your Honor, Mr. Kilaru is telling me
9  you ruled on this this morning and said it could remain under
10 seal under a different document number. So if that was my
11 error, but I --
12       THE COURT:  Well, this paragraph A that she's
13 referring to is referring to a past event. Can you tell me why
14 that particular paragraph needs to be under seal? And he can
15 come forward and speak.
16       MS. WILKINSON:  Yeah.
17       (Pause in proceedings.)
18       MS. WILKINSON:  Which paragraph?
19       THE COURT:  She's referring to 2.3A; correct?
20       MS. FLEURY:  Thank you, Your Honor.
21       MR. KILARU:  I'm mistaken. I thought it was C,
22 Your Honor, not A. We're reading A?
23       THE COURT:  We're in A.
24       MR. KILARU:  Okay. Then I apologize.
25       THE COURT:  You may go ahead.

204

1  BY MS. FLEURY:
2  Q.   So 2.3 says (as read):
3        "The parties" -- which here is Microsoft and Nvidia;
4        correct?
5  A.   Yes.
6  Q.   (as read):
7        -- "will issue a joint press release announcing an
8        agreement to allow Microsoft's games to be accessed on
9        GFN" -- which stands for GeForce NOW; correct?
10 A.   Yes.
11 Q.   (as read):
12       -- "including references to the agreement's term and
13       scope of games to be included on either Monday,
14       February 20th, 2023, or Tuesday, February 21st, 2023.
15       Final day to be determined by Microsoft."
16       Do you see that?
17 A.   I do.
18 Q.   Is this kind of requirement to issue a joint press release
19 about the agreement a typical contractual term in agreements
20 for content?
21 A.   Sometimes we do put this in contracts.
22 Q.   Stepping away from the terms of this specific Nvidia
23 agreement, I have a different question. Microsoft's counsel
24 referred to another agreement entered into by Nvidia and
25 Microsoft on the same day as this agreement; correct?

205

1  **A.**  Yes.

2  **Q.**  You were not the signatory of that agreement; correct?

3  **A.**  No.

4  **Q.**  I'd like to show it to you.  I believe it is in your

5  binder as 1784.

6  **A.**  Do you know what tab it's in?

7  **Q.**  It was a late addition, so I do not know.

8  **A.**  Okay.  I'll look around.

9  **THE COURT:**  Toward the back.  Not that one.

10  **MS. FLEURY:**  It was not added by me so I do need to

11  check on confidentiality.

12  **THE COURT:**  Okay.

13  **MS. WILKINSON:**  It is under seal, Your Honor.  I think

14  because this was the first day we did this, we had some

15  different exhibit numbers, which has caused some of the

16  confusion, but that is under seal.

17  **MS. FLEURY:**  Okay.  I will not read aloud from this

18  document, but I will ask you some questions about it.

19  **THE COURT:**  Okay.  Let me just say because the

20  representation is that it's a confidential agreement?

21  **MS. WILKINSON:**  Correct, Your Honor.

22  **THE COURT:**  Okay.

23  **THE WITNESS:**  Could you just direct me a little bit

24  more precisely where to find it?  Especially because I do have

25  to read it and I didn't negotiate it, so I'm really flying

206

1  blind.

2  **BY MS. FLEURY:**

3  **Q.**  I believe you should look for the tab that says PX1784.

4  **A.**  Okay.

5  **Q.**  I'm going to guess it's at the back.

6  **A.**  Yep, I'm looking.

7  (Witness examines document.)  I found 1784.

8  **Q.**  And this is a short agreement, but rather than reading the

9  entire thing, especially under the circumstances, I'm going to

10  start by asking you a couple of general questions.

11  **A.**  Okay.

12  **Q.**  You need a Windows license to stream PC games; correct?

13  **A.**  No.

14  **Q.**  You do not?

15  **A.**  You can stream PC games without a Windows license.

16  **Q.**  This agreement involved a license for Windows; correct?

17  **A.**  That was my understanding.

18  **Q.**  And Microsoft owns Windows; correct?

19  **A.**  It does.

20  **Q.**  And this agreement, as we've discussed, was entered into

21  separately but on the exact same day as the other agreement

22  with Nvidia; correct?

23  **A.**  Yes.

24  **Q.**  Ms. Bond, you testified on direct that there are currently

25  some challenges with cloud gaming because of latency; correct?

207

1  **A.**  Correct.

2  **Q.**  But you also testified that Microsoft has entered into an

3  agreement with Nvidia to enable Xbox players to stream games

4  from the cloud using Nvidia's service; correct?

5  **A.**  Yes.

6  **Q.**  You do not have any concerns about the quality of the

7  cloud gaming experience on Nvidia's GeForce NOW; correct?

8  **A.**  It was Nvidia's view that this was desirable to them and

9  so we entered into the agreement on that basis.

10  **Q.**  I understand.  But you personally, Ms. Bond, do not have

11  any concerns about the quality of the cloud gaming experience

12  on Nvidia's GeForce NOW; correct?

13  **A.**  I personally have not done diligence to come to my own

14  conclusion on that.

15  **MS. FLEURY:**  I move to admit PX1784.

16  **THE COURT:**  Any objection?  I think you referred to it

17  on direct, so...

18  **MS. WILKINSON:**  I'm sorry, Your Honor.  I was reading.

19  **THE COURT:**  1784 is the addendum, Nvidia addendum.

20  **MS. WILKINSON:**  Yes, that is under seal.

21  **THE COURT:**  That's fine, under seal.  So it will be

22  admitted under seal.

23  (Trial Exhibit 1784 received in evidence.)

24  **THE COURT:**  We usually take an afternoon break for the

25  court reporter.  Is now a good time?

208

1  **MS. FLEURY:**  Now is a great time.

2  **THE COURT:**  Okay.  We'll do that.  A 15-minute break.

3  Thank you.

4  (Recess taken at 2:01 p.m.)

5  (Proceedings resumed at 2:15 p.m.)

6  **THE CLERK:**  Remain seated.  Come to order.

7  **THE COURT:**  Okay.  We can resume with the cross.

8  **MS. FLEURY:**  Your Honor, we pass the witness.

9  **THE COURT:**  Oh, okay.

10  (Pause in proceedings.)

11  **MS. WILKINSON:**  I believe if you let us, Your Honor,

12  we will be done for the day very soon.

13  **THE COURT:**  Well, you only told me you had three

14  witnesses so...

15  **MS. WILKINSON:**  That's true, and we have FTC as well.

16  **REDIRECT EXAMINATION**

17  **BY MS. WILKINSON:**

18  **Q.**  I just want to clarify a few points, Ms. Bond.

19  In the xCloud streaming service you provide, do you use

20  Azure, the Microsoft cloud product?

21  **A.**  No.

22  **Q.**  Just briefly what is Azure?

23  **A.**  Azure is a cloud service that Microsoft provides to other

24  companies.

25  **Q.**  Okay.  Your streaming service is called xCloud?

209

1  **A.**  Yes.

2  **Q.**  So explain to us why you don't use Microsoft's cloud to

3  stream Xbox games?

4  **A.**  So the games we are streaming are console games.  They are

5  built using the dev kit we talked about with the console

6  operating system and system architecture so they can only be

7  streamed from consoles.

8      So at the simplest form, what we did when we created

9  xCloud is we took off the plastic cover and we took the -- that

10  piece of hardware and we put it in the cloud.

11  **Q.**  You put it in a data center?

12  **A.**  Put it in a data center, yeah.

13  **Q.**  And so there's Azure equipment in the data center?

14  **A.**  Uh-huh.

15  **Q.**  Then there's Xbox?

16  **A.**  Xboxes sitting in racks in the data center.

17  **Q.**  Okay.  And the fact that you have to use the Xbox console

18  to stream, does that affect the costs and/or profits of

19  streaming?

20  **A.**  It's absolutely a factor, yes.

21  **Q.**  Can you explain generally, without going through the

22  numbers, why that is?

23  **A.**  Well, that hardware has a particular cost to acquire and

24  then there's a cost of running it and then there's the cost of,

25  like, the data stream kind of going from your phone to the data

210

1  center and back.

2  **Q.**  And if that Xbox were in the hands of an individual, you

3  would also get the benefits of the gaming revenue, and you're

4  not getting that when it's -- or are you getting that when it's

5  in the data center?

6  **A.**  We do get it.  We get revenue from it, but the -- when we

7  look at all the numbers, the revenue we get, you know, per

8  minute, per hour from that is lower than the cost we get per

9  minute or per hour of that.

10      **MS. WILKINSON:**  That's all we have, Your Honor.

11      **THE COURT:**  Anything further?

12      **MS. FLEURY:**  No, Your Honor.

13      **THE COURT:**  Well, I guess we shouldn't have taken that

14  break.

15      Okay.  Ms. Bond, you may step down.

16      And I want to thank the FTC for allowing the Defendants to

17  call Ms. Bond out of order.

18      All right.  So that concludes us today.  So tomorrow see

19  if you can have your witnesses available to go to 3:00 p.m.,

20  but I know we have all been running on an expedited basis and

21  we're feeling things out.

22      I will see you at 8:15 a.m.  And, again, if you could

23  today provide us with the list of your witnesses and exhibits

24  because that's really helpful for me to go through as to the

25  confidentiality and by 4:00 o'clock or earlier, given we

211

1  finished early, provide Ms. Means jointly the admitted

2  exhibits, except for those in camera, the admitted exhibits and

3  those few that were just redactions that needed to be so that

4  we could put them up publicly.

5      All right.  Thank you.

6      (Proceedings adjourned at 2:19 p.m.)

7      ---o0o---

3      **CERTIFICATE OF REPORTER**

4      I certify that the foregoing is a correct transcript

5  from the record of proceedings in the above-entitled matter.

7  DATE:  Thursday, June 22, 2023

11  _____

12  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
     United States District Court - Official Reporter

213

**Volume 2**

**Pages 212 – 490**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

```
FEDERAL TRADE COMMISSION,    )
                             )
            Plaintiff,       )
                             )
      VS.                    )  NO. C 23-02880 JSC
                             )  SEALED PAGES 216-225, 228-266
MICROSOFT CORPORATION, et al.)  and 369-389
                             )
            Defendants.      )
```

San Francisco, California
Friday, June 23, 2023

TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS

APPEARANCES:

For Plaintiff:

> FEDERAL TRADE COMMISSION
> 600 Pennsylvania Avenue, NW
> Washington, D.C. 20580
> BY: JAMES H. WEINGARTEN, ATTORNEY AT LAW
>     JAMES ABELL, ATTORNEY AT LAW
>     JENNIFER FLEURY, ATTORNEY AT LAW
>     PEGGY FEMENELLA, ATTORNEY AT LAW
>     CEM AKLEMAN, ATTORNEY AT LAW
>     ETHAN GURWITZ, ATTORNEY AT LAW

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

---

APPEARANCES: (cont'd)

For Defendant Microsoft:

> WILKINSON STEKLOFF LLP
> 2001 M Street, NW - 10th Floor
> Washington, D.C. 20036
> BY: BETH WILKINSON, ATTORNEY AT LAW
>     RAKESH N. KILARU, ATTORNEY AT LAW
>     KIERAN GOSTIN, ATTORNEY AT LAW
>     GRACE HILL, ATTORNEY AT LAW
>     ANASTASIA PASTAN, ATTORNEY AT LAW

For Defendant Activision Blizzard, Inc.:

> SKADDEN ARPS SLATE MEAGHER & FLOM LLP
> 1440 New York Avenue, N.W.
> Washington, D.C. 20005
> BY: STEVEN C. SUNSHINE, ATTORNEY AT LAW
>     JULIA K. YORK, ATTORNEY AT LAW

---

214

**I N D E X**

Friday, June 23, 2023 - Volume 2

PLAINTIFF'S WITNESSES

| | PAGE | VOL. |
|---|---|---|
| **LAWER, JAMIE (UNDER SEAL)** | | |
| (SWORN) | | |
| Direct Examination by Mr. Gurwitz | 228 | 2 |
| Cross-Examination by Mr. Gostan | 229 | 2 |
| Redirect Examination by Mr. Gurwitz | 252 | 2 |
| Recross-Examination by Mr. Gostan | 262 | 2 |
| | 264 | 2 |
| **SPENCER, PHIL** | | |
| (SWORN) | | |
| Direct Examination by Mr. Weingarten | 267 | 2 |
| Cross-Examination by Ms. Wilkinson | 267 | 2 |
| Redirect Examination by Mr. Weingarten | 360 | 2 |
| | 445 | 2 |
| **ZIMRING, DOV** | | |
| (SWORN) | | |
| Direct Examination by Mr. Akleman | 466 | 2 |
| Cross-Examination by Ms. Pastan | 466 | 2 |
| Redirect Examination by Mr. Akleman | 482 | 2 |
| | 488 | 2 |

**E X H I B I T S**

TRIAL EXHIBITS

| | IDEN | EVID | VOL. |
|---|---|---|---|
| 1065 | | 306 | 2 |
| 1093 | | 396 | 2 |
| 1093 | | 400 | 2 |
| 1114 | | 281 | 2 |
| 1116 | | 237 | 2 |
| 1125 | | 391 | 2 |
| 1141 | | 400 | 2 |
| 1145 | | 299 | 2 |
| 1147 | | 407 | 2 |

---

215

**I N D E X**

**E X H I B I T S**

TRIAL EXHIBITS

| | IDEN | EVID | VOL. |
|---|---|---|---|
| 1156 | | 409 | 2 |
| 1850 | | 342 | 2 |
| 1851 | | 344 | 2 |
| 1852 | | 348 | 2 |
| 1887 | | 289 | 2 |
| 1888 | | 284 | 2 |
| 1889 | | 285 | 2 |
| 1895 | | 324 | 2 |
| 1895 | | 330 | 2 |
| 1897 | | 331 | 2 |
| 1898 | | 323 | 2 |
| 2170 | | 444 | 2 |
| 3156 | | 437 | 2 |
| 3166 | | 404 | 2 |
| 4309 | | 242 | 2 |
| 4312 | | 249 | 2 |
| 4334 | | 244 | 2 |
| 4344 | | 232 | 2 |
| 4377 | | 340 | 2 |
| 4725 | | 358 | 2 |
| 5046 | | 437 | 2 |
| 8003 | | 480 | 2 |



Friday - June 23, 2023          8:17 a.m.

PROCEEDINGS

---oOo---

(The following pages 216 through 225 were placed under seal by Order of the Court:)





224

227

225

16    (Recess taken at 8:28 a.m.)
17    (Proceedings resumed at 8:33 a.m.)
18    (The following proceedings were heard in open court:)
19         THE CLERK:  Remain seated.  Come to order.
20         THE COURT:  Okay.  Good morning.
21    All right.  So I understand that the FTC's next witness is
22    Ms. Lawver?
23         MR. WEINGARTEN:  Yes, Your Honor.  The FTC will call
24    Ms. Lawver.  My colleague Ethan Gurwitz will be examining.
25         THE COURT:  And Ms. Lawver is the CFO?

226

1         MR. WEINGARTEN:  No, Your Honor.  She's not the CFO,
2    but she's a senior finance officer.
3         THE COURT:  A senior finance person.
4    So I've gone over with the parties and given the nature of
5    her testimony, it's all confidential financial information,
6    internal business information.  So, unfortunately, for this
7    portion of the trial, we need to seal the courtroom.
8    I know you-all just came in and now I'm kicking you out,
9    but I wanted to explain what we're doing.
10    We went through, and although we're trying very hard to
11    keep the proceedings open, there's just no way to do it with
12    this particular testimony because it's all financial
13    information.
14    So we're going to close the courtroom.  We anticipate it
15    will be about 45 minutes total.
16    There is a cafeteria on the second floor if, in any event,
17    you would like to go there or you're welcome to hang out in the
18    hallway.  Just try not to be too noisy.  We can sometimes --
19    we'll go as quickly as we can.  And I apologize.  There's just
20    no way to conduct this particular witness in open court.
21    I do know that the Plaintiff's Counsel from DeMartini is
22    here, and so I need to ask Microsoft, given that they would get
23    access to this testimony in any event, if you have any
24    objection to them being present.
25         MS. WILKINSON:  Your Honor, I know they're under the

227

1    protective order we're under in DeMartini.  I don't know if
2    it's exactly the same here so I'm a little uncomfortable.
3         THE COURT:  Is it just you, Mr. Zirpoli, today?
4         MR. ZIRPOLI:  May I approach, Your Honor?
5         THE COURT:  Yes, you may.
6    I think it's only Mr. Zirpoli today.
7         MS. WILKINSON:  Well, he's a very nice guy and I'm
8    sure he will --
9         MR. ZIRPOLI:  Thank you.
10         MS. WILKINSON:  -- follow the rules.  I mean, we can
11    always give him the transcript afterwards.
12         THE COURT:  No, I'm just saying -- I'm sure you would
13    have to do that in any event.  So since he's here, I'm
14    wondering whether just to allow him.
15         MS. WILKINSON:  Promise to follow the rules?
16         MR. ZIRPOLI:  I promise, Your Honor.
17         THE COURT:  All right.  You may stay then.
18         MR. ZIRPOLI:  Thank you.
19         THE COURT:  All right.  Everyone else, though, I'm
20    sorry, because you are not counsel in the other case, you do
21    need to leave unless you're a Microsoft person.
22    And, Microsoft, I'm going to leave it to you and
23    Activision to tell me if the people who are staying are with
24    you.
25         (Pause in proceedings.)

1    (The following pages 228 through 266 were placed under

2    seal by Order of the Court:)













264



265

266



(Pause in proceedings.)

(The following proceedings were heard in open court:)

THE COURT: All right. We're now ready to proceed again in open court.

Is FTC prepared to call your next witness?

MR. WEINGARTEN: Thank you, Your Honor.

The FTC calls Mr. Phil Spencer.

\\\

267

PHIL SPENCER,

called as a witness for the Plaintiff, having been duly sworn, testified as follows:

THE CLERK: Can you please state your name for the record?

THE WITNESS: Phil Spencer.

THE CLERK: Thank you.

THE COURT: Good morning.

THE WITNESS: Good morning. How are you?

THE COURT: You may proceed.

MR. WEINGARTEN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WEINGARTEN:

Q. Good morning, Mr. Spencer.

A. Good morning.

Q. You are the CEO of Microsoft Gaming; correct?

A. Yes.

Q. And you are the final decision maker at Microsoft Gaming; right?

A. Yes.

Q. And you report directly to the CEO of all of Microsoft Corporation, Mr. Satya Nadella?

A. I do.

Q. And I'll note you're attending this hearing as the corporate representative for Microsoft in this matter; right?

268

1   A.   I don't actually know what my official title is sitting at

2   the table.

3   Q.   You've sat at the counsel table and you've heard all the

4   testimony so far; right?

5   A.   And I'll be here next week.

6   Q.   Okay.  So you heard the testimony that you are the decider

7   about what is exclusive in terms of video games for Microsoft

8   Gaming; right?

9   A.   Yes.

10  Q.   And that's true; right?

11  A.   Yes.

12  Q.   Okay.  You have been the leader of the strategy at

13  Microsoft to acquire more content over the last six years or

14  so?

15  A.   I've been the leader of Microsoft Gaming for nine years.

16  Q.   And you've been the leader of the strategy to acquire more

17  content; right?

18  A.   Yeah.

19  Q.   Okay.  And when you took over as the head of Gaming,

20  Microsoft maybe had approximately ten studios?

21  A.   I don't actually remember the number.

22  Q.   Okay.  Do you remember how many studios there are now?

23  A.   I think the number we use for PR is 20 -- over 23 studios.

24  Q.   Okay.  Do you think it would refresh your recollection

25  about the number of studios when you took over if I showed you

269

1   your investigational hearing transcript?

2   A.   I'm not disputing ten.  I just don't remember exactly.

3   Q.   No, that's okay.

4   A.   Yeah.

5   Q.   Do you think it would help you remember if I showed you

6   where you talked about it under oath?

7   A.   We can say it's ten.

8   Q.   Well, I just want to make sure, sir, that you say it's

9   ten.

10  A.   I can say it's ten.

11  Q.   Thank you.

12       Now, the Xbox ecosystem refers to Xbox as a place where

13  Xbox customers invest their time and money; right?

14  A.   We talk about the Xbox ecosystem as the platform where

15  creators build games for players to play and the place that

16  players come to play video games.

17  Q.   The Xbox ecosystem includes Xbox console?

18  A.   Yes.

19  Q.   The Xbox ecosystem includes Game Pass?

20  A.   Game Pass is part of it, yes.

21  Q.   Xbox ecosystem includes xCloud?

22  A.   Yes.

23  Q.   And the Xbox ecosystem includes Xbox products that are

24  available on PC; right?

25  A.   And our Xbox PC app and the players that we have on PC

270

1   that play Game Pass games or subscribe to Game Pass on Windows

2   PCs.

3   Q.   Okay.  The standard --

4        MR. WEINGARTEN:  Standard revenue split for consoles,

5   I don't think there's any issue with the standard split.

6        MS. WILKINSON:  That's right.  I think that's what

7   they call it.

8   BY MR. WEINGARTEN:

9   Q.   Yeah.  The customary split is 70 percent to the content

10  creator, 30 percent to a platform like Microsoft; right?

11  A.   That's correct.

12  Q.   Okay.

13       MR. WEINGARTEN:  On the PC, the standard or customary

14  split, any issue with that?

15       MS. WILKINSON:  Well --

16       MR. WEINGARTEN:  One second, Your Honor.

17       THE COURT:  Of course.

18            (Pause in proceedings.)

19  BY MR. WEINGARTEN:

20  Q.   Could you please turn, sir, in your invest- -- if you look

21  in your binder, you should have a binder that's labeled

22  depositions or testimony.

23  A.   The witness binder; is that --

24       MR. WEINGARTEN:  May I approach the witness,

25  Your Honor?

271

1        THE COURT:  You may.

2            (Pause in proceedings.)

3        THE WITNESS:  Thank you.

4   BY MR. WEINGARTEN:

5   Q.   If you could please turn to the tab that's your

6   investigational hearing transcript.  It's 7011.

7   A.   Yep.

8   Q.   And if you could look at page 87, please, of that.

9   A.   Yeah.

10  Q.   Actually page 88.

11  A.   88?

12  Q.   Don't read it out loud.  Little page 88 in the upper

13  corner.  Do you see the little four corners?  There's like four

14  pages per page?

15  A.   Oh, sorry.  I was looking at the --

16  Q.   So in the little corners page 88.

17  A.   Sorry about that.

18  Q.   That's okay.  It's -- I don't want to confuse you further,

19  but it's page 023 of the big numbers at the bottom.

20       So page 88, and I wanted you to look at the testimony that

21  starts on line 5.  And do you see those numbers there, the

22  percent that goes to partner, percent that stays with

23  Microsoft?

24  A.   Yes.

25  Q.   Is that Microsoft's customary revenue split for PC games,

272

1   those two numbers?

2   A.   Yes.

3   Q.   Okay.  Thank you.

4        And for Game Pass, the customary split, is the console

5   customary split the same 70/30?

6   A.   Game Pass is a subscription so there isn't a revenue split

7   per se.  We -- sign content to come into the subscription,

8   and it's some combination of an upfront fee that we will pay

9   creators to put the game in or an ongoing usually based on

10  usage of the game in the subscription.  So it doesn't really

11  fit the store model that you're talking about.

12  Q.   There is a customary split for Game Pass, for example, for

13  post-sale monetization, all the money that gets made in the

14  game after the initial sale; right?

15  A.   Any player who's playing a game on our platform, whether

16  it's a free-to-play game or a game that they acquired through

17  the subscription or a game that they paid to own, has the same

18  royalty split we talked about previously.

19  Q.   Okay.  That's the 70/30 split?

20  A.   Yes.

21  Q.   Okay.  Thank you.

22       Now I want to talk to you a little bit about the console

23  market, sir, and in particular Generation 9.

24       Now, a game built to showcase Generation 9 hardware can

25  showcase Generation 9 hardware on a PlayStation 5; right?

273

1   A.   Yes.

2   Q.   And a game built to showcase Generation 9 hardware can

3   showcase Generation 9 hardware on an Xbox X; right?

4   A.   Xbox Series X, yes.

5   Q.   Okay.  And it can do that on an Xbox Series S as well;

6   right?

7   A.   S is a lower specced machine than Series X.  Its price is

8   lower so the features are not the same as they are with

9   Series -- the Xbox Series X.  So there is a functional

10  difference between games running on Series X and running on the

11  lower priced Series S.

12       You refer to X and S together as the Xbox series consoles;

13  right?

14  A.   Yes.

15  Q.   Okay.  And I want you to turn in PX7011, that's your IH

16  transcript, and I want to look at little number 345.

17  A.   Little number 345?

18  Q.   Yeah, page 345 of the transcript, please.

19       (Witness examines document.)  Yeah.

20  Q.   If you look at line 17, the question was (as read):

21       "Putting aside cross gen, game built for Gen 9

22       hardware can showcase Gen 9 hardware on either a

23       PlayStation 5 or an Xbox series; right?"

24       And your answer was:  "Yes."

25  A.   Yeah.  I'm making the distinction that the two consoles

274

1   are not functionally equivalent.

2   Q.   You're making that distinction now, but my question is

3   about your testimony then.  That was your testimony then;

4   right?

5        THE CLERK:  Mr. Weingarten, I'm sorry.  Would you

6   please slow down for the reporter?

7        MR. WEINGARTEN:  Yes, ma'am.

8   BY MR. WEINGARTEN:

9   Q.   I'm asking -- I don't mean to interrupt you, sir, but I'm

10  trying to ask you about that testimony.

11       That was truthful and accurate when you gave it; right?

12  A.   My answer here was "Yes."

13  Q.   Thank you.

14       Now, you don't know whether a game built for Generation 9

15  hardware can or cannot showcase Generation 9 hardware

16  capabilities on a Switch; right?

17  A.   Switch is differently designed device, yes.

18  Q.   And in terms of processing power of GPU, the

19  graphics processor, and the CPU Switch is more akin to a

20  Generation 8 than a Generation 9; right?

21  A.   No, I wouldn't agree with that.  The Switch was designed

22  for people to take on the go.  I mean, an obvious difference

23  when you look at all of them is the Switch has a screen.  It

24  has a battery.  It's a mobile platform.  People can take it

25  with them.  Whereas, the Gen 8 consoles require that they're

275

1   plugged into the wall and don't have a screen.  It's --

2   Nintendo built a different platform.

3   Q.   Okay.  I just want -- on that question I asked you, sir,

4   please look at little page 168 in your sworn testimony.

5   A.   Little page 168?

6   Q.   Little page 168, transcript page 168, line 21.  Let me

7   know when you're there.

8   A.   (Witness examines document.)  I'm there.

9   Q.   (as read):

10      "QUESTION:  Well, let me ask you two questions then.  In

11      terms of processing power, meaning CPU and GPU, is the

12      Switch more akin to a Gen 8 device or a Gen 9 device?"

13      Your answer (as read):

14      "In terms of CPU and GPU, it would be more akin to a

15      Gen 8 device."

16      That was your testimony?

17  A.   That was.

18  Q.   And it was truthful and accurate when you gave it?

19  A.   That was, yes.

20  Q.   Okay.  Now, the Nintendo Switch cannot support the highest

21  level of resolution that the Xbox Series X can support; right?

22  A.   That's correct.

23  Q.   The maximum advertised Xbox X resolution is 4K HD; right?

24  A.   That's correct.

25  Q.   And even the Series S can upscale and also support 4K HD;

276

1   right?
2   A.   It can upscale to 4K.
3   Q.   Now, you don't know what the maximum resolution is for a
4   Switch; right?
5   A.   Not sitting here today, no.
6   Q.   Okay.  And there's also a metric for gaming consoles
7   that's called frames per second or FPS; right?
8   A.   Yes.
9   Q.   And that also has to do with what the game looks like when
10  you play it?
11  A.   I would say it's more what the game feels like when you
12  play it.
13  Q.   Okay.  Xbox X and S can both support 120 frames per
14  second; right?
15  A.   If the developer designs for that, yes.
16  Q.   And you don't know the maximum frames per second that a
17  Switch can support; right?
18  A.   I do not know.
19  Q.   Now let's talk about the PlayStation 5.
20       You do know that the PlayStation 5, like the X and the S,
21  can support 4K HD?
22  A.   I do.
23  Q.   And you do know that the PlayStation 5, like the X and the
24  S, can support 120 frames per second?
25  A.   I believe that's true.

277

1   Q.   Okay.  Now, there's also a metric for measuring processor
2   performance called floating point operations per second or
3   FLOPS; correct?
4   A.   That's correct.
5   Q.   You don't know the maximum advertised FLOPS for a Switch;
6   right?
7   A.   I do not.
8   Q.   Okay.  But it's fair to say even if you don't know exactly
9   the Switch FLOP metric, the Xbox X operates at a higher FLOPS
10  than a Switch; right?
11  A.   That's fair to say.
12  Q.   And it's your understanding that Xbox S also operates at a
13  higher FLOPS rate than Switch; right?
14  A.   Yes, I believe that's true.
15  Q.   Okay.  Now, you're familiar, these consoles to play them,
16  you often need a type of a controller; right?
17  A.   You -- yeah.
18  Q.   Okay.  And a haptic controller is a type of controller
19  that when you do something in the game, you actually feel it
20  through the controller; right?
21  A.   Yeah.
22  Q.   Okay.  Xbox X can work with a haptic controller; right?
23  A.   Yes.
24  Q.   And Xbox S can work with a haptic controller; right?
25  A.   Yes.

278

1   Q.   And the PlayStation 5 can work with a haptic controller;
2   right?
3   A.   It can, yes.
4   Q.   And you don't know if the Nintendo Switch has a haptic
5   controller; right?
6   A.   I do not.
7   Q.   Now, the Switch sells at a lower price than Xbox Series X;
8   right?
9   A.   It's equivalently priced to the S and it's lower priced
10  than the X.
11  Q.   Okay.  And it sells at a lower price than the
12  PlayStation 5; right?
13  A.   It sells at a lower price than the PlayStation 5.
14  Q.   Now I want to take a look at some of the documents that
15  you and your team use when you're thinking about consoles.
16       So turn in your binder, the one that has the documents,
17  please, to PX1114.
18  A.   (Witness examines document.)
19  Q.   I know the print in the beginning is very tiny.
20       THE COURT:  Illegible.
21       THE WITNESS:  Yeah, thank you.
22  BY MR. WEINGARTEN:
23  Q.   We will work on swapping something, but I don't have a
24  question about too much about that.  I have a question that
25  starts on page 8 where the print is much better.

279

1   A.   (Witness examines document.)
2   Q.   Okay.  This -- this document that starts on page 8 is an
3   example of a strategy document for Microsoft Gaming?
4   A.   I don't seem to have the cover letter for the document.
5   Q.   That's part of the legibility, but do you see the part
6   where it says "Ambition of the CSA"?
7   A.   I see that.  I just don't see the context of the bullet
8   point.
9   Q.   Okay.  And you've seen documents like this for Gaming
10  before; right?
11  A.   I've seen documents, yeah.
12  Q.   Okay.  What does "CSA" mean at Microsoft?
13  A.   Customer solution area.
14  Q.   Okay.  And that's like a division at other companies?
15  A.   Roughly, yes.
16  Q.   Okay.  Gaming is a CSA at Microsoft?
17  A.   Yes.
18  Q.   Okay.  Take a look, please, at page 013.
19  A.   (Witness examines document.)
20  Q.   Do you see that page, sir?
21  A.   I do.
22  Q.   And you see number 4, "Growth Horizon 1, fiscal year
23  2022"?
24  A.   I do.
25  Q.   And it says (as read):

280

1    "For fiscal year" --
2        No, I can't read that aloud. Well, take a look at that
3    and look at number 1. Do you see the heading for number 1
4    there?
5    A.   I do.
6    Q.   Okay. That was a -- a priority for the Gaming leadership
7    team for fiscal year 2022?
8    A.   Yeah, it is or was.
9    Q.   Okay. And if you look under it, do you see where it says
10   "Key metrics to evaluate success"?
11   A.   I do.
12   Q.   Okay. Don't read it out loud, but that second bullet, do
13   you see that one about share?
14   A.   I do.
15   Q.   Okay. That was the key metric to evaluate your success in
16   that priority we just discussed; correct?
17   A.   There's more than one listed. So when you say it's the --
18   Q.   I'm sorry. I'll rephrase.
19       Of the two metrics listed, the one in the second bullet is
20   one of those two metrics for your success in Gaming in that
21   priority that's shown in number 1 there; right?
22   A.   It is the second bullet of the first bullet of three
23   different bullets about our overall priorities.
24   Q.   Okay. But it's one of the key metrics for evaluating
25   success in that number 1 there; right?

281

1    A.   Yes.
2    Q.   Okay. Thank you.
3        You can put that one aside.
4        Oh, and there's -- well, thank you.
5        MR. WEINGARTEN: Your Honor, I know we have a
6    legibility concern, but can I move -- I'd like to move to admit
7    PX1114, and we'll work with the other side if we get a better
8    version of the cover.
9        THE COURT: All right. Admitted.
10       (Trial Exhibit 1114 received in evidence.)
11       MR. WEINGARTEN: Thank you, Your Honor.
12   BY MR. WEINGARTEN:
13   Q.   Could you please turn in the binder, sir, to PX1888?
14   A.   Okay.
15   Q.   Take a look at page 002. Do you see the title?
16   A.   I do.
17   Q.   Do you see the date?
18   A.   I do.
19   Q.   Okay. You've seen these kind of business documents
20   before, correct, at Microsoft?
21   A.   Yes.
22   Q.   And this kind of document is presented to the board of
23   directors of Microsoft; correct?
24   A.   Um, this kind of document's used in many places one of
25   which is with the board, yes.

282

1    Q.   Okay. And if you look back at page 1 of the document --
2    of PX1888, look at the first sentence, please.
3    A.   (Witness examines document.) Yes.
4    Q.   Does that indicate to you that this document is being used
5    for a board meeting?
6    A.   It does.
7    Q.   Okay. Could you please turn to page 036?
8    A.   (Witness examines document.) I'm there.
9    Q.   Okay. Thank you, sir.
10       And that page is headed "Gaming Scorecard"; right?
11   A.   It is.
12   Q.   Okay. And that's a scorecard that gets presented to
13   Microsoft's board of directors; right?
14   A.   It is.
15   Q.   Okay. And there are four metrics in the scorecard for
16   Gaming in that top box; right?
17   A.   There are.
18   Q.   The metric in the fourth row, don't read it out
19   loud, but that is one of the metrics that was presented to the
20   board; correct?
21   A.   It is.
22   Q.   Okay. And the next columns, that shows Microsoft Gaming's
23   performance in that metric; right?
24   A.   It does.
25   Q.   Okay. And I want you to look over to the side. There are

283

1    bullets that sort of give some explanation or commentary on the
2    metrics; right?
3    A.   There are.
4    Q.   Okay. Look at the third bullet, please.
5    A.   I see it.
6    Q.   Okay. So that says that metric has been improving;
7    correct?
8    A.   It says it improved in a certain month, yeah.
9    Q.   And I want you to look, please, at the footnotes at the
10   bottom. There's footnotes so the board can understand what
11   they're being shown; right?
12   A.   There are.
13   Q.   Okay. And if you would look at the second -- they're
14   separated by italicus; right? So the second footnote is
15   italicized and it refers back to that metric we were just
16   looking at; right?
17   A.   Yes, it does.
18   Q.   Okay. And it tells us who is included in that relative
19   market share; correct?
20   A.   It does.
21   Q.   And it tells the board what competitors are excluded from
22   that market share; right?
23   A.   It does.
24   Q.   Okay. And that information about how those metrics work,
25   you understand that's accurate when it's presented to the

284

1  board?

2  **A.**  The information is accurate.

3  **Q.**  And the descriptions are -- I'm sure you try to be

4  accurate when you give them to the board?

5  **A.**  Yes, we do.

6  **Q.**  Okay.  You can put that one aside and look at 188 -- oh,

7  excuse me.

8       MR. WEINGARTEN:  Move to admit, please, PX1888.

9       THE COURT:  Admitted.

10      (Trial Exhibit 1888 received in evidence.)

11  BY MR. WEINGARTEN:

12  **Q.**  Let's try PX1889.  This document starts with a chat with

13  the senior leadership team; right?

14  **A.**  It does.

15  **Q.**  Actually you're also listed on the chat; right?

16  **A.**  Yeah.  I'm not sure why but, yeah.

17  **Q.**  That's okay.  You're a member of the senior leadership

18  team of Microsoft?

19  **A.**  Yeah.  I didn't understand why I was listed twice but,

20  yeah.

21  **Q.**  I understand.  But for the record, you are a member of the

22  senior leadership team at Microsoft; right?

23  **A.**  I am.

24  **Q.**  And that's the senior-most leaders across the entire

25  company?

285

1  **A.**  It is.

2  **Q.**  Okay.  And Ms. Bonita Armstrong tells the senior

3  leadership team that there are some documents attached related

4  to your discussion at the June 15th board meeting.  Do you see

5  that?

6  **A.**  I do.

7  **Q.**  Okay.

8       MR. WEINGARTEN:  Your Honor, I move to admit PX1889,

9  please.

10      THE COURT:  Admitted.

11      (Trial Exhibit 1889 received in evidence.)

12  BY MR. WEINGARTEN:

13  **Q.**  Let's look again at what the board was told.  This one is

14  not completely redacted so I can say if you look at page 2,

15  sir, this is called a "State of the Business Report"; right?

16  **A.**  It is.

17  **Q.**  And this one is from June 2022?

18  **A.**  It is.

19  **Q.**  So just a year ago.  Yes, sir?

20  **A.**  Yes, June was a year ago.

21  **Q.**  Thank you.

22      And I would like you to look at page 035, please.

23  **A.**  (Witness examines document.)

24  **Q.**  Are you there, sir?

25  **A.**  I am.

286

1  **Q.**  Okay.  Here again are the metrics; correct?

2  **A.**  The same metrics we saw before, yeah.

3  **Q.**  And it looks like the bottom one is not redacted.

4       MR. WEINGARTEN:  I'm looking at Counsel for Microsoft.

5  Can I say it?

6       MS. WILKINSON:  Can I see it redacted?

7       MR. WEINGARTEN:  Okay.  Then I won't say it.

8       MS. WILKINSON:  Can we just --

9       MR. WEINGARTEN:  Yeah, come look at mine.

10          (Pause in proceedings.)

11      MR. WEINGARTEN:  I won't do the numbers.

12  BY MR. WEINGARTEN:

13  **Q.**  So if you look at the fourth metric, sir, the fourth

14  metric that the board is being told about is console Gen 9

15  share; right?

16  **A.**  It is.

17  **Q.**  And if you look at the explanatory bullet to the right,

18  don't say it out loud but read it to yourself, please, about

19  console Gen 9 share.

20  **A.**  (Witness examines document.)

21  **Q.**  Have you read it?

22  **A.**  I have read it.

23  **Q.**  Okay.  And your belief is that -- do you understand that

24  to be an accurate representation of Microsoft Gaming's position

25  with respect to console Gen 9 share at the time this

287

1  presentation was made?

2  **A.**  In January of 20 -- June of 2022, yes.

3  **Q.**  Okay.  And you'll see there's a description of some

4  markets there.  Do you see that?

5  **A.**  I do.

6  **Q.**  Okay.  And those are broken out by different geographies;

7  right?

8  **A.**  They are.

9  **Q.**  Okay.  And they're called the key markets; right?

10  **A.**  Just key.  There's no "the."

11  **Q.**  Sorry.  In key markets?

12  **A.**  Yeah.

13  **Q.**  Okay.  And if you look again -- strike that.

14      You can put that one aside, sir.

15      I'd like you to look, please, at PX1887.

16  **A.**  (Witness examines document.)

17  **Q.**  Now, this document is an e-mail from you to the Gaming

18  leadership team and Mr. Leder of ZeniMax; right?

19  **A.**  It is.

20  **Q.**  And you're talking here about a meeting that you attended

21  with the Microsoft Board of Directors?

22  **A.**  Yes.

23  **Q.**  And it's, again, from November -- this one's from November

24  of 2022 so six months later from the --

25  **A.**  Yes, yes.

288

1 **Q.** Okay. So just roughly six or seven months ago?

2 **A.** Yes.

3 **Q.** Okay. And if you would, please, look, you say "My" -- in

4 the third paragraph you say "My talk track was" --

5 **MR. WEINGARTEN:** Oops, sorry. I assume that's okay.

6 **MS. WILKINSON:** Yes. He says it all the time.

7 **BY MR. WEINGARTEN:**

8 **Q.** Okay. So your talk track, that means the things you

9 told the board basically in this particular example?

10 **A.** Yes.

11 **Q.** Okay. I won't read this one, but the second bullet point,

12 you see what's that says? Just the first sentence?

13 **A.** Yes.

14 **Q.** Okay. Is that accurate about what you told the board in

15 November of 2022?

16 Just I really only care about the first sentence of that

17 bullet. It starts with "I" and ends with something, a period.

18 **A.** That -- that's -- can you just ask the question

19 specifically again?

20 **Q.** All right. I just want to make sure when you told that to

21 the Gaming leadership team that that's what you told the board,

22 was that -- were you being accurate?

23 **A.** I think we're misreading. My point there was that topic.

24 **Q.** I understand.

25 **A.** It's the first topic I talked -- or the second topic I

289

1 talked about with the board.

2 **Q.** I understand. And that was the topic that you talked

3 about with the board.

4 **A.** That's right.

5 **Q.** Okay. Was that company?

6 **A.** Sorry?

7 **Q.** About that company --

8 **A.** Yes.

9 **Q.** -- that's mentioned?

10 **A.** Yeah.

11 **Q.** Okay.

12 All right. You can put that one aside.

13 **MR. WEINGARTEN:** Move to admit PX1887, Your Honor.

14 **THE COURT:** Admitted.

15 (Trial Exhibit 1887 received in evidence.)

16 **MR. WEINGARTEN:** Thank you.

17 **BY MR. WEINGARTEN:**

18 **Q.** Now, do you remember, sir, there have been discussions

19 among members of the Gaming leadership team about whether to

20 include Nintendo in metrics for console share?

21 **A.** Is there a specific conversation?

22 **Q.** I'm just asking if you remember that there were

23 discussions among Gaming leadership team members about whether

24 to include Nintendo in metrics about console share.

25 **A.** I can agree that we've probably talked about that. I

290

1 don't -- I don't have a specific conversation in mind.

2 **Q.** Okay. And there was a period of time when Nintendo was

3 not included in the share metrics because the PlayStation 5 and

4 the Xbox Series X and S all launched on the same effective

5 date; right?

6 **A.** We are -- there are different views we have of our share.

7 Some of those shared metrics include both Sony and Nintendo,

8 others do not. When we talk about the current generation of

9 consoles, we're usually talking about all three that are

10 available in the market when a consumer walks in the store,

11 which are the three or four in front of you today.

12 And -- but you're right, that PlayStation 5, Xbox Series X

13 and S launched at similar timeframe. So many times on launched

14 alignment views we will show just those two.

15 **Q.** Well, the biggest driver in your view, sir, of why

16 Nintendo would not be included in Gen 9 share is because the

17 Xbox series consoles and the PlayStation 5 launched on the same

18 date and those consoles are at the same place in their life

19 cycle and the Nintendo is not; right?

20 **A.** That is a consideration definitely when we're looking at

21 the sales of PlayStation versus Xbox is they launched at

22 similar time.

23 **Q.** And I appreciate it's a consideration. My question is:

24 That's the reason or part of the reason why Nintendo was not

25 included in Gen 9 console share by the GLT, the Gaming

291

1 leadership team; right?

2 **A.** I honestly am not trying to be difficult. I just want to

3 be sure.

4 I get a weekly report on share that shows Nintendo, Sony,

5 and Xbox run rate, say, in the U.S. So that's a view I see all

6 the time. If there's a specific view that you want me to look

7 at to say why are we not including Nintendo in that view, I'm

8 happy to create, like, a positive assertion for your point.

9 **Q.** Sure. Let's look in your deposition, please, your

10 deposition transcript, not the investigational hearing.

11 **A.** Yeah.

12 **Q.** And it's page -- little page 158. So transcript page 158.

13 **A.** That's the little number?

14 **Q.** Yeah. The transcripts binder. It says "Previous

15 Testimony" on the cover that -- you got it.

16 **A.** Yeah. And the little number 158?

17 **Q.** The little number 158.

18 **A.** Thank you.

19 **Q.** Are you there, sir?

20 **A.** I am.

21 **Q.** Okay. And look at line 16 (as read):

22 **QUESTION:** Okay. Do you remember any discussion amongst

23 GLT members about whether to include Nintendo in metrics

24 regarding console share?

25 **ANSWER:** We have had those discussions.

292

1  **QUESTION:** Was there a period of time when Nintendo was
2  not included in Gen 9 share metrics, like how we saw it
3  was not included?
4  **ANSWER:** Yes.
5  **QUESTION:** Okay. Why was that?
6  **ANSWER:** My belief is the biggest drivers because
7  PlayStation 5 and Xbox Series X and S all launched on the
8  same effective date.
9  **QUESTION:** Why would that lead you and the GLT to not
10  include Nintendo in calculations of share for console?
11  **ANSWER:** Because PlayStation 5 and Xbox Series X are at
12  the same place in their life cycle in the consumer
13  market."
14  **A.** That's correct.
15  **Q.** That was your testimony; correct?
16  **A.** Yes.
17  **Q.** And it was truthful and accurate?
18  **A.** It was.
19  **Q.** Okay. Thank you.
20      Now, you mentioned a minute ago in your testimony that
21  there are times when you include PlayStation 5, the Xbox series
22  consoles, and Switch in the share metrics; right?
23  **A.** That's correct.
24  **Q.** And you do that and you include all three and not just the
25  Xbox series and the PlayStation 5 when you're trying to show a

293

1  global perspective of Xbox's relevance; right?
2  **A.** That's not right.
3  **Q.** Okay. Could you please turn, the same page actually,
4  little number 16?
5  **A.** (Witness examines document.) Yes.
6  **Q.** If you look at line 6 (as read):
7      **QUESTION:** Did there come a time where Nintendo was added
8      back into the share calculation for console along side X,
9      S, and PS5?
10     **ANSWER:** There are times when we show all three and
11     there's times when we show two.
12     **QUESTION:** Any overall factors you can tell us as to when
13     you show all three versus showing just Xbox and
14     PlayStation 5?
15     **ANSWER:** When we're trying to show an accurate global
16     perspective of our relevance, we would show all three."
17     That testimony was truthful and accurate when you gave it?
18  **A.** Yes.
19  **Q.** Okay. Would you agree that in the United States Xbox's
20  market share versus Sony has traditionally been more
21  competitive than in Europe?
22  **A.** We've been behind Sony the whole time in the U.S.
23  **Q.** Would you agree, sir, in the United States Xbox's market
24  share versus Sony has traditionally been more competitive than
25  in Europe?

294

1  **A.** Than in Europe, it is, yes.
2  **Q.** Let's take a look in your binder --
3      **THE COURT:** Is this a good time to take our break?
4      **MR. WEINGARTEN:** Certainly, Your Honor. Whatever is
5  convenient for the Court.
6      **THE COURT:** All right why don't we take our 15-minute.
7  Morning break.
8      **MR. WEINGARTEN:** Thank you.
9          (Recess taken at 10:05 a.m.)
10         (Proceedings resumed at 10:20 a.m.)
11     **THE COURT:** Okay. You may resume.
12     **MR. WEINGARTEN:** Thank you, Your Honor.
13  **BY MR. WEINGARTEN:**
14  **Q.** I want to talk to you a little bit now, Mr. Spencer, about
15  Sony and the so-called console wars; right? You're familiar
16  with the "term console wars"?
17  **A.** Yes, I am.
18  **Q.** Okay. And that roughly refers to the intense competition
19  in the console space in the United States?
20  **A.** I actually think it probably more reflects the fans of the
21  different platforms and the social commentary more maybe akin
22  to like sports fans for their local team.
23  **Q.** Do you think that Microsoft Gaming's Xbox lost the console
24  wars?
25  **A.** As the console wars is a social construct with the

295

1  community, I would never want to count our community out.
2  They're big fans. If you look at our market share in the
3  console space over the last 20-plus years, we're in third
4  place. We've remained in third place for quite a while. I
5  think it's hard to look at our position now and see us in
6  anything other than third place.
7  **Q.** And part of the reason what that means in practical effect
8  is the Xbox just didn't sell as much as, say, Sony?
9  **A.** Yeah, we're behind Sony and Nintendo in console share
10  globally.
11  **Q.** Okay. Could you please turn in your binder to PX1145,
12  please?
13  **A.** This is in the documents binder; correct?
14  **Q.** Yes, sir. Thank you.
15  **A.** (Witness examines document.) I have it.
16  **Q.** Okay. This is an e-mail chain between you and Mr. Tim
17  Stuart; right?
18  **A.** Yes, it is.
19  **Q.** Mr. Stuart is the CFO of Microsoft Gaming; right?
20  **A.** Yes, he is.
21  **Q.** And this is an e-mail chain dated December 4th, 2020?
22  **A.** Yes, it is.
23  **Q.** And that's right around the time that the Xbox series
24  consoles launched; right?
25  **A.** Yes.

296

1  Q.   Okay.  And the bottom e-mail on page 1 is the start of the
2  chain.  It's a lengthy, lengthy e-mail from you to
3  Mr. Spencer [sic] with the subject "Xbox Console Volume";
4  right?
5  A.   Yes.
6  Q.   Do you remember what month in 2020 the Xbox Series X and S
7  launched, roughly?
8  A.   November.
9  Q.   Okay.  So this is just right after the launch then; right?
10  A.   Yes.
11  Q.   Could you please turn to page 002?  And this paragraph,
12  the second paragraph, is highlighted so don't say it out loud.
13  I want you to look at the first sentence that says "I believe."
14  Do you see that?
15  A.   I do.
16  Q.   Can you read that sentence to yourself?  And I'm going to
17  ask you if that sentence was truthful and accurate when you
18  made it.
19  A.   (Witness examines document.)  Yeah, I wrote that to Tim
20  believing I was being truthful.
21  Q.   Okay.  And if you would please look at the -- one, two,
22  three -- fourth sentence.  It says "Sony."  Don't read the
23  rest.  Do you see that?  And then it ends up with the word
24  "coming," that sentence?
25  A.   It ends with the word "coming," yeah, I see that.

297

1  Q.   Okay.  So read that sentence to yourself, please.
2       And you also believed that when you wrote it to Mr. Stuart
3  at the time of the launch; right?
4  A.   I did.
5  Q.   Okay.  And you believed it at the time?
6  A.   I believed it at the time.
7  Q.   Okay.  Fair to say that you view Sony as an aggressive
8  competitor?
9  A.   Yeah, Sony is the market leader with considerable
10  capability and an aggressive competitor and leader.
11  Q.   Okay.  And in your view, the Sony PlayStation platform is
12  hostile to Xbox's survival?
13  A.   Yeah.
14  Q.   Okay.  And in your view, shipping more content on a
15  platform that is hostile towards Xbox's survival feels like
16  you're enabling an aggressive competitor to further damage you;
17  right?
18  A.   Every time we ship a game on PlayStation going back to the
19  70/30 revenue split that we discussed, Sony captures 30 percent
20  of the revenue that we do on their platform, and then they use
21  that money, among other revenue that they have, to do things to
22  try to reduce Xbox's survival in the market.
23  Q.   So there's a lot of competition between Sony and Xbox;
24  right?
25  A.   We try to compete; but as I said, over the last 20 years,

298

1  we've failed to do that effectively.
2  Q.   And it's your view that if you are shipping more content
3  on Sony PlayStation, a platform that's hostile towards Xbox's
4  survival, that would feel like enabling an aggressive to damage
5  you; right?
6  A.   It enables them to take the revenue they make off of our
7  products to sign third-party exclusive deals to block games
8  from our platform to price their console at a certain level.
9  So they -- they have the opportunity to use the revenue from
10  the games that we ship on their platform to block Xbox's
11  survival.
12  Q.   Let me show you -- if you go to your investigational
13  hearing transcript, please, sir.  It's in the testimony binder.
14  It's the bigger -- it's PX7011.  It's page -- I'll do the big
15  numbers -- 7011-092.
16  A.   (Witness examines document.)
17  Q.   If you look at little page 363, that's the transcript
18  page, please, line 14.
19       And the question was actually about multiplayer and
20  cross-platform so (as read):
21       "QUESTION:  Why not have multiplayer games launch also on
22       PlayStation so that folks can have cross-platform play?
23       "ANSWER:  I believe right now one of the biggest risks to
24       Xbox's survival is that what I've mentioned of Sony paying
25       Teams to exclude Xbox from their shipping platforms.  So

299

1       if I'm shipping more content on a platform that is hostile
2       towards Xbox's survival, I feel like I'm enabling an
3       aggressive competitor to further damage our aspirations."
4       That was your testimony?
5  A.   It is.
6  Q.   And it's truthful and accurate?
7  A.   Yeah, I think it's in line with what I just said.
8  Q.   And it's about -- and that was in response to a question
9  about having cross-platform games and multiplayer games launch
10  also on PlayStation; right?
11  A.   It was.
12  Q.   Okay.  Now --
13       MR. WEINGARTEN:  Oh, I again forget to -- I apologize,
14  Your Honor.  Can I move to admit PX1145?
15       THE COURT:  Yes, admitted.
16       (Trial Exhibit 1145 received in evidence.)
17       MR. WEINGARTEN:  I will do better.
18  BY MR. WEINGARTEN:
19  Q.   You and your team analyze Sony PlayStation price changes
20  and determine responses accordingly; right?
21  A.   Yeah, we try to compete in the market on price.
22  Q.   Okay.  I want to talk to you about a different market.
23  Let's move off consoles for a second and talk about
24  subscription.
25       Microsoft Gaming tells developers that Game Pass --

300

1 joining Game Pass with their games is accretive to standalone
2 game sales; right?
3 **A.** We have said that in the past.
4 **Q.** That's a message that Microsoft Gaming says to developers
5 whom it wants to put their games on Game Pass; right?
6 **A.** It is a message we've used in the past when we're
7 describing Game Pass to developers. Now our message is more
8 around the financial investment that we can make in their
9 creative to help support them doing innovative things with
10 their games.
11 **Q.** Okay. And you would agree that fundamentally Game Pass is
12 a reach bet to get off of console fueled by console users as an
13 early catalyst?
14 **A.** Game Pass is a business model that we think has more reach
15 capability than $70 retail games, yeah.
16 **Q.** And it's a bet to get off of console; right?
17 **A.** It is definitely a bet to get to every endpoint where
18 somebody wants to play.
19 **Q.** To do that you have to get off console with Game Pass;
20 right?
21 **A.** We would include console. We see console as part of our
22 future so I would -- I would talk about it more as expanding
23 beyond just console; but off console kind of presumes that we
24 would leave console, which isn't our goal with Game Pass.
25 **Q.** Okay. Can you please turn in your deposition transcript

301

1 to the little page 225, transcript page 225. And I'm going to
2 look at line 8, please, on little page 225.
3 **A.** (Witness examines document.)
4 **Q.** Let me know when you're there. Sorry.
5 **A.** Yeah. Sorry.
6 **Q.** Take your time.
7 **A.** (Witness examines document.) I'm on 225.
8 **Q.** Okay. Look at little -- look at line 8, please. That's
9 me asking you a question (as read):
10     "You write 'Fundamentally GP is a reach bet off of
11     console fueled by console users as an early catalyst.'
12     Still agree with that?"
13     And your answer was "Yes."
14     Was that truthful and accurate testimony when you gave it?
15 **A.** Yes.
16 **Q.** Okay. And "GP" there means Game Pass?
17 **A.** It does.
18 **Q.** Game Pass is a reach bet off of console?
19 **A.** I would include console. Game Pass is available on
20 console. So it -- Game Pass is available on console PC, so
21 it's inclusive of all of those.
22 **Q.** Okay. Let's talk about the role of content in
23 subscription services like Game Pass.
24     It is your view that Microsoft needs a predictable cadence
25 of AAA launches in its products and services; right?

302

1 **A.** For our customers I think having games that our customers
2 are anticipating that they know the ship dates for, that they
3 can see into the future, is an important part of their
4 investment in our platform.
5 **Q.** So is the answer to my question "Yes"?
6 **A.** I think I affirmed your question, yes.
7 **Q.** And it is your view that Microsoft needs AAA content to
8 drive acquisition of users across its services?
9 **A.** We need AAA content, yes.
10 **Q.** You need AAA content to drive acquisition of users?
11 **A.** Acquisition and retention.
12 **Q.** Of users?
13 **A.** Of users.
14 **Q.** Of the products and services that Microsoft offers?
15 **A.** Products and services that Microsoft offers, yes.
16 **Q.** Thank you.
17     And adding more content to Game Pass subscription service
18 is one of the things that you believe will increase the number
19 of subscribers across many different devices for Game Pass;
20 right?
21 **A.** As users are making their bet on Game Pass and subscribing
22 and choosing to stay subscribed, great content coming to the
23 subscription we believe is important for that.
24 **Q.** So adding more content to a subscription service like
25 Game Pass increases the number of subscribers; right?

303

1 **A.** That's our goal.
2 **Q.** And subscriber scale, meaning the number of subscribers,
3 is imperative for a successful subscription service in gaming;
4 right?
5 **A.** Having a large number of subscribers is important to our
6 subscription success, yes.
7 **Q.** In fact, having scale and subscribers is imperative, in
8 your view, to success in gaming subscription; right?
9 **A.** Yes.
10 **Q.** Have you ever expressed the view that you want to make it
11 clear to Google, Amazon, and others that they will not catch up
12 to Microsoft in gaming at all, not just in subscriber numbers?
13 **A.** For us gaming is a capability that Microsoft has where we
14 want to continue to extend our capability and show leadership
15 relative to potential competitors or today's competitors.
16 **Q.** And I appreciate that, but my question was: Have you ever
17 said that you want to make it clear to Google and Amazon that
18 they will not catch up to Microsoft in gaming all in, not just
19 in terms of subscribers even?
20 **A.** Yeah, I believe I've said that.
21 **Q.** Okay. And have you also -- do you also believe that
22 content is part of the differentiator for Microsoft versus
23 Google and Amazon in subscription?
24 **A.** Gaming content is today, yes.
25 **Q.** So I'll make it more clear. I thank you for the

304

1 correction.

2     Gaming content is a differentiator for Microsoft versus

3 Google and Amazon in video game subscription services; right?

4 **A.**   It is today, yes.

5 **Q.**   Just briefly on -- we've heard a lot of testimony, you've

6 been here for it, about AAA games; right's.

7     There are relatively few AAA titles released in a year

8 relative to the total number of titles released in gaming in a

9 year; right?

10 **A.**   Yeah. Given -- yes. Given the number of independent

11 titles that are developed in the market, the number of -- I

12 think you can equate maybe Blockbuster that is used in movies

13 with AAA games -- that AAA games are a small part of the

14 overall game releases in a given year.

15 **Q.**   There may be 10 to 20 AAA games out of 300 or 400 total

16 console game titles that are released?

17 **A.**   I don't have those exact numbers in my head, but there are

18 a lot more independent and smaller games than there are AAA

19 games developed in a year.

20 **Q.**   Okay. Let's take a look, please, at your investigational

21 hearing transcript page 38. It's the little 38. So

22 PX7011-011. Those are the big numbers at the bottom. And then

23 it's investigational hearing transcript page 38.

24 **A.**   (Witness examines document.) I'm on that page.

25 **Q.**   And the question I'm interested in starts at line 22 (as

305

1 read):

2     **"QUESTION:** How many AAA games do you think come out in a

3     year -- in a given year in your experience?

4     **"ANSWER:** I would say there's -- there are probably 10 to

5     20 AAA games in a given year -- calendar year.

6     **"QUESTION:** And how many games -- let's say, console --

7     how many console games do you think launch -- titles

8     launch in a given year, give or take?

9     **"ANSWER:** 300 to 400."

10     Those are the estimates you gave under oath; right?

11 **A.**   In October of '22, yes.

12 **Q.**   Okay. And that was truthful and accurate when you gave

13 it?

14 **A.**   That was the best of my guess in October of '22, yes.

15 **Q.**   Okay. Let's talk a little bit more about content.

16     Every year the Gaming leadership team publishes to the

17 gaming organization a strategy document; right?

18 **A.**   We try to. I think there's some years we've missed but,

19 yes, we try to.

20 **Q.**   And the annual strategy document presents the annual

21 strategy and shows a view on the long-term trends in the

22 business; right?

23 **A.**   Yeah. It's the document we try to use to align the team

24 behind the strategy.

25 **Q.**   Please turn in your binder to PX1065.

306

1 **A.**   This is the document binder; right?

2 **Q.**   Yes, sir. The other one.

3 **A.**   (Witness examines document.) I'm at the document. Or

4 it's a mail exchange; right?

5 **Q.**   Yeah. The first cover is an e-mail exchange, and the top

6 e-mail is from Mr. Hampton to some listserv called "Gaming

7 Business Planning and Strategy." And the next e-mail down is

8 from you to, among others, Ms. Hood and Mr. Nadella; right?

9 **A.**   It is.

10 **Q.**   All right.

11     **MR. WEINGARTEN:** Move to admit PX1065, please.

12     **THE COURT:** Admitted.

13     (Trial Exhibit 1065 received in evidence.)

14 **BY MR. WEINGARTEN:**

15 **Q.**   Now, this is a strategy document that's about a particular

16 potential acquisition; right?

17 **A.**   It is.

18 **Q.**   Okay. But you attached a memo describing gaming strategy

19 at this time to some pretty senior executives, including Amy

20 Hood and Mr. Nadella; right?

21 **A.**   Yes.

22 **Q.**   And I want to turn you, please, to page 017 and it's

23 bullet point 9.2, and it says "Xbox Game Pass State of the

24 Union." So this is you're giving Ms. Hood and Mr. Nadella an

25 overview here; right?

307

1 **A.**   It's hard to read it this way. This is the strategy

2 document that was attached to the e-mail. So this is the

3 strategy document that we used for the entire org and we

4 attached it so Amy and Satya would have access to this

5 document, yes.

6 **Q.**   Great.

7     And if you look at number 1 -- well, right above the

8 number 1, it says (as read):

9     "To that end, Xbox Game Pass faces three primary

10     content dynamics."

11     And the number one dynamic listed is "Need for

12 differentiated content," and then you're explaining to Ms. Hood

13 and Mr. Nadella that (as read):

14     "For gaming, 'differentiated content' means investing

15     in content that is, one, exclusive to the service to

16     differentiate relative to other services; two, blockbuster

17     in scale to attract and engage users; and, three, released

18     on a day-and-date basis; i.e., releases in the service on

19     the day it launches to maximize the value of the content

20     to subscribers."

21     Do you see that?

22 **A.**   I do see that.

23 **Q.**   That's the definition of "differentiated content" that you

24 gave to Ms. Hood and Mr. Nadella?

25 **A.**   It was in the strategy document that was attached to the

308

1  other request, yes.

2  Q.  Do you see number 2 there, "Expanding Beyond Console"?

3  A.  I do.

4  Q.  Do you see how it says "PC and cloud dramatically expand

5  our market opportunity"?

6  A.  Yes, I see that.

7  Q.  So PC gaming and cloud gaming will dramatically expand the

8  opportunity for Microsoft beyond its traditional areas like

9  console; right?

10  A.  This is in a subsection talking about Game Pass, so

11  talking about where Game Pass can find new users.

12  Q.  And then the next point, number 3, is "Limited content

13  supply," and it says (as read):

14        "Different than other entertainment markets, the

15        supply of attractive games is structurally limited."

16  Do you see that?

17  A.  I do see that.

18  Q.  Okay.  You told that point to Ms. Hood and Mr. Nadella in

19  this document also; right?

20  A.  Yeah.  It's in the same document, yes.

21  Q.  You can put that aside, please.

22  A.  Okay.

23  Q.  I want to talk to you a little bit about Activision

24  content.

25      Activision is a publisher of AAA games?

309

1  A.  Activision is a publisher of AAA games on console, PC, and

2  mobile games, which we don't usually use the -- the users don't

3  usually use AAA when discussing mobile games.  So they -- they

4  develop games across all three platforms.  Some of them are AAA

5  games.

6  Q.  Okay.  Call of Duty is a AAA game; correct?

7  A.  I would consider Call of Duty a AAA game.

8  Q.  I want to take you back in time, we're not going to do

9  details in open court, but take you back to 2020 when Microsoft

10  Gaming and Activision were negotiating to get Call of Duty onto

11  the Xbox X and S in time for the launch of those products.  Do

12  you remember that?

13  A.  I do remember.

14  Q.  Okay.  And Microsoft made an offer -- let me see how I

15  want to do this.

16      MR. WEINGARTEN:  One second, Your Honor, while I try

17  to figure out to work around?

18      THE COURT:  Of course.

19      MR. WEINGARTEN:  Thank you.

20      (Pause in proceedings.)

21  BY MR. WEINGARTEN:

22  Q.  Okay.  There were different offers for Activision with

23  respect to where their content would be located; right?  So

24  console revenue share would be different than PC share;

25  correct.  I can't say the numbers.

310

1  A.  Well --

2  Q.  I don't want to say the numbers.

3  A.  -- I appreciate us not saying the numbers in the room.

4  Q.  Yeah.

5  A.  I'm --

6  Q.  I'll try it better.

7  A.  Okay.

8  Q.  In negotiating with Activision, Microsoft put forward a

9  proposal about a revenue share for revenues on Activision

10  content sold on the console; right?

11  A.  That would be part of the proposal that we would make to a

12  partner, yes.

13  Q.  You also put forward a proposal for a revenue share for

14  content sold for PC games; right?

15  A.  I don't remember that specifically, but it would be a

16  normal part of us working with a partner.

17  Q.  Okay.  Let's look at page 118 -- well, it's the IH

18  transcript, your investigational hearing.  It's that PX7011 and

19  it's the page PX7011-031, page 118 and 119 of the little

20  transcript pages.

21  A.  I'm on the page.

22  Q.  Okay.  And look at page 118, lines 14 to 16.  Your answer

23  continues to 18, but I'm trying to get to the numbers here.  Do

24  you see that?

25  A.  I do see 118, yes.

311

1  Q.  And you see lines 14 to 17?

2  A.  Yes.

3  Q.  It says "On," question "On"?

4  A.  Yeah.

5  Q.  Okay.  So that first clause "On" and it talks about the PC

6  store, that's the revenue split that Microsoft offered to

7  Activision for games in the PC store; right?

8  A.  I believe that's true, yes.

9  Q.  If you look at the second split in that question, it says

10  (as read):

11        "We talked earlier about the rationale for sometimes

12        offering blank economic split."

13  Do you see that?

14  A.  I do.

15  Q.  Okay.  That's the traditional economic split that

16  Microsoft offers for PC store?

17  A.  That Microsoft does, yes.

18  Q.  Okay.  So if you look at the top number, that's what was

19  offered to Activision, the bottom number on line 16 is the

20  traditional customary split; right?

21  A.  It looks to be true, yes.

22  Q.  Okay.  And let me try it this way.

23      Look at page 126, please, of your investigational hearing,

24  same document, just transcript page 126.  Sorry.  Transcript

25  page.

312

1  A.  I'm there.

2  Q.  Okay.  Look at lines 8 through 12.

3       Okay.  So that's a contrast of the splits for the console

4  piece; right?  "The first number is so at blank," that blank is

5  the offer?

6  A.  It is.

7  Q.  And the next one is the customary; right?

8  A.  It is.

9  Q.  70/30 is the customary.  And your testimony was that the

10  offer split that was made to Activision, and you see what you

11  said about it?

12  A.  I do.

13  Q.  Was that truthful and accurate?

14  A.  It was.

15  Q.  Okay.  And you were willing to make that kind of offer

16  that would have had that impact that you're describing on 126,

17  lines 10 to 13, because you had to make the economics good

18  enough for Activision to not skip Xbox X and S; right?

19  A.  That was the threat.

20  Q.  Okay.  And you were willing to do that kind of offer with

21  those effects because you could not afford to have Activision

22  skip Xbox console with key franchises; right?

23  A.  I would say it's too simplistic to talk about an

24  individual title.  In the overall Xbox trying to compete with

25  the competitive platforms, there were a number of third-party

313

1  games that the competition was paying to exclude Xbox which had

2  already been announced.  One of those games launched this week,

3  Final Fantasy XVI not coming to Xbox.

4       So knowing that we have a competitor who is actively

5  signing third-party games to skip our platform, it became more

6  important for us, for our customers, and for continued sales of

7  our console that we're able to secure third-party games onto

8  our platform inclusive of Call of Duty.

9  Q.  Okay.  And so because of a fear that Sony might pay

10  Activision to skip Xbox console with a key franchise, you had

11  to make an offer to get that content?  You needed that content

12  for Xbox; right?

13  A.  We needed to do a lot of work with a lot of partners given

14  the competitive situation we had against the market leader.

15  Q.  And if you own content, you don't have to pay it to be

16  exclusive on Xbox anymore, do you?  You don't pay the companies

17  that are already part of Microsoft, do you?

18  A.  We pay them a salary but, yes, we don't pay them.

19       (Laughter)

20       THE WITNESS:  We don't pay for exclusivity on our own

21  platform.

22  BY MR. WEINGARTEN:

23  Q.  That factor falls out once you actually own the company;

24  right?

25  A.  There is an overall profitability of a title so we're

314

1  obviously paying the employees to work on the game, to market

2  the game.

3       So when you exclude platforms, it does hurt the financial

4  return on the individual game that you're working on; but it --

5  yes, it's obviously true that there's no other entity that

6  you're having to pay directly.

7  Q.  Okay.  And one of the benefits of owning content in

8  gaming, from your perspective, is that it enables Microsoft to

9  be the decision maker about what platforms that gaming content

10  will appear on; right?

11  A.  What I would say more recently is that with a competitor

12  who's paying third parties to skip our platform, that we felt

13  it's necessary for us to secure ownership of more content so we

14  can have more input into that content on our platform and in

15  our subscription.

16       I think ZeniMax is a great example; that when we acquired

17  ZeniMax, one of the impetus for that was that Sony had done a

18  deal for Deathloop and Ghostwire, as came up yesterday, to pay

19  effectively Bethesda to not ship those games on Xbox.

20       So the discussion about Starfield, when we heard that

21  Starfield is potentially also going to end up skipping Xbox, we

22  can't be in a position as a third-place console that -- where

23  we fall further behind on our content ownership.  So we've had

24  to secure content in order to remain viable in the business.

25  Q.  Right.  And my question was a little -- maybe I was

315

1  inartful, but I meant it to be more simple.

2       Another benefit of owning content in gaming from your

3  perspective is that it enables Microsoft to be the decision

4  maker about what platforms that content appears on; right?

5  A.  That's one of the benefits, yes, it is.

6  Q.  Okay.  And in your entire time -- how long have you been

7  at Xbox?

8  A.  I started at Xbox in 2001.

9  Q.  Okay.  In the entire time that you've been at Xbox,

10  there's always been discussions about the role of exclusives

11  and the impact of exclusives on Xbox platform sales; right?

12  A.  It is -- it's been a topic, yes, over the two decades that

13  Xbox has been in the business.

14  Q.  And you've had discussions in your role in Xbox about the

15  financial implications of not shipping on other platforms,

16  including not shipping on PlayStation; right?

17  A.  The discussion's a little more complete than just not

18  shipping on Xbox.  A decision we make with all of our games is

19  to ship on Xbox and Windows PCs, and there's a financial upside

20  when we ship on Windows PCs.  It has an impact on potentially

21  somebody buying an Xbox because obviously you can play the game

22  on PC.  So we have complete discussions about where content

23  will show up in the overall return to us.

24  Q.  Well, you've had conversations and participated in

25  conversations, at either the senior leadership team for all of

316

1  Microsoft or the Gaming leadership team for gaming, about the
2  economic costs and benefits of Microsoft Gaming skipping
3  PlayStation with a title; right?
4  A.  That would be more of a Gaming leadership team discussion
5  than it would be a Microsoft senior leadership team discussion.
6  Q.  And those discussions about the economic costs and
7  benefits of Microsoft skipping PlayStation with a title have
8  happened; right?
9  A.  Again, I'd just say when we're thinking about where a
10  title is, we're thinking about the overall financial impact of
11  us shipping a title inclusive or exclusive of certain
12  platforms.
13  Q.  Let's look, please, in your investigational hearing
14  transcript, it's PX7012.  This is Volume II of the transcript,
15  7012, and it's page 013 of PX7012.
16  A.  (Witness examines document.)  I'm on the page.
17  Q.  Okay.  Little transcript page 441, I started to ask a
18  question.  I screwed it up so I asked a better one I hope.
19  Line 25 (as read):
20      "QUESTION:  I want to understand more about" -- and it
21      continues.  Do you see that? -- "Other than just general
22      discussions about shipping on platforms, have you talked
23      about, at either SLT or GLT, the economic costs and
24      benefits to Microsoft Gaming of skipping PlayStation with
25      a title?"

317

1  Your answer was "Ever?"  And I clarified "Yes."  And you
2  said (as read):
3      "ANSWER:  We have had discussions about the financial
4      implications about not shipping on other platforms.
5      "QUESTION:  Including not shipping on PlayStation?
6      "ANSWER:  Including not shipping on PlayStation."
7      That was your testimony.
8  A.  Yes.
9  Q.  Truthful and accurate when you gave it?
10  A.  It is.
11  Q.  Okay.  You've also participated in conversations at
12  Microsoft about whether to skip PlayStation with Microsoft
13  first-party titles; right?
14  A.  Sorry.  Maybe I misunderstood.  I thought the last
15  discussion was about first-party titles.
16  Q.  Okay.  Good.  So then we've had those -- you have had
17  those conversations; right?  We established that?
18  A.  Yes.
19  Q.  Okay.  But you don't remember anything specific about
20  those conversations?
21  A.  We have discussions, and I think the -- our back and forth
22  four months ago on this was similar where you put a context.
23  We have overall discussions about the financial impacts of a
24  piece of content inclusive of what platforms it ships on.
25      If what you want is a specific of the PlayStation

318

1  component of an overall analysis, I obviously have a general
2  recollection; but if it's going to be about a specific number,
3  I'll probably need a document to look at.
4  Q.  Well, you can't provide any more -- I appreciate your
5  testimony about the conversations that have happened, but you
6  can't remember or can't provide any more detail than what we
7  just discussed about those conversations; correct?
8  A.  I could talk longer about it if we want to.
9      (Laughter)
10  BY MR. WEINGARTEN:
11  Q.  All right.  Look at your -- same page of your
12  investigational hearing transcript, page 443, line 17, question
13  was (as read):
14      "Can you provide me any more detail about those
15      conversations?"
16      And your answer was (as read):
17      "Only -- only to say that my entire time at Xbox
18      there's always been a discussion about the role of
19      exclusives and the impact on our platform sales."
20      So that was your answer then; right?
21  A.  It was.
22  Q.  Okay.  And that was truthful and accurate; right?
23  A.  It was.
24  Q.  Now, you've told a colleague before that you actually
25  don't see a point in putting out individual games on other

319

1  platforms; right?
2  A.  I'm -- I guess -- have I told a colleague before?
3  Q.  That you do not see a point in putting individual games on
4  other closed platforms.
5  A.  Ah, sorry.  Yes.
6  Q.  Okay.  That's not a one-off statement.  You've said that
7  other times likely; right?
8  A.  I have.
9  Q.  All right.  You've had conversations at Microsoft about
10  skipping PlayStation with Activision titles; right?
11  A.  I think when we're looking at the -- any content we own,
12  we should look at all the capabilities that we have with the
13  content.
14  Q.  So you've had conversations with -- at Microsoft about
15  skipping PlayStation with Activision titles?  Yes or no.
16  A.  I don't remember a specific conversation, but I could --
17  it would seem like a normal conversation for us to have.
18  Q.  Let me -- let me refresh your recollection then.  Take a
19  look at page 465, same transcript, look at line 7 on little
20  transcript page 465.  Do you see that?  Look at 7 to 12.  Read
21  that to yourself.
22  A.  (Witness examines document.)  Yes.
23  Q.  Does that refresh your recollection that you have had
24  conversations at Microsoft about skipping PlayStation with
25  Activision titles?

320

1  A.  Yes.

2  Q.  So you have had those conversations?

3  A.  I remember having -- well, I don't remember the specific

4  conversations, but we would have had conversations about that.

5  Q.  Okay.  So to be clear, you do remember that there are

6  conversations about whether to skip PlayStation with Activision

7  content, but you don't remember any of the detail?

8  A.  I remember the result we came up with, which was the

9  financial model that we presented to the board, which included

10  shipping the games on PlayStation.

11  Q.  Okay.  And other than that, you don't remember the details

12  of any of the conversations about skipping PlayStation with

13  Activision content?

14  A.  Only the final result, which was that we would continue to

15  ship on PlayStation.

16  Q.  Okay.  And that's the final result that was put into the

17  Denali model in the board deck?

18  A.  Yes.

19  Q.  Let's talk about the model a little bit.

20       When evaluating an acquisition --

21       MR. WEINGARTEN:  Your Honor, do you want to pause for

22  a second?

23       THE COURT:  No.

24       MR. WEINGARTEN:  Oh, sorry.

25  \\\

321

1  BY MR. WEINGARTEN:

2  Q.  When evaluating an acquisition, Microsoft looks at both

3  the economic value and the strategic value; correct?

4  A.  Yes, we do.

5  Q.  And the economic value is what is the near-term financial

6  return have to be to justify the valuation given; right?

7  A.  Yes.

8  Q.  Okay.  And the economic value is about what you pay to

9  acquire an asset, but that's not the same as the strategic

10  value of the asset to Microsoft; right?

11  A.  The strategic rationale and the financial rationale are

12  two different discussions.

13  Q.  And do you agree that it may be the case that an asset has

14  significant strategic value that may, in fact, outweigh the

15  economic value?  Correct?

16  A.  I think they're both evaluated in their acquisition.

17  Q.  Well, but it may be the case that an asset has such

18  significant strategic value that it may outweigh the economic

19  value; right?

20  A.  In my experience, we would be encouraged to find the

21  results of that strategic value in an economic model that we

22  would be able to present.

23  Q.  Okay.  Well, I think we discussed that those are two

24  different things, the economic and the strategic; right?

25  A.  They are.

322

1  Q.  They don't always -- there's no mathematical necessarily

2  equivalence between them; right?

3  A.  The strategic rationale that we use is to look at a -- the

4  opportunity relative to the company strategy and in our case

5  the gaming strategy.  So how does any opportunity relate to the

6  strategy that we're on; and then the financials analysis, the

7  final go/no go that you talked about with Jamie is the

8  financial implications of us acquiring an asset.

9  Q.  Okay.  And the strategic value can differ from the

10  economic value?  They're two components?

11  A.  There isn't a value on the strategic.  It's a strategic

12  analysis.  So it's more of a commentary on how this asset fits

13  into the strategy that we have.

14       So it -- there isn't a numeric number that is the output

15  of the strategic value.  So there's no value-to-value

16  comparison between the two documents.

17  Q.  Okay.  Let's take a quick look, sir.  I want to talk to

18  you about -- more about some exclusives.

19       Can you turn in your binder -- this is the document

20  binder -- to PX1898, please?

21       Now, we've heard some talk here in the case that you've

22  been present for about Minecraft.  This is a chat -- PX1898 is

23  a chat between you and a Mr. -- I assume it's a Mr. Nichols or

24  Ms. Nichols of Microsoft?

25  A.  It's Mr. Nichols.

323

1  Q.  I see Mike Nichols, okay.

2  A.  Yes.

3  Q.  And this is a chat that you had in 2019 with Mr. Nichols;

4  right?

5  A.  It is.

6       MR. WEINGARTEN:  Move to admit PX1898, please,

7  Your Honor.

8       THE COURT:  Admitted.

9       (Trial Exhibit 1898 received in evidence.)

10  BY MR. WEINGARTEN:

11  Q.  And you -- Mr. Nichols writes to you (as read):

12       "I'm of the mind that Dungeon ought to be Xbox and PC

13  only" --

14       Dungeons is a Minecraft game?

15  A.  Minecraft Dungeons, yes.

16  Q.  And he says (as read):

17       -- "i.e., where you can buy Game Pass, and we should

18  hold on Nintendo and PlayStation.  I was not aware of

19  that part of the plan, and will talk to the team about

20  it but wanted you to know."

21       And you wrote "I agree."  You wrote that?

22  A.  I wrote "I agree" and the game ended up shipping on all

23  the platforms listed there.

24  Q.  You agreed at that point in time that Microsoft should

25  hold on Nintendo and PlayStation; right?

324

1   A.   I agreed in a chat with Mike Nichols.  We ended up
2   shipping Minecraft Dungeons on all platforms.
3   Q.   Let's take a look at another one.  Can you look, please,
4   at PX1895?
5   A.   (Witness examines document.)
6   Q.   This is from 2020 now.  The previous one was 2019.  This
7   is a 2020 e-mail.  I will wait for you to get there.
8   A.   I'm there.
9   Q.   Okay.  PX1895 is an e-mail between you and Mr. Booty and
10  Ms. Bond.  Do you see that?
11  A.   I do.
12  Q.   Okay.  And it was -- this is from March 31st, 2020.  Do
13  you see that?
14  A.   I do.
15       MR. WEINGARTEN:  Move to admit PX1895, please.
16       THE COURT:  Admitted.
17       (Trial Exhibit 1895 received in evidence.)
18  BY MR. WEINGARTEN:
19  Q.   Now, I can't read it out loud, but let's start with the
20  second paragraph.  Do you see where it says "To me"?
21  A.   I do.
22  Q.   And you were aware of an arrangement -- I don't think this
23  part's confidential -- an arrangement with Sony to pay
24  Activision -- to give Activision some timed exclusivity with
25  Call of Duty on PlayStation 4?

325

1   A.   Yeah.  It's a practice that's still in place today.
2   Q.   Okay.  So the game gets out earlier on PlayStation 4 and
3   only comes to an Xbox later?
4   A.   The advantage is that PlayStation customers get with Call
5   of Duty today are different than that, but there are still
6   advantages that Sony pays for.
7   Q.   Right.  And at the time of this e-mail, it was your
8   understanding that Sony was paying Activision to get Call of
9   Duty on PlayStation 4 earlier than it would come to Xbox?
10  A.   Yes.
11  Q.   Okay.  And then you have a comment in that contrasting
12  that with something you're doing with Minecraft; right?
13  A.   That's right.
14  Q.   Okay.  And can you remind the Court, please, what day and
15  date means?  When you say that last clause, what does that mean
16  when something is day and date?
17  A.   I don't see the clause "day and date," but when we talk
18  about day and date, it's the day a game ships.
19  Q.   So --
20       THE COURT:  The same day, Xbox and PlayStation?
21       THE WITNESS:  Yes.
22  BY MR. WEINGARTEN:
23  Q.   And so you're contrasting what Sony is doing with what
24  you're doing.
25       And the next paragraph you talk about a particular

326

1   strength that you believe Microsoft has, and you have some
2   regrets about the limitations of that strength; right?
3   A.   I'm talking about how we're using our content.
4   Q.   Okay.  Those are the words you wrote there.  I can't read
5   them, but those are your words; right?
6   A.   The word "regret" there is reflecting on our overall
7   content strength.
8   Q.   Right.  It's limited only to that one title; right?
9   A.   Yes.
10  Q.   Okay.  And you also think your content strength has to be
11  that thing that you're saying in the rest of that sentence;
12  right?  The part that's before to us, that's what you want your
13  content strength to be; right?
14  A.   Our content has to be a strength for our strategy and our
15  platform, yes.
16  Q.   Okay.  And it can't just be about -- and then you have
17  some other language there; right?
18  A.   Yes.
19  Q.   You believed that when you wrote that; right?
20  A.   In 2020, yes.
21  Q.   Yeah.  So it can't just be about maximizing and then
22  there's that word there?
23  A.   Yes.
24  Q.   That means putting content on other platforms; right?
25  A.   Yes.

327

1   Q.   Okay.  It can't be just about maximizing that, and so you
2   need -- and when you say "us," you mean Microsoft Gaming;
3   right?
4   A.   "Us" would be Micro -- Xbox.
5   Q.   Okay.  "To find ways," and then that's what you want them
6   to find ways to do; right?
7   A.   We have to find ways to use our content.
8   Q.   And that's one of the things you wanted to do with the
9   content in 2020; right?
10  A.   Well, you say we wanted to, but it's not what we did.
11  Q.   Well, your directive to Mr. Booty, who runs first-party
12  studios, and Ms. Bond, who also had a senior role, was "I need
13  us to find ways to," and that's what you wanted them to find
14  ways to do; right?
15  A.   It was a discussion between the three of us which led to
16  us shipping -- in this case continuing to ship Minecraft on all
17  platforms on the same day.
18  Q.   Well, let's talk about that.
19       Minecraft -- strike that.
20       Microsoft has not optimized Minecraft to be played on
21  PlayStation 5; correct?
22  A.   We have not yet optimized Minecraft, the core game, for
23  PlayStation 5.
24  Q.   Actually instead if a PlayStation 5 gamer wants to play
25  Minecraft, they have to play the PlayStation 4 version; right?

328

1  **A.**  Sony was reluctant to send us development kits for the
2  PlayStation 5 at the same time they were sending development
3  kits to other developers, which put our game at a disadvantage
4  relative to other PlayStation games that were launching, which
5  put us behind in our development of Minecraft on PlayStation 5.
6  **Q.**  When did that happen when those developer kits didn't show
7  up?
8  **A.**  I don't have an exact date in my head.
9  **Q.**  PlayStation 5 launched in 2020 also; right?
10  **A.**  Yes.
11  **Q.**  So it's been three years; right?
12  **A.**  The launch of a -- of the PlayStation and our content not
13  being held at a disadvantage by the platform holder by
14  withholding development kits from us and not from the
15  competitive content creators is a pretty significant -- shows a
16  pretty significant lack of support for us by the platform
17  holder, which hurts our ability to compete.
18  **Q.**  So Sony held back the dev kits and you fought back by not
19  giving them the optimized Minecraft even when you got the dev
20  kits; right?
21  **A.**  All we did with Minecraft was looked at the -- how we
22  maximize the success of Minecraft.  There is a version of
23  Minecraft that runs on the PlayStation 5.  The customers who
24  buy a PlayStation 5 get to use the version they had on their
25  PlayStation 4 so we don't charge them to buy a new version of

329

1  Minecraft on the new platform.
2  They -- and then with Minecraft, which I know you're aware
3  is a very big product shipping on 20-plus platforms, we have to
4  be very diligent in our use of the resources on Minecraft to
5  make sure that we're doing the best thing for the Minecraft
6  community.
7  **Q.**  I appreciate everything you just said, but it doesn't
8  change the fact that the version of Minecraft that a
9  PlayStation 5 user gets to use is from a PlayStation 4; right?
10  It's a PlayStation 4 version; right?
11  **A.**  The PlayStation 4 version runs on PlayStation 5.
12  **Q.**  And the version that an Xbox user of Minecraft gets to
13  play on the Xbox consoles was optimized for those Xbox
14  consoles; right?
15  **A.**  Yeah.  Our team got the development kits from Xbox in time
16  to get that work done for the launch of Series X and S.
17  **Q.**  That's -- definitely got them in time because Minecraft is
18  part of Microsoft.  You're the same company; right?
19  **A.**  I don't -- I think our -- I think that Sony could have
20  sent the development kits to Microsoft just as easily as they
21  could have sent to any other publisher of games.
22  **Q.**  Oh, even putting that aside, though, Sony didn't send you
23  the kits and so you still haven't optimized Minecraft for
24  PlayStation 5?
25  **A.**  We have used our Minecraft resources in places that we

330

1  think work best for what we're trying to do with Minecraft.  We
2  continue to ship Minecraft Dungeons, as we talked about,
3  Minecraft Legends day and date inclusive of being native for
4  PlayStation 5, but we were put at a distinct disadvantage with
5  Minecraft on PlayStation 5's launch.
6  **MR. WEINGARTEN:**  One more document and then if
7  Your Honor wants to take lunch, but I'm happy to keep going.
8  Oh, it's only 11:00.
9  **THE COURT:**  It's too early for lunch.
10  **MR. WEINGARTEN:**  Oh, thank you, Your Honor.  Sorry
11  about that.
12  **THE COURT:**  Not unlimited time.
13  **MR. WEINGARTEN:**  Apologies.
14  **BY MR. WEINGARTEN:**
15  **Q.**  Let's look at PX1897.
16  **MR. WEINGARTEN:**  Move to admit PX1897; and if I didn't
17  move to admit -- strike that.
18  Move to admit PX1895, please, if I didn't.
19  **THE COURT:**  Admitted.
20  (Trial Exhibit 1895 received in evidence.)
21  **MR. WEINGARTEN:**  Thank you, Your Honor.
22  **BY MR. WEINGARTEN:**
23  **Q.**  Let's look at PX1897.  Now, this is even more recent in
24  time.  The last e-mail was from 2020.  Now we're up to 2021.
25  This is an e-mail from Mr. Stuart to you at the top;

331

1  right?
2  **A.**  It is.
3  **Q.**  And the middle e-mail, the next one down, is from you to
4  Mr. Leder, Ms. Braff, Mr. West, Mr. Stuart.  Do you see that?
5  **A.**  I do.
6  **Q.**  And it's dated September 1, 2021?
7  **A.**  It is.
8  **Q.**  Okay.
9  **MR. WEINGARTEN:**  Move to admit PX1897, please.
10  **THE COURT:**  Admitted.
11  (Trial Exhibit 1897 received in evidence.)
12  **BY MR. WEINGARTEN:**
13  **Q.**  Look at the first paragraph that you wrote to those
14  leaders (as read):
15  "I'm fine with F76 and PS Now."
16  F76 is a Forza driving game?
17  **A.**  No.  It's Fallout 76.
18  **Q.**  Sorry.  So that's another game?
19  **A.**  It's another game from Bethesda.  They're part of the
20  ZeniMax acquisition.
21  **Q.**  Ah, okay.  So this is an e-mail to people, including
22  Mr. Leder, who is a ZeniMax leader; right?
23  **A.**  That's correct.
24  **Q.**  Okay.  So you're telling Mr. Leder you're fine with the
25  F76 Bethesda game being in PS Now; right?

332

1  A.  I am.

2  Q.  And PS Now is PlayStation's version of Game Pass?

3  A.  They have multiple tiers but, yes, for this conversation

4  let's assume it's part of...

5  Q.  Okay.  And then you wrote to Mr. Leder (as read):

6      "We have not allowed Minecraft to support PS Now as

7      we do see PS Now as competition to XGP and don't need to

8      support their financial position with PS Now, which would

9      just allow them to compete more effectively with XGP."

10      You wrote those words?

11  A.  I did.

12  Q.  Okay.  And so Microsoft Gaming did not allow Minecraft to

13  support PlayStation subscription service because Gaming sees

14  PlayStation subscription as competitive to Game Pass and you

15  don't want to support them to compete more effectively; right?

16  A.  The way the relationship would work is Sony would come

17  forward to us with an offer.  PlayStation Now, it's not called

18  that anymore, but PlayStation Now is not something that a title

19  would -- or, let's say, their content subscription is not

20  something that a title elects to be part of.

21      There's a financial conversation between a content

22  creator, in this case us as the creators of Minecraft.  I

23  don't -- I have not been aware of any financial offer that Sony

24  has made to us to have Minecraft included in their content

25  subscription, but we have supported their content subscription

333

1  with other titles inclusive of Fallout 76 as listed here.

2  Q.  Not with Minecraft?

3  A.  I don't -- I'm not aware of an offer that Sony had made to

4  us so it -- the way it reads makes it seem like it's our

5  elective to put a game into PlayStation's content subscription.

6  That's not true; that Sony is the acquirer of content for their

7  subscription, and I don't remember us declining an offer from

8  Sony to put Minecraft in their content subscription.

9  Q.  So it's Sony's fault that Microsoft Gaming has not allowed

10  Minecraft to support PlayStation Now?

11  A.  I don't remember an offer from Sony to include Minecraft

12  in PlayStation what I'll call Plus Now, which is their consent

13  subscription.

14  Q.  Okay.  Let's talk just briefly about Nintendo for a second

15  here.

16      I want to talk to you about Call of Duty and I want to

17  talk to you about Call of Duty in relation to the Switch.

18      Let's talk about Call of Duty and its relationship to the

19  Switch, please.

20      If Call of Duty launches on the Switch, it's not going to

21  look the same to a player as if that player were playing it on

22  an Xbox X; correct?

23  A.  Our goal if we launch Call of Duty on the Switch is that

24  it would be an equal or better quality as other Switch games.

25  Q.  Can you please turn in your deposition transcript to

334

1  page 188?

2  A.  Is this the first deposition?

3  Q.  It is --

4  A.  The 7011?

5  Q.  No.  I believe it's the other one.  It would say on the

6  cover page.  I don't know the exact -- I don't know the number.

7  I apologize.  It would say "Videotaped Deposition" on the cover

8  page instead of "Investigational Hearing."

9      THE COURT:  7028.

10      MR. WEINGARTEN:  70 -- thank you, Your Honor.

11      THE WITNESS:  28?

12      THE COURT:  The first volume in there.

13      THE WITNESS:  Oh, okay.  Thank you.

14      (Witness examines document.)  Sorry.  What was the page

15  number again.

16  BY MR. WEINGARTEN:

17  Q.  Yeah, I appreciate that.

18      It's little page 191 of the transcript.  So in your

19  deposition transcript page 191 and it starts at line 16, and I

20  asked you (as read):

21      "QUESTION:  Do you anticipate that Call of Duty, if it

22      launches on Switch, will look the same as it looks for a

23      player who plays that title on Xbox X?

24      "ANSWER:  I think it will play as a great" --

25      MS. WILKINSON:  Excuse me.  This is redacted.

335

1      MR. WEINGARTEN:  Oh.  I apologize.

2      THE COURT:  Well, this seems fine.

3      MS. WILKINSON:  It's in response and explains what he

4  said so --

5      MR. WEINGARTEN:  Okay.

6      MS. WILKINSON:  -- this portion is fine.

7      MR. WEINGARTEN:  I'm sorry.  I did not know that.  I

8  don't think we received redacted transcripts from you guys.

9      THE COURT:  It's okay.  I don't think it is

10  confidential.  Go ahead.

11      MR. WEINGARTEN:  Okay.

12  BY MR. WEINGARTEN:

13  Q.  So let's start again.  Page 191, question on line 16 (as

14  read):

15      "Do you anticipate that Call of Duty, if it launches

16      on Switch, will look the same as it looks for a player who

17      plays that title on Xbox X?"

18      And your answer (as read):

19      "ANSWER:  I think it will play as a great Switch game.

20      "QUESTION:  My question -- respectfully it was not the

21      question.  The question was:  Do you anticipate that Call

22      of Duty, if it launches on Switch, will look the same to a

23      player as if that player were playing on Xbox X?

24      "ANSWER:  It will not look the same."

25      That was your testimony?

336

1　A.　It was.

2　Q.　And it was truthful and accurate when you gave it?

3　A.　Yes.

4　Q.　You're aware that Microsoft and Nintendo have entered into

5　an agreement with respect to Call of Duty if this deal that

6　we're all here talking about is completed; right?

7　A.　I am.

8　Q.　You're not aware of anyone at Microsoft doing any kind of

9　economic analysis of entering into that agreement, right, with

10　Nintendo?

11　A.　You mean prior to the deal being done?

12　Q.　Yeah.

13　A.　No. We have experience shipping on Switch. We've shipped

14　games on the Switch before so we do have an understanding of

15　how our games can perform.

16　Q.　Oh, I'm sorry. I was asking about the economics.

17　　　So you're not aware of anyone at Microsoft doing any

18　analysis of the economic effect of entering into an agreement

19　with Switch or Nintendo for Call of Duty; right?

20　A.　No.

21　Q.　Okay. And you're not aware of any analysis at Microsoft

22　about how entering into an agreement with Nintendo to bring

23　Call of Duty to Switch will affect Microsoft Gaming's profit

24　and loss?

25　A.　Not directly.

337

1　Q.　Okay. And you're not aware of any analysis that

2　Microsoft -- well, strike that.

3　　　You're not aware of any work at Microsoft to understand

4　the impact of the Nintendo agreement on Microsoft's valuation

5　of the Activision business; right?

6　A.　Inclusive in the valuation as we've seen is a large

7　running the existing business inclusive of shipping the games

8　on console.

9　Q.　Uh-huh.

10　A.　Nintendo Switch is a console. So as I think about it, I

11　think about the expansion of console sales through the reach on

12　a new platform, but there isn't a specific analysis but we do

13　think it's additive to that first line item, which is to run

14　the existing business.

15　Q.　Well, let me -- let me break that down a bit.

16　　　The model at Microsoft models Activision's existing

17　business; right?

18　A.　Yes.

19　Q.　The existing business of Activision does not ship Call of

20　Duty on Switch; right?

21　A.　They have other games on Switch, but they do not ship Call

22　of Duty on Switch.

23　Q.　Right. And so my question is: You're not aware of any

24　work at Microsoft one way or the other about the impact of

25　executing that agreement with Nintendo and how that affects

338

1　this model that Microsoft developed, the results of the model?

2　A.　No.

3　Q.　The answer to my question is correct; right? There's

4　no -- you're not aware of any such analysis?

5　A.　Correct.

6　Q.　Okay. Let's talk a little bit about ZeniMax, please.

7　　　Microsoft announced the acquisition of ZeniMax in roughly

8　September 2020?

9　A.　That's correct.

10　Q.　And Microsoft completed the acquisition in February or

11　March of 2021?

12　A.　That's correct.

13　Q.　Okay. When Microsoft completed the transaction, you did a

14　roundtable at Bethesda; right?

15　A.　We did -- I think you're alluding to the press event we

16　did, the kind of open roundtable with viewers watching, yes.

17　Q.　Okay. So you did an open press, I think it's even on

18　YouTube now, sort of "We're excited to have acquired ZeniMax"

19　speech or, you know, series of programming; right?

20　A.　Yes.

21　Q.　Okay. So you and other Microsoft executives could talk to

22　the public and the gamers about the deal?

23　A.　And ZeniMax executives, yeah.

24　Q.　Great.

25　　　So you clearly remember talking about that?

339

1　A.　I do.

2　Q.　And you remember that -- do you remember in the roundtable

3　you said that (as read):

4　　　"If you're an Xbox customer, the thing I want you to

5　　　know is this about delivering great exclusive games for

6　　　you that ship on platforms where Game Pass exists and

7　　　that's our goal. That's why we're doing this"?

8　　　Do you remember that?

9　A.　I do remember saying that.

10　Q.　Okay. That's in -- and you said that around the time the

11　deal closed in March of 2021?

12　A.　The roundtable was, yeah, right around of the deal's

13　closing time.

14　Q.　Let's back up a minute.

15　　　After the deal was announced before it closed, you and

16　Mr. Stuart would talk about the upcoming ZeniMax deal, I'm

17　sure, as part of your duties; right?

18　A.　We would discuss many things inclusive of the deal, yes.

19　Yeah.

20　Q.　Do you remember in November of 2020 agreeing with

21　Mr. Stuart -- well, let's just show it to you.

22　　　Can you please turn in your binder to PX4377? 4377,

23　please.

24　A.　(Witness examines document.) I found it.

25　Q.　Okay. This is a chat between you and Mr. Stuart in

340

1 November 17, 2020?
2 **A.** Yes.
3     **MR. WEINGARTEN:** Move to admit PX4377, please.
4     **THE COURT:** Admitted.
5     (Trial Exhibit 4377 received in evidence.)
6 BY MR. WEINGARTEN:
7 **Q.** If you would, please, turn to page 002. I want to direct
8 your attention to the bottom -- one, two, three, four -- five,
9 lines of the chat between you and Mr. Stuart. Do you see that?
10     First, so there's a chat that starts at 2346 hours on the
11 17th of November and it starts with your words. Do you see
12 that?
13 **A.** I do see that.
14 **Q.** So starting from there to the bottom, take a look.
15     (Witness examines document.)
16 **Q.** And do you see Mr. Stuart says in the next chat there at
17 2348 hours wish -- something he wishes? Do you see that?
18 **A.** I do.
19 **Q.** Okay. And he expresses to you a wish about something you
20 could say or something you could do, and you wrote back that
21 you agreed; right? You said, "Yeah."
22 **A.** That I wish we could say.
23 **Q.** Well, he says what he wishes you could do, and you said,
24 "Yeah. We just can't say."
25 **A.** Well, his comment is what he wishes we could say.

341

1 **Q.** Uh-huh.
2 **A.** So --
3 **Q.** Yeah. "We just can't say" was your response; right?
4 **A.** Yeah, because it wasn't true.
5 **Q.** Oh. That's your response, is that it wasn't true?
6 **A.** Right.
7 **Q.** Okay. Let's take a look at February 2021 again.
8     You don't remember a meeting with ZeniMax executives in
9 February 2021 about the acquisition and plans for ZeniMax?
10 **A.** I don't remember a specific meeting, but I meet with them
11 often.
12 **Q.** Well, you don't recall talking about exclusivity with
13 anyone at ZeniMax in February 2021; right?
14 **A.** I talk to them about all topics. I don't remember a
15 specific exclusivity conversation in February of 2021.
16 **Q.** Okay. And there were lots of meetings, as you said, with
17 ZeniMax executives as you guys are getting ready for the close
18 of the deal and even in the immediate aftermath of closing the
19 deal; right?
20 **A.** Continuing until today, yes.
21 **Q.** Right. But you don't remember attending any meetings in
22 February or March of 2021 with the ZeniMax leadership; right?
23 **A.** Not specifically.
24 **Q.** Okay. And you don't remember, if you don't remember the
25 meetings, whether exclusivity was talked about at any of those

342

1 meetings; right?
2 **A.** Not specifically, no, I don't.
3 **Q.** Okay. Let's look at PX1850, please.
4     **MR. WEINGARTEN:** I have this as not redacted. I want
5 to make sure there's no confidentiality. 1850.
6     **MS. WILKINSON:** Give me a moment.
7     **MR. WEINGARTEN:** Please.
8     (Pause in proceedings.)
9     **MS. WILKINSON:** Correct.
10 BY MR. WEINGARTEN:
11 **Q.** So PX1850 is an e-mail from Ms. Braff to you and Matt
12 Booty, and it's dated February of 2021; right?
13 **A.** It is.
14 **Q.** Okay.
15     **MR. WEINGARTEN:** Move admit PX1850, please.
16     **THE COURT:** Admitted.
17     (Trial Exhibit 1850 received in evidence.)
18 BY MR. WEINGARTEN:
19 **Q.** This e-mail was sent on February 10th and it's about a
20 prep session for a ZB meeting on the 16th. Do you see that?
21 **A.** I do.
22 **Q.** A "ZB" meeting is a ZeniMax Bethesda meeting?
23 **A.** It is.
24 **Q.** Okay. And Ms. Braff was responsible for the integration
25 of ZeniMax and Microsoft?

343

1 **A.** She was.
2 **Q.** Okay. She says (as read):
3     "Hi, Phil, Matt. When we meet up later today, it's a
4     quick touch base among us to get aligned out of our
5     Tuesday 16th planning session with ZM. Thinking we'll
6     focus on the big rocks with them."
7     Does "ZM" mean ZeniMax?
8 **A.** It does.
9 **Q.** And she says "Potential topics." And do you see the third
10 bullet there, "How we think about exclusivity"?
11 **A.** I do.
12 **Q.** Okay. And she says "Reminder, the attendees are" -- or
13 "The attendees for the 16th are" and she lists a whole bunch
14 of -- well, strike that -- she lists several ZeniMax and Xbox
15 executives, including you; right?
16 **A.** She does.
17 **Q.** You don't remember a meeting on the 16th or in February at
18 all about how we think about exclusivity?
19 **A.** I don't remember this specific meeting.
20 **Q.** Okay. Let's look at PX1851, please.
21     This is an e-mail from Mr. Stuart to Ms. Bond and you and
22 Mr. Booty and others; right?
23 **A.** It is.
24 **Q.** Also February of 2021?
25 **A.** Yes.

344

1      MR. WEINGARTEN:  I move to admit PX1851, please.

2      THE COURT:  Admitted.

3      (Trial Exhibit 1851 received in evidence.)

4  BY MR. WEINGARTEN:

5  Q.   So you're getting ready here to figure out how to announce

6  the completion of the Bethesda transaction; right?

7  A.   Yes.

8  Q.   Okay.  Look at page 002, please.  That's an e-mail from

9  you on February 26th, 2021, and the subject says "ACP Bethesda

10  Announce"; right?

11  A.   Yes.

12  Q.   The importance is high; right?

13  A.   Yes.

14  Q.   You wrote to senior leaders, including Mr. Booty,

15  Mr. Stuart, Ms. Bond (as read):

16          "I want us to be bold in our announce of Bethesda

17      close regarding Bethesda titles focusing on Xbox.  I know

18      there are financial implications, XGP implications, legal

19      implications.  We film our announce next Tuesday and I

20      want us to get comfortable with saying, not exact wording,

21      the acquisition of Bethesda is about making Xbox stronger.

22      Our focus with Bethesda will be on the Xbox ecosystem."

23      Do you see that?

24  A.   I do.

25  Q.   So I appreciate you don't remember the meetings with

345

1  ZeniMax we talked about and your thinking on exclusivity, but

2  that's some of your thinking, at least, about Bethesda ZeniMax

3  when it closes -- the acquisition closes; right?

4  A.   This is about my words to our community who's watching the

5  announce and why we did it, yes.

6  Q.   Okay.  Let's fast forward in time a little bit to

7  November, please, of 2021.  So that's after the deal closes;

8  right?

9      Okay.  Could you please turn your binder to PX1852?

10  A.   (Witness examines document.)

11  Q.   PX1852 is Ms. Braff writing an e-mail to you, Mr. Booty,

12  and now also Mr. Leder who was heading ZeniMax; right?

13  A.   Yes.

14  Q.   And she writes the e-mail, and it's dated November 4,

15  2021, and the subject is "Zeni MBR 11/10 Agenda."  Do you see

16  that?

17  A.   I do.

18  Q.   And what's an MBR?

19  A.   Monthly business review.

20  Q.   And she says (as read):

21          "Hi.  We have our MBR with the Zeni team next week.

22      Please note the agenda below."

23      And let's look at the agenda.  The second item in the

24  agenda is "Phil's top of mind, 20 minutes," and the number one

25  item for your top of mind is "Guidance on exclusivity of future

346

1  titles."  Do you see that?

2  A.   I do see that.

3  Q.   Now, you don't remember this particular speaking slot to

4  talk about what was at the top of your mind; right?

5  A.   I don't remember specifically what I said in November of

6  2021 at this meeting.

7  Q.   You testified previously you don't have any understanding

8  of what "guidance on exclusivity of future titles" means;

9  right?

10  A.   Those were words that Jill wrote.

11  Q.   You don't remember sharing your guidance on exclusivity

12  with ZeniMax in November 2021; right?

13  A.   I do not.

14  Q.   And you don't remember talking with any other executives

15  about exclusivity and ZeniMax titles in the fall of 2021?

16  A.   Not specifically in the fall of 2021.

17  Q.   Okay.  But outside of the fall of 2021, the topic of

18  exclusivity of ZeniMax titles has been a topic of conversation

19  among you and other Xbox executives; right?

20  A.   In running the platform business, the Xbox business, the

21  topic of exclusivity -- do you need to admit that one?

22  Q.   Go ahead.

23  A.   All right.

24      -- the topic of exclusivity is something we generally have

25  to talk about.  All -- the Nintendo Switch, the PlayStation,

347

1  they both have significantly higher number of exclusive games

2  on their platform than Xbox does.  It's talked about as a

3  weakness of our platform when people are making a decision

4  between the three platforms and what -- which ones they're

5  going to buy.

6  Q.   So you don't remember in November of 2021 talking with

7  other executives about exclusivity and ZeniMax; but outside of

8  that timeframe, you do remember that you had some conversations

9  about exclusivity and ZeniMax titles.

10  A.   Exclusivity in the console business is a topic

11  continuously inclusive of talking about ZeniMax titles.

12  Q.   Some of those conversations were about whether a Zeni

13  game -- strike that.

14      But you don't remember any other conversations or any

15  other details about conversations with Microsoft executives

16  about ZeniMax titles and exclusivity?

17  A.   There have been so many discussions in general about

18  exclusivity of titles on Xbox, I don't remember one specific in

19  fall of 2021; but exclusivity among console titles is just a

20  general topic in the console business so it is a constant

21  conversation when you run the Xbox business.

22  Q.   You don't remember any conversations with Mr. Leder about

23  taking ZeniMax titles exclusive?

24  A.   I've had many conversations with Jamie Leder about his

25  titles at ZeniMax and what platforms they ship on.

348

1   THE COURT: Do you want to admit 1852?
2   MR. WEINGARTEN: Yes, please, Your Honor.
3   THE COURT: Admitted.
4   (Trial Exhibit 1852 received in evidence.)
5   MR. WEINGARTEN: I will improve one day.
6   BY MR. WEINGARTEN:
7   Q.   Let's take a look at page 44 of your deposition, please.
8   Page 44, line 16, of the deposition.
9   A.   (Witness examines document.)  I'm on there.
10  Q.   Okay.  Question -- I told you you could put a document
11  aside, but the question was (as read):
12        "In fall of 2021 do you remember if you had
13        conversations with Jamie Leder about exclusivity of
14        ZeniMax titles?"
15  And your answer was (as read):
16        "Then I do not."
17  And the question was (as read):
18        "Do you remember telling Mr. Leder in the fall of
19        2021 that all ZeniMax content going forward would be
20        exclusive to Xbox and PC?"
21  And your answer was "I do not."
22  That was truthful and accurate testimony when you gave it?
23  A.   It was.
24  Q.   Okay.  Do you remember talking with Mr. Leder about future
25  ZeniMax titles and that there would be a presumption about what

349

1   platforms ZeniMax titles would be available on?
2   A.   In talking to Jamie about the development teams at ZeniMax
3   and trying to align on our production schedules, I wanted to
4   make it clear to the team that their games they're building
5   would at least be shipping on Xbox and PlayStation -- Xbox and
6   PC.
7        So I wanted to make -- so I had a discussion with Jamie
8   about ensuring that we were focused on at least supporting
9   those two platforms.
10  Q.   So the presumption that was shared between you and
11  Mr. Leder was that ZeniMax titles would be available on PC,
12  Xbox console, and xCloud; right?
13  A.   Yes.
14  Q.   But you just don't remember if you talked to Mr. Leder
15  about whether future ZeniMax titles would just be exclusive to
16  Xbox, PC, and xCloud; right?
17  A.   When we announced the ZeniMax deal, I made the statement
18  that we would make the decision on exclusivity on a
19  case-by-case basis.  So I know that the ZeniMax titles will at
20  least be shipping on Xbox and PC.  And we would leave the
21  decisions that we would make for other platforms to a later
22  date as we had kind of more clarity on our relationship with
23  those platforms.
24  Q.   So you have an understanding, as the head of Gaming at
25  Microsoft, of what platforms ZeniMax games are going to ship

350

1   on; right?
2   A.   What I would say is in running our business, I understand
3   that the games that ZeniMax is building, absent the mobile
4   games, ZeniMax also launches some mobile games, but that there
5   are -- their core games being launching on PC and Xbox.
6   Q.   I guess my question was -- again, I'm sorry for being
7   inartful -- my question was:  You have an understanding in your
8   head of what platforms ZeniMax games will ship on; right?
9   A.   I know that at least they will ship on Xbox and PC, and I
10  think the other -- the platforms that we choose to support with
11  our content would be on a case-by-case basis, which is what --
12  the statement I've made publicly and what we've adhered to.
13  Q.   Well, if that's your general understanding, did you
14  express that to Mr. Leder?
15  A.   When you're asking me about the dates, you keep circling
16  in on the fall of 2021.  So I just want to make sure.  I don't
17  know if I said that in the winter of 2022.
18        In general, the first-party teams, both Xbox Game Studios
19  and ZeniMax, understand that the games they're going to build
20  will be shipping on Xbox and PC and other platforms we would
21  decide in most cases at a later date.
22  Q.   Can you please turn in your deposition transcript to
23  page 51 of the deposition?
24  A.   (Witness examines document.)  I'm on it.
25  Q.   Please look at line 14.  The question on page 51, line 14

351

1   was (as read):
2        "And do you recall a general discussion on that point
3        with Mr. Leder?"
4   And your answer was (as read):
5        "ANSWER:  In general, I have an understanding of what
6        platforms the games will ship on."
7   And then I asked a bad question and hopefully got better
8   (as read):
9        "Did you express that general understanding to
10        Mr. Leder?"
11       "ANSWER:  No."
12  So you had an understanding -- that testimony was truthful
13  and accurate when you gave it; right?
14  A.   No, I would say that's an inaccurate statement.  I would
15  say Jamie understands that the games that ZeniMax is building
16  in line with the conversation we just had will be shipping on
17  Xbox and PC.
18  Q.   Well, so you're saying that this sworn testimony was
19  incorrect when you gave it?
20  A.   I think I might have, in the context of the flow of the
21  conversation here, been in a different space.  I wasn't trying
22  to mislead anybody.
23        I'm saying that the content that we build at Xbox, we've
24  made public statements about that content being on Xbox and PC;
25  and the studios in general understand that the content that we

352

1  wield, absent mobile content, will be available at least on
2  those two platforms, and that's the public statement we've made
3  to our fans.
4  Q.   Well, and I'll -- you've had many conversations with
5  Mr. Leder about Microsoft's titles being on Sony's platform?
6  A.   I wouldn't say I've had many conversations on that topic,
7  but we have had conversations on that topic.
8  Q.   Okay.  But you don't recall any conversation in which you
9  talked with Mr. Leder about a plan that ZeniMax titles would
10  launch day-date on the Xbox platforms but not Sony?
11  A.   As I said, we make the decision on a case-by-case basis.
12  There are games that we have shipped from ZeniMax on
13  PlayStation only and not day and date on Xbox.  There have been
14  games that we have shipped on Xbox day and date and not on
15  PlayStation, and we've done releases on day and date on both
16  Xbox and PlayStation.
17      So in general, Jamie running ZeniMax and me as his
18  manager, we would have discussions about his content and what
19  platforms they would show up on.
20  Q.   My question was just:  Did you ever talk to Mr. Leder
21  about a plan that ZeniMax titles would launch on day one on the
22  Xbox platforms but not Sony?
23  A.   There are titles that we have from ZeniMax that ship day
24  one on Xbox and PC and not Sony, so I would obviously have had
25  discussions with him on those titles.

353

1  Q.   Okay.  You don't recall a specific conversation?
2  A.   I think more accurately I recall like a hundred
3  conversations on this topic and many other topics in running
4  the business, but not any specific conversation.
5  Q.   Okay.  Let's talk about some of the examples you just
6  gave.
7      So Ghostwire launched after Microsoft acquired ZeniMax,
8  but it's a ZeniMax title; right?
9  A.   It did.
10  Q.   And that launched exclusive on Sony; right?
11  A.   And PC, yes.
12  Q.   And ZeniMax had a preexisting contract to launch
13  exclusively on Sony and PC; right?
14  A.   I would say it differently.  I would say Sony had paid
15  ZeniMax to not ship on Xbox.
16  Q.   That was a contractual obligation?
17  A.   They paid them through a contract, yes.
18  Q.   Ghostwire shipping exclusively on Sony and PC was due to a
19  contractual obligation; correct?
20  A.   Through a payment from Sony to skip Xbox.
21  Q.   Same thing for Deathloop?
22  A.   Deathloop was also paid to skip Xbox.
23  Q.   Redfall, no payment from Sony; right?
24  A.   No.
25  Q.   Okay.  No contract obligation to ship on PC and Sony?

354

1  A.   No.
2  Q.   Redfall skipped PlayStation 5 when it launched; right?
3  A.   Redfall shipped on Xbox and PC and not PlayStation.
4  Q.   Starfield, no contract requiring launch on Sony; right?
5  A.   We had adhered to every contract that we've had in place
6  on content when we've acquired it.  So for Ghostwire and
7  Deathloop, as you said, we had a contract and we adhered to
8  that contract similar to what I expect to do with Call of Duty
9  on Switch.  And when those games launched, there was no
10  contract with Sony to launch those games on the platform on
11  PlayStation, and they did not.
12  Q.   Okay.  Elder Scrolls 6 is a ZeniMax game; right?
13  A.   It is not an Elder Scrolls -- it is not a ZeniMax game
14  yet.  It's many years away.  But it's a game that we've
15  announced that we would begin working on.
16  Q.   The public announcement also said that there was a plan to
17  not launch that game on PlayStation 5; right?
18  A.   I think we've been a little unclear on what platforms it's
19  launched on given how far out the game is.  It's -- it's
20  difficult for us right now to nail down exactly what platforms
21  that game would be available on.
22  Q.   I see.  So in the case of Redfall, skipped PlayStation;
23  right?
24  A.   Redfall did not ship on PlayStation.
25  Q.   In the case of Starfield, skipped PlayStation; right?

355

1  A.   Starfield hasn't launched yet.
2  Q.   When it does, it will skip PlayStation?
3  A.   We do not have plan for a PlayStation game, yes.
4  Q.   Elder Scrolls 6, many moons away but no plan yet to launch
5  that on PlayStation; right?
6  A.   As I said, with Elder Scrolls 6, it's so far out, it's
7  hard to understand what the platforms will even be at this
8  point.  It's the same team that's finishing Starfield, which
9  comes out this September.  So we're talking about a game that's
10  likely five-plus years away.
11  Q.   You haven't committed an announcement publicly that it
12  would launch on Sony; right?
13  A.   I have not.
14  Q.   You're the decision maker with respect to all of those
15  titles we've just been discussing?
16  A.   I am.
17  Q.   And I think on Elder Scrolls 6 you said you've been
18  ambiguous or it hasn't been publicly clear what platforms it
19  will launch on; is that right?
20  A.   That's what's in my head.  I don't have every piece of PR
21  that we've talked about.  As I stated, the game's so far away,
22  that I think making a definitive statement on what platforms
23  it's going to launch on at this point, inclusive, frankly, of
24  our own platforms, would be getting ahead of ourselves a bit.
25  Q.   Okay.  With that in mind, can you please look at your

356

1   investigational hearing transcript page PX -- strike that.
2   It's PX7012-009 and it's transcript page 426.
3   A.   Sorry.  Was this 7012?
4   Q.   Yes, sir.
5   A.   You said 4 --
6   Q.   Little page 426.  PX page is 009.
7   A.   (Witness examines document.)  Got it.
8   Q.   Okay.  Line 7 (as read):
9        **QUESTION:**  Have you talked to anyone about whether
10       Elder Scrolls 6 will skip PlayStation?
11       **ANSWER:**  I have made public estimates that
12       Elder Scrolls 6 will be exclusive to Xbox and PC."
13       Was that testimony truthful and accurate when you gave it.
14  A.   I don't -- I don't know.  I don't know that I've made a
15  public statement saying that.
16  Q.   So you don't know whether that was accurate testimony at
17  that time?
18  A.   When I said it, I believed it was; but if you ask me
19  today, I can't recall a public statement where I've said that.
20  Q.   Okay.  Let's talk about Indiana Jones.
21       Disney owns the intellectual property for Indiana Jones?
22  A.   Disney does, yes.
23  Q.   ZeniMax was developing an Indiana Jones game for multiple
24  platforms when Microsoft acquired ZeniMax; right?
25  A.   They were.

357

1   Q.   And then you approved paying Disney to amend its deal so
2   that the Indiana Jones game would be exclusive to Xbox, PC, and
3   Game Pass; right?
4   A.   We acquired ZeniMax.  They had the Indiana Jones game in
5   development.  It did not include -- including the game in
6   Game Pass and it include launching the game on multiple
7   platforms.
8        So my request for the team was to go back and open up a
9   discussion with Disney first about ensuring we can ship on
10  PlayStation -- ship on Game Pass, and then a discussion about
11  what platforms we would launch in.
12       One of Sony's biggest exclusive games is Spiderman, also a
13  Disney-owned IP that doesn't ship on Xbox; and in competing
14  effectively with them, I think it's important that we have kind
15  of outside gaming known IP that is part of our portfolio on our
16  platform.
17  Q.   Could you please turn in your binder to PX4725?
18  A.   This is in the document?
19  Q.   Yes.  I'm sorry.  It's in the document binder, please.
20  A.   (Witness examines document.)
21  Q.   Do you have PX4725 in front of you, sir?
22  A.   I do.
23  Q.   It's an e-mail chain.  I know you're not on the top of it,
24  but you are at the bottom.  You see two up from the bottom it's
25  from you dated September 29th, 2022, 10:55 a.m.?

358

1   A.   Yes.
2   Q.   It's from Jamie Lawver -- or strike that.
3        It's from you to Jamie Lawver and others at Microsoft;
4   right?
5   A.   It's in response to Jamie Lawver, yes.
6        MR. WEINGARTEN:  Move to admit PX4725, please.
7        THE COURT:  It's admitted.
8        (Trial Exhibit 4725 received in evidence.)
9   BY MR. WEINGARTEN:
10  Q.   Let's -- you're approving something there.  You say
11  "approved"; right?
12  A.   I do.
13  Q.   Let's go to the next e-mail down that you're approving.
14  That's on page 2.  Take a look at that e-mail.  That one's from
15  Ms. Lawver to you, and she says "Hi, Phil."  And then take a
16  look at what she asks for you to approve.  Do you see that
17  first sentence?
18  A.   I do.
19  Q.   Okay.  And that's what you approved; right?  What she
20  asked for in the first sentence; right?
21  A.   Yes.
22  Q.   Then let's look at that table.  You see the total number
23  there?
24  A.   I do.
25  Q.   That's the total that you approved; right?

359

1   A.   It is.
2   Q.   Okay.  If you had the financial ability to pay for
3   exclusivity as needed or as you thought was needed, the only
4   thing technically keeping you from paying a developer in the
5   future to skip or deprecate the experience of a game on arrival
6   is your word; right?
7   A.   Can you restate it?
8   Q.   Yeah.  Do you remember testifying that the only --
9   recognizing that if you were going -- had the financial ability
10  to pay for a developer to skip or make its content worse on
11  arrival, you wouldn't do that, but the only way -- the only
12  guarantee that you wouldn't do that is your word; right?
13  A.   I'm still kind of confused by the question.  I apologize.
14  Q.   No.  It's my fault.
15       THE COURT:  Can you separate it out between skip
16  and --
17       MR. WEINGARTEN:  Yeah, I can try that.
18       THE COURT:  Because I think those are two very
19  different things.
20       MR. WEINGARTEN:  Okay.  Let me get to the testimony
21  and see how we can do it.
22       (Pause in proceedings.)
23  BY MR. WEINGARTEN:
24  Q.   Okay.  If you had the financial ability to pay a developer
25  to skip PlayStation whenever you wanted, would you do it?

360

1   **A.**   The developer's an Xbox Game Studios game or a third-party
2   game?
3   **Q.**   Either.
4   **A.**   I would not.
5   **Q.**   Okay.  And if you had the financial ability to pay a
6   developer to deprecate the content, make it worse, on a
7   PlayStation, would you do it?
8   **A.**   Not in practice, no.  It's not something I think I would
9   do.
10  **Q.**   And why?  What do we have to base that on that you
11  wouldn't do that?
12  **A.**   I think probably the best thing are the actions that we've
13  taken as a publisher.
14          **MR. WEINGARTEN:**  Nothing further, Your Honor, at this
15  time.
16          **THE COURT:**  All right.  Do you want to start or do you
17  want to take an early lunch?
18          **MS. WILKINSON:**  What would you like to do, Your Honor?
19          **THE COURT:**  It's up to you.
20          **MS. WILKINSON:**  I have a few things I --
21          **THE COURT:**  All right.  Why don't we start.
22                      CROSS-EXAMINATION
23  BY MS. WILKINSON:
24  **Q.**   Mr. Spencer, I want to start where you left off.
25          Would you ever purposely degrade a game that you're

361

1   putting on another platform?
2   **A.**   For a game that we're building, the thought that we would
3   create a lower quality game on another platform, my view is it
4   diminishes our brand and our reputation, and it's not something
5   that I would do.
6   **Q.**   So can you explain to Her Honor why it makes no sense
7   financially for you to do that, to put it on your own platform
8   as, you know, a higher quality and degrade it and put it on the
9   PlayStation -- let's use PlayStation as an example --
10  **A.**   Yeah.
11  **Q.**   -- the PlayStation console?
12  **A.**   Developing big games today is very expensive.  When you're
13  spending all of the development costs and making a decision to
14  launch in this case, say, on PlayStation, you're obviously
15  building into your return on the investment of building these
16  large games sales on the PlayStation platform to help recoup
17  and be profitable in running the business.
18          And given that PlayStation is significantly larger than
19  Xbox, building a high-quality game for Xbox and somehow
20  building a lower quality game on the largest market segment
21  doesn't make financial sense or, as I said, brand sense for us,
22  and we haven't done it.
23  **Q.**   So if we use our movie analogy that you have taught me, if
24  you designed a movie for Omaha and you made it worse for New
25  York City, that wouldn't make any economic sense; right?

362

1   **A.**   Yeah.  When you've built the entertainment property movie,
2   whatever it is, your -- the best return that you can get -- the
3   most profitable thing in our industry are massively hit games,
4   and what you do to keep those games at their peek of popularity
5   is to continue to deliver high-quality content to as many
6   customers as you can.
7   **Q.**   And the --
8           **THE COURT:**  Can I ask you about those as many
9   customers as you can?  But you have games like Halo that aren't
10  on PlayStation 5.
11          **THE WITNESS:**  That's right.
12          **THE COURT:**  You could deliver it to way more customers
13  if it were?
14          **THE WITNESS:**  Yes.
15          **THE COURT:**  So can you reconcile that inconsistency?
16          **THE WITNESS:**  Yeah, absolutely.
17          In the console space, all of the platforms have exclusive
18  games that don't launch on the competitive platforms.  So for
19  us, we're at a deficit, a significant deficit, like orders of
20  magnitude, behind PlayStation and Nintendo on the hit quality
21  and number of exclusive games, and it's one of the decisions
22  people make when they're going into a store on what console to
23  go buy.
24          But in the case of, say, Minecraft, which is our largest
25  game by revenue, that game has reached a financial level of

363

1   success where it's -- it's a significant profit driver for us
2   given that it's shipping on all the platforms.  So if you can
3   get a game that's at that level of hit and that level of
4   business, the size of the business, our job is to maintain and
5   grow that.
6           When you talk about other games that are only launching on
7   one platform or another, they're usually much smaller games.
8   In terms of scale, Halo is much smaller than Call of Duty, as
9   an example.  Starfield is much smaller than Minecraft.
10  Starfield hasn't launched yet.
11          **THE COURT:**  Well, you hope that it would be bigger;
12  right?
13          **THE WITNESS:**  You do.  And it's -- it's why in the
14  evolution of our strategy -- and I apologize if I'm going
15  long -- we used to just ship games on our Xbox.  We didn't even
16  ship them on Windows when we day and date, when we launched;
17  and it was a few years ago that we made the decision that our
18  console games would launch on our console and PC on the same
19  date.
20          That's not something, say, that Sony does.  Sony delays
21  the launch of their games on PC because they're trying to drive
22  people to buy a PlayStation.
23          And our strategy is very much:  How do we find as many
24  players as we can with Xbox?
25          **THE COURT:**  All right.  Sorry.

364

365

1    MS. WILKINSON: No problem.

2    BY MS. WILKINSON:

3    Q.    Let's also talk about the financial considerations you

4    have when you are responsible for the costs of developing that

5    game --

6    A.    Yeah.

7    Q.    -- versus a third-party game.  Okay?

8          So let's talk about ZeniMax.  Once you bought ZeniMax,

9    were you responsible for all the costs of developing whatever

10   new games they developed?

11   A.    We are.

12   Q.    When you used to contract with ZeniMax to put the games on

13   your platform, were you responsible for all those development

14   costs?

15   A.    We were not.

16   Q.    So once you are responsible for all those development

17   costs, do you different -- do you do a different kind of

18   financial analysis than you would when you're making an

19   agreement with a third party?

20   A.    Yeah.  There's a lot less risk for us in working with

21   third parties who are building games on our platform because

22   we're not funding the development.

23         We want them to be very successful on our platform, but we

24   do not have the same financial risk and we partner with them

25   differently than the games that we fund completely.

1    Q.    When you're building a new game, is there a different

2    analysis on where you put it in terms of platforms versus

3    getting a game that already exists and is multiplatform?

4    A.    For us building our own games?

5    Q.    Versus when you're acquiring a multiplatform game, is

6    there a different calculation?

7          I think -- oh.  Should I rephrase it?

8    A.    No.  I think I understand it.

9          If a game is in the market and it has customers on another

10   platform, in any entertainment industry, including gaming,

11   that's the most difficult thing for us to get, is a customer

12   who loves our product on a platform.

13         So if we were to acquire something that has found customer

14   love, users, business on another platform, we want to nurture

15   and grow that for the games that we're building.  When we're

16   building a new game, which has no customers today, we're

17   usually thinking about how to maximize our creative capability

18   while minimizing our cost and production risk in a game.

19         So it's a different math when you're thinking about games

20   that you're building new versus maybe games that you would

21   acquire that have existing communities.

22   Q.    Let's go to the game at issue, Call of Duty.

23         When you acquire Activision, are you going to maintain it

24   on PlayStation if Sony will agree or would you remove it from

25   the PlayStation?

366

367

1    A.    We will keep Call of Duty on PlayStation if Sony will

2    allow us to do that, current versions, past versions that

3    players are playing and subsequent versions in development.

4    Q.    Assume Sony would agree.  Would you have any reason to,

5    nevertheless, pull it from their platform, not honor your

6    Nintendo contract, and keep it exclusive to Xbox?

7    A.    No.  The financials that Jamie walked through -- and I

8    appreciate her coming up here and doing that -- the size of

9    Call of Duty, the role it plays in the valuation of buying

10   Activision makes it both financially impossible for us to

11   figure out how we would recover from losing Call of Duty on its

12   largest console platform.

13         And as a business, we -- we have over 50 games in the

14   PlayStation digital store today.  We are very familiar with

15   shipping games on PlayStation.  We partner with them incredibly

16   well outside of the discussion on this deal.

17         So I would look to continue -- to expand really where Call

18   of Duty is.  Continue to ship all future versions of Call of

19   Duty on PlayStation is my goal; and, as you said, also bring it

20   to the Nintendo Switch, and we have a contract to go do that.

21   Q.    Today when you compare the number of gamers that play Call

22   of Duty on your platform to the Call of Duty players that play

23   on PlayStation, what's the relative comparison?

24   A.    There's significantly more players on PlayStation than

25   there are Xboxes.  As we know -- it keeps getting put up

1    there -- there are a lot more PlayStations than Xboxes in the

2    market and the game is very successful on both platforms.  So

3    PlayStation is by far the largest.

4    Q.    Last question before lunch.

5    A.    Yeah.

6    Q.    Since it already has an existing community, if you pulled

7    the game from PlayStation, do you anticipate or would you

8    anticipate any reaction from those customers?  Or they're not

9    your customers I guess, but those players on PlayStation.

10   A.    Yeah.  I think as we've seen even in preparation for this,

11   that gamers are an active and vocal group.  Us pulling Call of

12   Duty from PlayStation in my view would create irreparable harm

13   to the Xbox brand after me in so many public places, including

14   here, talking about and committing to us not pulling Call of

15   Duty from PlayStation.

16         THE COURT:  You're testifying under oath.

17         THE WITNESS:  Yes.

18         THE COURT:  You're testifying under oath that you will

19   make future versions of Call of Duty available for the

20   PlayStation 5?  You will invest whatever developer expenses you

21   need to do to do that?  Of course Sony has to --

22         THE WITNESS:  That's right.

23         THE COURT:  -- let you do it, but you're testifying

24   under oath that you will do that?

25         THE WITNESS:  Absolutely, and I would do it -- I

368

```
 1    would -- I'll raise my hand.  I will do whatever it takes.  We
 2    are not -- we have no plan to pull Call of Duty from --
 3              THE COURT:  No, putting aside a plan.
 4              THE WITNESS:  I'm making the commitment standing here
 5    that we will not pull Call of Duty, it is my testimony, from
 6    PlayStation.  And, as you said, Sony obviously has to allow us
 7    to ship the game on their platform; but absent any of that, my
 8    commitment is and my testimony is, to use that word, that we
 9    will continue to ship Call of -- future versions of Call of
10    Duty on Sony's PlayStation platform.
11              THE COURT:  Ready for lunch?
12              MS. WILKINSON:  Yes, ma'am.
13              THE COURT:  Are you done with your questions or you're
14    just ready for lunch?
15              MS. WILKINSON:  No, that's perfect.  Both actually.
16              THE COURT:  Both?  Well, then I actually --
17              MS. WILKINSON:  Yes, you go right ahead, Your Honor.
18              THE COURT:  I wanted to go back, if we could, to
19    Exhibit --
20              MS. WILKINSON:  Oh, Your Honor, I do have plenty of
21    questions about the other exhibits.
22              THE COURT:  Oh, you do have.  I thought you were done
23    with your questions.
24              MS. WILKINSON:  Oh, no.  That would be nice.
25              THE COURT:  Okay.  Fine then let's take our lunch
```

369

```
 1    break, and what I'd like to do is come back at -- so it will be
 2    a 45-minute lunch break.  We'll resume at 12:45, but I need all
 3    the lawyers here and Ms. Bennett here at 12:30 to go over
 4    Mr. Ryan.  And so that will be closed session.  Just so the
 5    audience knows, we're going over confidentiality, so at 12:45
 6    we can resume in public session.
 7              (Luncheon recess was taken at 12:00 p.m.)
 8    AFTERNOON SESSION                              12:32 p.m.
 9              (The following pages 369 through 389 were placed under
10    seal by Order of the Court:)
```













388

389

14  (The following proceedings were heard in open court:)

15      **THE COURT:** Okay. We're going to resume with court.

16  We need quiet, please.

17          (Pause in proceedings.)

18      **THE COURT:** Ms. Wilkinson, you may proceed.

19      **MS. WILKINSON:** Thank you, Your Honor.

20      Your Honor, I was just informed that the Zoom is not on.

21      **THE COURT:** Now it's on.

22  **BY MS. WILKINSON:**

23  **Q.** Let's start this afternoon, Mr. Spencer, with just an

24  overview of how the industry has changed just in the last few

25  years.

---

390

1      You were shown many documents from 2019, 2021, '22, and

2  '23; right?

3  **A.** Yes.

4  **Q.** And have your views on how the industry is developing and

5  your place in the industry changed over that time?

6  **A.** It has, yeah.

7  **Q.** Would you call it a rather rapid change?

8  **A.** Yeah. The game industry is a place of rapid innovation

9  and business model and creative change.

10  **Q.** Okay. I want to start by looking at PX112 -- I mean

11  RX1125. It should be in the dark -- the black notebook.

12  **A.** Oh.

13  **Q.** Thank you.

14      **MR. WEINGARTEN:** I'm sorry. I don't believe I have

15  the RX notebook.

16          (Pause in proceedings.)

17      **THE COURT:** What number?

18      **MS. WILKINSON:** 1125, RX1125.

19  **BY MS. WILKINSON:**

20  **Q.** Just to put in context, Mr. Spencer, look at the first

21  page. Is this an e-mail transmitting some strategy review on

22  behalf of gaming?

23  **A.** Yes, it is.

24  **Q.** What is it dated?

25  **A.** April 21st, 2020.

---

391

1  **Q.** Let's start on page 003.

2  **A.** Yes.

3  **Q.** And you'll see there's some redactions, but go down to

4  1.3, "Industry Context." Do you see that?

5  **A.** I do.

6  **Q.** And that is not redacted.

7      **MS. WILKINSON:** Your Honor, we'd like to move in a

8  redacted copy -- well, a full copy for you, RX1125.

9      **THE COURT:** Admitted.

10      (Trial Exhibit 1125 received in evidence.)

11      **MS. WILKINSON:** And could we show, Roger -- oh, you

12  got it. Okay. I just can't see it. There we go.

13  **BY MS. WILKINSON:**

14  **Q.** And this is talking about 2019; correct?

15  **A.** It is.

16  **Q.** What was the total gaming industry revenue of estimate for

17  that time period?

18  **A.** $182 billion.

19  **Q.** All right. How does that compare to movies and music?

20  **A.** It's larger than movies and music.

21  **Q.** Turn to the next page, if you could to, Figure Number 2,

22  and I want to focus on the state of mobile console and PC

23  client.

24      Are those numbers accurate, to the best of your knowledge,

25  for 2019?

392

1   A.   They are.

2   Q.   And how -- they're kind of split between mobile and

3   console.  How has that changed from when you first joined Xbox

4   to 2019?

5   A.   Mobile has grown to become the number one gaming platform

6   on the planet, both in terms of users and monetization revenue.

7   Q.   And if we put a pie chart together and we put mobile,

8   console, and PC client, has mobile been gaining share within

9   that world of revenues?

10  A.   Yes.  It's growing -- it's growing the fastest and

11  continues to really be the only segment that grows with any

12  consistent rate.

13  Q.   In 2019 seeing these revenue numbers, did you have a

14  strategy about where you wanted to go with Xbox gaming?

15  A.   It was -- yes, we did.

16  Q.   What was it?

17  A.   It was very imperative to us being that if we were going

18  to remain and grow our relevance in the gaming market, we were

19  going to have to find customers on mobile platforms for Xbox.

20  Q.   Did you discuss that with your Gaming leadership team?

21  A.   Yes.  It's been a constant topic with the board of

22  Microsoft, the senior leadership team at Microsoft, and our

23  Gaming leadership team.

24  Q.   Give the Court an example of some of the things -- some of

25  the things you tried to do to gain access to those mobile

393

1   customers.

2   A.   So over the years as mobile's grown to be a bigger part of

3   gaming, there's really been two approaches for us.  One is

4   we've built more native games on mobile, found very limited

5   success in that space outside of the Minecraft title.

6        And we had a strategy that we've talked about here on

7   streaming console games to mobile devices with the hope that

8   users on mobile phones would find access to console games to be

9   an interesting business for them and a place

10  that they wanted to play games.

11  Q.   Can you explain that a little bit more?  You had a cloud

12  streaming service; right?

13  A.   Yes.

14  Q.   You still have one?

15  A.   We still do.

16  Q.   And what was -- what was your strategic reason for having

17  that cloud streaming business?

18  A.   We built xCloud, which is the kind of code name for our

19  cloud streaming business, knowing that on Xbox we have many

20  games that run on our console platform.

21       And there are many users around the world that have phones

22  that aren't able to play those games nor will they be because

23  those games were built for a console over the years.

24       So our strategy was to put consoles in our data centers

25  and stream the game play from those consoles to a mobile phone.

394

1   So that if somebody wanted to play Halo on a mobile phone or

2   they wanted to play our driving games on a mobile phone, that

3   they would have access to those through streaming and that we

4   would find a significant number of customers given the

5   installed base of people playing games on mobile phones is the

6   largest segment of people playing.

7   Q.   So you're taking the native version on a console and

8   streaming it to a phone?

9   A.   Yeah.  Literally in an Azure data center, so big building,

10  cement, there's a rack of Xbox motherboards.  As Sarah was

11  explaining, it doesn't quite look like that.  It's just the

12  silicon part of the console that is running the game when

13  somebody launches it on xCloud.

14       On their phone, the person launches the game and when they

15  give it input, so say click "A" on the screen, that click is

16  sent via the internet to the data center which clicks "A" on

17  the game sitting in the data center.  And then the bits that

18  are actually being displayed on the screen are also streamed

19  down to the phone giving you a round-trip ability to play.

20  This is what xCloud is today.

21  Q.   In 2019 were you hoping that would move a lot of -- or at

22  least expand your customer base over on the mobile side?

23  A.   Yeah.  My real hope was the fact that we'd had at that

24  point nearly 20 years of Xbox games built on our console

25  platform, that that would give us a unique offer to players on

395

1   phones.  That you don't have to go buy a video game console to

2   play these games, that we could stream the game directly to the

3   phone, and we would unlock the billions of people or

4   1.8 billion I think people play on mobile phones today.  That

5   was our hope.

6   Q.   Mr. Spencer, how did that work out for you?

7   A.   It turns out there are a lot of barriers to console games

8   being displayed on a phone screen.  I'll start with a few of

9   them.

10       One that Sarah talked about is the latency.  Latency is

11  the time difference between when you want something to happen

12  on the screen and when it actually happens.

13       So what I talked about before of pulling a trigger or

14  clicking a button, the speed of light, it takes time for that

15  action to go to the cloud and come back.  So latency is clearly

16  one issue.

17       Another, I guess, fairly obvious issue are these games

18  were built for a television screen.  So even things like the

19  font size as you take something that was built for a 40- or

20  50-inch screen and shrink it down to like a 6- or 7-inch

21  screen -- 6-inch screen on a big phone, it's very hard to see

22  even what's happening or read what's happening on the screen.

23       And the last thing, which is also obvious, is people play

24  console games with a controller, and the controller is --

25  whether it's the Switch or PlayStation or an Xbox, you have a

396

1  controller that has buttons and triggers. Your phone doesn't
2  have that.
3      So our xCloud software was trying to mimic a controller on
4  the touch screen of the phone, which turns out to be very
5  limiting to the experience that people have. And,
6  consequently, we didn't make much traction actually finding new
7  phone customers for Xbox.
8  Q.  Take a look at RX10 --
9      MS. WILKINSON:  Your Honor, I did move that in, yes,
10  1125.
11 BY MS. WILKINSON:
12 Q.  Take a look at RX1093. Is that an e-mail chain which at
13 the top is from Catherine Gluckstein to you on February 21st,
14 2019?
15 A.  Sorry. I want to make sure I'm on the right one. 1093?
16 Yes.
17     MS. WILKINSON:  We move 1093 in.
18     THE COURT:  Yes.
19     (Trial Exhibit 1093 received in evidence.)
20 BY MS. WILKINSON:
21 Q.  Is this a discussion with some of your colleagues about
22 some of the issues you're trying to address in the mobile
23 market?
24 A.  It is.
25 Q.  Turn to page 4, please. Look at the top where you wrote

397

1  to Catherine and the subject is "xCloud Strategy and GDC."
2  A.  Yes.
3  Q.  What is GDC?
4  A.  It's the Game Developers Conference, which is held here in
5  San Francisco every year in March.
6  Q.  In the second paragraph, you say "First, we are exactly
7  like Polaroid." What did you mean by that?
8  A.  Catherine, who went on to run our xCloud team, was making
9  a point that as digital photography came about, Polaroid had a
10 strategy that really hinged on their current strengths, which
11 was printing photos out, and it turns out that what phone
12 customers wanted was just the ability to capture digital images
13 directly on their phone.
14     So her -- if you read lower, you'll see that Catherine's
15 talking about the fact that Polaroid built a strategy based on
16 their strengths, not the market demands. And I'm -- I'm making
17 the point that xCloud is really a strategy built out of we have
18 console games, so let's try to stream them to phones, not
19 actually a strategy built out of what customers are asking for.
20 Mobile customers specifically.
21 Q.  Did you contrast below when you said, "This is kind of
22 what Bobby K is trying to do at ATVI"?
23 A.  Yeah. Bobby Kotick, who's the CEO of Activision, has done
24 a really good job on diversifying where Activision finds
25 customers. As we saw earlier, their biggest revenue stream

398

1  today is from mobile games. That was not true 15 years,
2  10 years ago. They're finding new customers for existing
3  franchises through things like Call of Duty mobile and new
4  things that they've -- they've acquired or built.
5  Q.  When you get on a mobile phone and use Candy Crush, to
6  access the game do you have to pay anything?
7  A.  Candy Crush is a free-to-play game.
8  Q.  Go down to the fifth paragraph that says "Because" and go
9  halfway down where you say (as read):
10     "They also don't pay for any games. All the mobile
11     games are FTP."
12     Free to play; right?
13 A.  Yes.
14 Q.  (as read):
15     "So even the business model around our games that
16     mobile players don't want is wrong."
17     What do you mean by that?
18 A.  As Mr. Weingarten and I were talking about, our goal with
19 Game Pass was to lower I'd say the entry price for somebody
20 getting into playing console games from $70 to in the case of
21 console Game Pass $10 a month thinking that as you're finding
22 more customers, that the business model needs to be more
23 flexible for a less core customer.
24     On phone, almost every game that somebody plays is free
25 and has a business model around transactions or time.

399

1      So not only was our content hard to see on the screen and
2  hard to control on a phone, the predominant business model for
3  games on the phone did not match the content base that we had
4  on Xbox.
5  Q.  Did there come a time when you tried a different strategy
6  through acquisition?
7  A.  Yeah. Every time we would -- yes. Every time we'd sit
8  down with the Microsoft Board or the senior leadership team,
9  while they might appreciate our strategy on console and PC, it
10 was pretty clear that if we did not have a strategy that found
11 success on mobile, our relevance in the market was going to
12 continue to shrink.
13     If you're on the two platforms that are not growing and
14 there's a third platform called mobile phones that are really
15 the sole source of video game growth over the last few years,
16 you are going to be less and less relevant as a platform. So
17 we started to look at acquisition as a strategy.
18 Q.  Before the Activision opportunity came along, did you make
19 some significant steps toward acquiring a mobile gaming
20 company?
21 A.  Yes. We had entered into some discussions, preliminary
22 discussions, with a company called Zynga, which was based here
23 in San Francisco. It ended up getting acquired by Take-Two,
24 which is one of the game publishers in the video game business,
25 but that was an opportunity that we spent quite a bit of time

400

1   on.
2   Q.   Please take a look at FX1141.
3        MS. WILKINSON:   We move into evidence.
4        THE COURT:   1141?   1093 you want admitted as well?
5        MS. WILKINSON:   Yes, Your Honor.
6        (Trial Exhibits 1093 and 1141 received in evidence.)
7   BY MS. WILKINSON:
8   Q.   This is a May 5th, 2021, with a deck attached; right?
9   A.   Yes, it is.
10  Q.   And the first page of the deck is titled what?
11  A.   The "M & A Pipeline."
12  Q.   And if you go to page 007, you have your strategy laid out
13  there; correct?
14  A.   Yes.
15  Q.   And you have a list of gaps.   What do you mean by "gaps"?
16  A.   Looking at the -- looking at the games that we currently
17  build in Xbox Game Studios, which is the XGS acronym, which is
18  our first-party organization, looking at what we have today
19  versus what we believe we need to have to be successful in the
20  broadest gaming market.
21  Q.   And it included there under the first set of bullet points
22  is "Lack of mobile native content."   It says (as read):
23            "Scarcity of relevant PC content and lack of mobile
24       native content."
25  A.   I might be on the wrong page.

401

1   Q.   Page 007 or page 5 of the deck.
2        THE COURT:   1141.
3        THE WITNESS:   1141.   Sorry I'm not -- it is a true
4   statement.   I just don't see it on the paper.   Am I --
5   BY MS. WILKINSON:
6   Q.   It's this page (indicating).
7   A.   Oh, I can't read -- scarcity of relevant PC content, lack
8   of mobile native content, yes, it continues to be a gap in our
9   portfolio.
10  Q.   Did Zynga have some significant native mobile content?
11  A.   They do.
12  Q.   And look at page 001 -- I mean 017.
13  A.   Yes.
14  Q.   Did your team do an analysis of potential targets?
15  A.   We did.
16  Q.   There are quite a few there, a thousand potential targets.
17  Why did you have them look at so many?
18  A.   It was critical for us to find the right content partners
19  in the mobile space.   Mobile being the largest gaming platform
20  in the world has a lot of publishers and developers so we
21  started with the broadest collection and tried to work down
22  through a criteria to the opportunities that would be a good
23  fit for us.
24  Q.   Did you end up -- or can you tell us why you didn't
25  acquire Zynga?

402

1   A.   I have a lot of respect for the people at Zynga and what
2   they've built.   In the end for our opportunity, we thought we
3   needed to have something that was even bigger than what Zynga
4   was given our small -- very small starting space in the
5   mobile -- in the mobile gaming business.
6   Q.   Let's turn to Activision -- Activision if we could.
7        Do you recall when you found out that Activision might be
8   an opportunity for you to acquire?
9   A.   Yes.   That would have been November of the -- what? --
10  2021.
11  Q.   Did you speak to Mr. Kotick, the CEO, about the
12  acquisition?
13  A.   I did.   I gave him a phone call.
14  Q.   Did you also have the folks at the company do an analysis
15  of Activision?
16  A.   We did.
17  Q.   Including a financial analysis?
18  A.   We did.
19  Q.   Did you also determine whether Activision met your
20  strategic goals?
21  A.   We did.
22  Q.   And just give an overall description of why Activision
23  meets both your strategic and financial goals.
24  A.   Activision, while we're spending a lot of time talking
25  about Call of Duty on PlayStation, it turns out they're the

403

1   largest publisher of mobile content outside of China, meaning
2   Chinese companies that are not really companies that we can
3   acquire.
4        After we went through our Zynga work and analysis, I spent
5   time with Amy Hood, the CFO of the company, to look at the
6   mobile opportunities that were in the market and Activision was
7   the biggest publisher of mobile content, and it's a partner
8   that we know well given our long history of working together.
9   So we -- we both had comfort with the studios and the teams
10  but, most importantly, was their -- their portfolio and
11  engagement that they have on mobile.
12  Q.   Did you make several presentations to the board as you
13  were considering and seeking approval of the acquisition?
14  A.   We did.
15  Q.   Turn to FX3166.   This is a document under seal, but
16  there's a small portion on page 003 on the gaming industry
17  landscape.   Do you see that?
18  A.   I do.
19       MS. WILKINSON:   Roger, would you mind putting up the
20  redacted version that we can show from page 3?
21  BY MS. WILKINSON:
22  Q.   Did you share these numbers with the board of directors?
23  A.   We did.
24  Q.   And just to make the record clear, is this a board
25  presentation on December 8th, 2021?

404

1   A.   It is.
2        MS. WILKINSON:   We move in RX3166.
3        THE COURT:   Admitted.
4        (Trial Exhibit 3166 received in evidence.)
5   BY MS. WILKINSON:
6   Q.   And if we look at the numbers or the percentages over on
7   the left, they don't add up.  Can you tell us why that is?
8   A.   There are players that play on more than one platform.
9   Q.   The percentage, though, of all gamers who play on mobile
10  is quite large; right?
11  A.   Yeah.  Mobile is by far the largest gaming platform.
12  Q.   Then look over at the other side for the total.  What is
13  the total revenue in the gaming industry as of 2020?
14  A.   216 billion.
15  Q.   2020.  Sorry.
16  A.   216 million.
17  Q.   How much is the mobile portion?
18  A.   $113 billion.
19  Q.   When we looked at the figures from 2019, the mobile
20  portion was 87?
21  A.   Yes.  Mobile gaming is by far the fastest growing segment
22  as well.
23  Q.   And is console growing relative to the PC and mobile
24  segments of the market or is it shrinking?
25  A.   Even if console stays flat, if a segment like mobile is

405

1   growing quickly, it becomes a smaller part of the overall
2   gaming market.  So it is shrinking as a percent of the overall
3   gaming market.
4   Q.   And after this board presentation, did there come a time
5   when you and your staff and Ms. Hood did a valuation for the
6   Activision deal?
7   A.   That's right.
8   Q.   And tell us what -- from your business perspective, what
9   that was supposed to capture?
10  A.   Whenever we're looking at an opportunity to acquire a
11  company, we're looking at the value to Microsoft, what we would
12  expect to be able to pay giving us up to some limit that we
13  would be willing to invest in an acquisition.
14       Obviously, a company, a publicly traded company is looking
15  for a return on investment.  So your return should be higher
16  than what you're willing to pay.  There has to be a delta
17  between what you're going to spend and what you're going to
18  acquire.
19       So we build a financial analysis to help us give a -- a
20  range for what we could afford to pay for a company and still
21  feel like we got the right return as a company.
22  Q.   If anyone were to suggest that Microsoft would permit us
23  to pay, you know, any price just to get Activision, would that
24  be accurate?
25  A.   It would not.  The gaming business inside of Microsoft

406

1   actually runs as a standalone profit-and-loss business inside
2   of Microsoft.  It's one of the few Microsoft CSAs, as we used
3   before, or businesses that runs that way.
4        And we have a commitment to the company and the board to
5   run a profitable and growing business where we are effectively
6   a standalone business inside of Microsoft.
7   Q.   Did you stand before the board and tell them that you
8   believed that the price you were paying for Activision and the
9   strategic goals you had were sufficient to justify the -- the
10  purchase price of $69 billion?
11  A.   I did.
12  Q.   Is -- there are synergies we saw earlier.  We won't reveal
13  those numbers.  But if one were to suggest those synergies
14  allowed you to lose money, for example, by pulling COD revenues
15  from PlayStation, would that be accurate or inaccurate?
16  A.   That would be inaccurate.
17  Q.   Why?
18  A.   The commitments that I make to the board around the
19  financial return of any acquisition, especially one of nearly
20  $70 billion, it's -- I look at it as critical to my job
21  function to deliver on the results that I commit to the board
22  and the company and manage an effective and growing business.
23       So when I'm presenting our financial view of Activision
24  and what I expect the return to be so that the company would
25  deploy that amount of money to go acquire Activision, it is

407

1   kind of critical to my job stability to that I deliver on that.
2   Q.   Has Activision successfully developed a native game for --
3   a native Call of Duty for mobile?
4   A.   They're very effective, yes, with Call of Duty mobile.  It
5   is a very big franchise for them.
6   Q.   Take a look at RX1147, please.
7   A.   (Witness examines document.)
8   Q.   Do you see that document?
9   A.   I do.
10  Q.   Is this an e-mail that includes Sarah Bond, you, Tim
11  Stuart, and Matt Booty?
12  A.   It is.
13  Q.   What is Mr. Stuart's job?
14  A.   Tim Stuart is the CFO of Xbox.
15  Q.   This is dated 5-2-2022?
16  A.   It is.
17       MS. WILKINSON:   Your Honor, we move in RX1147.
18       THE COURT:   Admitted.
19       (Trial Exhibit 1147 received in evidence.)
20  BY MS. WILKINSON:
21  Q.   And if you look through this.  Go to page 2 and 3, did
22  someone take out the public numbers from Activision's 10K to
23  assess their revenue streams?
24  A.   They did.
25  Q.   Okay.  If you turn to that, to page 2, and you see you ask

408

1  specifically "What line does COD mobile show up in Activision";
2  right?  Do you see that in the middle of page 2?  It's from you
3  to Tim and Sarah.
4      A.    Yeah.  I see my question, yes.
5      Q.    Why were you interested in how much the revenues came from
6  COD mobile?
7      A.    It is -- one of the biggest strategic assets for us in
8  this deal is mobile engagement and the size of the mobile
9  business for Call of Duty.
10     Q.    Look on the first page and your e-mail, which is the
11  second from the bottom, and you say (as read):
12            "Wow.  Huge percentage of COD revenue."
13            We all know what "wow" means, but can you put that in
14  perspective of why were you surprised about the size of the COD
15  mobile revenues?
16     A.    I think to most people when they think about Call of Duty,
17  especially in the core gaming world, they think about it as
18  predominantly a console and PC game and that a majority of the
19  revenue comes from that market.
20            But when you actually look at the numbers, you realize
21  that Call of Duty mobile is a very significant part of the
22  franchise and really the biggest reach for Call of Duty in
23  their -- in the Call of Duty portfolio.
24     Q.    Take a look at RX1156, please.
25     A.    (Witness examines document.)

409

1      Q.    Is this another board deck that was presented regarding
2  the Activision Blizzard acquisition?
3      A.    It is.
4            MS. WILKINSON:  Your Honor, we move in RX1156.
5            THE COURT:  Admitted.
6            (Trial Exhibit 1156 received in evidence.)
7  BY MS. WILKINSON:
8      Q.    A transaction was announced on what day, Mr. Spencer?
9      A.    I believe it was January 18th.
10     Q.    And this is under seal, as you can see, but if you turn to
11  page 10 and it says "Activision Blizzard drivers."
12     A.    Yes.
13     Q.    And under almost every category do you include mobile?
14     A.    Yes.
15            MS. WILKINSON:  That's very kind of Mr. Weingarten.
16  BY MS. WILKINSON:
17     Q.    And it says "existing business"; right?
18     A.    It does.
19     Q.    It says "Game Pass"?
20     A.    Yes.
21     Q.    It says "universal store"?
22     A.    It does.
23     Q.    And "advertising"?
24     A.    Yes.
25     Q.    Can you tell us what you mean by "universal store"?

410

1      A.    Yeah.  As Sarah was talking about, when you're playing on
2  your mobile phone, all of the monetization happens through
3  Google's store or Apple's store.  So they capture all of the
4  transactions in gaming and almost every other category, which
5  is, say, different than on Windows where there is a Windows
6  store but there's a lot of other storefronts.
7            For us, we believe there's an opportunity create a gaming
8  storefront on Windows phones -- sorry, Windows phones -- on
9  mobile phones, not the Windows phone, for Apple and Google
10  phones where people can come to find games to play in a
11  storefront that was really tailored towards players on Google
12  and Apple's platform.
13            Now, Google and Apple will fight us to do this.  They
14  don't openly allow other storefronts on their -- on the largest
15  gaming platform.  So we -- as we talked about, we started with
16  the strategy of xCloud with maybe over the cloud outside of
17  their store we would be able to deliver content to them.  This
18  is an approach of having a native storefront on a phone that --
19  where people could come to find our games and third-party
20  games.
21     Q.    So today if you wanted to put your Xbox app in the Apple
22  app store, can you do that?
23     A.    No.  Apple blocks our Xbox app from their store.
24     Q.    If you want to put your Xbox app in the Google store, can
25  you do that?

411

1      A.    We can do that, but we can't -- we get no monetization.
2  They won't allow us to sell anything in our store, which
3  obviously makes it difficult for us to grow a business.  So
4  both Google and Apple exert control over the largest gaming
5  platform.
6      Q.    So when you have a game on your console and someone spends
7  money in the game, you get a portion of that; right?
8      A.    We do.
9      Q.    You're saying if that game were in the Google app store
10  under your Xbox or within your Xbox app, you could not collect
11  any monetization?
12     A.    That's right.  Google -- Apple won't let us put the
13  streaming app in their store so we can't bring the console
14  games through their storefront.
15     Q.    In contrast, is Candy Crush in the app store?
16     A.    Candy Crush is in the Apple's app store.
17     Q.    Apple decides that game is okay, but your suite of games
18  is not?
19     A.    That's right.
20     Q.    And in Candy Crush is there in-game monetization?
21     A.    There is, yeah.  It is a free-to-play game, yeah.
22     Q.    And do you know if the Call of Duty mobile game is
23  available on the Apple app store?
24     A.    It is.
25     Q.    And is there in-game monetization in that game?

1   A.   There is.

2   Q.   So if you owned those franchises, you would then be able
3   to at least collect the revenues that they generate within the
4   game?

5   A.   Yes.  In the existing business line, in the model, is the
6   capture of existing Call of Duty, Candy Crush on mobile
7   platforms.

8   Q.   Do you know why Apple is not letting you put the GameBox
9   app within its app store?

10  A.   Because it's competition for their control over the
11  largest gaming platform between them and Google.  There's --
12  these are games that players want to play.  We have a delivery
13  mechanism to deliver the games to those phones for their
14  customers, and they just choose to block it and they've been
15  allowed to do that.

16  Q.   Aside from the revenues you would get if you owned Call of
17  Duty and Candy Crush, are there any other benefits you would
18  have in terms of learnings about mobile if you owned those
19  franchises?

20  A.   Yes.  Any launch for us of a store is -- it -- it's a
21  critical part of our strategy and I would say a high-risk part
22  of our strategy.  One way to offset that risk is to have
23  millions of players of games on the store -- on the mobile
24  devices that you can then advertise to the fact that you have a
25  storefront available.

1   So instead of just launching a store today and trying to
2   find customers, when you have the users of Candy Crush and Call
3   of Duty and Diablo Immortal, which is another mobile game,
4   you're going to be able to gain exposure for the mobile store
5   that you've built through the engagement that you have with the
6   games that you own on the platform.

7   Q.   Who's Amy Hood?

8   A.   Amy Hood is the chief financial officer of Microsoft.

9   Q.   We'll hear from her next week, but would you consider her
10  a rigorous reviewer of your financials?

11  A.   The most rigorous I've ever found.

12        (Laughter)

13  BY MS. WILKINSON:

14  Q.   How regularly does she review your financials?

15  A.   Can I say daily?  She's --

16  Q.   Officially.

17  A.   Yeah.  Monthly.  Amy is in a monthly business review for
18  the gaming business and other CSAs.  It's part of the normal
19  rhythm of running the business.

20  Q.   Do you work with her to set targets for your business?

21  A.   We do, yes.

22  Q.   What kind of targets do you set?

23  A.   We will set annual targets.  Microsoft's fiscal year is
24  July 1st through June 30th of the following year.  So we're
25  right in the middle of getting ready for next fiscal year so a

---

1   lot of work.  And our quarterly earnings that we would have as
2   a business, that's where I would say most of the effort goes
3   into in terms of locking what our expectation is for the
4   business.  And I meet with her weekly on how the overall user
5   trends and metrics look for our business.

6   Q.   Do you have margin targets?

7   A.   Yeah, we have -- yes, we do.  We have both gross margin
8   targets and accountability margin, the AM that we talked about
9   earlier, also known as profit.  So we have both of those
10  targets for the business.

11  Q.   If you don't meet those targets, say your accountability
12  margins, what does Ms. Hood do?  Does she give you more money?

13  A.   No.  I mean, no, she does not.  We have to grow the
14  business at what we would call the top line, grow the revenue
15  of the business and the profitability of the business; and if
16  we're not able to grow enough revenue to cover any cost
17  increases we have in the business, we have to find other ways
18  of cutting costs to meet the accountability margin targets that
19  we have as a business.

20        You can see job eliminations.  Regretfully, we had some of
21  those this year.  Cutting back on spend on other things in the
22  market.  I think because the profitability of our business and
23  our commitment to deliver that is a nonnegotiable with the
24  company.

25  Q.   As part of the valuation, did you make a commitment to

1   Ms. Hood and the board that you would meet that overall number
2   that you -- the purchase price, but the sub-numbers that
3   justify the purchase price?

4   A.   Yes.  They understood that the -- they understood the
5   financial model for the deal and my commitment behind every one
6   of the line items in the valuation model.

7   Q.   So if someone were to suggest that you could just buy
8   Activision and lose a lot of money over time; is that correct
9   or incorrect?

10  A.   That is incorrect.  There's no part of our business where
11  I get to lose money over time.  The overall part of our -- the
12  overall business for gaming has to be a profitable and growing
13  business, which is also why getting into mobile is so critical
14  for us.

15  Q.   That said, is it you or Ms. Hood who decides how you're
16  going to meet those numbers?

17  A.   I'm given latitude in managing the sub-numbers, if you
18  want to call it that, the intricacies of the business on a
19  per-title of business, ship dates of different games, marketing
20  budgets on where we're going to spend -- how much we're going
21  to spend on titles.  So I'm given latitude on where I'm
22  spending money.

23        Amy will definitely spend time to understand the gives and
24  takes of our plan versus expectation, and she'll have her own
25  judge of the risk.  But she gives Tim Stuart and I and our

416

1  Gaming leadership team support, but she definitely has a strong
2  point of view herself.
3  **Q.**  Does she agree with your strategy to move as much as you
4  can into the mobile market?
5  **A.**  She does and Satya and the board as well.  One of the
6  challenges for us being the third place console manufacturer is
7  our margins are significantly lower than both Nintendo and
8  Sony's because we spend effectively the same amount of money on
9  our people and we sell fewer consoles so we make less money.
10      Inside of our company we have to find ways of growing the
11  profitability of the business.  Growing from a third place
12  console position in a market that's not growing that we've
13  tried for 20 years is not really something the company is going
14  to support as our sole method of growing the business.
15      So for the longest time we've had discussions with the
16  board and the senior leadership team on how we find more
17  margin-positive ways for us to grow the gaming business all up.
18  **Q.**  As the financial analysis was being done for the deal, did
19  you ever ask anyone to run a financial model to see what it
20  would look like if you did not provide Call of Duty to
21  PlayStation in the future?
22  **A.**  We did not and, in fact, if you look at the deal model,
23  nowhere in the deal model is there any modeling of a shift of
24  share between us and PlayStation.  If we had a plan -- if we
25  thought that this was a deal about driving more Xbox share

417

1  relative to PlayStation, you would see it -- a line called out
2  that would talk about the financial benefits of a share shift
3  between us and PlayStation, which is, as we've just gone
4  through, nowhere in the model.  In fact, the only part of the
5  model -- or the biggest part of the model that includes
6  PlayStation is actually growing the existing business and
7  continuing to maintain that.
8  **Q.**  Does the model include any increase in console sales based
9  on that -- you know, the alleged shift in the market if you
10  were to pull or not provide Call of Duty to PlayStation?
11  **A.**  It does not.  There was nothing about this deal.  This
12  deal came from our need to find users and relevance on the
13  largest gaming platform, which are mobile phones.  The fact
14  that Activision also builds PC and console games and we know
15  them was obviously part of our consideration in the overall
16  valuation, but this -- this deal has nothing to do with
17  increasing Xbox share.
18  **Q.**  The FTC's economic expert, who will testify next week,
19  claims that it is in your financial interest, makes sense, for
20  you to pull Call of Duty from PlayStation and that there will
21  be a 5 percent or so share shift in the console market as a
22  result of that strategy.  Has anyone ever suggested to you
23  that's a legitimate positive economic action?
24  **A.**  Being honest, the CMA had a similar model at some point
25  that they -- the CMA being the U.K. regulatory body -- where

418

1  they had made a math error; and when we corrected the math
2  error, they reversed that point of view.
3      Nobody inside of Microsoft has ever presented a model that
4  would -- to me that would show that pulling Call of Duty off of
5  PlayStation would be beneficial to or would cover the cost that
6  we would -- the revenues we would lose.
7  **Q.**  Setting aside the model, has anyone on your team suggested
8  "You know what would be a great idea?  If we're allowed to buy
9  Activision, let's just withhold Call of Duty from PlayStation"?
10  **A.**  No.
11  **Q.**  Okay.  In fact, when you announced the transaction, did
12  you reach out to your partners, including Sony, to assure them
13  that you would continue to allow them to have access to those
14  games on their platform?
15  **A.**  We did.
16  **Q.**  Did you personally speak to anyone at Sony?
17  **A.**  I -- I spoke with the CEO of Sony Corporation,
18  Yoshida-san, and I had a conversation with Jim Ryan.
19  **Q.**  What assurances did you give them?
20  **A.**  It was -- with Yoshida-san it was Satya and Nadella and I
21  on the phone call, the CEO of Microsoft, and we -- we really
22  just explained the same rationale that we've talked about here
23  about this deal; and that this deal, we wanted to continue to
24  be a good partner for Sony which -- with Sony, which we feel
25  like we are today, in the shipping of games on their platform,

419

1  and that we would continue to do that after this deal closes.
2      And I got positive affirmations from Yoshida-san.  Jim
3  Ryan and I had a slightly longer conversation just given we do
4  more business together, but had a similar outcome; that he
5  understood our rationale behind the deal.
6      And I think the e-mail exchange that was shared kind of
7  landed that -- shows that he understood that this was not about
8  PlayStation, which is what he shared.
9      And then I made a public statement as the deal was
10  announced, that I said we are committed to continuing to ship
11  Call of Duty on not only the PlayStation 5 but future versions
12  of PlayStation, assuming I don't know anything about their
13  future plans but I'll guess that there will be future
14  PlayStations that we would want to continue.  And publicly Sony
15  affirmed that they believed our commitment -- or my commitment
16  that we would continue to ship Call of Duty on PlayStation.
17  **Q.**  Have you made more formal offers to them in writing?
18  **A.**  We have.
19  **Q.**  Has that continued throughout the pendency of the
20  acquisition?
21  **A.**  It has, yeah.  Not always at a pace I would like, but
22  maybe a little bit on that just quickly.
23      As I mentioned earlier, we have a number of games in the
24  PlayStation store today, I think it's over 50, that we sell.
25  Some of those we acquired.  Some of those we've launched.  But

420

1  we don't have a deal on individual titles with Sony to ship.
2  We have a publisher agreement with Sony that allows us to ship
3  games on their platform, and it's a very cordial relationship
4  we have with them on shipping, and they support us well when we
5  ship games on their platform.
6       That -- so when we offer them something on a commitment, a
7  ten-year commitment, to ship Call of Duty on PlayStation or --
8  it's in the context of us already doing a lot of business
9  together and understanding both how to deliver games on
10 PlayStation and how to kind of partner with them as a platform.
11 Q.   Maybe you can explain that a little bit more.  When you
12 put a game on Nintendo or you put a game on PlayStation, do you
13 negotiate individual contracts for those games?
14 A.   No, we do not.  And it's the same when somebody ships on
15 Xbox.  In general, what you do is a publisher would sign a
16 publisher license agreement -- we call it a PLA -- which
17 basically gives them the right to ship games on our platform,
18 and then we -- in the business terms that that will exist
19 under.
20      And that covers any game that a publisher would want to
21 ship on Xbox or we would want to ship on Nintendo or Sony.  We
22 don't usually do individual deals for each title that ships on
23 the platform.  It is -- we give them a heads-up that we're
24 going to ship Minecraft Legends, which is the last game we
25 shipped on PlayStation, and their account team works with our

421

1  team to ensure that the game ships seamlessly on their
2  platform.
3  Q.   Let's fill in the blanks there since you mentioned
4  Minecraft Legends.
5       You were asked by counsel whether you updated or provided
6  Minecraft for the PS5; right?
7  A.   Yes.
8  Q.   How many Minecraft games are available today?
9  A.   Today in the console space there are really three main
10 franchises.  There's Minecraft, a game just called Minecraft,
11 Minecraft Dungeons, and Minecraft Legends.  Those would be our
12 three main Minecraft games today.
13 Q.   I want you to look at -- I think I have to hand it up to
14 you because I don't believe it's in your notebook -- RX3156,
15 and ask you if this is a public announcement of that Minecraft
16 Dungeons -- that Minecraft Dungeons will also be in PS Plus.
17 A.   Yes.  This is an announcement that Minecraft Dungeons will
18 be available on PlayStation Plus.
19 Q.   So PS Plus is what you were talking to counsel earlier
20 about their streaming service used to be called something else?
21 A.   PlayStation Plus is actually their content subscription
22 like Game Pass.  So they have multiple tiers, but PlayStation
23 plus is kind of the base name for their version of Game Pass.
24 Q.   Was their version of Game Pass called PlayStation Now in
25 the past?

422

1  A.   PlayStation Now is their equivalent of xCloud, of their
2  ability to stream, and they've incorporated PlayStation Now,
3  which I don't believe is a name they use today.  And I think I
4  have this right, but I apologize if I have some of it wrong.
5  So all of it now is part of the PlayStation Plus family of
6  subscriptions is my understanding.
7  Q.   Okay.  So if someone owns a PlayStation and they want to
8  play -- they want to buy the game on the PlayStation store, can
9  they buy Minecraft Legends?
10 A.   Yes.
11 Q.   Can they buy the Minecraft?
12 A.   Yes.
13 Q.   And can they buy the third game?
14 A.   Minecraft Dungeons, yes, they can.
15 Q.   And if they want to play it in PlayStation subscription
16 service, what Minecraft games can they play in the subscription
17 service?
18 A.   Today we have a deal.  This is an instance where we would
19 have had a deal with Sony.  They would have come and asked to
20 put Minecraft Dungeons and PlayStation Plus -- sorry -- and
21 then we would have done a business deal that would have us
22 include Minecraft Dungeons in PlayStation Plus.  I believe
23 today that's the only version of Minecraft that's in
24 PlayStation Plus, but it's not the only game that we've ever
25 put in PlayStation Plus.  We've had other games that have been

423

1  in PlayStation Plus.
2  Q.   I believe you explained this earlier, but this is a
3  different financial arrangement when you're putting it in a
4  subscription service than when you're just putting it in the
5  store and allowing them to purchase it and play it on their
6  device?
7  A.   That's correct.  When we're putting a game in the store,
8  as Mr. Weingarten and I talked about, there's a standard
9  revenue split of 70/30 that we expect.  That's the kind of
10 agreed-upon financial relationship for games.
11      Because we're putting a game in the subscription, and as
12 you can see in the ad, the ad says "Play Dungeons for free on
13 PlayStation Plus," there's -- we're foregoing some sales of the
14 game.  So there would be a financial -- direct financial
15 relationship with Sony on this title for inclusion in
16 PlayStation Plus.
17 Q.   Okay.  Let's talk -- well, let's finish up on this.
18      THE COURT:  Why would you do that?
19      THE WITNESS:  When a game reaches a certain point in
20 its evolution, in its sales, it's an opportunity for us to find
21 customers who did not originally buy the game, and obviously
22 the financial consideration that they would -- they would give
23 us.
24      In general, with Sony and Nintendo, we try to be good
25 content partners.  So when a good business deal comes that

424

1  matches our kind of goals, we do a lot of work with both of
2  them, as well as with Valve, on the PC storefront to get our
3  games in front of as many people as possible.
4      So they -- they come to us. I say "they come to us."
5  There's an ongoing conversation between the account managers at
6  Sony and our Xbox Game Studios teams about things that we could
7  do together, and opportunities arise and we evaluate it; and if
8  it makes sense for us with timing and economics, then we -- we
9  would make that move.
10     I know we talked about console wars earlier so it could be
11 confusing. Like, why would we ever help PlayStation? Our
12 long-term goals in this business are to help grow the gaming
13 industry and be a substantial part of the growth in the
14 industry.
15     We are -- we do not model our success kind of at the sole
16 expense of other platforms that are there. It just doesn't
17 really make sense from a Microsoft perspective if the market is
18 a fixed size.
19     THE COURT: But it's on X Pass I would guess.
20     THE WITNESS: It is Xbox Game Pass.
21     THE COURT: So then someone who's on the
22 PlayStation -- someone on the PlayStation, they don't need,
23 then -- in other words, they'll buy Sony subscription service
24 instead of yours if they want to play the Minecraft?
25     THE WITNESS: That's right. So good clarification is

425

1  that Xbox Game Pass is not available on PlayStation. So when
2  we're looking at PlayStation customers, today, unless they're
3  also playing on PC Game Pass, isn't really an option for them
4  on PlayStation. So our choice for a PlayStation customer is
5  they would either buy our game; or if we have a relationship
6  with Sony, it would be part of the console -- the
7  PlayStation Plus subscription.
8      We love Game Pass and it's, I think, a good part of our
9  strategy, but it -- it is not really one of those things that
10 we see as pulling people away from PlayStation.
11     So participating -- since we're already selling games in
12 their store, participating in all of the ways that you can
13 monetize games on their platform in conjunction with Sony makes
14 sense for us.
15 BY MS. WILKINSON:
16 Q.  Let's explain that just in some simple numbers.
17 A.  Sorry.
18 Q.  No. It's easy for you and a little harder for some of us
19 to understand, especially me.
20     So let's use your Minecraft Dungeons example.
21 A.  Yes.
22 Q.  It's in the PlayStation store?
23 A.  It is, yeah.
24 Q.  You get some revenue from that?
25 A.  We keep 70 percent of the transaction, yeah.

426

1  Q.  That's why it's worth having it in your competitors'
2  store?
3  A.  Yes.
4  Q.  And if they -- when you put it into their streaming -- I
5  mean, in their content library subscription service, you get
6  some kind of compensation for that as well?
7  A.  We do from Sony, yes.
8  Q.  A different calculation?
9  A.  Yeah. It -- yes. It's usually more of an upfront
10 payment, just talking generalities, where it's the same that we
11 would do with Game Pass of if we -- let's flip it around so I'm
12 not talking about Sony doing their business.
13     When we would go to a game like Dungeons, this is our own
14 game, but say a third-party game, we would offer up a certain
15 amount of money upfront to include the game in our content
16 subscription for some amount of time.
17     And as the owner of the content, you look at your current
18 run rate of sales versus how much they're willing to give you
19 today and what period of time it will be in the subscription
20 and you make a balanced business decision based on that.
21 Q.  Is this part of your process of deciding game by game
22 whether you're going to keep it exclusive or make it available
23 on multiple platforms?
24 A.  Yeah. The managing the portfolio of games across so many
25 different platforms and so many different business models is an

427

1  ongoing discussion, which is maybe why I got a little bit
2  confused earlier about is there, like, one specific time when
3  I'm having this discussion. This is kind of a constant part of
4  managing 23 studios and the number of game franchises that we
5  have.
6  Q.  So is it possible that you develop a game within Xbox --
7  so we'll call it a first-party game; right?
8  A.  Yes.
9  Q.  -- and you decide to make it available initially on Xbox
10 and on PC?
11 A.  Yes.
12 Q.  Can you reassess -- do you reassess that at times and
13 decide whether you're going to provide it on PlayStation and/or
14 Nintendo?
15 A.  We do and we've done that in the past.
16 Q.  And are there sometimes when you have games set are
17 available initially on all three platforms?
18 A.  We do.
19 Q.  And then when you acquire studios that have existing games
20 on other platforms, especially those that involve
21 multiplatforms, do you maintain those on those platforms?
22 A.  We do. When we closed the ZeniMax acquisition, two of
23 their what we would call ongoing service-based games where
24 customers engage with the games in an ongoing basis and those
25 games continue to evolve, Fallout 76 and Elder Scrolls online,

428

1  both of those games post-acquisition we've continued to update
2  and add content across PC, across PlayStation, and Xbox at
3  roughly the same time.
4  Q.  Go back to Minecraft Legends.  When it first came out, it
5  was available on Xbox and PC; right?
6  A.  And Switch and PlayStation all on the same day.
7  Q.  All on the same day and date?
8  A.  Yeah.
9  Q.  And that was in the store?
10  A.  Yeah.
11  Q.  On PlayStation, therefore, you could play.  The only
12  difference is it wasn't in the subscription service right away?
13  A.  Yeah.  This game launched in April of this year, so it's a
14  relatively new game.  Sony's policy is, for the most part, they
15  don't put day and date games in their subscription.  So it's --
16  they're not -- I don't know of them asking about Legends in
17  PlayStation Plus.
18      But, yes, that game was available on Switch, PlayStation,
19  Xbox, and PC on its launch date and the players across all
20  those platforms could play together.
21  Q.  Does Minecraft Dungeons have endgame monetization?
22  A.  I don't believe there's any post-sale monetization or
23  endgame monetization in Minecraft Dungeons.
24  Q.  So once you put it into Sony's subscription service,
25  you're not getting that additional revenue split because there

429

1  isn't post -- I don't know.  What did you call it?  Post --
2  A.  Post-sale monetization.
3  Q.  Post-sale monetization.
4  A.  We will still sell some copies of the game; but, yes, for
5  the most part we're foregoing the retail revenue of people
6  buying the game when we put it into the subscription.
7  Q.  So if there was any suggestion that you always are going
8  to make games exclusive to Xbox and PC, would that be correct
9  or incorrect?
10  A.  That's incorrect.
11  Q.  Even with regard to the ZeniMax games?
12  A.  That's correct.
13  Q.  And with regard, of course, to your plans with the
14  Activision games?
15  A.  The Activision games will remain cross-platform.
16  Q.  Including the Call of Duty game?
17  A.  Call of Duty.
18  Q.  And --
19  A.  On Call of Duty, just specifically because you asked me a
20  good question right before lunch, I want to just be clear, yes.
21  Under testimony, Call of Duty will remain on PlayStation 5 and
22  future versions, as I said, of PlayStation.
23      I could imagine maybe somebody thinks there's some kind of
24  game I'm playing on which version of the console I'm committing
25  to.  Our goal is to continue to make Call of Duty a great game

430

1  for this PlayStation and future PlayStations.
2  Q.  Okay.  Quickly go to the PX1065, which was in the FTC
3  notebook you got.
4  A.  Oh, the FTC one.
5  Q.  And you tell me when you're there.
6  A.  1065 you said?
7  Q.  Yes, please.
8  A.  (Witness examines document.)
9  Q.  Big notebooks are not easy to work with.
10  A.  I haven't been around this much paper in a long time.
11  Q.  My team always gives me grief because I don't like those
12  big notebooks.
13  A.  I might agree with them, but...
14                  (Laughter)
15  BY MS. WILKINSON:
16  Q.  Okay.  Go to page 15 or 017 on the PX number, and do you
17  recall you and Mr. -- sorry -- Mr. Weingarten reading the
18  differentiated content section?
19  A.  I do.
20  Q.  And it talked about exclusive to the service
21  differentiates relative to other services?
22  A.  I do.
23  Q.  Turn to I think it's page 002 of that same document or the
24  e-mail that is attached to it.
25  A.  (Witness examines document.)

431

1  Q.  In the section where we just looked, where you were
2  talking about differentiated content, did you mean to suggest
3  to anyone that you would always have your content exclusive to
4  Xbox?
5  A.  I did not.
6  Q.  And if you look at the value drivers and you go back to
7  game -- down to "Game transactions," what does it say there?
8  A.  It says (as read):
9      "We will continue to sell acquired games and
10      franchises across all gaming platforms.  Previously
11      unavailable titles on Xbox will be brought over to the
12      platforms for additional monetization opportunities."
13  Q.  Keep going.
14  A.  Do you want me to keep going?
15  Q.  Yes.
16  A.  (as read):
17      "And future titles will no longer observe a delay on
18      launching on Xbox."
19  Q.  Okay.  So explain why in the differentiated content
20  section you're talking about exclusives, how do you reconcile
21  with the idea that you're still going to sell many of your
22  games cross-platform?
23  A.  Yeah, the area that Mr. Weingarten and I were looking at
24  was a specific Game Pass area, not the overall strategy for
25  running our gaming business.

1  Gaming subscriptions are really differentiated based on
2  the platforms that's there. The highest value driver in the
3  gaming business are the hit franchises, and expanding the reach
4  of the franchises that you have is critically important to our
5  success.
6      MS. WILKINSON: All right. I just want to cover two
7  more topics, Your Honor. Is there a time when you want to take
8  a break?
9      THE COURT: Why don't we do it when you finish.
10     MS. WILKINSON: Okay. Great.
11 BY MS. WILKINSON:
12  Q.  I want to talk to you about your competitors and where you
13 think the market is. Okay?
14  A.  Yes.
15  Q.  You got asked a lot of questions and were shown a few
16 documents about whether -- well, the implication was that
17 Nintendo is not one of your competitors; right? That was the
18 implication?
19  A.  That was -- that was what was put forward, yes.
20  Q.  Is that true?
21  A.  In my mind, it is not.
22  Q.  And do you get weekly reports on unit volume and share of
23 Gen 9 hardware that even includes Nintendo?
24  A.  I do.
25  Q.  Take a look at RX5046.

1  A.  Is this in the smaller book?
2  Q.  Yes.
3  A.  Okay. RX5 --
4  Q.  Do I need to hand this up? Hold on. That's one we didn't
5  have an extra.
6  A.  Okay.
7      MS. WILKINSON: Can I hand it to Mr. Spencer,
8  Your Honor?
9      THE COURT: You may.
10 BY MS. WILKINSON:
11  Q.  Do you recognize that?
12  A.  I do.
13  Q.  Is that dated 3-17-2021?
14  A.  Mine says January 11th, 2023.
15  Q.  Okay. That's not the right document. Sorry.
16     This is the right document. I'm just going to give you
17 the one I have. I must have taken --
18  A.  Unless I'm reading the wrong date.
19     THE COURT: You gave me a whole bunch of copies. Do
20 you want one?
21     MS. WILKINSON: Fine, Your Honor. Yes.
22     THE WITNESS: The December 5th, is that the --
23     MS. WILKINSON: No, that's not the right one.
24     THE WITNESS: Okay.
25     MS. WILKINSON: It's 3-17-21.

1          (Pause in proceedings.)
2  BY MS. WILKINSON:
3  Q.  Here you go. Sorry about that.
4  A.  That's okay.
5  Q.  Now it's PX5046 dated 3-17-2021?
6  A.  Yes.
7  Q.  And is this just one example of the weekly reports that
8  you get?
9  A.  It is.
10  Q.  Is it addressed to you?
11  A.  This one is, yes.
12  Q.  All right. We can't show this portion, but look at
13 page 2, and does that include -- does that show console volume
14 and share?
15  A.  It does.
16  Q.  And which consoles are included?
17  A.  Xbox Series X and S as one combined number, PlayStation 5
18 and Nintendo Switch.
19  Q.  And do you get regular reports on Nintendo Switch as well
20 as PlayStation 5?
21  A.  I get this report every week.
22  Q.  Okay. Now, up at the top, though, it says "Gen 9
23 Hardware." Is that actually a correct description of all of
24 these?
25  A.  It should say "Current Gen."

1  Q.  So explain that to the Court. What do you -- what's the
2  difference between "current generation" and "Generation 9" when
3  you're normally using those terms?
4  A.  "Generation 9" is very much an industry term. As a
5  customer, you're walking into the store because you want to buy
6  a video game console and there are three manufacturers on the
7  shelf. There's one from Nintendo, one from Sony, and two from
8  Xbox.
9      So when we think about the consumer's purchase decision,
10 they're walking into the store hopefully to buy a video game
11 console. They're almost certainly, if they're going to
12 purchase, they're going to purchase one; and once they purchase
13 that console, that's where their gaming activity would happen.
14 And if they purchase the Switch, they likely did not purchase
15 an Xbox. So I would see it as competition.
16  Q.  Counsel asked you about the differences between the Switch
17 and the Xbox. Do you think the differences he asked you about
18 make it a device that is not substitutable among your
19 customers?
20  A.  No, not at all. In fact, the weekly run rates of this
21 chart, this analysis, that I get continue to show Switch as
22 usually the number one selling console. The decisions that
23 Nintendo made on that console to make it portable, which was
24 really their first pure portable console that also plugs into
25 the television; and if you look at the big third-party games

436

1  that are successful on that platform -- Fortnite, FIFA, even
2  Minecraft -- they're the same or very -- they're the same
3  third-party games that are successful on PlayStation and Xbox
4  for the most part.  So people are playing the same third-party
5  games across Switch.
6        And as I said, the -- but the choices that Nintendo made
7  was obviously to put a screen on the device, to have a battery
8  inside, to make it dockable so that you can slide it into a
9  dock and the picture will then show up on your television if
10 you want to play --
11 Q.  Meaning --
12 A.  -- on the television.
13 Q.  Sorry.  Meaning it can act like a console?
14 A.  It can act like what you'd consider a television-based
15 console; but when you want to take it with you on the go, you
16 slide it out of the dock and you can continue to play their
17 games.  So --
18 Q.  Go ahead.
19 A.  So while we can analyze the graphical differences between
20 a Switch and a PlayStation or an Xbox, the design decisions
21 around the Switch were a console that would run on battery so
22 it has a power profile that's different.
23       They made different technical decisions to enable an
24 experience that they thought their customers would want to
25 have, and it's the best selling console right now in the

437

1  market.
2        So when I -- when people try to tell me it's not
3  competition -- competitive, for any number of reasons, I don't
4  believe that because I just look at what's selling.
5  Q.  And this, I hope is obvious, but the Switch has a screen;
6  right?  So you can carry it with you and see your game?
7  A.  Yeah, the Switch has a screen.
8  Q.  How about your Xbox?
9  A.  The Xbox is in the PlayStation, rely on being plugged into
10 an external screen like a television, yeah.
11 Q.  In your regular business, do you and Mr. Stuart track the
12 success of the Switch?
13 A.  We do.
14 Q.  Take a look at PX1145.  It's a December 4th, 2020, e-mail
15 from Tim to --
16       THE COURT:  Do you want to admit 5046?
17       MS. WILKINSON:  I do, Your Honor.  Thank you.
18       THE COURT:  And 3156?
19       MS. WILKINSON:  Yes.
20       THE COURT:  Both admitted.
21       MS. WILKINSON:  Yes, Your Honor.
22       (Trial Exhibits 3156 and 5046 received in evidence.)
23       THE WITNESS:  1145?
24 BY MS. WILKINSON:
25 Q.  Yes, in the small notebook.

438

1  A.  Oh, in the small.
2  Q.  It's our PX1145.
3  A.  (Witness examines document.)  I have RX in the small
4  notebook.
5  Q.  Okay.
6  A.  Is it --
7  Q.  Maybe it's in there.  I just pulled it out to use it for
8  us.
9  A.  Okay.
10 Q.  It is.  PX1145, which is in the big notebook.
11 A.  Okay.
12       (Witness examines document.)  Yes, I found it, the mail
13 from Tim to me.
14 Q.  Right.  You were discussing certain portions of this, but
15 I want to go to at the very top from Tim, and it says "Fourth
16 bullet."  Do you see that?
17 A.  I do.
18 Q.  It's not redacted.  What does that say?
19 A.  (as read):
20       "Fourth bullet:  Might be good to highlight that we
21       know we will likely be behind Switch and PlayStation 5 in
22       the holiday volume due to supply in addition to the comp
23       versus Xbox 360."
24 Q.  Why is the holiday season so important to look at?
25 A.  A majority of console sales are done in the -- in a

439

1  Northern American holiday period of December.  So it's a -- in
2  that quarter, which is Microsoft's Q2, it's our largest selling
3  console quarter by far, and same thing with PlayStation and
4  Switch.
5  Q.  Let's move to the other contention about the market that
6  the FTC has that it's U.S. only and not global.  Do you agree
7  with that?
8  A.  No.  Gaming is very much a global market.
9  Q.  Why?  Why do you say that?
10 A.  When you're building a platform, one of your primary
11 customers are the creators who are building games to run and
12 sell on your platform, and those creators are looking to reach
13 a global audience with the games that they are building.
14       So if you're going to offer a competitive and vibrant
15 platform for -- for creators, which is really the lifeblood of
16 this business, you need to be a relevant platform in all
17 markets where you find players.
18 Q.  Is that one of your goals as you develop new games at
19 Xbox?
20 A.  Yeah.  Yes, it is.  And as we work on Xbox's relevant --
21 relevance in different markets, it's important that we're
22 growing global share for Xbox because if you're one of the
23 world's biggest games, you're looking to make money off of our
24 game on the global market.
25 Q.  Again, this may be obvious, but if you have many more

440

1  customers buying your game, what does that do for cost purposes
2  when you spend hundreds of millions developing a game?
3  **A.**  If you're a third-party game, you're obviously, as we
4  talked about, capturing 70 percent of the revenue that you're
5  selling on our platform.  So if we're there talking to an
6  Electronic Arts or a Take-Two or a Ubisoft, kind of big
7  publishers of video games, they are looking at their global
8  business and the role that Xbox plays in their global business.
9       Even for us with our first-party games, as we look to
10  reach as many customers as possible, we know there are gamers
11  in Europe, there are gamers in Asia, there are gamers in
12  South America, North America, us being a relevant and vibrant
13  platform in all of those regions is very important.
14  **Q.**  With regard to first-party games or exclusive games for
15  the platform itself, does Sony have exclusive games?
16  **A.**  Sony -- yes.  Sony has a significant catalog of exclusive
17  games.
18  **Q.**  How does it compare to the number of exclusives you have?
19  **A.**  It's drastically larger, dramatically larger than what we
20  have on Xbox today, um, like multiples.
21  **Q.**  What about Nintendo?
22  **A.**  The same with Nintendo.  Both Sony and Nintendo's first
23  party today is stronger than Xbox's.
24  **Q.**  Is it fair to say, then, that exclusives are a part of the
25  video gaming business and everyone in the industry uses them

441

1  from time to time?
2  **A.**  Yes.  And it is an established part of the console
3  business, the video game business, and Sony and Nintendo are
4  very strong with their exclusive games.
5  **Q.**  Finally, transactions you've done before Activision, it
6  was suggested yesterday -- maybe it was inaccurate -- that you
7  have done several transactions since 2021; is that right?
8  **A.**  We've done one acquisition since 2021, which was ZeniMax.
9  **Q.**  And are you aware of whether Sony has done any
10  acquisitions either right before this acquisition was announced
11  or since you announced it?
12  **A.**  They've done a number of acquisitions even in the time
13  since we've announced this deal, the largest of which was
14  Bungie, which is a developer of many games; but one, a big one,
15  called Destiny, and I believe it was a $5 billion acquisition
16  that was announced about a month or so after we announced our
17  Activision acquisition.
18  **Q.**  Have you seen Sony make other competitive actions or
19  perhaps, you know, competitive responses since you've announced
20  the acquisition?
21  **A.**  Sony continues to sign exclusive third-party games.  As I
22  mentioned, one of those launched this week in
23  Final Fantasy XVI.
24       They've made investments in their cloud infrastructure
25  adding new features to their cloud capability as we've been

442

1  involved in this acquisition and the regulatory review of it.
2       They've acquired quite a number of studios in that time.
3  Yes, they continue to be very active and competitive in the
4  market.
5  **Q.**  Let's use Final Fantasy XVI as an example.  Was that game
6  available at some point on Xbox?
7  **A.**  Final Fantasy XV, the prior version of Final Fantasy,
8  launched on Xbox and PlayStation day and date, and
9  Final Fantasy XVI has just launched for PC and PlayStation and
10  it skipped Xbox.
11  **Q.**  So if someone is on Xbox, they can't play
12  Final Fantasy XVI?
13  **A.**  Sony has an exclusive marketing deal for Final Fantasy XVI
14  so they're marketing it as a console exclusive given that it's
15  not available.
16  **Q.**  Is that a popular --
17  **A.**  -- on Xbox.
18  **Q.**  Sorry.  Is that a popular franchise?
19  **A.**  Final Fantasy is one of the biggest game franchises with a
20  long history.
21  **Q.**  What kind of game is it?
22  **A.**  It's a great role-playing game developed by a publisher
23  called Square Enix.  It's a Japanese publisher.  You can
24  imagine Final Fantasy XVI, there have been 16 versions,
25  actually a couple more, of Final Fantasy and it is one of the

443

1  kind of historic video game franchises.
2  **Q.**  We talked about how you tried to engage with Sony and
3  provide offers and counteroffers.  I want you to look at RX2170
4  in the smaller notebook.
5  **A.**  RX2170.
6       (Witness examines document.)  Yes.
7  **Q.**  And I don't expect you to memorize this, but do you know
8  that around December 23rd, 2022, Ms. Bond and others sent this
9  to Sony?
10  **A.**  I do.
11       **MR. WEINGARTEN:**  I'm sorry, Beth, I don't have that.
12       **MS. WILKINSON:**  Here you go.  Sorry.
13       **MR. WEINGARTEN:**  Thank you very much.
14       **MS. WILKINSON:**  Of course.
15  **BY MS. WILKINSON:**
16  **Q.**  We're not going to discuss the details because it's under
17  seal, but I believe it's public.
18       What term have you offered for the Call of Duty franchise
19  to remain on PlayStation?
20  **A.**  A ten-year term.
21  **Q.**  And do you have any other games where you've promised to
22  be on -- put your game on another platform for ten years?
23  **A.**  Call of Duty on the Switch, on Nintendo's platform.  We've
24  made the commitment for Call of Duty on both Sony and Nintendo.
25  Nintendo has accepted the -- that offer.  Sony has not.

444

1  Q.  Any others?

2  A.  Some of our cloud streaming deals that I think Sarah went

3  through, but not a traditional gaming console.

4  Q.  Generally do you even make an independent financial

5  commitment for a term of years when you're putting a game on

6  someone else's platform?

7  A.  We do not.  As I was stating earlier, that we ship games

8  on other platforms on a per-title basis only when we're doing

9  something unique from a marketing or distribution standpoint

10  where we usually have independent deals.

11  Q.  And despite your lack of success, do you still hope that

12  you and Sony will come to an agreement so you can keep Call of

13  Duty on PlayStation?

14  A.  I do.

15      MS. WILKINSON:  That's all I have, Your Honor.

16      THE COURT:  All right.  Why don't we take -- do you

17  want to admit 2170?

18      MS. WILKINSON:  Yes.

19      THE COURT:  Admitted.

20      (Trial Exhibit 2170 received in evidence.)

21      THE COURT:  We'll take a 10-minute break.

22      (Recess taken at 2:18 p.m.)

23      (Proceedings resumed at 2:29 p.m.)

24      THE CLERK:  Court is now in session.

25      THE COURT:  Okay.  Mr. Weingarten.

445

1      MR. WEINGARTEN:  Before I begin, Your Honor, I just

2  want to say I'm going to move as quickly as I can because we

3  have a third party, a Google witness, and I want to make sure

4  this person gets on and off today for their convenience.  So is

5  it possible we might be able to stay past 3:00 for a little?

6      THE COURT:  Is that okay with you, Ms. Knox?

7      MR. WEINGARTEN:  I'll go slower.

8      THE COURT:  Do you have --

9      THE OFFICIAL REPORTER:  Yeah, as long as you're not --

10     MR. WEINGARTEN:  Okay.  Thank you, Your Honor.

11     THE COURT:  All right.

12     MR. WEINGARTEN:  I'll try to be efficient but not talk

13  too fast.

14     THE OFFICIAL REPORTER:  Thank you.

15     THE COURT:  Okay.

16     MR. WEINGARTEN:  I'm sure the witness appreciates

17  that.  Thank you.

18              REDIRECT EXAMINATION

19  BY MR. WEINGARTEN:

20  Q.  Okay.  Mr. Spencer, you were asked a little bit about

21  whether you could promise here in court that you would ship on

22  PlayStation 5, and the judge asked you a question, and you

23  later clarified it's not just about PlayStation 5, it's about

24  all the versions.

25      So can you swear under oath that without looking at any

446

1  future terms that need to be hashed out, you'll ship all the

2  versions of Call of Duty that may exist -- on all the versions

3  of PlayStation that may exist in the next ten years?

4  A.  That's my goal, yes.

5  Q.  Well, that's your goal, but can you swear without

6  reviewing terms -- let me back up a second.

7      Before an agreement is made to ship a game like Call of

8  Duty on PlayStation, there's a lot of terms in a contract like

9  that; right?

10  A.  No, not usually.  Usually when we ship a game on a

11  platform, it falls into our publishing licensing agreement.

12  Q.  Well, Ms. Wilkinson showed you RX2170, which is this

13  proposal from Microsoft to PlayStation.  So it's not about Call

14  of Duty.  So it's not just going to fall under the usual

15  Microsoft PlayStation agreement; right?

16  A.  Well, it could have; but as part of us getting passed into

17  this regulatory review, it has been asked that we make a future

18  commitment for a game that we don't own on future development

19  so that is when we end up into an agreement.

20  Q.  Okay.  And this agreement, have you ever seen it before?

21  A.  I haven't read the full agreement.  I know the pertinent

22  deal terms.

23  Q.  Okay.  And are you responsible for negotiating this

24  agreement with Sony?

25  A.  I am not.

447

1  Q.  All right.  And this agreement has a lot of terms and a

2  lot of provisions, and there's been some back and forth with

3  Sony about it; right?

4  A.  There has.

5  Q.  And redlines?  You know what a redline is?

6  A.  I do.

7  Q.  And those have gone back and forth between Microsoft and

8  Sony?

9  A.  They have.

10  Q.  Okay.  And so when you say you swear under oath that

11  you'll ship Call of Duty on all the future versions of

12  PlayStation, you mean after you reach agreement, I assume, on a

13  contract like this one?

14  A.  My goal is that we would -- we would ship Call of Duty on

15  all future versions of PlayStation.  I don't own the future

16  versions of PlayStation nor can I even dictate there are future

17  versions of PlayStation.  So I -- I just want to understand

18  exactly the question that you're asking.

19      I answered Your Honor's question.  I tried to completely.

20  Q.  So my question, I'm just trying to understand:  Can you

21  swear under oath that you can promise that you'll ship Call of

22  Duty on PlayStation, all the future versions, whatever they

23  might be, for ten years without knowing what the terms are that

24  the parties are going to agree to?

25      THE COURT:  No, that's not true.  It's not going to be

448

1  for zero dollars.

2  **MR. WEINGARTEN:** I appreciate -- exactly, Your Honor.

3  **THE COURT:** Well, no, that was understood.

4  BY MR. WEINGARTEN:

5  Q.  Well, somewhere between, Mr. Spencer, a zero and another

6  amount, you guys have to reach agreement on a lot of different

7  terms before you'll be able to promise and have Call of Duty

8  move onto PlayStation; correct?

9  A.  We do not have to agree -- we do not have to reach

10  agreement to ship most games on PlayStation, like Minecraft

11  Legends.  We just announce that we are able -- that this game

12  is coming, and the PlayStation team accepts that as part of

13  their portfolio.

14     So in answering the question, I have in my head a

15  framework that we know how to ship games on PlayStation and

16  what the standard business terms are.

17     If what you're try to propose is that Sony might offer or

18  change the standard business terms of how we ship products on

19  their platform, then, yeah, I think that would -- that would

20  prohibit us from shipping on their platform.

21  Q.  And this agreement RX2170, to the extent you looked at it,

22  is not the Microsoft standard Sony agreement?  It's a brand new

23  one; right?

24  A.  Sony is asking for significant commitments beyond the

25  standard shipping of the game on the platform that has caused,

449

1  as you said, the deal to go back and forth even though we know

2  how to ship games at parity on PlayStation, which we do on a

3  regular basis.

4  Q.  Okay.  Would you make the same promise with respect to all

5  of Activision's content?

6  A.  I was asked specifically about Call of Duty, which is

7  the -- I can't -- no.  Activision ships games on mobile, on

8  many different platforms.  They have some PC-only games, like

9  World of Warcraft.  I don't think there's a blanket statement

10  you can make for Activision Blizzard King content on

11  PlayStation.

12  Q.  What about Diablo?  Can you promise you'll ship on all

13  future versions on PlayStation?

14  A.  Can I promise?  I am able to promise, yes.

15  Q.  Are you able to bind Microsoft today?  Are you able to

16  bind the corporation here today?

17  **MS. WILKINSON:**  Objection, Your Honor.  This is

18  argument.

19  **MR. WEINGARTEN:**  I think the point has been made.  I'm

20  happy to move along, Your Honor.

21  **THE COURT:**  Why don't we move along.

22  **MR. WEINGARTEN:**  All right.

23  BY MR. WEINGARTEN:

24  Q.  You talked with Ms. Wilkinson a lot about free to play and

25  mobile and changes in the industry; right?

450

1  A.  I did.

2  Q.  Okay.  And you looked at a deal value -- valuation model

3  that Microsoft put together for Activision; right?

4  A.  We did.

5  Q.  Okay.  And the mobile-related synergies in that model,

6  they were a small portion of the total value; correct?

7  A.  No, I don't believe that's true.

8  Q.  Okay.  Can you look at RX1093, please?

9  A.  (Witness examines document.)

10  Q.  I'm sorry.  Let's do 1156, please.

11  A.  Still RX?

12  Q.  Yes, sir.

13  A.  (Witness examines document.)  I have it.

14  Q.  Look at the number that says "Total Value to Microsoft."

15  Do you see that?

16  A.  Sorry.  On what page are you on?

17  Q.  I apologize.  013.

18  A.  013.  Sorry.

19     (Witness examines document.)  Yes.

20  Q.  Okay.  And that is the value to Microsoft that's been

21  calculated in the model; right?

22  A.  It is.

23  Q.  Okay.  And there's a total number in the bottom right

24  corner?

25  A.  There is.

451

1  Q.  And one of the rows says "Mobile Store" and there's a

2  value there; right?

3  A.  For mobile store, yes, there is.

4  Q.  And there's a -- and that's the only value that's

5  attributed to scaling the Xbox store to mobile; right?

6  A.  That's the only store value.  You asked me if that was the

7  only mobile value.

8  Q.  Okay.  That's the only value attributable to this idea of

9  unlocking the duopoly that you were talking about on phones?

10  A.  That is the only store value, yes, of being able to sell

11  games on the phone.

12  Q.  Okay.  So the whole thing you were talking about where

13  there's iPhone and Google and their stores and you were talking

14  with Ms. Wilkinson about a plan that if this deal goes through,

15  Microsoft wants to become a new store on mobile phones;

16  correct?

17  A.  That's correct.

18  Q.  Okay.  And the value, if that happens, let's calculate it,

19  is that number on the -- one, two, three -- fourth row down;

20  right?

21  A.  That is where we've captured the value, yes.

22  Q.  Okay.  And that number compared to the total number is not

23  half; right?

24  A.  Your original question was -- sorry.  Yes, that is not

25  half of the other number.

452

1    Q.   Sorry for the vagueness. I'm trying to talk around it.
2         You talked about how you have these commitments to the
3    board, and Ms. Wilkinson suggested that somehow we're
4    suggesting you would lose money on your synergies. And
5    I believe you said it was critical to deliver to the board on
6    your commitments; right?
7    A.   Yes.
8    Q.   Okay. Was it critical to deliver to the board on your
9    commitments in the ZeniMax deal?
10   A.   Yes.
11   Q.   But you took Redfall exclusive; right?
12   A.   We did.
13   Q.   And you took Starfield exclusive; right?
14   A.   We haven't shipped but, yes, it will be exclusive.
15   Q.   And the deal model that had the commitments for ZeniMax
16   that went to the board did not show those titles going
17   exclusive, did it?
18   A.   It did not have Redfall in the deal model at all.
19   Q.   Okay. You talked about Call of Duty mobile -- and this is
20   getting back to your point about mobile -- and how there were
21   benefits to Microsoft from getting all the learning that
22   Activision had about building Call of Duty for mobile; right?
23   A.   No. I said from running Call of Duty on mobile --
24   Q.   Okay.
25   A.   -- and having the engagement. It wasn't built by

453

1    Activision.
2    Q.   Okay. Let's get that out.
3         So Activision didn't actually build Call of Duty mobile,
4    did they?
5    A.   No. They own it, but they did not build it. They had an
6    external developer build it.
7    Q.   They had to pay someone else to handle building Call of
8    Duty mobile?
9    A.   They would have had to pay their own employees if they
10   would have built it as well.
11   Q.   I appreciate that, but they actually paid someone else to
12   build Call of Duty mobile; right?
13   A.   Yep, they paid a company to build Call of Duty mobile.
14   Q.   Okay. You talked about Ms. Hood and you said, "If I don't
15   meet my margins, she doesn't give me more money." Something
16   like that; right? She runs your business pretty strictly?
17   A.   She requires that we run our business pretty strictly,
18   yes.
19   Q.   Okay. But your business is not necessarily meeting your
20   internal targets today; right?
21   A.   It is not right now, no.
22   Q.   And I believe you testified earlier and we talked about
23   you have a view that the business is not strong in a general
24   sense; right?
25   A.   Today being with the majority of our business residing as

454

1    the third place console business, we are not a robust business,
2    yes.
3    Q.   But Ms. Hood approved a $70 billion acquisition for your
4    business; right?
5    A.   The board approved the $70 billion acquisition.
6    Q.   Okay. So despite the weaknesses you've described, you got
7    a $70 billion approval?
8    A.   The approval -- the deal, as we've talked about, expands
9    our business to the mobile platform to help us specifically for
10   the reason that you're talking about; that the existing
11   business that we run today as the third-party place console
12   business is a very difficult business to drive profit and
13   margin. So the opportunity for us to expand into a meaningful
14   way onto mobile, the world's largest gaming platform, was
15   really the both strategic and business opportunity behind this
16   deal. So, yes, exactly.
17   Q.   Okay. So you're paying $70 billion for a mobile business?
18   A.   The business is across mobile, PC, and console; but when
19   you think about the unique capability relative to what our
20   business has today, it's really the mobile engagement and
21   business that Activision drives.
22   Q.   Okay. You talked about in the commitments that you have
23   the discretion to decide how Microsoft Gaming is going to meet
24   those commitments; right?
25   A.   To some extent.

455

1    Q.   Okay. So, for example, you have latitude to make
2    decisions about how you think Microsoft Gaming can best compete
3    and still hit numbers that the board was presented; right?
4    A.   To some extent, yes.
5    Q.   And if you could make a decision that would benefit
6    Microsoft and harm Microsoft's competitors in any of the
7    markets we've been discussing, that would be good for Microsoft
8    Gaming's numbers; right?
9    A.   We are trying to compete in the market by growing our
10   business. Some of our business growth is obviously growth that
11   our competitors would like to have. So in the end, our growth
12   probably somewhere comes from some of our competitors not
13   realizing that growth themselves.
14   Q.   Okay. Great.
15        We talked about you said, "You know, we didn't model share
16   shift," when you were doing the model for the board; right?
17   A.   That is accurate, we did not model any console share shift
18   in the deal model.
19   Q.   But the question I just asked you makes it pretty clear
20   that if Microsoft is going to grow, particularly in a business
21   like console, then it can grow by taking share from its
22   competitors. That's how it would grow?
23   A.   There's no console growth in our deal model.
24   Q.   I understand, but do you have any intention of this deal
25   helping you climb out of the number three spot?

456

1  A.  In console we do not.

2  Q.  Okay.  So that's just a write-off?

3  A.  I don't understand how it's a write-off.

4  Q.  Okay.  You said you have a cordial relationship with Sony

5  and a good relationship when it comes to being partners on

6  games shipping on Sony platforms?

7  A.  We do.

8  Q.  Okay.  But previously we saw some of the e-mails where you

9  were talking about withholding certain versions of Minecraft

10  from Sony; right?

11  A.  We did.

12  Q.  That's part of the same relationship?

13  A.  We -- part of the same relationship.  We have a

14  multifaceted relationship with Sony.  As I've stated, we have

15  probably 50 games in their store.  There are ongoing

16  conversations about the updates and monetization of all of

17  those games that we have; and with any partner, there's some

18  areas where we agree and some areas where we disagree on

19  per-title work that we should do.

20  Q.  And it's a multifaceted relationship because in the one

21  facet you provide content that goes onto Sony platforms; right?

22  A.  Yes, we do.

23  Q.  And in another facet, you're a competitor to Sony, for

24  example, in selling consoles or subscription or cloud?

25  A.  Yes.

457

1  Q.  You talked with Ms. Wilkinson quite a bit about Minecraft.

2  I just want to still be clear.

3      The version of at least one of the Minecraft titles that's

4  on the PlayStation 5 was not optimized for PlayStation 5;

5  correct?

6  A.  That is correct.  All three versions of Minecraft that we

7  launch are available on the PlayStation 5.  The recent one is a

8  PlayStation 5 optimized game.  The oldest of the three, which

9  is now over ten years old, has not yet been upgraded for the

10  PlayStation 5 but is completely playable on the PlayStation 5.

11  Q.  I appreciate that.  So PlayStation 5 has backwards

12  compatibility so you can play your PS4 game on PlayStation 5;

13  right?

14  A.  You -- yes, you can.

15  Q.  Okay.  But Xbox got the optimized Gen 9 versions of all

16  Minecraft titles; right?

17  A.  It's the same discussion we had.  We started our own

18  development kits for that platform when we had access to them.

19  We did not get access to the Sony development kits in time to

20  hit their launch with the upgraded version of Minecraft.

21  Q.  Okay.  Did you communicate to Mr. Leder in the fall of

22  2021 that all future ZeniMax titles would be exclusive to the

23  Xbox ecosystem?

24  A.  I don't remember communicating to Mr. Leder in 2021 that

25  that would be true.  It's not true.  We just shipped our

458

1  biggest update to ESO, Elder Scrolls online, this year on

2  PlayStation, which is one of our ZeniMax studios.  So if I said

3  it, it factually isn't true because we're continuing to ship

4  games on PlayStation.

5  Q.  Well, I appreciate that's an update, but the new titles.

6  A.  It's not actually an update.  It's a new content addition

7  to an existing multi -- massively multiplayer game.

8  Q.  You were here in the courtroom when we saw some of the

9  conversation and chats that Ms. Lawver was having; right?

10  A.  I was.

11  Q.  Okay.  And were she and Mr. Stuart just wrong when they

12  were chatting about you having told Mr. Leder that all future

13  titles would be exclusive?

14  A.  They're factually wrong because we continue to ship games

15  on PlayStation.

16  Q.  Were they wrong that you said that?

17  A.  I don't know.  I don't remember saying that.  If we have a

18  chat stream or a deck that I created where it says that, I

19  could review it.

20  Q.  Uh-huh.  Ms. Wilkinson towards the end was talking about

21  the competitor set, and you were talking about how you think

22  it's incorrect to say that Nintendo is just not a competitor;

23  right?

24  A.  I do think that's incorrect.

25  Q.  Right.  But let me ask you this:  As between PlayStation 5

459

1  and the Nintendo Switch, who's the closer competitor to the

2  Xbox series?

3  A.  The PlayStation 5 and Xbox series got shipped at the same

4  time, don't have a screen, aren't able to be taken on their

5  own.  So from a form factor perspective, those two kind of

6  functionally look more equivalent.

7  Q.  Well, even just aside from functionally looking more

8  equivalent -- even putting aside form factor -- which you would

9  agree is radically different between these devices; correct?

10  A.  The Switch is radically different than the other ones,

11  yes.

12  Q.  Even putting aside form factor, would you agree that the

13  PlayStation 5 is a closer competitor to the Xbox series

14  consoles than the Switch?

15  A.  I don't know how you're defining "closer."

16  Q.  Okay.  Ms. Wilkinson showed you RX5046.  Can you please

17  look at RX5046?

18  A.  (Witness examines document.)

19      I think it was a loose piece of paper.  Sorry.

20  A.  Sorry.  Those --

21  Q.  This gaming data service is one.

22  A.  Yeah.  I have two of them.  If you can give me the date.

23  Q.  Yeah.  Sorry.  It's the one that says "5046" on the bottom

24  and the date is March 17, 2021.

25  A.  Got it.  Thank you.

1  Q.  Yep. And there's a box that we're not going to talk about
2  the numbers, but it's a chart?
3  A.  Yes.
4  Q.  Ms. Wilkinson talked about how the chart shows all three
5  groups; right?
6  A.  It does.
7  Q.  And you corrected the chart. You said the chart should
8  not be called "Gen 9 Hardware." It should be called "Current
9  Generation Hardware"; right?
10  A.  I think that would more accurately track what it's
11  showing, yes.
12  Q.  Because "Generation 9" is an industry term that would not
13  apply to the Switch; right?
14  A.  It's just an industry term that I don't think most
15  consumers recognize as part of their decision-making process.
16  Q.  I appreciate that. That was not the question.
17  A.  Sorry.
18  Q.  The question was: It shouldn't say "Gen 9" because Gen 9
19  is not applicable to the Switch; right?
20  A.  When I was answering that question, I was answering more
21  from a forward-looking market perspective. I was not answering
22  it based on the criteria you're giving me right now.
23  Q.  I'm sorry?
24  A.  I'll say it again. I think of it as the current products
25  that are in the market. This is a weekly run rate of console

1  sales, I believe, in the U.S. market but could be global, I'd
2  have to look at it, that shows me how the different consoles
3  are selling in the market.
4      So I don't think it's a breakdown by generation. I think
5  it is consumer activity in the market so I use the word
6  "current" to reflect what currently is selling.
7  Q.  Do you believe the Gen -- that the Switch is a Gen 9
8  console?
9  A.  I do not.
10  Q.  Okay. And I appreciate you calling it out.
11     The title page on 5046 is the U.S. weekly call down;
12  right?
13  A.  This one is U.S., yes.
14  Q.  You get regular reports on what's going on in a market
15  that is geographically the United States; right?
16  A.  I get many different reports. I'm just saying the one
17  that you're showing me here is a U.S. -- happens to be a U.S.
18  report.
19  Q.  Okay. And, interestingly, we talked about with
20  Ms. Wilkinson how the Switch outsells by a fair margin in terms
21  of volume here the PlayStation 5 and the two series put
22  together; right?
23  A.  It does.
24  Q.  But they're listed with Series X and S first because
25  that's your product; right?

1  A.  I don't know why it's listed first.
2  Q.  Well, that's your product; right?
3  A.  It is our product. Sorry. Yes.
4  Q.  Okay. And then comes PlayStation 5 next in the list;
5  right?
6  A.  Yes.
7  Q.  And then comes Switch at the bottom of the list even
8  though they're the number one seller.
9      You don't give any -- there's no significance to the fact
10  that your reporting is Xbox Series X, S, then PlayStation 5,
11  and then Switch?
12  A.  This report comes -- my understanding is it comes from a
13  third-party data source and gets translated by our data team to
14  us. I have no idea the significance of the order. As you
15  said, it happens that the largest share console happens to be
16  the third one listed in the list, but I do not know why that
17  is.
18  Q.  Okay. When you talked with Ms. Wilkinson, you talked
19  about at the very end Final Fantasy XVI, and I believe
20  there's -- you talked about how you think there's a marketing
21  deal between Sony and the company that makes Final Fantasy XVI;
22  right?
23  A.  Sony is marketing the game as a console exclusive.
24  Q.  Okay. And I believe you've testified in the past that as
25  head of Gaming for Xbox, you just can't afford to make those

1  kinds of upfront payments to compete with Sony on exclusives;
2  right?
3  A.  It is more expensive -- yes, it is more expensive for us
4  to pay somebody to not ship on PlayStation than it is for Sony
5  to pay somebody to not ship on Xbox.
6  Q.  It's economically difficult for you to make an upfront
7  payment like that that you think the way Sony can?
8  A.  Yes. Given our share position in the market as the third
9  place, paying somebody to skip the console that has twice the
10  market share of us is more expensive.
11  Q.  Now you have $70 billion upfront payment that you're
12  making to Activision; right?
13  A.  No. When you acquire something, it's not a payment. It's
14  actually you're -- you're taking -- it's like when you buy a
15  house, that you don't -- you're buying an asset that has value.
16  So it is really a transfer of cash into an asset called
17  Activision that you believe retains the value that you
18  acquired.
19      So to try to characterize the $70 billion as somehow spent
20  is incorrect financially. It's really moving $70 million [sic]
21  in cash into an asset, which is a game publisher, that you
22  believe to us is actually worth more than $70 billion. So it
23  is not spent.
24  Q.  Well, presumably when Sony spends money on exclusive with
25  Final Fantasy XVI, it's at least in part because there's some

464

1  brand effects that will come from having such an exclusive;
2  right?
3  A.   Yes.  When you do those deals like us on an operating -- a
4  P&L for a business, a profit and loss statement, for a year,
5  the cost of those deals hit your P&L when you spend the money
6  to pay for exclusivity.  They do for us.  I presume Sony runs
7  with the same accounting practices.
8       When you acquire an asset, it is not a profit-and-loss
9  transaction as.  It is a balance sheet transaction.  I'm not an
10  accountant so everything I learned was from Jamie Lawyer, who
11  we had earlier.  But it is not the same when you're paying
12  in -- in on P&L as opposed to when you're acquiring something.
13  Q.   So the $70 billion that's being spent by Microsoft for
14  Activision in your view is not about $70 billion going out the
15  door?  It's about acquiring an asset that will have enduring
16  value to Microsoft?
17  A.   Yes.  Presumably after you acquire it, the asset still has
18  $70 billion in value that you could potentially sell.
19  Q.   We saw the number about the value in the board deck;
20  right?
21  A.   We did.
22  Q.   And that number is bigger than 70 billion; right?
23  A.   That number is the value to Microsoft, not what we're
24  spending in the market.
25  Q.   It's quite larger than 70 billion; right?

465

1  A.   As a -- yes, it is.  As a company, when we're going to put
2  that much capital, $70 billion, into the market, the company is
3  going to look to make money on the money it spends so there
4  would be no reason to look at the transaction if the value to
5  Microsoft was equal or less than what we were spending.
6       MR. WEINGARTEN:  Okay.  Let me just check with my
7  colleagues, Your Honor.  If I may have one minute.
8       (Pause in proceedings.)
9       MS. WILKINSON:  I have nothing, Your Honor.
10      MR. WEINGARTEN:  Oh, wait.  Okay.  I just have one
11  more.  Sorry.  I haven't finished yet.  You might.
12  BY MR. WEINGARTEN:
13  Q.   Just going back to the commitment -- not to try anyone's
14  patience here -- the commitment you made when the Court asked
15  you a question.  That was about consoles when you answered;
16  right?  You talked about PlayStation 5?
17  A.   I think you asked me about PlayStation.
18      THE COURT:  I think so.
19      THE WITNESS:  Yeah.  I was trying to answer.
20  BY MR. WEINGARTEN:
21  Q.   Are you going to make the same commitment under oath with
22  respect to cloud?
23      THE COURT:  What cloud?
24      MR. WEINGARTEN:  Sony's cloud, that you would ship
25  Activision, Call of Duty --

466

1       THE COURT:  I don't think that's it.  I'm going to cut
2  off the question there.
3       MR. WEINGARTEN:  Thank you, Your Honor.
4       THE COURT:  Okay.
5       All right.  Mr. Spencer, you may step down.
6       (Witness excused.)
7       THE COURT:  All right.  We have another witness, our
8  last witness and a short witness everyone promised, for today.
9       MR. WEINGARTEN:  Your Honor, the FTC calls
10  Mr. Dov Zimring.  My colleague Cem Akleman will be examining.
11      THE COURT:  All right.
12      THE CLERK:  Please raise your right hand.
13                  DOV ZIMRING,
14  called as a witness for the Plaintiff, having been duly sworn,
15  testified as follows:
16      THE CLERK:  Please state your name for the record.
17      THE WITNESS:  Dov Zimring.
18      THE CLERK:  Thank you.
19      THE COURT:  Thank you for waiting today.
20              DIRECT EXAMINATION
21  BY MR. AKLEMAN:
22  Q.   Good afternoon.  Mr. Zimring.
23       Are you currently employed at Google?
24  A.   Yes, I am.
25  Q.   How long have you worked at Google?

467

1  A.   13 years.
2  Q.   And what's your current position?
3  A.   I'm a product director in core, which is an internal team
4  within Google.
5  Q.   And how long have you worked in the tech industry?
6  A.   Over 25 years now.
7  Q.   Prior to your current position, what was your position at
8  Google?
9  A.   For roughly the last decade I worked on Stadia.  I was the
10  first employee on Stadia, and I was there from the very
11  beginning to the very end.
12  Q.   And what was the title that you held in January of 2023?
13  A.   I was the product director for Stadia.
14  Q.   Have you ever worked on Google's mobile store application
15  called Play?
16  A.   No.
17  Q.   What was Stadia?
18  A.   Stadia was a cloud gaming service developed by Google.
19  Q.   What's a cloud gaming service?
20  A.   So cloud gaming is intended to offer consumers the ability
21  to enjoy entertainment, interactive entertainment, without the
22  need for physical devices.  So enabling game play on any
23  connected screen.
24  Q.   Can you describe some more of the features of a cloud
25  gaming service?

468

1  A.  Certainly.  The -- at least with respect to Stadia, the
2  intention was to provide access to the best games that existed
3  in the market, and over time games that could not be built on
4  legacy console or PC architectures.  So games that could take
5  advantage of the data center as sort of the creative canvas for
6  the game developers.
7      Features included just the ability to click to play so you
8  wouldn't need to wait for long downloads or have physical
9  media, or anything like that, and associate that with any
10 particular screen.  So similar to the way we enjoy music and
11 movies today, the ability to enjoy content that is interactive
12 on any connected screen.
13 Q.  Okay.  So a gamer wouldn't need to download a game?  They
14 can play it instantly, is that --
15 A.  Correct.
16 Q.  What are some of the devices that a cloud gaming service
17 can stream to?
18 A.  Ideally any device that is capable of playing back video
19 should be eligible for enjoying cloud gaming.  So any type of
20 connected screen, be it a TV, a mobile device, a tablet, PC.
21 Q.  A gaming console?
22 A.  Certainly could, yes.
23 Q.  I have a few questions about how the cloud gaming servers
24 work.
25     Where -- it may be helpful to explain sort of how the data

469

1  gets from a cloud gaming server to a device.
2  A.  So in -- in a typical cloud gaming architecture, the one
3  Stadia implemented, the game is rendered -- the image is
4  rendered on a server in a data center ideally close to end
5  users, and it's streamed.
6      So we take a rendered sequence of images, package them to
7  carry them over a network, and stream them to a consumer's
8  device, and a consumer only needs a decent internet connection
9  and a screen.
10     And the consumer's interactions might be mouse and
11 keyboard or a game pad, anything like that, would go in the
12 opposite direction back to the server to enable the
13 interactivity and update the imagery that's streaming down.
14 Q.  You said "ideally close."  Why ideally close?
15 A.  So in any type of network, the further away the data
16 center is from a consumer, the more latency will exist in the
17 connection.  Gaming, especially at the highest ends of gaming,
18 is a very latency-sensitive form of entertainment.  So the
19 lower the latency, the better the experience.
20 Q.  Okay.  So a closer server means lower latency?
21 A.  Correct.
22 Q.  Could a user in the United States use a cloud game
23 streaming server that's based, for example, in Europe?
24 A.  It's a far from ideal experience.  I think technically
25 that can work.  And, you know, economically somebody entering

470

1  the space might only want to have a single data center for the
2  whole planet, but the corresponding experience that consumers
3  would have would really be degraded relative to what they could
4  have if -- if the servers were much closer.
5  Q.  And that's for the latency reason you just described?
6  A.  That's correct.
7  Q.  Let's go back to Stadia.  When was Stadia launched?
8  A.  So there was a -- what we thought of as our public beta
9  was towards the end of 2018, what we called Project Stream.  We
10 announced the broader version for Stadia at the Game Developer
11 Conference in March of 2019, and Stadia was introduced as an
12 actual service in November of 2019.
13 Q.  And is Stadia still operating?
14 A.  No.
15 Q.  When did Stadia shut down?
16 A.  January 18th, 2023.
17 Q.  Were there any significant factors that led to --
18 contributed to Stadia's lack of success?
19 A.  I believe so.  In my opinion, the primary factor was our
20 ability to have sufficient content breadth.  So the number of
21 games that were on the platform as well as depth.  The
22 Blockbusters.
23     You know, at a certain time I think that was part and
24 parcel to us being able to have a healthy two-sided market that
25 would have enough players interested and enough publishers

471

1  interested to have a long-term viable product.
2  Q.  Okay.  We'll come back to content, but I want to ask a
3  couple questions about sort of the technical makeup of Stadia.
4      Was the -- from a technical standpoint, was the cloud
5  gaming service that Google created, Stadia, was that a success?
6  A.  We believe so, yes.
7  Q.  Why?
8  A.  The -- I think there's different ways to answer that.  So
9  in my opinion, one factor is all of the qualitative testing
10 that we did.  So bringing -- bringing players into lab
11 environments and doing comparative testing of the experience
12 that they would have over, you know, something streamed from a
13 data center over a network versus the experience they would
14 have on a console or PC.
15     In establishing the -- the place where the experience was
16 console comparable, where they couldn't tell the difference,
17 what we would describe internally as the Pepsi challenge, in
18 most cases we succeeded with that.
19     As well, I think, there was lots of feedback from players
20 and publishers that we'd done a very good job on the tech, and
21 it was not a limiting factor in the experience.
22 Q.  How would you rate the technical capabilities of Stadia as
23 a cloud gaming service compared to other cloud gaming services
24 before Stadia shut down?
25 A.  To my knowledge, we had the best technology in the market.

472

1  Q.  Were there any metrics that you used to compare Stadia to
2  other cloud game streaming services?
3  A.  Certainly.  So we use a measure known as mean opinion
4  score, and it's effectively a qualitative feedback measure of a
5  player's experience during a game.
6      Any Stadia consumer was able to provide that after a game
7  session.  That's also how we did our user experience research
8  internally.
9      And we had explored sort of competitive alternatives, just
10  a baseline where we stood.  With that measure, Stadia tended to
11  be superior.
12     As well, we had performance capabilities that weren't
13  common to -- or, to my knowledge, don't exist in the market
14  otherwise.  So, for example, 4K resolution, 10-bit color depth,
15  things that cloud gaming hadn't done before.
16  Q.  What about something like video quality?
17  A.  We believe the approach that we took to encoding and
18  delivering video was superior to alternatives that existed in
19  the market.
20  Q.  Was the latency of Stadia compared to other cloud game
21  streaming services?
22  A.  So, to the best of my knowledge, we on average have
23  superior latency, which means we'd have the lowest numbers.
24  That can depend on where you're taking the measurement.  So if
25  you're measuring right next-door to a data center, you have a

473

1  very low signal; but in terms of the number of data centers we
2  had in the markets that we were operating in, I believe on
3  average we delivered the best latency.
4  Q.  Okay.  Are you familiar with the term "technology stack"
5  in relation to Stadia?
6  A.  I believe so.
7  Q.  Can you explain what that is?
8  A.  So there's a layering from the underlying hardware that
9  may exist in a data center to operating systems and application
10  programming interface is sort of the middle parts to ultimately
11  what the games are themselves and what the games are running
12  on.  So the technology stack encompasses that totality from
13  hardware to game.
14  Q.  Okay.  I want to ask a few questions about Stadia's
15  technology stack.
16     Are you familiar with something called Linux?
17  A.  Yes.
18  Q.  What is Linux?
19  A.  Linux is an operating system.  It's -- at the lower layers
20  in the stack it is an open-source royalty-free operating
21  system.
22  Q.  Did Stadia use Linux?
23  A.  Yes, we did.
24  Q.  Is Microsoft Windows an alternative to Linux?
25  A.  Yes, it is.

474

1  Q.  And I think we're talking about the data centers where
2  Stadia was located.  Why did -- why didn't Stadia use Windows?
3  A.  We had prototyped on Windows early on, and we had done
4  both technical and commercial evaluations of the operating
5  system options.
6      So the mission we had established at the very beginning
7  was to enable revolutionary gaming experiences on any connected
8  screen.  For the experiences themselves to be revolutionary,
9  what that meant to us is we were enabling game developers to
10  create experiences we hadn't seen before in data centers.
11     And we saw Windows as limiting our ability to innovate in
12  that regard because we didn't have control over the operating
13  system and how game developers might ultimately express what
14  they were trying to do inside of the data center, as well as
15  the licensing fees were commercially untenable.
16  Q.  So you said you didn't have control over the --
17  A.  Yeah.
18  Q.  -- operating system.  What were the -- what would be the
19  downsides of not having control of the operating system?
20  A.  Our ability to get into the depths of the networking
21  stacks of what happens when a video frame is rendered and
22  delivered to the networking stacks, what would happen in the
23  multiplayer context when different game instances are trying to
24  talk to one another.
25     So all of those things are areas that we innovated both

475

1  above and beneath the operating system layer because we had
2  access to the open source, and that very much was a principal
3  choice we made in selecting Linux early on.
4  Q.  What about the price difference?  Is there any -- were
5  there any downsides from a licensing perspective in choosing
6  Windows?
7  A.  If I remember correctly, the Windows licensing cost would
8  have two X'd, so over doubled -- I'm sorry, it would have over
9  doubled our total cost of operating on -- on a hardware that
10  was equivalent to the 8th generation of consoles.  So like a
11  PlayStation 4 or an Xbox Series X.
12     And the Windows licenses on a per-CPU basis, what changed
13  in the industry between the 8th generation of consoles and the
14  current generation, like a PlayStation 5, is double the number
15  of CPU.  So that would have, again, doubled what was already --
16  what we saw as an untenable cost.
17  Q.  Thank you.
18     What is Vulkan?
19  A.  Vulkan is a graphics application programming interface.
20  So it sort of separates an underlying graphic accelerator or a
21  GPU from what a game or graphics-intensive application would
22  want to talk to, enabling a standard for the game to stand
23  upon.
24  Q.  And this is a Vulkan with a K?
25  A.  That's correct.

476

1  Q.  Did Stadia use Vulkan?

2  A.  Yes, we did.

3  Q.  And why did Stadia use Vulkan?

4  A.  So it at the time of selection, and if I remember

5  correctly it was somewhere in the 2015 to 2016 timeframe, the

6  only options in the industry were Microsoft's Direct xAPI,

7  which would have obligated us to be in the Microsoft ecosystem,

8  including with Windows, as I understood it, or what was then

9  known as Open GL, neither of which were going to work for what

10 we needed.

11     And in particular Open GL, which was an open standard, was

12 really more for mobile and just didn't have the performance

13 that high-end games required.

14     Vulkan was a new standard coming out of the same

15 committees that drove the standards for Open GL, and it -- the

16 intention was to enable an explicit API, so enabled very

17 high-performance interaction between something like the game

18 and the underlying GPU hardware.  We believe that was the most

19 effective path to enable -- to enable AAA gaming.

20 Q.  Okay.  I'd like to go back to content.

21     Are you familiar with the term "AAA game"?

22 A.  I believe so, yes.

23 Q.  What is that?  What is a AAA game?

24 A.  So the way I understand the term, the way we would use it

25 in Stadia, is referring to the largest games, which typically

477

1  have the highest production value and tend to be the

2  blockbusters in the industry at that point in time.

3  Q.  Did Stadia want AAA claims on its cloud gaming service?

4  A.  Very much so.

5  Q.  Why?

6  A.  All of our consumer research helped us understand that for

7  players to be interested in a new games platform, there needed

8  to be AAA games recent, you know, sort of the Blockbusters, if

9  you will, of the current time.  That was important to them

10 as a breadth of games to choose from.

11 Q.  Is it just AAA games that Stadia needed?

12 A.  I think of AAA games as providing the depth that players

13 expressed interest in and as well having breadth via what we

14 might refer to as AA or indie, that being independent games,

15 which would canvas more game developers and introduce more sort

16 of unique and bespoke content.

17 Q.  Did Google do anything to try and bring AAA games to

18 Stadia?

19 A.  Yes.  The -- we spent substantial energy creating a games

20 platform that the leading game developers could build for us.

21 So to bring their AAA content to the platform, providing them

22 the tools and resources they would need to accomplish that

23 technically.

24     As well, we knew commercial incentives would be required

25 for them to participate early on until we reached a certain

478

1  level of player participation for that to be in their best

2  interest.

3  Q.  Are you familiar with something called SG&E?

4  A.  I believe the acronym is referring to Stadia Games and

5  Entertainment.

6  Q.  What was Stadia Games and Entertainment?

7  A.  So at the same time we announced Stadia in March of 2019,

8  we introduced Stadia Games and Entertainment, which was a

9  first-party studio intending to build games that were unique to

10 Stadia very much intending to show the way to a cloud-native

11 gaming future.

12 Q.  Why did Google set up a first-party game development

13 studio?

14 A.  So I don't know that I have all the answers to that

15 question.  From my perspective, the -- the opportunity for game

16 development to move towards cloud-native experiences, to,

17 again, take advantage of data centers and deliver experiences

18 that have had never been delivered before.  I believe we

19 realized we would need to be building some of those

20 forward-looking experiences ourselves because it was unlikely

21 we were going to incentivize third parties to do it on their

22 own.  So one way we would speak about that is being a

23 lighthouse for the industry in the direction of innovation we

24 could take.

25     As well, we thought it was important to have reasons for

479

1  players to come to Stadia, and games they couldn't get anywhere

2  else would certainly be a reason.

3  Q.  Okay.  When you say "games they couldn't get anywhere

4  else," are you talking about exclusive games?

5  A.  Yes.

6  Q.  What's the value of exclusive AAA content from the

7  perspective of a cloud gaming service like Stadia?

8  A.  If there was interesting content that a consumer, you

9  know, wants to enjoy their decision of where to enjoy that --

10 right? -- is effectively guided by where it's available.  So if

11 there's an amazing gaming experience on a given games platform,

12 that's likely to draw consumer interest who otherwise might not

13 be interested.

14 Q.  What happened to Stadia Games and Entertainment?

15 A.  As I understand it, we found ourselves at a difficult

16 place where the industry was consolidating.  That was driving

17 costs up, and the total time that we imagined it would take to

18 bring AAA games to market, which historically has been upwards

19 of five years for a given game, was going to be far more

20 expensive in the environment that we found ourselves in than we

21 had originally planned for.

22 Q.  When did Google shut down Stadia Games?

23 A.  If I remember correctly, it was early in 2021.

24 Q.  And did the shutdown of SG&E occur before the shutdown of

25 Stadia?

480

1  A.  Yes.

2  Q.  Outside of SG&E, I think we already talked about some of

3  the ways that Google brought content to the service.

4      You mentioned something called porting I think.  What is

5  porting?

6  A.  Yeah.  So from a game development perspective, a studio

7  may be building for a specific console or building a game for a

8  PC.  They may -- they may think of that as the primary SKU that

9  they're building for, and any other platforms that they want to

10 release that game on would be a port.  So they'd take the work

11 that they've done for the primary target and port it to other

12 platforms.

13     In many cases with all of the third parties Stadia was

14 dealing with, as a new service in the market, we were a porting

15 target for those studios and we needed to make it incredibly

16 efficient for them to do that.

17 Q.  And did Google offer financial incentives for developers

18 to port their games to Stadia?

19 A.  Yes.

20 Q.  So mindful in trying to keep the court open, could you

21 turn to PX8003 that's in your binder.

22 A.  8003?

23     (Witness examines document.)  Okay.

24     MR. AKLEMAN:  I move to admit PX8003.

25     THE COURT:  Admitted.

481

1      (Trial Exhibit 8003 received in evidence.)

2  BY MR. AKLEMAN:

3  Q.  Can you look in the second paragraph?  It's the fourth

4  line from the bottom, there's a number there.

5  A.  Yes.

6  Q.  Is that the amount that Google invested to bring the games

7  to the platform -- to the Stadia platform?

8  A.  To the best of my knowledge, I believe this is accurate.

9  Q.  Okay.  We can set that aside for a minute.  Did the size

10 of Stadia subscriber base affect the availability of games on

11 the service?

12 A.  Yes.

13 Q.  Did Stadia have any overall targets for subscribers?

14 A.  So we certainly had an early concept based on historical

15 precedent of what we thought of as critical mass.  And so at

16 what point would a games publisher naturally develop a title

17 for a platform independent of any incentives or deals or so

18 forth just because of how many subscribers, you know, existed

19 on that platform.  So that was a target we had set early on as

20 a place we wanted to get to.

21 Q.  Okay.  And once Stadia reached that critical mass,

22 developers would bring their games to Stadia?

23 A.  That was the belief.

24 Q.  Again, let's -- without saying the number in open court,

25 could you turn back to your declaration?  This is PX8003.

482

1      And can you go to paragraph 20?  And do you see the first

2  line of paragraph 20?  Does that -- do you see that number

3  there?

4  A.  Yes.

5  Q.  Is that the number that Google thought was the critical

6  mass for Stadia?

7  A.  I believe so, yes.

8  Q.  Okay.  We can set that back aside.

9      Based on your experience in building out Stadia, how

10 difficult is it to build a cloud gaming service independent of

11 the Microsoft ecosystem?

12 A.  You know, from my perspective, Google put substantial

13 effort into all of the underlying technology, all of the data

14 centers that we built out to deliver the lowest possible

15 latency and all of the commercial incentives that we thought

16 were necessary to sort of bootstrap the ecosystem.

17     I guess my short answer is it's extremely difficult

18 outside of how the ecosystem is today for something new like

19 Stadia to be able to find a footing.

20     MR. AKLEMAN:  Thank you.  No more questions.

21     THE COURT:  Any cross-examination?

22     MS. PASTAN:  Anastasia Pastan for Microsoft.

23                 CROSS-EXAMINATION

24 BY MS. WILKINSON:

25 Q.  Good afternoon, Mr. Zimring.  I just have a few questions.

483

1      You testified on direct that Google launched a cloud

2  gaming service in 2019 called Stadia; correct?

3  A.  Yes.

4  Q.  Stadia had several competitors when it launched; right?

5  A.  When you say "competitors," I'm not sure what you're

6  describing.

7  Q.  Did Stadia have several competitors when it launched?

8  A.  So I think Stadia's -- I would say that our perspective

9  was that the existing console and PC gaming participants were

10 what represented who we were competing with.

11 Q.  So Stadia competed with consoles including Xbox?

12 A.  Yes.

13 Q.  And Stadia competed with PC distribution platforms?

14 A.  Yes.

15 Q.  Such as Steam and Epic?

16 A.  I think that's fair to say.

17 Q.  And Stadia also had cloud gaming competitors; is that

18 right?

19 A.  I don't remember the state of the market at the time we

20 launched, but I don't believe there were cloud gaming --

21 outside of Sony's capabilities, I don't know that the other

22 players that currently exist in the market were there at that

23 time in 2019.

24 Q.  During Stadia's existence, maybe not at launch but at some

25 point during the existence, Stadia faced competition from cloud

484

1  gaming services?

2  A.  Yes.

3  Q.  One of them would have been Nvidia's GeForce NOW?

4  A.  That's correct.

5  Q.  Another one might have been Xbox's Cloud Gaming service?

6  A.  Uh-huh, yes.

7  Q.  A few moments ago you testified about how Stadia has since

8  shut down; correct?

9  A.  Yes.

10  Q.  And you discussed some of the reasons that Stadia shut down;

11  right?

12  A.  Yes.

13  Q.  And one of the things you told the Court was that Stadia

14  very much wanted AAA content; is that right?

15  A.  That's correct.

16  Q.  And, in fact, Stadia was able to get some AAA games onto

17  its service; is that right?

18  A.  That is correct.

19  Q.  You don't think Stadia was able to get enough AAA content

20  onto its service?

21  A.  I believe with more content we would have seen more

22  success.

23  Q.  Google talked to you, Activision, at one point to try to

24  get its content onto Stadia; is that right?

25  A.  Yes.

485

1  Q.  You are aware that there is no cloud gaming service that

2  has Activision content today?

3  A.  Honestly, I don't know the state of Activision's presence

4  in other cloud gaming systems.

5  Q.  Do you know of any cloud gaming service that has

6  Activision content today?

7  A.  Nothing comes to mind.

8  Q.  And earlier you agreed that Xbox Cloud Gaming was one of

9  Stadia's competitors; right?

10  A.  Yes.

11  Q.  And Xbox Cloud Gaming doesn't have Activision games, does

12  it?

13  A.  I -- honestly I don't know the full catalog of what Xbox

14  has.

15  Q.  So you have no reason to believe Xbox Cloud Gaming has

16  Activision content on it today?

17  A.  I don't have a reason to believe one way or the other.

18  Q.  And, again, you identified GeForce NOW as one of Stadia's

19  competitors; is that right?

20  A.  That is correct.

21  Q.  And you have no way of knowing whether GeForce NOW has

22  Activision content on it today?

23  A.  Correct.

24  Q.  You can't name any cloud gaming service that has

25  Activision content?

486

1  A.  No.  I'd be -- it would be difficult for me to recite what

2  the different publishers and titles are across the market at

3  this time.

4  Q.  Despite over a decade of time in the cloud gaming

5  industry, you do not keep up to date on the status of cloud

6  gaming services?

7  A.  All I can tell you is that I don't know definitively which

8  titles are on which services at this time.

9  Q.  Okay.  You testified about a number of places that gamers

10  could play on Stadia?

11  A.  Yes.

12  Q.  Was Stadia playable on Xbox?

13  A.  No.

14  Q.  Not even through Xbox's browser?

15  A.  Actually, I don't know honestly.

16  Q.  Do you know whether Stadia was playable on PlayStation?

17  A.  So if PlayStation has a Chromium-based browser or Xbox,

18  Stadia may have been playable.  I think perhaps the more

19  appropriate thing would be for me to say that I'm not aware of

20  us qualifying those as supportive platforms.

21            (Pause in proceedings.)

22  BY MS. PASTAN:

23  Q.  Although Stadia is out of the cloud gaming business now,

24  are you aware that Microsoft has entered into contracts to make

25  Activision games available to cloud providers if this deal goes

487

1  through?

2  A.  I've heard some news about that.  I don't know any of the

3  details.

4  Q.  You've heard news that they've reached a deal with Nvidia

5  to make Activision content available on GeForce NOW?

6  A.  I believe so.

7  Q.  Have you heard news that they've made a deal to make

8  Activision content available on Boosteroid?

9  A.  I believe so.

10  Q.  And on Ubitus?

11  A.  I believe so.

12  Q.  And on EE cloud gaming service?

13  A.  I'm not aware of that service.

14  Q.  And on Nware cloud gaming service?

15  A.  Also I'm not aware of that.

16  Q.  But you're aware of the first several that I listed?

17  A.  Yes.

18  Q.  And you're not aware of any services -- of any cloud

19  gaming services that have Activision content today?

20  A.  That's correct.

21  Q.  It's fair to say that if the deal goes through, Activision

22  content would be available on more cloud gaming services than

23  you're aware of today?

24       MR. AKLEMAN:  Objection.  Foundation.

25       THE COURT:  I'll sustain it.  We get it.

488

1  MS. PASTAN: One moment, Your Honor.

2  (Pause in proceedings.)

3  MS. PASTAN: I have nothing else.

4  THE COURT: Great. Anything further?

5  MR. AKLEMAN: Just one question.

6  THE COURT: Okay? It better be a good one.

7  MR. AKLEMAN: Maybe I shouldn't have promised that.

8  THE COURT: No pressure. No pressure.

9  REDIRECT EXAMINATION

10 BY MR. AKLEMAN:

11 Q. Ms. Pastan asked you a few questions about who Stadia

12 competed with when they launched.

13    At the time that Stadia launched, were there any other --

14 were any of those other cloud gaming services that she

15 described operating?

16 A. I don't believe so.

17    MR. AKLEMAN: Okay. Thank you. I have no more

18 questions.

19    THE COURT: Perfect. You are excused. Happy Friday.

20    (Witness excused.)

21    THE COURT: All right. So, as you know, that

22 concludes the testimony for today. We are not going to go on

23 Monday.

24    Let me tell you a little bit about the schedule so you can

25 plan. So we have Tuesday, Wednesday, Thursday. You went a bit

489

1  over today. So you'll need to use the weekend and Monday to

2  tighten your remaining witnesses.

3     What I would like to do is when we finish up on Thursday,

4  then have closing arguments. I do think that will be very

5  helpful, but I would want -- I will want the final Proposed

6  Findings of Fact and Conclusions of Law by 5:00 p.m. on Friday

7  the 30th, and I'm doing that to save everybody's holiday

8  weekend except maybe mine, but everybody else's. All right?

9  So 5 p.m.

10    So start now. I mean, you've already started. It's an

11 ongoing process. You know what you anticipate the evidence to

12 be so have that, but I will want closing arguments on Thursday.

13 That's the plan.

14    Yes.

15    MR. WEINGARTEN: Your Honor, James Weingarten.

16    Do you have any plan for how long you would like closings

17 to be?

18    THE COURT: I'm not going to limit you, but I'm going

19 to trust you to know your audience.

20    MR. WEINGARTEN: Yes, ma'am. Thank you, Your Honor.

21    (Laughter)

22    THE COURT: I expect it to be interactive so you

23 should prepare it, but I expect it to be interactive.

24    The other thing is the parties have been -- I understand

25 it's an ongoing process -- submitting like modified

490

1  administrative motions to seal, it's all coming in, so what I

2  need is an omnibus administrative motion to seal that covers

3  everything, trial exhibits, that we've done up to now. We've

4  now ruled on everything so I think you can do it so that we

5  have one motion that we can grant and it will be all accurate.

6     And to the extent you can include stuff going forward

7  because you have a little bit more time now to know for

8  Tuesday, Wednesday, Thursday, that would be great. But at

9  least that covers up to now.

10    Did I cover everything?

11    Okay. I really appreciate everyone's courtesy in the

12 presentation, and the advocacy has been outstanding. And I

13 wish you all a good weekend, and I will see you Tuesday again

14 at 8:15 in closed session and 8:30 to begin the evidence.

15 Thank you.

16    (Proceedings adjourned at 3:30 p.m.)

17    ---oOo---

18

19

20

21

22

23

24

25

1

2

3  CERTIFICATE OF REPORTER

4     I certify that the foregoing is a correct transcript

5  from the record of proceedings in the above-entitled matter.

6

7  DATE:  Friday, June 23, 2023

8

9

10

11

12  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
    United States District Court - Official Reporter

13

14

492

**Volume 3**

**Pages 491 - 688**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

```
FEDERAL TRADE COMMISSION,    )
                             )
          Plaintiff,         )
                             )
     VS.                     )  NO. C 23-02880 JSC
                             )  SEALED PAGES 495-520
MICROSOFT CORPORATION, et al.,)
                             )
          Defendants.        )
_____)
```

San Francisco, California
Tuesday, June 27, 2023

TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS

APPEARANCES:

For Plaintiff:

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, D.C.  20580
BY:  JAMES H. WEINGARTEN, ATTORNEY AT LAW
     MERRICK PASTORE, ATTORNEY AT LAW
     JENNIFER FLEURY, ATTORNEY AT LAW
     PEGGY FEMENELLA, ATTORNEY AT LAW
     MEREDITH LAVERT, ATTORNEY AT LAW
     NICOLE CALLAN, ATTORNEY AT LAW

For Defendant Microsoft:

WILKINSON STEKLOFF LLP
2001 M Street, NW - 10th Floor
Washington, D.C.  20036
BY:  BETH WILKINSON, ATTORNEY AT LAW
     RAKESH N. KILARU, ATTORNEY AT LAW
     KIERAN GOSTIN, ATTORNEY AT LAW
     GRACE HILL, ATTORNEY AT LAW

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

---

APPEARANCES:  (cont'd)

For Defendant Activision Blizzard, Inc.:

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C.  20005
BY:  STEVEN C. SUNSHINE, ATTORNEY AT LAW

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California  94301
BY:  CAROLINE VAN NESS, ATTORNEY AT LAW

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
1 Manhattan West
New York, New York  10001
BY:  EVAN R. KREINER, ATTORNEY AT LAW

For Nvidia Corporation:  (telephonically)

QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street NW - Suite 900
Washington, D.C.  20005
BY:  MICHAEL D. BONANNO, ATTORNEY AT LAW

For Sony Interactive Entertainment:

CLEARY GOTTLIEB STEEN & HAMILTON, LLP
2112 Pennsylvania Avenue, NW-Suite 1000
Washington, D.C.  20037
BY:  ELSBETH BENNETT, ATTORNEY AT LAW

---

493

**I N D E X**

Tuesday, June 27, 2023 - Volume 3

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| RYAN, JIM | | |
| By Video Deposition (not reported) | 523 | 3 |
| LEE, ROBIN | | |
| (SWORN) | 526 | 3 |
| Cross-Examination by Ms. Wilkinson | 526 | 3 |
| Redirect Examination by Mr. Pastore | 615 | 3 |
| PHIL, EISLER | | |
| By Video Deposition (not reported) | 654 | 3 |
| (SWORN) | 655 | 3 |

| DEFENDANTS' WITNESSES | PAGE | VOL. |
|---|---|---|
| BAILEY, ELIZABETH MEEKER | | |
| Direct Examination by Mr. Kilaru | 655 | 3 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 0020 | | 524 | 3 |
| 20 | | 652 | 3 |
| 0079 | | 524 | 3 |
| 1136 | | 652 | 3 |
| 1162 | | 524 | 3 |
| 1781 | | 654 | 3 |
| 2064 | | 524 | 3 |
| 2069 | | 652 | 3 |
| 2073 | | 652 | 3 |
| 2098 | | 652 | 3 |

---

494

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2163 | | 524 | 3 |
| 2391 | | 654 | 3 |
| 3052 | | 654 | 3 |
| 3103 | | 654 | 3 |
| 3104 | | 654 | 3 |
| 3106 | | 524 | 3 |
| 3109 | | 524 | 3 |
| 3110 | | 524 | 3 |
| 3144 | | 654 | 3 |
| 5000 | | 653 | 3 |
| 5053 | | 586 | 3 |
| 5054 | | 591 | 3 |
| 7053 | | 524 | 3 |
| 7054 | | 524 | 3 |
| 7060 | | 654 | 3 |
| 8000 | | 654 | 3 |
| 8001 | | 524 | 3 |

495

1   Tuesday - June 27, 2023                    8:08 a.m.

2                    P R O C E E D I N G S

3                        ---oOo---

4   (The following pages 495 through 520 were placed under

5       seal by Order of the Court:)









519



520



20   (The following proceedings were heard in open court:)
21       **THE COURT:**  All right.  Before we begin with the
22   evidence this morning, I do -- we are actually streaming these
23   proceedings by Zoom audio.  We have a license for 1,000 people
24   to listen.
25       This is something that we've -- the pandemic created the

---

521

1   need for and that we're very much hoping to continue to do it
2   because it increases access to the public.
3       As anyone who clicks on the link knows, though, you are
4   strictly prohibited from copying the audio, from recording it,
5   and that includes live streaming it, and it has been brought to
6   our attention that at least one person was live streaming the
7   audio last week.  When you do that, what you are doing is
8   jeopardizing the ability of us to even offer the live audio
9   Zoom at all.
10      Prior to the pandemic if you wanted to watch or listen to
11  a court proceeding, you had to come to the courtroom and that
12  was the only way to do that.  I very much want to continue this
13  public access.
14      My understanding is we are using our full license; but for
15  those of you who have recorded or live streamed it, you are
16  jeopardizing that, and probably not just for this proceeding
17  but for all proceedings across the United States if you
18  continue to do that.
19      So I'm just reminding all of you on the Zoom audio that
20  you are strictly prohibited from recording or live streaming
21  these proceedings.  You are welcome to live blog, that is fine,
22  but no recording or streaming.
23      All right.  Thank you.
24      Mr. Weingarten, is the FTC prepared to present your next
25  witness?

---

522

1       **MR. WEINGARTEN:**  Yes, we are, Your Honor.
2       The FTC calls Mr. Jim Ryan of Sony.  His testimony will be
3   presented by video deposition designation.  My colleague,
4   Meredith Levert, will be handling any of the administrative
5   aspects.
6       And I believe the Defendants have the tape to hit play.
7       **THE COURT:**  All right.  I know there are some people
8   sitting in the front row.  You're not going to be able to see
9   the depo.  If you want, you're welcome to come sit in the jury
10  box where, I believe, it will be in the screens there as well
11  if you can't get to a seat in the back where the video displays
12  are.
13      **MS. BENNETT:**  Your Honor, do you mind if I --
14      **THE COURT:**  You may, Ms. Bennett, yeah, of course.
15      **MS. LEVERT:**  Meredith Levert for the FTC.  Good
16  morning again, Your Honor.
17      As my colleague Mr. Weingarten just said, we're calling
18  Mr. Ryan by deposition video.  The video will include
19  designations from both sides that are not in camera.  The video
20  runs approximately one hour and ten minutes.
21      The parties will also provide the Court with an in-camera
22  version of the video for Your Honor to view in chambers.
23      And I believe in your binders up there that you should
24  have a transcript of both the public video and the in-camera
25  video.

523

1    THE COURT: Great. Thank you.
2    And just so the audience knows, we have -- there will be
3    some jumpy things because those portions that have been
4    designated confidential have been edited out of the deposition
5    that is being shown here in the courtroom.
6    MS. LEVERT: Thank you, Your Honor.
7    I think we can start the video.
8    THE COURT: Start the video.
9    (Video played but not reported.)
10    THE COURT: That concludes the testimony.
11    How do you want to go about admitting the exhibits?
12    MS. LEVERT: That's what I was going to do,
13    Your Honor.
14    THE COURT: Do you have a list?
15    MS. LEVERT: Yes, we have a list of Plaintiff's
16    exhibits.
17    THE COURT: And does Microsoft have a list as well?
18    We can just read them into the record.
19    All right. FTC, so why don't you list the exhibits you
20    want admitted.
21    MS. LEVERT: Certainly, Your Honor. Do you want me to
22    just list the exhibit numbers or describe what they are?
23    THE COURT: No, no. Just the number.
24    MS. LEVERT: Okay. Excellent.
25    PX8001, PX3109, PX3106, PX3110. And we would also like to

524

1    move to admit the underlying Jim Ryan deposition transcripts.
2    Those are PX7053 and PX7054.
3    THE COURT: Okay. Those are all admitted.
4    (Trial Exhibits 3106, 3109, 3110, 7053, 7054, and 8001
5    received in evidence.)
6    MR. KILARU: We have a few more. PX3106.
7    THE COURT: She mentioned that one.
8    MR. KILARU: Okay. Sorry. 3109.
9    THE COURT: Okay. She also mentioned that one.
10    MR. KILARU: Sorry. 3110.
11    THE COURT: Not -- you struck out.
12    MR. KILARU: All right. I'll keep trying. I only
13    have a few more.
14    I believe 8001 was already in; is that right?
15    THE COURT: Already in.
16    MR. KILARU: RX0020.
17    THE COURT: Okay.
18    MR. KILARU: RX0070, RX0079, RX1162, RX2064, and
19    RX2163. And I guess the RX should have been a clue.
20    THE COURT: Okay. Those are all admitted as well.
21    (Trial Exhibits 0020, 0079, 1162, 2064, 2163 received
22    in evidence.)
23    THE COURT: All right. Ms. Knox, are you okay just to
24    go?
25    Is everyone okay to just go since you weren't -- you were

525

1    working but not the same way.
2    Ms. Means, are you okay if we just go?
3    All right. Is the FTC prepared to call your next witness?
4    MR. WEINGARTEN: Yes, we are, Your Honor.
5    The Federal Trade Commission is going to call Professor
6    Robin Lee. Professor Lee's direct testimony is being presented
7    by written declaration.
8    But, Dr. Lee, if you could please come to the stand.
9    THE COURT: Professor Lee's testimony has come in by
10    declaration so we're going to start with the cross-examination
11    of Professor Lee, and then we'll move to the redirect.
12    MS. WILKINSON: Your Honor, I'm going to be doing the
13    cross. And if we could, I'd need a short --
14    THE COURT: You may have a short break, yes.
15    MS. WILKINSON: Thank you.
16    THE COURT: All right. Professor Lee, we'll just --
17    take a five-minute break.
18    THE WITNESS: Thank you.
19    THE COURT: Okay.
20    (Recess taken at 10:07 a.m.)
21    (Proceedings resumed at 10:13 a.m.)
22    THE COURT: All right. Professor Lee, we're going to
23    place you under oath.
24    THE CLERK: Can you please raise your right hand?
25    \\\

526

1    ROBIN LEE,
2    called as a witness for the Plaintiff, having been duly sworn,
3    testified as follows:
4    THE CLERK: Thank you.
5    Can you please state your name for the record.
6    THE WITNESS: My name is Robin Lee.
7    THE CLERK: Thank you.
8    CROSS-EXAMINATION
9    BY MS. WILKINSON:
10    Q. Good morning, Dr. Lee?
11    A. Good morning.
12    Q. Do you like to be called doctor or professor?
13    A. Professor would be nice. Thank you.
14    Q. Perfect.
15    In this case you were hired by the FTC to analyze some of
16    the economic consequences of the transaction; correct?
17    A. I was retained by the FTC to analyze the competitive
18    effects of the proposed transaction.
19    Q. Is there a difference between retained and hired?
20    A. I just was -- I was retained by the FTC.
21    Q. As part of your work, you reviewed many of the documents
22    in this case; correct?
23    A. Correct.
24    Q. You couldn't have reviewed every document; right?
25    A. It's my understanding there were many, many documents. I

527

1  did not review all of the documents that were produced.
2  Q.  When you came to your conclusions, you tried to look for
3  documents that were relevant or could support or contradict
4  your conclusions; correct?
5  A.  That is correct.  I tried to look at the totality of
6  evidence, evidence that pointed in different directions.
7  Q.  You didn't just look at evidence that supports your
8  conclusions; right?
9  A.  I tried to look at all the evidence that I reviewed.
10  Q.  I think I asked you a different question.
11  A.  Oh.  Including evidence that pointed in different
12  directions, that is correct.
13  Q.  You did do that; right?
14  A.  I did do that.
15  Q.  And that's important to do; correct?
16  A.  I believe it is important to do.
17  Q.  You also agree it's important to consider what the
18  executives who run these businesses are saying about some of
19  the issues on which you have opined?
20  A.  I believe it's important to consider all evidence,
21  including that.
22  Q.  Now, let's start with your market definition.  Okay?
23      You have said that the market in this case should be
24  high-console -- I mean, high-performance consoles which are
25  only the Sony PlayStation and the Xbox X and S; right?

528

1  A.  I defined two markets that involve consoles; one as you
2  characterize as the high-performance video game consoles market
3  with Xbox series and PlayStation 5 console and a broader market
4  including all video game consoles.
5  Q.  But most of your analysis is focused on that more narrow
6  market; right?
7  A.  As it pertains to these two console markets, my analysis
8  applies to both.
9  Q.  Okay.  So when you ran your models, you used both markets
10  when you were talking about the Switch and market share?
11  A.  Well, some of my competitive analysis focused on
12  competition between Xbox series and PlayStation 5.  I noted
13  that competitive harms that could arise would also occur in
14  this broader market that also contained the Switch.
15  Q.  But when you did your modeling in your economic
16  quantitative analysis, you did not put Nintendo into the market
17  when you were assessing those issues; right?
18  A.  So for some of my quantitative analyses I focused on
19  products that were only available on PlayStation and Xbox
20  consoles, like Call of Duty; and for that, that is correct, the
21  Switch was not included.
22  Q.  So you agree that Nintendo is in the market of consoles
23  for this case?
24  A.  So, again, I presented two relevant product markets that
25  contain video game consoles.  One is a broad video game

529

1  consoles market with the Switch and the other is one that's
2  ordinarily focused on Generation 9 consoles.
3  Q.  So Her Honor has to make the decision which market do you
4  think is the proper market to consider in this case.
5  A.  I think it's important to understand the role of market
6  definition.  It's to focus attention on where competitive
7  effects may occur, and there need not be a single market to use
8  when evaluating these competitive effects.
9      Again, the purpose is to highlight where, again,
10  competitive effects, competitive harm to benefits could occur,
11  and so that's why in my report I found it appropriate to find
12  multiple markets.  I find two that have consoles and I define
13  three that contain subscription services and cloud streaming
14  services.
15  Q.  Do you think that Nintendo is a close competitor to the
16  PlayStation 5?
17  A.  It's hard to know what you mean by "close."  I believe
18  that there is some substitution in that some consumers may
19  elect to buy a Switch instead of a PlayStation.
20  Q.  So you really can't say whether it is a close competitor
21  or it is not?
22  A.  Well, for the purposes of market definition, the economic
23  framework that is used is the hypothetical monopolist test.  It
24  asks:  If a set of products can be monopolized by a single firm
25  would that firm likely increase prices by a small but

530

1  significant amount, maybe 5 percent?
2      And that's the framework I use to evaluate whether
3  Generation 9 consoles are a relevant antitrust product market.
4  So if there is substitution to the Switch, I provided evidence
5  that that substitution wouldn't likely constrain a single firm
6  that owned PlayStation 5 and series consoles from implementing
7  a price increase.
8  Q.  Professor Lee, you didn't consider the Nintendo Switch
9  when you did your diversion analysis for the hypothetical
10  monopolist test; right?
11  A.  So the hypothetical monopolist test was a framework I used
12  to define all of my markets, and it can be implemented both
13  using qualitative and quantitative evidence.
14      And I presented considerable amount of evidence that
15  supports the conclusion that the Switch would not constrain a
16  price increase of a hypothetical monopolist owning Generation 9
17  consoles.
18  Q.  That was in the console market, right, the general console
19  market?  It wasn't in the high-performance console market;
20  right?
21  A.  So maybe I misunderstood your question.  Would you be able
22  to repeat it, please?
23  Q.  Sure.  Let me go at it a different way.
24      In the high-performance console market you defined, you
25  did not consider Nintendo part of that market; right?

531

1  A.  Correct.

2  Q.  Yes or no, Doctor.

3  A.  Yes, the Switch is outside of the high-performance video
4  game consoles market.

5  Q.  So you don't believe it is a close competitor in that
6  market?

7  A.  I wouldn't use that language.  What I conclude is that a
8  Switch would not likely constrain an exercise of market power
9  of a firm that owned all Generation 9 consoles, all
10 high-performance video game consoles.

11 Q.  You don't believe that Nintendo is a principal rival for
12 Microsoft's Xbox, the current generation and the current
13 generation of PlayStation; right?

14 A.  As an economist, it's difficult to be precise about what
15 that language means, and that's why I'm giving a more formal
16 economic framework to be more specifics about what it means for
17 products to be close substitutes or primary constraints on --

18 Q.  So did you consider what -- did you finish?  I don't want
19 to cut you off.

20 A.  Yes.  Thank you.

21 Q.  Did you consider what Sony has said about whether Nintendo
22 is a principal rival or a close competitor?

23 A.  I have considered quite a bit of evidence, including what
24 industry participants have said.

25 Q.  Did you consider that specific statement that the

532

1  Nintendo Switch is a principal rival of Microsoft's Xbox
2  console and Nintendo's -- and Sony's PlayStation 5?

3  A.  I can't recall that statement directly nor the context in
4  which it was made.  "Rival" can mean many things.  As I noted,
5  antitrust product markets don't need to contain all substitutes
6  for it to be supported.

7  Q.  You would expect when a company submits documents to a
8  regulator about what the market is and who their competitors
9  are, you would expect them to be accurate if you were reading
10 those documents; right?

11 A.  I wouldn't have a reason to believe otherwise.

12 Q.  Let's take a look at RX2069 if we could.

13      MS. WILKINSON:  And, Your Honor, this is a redacted
14 document, but the portion I'm going to show is public.

15      THE COURT:  Okay.

16 BY MS. WILKINSON:

17 Q.  So if you could take a look at that.  It's RX2069.  Take a
18 look in your notebook.

19 A.  Okay.

20 Q.  Do you see 2069?  Did you find that?

21 A.  Is it on top of the divider or below the divider?

22 Q.  It's normally below the divider, and it says "Sony
23 Interactive Entertainment's acquisition of Bungie."

24 A.  I see that.

25 Q.  And it's dated February 11th, 2022; correct?

533

1  A.  Yes, I see that.

2  Q.  You know that Sony acquired Bungie?

3  A.  I recall that, yes.

4  Q.  And you know Bungie is a studio that develops games;
5  correct?

6  A.  Yes.

7  Q.  And you understand that sometimes, like in this case,
8  companies have to submit filings to a regulator to describe the
9  basis of their transaction and why it is not anticompetitive;
10 correct?

11 A.  That's my understanding, that they submit filings to
12 regulators.

13 Q.  And you understand that in today's world they submit them
14 to foreign regulators and U.S. regulators; right?

15 A.  Yes.

16 Q.  And you would expect those submissions to be accurate
17 regardless of where they were submitted; right?

18 A.  I would expect that to be true.

19 Q.  And when you're reading them, you would think were
20 accurate unless someone told you otherwise?

21 A.  I wouldn't have a reason to believe otherwise.

22 Q.  Okay.  So when you look at this document -- go to page 4,
23 please, and we're going to show you Footnote Number 19.

24      MS. WILKINSON:  If we could publish that.

25 \\\

534

1  BY MS. WILKINSON:

2  Q.  And this is Sony writing to the CMA; right?  Look at the
3  front cover if you have any question.

4  A.  I believe -- I believe it is, yes.

5  Q.  And you see there in Footnote 19 they're talking about the
6  PlayStation sales in the U.K., right, for 2020?  Do you see
7  that?

8  A.  I see that.

9  Q.  And it said its principal rivals were Microsoft Xbox and
10 Nintendo Switch console; right?

11 A.  I see that.

12 Q.  And in 2021 they say again those rivals are -- and how the
13 shares changed -- Microsoft and Nintendo Switch; correct?

14 A.  I see that.

15 Q.  And did you consider that when you were coming to your
16 determination about whether Nintendo should be considered a
17 principal rival or a close competitor?

18 A.  I don't recall this precise document, but I have seen
19 documents that indicated similar or used similar language to
20 describe Switch versus Gen 9.

21 Q.  You don't challenge the accuracy of that; right?

22 A.  Of?

23 Q.  Sony's filing to its regulator.

24 A.  I do not challenge this finding.

25 Q.  Okay.  Take a look now at -- also on page 4, and we're

535

1  going to show you paragraph 19. Do you see that?
2      And we can show that because that's also not confidential.
3      Do you see that?
4      MS. WILKINSON: You can publish that, please.
5      THE WITNESS: I see paragraph 19, yes.
6  BY MS. WILKINSON:
7  Q.  And here, Sony is talking about who its storefronts
8  compete with; right?
9  A.  Yes.
10 Q.  And "storefronts" means when they do buy-to-play, who are
11 their competitors; right?
12 A.  I believe so.
13 Q.  And they say that includes those operated by Nintendo and
14 Microsoft; right?
15 A.  I see that, yes.
16 Q.  And if you look below, it says also subscription services;
17 right?
18 A.  Yes, I see that.
19 Q.  And when you considered the market definition for
20 consoles, you have considered subscription services a separate
21 market; right?
22 A.  I supported the conclusion that there is a separate market
23 containing content library subscription services.
24 Q.  You agree, though, that PlayStation does compete against
25 other people's -- or other company's subscription services;

536

1  right?
2  A.  I think the language "competes" means that there is some
3  perhaps degree of substitution; and as I noted before, a
4  relevant antitrust product market does not need to contain all
5  substitutes. The purpose is to focus attention on the closest
6  substitutes, those that would meaningfully constrain an
7  exercise of market power.
8  Q.  Dr. Lee, you understand I'm asking you questions. If you
9  could answer the questions, then your Counsel then can let you
10 explain. Do you understand that?
11 A.  Yes.
12 Q.  Okay. So let's take a look now at -- this is going to be
13 under seal, but it was mentioned in the last deposition with
14 Mr. Ryan -- look at RX0020. I believe it's in the notebook.
15     And this is Sony's contract with Activision regarding Call
16 of Duty; right?
17 A.  That's what it says.
18 Q.  And you see in this contract Sony specifically defines who
19 their competitor platforms are; correct?
20 A.  Could you please point me to a page?
21 Q.  Of course. It's just going to be on page 01 -- 001. Go
22 down to the bottom and it says this -- part I can read --
23 "Competitive platform means..."
24 A.  (Witness examines document.) I see that.
25 Q.  So they are telling Activision who they think the

537

1  competitive platforms are for purposes of this contract; right?
2  A.  I -- I'm not a lawyer, but I see those terms there next to
3  that phrase.
4  Q.  Okay. And you see how it identifies different platforms?
5  A.  I do see that.
6  Q.  Do you disagree with this characterization of what a
7  competitive platform is for Sony? Just do you agree or
8  disagree?
9  A.  I'm not sure how the phrase "competitive platform" is
10 being used. As an economist, I have a way that competition
11 is -- or how economists think about competition.
12     Here, I'm not disagreeing that it states for the purposes
13 of this contract, I believe, "competitive platform" means
14 what's listed after that.
15 Q.  Okay. First of all, you know this whole case is about
16 competition; right?
17 A.  I understand competition is part of this case, yes.
18 Q.  And how the people who run the business actually consider
19 whether -- what their competition is or who their competition
20 is; right?
21 A.  I understand that.
22 Q.  So we were looking at that document, the contract, to say
23 that's who Sony lists. And all I said to you is: Do you agree
24 with that, that you think those are also competitors?
25     I'm not asking you whether you agree. That's what they

538

1  wrote. I'm asking if you agree that those are competitive
2  platforms to Sony's PS5.
3  A.  I haven't conducted analysis for all the devices that are
4  listed here in this paragraph.
5  Q.  So you can't say?
6  A.  I don't have an opinion at this moment.
7  Q.  You don't include PC as a competitive platform; correct?
8  A.  I don't use the phrase "competitive platform" in my
9  analysis.
10 Q.  You don't include them in your market definition, correct,
11 for consoles?
12 A.  For my two console markets, PCs are excluded.
13 Q.  Now take a look at -- this is the transcript that --
14 confidential portion of Mr. Ryan's transcript that was not
15 played but is submitted to the Court, and it's PX7053 at
16 page 29.
17                 (Pause in proceedings.)
18     MS. WILKINSON: Actually, I think that portion was
19 read.
20     THE WITNESS: Can you please repeat the page number?
21     THE COURT: It's not there.
22     MS. WILKINSON: Page 29, lines 27 through 22.
23     THE COURT: The deposition?
24     MS. WILKINSON: Excuse me. 17 through 22.
25     Sorry, Professor, we're trying to be very careful, as I

539

1  know you are, about the confidential information. I thought
2  that portion was read. Let me just check.
3      **THE COURT:** The page is not in here.
4      **MS. WILKINSON:** It's not?
5      **THE COURT:** The -- no. We start with page 186.
6      **MS. WILKINSON:** I'm sorry, Your Honor. Let me see if
7  I can -- if we have a full transcript.
8          (Pause in proceedings.)
9      **MS. WILKINSON:** Why don't we check on that,
10 Your Honor. I will move on.
11 BY MS. WILKINSON:
12 Q.   I'll try to ask you a more general question.
13      Did you consider what Mr. Ryan said about whether PC is a
14 competitor?
15 A.   I did review his testimony and considered that statement.
16 Q.   Okay. And you still didn't include PC as a competitor to
17 the consoles?
18 A.   PCs are not in the relevant antitrust markets that are
19 defined which contain consoles.
20 Q.   Okay. Great.
21      Now, let's talk more generally about what you did in this
22 case and what you did not do.
23      You did some quantitative modeling in this case; right?
24 A.   Yes.
25 Q.   And you also made statements about what you thought about

540

1  whether COD was important to competition; right?
2  A.   Yes. I -- I provided opinions about the importance of the
3  impact that Call of Duty could have on competition in the
4  relevant markets.
5  Q.   You said specifically that COD -- and we're always meaning
6  Call of Duty, right, when we talk about that?
7      You specifically say COD is important to competition;
8  right?
9  A.   I believe I used the phrase "can meaningfully affect
10 demand and competitiveness" in the consoles market. I don't
11 remember that precise language.
12 Q.   Do you remember being deposed a few days ago?
13 A.   Yes. So I'm -- I don't disagree with the
14 characterization. That is important for competitiveness.
15 Q.   And you said it was important; right?
16 A.   I -- I don't recall the exact language, but I believe I
17 could have used those words.
18 Q.   You do not take the position that COD is essential
19 content; correct?
20 A.   I don't express the opinion that it's essential as in it's
21 required to produce a viable product in the console markets.
22 Q.   So you did not take the position that it is essential;
23 correct?
24 A.   Correct.
25 Q.   And you say there are other video games that are also

541

1  important to competition; right?
2  A.   There are other video games that can affect competition.
3  Q.   COD is not the only video game that's important to
4  competition?
5  A.   Again, there are other video games it also can affect --
6  easily affect competition.
7  Q.   FIFA, is that an important game to competition?
8  A.   I haven't conducted the analysis of that particular game,
9  but it's my understanding it's a very popular game and likely
10 would have meaningful effects on demand and competition.
11 Q.   You're not suggesting that you did an economic
12 quantitative assessment to determine whether COD itself was
13 important to competition, did you?
14 A.   I'm sorry. I didn't follow the question.
15 Q.   You didn't -- your models don't specifically address
16 whether COD is important to competition? Did you make a model
17 that produces that result?
18 A.   I think that determination is -- arises from an evaluation
19 of the totality of evidence that I reviewed.
20 Q.   Okay. So looked at other games in the market?
21 A.   I did examine other games in the market.
22 Q.   So is FIFA important to competition?
23 A.   I don't recall the precise characteristics of FIFA at this
24 moment.
25 Q.   Are the Madden games important to competition?

542

1  A.   I believe large franchises with a significant number of
2  sales and consumers can meaningfully affect competition and
3  demand in the console markets.
4  Q.   So PlayStation's first-party exclusive game God of War
5  Ragnarök is important to competition; correct?
6  A.   I will say that titles with large sales as I just said.
7  If God of War Ragnarök does have those characteristics and
8  people really value it, it can meaningfully affect demand and
9  competitiveness in the console markets.
10 Q.   So COD is important and some other games are important,
11 but you don't name any of those and consider those in your
12 analyses; correct?
13 A.   I consider the impact of many games. Like, for example,
14 in one of my quantitative analysis -- analyses, I compute what
15 the predicted change in console shares would be from taking a
16 variety of titles exclusive and then compute what the impact on
17 shares would be.
18 Q.   But those are Activision titles. You didn't consider
19 these other titles from other publishers?
20 A.   In my initial report I present a table of the
21 implementation fact of non-Activision titles on Generation 8
22 console shares, so I do consider non-Activision titles in my
23 analysis.
24 Q.   And how did you input them into your analysis?
25 A.   So in my analysis, one of my economic opinions is that

543

1  exclusive differentiated content can meaningfully affect
2  demand, and that analysis where I made non-Activision content
3  exclusive helped to support that economic opinion.
4  Q.  But you -- did you -- I'm trying to make this simple, and
5  maybe I'm misunderstanding.
6      So did you put in games like Madden or FIFA that are not
7  exclusive, they are multiplatform games?
8  A.  So I apologize if I'm unclear.
9      In my share model, one of the predictions is taking games
10  that were multiplatform and simulating what the impact would
11  have been had they been taken exclusive, and for that analysis
12  I also looked at games that were provided by non-Activision
13  publishers.
14  Q.  So you're saying if we go to your choice model in your
15  report, we can find out what the impact would be if FIFA was
16  taken exclusive?  You can't find that, can you, in your report?
17  A.  In my initial report I can find a table of certain
18  non-Activision games and the impact of those.  I don't recall
19  if FIFA precisely is contained in that table.
20  Q.  Did you consider Madden?
21  A.  I don't recall if I -- if you let me look at my initial
22  report a second.
23  Q.  Go right ahead.
24  A.  Okay.  Thank you.
25  Q.  Please.  Just tell us the page that you're referring to,

544

1  please.
2  A.  (Witness examines document.)  Figure 37.
3  Q.  Which is on what page?
4  A.  PX5000-159.  It is page 152 of my initial report,
5  Figure 37.
6      And it appears that in this table Madden is included and
7  is a predicted share change from taking Madden exclusive.
8  Q.  Now, you put that in your choice model, right, which we'll
9  get to in a moment?  Right?
10  A.  There are different quantitative models in my report.  I'm
11  referring here to what I refer to as the share model.
12  Q.  Isn't that the choice model?
13  A.  So all of my quantitative analyses there's some element of
14  choice.  It models consumer choice.  Like share model is a
15  discrete model.  The share model is based on a discrete choice
16  model.  My vertical foreclosure model models consumer choice.
17      I just need more specific language to better understand
18  which model you're referring to.
19  Q.  The model you're referring to in Figure 37 is what you
20  have also called the choice model as well as the share model or
21  are you saying those are two different models?
22  A.  I apologize.  I don't recall the language.  It may have
23  been referred to as a demand model, but this is the demand
24  model or share model.
25  Q.  So that was your initial model, which we'll get to, where

545

1  you produced a number that 8.9 percent of PlayStation COD
2  players would move to Xbox; right?
3  A.  That is not the characterization of that number.  I think
4  you're referring to this model predicting that on average,
5  across Call of Duty titles during Generation 8, if it were made
6  exclusive to Xbox, Xbox share would increase on average by 8.9
7  percentage points.
8  Q.  So can we just make clear so we are all referring to the
9  same models, you call that model the demand model?
10  A.  The share model, yes.  Once --
11  Q.  You want to call it the share model?  It doesn't matter.
12  Whatever you want to call it just so we have it in the record
13  and refer to it the same way.
14  A.  Thank you.  Let's call it the share model, please.
15  Q.  So that's the share model.
16      THE COURT:  But that market is Xbox -- of
17  high-performance console market, its share would increase?
18      THE WITNESS:  Yes.  So the share model is the relative
19  share between just Xbox and PlayStation consoles.
20      THE COURT:  So that means migrating from PlayStation
21  to Xbox?
22      THE WITNESS:  Correct.
23      THE COURT:  You said Microsoft share would increase by
24  8.9 percent, but that would have to come from PlayStation?
25      THE WITNESS:  In this model, yes, it would come from

546

1  that.  And it's -- just to be clear -- I apologize, it's
2  confusing -- it's Generation 8 --
3      THE COURT:  Yes.
4      THE WITNESS:  -- so it's looking at PlayStation 4 and
5  Xbox 1.
6  BY MS. WILKINSON:
7  Q.  Okay.  And you have another model called the foreclosure
8  model; right?
9  A.  A vertical foreclosure or foreclosure model is fine.
10  Q.  This is a vertical merger case; right?
11  A.  Yes.
12  Q.  And on Figure 37, these are -- you use your share model to
13  predict what will happen to these games or what would happen if
14  these games were taken exclusive?
15  A.  It predicts what happens to console shares if these games
16  were taken.
17  Q.  If these games are taken exclusive?
18  A.  Correct.
19  Q.  Okay.  And how did you pick these games?
20  A.  So Figure 36 is looking at Activision titles.  Figure 37
21  we're looking at the top ten non-Activision titles released
22  during this period I believe based on unit sales.
23  Q.  Okay.  So let's go back to what kind of analysis you've
24  done using your models and what you haven't.
25      You have modeled console share shift if Call of Duty is

547

1   taken exclusive to Xbox; right?
2   A.   Yes, for Generation 8.
3   Q.   Yes.  And that's one of the markets you've defined; right?
4   Console market?
5   A.   I defined two console markets, but this is -- you know,
6   Xbox and PlayStation are in both.
7   Q.   But you just explained to Her Honor that the one you used
8   here was just Xbox and PlayStation 5; right?
9   A.   So --
10  Q.   Just --
11  A.   I'm sorry.
12  Q.   Professor Lee --
13  A.   This is PlayStation 4 and Xbox 1, and they're not in the
14  high-performance console market today because today it's
15  PlayStation 5 and Xbox series.
16  Q.   So that's my point.  You used different games, different
17  data from different models, to predict what would happen with
18  these models.
19  I shouldn't say "models."  With these -- this generation
20  of Xbox and PlayStation; right?
21  A.   That's right.  It's using Generation 8 data.
22  Q.   And not data from Xbox S and X; correct?
23  A.   Yes, that is correct.
24  Q.   But then you apply it to today's market to predict what
25  will happen for PS5 and Xbox S and X?

548

1   A.   I don't agree with that characterization.  I use this as
2   one of many pieces of evidence that support my later analysis
3   when I analyze Generation 9 foreclosure.
4   Q.   In the model, that's what you do, you take the data from
5   the older versions of PlayStation Xbox; right?
6   A.   If you can finish the question --
7   Q.   That's the model, that's the data you use.  And when you
8   apply the share shift that comes out of that model, you apply
9   it to the current generation?
10  A.   So it's the language "apply" that I don't agree with.
11  This is one piece of evidence that I use as supporting evidence
12  for my -- an input later on in my proportion model.  I don't
13  apply it in that way.
14  Q.   Okay.  So you did that for consoles.
15  You have another market called content library services;
16  right?
17  A.   Yes.
18  Q.   And that is the subscription services we've been talking
19  about for content libraries or a catalog of different games;
20  right?
21  A.   Yes.
22  Q.   And you define that as a market and say that that market
23  will be harmed if Call of Duty is taken exclusive; right?
24  That -- that competitive market will be harmed if it's taken
25  exclusive?

549

1   A.   My economic opinion is that likely foreclosure of
2   Activision content -- not restricted to Call of Duty, so all
3   Activision content, both current and back catalog -- it's that
4   foreclosure, the greater likelihood of foreclosure, that would
5   likely lead to competitive and consumer harm.
6   Q.   Dr. Lee, you did a quantitative analysis of how it would
7   affect the console market; right?  I can go look up the numbers
8   of how you say it affects the console market.
9   A.   Could you repeat your question, please?
10  Q.   If I look up in your report your models and your models
11  predict what the change in the console market will be if Call
12  of Duty is taken exclusive by Xbox, what Her Honor just asked
13  you about, those two shares, you say they're going to shift if
14  Xbox is taken exclusive; right?
15  A.   I have a quantitative model for Generation 8 that predicts
16  how shares would change if Call of Duty and other titles were
17  taken exclusive.
18  Q.   And you actually produce a percentage share shift from
19  that model; right?
20  A.   Correct.
21  Q.   Okay.  So in the content library services area, you don't
22  have a market that predicts the quantitative share shift that
23  would occur; right?
24  A.   I do not have a quantitative model for that market.
25  Q.   And for the cloud gaming services market that you define,

550

1   you also don't have a quantitative model that predicts the
2   share shift if Call of Duty is taken exclusive by Xbox?
3   A.   I do not have a quantitative model for the cloud market.
4   Q.   Okay.  Now, let's -- that's for what we would call
5   complete foreclosure; right?
6   A.   Taking a title fully exclusive is what could be referred
7   to as complete or full foreclosure.
8   Q.   That's what your quantitative model was based on.  For the
9   console market it was based on the Call of Duty being taken
10  totally away from PlayStation 5; right?
11  A.   So this part of my analysis --
12  Q.   That's all we're asking about.
13  A.   But you had said my quantitative analysis, and there are
14  other quantitative models in my report.  I just wanted to
15  clarify we're talking about the first one, the share model.
16  Q.   Yes, and then we'll get to the foreclosure model.
17  But the share model -- right? -- this is based on complete
18  foreclosure.  In other words, PlayStation cannot get any of the
19  Call of Duty games; right?
20  A.   This is done in a one-by-one title basis.  So, yes, for a
21  given title, it is taken fully away from PlayStation.
22  Q.   Professor Lee, there's a difference between full or
23  complete foreclosure and partial foreclosure; right?
24  A.   Yes.
25  Q.   And you modeled using your economic quantitative model

551

1 full or complete foreclosure; right?

2 A. Full foreclosure on a title basis.

3 Q. Okay. And for partial foreclosure, you did not do an

4 economic modeling quantitative analysis of what would happen if

5 there was partial foreclosure; right?

6 A. I did not predict the share change arising from a partial

7 foreclosure strategy.

8 Q. Exactly.

9 So if Her Honor wanted to go to your testimony or your

10 report and find what the share shift would be if there was

11 timed exclusivity, for example, which is partial foreclosure,

12 she couldn't find that in your testimony or your report; right?

13 A. There may be other qualitative evidence that speaks to it.

14 THE COURT: She was asking about quantitative.

15 THE WITNESS: Quantitative. So the first model, the

16 share model, does not do that.

17 BY MS. WILKINSON:

18 Q. It also does not model content exclusivity, does it?

19 A. Maybe I'm confused. You said content exclusivity?

20 Q. Partial exclusivity --

21 A. Ah.

22 Q. -- where you get certain content but not others, it

23 doesn't model that, does it?

24 A. The share model does not model that.

25 Q. And it doesn't model what might be considered partial

552

1 foreclosure and described as degraded content; right?

2 A. It does not model that.

3 Q. And it doesn't produce a share shift for any of those

4 types of partial foreclosure; right?

5 A. The share model does not produce...

6 Q. All right. Now let's go to your vertical foreclosure

7 model. Okay?

8 And your vertical foreclosure model does give a share

9 shift in the console market if there's full foreclosure, right,

10 of Call of Duty?

11 A. So the vertical foreclosure model uses as an input

12 something known as a conversion rate, and that input

13 corresponds to an amount of share. It doesn't produce that

14 number. It's an input.

15 Q. Well, you put the input of the 20 percent conversion.

16 That's different. That's like who will switch; right? You're

17 saying 20 percent will switch. That's what you put into your

18 market; right?

19 A. So the 20 percent is a set of users who switch. I don't

20 need to give you a precise definition, but that is an input,

21 that's correct.

22 Q. Right? It's not produced by the model after you run it.

23 The 20 percent conversion is an input?

24 A. Correct.

25 Q. And after you run your model based on that and other

553

1 inputs, you predict that there will be a 5.5 percent share

2 shift between PlayStation 5 and Xbox X and S if Call of Duty is

3 fully withheld; right?

4 A. I just want to be very precise. The vertical foreclosure

5 model says for a 20 percent conversion, there is 5.5 percent

6 more Xboxes sold as a function of 2022 Gen 9 sales. It's not

7 necessarily a share -- it's --

8 Q. It's not a share shift?

9 A. No. It's a share of Gen '22 -- 2022 Gen 9 sales.

10 Q. That's a share shift; right?

11 A. The vertical foreclosure model, there is some small

12 details, but for the purposes of right now, it is a share

13 shift.

14 Q. Let's write this down so there's no doubt about what

15 you're saying.

16 (Pause in proceedings.)

17 BY MS. WILKINSON:

18 Q. Let's make it simple. My handwriting stinks so tell me if

19 you can't read it.

20 For now we're just going to talk about these two models so

21 we can understand what comes out of them.

22 The first one, the first model we were discussing, you're

23 calling it?

24 A. A share model.

25 Q. A share model.

554

1 Okay. And over here we're going to call it the

2 foreclosure model; right?

3 A. Yes.

4 Q. So we're going to talk about consoles, what you define as

5 the console market.

6 And one of the things that comes out of your share model

7 is a share shift that you predict in the console market defined

8 as a PlayStation console and Xbox consoles; right?

9 A. A Generation 8 share shift.

10 Q. And what is that share shift?

11 A. For Call of Duty titles on average?

12 Q. Yes.

13 A. It's 8.9 percentage points.

14 Q. Okay. Now, so we make this easier for everyone to follow,

15 especially me, we're only going to talk about share shift of

16 Call of Duty based on Call of Duty right now. Okay?

17 A. Yes.

18 Q. You have to caveat that. Do you understand that's what

19 I'm asking you about?

20 A. I understand.

21 Q. Okay. So we'll put "COD" up here so there's no

22 misunderstanding.

23 In your foreclosure model, you predict a different

24 percentage share shift; right?

25 A. I have different inputs, but for one input it's a

555

1  20 percent conversion rate. It implies a 5.5 percentage point
2  shift.
3  Q.  Dr. Lee, I just asked you about the output not what the
4  inputs were.
5      It predicts a 5.5 percent share shift; correct?
6  A.  For a given input, it outputs a 5.5 percentage point share
7  shift.
8  Q.  So the inputs in this foreclosure model are not the same
9  as in the share model; right?
10 A.  It's a different model using different inputs.
11 Q.  All right. Okay.
12     And for both of these, you use data from the older
13 consoles that you were talking about?
14 A.  That is not correct.
15 Q.  So you actually use different data for each model; right?
16 A.  That's correct.
17 Q.  You use global versus U.S. depending on which model you're
18 using; right?
19 A.  The vertical foreclosure model is forward looking.
20 Q.  And so you're using global data?
21 A.  And foreclosure here is modeled as taking a title
22 exclusive globally.
23 Q.  Okay. So you're using global data and over in the share
24 model you're using U.S. data; right?
25 A.  Correct.

556

1  Q.  And are these data from the same data source?
2  A.  They are different data sources.
3  Q.  So different datasets?
4  A.  Different data.
5  Q.  I'm just going to call it Set 1 and Set 2.
6      So you're not making a direct comparison between these two
7  market shifts; right?
8  A.  I'm noting the 5.5 percent is lower than the 8.9 in my
9  analysis.
10 Q.  But it's based on different data; right?
11 A.  Yes.
12 Q.  Different inputs?
13 A.  Yes.
14 Q.  Okay. And now if we go back to the question about content
15 library services, asking the same questions, there is no way
16 from the share model to get a percentage share shift out of
17 this; right?
18 A.  The share model does not predict --
19 Q.  Okay. And --
20 A.  -- the content library.
21 Q.  Nor does the foreclosure model; right?
22 A.  No. Those models are for the console markets.
23 Q.  Okay. But you don't have any models for the content
24 library. That's all we're trying to establish.
25 A.  I don't have a quantitative model predicting those

557

1  outputs.
2  Q.  Right. And for cloud gaming, you get the same answers.
3  There's no share shift or model that produces a share shift
4  estimate for the cloud gaming services market you define?
5  A.  That is correct.
6  Q.  And there's -- nor is there one from the -- it doesn't --
7  excuse me. Let me start again.
8      Your foreclosure model doesn't provide a quantitative
9  share shift estimate in the cloud market; right?
10 A.  Correct.
11 Q.  And we went over, but I just want to make sure, if we go
12 this is full we said; and if we do partial foreclosure of COD
13 and we start with consoles, there's no share shift percentage
14 coming out of any of your models; right?
15 A.  No.
16 Q.  So that's no for consoles, for both models; right?
17 Foreclosure and your share model?
18 A.  Both of them focus on total exclusivity or full
19 exclusivity.
20 Q.  And that would be true for your content library and cloud
21 market -- markets as well; right?
22 A.  Yes.
23 Q.  So let's talk about your model that does predict these two
24 models that give a different prediction of the share shift.
25 Okay?

558

1      You told us that the share model uses U.S. data; right?
2  A.  Yes.
3  Q.  Okay. And the other uses global.
4      What else is different about the share model from the
5  foreclosure model that results in these different predictions?
6      I'll just ask you the simple question: Why don't they
7  come out the same?
8  A.  So my vertical foreclosure model I note that I'm using a
9  conservative input relative to the 8.9 percent. If I use the
10 higher conversion rate in a vertical foreclosure model, it
11 would predict a higher share shift and a greater likelihood of
12 foreclosure. I use other evidence to support the inputs of my
13 vertical foreclosure model.
14 Q.  We'll get to the support. We're just trying to figure out
15 what's different about the models.
16 A.  So --
17 Q.  So here in the foreclosure model, one input that's
18 different is the conversion rate; right?
19 A.  The share model doesn't have a conversion rate. So
20 they're just different models. But my vertical foreclosure
21 model I said again uses a conversion rate that implies a lower
22 share shift than what I predicted with the share model.
23 Q.  The share side you don't even have a conversion rate;
24 right?
25 A.  It's a different model.

559

1    Q.   Right.
2         Here in your foreclosure model you have an input for
3    conversion, which means those gamers that will move off
4    PlayStation and go buy an Xbox if there's total foreclosure?
5    A.   The conversion is a subset of users on PlayStation who
6    would buy a new Xbox, that's correct.
7    Q.   And you put in the model 20 percent of people who play
8    Call of Duty on PlayStation would go buy an Xbox; right?
9    A.   It's 20 percent of a subset of users on PlayStation.  It's
10   the users who would have played Call of Duty on PlayStation and
11   of those users who don't already own an Xbox; right?  The folks
12   who could possibly buy an Xbox and also they don't play on a PC
13   Call of Duty.  So with that subset of users I'm assuming
14   20 percent of them would purchase a new Xbox box.
15   Q.   Okay.  So we're going to -- we're -- you're getting ahead
16   of what that is 20 percent of, but put an input based on
17   however you measured that group, whoever that group is, of
18   20 percent of those folks would convert; right?
19   A.   That is an input for one specification, that is right.
20   A.   That is not a quantitative assessment produced from either
21   of your models; right?
22   A.   So I provide support for the various inputs using --
23   Q.   Professor Lee --
24   A.   -- quantitative evidence, yeah.
25   Q.   -- I didn't ask you for the other support.  We'll get to

560

1    that.
2         I just asked you whether your -- either of your models
3    produces this conversion rate of 20 percent after you run it.
4    A.   The 20 percent is input so it's not produced.
5    Q.   So you put that into the model, that number, and you put
6    that in and you say you have justification for why you made it
7    20 percent; right?
8    A.   I provide support for that input.
9    Q.   Okay.  And then let's erase these underneath here and
10   start with the -- who you were measuring in each of these
11   models.  Okay?
12        Go to where you were talking about first foreclosure
13   model.  This is 20 percent of what world?
14   A.   So we're focusing first the universe of PlayStation users
15   and then --
16   Q.   That's the hundred percent?  Is that who you measured?
17   A.   I'm sorry.  Are you asking me the population that
18   conversion rate applies to?
19   Q.   Yes.
20   A.   Yes.  So I'm starting with a set of all PlayStation
21   users --
22   Q.   All?  I'm sorry?
23   A.   -- all PlayStation users, and then --
24   Q.   That play Call of Duty or don't?
25        THE COURT:  He's getting there.  He's getting there.

561

1         THE WITNESS:  So all PlayStation users, and then we'll
2    look at the folks who are predicted to play or purchase Call of
3    Duty on PlayStation.  Let's call those users affected users.
4    Those are the ones who would be affected by the vertical
5    foreclosure.
6    BY MS. WILKINSON:
7    Q.   So that's a smaller circle; right?
8    A.   It's a subset, that's correct.
9    Q.   And these are -- are these people who play COD?
10   A.   They're the ones who purchase it and presumably play it.
11   Q.   Would you purchase it if you didn't play it?
12   A.   I would personally not.
13   Q.   Okay.  So these are people who play COD; right?
14   A.   For the purposes of this, yes, the Call of Duty players
15   who would be playing the feature.
16   Q.   Okay.
17   A.   And now of these folk --
18   Q.   Yes.
19   A.   -- there's a fraction that don't own an Xbox.
20   Q.   And that's only in this smaller circle, not in the bigger
21   circle?  There's a -- you're already looking at the people who
22   play or would go buy Xbox to get COD, and you're saying that
23   some of those people already own an Xbox; right?
24   A.   Correct.
25   Q.   Okay.  So that's a little bit smaller world; right?  These

562

1    people own an Xbox so you're not going to count them?
2    A.   That's correct.
3    Q.   Okay.  Now who are we left with?
4    A.   And then some subset of them may actually -- they don't
5    own Xbox but they own a PC, and some of those folk may decide:
6    You know, Call of Duty is foreclosed.  I'm going to play on my
7    PC instead.  And we're going to set those folk aside.
8    Q.   Okay.  And in this -- before you get to that smaller set,
9    in this set of people you didn't consider because they either
10   own an Xbox or a PC and you don't think they would convert;
11   right?  That's the --
12   A.   The ones who purchased a PC, right.
13   Q.   PC; right?
14   A.   Right.  Right.
15   Q.   You don't include anyone who might go buy a Nintendo in
16   the future to play COD; right?
17   A.   So, yeah, this is focusing on COD as being available on
18   PlayStation Xbox using projections from Microsoft's deal model
19   for future sales of Call of Duty on the two platforms.
20   Q.   That wasn't my question.  My question was:  When you
21   consider who to measure, you didn't consider people who might
22   go buy a Nintendo in the future when Call of Duty is available
23   on it; right?
24   A.   So in the vertical foreclosure model, I don't -- I have
25   sales projections for COD and Switch and those -- that

563

1  possibility is not contained.
2  Q.  Okay.
3      All right.  So we're down in this world of people who play
4  COD to own an Xbox or a PC that they would already use for COD,
5  and is that the world you were measuring?
6  A.  So that is the population of potential Xbox purchasers in
7  my model.
8  Q.  Okay.  So that's what we call the potential Xbox
9  purchasers.  And that means in the future world that you're
10  measuring in theory, Call of Duty is not accessible on a
11  PlayStation; right?
12  A.  Yes.
13  Q.  And you're predicting that a certain percentage of these
14  people will go buy an Xbox because they want to play Call of
15  Duty?
16  A.  Yes.
17  Q.  Okay.  So 20 percent is of which world?
18  A.  Potential Xbox purchasers.
19  Q.  So of this world?  Not of all PlayStation folks.  So it's
20  20 percent of this world; right?
21  A.  Yes.
22  Q.  Now, you've looked at other studies, surveys, models and
23  they measure it differently; right?
24  A.  Different pieces of evidence have different measures.
25  Q.  Okay.  So over here in your share model, can you describe

564

1  for us what world you're measuring?  When you say 8.9 percent
2  of people who switch, 8.9 percent of what?  For who?
3  A.  It's 8.9 percent of overall Gen 8 console sales.
4  Q.  So this world is you looked at all of the sales of Gen 9
5  consoles, which would only -- which would mean PlayStation 5
6  and Xbox X and S?
7  A.  The share model again is Gen 8.  The share model is Gen 8.
8  Q.  Right.  So this is not all sales of Gen 9?
9  A.  It is all sales of Gen 8 of PlayStation 4 and Xbox 1.
10  Q.  Okay.  So this world that you used for share is a very
11  different world than the world you measured for your
12  foreclosure model; right?
13  A.  It's different data as we discussed.
14  Q.  Yeah.  And this is that U.S. data for Gen X and Xbox 1;
15  right?
16  A.  Correct.
17  Q.  Did you look at all that or is there a smaller world that
18  you measured before you got to the 8.9 percent?
19  A.  So the data in the share model is all Gen 8 sales --
20  Q.  So this --
21  A.  -- in the U.S.
22  Q.  Sorry.  You go ahead.  Finish.
23  A.  All Gen 8 sales in the U.S.
24  Q.  Okay.  So this is U.S. only.
25      Okay.  And this is, out all of those folks, 8.9 percent

565

1  you're predicting with this model would buy an Xbox; right?
2  A.  To shift, yes, in the shares.
3  Q.  So this is not -- the share model is not -- when you
4  compare the share to the foreclosure, those are not apples to
5  apples; right?
6  A.  So the 20 percent of potential Xbox purchasers if they
7  bought a new Xbox in the vertical foreclosure model would imply
8  a share shift of overall console sales.  So that's the 5.5
9  percentage points.
10  Q.  Right.  But that wasn't my question.
11  A.  I apologize.
12  Q.  You are not -- you've heard the phrase "comparing apples
13  to apples or apples to oranges"?
14  A.  I have heard that phrase.
15  Q.  Yeah.  And apples to apples means they're basically the
16  same based on the same, here, datasets so you can compare to
17  see whether you're producing a similar result.  That's not what
18  you did here; right?
19  A.  Comparisons inevitably have differences, and I think
20  that's why it's important to look at many different sources.
21  And I agree with you that for reasons that you correctly
22  pointed out, there are differences that go into the two
23  different models.
24  Q.  And just to make this clear, over in the foreclosure model
25  it's global data, right, which is not what you did in share?

566

1  Right?
2  A.  It is global projected sales.
3  Q.  And is it Gen 8 and Xbox 1 data?
4  A.  It is future sales of content which includes Gen 9
5  consoles.
6  Q.  So this includes Gen 9, the foreclosure model, but the
7  share model doesn't?
8  A.  Correct.
9  Q.  Now, you say that -- we can go back to the share model,
10  but let's focus on the foreclosure model because you're saying
11  you think that's more conservative because it's a smaller
12  number; right?
13  A.  Yes.
14  Q.  It's -- it's -- I don't know, you do the math for me
15  because you're the math guy -- but it's a little -- the share
16  model is a little less than half as large or double as the 5.5?
17  How would you describe it?
18  A.  5.5 is less than 8.9.
19  Q.  Okay.
20      THE COURT:  3.4 percent.
21      MS. WILKINSON:  Pardon?
22      THE COURT:  3.4.
23  BY MS. WILKINSON:
24  Q.  Do you agree with that?
25  A.  I agree with Your Honor.

567

1    (Laughter)

2    **THE COURT:** Okay. I can do basic math.

3  BY MS. WILKINSON:

4    Q.   That's a good move on your part.

5         Okay. So let's talk about, you say: Okay. This produces

6    5.5 percent and it's true that I picked this 20 percent, but

7    I've looked at other things that make me believe this is a

8    correct prediction. Right?

9    A.   I think that's -- that's important to emphasize in my

10   vertical foreclosure model I use a range of conversion rates

11   because I agree that precision is difficult for numbers that

12   might be uncertain, and so I looked across a range of

13   conversion rates and implied share shifts to inform my economic

14   opinions.

15   Q.   When you -- we'll get there, but when you change these

16   levers, the 20 percent and another lever you have -- which is

17   the LIV, the value of the console over the life of the console?

18   A.   That is another input, correct.

19   Q.   When you change those, you get a different share shift;

20   right?

21   A.   The LIV does not affect the share shift.

22   Q.   You get a different value for what it is worth? In other

23   words, what you would recoupe versus what you lost; right?

24   A.   The LIV affects whether the vertical foreclosure model

25   predicts foreclosure would be -- the benefits would exceed the

568

1    costs, that's right. It's --

2    Q.   And, again, to try to keep it simple, you were trying to

3    figure out if it was worth it economically in this model or at

4    what point it would be worth it for Xbox to withhold Call of

5    Duty; right?

6    A.   The vertical foreclosure model with only the benefits and

7    costs that it contains looks at whether the benefits from

8    taking a title exclusive would exceed the cost; and that's

9    right, that's an output of the --

10   Q.   So if we were at a hundred percent, that means you would

11   lose those revenues on -- from PlayStation, Xbox would, because

12   it's pulling it from PlayStation; right? But it would -- by

13   putting it on Xbox, it would gain the same amount so it would

14   be neutral basically; is that right?

15   A.   That's right. The hundred percent says the benefits

16   within the model are equal to the costs; and if it's above a

17   hundred percent, then the model using only those benefits would

18   predict they would exceed the costs.

19   Q.   Right. So if it's 113 percent, which is what you say it

20   can be and will produce this 5-point, that is a positive,

21   meaning they would make more money by withholding it than they

22   would by providing it to PlayStation; right?

23   A.   Within the model and the benefits contained, that's the

24   model's prediction.

25   Q.   Okay. And I don't know that we can say the numbers

569

1    publicly, but there's a known number that everybody agrees on

2    of the sales that you're using that would be on PlayStation;

3    right?

4         You -- everybody agrees. There's -- you are looking at a

5    number of sales that you predict and that Xbox predicts it

6    would get from selling it on PlayStation; right?

7    A.   I'm using Microsoft projections for future sales.

8    Q.   Right. And that is for -- that is also for only

9    withholding the 2025 version, is that right, of PlayStation --

10   I mean of COD?

11   A.   I have two analyses with COD. One with just 2025 and also

12   one that looks at removing four years in a row of COD. So '25,

13   '26, '27, '28. So that's another variant, but we can for now

14   just talk on the '25 one.

15   Q.   So this one you're saying if you -- if they did not give

16   PlayStation COD 2025, they would lose a certain amount of money

17   because they would forego those sales on PlayStation; right?

18   They would lose revenues?

19   A.   That is one of the costs, that's right.

20   Q.   And you have a number in your report what that number is;

21   right?

22   A.   In terms of lost revenues on PlayStation sales, lost

23   profits on PlayStation sales.

24   Q.   I'm just going to call it X lost revenue. Okay? We don't

25   need to say the number.

570

1         And then you have a number that's Y, which are the

2    increased revenues or the revenues it would get if it sold it

3    only on Xbox; right?

4    A.   I may have misspoken. It's supposed to be profits. But,

5    yes, increased profits --

6    Q.   Okay.

7    A.   -- from sales on Xbox, from increased console sales, and

8    from increased, you know, other things that Microsoft earns

9    when consumers come over to the Xbox platform.

10   Q.   Right. But it's -- we'll call those the profits they make

11   from putting it only on Xbox; right?

12   A.   Yes.

13   Q.   From Call of Duty and the other things you think.

14        So over here on the losses, it's not lost revenue, it's

15   loss profits; right?

16   A.   Yes.

17   Q.   So there you're comparing apples to apples; right?

18   A.   I'm comparing profits -- lost profits to recoupe profits.

19   Q.   That's apples to apples. Those are compared to -- profits

20   you would make on one platform versus profits you would make on

21   another?

22   A.   Yes.

23   Q.   Okay. And you're -- you predict that that would be

24   113 percent; is that right? In other words, it would be more

25   positive to withhold it because you would net out more profits

571

1 than if you kept it -- excuse me. If I'm walking away, please
2 tell me -- than if you kept it on PlayStation; right?
3 **A.** So for one set of many inputs, I tried; but for one
4 particular set of inputs, that number is 113 percent.
5 **Q.** Let's -- so we can show all the changes, why don't you
6 tell Her Honor where you have that chart which shows what
7 happens when you change some of those inputs.
8 **A.** Sure. Your Honor, it is on PX5001-076 or page 72 of that
9 document.
10 **Q.** Is that your rebuttal report?
11 **A.** It is my reply report and it is Figure 11. Again,
12 PX5001-076.
13                   (Pause in proceedings.)
14 **BY MS. WILKINSON:**
15 **Q.** I don't think we can show this -- right? -- so we're going
16 to refer to it carefully because Her Honor sees this version,
17 the public doesn't.
18     So I'm going to count rows and things like that if you
19 don't mind. Okay?
20 **A.** Understood.
21 **Q.** All right. So what this shows is two of the inputs that
22 you put into your foreclosure model, one is the LTV adjustment
23 factor; right?
24 **A.** Yes.
25 **Q.** And the other is the Xbox conversion rate; right?

572

1 **A.** Yes.
2 **Q.** Okay. The LTV adjustment factor, you're saying that when
3 Xbox withholds PlayStation, they don't just get the exact same
4 revenues, they get more because Call of Duty people spend more
5 over the lifetime of the console, right, compared to non-COD
6 players?
7 **A.** If it helps Your Honor to provide a bit more context what
8 the LTV means or references, so the LTV or lifetime value is
9 what Microsoft projects a new Xbox user is worth, and there's
10 an average LTV across all new Xbox users.
11     And what this adjustment factor accounts for is that
12 somebody who comes over to Xbox to play a particular piece of
13 content, like Call of Duty, might actually be worth more to
14 Microsoft because that user would likely spend more.
15     And so 40 percent says --
16         **THE COURT:** Spend more than someone who came over for
17 different titles?
18         **THE WITNESS:** Just an average -- just an average Xbox
19 user.
20     So compared to the overall set of new Xbox users, people
21 come over to play Call of Duty. Here, it indicates they would
22 spend -- it would be worth 40 percent more to Microsoft over
23 this five-year period.
24 **BY MS. WILKINSON:**
25 **Q.** Okay. And if we turn back to 71, just so Her Honor can

573

1 see the numbers, in the last paragraph, 2018, this describes
2 what we've been describing; that what happens when you withhold
3 the 2025 release of Call of Duty. And it shows the loss of
4 profits from withholding it from PlayStation but what they
5 would recoup on Xbox; right?
6 **A.** Can you point me again to where you're looking at?
7 **Q.** Paragraph 218 on page 71. Just a page before where you
8 are.
9     Right? That -- that was a scenario that you used
10 originally in your first report; right?
11 **A.** So there's a revised LTV, but that is the scenario that I
12 evaluated.
13 **Q.** And after Professor Carlton submitted his report, you
14 revised the LTV; right?
15 **A.** So this LTV came from data I did not have access to so I
16 updated it with the most recent data that was provided.
17 **Q.** And when you predict this loss of profits, you're doing it
18 over five years; right?
19 **A.** This is looking forward over five years of lost sales.
20 **Q.** But it's withholding only one year of Call of Duty; right?
21 **A.** This one is withholding one year of Call of Duty.
22 **Q.** Right. So now let's look at paragraph 219 with your
23 Figure 11.
24     And there, you're responding to criticisms from
25 Professor Carlton and you're trying to say, "Well, look what

574

1 happens. Even when you change my inputs, here are the
2 results"; right?
3 **A.** Figure 19 sets up -- paragraph 219 -- sorry -- sets up
4 Figure 11, which presents a range of predictions for different
5 inputs.
6 **Q.** You didn't have Figure 11 in your original report, did you
7 or do you remember?
8 **A.** I believe I had --
9 **Q.** You did.
10 **A.** -- a sensitivity analysis like this in my original report
11 for all three proposed scenarios I analyzed.
12 **Q.** Let's look at this one.
13     And you show -- let's start with the one that we were --
14 that was on the prior page. So that is a certain percentage
15 LTV adjustment factor; right? You see the third one down?
16 **A.** I do see that.
17 **Q.** And when you go over for 15 percent, it is not a net
18 positive to withhold Call of Duty 2025 from PlayStation; right?
19 **A.** As I note, this model is missing many other benefits, but
20 within the model --
21 **Q.** That's all we're asking.
22 **A.** -- it's 97 percent.
23 **Q.** So it's not a hundred percent. We're trying not to reveal
24 all the numbers, but --
25 **A.** Sorry.

1  Q.  -- that's all right.  You made my point.  It's not a
2  hundred percent; right?
3  A.  This table is below.  The number is below.
4  Q.  So if you're wrong about your conversion rate and it
5  should be 15 percent and not 20 for number three for your --
6  even including the LTV adjustment you make, it doesn't give
7  Xbox a net positive or incentive or reason to -- based on the
8  numbers, to withhold Call of Duty from PlayStation; right?
9  A.  I wouldn't draw that conclusion.  I would say that within
10  the model, that is what is predicted.
11  Q.  That's what we're talking about as we go forward.  We're
12  just talking about the model.  Not other things you looked at
13  right now.  Okay?
14       Your model produces a percentage that's less than a
15  hundred percent, and you told us a hundred percent is where
16  it's even; right?
17  A.  Within the model, that's correct.
18  Q.  Okay.  Now, within model, if you change the LTV adjustment
19  factor, right, you also get different percentages?  Right?
20  A.  That is correct.
21  Q.  The lower it is, the lower the recoupment or conversion
22  rate and the higher you make the LTV, the higher the conversion
23  rate -- I mean, the recoupment rate or percentage; right?
24  A.  Correct.
25  Q.  And the same is true, you only modeled down to the LTV --

1  for the Xbox conversion rate you only modeled down to
2  15 percent; right?
3  A.  I present --
4  Q.  You only use 15 -- the lowest percentage you use is
5  15 percent for a conversion rate?
6  A.  I don't recall in my -- the backup material, but on this
7  table the lowest number that is presented is 15 percent.
8  Q.  Okay.  So you have -- one, two, three, four -- five
9  percentages here and you picked the one in the middle,
10  20 percent, when you initially made the prediction -- I mean,
11  you put that as the input into your model?
12  A.  I have a 20 percent input and I present sensitivities
13  around that input.
14  Q.  Okay.  So if someone thinks it's 15 percent and disagrees
15  with you, since you picked that yourself, they're going to come
16  up with a different recoupment rate even using your -- every --
17  keeping everything else the same in your model?
18  A.  That is correct.  With different inputs, one gets
19  different recoupment rates.
20  Q.  Okay.  So is it fair to say this 20 percent input is
21  important because if you use a different number, you produce a
22  different result in your model?  I think that's pretty
23  elementary, isn't it?
24  A.  I think the characterization is important is what I'm
25  saying.  I agree that for a given input, you get different

1  outputs; but when forming my economic opinions, I'm looking at
2  the output across a range of inputs.  And also --
3  Q.  We're just talking about the model right now.
4  A.  That's correct.  My use of the model looks across the
5  range of inputs and understands the limitations of the model
6  and benefits that are left out of the model to inform my
7  opinions.
8  Q.  If you change the conversion rate input, you get different
9  outputs from your model?
10  A.  Correct.  And I -- and I -- I understand that and factor
11  that into forming my economic opinions.
12  Q.  Okay.
13  A.  Sensitivity of results is a critical input into reasonable
14  economic modeling.
15  Q.  Great.
16       All right.  Now let's talk about other information you
17  looked at in addition to your modeling to determine whether
18  this 5.5 percent share shift is reasonable; right?
19  A.  Okay.
20  Q.  You did that, didn't you?
21  A.  Yes.
22  Q.  You didn't just rely on the model?
23  A.  I provided other evidence that supported the use of this
24  input.
25  Q.  And one of the things you site is Microsoft Xbox e-mail;

1  right?
2  A.  Yes, I believe.
3  Q.  They talk about --
4  A.  Is there a particular --
5  Q.  Sure.  PX1136.  Take a look at that.
6  A.  (Witness examines document.)
7  Q.  You're familiar with this document; right?
8  A.  I am.
9  Q.  And this is -- we can look at the e-mail.  This is an
10  e-mail that is forwarding an assessment of purchasing a
11  different studio and different games and how that might affect
12  whether to take those games exclusive; right?
13  A.  That is my understanding.
14  Q.  Okay.  And then the document is dated 11-1-2019?
15  A.  The latest e-mail on that chain is dated that.
16  Q.  Great.
17       And it -- it -- it attaches a strategy approval for
18  purchasing this studio; right?
19  A.  Yes.
20  Q.  Do you know if Xbox did purchase that studio?
21  A.  It's my understanding they did not.
22  Q.  So you look in this document, and let's look at 004, and
23  you point to these numbers to say that they support your
24  calculation of a 5.5 percent share shift; right?
25  A.  I use this document to note it's consistent with both the

579

1  share model and the foreclosure model.
2  Q.  I believe we can show this portion, which is number two,
3  the role of content.
4      MS. WILKINSON:  Roger, if you can show that -- publish
5  that, please.
6  BY MS. WILKINSON:
7  Q.  Okay.  And this is the paragraph you're talking about;
8  right?
9  A.  Yes.
10  Q.  And in this they are evaluating what would happen if they
11  held content exclusive that they're buying instead of putting
12  it on multiple platforms; right?
13  A.  I believe this is -- are you talking about the highlighted
14  passage?
15  Q.  No.  The whole paragraph.  We'll get to the highlighted
16  portion.
17  A.  Yes, it's my --
18  Q.  I'm trying to show what would change -- would it change
19  growth in the console for them; right?
20  A.  It's my understanding this is talking about how content,
21  exclusive content, can affect console sales.
22  Q.  And in parentheses it says (as read):
23          "Where an exclusive AA" -- or "AAA release accounts
24      for a 2 to 4 percent console share shift in the U.S."
25      Right?

580

1  A.  Yes.
2  Q.  You weren't measuring in your foreclosure model U.S. data;
3  right?  You were using global?
4  A.  It's looking at global sales.
5  Q.  So you're not suggesting the 2 to 4 percent is similar and
6  comparable to your 5.5 percent, are you?
7  A.  The 2 to 4 is used to compare the share model against.
8  It's the 1 to 3 to which you would use to compare against the
9  foreclosure model.
10  Q.  Right.  So when you look at this document, the share shift
11  that is estimated here is much lower than 5.5 percent; right?
12  A.  It is lower.
13  Q.  It's 1 to 3 percent; right?
14  A.  For -- it's my understanding this is for AAA titles in
15  general.  I provide evidence that Call of Duty likely has a
16  much larger share shift than a typical AAA title.
17  Q.  But you picked this and in your report said this supports
18  that your 5.5 is a reasonable share shift estimate; right?
19  A.  I note that my share model notes that Call of Duty,
20  because it sells so many more copies than other AAA titles, is
21  likely to have a larger share shift than a typical AAA title.
22  Q.  And if you picked 2 percent to test between -- which is
23  the middle, between 1 and 3 percent; right?
24  A.  2 is between 1 and 3.
25  Q.  Okay.  I'm glad we can agree on that.

581

1  -- and you modeled that out, the 2 percent, that would not
2  make it financially feasible or reasonable to withhold Call of
3  Duty from PlayStation; right?
4  A.  So in my vertical foreclosure model, I don't recall the
5  exact numbers, but if the conversion rate fell and you got a
6  2 percent shift and you held fixed all the other inputs, that
7  likely will be the case in the model.
8  Q.  You know that because Professor Carlton pointed that out
9  to you, right, in his report?
10  A.  I know -- I guess -- I'm inferring that because we
11  discussed how a 15 percent conversion rate would be a little
12  less than a hundred, and so an even lower conversion rate would
13  also be below a hundred.
14  Q.  Did you yourself do the modeling using an -- only a
15  2 percent or even a 3 percent shift worldwide?
16  A.  So I conducted my model using what I, through my
17  evaluation of the evidence, believed to be reasonable share
18  shifts for a title like Call of Duty.
19  Q.  But you didn't separately analyze it with a 2 or 3 percent
20  market shift; right?
21  A.  It was not consistent with what I viewed in the documents
22  in the share model.  For example, the share model predicts in
23  the U.S. share shifts of AAA titles that are actually around
24  2 percent or even less.  So it's within this range of 2 to 4,
25  and the share model predicts the Call of Duty in the U.S. has a

582

1  much larger share shift.
2      And so those pieces of evidence together is what I
3  discussed at length in my reports as supporting this value for
4  my vertical foreclosure model.
5  Q.  Okay.  And did you look at page 5 of this same document?
6  A.  I recall looking through this document.
7  Q.  And I just want to make sure I have the right page.
8          (Pause in proceedings.)
9  BY MS. WILKINSON:
10  Q.  Did you see that they -- the folks at Xbox did a
11  subsequent analysis based on their predictions that showed
12  exclusivity would lose money and they recommended maintaining
13  those games if they purchase the studio to be cross platform?
14  A.  I'm aware that an evaluation of exclusivity for these
15  games on this particular studio they had a recommendation not
16  to go exclusive.  In my report I detail this at length and
17  discuss why it's different than or likely different than the
18  incentives at issue here with Activision.
19  Q.  But at least if you're looking at these numbers, no one at
20  Xbox was recommending that you withhold these games that you
21  were comparing your share shift to from multiple platforms;
22  right?  Just a yes or no answer.
23  A.  I don't -- maybe I didn't -- I didn't follow the question.
24  Q.  No one at Xbox when analyzing these same figures you're
25  comparing to recommended that they withhold the games of this

583

1  acquisition target studio because it would be economically
2  favorable; right? They didn't recommend that, did they?
3  **A.**  It's my understanding for this studio they did not
4  recommend.
5  **Q.**  They recommended keeping the games cross platform; right?
6  **A.**  It's my understanding that for consoles, they recommended
7  not exclusive; but for subscription services, they recommended
8  exclusivity.
9  **Q.**  Okay. You don't have a model on subscription services so
10  we're just talking about the model numbers that you're
11  producing -- the numbers you're producing from your model.
12  **A.**  Okay.
13  **Q.**  Right? And based on their modeling, they do not recommend
14  withholding those games?
15  **A.**  On consoles.
16  **Q.**  Right. Okay.
17       Now, you also say that survey evidence you've looked at
18  corroborates your prediction of a 5.5 percent model; right?
19  **A.**  There is survey evidence consistent with output from the
20  20 percent conversion rate.
21  **Q.**  And did you familiarize yourself with that survey so you
22  know what they were measuring?
23  **A.**  I believe I am familiar with the survey.
24  **Q.**  Okay. And this is the YouGov survey that was done over in
25  Europe?

584

1  **A.**  My understanding it's a survey that was commissioned by
2  Microsoft and presented to the CMA.
3  **Q.**  It was done in Europe not in the U.S.; right?
4  **A.**  Correct. It's my understanding it was European users.
5  **Q.**  So let's get rid of the share model.
6       And this is the YouGov data we're going to talk about for
7  a minute to show that you say this also supports your
8  5.5 percent share shift and your input of 20 percent
9  conversion; right?
10  **A.**  Yes.
11  **Q.**  Okay. So this is YouGov and let's start with their world.
12  Who did they survey?
13  **A.**  It's my understanding they surveyed PlayStation users in
14  certain countries in Europe as well as those who are looking to
15  potentially purchase a PlayStation.
16  **Q.**  Potential and purchase, is that what you said?
17  **A.**  I believe the two statistics I cite are among existing
18  PlayStation owners and those who would potentially purchase a
19  PlayStation.
20  **Q.**  So the difference, just to be clear, is the existing is
21  the person A owns a PlayStation and if Call of Duty is
22  withheld, they're predicting or asking those folks whether they
23  would go out and buy an Xbox; right?
24  **A.**  I believe it's what would they have done, but I just need
25  to look at that --

585

1  **Q.**  Okay.
2  **A.**  -- survey. If you can --
3  **Q.**  And then for potential, they're looking at what they would
4  do not right then but when a new generation of consoles come
5  out; right?
6  **A.**  That is my understanding.
7  **Q.**  That's future purchase?
8  **A.**  That is my understanding.
9  **Q.**  Now, they didn't measure all these folks; right? They
10  measured a subset of these folks; right?
11  **A.**  It's my understanding they surveyed a sample of the
12  population.
13  **Q.**  And what was the sample population that they surveyed?
14  **A.**  My understanding as was represented by Microsoft it's a
15  more representative population than the survey conducted by the
16  CMA. I think it was PlayStation users and those that were
17  considering purchasing a PlayStation.
18  **Q.**  So you think that was -- that was the world of folks that
19  they surveyed? There was no other limitation? It was just
20  people that had PlayStations, played COD, and might switch or
21  might buy the new Xbox?
22  **A.**  I -- the evidence or the slide deck that I cited to looked
23  at, it said it surveyed a set of users that were PlayStation
24  users or potential future PlayStation users, and I believe that
25  Microsoft described it in a submission to the CMA as a wider

586

1  set of users, more representative in the CMA.
2  **Q.**  That's what you're saying, that it's wider than the folks
3  you looked at? It's a broader group than what you looked at?
4  **A.**  It's -- it's people who also do not play Call of Duty, for
5  example.
6  **Q.**  Okay. Let's head up Exhibit RX5053. This is the complete
7  deck; right?
8       **MS. WILKINSON:**  Can I hand it up, Your Honor?
9       **THE COURT:**  Yeah.
10       **THE WITNESS:**  I --
11  **BY MS. WILKINSON:**
12  **Q.**  This is what you reviewed; right?
13  **A.**  I recall reviewing a different or --
14       (Witness examines document.) I believe the slide deck I
15  cited to is a subset of this slide deck, but it is -- this
16  is -- yeah, it seems to be referring to the survey that I
17  reference in my initial report.
18  **Q.**  Okay. So it has some of the slides you reference and
19  more; right?
20       Well, why don't we start so we can see if you're right
21  about who they surveyed and whether you can compare it. Okay?
22  Look at --
23       **MS. WILKINSON:**  Your Honor, we would move in RX5053.
24       **THE COURT:**  Admitted.
25       (Trial Exhibit 5053 received in evidence.)

587

BY MS. WILKINSON:

Q.   And page 6, please.  Do you see the sample up at the top
and it says how many people they sampled?

A.   I see that.

Q.   Not filtered based on games played; right?

A.   I see that.

Q.   And then they were asked a question or questions; right?
And they responded to that and that data was used to analyze
whether people would move and how many would move to an Xbox
console; right?

A.   I see that.

Q.   You didn't do a survey; right?

A.   I did not conduct a survey.

Q.   All right.  And so they focus specific questions on
favorite games; right?  Take a look under the diversion
estimation on that same page, 006.

A.   I see that.

Q.   So they were asking, thinking back about your latest
console purchase, what would they have done if their favorite
or second-most favorite game had not been available on the
console; right?  That's for past diversion; right?  That's what
it says on page 6; correct, Professor Lee?

A.   I understand that that's what it says on page 6.  I'm
looking for the statistic that I cited.

     THE COURT:  No, no.

588

     THE WITNESS:  Yeah.

     THE COURT:  She's just asking you first about page 6.
Okay?

     THE WITNESS:  Yeah, that is what it says on page 6.

BY MS. WILKINSON:

Q.   For future diversion, if -- they ask would they change
their planned console purchase, if they have one, if future
releases of their favorite or second-most favorite game will
not be available on the console the plan -- they plan on
purchasing; right?

A.   I see that.

Q.   So these are very different questions and responses that
they're using to measure or predict conversion than you did;
right?  Or market share shift.  Sorry.

A.   For this survey, that appears to be a different set of
questions.

Q.   Okay.  So you pointed out, I believe, in your report that
this survey would show and result in 5 percent of those folks
would shift; right?

A.   It's referencing the statistic on page 2 of this slide
deck.  I -- I -- this slide deck -- yeah, it's a different
slide deck that I reference in my -- in my report.

Q.   Okay.  Do you want to turn to those pages so you're more
comfortable with what was done in your report?

     THE COURT:  Can you point me to the page in the report

589

you're referring to?

     MS. WILKINSON:  Yes.  That's what I'm -- I'm sorry,
Your Honor.  That's what I'm -- I don't know which one he's
referring to.

BY MS. WILKINSON:

Q.   So I'm asking, Professor Lee, if there's a page you want
us to look at in your report and which report it's in.

A.   Yes.  So the document that I'm referencing -- am I able to
show my demonstratives in my witness binder?

     THE COURT:  You can look at them.

     THE WITNESS:  Are you able to see them, Your Honor?

     THE COURT:  Yeah.  But first I want to find -- you're
questioning him about support that he gave for his foreclosure
model number.  Where in the report did he give that support?
That's my question for you, Ms. Wilkinson.

     MS. WILKINSON:  Yes.  And where did he reference?

     THE COURT:  Where in FX5000, what page, do I go to see
in the report?  You don't know?

     MS. WILKINSON:  No.  I'm asking him what page he says
discusses the YouGov survey.

     THE COURT:  Yes, but you asked him specifically about
this, that he referenced it in his report.  Where in his report
did he reference this?  That's my question.

     MS. WILKINSON:  I'm not sure, Your Honor.  That's why
I'm asking him.

590

     THE COURT:  So you don't know.

     MS. WILKINSON:  I do know he did --

     THE COURT:  Oh, okay.

     MS. WILKINSON:  -- I believe; but if he didn't, then
that's also of interest to us.

BY MS. WILKINSON:

Q.   So did you reference this survey in your report?

A.   On page FX5000-345.

Q.   That's your initial report; right?

A.   This is my initial report, paragraph 762.

Q.   762?

A.   Correct.

     (Witness examines document.)  And this is -- Footnote 959
is a document that I reviewed and considered.

          (Pause in proceedings.)

BY MS. WILKINSON:

Q.   Okay.  So that's on page 345; right?

A.   Correct.

Q.   And it's down in your footnote; right?

A.   Footnote 959.

Q.   Last one on the bottom.  And you're referring to the slide
presentation that was done from this data that we were just
looking at, the complete survey information; right?

A.   It's my understanding this was a presentation made to the
CMA is my understanding.

1  Q.  Okay.  So it's easier for you to reference.  Let me give
2  you that document as well, which is 5054.
3      MS. WILKINSON:  And we'd move that into evidence,
4  Your Honor.
5      THE COURT:  All right.  Admitted.
6      (Trial Exhibit 5054 received in evidence.)
7  BY MS. WILKINSON:
8  Q.  And before you look at it, I just want to ask you a few
9  questions about it.  Okay?
10     5054 is a set of slides that were presented to the EC;
11 right?  Is that right?
12 A.  It's my recollection it was the CMA.
13 Q.  Okay.  But these are slides that were presented to the CMA
14 summarizing the YouGov survey information, right?
15 A.  This is the slide deck I reviewed.  That's my
16 understanding of what the slide deck is.
17 Q.  So you reviewed 5054; right?
18 A.  I reviewed 5054.
19 Q.  Did you, in coming to your conclusions, review RX5053?
20 A.  I don't recall that full document.  I tried -- my
21 recollection is I'm trying to find more information.
22     I will note that the slide deck 5054 does not -- I don't
23 recall having that question asked.
24     On Slide 11 and 12 of 5054, Your Honor, these are the 3
25 percent and the 5 percent numbers that I referenced, and you

1  will see here that a large fraction of those users are said to
2  not play Call of Duty.
3      And it's my understanding that if a game is one of their
4  favorite games, it's odd that a very large percent of them do
5  not actually play that game.  It's strange that, you know, you
6  don't actually play a game if it's one of your favorite games.
7  And so my -- just having access to this deck, when I looked at
8  it, I -- I saw the survey as the whole -- the population of
9  PlayStation users that didn't condition on whether Call of Duty
10 was their favorite game.
11 Q.  Okay.  So you didn't understand what the basis of this
12 slide was?  You found it questionable on RX5054-011?
13 A.  I didn't say I found it questionable.  I looked at that
14 document.  I noted that there's a population of PlayStation
15 users.  There is a submission to the CMA by Microsoft that
16 represented it being a more representative sample.
17     The -- Microsoft raised criticisms of the survey used by
18 the CMA because they engaged in a sample restriction.  They
19 focused on users who only spent I think over a hundred dollars
20 or over ten hours on Call of Duty.
21     This one they said, "You know, we want to look at a wider
22 sample of users."  And so they have this YouGov survey.  So
23 with those documents, I evaluated the slide as if it was
24 looking at the wider population.
25 Q.  Right.  So that it was looking at all gamers, right, who

1  use existing PS or PlayStation gamers?  Right?
2  A.  Are you still representing that it's conditional on it
3  being their favorite game?  I guess I'm just wondering where
4  are we now in our understanding of this.
5  Q.  I'm trying to figure out what you knew about this survey
6  when you said it was consistent with your results.
7      They do not limit it to people who play Call of Duty, do
8  they?
9  A.  It's my understanding it's not limited because it has a
10 significant fraction of users who do not play Call of Duty in
11 the sample.
12 Q.  So 66 percent of the people that were surveyed don't play
13 at all and, therefore, wouldn't switch; right?
14 A.  For this question, that is the number.
15 Q.  Okay.  And if you look at the next page, which is 012, the
16 question is:  What would gamers plan to buy on PlayStation if a
17 PlayStation did not have COD?  Right?  Do you see that?
18 A.  Yeah.  What would gamers planning to buy a PS do if COD
19 were not on PS?
20 Q.  Okay.  And 31 percent here would play COD but would still
21 buy the PlayStation; right?
22 A.  That is what the slide says.
23 Q.  And it says 5 percent would move to Xbox; right?
24 A.  If that's what this slide says.
25 Q.  So do you understand that to be 5 percent of this entire

1  world of folks that use a PlayStation?
2  A.  I understand it to be 5 percent of the sample of European
3  users who planning -- people who would plan to buy PS, what
4  would they do.
5  Q.  Okay.  So it's 5 percent of this big world we've defined;
6  right?
7  A.  That is my understanding.
8  Q.  All right.  And that's not the world that you measured,
9  right, in your foreclosure model?
10 A.  In paragraph 762 of my initial report in Footnote 958, I
11 provide a way to convert the conversion rate into something
12 that is comparable to the --
13 Q.  Professor Lee, can you answer my question?  Did they
14 measure -- I didn't ask you whether you could convert it.  I'm
15 asking you:  Did they measure this -- did you measure the same
16 or assess the same group of people that the YouGov survey did?
17 A.  I think the way we started, my analysis started with all
18 PS users and then I narrowed it down to those who play COD.
19 Q.  Right.
20 A.  Global.  It's global.  I understand the YouGov survey is a
21 sample of Europe where Call of Duty is less popular is my
22 understanding.
23     But I looked at the global and then I narrowed it down.
24 And so what I did is provide you a varied conversion of
25 20 percent from that smaller circle and figuring go out what

595

1 the equivalent percentage would be for the big circle. And so
2 I can do an apples-to-apples comparison then between those
3 percentages.
4 Q. Do you believe that -- so this 5 percent, though, are
5 people that say COD is their first or second favorite game; is
6 that right? Or no?
7 A. That's not my under --
8 Q. They have a first or second game they would play favorite
9 on PlayStation?
10 A. In the slide deck I reviewed I did not see this sample
11 restriction you're referring to. I note that 64 percent of
12 people on this slide do not play Call of Duty.
13 Q. Right. So Call of Duty can't be their first or second
14 favorite game; right?
15 A. I don't know. I'm just interpreting that it seems
16 strange.
17 Q. Okay. So you don't know is the answer whether this
18 5 percent are people that say Call of Duty is their first or
19 second favorite game; right? You don't know the answer to that
20 question, do you?
21 THE COURT: Maybe I can cut through it.
22 You didn't look at the survey itself.
23 THE WITNESS: I didn't have -- I don't --
24 THE COURT: You only looked at the slides.
25 THE WITNESS: I looked at the slides is what I had

596

1 access to.
2 THE COURT: All right. Why don't we take our lunch
3 break now.
4 MS. WILKINSON: Thank you, Your Honor.
5 THE COURT: Why don't we resume at 12:35.
6 All right. Thank you.
7 THE WITNESS: Thank you, Your Honor.
8 (Luncheon recess was taken at 11:55 a.m.)
9 AFTERNOON SESSION                                    12:39 p.m.
10 THE CLERK: Remain seated. Come to order.
11 THE COURT: Okay. Are we ready to resume with
12 Professor Lee?
13 MS. WILKINSON: Yes, Your Honor.
14 BY MS. WILKINSON:
15 Q. Professor Lee, you ready?
16 A. Yes.
17 Q. Okay. Just a few more areas I want to talk to you about.
18 One of the things you look at after you determine whether
19 Xbox would have an incentive and ability to foreclose is what
20 Sony might do in response; right?
21 A. I consider potential reactions. I actually explicitly
22 analyze price effects, what might happen with prices.
23 Q. But there's lots of things Sony can do in response to
24 competition; right?
25 A. Generally speaking, yes.

597

1 Q. And it did that by buying Bungie just days after the
2 Activision Xbox transaction was announced; right?
3 A. I don't know if it responded, but it did purchase Bungie
4 after the acquisition was announced.
5 Q. It could do things like that in the future; right?
6 A. I presume that would be the case.
7 Q. And one of the things it could do now before the
8 transaction is completed is it could come to an agreement with
9 Microsoft to put Call of Duty and maintain Call of Duty on the
10 PlayStation; right?
11 A. Generally an agreement requires a meeting of both sides,
12 but that is a possibility.
13 Q. There's an offer outstanding from Microsoft to Sony that
14 would allow them to maintain Call of Duty on Sony's platform
15 for ten years; right?
16 A. It is my understanding an offer is available or made.
17 Q. And like most businesspeople, if they could come to
18 mutually beneficial terms and sign that agreement, then that
19 would allow Sony and PlayStation to keep Call of Duty on its
20 platform; right?
21 A. That's my general understanding of the terms that have
22 been offered.
23 Q. You didn't include that in your analysis because it hasn't
24 been signed; right?
25 A. In my analysis I only look at agreements -- I mean, I look

598

1 at agreements that have been signed. This one, you're correct,
2 I'm not taking it as given.
3 Q. So there are other agreements that Xbox and Microsoft have
4 signed with other participants in the market; right?
5 A. In particular markets there are agreements.
6 Q. And those are signed agreements?
7 A. That is my understanding.
8 Q. Suggesting that two parties came to an agreement on
9 mutually beneficial economic terms; right?
10 A. That is my understanding.
11 Q. And you're going to presume those contracts are going to
12 be honored; right?
13 A. I presume they are -- the parties have come to an
14 agreement and those are in effect in my analysis.
15 Q. Now, one of the things that Sony could do, and has done in
16 the past, is to take a game that was on multiple platforms and
17 pay to have it only on the PlayStation; right?
18 A. That is my understanding.
19 Q. Okay. And you know they've done that very recently;
20 right?
21 A. Do you have a particular example?
22 Q. Yes. Do you know the game Final Fantasy XVI?
23 A. I have heard of that game.
24 Q. And do you know that that was on Xbox and PlayStation 5?
25 A. I don't know the consoles it was released on.

599

1   Q.  Well, assuming it was on those platforms last year, I want
2   you to take a look at RX2073, please.
3                  (Pause in proceedings.)
4   BY MS. WILKINSON:
5   Q.  Do you see that document?
6   A.  I see the document.
7   Q.  It's on yellow paper.  That means it's confidential and
8   under seal.  So we're just going to refer to it generally.
9   Okay?
10  A.  Understood.
11  Q.  And, again, this is an e-mail, a Sony e-mail; right?
12  Between folks at Sony; right?
13  A.  Yes.
14  Q.  And it's dated February 25th, 2022; right?
15  A.  Yes.
16  Q.  And there's a chart on page 8.  Let's take a look at that
17  chart.
18                 (Pause in proceedings.)
19  BY MS. WILKINSON:
20  Q.  And you understand that when --
21  A.  Excuse me.  Is there a chart on page 8?
22         THE COURT:  2073-008.
23         THE WITNESS:  Thank you.
24  BY MS. WILKINSON:
25  Q.  Do you see that?

600

1   A.  I see that.
2   Q.  Okay.  Great.
3       Now, you know that games can be put on a platform under a
4   general publishing agreement; right?
5   A.  That's my understanding.
6   Q.  But sometimes folks at Sony or Xbox engage in specific
7   agreements that provide some limitations or specific agreements
8   about how that game will be played either on their platform or
9   put on other platforms; right?
10  A.  That's my understanding.
11  Q.  And that's not unusual?  You've seen those partial or
12  total exclusive arrangements; right?
13  A.  I have seen similar types of arrangements.
14  Q.  Now, look at this, and this is looking at FY22; right?
15  A.  Yes.
16  Q.  And do you see down there on the left all of those are
17  measured as global; right?
18         MS. BENNETT:  Your Honor, can we talk around the
19  document a little bit more?
20         THE COURT:  Well, I don't know that --
21         MS. WILKINSON:  I'm not going to go into any more
22  detail.  It's just that that --
23         THE COURT:  Than that, okay.
24  BY MS. WILKINSON:
25  Q.  Those are -- the region is global for each of those;

601

1   right?
2   A.  I see that.
3   Q.  It doesn't say U.S. only; right?
4   A.  I see that.
5   Q.  Okay.  So go down one -- one, two, three -- the third game
6   there.  Do you see that?
7   A.  I see that.
8   Q.  And that game is published by another publisher not Xbox
9   or PlayStation 5; right?
10  A.  Yes, it is not published.
11  Q.  Right.  It says what genre it is; right?
12  A.  Yes.
13  Q.  And it says -- it looks like an estimate of total
14  revenues; right?
15  A.  I do not know what the -- that column represents.
16  Q.  Now turn to page 013, a different chart.  And you see the
17  title of that chart for FY22 -- I don't want to read it out
18  loud -- but do you see the title of that chart?
19  A.  I see that.
20  Q.  Okay.  And this involves some contracts; right?  It says
21  "contracted"?  That part we can say.
22  A.  I see that word.
23  Q.  All right.  Now, go down to the second game.  Do you see
24  that?
25  A.  Yes.

602

1   Q.  That's the same game we were pointing out on the last
2   chart; right?
3   A.  Yes.
4   Q.  And in the last column, it describes how that game will be
5   shown in terms of what platform; right?
6   A.  I see that the term is there.
7   Q.  You see the heading for the term?
8   A.  Yes.
9   Q.  And you accept that that's what Sony is talking about when
10  they're talking about this game on this -- in this chart;
11  right?
12  A.  I understand.  I believe so.
13  Q.  Okay.  Now, Sony has many first-party exclusive games;
14  right?
15  A.  That is my understanding.
16  Q.  And it also has some third-party games that it pays to
17  have exclusive or at least for periods of time; right?
18  A.  I believe that is the case.
19  Q.  Okay.  Take a look at RX2098.
20  A.  (Witness examines document.)
21  Q.  Do you see that document?
22  A.  I do.
23  Q.  I want to ask you when a third-party game is taken
24  exclusive to one platform, let's just say it's PlayStation, is
25  that an advantage for PlayStation?

603

1  **A.**  It depends what the comparison would be absent the
2  exclusivity.  So when making a comparison of an advantage or if
3  something is harmful, it's important to specify what the
4  but-for alternative is.
5  **Q.**  So you can't -- and I know you won't because of your prior
6  writings -- you won't say that exclusive games themselves are
7  harmful to competition?
8  **A.**  Exclusivity can have both pro and anticompetitive effects.
9  **Q.**  Now, take a look at this.  This is --
10       **MS. WILKINSON:**  Can we show a redacted copy of that or
11  no?  We can't.  Okay.
12  **BY MS. WILKINSON:**
13  **Q.**  So take a look at RX2098.  And you see that again this is
14  a Sony e-mail; right?
15  **A.**  Yes.
16  **Q.**  And it's dated October 12th, 2022; right?
17  **A.**  Yes.
18  **Q.**  And down in the second e-mail, do you see that it says hi,
19  so and so best from someone else?  Do you see that?
20  **A.**  I see the second e-mail, yes.
21  **Q.**  And when you look at that, do you see a discussion about
22  comparing this type of treatment of games between two
23  platforms.
24  **A.**  (Witness examines document.)  Sorry.  I was reading it.
25  Can you repeat your question, please?

604

1  **Q.**  Yes.  Doesn't this discuss a comparison between treatment
2  of games on one platform versus how many of those are on
3  another platform?
4  **A.**  The e-mail is making a comparison like that.
5  **Q.**  And, again, in and of itself, taking games exclusive is
6  not automatically anticompetitive or harmful to competition?
7  **A.**  I don't think a general statement can be made without
8  further details.
9  **Q.**  Can a new game that's made exclusive be a response to a
10  competitor?
11  **A.**  In sort of a hypothetical world, it -- many things are
12  possible.
13  **Q.**  What if a game had been on Xbox and PlayStation and it was
14  taken off for the next, you know, version of the game and only
15  put on PlayStation?  Do you think that's a response to
16  competition?
17  **A.**  I'm not clear I follow.
18  **Q.**  Okay.  So a game is multiplatform and the next year when
19  the next version is coming out, one of the platforms pays to
20  keep it for a certain time period only on their platform and
21  it's no longer available on the other platform.
22  **A.**  Under that hypothetical, what is the question?
23  **Q.**  Is that a competitive response?
24  **A.**  I don't know what you mean by "competitive response."  A
25  response to what?

605

1  **Q.**  To the other competitor who had it on its platform before.
2  **A.**  Without understanding more about the hypothetical, I'm not
3  quite sure --
4  **Q.**  Okay.
5  **A.**  -- I know how to answer that question.
6  **Q.**  So, even when a game is on multiple platforms and it's
7  removed from a competitor's platform, it's not automatically
8  anticompetitive you said; right?
9  **A.**  Exclusivity is not automatically anti or pro competitive.
10  It depends on, for example, if the game is different as a
11  result of the exclusivity for example, it's comparing against
12  without the exclusivity what would have happened --
13  **Q.**  And --
14  **A.**  -- is an important consideration.
15  **Q.**  Sorry.  And you're saying without more knowledge, you
16  can't say whether by removing it from the competitor's platform
17  for a certain time period, whether that's a competitive
18  response or not?
19  **A.**  Again, without the hypothetical, I'm not quite sure what
20  response you're referring to.
21  **Q.**  Okay.  Let's end by talking about what's going to happen
22  if the merger goes through and if it does not.  Okay?
23  **A.**  Okay.
24  **Q.**  And what the status is today.  So I'm going to ask you
25  some questions first, and then we're going to put up a chart so

606

1  we don't have to see my handwriting and see if we can make it
2  clear.
3       All right.  I'm going to ask you about COD on certain
4  platforms and whether they're on today, whether they will be on
5  after the merger -- okay? -- and whether they will be on, let's
6  assume the merger doesn't go through, the day after.  So the
7  but-for world right after the merger does not go through.
8  Okay?
9  **A.**  Okay.
10  **Q.**  We can pick a date.  You want to say October 1st?  Let's
11  say the merger doesn't go through -- okay? -- by October 1st,
12  I'm just picking a date that gives us a few months out, and
13  what will happen after that.  Because we're talking about what
14  the world looks like with the merger and what it looks like
15  without; right?
16  **A.**  The merger world and but-for world are both uncertain,
17  they're in the future, and there's not a precise clarity on
18  that particular date something will or will not happen.
19  **Q.**  Correct, exactly.  So you're -- with the but-for world,
20  you're trying to predict what will happen without the
21  transaction?
22  **A.**  It's forward looking what would happen without the
23  transaction.
24  **Q.**  Your point is you don't know that for certain?
25  **A.**  It's difficult to predict the future for certain.

607

1  Q.  Correct.  So you're just trying to determine from what
2  happened before the transaction and what's going on what you
3  think is going to happen in the market, what it will look like
4  without the transaction?
5  A.  So my economic analysis is comparing a future world with
6  the merger against a future world without the merger.
7  Q.  And in the future world without the merger, the only
8  change is that the merger doesn't occur; right?
9  A.  That is a primary difference between the with merger and
10  the but-for world.
11  Q.  Okay.  So let's try this:  We're talking about COD; right?
12  A.  Okay.
13  Q.  Okay.  Today is it on Xbox console?
14  A.  That is my understanding.
15  Q.  Is it on the PlayStation 5?
16  A.  That is my understanding.
17  Q.  Is it on the PC?
18  A.  That is my understanding.
19  Q.  Is it on Nintendo?
20  A.  It is my understanding it is not on the Switch console.
21  Q.  And let me just ask Roger.
22      MS. WILKINSON:  Roger, can you put up just that column
23  first and cover the other two while we're going through it?
24  No, you cannot.  Sorry.  That's my fault.
25  \\\

608

1  BY MS. WILKINSON:
2  Q.  It's not on GeForce; right?  Or it's not able to be
3  streamed on GeForce today; right?
4  A.  It's my understanding Call of Duty is not available on
5  GeForce NOW.
6  Q.  Nor on Boosteroid; right?
7  A.  That is my understanding.
8  Q.  Ubitus no?
9  A.  My understanding that it's not, that is my understanding.
10  Q.  Nware?
11  A.  No.
12  Q.  And EE; right?
13  A.  Not to my understanding.
14  Q.  So let's go with the merger.  It's going to be on Xbox;
15  right?
16      MS. WILKINSON:  You can show this now, Roger.  And
17  you're going to check my work.  If you don't agree, we'll
18  change it.
19  BY MS. WILKINSON:
20  Q.  Okay.  So with the merger, it's going to be on Xbox;
21  right?
22  A.  That is my -- it will likely be on Xbox, that's my
23  understanding.  It will likely be on Xbox.
24  Q.  And with the merger, you don't agree that it will be on
25  PlayStation or you do?

609

1  A.  I don't agree it will be on PlayStation for certainty.  It
2  is difficult to predict the future.  I think the likelihood of
3  Call of Duty on PlayStation is lower with the merger than
4  without the merger.  My analysis looks at all Activision
5  content and that there's likely foreclosure as a result of the
6  merger.
7  Q.  You understand the comparison is not whether it's more
8  likely with the merger or without; it's is it likely with the
9  merger?
10  A.  I looked at -- the chart is no longer on my screen.
11  Q.  I'm just asking you, this column just when you compare the
12  but-for world is:  Is it likely to be on with the merger?
13  A.  My economic opinion is that it's likely that foreclosure
14  of Activision content will occur with the merger in the console
15  markets.
16      THE COURT:  What about Call of Duty?
17      THE WITNESS:  It's difficult -- because foreclosure
18  can take many forms and it's difficult to predict with
19  certainty the exact form that foreclosure will take.
20      I noted that -- one of my conclusions is that the merged
21  firm will have a likely economic incentive to take titles like
22  COD exclusive; but to predict what will happen due to the
23  merger, there's uncertainty.  And my analysis informs the
24  probability of foreclosure -- of complete foreclosure but also
25  partial foreclosure potentially happening.  So my conclusion is

610

1  that Activision content overall will likely be foreclosed in
2  console markets.  Does that --
3      THE COURT:  What about Call of Duty?
4      THE WITNESS:  Yeah, for Call of Duty it's difficult to
5  give a precise, like --
6      THE COURT:  Is it likely or not likely?  And it's
7  post-2025, right?  Because there is a contract, there's been
8  lots of testimony, through 2024.  So you're not saying it's
9  likely to be foreclosed prior to the expiration of that
10  contract.
11      THE WITNESS:  That's -- I'm not looking at prior to
12  the contract expiration.  So my conclusion is really about all
13  of Activision content and not taking a stance on --
14      THE COURT:  You don't have an opinion just about Call
15  of Duty?
16      THE WITNESS:  I noticed it's an economic incentive and
17  there's reasons why firms -- firms as economists tend to put in
18  their economic incentives, but it is difficult to predict a
19  particular likelihood on complete foreclosure on Call of Duty.
20      THE COURT:  One way or the other you can't say?
21      THE WITNESS:  It's more likely than --
22      THE COURT:  You can say?
23      THE WITNESS:  No.  It's more likely without the merger
24  to be foreclosed.
25      THE COURT:  Call of Duty?

611

1    THE WITNESS: Call of Duty with the merger than
2  without the merger.
3        THE COURT: But more -- but I see, comparatively --
4        THE WITNESS: Comparatively.
5        THE COURT: -- you're not prepared in your opinion to
6  say it is with the merger likely to be more likely than not?
7        THE WITNESS: For that particular content, but overall
8  Activision content likely, that Activision content. I under --
9  yeah.
10       THE COURT: I see. I understand.
11       THE WITNESS: Yeah.
12 BY MS. WILKINSON:
13   Q.  Okay. Let's go back, put our chart up.
14       And so we're just saying with the merger, like Her Honor
15 was trying to ask you -- and if you say you don't have an
16 opinion, not comparing it to without, just after the merger is
17 it likely to be on PlayStation? Should we put a question mark
18 there instead of a check?
19   A.  I don't know what you would like to put there. I
20 expressed my opinion.
21   Q.  Right. So you can't tell us whether it's likely to be on,
22 not certainty but whether it's likely to be on PlayStation
23 after the merger and post-2024?
24   A.  I'm not expressing an opinion on that precise probability.
25   Q.  We'll use a question mark then to say.

612

1  For PC it will be on after the merger; right?
2    A.  Likely.
3    Q.  Okay. It will be on Nintendo; correct?
4    A.  I note in my report there is some uncertainty of the
5  technical feasibility of bringing Call of Duty to
6  Nintendo Switch so I -- I don't express opinion on the
7  probability, but I evaluate the competitive effects as if it's
8  likely to be on Switch. So I account for that possibility that
9  it will likely be on Switch as a result of the merger.
10   Q.  So does that mean I can check the box and say you think
11 it's likely it will be subject -- you're not saying the
12 technical challenges will stop it from being on Nintendo, are
13 you?
14   A.  I'm saying there's evidence that it's uncertain; but for
15 the purposes of evaluating or conducting my evaluation, I am
16 treating it as it will be on -- or likely be on -- let me step
17 back.
18       I'm not providing an economic opinion on the probability
19 of that happening.
20   Q.  Okay. There's a contract signed now between Microsoft
21 Xbox and Nintendo to put it on Nintendo; correct?
22   A.  Correct.
23   Q.  All right. But in this box you want me to put a question
24 mark because you're not opining on it?
25   A.  I'm not opining, but I am -- my analysis --

613

1        THE COURT: He's saying it is likely.
2        THE WITNESS: Yeah, it is likely. It is likely.
3  BY MS. WILKINSON:
4    Q.  It is likely so we can check the box.
5        Okay. And how about on Xbox Game Pass?
6    A.  With the merger?
7    Q.  Yes.
8    A.  Likely.
9    A.  Likely.
10       Okay. And it -- I'm not sure I made this clear, but it's
11 not on Game Pass now; right?
12   A.  No, that's not my understanding.
13   Q.  And after the merger, will it likely be streamed on
14 GeForce?
15   A.  My understanding is likely, yes.
16   Q.  Okay. And will it likely be streamed on Boosteroid?
17   A.  Yes.
18   Q.  On Ubitus?
19   A.  Yes.
20   Q.  And Nware?
21   A.  Yes.
22   Q.  And EE; right?
23   A.  It's my understanding that's -- yeah.
24   Q.  Okay. Now we can pick any date you want. Let's say we
25 have -- we have a break date on July 18th so why don't you pick

614

1  July 19th. Okay? So there's no merger on July 18th.
2    A.  Okay.
3    Q.  Okay? And it will -- it will -- do you believe it will
4  still be on Xbox if the merger doesn't go through?
5    A.  Yes.
6    Q.  Okay. Do you believe it is likely to be on PlayStation?
7    A.  Yes.
8    Q.  Okay. Do you believe it will be likely to be on PC?
9    A.  Yes.
10   Q.  Do you believe it's likely it will be on Nintendo?
11   A.  Uncertain.
12       That's a question mark.
13       Okay. What about on Xbox Game Pass?
14   A.  Uncertain.
15   Q.  Okay. GeForce?
16   A.  I think for the rest --
17       (Witness examines document.) I can explain my analysis
18 it's uncertain, but there are reasons to suggest it might be
19 more likely --
20   Q.  So for the rest --
21   A.  -- for them.
22   Q.  -- of these streaming services we've been discussing, we
23 should put a question mark in the rest of those too?
24   A.  If you would like to.
25   Q.  Well, I'm just -- we're trying to reflect your answers

615

1   so --
2   **A.**   It's uncertain.
3   **Q.**   Okay. We'll do that.
4          **MS. WILKINSON:** That's all I have, Your Honor.
5          **THE COURT:** Okay. Any redirect?
6          **MR. PASTORE:** Yes, Your Honor.
7                    REDIRECT EXAMINATION
8   BY MR. PASTORE:
9   **Q.**   Good afternoon, Dr. Lee or Professor Lee. I'm sorry.
10  **A.**   Good afternoon.
11  **Q.**   So Counsel for Microsoft was just discussing your analysis
12  of Call of Duty content in particular with regards to the
13  likelihood of foreclosure. Why did you analyze all Activision
14  content?
15  **A.**   I think it's important to understand that Activision
16  produces many games -- or I'm sure Your Honor knows that -- and
17  that all Activision content is -- can be valuable and
18  meaningful for competition. There can be future games that are
19  developed and also there is non-Call of Duty content that is
20  popular on consoles.
21       As well for subscription services and cloud streaming
22  services there is evidence that catalog content and content
23  that's not just Call of Duty is also meaningful for the
24  competitiveness of one of those services.
25       And so I think it's important to expand the analysis to

616

1   look beyond current content, that is catalog content, content
2   that was released a few months or a year prior, and other
3   content that Activision produces as well as could produce in
4   the future.
5          **THE COURT:** But there are a lot of popular games, not
6   just Activision; right? And there's no way of predicting
7   what's going to be the popular game.
8          **THE WITNESS:** It's difficult --
9          **THE COURT:** Are you suggesting, then, that, whether it
10  be Sony -- because we would be here if it was Sony acquiring
11  Activision as well no question; right? -- that any purchase of
12  a publisher then is going to have anticompetitive effects
13  because they always have an incentive then to make it
14  exclusive?
15       Or is this particular to Activision? If it's particular
16  to Activision, I think it's pretty clear it's driven by Call of
17  Duty, which is a unicorn; right? It's a unicorn in the
18  durability and the popularity and the numbers. It certainly
19  stands out separately. You were here for Mr. Ryan's testimony,
20  and that made it clear that that's the concern is Call of Duty.
21  So I don't quite understand what you're saying.
22          **THE WITNESS:** Okay. I apologize.
23       I think it's true that Call of Duty is very, very
24  important to the competitiveness of -- you know, it's like you
25  said, it's a unicorn. It's differentiated.

617

1        I do think, though, that the supply of new content,
2   there's evidence that it's scarce. These AAA games don't come
3   up that frequently so I -- you know, let's put the Call of Duty
4   aside. It's not the case that there are many other
5   replacements for Activision content, not just restricted to
6   Call of Duty.
7        If, for example, entrants or smaller streaming services
8   might very well benefit from having access to more content
9   that's provided by Activision as opposed to not having access
10  to it at all if it were foreclosed to them.
11          **THE COURT:** Okay. But I guess I'm still trying to say
12  when you analyzed it that all of Activision's content, why --
13  I guess why didn't you analyze Call of Duty separately as to
14  whether it was likely or the incentive to make that exclusive
15  or that you don't have an opinion, I guess I should say?
16          **THE WITNESS:** So I had -- my economic opinion is that
17  it's -- the merged entity has a likely economic incentive to
18  foreclose Call of Duty as well as other Activision titles. And
19  I note that, you know, an economist thinks firms tend to act in
20  their economic interests, but there is, you know, some
21  uncertainty in the future.
22       And so for the proposed transaction to necessarily likely
23  lead to foreclosure, I'm allowing for the possibility it
24  doesn't necessarily take the form of, say, a full foreclosure
25  or full exclusivity with respect to Call of Duty. The analysis

618

1   also applies to these other pieces of content which I think can
2   still meaningfully affect --
3          **THE COURT:** Like what? Give me an example because
4   there's so much content there. I mean, that's what I'm just --
5   that's what I'm trying to figure out.
6          **THE WITNESS:** Sure. I think --
7          **THE COURT:** I mean, all the testimony has been about
8   Call of Duty in this case. That's what it is, Call of Duty.
9          **THE WITNESS:** I think there's another game, for
10  example, that Activision released called Diablo, that is my
11  understanding, did very well. That was released a few weeks
12  ago. That's an Activision title.
13       They have, it's my understanding, catalog content and
14  other franchises I think.
15              (Pause in proceedings.)
16          **THE WITNESS:** I think there's a game Tony Hawk is my
17  understanding. Other games -- I don't want to -- I don't
18  recall all the names, but there's evidence that the catalog of
19  even older Call of Duty content is important as well for these
20  streaming services. I think --
21          **THE COURT:** For the streaming so you're --
22          **THE WITNESS:** For streaming and --
23          **THE COURT:** Well, are you talking about the
24  subscription services or the cloud?
25          **THE WITNESS:** Both. I'm sorry. My language isn't

**1-SER-159**

619

1 precise. Subscription services and cloud streaming services.
2     THE COURT: Okay. So when you're talking about all
3 the Activision, you're now really talking about the cloud and
4 the streaming as opposed to the console; right? When we're
5 talking about console and you were talking about your vertical
6 foreclosure theory, you're really talking about Call of Duty
7 driving people to change or -- or purchase an Xbox; but what
8 you're saying is when you're talking about the cloud or the
9 subscription services, you're saying it's the catalog.
10     THE WITNESS: The catalog as well.
11     I do know with Diablo it can have an effect on console
12 sales. It can affect consumer demand. So, a title like Diablo
13 if it's removed from PlayStation, it can still harm consumers,
14 and I have a quantification of that.
15     It's not going to be as large as removing Call of Duty;
16 but if, you know, Diablo is removed or a title like Diablo is
17 removed from Sony PlayStation, consumers there, absent other
18 benefits, would generally be harmed because, you know, they
19 just have less content available to them. The product they
20 bought is worse.
21     THE COURT: Well, if it becomes exclusive.
22     THE WITNESS: Yeah, that's right. That's right. So
23 even the console market, current content, if it's taken
24 exclusive, can harm consumers if there aren't offsetting
25 benefits.

620

1     THE COURT: But if something is in a subscription
2 service versus not in a subscription service, doesn't that
3 benefit consumers?
4     THE WITNESS: I -- it can. I think in the
5 subscription service market, my economic opinion is that it's
6 more likely rivals to Game Pass will be foreclosed from
7 Activision content. So a company like PlayStation Plus may be
8 less likely because of the merger to be able to get access to
9 Activision content.
10     THE COURT: Do you have an opinion as to whether
11 PlayStation Plus has actually tried to get access to certain
12 games or whether it has the same even business model or goals
13 as X Pass [sic]? And I'm just thinking about some of the
14 testimony we heard from Mr. Ryan. I mean -- right? Isn't --
15 do you take that into account?
16     THE WITNESS: I do. My recollection of the testimony
17 of Mr. Ryan, I think back to it, he was mentioning they focus
18 on catalog content. He wasn't looking for day and date or new
19 releases.
20     And I provide some evidence in my direct testimony that
21 Game Pass, most usage is on games that are released more than
22 six months ago. I think the majority of game time is on older
23 catalog content, and so that supports the idea that streaming
24 services -- I'm sorry -- subscription services do kind of
25 depend on the whole catalog and not just new releases to

621

1 attract consumers.
2     THE COURT: All right. Sorry. Go ahead.
3     MR. PASTORE: No worries.
4 BY MR. PASTORE:
5 Q. And, Professor Lee, we've talked about something called
6 partial foreclosure a bit today. What is partial foreclosure?
7 A. Partial foreclosure is a term that generally refers to
8 strategies. It is also referred to as partial exclusivity. So
9 time exclusives, exclusive add-on content, or content that
10 might be not optimized or degraded relative to another version.
11 Q. So is partial foreclosure solely purposefully degrading
12 content?
13 A. No. As I mentioned, there are other forms of partial
14 foreclosure. And it's important to remember, like, it's a
15 comparison to what would have happened but for that action;
16 right?
17     So partially foreclosed could be there would have been
18 equal versions produced on two consoles; but in the other
19 world, there's still two versions but just one is just not as
20 optimized or it doesn't have all of the same features as the
21 other.
22 Q. And has Microsoft acknowledged -- have you seen evidence
23 or have you considered evidence of Microsoft acknowledging the
24 benefits of such partial foreclosure?
25 A. I have seen evidence that Microsoft does, for example,

622

1 engage in timed exclusives, for example, with regards to
2 subscription services, and -- yep.
3 Q. And to tie it all together, Professor Lee, what evidence
4 have you seen regarding the likelihood that the merged entity
5 will engage in partial foreclosure or is likely to engage in
6 partial foreclosure if this transaction goes through?
7 A. I think it's important to note that, you know, although
8 most of my quantitative analysis focuses on total foreclosure,
9 that is the form of exclusivity that is -- it tends to be most
10 often seen in this industry.
11     Most of Microsoft's first-party titles are fully exclusive
12 and that the economic incentives for full and partial
13 exclusivity are very similar; right? They both have the core
14 economic incentive of trying to steer consumers away from
15 rivals to one's own console or subscription service.
16 Q. And so do you think that partial foreclosure can harm
17 consumers?
18 A. Like exclusivity, it can be both pro and anticompetitive
19 and have similar effects.
20 Q. So, sorry, to put it --
21 A. Yeah.
22 Q. -- to ask a better question, do you think that partial
23 foreclosure could affect competition?
24 A. Yes.
25 Q. I want to turn back to something Microsoft's Counsel

623

1  discussed with you a bit earlier in her cross-examination and
2  just ask you directly: Professor Lee, can you explain why you
3  exclude PCs from your console markets?
4  A.   Yes.  So the economic framework I use to support my
5  antitrust product markets is the hypothetical monopolist test.
6  It asks for a set of products, if one firm owned those
7  products, could it profitably implement -- or would it
8  profitably implement a small but significant increase in price,
9  like a 5 percent price increase.  And the question is:  Is
10  there enough substitution outside the market so the monopolist
11  wouldn't want to do that?
12  And I provide evidence in my report and in my testimony
13  that indicates PCs would not constrain such a monopolist from
14  increasing prices on all video game consoles or on Gen 9
15  consoles.
16  Q.   And is this still the case given that you can, as you
17  discussed, play Call of Duty on an Xbox or a PC?
18  A.   That's right.  The question here is:  For example, you
19  know, would a price increase lead so many consumers to switch
20  away from a PlayStation or an Xbox console?
21  THE COURT:  You know what?  Maybe I didn't understand,
22  but when you were talking about the vertical foreclosure theory
23  and you had your Venn diagram, you excluded from that people
24  who played Call of Duty on the PC, you excluded them from those
25  who might convert to the Xbox -- I mean, yeah, to the Xbox for

624

1  Call of Duty.
2  Doesn't that suggest that playing on the PC is then a
3  substitute for the console if making Call of Duty exclusive to
4  the Xbox wasn't enough to make them migrate to buy the Xbox?
5  THE WITNESS:  That's a good question, Your Honor.  So
6  in my vertical foreclosure model I look at these folks who
7  might own a PlayStation and a PC, and I note that some of the
8  PC users, they may not want to play on the PC.  It's not as --
9  it's not a similar experience as playing on the console.  And
10  so there's still some folk who own a PC and a PlayStation who
11  can buy an Xbox, but I still admit that there are some folk
12  who -- who would choose to play on the PC.
13  Now, that form of substitution, where I play a game, is
14  different than asking the question:  You know, if I'm a
15  customer who would have bought an Xbox or PlayStation and they
16  got more expensive, would I go out and buy a brand-new gaming
17  PC?  Like, gaming PCs, they're multipurpose.  They can be
18  $1500; whereas, these consoles are $500.  So if a consumer who
19  saw a PlayStation go up by $25, are they more likely to buy an
20  Xbox or by a brand-new gaming PC?
21  THE COURT:  Well, A gaming PC you can do other things
22  with; whereas, the Xbox there's only one thing you can do with.
23  THE WITNESS:  Absolutely, and in that sense PCs are
24  differentiated significantly from consoles.  They're
25  multipurpose devices.

625

1  So that's what -- that hypothetical monopolist test is
2  sort of asking the question:  For the consumer who would have
3  bought a console and the console has got more expensive, where
4  are they substituting to?  Are they going to substitute to PCs
5  or are they probably more likely going to substitute within
6  video game consoles?
7  THE COURT:  Okay.  I guess I just -- why wouldn't they
8  substitute to a PC in which they get so much more value out of
9  it?  Like, they can play their games, but they can also then
10  get $1,000 worth of everything else that we mostly do with our
11  PCs.
12  THE WITNESS:  Well, I think there are some consumers
13  who might choose to do that.  I think like in my testimony and
14  my reports, I provide evidence that, you know, PlayStation and
15  Xbox benchmark their pricing against each other.
16  What that means is, like, if one of them increases the
17  price, the other considers matching the price.  And if a lot of
18  the customers are buying PCs, it's not clear why the past price
19  is the only relevant distribution or the most relevant
20  consideration for the Xbox price.  Does that make sense?
21  THE COURT:  I see what you're saying.
22  And then let me ask you, because the Xbox -- is it the
23  Xbox S has the price similar to the Nintendo Switch?
24  THE WITNESS:  Yes, the S is the lower-priced console.
25  THE COURT:  Doesn't that suggest that it's -- I

626

1  mean -- I mean, it seems to me the obvious inference is that
2  was done to compete with the Switch.
3  THE WITNESS:  So that's right.  Well, there's the
4  Series X and the PlayStation 5 and the S is still in that
5  market.  So if you're thinking about, like, a price increase,
6  think about a price increase on the X, who are the customers
7  who buy the X console?  Are they more likely to switch to the
8  PlayStation 5 or to a Switch?  Right?
9  So this exercise of market definition, you can evaluate a
10  price increase on any of the products in the market.  So, you
11  know, this hypothetical monopolist who owns all the Gen 9
12  consoles, it doesn't have to increase the price just on the S.
13  It can choose to exercise a price increase on the PlayStation 5
14  or the X.
15  THE COURT:  Because those people will stick to it?
16  And how do you determine which are those?  Like, they're the
17  people who play how many hours a day versus -- I mean, I'm just
18  wondering.  You're the economist.  I'm not.  I'm just a judge.
19  Like, how do you even -- how do we even know; right?
20  THE WITNESS:  There's a lot of qualitative and
21  quantitative evidence one can look at that informs the extent
22  to which consumers substitute between these products.  I just
23  mentioned one piece of evidence is evidence that these firms
24  benchmark each other for pricing.  That's pretty strong
25  evidence that they see each other as the closest price

1    constraints on one another.

2        There's, you know, more sophisticated -- like a little bit
3    more sophisticated economic modeling you can sort of compute:
4    Well, if PlayStation increased the price, what's the minimum
5    percent of folk who have to go to an Xbox?  So a price increase
6    would be profitable.

7        And I compute that number and, you know, provide evidence,
8    like, well, as long as more than about 10 or 15 percent of folk
9    who leave an Xbox would go to a PlayStation or vice versa, a
10   hypothetical monopolist who owned all those consoles, Gen 9
11   consoles would find a 5 percent increase likely profitable.

12   BY MR. PASTORE:

13   Q.   Just one more point about the PC gaming, Professor Lee.

14        Is your understanding that the PC games are, you know,
15   many times played on the Windows operating system?

16   A.   It's my understanding that many PC games are in Windows.

17   Q.   Windows operating system, is that a Microsoft product?

18   A.   It's my understanding Windows is a Microsoft product.

19   Q.   So for those gamers you're talking about that might go to
20   PC versus buy an Xbox, does Microsoft benefit at all from that
21   switch?

22   A.   They may still benefit if they purchase a Windows PC.

23   Q.   I want to talk about your share model a little bit.

24        And as Microsoft's Counsel spoke with you extensively
25   about, you know, you used Generation 8 data in your share

1    model.  Can you please explain why you used Generation 8 data
2    in that share model?

3    A.   Sure.  So the share model is trying to look at the impact
4    of new exclusive titles or the impact of exclusive titles on
5    hardware sales, and for that kind of exercise it's useful to
6    have a long period of data.

7        So Gen 9 I had from 2013 to 2020.  Gen -- sorry.  Gen 8 I
8    had from 2013 to 2020.  Gen 9 less data to work with.  Also
9    Gen 9 there were well-documented supply shortages in consoles.
10   So if there's something like a supply shortage affecting sales
11   of consoles, it's going to be difficult to really tease out the
12   relationship between software and hardware sales.

13        And for those reasons I use Gen 8 data to inform the
14   likely effects of exclusivity on hardware sales.

15   Q.   And then for your vertical foreclosure model, you then
16   considered Gen 9 data; is that -- am I remembering that
17   correctly?

18   A.   That's correct.

19   Q.   So why do you use Gen 9 data in your vertical foreclosure
20   model?

21   A.   The role of the vertical foreclosure model is to look at
22   the economic incentives to engage in foreclosure in the future,
23   and so it used projections of Activision sales going forward.

24   Q.   I'm going to point you to a demonstrative which we've been
25   asked to hold confidential.

---

629

1        MR. PASTORE:  So I will just point him to it,
2    Your Honor, and we'll ask questions around it.

3    BY MR. PASTORE:

4    Q.   Professor Lee, could you please turn to Demonstrative 11?
5    It's on page 11 of the demonstratives.  Let me know when you're
6    there.

7    A.   (Witness examines document.)  I'm on that page.

8    Q.   And can you -- can you generally describe for Her Honor
9    what this -- what this demonstrative represents?

10   A.   Sure.

11        Your Honor, on Slide 11 is output from the share model.
12   What it's doing is plotting for a set of AAA titles during
13   Generation 8 on the vertical axis what is the predicted change
14   in Xbox shares from taking that title exclusive, and you'll see
15   that for many of those dots, they're kind of below -- are all
16   the numbers under seal?

17   Q.   I defer to --

18        MR. PASTORE:  Yes?

19        MS. WILKINSON:  Yes.

20        MR. PASTORE:  Yes.  Apologies.  So we'll have to be a
21   little vague here.

22        THE WITNESS:  So you'll see the numbers and that's the
23   predicted share shift for taking many of those titles
24   exclusive.

25        And you'll see for a lot of the AAA titles most of them

---

630

1    are kind of within or below the range we were talking about
2    before for U.S. share shifts.

3        What you'll also see on this chart are these red dots and
4    those are titles that are part of the Call of Duty franchise,
5    and you'll note that those red dots have a much higher
6    predicted change in Xbox shares if they're taken exclusive, and
7    that's because they're sort of higher on the graph.  They're
8    more towards the top of the graph.

9        And you might ask:  Well, why is that the case?  Well, if
10   you also look at the horizontal part, you'll see that those
11   Call of Duty titles sell many more units than many of the other
12   blue dots; right?

13        And so the share model is predicting that, well, titles
14   that have greater sales, they're more popular, more users play
15   those games are predicted to have a bigger impact on the shares
16   of hardware consoles.

17   BY MR. PASTORE:

18   Q.   If you could briefly flip to the previous slide in your
19   demonstrative.  I believe this one is also confidential.  So
20   we'll have to speak around it a little bit.

21        But do you see the quote on the slide?

22   A.   I do.

23   Q.   And these -- these --

24        MS. WILKINSON:  It's not confidential so you can use
25   it.

---

631

1  **MR. PASTORE:** Oh, it's not? Oh, okay.

2  Apologies. It's not confidential so we can put it on the

3  screen.

4  Thank you, Beth.

5  **MS. WILKINSON:** Sure.

6  **BY MR. PASTORE:**

7  **Q.** And so it reads an exclusive AAA release accounts for 2 to

8  4 percent console share shift in the U.S. and the 1 to

9  3 percent shift worldwide.

10  Given -- first, are those similar numbers to what you

11  discussed with Microsoft's counsel in her cross-examination?

12  **A.** Yes, those numbers are what we discussed.

13  **Q.** And are these numbers consistent with your -- your

14  modeling with regards to Call of Duty given this page 11 that

15  we just looked at?

16  **A.** Yes. Page 10 talks about AAA releases in general; and

17  page 11, when I described the output of the share model, I note

18  that most AAA models in the set have predicted share shifts

19  that are actually below or within that range.

20  **Q.** I guess to tie it together to make it clear, how did you

21  account for what we see on page 11 when determining share shift

22  for Call of Duty games or estimating -- sorry -- share shift

23  for Call of Duty games?

24  **A.** Well, I note that in page 11 it says -- or the share model

25  predicts a title with greater software sales have higher

632

1  predicted shifts. And so that's why the share shift in my

2  vertical foreclosure model for Call of Duty is a little higher

3  than the range the 2 to 4 -- the 1 to 3 or 2 to 4 percent

4  range.

5  You know, Call of Duty is a unicorn. It's very unique.

6  So it's not surprising that the predicted share change from

7  Call of Duty will be higher than the typical AAA title.

8  **Q.** Did you look at a range of potential we'll call it Call of

9  Duty modifiers onto this -- this -- these numbers that we've

10  just been discussing?

11  **A.** In my vertical foreclosure model I use various conversion

12  rates that correspond to different Call of Duty share shifts,

13  sort of around that 5 and a half percentage point number, but

14  they're all numbers that are below the average that's predicted

15  by my share model, which is the 8.9 percentage point number

16  that I discussed earlier.

17  **Q.** And, generally, why do you look at all these different

18  ranges here?

19  **A.** I think it's important to try to sort of triangulate from

20  many sources my own independent quantitative analysis the share

21  model as well as the survey evidence we discussed before, which

22  I can talk a little bit more about if helpful to Your Honor.

23  **THE COURT:** Is that the survey that you didn't read?

24  **THE WITNESS:** Well, it's the survey --

25  **THE COURT:** It's a different survey.

633

1  **THE WITNESS:** It's a survey that I had a sample --

2  **THE COURT:** You had the -- did you have the underlying

3  survey or just the slides that someone prepared summarizing

4  what that person thought the survey said?

5  **THE WITNESS:** I had other documents.

6  **THE COURT:** About the survey?

7  **THE WITNESS:** About the survey, that's right.

8  **THE COURT:** Not just the slides?

9  **THE WITNESS:** No, I did not -- I had other documents

10  that I read. And if you look at the slides, if you still have

11  it, RX5053-010, and this is exactly how I used the survey

12  information. I interpreted it as, if you'll note on the

13  slide -- is this under seal? Do I have to talk around this?

14  **THE COURT:** What page are you looking at?

15  **THE WITNESS:** 010. 5053-010.

16  **MS. WILKINSON:** I believe that's public, Your Honor.

17  **THE COURT:** It is or is not?

18  **MS. WILKINSON:** It is. RX5 -- are you talking about

19  RX5053?

20  **THE COURT:** Yes.

21  **MS. WILKINSON:** Yes, that slide is public.

22  **THE WITNESS:** And so you'll notice this slide it says

23  it's more informative as to how the withholding of COD would

24  impact Sony, and it actually has this diagram of all potential

25  folk who would purchase the PlayStation at their next major

634

1  console purchase. And the number there is 5.3 percent.

2  I will note two slides earlier, Your Honor, it talks about

3  how the sample -- this number is about all PS gamers, not just

4  those who list Call of Duty as their favorite game.

5  And this 5.3 percent, I will point out, again is coming

6  from users in Europe where Call of Duty is less popular. My

7  conversion rate of 20 percent corresponds to 5 percent of all

8  PlayStation users purchasing a new Xbox, which is consistent

9  with this number and also is meant to be from a global

10  population where Call of Duty might be more popular than in

11  Europe.

12  **THE COURT:** Was the amount -- the number of gamers

13  surveyed statistically significant? Or you don't know?

14  **THE WITNESS:** I can't answer that question.

15  **THE COURT:** So we don't know because you haven't seen

16  the underlying survey data. I mean, you know that. You're a

17  scientist. You're esteemed; right? I mean, usually you would

18  need to know. You would need to know what the underlying

19  statistics were before you can draw some conclusion from it;

20  right?

21  I mean, if you can't tell me if that's statistic -- I

22  understand --

23  **THE WITNESS:** Yeah.

24  **THE COURT:** -- this is what Microsoft posited to you.

25  **THE WITNESS:** Has represented, yeah.

635

1    THE COURT:  I get that.  So if you want to say, "Well,
2    it's an admission, therefore" --
3        THE WITNESS:  You're --
4        THE COURT:  -- then that's fine.
5        THE WITNESS:  Your Honor --
6        THE COURT:  It's an admission; right?
7        THE WITNESS:  Your Honor, I take that point.  So
8    that's why I'm presenting other evidence.  This is one of many
9    pieces of evidence I present.  In my share model I note
10   predicts, you know, results that are consistent with
11   documentary evidence.
12       THE COURT:  Right, okay.
13       THE WITNESS:  And the survey is -- it's additional
14   support, but --
15       THE COURT:  This is what Microsoft said, but you don't
16   even know if it was statistically significant?
17       THE WITNESS:  I'm using Microsoft's representation
18   saying it's consistent but relying on other pieces of evidence,
19   correct.
20   BY MR. PASTORE:
21   Q.   I want to pivot a bit from consoles, which I think we've
22   been talking about a lot, to content library subscription
23   services.
24       And just generally, Professor Lee, can you explain the
25   evidence that supports your conclusion that the merged entity

636

1    would likely foreclose Activision content in the content
2    library subscription services market?
3    A.   So my conclusion it would be more likely because of the
4    merger ban absent the merger to engage in foreclosure of
5    Activision content and content library services and cloud
6    streaming services.
7        And that comes from a few sources of evidence analysis.
8    One is that I conclude the merged entity would have a greater
9    economic incentive to engage in foreclosure, and this is for
10   the reasons we discussed already:  Foreclosure, taking content
11   exclusive, tends to steer consumers away from rival products to
12   your own and Microsoft earns profits from the sale of its
13   services.
14       As well as documentary evidence that exclusivity in
15   subscription service and cloud streaming is a practice that
16   Microsoft engages in, and there are documents expressing a
17   tendency not to supply rivals in these markets with its own
18   first-party content.
19   Q.   And I know you talked about this earlier with Microsoft's
20   Counsel, but can you explain for Her Honor why you didn't do a
21   quantitative model as part of your analysis with regards to
22   content library subscription services?
23   A.   I did note earlier there's this other evidence that
24   suggests Microsoft has an incentive to continue foreclosing
25   rivals.  In many of their dual analysis they don't incorporate

637

1    supplying content to rival subscription or streaming services.
2    That's just -- that's just a practice that I've seen to be the
3    case.
4        In terms of my economic conclusion that it will be more
5    likely to supply rivals in these markets, it comes from the
6    conclusion that it just has a greater incentive to do so.
7    Activision has a greater incentive to supply rivals but for the
8    merger just with the merger.
9    Q.   Just to be clear, I have a similar question for you for
10   cloud gaming services.
11       Could you describe -- explain the evidence that supports
12   your conclusion that the merged entity would likely foreclose
13   Activision content in cloud gaming services?
14   A.   So it would have a likely economic incentive to
15   foreclosure in cloud gaming services for some of the reasons I
16   described before.
17       There's this documented evidence that Microsoft has a
18   desire to keep its first-party content off rival cloud
19   streaming services and continue engaging in that practice.
20   Q.   Sorry, Dr. Lee -- Professor Lee, to stop in the middle of
21   the cloud gaming services question, but I want to make sure
22   that Her Honor understands the point about quantitative
23   modeling with regards to content library subscription services.
24       I understand that you analyze a lot of different evidence,
25   but why in particular was doing a quantitative analysis in the

638

1    content library services market not something you performed in
2    this matter?
3    A.   Well, I think, you know, this is -- it's a newer market
4    and the data wasn't as -- you know, these types of quantitative
5    analysis often require historical data, a longer data, where we
6    have with consoles variation in software availability and
7    hardware sales over time.  You know, content and particularly
8    cloud it's a nascent market.
9        THE COURT:  But cloud is very different from the
10   subscription service.
11       THE WITNESS:  That's right, they're different, they're
12   both different, but they're both relatively nascent and new
13   compared to consoles, and the lack of really good data for
14   these services made it very difficult to perform something that
15   I would view as reliable that's quantitative for those markets.
16   BY MR. PASTORE:
17   Q.   So just so I understand, for example, the Xbox 360, that's
18   a Generation 7 console; right?  So it came before Generation 8?
19   A.   My understanding, that's right.
20   Q.   Is it your understanding Xbox Game Pass was available on
21   Xbox 360?
22   A.   It's not my understanding that Game Pass was around back
23   then.
24   Q.   Do you have an understanding of when Xbox Game Pass first
25   released?

639

1   **A.**  In the mid-2010s.  About '16 I think is my recollection.
2  I don't know the exact date.  '17 perhaps.
3   **Q.**  So that's right in the middle of Generation 8 then; right?
4   **A.**  That's right.
5   **Q.**  So I want to go back to cloud gaming.  Sorry for --
6       **THE COURT:**  Can we go back to --
7       **MR. PASTORE:**  Yes, of course.
8       **THE COURT:**  -- library subscription in terms of it
9  being a separate market?
10     Because it seems like it's just a different way to pay for
11  the same games.  I mean, you're paying for a game to pay on
12  your console; right?  But you're paying a month -- you're
13  paying Netflix instead of going on Prime and paying for a
14  single or wherever, Apple, and buying the movie itself.  You're
15  paying a monthly fee and you get to play that game.
16     So why is it a different market as opposed to -- because
17  you're playing the game exactly the same way on the console;
18  right?  You just paid for it through a different way.
19       **THE WITNESS:**  It's, again, a good question.
20       **THE COURT:**  Don't quit flattering me.
21       **THE WITNESS:**  I'm not trying to flatter you.
22  It's a key question for defining this market; right?  So
23  how I thought about it as an economist is let's think about the
24  products that offer cloud library services and what is the
25  value that they're providing to consumers.

640

1     I provided evidence that cloud library services, they
2  provide discovery of new games you wouldn't have tried, you
3  would have paid $70 to test something out.  You get exposed to
4  new games, a fresh library of content.  You know, again, you
5  can play more than you maybe would have if you could only buy
6  the play.
7       **THE COURT:**  We can debate whether that's actually a
8  positive or a negative.
9       **THE WITNESS:**  It's something that consumers appear to
10  value; right?  They're subscribing to it, and so for that
11  reason the same hypothetical monopolist test I used for this
12  market, let's look at all content library services.  Maybe they
13  charge $10 a month, $15 a month.  And imagine one firm owned
14  them all.  Is it likely that they could increase prices by like
15  5 percent, by 50 cents or a dollar per month?
16     Because think about the value proposition they're
17  offering, these content library services.  Would people really
18  move away from those services and start just buying a la carte
19  games?  It's maybe likely that the consumers who subscribe to
20  these services really put value on what they're delivering and
21  it's really other content library services that consumers would
22  substitute to.
23     You used Netflix.  Think about video streaming services.
24  If Netflix and all those other streaming services, you know,
25  raised their prices slightly, maybe a dollar a month, would

641

1  people start just buying movies or buying a la carte TV shows
2  in response?  Or would it maybe be more likely they would
3  substitute to other subscription services?
4       **THE COURT:**  It depends on the content.
5       **THE WITNESS:**  It depends on the content for sure, but
6  it also depends on those characteristics like offering a
7  library of content for a monthly subscription fee.
8       **THE COURT:**  Okay.
9       **MR. PASTORE:**  So going to cloud gaming now if
10  Your Honor is ready to go with us.
11       **THE COURT:**  Sure.
12       **MR. PASTORE:**  Great.
13  **BY MR. PASTORE:**
14   **Q.**  So, again, similar question as I had about content library
15  subscription services, Dr. Lee.
16     Will you just please explain the evidence, you know, that
17  supports your opinion that the merged entity would likely
18  engage in foreclosure of Activision content with regards to the
19  cloud gaming services market?
20   **A.**  Sure.  I discussed before the likely economic incentive is
21  supported by documentary evidence I reviewed that Microsoft
22  tends to or has expressed the incentive to withhold its
23  first-party content from rival streaming services compared to
24  cloud streaming services.
25   **Q.**  When you say "rival cloud streaming services," what --

642

1  just for our, you know, edification, what does that mean
2  compared to content library services?
3   **A.**  Sure.  So I think this is actually a useful distinction.
4  Where maybe some of the analysis gets complicated is that some
5  of the products that offer content library services also offer
6  cloud streaming services.
7     So Game Pass Ultimate offers both content library and
8  cloud streaming services.  PlayStation Plus Premium also offers
9  both too, and they're in some sense offering a bundle of these
10  services.
11     So my analysis I look at a content library service market.
12  I also look at a cloud streaming market.  Now, what may be a
13  little different is that Ultimate -- Game Pass Ultimate and
14  PlayStation Plus Premium are in both of those markets because
15  they both offer both of those services.
16     But the cloud streaming market also contains products that
17  only have streaming like GeForce NOW, which is a
18  bring-your-own-game cloud streaming service and doesn't offer
19  at the moment content library services.
20   **Q.**  I just want to maybe visualize this, call your attention
21  to a few demonstratives -- these are public -- pages 21, 22,
22  and 23, a series of Venn diagrams.
23     Professor Lee, does this represent your conclusions with
24  regards to the content and cloud gaming services market than
25  the narrow markets that are also incorporated into --

643

1 **A.** That's right.

2 So on -- starting on page 21, Your Honor --

3 **THE COURT:** I have it.

4 **THE WITNESS:** -- that is the broader market. This is

5 what I call the content and cloud gaming services market. It

6 includes products that offer either cloud streaming or content

7 library services for games that are primarily played in

8 nonmobile devices.

9 But as you'll see there, it's kind of a Venn -- it is a

10 Venn diagram. At the intersection are those products that

11 offer both content library and cloud streaming services. Now,

12 that's the broadest market.

13 On the next two pages are the narrower markets. That's

14 the content library services market and that's the cloud gaming

15 services market; and as I mentioned before, there are products

16 that are in both of those markets because they offer both of

17 those services.

18 **BY MR. PASTORE:**

19 **Q.** Okay. And I think you mentioned before we got diverted --

20 before we move back to cloud -- sorry.

21 When we were initially discussing cloud gaming services, I

22 think you mentioned nascency. The cloud gaming services are

23 nascent. What -- what did you mean by that?

24 **A.** So the word "nascent," I'm using it as a term to refer to

25 a relatively new market, one that's developing, one that is

644

1 perhaps showing potential for growth but there's uncertainty.

2 And nascent markets just tend to have, again, greater

3 uncertainty than more mature markets.

4 **Q.** Does that -- and you touched on this, but just to put a

5 pin on it, does that nascency make it more difficult to

6 quantify the likelihood of harm in, say, the cloud gaming

7 services market?

8 **A.** It does. Quantification, you know, there's always never

9 been uncertainty when uncertainty is exacerbated because the

10 nascency is going to be even harder.

11 I will note that the nascency also affects the conclusions

12 about the harm. In nascent markets, the role that's smaller

13 players that entrants have in competition could be greater than

14 in markets that are more mature.

15 And so if smaller players of entrants are disadvantaged

16 because they can't get access to content, then harmful

17 foreclosure could be magnified in the future.

18 **Q.** We talked about the entrants. Does the nascent nature of

19 the market affect, you know, the amount of entrants that could

20 enter?

21 **A.** The cloud market has seen recent entry, also recent exit.

22 It's different than the console market than we've seen

23 basically three players for quite a while now.

24 **Q.** Have you seen evidence that the industry believes that

25 there is a future in cloud gaming?

645

1 **A.** I note again it's uncertain, but there are industry

2 projections that provide evidence of that, that cloud gaming is

3 growing. It might be a very significant part of gaming and

4 going forward.

5 **Q.** Okay. Just a few more questions.

6 I want to focus -- turn to modeling now, which I will try

7 to keep up with you here.

8 But you talked about two inputs to your vertical

9 foreclosure model, and one of them was LTV or lifetime value.

10 Do you remember that?

11 **A.** I do remember that.

12 **Q.** So what is your basis, you know, for your conclusion that

13 the LTV value for Call of Duty gamers would be more profitable,

14 you know, for Xbox than your average Xbox gamer?

15 **A.** Sure. So I looked at spending data on both Xbox and

16 PlayStation, and I compared spending for all users and compared

17 it to spending for people who play Call of Duty or -- and as

18 well as other Activision content, and I found that for the

19 average user who plays Call of Duty --

20 **MS. WILKINSON:** I object, Your Honor. I just want to

21 make sure he doesn't reveal the numbers.

22 **THE WITNESS:** Understood.

23 **THE COURT:** They spend more.

24 **THE WITNESS:** They spend more. Indeed, they do spend

25 more. And that's consistent with other documentary evidence

646

1 I've seen where Microsoft had studied what the value of

2 customers who join Xbox to play particular content, and that

3 also found that consumers who join for content spend more.

4 I think what's also interesting in my analysis is that

5 consumers who actually play more Call of Duty, the ones who

6 play more hours of Call of Duty, spend even more. And as

7 economists, when you think about the value that consumers get

8 from a product, I think it typically is correlated with the

9 time spent on that activity.

10 So if a user spends 10 hours, 50 hours, a hundred hours a

11 month on Call of Duty, they're probably getting more value from

12 it because they're looking at all the hours they spend on Call

13 of Duty. And then if it's foreclosed, you know, is it worth it

14 to buy a $500 Xbox Series X, let's say?

15 And so the fact that gamers who spend more time on Call of

16 Duty spend even more suggests that the -- this LTV adjustment I

17 used is perhaps conservative; that actually folks who come over

18 to Xbox when Call of Duty is foreclosed would be even more

19 valuable.

20 **BY MR. PASTORE:**

21 **Q.** Okay. And your vertical foreclosure model, I think you

22 mentioned that, you know, there are some potential benefits to

23 foreclosure that are not contained within that model, unmodeled

24 benefits so to speak.

25 What are some examples of these unmodeled benefits and how

647

1 they affect the analysis?
2 A. Of course. So the vertical foreclosure model focuses only
3 on these users who are projected to have purchased Call of Duty
4 in the future.
5 Now, when titles are taken exclusive and, let's say, Call
6 of Duty is not on the PlayStation, now it's on Xbox, it may be
7 that beliefs of future consumers change. Like, so consumers
8 who may not have bought Call of Duty but now think Xbox is
9 where you want to go for great content, their decisions can be
10 influenced.
11 And that's going to bring even more profits to Microsoft
12 from this foreclosure action. That's not in the vertical
13 foreclosure model.
14 As well, if you think that taking away Activision content
15 from Sony reduces how much Sony earns on a user, it's less
16 profitable to sell the console; right? Because Sony is not
17 making money on Activision consent, let's say. Then Sony might
18 have less of an incentive to subsidize a console, and that's
19 going to put upward pressure on the prices of PlayStation
20 consoles and that could shift more sales to Xbox as well as not
21 accounting for the possibility that this foreclosure could
22 enhance Microsoft's market power and ability to increase prices
23 further.
24 So these are all things that are outside of the vertical
25 foreclosure model that represent additional benefits that

648

1 potentially could accrue to the merged firm.
2 Q. So say your vertical foreclosure model shows a hundred
3 percent recruitment, so even, break even, what's the practical
4 implication of these unmodeled benefits on that percentage?
5 A. So the fact that the model doesn't account for that means
6 that the recruitment could actually be below a hundred percent
7 and that it would still be in the merged firm's economic
8 interest to engage in foreclosure.
9 Q. So it could be 91 percent say? 92 percent?
10 A. It could be lower than a hundred percent, and there's
11 evidence that these other benefits Microsoft recognized in
12 documents, in other analyses of exclusivity, particularly with
13 regards to the ZeniMax transaction, some of these unmodeled
14 benefits were mentioned.
15 THE COURT: When you look at benefits, do you also
16 look at potential detriments to going exclusive in terms of
17 negative public reaction?
18 THE WITNESS: I did consider that; right? There are
19 some other costs, let's say, that I considered. For example, I
20 think one consideration is, well, maybe Call of Duty is
21 multiplayer and so maybe there's a benefit to having a wider
22 user base play the game. These are called network effects;
23 right?
24 And, you know, as a matter of economics, it could be that
25 these networks effects are diminishing so as long as you have a

649

1 big enough group, maybe having more people on the game doesn't
2 deliver that much more value, but it still was interesting to
3 see: Is there evidence that suggests they're just so big that
4 would be additional cost to taking the game exclusive?
5 Well, I noted, you know, that there are popular
6 multiplayer games on Xbox that are exclusive; right? And if
7 you think that network effects are really important, really,
8 really important, would that be enough to offset the benefits
9 from exclusivity?
10 THE COURT: I guess my question was different --
11 THE WITNESS: Okay.
12 THE COURT: -- and it's Call of Duty specific because
13 it has been around on these two platforms for a while, and I've
14 heard some people feel very strongly about the particular
15 console that they use. And it's been suggested that there
16 would be just reputational damage due to making it exclusive
17 and, again, because we're talking about a franchise that's very
18 unique. Did you take that into account?
19 THE WITNESS: I understood. I took it into account.
20 I just couldn't find evidence that gave me a good sense of how
21 large the magnitude would be.
22 I will note that my vertical foreclosure model once you
23 account for all the conservative inputs, predicts pretty
24 substantial benefits, economic benefits, to taking it
25 exclusive. So if there is a reputational hit, it would need to

650

1 be fairly significant to kind of change the overall finding
2 that it would be -- wouldn't be in the economic interest of the
3 merged firm.
4 BY MR. PASTORE:
5 Q. Just a couple final questions, Professor Lee.
6 Ms. Wilkinson went through a chat with you towards the end
7 of her cross about predicting the future. Is your analysis
8 predicting precisely what will happen in the future?
9 A. No, it does not. As we discussed, the future is
10 uncertain, both the but-for world and the world with the merger
11 are uncertain, but that doesn't mean it's not possible to
12 obtain economic conclusions about likely competitive effects.
13 I think one of my conclusions is that foreclosure is more
14 likely with the merger than but for the world; and when you
15 have that relative comparison, it's possible to obtain
16 conclusions of likely economic harm; right? If it's more
17 likely, an anticompetitive effect will happen or it's more
18 likely consumers will be harmed -- right? -- across various
19 states of the world as we look out forward.
20 Q. So this is economic incentive you're considering here;
21 right? Can you just explain the difference between economic
22 incentive versus what will happen in the future?
23 A. That's right. Again, I'm an economist. I'm focusing on
24 the economic incentives of the firms. And, you know, firms
25 tend to act on their economic incentives; but also, like

651

1 there's some uncertainty with cloud and content library
2 services because of their nascency; right?
3        And, you know, with cloud gaming because there's that
4 uncertainty, it may not be as -- it's very difficult to put a
5 precise probability on, you know, let's say Activision
6 supporting or not supporting cloud streaming but for the
7 merger.
8        But, you know, cloud continues to grow, it continues to be
9 a really attractive place for consumers to access games, and
10 the gains from trade of seeing an independent Activision on a
11 streaming service grows as well.  Then it becomes more likely
12 that but for the merger, we would see Activision content on
13 streaming services.
14 Q.   That's purely because of objective economic incentives;
15 right?
16 A.   Exactly.  If there are economic gains from trade and they
17 grow large, it's in the economic interests of parties to come
18 to an agreement.
19        MR. PASTORE:  I have no further questions, Your Honor.
20 Thank you.
21        MS. WILKINSON:  I don't have -- I don't have any
22 questions, Your Honor.
23        I'd just like to move in some of the exhibits.
24        THE COURT:  Oh, sure.
25        MS. WILKINSON:  RX20, which is the agreement between

652

1 Sony and Activision on Call of Duty.
2 2069.
3        I'm not going to say all what they are because I think
4 they're confidential.
5        PX1136.
6        I believe I already moved in 5053 and 5054, which were
7 the survey documents.
8        THE COURT:  Yes.
9        MS. WILKINSON:  We want to move in RX2073, which is a
10 Sony document; RX2098, which is a Sony document.
11        THE COURT:  Admitted.
12        (Trial Exhibits 20, 1136, 2069, 2073, and 2098
13        received in evidence.)
14        THE COURT:  All right.
15        MR. PASTORE:  Sorry, Your Honor.
16        THE COURT:  Oh, you have some too.
17        MR. PASTORE:  I have some too.
18        THE COURT:  Sure.
19        MR. PASTORE:  Apologies.  I'd like to admit PX5000.
20        THE COURT:  That's the report?
21        MR. PASTORE:  Yeah, his initial report.
22        MS. WILKINSON:  Your Honor, just I just have a
23 question.  Normally in federal court we don't admit the
24 underlying reports of the experts.  Should -- do you want those
25 and should we then include ours?

653

1        THE COURT:  Well, include them all.  It's a bench
2 trial.
3        (Trial Exhibit 5000 received in evidence.)
4        MS. WILKINSON:  Okay.  Great.  Thanks.
5        MR. PASTORE:  And, Your Honor, there are quite a
6 number of exhibits here, and it's really -- it's reflective of
7 a lot of the --
8        THE COURT:  These are the exhibits attached to the
9 declaration of --
10        MR. PASTORE:  To the declaration, yeah.
11        THE COURT:  Okay.  We'll discuss that later.
12        MR. PASTORE:  Okay.  Thank you, Your Honor.
13        THE COURT:  Okay.  Professor Lee, you may step down.
14        THE WITNESS:  Thank you.
15        (Witness excused.)
16        THE COURT:  It's 2:00 o'clock or almost, so why don't
17 we take a ten-minute break.  Is your next witness live or by
18 video?
19        MR. WEINGARTEN:  I'm going to check on the video
20 during the break, Your Honor.
21        THE COURT:  Okay.  All right.
22        (Recess taken at 1:59 p.m.)
23        (Proceedings resumed at 2:32 p.m.)
24        THE CLERK:  Court is back in session.
25        Are we ready for video?

654

1        MR. WEINGARTEN:  Yes.
2        THE COURT:  Okay.  We're back on the record.
3        And is the FTC ready to call your next witness?
4        MR. WEINGARTEN:  We are, Your Honor.  We have a
5 nine-minute video featuring Mr. Eisler of Nvidia.
6        And then we don't want to make any mistakes with the
7 Nvidia confidential info so I believe Defendants will be ready
8 to call their expert, Dr. Bailey, and then we can do
9 Mr. Fisher --
10        THE COURT:  Tomorrow.
11        MR. WEINGARTEN:  -- at the end of the day or tomorrow.
12        THE COURT:  Great.  Okay.  We will watch the video,
13 then, of Mr. Eisler's deposition.
14        (Video was played but not reported.)
15        MR. WEINGARTEN:  Thank you, Your Honor.
16        My colleague Ms. Callan has some documents to move into
17 evidence.
18        THE COURT:  Okay.  Great.
19        MS. CALLAN:  Your Honor, I'd like to move to admit the
20 exhibits used in Mr. Eisler's designations into evidence.
21 That's PX8000, PX3103, PX3104, PX3144, PX3052, PX2391, PX1781,
22 and I'll also move to admit the deposition transcript PX7060.
23        THE COURT:  All right.  Admitted.
24        (Trial Exhibits 8000, 3103, 3104, 3144, 3052, 2391,
25        1781, and 7060 received in evidence.)

655

1   THE COURT:  So now we're going to call a witness out
2   of order.
3       MR. WEINGARTEN:  Yes, Your Honor.
4       MR. KILARU:  That's right, Your Honor.  Defendants
5   call Dr. Elizabeth Bailey.
6       THE COURT:  Dr. Bailey, if you can stop right there
7   and Ms. Means will swear you in.
8       THE CLERK:  Can you please raise your right hand?
9           **ELIZABETH MEEKER BAILEY,**
10  called as a witness for the Defendant, having been duly sworn,
11  testified as follows:
12      THE CLERK:  Please state your name for the record.
13      THE WITNESS:  Sure.  It's Elizabeth Meeker,
14  M-E-E-K-E-R, Bailey.
15      THE COURT:  You can be seated now.
16      MR. KILARU:  Your Honor, may I approach to give --
17      THE COURT:  You may.
18          <u>DIRECT EXAMINATION</u>
19  BY MR. KILARU:
20  Q.  Good afternoon, Dr. Bailey.
21  A.  Good afternoon.
22  Q.  Could you please introduce yourself to Her Honor?
23  A.  Sure.  Good afternoon.  I'm Liz Bailey.  I'm a Ph.D.
24  economist.
25  Q.  Are you ready to continue our day of economics here,

656

1   Dr. Bailey?
2   A.  I am.
3   Q.  What brings you to court today?
4   A.  I was asked to consider some of the economic issues that
5   have arisen in this matter.
6   Q.  And were you ultimately able to reach some opinions that
7   you're prepared to offer to the Court?
8   A.  Yes, I was.
9   Q.  Well, before we offer those opinions, let's just do a
10  little bit of background.
11      Where did you go to school?
12  A.  I did my undergraduate at Colgate University in upstate
13  New York, and I did my Ph.D. at MIT in Cambridge,
14  Massachusetts.
15  Q.  And do you teach, Dr. Bailey?
16  A.  I do -- I have until recently, yes.
17  Q.  Where at?
18  A.  I've taught at Arizona State University.  I've taught at
19  the University of California Berkeley in the Haas School of
20  Business, and most recently I've taught executives at the
21  Wharton School.
22  Q.  And have you published articles in the field of economics?
23  A.  Yes, I have.
24  Q.  Where do you work today?
25  A.  I work at Charles River Associates.  I'm a vice president

657

1   in the competition practice.
2   Q.  What type of work do you do?
3   A.  I provide economic analysis on a wide variety of mergers
4   and acquisitions.
5   Q.  Dr. Bailey, turning your attention to this case, when did
6   you first get retained?
7   A.  About a year ago.  Roughly this time a year ago.
8   Q.  And are you being compensated for your work on this
9   matter?
10  A.  Charles River Associates is compensated at $1200 an hour
11  for my time.
12  Q.  Any aspect of your opinions tied to that compensation?
13  A.  No, it's not.
14  Q.  One last question.  This case is about video games.  Do
15  you play video games at all?
16  A.  I play video games when my son -- sometimes when my son
17  asks me to play with him.
18  Q.  Dr. Bailey, do you feel that you had all the information
19  you needed to reach economic opinions in this case?
20  A.  I do.
21  Q.  And we're going to show some slides today.  Have you had a
22  chance to review these slides before we came to court?
23  A.  Yes, I have.
24  Q.  Anything in here that's not contained in your report?
25  A.  No.

658

1   Q.  Well, could you give a brief overview of the types of
2   information that you reviewed in coming to your opinions?
3   A.  Sure.  So I reviewed a -- wide variety of materials
4   in -- in this matter.  One of the starting spots for me was
5   telemetry data, and I had that available to me from Microsoft,
6   from Activision, as well as from Sony.
7       I reviewed a wide variety of third-party data sources.  Do
8   you mind if I --
9   Q.  Yes, I do.
10      MR. KILARU:  Ms. Means, can we turn on the monitors,
11  please?
12          (Pause in proceedings.)
13      THE WITNESS:  (Witness examines document.)  I reviewed
14  a wide variety of third-party data sources, Nielsen data, a
15  data source called SuperData, a third-party data source called
16  Statista which contained data on video game revenues, a data
17  source called Metacritic that contained data on ranking and
18  scores of video games, as well as I reviewed and used in my
19  analyses internal data on finances and sales from both
20  Microsoft and Activision.
21      MR. KILARU:  And just for the record, a few of these
22  slides are marked in camera, but I believe the ones that aren't
23  we can publish if that's okay, Your Honor.
24      THE COURT:  Yes, you may.
25      MR. KILARU:  Okay.

1   **THE COURT:**  They're demonstratives; right?
2   **MR. KILARU:**  Yes.  We'll be cautious about that.
3   BY MR. KILARU:
4   **Q.**   Dr. Bailey, you mentioned a couple of types of data that I
5   just want to follow-up on in particular.
6       What is telemetry data?
7   **A.**   Sure.  So I think the simple way that I think about
8   telemetry data is a -- is a log or record of the activity
9   that -- or the characteristics of the -- of the console.
10  **Q.**   Was that data anonymized before you looked at it?
11  **A.**   It was.  So it was anonymized.  It didn't contain any PII,
12  which is personally identifiable information.
13  **Q.**   And just one other.  There's a category on here called
14  Nielsen SuperData.  What is that?
15  **A.**   Sure.  So in -- in this matter one of the things that has
16  been referred to by Dr. Lee and others are what are called AAA
17  games, and I know there's a -- I don't know, I guess I think
18  about it a little bit like you know it when you see it.  Like,
19  there's a lot of different views around what is a AAA game, but
20  this was a data source that provided its rankings of what
21  was -- what they viewed as AAA or AA, and so I use that as a
22  way of kind of getting my arms around what people were talking
23  about.
24  **Q.**   Beyond data, did you look at documents, testimony, that
25  kind of thing?

1   **A.**   Yes, I did.
2   **Q.**   Were you ultimately able to reach some economic opinions
3   in this case?
4   **A.**   I did.  I had three main opinions in this matter.
5   **Q.**   And were each of those opinions reached to a reasonable
6   degree of certainty in your field?
7   **A.**   Yes, they were.
8   **Q.**   And did you have sufficient facts and data to reach those
9   opinions?
10  **A.**   Yes, I did.
11  **Q.**   Let's walk through what those three opinions are if you
12  could.
13  **A.**   Sure.  So my first is that Call of Duty is not essential,
14  critical, must have, or uniquely important.
15      And, Your Honor, I heard the word "unicorn" this morning.
16  I'm going -- if I had space to add another word, I would put
17  "unicorn" in there.  It's not a unicorn.
18      My second is that Dr. Lee's markets are too narrow and
19  don't align with market realities.
20      And the third is that the transaction will expand the
21  availability of Activision games.
22  **Q.**   And just to be clear, when you talk about Dr. Lee's
23  market, are you talking about products, geography, or both?
24  **A.**   I'm talking about both.
25  **Q.**   Well, before we get into those specific opinions, it might

1   be helpful to just take a step back and talk about gaming more
2   generally.
3       We've heard about console gaming, PC gaming, and mobile
4   gaming.  Did you look at any data to see how users break down
5   across those three different platforms?
6   **A.**   I did.  So there's essentially I think about it as three
7   sources of -- of hardware on which gaming happens, and mobile
8   is the largest.  It's about 70 percent.  What I'm showing here
9   is global gaming revenue from 2021, and mobile gaming is nearly
10  150 billion.  About 70 percent.
11      And then lagging behind that is gaming on PCs at about
12  33 billion and then console gaming at 28 billion.
13  **Q.**   And were you able to assess that these proportions between
14  mobile, console, and PC have been changing over the years?
15  **A.**   I did.  I had this data over time.  This is a snapshot for
16  one year.  And then what I do on this chart is that middle bar
17  is the same data as the previous chart, and now I'm just
18  showing it over time.
19      So starting at 2017, then the 2021 data we saw before,
20  moving forward to 2026.  And mobile gaming is the fastest
21  growing segment.  All of the gaming is growing, but mobile is
22  growing the fastest so, as a result, both PC gaming and console
23  gaming are shrinking as a percent.
24  **Q.**   And we've heard some testimony that part of Microsoft's
25  motivation for this acquisition was getting a position in

1   mobile.  Were you able to form an assessment of Microsoft's
2   current position in mobile gaming?
3   **A.**   I was.  I had data available to do that.
4   **Q.**   And what did you find?
5   **A.**   Sure.  So on the -- on the left-hand side on this -- on
6   these pie charts, the one with all the dark blue, today Xbox is
7   a very tiny sliver, less than half a percentage, of mobile
8   gaming revenue.
9   **Q.**   And how, if at all, will that change if the transaction
10  goes through?
11  **A.**   Well, not very much because Activision Blizzard is also
12  very small in mobile gaming.  So combined they'll have a
13  3.8 percent share.
14  **Q.**   Were you here in court for the testimony of Dr. Lee?
15  **A.**   I was here.
16  **Q.**   And did you have a chance to review his written testimony
17  as well?
18  **A.**   I did.
19  **Q.**   Did he do any analysis of how this transaction will affect
20  competition in the mobile market?
21  **A.**   No, he did not.
22  **Q.**   How about in the PC segment?
23  **A.**   I think largely, no.  He didn't include PC in his relevant
24  product markets.  I don't want to give it a flat no because I
25  did hear him talk about some of the reasons why he didn't

663

1  include PC, but it wasn't a focus of his work.
2  Q.  Well, we'll probably talk about this more later, but is it
3  a point of disagreement between you and him as to whether PCs
4  should be considered at part of the competitive assessment in
5  this case?
6  A.  I think so.  The evidence that I've reviewed says PC is a
7  competitive constraint.
8  Q.  Okay.  Let's turn to console gaming, which I think is
9  where most of the focus was this morning.
10  Did you do any analysis of the role that Activision's
11  content plays in console gaming?
12  A.  I did.
13  Q.  And what did you find?
14  A.  So this is a -- chart from my report and then turned
15  into a pie chart on the left-hand side.  Then just kind of to
16  orient, the pie chart just takes -- the wedges are the shares
17  coming off the table and the table on the right-hand side gives
18  the ranking of the publishers, their global share of console
19  gaming.
20  Q.  And where does Activision fall in the pie chart or in the
21  list?
22  A.  So Activision's fifth on the list with a 7.4 percent share
23  of console gaming.
24  Q.  And do you know if all of Activision's revenues here come
25  from Call of Duty?

664

1  A.  No, they don't all come from Call of Duty.  Activision has
2  other video game content.
3  Q.  Where does Xbox Game Studios fall on this list?
4  A.  So they're the second yellow bar.  They're eighth on this
5  list with 4.9 percent share.
6  Q.  And just to be clear, in your assessment of Xbox, are you
7  including the Bethesda studios that we've heard about?
8  A.  Yes, that's included here.
9  Q.  And just one last, Doctor.  Where does Sony fall in this
10  chart?
11  A.  Sure.  So Sony is right -- right -- one step higher than
12  Activision Blizzard.  They are at number four with the 7 and a
13  half percent share.
14  Q.  And what does this analysis of global console shares tell
15  you about Activision's content?
16  A.  Well, for me as -- in one of the things that Dr. Lee
17  focused on was the uniqueness or the importance of Activision
18  Blizzard, and so this was a very useful starting point for me
19  to get my arms around that question of:  Was there something
20  unique and special about the way it's positioned in console
21  gaming revenues?
22  And, you know, when I look at this pie chart, there are --
23  there are four other larger publishers above Activision
24  Blizzard.  It -- I mean, it's obviously not the end of the
25  analysis, but it was where I started and I found it an

665

1  informative starting point.
2  Q.  Doctor, I noticed at the very bottom -- it can be a little
3  hard to see on the monitor -- there's a category of "All Other
4  Publishers" and I think it has over 3900.  Do you see that?
5  A.  I do.
6  Q.  Or over 3.9 billion in revenue.
7  What does that tell you about the industry, whether it's
8  concentrated or not?
9  A.  Well, it's quite unconcentrated.  That all others is very
10  fragmented.  I mean, this list already is fragmented, but that
11  group of all others is a very long tail of other console gaming
12  publishers.
13  Q.  I see that this is a chart based on global data, and I
14  think we'll come back to that.
15  Did you look at any other sort of slices of this
16  publishing data as well?
17  A.  I did.  I mean, I was trying to get my arms around kind of
18  the perspective that Dr. Lee had, and so what's on this slide
19  is Dr. Lee focuses on the United States and so I looked at that
20  as well.
21  Q.  And what did you find?
22  A.  So what I -- what I have done here is really just -- the
23  first chunk that says "Global" here, the first boxes, I'm just
24  porting over from the previous slide so we have a point of
25  comparison.  Those are the same percentages we just talked

666

1  about in the top set of boxes.
2  The middle set of boxes, those are the same shares if we
3  do that same analysis on the previous chart but now just
4  limited to the United States.  And the shares go up a little
5  bit, but it's not -- it's not dramatically different.
6  And then the last box, I mentioned the AAA when we were
7  talking about the Nielsen SuperData, and this is what the
8  shares look like if you further subset the game publishing
9  revenue to the United States and then add the further
10  limitation of the game has to be a AAA game, and it's not very
11  different.
12  Q.  And could you tell the Court what the set of numbers tells
13  you as an economist about Activision's content?
14  A.  Well, as a starting point, it tells me that it raises a
15  good question in my mind whether there's something unique or
16  special or must have or unicorn-ish about Activision Blizzard
17  content.
18  Q.  Before we get to that, Doctor, I want to talk about this
19  global versus U.S. issue.
20  Did you come to an opinion as to whether the market is
21  properly limited to the United States as Dr. Lee says?
22  A.  I did.  I disagree with that.
23  Q.  And how did you come to that conclusion?
24  A.  Sure.  So I -- I looked at a wide variety of evidence, and
25  all of those items that I looked at, both the data and the

667

1   documents and the testimony, all pointed in that same
2   direction.
3   **Q.**   Was one of the first things you looked at the actual
4   products themselves?
5   **A.**   It was.  So when I -- when I look at the products, one of
6   the -- one of the features that jumped out at me is that it is
7   the same products and the same brands and it's even the same
8   devices that are sold around the world.  They're not different
9   devices and different brands and different products in the U.S.
10  versus other places.  It's the same, and that -- that was an
11  informative starting point for me.
12  **Q.**   So these four devices we have here -- the PlayStation, the
13  two Xboxes, the Switch -- same here as abroad?
14  **A.**   Yes.  I mean, maybe subject to a different plug to plug
15  into the socket in -- but it's the same.
16  **Q.**   Did you also look at the release dates for these consoles?
17  **A.**   I did.  So not only is it the same products and the same
18  brands and the same devices, but those console devices are
19  released on the same day in the United States as the rest of
20  the world.  That's what this slide here shows, and I've
21  highlighted in green when the dates are the same and you can
22  see they're all green.  The date -- the release dates are the
23  same.
24       So from an economic perspective, what it tells me is that
25  nexus of where competition is happening is it's happening --

668

1   it's happening certainly at a level that's broader than the
2   United States; where those sort of production and marketing and
3   development decisions get made, that it's a decision that goes
4   beyond the United States.
5   **Q.**   Did you stop looking at consoles or did you also look at
6   the games that can be played on the consoles?
7   **A.**   Correct.  So games go with consoles so I also looked at
8   the games.
9   **Q.**   And what did you find when you looked at that?
10  **A.**   Well, I found the same -- the same thing.  So what this
11  chart is showing is for Xbox, it's the top 10 popular games by
12  play time; and what I'm showing is the release date in the
13  United States compared to the release date in -- in the rest of
14  the world, in a country and the rest of the world.
15       And just like the console chart, what I've done is
16  highlighted in green where the dates are the same; and you can
17  see for all of the top ten games, the release date is the same.
18  **Q.**   Did you -- did this analysis carry on past just the top
19  ten?
20  **A.**   Oh, yeah.  So in my report I have many, many, many more
21  games and nearly all of them were also green.  Yep, the same
22  release date.
23  **Q.**   Did you do a similar analysis on the PlayStation?
24  **A.**   I did.
25  **Q.**   What did you find there?

669

1   **A.**   I found the same thing.  These are the top ten games by
2   play time on PlayStation, and the release date is the same in
3   the United States as the rest of the world.  You can see
4   they're all green.
5   **Q.**   And what did you take away as an economist from the same
6   release dates for these games in the United States and
7   elsewhere?
8   **A.**   As an economist, what it does is reinforce the perspective
9   that the nexus of competition, where that -- where that
10  competitive activity is happening is at a level that's broader
11  than the United States.
12  **Q.**   Doctor, did you look at whether any of these games can
13  actually be played across countries?
14  **A.**   I did.
15  **Q.**   And what did you find?
16  **A.**   So there are many console games that have cross-regional
17  or global play, and these are multiplayer games where you play
18  with other players.  And so not only are there games where you
19  have the ability to do that, but I also had telemetry data
20  available to me where I could actually look to see how
21  important it was.
22  **Q.**   Before we get to that, why does it matter that the games
23  can be played across the world?
24  **A.**   Well, it helps reinforce why the nexus of competitive
25  activity is global, not limited to the United States.  The

670

1   games are more enjoyable to play when you have -- when you are
2   matched with players with similar skills as you have; and so
3   that ability to have a broader set of players, it matters.  It
4   matters for the enjoyability of those games.
5        **MR. KILARU:**   And I think the next few slides are in
6   camera so if we could please take off the public monitors.
7   Thank you so much.
8                  (Pause in proceedings.)
9   **BY MR. KILARU:**
10  **Q.**   Doctor, you just talked about whether the games can be
11  played across regions.  Did you do any analysis of whether they
12  actually are played across regions?
13  **A.**   I did do that, yes.
14  **Q.**   And without getting into the specific numbers, what did
15  you find?
16  **A.**   As I mentioned, I have telemetry data available to me
17  from --
18       **THE COURT:**   What does telemetry data mean?
19       **THE WITNESS:**   Yeah.  So telemetry data, I think about
20  it as a log of the activity that's happening on a console or
21  that the -- that the activity that's happening on a game.
22       So you could imagine at the extreme, like you could track
23  every keystroke that's happening, but that's not what I have.
24  What I have is, like, when you first turned on your console,
25  when you first bought your console, or how long you played a

671

1  game. That's what I have.
2  **THE COURT:** And how do you get that data?
3  **THE WITNESS:** I asked for it.
4  (Laughter)
5  **THE COURT:** But from Microsoft?
6  **THE WITNESS:** Yes. I asked for it from Microsoft.
7  **THE COURT:** You don't have it from PlayStation?
8  **THE WITNESS:** I do have it from PlayStation.
9  **THE COURT:** Did you ask them --
10  **THE WITNESS:** Because I asked, yeah.
11  **THE COURT:** Okay.
12  **THE WITNESS:** I have it from Microsoft, I have it from
13  PlayStation, and I have it from Activision. I think we'll talk
14  about all of that today.
15  BY MR. KILARU:
16  Q.  And, Dr. Bailey, before we get into that, are you aware of
17  whether Dr. Lee had access to that data as well?
18  A.  He did.
19  Q.  What did you find looking at the telemetry data about the
20  frequency with which games are played across the globe, if you
21  will?
22  A.  So there's actually -- so let me -- let me do it this way:
23  So see the box on the slide. That percentage that's shown
24  there is for the game Call of Duty Modern Warfare. That's the
25  percentages of North American lobbies that had players from

672

1  other regions around the world.
2  And the lob -- so a lobby is the group of players who are
3  playing a game together. So what this percentage is, is the
4  percentages of groups of players that were playing Call of Duty
5  Modern Warfare that had players from regions outside of the --
6  outside of North America, North America plus players from other
7  regions. It's a -- it's a substantial percentage.
8  Q.  And what did that tell you?
9  A.  Well, it reinforces why that nexus of competition and
10  where competitive decisions get made are global, not local or
11  limited to the United States. Because the game is more
12  enjoyable, because the gamers are playing across regions, it
13  makes sense that those competitive decisions are being made far
14  broader than the United States.
15  Q.  Doctor, did you do any further analysis on this geographic
16  issue?
17  A.  I did.
18  Q.  Could you tell the Court what you did?
19  A.  Sure. So I did a number of additional analysis because
20  what we just looked at here is, I think about it as the
21  outcome, kind of the observables of what's happening.
22  But that's got to be driven by something, and in part it's
23  driven by players playing around the world on the same game
24  together in these lobbies. But it's also driven by what I have
25  on this slide, and that's that gamer characteristics are really

673

1  similar in the U.S. compared to around the world.
2  Q.  So one of the items listed on this slide is age
3  distribution. What do you mean by that?
4  A.  So what I mean is that the percentage of gamers that fall
5  into age buckets are really similar between the United States
6  and other regions of the world. So like the percentage of
7  gamers that are between the ages of 18 and 24 in the U.S. is
8  really similar to the percentage of gamers between that same
9  age bracket in other regions of the world. That distribution
10  looks really very similar.
11  **THE COURT:** And what product market are you using when
12  you give this? Are you talking about AAA gamers? All gamers?
13  **THE WITNESS:** So I've done it two ways. What I'm
14  talking about here is all gamers, but I've also looked at it
15  for Call of Duty gamers and it's -- it's the same whether you
16  subset it like that or not.
17  BY MR. KILARU:
18  Q.  How about hours distribution, which I think is the next
19  item here?
20  A.  Yeah. So the next on the number of hours that gamers
21  play, that distribution looks very much the same in the U.S.
22  versus other regions of the world too. And by game time hour
23  distribution I mean the percentage of gamers that play like 0
24  to 10 hours a year or 50 to a hundred hours a year. That
25  distribution and how often groups of players play, it's very

674

1  similar.
2  Q.  And following on the Court's question, is that true just
3  for all games or is it also true for Call of Duty in
4  particular?
5  A.  I looked at it both ways, for all gamers and then limited
6  to Call of Duty gamers.
7  Q.  And were you able to determine if the same games are
8  popular in the United States as in other parts of the world?
9  A.  Yes. So there's -- that's also true. If you look at the
10  most highly played games, that set of games that are most
11  highly played in the U.S. is a very similar set to the most
12  highly played games in other countries around the world.
13  Q.  So taking all this evidence together, what conclusion did
14  you reach about whether the geographic market in this case
15  should be limited to the United States?
16  A.  So my conclusion was that the relevant market is broader
17  than the United States. All of this speaks to the nexus of
18  where those important competitive decisions that are getting
19  made, they are getting made at a broader level -- a broader
20  level than the U.S. because the gamers are similar, because of
21  the way the games are getting released. Those production and
22  marketing and development decisions go beyond the U.S.
23  Q.  So in his written direct testimony, Dr. Lee said he
24  doesn't agree with that because if the price of a PlayStation
25  goes up in the United States, someone won't go and buy a

675

1  PlayStation in Europe instead. What's your response to that?
2  **A.**  Well, I mean, that's -- it's not a construct that makes
3  sense here because of where I started; is that sometimes we
4  think about it like that because there are all these other
5  competitors in other regions. And if we think about broadening
6  the market, we're bringing in other competitors, but that's not
7  the case here. We have the same products and the same brands
8  and the same devices being sold around the world.
9  **Q.**  Well, let's turn now to --
10  **THE COURT:**  I think you just need to spin that out a
11  little bit.
12  So the price will impact in Europe? I mean, what's your
13  conclusion that you draw from that?
14  **THE WITNESS:**  So my conclusion is that when those
15  pricing decisions get made, those production decisions, those
16  development decisions, investment decisions, they're not made
17  uniquely for the United States. They're made taking into
18  account the global nature of this business.
19  **THE COURT:**  Ah. Price just being one decision that
20  they make, but all those other decisions as well are informed
21  by what's happening around the world?
22  **THE WITNESS:**  Exactly. Because those gamers interact
23  around the world, because those gamers look similar around the
24  world, because so much is the same, it informs that those same
25  decisions make sense to make around the world as one decision

676

1  not as a million different decisions for each country.
2  **THE COURT:**  Go ahead.
3  **MR. KILARU:**  No, of course, Your Honor.
4  **BY MR. KILARU:**
5  **Q.**  Let's turn back to Activision and to Call of Duty.
6  One of the claims we've heard in this case is that Call of
7  Duty is essential to Sony or very important to Sony. Did you
8  do any analysis of that issue?
9  **A.**  Yes, I did a number of analyses.
10  **Q.**  To follow-up on the question earlier, did you base these
11  analyses on Sony's data?
12  **A.**  Yes, I -- because this was a question that was teed up
13  with respect to Sony, I looked particularly at these questions
14  using the Sony telemetry data that I had available to me so
15  that I could be answering the precise question that's at issue
16  here.
17  **Q.**  So, Doctor, for the next few slides we're going to avoid
18  discussing any numbers and maybe try to speak about shapes and
19  things like that.
20  But what was the first thing you looked at in trying to
21  assess this issue?
22  **A.**  Sure. So the first thing that I looked at is -- is how
23  gamers play -- how often gamers play COD, and so -- Call of
24  Duty. So what this chart shows, it has two boxes, and the box
25  on the left-hand side, the one that's the dark blue one with

677

1  the red percentage above it, that's the percentage of gamers on
2  PlayStation console that have never played Call of Duty.
3  Never.
4  **Q.**  As we look over on the right side, what does that box
5  represent?
6  **A.**  So that box on the right-hand side then takes the -- you
7  know, the remaining. Those are the gamers that have played
8  some, and I break it up into bins by how much Call of Duty
9  they've played.
10  **Q.**  And, again, without talking about the percentages, is the
11  first bin or the first lighter blue rectangle folks who play
12  less than 5 hours in a year in 2022?
13  **A.**  That's right. That's what that first bar shows, the
14  percentage that played less than 5 hours of Call of Duty across
15  the entire year of 2022 on their PlayStation console.
16  **Q.**  The one after that is folks who played between 5 and
17  20 hours in a year?
18  **A.**  Correct.
19  **Q.**  So at most less than 2 hours a month?
20  **A.**  Correct.
21  **Q.**  Let's turn to the next slide, Doctor. What was the next
22  analysis that you did?
23  **A.**  So the second analysis I did to think about whether there
24  was something uniquely important about Call of Duty on
25  PlayStation is I -- is I wanted to think about: Those gamers

678

1  that were playing Call of Duty on a PlayStation console, what
2  portion of them were only playing Call of Duty? Like, if you
3  played Call of Duty, was that all you did? And that's what
4  this chart or this pie chart answered.
5  And you can see that the dark blue wedge here, that's the
6  percentage of Call of Duty gamers playing on a PlayStation
7  console that played six or more other franchises.
8  And I don't show it here because it starts to get kind of
9  hard to read, but there are quite a few -- a good percentage of
10  gamers that are playing, you know, more than 10, more than 20
11  franchises.
12  **Q.**  When you use the term "franchises," what do you mean by
13  that?
14  **A.**  I mean a franchise is like a game that gets issued in
15  different iterations over time. So Call of Duty is a
16  franchise. It comes out as Call of Duty Vanguard and Call of
17  Duty Modern Warfare. Different iterations of it, different
18  versions.
19  **Q.**  So dark blue is folks who played six or more franchises.
20  What's the light blue represent?
21  **A.**  The light blue is that percent of Call of Duty gamers that
22  played two to five other franchises over the course of 2022 on
23  their PlayStation console.
24  **Q.**  How about the gray wedge?
25  **A.**  Those are the ones that only played Call of Duty on their

679

1   PlayStation console.
2   Q.   Among franchises?
3   A.   Among franchises.
4   Q.   We heard earlier today some statements from Dr. Lee about
5   the relative amounts of money that Call of Duty gamers spend.
6   Did you remember hearing that?
7   A.   I did hear that.
8   Q.   Did you look at any data to try to assess that or put it
9   into context?
10  A.   Yes.  I had that data available to me.
11  Q.   Again without discussing the details, what are we -- what
12  are we generally looking at here?
13  A.   Sure.  So this is also coming from Sony telemetry data,
14  and what I'm looking at are gamers of different franchises here
15  and how much they spend on average in a year.
16       And so if you read the numbers at the top, those are the
17  average spending for that -- that franchise gamer, that type of
18  franchise gamer.
19  Q.   So the highest level of spending would be the box on the
20  far left; is that right?
21  A.   That's correct.
22  Q.   Lowest on the right?
23  A.   That's correct.
24  Q.   I see there's two entries highlighted here.  What are
25  those entries?

680

1   A.   Can I say the names?
2   Q.   You can say the names, yes.
3   A.   Okay.  So one of them is the Sony first-party game, which
4   is an exclusive game.  It's God of War and the other one is
5   Call of Duty.
6   Q.   And when you say God of War is an exclusive game, does
7   that mean Sony publishes it just for the PlayStation and not
8   the Xbox?
9   A.   That's what I mean, yes.
10  Q.   And does this chart show the relative disproportion of
11  spending for that game versus Call of Duty?
12  A.   Exactly.  I thought that was an -- an informative
13  comparison for me in thinking about whether there was something
14  unique or special about Call of Duty with respect to how much
15  those Call of Duty gamers spend.
16  Q.   Doctor, did you --
17       THE COURT:  Can I just -- by "spend" you mean buying
18  the game and also in-game purchases?
19       THE WITNESS:  Yes, that's exactly right.  My average
20  annual spend is both the game itself as well as the post-sale
21  monetization however it happens.
22  BY MR. KILARU:
23  Q.   Doctor, did you do any analysis or try to do any analysis
24  of the role that Call of Duty plays in informing purchase
25  decisions of a console?

681

1   A.   Yes, I did that too.
2   Q.   How did you do that?
3   A.   So, look, I don't know why someone buys a new PlayStation
4   console.  I can't ask all of them.  But as an economist, when
5   I -- one thing I can do is think of ways that I might be able
6   to tease that out.
7       And as I said before, I had PlayStation telemetry data
8   available to me.  So what I did is I looked at a particular
9   window of time, and that's October -- the end of October to the
10  end of December 2022, and that was a very good period for me to
11  look at because there were two games that came out during that
12  time.  One was Call of Duty Modern Warfare 2 and the other one
13  was the Sony first-party exclusive game God of War Ragnarök.
14      So looking at that period of time, as an economist, the
15  way that I thought about this is if you really like and care
16  about a game, it's probably going to be the game you're going
17  to play on the first day.
18      And so what I did was in this period of time, I tabulated
19  what games people played on their first day of play.  So, you
20  know, you imagine you plug in your console and you fire it up,
21  and what's the first game that you play?  And some people play
22  more than one game on their first day.  I should be clear about
23  that.
24      So all I'm doing here is tabulating the percentage of
25  times those games were played on the first day.

682

1   Q.   Now, you said the bottom two games, Modern Warfare 2 and
2   God of War, came out during this two-month, three-month period.
3   Was that true of the other games represented here?
4   A.   Those are the two that game out in this window.  A number
5   of the other games on this list came out in -- in -- sometime
6   several -- several months ago or even several years ago.
7   Q.   And does this chart still show that -- the levels of
8   engagement they had despite being older games on the first day?
9   A.   Yes, it does.
10  Q.   And did you take anything in particular from the
11  comparison between the Modern Warfare game and the God of War
12  game?
13  A.   Yes.  So the reason that I thought that this was
14  informative as a comparison, those two that are in yellow, was
15  because both of those two games were recent releases; right?
16  They -- not only, like, recent in the current time period
17  getting to the end of 2022, but they were released roughly at
18  the same time so that made them a useful comparison.
19      Both of those two games were bundled with a PlayStation
20  console.  And I don't mean like all together.  I mean that you
21  could get a PlayStation console that was bundled with Call of
22  Duty Modern Warfare 2 or you could get a PlayStation that was
23  bundled with God of War Ragnarök.  When you bought the console,
24  what came with it was the game.
25      THE COURT:  They threw in a game?

683

1    THE WITNESS: Yeah, exactly. Yeah.

2    And then the third part that was useful for comparison for

3    me is that I understand from third-party public information,

4    that Sony put in substantial marketing investment into both of

5    those games. So it was a useful comparison.

6    BY MR. KILARU:

7    Q.    Does this chart show how often people played those two

8    games you mentioned on the first day?

9    A.    Exactly, right. So those percentages at the end of the

10   bars and the length of the bars tells you how often that game

11   was played on the first day as a proxy for how important that

12   game was to -- to sets of gamers.

13   Q.    Now I see on this --

14   THE COURT: When people bought it and it was bundled,

15   did they have a choice of which bundle?

16   THE WITNESS: That's a good question.

17   THE COURT: In other words, was it in particular if

18   you were buying it in Philadelphia, were you only offered

19   God of War or Call of Duty?

20   THE WITNESS: I don't know the answer to that other

21   than when we bought our PlayStation 5 -- I'm just going to give

22   you an anecdote, which should not be like worldwide

23   information, but my anecdote was that I -- that we made a

24   choice between did we want the Modern Warfare 2 bundle or did

25   we want the God of War bundle.

684

1    THE COURT: Okay.

2    BY MR. KILARU:

3    Q.    Doctor, on this chart are there other games that are

4    exclusive first-party games to Sony?

5    A.    Yes, there are. So the lines that are in that blue color

6    are all Sony first-party exclusive games.

7    MR. KILARU: And I think we can turn the monitors back

8    on. We're out of the in-camera portion.

9    (Pause in proceedings.)

10   BY MR. KILARU:

11   Q.    Doctor, are those the only three exclusive games that Sony

12   has?

13   A.    No. This -- this pie chart shows that -- that -- that

14   PlayStation has roughly three times -- a little more than three

15   times as many exclusive games than Xbox does.

16   Q.    Are you aware of anything stopping Sony from putting

17   marketing dollars behind any of its other exclusive games?

18   A.    No, I'm not.

19   Q.    So taking all of this information together, what

20   conclusions did you draw about Call of Duty's importance to

21   Sony?

22   A.    I mean, Call of Duty is -- it's an important game and it's

23   a popular game; but based on the analyses that I did, there's

24   nothing that suggested it is must have or essential or -- or

25   particularly or uniquely important to Sony.

685

1    Q.    And, Doctor, did you do any analysis of whether other

2    gaming consoles or platforms have been able to have competitive

3    success without Call of Duty?

4    A.    Yes, I did.

5    Q.    What was the first one?

6    A.    So the first one I looked at was the Nintendo console

7    between 2017 and -- I mean, this goes to 2022, but through

8    today, that Nintendo console does not have Call of Duty, and

9    its share has grown from 35 percent to 46 percent.

10   Q.    We'll circle back on this a little bit, but does that mean

11   that it's in a different market because it can succeed without

12   Call of Duty?

13   A.    No, it does not mean that.

14   Q.    All right. Did you also look at how important Call of

15   Duty was to the PC platform?

16   A.    I looked at that as well.

17   Q.    And what did you find?

18   A.    So here what I'm showing are the monthly active users for

19   Valve, Steam. Steam is a distribution service for gaming on

20   PC. And in 2017 Steam had -- had access -- Call of Duty was

21   available on Steam, but it was no longer available in 2018

22   through 2021. And what -- what this chart does is it's

23   tracking those monthly average users on Steam over time, and

24   you can see it continued to grow.

25   Q.    And what do these last two analyses tell you about the

686

1    importance of Call of Duty?

2    A.    Well, it reinforces the work that I did using the

3    telemetry data, Sony's telemetry data; that it's consistent

4    with there's nothing unique or special about Call of Duty in

5    having a console or even PC be successful.

6    MR. KILARU: Your Honor, I see that's it 3:00.

7    THE COURT: Yeah. Is now a good time to stop?

8    MR. KILARU: We could, yes.

9    THE COURT: Okay. All right. We'll end the testimony

10   today. We'll resume at 8:30 and we will continue with

11   Dr. Bailey at that time.

12   MR. KILARU: Can I raise an issue about that,

13   Your Honor?

14   THE COURT: Yes.

15   MR. KILARU: Just in terms of scheduling, we have two

16   witnesses testifying tomorrow. Mr. Kotick and Mr. Nadella.

17   Mr. Kotick is the CEO of Activision as you know.

18   THE COURT: Yes, I know.

19   MR. KILARU: Mr. Kotick, his schedule, we need him to

20   testify in the morning, if that's possible.

21   THE COURT: You want to take him out of -- do you want

22   to stop this witness' testimony?

23   MR. KILARU: Yes, and we can pick up Dr. Bailey after

24   that if that's okay.

25   THE COURT: Is there any objection from the FTC?

687

1    MR. WEINGARTEN:  As long as the witness remains

2  sequestered, Your Honor, yes, it's okay.

3    THE COURT:  Yes.  The witness should not be talking to

4  your counsel about your testimony.

5    MR. KILARU:  And as to Mr. Nadella, we've worked this

6  out with the government, he needs to testify at 1:00 so we'll

7  just be a little fluid during the day.  At 1:30.

8    THE COURT:  At 1:00?  At 1:30, yeah.

9    Let me tell you, I actually have to moderate a panel from

10  12:00 to 1:00 so we wouldn't start until -- maybe we should

11  just say we're going to have a break from 12:00 to 1:30, and

12  we'll start with him tomorrow.

13    MR. KILARU:  That will be great, Your Honor.

14    THE COURT:  We'll do that for your planning purposes,

15  and maybe we will end up having to go a little bit later in the

16  afternoon.

17    MR. KILARU:  And could I ask just one final scheduling

18  issue, Your Honor?  This is more for the findings of fact that

19  are due at the end of the week.

20    Because of the time crunch, which we're all very thankful

21  for, can we file them under seal and then file the redacted

22  versions next week?

23    THE COURT:  Yes.  Absolutely.  For both sides.

24    MR. KILARU:  Thank you.

25    MR. WEINGARTEN:  Same question.

688

1    THE COURT:  For both sides, yes, for sure.

2    All right.  Thank you.  We'll see you tomorrow morning.

3    (Proceedings adjourned at 3:06 p.m.)

4    ---oOo---

5

6    CERTIFICATE OF REPORTER

7    I certify that the foregoing is a correct transcript

8  from the record of proceedings in the above-entitled matter.

9

10  DATE:  Tuesday, June 27, 2023

11

12

13

14  _____

15  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR

   United States District Court - Official Reporter

16

17

18

19

20

21

22

23

24

25

**Volume 4**

**Pages 689 - 917**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

FEDERAL TRADE COMMISSION,           )
                                    )
            Plaintiff,              )
                                    )
VS.                                 )   NO. C 23-02880 JSC
                                    )   SEALED PAGES 693-707 and
MICROSOFT CORPORATION, et al.,      )   902-916
                                    )
            Defendants.             )
_____)

San Francisco, California
Wednesday, June 28, 2023

**TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

                    FEDERAL TRADE COMMISSION
                    600 Pennsylvania Avenue, NW
                    Washington, D.C.  20580
              BY:   JAMES H. WEINGARTEN, ATTORNEY AT LAW
                    JAMES ABELL, ATTORNEY AT LAW
                    JENNIFER FLEURY, ATTORNEY AT LAW
                    PEGGY FEMENELLA, ATTORNEY AT LAW
                    CEM AKLEMAN, ATTORNEY AT LAW
                    NICOLE CALLAN, ATTORNEY AT LAW
                    MARIA CIRINCIONE, ATTORNEY AT LAW
                    ALEX ANSALDO, ATTORNEY AT LAW

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

**APPEARANCES:**  (continued)

For Defendant Microsoft:

                    WILKINSON STEKLOFF LLP
                    2001 M Street, NW - 10th Floor
                    Washington, D.C.  20036
              BY:   BETH WILKINSON, ATTORNEY AT LAW
                    RAKESH N. KILARU, ATTORNEY AT LAW
                    KIERAN GOSTIN, ATTORNEY AT LAW
                    GRACE HILL, ATTORNEY AT LAW
                    SARAH NEUMAN, ATTORNEY AT LAW
                    ANASTASIA PASTAN, ATTORNEY AT LAW

For Defendant Activision Blizzard, Inc.:

                    SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                    1440 New York Avenue, N.W.
                    Washington, D.C.  20005
              BY:   STEVEN C. SUNSHINE, ATTORNEY AT LAW

                    SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                    525 University Avenue
                    Palo Alto, California  94301
              BY:   CAROLINE VAN NESS, ATTORNEY AT LAW

                    SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                    1 Manhattan West
                    New York, New York  10001
              BY:   EVAN R. KREINER, ATTORNEY AT LAW

For Nintendo of America, Inc.:

                    VENABLE LLP
                    151 West 42nd Street - 49th Floor
                    New York, New York  10036
              BY:   BENJAMIN P. ARGYLE, ATTORNEY AT LAW

For Sony Interactive Entertainment:

                    CLEARY GOTTLIEB STEEN & HAMILTON, LLP
                    2122 Pennsylvania Avenue, NW-Suite 1000
                    Washington, D.C.  20037
              BY:   ELSBETH BENNETT, ATTORNEY AT LAW

---

691

1               I N D E X

2   Wednesday, June 28, 2023 - Volume 4

3   PLAINTIFF'S WITNESSES                    PAGE  VOL.

4   FISHER, JEFFREY
    By Video Deposition (not reported)       822   4
5
    NADELLA, SATYA
6   (SWORN)                                  823   4
    Direct Examination by Mr. Abell          824   4
7   Cross-Examination by Mr. Kilaru          848   4
    Redirect Examination by Mr. Abell        853   4
8
    DEFENDANTS' WITNESSES                    PAGE  VOL.
9
    KOTICK, BOBBY
10  (SWORN)                                  708   4
    Direct Examination by Ms. Wilkinson      708   4
11  Cross-Examination by Ms. Cirincione      735   4
    Redirect Examination by Ms. Wilkinson    774   4
12  Recross-Examination by Ms. Cirincione    777   4

13  BAILEY, ELIZABETH MEEKER (RECALLED)
    (PREVIOUSLY SWORN)                       778   4
14  Direct Examination resumed by Mr. Kilaru 778   4
    Cross-Examination by Mr. Ansaldo         793   4
15
    CARLTON, DENNIS WILLIAM
16  (SWORN)                                  854   4
    Cross-Examination by Ms. Femenella       855   4
17  Redirect Examination by Mr. Kilaru       898   4

18              E X H I B I T S

19  TRIAL EXHIBITS                     IDEN  EVID  VOL.

20  1274                                     833   4

21  1746                                     842   4

22  1747                                     829   4

23  1750                                     844   4

24

25

692

1               I N D E X

2             E X H I B I T S

3   TRIAL EXHIBITS                     IDEN  EVID  VOL.

4   1751                                     839   4

5   1777                                     845   4

6   2133                                     754   4

7   2282                                     759   4

8   2421                                     771   4

9   2465                                     821   4

10  3103                                     822   4

11  3354                                     863   4

12  4066                                     840   4

13  4678                                     878   4

14  4743                                     864   4

15  4849                                     867   4

16  5055                                     821   4

17  5056                                     915   4

18  9012                                     838   4

19  9015                                     827   4

20  9084                                     828   4

21  9102                                     836   4

22  9106                                     737   4

23  9441                                     741   4

24  9453                                     888   4

25

Wednesday - June 28, 2023                8:19 a.m.

2          P R O C E E D I N G S

3                ---oOo---

4    (The following pages 693 through 707 were placed under

5    seal by Order of the Court:)







707

1
2
3
4
5
6      (The following proceedings were heard in open court:)
7      **THE COURT:** We're opening the courtroom and going to
8 begin the proceedings. I do want to remind those in the
9 courtroom and those listening via Zoom audio that these
10 proceedings are being recorded by this court.
11      Any other recording of this proceeding either by video,
12 audio, including screenshots or live streaming or other copying
13 of the hearing is strictly prohibited.
14      (Pause in proceedings.)
15      **THE COURT:** Is the FTC prepared to call your next
16 witness?
17      **MR. WEINGARTEN:** We have a witness out of order. I
18 think we have --
19      **THE COURT:** Oh, this is Microsoft's witness.
20      **MR. WEINGARTEN:** Yes, Your Honor. I think we have
21 Mr. Nadella and Mr. Stuart left, but I think we're passing --
22      **THE COURT:** Okay. Is Microsoft prepared to call your
23 next witness?
24      **MS. WILKINSON:** Yes, Your Honor. We call Bobby
25 Kotick.

708

1      **THE COURT:** Mr. Kotick, if you stop right there,
2 Ms. Means will swear you in.
3      **THE CLERK:** Please raise your right hand.
4                <u>**BOBBY KOTICK**</u>,
5 called as a witness for the Defendant, having been duly sworn,
6 testified as follows:
7      **THE CLERK:** Please state your name for the record.
8      **THE WITNESS:** Bobby Kotick.
9      **THE CLERK:** Thank you.
10      **THE COURT:** Thank you. You may be seated.
11              <u>**DIRECT EXAMINATION**</u>
12 **BY MS. WILKINSON:**
13 **Q.** Good morning, Mr. --
14      **THE COURT:** You may proceed.
15      **MS. WILKINSON:** I'm sorry, Your Honor.
16      **THE COURT:** You may proceed.
17 **BY MS. WILKINSON:**
18 **Q.** Good morning, Mr. Kotick.
19 **A.** Good morning.
20 **Q.** We have heard a lot about you and your company before you
21 came. So could you give just a brief introduction to the Court
22 of who you are?
23 **A.** Sure. I'm Bobby Kotick. I'm the CEO of Activision
24 Blizzard. I think this is my 32nd year in that role, and the
25 company started out, I just realized, in some ways in this

1  building.  It was a bankruptcy and the bankruptcy court was
2  downstairs; and when my friends and I first purchased it, it
3  was an insolvent company and it had a history of great games
4  that had been developed mainly for the Atari and early video
5  game systems and it had lost its way; and we purchased control
6  of the company, and then started developing video games for a
7  variety of different formats.
8  Q.   Great.
9       Let's go back just a few years, and can you tell us how
10 you first got involved with the software business?
11 A.   Sure.  I was in college and I was a history of art major.
12 I had a college roommate who was a computer engineer, and he
13 had seen -- he worked at Apple Computer in the summer of 1983,
14 and he saw a prototype of the Lisa computer and came back and
15 thought it would be a good idea to try and make something like
16 that, a graphical user interface and a mouse, for the Apple II.
17 So we started a business in Ann Arbor where we lived, we were
18 in college, making software for the Apple II and have been
19 making software ever since.
20 Q.   So are you a graduate of the -- of Michigan -- University
21 of Michigan?
22 A.   No.  As part of the contract we had with Apple, Steve Jobs
23 actually made me quit college.
24 Q.   And have you been in the software and gaming business ever
25 since?

1  A.   Yes.
2  Q.   And about what year did you buy Activision out of
3  bankruptcy?
4  A.   1991.
5  Q.   And can you tell us how the gaming market -- the status of
6  the gaming market at the time you bought Activision took
7  control?
8  A.   So in the late '80s, early '90s, the principal place you
9  played video games would either be the Nintendo Family
10 Entertainment System or Sega or on personal computers, and most
11 of the cost was actually in the cartridges that the games came
12 on, and so the barriers to entry were somewhat high because you
13 needed a lot of capital to make those cartridges.
14      But Nintendo and Sega were the principal makers, and then
15 over time Sony entered the market, Microsoft entered the
16 market, and the business has evolved to be what's today
17 probably a $130 billion-a-year industry.
18 Q.   How would you compare that to the movie industry?
19 A.   Well, I think if you look at the movie and television
20 around the world, I think it's something like $700 billion, and
21 so it's still substantially bigger.
22      But I think the thing about video games, it's very
23 different than film and television.  In film and television,
24 creators are focused on convincing you to believe the
25 characters on the screen so you're suspending your disbelief

1  and creating an emotional connection with those characters.
2       Our business is much more about you experiencing something
3  and feeling like you're in the action.  You're flying a plane.
4  You're driving the car.  And the story and character component,
5  that emotional connection, is -- it's not as relevant as
6  ensuring that you have a great visceral connection.
7  Q.   Let's go to the 2000s when Sony was in the market and
8  Microsoft started in the market.  What kind of platforms did
9  they have at that time?
10 A.   What kind of platforms did Sony have?
11 Q.   Yes.
12 A.   So, you know, Sony is, and always has been, this
13 extraordinary consumers electronic company.  If you think back
14 in the history of the company, they invented the Walkman, they
15 coinvented the CD.  You know, they're one of the great
16 pioneering companies and probably the best company in the world
17 in consumer electronics in my view.
18      And in the early '90s they decided they wanted to create a
19 dedicated video game system, and so they put a team together
20 and they built the PlayStation; and when they launched it, it
21 was probably the best-designed video game system that had ever
22 been created.
23 Q.   Let's focus a bit on where the market is today and we'll
24 go back, obviously, to Sony and to Microsoft.
25      Can you tell us where people are playing games today?

1  A.   Well, the business has undergone this incredible
2  transformation.  For most of the time that I've been in my job,
3  we're a business that sold to middle class consumers in
4  developed countries.
5       In the mid-2000s when the iPhone was introduced, that was
6  the transformation of the business where all of a sudden the
7  audiences became people of every economic strata and in every
8  country in the world.  And so today the bulk of games are
9  played on phones, and that's been this dramatic shift but
10 that's really democratized the opportunity for game play.
11 Q.   And when did that change really start where gamers started
12 to move to play primarily on mobile?
13 A.   I would say we started to see it like 2010-2011 you were
14 seeing this big shift and phones were getting more capable and
15 more powerful, and the microprocessors that were in phones were
16 not dissimilar from those that were in prior video game
17 systems.  So that's really where you started to see this
18 momentum pick up.
19 Q.   Let's focus on Call of Duty, if we could, for a few
20 minutes.
21      Can you tell the Court how Call of Duty began?
22 A.   Well, it actually began as a competitor of ours called
23 Electronic Arts.  They had developed a game called Medal of
24 Honor, and it was successful and a lot of people at Activision
25 had been playing it and we thought:  Wow, this is a really

713

1 great idea. It's public domain concept but you, you know,
2 think about sort of military conflict through history backwards
3 and forwards, and you would never really run out of ideas if
4 you actually used that as a construct.
5     And we liked the idea of having something that you knew
6 that you could envision what the sequel content would be, and
7 so we put a team together and the first game was a World War II
8 based game and that was, I think, in 2003 and it's evolved
9 since then.
10 Q.   So let's go back to your concept of sequels.
11     Back when Call of Duty was starting, was it common in the
12 gaming development business that people were making sequels
13 from the -- you know, based on the initial IP?
14 A.   There -- the nature of the business, people are so
15 intellectually curious who make games and so I don't -- I don't
16 think it was easy early on to get people to want to work on a
17 sequel. They wanted to do something new.
18     So we had to instill a discipline and a compensation and
19 reward system that actually rewarded you to stay focused on
20 developing sequels based on original games.
21 Q.   The first time Call of Duty came out, was that a
22 multiplayer game or a single-player game?
23 A.   The focus of the -- of that first game was very much a
24 campaign, but the big evolution of the industry has been this
25 transformation to the social experience. And so you really

714

1 started to see games take off when you had the ability to
2 communicate with another player, play against another person.
3 And this is when I think we shifted from being this solitary
4 form of entertainment, you against the game machine or
5 computer, to you playing with your friends, and it became more
6 like sport. So you had the ability to compete. You could play
7 in tournaments. You had a social experience. So you could get
8 together with your friends and play. And that really, I think,
9 started to transform the business and make it even more
10 popular.
11 Q.   Okay. So the first year was campaign only?
12 A.   Let's see, 2003, I -- that was -- I'm not -- I can't tell
13 you for certain. There may have been a multiplayer component
14 to it, but my recollection is I think it was just campaign.
15 Q.   When you use the word "campaign," do you mean what you
16 just described, which is I, the player, play against the game
17 and I'm not playing against my friends or --
18 A.   Yeah, you're playing in the solitary experience.
19 Q.   After that first year, did Call of Duty become a
20 multiplayer game?
21 A.   Call of Duty is a multiplayer game.
22 Q.   Has it always been a multiplayer game since that time?
23 A.   It has.
24 Q.   What about multiplatform? What does that mean?
25 A.   The way I would describe that is that it's available on

715

1 every device that has a microprocessor and a display that's
2 capable of delivering that kind of experience.
3 Q.   When you first announced the very first version of Call of
4 Duty, was that available on more than one platform?
5 A.   Yes.
6 Q.   Which platforms, if you recall?
7 A.   That's a great question. Let's see, it was probably
8 PlayStation -- the end of the life of PlayStation 2,
9 PlayStation 3, Xbox 360, PC. I don't remember exactly.
10 Q.   Okay. And every year since then, has Call of Duty been
11 available on more than one platform?
12 A.   Yes.
13 Q.   Has it ever been exclusive in terms of only available on
14 one platform?
15 A.   No.
16 Q.   Why is that? Why have you maintained it as a
17 multiplatform game over the years?
18 A.   Well, if you think about like from a business perspective
19 and from a consumer perspective, one of the most important
20 things is building communities of players, especially now that
21 you have the ability to compete and socialize. And so our view
22 has always been that you want to create your content for as
23 many platforms as possible and build your audiences to be as
24 big as possible.
25 Q.   Did there come a time when players could play Call of Duty

716

1 even if they didn't own the same platform?
2 A.   Sure.
3 Q.   Why is that beneficial for the game and for the community
4 and your business?
5 A.   Well, it just expands the market and also makes you --
6 let's say you have a group of friends, not everybody's going to
7 have the same device so it gives you the opportunity to be able
8 to play with your friends.
9 Q.   Have you ever contemplated over the years making Call of
10 Duty exclusive to one platform?
11 A.   Not really.
12 Q.   And do you currently see any reason why either you, as the
13 CEO of Activision, or Xbox would ever want to take Call of Duty
14 exclusive to one platform?
15 A.   No.
16 Q.   Why?
17 A.   Well, you would alienate this -- we have a hundred million
18 monthly active players. Half of them play on phones but the
19 rest of them play on computers and Xboxes and PlayStations, and
20 you would have a revolt if you were to remove the game from one
21 platform.
22 Q.   As the CEO of a gaming business, in the past have you
23 heard loud and clear messages from the gaming community?
24 A.   Gamers are incredibly passionate. Because of the nature
25 of the experience, you get very invested in the experience.

717

1  Like I said, in many cases because they're like competitive
2  play. It's like a sport.
3       And so with that kind of investment in time and effort,
4  you have an enthusiastic, passionate group of people, and they
5  just -- they take the gaming experience very seriously.
6  Q.   You said you have about a hundred million active gamers;
7  is that right?
8  A.   For Call of Duty about a hundred million monthly active
9  users.
10 Q.   Let's talk about those hundred million folks.
11      Are they all amateurs? Are they all groups of friends?
12 How would you categorize how people play Call of Duty?
13 A.   That's a pretty broad range. Some people -- you know, the
14 phone games are more casual, but people play them in different
15 circumstances, and I would say it's a -- you know, it's pretty
16 representative of the world. It's predominantly male, but I
17 think the game is available in something like 200 countries.
18 Q.   And are there professional Call of Duty players?
19 A.   There are.
20 Q.   What does that mean?
21 A.   So they play professionally competitively. In fact, we
22 have a league called the Call of Duty League with team owners
23 much like a traditional sport, and they play in organized
24 competitions against each other.
25      There's a whole group of amateur players but who also

718

1  compete, and then there is what I would call semiprofessional
2  players. But, you know, it's -- it's now become an opportunity
3  where if you are not -- don't excel at a traditional sport, you
4  actually have the ability to have the camaraderie and
5  connection and the same kinds of experiences that you might
6  have if you were playing a traditional sport.
7  Q.   If I were to draw my circle of a hundred million monthly
8  active users, is there a subgroup of that that plays daily?
9  A.   Sure. I mean --
10 Q.   What do you call those folks or how do you keep --
11 A.   We would call them like daily active users.
12 Q.   And do you have an idea of approximately how many daily
13 active users you have for the COD games?
14 A.   Can I guess?
15 Q.   No, you can't. You can give us an estimate if you know.
16 If you don't --
17 A.   I would say 7 to 10 million players.
18 Q.   Okay. So 90 percent of the people or so that play are not
19 on Call of Duty every day playing?
20 A.   Well, the monthly active users all play monthly, but on
21 any given day there's probably 7 to 10 million people playing.
22 Q.   Let's turn to the different games or titles that fall
23 under the Call of Duty rubric.
24      Where do you have those games available and -- well, let's
25 just start. What are the different versions of those games

719

1  that you have that would fall under the Call of Duty franchise?
2  A.   So, like I said, the bulk of players are playing on
3  phones. Then you have probably 20 -- 20-some odd percent
4  playing on personal computers and then there's probably, let's
5  say, 15 or 16 percent that play on PlayStation and probably 7
6  or 8 percent that play on Xbox.
7  Q.   Is there a Call of Duty game, Call of Duty War Zone,
8  that's free-to-play?
9  A.   Yeah. I think that's a very important part of how the
10 business has evolved. One of the things that we realized is
11 that the way you build big communities of players is make the
12 games available for free.
13      So, for us, you know, our main focus as a company is
14 making sure that each one of our games is first available free
15 on as many formats as we can create; and then you have the
16 ability to have players invest in different ways, but they also
17 don't have to invest at all.
18 Q.   So the investment is the in-game monetization? They can
19 buy things while they're playing?
20 A.   Yes.
21 Q.   So Call of Duty War Zone, the free-to-play game, is that
22 available on PlayStation 5 and Xbox?
23 A.   Yes.
24 Q.   Is that available on PC?
25 A.   Yes.

720

1  Q.   And is that available on mobile?
2  A.   It will be this fall.
3  Q.   Okay. And is there another Call of Duty mobile game
4  available today for people who use their phones?
5  A.   Yeah. It's not linked to the other games. It's its own
6  game, but it's available today and it's widely played.
7  Q.   So people who like to hear that Call of Duty War Zone is
8  coming to phones, why did you decide to put that specific title
9  onto mobile -- design that game specifically for a mobile
10 phone?
11 A.   Because it's the biggest part of the market.
12 Q.   Okay. And based on your experience, where do you see the
13 market going in the next five to ten years in terms of
14 platforms and the ability to access games?
15 A.   Most of my five- to ten-year predictions have not been
16 that accurate, but --
17 Q.   We'll get to that. We'll get to that.
18 A.   -- I would say that the growth of gamers and gaming will
19 continue principally on phones. And, you know, that's what we
20 have seen's has been the majority of the growth over the last
21 decade, and that I think will continue as phones continue to
22 get more powerful.
23      And you look at the chips that are being incorporated into
24 phones today, they're the equivalent of what you might have
25 seen in the past in a dedicated video game system. So I would

721

1 say phones are going to have a very important role in the
2 growth of the business.
3     Then you look at companies like Meta with the Oculus VR or
4 Apple just announced the VR headset, and so we're going to
5 think out five to ten years I think the VR opportunities are
6 going to expand, and that will be another interesting area for
7 development.
8 Q.  We have --
9     THE COURT:  But are the mobile games multiplayer as
10 well?
11     THE WITNESS:  Yes.
12     THE COURT:  And can an Android play against an iPhone?
13     THE WITNESS:  It can.
14 BY MS. WILKINSON:
15 Q.  We haven't said much about Nintendo.  At one time did you
16 have Call of Duty titles available on Nintendo?
17 A.  Yes.
18 Q.  And around 2013 did that end?
19 A.  I don't know the specific year.  I think the last one was
20 on the Wii U.
21 Q.  Before the Switch was coming onto the market, did you
22 consider whether to put Call of Duty on the Switch?
23 A.  Yes.
24 Q.  Why didn't you?
25 A.  I made a bad judgment.  I -- when I had seen the prototype

722

1 of the Switch, it was very different than -- when I saw the
2 prototype of the Wii, I thought it was the most extraordinary
3 video game system that was ever created, and it really was
4 transformative in our industry because it made games very
5 physical.
6     When I saw the prototypes for Switch, I was concerned
7 that -- because they were trying to accomplish a lot.  It was a
8 console but also had a portable capability.  I didn't think it
9 was going to be wildly successful.
10 Q.  How did that turn out for you?
11 A.  It's probably the second-most successful video game system
12 of all time, so it was a bad -- bad decision on my part.
13 Q.  Okay.  Somehow you've muddled through, though; right?
14 A.  Muddled through.
15 Q.  Okay.  Let's talk a little bit about Call of Duty revenues
16 and where they come from generally.
17     In terms of platforms, percentage-wise where do your
18 revenues come when you compare the PlayStation 5 to the Xbox X
19 and S series?
20 A.  Oh, I would say the PlayStation revenues are probably
21 twice the Xbox revenues.
22 Q.  Is that consistent with the idea that there's twice as
23 many Call of Duty gamers on PlayStation versus Xbox?
24 A.  We have to remember the PlayStation has the benefit of
25 Sony's breadth of distribution.

723

1 Q.  Explain that a little more.
2 A.  So Sony is -- you know, in my view is the most successful
3 consumer electronics company of all time and they have
4 distribution in every country, in every small town, everywhere
5 in the world.  And so, you know, they sell televisions and they
6 have phones and they have every type of consumer electronics
7 product, so they have this incredible breadth of distribution
8 and very recognizable brand and that's enabled them to have
9 this disproportionate market share everywhere in the world.
10 Q.  How do you assess their ability to develop new IP?  Is
11 there anything unusual about Sony especially in comparison to
12 Xbox?
13 A.  Yeah.  They have an enormous competitive advantage.  They
14 own Sony Music, Sony TV, and Sony's film library and so they
15 have, you know, thousands of different intellectual properties
16 that they can commercialize into video game content.
17     They also have the ability to do something that is really
18 difficult to do and they did it incredibly successfully with
19 The Last of Us.  So they were able to take a very popular video
20 game and turn it into one of the most successful TV shows of
21 all time.
22 Q.  Why is that beneficial?
23 A.  Well, again, if you think about the nature of our players,
24 they love the idea that they are intellectual property, that
25 they are so invested in as a game comes to a big screen or a

724

1 small screen.
2     I also think that by being on television or film, it
3 actually gives them the opportunity to expand the audience for
4 those games to people that might not otherwise play them.
5 Q.  Do you have any concern that if the transaction goes
6 through and Activision becomes part of Xbox, that Sony will
7 have any difficulty having a competitive response in competing
8 against Xbox?
9 A.  From what perspective?
10 Q.  Will they be able to develop new games?
11 A.  Yeah.  They have enormous amount of development capacity.
12 They own some of the very best game developers in the world.
13 Q.  And where have they been in terms of the market for
14 consoles for the past 20 years?
15 A.  I think PlayStation 2 is probably the best-selling video
16 game system of all time, but they've generally had -- since
17 they launched PlayStation, been the dominant player in the
18 video game console industry.
19 Q.  And you told us that it wouldn't make any sense to take
20 Call of Duty off a platform like PlayStation; right?
21 A.  Not just it wouldn't make any sense, it would be very
22 detrimental to our business.
23 Q.  So it would be detrimental to the business because of how
24 players would respond?
25 A.  How players would respond.

725

1  Q.  What else?

2  A.  Where we generate revenues from.  You know, there's always
3  opportunities to have different types of innovation and you
4  want to take advantage of that innovation, but our -- if we
5  were to remove Call of Duty from PlayStation, it would have
6  very serious reputational -- it would cause reputational damage
7  to the company.

8  Q.  And before you signed the merger agreement with
9  Mr. Spencer and the folks at Microsoft and since then, have
10 they ever discussed with you that they want to pull Call of
11 Duty from PlayStation?

12 A.  No.

13 Q.  Never part of any conversation you've had with them?

14 A.  No.  I'd say the opposite.  They've always said that
15 they're a multiplatform company, and that we would make it
16 available on every platform.

17 Q.  Let's go back to mobile for a moment, if we could.

18     In 2016 did you buy a company named King?

19 A.  We did.

20 Q.  And what did -- at that time what was King doing?

21 A.  King was one of the most successful mobile game companies
22 in the world.

23 Q.  And has the value of King increased since you bought it?

24 A.  Yes.

25 Q.  And what are the most popular games that King develops?

726

1  A.  So the ones -- the Candy Crush is the biggest and then
2  they have a game called Pet Rescue, another called Farm Heroes,
3  another called Bubble Witch, but Candy Crush is virtually all
4  of the revenues of King.

5  Q.  Are all of those mobile games free-to-play?

6  A.  They are.

7  Q.  And is there additional skills that the King folks bring
8  not to just develop the game itself but how you actually
9  attract and retain consumers on a mobile device versus a
10 platform?

11 A.  Yes.

12 Q.  And what -- you've seen that since you took them over.
13 What is that that they do so different in mobile versus
14 platform?

15 A.  Well, for starters it's a very different experience
16 because you're playing it on a small screen and you're using
17 the touchscreen as the interface.  I think that was really
18 where this model of free-to-play started.

19     And the successful mobile game companies were all very
20 focused on the idea of building these big communities of
21 players, and then they -- they do a very good job of blending
22 creativity and inspiration in the product development function
23 with commercial thinking and commercial capability.

24     The -- the thing about mobile games is because they're
25 free-to-play, a very small percentage of the people who play

727

1  those games actually pay.  So in the case of a game like
2  Candy Crush, maybe 2 percent of the 150 million monthly active
3  users pay for the game and then you have supplemental forms of
4  monetization like advertising.

5  Q.  So you have 150 million monthly average users for
6  Candy Crush and a hundred million for Call of Duty?

7  A.  Yes.

8  Q.  If you -- or have you ever seen your developers in any
9  game, but we're really focused on Call of Duty, be willing to
10 even considered to produce a game that was subpar for a certain
11 platform?

12 A.  No.

13 Q.  Can you ever imagine your developers wanting to or being
14 persuaded to develop a subpar version of a game to put on a
15 certain platform?

16 A.  No.

17 Q.  All right.  So we're calling that degrading the game.  Why
18 would that not be something that anyone would want to do?

19 A.  Oh, multiple reasons.  For starters, in order to do that,
20 you would have vitriol from gamers that would be well deserved,
21 and you would see that being something that would be very vocal
22 and also cause reputational damage to the company.

23     The other thing is, most of the people who make video
24 games, they're -- they take great pride in the work that they
25 do, and so they always want to put their best foot forward and

728

1  deliver the best experiences that they can.

2  Q.  Have you ever heard of developers developing a subpar game
3  for one platform versus another?

4  A.  You mean intentionally doing it?

5  Q.  Yes.

6  A.  No.

7  Q.  Are there different features that are available on
8  different devices?

9  A.  Yes.

10 Q.  And sometimes have there been in the past different maps
11 or weapons or things that you could buy on one platform versus
12 another for Call of Duty?

13 A.  Sure.

14 Q.  But you don't consider that degrading the experience for
15 one player on a platform versus another, do you?

16 A.  No.  That's more --

17 Q.  Why not?

18 A.  It's just more marketing, more promotional kinds of ideas.

19 Q.  Okay.  I want to talk about the two other topics that have
20 come up in this case, which are putting games into subscription
21 services for content library and streaming.

22     You have strong views on both of those ideas, do you not?

23 A.  I'm generally considered a strong-view person when it
24 comes to that.

25 Q.  Okay.  Well, let's start with how you've looked at over

729

1  the years whether you should put Call of Duty, or any of your
2  games, into a subscription content library service.
3  A.  So I have a general aversion to the idea of a multigame
4  subscription, and maybe part of it is being in Los Angeles and
5  having watched the big media companies move their content to
6  these subscription streaming services and the business results
7  have suffered, most everyone of those companies, as a result.
8      We also have a game that has a subscription called World
9  of Warcraft, and our players pay us $15 per month for that
10 single game.
11     So the idea of having a game in a multigame subscription
12 service I think would degrade the economics, and it's not --
13 it's inconsistent with the idea of starting out with
14 free-to-play as the way that you build game universes and
15 franchises and then having multiple forms of player investment
16 that gives flexibility to the player.
17 Q.  Have you made your views known to people in the gaming
18 industry?
19 A.  They are widely known.
20 Q.  So when Mr. --
21     THE COURT:  I'm sorry.  Can I interrupt you?
22     MS. WILKINSON:  Yes, please.  Of course.
23     THE COURT:  For the World of Warcraft subscription,
24 why would anyone pay $15 a month to play as opposed to just pay
25 $70 and have it?  What does the monthly subscription give you?

730

1      THE WITNESS:  It was developed almost 20 years ago,
2  and it's a really rich game experience where the players are
3  playing for longer hours than most, and historically what we've
4  done is tried to introduce new content that you wouldn't have
5  to necessarily pay for.  So you play the game.  You pay your
6  $15 a month.  We'll deliver you new content that you wouldn't
7  necessarily have to pay for.
8      THE COURT:  I see.  If you had the console or that you
9  bought it, you'd have to pay for these things, but it's sort of
10 a an all-in, an all-you-can-eat fee?
11     THE WITNESS:  There -- sometimes there's special
12 content that we will charge for or valuated services.  For the
13 most part, you get to play the game and, you know, whatever we
14 create, we're going to give you new patches and updates.
15     It's not a big audience of players, but it's -- it shows
16 that there's an opportunity -- and it's a hard one to actually
17 create.  There aren't very many examples of games that have a
18 subscription model that have been successful for that long.
19 BY MS. WILKINSON:
20 Q.  Going back to the content -- the library content model,
21 that's many games available, right, to someone who buys into
22 that subscription?
23 A.  Yeah, theoretically.
24 Q.  You heard Mr. Ryan say yesterday that he didn't even ask
25 you whether you would put Call of Duty into his subscription

731

1  service because he knew you wouldn't do it.  Is that true?
2  A.  If Mr. Ryan said it, I assume it's true.
3  Q.  Is it true that you wouldn't do it?
4  A.  I wouldn't.
5  Q.  And but for this transaction, would you put Call of Duty
6  into Game Pass?
7  A.  No.  We've never put a single title into Game Pass.
8  Q.  And without describing in detail your future plans,
9  assuming the transaction did not go forward, do any of your
10 future plans include putting Call of Duty into any kind of
11 content subscription -- content library subscription service?
12 A.  No.  In our current long-range plan, we don't have any
13 revenues that are being generated from a multigame subscription
14 service.
15 Q.  What about streaming of your console and PC games?  Do you
16 allow streaming services to stream Call of Duty?
17 A.  We have experimented with a few of them but, again, I
18 don't really think that's a big opportunity for the company.
19 Q.  When you say you experimented, did you experiment with
20 some service before it was commercialized to see whether it
21 would be doable?
22 A.  Yeah.  For example, Nvidia had a service which you had to
23 own the game.  So let's say you owned a version of Call of
24 Duty, it was almost like you had the ability then to play it on
25 devices other than in your home.  So if you didn't have your

732

1  disk or you didn't have your account with you, you would be
2  able to play it somewhere else, and we tried that as an
3  experiment.
4  Q.  We've heard testimony that one of the reasons Xbox is
5  interested or was interested in streaming is they thought they
6  could get onto mobile and avoid the app store issue that they
7  have.
8      What is your opinion about the ability to take a console
9  game and stream it onto a phone and provide a, you know, good
10 gaming experience for Call of Duty players?
11 A.  If you look at the plans of Samsung and, you know, all the
12 other major phone companies, the microprocessors that are being
13 incorporated into phones today are these octa-core processors.
14 They have AI cores.  They have graphics processing.  They have
15 memories.  So they're as powerful and capable as some video
16 game consoles.
17     And I don't think that -- with all the risks of latency
18 and storage, I actually think the playing the game on the phone
19 using the local processor is going to be a much greater
20 opportunity for us than the idea of streaming.
21 Q.  And is your upcoming Call of Duty War Zone that's been
22 developed for mobile an example of that?
23 A.  Yes.
24 Q.  So that's what is -- what we call a native game to the
25 phone?

733

1  A.  Sure.

2  Q.  Okay.  And what would happen if someone streamed today's

3  Call of Duty that's designed, let's say, for the Xbox onto

4  their phone?  What kind of experience would they have?

5  A.  I doubt it would be a very good one.

6  Q.  Why?

7  A.  Well, all the reasons I mentioned, but the -- if you think

8  about processing in the cloud, I think there was a -- you know,

9  some years ago there was this view that you could actually more

10  cost efficiently deliver processing in the cloud.  But I think

11  what people have come to realize is that the local devices,

12  whether it's a computer or a phone or a console, the processing

13  capabilities are advancing at very rapid rates, and so it's not

14  more efficient to process in the cloud.

15  Q.  And with a console game being played on a tiny screen, are

16  there also disadvantages for just the design transferring to a

17  mobile phone?

18  A.  Yeah.  When you're playing a console game, you're using a

19  dedicated controller and that's a different way to interact

20  with the game than with a glass on a touchscreen.  So that

21  wouldn't really work so well.

22  Q.  Today could a player stream Call of Duty from any platform

23  to another platform?

24  A.  No.

25  Q.  You haven't given those rights to anyone?

734

1  A.  No.

2  Q.  And I ask you the same question about subscription

3  services.  Absent the deal, do you have any plans to put -- or

4  permit Call of Duty to be streamed?

5  A.  No.

6  Q.  Last set of questions.

7  Mr. Kotick, do you want this deal to go through?

8  A.  Very much.

9  Q.  Why?

10  A.  Well, for starters, 98 percent of our shareholders voted

11  for the transaction and my responsibility is to make sure that

12  we honor the obligations we have to our shareholders.

13  Q.  Do you have voting control of your shareholders --

14  A.  No.

15  Q.  -- or their shares?

16  So you have to act in the best interest of all of those

17  shareholders?

18  A.  Yes.

19  Q.  What about if this transaction is enjoined and the parties

20  have to go into the administrative process?

21  A.  My board's view is that if the preliminary injunction is

22  granted, that they don't see how the deal could continue.

23  Q.  Okay.  Thank you very much.

24  A.  Sure.  Thank you.

25  MR. WEINGARTEN:  Your Honor, my colleague Maria

735

1  Cirincione will be handling the cross-examination.

2  THE COURT:  Great.

3  MS. CIRINCIONE:  Good morning again, Your Honor.

4  Maria Cirincione for the Federal Trade Commission.

5  May I approach the witness?

6  THE COURT:  You may.

7  CROSS-EXAMINATION

8  BY MS. CIRINCIONE:

9  Q.  Good morning, Mr. Kotick.

10  A.  Good morning.

11  Q.  As CEO of Activision, you answer to the Activision board

12  of directors; correct?

13  A.  Yes.

14  Q.  And in your role, you have a duty to maximize shareholder

15  value; right?

16  A.  Yes.

17  Q.  Activision has the broad and deep capabilities that are

18  required to sustain AAA games; right?

19  A.  Yes.

20  Q.  And Activision has the broad and deep capabilities that

21  are required to create AAA games every year; right?

22  A.  Well, we -- it is somewhat of a hit-driven business.  So,

23  yes, we have that capability but that doesn't always translate

24  into AAA titles.  There are instances where we might miss the

25  mark.

736

1  Q.  Many of Activision's games are beloved and iconic;

2  correct?

3  A.  Yes.  We like to think so.

4  Q.  And the industry thinks so too?

5  A.  Sure.

6  Q.  Iconic because of their duration; right?

7  A.  I haven't really spent the time to think about the

8  definition of "iconic," but I would say partly it's duration,

9  popularity, the joy, and fun that people experience from them.

10  Q.  One of those beloved and iconic games is Call of Duty;

11  right?

12  A.  Yes.

13  Q.  And gamers have been playing Call of Duty for the last

14  20 years; right?

15  A.  Yes.

16  Q.  Since 2003, Activision has released a new Call of Duty

17  title every year except for one year; right?

18  A.  Yes, more or less.

19  Q.  And as of 2021, Call of Duty was the number one selling

20  console game for 13 years in a row in the United States; right?

21  A.  I think so.

22  Q.  And then in 2022, Activision released Call of Duty Modern

23  Warfare 2; right?

24  A.  Yes.

25  Q.  And that launch smashed records dating back 20 years for

737

1    the Call of Duty franchise; right?
2    A.    Yes.
3    Q.    Call of Duty Modern Warfare 2 made a billion dollars
4    within ten days of launching; right?
5    A.    It did.
6    Q.    If you could, Mr. Kotick, take a look at a document marked
7    as PX9165.
8              (Pause in proceedings.)
9    BY MS. CIRINCIONE:
10   Q.    This is Activision's press release following Call of Duty
11   Modern Warfare 2's launch, and it was released on November 7,
12   2022; right?
13   A.    I don't see that document.
14   Q.    It should be behind a tab marked PX9165.
15   A.    (Witness examines document.)  Okay.
16         MS. CIRINCIONE:  Your Honor, I move to admit PX9165
17   into evidence, please.
18         THE COURT:  Admitted.
19         (Trial Exhibit 9165 received in evidence.)
20   BY MS. CIRINCIONE:
21   Q.    And Call of Duty Modern Warfare 2 didn't just break the
22   20-year franchise record, it was also the highest grossing
23   entertainment opening of the year; right?
24   A.    Yes.
25   Q.    And when we say "highest entertainment opening," that

738

1    includes games, TV, and movies; right?
2    A.    I think we've -- it's more comparable to like the box
3    office, but it would probably include television.  It would be
4    hard to figure out how to calculate that.
5    Q.    Can you turn, Mr. Kotick, to PX7035 in your binder?  This
6    is your deposition transcript.
7    A.    (Witness examines document.)  Yes.
8    Q.    And when you testified at your deposition, Mr. Kotick, you
9    testified under oath; correct?
10   A.    Yes.
11         MS. WILKINSON:  Excuse me, Counsel.  Could you give us
12   the page?
13         MS. CIRINCIONE:  Yes.  I'm getting there.
14   BY MS. CIRINCIONE:
15   Q.    If you could turn to page 26, please.
16   A.    (Witness examines document.)
17   Q.    And line 8 -- I'm sorry, line 7, you were asked a question
18   (as read):
19         "QUESTION:  What does that mean, of all entertainment
20   types?"
21         And you answered (as read):
22         "ANSWER:  The way we think about is compared to the
23   opening of a film, that will probably be the principal
24   thing where you would be able to have an apples-to-apples
25   comparison or the dollar value, I guess, of the television

739

1    program.
2         "QUESTION:  Anything else within that phrase,
3    'entertainment sites,' besides film and television?
4         "ANSWER:  That's how I think of it.  There may be a way
5    that -- there may be something else in the definition, but
6    I think typically that's what we would need."
7         And your testimony here, Mr. Kotick, was truthful and
8    accurate?
9    A.    Yes.
10   Q.    Call of Duty Modern Warfare 2 beat the day one record of
11   any title on the PlayStation; correct?
12   A.    I believe so.
13   Q.    You're not aware -- I'm sorry?
14   A.    For that year?
15   Q.    Yes, for that year.
16   A.    Yes.
17   Q.    You're not aware of any other console games with a more
18   successful launch; correct?
19   A.    I'm not sure about Grand Theft Auto, but I think we
20   generally have always been the most successful of the -- of
21   those types of games.
22   Q.    We've talked about now how Call of Duty has been the
23   number one franchise for the last now 14 years, including 2022.
24   The 2021 Call of Duty title was Vanguard; right?
25   A.    Yes.

740

1    Q.    That Call of Duty title was a disappointment for you;
2    right?
3    A.    It was disappointing in the commercial results, but I
4    think creatively it was a good game.
5    Q.    Yet again, it was the number one selling console game in
6    the United States in 2021; right?
7    A.    Yes.
8    Q.    And that same year the number two title was also a Call of
9    Duty title.  That was Call of Duty Black Ops Cold War; right?
10   A.    I believe so.
11   Q.    Activision's Diablo franchise also just released a new
12   title; right?
13   A.    Yes.
14   Q.    Activision launched Diablo IV earlier this month?
15   A.    We did.
16   Q.    It also was a record-breaking launch; right?
17   A.    For Blizzard it was a record-breaking launch.
18   Q.    Let's take a look at PX9441, please.
19   A.    (Witness examines document.)
20   Q.    This is Activision's press release for Diablo IV released
21   on June 12th, 2023?
22   A.    Yes.
23         MS. CIRINCIONE:  Your Honor, I move to admit PX9441
24   into evidence, please.
25         THE COURT:  Admitted.

741

1    (Trial Exhibit 9441 received in evidence.)

2  BY MS. CIRINCIONE:

3    Q.  As you said, Diablo IV was a record-breaking launch.  It
4  made over $666 million in its first five days after the launch;
5  correct?

6    A.  Yes.  It's a little different than Call of Duty because we
7  have only been able to do this every decade.

8    Q.  The Diablo IV launch was record breaking for all Blizzard
9  games; right?

10    A.  Yes.

11    Q.  And not only did Diablo IV have a record-breaking launch
12  for Blizzard, it also had the box office equivalent of the
13  biggest opening week of the year; correct?

14    A.  Where do you see that?

15    Q.  The first paragraph, last sentence.

16    A.  (Witness examines document.)  Yes.

17    Q.  Activision doesn't make a console; right?

18    A.  We don't.

19    Q.  Activision doesn't have a multigame subscription service
20  like Game Pass; right?

21    A.  We don't.

22    Q.  Activision doesn't offer a cloud streaming service like
23  Game Pass; right?

24    A.  We do not.

25    Q.  Activision's core business is making games; right?

742

1    A.  Yes.

2    Q.  And from Activision's perspective, it's up to the player
3  to decide how they want to access their games; right?

4    A.  Sure.

5    Q.  When it comes to where Activision offers its games,
6  Activision is platform agnostic; correct?

7    A.  Generally speaking.

8    Q.  That means Activision wants to make its games available
9  wherever players want to be playing them; right?

10    A.  That's our aspiration.

11    Q.  Activision wants to be on whichever platforms its
12  communities are using; correct?

13    A.  Yeah, generally speaking.

14    Q.  And if there's a device capable of delivering Activision's
15  games, Activision wants their games on that device?

16    A.  Yes.

17    Q.  You testified just a few moments ago that you wouldn't
18  degrade Call of Duty.  That's your perspective as an
19  independent developer; right?

20    A.  Yes.

21    Q.  You also previously testified about offering Call of Duty
22  on multiple platforms, and you said you've never launched only
23  one console; correct?

24    A.  Well, that was -- I was asked about Call of Duty.

25    Q.  Yes.  I am asking about that too.

743

1    A.  Yeah, Call of Duty I don't believe we've ever launched on
2  just a single console.

3    Q.  But Activision has signed agreements with platform owners
4  to launch Call of Duty on the platform first before other
5  consoles; right?

6    A.  It's possible.  I can't -- I don't know exactly but that's
7  possible, sure.

8    Q.  Activision hasn't had agreements with Sony and Microsoft
9  to make a Call of Duty title available on one platform or the
10  other before the opposite platform?

11    A.  I mean, sitting here I can't tell you specifically, but
12  it's possible.

13    Q.  You also testified that Activision made content or
14  features available on one console versus another; right?

15    A.  Yes.  What I was explaining is it -- you know, different
16  devices have different capabilities and you try your best to
17  take advantage of the unique capabilities that the device would
18  offer.

19    Q.  That's a different player experience for a player
20  depending on which console they choose to buy?

21    A.  Yeah, it can be a different experience.

22    Q.  You testified previously that you have a philosophical
23  aversion to subscription services; correct?

24    A.  Yes.

25    Q.  Your aversion isn't based on any specific metrics; right?

744

1    A.  It's just on the idea that when you aggregate all of this
2  type of content into a single service, that's not the best way
3  to provide player investment opportunities or returns to your
4  shareholders.

5    Q.  I'll ask again my specific question.  Your aversion isn't
6  based on any specific metrics?

7    A.  No.

8    Q.  And your aversion isn't based necessarily on
9  cannibalization; right?

10    A.  Not necessarily, but cannibalization would play a role in
11  that.

12    Q.  Your aversion to subscription -- your philosophical
13  aversion to subscription services is based on your own personal
14  view about the best way to create financial opportunity for
15  games; right?

16    A.  And the best way to provide flexibility for players to
17  invest in those games.

18    Q.  You would agree that subscription services can play a role
19  in creating the best financial opportunity for your games;
20  right?

21    A.  No, not when -- as a multigame subscription service, no, I
22  don't.

23    Q.  If you could, Mr. Kotick, turn again to your deposition
24  transcript, please.  It's PX7035.

25    A.  (Witness examines document.)

745

1 Q. And specifically to page 135, please.

2 A. 7035, to which page?

3 Q. Page 135, line 19.

4 A. (Witness examines document.)

5 Q. Okay. Here you were asked a question (as read):

6 **"QUESTION:** So you mentioned your aversion is more

7 philosophical. Just to be clear, it's not based on any

8 specific analysis?

9 **ANSWER:** Well, I answered your question. It's high

10 level. What is the -- my personal view, the best way to

11 create financial opportunity for games. That's not to say

12 that subscription can't play a role in those

13 opportunities. They may and can."

14 And you your testimony, Mr. Kotick, was truthful and

15 accurate when you gave it?

16 A. Yeah. So World of Warcraft is a good example. That's a

17 subscription game, we charge a monthly subscription, but it's a

18 singular game subscription. So that was a truthful answer,

19 yes.

20 Q. And when you gave your answer at your deposition, you

21 didn't include that distinction?

22 A. Well, you didn't ask that specific question. You just

23 said, "Does subscription play a role?"

24 Q. No. I asked a different question. That was just your

25 answer.

746

1 A. Well, you said (as read):

2 "So you mentioned your aversion is more

3 philosophical. Just to be clear, it's not based on any

4 specific analysis."

5 Q. Lots of people at the company disagree with your aversion

6 to subscription; correct?

7 A. I would say a lot of people do, yes.

8 Q. Activision hasn't made a formal decision against offering

9 its games on subscription; correct?

10 A. I'm not sure I understand that question.

11 Q. Activision hasn't taken a formal decision not to offer its

12 games on a subscription service; correct?

13 A. No. In fact, I think we've from time to time experimented

14 with it; but, generally speaking, I think it's not the right

15 way for us to deliver the most value to our shareholders or to

16 provide the most flexibility to our players.

17 Q. Let me just ask one more time. Activision hasn't made a

18 formal decision against offering its games on subscription?

19 A. A formal one, no, but I would say it's just not something

20 that we do have any plans to do or have ever done in a

21 multigame subscription service.

22 Q. Activision would evaluate an opportunity to offer its

23 consent on a subscription service; right?

24 A. Yeah, we would be -- yeah, that would be the responsible

25 thing to evaluate.

747

1 Q. And Activision, as you mentioned earlier, has made

2 judgments to support these services before; right?

3 A. Mainly they're in experiments or for a promotional purpose

4 or in the service of trying to have a more expansive

5 opportunity with whomever the -- the other party was. But,

6 generally speaking, we don't believe that -- I don't believe

7 and the management doesn't believe that a multigame

8 subscription service for games is the best way to enable

9 players to make their investments or to provide the superior

10 shareholder returns that we have for 30 years.

11 Q. Activision hasn't decided against putting its content on

12 Sony subscription service; right?

13 A. Yes, we have.

14 Q. If you could turn again to your deposition transcript,

15 Mr. Kotick.

16 A. (Witness examines document.)

17 Q. Just to make sure you understood my question, I asked:

18 Activision hasn't decided against putting its content on Sony

19 subscription service?

20 A. You mean in the past?

21 Q. In the past or going forward.

22 A. I would tell you sitting here today that we have no plans

23 to provide our games to the Sony multigame subscription service

24 in anything other than a test or something promotional but not

25 as a business that would generate any significant revenues.

748

1 Q. Let's take a look at your transcript from your deposition

2 again, Mr. Kotick, page 131, please.

3 A. (Witness examines document.) Which tab are you referring

4 to?

5 Q. PX7035.

6 A. Which page?

7 Q. 131, please, line 24.

8 A. (Witness examines document.)

9 Q. You were asked a question here (as read):

10 **"QUESTION:** Has there been a formal decision never to

11 offer Activision content on Sony subscription service?

12 **ANSWER:** No. As I told you, I think we offer games on

13 Sony subscription service."

14 And your testimony at your deposition, Mr. Kotick, was

15 truthful and accurate?

16 A. Yeah, and consistent with what I just shared with you.

17 Q. And, in fact, Activision has put its games on Sony

18 subscription service before?

19 A. Like I said, we've done it in a limited, either

20 experimental or promotional, basis to either see what it was

21 like or to -- as part of a bigger negotiation but, yes.

22 Q. Activision hasn't formally decided against offering its

23 content on Nintendo subscription services; right?

24 A. I wasn't aware that Nintendo had a subscription service.

25 Q. You're close to where I'm going to direct you in your

749

1  deposition I think right now, to page 132, line 5.
2  A.  132, line 5.
3  (Witness examines document.)  Okay.
4  Q.  You were asked a question (as read):
5  "QUESTION:  Has there been a decision never to offer
6  Activision content on Nintendo's subscription service?
7  "ANSWER:  No."
8  And your testimony was truthful and accurate when you gave
9  it, Mr. Kotick?
10  A.  Yes.
11  Q.  Before making a decision, you'd evaluate the commercial
12  terms for a subscription opportunity; right?
13  A.  Do I personally?  Usually it will get elevated to me.
14  Q.  Activision -- before making a decision, Activision would
15  evaluate the commercial terms for a subscription opportunity;
16  right?
17  A.  Sure.
18  Q.  You agree there could be strategic reasons for Activision
19  to offer content on a subscription service; right?
20  A.  So for a small duration of time or for a promotional
21  purpose, but not as something that would be a sustainable
22  long-term business.
23  Q.  There could be a greater commercial context for offering
24  Activision's games on subscription; right?
25  A.  Could you give me an example?

750

1  Q.  I'm just using your words from the deposition on page 197.
2  And I apologize.  From your investigational hearing.  It's
3  PX7006.
4  A.  Yeah.  I think if -- if you're talking about if a
5  subscription opportunity is offered, would Activision consider
6  it?  That's what you're asking?
7  Q.  Yes.  And specifically one of the strategic reasons that
8  you testified to for why Activision would consider it would be
9  a greater commercial context; correct?
10  A.  So like a promotion, a marketing, some, you know, moment
11  where we might, as we have in the past, used a very old catalog
12  title for a short period of time.  Those are the types of
13  things where we would consider those opportunities.
14  Q.  Strategic reasons include learning about a new device;
15  correct?
16  A.  Sure.
17  Q.  Strategic reasons include learning about a new market
18  opportunity; right?
19  A.  Yes.
20  Q.  Strategic reasons include bundling software with hardware;
21  correct?
22  A.  Could be, sure.
23  Q.  Strategic reasons could also include sponsorships for your
24  professional gaming leagues; right?
25  A.  Yes.

751

1  Q.  In 2020, Activision considered putting its games on
2  Game Pass when negotiating with Microsoft for their latest
3  licensing agreement; correct?
4  A.  I think we considered it, yes.
5  Q.  And no decision has been taken against offering Activision
6  games on Microsoft's Game Pass; right?
7  A.  Yes, we made a decision not to include our games on
8  Game Pass' subscription service.
9  Q.  Please turn back to PX7035 in your binder.
10  A.  (Witness examines document.)  Yes.
11  Q.  Page 20 -- I'm sorry, page 131.
12  A.  Yes.
13  Q.  Here at line 17 you were asked a question (as read):
14  "QUESTION:  Has there been a company decision never to
15  offer its games on Game Pass?
16  "ANSWER:  There's not a specific mandate that we would
17  never do so, but thus far we haven't."
18  And your testimony was truthful and accurate, Mr. Kotick?
19  A.  Yeah, and that's consistent with what I believe today.
20  Q.  It's consistent with thus far you haven't; right?
21  A.  Yes.
22  Q.  The principal reasons for why Activision doesn't offer its
23  games on Microsoft Game Pass have been commercial; right?
24  A.  I think there are probably some technical reasons also,
25  but I would say it's -- for me it's principally commercial.

752

1  Q.  If Microsoft offered Activision attractive commercial
2  terms, it's possible Activision would put its games on
3  Game Pass; right?
4  A.  We would have to evaluate commercial terms, but I don't
5  think that there is a circumstance where a company could ever
6  offer us a commercial arrangement where that would make sense.
7  When you look at what's happened in Hollywood and you see the
8  devaluation of these businesses, I just -- I can't imagine that
9  there would be any company that would be willing to make the
10  type of commercial commitment that would be required to avoid
11  the destruction of value.
12  Q.  Before flipping back to your investigational hearing
13  transcript, I'll ask my specific question one more time.
14  If Microsoft offered Activision attractive commercial
15  terms, it's possible Activision would put its games on
16  Game Pass; right?
17  A.  Like I said, it's possible, but I can't imagine anyone
18  ever offering the kind of commercial terms that we would
19  require.  It just wouldn't be likely.
20  THE COURT:  Can I ask you?  You know it's Microsoft's
21  express purpose to put Activision content on its Game Pass if
22  the merger goes forward.  You knew that when you agreed to the
23  merger, so why did you agree to that if you think it doesn't
24  make commercial sense?
25  THE WITNESS:  Well, I -- I can have a philosophical

753

1    disagreement with the way that Microsoft approaches its
2    business, but the premium that they offered to the company's
3    shareholders was the sole consideration that I needed to make
4    in determining to sell the company.  I don't agree with the
5    idea of a multigame subscription service as a business
6    proposition for games going forward, but we can agree to
7    disagree on that.
8        **THE COURT:**  Thank you.
9    **BY MS. CIRINCIONE:**
10   **Q.**   Activision hasn't taken a formal decision against putting
11   its games on Nvidia's GeForce NOW cloud streaming service;
12   correct?
13   **A.**   I can't say we've taken a formal decision.  We tried it in
14   the beta test, and then we took the games off after the beta
15   test.
16   **Q.**   Can you look at PX7035, page 132, please?
17   **A.**   (Witness examines document.)  Okay.  Which page?
18   **Q.**   Page 132, please, line 9.  You were asked a question here
19   (as read):
20       **"QUESTION:**  Has there been a decision at the company never
21       to put Activision's content on GeForce NOW?
22       **"ANSWER:**  Never?  No, but I don't -- I don't think we
23       support it now."
24       And your testimony was truthful and accurate, Mr. Kotick?
25   **A.**   Yes.

754

1    **Q.**   And, in fact, Activision's games have been on Nvidia's
2    GeForce NOW; correct?
3    **A.**   Yeah.  Like I said, we put it on in their beta test; but
4    then when they launched the service commercially, we removed
5    our titles.
6    **Q.**   Okay.  I want to take a look at PX2133, please.  And we'll
7    be careful here because parts of this have been marked as
8    confidential, but I don't think we need to read out loud the
9    parts that are.
10   **A.**   Okay.
11   **Q.**   This is an e-mail from Activision's CFO Armin Zerza sent
12   to you on February 7th, 2020.  Its titled "GeForce NOW Update";
13   correct?
14   **A.**   Yes, but I think at the time Armin was the chief
15   commercial officer not the chief financial officer.
16   **Q.**   Okay.
17       **MS. CIRINCIONE:**  Your Honor, I'd like to move to admit
18   PX2133.
19       **THE COURT:**  Admitted.
20       (Trial Exhibit 2133 received in evidence.)
21       **MS. CIRINCIONE:**  Thank you.
22   **BY MS. CIRINCIONE:**
23   **Q.**   Mr. Kotick, here where the e-mail in the subject line
24   references "GFN," that means Nvidia's GeForce NOW; correct?
25   **A.**   Yes.

755

1    **Q.**   Mr. Zerza's e-mail to you includes talking points for your
2    call with Jensen the following day; right?
3    **A.**   That's what it says.
4    **Q.**   Jensen is Jensen Huang, Nvidia's CEO; right?
5    **A.**   Yes.
6    **Q.**   The first of your talking points indicates that both
7    Activision and Nvidia have appreciated their long-standing
8    partnership; correct?
9    **A.**   These are the proposed talking points from Armin, our
10   chief commercial officer, yes.
11   **Q.**   And talking point one indicates that both Activision and
12   Nvidia have appreciated their historical partnership; right?
13   **A.**   That's what it says.
14   **Q.**   Your second point talking point states that you instructed
15   your team that Activision requires a commercial deal to have
16   its content support commercialization of GeForce NOW; right?
17   **A.**   That's what it says.
18   **Q.**   And here is where we shouldn't read anything out loud,
19   Mr. Kotick, but your fourth talking point includes principles
20   of a potential commercial arrangement to put Activision's
21   contents back on GeForce NOW; correct?
22   **A.**   That's what it says.
23   **Q.**   And that's what you said also when you testified at your
24   investigational hearing; correct?
25   **A.**   I think so.

756

1    **Q.**   And these terms in talking point four were reasonable;
2    right?
3    **A.**   They might have been reasonable, but they weren't talking
4    points that I actually ever used.  They were just suggested,
5    but I didn't use them.
6    **Q.**   These were talking points that Armin Zerza sent to you for
7    the call that you would have with Jensen Huang the following
8    day; correct?
9    **A.**   Yes.
10   **Q.**   And I don't know if you answered my question specifically.
11   If you did, you can let me know.  But these terms in talking
12   point four were reasonable; right?
13   **A.**   I think in Armin's mind they were considered reasonable.
14   **Q.**   If you look at PX7006 on page 175, please, line 2 you were
15   asked --
16   **A.**   One second.  7006.
17       (Witness examines document.)  Okay.
18   **Q.**   "Were the terms" --
19   **A.**   I apologize.  Which page?
20   **Q.**   I'm sorry.  At page 175, line 2, please.
21   **A.**   (Witness examines document.)
22   **Q.**   You were asked (as read):
23       **"QUESTION:**  Were the terms -- let me be clear.  I'm going
24       back now to what we were discussing before.  So not the
25       question I just asked on subscription, but the

1-SER-194

757

1   conversation we were just having about cloud streaming.
2       "Were the terms that are listed in Mr. Zerza's
3   talking points for you for your call with Nvidia, are
4   those economic terms unreasonable?
5   **ANSWER:** No, I don't think they're unreasonable."
6     And you testified truthfully and accurately at your
7   investigational hearing, Mr. Kotick?
8   **A.**   Yeah. That's not inconsistent with what I just said.
9   **Q.**   You're not aware of Activision being dissatisfied with the
10   technical capability of the GeForce NOW service; correct?
11   **A.**   I don't really think -- I don't really know that we were
12   dissatisfied with it. I just think that it was not an
13   opportunity we thought made sense.
14   **Q.**   The talking points that Armin Zerza prepared for your
15   discussion with Nvidia don't mention at all being dissatisfied
16   with the quality of Activision's games while being streamed on
17   GeForce NOW; right?
18   **A.**   Should I go back to them?
19   **Q.**   You can if you need to.
20   **A.**   Can you tell me where they are?
21   **Q.**   It's PX2133.
22     (Witness examines document.) I don't see anything that
23   says we were dissatisfied with the -- how did you phrase it?
24   **Q.**   The quality of Activision games while being streamed on
25   GeForce NOW.

758

1   **A.**   Yeah, that was not in these talking points, no.
2   **Q.**   You testified earlier about the King division. Prior to
3   2016, Activision didn't have any mobile games; right?
4   **A.**   We had put games on the iPhone, like Guitar Hero, so we
5   had some mobile games.
6   **Q.**   It was in 2016 that Activision bought King, the maker of
7   Candy Crush; right?
8   **A.**   That's correct.
9   **Q.**   Outside of King, Activision doesn't have a well-developed
10   capability to make mobile games; correct?
11   **A.**   Last year it's improved dramatically, but King really --
12   like, they're an exceptional group of people that has the
13   well-developed expertise for mobile. We've been actually able
14   to take King resources and King talent over the last year and
15   add them to the Blizzard business and the Activision business.
16   And it's still hard to get access to that -- the very best
17   quality mobile talent, but King has that as an assembled
18   workforce, yes.
19   **Q.**   When you testified at your investigational hearing, which
20   was in September of 2022, you testified that outside of King,
21   Activision doesn't have a well-developed capability to make
22   mobile games; is that correct?
23   **A.**   Yeah. Like I said, King is that real assembled workforce
24   of capability for mobile, but we're continuously trying to get
25   mobile talent for each one of the other divisions.

759

1   **Q.**   September '22 -- 2022 was eight months after Microsoft
2   agreed to buy Activision; correct?
3   **A.**   Eight or nine. Yeah, eight, nine months. I think it was
4   January that we announced it.
5   **Q.**   We talked about outside of King, but even King is not
6   focused on making new games; right?
7   **A.**   King's main focus has really been optimizing Candy Crush.
8   They've -- they've tried to make other new games, but they
9   haven't really been successful.
10   **Q.**   King is focused on making content for its games that
11   already exist, not new IP; correct?
12   **A.**   Yeah. Generally they haven't been successful with new IP.
13   They've been much more focused on the Candy Crush franchise.
14   **Q.**   I'd like to show you another document, Mr. Kotick. It's
15   marked as PX2282. This is also a document that's been
16   partially marked as confidential, so we'll be careful not to
17   read the parts we're not supposed to.
18     This is an e-mail sent to Daniel Alegre, who is president
19   of Activision Blizzard, and it was sent on July 18th, 2020;
20   correct?
21   **A.**   Yes.
22       **MS. CIRINCIONE:** Your Honor, I move to admit PX2282
23   into evidence, please.
24       **THE COURT:** Admitted.
25     (Trial Exhibit 2282 received in evidence.)

760

1       **MS. CIRINCIONE:** Thank you.
2   **BY MS. CIRINCIONE:**
3   **Q.**   The subject of your e-mail to Mr. Alegre is about
4   Activision's long-range plan; right?
5   **A.**   Yes.
6   **Q.**   And Activision's long-range plan spans for the following
7   three years; correct?
8   **A.**   Correct.
9   **Q.**   I'd like you to read just to yourself, Mr. Kotick, not out
10   loud, that first paragraph starting with "As" and ending with
11   "purposes."
12   **A.**   (Witness examines document.) Yes.
13   **Q.**   You wrote that sentence, Mr. Kotick?
14   **A.**   I did.
15   **Q.**   I'd like you to read the second paragraph starting with
16   "They" and ending with "far."
17   **A.**   (Witness examines document.) Okay.
18   **Q.**   You wrote that sentence as well?
19   **A.**   Yes.
20   **Q.**   Activision launched its first mobile version of Call of
21   Duty called Call of Duty Mobile in October 2019; right?
22   **A.**   I can't be certain, but that sounds about right.
23   **Q.**   But Activision didn't make Call of Duty Mobile; right?
24   **A.**   That version was largely made by Tencent, that's our
25   partner in China and the world's largest video game company.

761

1  Q.  The reason Tencent made Call of Duty Mobile for Activision
2  was because Activision couldn't make that game on its own;
3  right?
4  A.  It would have been very difficult for us to make that game
5  on our own.
6  Q.  The reason Tencent made Call of Duty Mobile for Activision
7  was because Activision couldn't make that game on its own?
8  A.  Like I said, it would have been very difficult for us to
9  have made that game, especially in that timeframe, on our own.
10  Q.  I want to flip to your investigational hearing transcript,
11  Mr. Kotick, because this language is very important. It's
12  PX7006, page 73. It's starting at line 8.
13  A.  Page 73?
14  Q.  Yes.
15  A.  (Witness examines document.) Okay.
16  Q.  Let me get there myself. Just one second.
17             (Pause in proceedings.)
18  BY MS. CIRINCIONE:
19  Q.  You were asked a question at line 2 (as read):
20     "QUESTION:  Do you have any other partnerships or joint
21     ventures that are similar in nature, in other words, where
22     Activision works with a third party to develop a game
23     because Activision's lacking the technical capability to
24     do so?
25     "ANSWER:  Yes. So Tencent, who they're of the world's

762

1  largest -- excuse me -- world's biggest game company, they
2  made Call of Duty Mobile for us, and we couldn't make that
3  game on our own at the time so we entered a joint venture.
4  We worked with them."
5  Your testimony was truthful and accurate at the time,
6  Mr. Kotick?
7  A.  Yes.
8  Q.  The Diablo franchise also has a mobile game that was
9  released relatively recently; right?
10  A.  Yes. Probably a little more than a year ago.
11  Q.  It's called Diablo Immortal; right?
12  A.  Yes.
13  Q.  Activision didn't make that game either; right?
14  A.  It was principally made by another Chinese company, also
15  one of the largest game companies in the world, called NetEase.
16  Q.  Activision evaluates how best to optimize its content for
17  every device; right?
18  A.  Yeah, generally speaking.
19  Q.  "Optimize" means take the steps and do the work needed to
20  ensure a good player experience on a particular device; right?
21  A.  Yeah.
22  Q.  The Switch is Nintendo's current gaming device; right?
23  A.  It is.
24  Q.  If I wanted to know how to optimize Call of Duty for the
25  Switch, I'd have to ask Activision's game teams; right?

763

1  A.  Sure.
2  Q.  That's because each publisher knows the process to
3  optimize its own titles; right?
4  A.  I'd say each developer because a publisher might be more
5  of a commercial way to think about it.
6  Q.  That's fair.
7     For example, you wouldn't know how to optimize Minecraft
8  for the Switch; right?
9  A.  Would I know the details of how to do it? No. Could I at
10  a high level sort of think about the game and evaluate how you
11  might do it? At a high level, but I wouldn't know from a
12  detailed perspective. It's not our game.
13  Q.  Likewise, Microsoft wouldn't know what it takes to
14  optimize Call of Duty for the Switch because they don't make
15  Call of Duty; right?
16  A.  Similarly, from a high level, they could evaluate what
17  would be required or they could envision a game that they might
18  make for a Call of Duty for the Switch.
19  Q.  Two different games from two different franchises wouldn't
20  have the same technical considerations when you're thinking
21  about optimizing; correct?
22  A.  I'm not sure I really understand the question.
23  Q.  Just because Microsoft makes other games for the Switch
24  doesn't mean that they know what it takes to make Call of Duty
25  for the Switch?

764

1  A.  Here's what I would say, is if you think about Call of
2  Duty as armed conflict through history, if you're a game team
3  at Microsoft, you could reasonably conceive of what a Call of
4  Duty on the Switch would be or would look like. It's not like
5  there's anything proprietary about military conflict.
6  Q.  I want to look at some of your language at PX7035 again at
7  page 92.
8     You were asked a question at line 11 (as read):
9     "QUESTION:  Okay. Can you explain to me, Mr. Kotick, from
10     a technical perspective, how to optimize the title
11     Minecraft for the Nintendo Switch?
12     "ANSWER:  No, I couldn't.
13     "QUESTION:  Why not?
14     "ANSWER:  Well, I don't make Minecraft.
15     "QUESTION:  Who makes Minecraft?
16     "ANSWER:  Microsoft.
17     "QUESTION:  Are you saying that if I want to know the
18     process that it would take to optimize Minecraft with a
19     Nintendo Switch, I'd have to ask Microsoft?
20     "ANSWER:  Yes.
21     "QUESTION:  Because it's their game?
22     "ANSWER:  Yes."
23  A.  Right, but the key here is that you're saying from a
24  technical perspective. What I was saying is that from a
25  high-level perspective, you could think about the franchise and

765

1   envision what that -- what would be possible at a detailed
2   technical level to actually create a product, create a plan.
3   You would need to be the owner of the game to be able to do
4   that.
5   Q.   To create a product or to create a plan, meaning to be
6   able to analyze costs, for example?
7   A.   I think, you know, just the detailed specificity of what
8   that game would be, you're probably going to need to be the
9   owner or developer of that to do that; but from a high level,
10  you could come up with ideas.
11  Q.   Call of Duty for the Switch would not be the same as Call
12  of Duty on the Xbox X-S series or PlayStation 5; correct?
13  A.   Correct.
14  Q.   That's because the Switch has unique characteristics;
15  right?
16  A.   Yes.
17  Q.   And it has unique hardware; right?
18  A.   It does.
19  Q.   And it has different processors; right?
20  A.   Yes.
21  Q.   And different capabilities; right?
22  A.   Yeah. It has -- it's a console but also has portability.
23  It's very well differentiated.
24  Q.   Microsoft recently signed an agreement that purports to
25  offer a future Call of Duty on the Switch; right?

766

1   A.   That's what I'm told.
2   Q.   You've never seen Microsoft's agreement with Nintendo;
3   right?
4   A.   No.
5   Q.   You learned about it after reading about it in the news;
6   right?
7   A.   I did.
8   Q.   Activision's game teams weren't involved in the agreement
9   in any way; right?
10  A.   No.
11  Q.   Activision hasn't shared any information with Microsoft
12  about optimization of any Activision titles for the Switch;
13  right?
14  A.   No.
15  Q.   It's your understanding that the Microsoft Nintendo
16  agreement also purports to bring a future Call of Duty game to
17  a future Nintendo console; right?
18  A.   I believe so.
19  Q.   Even without Microsoft buying Activision, it's likely that
20  Activision would on its own make Call of Duty available for
21  Nintendo's future console; right?
22  A.   I think we would consider it once we had the specs, but we
23  don't have any present plan to do so.
24  Q.   It's likely that Activision on its own would make a Call
25  of Duty game for Nintendo's future generation console; right?

767

1   A.   Like I said, I think once we have -- get the detailed
2   specifications. We missed out on the opportunity on the --
3   this past generation of Switch, so I would like to think that
4   we would be able to do that, but we'd have to wait until we got
5   the technical specifications. But we don't have any present
6   plan to do so.
7   Q.   Can we again look at PX7035 of your transcript, page 123,
8   please?
9   A.   (Witness examines document.)
10  Q.   At line 9 you were asked a question (as read):
11       "QUESTION: Has Activision decided that it won't offer
12       Call of Duty on a future Nintendo console?
13       "ANSWER: No. I actually think we will likely make a Call
14       of Duty for a new Nintendo console.
15       "QUESTION: There are plans to make a Call of Duty game
16       for a next generation Nintendo console?
17       "ANSWER: I can't tell you that there are specific plans,
18       but I would say it would -- it's probably something we'll
19       consider.
20       "QUESTION: Something that Activision will consider?
21       "ANSWER: Yes."
22  A.   Yeah. That's very consistent with what I just shared with
23  you, but we don't have any present plan to do so.
24       THE COURT: Well, if the merger doesn't go through --
25  you said that you made a mistake with respect to the Switch

768

1   earlier; right? You're not going to make that mistake again;
2   right? You would -- I mean, what would be a reason that you
3   wouldn't do so?
4        THE WITNESS: Well, if we didn't have the resources
5   and there was something else we wanted to prioritize that was
6   more important; or when we saw the new design of the device, we
7   didn't think it was appropriate for a particular title.
8        THE COURT: Okay. But that's never happened with an
9   Xbox or PlayStation, that when you saw the new specs, you
10  didn't think it was appropriate for the title?
11       THE WITNESS: I can't say that that was the case.
12  With Nintendo there's a different level of complexity
13  because --
14       THE COURT: Okay. Let me stop you there.
15  You would like to be able to put Call of Duty on the
16  Nintendo Switch?
17       THE WITNESS: I think we would consider it; and if it
18  was something that we knew we could make a great game from, we
19  would likely consider it.
20       THE COURT: Okay. All right. I think you move on to
21  the next topic.
22       How much longer do you have? Because we're at 10:00. I'd
23  rather finish with the witness, but I don't know how long you
24  have.
25       MS. CIRINCIONE: I think very little.

769

1    THE COURT: Should we take our break now?
2    MS. WILKINSON: I think we should. I have questions,
3 Your Honor.
4    MS. CIRINCIONE: Okay. That's fine.
5    THE COURT: I just want to ask.
6    Okay. All right. Why don't we take our --
7    MS. CIRINCIONE: I wasn't finished yet. It's okay.
8    THE COURT: No, no, no. I'm not --
9    MS. CIRINCIONE: Okay.
10   THE COURT: I'm not ending your questioning. I'm
11 interrupting your questioning.
12   MS. CIRINCIONE: Thank you, Your Honor. I'm sorry.
13 Just confirming.
14   THE COURT: That's okay.
15   Because the court reporter has been going since 8:15.
16   MS. CIRINCIONE: Understood. Thank you.
17   THE COURT: All right. So we'll take our 15-minute
18 morning break.
19   You're still on the stand so you shouldn't talk to your
20 lawyers.
21   THE WITNESS: Should I just stay here?
22   THE COURT: No. You can get down if you want, but
23 only talk about, I don't know, what the Lakers next move is or
24 something.
25              (Laughter)

770

1              (Recess taken at 10:05 a.m.)
2              (Proceedings resumed at 10:21 a.m.)
3    THE CLERK: Court is back in session.
4    THE COURT: You can remain seated.
5    All right. You may resume.
6    MS. CIRINCIONE: Thank you, Your Honor.
7    I know you said it was okay to move on to the next topic,
8 but there was one --
9    THE COURT: Sure.
10   MS. CIRINCIONE: -- ordinary course document I just
11 wanted to get in for your benefit.
12   THE COURT: Of course.
13   MS. CIRINCIONE: It's PX2421.
14              (Pause in proceedings.)
15   MS. CIRINCIONE: It's a document that's been marked
16 entirely as confidential except for one part actually, and I
17 can get to that, if that's helpful to you, Your Honor.
18   THE COURT: Go ahead.
19 BY MS. CIRINCIONE:
20   Q. Mr. Kotick, this is an executive briefing that your CFO
21 Armin Zerza sent to you on December 14th, 2022; right?
22   A. Yes.
23   Q. The executive briefing is for your call with Furukawa-San
24 the following day?
25   A. Yes.

771

1    Q. And Furukawa-San is the head of Nintendo; right?
2    A. Yes, he is.
3    MS. CIRINCIONE: Your Honor, I move to admit PX2421
4 into the record, please.
5    THE COURT: Admitted.
6    (Trial Exhibit 2421 received in evidence.)
7    MS. CIRINCIONE: The paragraph, Your Honor, that we've
8 agreed with Defendants would not be confidential is on the last
9 page of the document PX2421-009.
10              (Pause in proceedings.)
11   THE COURT: The next steps?
12   MS. CIRINCIONE: It's a header at the top that reads
13 "Conclusion" and the next paragraph says -- the paragraph that
14 I'm referencing is "Given the closer alignment."
15   THE COURT: All right. That will not be under seal?
16   MS. CIRINCIONE: Correct, unless you obviously --
17 unless you feel like more should be open.
18   THE COURT: If no one wants it, then I'm okay with
19 that.
20 BY MS. CIRINCIONE:
21   Q. I think, Mr. Kotick, at the end of the executive briefing
22 on page 007, there's something called "Switch NG Exec Summary";
23 correct?
24   A. Yes.
25   Q. And on the following page 008 at the very bottom of the

772

1 page there's a paragraph that starts "This," and that sheds
2 some clarity on what "NG" means; correct?
3    A. (Witness examines document.) Okay. I'm sorry. I didn't
4 hear the question.
5    Q. I just want to give the Court the benefit of understanding
6 what "NG" means so that it's clear.
7    A. Oh. I think it means next generation.
8    Q. Thank you.
9    And then on the next page where I was referencing
10 previously there's a conclusion section?
11   A. Yes.
12   Q. And the third paragraph down, do you see that?
13   A. It starts "However"?
14   Q. Yeah, it starts "Given" -- "Given."
15   A. I see, uh-huh.
16   Q. Do you see that?
17   A. I do.
18   Q. Okay. I'll read this because we can read it out loud (as
19 read):
20        "Given the closer alignment to Gen 8 platforms in
21    terms of performance and our previous offerings on
22    PS4/Xbox 1 it is reasonable to assume that we could make
23    something compelling for NG Switch as well."
24   Is that correct, Mr. Kotick?
25   A. That's what it says.

773

1  Q.  Mr. Kotick, Call of Duty Modern Warfare 2 is not the same
2  as Call of Duty War Zone; right?
3  A.  No.
4  Q.  Modern Warfare 2 can't be played on a phone; right?
5  A.  It -- the console game for PS5 and Xbox Series X couldn't
6  be played on a phone, no.
7  Q.  There isn't a Modern Warfare 2 for the phone; right?
8  A.  Well, you'll get to the point to where a lot of that
9  content will be playable on a phone.
10       THE COURT:  But today it's not?
11       THE WITNESS:  No.
12  BY MS. CIRINCIONE:
13  Q.  You said playing Modern Warfare 2 on a phone would be like
14  using a refrigerator for a safe; right?
15  A.  I think so.
16                    (Laughter)
17  BY MS. CIRINCIONE:
18  Q.  Mr. Kotick, Microsoft agreed to buy Activision at $95 a
19  share; right?
20  A.  Yes.
21  Q.  That's an extremely large premium; right?
22  A.  It was a great premium for our shareholders.
23  Q.  And you own approximately 4.3 million shares in
24  Activision; right?
25  A.  I don't know exactly the number, but somewhere

774

1  thereabouts.
2  Q.  I just did rough math, but if the deal closes, your stock
3  would then be worth approximately $408 million; right?
4  A.  With your rough math, yes.
5       MS. CIRINCIONE:  I don't have anything further,
6  Your Honor.  Thank you.
7                    REDIRECT EXAMINATION
8  BY MS. WILKINSON:
9  Q.  Let's talk about the few times that you allowed any of
10  your games to go into a content library content subscription
11  service.
12       When did you do that, did you ever allow those games to go in
13  day and date?
14  A.  No, I don't believe so.
15  Q.  Why is that?
16  A.  In most of those experiments we were using titles that
17  were old.
18  Q.  Did you have them in those subscription services for a
19  limited time period?
20  A.  Yes, I believe, for the most part they were in for a
21  limited timeframe.
22  Q.  Okay.
23  A.  Some might have been for a longer period of time, but they
24  were all old content that wasn't really being commercialized.
25  Q.  And as the CEO of the independent Activision, is it your

775

1  best business judgment that today it's not in your
2  shareholders' financial interest to put Call of Duty games into
3  a subscription service day and date?
4  A.  Yes.
5  Q.  All right.  You were talking to Her Honor about what would
6  happen when Microsoft and Xbox acquire Activision.
7       Do you believe they have a different perspective on what's
8  in the best interest of their shareholders once they own the
9  content?
10  A.  Yes.  From what I understand, they -- they think that
11  there's a greater opportunity for that type of product.
12  Q.  Have you seen the content that they own, their first-party
13  games, and whether they do put those into their Game Pass
14  subscription day and date today?
15  A.  I'm not sure I understand the question.
16  Q.  So are you aware that some of Xbox's own games are in
17  Game Pass today?
18  A.  Yes.
19  Q.  And they are in their day and date?
20  A.  I can't be certain, but I'll take your word for it.
21  Q.  Okay.  And PlayStation has its own subscription service;
22  correct?
23  A.  Yes.
24  Q.  And it has its own games in their content library
25  subscription service; right?

776

1  A.  I believe so.
2  Q.  And are you aware that Mr. Ryan has made a different
3  business judgment about whether it's appropriate to put those
4  games in day and date?
5  A.  I was not aware of that.
6  Q.  Okay.  Do you think that your team at Activision working
7  in concert with the engineers, developers at Xbox will be able
8  to put a version of Call of Duty onto the Nintendo Switch?
9  A.  The current Switch?
10  Q.  Yes.
11  A.  Yes.
12  Q.  Okay.  You believe working together they can make the
13  technical adjustments or refine the game in a way that will be
14  a good gaming experience on the Switch?
15  A.  Yes, I think we can make a great -- a good game for the
16  Switch.
17  Q.  On the mobile -- War Zone Mobile, you were asked about
18  other mobile games, the early ones you've developed, that were
19  not made in house by Activision Blizzard King; correct?
20  A.  Yes.
21  Q.  You told us earlier that you're going to be putting
22  War Zone onto the mobile phone; right?
23  A.  That's correct.
24  Q.  Is that game being developed in-house at Activision or by
25  another third party?

777

1   **A.**   Internally.

2      **MS. WILKINSON:**  That's all.

3      **THE COURT:**  Anything further?

4             <u>RECROSS-EXAMINATION</u>

5   BY MS. CIRINCIONE:

6   **Q.**   For the mobile game you were just -- you just responded to

7   Ms. Wilkinson's questions about that you said was going to be

8   released, when is that going to be released?

9   **A.**   I think we're currently planning for the fall.

10  **Q.**   Is that when it was planned to be released initially?

11  **A.**   I think it was planned for earlier, but we had some

12  delays.

13  **Q.**   Thank you.

14      **MS. CIRINCIONE:**  No further questions.

15      **THE COURT:**  All right.  That ends your testimony.  You

16  are excused.

17      **THE WITNESS:**  Thank you very much.

18          (Witness excused.)

19      **THE COURT:**  I don't know who's going next, so who's

20  our next witness?

21      **MR. KILARU:**  Your Honor, I think we were going to

22  resume the testimony of Dr. Bailey.

23      **THE COURT:**  Great.

24          (Pause in proceedings.)

25  \\\

---

778

1           <u>ELIZABETH MEEKER BAILEY</u>,

2   called as a witness for the Defendant, having been previously

3   duly sworn, testified further as follows:

4         <u>DIRECT EXAMINATION</u>  (resumed)

5   BY MR. KILARU:

6   **Q.**   Welcome back, Dr. Bailey.

7   **A.**   Good morning.

8   **Q.**   Thanks for being flexible.

9       When we left off yesterday, you were discussing Nintendo

10  and PC's competitive success without Call of Duty.  Did you

11  form an opinion as to whether those products are properly

12  excluded from the product market in this case for hardware?

13  **A.**   Nintendo and PC?  I did.

14  **Q.**   Now, did you hear during Ms. Wilkinson's cross of Dr. Lee

15  yesterday that Sony has represented to regulators that the

16  Nintendo Switch is a principal rival?

17  **A.**   I did.

18  **Q.**   Did you do any economic analysis to try to evaluate

19  whether that's the case?

20  **A.**   Yes, I did.

21  **Q.**   I'll ask you to turn to Slide 23.

22      **MR. KILARU:**  And, Roger, if we could go to Slide 23,

23  that would be great.

24      But, Ms. Means, I think this one's in camera so...

25  \\\

---

779

1   BY MR. KILARU:

2   **Q.**   Doctor, could you explain the analysis that you did

3  looking at the Nintendo Switch?

4   **A.**   Sure.  So we talked yesterday about telemetry data, and

5  this chart that's on the screen, the green is Xbox telemetry --

6  is based on Xbox telemetry data and the blue is based on

7  PlayStation telemetry data.  And so the -- the question at hand

8  is whether the Nintendo Switch is an important rival, a

9  competitive constraint, on Xbox and on PlayStation, and I was

10  able to look at that question by considering what happened when

11  the Nintendo Switch entered in 2017.

12  **Q.**   And how did you do that analysis?

13  **A.**   Sure.  So in economics we have a technique that's called

14  difference-in-difference, and the reason why I use that

15  technique is gaming, there are seasonal features to it, so I

16  wanted to be as sure as I could that the effect that I was

17  picking up was the effect of the Nintendo Switch entering on

18  Xbox and PlayStation, not the ordinary fluctuations that might

19  come from seasonality.

20  **Q.**   So how did you do that?

21  **A.**   So what I looked at is if Nintendo Switch mattered to

22  competition for -- on Xbox and PlayStation, then when the

23  Nintendo Switch entered, what I would expect to see is an

24  effect on gamer behavior.

25      And so this chart that's up on the screen, there were two

---

780

1   ways in which I looked at gamer behavior.  One was the change

2  in the number of active gamers, the number of gamers on the --

3  on the console and the Xbox console and the PC -- and the

4  PlayStation console.

5      And then the other way that I looked at a change in gamer

6  behavior was I looked at whether there was a change in

7  game-time hours; how -- even those people who continued to

8  play, did they change the number of hours that they were

9  gaming.

10      And this chart shows the result of that study.

11  **Q.**   Without talking about the numbers, did you see a rise or a

12  fall?

13  **A.**   So I saw a fall.  And so what's on the left-hand side is

14  you can see the decline in the number -- the percentage decline

15  in the number of gamers on the Xbox console; and then next to

16  it the blue line, the blue bar, the decline in the number of

17  gamers on the PC -- on the PlayStation console.

18      And then the right-hand side of the chart you can see for

19  those gamers that -- that stayed, how the game-time hours

20  changed.  And you can see a decline there both on the Xbox and

21  on the PlayStation console.

22  **Q.**   And what does this tell you about substitution,

23  Dr. Bailey?

24  **A.**   Well, this is what I would expect to see if there were --

25  if there was substitution.  If gamers on Xbox and PlayStation

781

1 considered the Nintendo Switch a substitute, this is what I
2 would expect to see and that's what I found.
3     **THE COURT:** Can I ask you? I think, if I recall from
4 your report, you looked at data for ten weeks?
5     **THE WITNESS:** Yes, that's correct.
6     **THE COURT:** So did that same decline then exist past
7 the ten weeks? In other words, one of the arguments is, is
8 that the Switch performance is not as good. So one might think
9 that initially consumers would buy it; and then if they
10 thought, "Oh, not as good," then they'd go back to their Xbox
11 or PlayStation. So what did you see past the ten weeks?
12     **THE WITNESS:** So the -- so I didn't look past ten
13 weeks, and here is why: It's because there's a lot of things
14 that happen in this world, and I wanted to be able to isolate
15 the effect.
16     And so the longer we go out, the more events that start to
17 come in and the harder it is to start to control for what's
18 happening. So that's why I focused right on that period.
19     **THE COURT:** So do you -- all right.
20     So the opinion you draw is that at least when it came out,
21 consumers played on it and purchased it?
22     **THE WITNESS:** Not only did they play on it and
23 purchase it, but more specifically Xbox gamers and PlayStation
24 gamers switched. They switched entirely their gaming behavior
25 and they switched in part their gaming behavior.

782

1     **THE COURT:** No pun intended.
2     **THE WITNESS:** Yes.
3     (Laughter)
4     **THE COURT:** Okay. For at least that ten-week period?
5     **THE WITNESS:** For at least that ten-week period. And
6 as an economist, it's informative to substitution because, you
7 know, you could imagine it was a whole different set of gamers,
8 that it wasn't pulling from PlayStation or from Xbox, and
9 that's not what this analysis shows. It shows that kind of
10 substitution.
11 **BY MR. KILARU:**
12   **Q.** Doctor, did you do any other analysis of comparability
13 between the Switch and the other platforms we've talked about?
14   **A.** I did, and it's complementary to this analysis, yes.
15     **MR. KILARU:** Can we go to the next slide? And can we
16 turn the public view back on -- or published rather?
17     (Pause in proceedings.)
18 **BY MR. KILARU:**
19   **Q.** What do we see here, Doctor?
20   **A.** So what I have here is the -- a collection of the popular
21 games that are played on Xbox, and those are all the green
22 checks on this chart. And what I'm showing is that those same
23 set of popular games are also available on Nintendo.
24   **Q.** And are some of these games available to be played between
25 folks on Nintendo and folks on the Xbox?

783

1   **A.** Cross platforms play, yes. Yes.
2   **Q.** Did you do a similar analysis for the PlayStation?
3   **A.** I did. I did the same kind of analysis for PlayStation
4 games; and many of the popular PlayStation games, those are the
5 blue checks, are also available for play on Nintendo.
6   **Q.** And what does all that tell you about the product market?
7   **A.** Well, the -- taken holistically, the collection of these
8 economic studies plus the testimony and the documents in the
9 record that I reviewed, these are all consistent with Nintendo
10 being considered a rival by Xbox and by PlayStation.
11   **Q.** We've heard some testimony that the PlayStation 5 and the
12 Switch are sold at different price points. Does that change
13 your analysis?
14   **A.** No, because the -- certainly with respect to the
15 PlayStation S and the Switch, they are -- they're priced the
16 same at 299.99.
17   **Q.** I think you said "PlayStation." Did you mean Xbox?
18   **A.** Oh, I apologize. The Nintendo. I'm looking at
19 PlayStation.
20   **Q.** Fair enough.
21     And, Doctor, what does it do, from a share perspective, if
22 Nintendo is included in the global console market?
23   **A.** Sure. So what I'm showing here is three ways to measure
24 console shares by revenue, by units, or by installed base; and
25 no matter which metric we use, Xbox is the third place console.

784

1   **Q.** And has that generally been true for the last five years?
2   **A.** Yes. That's generally true, yes.
3   **Q.** Were you here yesterday when Mr. Ryan testified that PC is
4 a very direct competitor to the PlayStation?
5   **A.** I did hear that testimony.
6   **Q.** Were you able to look at telemetry data to determine
7 whether there's similar substitution on the PC?
8   **A.** So I testified yesterday that I asked for telemetry data,
9 but telemetry data wasn't available in a systematic or robust
10 way for me to look at it for PC so I didn't have that
11 available.
12   **Q.** Did you try to do any analysis of comparability between
13 PCs and consoles?
14   **A.** I did.
15   **Q.** What did you find?
16   **A.** Well, what this -- that's what's on this chart here. What
17 I'm showing here in my report, I have many more games but here
18 these are the top 15 games that are played on Xbox and on
19 PlayStation, and you can see all of those top 15 games are also
20 available for play on PC.
21   **Q.** And similar question to before. Can some of these games
22 be played between PCs and consoles?
23   **A.** Yes. There is cross-platform play, yes.
24   **Q.** Were you able to come to an opinion as to whether Nintendo
25 and PC can properly be excluded from a hardware market in this

785

1  case?

2  A.  I was.  Based on the economic analyses that I have done,
3  the data-driven ones as well as my review of the testimony and
4  the documents, the Nintendo and PC are properly included in
5  that relevant market.  That Dr. Lee's market is too narrow.

6  Q.  Just a few more topics, Dr. Bailey.

7      THE COURT:  Well, before can you just sort of expand
8  on that?  So why?  Why does the fact that they're available on
9  both PC and -- same games, you can play the same games on both,
10 for some games you can even cross-play.  Why -- what is it,
11 from the economic point of view, that means they should be
12 considered in the same market?

13     THE WITNESS:  Sure.  So when we looked at what
14 happened when the Switch entered, from a data-driven economic
15 perspective, which is that's my heart and soul, that that's the
16 kind of data that tells you real-world behavior.  You don't
17 have to guess about what's going on or think about a model of
18 what's going on.  You can look at the data and the data tells
19 you what are those gamers doing.

20     And that's what I see when I look at this event of what
21 happened to the Xbox gamers and the PlayStation gamers when the
22 Switch entered.  I see they -- again, pardon the pun -- they
23 switched.

24     THE COURT:  And the fact that they had the same games,
25 that just enables them to switch?  If they didn't -- couldn't

786

1  play the same games, then you would think, well, it might be a
2  different market because you can't -- you'd have to play
3  completely different games; but because they can play in the
4  same games, to you it seems like an available -- an appropriate
5  substitute?

6      THE WITNESS:  Yeah.  It's additive for me.  So it may
7  be that different games are substitutes because, you know, you
8  have your time and what you're really substituting is how you
9  spend your time, but it's -- it is additive and more robust for
10 me that it's, in fact, the same games so that you could
11 substitute to a different device and play different games or
12 play the same.

13     THE COURT:  Since you didn't have the data for the PC
14 and you didn't -- you heard Professor Lee say, well, the PC,
15 the price difference is greater, what do you say to that?

16     THE WITNESS:  Um --

17     THE COURT:  In other words, I'd have to spend $1,500,
18 I believe he testified, to buy a PC.

19     THE WITNESS:  Yeah.  So I was here yesterday and I
20 heard that testimony.  I guess what I -- on my review of -- of
21 the documents and the testimony is that many gamers multi-home.
22 They already have a PC.  And in my report I talk about it, and
23 I'm not going to remember exactly what footnote sitting here,
24 but I talk about the percentage of gamers that multi-home with
25 PC, and it's a large percentage.

787

1      And so that construct of having to go out and buy a PC, I
2  mean, maybe some do, but more likely because you -- many of
3  them already multi-home with a PC, that substitution is made
4  easier.

5      THE COURT:  Okay.

6  BY MR. KILARU:

7  Q.  Doctor, there's -- are you aware that Dr. Lee also defines
8  a product market of multigame library subscription services?

9  A.  Yes, I am.

10 Q.  And did you hear during cross-examination that he said he
11 looked primarily at documents because there wasn't quite as
12 much data here?

13 A.  Yes, I did hear him.

14 Q.  Did you try to do any analysis based on data?

15 A.  I did.

16     MR. KILARU:  This next slide is in camera, Ms. Means.
17 Thank you.

18 BY MR. KILARU:

19 Q.  Dr. Bailey, what did you look at in trying to assess
20 whether subscription and buy-to-play games are in different
21 markets?

22 A.  Sure.  So this goes back to the telemetry data.  I had
23 available to me Xbox telemetry data, and what I was able to
24 look at to assess that question of are subscription services
25 and buy-to-play games, do they compete, are they two ways to

788

1  basically monetize the same game, and so what I was able to
2  look at was I took the set of games that were added to
3  Game Pass and I asked:  What happened to their buy-to-play
4  sales when those games were added to Game Pass?

5      Because if they were substitutes, I would expect the
6  buy-to-play sales to decline.  And I know it's not on the
7  screen, so if you look at the top horizontal row of that slide,
8  that percentage in black bold, that's what my analysis showed.
9  And maybe too much in the weeds, but I did the same kind of
10 analysis using this economic tool of difference-in-difference
11 so you can control for that -- to the extent there's any
12 seasonality, you're able to control for that.

13 Q.  Was that the only thing you looked at?

14 A.  It's not the only thing I looked at.  I could look at the
15 reverse of that.  So what happened when games were removed from
16 Game Pass?  What happened to those buy-to-play sales when that
17 game was removed from Game Pass.

18     And what you can see in the second row, that percentage
19 that's in black and in bold, is that's the percentage increase
20 in buy-to-play sales on average of the games when they get
21 removed from Game Pass.  So that same game, those buy-to-play
22 sales increased by that percentage that's there.

23 Q.  And what does this analysis tell you about
24 substitutability?

25 A.  From an economic perspective, this is strong, robust

789

1  evidence of substitution, gamer substitution, between
2  subscription services and buy-to-play.
3  **Q.**  Last topic on markets, Dr. Bailey, is cloud gaming.
4      Similar question.  You're aware that Dr. Lee defines a
5  product market of cloud gaming services?  I may not get the
6  words exactly right.
7  **A.**  Yes, I am.
8  **Q.**  And here too are you able to try to look at some data to
9  determine what we can assess about whether this is a separate
10 market or not?
11 **A.**  Yes.  I was able to look at that.
12     **MR. KILARU:**  Next slide is not in camera, Ms. Means.
13 Thank you.
14 BY MR. KILARU:
15 **Q.**  What did you look at and what did you find, Dr. Bailey?
16 **A.**  So what's here is also telemetry data from Xbox, and that
17 green line shows you the monthly total gaming hours on console
18 between 2019 and the start of 2023.
19     And just in case there's a question what's the big blip in
20 the middle, that's COVID.  That's everyone staying home and
21 playing games.
22     And then the orange line, that's cloud gaming hours.
23 **Q.**  And what does this data tell you about how and why people
24 are using cloud gaming on Xbox?
25 **A.**  Sure.  So I -- I found this informative.

790

1      Is this public?
2  **Q.**  Yes, it is.
3  **A.**  Okay.
4      So this was informative to me because cloud gaming hours
5  is less than 1 percent of console gaming hours.  So it's very,
6  very small.
7      But in addition to just its small nature, I was able to
8  look at how -- how cloud gaming is used by gamers.  So on Xbox
9  in order to access the cloud gaming, it's through the Game Pass
10 Ultimate subscription there's a feature for cloud gaming, and I
11 could look to see how those gamers of Game Pass Ultimate were
12 using cloud gaming.
13     And what I found was that of those Game Pass Ultimate
14 gamers, a very small fraction of them access the cloud gaming
15 feature.  Their proportion of game time hours through cloud
16 gaming are even smaller.  When they access that cloud gaming
17 feature, the overwhelming majority of them are accessing it at
18 least once through a console, and that in and of itself tells
19 me there's some substitution there between console and cloud
20 because they are accessing the cloud through the console.
21     And then the last thing that I was able to look at through
22 the telemetry data was:  Once they were on the cloud, how were
23 they using it?  And the data is consistent with those gamers
24 when they use the cloud, using the cloud to try out a game,
25 it's not sustained game playing; it is largely playing one game

791

1  they never played before and not playing it ever again other
2  than that one day that they tried it out.
3      **THE COURT:**  So I think Ms. Bond testified that at
4  least that what she was seeing was that gamers would use the
5  cloud to play the game while they were downloading.  Say they
6  had bought the game and while they were downloading it, they
7  would use it.  Is the data that you saw consistent with that?
8      **THE WITNESS:**  It would be exactly consistent with
9  that.
10 BY MR. KILARU:
11 **Q.**  Dr. Bailey, did you hear the testimony of Mr. Zimring from
12 Google about their cloud service?
13 **A.**  I did.
14 **Q.**  And what did you take away from that as an economist?
15 **A.**  Well, as an economist, what I took away was the
16 competitive constraint he was facing was from console and PC as
17 well.
18 **Q.**  So what does that tell you about whether cloud gaming is a
19 separate product market?
20 **A.**  Well, when a product faces strong competition from another
21 product, typically we think about those products in the same
22 relevant market.
23 **Q.**  Just one final topic, Doctor.
24     We've heard throughout the trial that Call of Duty is
25 available on Xbox, PC, PlayStation, and mobile.  Is that

792

1  consistent with your understanding?
2  **A.**  Yes, it is.
3  **Q.**  Now, are you aware of the contract that Microsoft has
4  signed to bring Call of Duty to the Nintendo platforms if the
5  transaction closes?
6  **A.**  Yes, I am.
7  **Q.**  And the five other contracts with cloud streaming
8  providers?
9  **A.**  Yes.
10 **Q.**  Do you have an understanding of whether those contracts
11 are contingent on the deal going through as to Call of Duty?
12 **A.**  I'm not a lawyer, but that's -- that's how I interpret
13 them.  Yes, it is contingent.
14 **Q.**  So as an economist, what does that signify to you about
15 the effects of the transaction on output?
16 **A.**  Well, it -- it means the transaction is output expanding,
17 it expands the availability of the Activision video game
18 content to more gamers.  It brings more games to more gamers.
19     **MR. KILARU:**  Your Honor, that's all we have for now.
20 Thanks.
21     **MR. WEINGARTEN:**  Your Honor, my colleague Mr. Alex
22 Ansaldo will be conducting the cross-examination.
23     **MR. ANSALDO:**  Good morning, Your Honor.
24     May we approach with a witness binder?
25     **THE COURT:**  You may.

793

1    (Pause in proceedings.)

2    **CROSS-EXAMINATION**

3    BY MR. ANSALDO:

4    Q.   Good morning, Dr. Bailey.

5    A.   Good morning.

6    Q.   I just wanted to touch on the last point you were raising

7    with respect to the conditional contracts that you view as an

8    output-enhancing feature of the merger.

9         If any merging firm committed to cutting prices

10   conditioned on the merger being approved, would you consider

11   that a merger-specific efficiency?

12   A.   Gosh, I'd certainly consider it.  I mean, that's very

13   broad.  I would have to consider -- I would consider it.

14   Q.   Turning back to Demonstrative 29, which you were just

15   discussing, this is your demonstrative.

16        (Pause in proceedings.)

17   BY MR. ANSALDO:

18   Q.   That's based on -- solely on Xbox data; right?

19   A.   It's Xbox telemetry data.

20   Q.   You said this demonstrates people are using cloud on

21   console; is that right?

22   A.   Xbox gamers.

23   Q.   Xbox gamers are using Xbox cloud on Xbox consoles?

24   A.   The majority of the Xbox Game Pass Ultimate gamers that

25   access cloud, the majority of them at least once are accessing

794

1    cloud through a console -- through their console.

2    Q.   So they're using them both at the same time; right?

3    A.   They're using the console to access cloud.  I guess if

4    you're thinking about that as at the same time, that's the way

5    they're doing it.

6    Q.   So they're not really substituting between xCloud and Xbox

7    console in the chart that you displayed on Demonstrative 29?

8    A.   I disagree.  If you have a console that you're using to

9    access the cloud by -- I mean, by definition you have a

10   console.

11   Q.   So in your view, if someone is using a console to access

12   the cloud, do you view that as substitution between cloud and

13   console?

14   A.   I view it as strong evidence of the ability to substitute

15   because there's nothing else you do with a console.  I mean,

16   maybe a clever teenager figures out, like, you could make

17   something else with it, but the console is no good without the

18   game.

19        So if you have a console, you -- if you have a console,

20   you have a console to play games on it; and so when you're

21   accessing -- when I can see gamers, Xbox gamers, accessing the

22   cloud through a console, it tells me they have a console for

23   playing games.

24   Q.   I'd like to ask some more questions about relevant product

25   market in this case.

795

1         Yesterday afternoon and this morning you discussed a

2    number of figures describing various features of gamer

3    behavior.  Do you recall that?

4    A.   I do.

5    Q.   But in antitrust terms, the relevant product market is the

6    set of products to which consumers can turn in the face of a

7    price increase; right?

8    A.   I think that's one way -- it's one way it's described.  I

9    don't think it's the only way, but it's one way it's described.

10   Q.   Defining a relevant product market requires identifying

11   the set of products that impose a competitive constraint;

12   right?

13   A.   Correct.

14   Q.   And those are products that, from the consumer's

15   perspective, are reasonable substitutes?

16   A.   Yes.

17   Q.   And you're not offering an opinion as to what the correct

18   product market actually is in this case; right?

19   A.   I think that's right.  I think my -- my opinions are

20   around the -- the -- largely the data-driven evidence but also

21   the documents and testimony that I've seen that -- that -- that

22   speak to the relevant markets that Dr. Lee has defined and that

23   they're too narrow.

24   Q.   You never performed a hypothetical monopolist test; right?

25   A.   Well, the analyses that I do speak directly to the

796

1    hypothetical monopolist test concept.

2    Q.   What do you mean when you say "speak to"?

3    A.   Well, the hypothetical monopolist test is a -- is one way

4    to think about identifying where that nexus of competition is.

5    And so all of the analyses that I talked through yesterday and

6    the ones that I talk to now this morning, they speak to

7    substitution.  They speak to gamer behavior, and that speaks to

8    the nexus of competition, what those competitive constraints

9    are.

10   Q.   But you didn't actually perform a hypothetical monopolist

11   test; right?

12   A.   Well, I'm not -- I guess I'm not sure what -- what you

13   mean by that because there are many ways to do a hypothetical

14   monopolist test, and the work that I did speaks to that.

15   Q.   So I guess I'm having trouble with the phrase that you

16   would say that your work "speaks to it."

17        But the term "hypothetical monopolist test" appears five

18   times in your report and each of those is in reference to the

19   hypothetical monopolist test that Dr. Lee performed; right?

20   A.   So maybe that's the point of disagreement, is I disagree

21   that Dr. Lee did a hypothetical monopolist test.  He says he

22   did a critical loss test and he transforms that language into

23   saying an aggregate diversion ratio, and I disagree that that's

24   what he did.  I understand he's calling it that, but I disagree

25   that that's what he did.

797

1  Q.  Okay.  Understood.

2      But you also did not perform a hypothetical monopolist

3  test?

4  A.  Well, to the extent that -- that Dr. Lee brought

5  information to bear on that question, I brought information to

6  bear on that question.

7  Q.  You're not offering an opinion as to whether consumers

8  would substitute purchases of high-performance consoles to

9  purchases of other devices in response to a price increase;

10 right?

11 A.  Can you say that question one more time?

12 Q.  You're not offering an opinion as to whether consumers

13 would substitute from purchases of high-performance consoles to

14 purchases of other devices in response to a price increase?

15 A.  No, I disagree.  I think that that's what my analysis of

16 the Nintendo Switch entry speaks to.

17 Q.  But you didn't study purchases of consoles; right?  You

18 studied gamer behavior on devices they already owned?

19 A.  Sure.  And in economics we can have a wish list of the

20 kind of data that we want to do a study, but it's not always

21 available.  And so the analyses that I did with the data that

22 was available to me speak -- they inform that question, they

23 speak to that question on substitution, how gamers behave.

24 Q.  Do you recall yesterday Mr. Kilaru asked you questions

25 about your conclusions with respect to geographic market?

798

1  A.  I do.

2  Q.  You discussed some of the facts that your analyses showed

3  and that you considered including indications that across

4  geographies games are similar, devices are similar, release

5  dates are similar, gamer demographics are similar.  Do you

6  recall that portion of your testimony?

7  A.  I do.

8  Q.  You would agree that a Taco Bell in Washington, D.C., and

9  a Taco Bell in San Francisco could also have similar menu

10 items, similar graphic design and marketing, similar item

11 sales, similar customer demographics; right?

12 A.  Are you asking me to imagine?  I could imagine.

13 Q.  You can imagine that a Taco Bell in Washington, D.C., and

14 a Taco Bell in San Francisco would share those similar --

15 similar features; right?

16 A.  I have not done a study of that; but if you're asking me

17 the hypothetical, I could imagine, yes.

18 Q.  So let's assume they do.

19 A.  Okay.

20 Q.  But that similarity doesn't mean they're in the same

21 geographic market, does it?

22 A.  Well, what -- what's important for understanding the

23 answer to that question is where the nexus of those competitive

24 decisions are being made.  Are they being made locally at the

25 Taco Bell in San Francisco?  And I apologize.  I forgot the

799

1  other geography already.  Are they being made locally or are

2  they being made -- you know, there's -- in retail, which would

3  be kind of like Taco Bell, there's omni-channel, that the

4  decisions around pricing, around selection are not made at the

5  local level.  It's omni-channel.  It's made at a level higher

6  up.

7      And so to evaluate that question, it is around the nexus

8  of where those competitive decisions get made, and that's what

9  I talked about yesterday.  And the items you just talked about

10 now, the nexus of the decision-making for the -- for consoles,

11 it's the same product and the same brands and the same devices.

12 So those nexus are being made at a level that's broader than

13 the United States.

14 Q.  You're aware that Microsoft recently announced a price

15 increase for Xbox and Game Pass in certain geographies but not

16 others; right?

17 A.  You showed me a document in my deposition so I'm aware

18 through that.  I don't -- as we talked about, I do not think it

19 undermines my opinion at all, but I'm aware of it.

20 Q.  Based on your opinions, you don't have any expectation as

21 to how consumers will respond to those price increases?

22 A.  Can you ask that question one more time?

23 Q.  Based on the analyses that you've conducted, you don't

24 have any expectation as to how consumers will respond to those

25 price increases?

800

1  A.  To -- to all of them together or -- are you -- I need a

2  little more precision in the question.

3  Q.  To any price change by Xbox, the analysis that you've

4  performed doesn't give you an expectation as to how a consumer

5  will respond?

6  A.  Well, I -- it -- what you're proposing is not the precise

7  study that I did, but the work that I did tells me that the

8  Nintendo Switch is a substitute.

9      The PlayStation console is a substitute.  PC gaming

10 through the analysis that I've done and through the testimony

11 and documents that I've reviewed I believe is a substitute.  So

12 that's informative to me that it may affect gamer behavior.

13     I haven't studied it.  I don't know what would happen, and

14 I don't even know the reason why that price is being changed,

15 but I do believe my analyses do speak to that.

16 Q.  And backing up a little bit, in general, you're not

17 offering an opinion as to whether consumers can substitute to

18 purchases outside the United States in response to a price

19 increase in the United States?

20 A.  So I think this is the question that I was asked

21 yesterday; and if yours is slightly different, you can stop me

22 and adjust.

23     But -- but this is -- this is not an industry where we're

24 talking about there are other products or other devices or

25 other brands outside of the United States that a consumer would

801

1  substitute too; that it is the same products and the same
2  brands and the same devices, and that nexus of competition is
3  happening at a level broader than the U.S.
4  Q.  But you're not offering no opinion as to whether if Xbox
5  increased its prices in certain geographies, such as the United
6  States, consumers in the United States would be able to
7  purchase Xboxes outside of the United States?
8  A.  That's -- that's not a component of my -- of my opinion or
9  my analysis.
10 Q.  You're not offering an opinion as to how close of a
11 substitute PCs are for gaming consoles?
12 A.  I think I'm -- I'm offering the analysis that's contained
13 in my report and that we talked about here is that it's the --
14 the same type of games, in that -- that many console and PC
15 gamers multi-home.
16 Q.  You're offering no opinion as to how close of a substitute
17 Switch is for Xbox and PlayStation consoles?
18 A.  I'm offering the opinion that it is a -- that it is a
19 substitute, that it is an important rival, that it is a
20 competitive constraint.
21 Q.  Your conclusion that it's a competitive constraint is
22 based on your observations of the gaming behavior on the
23 consoles that are described in your report and the
24 demonstratives today?
25 A.  Well, I think it's much stronger than observations.

802

1  It's -- it's a quantitative data-driven analysis set out using
2  a difference-in-difference approach, which is robust technique
3  in economics.  It's more than an observation.
4  Q.  You didn't have the data of console sales to consider to
5  see how consumers respond in -- to price increases on one
6  product but not the other?
7  A.  It's true, that sometimes the data that I would -- that I
8  would hope to have is just not available to me.
9  Q.  And as a result, you have no basis today to opine as to
10 whether, without the transaction, consumers would substitute
11 from Xbox to PlayStation in response to a price increase such
12 as the one that Xbox recently announced?
13 A.  I disagree with that.  I -- I think the starting point
14 from Dr. Lee's report was that Xbox and PlayStation are in the
15 same relevant market; and the analyses that I did with the
16 telemetry data that I talked about speak to the gamer
17 substitution to the Nintendo console, and we talked about
18 substitution to PC.  The -- I'll leave it at that.
19 Q.  My question was about substitution between Xbox and
20 PlayStation, and so I'll rephrase it a little bit.
21     You don't have any basis to know if Call of Duty gamers,
22 for example, on Xbox could substitute to PlayStation if Xbox
23 doubled its price?
24 A.  That's not an analysis that I've done.
25 Q.  Turning to the importance of Activision content, we looked

803

1  at a variety of figures during your direct examination that you
2  rely on in reaching your opinion that Activision content,
3  including Call of Duty, is not, quote, "essential, critical,
4  must have, or uniquely important."  So those are a lot of
5  adjectives, and I'm just wondering, so we're all on the same
6  page, are those synonyms for each other?
7  A.  I guess for this purpose I'm -- I'm using -- I'm using
8  them that way; that I've seen all of those terms being used in
9  this matter, and I guess I just wanted to be complete with
10 those terms.
11 Q.  And could we turn to your Demonstrative 8, please?
12     MR. ANSALDO:  I believe that this one is public.
13     MR. KILARU:  It is.
14 BY MR. ANSALDO:
15 Q.  Do you have that, Dr. Bailey?
16 A.  I do.
17 Q.  And looking first just at the revenue column, am I correct
18 that this shows Activision gets roughly 60 percent of its
19 revenue from sales within the United States?
20 A.  Are you asking me to compare 2.097 billion to 1.298?
21 Q.  Well, actually first I should ask.  Does the global
22 revenue include the United States revenue?
23 A.  Yes, I consider the United States part of global.
24 Q.  And so, right, 1.2 is roughly 60 percent of 2?
25 A.  I'll take your representation.  I'm good at math, but not

804

1  on the fly so quick like that.
2  Q.  This is one of the pieces of information you used to
3  assess the importance of Activision content; right?
4  A.  It was a starting point for me.  I think that's how I
5  characterize, is that -- that it's where I started because I --
6  what I had seen with Dr. Lee's report was that it was important
7  content and that I think he was even stronger than that saying
8  that Activision had market power.
9      And so a start -- and it wasn't explained in a particular
10 relevant market; and so as a starting point for me, I wanted to
11 understand where he was coming from.  I wanted to try to
12 appreciate his point of view, and that's why I put this
13 together.
14 Q.  So if we subtract Activision's -- well, actually, the
15 United States AAA revenue for Activision Blizzard is the same
16 as all of its revenue in the United States; right?
17 A.  So, yes, as shown here.  And just flagging that, as I
18 talked about yesterday, AAA is a little bit "you know it when
19 you see it."  Different people have different views of what's
20 AAA content.  So to get my arms around that, I used Nielsen
21 SuperData.
22 Q.  Okay.
23 A.  And -- and that -- that's what -- that's what aligned in
24 Nielsen SuperData.
25 Q.  So based on the criteria you used for AAA, all of

805

1 Activision's revenue in the United States is from AAA games?
2 A. That's probably right. I don't see all the decimal points
3 out there, but that's probably right.
4 Q. If we subtract Activision's United States revenue from the
5 global revenue, we could compare Activision's revenue share in
6 the United States with its revenue share outside the United
7 States; right?
8 A. Are you back to asking is 1.298 billion 60 percent of
9 2.097 billion?
10 Q. So on the -- we see that Activision Blizzard has roughly
11 12 percent share in the United States.
12 A. I see that.
13 Q. But the global share percentage includes Activision's
14 United States revenue; right?
15 A. Correct. That 2.097 billion contains the United States
16 revenue that's down below of 1.298 billion.
17 Q. And so if we removed the United States revenue from the
18 global revenue, Activision's share of global revenue would
19 actually be much smaller?
20 A. I -- I don't know if that's right. Like, why -- because
21 it would change my denominator too. I don't understand what
22 calculation you're working at.
23 I would remove the United States from -- from global
24 Activision Blizzard, but then I would leave the rest of global
25 the same including the United States.

806

1 Q. We can move on.
2 Just so that we can all get on the same page, you agree
3 that Call of Duty is important, you just disagree that it's a
4 unicorn?
5 A. I agree that Activision Blizzard -- in particular what I
6 was talking about was Call of Duty because that's kind of the
7 crux of this matter. I agree that Call of Duty is an important
8 and popular game. What my data-driven analyses show is that
9 it's not uniquely important or must have or essential content.
10 THE COURT: Can I ask you? Because you testified
11 yesterday to Sony how important it was, and you showed --
12 somebody stop me if I'm saying something that's not supposed to
13 be public -- that I'm going to call it the Thor game, it's the
14 God --
15 THE WITNESS: I think you can say I said it. God of
16 War Ragnarök.
17 THE COURT: Yeah, God of War. That that, from a
18 revenue point of view, is more important to Sony than Call of
19 Duty, but God of War is exclusive to Sony and Call of Duty is
20 not. So that makes sense; right? Because everyone who plays
21 God of War has to play on a PlayStation or some other Sony, but
22 Call of Duty is diffuse and set out.
23 And I know we know that people own Xboxes and PCs and
24 PlayStations. So they're spreading their Call of Duty dollars
25 out. So doesn't your analysis -- how does that -- so by saying

807

1 that it may be more important to Sony, but that doesn't
2 necessarily reflect on how important it is to the industry as a
3 whole because those Call of Duty dollars are being spread out
4 but God of War is only on Sony?
5 THE WITNESS: I think I understand what you're asking.
6 So I'm going to try to answer; but if it's not the question,
7 cut me off.
8 So the reason why I looked at that analysis the way I did
9 with respect to Sony is that the concern that was being -- that
10 is being raised and that Dr. Lee was looking at was with
11 respect to foreclosure on Sony PlayStation, and so it made
12 sense to me to look at that question about spending or
13 importance with respect to the Sony PlayStation.
14 I entirely agree that Call of Duty is available on other
15 platforms; but with respect to the question of what happens to
16 Sony, it made sense for me to look with respect to the
17 PlayStation on how those games are relatively important.
18 THE COURT: Okay. I understand that. I guess maybe
19 then I'm saying -- to take it further say, well, Call of Duty
20 is not so important or not so -- I guess that's what I was
21 quibbling with, that I don't think it necessarily shows that
22 because you're not looking at all of the Call of Duty dollars
23 spent cross platforms.
24 THE WITNESS: Correct. My -- my opinion is all of
25 those analyses are with respect to Sony PlayStation, correct.

808

1 BY MR. ANSALDO:
2 Q. Dr. Bailey, you did not conduct an analysis of whether
3 Activision content generally is important for gaming platforms?
4 A. I looked at it with respect to the Sony PlayStation and I
5 also looked with respect to Xbox.
6 Q. For Call of Duty.
7 A. For Call of Duty.
8 Q. For other Activision content you haven't analyzed?
9 A. So my focus was on Call of Duty. There -- there are
10 tables and charts in my report where I think Overwatch and
11 maybe there are some other of the Activision content appear,
12 but my focus was on Call of Duty.
13 Q. And you were in the courtroom yesterday when Mr. Ryan
14 testified by video?
15 A. I was.
16 Q. Do you recall his testimony that one of the reasons Sony
17 views Microsoft's current offer to be inadequate is that it
18 does not include Overwatch?
19 A. I can take your representation. I don't remember that.
20 Q. You remember this morning Mr. Kotick testifying that
21 Diablo IV, which was released on June 6th of this year, sold
22 $666 million in its first five days?
23 A. Yes, I think that's what he said.
24 Q. You didn't conduct an analysis of the importance of
25 Diablo?

809

1  **A.**  I looked at Call of Duty because it is the -- the -- of
2  the Activision content that's on mobile, it's large -- it's the
3  largest.
4  **Q.**  $666 million in five days is pretty large; right?
5  **A.**  Remind me, was that 2022 or 2023?
6  **Q.**  That was June 6th of this year.
7  **A.**  Of this year.  So I -- I didn't look at it; but in part, I
8  didn't look at it because that date when it was released is
9  quite close in time.  The data wasn't available to me.
10  **Q.**  And you referenced God of War just a few minutes ago.  Do
11  you remember when the last God of War release was?
12  **A.**  I don't sitting here right now.
13  **Q.**  Does 2017 seem roughly accurate?
14  **A.**  I couldn't say one way or the other.
15  **Q.**  Dr. Bailey, you're not offering an opinion as to whether
16  Activision content drives adoption of video game platforms;
17  right?
18  **A.**  Well, I think the analysis that I talked about yesterday
19  about the -- the first game played does speak to that.  When
20  I -- when I talked about that analysis, the way in which I
21  think about analysis is what's -- what's the -- what's the
22  reason you purchase that console.  It can be interpreted based
23  on what game you're playing on the first day you start playing.
24  **Q.**  Well, your opinions in this matter don't include anything
25  about Activision's ability to transition its business from one

810

1  platform to another; right?
2  **A.**  I'm not sure I understand that question.
3  **Q.**  I'll just restate it and we'll see.
4       Your opinions in this matter don't include anything about
5  Activision's ability to transition its business from one
6  platform to another?
7  **A.**  I don't know what you mean by "transition its business."
8  If you have an example or I could try to help.
9  **Q.**  If you turn to page 149 of your deposition.  That's in the
10  white...
11       (Pause in proceedings.)
12       **THE WITNESS:**  (Witness examines document.)
13  BY MR. ANSALDO:
14  **Q.**  Are you at page 149, line 10?  And you were asked (as
15  read):
16       **"QUESTION:**  Is it consistent with your opinion that
17       Activision has the ability to transition its business from
18       Xbox to other platforms?"
19  **Q.**  I'm sorry, what?
20  **Q.**  Line 3 or line 2.
21  **A.**  On 149?
22  **Q.**  I'm sorry.  This is on 150.  I apologize.
23  **A.**  (Witness examines document.)
24  **Q.**  150, line 2.  Are we there?
25  **A.**  Yeah.

811

1  **Q.**  And you were asked (as read):
2       **"QUESTION:**  Is it consistent with your opinion that
3       Activision has the ability to transition its business from
4       Xbox to other platforms?"
5       And you responded (as read):
6       **"ANSWER:**  I don't express an opinion about anything about
7       Activision transitioning its Xbox business to other
8       ecosystems.  I mean, that's not -- I don't even think I
9       have a paragraph that discusses that as a component of my
10       opinion."
11       Is that correct?
12  **A.**  Well, I see that, but I also see that I said right before
13  you asked that question that "I guess I'm not sure what you're
14  asking.  I'm not sure what you're asking that -- with respect
15  to that bullet point."  So I guess I'm consistent that I still
16  don't understand, but I -- but I do see that that's how I
17  eventually responded.
18       (Pause in proceedings.)
19       **THE WITNESS:**  And I see if I kept reading down --
20       **THE COURT:**  Wait for the next question.
21  BY MR. ANSALDO:
22  **Q.**  Dr. Bailey, could you turn to PX2463 in your binder?  This
23  is confidential so we're going to talk around it.
24  **A.**  (Witness examines document.)  Okay.  I'm there.
25  **Q.**  If it helps to get you oriented, if it becomes necessary

812

1  while we're discussing the document, you cited the attachment
2  to this on page 66 of your report in Footnote 140.  I just plan
3  to ask you questions about the document.
4  **A.**  Say that one more.  There's an attachment to this e-mail?
5  **Q.**  Right.  This exhibit is an e-mail with an attachment.  The
6  attachment begins on page 003.  It's a slide titled "Microsoft
7  Partnerships Negotiation Update."
8  **A.**  I just have 01 and 02.
9  **Q.**  Are you on PX2465?
10  **A.**  2463.  2463.
11       **THE COURT:**  Oh, it's 5?  You said 3.  Do you want --
12       **MR. ANSALDO:**  I apologize.  PX2465.
13       **THE WITNESS:**  (Witness examines document.)  Okay.  I'm
14  there.
15  BY MR. ANSALDO:
16  **Q.**  This is a document, PX2465, that is cited in -- on page 66
17  of your report in Footnote 140.  And on the second page there's
18  a slide deck attached titled "Microsoft Partnerships
19  Negotiation Update"?
20  **A.**  I see that.
21  **Q.**  If you turn to page 2465-005.  Let's be careful here not
22  to discuss any of the details on this slide.
23       The title of the slide is "Partnership Negotiation
24  Update."  And do you understand this to be about Overwatch 2
25  and Diablo IV partnership between Microsoft and Activision?

813

1  A.  Yeah, I could interpret the title like that.

2  Q.  And do you see the column "Microsoft Position" in the

3  table?

4  A.  I do.

5  Q.  Okay.  And to the left is another column that has

6  categories of terms I think that are laid out in the table?

7  A.  Are you talking about the blue column?

8  Q.  Yes.  Do you see that?

9  A.  I do.

10  Q.  And the first row is "Economics"?

11  A.  Yes, I see that.

12  Q.  And do you see Microsoft's position on economics without

13  saying it out loud?

14  A.  I do.

15  Q.  And the next row down is "Publishing Requirements."  Do

16  you see that?

17  A.  I see that.

18  Q.  And then the third bullet under "Microsoft Position" is

19  "Services"?

20  A.  I see that.

21  Q.  We'll take a minute to read the sub-bullets under that.

22          (Pause in proceedings.)

23  BY MR. ANSALDO:

24  Q.  The next row is "Media"?

25  A.  I see that.

814

1  Q.  Do you see the first bullet there?

2  A.  Yes.

3  Q.  And is it consistent with your opinions that these are the

4  types of terms that Microsoft seeks from an independent

5  Activision?

6  A.  I mean, I -- I see what it says here on the page.  I

7  see -- I see what the title of the column says.

8  Q.  Okay.  We can put that aside.  So let's talk about the

9  but-for world.

10      That's the world that would exist without the transaction;

11  right?

12  A.  Yeah.  I think that's how we've been using it.

13  Q.  And this morning you heard Mr. Kotick describe incentives

14  for Activision to make its games broadly available across

15  platforms as an independent publisher; right?

16  A.  Yes.

17  Q.  You're not offering any opinion as to how the transaction

18  would affect Activision's incentives to contribute its content

19  to rival consoles in the future?

20  A.  My -- my assignment was to -- to think about other

21  economic questions, that there's another expert who's looking

22  at that.

23  Q.  So you're not offering that opinion?

24  A.  That -- no, I'm not.

25  Q.  So you're not offering an opinion as to how the

815

1  transaction would affect Activision's incentives to contribute

2  its games to content subscription services?

3  A.  Oh, I see what you mean.  Well, my analyses, you know,

4  they speak to that.  They -- particularly when I look at cross

5  platform or multi-region play, which we talked about yesterday,

6  it's informative to that, but my -- my opinions don't go the

7  next step to use that word "incentive" and say "What is the

8  incentive?"  That's not a component of -- of the work that I --

9  that I did.

10  Q.  And same thing is true for cloud subscription services?

11  A.  Can you ask the whole question?

12  Q.  You're not offering an opinion as to how the transaction

13  would change Activision's incentives to contribute its games to

14  cloud subscription services?

15  A.  In the but-for world?  Can you say that -- ask the

16  question one more time?

17  Q.  You're not offering an opinion as to how the transaction

18  would change Activision's incentives to contribute its games to

19  cloud subscription services?

20  A.  With the transaction?

21  Q.  You're not offering an opinion as to the change the

22  transaction causes?

23  A.  No, I'm not.

24  Q.  You agree that there are circumstances under which

25  Activision will agree to contribute its games to content

816

1  subscription services?

2  A.  I was here in the courtroom this morning.  I heard

3  Mr. Kotick's testimony.  I believe him when he -- he testified,

4  and I understand there are a limited set of circumstances when

5  he's done that in the past.

6  Q.  So your critique of the but-for world that Professor Lee

7  describes is based on your interpretation of the data and

8  evidence that exists in this matter?

9  A.  My understanding of the documents and testimony is that

10  the but-for world, in the absence of the transaction, is -- is

11  as Mr. Kotick testified earlier this morning; that -- that it

12  would not be on subscription services and in a way other than

13  the -- the kind of cabined way he described what he currently

14  does for testing or experiments or marketing, and the same with

15  respect to cloud.

16  Q.  That understanding, your understanding, is based on

17  interpreting the documents and testimony in this matter?

18  A.  I don't know that -- I mean, I heard Mr. Kotick testify.

19  I don't know that I was interpreting.  I mean, I -- I heard him

20  testify.

21  Q.  Okay.  And I'd like to turn to some questions about how

22  your opinions relate to the effect of the transaction on

23  competition and consumers.

24      The only output expansion that you conclude will result

25  from the transaction is the addition of Activision content to

817

1  Game Pass; right?
2  **A.**  I don't think that's -- that's right. The -- there is the
3  addition of the Activision content to Game Pass that I talk
4  about, and then I talk about the output expansion with respect
5  to the -- to the conditional contracts.
6  **Q.**  You're not offering any opinion about what the value is
7  that results from additional content being put on Game Pass?
8  **A.**  That's not a term that I used in my report.
9  **Q.**  And you didn't determine specifically how the change in
10 output would impact consumer welfare?
11 **A.**  No, I did not.
12 **Q.**  You're not offering an opinion as to whether Microsoft
13 would seek to raise prices of Game Pass again following the
14 addition of Activision content?
15 **A.**  That -- I mean, that was not -- that was not a component
16 of my -- of my analysis.
17 **Q.**  And with respect to the post-complaint agreements that you
18 referenced, your analysis assumes the existence and
19 effectiveness of the agreements; right?
20 **A.**  I guess if what you mean by that that I -- that I believe
21 people when they enter a contract and they're not entering it
22 like with the -- I don't know, like the willful intent to
23 violate it, I mean, I -- yeah, I guess that's how I interpret
24 it; that if someone has entered into a contract, they've
25 entered into a contract with the -- with the view that they

818

1  would honor the contract.
2  **Q.**  Setting aside what their intent might be in entering the
3  contract, you're generally aware of the concept of incomplete
4  contracts?
5       **THE COURT:**  She's not a lawyer.  Why are we going into
6  this?  I think this is a question for me.
7       **MR. ANSALDO:**  Can I have a little leeway?
8       **THE COURT:**  Sure.
9  **BY MR. ANSALDO:**
10 **Q.**  Dr. Bailey, is there an economic concept of incomplete
11 contracts?
12      **THE COURT:**  Ah, okay.  That's a good question.
13      **THE WITNESS:**  There is a field of economics that --
14 that goes under the header of incomplete contracts, which means
15 that it isn't -- it's not about violating contracts.  It's
16 about that it's impossible to contract on every possible
17 contingency that might happen.
18 **BY MR. ANSALDO:**
19 **Q.**  You're not offering an opinion about the combined firms'
20 incentive to deviate from the post-complaint agreements; right?
21 **A.**  No, I'm not.
22 **Q.**  There are some other benefits of the transaction that you
23 identify in paragraph 132 of your report.  You're just taking
24 those as given what you understand Microsoft anticipates will
25 result from the transaction?

819

1  **A.**  Can you say the paragraph number again?
2  **Q.**  132.  It's pretty much at the end before the appendix.
3  **A.**  (Witness examines document.)  That's correct.  It -- as an
4  economist, when I -- when I start my work, it's useful to
5  understand the landscape and the backdrop, and that's all
6  I'm -- I'm -- it was part of the landscape and backdrop for me.
7  **Q.**  We heard this morning -- well, we've heard from many
8  witnesses, including Mr. Kotick this morning, about mobile
9  gaming.  And this morning Mr. Kotick testified that Activision
10 has improved its mobile capability over the last year.  Did you
11 hear that testimony?
12 **A.**  I did.
13 **Q.**  And that's all been after the merger agreement was entered
14 into; right?
15 **A.**  You would have to represent those dates back to me.  I
16 don't remember precisely what dates he was -- he was
17 mentioning, but I do remember that -- the opinion or view he
18 expressed.
19 **Q.**  And that the merger agreement was more than a year ago?
20 **A.**  That sounds about right, yep.
21 **Q.**  You're not offering an opinion as to -- about how the
22 transaction would affect competition in any mobile market;
23 right?
24 **A.**  I mean, to the extent that I put up those two pie charts
25 and I showed that -- that Xbox share is -- I'm going to do this

820

1  off memory -- was .3 percent and combined it was 3.8 percent,
2  that's the extent to which I'm expressing a view.  It's -- it's
3  tiny.  I would not think it would have an -- an affect.  It's
4  tiny.
5  **Q.**  You didn't verify any of the claimed deficiencies of the
6  transaction; is that correct?
7  **A.**  No.
8  **Q.**  No?
9  **A.**  No.
10 **Q.**  No, it's not correct or --
11 **A.**  No, I did not.
12 **Q.**  You did not assess the competitive effects if Call of Duty
13 were to be foreclosed?
14 **A.**  My assignment was not to develop a model like that.  A
15 different expert did that.
16 **Q.**  You did not assess competitive effects if Overwatch were
17 to be foreclosed?
18 **A.**  That was not -- that was not my assignment or the work
19 that I did.
20 **Q.**  You didn't assess competitive effects if Diablo were to be
21 foreclosed?
22 **A.**  No.  Again, that was not the assignment of the economic
23 work that I did.
24 **Q.**  So there was no assessment of competitive effects of
25 foreclosure of any Activision content in your report?

821

1    **A.**   Well, the analyses that I did are informative to that; but
2    if you're asking did I write down a model, that -- that was not
3    my assignment.  There's a different expert who worked on a
4    model.
5         **MR. ANSALDO:**  No further questions.
6         **MR. KILARU:**  Your Honor, unless you have nothing -- I
7    mean, any other questions, we don't have anything further for
8    Dr. Bailey.
9         **THE COURT:**  Okay.  All right.  Dr. Bailey, you are
10   excused.
11              (Witness excused.)
12        **MR. KILARU:**  Your Honor, if I could, consistent with
13   the ruling yesterday, move RX5055, which is Dr. Bailey's
14   report.
15        **THE COURT:**  Okay.  It's admitted.
16        (Trial Exhibit 5055 received in evidence.)
17        **MR. KILARU:**  Thank you.
18        **THE COURT:**  And did the -- yes, did you want to admit?
19        **MR. ANSALDO:**  We'd like to admit RX2465, Your Honor.
20        **THE COURT:**  Yes.  Admitted.
21        (Trial Exhibit 2465 received in evidence.)
22        **THE COURT:**  Okay.  How long -- we have Dr. --
23   Mr. Fisher's --
24        **MR. WEINGARTEN:**  I understand Mr. Fisher's video to be
25   roughly 27 minutes.

822

1         **MS. FLEURY:**  It's 19 minutes.
2         **MR. WEINGARTEN:**  Oh, 19 minutes.  Even better.
3         **THE COURT:**  Okay.  I'm supposed to be moderating
4    something at noon.  So let's just start it, and you go and I'll
5    be late to it.  So play.  Play.
6         **MR. WEINGARTEN:**  Very kind, Your Honor.
7         Roll tape, please.
8              (Video was played but not reported.)
9         **MR. WEINGARTEN:**  That's it.  Thank you, Your Honor.
10   Oh.  I would just like to move in to admit PX3103, please.
11   It was mentioned in the video.
12        **THE COURT:**  Yes, admitted.
13   (Trial Exhibit 3103 received in evidence.)
14        **THE COURT:**  Okay.  We will resume at 1:30.  Thank you.
15        (Luncheon recess was taken at 12:04 p.m.)
16   AFTERNOON SESSION                                    1:30 p.m.
17        **THE CLERK:**  Remain seated.  Come to order.  Court is
18   now in session.
19        **THE COURT:**  Okay.  I think this is Microsoft calling
20   our next witness.
21        All right.  Are you prepared to call your next witness?
22              (Pause in proceedings.)
23        **THE COURT:**  Oh, is there an issue?
24        **MR. WEINGARTEN:**  That's my mistake, Your Honor.
25   Actually, it's on both witness lists, I believe, so the FTC is

823

1    calling --
2         **THE COURT:**  And you're questioning first?
3         **MR. WEINGARTEN:**  Yes, Your Honor.
4         **THE COURT:**  Okay.
5         **MR. WEINGARTEN:**  Mr. Satya Nadella.  And my colleague
6    Mr. Jim Abell will be conducting the exam.
7         **MR. ABELL:**  Good afternoon, Your Honor.
8         **THE COURT:**  Oh, you may come forward.
9              (Pause in proceedings.)
10        **THE COURT:**  If you stand right there, Ms. Means will
11   swear you.
12        **THE CLERK:**  Please raise your right hand.
13                    SATYA NADELLA,
14   called as a witness for the Plaintiff, having been duly sworn,
15   testified as follows:
16        **THE CLERK:**  Can you please state your name for the
17   record?
18        **THE WITNESS:**  Satya Nadella.
19        **THE CLERK:**  Thank you.
20        **THE COURT:**  You may be seated.
21        **MR. ABELL:**  And, Your Honor, may we approach the
22   witness?
23        **THE COURT:**  You may.
24              (Pause in proceedings.)
25   \\\

824

1                    DIRECT EXAMINATION
2    BY MR. ABELL:
3    **Q.**   Good afternoon, Mr. Nadella.
4    **A.**   Good afternoon.
5    **Q.**   You are a chairman and CEO of Microsoft; correct?
6    **A.**   That is correct.
7    **Q.**   And you report to the board of directors; is that correct?
8    **A.**   That is correct.
9    **Q.**   And you have an obligation to be truthful and accurate
10   when you make presentations to the board of directors; correct?
11   **A.**   That's correct.
12   **Q.**   You're familiar with the senior leadership team of
13   Microsoft; correct?
14   **A.**   Yes.
15   **Q.**   And the senior leadership team is sometimes abbreviated as
16   SLT; correct?
17   **A.**   That's correct.
18   **Q.**   And the senior leadership team includes the senior
19   executives at Microsoft who report directly to you; correct?
20   **A.**   And that's right, and there are also a couple people who
21   don't report directly to me.
22   **Q.**   Mr. Spencer is a member of the senior leadership team at
23   Microsoft; correct?
24   **A.**   That's correct.
25   **Q.**   Microsoft's business is divided up into customer solution

825

1  areas; correct?

2  A.  That's correct.

3  Q.  And gaming is one of the customer solutions areas;

4  correct?

5  A.  That's correct.

6  Q.  And Mr. Spencer leads the gaming business?

7  A.  That's correct.

8  Q.  Mr. Spencer and his team have responsibility for managing

9  the gaming business; correct?

10  A.  That's correct.

11  Q.  You don't negotiate game publishing deals yourself;

12  correct, Mr. Nadella?

13  A.  I don't.

14  Q.  Okay.  And you also don't make decisions about content

15  exclusivity yourself; correct?

16  A.  That's correct.

17  Q.  Mr. Spencer makes the calls about content exclusivity

18  decisions; correct?

19  A.  That's correct.

20  Q.  As part of your duties as CEO, you conduct Microsoft's

21  earnings calls with the investment community; correct?

22  A.  That's correct.

23  Q.  The purpose of those earnings calls is to highlight for

24  Microsoft's investors how the company has performed for a

25  particular quarter; is that correct?

826

1  A.  That's correct.

2  Q.  And there are certain key metrics that are used to measure

3  that performance; correct?

4  A.  That's correct.

5  Q.  You try to highlight items that are important to

6  Microsoft's long-term strategy during these earnings calls; is

7  that right, Mr. Nadella?

8  A.  That's correct.

9  Q.  And during those earnings calls, as CEO of Microsoft, you

10  have an obligation to be truthful and accurate in your

11  statements to the investment community; correct?

12  A.  That's correct.

13  Q.  Mr. Nadella, Microsoft tracks share developments in the

14  newest generation of Gen 9 consoles between the company and

15  Sony; correct?

16  A.  You said the newest consoles?

17  Q.  Yes.  Share developments in the newest generation of

18  consoles between Microsoft and Sony.

19  A.  Of many things, yes, I do track that.

20  Q.  And Mr. Nadella, when you conduct earnings calls with

21  Microsoft's investors, you give updates to those investors how

22  Microsoft is performing in terms of its market position for

23  next gen consoles; correct?

24  A.  Yeah.  I mean, we do have a gaming section in each

25  earnings call, and I try to -- you know, I try to sort of give

827

1  the characterization of both our ambition of gaming as well as

2  traction we have in a given quarter.  So I kind of define it

3  based on how the market defines gaming, not just by a

4  particular metric.

5  Q.  If I could have you turn your binder to PX9015, and this

6  is the Q3 2022 Microsoft earnings call transcript.

7     MR. ABELL:  And, Your Honor, at this time I'd like to

8  move PX9015 into evidence.

9     THE COURT:  Admitted.

10    (Trial Exhibit 9015 received in evidence.)

11    THE WITNESS:  Which page?

12  BY MR. ABELL:

13  Q.  Mr. Nadella, can I direct your attention to page 005 of

14  PX9015?  Let me know when you're there.

15  A.  I'm there.

16  Q.  On the fifth paragraph here, this is your section of the

17  presentation, do you see where you state (as read):

18      "With our Xbox Series S and X consoles we have taken

19      share globally for two quarters in a row and we are the

20      market leader this quarter among the next gen consoles in

21      the United States, Canada, U.K., and Western Europe"?

22      Do you see that, sir?

23  A.  Yep.

24  Q.  That statement was accurate when you made it to

25  Microsoft's investment community; correct?

828

1  A.  Yep.

2  Q.  Now, Mr. Nadella, I'd like to show you a document that's

3  marked PX9084 in your binder.  This is the Q4 2022 earnings

4  call.

5     MR. ABELL:  Your Honor, at this time I'd like to move

6  PX9084 into evidence.

7     THE COURT:  Admitted.

8     (Trial Exhibit 9084 received in evidence.)

9  BY MR. ABELL:

10  Q.  If I could direct your attention to page 005 of PX9084,

11  Mr. Nadella.  Do you see the fourth paragraph where you state

12  (as read):

13      "We sold more consoles life to date than any previous

14      generation of Xbox and have been the market share leader

15      in North America for three quarters in a row among next

16      gen consoles"?

17      Do you see that?

18  A.  This is?

19  Q.  I'm sorry, Mr. Nadella.  This is page 005 of PX9084.

20  A.  Yep.  Got it.

21  Q.  Okay.  Do you see that statement, sir?

22  A.  Yep.

23  Q.  And that statement was true and accurate when you made it

24  to Microsoft's investors; correct?

25  A.  Yep.

829

1  Q.  Mr. Nadella, when you refer to next gen consoles during
2  these earnings calls, you're referring to Generation 9
3  consoles; correct?
4  A.  I believe so.
5  Q.  Switching topics a little bit, Mr. Nadella.  You submit an
6  annual CEO self-assessment as part of your performance
7  evaluation to the Microsoft Board of Directors; correct?
8  A.  I do.
9  Q.  I'd like you to turn to page PX1747 in your binder.
10  A.  1747?
11  Q.  1747.
12  A.  (Witness examines document.)  Okay.
13  Q.  And, Mr. Nadella, this is your August 2022 CEO
14  self-assessment; correct?
15  A.  Yes.
16      MR. ABELL:  Your Honor, at this time I'd like to move
17  PX1747 into evidence.
18      THE COURT:  Admitted.
19      (Trial Exhibit 1747 received in evidence.)
20  BY MR. ABELL:
21  Q.  Now, Mr. Nadella, this document is confidential so we're
22  not going to be getting in any specifics here.
23      In general, sir, as part of the self-assessment, you
24  provide a memo dealing -- detailing some of the company's key
25  achievements in the past year; correct?

830

1  A.  Yes.
2  Q.  And, Mr. Nadella, you're familiar with the term "SLT
3  scorecard"; correct?
4  A.  Yes.
5  Q.  And "SLT" means senior leadership team?
6  A.  That's correct.
7  Q.  The SLT scorecard contains the metrics used to track the
8  senior leadership team's performance?
9  A.  That's correct.
10  Q.  And you included a copy of the SLT scorecard with your own
11  performance assessment here; correct?
12  A.  That's correct.
13  Q.  Okay.  If I could direct your attention to page 009 of
14  PX1747?
15  A.  (Witness examines document.)  Yes.
16  Q.  Now, Mr. Nadella, we're not going to get into specifics on
17  this slide, but this slide contains the SLT metrics for
18  Microsoft's gaming business in this particular table; correct?
19  A.  Yes.
20  Q.  And do you see the third row of this table contains a
21  particular metric, Mr. Nadella, with a green dot?
22  A.  I do.
23  Q.  Okay.  And at the bottom right-hand side of page 9,
24  Mr. Nadella, there is a series of footnotes that explains some
25  of the metrics.  I'm going to direct your attention to the

831

1  second one.  I don't want you to read it out loud, but,
2  Mr. Nadella, does this footnote explain how this particular
3  metric is calculated?
4  A.  It does.
5  Q.  And it explains what is and what is not included in that
6  metric; correct?
7  A.  That's correct.
8  Q.  Now, this table highlights Microsoft's target for the
9  gaming business for this reporting period; correct?
10  A.  That's correct.
11  Q.  It also highlights Microsoft's actual achievement for the
12  gaming business for this reporting period; correct?
13  A.  Yeah.  That's one metric of the -- you know, the three
14  that I have there.
15  Q.  So for this reporting period, which is your most recent
16  CEO self-assessment, Microsoft exceeded its goal on this metric
17  for the gaming business; is that correct, Mr. Nadella?
18  A.  Yeah.  We set it low.
19  Q.  And if you could please flip to page 029 of PX1747.  Let
20  me know when you're there.
21  A.  Two zero --
22  Q.  029, sir.
23  A.  Sorry.  I'm -- 029.  I don't --
24      THE COURT:  The same exhibit, page 029.
25      THE WITNESS:  Oh, sorry.

832

1  BY MR. ABELL:
2  Q.  Page 029.  Same exhibit, Mr. Nadella.
3  A.  Oh, sorry.  I thought you went -- let me back to the right
4  page.
5  Q.  Page 029 of PX1747.
6  A.  (Witness examines document.)  Okay.
7  Q.  Now, Mr. Nadella, this is part of your actual CEO
8  self-assessment memo; correct?
9  A.  Yes.
10  Q.  And I'm going to direct your attention to the top portion
11  of this page.  There are six bullets listed under here.  Do you
12  see those, Mr. Nadella?
13  A.  Yes, I do.
14  Q.  Okay.  Now, we're not going to read any of those bullets
15  but, Mr. Nadella, broadly speaking, these six bullets provide
16  your summary of the Microsoft Gaming business' highlights and
17  key accomplishments for this reporting period; correct?
18  A.  Yeah.  The top is the highlights and the bottom is the
19  lowlights.
20  Q.  And, Mr. Nadella, this self-assessment memo forms part of
21  the basis for how you are compensated for your performance;
22  correct?
23  A.  Yeah.
24  Q.  All right.  Mr. Nadella, you can set that document aside.
25      We're going to go ahead and show you what's been premarked

833

1    as PX1274.  If you could flip to that in your binder.

2    A.   (Witness examines document.)  Okay.

3    Q.   Mr. Nadella, this is an e-mail from you to Mr. Phil

4    Spencer, Mr. Tim Stuart, and several other individuals with the

5    title subject as "Xbox Share versus PlayStation."  Do you see

6    that?

7    A.   Yep.

8    Q.   Okay.

9         **MR. ABELL:**  Your Honor, at this time I'd like to move

10   PX1724 into evidence.

11        **THE COURT:**  Admitted.

12        (Trial Exhibit 1274 received in evidence.)

13   BY MR. ABELL:

14   Q.   Mr. Nadella, you were asking Mr. Spencer and Mr. Stuart

15   and the others "What is the share difference between

16   PlayStation and us in this generation right now in the U.S.";

17   correct?

18   A.   That's correct.

19   Q.   Okay.  And this generation, again, Mr. Nadella, that's

20   Gen 9; right?

21   A.   That's correct.

22   Q.   I'd like to switch topics now and talk to you a little bit

23   about cloud gaming.

24        Mr. Nadella, you're familiar with cloud streaming?

25   A.   Yes, I am.

834

1    Q.   And you're familiar with cloud gaming?

2    A.   Yes, I am.

3    Q.   Streaming games on the cloud allows the user to

4    potentially play on lower-powered devices, such as a Samsung

5    TV; is that right, Mr. Nadella?

6    A.   Yeah.  I mean, it -- cloud streaming can essentially

7    transcend any device, but that would be one use case.

8    Q.   And that allows gamers to enjoy the best graphics without

9    having to rely on a high-powered console, for example; is that

10   right?

11   A.   Yeah.  I don't think of it as a -- strictly a substitute

12   to the console.  I mean, at least the market feedback to date

13   has been people love their console, people love their PCs,

14   people love their phones and use cloud gaming as an adjunct.

15   Q.   By allowing those lower-powered devices to play

16   high-intensity games, cloud gaming potentially expands the

17   overall gaming market; is that right?

18   A.   That's correct.

19   Q.   Okay.  Today, Mr. Nadella, gamers can play their games on

20   the console, the PC, and their mobile phones; is that right?

21   A.   That's correct.

22   Q.   Okay.  Cloud gaming has the potential to emerge as the

23   fourth platform for gamers to play on -- play their games; is

24   that right?

25   A.   It's potentially possible.  We've been working on it for

835

1    close to a decade.  It will take more than a decade.  But, yes,

2    the feedback to date is that it's just not good enough, you

3    know, definitely as a substitute to any of the current

4    platforms.  But, you know, it can break through at some point

5    on something new, but it's not yet happened both on the

6    economics as well as the content side.

7    Q.   And you provide updates on Microsoft's cloud gaming

8    business as part of Microsoft earnings calls; correct?

9    A.   I do.

10   Q.   And the cloud is one of the pillars that makes up the core

11   of Microsoft's gaming strategy; correct?

12   A.   Yes, it is.

13   Q.   And you have highlighted that fact to Microsoft's

14   investors; correct?

15   A.   Yeah.  And just to make sure it's clear, whenever I think

16   about the cloud in the context of the Xbox pillars of content

17   cloud and community, to me Xbox Live is part of the cloud.  So

18   even when you're thinking about a console or a PC, the cloud is

19   actually very integral to the experience.  So it's not

20   streaming alone when I think about the cloud.

21   Q.   And streaming is still part of that overall cloud?

22   A.   It's a minor part of that cloud really because if I look

23   at the metrics that you were pointing me to earlier, we measure

24   monthly active users of xCloud.  That's a pretty important

25   thing for Phil and team to track.

836

1    Q.   And you've described the cloud as one of the big bets that

2    is paying off for Microsoft's gaming business in an earnings

3    call to investors last year; is that right?

4    A.   Yeah, I'm sure I may have done so.

5    Q.   I'm going to show you a document which has been premarked

6    as PX9102.  If you can please turn to that.

7    A.   (Witness examines document.)

8         **MR. ABELL:**  Your Honor, I'd like to move PX9102 be

9    admitted into evidence.

10        **THE COURT:**  Admitted.

11        (Trial Exhibit 9102 received in evidence.)

12   BY MR. ABELL:

13   Q.   And if you could, Mr. Nadella, please turn the page to

14   page 009 of PX9012.

15   A.   Okay.

16   Q.   You see where you state (as read):

17        "Now on to gaming.  The big bets we have made across

18   content, community, and cloud over the past years are

19   paying off.  We saw record engagement as well as revenue

20   this quarter"?

21        Do you see that?

22   A.   Yes, I do.

23   Q.   And, Mr. Nadella, that was an accurate and true statement

24   when you made it to the Microsoft investment community;

25   correct?

837

1   A.   That's correct.

2   Q.   And right below that, Mr. Nadella, you also highlight that

3   Microsoft's Game Pass had achieved more than 25 million

4   subscribers across PC and console; correct?

5   A.   That's correct.

6   Q.   And that was a true and accurate statement when you made

7   it to the Microsoft investment community?

8   A.   That's correct.

9   Q.   And at the very bottom of that paragraph, Mr. Nadella, do

10  you see where you highlight "and more than 20 million have

11  played Halo Infinite making it the biggest Halo launch in

12  history"?  Do you see that?

13  A.   I do.

14  Q.   And that was a true and accurate statement when you made

15  it to Microsoft's investment community?

16  A.   Yes.

17  Q.   You represented to investors that Microsoft continues to

18  lead the fast-growing cloud gaming market in an investor call;

19  correct?

20  A.   I may have, but are you referring to that particular --

21  Q.   I'll go ahead and direct your attention, Mr. Nadella, to

22  page -- to PX9012 again.

23  A.   9012?

24  Q.   Yes.

25  A.   (Witness examines document.)

838

1   Q.   I'll direct your attention to page 006 of 9012.

2   A.   Okay.

3        MR. ABELL:  And, Your Honor, at this time I'd like

4   move for PX9012 to be admitted.

5        THE COURT:  Admitted.

6        (Trial Exhibit 9012 received in evidence.)

7   BY MR. ABELL:

8   Q.   Do you see at the very bottom, Mr. Nadella, where you

9   state (as read):

10          "We continue to lead in the fast-growing gaming" --

11       "cloud gaming market with last month" -- "just last month

12       we made Xbox cloud gaming available on PCs as well as

13       Apple phones and Tablets via the browser in 22 countries

14       with more to come"?

15       Do you see that?

16  A.   Yes, I do.

17  Q.   Mr. Nadella, xCloud is Microsoft's cloud gaming app; is

18  that right?

19  A.   That's correct.  Cloud streaming app.

20  Q.   Cloud streaming app.  Thank you.

21       And, again, Mr. Nadella, when you made this statement to

22  Microsoft's investors, that was a true and accurate statement?

23  A.   Yes.

24  Q.   Okay.  Microsoft today wants to ensure that it can stream

25  its content to any platform; is that a fair statement,

839

1   Mr. Nadella?

2   A.   Yes.

3   Q.   And you've described a future state of gaming as the North

4   Star vision; is that right?

5   A.   Yeah.  I mean, to me, as we've done and, quite frankly, as

6   a software company I always think software first, which is I

7   want to be able to work on all platforms.

8   Q.   And you've discussed this North Star vision with

9   Mr. Spencer; is that right?

10  A.   That's correct.

11  Q.   I'm going to show you PX1751, which is in confidential,

12  Mr. Nadella.  So I'm not going to get into any details, but if

13  you can please turn to that in your binder.

14  A.   It's --

15  Q.   1751.

16  A.   (Witness examines document.)  Okay.

17       MR. ABELL:  And, Your Honor, at this time I'd like to

18  move for PX1751 to be admitted?

19       THE COURT:  Admitted.

20       (Trial Exhibit 1751 received in evidence.)

21  BY MR. ABELL:

22  Q.   Again without going into any details, Mr. Nadella, does

23  this e-mail capture the exchange you had between you and --

24  yourself and Mr. Spencer about the North Star vision for cloud

25  gaming?

840

1   A.   It seems like it.  I don't recall it, but I see it.

2   Q.   Okay.  Mr. Nadella, I'm going to go ahead and show you

3   what's been premarked as PX4066 in your binder.

4   A.   PX?

5   Q.   4066.

6   A.   Okay.

7   Q.   Are you there, sir?

8   A.   Yes, I do.

9   Q.   And this is an e-mail from Ms. Bond to Mr. Spencer,

10  Ms. Wright, and Ms. McKissick.  The title here is "Meta Quest

11  Event."  Do you see that?

12  A.   I do.

13       MR. ABELL:  Your Honor, at this time I'd like to move

14  PX4066 to be admitted into evidence.

15       THE COURT:  Admitted.

16       (Trial Exhibit 4066 received in evidence.)

17  BY MR. ABELL:

18  Q.   And at the very bottom, Mr. Nadella, there's a part of the

19  chain where you write (as read):

20          "I want this to be like, say, Samsung TV like socket

21       for us when your schedule allows and they have the

22       volume."

23       Mr. Nadella, when you refer to the "Samsung TV like

24  socket," can you explain what you're referring to when you use

25  the term "socket"?

841

1  A.  Just a device endpoint.
2  Q.  And the Meta Quest event here, Mr. Nadella, that relates
3  to the launch of a device by Meta; is that correct?
4  A.  That's correct.
5  Q.  And they requested a demonstration of the xCloud app as
6  part of the launch; is that right?
7  A.  Yeah.  We were part of the launch and we showed many
8  different pieces of our software from product really to gaming,
9  yeah.
10 Q.  And if I could actually turn the page and direct your
11 attention to the top of page 002 of PX466 [sic].  Do you see
12 that, Mr. Nadella?
13 A.  Yeah.
14 Q.  Okay.  And you write (as read):
15         "I want to make it clear to the world that Microsoft
16      is focused on cloud first approaches, Teams, WIN365,
17      xCloud as the future of their end-use sockets."
18      Do you see that?
19 A.  Yes, I do.
20 Q.  And, Mr. Nadella, "WIN365" is Windows 365?
21 A.  That's correct.
22 Q.  You also write (as read):
23         "But want to basically use every opportunity to make
24      cloud streaming more mainstream.  The better it is for us
25      in the long run for all the strategic reasons we talk

842

1  about."
2  Q.  Do you see that, sir?
3  A.  I do.
4  Q.  And, Mr. Nadella, did Microsoft debut the xCloud app as
5  part of the Meta Quest launch?
6  A.  I'm actually not sure.  I think we tried to or at least we
7  intended to by this e-mail.  I'm not particularly sure whether
8  we did or not.
9  Q.  All right, Mr. Nadella, are you familiar with the LK --
10 LKG memos at Microsoft?
11 A.  Yes, I am.
12 Q.  And just broadly speaking, Mr. Nadella, what is an LKG
13 memo?
14 A.  In Windows there's this concept of the last-known good so
15 I brought it to our strategy.
16 Q.  If I could direct your attention to page 1746 -- sorry --
17 Exhibit PX1746 in your binder, Mr. Nadella.
18 A.  Yes.
19       MR. ABELL:  Your Honor, I'd like to move PX1746 into
20 evidence.
21       THE COURT:  Admitted.
22       (Trial Exhibit 1746 received in evidence.)
23 BY MR. ABELL:
24 Q.  Again, Mr. Nadella, this is confidential so we're going to
25 talk around this so we don't reveal any confidential

843

1  information here.
2      But broadly speaking, LKG memo set out Microsoft's overall
3  corporate strategy for the board of directors; correct?
4  A.  Yeah.  It's a living document that we use as a way to
5  discuss topics.
6  Q.  And if I could direct your attention to page 009 of
7  PX1746.  Let me know when you're there.
8  A.  Yes, I am.
9  Q.  Okay.  And broadly speaking, Mr. Nadella, PX009 describes
10 how Microsoft is generally organized; is that a fair
11 assessment?
12 A.  Yeah, it is.
13 Q.  And if I could direct your attention to the second
14 paragraph.  Do you see the first sentence that starts with the
15 words "For each"?
16 A.  Yes, I do.
17 Q.  This section sets out some priorities for the various
18 components of the Microsoft business units; is that right,
19 Mr. Nadella?
20 A.  That's correct.
21 Q.  And do you see at the bottom, Mr. Nadella, there's a
22 footnote that defines how these priorities are -- are captured
23 within this document?  Do you see that footnote?
24 A.  I do.
25 Q.  Okay.  If I could have you flip to page 018 of PX1746.

844

1  A.  (Witness examines document.)  Yes.
2  Q.  Again, discussing those priorities as explained with that
3  previous footnote, Mr. Nadella, the series of bullets, the very
4  top middle column, they list the priorities for the Microsoft
5  gaming business; is that correct?
6  A.  Yes, they do.
7  Q.  Okay.  All right.  Mr. Nadella, you can set that document
8  aside.
9      You discussed Microsoft's cloud streaming competitors with
10 Mr. Spencer; correct?
11 A.  Yes, I do.
12 Q.  Okay.  I'd like to show you PX1750, if we can.  If you can
13 please turn to that in your binder.
14 A.  (Witness examines document.)  Okay.
15       MR. ABELL:  Okay.  At this time, Your Honor, I'd like
16 to move PX1750 into evidence.
17       THE COURT:  Admitted.
18       (Trial Exhibit 1750 received in evidence.)
19 BY MR. ABELL:
20 Q.  Again, Mr. Nadella, I want to be careful there's
21 confidential information here.  Could I direct your attention
22 to the middle of the page of the e-mail.  Do you see where it
23 begins "I thought"?  Do you see that?
24 A.  I do.
25 Q.  And you refer to one of Microsoft's cloud gaming

845

1  competitors right here; is that correct, Mr. Nadella?

2  A.  I do.

3  Q.  Okay.  I'm going to direct your attention to the top of

4  the page.  Mr. Spencer responds with his views about that same

5  cloud gaming competitor; correct?

6  A.  Yes.

7  Q.  Now, don't read the information out loud, Mr. Nadella, but

8  in the sentence that starts with "That's right," Mr. Spencer is

9  agreeing with the point that you raised previously; correct?

10  A.  Yeah.

11  Q.  You can set that document aside.

12     Mr. Nadella, you're familiar with the gaming CSA SLT

13  strategy review; correct?

14  A.  Yes.

15  Q.  And that's where the senior leadership team sits down with

16  the leaders of the gaming business to discuss strategy; right?

17  A.  That's correct.

18  Q.  I'm going to direct your attention to PX1777.

19  A.  (Witness examines document.)  Okay.

20     MR. ABELL:  Your Honor, at this time I'd like to move

21  PX1777 into evidence.

22     THE COURT:  Admitted.

23     (Trial Exhibit 1777 received in evidence.)

24  BY MR. ABELL:

25  Q.  Mr. Nadella, the Court has heard some testimony about

846

1  Microsoft's xCloud app and the way it works today on consoles.

2     But consumers can access xCloud in other ways; is that

3  correct?

4  A.  Yeah.  They can access it from any platform, yeah.

5  Q.  And, Mr. Nadella, Microsoft has a partnership with Samsung

6  to put the xCloud app on smart TVs; correct?

7  A.  I believe so.  I'm not into the details on it, but I

8  believe so.

9  Q.  And that means that Samsung TV owners have access to the

10  xCloud app and can stream games on their smart TVs?

11  A.  That's correct.

12  Q.  So no console is required for that; right?

13  A.  That's correct.

14  Q.  Okay.  No mobile phone is required for that; correct?

15  A.  Correct.

16  Q.  Now, playing games on a Samsung smart TV does require

17  cloud streaming on the back end; is that right?

18  A.  That's correct.

19  Q.  I'd like to direct your attention to page 003 of page --

20  of PX1777.

21  A.  Yes.

22  Q.  Now, just generally speaking, Mr. Nadella, I don't want to

23  go into any specifics, these are notes related to the CSA SLT

24  strategy review that reflect the discussion that the leadership

25  team, including you, had at this meeting; correct?

847

1  A.  It looks like it, yeah.

2  Q.  Okay.  I just want to direct your attention to the top of

3  the page, Mr. Nadella.  You asked a question at the top of the

4  page.  Do you see that?

5  A.  Yes.

6  Q.  And Mr. Spencer responded.  And, again, I'm just going to

7  direct you to read the first and last part of his response to

8  yourself.

9  A.  (Witness examines document.)  Yeah, I do.

10  Q.  Okay.  And then skipping down, do you see where Ms. Bond

11  responds with the sentence that starts "We need to."  Do you

12  see that?

13  A.  Yeah, I do.

14  Q.  And Mr. -- moving back up just a little bit, Mr. Nadella,

15  do you see where Mr. Kareem Choudhry also responds to your

16  question?

17  A.  Yeah.

18  Q.  And Mr. Choudhry was the corporate vice president for

19  xCloud; is that right?

20  A.  That's correct.

21  Q.  Okay.  In Mr. Choudhry's response he talks about a

22  conversion; correct?

23  A.  Yeah.

24  Q.  And there's an abbreviation in the response here.  Do you

25  see that, Mr. Nadella?

848

1  A.  In Mr. Choudhry's?

2  Q.  In Mr. Choudhry's response, correct.

3  A.  Yes, I do.

4  Q.  Okay.  And "GP" stands for Game Pass; correct?

5  A.  That's correct.

6  Q.  And this conversation took place in November of 2022; is

7  that correct?

8  A.  If you say so.

9  Q.  Do you see the date on the e-mail on the first page of

10  PX1777-01?

11  A.  Yeah.

12     MR. ABELL:  All right.  Your Honor, we have no further

13  questions at this time.  Pass the witness.

14     CROSS-EXAMINATION

15  BY MR. KILARU:

16  Q.  Good afternoon.

17  A.  Hi.

18  Q.  How long have you been the CEO of Microsoft?

19  A.  Nine and a half years.

20  Q.  And in that time has it been your general philosophy to

21  make software available on more platforms or fewer platforms?

22  A.  More platforms.  I grew up in a company that always

23  believed that software should run in as many platforms as

24  possible, and that's the Microsoft I grew up in.  I believe in

25  that.

849

1  Q.  Are you aware that Xbox has some games that are exclusive
2  to its consoles?
3  A.  I believe it is; and if it is up to me, I would love to
4  get rid of the entire sort of exclusives on consoles, but
5  that's not for me to define especially as a low-share player in
6  the console market.  The dominant player there has defined
7  market competition using exclusives and so that's the world we
8  live in.
9  Q.  But is that the world you'd like to be the case in gaming?
10 A.  I have no love for that world.
11 Q.  You were also asked some questions about whether you
12 report out on Microsoft's position with the Xbox relative to
13 the PlayStation and Generation 9.  Do you remember that?
14 A.  I do.
15 Q.  Did those consoles release at about the same time?
16 A.  Yeah.  In fact, that's one of the fundamental reasons why
17 I wanted to make sure.  I mean, having really not won the
18 previous generation even, we were trying to track when because
19 both of them launched at the same time and there was supply
20 constraint because both the chips were being made by the same
21 designer and so, therefore, we wanted to make sure that we were
22 getting our fair share there.
23 Q.  As the CEO of Microsoft, do you view competition in
24 consoles as just limited to the PlayStation and the Xbox?
25 A.  I mean, at the end of the day, we are defined by the

850

1  market and their definition of gaming.  And when I look at
2  anyone who's going to look at how Microsoft is doing in gaming
3  or how Phil and team are doing in gaming, they look at how
4  we're doing in console, which is us and Sony and Nintendo.  And
5  then beyond that, how are things happening.  You know, what
6  about PC gaming and what about mobile gaming, and anything that
7  may emerge in cloud gaming.  All of those would be aspects of
8  our gaming ambition.
9  Q.  You were also asked some questions about whether you've
10 tracked share in the United States among consoles.  Do you
11 remember that?
12 A.  I do.
13 Q.  Do you view gaming as a United States specific phenomenon?
14 A.  Not really.  I mean, it's a worldwide phenomena.  It's the
15 same content worldwide.  It's the same consoles worldwide, same
16 PC's worldwide, same phones worldwide; but we do care about,
17 you know, having a share position in the U.S. and all the
18 markets, like including Japan.
19 Q.  I'm sorry to make you go back to the binder, but could you
20 go to PX4066 for a minute?
21 A.  4066, yep.
22 Q.  Page 002.  If you look at that paragraph, I believe you
23 were asked about the first sentence and the third sentence, but
24 the second sentence reads (as read):
25         "This does not mean we take away" --

851

1          And you were talking about the cloud strategy here; right?
2  A.  Yes.
3  Q.  And the second sentence you say (as read):
4          "This does not mean we take away from all our volume
5  runners of Windows and console."
6          Do you see that?
7  A.  That's correct.
8  Q.  Have you seen cloud become a replacement for console
9  gaming?
10 A.  It's not, and this has been our experience with many of
11 these new platforms.  You have to be competitive in each of
12 these platforms and then look around and see what is the way to
13 expand the market.
14 Q.  Have you been exploring cloud in order to get more
15 traction on mobile devices?
16 A.  That's been our primary.  Like, it's well known that, you
17 know, mobile systems are closed systems unlike the PC.  The
18 only way is through their app stores, and one mechanism that we
19 wanted to use was cloud streaming as a way to bring more
20 competition to mobile platforms and bring sort of more
21 opportunity for more publishers even.
22          So that has been a goal, but it's not -- it's tough.  It's
23 not worked out as well as we would hope to because they're just
24 too closed and browsers just don't work that well.
25 Q.  For Activision is mobile games part of the rationale for

852

1  acquiring the company?
2  A.  Oh, absolutely.  I mean, I love their console games, I
3  love their PC games, and I particularly love their mobile games
4  because we don't have a footprint at all.
5          THE COURT:  Have you played Candy Crush yourself?
6          THE WITNESS:  I do.
7                  (Laughter)
8          THE WITNESS:  And Call of Duty.
9  BY MR. KILARU:
10 Q.  Speaking of Call of Duty, I think one of the claims in
11 this case is that Microsoft would be willing to forego sales of
12 Call of Duty on the PlayStation to sell more consoles.  Does
13 that strategy make any sense to you?
14 A.  It makes no economic sense and no strategic sense.  As I
15 said, our goal with Activision in particular in their content
16 and, quite frankly, our content is to get our content onto more
17 platforms and become a fantastic first-class publisher.  And
18 that's what we have done, for example, with Office and I want
19 to do exactly the same thing with gaming.
20 Q.  After the transaction was announced, did you call the head
21 of Sony?
22 A.  We did -- I did.
23 Q.  And why did you make that call?
24 A.  I just wanted to make it very, very clear to Yoshida-San,
25 who's someone I have a fantastic relationship with, that there

853

1 should be no ambiguity in our support for the Sony platform
2 going forward; and that this Activision relationship, in fact,
3 if, anything, should be, you know, double. This will help us
4 reinforce our commitment to their platform.
5 Q. Have you reiterated that commitment since then?
6 A. Yeah, multiple times I had a chance to meet with
7 Yoshida-San as well as Mr. Ryan subsequently and I reiterated
8 that.
9 Q. Let me ask you here today, Mr. Nadella, will you commit to
10 continuing to ship Call of Duty on the Sony PlayStation?
11 A. A hundred percent.
12 Q. Are you aware that Microsoft has signed contracts with
13 Nintendo and five cloud providers to bring Call of Duty to
14 those platforms as well?
15 A. Yes, we have.
16 Q. Will Microsoft honor those contracts?
17 A. Yes, a hundred percent.
18    MR. KILARU: We have nothing further at this time,
19 Your Honor.
20    REDIRECT EXAMINATION
21 BY MR. ABELL:
22 Q. Just briefly, Mr. Nadella, you weren't personally involved
23 in negotiations with Sony regarding the proposal; is that
24 right?
25 A. That's correct.

854

1 Q. You deferred that to Mr. Spencer; correct?
2 A. That's correct.
3    MR. ABELL: Nothing further, Your Honor.
4    THE COURT: All right. Thank you. You are excused.
5    THE WITNESS: Thank you so much, ma'am.
6       (Witness excused.)
7    THE COURT: Okay. Who's our next witness?
8    MR. KILARU: Yes, Your Honor. We call Dr. Dennis
9 Carlton. As you know, his direct was submitted in writing.
10    THE COURT: Yes.
11    MR. KILARU: I believe it's RX5057, so we'll with
12 cross.
13    THE COURT: We'll go right to cross.
14       (Pause in proceedings.)
15    THE COURT: You can wait right there. Ms. Means will
16 swear you in.
17    THE CLERK: Please raise your right hand.
18 DENNIS WILLIAM CARLTON,
19 called as a witness for the Defendant, having been duly sworn,
20 testified as follows:
21    THE CLERK: Thank you.
22 Can you please state your name for the record?
23    THE WITNESS: Dennis William Carlton.
24    THE COURT: All right. You may be seated.
25 And you may give him the binder.

855

1       (Pause in proceedings.)
2    THE COURT: You may proceed.
3    MS. FEMENELLA: Peggy Femenella for the Plaintiff.
4    CROSS-EXAMINATION
5 BY MS. FEMENELLA:
6 Q. Good afternoon, Dr. Carlton.
7 A. Good afternoon.
8 Q. Microsoft is paying Compass Lexicon $2,000 an hour for
9 your work on this case; correct?
10 A. They bill my time at $2,000 an hour, yes.
11 Q. You've worked approximately 600 to 650 hours on this
12 matter; correct?
13 A. That sounds right, yes.
14 Q. So that is a bill of at least $1.2 million; correct?
15 A. Yes.
16 Q. You also receive additional compensation based on other
17 billings that Compass Lexicon charges for work on this matter;
18 correct?
19 A. That's correct.
20 Q. All of your income is currently from being an economic
21 expert consultant; correct?
22 A. That's correct.
23 Q. Appendix B of your expert report includes an accurate list
24 of the materials you relied upon in forming your opinions that
25 are expressed in your report; correct?

856

1 A. That's right. As I explained in my deposition, I --
2 whenever I have a footnote in my report to cite evidence, I --
3 and list it, I list that as material relied upon.
4 Q. In your materials-relied-on section of your expert report
5 in this case, setting aside data files, your opinion in this
6 case rely -- your opinions in this case rely on 29 ordinary
7 course documents; correct?
8 A. If that's what the number is, that's what it is. I have
9 no reason to dispute you. I haven't counted them.
10 Q. And only three of those 29 documents that you are relying
11 on in forming your opinions are from third parties; correct?
12 A. I haven't checked that, but I have no reason to dispute
13 what you're saying.
14 Q. In your materials-relied-on section of your report in this
15 case, your opinions in this case rely on 35 different websites
16 you visited; correct?
17 A. Again, I haven't counted them; but if that's what you say,
18 I'll -- I'll assume that's correct.
19 Q. There are no declarations listed in Appendix B; correct?
20 A. I haven't checked; but, again, I have no reason to dispute
21 what you're saying.
22 Q. So this means that you did not rely on any declarations in
23 this matter in forming your opinions in your report; correct?
24 A. Relied in the sense that I've just described. It would
25 not appear -- for every opinion in my expert report, if I feel

1  like I need a source, I put a footnote and then explain which
2  document it comes from.
3  Q.  And there are no declarations included in the report;
4  correct?
5  A.  I would have to check that, but I believe that's -- that's
6  correct, but I want to make clear I've seen lots and lots of
7  documents in this case.
8  Q.  But they're not in your materials-relied-on list; correct?
9  A.  Not relied upon in the way I described it, yes, that's
10  correct.
11  Q.  You don't list Dr. Bailey's report as material you relied
12  on in forming your opinions; correct?
13  A.  That is correct.  My recollection is I had not seen her
14  report at the time I filed my -- my report.  I've since looked
15  through it.
16  Q.  Your opinions in this case rely on ten academic sources
17  cited; correct?
18  A.  Again, I haven't counted them, but I have no reason to
19  dispute what you're saying.
20  Q.  And these are all listed in Appendix B; correct?
21  A.  They should be, yes.
22  Q.  And three out of those ten academic sources were written
23  by you yourself; correct?
24  A.  It's possible.  I could check, but I'll -- I have no
25  reason to dispute what you're saying.

1  Q.  And so assuming I am correct, 30 percent of the academic
2  sources you rely on were written by you; correct?
3  A.  That might be.  I -- I could look.  I think I must cite my
4  textbook, and if you look at my textbook, I, you know, cite
5  hundreds of academic sources, but --
6  Q.  So you can --
7  A.  -- I have no reason to dispute that of the ten, I was a
8  coauthor of three.
9  Q.  If you need to, your report is listed at PX5004 in your
10  binder if you want to look at that.
11  A.  Yes, I know that.
12  Q.  You have no reason to dispute what I just said; right?
13  A.  No, I'm not disputing your ability to count what's in my
14  Appendix B.
15  Q.  Now, you testified as an expert in the *Arista Networks* vs.
16  *Cisco Systems* case in the Northern District of California in
17  2018; correct?
18  A.  Yes, I believe that's correct.
19  Q.  In *Arista Networks* vs. *Cisco Systems* in 2018,
20  Judge Freeman in the Northern District of California excluded
21  part of your opinions; correct?
22  A.  I'd have to go back and check.  My recollection is it was
23  a very minor component of my opinion.
24  Q.  But that is a correct statement, that she did exclude part
25  of your opinions; correct?

1  A.  To my recollection, I'd have to go back and check, is she
2  excluded the ability for me to provide any statements that had
3  legal significance, and I never intended to do that.  So she
4  just made clear she didn't want to hear an economic view of
5  what the law should be.
6  Q.  And in excluding part of your opinions, Judge Freeman
7  found that, quote, "Dr. Carlton essentially opines that certain
8  conduct should not be punished by the antitrust laws"; correct?
9  A.  That's what she said; but, again, I wasn't intending to,
10  you know, interpret the law.  I was saying what an economic
11  view of competition would imply.
12  Q.  Federal courts have excluded your analysis in part in at
13  least five separate cases; correct?
14  A.  Perhaps.  I would have to check that.
15  Q.  Do you have any reason to dispute that?
16  A.  I don't have a reason to dispute that; but, again, in most
17  instances, my recollection is that the judge wanted to make
18  clear that my economic views on what the law should be was not
19  something that should be interpreted as giving a legal opinion,
20  and I never intended to do that.  I'm not a lawyer.
21  Q.  And these exclusions include being partially excluded
22  twice in the Northern District of California; correct?
23  A.  That, I would have to check.
24  Q.  The second case was *In Re: Cathode Ray Tube Antitrust*
25  *Litigation* in 2017; correct?

1  A.  That, I would have to check.
2  Q.  You testified in that case; correct?
3  A.  *Cathode Ray Tubes*, yes.
4  Q.  And the latest exclusion of your opinions came in just
5  May 2023 in the *American Airlines-JetBlue* matter; correct?
6  A.  That I was precluded from testifying?
7  Q.  That your opinions were excluded; correct?
8  A.  My recollection is the judge disagreed with one of my --
9  with my analysis.  I don't believe he excluded my opinion.
10  Q.  Sorry.  Let me clarify.
11      So in the *JetBlue* matter, the Court found that your
12  opinions were entitled to no weight; correct?
13  A.  That's correct, but my understanding is -- well, it
14  doesn't matter what my understanding is.  The case is on
15  appeal.
16      THE COURT:  Was that in a district or was that an ALJ?
17      MS. FEMENELLA:  District court.
18      THE WITNESS:  District court.
19  BY MS. FEMENELLA:
20  Q.  But you're not a lawyer; correct?
21  A.  I am not a lawyer.
22  Q.  And you're not offering any legal opinions in this case;
23  correct?
24  A.  Sorry.  I didn't hear you.
25  Q.  I'm sorry.  You are not offering any legal opinions in

861

1 this case?
2 A. That's correct.
3 Q. Now, you do agree there are some circumstances in which a
4 vertical merger can be anticompetitive; correct?
5 A. Yes, in some limited circumstances that can be true.
6 Q. You did not attempt to define a relevant market; correct?
7 A. I did not do that in this case. Someone else did that.
8 Q. You do not have an opinion one way or another about
9 relevant antitrust markets in this case; correct?
10 A. I am not giving an opinion about relative antitrust
11 markets in this case.
12 Q. You are not relying on Dr. Bailey's report for any product
13 market statements in your report; correct?
14 A. That's correct, yes.
15 Q. You did not create your own demand model as part of your
16 opinions; correct?
17 A. I did not. I modified Professor Lee's model to show its
18 unreliability and inadequacy to justify in particular
19 20 percent conversion rate.
20 Q. But you didn't do your own model; correct?
21 A. Correct. I modified his model.
22 Q. And you do not offer your own foreclosure model in this
23 report or this case; correct?
24 A. Again, on the foreclosure model I used what he put forth
25 and showed if you correct certain errors, you get no

862

1 foreclosure.
2 Q. But you didn't do your own model; correct?
3 A. Well, I modified his model.
4 Q. That's not doing your own model; correct? You used
5 Dr. Lee's model?
6 A. Well, I used the framework and he's using the framework in
7 part derived from some of the Microsoft modeling, but I altered
8 some of the assumptions in his model to show you get a
9 different result.
10 Q. In your written direct, you referred to Sony using
11 exclusivity to promote sales of their consoles; correct?
12 A. I can check my direct, but I certainly believe that.
13 Q. Microsoft also has agreements with third-party publishers
14 that require partial exclusivity of certain games; correct?
15 A. Microsoft has certain exclusivity arrangements; is that
16 what you are asking.
17 Q. Yes.
18 A. Yes.
19 Q. Could you please turn to PX3354 in your binder?
20 A. 365 --
21 Q. 3354, sir.
22 A. 3354.
23 (Witness examines document.) Yes.
24 MS. FEMENELLA: This document, I believe, Your Honor
25 is meant to be under seal so I'm going to talk around it.

863

1 THE COURT: Okay.
2 BY MS. FEMENELLA:
3 Q. This is an e-mail and a -- Dr. Carlton, we're doing this
4 in open court even though the document is sealed so we can't
5 say anything out loud on what the document actually says so
6 we're just going to have to be a little creative here.
7 A. Okay.
8 Q. So you see PX3354 and it's an e-mail with an attachment;
9 correct?
10 A. It's an e-mail, yes.
11 MS. FEMENELLA: Your Honor, I move to admit PX3354.
12 THE COURT: Okay. I'll add mitt it and it should be
13 confidential.
14 (Trial Exhibit 3354 received in evidence.)
15 BY MS. FEMENELLA:
16 Q. Sir, if you could please turn to PX3354-020. Again,
17 please do not say anything out loud about what's on that slide.
18 A. What page are you asking me to look at?
19 Q. PX3354-020.
20 A. 020.
21 (Witness examines document.) Okay.
22 Q. And you see the charts on this page?
23 A. There was a chart, yes.
24 Q. And now if you look at the chart on the left -- and,
25 again, please don't say anything about any of the details --

864

1 that chart has 16 rows; correct?
2 A. That's right.
3 Q. And the chart on the right has 13 rows; correct?
4 A. I'll take your word for it. It looks right.
5 Q. PX3354 is not included in your Appendix B for materials
6 relied on; correct?
7 A. I don't believe so.
8 Q. And you did not rely on PX3354 in forming your opinions;
9 correct?
10 A. That would be correct. If it's not listed, it wouldn't be
11 in my -- a footnote in my report. If it is not listed in
12 Appendix B.
13 Q. I'm done with that one, sir.
14 If you could turn to PX4743 in your binder, please.
15 A. Of course.
16 MS. FEMENELLA: Your Honor, this document, I believe,
17 is also mostly under seal. Counsel said I could say what the
18 actual document is, just none of the details.
19 THE COURT: Sure. We'll admit it and it will be under
20 seal other than the title.
21 MS. FEMENELLA: Thank you.
22 (Trial Exhibit 4743 received in evidence.)
23 BY MS. FEMENELLA:
24 Q. Sir, are you at PX4743?
25 A. Yes.

865

1 **Q.** This is a co-marketing and development agreement between
2 Microsoft and Activision; correct?
3 **A.** That, I can't tell. Let me read it.
4     (Witness examines document.) Yes.
5 **Q.** Now, again, just please don't say any of the terms out
6 loud when I point you places.
7     If you could look at Section 1.2. That lists what is part
8 of this agreement; correct?
9 **A.** I see 1.2, yes.
10 **Q.** Do you see that's the content included; correct?
11 **A.** It gives a definition.
12 **Q.** Could you please turn to Section 8.10.1? It's on page
13 PX4743-014 and it's Section 8.10.1.
14 **A.** 10.1?
15 **Q.** Yeah.
16 **A.** (Witness examines document.) I don't see a 10.1. What
17 page?
18 **Q.** I'm sorry. It's 8.10.1. It's on page 14.
19 **A.** 8.10.1.
20     (Witness examines document.) Yes, I have that now. Yes.
21 **Q.** Do you see that section and you can see what is -- what it
22 is describing?
23 **A.** I see it. Do you want me to read it?
24     **THE COURT:** To yourself.
25     **MS. FEMENELLA:** Yeah. Thank you.

866

1     **THE WITNESS:** Oh.
2     Witness examines document.) I don't know if I can ask
3 this question. There's a term here, I don't know what it
4 means.
5     **THE COURT:** She'll ask the question.
6 BY MS. FEMENELLA:
7 **Q.** Actually, you did not rely on PX4743 in coming to your --
8 in forming your opinions; correct?
9 **A.** If it's not in my appendix, I wouldn't have relied upon it
10 in the way I defined "rely."
11 **Q.** And PX4743 is not included in your Appendix B; correct?
12 **A.** I'd have to check that, but I'll take your word for it.
13 **Q.** I'm done with that document, sir.
14     Now, your understanding is that Microsoft intends to put
15 new Call of Duty titles into its Game Pass subscription on the
16 day they're released; correct?
17 **A.** Day and date, yes.
18 **Q.** Your understanding is that putting Call of Duty into
19 Game Pass was a prime motivation of this deal; correct?
20 **A.** I believe that's correct, yes.
21 **Q.** In your opinions in your report, you rely heavily on the
22 assumption that Call of Duty will be put on Game Pass
23 post-merger; correct?
24 **A.** Correct.
25 **Q.** I'd like you, sir, to turn to PX4894 in your binder.

867

1 **A.** 4894?
2 **Q.** Correct. And please don't say anything out loud about
3 this document either. There's been a request for this document
4 to be sealed.
5     **MR. KILARU:** Yes, that's right.
6 BY MS. FEMENELLA:
7 **Q.** PX4894 is an e-mail chain among Microsoft executives dated
8 February 2023; correct?
9 **A.** Yes. 2-15-2023, that's my birthday.
10     **MS. FEMENELLA:** Your Honor, I move to admit PX4849.
11     **THE COURT:** Admitted.
12     (Trial Exhibit 4849 received in evidence.)
13 BY MS. FEMENELLA:
14 **Q.** Now, Dr. Carlton, Matt Booty is the head of Xbox Game
15 Studios; correct?
16 **A.** I believe that's correct, yes.
17 **Q.** Now, if you could look on the first page, so PX4894-001,
18 do you see where there is a Matt Booty e-mail at the top?
19 **A.** There's a what in the e-mail?
20 **Q.** It's an e-mail from Matt Booty, but please do not say
21 anything else about the document out loud.
22 **A.** Yes.
23 **Q.** Do you see where he writes and it starts "I sent"?
24 **A.** Yes.
25 **Q.** Could you please read that to yourself?

868

1 **A.** Yes.
2 **Q.** Do you see that?
3 **A.** Just those few lines? I've read them.
4 **Q.** Yes.
5 **A.** Yes.
6 **Q.** You did not rely on PX4894 in forming your opinions;
7 correct?
8 **A.** Not to the best of my recollection. If it's not in my
9 appendix, I would not have relied on it in the way I described.
10 **Q.** And PX4894 is not listed in Appendix B of your report;
11 correct?
12 **A.** I haven't checked it, but I don't recall -- I don't recall
13 relying on this document.
14 **Q.** You may put that away, sir.
15     One of your opinions in this matter is that the agreements
16 Microsoft signed during the pendency of this litigation are pro
17 competitive; correct?
18 **A.** Yes, compared to the but-for world of the transaction not
19 going forward.
20 **Q.** Specifically your opinion is that these agreements are
21 merger-specific efficiencies; correct?
22 **A.** Yes.
23 **Q.** You also opine that Sony could avoid any potential harm
24 from the merger by signing a contract with Microsoft to ensure
25 it has access to Call of Duty on its current and future

869

1  consoles; correct?

2  **A.**   Yes.  I mean, I don't have the words in front of me, but

3  I believe what you just said.  I agree with what you just said.

4  **Q.**   You're aware that Microsoft made an offer to Sony

5  regarding Call of Duty; correct?

6  **A.**   Yes.

7  **Q.**   You rely on the existence of this offer in forming your

8  opinions in this case; correct?

9  **A.**   In part.

10  **Q.**   You are aware that Sony has not signed this offer;

11  correct?

12  **A.**   I am aware of that and I talk about that in my report.

13  **Q.**   You have used this fact in part in forming your opinions;

14  correct?

15  **A.**   Yes.

16  **Q.**   In your report at paragraph 24 --

17  **A.**   Wait.  Let me --

18        **MS. FEMENELLA:**  Is paragraph 24 allowed to be spoken

19  about?

20        **MR. KILARU:**  I'm sorry?

21        **THE COURT:**  His declaration or the report?

22        **MS. FEMENELLA:**  The report.

23               (Pause in proceedings.)

24        **MR. KILARU:**  That's okay.

25  \\\

870

1  **BY MS. FEMENELLA:**

2  **Q.**   Sir, in your report at paragraph 24 you state, quote (as

3  read):

4            "It is peculiar to claim that Sony's consoles will be

5        foreclosed from Call of Duty when Sony refuses to sign a

6        contract that Microsoft offered to guarantee PlayStation

7        access to Call of Duty."

8        Correct?

9  **A.**   Yes.

10  **Q.**   So it is your opinion that Microsoft's offer to Sony

11  guarantees access to Call of Duty; correct?

12  **A.**   Yes, that's my -- my characterization.  That's my

13  understanding, yes.

14  **Q.**   You did not even cite Microsoft's written offer to Sony in

15  your report; correct?

16  **A.**   I'd have to check that.  I believe that's correct.

17  I believe I cite Mr. Ryan's characterization of --

18  **Q.**   But you do not cite the written offer to Sony; correct?

19  **A.**   Yes.  I've seen the written offer and I saw it before I

20  wrote my report, but I'm citing Mr. Ryan for the proposition

21  that he has an offer and it had the -- am I allowed to say what

22  the footnote says?

23  **Q.**   I don't think so.

24        Microsoft's written offer to Sony is not listed in your

25  materials relied on; correct?

871

1  **A.**   That's correct, but I cite Mr. Ryan's characterization of

2  the offer.

3  **Q.**   Yes, that's not what I asked you.  I was focused on the

4  fact that you do not cite or rely on the actual written offer.

5  **A.**   That's correct, I don't.

6        **THE COURT:**  What is the footnote that you're referring

7  to.

8        **THE WITNESS:**  I'd have to find it.  It's where I talk

9  about the offer and I -- I cite Mr. Ryan for my

10  characterization -- for characterizing --

11        **THE COURT:**  All right.  Maybe we can --

12        **THE WITNESS:**  -- the offer.

13        **THE COURT:**  No, no.  Don't look for it.

14        Okay.  Next question.

15  **BY MS. FEMENELLA:**

16  **Q.**   One of your opinions is that, quote (as read):

17            "As an economic matter, that behavior is an

18        indication that Sony is more concerned about preventing

19        Xbox from becoming a more potent competitor (or using the

20        regulatory review process to extract even more favorable

21        terms for the distribution of Activision content) than it

22        is with the possible loss of access to Call of Duty."

23        Correct?

24  **A.**   Could you just tell me where you're reading from?  I was

25  looking for that footnote.

872

1  **Q.**   Same paragraph.  Paragraph 24, sir, of your report.

2  **A.**   One of the footnotes where I cite Ryan is Footnote 65.

3        **THE COURT:**  Now go to the bottom of page 20.

4        **THE WITNESS:**  Okay.

5        **THE COURT:**  Read to the top of page 21.

6        **THE WITNESS:**  Okay.  It is "As an economic..."  Yes,

7  that behavior is an indication that Sony is more concerned

8  about preventing Xbox from becoming a more potent competitor or

9  using the regulatory review process to extract even more

10  favorable terms for the distribution of Activision content than

11  it is with the possible loss of access to COD.

12  **BY MS. FEMENELLA:**

13  **Q.**   And you are forming that opinion without relying on

14  Microsoft's actual written offer to Sony; correct?

15  **A.**   Well, again, rely in the sense that it's not cited in my

16  footnote, but what I cite in the footnote is Mr. Ryan's

17  characterization of the offer.  My understanding is the offer

18  is not in dispute, but --

19        **THE COURT:**  Did you -- did you read the contract --

20        **THE WITNESS:**  Yes.

21        **THE COURT:**  -- before you wrote this report?

22        **THE WITNESS:**  Yes, I did.

23  **BY MS. FEMENELLA:**

24  **Q.**   But you chose not to rely on it?

25  **A.**   No.  I don't --

873

1    THE COURT:  No, he didn't put it in Appendix B.
2    Next question.
3  BY MS. FEMENELLA:
4    Q.  In your report you list and describe just two terms from
5  the Sony agreement; correct?  The Sony proposal.  Apologies.
6    A.  In my report?
7    Q.  Yep.
8    A.  The report speaks for itself.  If I remember right, I'd
9  say it's guaranteeing access to Call of Duty and it's giving
10  the terms.
11    MR. KILARU:  Please.
12    THE CLERK:  Mr. Kilaru wanted him to stop.
13    MR. KILARU:  Sorry.  Apologies.
14    THE COURT:  You're okay.
15    MR. KILARU:  A little paranoid at this point.  Thank
16  you.
17    MS. FEMENELLA:  It's the first term that is public.
18  The second one is not.
19    MR. KILARU:  Yes.
20  BY MS. FEMENELLA:
21    Q.  And the two terms that you rely on are the length of time
22  and the revenue split; correct?  Do not say what the --
23    A.  I do rely on those, but I don't see those in paragraph 24.
24  I think --
25    Q.  This is in your report in general, sir.

874

1    A.  It's I believe later in the report in paragraph 24.  I
2  mean, I won't -- it speaks for itself.
3    Q.  You would agree that there are other terms in Microsoft's
4  proposal to Sony; correct?
5    A.  Yes.
6    Q.  Your report does not include any economic analysis of any
7  of the terms in the Sony proposal; correct?
8    A.  That's correct.  I'm simply making the point Microsoft has
9  made an offer to guarantee -- Microsoft -- sorry -- to
10  guarantee Sony access to Call of Duty on -- and I won't say the
11  terms.  I mean, I do say the terms but I won't say them in open
12  court.
13    Q.  You say two terms; correct?
14    A.  Yes.
15    Q.  And you did not believe it was necessary to include any
16  economic analysis of any of the terms in the Sony proposal;
17  correct?
18    A.  Not for the point I'm making, which is that that contract
19  would guarantee access; and if access is the issue and the
20  terms on which the access are granted are terms that are
21  consistent with other market evidence, then a reasonable
22  interpretation on my part is that it is not that Sony is
23  concerned about foreclosure but rather -- because they could
24  easily solve that problem, but with some other motivation.
25    And as an economic matter, it's perfectly understandable

875

1  why a transaction that would make your competitor more
2  powerful, more potent, more effective as a competitor would be
3  something you should be concerned about.
4    Q.  You didn't do any economic analysis of the proposal;
5  right?
6    A.  Other than what I do in the report; namely, that if you're
7  worried about access, this solves that problem.  Access to Call
8  of Duty.
9    Q.  In coming to your opinion related to the Sony proposal,
10  you state in your report that the contractual terms are similar
11  to those of contracts that already exist; correct?
12    A.  I can say that.  It would help me if you tell me in the
13  report --
14    Q.  Paragraph 24 of your report, sir.
15    A.  (Witness examines document.)
16    Q.  You see that; correct?
17    A.  I do talk about it, but I don't see -- about those terms,
18  but it's not in paragraph 24 unless I'm missing something.
19    Q.  Where it starts as read:
20    "To assume that contracts cannot effectuate
21    transactions is an un" -- "is an extreme assumption
22    especially when the contractual terms are similar to those
23    of contracts that already exist."
24    Do you see that?
25    A.  Yes, but --

876

1    Q.  Now you don't cite --
2    A.  -- you asked me a question about the two terms.  I'm
3  pointing out that's not what this paragraph is about.  I agree
4  with the sentence you wrote.  I'm happy to answer a question
5  about it.
6    Q.  That's what I'm asking you, sir, about that sentence.
7    Now, you don't cite anything, any documents, in that
8  footnote to that point; correct?
9    A.  I don't cite a document for the proposition that contracts
10  can effectuate transactions, that's correct.
11    Q.  That the contractual terms are similar to those of
12  contracts that already exist.  You have no cites to that point;
13  correct?
14    A.  I do.  Did you look at Footnote 65?
15    Q.  The footnote that is there is Footnote 64; correct, sir?
16    A.  I'm sorry?  What did you say?  Look at Footnote 65.
17    Q.  Footnote 64 does not contain any document cites; correct?
18    THE COURT:  When you are referring to the contract
19  terms that are similar, you're referring to those two terms --
20    THE WITNESS:  Yes.
21    THE COURT:  -- that we discussed?
22    Okay.  That's what he's referring to.  He's relying on
23  just those two; right?  Just those two?
24    THE WITNESS:  Yes, but --
25    THE COURT:  Just those two?

877

1    **THE WITNESS:** -- I think it's somewhere else in the
2  report where I actually have a cite to those two terms, but --
3    **THE COURT:** Okay. Well, that could be. We don't need
4  to do that. There will be redirect.
5    Okay.
6  **BY MS. FEMENELLA:**
7  **Q.** You did not compare the terms of any existing agreements
8  with the full Sony proposal; correct?
9  **A.** I'm only -- what I'm focusing on is that it's for "X"
10 years -- I won't say what "X" is -- and its focus -- which is
11 longer than the typical term. I don't know if -- well, and
12 it's a certain split that is --
13    **THE COURT:** Okay. I understand.
14    **THE WITNESS:** Okay.
15 **BY MS. FEMENELLA:**
16 **Q.** Are you aware that Sony signed an agreement with ZeniMax
17 related to the game Ghostwire?
18 **A.** I'm sorry. Say that once more.
19 **Q.** Are you aware that Sony signed an agreement with ZeniMax
20 related to the game Ghostwire?
21 **A.** I don't have a specific recollection of that. I might
22 well have been aware of that fact at some time.
23 **Q.** You are aware that Microsoft acquired ZeniMax for roughly
24 $7 billion; correct?
25 **A.** I'm aware of that.

878

1  **Q.** Since Microsoft now owns ZeniMax, you had access to a copy
2  of the Ghostwire agreement; correct?
3  **A.** I had access to everything in the record --
4  **Q.** Please turn --
5  **A.** -- is my recollection.
6  **Q.** Please turn to PX4678 in your binder.
7  **A.** (Witness examines document.)
8  **Q.** This document itself is under seal so please don't
9  disclose any terms in here.
10    But PX4678 is the Ghostwire agreement; correct?
11 **A.** Can you just -- I don't see where Ghostwriter --
12    **THE COURT:** Right at the top.
13    **THE WITNESS:** Ghostwire.
14    **THE COURT:** Yes.
15 **BY MS. FEMENELLA:**
16 **Q.** That's what I said. Ghostwire.
17 **A.** Yes.
18    **MS. FEMENELLA:** Your Honor, I move to admit PX4678.
19    **THE COURT:** Admitted.
20    (Trial Exhibit 4678 received in evidence.)
21 **BY MS. FEMENELLA:**
22 **Q.** You did not rely on PX4678 in forming your opinions;
23 correct?
24 **A.** That would be correct, yes.
25 **Q.** PX4678 is not listed in your Appendix B; correct?

879

1  **A.** I don't believe it is. I'll take your word for it.
2  **Q.** Now, sir, if you could do me a favor and pop that document
3  out of your binder, please, so you can have it set aside next
4  to you. And then if you could turn to RX2170.
5  **A.** 2170?
6  **Q.** Correct.
7  **A.** Yes.
8  **Q.** This document is also under seal.
9  **A.** Okay.
10 **Q.** RX2170 is Microsoft's unsigned written proposal to Sony;
11 correct?
12 **A.** I believe that's correct, yes.
13    **MS. FEMENELLA:** Your Honor, just for the record,
14 RX2170 was already admitted.
15    **THE COURT:** Yes.
16 **BY MS. FEMENELLA:**
17 **Q.** Now, sir, you did not compare the terms of Microsoft's
18 proposal to Sony, which is RX2170, with the terms in the
19 Ghostwire agreement, PX4678; correct?
20 **A.** You're asking me did I compare the Ghostwire terms to the
21 terms in this agreement.
22 **Q.** Correct. You did not do that; right?
23 **A.** I did not -- I did not do that, but what I referenced --
24    **THE COURT:** No, no, no. That's it.
25    **THE WITNESS:** Okay.

880

1    **THE COURT:** Next question.
2  **BY MS. FEMENELLA:**
3  **Q.** Can you please turn again -- and this is under seal so
4  please do not divulge any information.
5    Can you please turn to Exhibit A in the Ghostwire
6  agreement PX4678-017?
7  **A.** Okay. Exhibit A?
8  **Q.** Yes.
9    Do you see Exhibit A without disclosing any information on
10 that?
11 **A.** (Witness examines document.) I have Exhibit A.
12 **Q.** Now, the Sony proposal RX2170 does not contain any terms
13 similar to those contained in Exhibit A of the Ghostwire
14 agreement; correct?
15 **A.** The Ghostwire agreement, just so I'm clear, does not deal
16 with Call of Duty; right?
17 **Q.** No. It's a different game.
18 **A.** So you're asking me did I compare this contract to the
19 one --
20 **Q.** You've already said, sir, that you did not compare them.
21 I am now asking you: Does the Sony proposal that Microsoft
22 made to Sony contain any of the terms that are in Exhibit A?
23 **A.** I'd have to check, but I didn't do that comparison. If
24 you want me to do it now, I can so I can compare the Call of
25 Duty proposal to this other contract if you want. Is that what

881

1   you're asking me to do?
2   **Q.**  So you don't believe -- let me go back.
3       In your report you said that these were similar terms, but
4   you were only relying on two terms for similarities not all
5   terms in ordinary course content agreements; correct?
6   **A.**  Well, maybe you misinterpreted.  When I said that the
7   split -- and I won't mention it -- is -- I don't know if I can
8   say this -- it's similar to a split elsewhere, I was referring
9   specifically to Call of Duty.  Okay?
10      You're asking me to compare two different -- you know,
11  contract for Call of Duty or contract not for Call of Duty,
12  but --
13  **Q.**  You didn't do that?
14  **A.**  -- I didn't do that.
15  **Q.**  Right.
16  **A.**  I didn't think that was relevant.
17  **Q.**  Sir, you can put the Ghostwire agreement away.
18  **A.**  Okay.
19  **Q.**  Keep out RX2170, please.
20  **A.**  You want me to turn to which one?
21  **Q.**  RX2170.  You should have had that open.
22  **A.**  That's the one Sony and --
23  **Q.**  The Microsoft proposal to Sony.
24  **A.**  Yes, okay.
25  **Q.**  Again, this is under seal so please do not read anything

882

1   out loud, but please look at Section 1.9.
2   **A.**  (Witness examines document.)  Okay.
3   **Q.**  Please look at this part where the sentence that begins
4   with "That makes it."  And please don't read anything else.
5       Do you see it?  It's the second-to-last line in that
6   section?
7   **A.**  Yes.
8   **Q.**  Do you see that there are two words after "That makes it"?
9   **A.**  Yes.
10  **Q.**  You did not analyze the implications of this term;
11  correct?
12  **A.**  I haven't studied the implication of these two terms.
13  **Q.**  And you did not consider if under this clause Microsoft
14  and Activision get to determine whether or not this term
15  applies; correct?
16  **A.**  I'm not a lawyer so I wouldn't claim to have the legal
17  expertise to interpret contractual terms and obligations.  I
18  just assumed this contract for what it was:  I'll give you
19  access to Call of Duty on terms that are what they are, which,
20  as I've explained, compared to other Call of Duty terms seem
21  reasonable.
22  **Q.**  Could you please turn to Exhibit B.6 in this same
23  document, RX2170?  It is on the last page of the agreement --
24  of the proposal.
25  **A.**  B.6?

883

1   **Q.**  Yes.
2   **A.**  (Witness examines document.)  Okay.
3   **Q.**  If you can look at the second paragraph that starts with
4   "Prior to," and if you can read the first sentence.
5   **A.**  Out loud or to myself?
6   **Q.**  To yourself.
7   **A.**  (Witness examines document.)  Yes.
8   **Q.**  In reaching your opinion, you did not take into
9   consideration this term of the proposal; correct?
10  **A.**  I wouldn't have taken into account this particular term.
11  On the other hand, I always assume contracts are entered into
12  in good faith so I won't reveal what this says, but I don't
13  know how it would have affected any analysis.
14      But you're correct, as I said earlier, what I relied upon
15  was my understanding that there is an offer and that it
16  contained terms that we've already discussed and that from my
17  point of view, that would resolve any concerns of Sony about
18  access to Call of Duty.
19  **Q.**  You are aware that Microsoft signed an agreement with
20  Nintendo; correct?
21  **A.**  Yes.
22  **Q.**  Are you aware of how quickly the agreement between
23  Microsoft and Nintendo was signed?
24  **A.**  How quickly, was that the word?
25  **Q.**  Yes.

884

1   **A.**  My understanding was it was signed, you know, since the
2   deal was announced.
3   **Q.**  Could you turn to PX7065 in your binder, please?
4   **A.**  7065?
5   **Q.**  I'm sorry.  7060.
6   **A.**  Is that my report?
7   **Q.**  No.  I'm sorry.  I had it right the first time.  7065.
8   **A.**  7065.
9       (Witness examines document.)  You'll have to give me a
10  little help.  Where is that in my -- oh, here it is.  7065.  I
11  have two 7065s.
12  **Q.**  It's right after the declaration tab.
13  **A.**  I have a 7065.
14  **Q.**  Yes.  Do you have that?
15  **A.**  7065.  Yes, okay.
16  **Q.**  These are excerpts from Mr. Singer's deposition.  This
17  part is under seal so if you could just look at transcript
18  page 119, lines 14 to 19, and please don't read it out loud.
19  **A.**  14...
20      (Witness examines document.)  Yes.
21  **Q.**  That contains the information on the length of time it
22  took to negotiate the agreement; correct?
23  **A.**  I don't know that for certain, but I'm willing to accept
24  that representation if that's what you're telling me this is
25  about.

885

1  Q.  That was under oath testimony; correct?

2  A.  That's under what?

3  Q.  Under oath testimony by Mr. Singer.

4       THE COURT:  I'll answer that for him.  Yes.

5            (Laughter)

6  BY MS. FEMENELLA:

7  Q.  Now, sir, you are not an expert in the technology of video

8  games; correct?

9  A.  Correct.

10  Q.  You are not offering an opinion about the quality that can

11  be expected from Call of Duty if it were to be ported to

12  current or future versions of the Nintendo Switch; correct?

13  A.  I'm not offering an opinion on that.  I mean, I'm -- you

14  know, based on my expertise, no.

15  Q.  Now, how important the option of Call of Duty on

16  Nintendo Switch is will depend upon the quality of Call of Duty

17  on the Nintendo Switch; correct?

18  A.  Well, generally the better the quality of a game, the

19  better an alternative it is to play it on one place versus

20  another.

21  Q.  And the worst the quality, the worst the option; correct?

22  A.  Yes.

23  Q.  Sitting here today you have no idea what the quality of a

24  future Call of Duty game done by Microsoft on Nintendo will be;

25  correct?

886

1  A.  That's correct.

2  Q.  You rely in forming your opinions on the fact that

3  Microsoft signed an agreement with NVidia; correct?

4  A.  Yes.

5  Q.  The NVidia agreement with Microsoft is not cited in your

6  report; correct?

7  A.  I thought I referred to the agreements with cloud

8  producers.  I don't know if I listed them.

9  Q.  The NVidia agreement is not included in your Appendix B;

10  correct?

11  A.  Whatever is in the appendix is in the appendix.  I do

12  refer in the report to my understanding that there are

13  agreements with cloud providers and that, you know -- period.

14  Q.  Please look at paragraph 46 of your report, which is

15  PX5004.

16  A.  46.

17       (Witness examines document.)  Yes.

18  Q.  If you look at Footnote 112, which is the footnote you

19  have after you describe the NVidia agreement; correct?

20  A.  Yes.

21  Q.  And Footnote 112 is a Verge article; correct?

22  A.  Yes.

23  Q.  It is not the agreement; correct?

24  A.  That's not the agreement, that's correct.

25  Q.  And the Verge article is a public article; correct?

887

1  A.  Yes.

2  Q.  And it does not include all of the terms of the NVidia

3  agreement; correct?

4  A.  That's -- I would assume so, yes.

5  Q.  Especially since the terms of that agreement are

6  confidential; correct?

7       THE COURT:  Did you read the NVidia agreement?

8       THE WITNESS:  I can't remember if I did.  It's quite

9  possible I did, but I can't tell you for certain.

10       THE COURT:  But wouldn't you have put that into your

11  footnote as opposed to an article?

12       THE WITNESS:  My recollection is I was trying to

13  characterize the agreement and this article characterized the

14  agreement and, therefore, I relied on this article to

15  characterize the agreement rather than my reading of an

16  agreement and me characterizing it.  Because then I -- you

17  know, someone could ask me "You're not an attorney.  How do you

18  know what it means?"

19       THE COURT:  Okay.

20       THE WITNESS:  This is their assumption of what it's

21  saying.

22       I'd have to think back.  It's likely, if the agreement was

23  available at the time of my report, that I did look at it.

24  BY MS. FEMENELLA:

25  Q.  But as we established, you didn't rely on it because it's

888

1  not included in your materials relied upon; correct?

2  A.  Yes, as we've discussed already.

3  Q.  So if you could turn in your binder to PX9453, please.

4  A.  Say that once more please.

5  Q.  9453.  And I will tell you, it's a bit hidden, at least it

6  was in mine.  It's behind 9441.

7  A.  (Witness examines document.)  Okay.

8  Q.  You thought this public article was pretty clear in

9  explaining the contract; correct?

10  A.  That there was a contract, yes.

11  Q.  In explaining the contract; correct?

12  A.  In explaining that there was a contract, yes.

13       MS. FEMENELLA:  Your Honor, I move to admit PX9453.

14       THE COURT:  Admitted.

15       (Trial Exhibit 9453 received in evidence.)

16  BY MS. FEMENELLA:

17  Q.  This article is dated February 21st, 2023; correct?

18  A.  Wait.  Maybe I'm -- you asked me to look at 9441?

19  Q.  No.  9453.

20  A.  9453.

21       THE COURT:  It's dated February 21st.

22       THE WITNESS:  Yes.

23  BY MS. FEMENELLA:

24  Q.  Can you please turn to page 3?

25  A.  (Witness examines document.)  Yes.

889

1  Q.  At the bottom do you see a quote -- the second-to-last
2  paragraph do you see a quote from Mr. Eisler?
3  A.  Yes.
4  Q.  It says that the companies haven't worked on detailed
5  implementation plans yet.  Do you see that?
6  A.  Yes.
7  Q.  So as of February of 2023, Microsoft and Nvidia had not
8  worked on detailed implementation plans; correct?
9  A.  Yes.
10 Q.  Now, if you could turn to the next page, PX9453-004.
11 A.  Yes.
12 Q.  If you look at the top of that part, it says (as read):
13      "Microsoft make me buy the game all over again?
14      Eisler won't say 'We have no announcement about Game Pass
15      right now.'  When I ask him yes or no 'Does the contract
16      give you the rights or not,' he says simply 'I can't
17      answer that question.'"
18      Do you see that?
19 A.  I see that, yes.
20 Q.  So from this article, it is unclear whether Game Pass
21 plays a role in the contract; correct?
22 A.  (Witness examines document.)  Yes, from the --
23 Q.  So in relying --
24 A.  Yes.
25 Q.  -- on this article instead of the actual agreement between

890

1  Microsoft and Nvidia, you had no idea whether or not Game Pass
2  was included in the agreement; correct?
3  A.  Yes.  When I -- when I -- the sentence in my report -- I'd
4  have to go back in the report -- in the report is that they
5  signed agreements with these cloud providers and that's
6  contingent only if the contract -- if this transaction goes
7  through and, therefore, that additional option to be on the
8  cloud is a benefit of the transaction.  I didn't speak about
9  Game Pass in that sentence.
10      (Pause in proceedings.)
11 BY MS. FEMENELLA:
12 Q.  Can you please turn in your binder to RX1211?  It's the
13 very next document.
14      THE COURT:  Can I ask you, because it's 3:05, should
15 we stop or do you think we can finish this witness today?
16      MR. KIARU:  I only have a few questions, Your Honor.
17      MS. FEMENELLA:  My best estimate I have 10 to 15
18 minutes.
19      THE COURT:  I think we should keep going.  Is that all
20 right, Ms. Means and Ms. Knox?
21      THE OFFICIAL REPORTER:  Yes.
22      THE COURT:  Yes?
23      15 max.
24 BY MS. FEMENELLA:
25 Q.  Looking at RX1211, again the document itself is under

891

1  seal, but this is the agreement between Nvidia and Microsoft;
2  correct?
3  A.  I'm at 1211.
4  Q.  Yes.  This is agreement between Microsoft and Nvidia;
5  correct?
6  A.  Oh.  I'm sorry.  Yes.
7  Q.  You are not offering any legal opinions about any terms in
8  RX1211; correct?
9  A.  Correct.
10 Q.  And you didn't analyze each paragraph of the agreement;
11 correct?
12 A.  Correct.
13 Q.  You can put that away, sir.
14      You state in your report that an independent Activision
15 would not have made agreements to put its content on cloud
16 gaming services; correct?
17 A.  That's my view, yes, based on the evidence.
18 Q.  Your opinion is that the evidence is unambiguous that
19 Activision strategy is not to support cloud gaming; correct?
20 A.  That was my view and I would say that's confirmed by the
21 testimony I heard today; but I also say that, in my report,
22 that to the extent there's a dispute about that, I leave that
23 to Your Honor to decide.  But my report is based on the premise
24 that Activision's current business strategy as well as past
25 behavior is not to put their games on the cloud.

892

1  Q.  Sir, could you turn in your binder to PX8000 please?
2  A.  Did you say 8000?
3  Q.  Yes.
4  A.  These aren't in order.  Do you want to give me a hint as
5  to where that is?
6  Q.  It's a bit hidden behind PX4984.  It's 8000 that you want.
7  A.  (Witness examines document.)  PX94 I have.
8  Q.  It should be right behind that, PX8000.
9  A.  PX9441, RX1211, RX1212, RX2170.
10      MS. FEMENELLA:  Your Honor, may I approach and just
11 give him my copy?
12      THE COURT:  You may, please.
13      THE WITNESS:  Okay.  Thank you.
14 BY MS. FEMENELLA:
15 Q.  PX8000 is the declaration of Mr. Eisler of Nvidia;
16 correct?
17 A.  Yes.
18 Q.  Now, the part that I'm going to talk to you about is under
19 seal so please don't say anything out loud, but could you
20 please turn to paragraph 43?
21 A.  (Witness examines document.)  Yes.
22 Q.  You did not rely on paragraph 43 in forming your opinion;
23 correct?
24 A.  Well, if it's not in Appendix B, I would not have relied
25 upon it in the sense I've described.

893

1  Q.   And if you look at paragraphs 45 and 46, again, since it
2  is not listed in Appendix B, you did not rely on these sworn
3  statements either; correct?
4  A.   That's correct.
5  Q.   You have no basis to dispute Mr. Eisler's sworn
6  assertions; correct?
7  A.   I've not attempted to read his assertions or investigate
8  them.
9       THE COURT:  Were you aware of them when you wrote your
10 report and you gave your opinion?
11      THE WITNESS:  I -- I don't recall seeing this
12 particular declaration.
13      THE COURT:  Okay.  All right.  That's fine.  I
14 understand.
15 BY MS. FEMENELLA:
16 Q.   You can put that down, sir.
17      In your report you refer to the cloud agreements Microsoft
18 signed during the pendency of this litigation; correct?
19 A.   I refer to the cloud agreements that Microsoft signed
20 during the pendency of this litigation, yes, I do and I explain
21 why they're --
22 Q.   You have not done any -- sorry, sir.  We're trying to be
23 efficient here of the Court's time.
24      You have not done any quantification or analysis to size
25 the cloud gaming market in the future; correct?

894

1  A.   I have not attempted to measure the size.  I did discuss
2  it, I believe, in the report, but I've not done an independent
3  investigation of the size.
4  Q.   Sir, if you could just keep your answers to "yes" or
5  "no" --
6  A.   Okay.
7  Q.   -- we will be more mindful of the Court's time.
8       You have no opinions or analysis about the size or scope
9  of the cloud gaming services that Ubitus provides; correct?
10 A.   Correct.  I don't discuss that.
11 Q.   You have no opinions or analysis about the size or scope
12 of the cloud gaming services that Boosteroid provides; correct?
13 A.   Correct.  I don't discuss that.
14 Q.   You have no opinions or analysis about the size or scope
15 of the cloud gaming services that Nware provides; correct?
16 A.   I don't analyze that.
17 Q.   Do you know what country Boosteroid is located in?
18 A.   Not immediately as I sit here.  I might once have known
19 that, but I don't recall.
20 Q.   Your report does not mention that Boosteroid is located in
21 Ukraine; correct?
22 A.   I don't believe the report says that.
23 Q.   You did not take Boosteroid's location into consideration
24 for your analysis; correct?
25 A.   That's correct.  It's irrelevant to my analysis where it's

895

1  located.
2  Q.   You did not take into consideration the location of
3  Boosteroid's cloud gaming servers in your opinion; correct?
4  A.   I simply -- correct.  I did not analyze --
5       THE COURT:  Correct.  Okay.
6  BY MS. FEMENELLA:
7  Q.   Do you know what country Ubitus is located in?
8  A.   I don't as I sit here, no.
9  Q.   Your report does not mention that Ubitus is located in
10 Taiwan; correct?
11 A.   I believe that's correct, it does not mention that.
12 Q.   You did not take Ubitus' location into consideration for
13 your analysis; correct?
14 A.   That's correct.
15 Q.   You did not take into consideration the location of
16 Ubitus' cloud gaming servers in your opinion; correct?
17 A.   Correct.
18 Q.   Do you know what country Nware is located in?
19 A.   I -- I haven't investigated that.
20 Q.   Your report does not mention that Nware is located in
21 Spain; correct?
22 A.   I believe that's correct.
23 Q.   You did not take Nware's location into consideration for
24 your analysis; correct?
25 A.   Correct.

896

1  Q.   You did not take into consideration the location of
2  Nware's cloud gaming servers in your opinion; correct?
3  A.   Correct.
4  Q.   Now, you were aware that Mr. Zimring from Google testified
5  in this court last week; correct?
6  A.   I have a general understanding of that, yes.
7  Q.   And Mr. Zimring was in charge of Google's Stadia; correct?
8  A.   I believe that is correct.
9  Q.   Mr. Zimring has substantial experience in cloud gaming
10 services; correct?
11 A.   I have no reason to doubt your representation.
12 Q.   You did not take into consideration Mr. Zimring's
13 testimony that the farther away a cloud gaming server is from a
14 gamer, the worse the latency gets; correct?
15 A.   I did not take that -- Mr. Zimring's testimony in that
16 into account in my report.
17 Q.   And the higher the latency, the lower the gaming
18 experience; correct?
19 A.   I believe that, yes.
20 Q.   Your opinion is that these agreements that Microsoft
21 signed during the pendency of this litigation represent the
22 creation of options that would not otherwise exist but for this
23 transaction; correct?
24 A.   Correct.
25 Q.   You did not verify what you conclude are efficiencies of

897

1 the deal; correct?

2 A. I don't know what you mean by that. The contracts are
3 signed. They're conditional on the transaction. That provides
4 another option that didn't otherwise -- wouldn't otherwise
5 exist. That's a benefit of the transaction. I did not attempt
6 to quantify the magnitude of that benefit.

7        (Pause in proceedings.)

8 BY MS. FEMENELLA:

9 Q. As we just discussed at length, you did not analyze the
10 agreements; correct?

11 A. Yes. Other than they exist, yes.

12 Q. You agree that the extent to which these agreements
13 provide options to consumers depends, at least in part, on the
14 language of the agreements themselves; correct?

15 A. In part but obviously the agreements, if they wouldn't
16 have otherwise existed, provide an option that wouldn't have
17 existed absent the agreements, and...

18 Q. You have not done any quantification of the benefits to
19 consumers on any of these agreements; correct?

20 A. I have not attempted to quantify the benefit other than to
21 point out it's a benefit.

22 Q. And you are not offering any quantitative analysis of the
23 value of these agreements that they may have created; correct?

24 A. I have not attempted to quantify the magnitude of those
25 benefits other than to point out they are benefits.

898

1        MS. FEMENELLA: Your Honor, I pass the witness.

2        REDIRECT EXAMINATION

3 BY MR. KILARU:

4 Q. Just very briefly, Dr. Carlton, is it fair to say that a
5 focus of your work was on evaluating the reliability of the
6 economic models that Dr. Lee prepared in this case?

7 A. Yes, that was the primary focus of my work.

8 Q. And just to use his terms, one was called the demand model
9 and one was called the foreclosure model. I believe I think he
10 said share model and foreclosure model yesterday. Do you
11 remember that?

12 A. He used share model and foreclosure model. I would prefer
13 to call it demand model because use of the term "share model"
14 implies that the only thing that matters is the Xbox share of
15 Xbox plus Sony when, in fact, his model that he referred to as
16 a share model is really a demand model that includes not just
17 the shares but also substitution to an outside option, and that
18 is what you need to analyze in order to figure out the
19 incentive to foreclose.

20        The reason for that is you are interested in the change in
21 Xbox sales. You don't care about the shares alone. You care
22 about the change in Xbox sales. And by failing to account for
23 substitution to the outside option, his demand model over --
24 when he just uses the share model instead of his entire demand
25 model, he underestimate -- he overestimates the increase in

899

1 Xbox sales from a hypothetical foreclosure, and I show the
2 error that causes in him in his analysis.

3 Q. Doctor, did you assume the markets that Professor Lee
4 defined for purposes of your analysis?

5 A. I used his definition -- definitions in writing my report;
6 but for the foreclosure analysis, it doesn't matter what the
7 antitrust market is. It's a very important point for
8 foreclosure analysis. Substitution to other goods are what
9 matters.

10        So if you foreclose PlayStation from Call of Duty, the
11 question is: Where do people go? He has them going to Xbox,
12 but some people will go to what he calls the outside option.
13 And if you can go to the outside option, then not as many
14 people will go to Xbox.

15        If you don't consider going to the outside option, you
16 overestimate how many people go to the Xbox and that causes you
17 to overestimate the profitability of foreclosure. So I show
18 that error in his analysis.

19 Q. Do you know if Dr. Lee's models account for Microsoft's
20 offer to Sony in any way?

21 A. They do not. My recollection is his report doesn't
22 discuss it.

23 Q. Does anything that occurred on cross-examination undermine
24 your analysis about the reliability of Dr. Lee's economic
25 models in this case?

900

1 A. Nothing at all. Nothing.

2        MR. KILARU: Nothing further.

3        THE WITNESS: My analysis had nothing to do with those
4 contracts.

5        MR. KILARU: Nothing further, Your Honor.

6        THE COURT: Anything further?

7        MS. FEMENELLA: No, Your Honor.

8        THE COURT: All right. You are excused.

9        THE WITNESS: Thank you.

10        (Witness excused.)

11        THE COURT: Okay. So let's talk about tomorrow and
12 what we have left. We have Mr. Singer by video.

13        MR. WEINGARTEN: I believe we have Mr. Singer by
14 video. That's a defense call. We have Mr. Stuart and we have
15 Ms. Hood by written declaration.

16        I don't -- I thought there was a proposal this morning
17 maybe to play Mr. Singer just for Your Honor if we were short
18 on time.

19        MS. WILKINSON: Yes, I think it was one of the issues.

20        And we are calling Ms. Hood as our witness and Mr. Stuart
21 will be theirs so we'll be --

22        THE COURT: So Ms. Hood is in person?

23        MS. WILKINSON: She is. Mr. Stuart is in person, yes;
24 and Ms. Hood is in person but since we're trying to streamline
25 for you, we submitted her declaration on direct so it's just

901

1    their cross.

2         **THE COURT:** Okay. And then Mr. Singer by video?

3         **MR. WEINGARTEN:** Yes.

4         **MS. WILKINSON:** Yes.

5         **THE COURT:** Okay. So I need to rule on the

6    confidentiality.

7         Okay. I can come back and do that in closed session in

8    like ten minutes so that you can prepare that tonight for

9    tomorrow.

10        Then for tomorrow in terms of schedule, I don't know how

11   long you think it goes, I have to do my case management

12   conferences at 1:30, from 1:30 to 2:30. So what we could do is

13   just plan on closing at 2:30, right, and you'll have the

14   evidence in maybe by noon?

15        **MR. WEINGARTEN:** We'll do our best.

16        **MS. WILKINSON:** Whatever you want, Your Honor, we will

17   do.

18        **THE COURT:** Yeah. I mean, we can't go right up to

19   1:30 and then do CMCs and then do closings. I won't be very

20   helpful.

21        **MS. WILKINSON:** I don't think we will have much at

22   all.

23        **THE COURT:** Okay. All right. So that will be the

24   plan. So let's just plan on doing the closings at 2:30 then,

25   and we'll take our lunch break from 1:30 to 2:30 and we will do

902

1    morning breaks as well.

2         **MR. WEINGARTEN:** Great. Thank you, Your Honor.

3         **THE COURT:** All right. We're emptying the courtroom,

4    and just for the under seal matter with respect to Mr. Singer,

5    we'll resume in ten minutes.

6         **MR. WEINGARTEN:** Thank you, Your Honor.

7              (Recess taken at 3:22 p.m.)

8              (Proceedings resumed at 3:34 p.m.)

9         (The following pages 902 through 917 were placed under

10   seal by Order of the Court:)



903

904





1    (Proceedings adjourned at 3:52 p.m.)

2                ---oOo---

3

4         **CERTIFICATE OF REPORTER**

5         I certify that the foregoing is a correct transcript

6    from the record of proceedings in the above-entitled matter.

7

8    DATE:   Wednesday, June 28, 2023

9

10

11

12    _____Marla Knox_____

13    Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
      United States District Court - Official Reporter

14

15

16

17

18

19

20

21

22

23

24

25

919

**Volume 5**

**Pages 918 – 1175**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

```
FEDERAL TRADE COMMISSION,        )
                                 )
            Plaintiff,           )
                                 )
    VS.                          )  NO. C 23-02880 JSC
                                 )  SEALED PAGES 923 to 928
MICROSOFT CORPORATION, et al.,   )
                                 )
            Defendants.          )
_____)
```

San Francisco, California
Thursday, June 29, 2023

TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS

APPEARANCES:

For Plaintiff:

    FEDERAL TRADE COMMISSION
    600 Pennsylvania Avenue, NW
    Washington, D.C. 20580
    BY: JAMES H. WEINGARTEN, ATTORNEY AT LAW
        JAMES ABELL, ATTORNEY AT LAW
        JENNIFER FLEURY, ATTORNEY AT LAW
        PEGGY FEMENELLA, ATTORNEY AT LAW
        CEM AKLEMAN, ATTORNEY AT LAW
        ALEX ANSALDO, ATTORNEY AT LAW
        NICOLE CALLAN, ATTORNEY AT LAW
        MARIA CIRINCIONE, ATTORNEY AT LAW
        MICHAEL FRANCHAK, ATTORNEY AT LAW
        MEREDITH LAVERT, ATTORNEY AT LAW

REPORTED BY: Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
        United States District Court - Official Reporter

---

APPEARANCES: (continued)

For Defendant Microsoft:

    WILKINSON STEKLOFF LLP
    2001 M Street, NW - 10th Floor
    Washington, D.C. 20036
    BY: BETH WILKINSON, ATTORNEY AT LAW
        RAKESH N. KILARU, ATTORNEY AT LAW
        KIERAN GOSTIN, ATTORNEY AT LAW
        GRACE HILL, ATTORNEY AT LAW
        SARAH NEUMAN, ATTORNEY AT LAW
        ANASTASIA PASTAN, ATTORNEY AT LAW

For Defendant Activision Blizzard, Inc.:

    SKADDEN ARPS SLATE MEAGHER & FLOM LLP
    1440 New York Avenue, N.W.
    Washington, D.C. 20005
    BY: STEVEN C. SUNSHINE, ATTORNEY AT LAW
        JULIA K. YORK, ATTORNEY AT LAW

    SKADDEN ARPS SLATE MEAGHER & FLOM LLP
    525 University Avenue
    Palo Alto, California 94301
    BY: CAROLINE VAN NESS, ATTORNEY AT LAW

    SKADDEN ARPS SLATE MEAGHER & FLOM LLP
    1 Manhattan West
    New York, New York 10001
    BY: EVAN R. KREINER, ATTORNEY AT LAW

For Nintendo of America, Inc.:

    VENABLE LLP
    151 West 42nd Street - 49th Floor
    New York, New York 10036
    BY: BENJAMIN P. ARGYLE, ATTORNEY AT LAW

---

920

### I N D E X

Thursday, June 29, 2023 - Volume 5

|                                      | PAGE | VOL. |
| ------------------------------------ | ---- | ---- |
| Closing Arguments                    | 1050 | 5    |

| **PLAINTIFF'S WITNESSES**            | PAGE | VOL. |
| ------------------------------------ | ---- | ---- |
| STUART, TIMOTHY (SWORN)              | 931  | 5    |
| Direct Examination by Mr. Weingarten | 932  | 5    |
| Cross-Examination by Mr. Gostan      | 1029 | 5    |

### E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
| -------------- | ---- | ---- | ---- |
| 0070           |      | 931  | 5    |
| 0083           |      | 929  | 5    |
| 1066           |      | 1032 | 5    |
| 1077           |      | 929  | 5    |
| 1078           |      | 929  | 5    |
| 1079           |      | 929  | 5    |
| 1080           |      | 929  | 5    |
| 1102           |      | 929  | 5    |
| 1105           |      | 929  | 5    |
| 1116           |      | 978  | 5    |
| 1119           |      | 1049 | 5    |
| 1120           |      | 1049 | 5    |
| 1128           |      | 1049 | 5    |
| 1133           |      | 1049 | 5    |

---

921

### I N D E X

### E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
| -------------- | ---- | ---- | ---- |
| 1137           |      | 1040 | 5    |
| 1140           |      | 1049 | 5    |
| 1151           |      | 941  | 5    |
| 1154           |      | 1049 | 5    |
| 1156           |      | 1049 | 5    |
| 1186           |      | 1049 | 5    |
| 1187           |      | 1049 | 5    |
| 1190           |      | 1010 | 5    |
| 1212           |      | 930  | 5    |
| 1240           |      | 936  | 5    |
| 1966           |      | 978  | 5    |
| 3166           |      | 1049 | 5    |
| 3218           |      | 930  | 5    |
| 3225           |      | 930  | 5    |
| 3233           |      | 930  | 5    |
| 3234           |      | 930  | 5    |
| 4028           |      | 929  | 5    |
| 4029           |      | 929  | 5    |
| 4033           | 1049 | 929  | 5    |
| 4044           |      | 929  | 5    |
| 4308           |      | 986  | 5    |







**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 4319 | | 1012 | 5 |
| 4334 | | 988 | 5 |
| 4341 | | 1003 | 5 |
| 4358 | | 1015 | 5 |
| 4359 | | 1021 | 5 |
| 4367 | | 1024 | 5 |
| 4375 | | 994 | 5 |
| 4376 | | 965 | 5 |
| 4377 | | 963 | 5 |
| 4380 | | 946 | 5 |
| 4472 | | 1027 | 5 |
| 4905 | | 948 | 5 |
| 5060 | | 930 | 5 |
| 5060A | | 930 | 5 |
| 7065 | | 930 | 5 |
| 9009 | | 929 | 5 |
| 9192 | | 957 | 5 |
| 9372 | | 930 | 5 |

**Thursday - June 29, 2023** **8:19 a.m.**

**P R O C E E D I N G S**

---000---

(The following pages 923 through 928 were placed under seal by Order of the Court:)

[redacted]

[redacted]

[redacted]

(The following proceedings were heard in open court:)

THE CLERK: Court is now in session.

For all of our faithful listeners out there, please remember any recording of this proceeding, either by video, audio, including screenshots and other copying of the hearing is strictly prohibited. Thank you.

THE COURT: All right. Good morning.

So I understand Defendant has called Amy Hood by declaration, which I've received in the record, and FTC has chosen not to cross-examine Ms. Hood.

MR. WEINGARTEN: Correct, Your Honor.

THE COURT: So the declaration is admitted into evidence. And then are there exhibits to be admitted with Ms. Hood?

MS. WILKINSON: There are, Your Honor. PX0083, PX1102, PX4028, PX4029, PX4033, PX4044, PX9009, RX1077, RX1078, RX1079, RX1080, and RX1105.

And, Your Honor --

THE COURT: Yes.

MS. WILKINSON: -- I assume you have no need to ask her any questions since FTC has decided not to cross-examine her, but she is here in case but I --

THE COURT: No, I do not.

MS. WILKINSON: Perfect. Thank you.

THE COURT: All right. All those exhibits are admitted.

(Trial Exhibits 0083, 1102, 4028, 4029, 4033, 4044, 9009, 1077, 1078, 1079, 1080, and 1105 received in evidence.)

THE COURT: Next, Defendants are calling Mr. Singer of Nintendo. I've gone over with the parties and so much of the video deposition involves confidential third-party information, that there's nothing really to show publicly. So I'll review that video deposition in camera.

Are there exhibits, then, to be admitted with Mr. Singer?

930

1    **MS. HILL:** Yes, Your Honor. Defendants would move in
2    RX5060, RX5060A, and RX1212.
3        **THE COURT:** Does the FTC have exhibits?
4        **MS. CIRINCIONE:** Yes, Your Honor. Thank you.
5    PX3218, PX3225, PX3233, PX3234, PX9372, and PX7065.
6        **THE COURT:** Okay. All those exhibits are admitted.
7    (Trial Exhibits RX5060, RX5060A, RX1212, 3218, 3225,
8        3233, 3234, 9372, and 7065 received in evidence.)
9        **MS. HILL:** Thank you, Your Honor.
10       **THE COURT:** And does the FTC have another witness to
11   call.
12       **MR. WEINGARTEN:** We do, Your Honor. The Plaintiff
13   calls Mr. Tim Stuart.
14               (Pause in proceedings.)
15       **MR. WEINGARTEN:** While we're waiting, Your Honor,
16   there was one housekeeping. We had discussed yesterday moving
17   into evidence some of the requests for admission responses that
18   we got, corporate admissions.
19       **THE COURT:** Yes.
20       **MR. WEINGARTEN:** So the exhibit is PX0070, which is
21   Respondent Microsoft's responses and objections to complaint
22   counsel's request for admission.
23       Just logistically, Your Honor, there's only obviously one
24   or two we want to move in as admissions. Would Your Honor want
25   to receive all of it or should we redact the ones we don't --

931

1        **THE COURT:** Well, you don't need to redact them. You
2    can just tell me.
3        **MR. WEINGARTEN:** Excerpt it?
4        Okay. It's the response to Request Number 9.
5        **THE COURT:** Number 9?
6        **MR. WEINGARTEN:** Thank you, Your Honor.
7        **THE COURT:** All right. That will be admitted.
8    (Trial Exhibit 0070 received in evidence.)
9        **THE COURT:** Mr. Stuart, if you can stand right there,
10   Ms. Means will swear you.
11       **THE CLERK:** Please raise your right hand.
12                   **TIMOTHY STUART,**
13   called as a witness for the Plaintiff, having been duly sworn,
14   testified as follows:
15       **THE CLERK:** Can you please state your name for the
16   record?
17       **THE WITNESS:** Tim Stuart.
18       **THE CLERK:** Thank you.
19       **THE COURT:** You may be seated.
20       **MR. WEINGARTEN:** Can we approach with a binder,
21   Your Honor?
22       **THE COURT:** Please.
23               (Pause in proceedings.)
24       **THE COURT:** You may proceed.
25   \\\

932

1                **DIRECT EXAMINATION**
2    BY MR. WEINGARTEN:
3    **Q.** Good morning, Mr. Stuart.
4    **A.** Good morning.
5    **Q.** You are the chief financial officer for Microsoft Gaming;
6    correct?
7    **A.** That's correct.
8    **Q.** And you are part of the overall Microsoft finance
9    organization; right?
10   **A.** That's correct.
11   **Q.** My understanding is you report to an intermediate person
12   who then reports to Ms. Amy Hood, the CFO of all of Microsoft?
13   **A.** That's correct.
14   **Q.** And even though there's a level between you, you do
15   interact with Ms. Hood quite frequently; correct?
16   **A.** That's correct.
17   **Q.** Especially when it comes to the financials and operations
18   of the Microsoft Gaming business?
19   **A.** That's right.
20   **Q.** You also sit on the Gaming Leadership Team; right?
21   **A.** I do.
22   **Q.** And that's the group of senior executives that helps run
23   Microsoft Gaming?
24   **A.** That's correct.
25   **Q.** Sometimes Gaming Leadership Team is abbreviated GLT?

933

1    **A.** That's right.
2    **Q.** Now, you are responsible for modeling of the Activision
3    deal value and financials as part of this proposed acquisition
4    that brings us all here; correct?
5    **A.** Yes, me and my team.
6    **Q.** And you own the output of the model of the financials and
7    the synergies; correct?
8    **A.** That's correct.
9    **Q.** And the code word for that model was Denali; right?
10   **A.** That's correct.
11   **Q.** D-E-N-A-L-I?
12   **A.** Yes.
13   **Q.** That's like the mountain?
14   **A.** It is.
15   **Q.** Okay. And you also sponsor and own the output for the
16   deal model that was created for the ZeniMax acquisition; right?
17   **A.** That's correct.
18   **Q.** Now, before we jump into those models, I want to ask you a
19   few questions about some agreements that we've heard about in
20   court.
21       You are not aware of any analysis of the profit and loss
22   impact to Microsoft from Microsoft having executed an agreement
23   with Nintendo about Call of Duty; correct?
24   **A.** That's correct.
25   **Q.** You and your team -- strike that.

934

1    Neither you nor your team has done any analysis of the
2  effect of entering into a listing agreement with Nvidia on the
3  Denali commitments or model; correct?
4  A.   That's correct.
5  Q.   And neither you nor your team has done any analysis of the
6  financial implications for Microsoft Gaming that could arise
7  from having entered into an agreement with Boosteroid; right?
8  A.   Correct.
9  Q.   And the same thing with respect to any agreement Microsoft
10  entered with Ubitus; correct?
11  A.   Correct.
12  Q.   And so on for EE, the cloud provider?
13  A.   Correct.
14  Q.   And for Nware, the cloud provider?
15  A.   Correct.
16  Q.   Okay.  And you and your team have not done any financial
17  analysis of the effects on Microsoft Gaming's business if any
18  of Microsoft's proposals to Sony were actually agreed and
19  executed; right?
20  A.   That's correct.
21  Q.   I want to ask you about some information that you shared
22  at the GLT with Mr. Spencer.
23    Now, Microsoft Gaming has something called a close review;
24  is that right?
25  A.   That's right.

935

1  Q.   And a close review is a monthly business review that goes
2  over things like the forecast and the budget for Microsoft
3  Gaming; right?
4  A.   That's right.
5  Q.   And you and your team create the monthly close review
6  presentation; right?
7  A.   Correct.
8  Q.   And you have a standing monthly meeting to discusses the
9  close review with Mr. Spencer and other members of the GLT;
10  right.
11  A.   That's right.
12  Q.   It doesn't always happen but it's scheduled?
13  A.   Correct.
14  Q.   And even if it doesn't happen, I assume the close review
15  deck gets circulated; correct?
16  A.   That's right, we'll e-mail it out if it -- if the meeting
17  doesn't happen.
18  Q.   Okay.  If you can please turn in your binder to
19  Plaintiff's Exhibit 1240.  You'll have to skip past all the
20  testimony.  Thank you.
21  A.   Give me a second to move the papers.
22  Q.   Please take your time.
23    (Pause in proceedings.)
24    THE WITNESS:  You said 1240?
25  \\\

936

1  BY MR. WEINGARTEN:
2  Q.   Yes, sir.
3  A.   (Witness examines document.)  Okay.  I'm here.
4  Q.   Okay.  The first page says "File provided natively," but
5  it indicates that the file is a close deck for April and it's
6  from April of 2022; is that right?
7  A.   That's correct.
8    MR. WEINGARTEN:  Okay.  The document has been entirely
9  designated as confidential, but I would move to admit
10  Plaintiff's Exhibit 1240, Your Honor?
11    THE COURT:  Admitted.
12    (Trial Exhibit 1240 received in evidence.)
13  BY MR. WEINGARTEN:
14  Q.   Okay.  So let's turn the page, sir, and you'll see the
15  cover page that says "Gaming Review April Results"; right?
16  A.   Yes.
17  Q.   Okay.  And I'd like to direct your attention in particular
18  to page 019.  It's the little pages in -- the little numbers in
19  the bottom corner.
20    And this document contains a lot of data that the GLT uses
21  to manage its business; right?
22  A.   That's right.
23  Q.   If you look at Plaintiff's Exhibit 1240-019 --
24    MR. WEINGARTEN:  I don't think the header is
25  confidential; right?  We're okay with that, the title of the

937

1  slide?
2    MR. GOSTAN:  That's fine.
3    MR. WEINGARTEN:  Okay.
4  BY MR. WEINGARTEN:
5  Q.   Q3 console market size share, do you see that?
6  A.   Yes.
7  Q.   Okay.  And Microsoft finance reports to the Gaming
8  leadership team about relevant information for the console
9  market; correct?
10  A.   Correct.
11  Q.   And it breaks down the console market into two different
12  components, a Gen 9 core console component and a total console
13  market; right?
14  A.   That's correct.
15  Q.   And the Gen 9 component of shares excludes the
16  Nintendo Switch and the Generation 8 consoles; right?
17  A.   That's correct.
18  Q.   And your team each month reports to the Gaming Leadership
19  Team -- if you look in the bottom left -- a share comparison
20  that's just in something called a core Gen 9 market; right?
21  A.   Those two lines, that's right, that's the Gen 9 market.
22  Q.   Okay.  And if you look in the upper right, there are two
23  geographies that are presented with special bar-and-line
24  graphs; right?
25  A.   Yes.

938

1  Q.   And the close review breaks out the United States into a
2  separate chart and the other market because historically those
3  tend to be the biggest regions for Xbox; right?
4  A.   That's correct.
5  Q.   Okay.  And, likewise, in the bottom right-hand corner,
6  there is a core Gen 9 market share that's divided up by regions
7  and geographies again; right?
8  A.   Correct.
9  Q.   The top line there is for the United States alone;
10 correct?
11 A.   The top row is United States, yes.
12 Q.   Okay.  And there's a worldwide number that is put at the
13 bottom of that table; right?
14 A.   Yes.  These are the markets that we track and we call it
15 worldwide and then total.
16 Q.   Okay.  And so, for example, Japanese data is not shown
17 here; correct?
18 A.   That's correct.
19 Q.   And that's because the data in Japan skews quite heavily
20 in favor of Nintendo or Sony because those are Japanese
21 companies; right?
22 A.   Among other things.  Data is also not as reliable on a
23 quarterly or monthly basis so we exclude it for other reasons
24 too.
25 Q.   Okay.  And those are the market size and share figures

939

1  that are shared each month among the members of the Gaming
2  Leadership Team?
3  A.   That's correct.
4  Q.   And you can put that aside, sir.  Thank you.
5       Now I want to talk to you a little bit about content.
6       Content is a key differentiator for gaming products and
7  services; right?
8  A.   That's right.
9  Q.   And without games being available, there's really no
10 reason for a player to be in an ecosystem to play games; right?
11 A.   That seems reasonable.
12 Q.   And for a video game subscription service, let's focus on
13 that kind of gaming service.
14      For a subscription service to scale up and reach scale,
15 that requires having a robust content pipeline; right?
16 A.   Yes.
17 Q.   And Microsoft Gaming under Mr. Spencer's leadership has
18 been spending money to acquire video game studios for the last
19 several years; right?
20 A.   That's correct.
21 Q.   And has engaged in a series of acquisitions leading up to
22 the, again, present acquisition that's the reason we're all
23 here today?
24 A.   That's right.
25 Q.   And have you ever heard the amount of money that's been

940

1  spent as a dump truck full of money over the years?
2  A.   I have a friend at work that likes to say "dump trucks of
3  money" and I've repeated it back to him.
4  Q.   Okay.  And so you were talking about the Microsoft surge?
5  Is that another fair way to describe this acquisition period
6  that's been underway for a couple of years?
7  A.   I would just say we have been acquiring companies over the
8  last few years.
9  Q.   I see.  And informally with your friend you refer to it as
10 spending dump trucks of money on content; right?
11 A.   He said that to me once and I rephrased it back to him.
12 Q.   Okay.  And it's your view that a pipeline of content helps
13 drive user or consumer decisions about a subscription service
14 or an ecosystem for video games; right?
15 A.   Yes, content is a big piece of that puzzle.
16 Q.   Okay.  And we'll get to the model in more detail, but the
17 Activision acquisition as its modeled in the Denali model has a
18 component that talks about the impact of the Activision content
19 on Microsoft Game Pass; right?
20 A.   That's right.
21 Q.   And that's because when you add that content, it helps
22 create another reason for someone to subscribe to Game Pass;
23 right?
24 A.   That's right.
25 Q.   And the theory is that new users subscribe and existing

941

1  users play more and the hours go up and engagement goes up and
2  so on; right?
3  A.   That's the rough theory, that's right.
4  Q.   Okay.  There is a correlation, at least in some sense,
5  between content and engagement and revenue on a subscription
6  service; right?
7  A.   Yes.  You have to have good games to play and you have to
8  have reasons to come in and play in service.
9  Q.   Okay.  I want to talk to you about the subscription and
10 Game Pass offerings in a little more detail.
11      Could you please turn to PX1151?
12 A.   (Witness examines document.)  Yes, I'm here.
13 Q.   This is an e-mail at PX1151 that is dated March 29th,
14 2022, and it's from you to Ms. Hood; right?
15 A.   That's right.
16 Q.   And it's also to a gentleman named Bill Duff.  Is Mr. Duff
17 your direct manager?
18 A.   That's right.
19 Q.   So then he reports in turn to Ms. Hood?
20 A.   Correct.
21 Q.   Okay.
22      MR. WEINGARTEN:  Your Honor, move to admit PX1151.
23      THE COURT:  Admitted.
24      (Trial Exhibit 1151 received in evidence.)
25      MR. WEINGARTEN:  Thank you.

942

BY MR. WEINGARTEN:

Q. We'll talk around the document. I believe it's -- actually, I don't have it marked as confidential.

MR. WEINGARTEN: Karen, this one is okay?

MR. GOSTAN: There's a portion underneath --

MR. WEINGARTEN: Okay. I'll talk around that.

MR. GOSTAN: Yeah.

MR. WEINGARTEN: Okay.

MR. GOSTAN: Where it starts "There is an opportunity."

MR. WEINGARTEN: Okay. Got it.

BY MR. WEINGARTEN:

Q. So the unredacted portion, sir, we can talk to is the top bit where you've laid out a table, and the table lays out a comparison of the tiers and the pricing for Sony's subscription service and Xbox's subscription services; right?

A. That's correct.

Q. And so for the PlayStation at this time a year and a half or so ago there's PS Plus Essential, PS Plus Extra, and PS Plus Premium; right?

A. That's right.

Q. And under the Xbox, the tiers are XBL Gold, which stands for Xbox Live Gold; right?

A. Correct.

Q. Then there's XGP, which is Xbox Game Pass; right?

943

A. That's right.

Q. And X, I think that says BP, but is it supposed to be XGP Ultimate?

A. That's correct.

Q. Okay. So it should be Xbox Game Pass Ultimate is the final tier; right?

A. Correct.

Q. And for each of the tiers you've listed the price and you've listed the features; right?

A. That's correct.

Q. And you wrote to Ms. Hood and Mr. Duff (as read):

"Wanted to send over my quick take on Sony's announce of their Game Pass compete and subscription tiers."

Do you see that?

A. Yes.

Q. And you included an article, and you say (as read):

"I created the table below to detail the high-level features within each tier and what it includes versus Xbox today."

Do you see that?

A. That's right.

Q. Now, I won't read this part aloud and neither should you, sir, but look under the table. Do you see the part that says "There is"?

A. Yes.

944

Q. That opportunity -- well, let's try it this way: Take a look at that word "opportunity," and then I want you to turn in your investigational hearing transcript, which is at the very beginning of your binder, to page 101 -- well, actually I can do it -- maybe we can do it a little bit easier. Sorry.

Let's stick at 1151. Do you see the word "opportunity"?

A. Yes.

Q. The next sentence is about what that opportunity is; right?

A. That's right.

Q. Okay. And so it's ability to blank is the opportunity; right?

A. Yes.

Q. Okay. And this is based on a benchmarking of Xbox's subscription service against the PlayStation subscription service; right?

A. Yes, based on value to the consumer. I believe we have "opportunity" here.

Q. All right. And you believed at the time you wrote this that Xbox was providing a more compelling service; correct?

A. I do.

Q. And that's because there was more content on the Xbox service and, therefore, more value for customers than the Sony service?

A. In addition to what I call out here, which is our

945

first-party day and date strategy in addition to the games that we have in service.

Q. Okay. So having first-party day and date go into Xbox's subscription service is an advantage, in your view, versus Sony's model?

A. I believe it provides more value to the consumer.

Q. And a more -- another reason for a consumer to engage with or subscribe to Xbox's product; right?

A. That's right.

Q. And I think we've established this before, but having high-quality titles, having key titles, that's important to content subscriptions because that drives hours and engagement; right?

A. That's right. You need quality content for people both to subscribe and to want to stay in the service.

Q. You can set that one aside. Thank you, sir.

Now I want to talk a little bit about the two kinds of Xboxes, the Xbox series consoles that are offered; right? So there's an Xbox Series X and there's an Xbox Series S; right?

A. That's right.

Q. And the X is priced at 499?

A. Yes.

Q. And the S is 299?

A. That's correct.

Q. Now the S is cheaper but the pricing strategy was to be an

946

1 entry point into the Gen 9 console market; correct?

2 A. Less about an entry point Gen 9 or otherwise. It's a
3 cheaper box relative to what consumers may want to pay at that
4 price point.

5 Q. Well, the function of going -- it's a -- let me strike
6 that.

7      So the generation -- the Xbox S is a Gen 9 console; right?

8 A. Gen 9 is kind of an inside baseball term. In any event,
9 the console also competes against other products in the market.

10 Q. Okay. Let me ask you to turn, please to page -- PX4380.

11 A. (Witness examines document.)

12 Q. Now -- yeah, go ahead. Please, take your time.

13 A. (Witness examines document.) Okay.

14 Q. Okay. Plaintiff's Exhibit 4380 is another e-mail from you
15 and this one is to Ms. Hood, Mr. Nadella, Mr. Spencer, and to
16 Mr. Jerret West dated September 16, 2020; correct?

17 A. That's right.

18      MR. WEINGARTEN: I move to admit PX4380, Your Honor.

19      THE COURT: Admitted.

20      (Trial Exhibit 4380 received in evidence.)

21 BY MR. WEINGARTEN:

22 Q. Now, September of 2020 when this e-mail was sent, that's
23 around the time when the Xbox series consoles were going to
24 launch; right?

25 A. That's right.

947

1 Q. And you're talking in this e-mail about some pricing news
2 that Sony had announced for the PlayStation 5; right?

3 A. That's correct.

4 Q. So Sony had put out some information about what their
5 Gen 9 console would be priced at; right?

6 A. That's right.

7 Q. And you are updating Microsoft's chief financial officer,
8 its chief executive officer, the gaming chief executive
9 officer, and others about the Sony pricing news; right?

10 A. That's right.

11 Q. And you are updating them about how the Xbox offering
12 compares on feature and price to the PlayStation offering;
13 right?

14 A. That's right.

15 Q. And if you look at the -- do you see where it says
16 "Relative to Xbox offering"?

17 A. Yes.

18 Q. Don't read it out loud. I believe this has been redacted.
19      Look at the second bullet.

20 A. Uh-huh.

21 Q. "We will have the best." Do you see that?

22 A. Yes.

23 Q. Read that to yourself.

24 A. (Witness examines document.) Yep.

25 Q. Now that was an accurate description of the Series S price

948

1 point and pricing when you wrote that to Ms. Hood, Mr. Nadella,
2 and Mr. Spencer; right?

3 A. That's right. This is relative to what Sony had just
4 announced so I'm benchmarking it against that.

5 Q. Okay. And is it still your testimony that the Xbox S is
6 not a Generation 9 console?

7 A. It's a Gen 9 console.

8 Q. Okay. So the S is a Gen 9 console?

9 A. Yes.

10 Q. Let's take a look, please, at PX4905 just a few tabs
11 further.

12 A. (Witness examines document.) Yes, I'm here.

13 Q. So this is an e-mail from you to Mr. Spencer and others
14 from about two years later, August of 2022; right?

15 A. That's correct.

16      MR. WEINGARTEN: Move to admit PX4905.

17      THE COURT: Admitted.

18      (Trial Exhibit 4905 received in evidence.)

19 BY MR. WEINGARTEN:

20 Q. Now, here again, you're informing Mr. Spencer and some
21 others about some pricing moves from Sony; right?

22 A. That's correct.

23 Q. And you're talking about some foreign exchange effects and
24 other pricing differences between the Xbox X and the Sony
25 PlayStation 5; right?

949

1 A. That's right.

2 Q. And the Xbox S and the PlayStation 5; right?

3 A. Correct.

4 Q. Okay. So, once again, two years after launch you're
5 informing leadership about the relative pricing of the Series X
6 and S versus the PlayStation 5; right?

7 A. That's correct.

8 Q. You can set that aside, please, sir.

9      Now I would like to talk to you about the Denali model.

10      The Denali model is the model for Microsoft's acquisition
11 of Activision; right?

12 A. That's correct.

13 Q. It's the model that was created and used to present
14 information to the Microsoft Board of Directors about the deal;
15 right?

16 A. That's correct.

17 Q. And the Denali model assumed that Activision's existing
18 businesses would continue to operate just as they were before
19 acquisition; right?

20 A. We have an existing business assumption. I wouldn't say
21 just as. There's a line in there for that.

22 Q. Okay. So in the model there's a line that's an output
23 line for the existing Activision business; right?

24 A. That's right.

25 Q. And the model assumes for the existing business no major

950

1  changes in platform strategy, for example?

2  A.  That's correct.

3  Q.  Now, with respect to the ZeniMax deal model, that was also

4  a model that you created and owned and your team created and

5  owned; right?

6  A.  That's correct.

7  Q.  That model for ZeniMax also went to the board as part of

8  its consideration of the ZeniMax deal; right?

9  A.  As they were when the ZeniMax deal.

10  Q.  And you made the same assumption with respect to the

11  ZeniMax model; namely, the ZeniMax existing business, if it was

12  met -- multiplatform, would continue as it was for the existing

13  business line; right?

14  A.  That's right.

15  Q.  So the ZeniMax model, like the Activision Denali model,

16  assumes that ZeniMax content will continue to be available on

17  Xbox and other platforms; right?

18  A.  We have an existing business line that continues, that's

19  right.

20  Q.  And that's the assumption in the existing business line

21  for both models; right?

22  A.  Yes.

23  Q.  And the model for ZeniMax assumed that there would be

24  non-Xbox platform revenue going forward for ZeniMax titles;

25  right?

951

1  A.  That's right.

2  Q.  So too for the Activision model; right?

3  A.  Correct.

4  Q.  Okay.  Now, at some point the model that gets presented to

5  the board of directors becomes what is called a final go/no go

6  model; right?

7  A.  That's right.

8  Q.  And the final go/no go is sort of the -- the model and the

9  output as they are when the final decision on whether to make

10  the acquisition is going to occur?

11  A.  Yes.  We make any final edits or adjustments since the

12  deal was approved to when the deal gets signed.

13  Q.  Okay.  And once the final go/no go version is set, fair to

14  say the Denali model is basically locked at that point;

15  correct?

16  A.  The valuation is set as a commitment.  The model obviously

17  changes over time, but the valuations, our commitment, that

18  gets locked at the final go/no go.

19  Q.  Okay.  So the model you can keep adjusting and using the

20  model as you need for your business needs?

21  A.  We don't change the core model that goes in the final

22  go/no go.  Likewise, we don't change the board deck.  We lock

23  the valuation and then move forward with the business.

24  Q.  Okay.  So, for example, in the case of Activision, after

25  the Denali model was set and the outputs and the commitments

952

1  were set, there came a time when the Activision negotiating

2  team gave Microsoft some updated information about its

3  financials; right?

4  A.  That's right.

5  Q.  And there was information about the financials that

6  differed from the information that had been used to build the

7  existing business Denali model; right?

8  A.  We would get updates throughout the course that

9  highlighted trends or changes in the business.

10  Q.  Do you remember a particular change that was of a greater

11  magnitude perhaps than some of the others?

12  A.  Not specifically, no.

13  Q.  Okay.  Let me refer you then -- would it help you refresh

14  your recollection if we looked at your deposition?

15  A.  Sure.

16  Q.  Okay.  Let's turn to your deposition, please.  We have a

17  lot of transcript there.  It's the smaller one I think, but

18  it's the one that says "Remote Videotaped Deposition," PX7040.

19  A.  All right.  Did you have a page for that one?

20  Q.  I do.  So in PX7040, can you please turn to little

21  page 39.  It's the transcript page 39.

22  A.  (Witness examines document.)

23  Q.  Actually, it's pages 38 and 39.  So when you get there,

24  read to yourself, please, page 38, line 19, through 39:3.  Take

25  your time.

953

1  A.  (Witness examines document.)  All right.  19 through

2  where?

3  Q.  Yep.  Little page 38, line 19, that starts "Do you

4  remember" and it ends with an answer on page 39 on the top.

5  Take a look at that and let me know when you've had a chance to

6  read it.

7  A.  (Witness examines document.)  Yes, I'm familiar with this.

8  Q.  Okay.  So does that refresh your recollection, sir, that

9  early in January 2022, the Activision negotiating team

10  communicated that it was going to be revising the Activision

11  financials in the manner that's described in that question and

12  answer?

13  A.  That's right.  They had submitted to us an updated

14  forecast for their business.

15  Q.  So in January 2022, before the deal was announced,

16  Activision sent over a revision and the revision was of that

17  magnitude that's described in page 38, line 22; right?

18  A.  That's right.

19  Q.  Not a small revision; correct?

20  A.  I would say it's relatively small when you're talking

21  about a ten-year model with terminal value in it.

22  Q.  Okay.

23  A.  This is specific to one title in the current year.

24  Q.  Okay.  And that revision of the financials was not

25  incorporated into the Denali deal model; right?

954

1   **A.**  That's correct. The output of that was not extremely
2   meaningful to the valuation.
3   **Q.**  And because in part the deal model was locked so the
4   events, the change in assumptions did not need to be reflected?
5   **A.**  This specific change here, I did not deem it worthy to run
6   through the model, and we had the board model already
7   completed.
8   **Q.**  Okay. So this one you didn't reflect in the model?
9   **A.**  We -- the board model was locked after this point. We did
10  not go back and update things to the board.
11  **Q.**  And you didn't update before it got to the board with this
12  new information; right?
13  **A.**  That's correct. Our commitment's to the valuation.
14  **Q.**  Now, you can put that aside.
15      I want to talk to you a little bit about ZeniMax.
16      Do you remember representing Xbox at an investor
17  conversation that the Jefferies Investment Bank hosted in
18  November of 2020?
19  **A.**  I do.
20  **Q.**  Okay. That's shortly after Microsoft's acquisition of
21  ZeniMax was announced; right?
22  **A.**  That's correct.
23  **Q.**  And it's around the time that the new Xbox Gen 9 consoles
24  are launching; right?
25  **A.**  It's around the time that Series S and Series X launched,

955

1   that's right.
2   **Q.**  Okay. And you were on a Q and A panel or interview on
3   a -- for an audience; right?
4   **A.**  It was an investor conference, that's right.
5   **Q.**  You were on a stage and you were asked questions?
6   **A.**  I don't recall if it was virtual or on stage, but I'm
7   asked questions.
8   **Q.**  Okay. And when asked about ZeniMax content, you told the
9   audience that Microsoft Gaming did not have any intention of
10  just pulling all of the ZeniMax content off of Sony, Nintendo,
11  or otherwise; right?
12  **A.**  That's right.
13  **Q.**  And sometimes, just so the record's clear, people use the
14  word "ZeniMax" or they use the word "Bethesda" interchangeably
15  to refer to that company; right?
16  **A.**  That's right.
17  **Q.**  Because Bethesda is, I guess, technically the studio that
18  makes the content?
19  **A.**  One of the studios but the biggest one, yeah.
20  **Q.**  Okay. If we use ZeniMax and Bethesda interchangeably, you
21  understand what we mean?
22  **A.**  Yes.
23  **Q.**  Okay. And then you told the audience after you had told
24  them Microsoft was not going to be pulling any content away,
25  you said (as read):

956

1         "But what we want is we want that content in the long
2     run to be either first or better or best or pick your
3     differentiated experience on our platforms."
4      Do you remember telling the audience that?
5   **A.**  Can I just look at the transcript? You said "any" and I
6   refer -- I think I said "all." I just want to make sure I was
7   clear what you asked me.
8   **Q.**  Yeah, no. Let's take a look.
9      So if you look in your binder at PX9192, that's the
10  transcript.
11  **A.**  (Witness examines document.)
12        **THE COURT:**  The last one.
13        **THE WITNESS:**  Sorry. Just give me a second.
14        **MR. WEINGARTEN:**  It always is.
15        (Pause in proceedings.)
16        **THE WITNESS:**  Thank you, Your Honor.
17      (Witness examines document.) Okay. I'm here.
18  **BY MR. WEINGARTEN:**
19  **Q.**  Okay. So PX9192 is a transcript of a Microsoft
20  Corporation management presentation at a Jefferies Interactive
21  Entertainment Virtual Conference. Do you see that?
22  **A.**  Yes.
23  **Q.**  And the transcript is of a conference event held on
24  November 12th, 2020, and you are listed as the company
25  participant; right?

957

1   **A.**  Correct.
2   **Q.**  Okay. And you have no reason to doubt the accuracy of
3   this transcript; right?
4   **A.**  That's right.
5   **Q.**  Okay.
6        **MR. WEINGARTEN:**  Move to admit PX9192, Your Honor.
7        **THE COURT:**  Admitted.
8        (Trial Exhibit 9192 received in evidence.)
9   **BY MR. WEINGARTEN:**
10  **Q.**  Okay. Let's take a look at page 014, please.
11  **A.**  (Witness examines document.) Okay.
12  **Q.**  And if you look at the second paragraph, there's that
13  sentence about "In the long run is we don't have intentions of
14  just pulling all of Bethesda content" -- does that say off of?
15  **A.**  Out of.
16  **Q.**  -- "out of Sony or Nintendo or otherwise."
17  **A.**  Yes. I said "all" there. I think you said "any" when you
18  asked me the question.
19  **Q.**  I'm sorry.
20      Okay. And then the next line was (as read):
21         "But what we want is we want that content in the long
22     run to be either first or better or best or pick your
23     differentiated experience on our platforms. We want" --
24     "We will want Bethesda content to show up the best as on
25     our platforms."

958

1     Do you see that?
2  **A.**  I do.
3  **Q.**  And that's what you told the participants from the public
4 at the investor conference; right?
5  **A.**  That's right.
6  **Q.**  And I just want to ask you a couple of questions about
7 that.
8     So "first" could mean showing up first on a Microsoft
9 platform as compared to another platform; right?
10  **A.**  It could be, like what we've done with Starfield, that's
11 right.
12  **Q.**  And "better" could mean, for example, that the game has
13 better resolution on a Microsoft platform as opposed to a
14 non-Microsoft platform; right?
15  **A.**  I didn't mean that in this scenario, no. I was looking
16 through the consumer lens of what "better" or "best" would
17 mean.
18  **Q.**  Well, having better resolution is better from a consumer
19 perspective when playing a game; right?
20  **A.**  Resolution is one thing. Frame rate's another thing.
21 There are many things you can use the word "best" for. I was
22 being pretty vague in my answers here pretty specifically. We
23 hadn't had plans at this point.
24  **Q.**  Okay. Let me -- "first" or "better" or "best" could also
25 refer to other characteristics or features of the content that

959

1 would be better on the Microsoft platform as opposed to the
2 non-Microsoft platform; right?
3  **A.**  I didn't define it when I was talking here. Again, I was
4 being specifically vague at this point. We had just closed the
5 acquisition and I was talking about experiences we -- things we
6 can do with ZeniMax. I wasn't being specific one way or the
7 other.
8  **Q.**  I understand you didn't make specifics at the conference;
9 but as you understand it, when you used terms like "first,"
10 "better," or "best," some of that could be referring to timing
11 of when the content is released; right?
12  **A.**  Yeah. If you're a consumer it could mean a lot of things.
13 It could mean resolution. It could be timing. It could be
14 some notion of downloadable content. I wasn't referring to any
15 of those in this -- this conversation here.
16  **Q.**  You weren't referring to them explicitly, but that is the
17 meaning that you agree is implied in "first," "better," and
18 "best"; right?
19  **A.**  I think a consumer could read that in any way. When I was
20 referencing it here, it's things like Starfield, how we're
21 bringing that to our platform or showing up in Game Pass is a
22 great experience for consumers.
23  **Q.**  Let me ask you, please, to look in your deposition at
24 page 257.
25  **A.**  Is it 7040?

960

1  **Q.**  Yes, sir?
2  **A.**  Okay.
3     (Witness examines document.) Yes, I'm here.
4  **Q.**  Okay. And if you look at page 257, starting at line 15
5 (as read):
6     **"QUESTION:** Yeah. When you say 'first on our platforms,'
7     that necessarily means first on our platforms as compared
8     to other platforms; right?
9     **"ANSWER:** As a vague example, it could be, that's right.
10     Again, it's title by title. So when I say 'first tier,'
11     it could be timing. It could be at a certain place.
12     'Better' could be showing up in resolution, safety,
13     security.
14     "Again, I'm giving some very vague examples here of
15     what that could look like."
16     That was your testimony; right?
17  **A.**  That's right.
18  **Q.**  That was truthful and accurate; right?
19  **A.**  That's right.
20  **Q.**  Okay. So "first," "better," "best" could include lots of
21 different kinds of features or timing or other things; right?
22  **A.**  Yes. It could be many things as defined by whoever's
23 reading "first," "better," or "best."
24  **Q.**  Okay. And then you said in your transcript of the
25 Jefferies conference (as read):

961

1     "Yes, that's not a point about being exclusive.
2     That's not a point about where being adjusting time and
3     content or road map; but if you think about something like
4     GP, if it shows up best in Game Pass, that's where we want
5     to see and we want to drive our Game Pass subscriber base
6     through that Bethesda pipeline."
7     Do you remember saying that?
8  **A.**  Yes.
9  **Q.**  And you also said at the conference to the public (as
10 read):
11     "So, again, I'm not announcing pulling content from
12     platforms one way or the other, but I suspect you'll
13     continue to see us shift towards a first or better or best
14     approach on our platforms."
15     Do you see that?
16  **A.**  I can go back. I believe you, yes.
17  **Q.**  Do you remember saying that?
18  **A.**  Yes.
19  **Q.**  Okay. And do you still believe that to be true as a
20 statement?
21  **A.**  I believe showing up in things like Game Pass, like I
22 said, is a great experience for customers. It could be one of
23 the best if that's how they play.
24     Again, things like Starfield and Redfall did show up first
25 on Xbox so we're following through on the things I said there.

962

1  Q. And you were being vague, deliberately so, for the
2  audience. You didn't want to make any announcements at that
3  conference; right?
4  A. Correct. When I'm talking to investors about long-range
5  planning when there's no plans, I wouldn't announce anything
6  specific.
7  Q. But even though you were vague, you believe that there
8  would continue to be a shift to a first or better or best
9  approach on Microsoft platforms; right?
10 A. Again, as evidenced by Starfield, we launched that
11 exclusively on our platform, that's an example of one of those
12 potentially.
13 Q. And after the Jefferies conference, do you remember
14 talking or chatting with Mr. Spencer about your comments that
15 you made at the Jefferies conference?
16 A. I do.
17 Q. Let's look, please, at Plaintiff's Exhibit 4377.
18 A. (Witness examines document.) Okay. I'm here.
19 Q. 4377 is in camera. It's confidential so don't read any of
20 it out loud, please.
21    But this is a transcript of a chat between you and
22 Mr. Spencer dated November 17th, 2020. Do you see that?
23 A. That's right.
24    MR. WEINGARTEN: And move to admit Plaintiff's
25 Exhibit 4377.

963

1     THE COURT: Admitted.
2     (Trial Exhibit 4377 received in evidence.)
3  BY MR. WEINGARTEN:
4  Q. So this is just a short period of time after the Jefferies
5  conference; right?
6  A. That's right.
7  Q. Okay. And Mr. Spencer on page 002 of PX4377 towards the
8  bottom says that you're --
9     MR. WEINGARTEN: Can I read that one, "Your words sure
10 did"?
11    (Pause in proceedings.)
12    MR. GOSTAN: Yeah, you can read that.
13 BY MR. WEINGARTEN:
14 Q. So Mr. Spencer says (as read):
15    "Your words sure did stir up a lot of stuff."
16    And then you responded, and I think we already did this in
17 public session, you wrote (as read):
18    "Wish we could just go out and say we are taking it
19    all exclusive at this point."
20    Mr. Spencer wrote back and said (as read):
21    "Yeah, we just can't say. I think it was the first
22    and best that got people going."
23    And he continued (as read):
24    "First assumes there is a second on PS."
25    And you wrote (as read):

964

1     "That's right. Needed to thread the needle versus
2     saying we don't intend to make any changes."
3     Do you see that?
4  A. Yes.
5  Q. That was your conversation with Mr. Spencer, right, after
6  the Jefferies conference?
7  A. Yeah, that's right.
8  Q. And when you said, "Wish we could just go out and say we
9  are taking it all exclusive at this point," "it all" means the
10 ZeniMax titles?
11 A. Yes. We aren't obviously able to say that, but that's
12 what I said here.
13 Q. Okay. And PS -- when Mr. Spencer writes "First assumes
14 there is a second on PS," you understand "PS" to mean
15 PlayStation?
16 A. That's correct.
17 Q. Okay. Now, Mr. Spencer makes the ultimate decisions about
18 whether content that Microsoft owns is going to become
19 exclusive to Microsoft in any way; right?
20 A. That's correct.
21 Q. All right. You can put that aside, please.
22    Let's take a look at Plaintiff's Exhibit 4376, please.
23 A. (Witness examines document.) Okay. I'm here.
24 Q. This is another short chat transcript. This one is
25 between you and Mr. Matt Booty; right?

965

1  A. That's right.
2  Q. Mr. Booty is the head of Microsoft's in-house game
3  studios; right?
4  A. That's correct.
5  Q. Okay. And those are sometimes called the first-party
6  studios; right?
7  A. That's right.
8  Q. The date of this transcript is December 1st, 2020; right?
9  A. Yes.
10    MR. WEINGARTEN: Move to admit Plaintiff's
11 Exhibit 4376, please.
12    THE COURT: Admitted.
13    (Trial Exhibit 4376 received in evidence.)
14 BY MR. WEINGARTEN:
15 Q. Now, Mr. Booty is writing to you about getting somebody's
16 perspective on exclusivity -- oh, strike that.
17    You write at the beginning of this chat (as read):
18    "Getting their perspective on exclusivity will be
19    fascinating. Example, are they wanting to go a single
20    platform and deal with the huge fan backlash that they've
21    built over years?"
22    Do you see that?
23 A. I do.
24 Q. That's -- "their perspective" is referring to the
25 perspective of ZeniMax executives; right?

1 **A.** I believe that's right.

2 **Q.** Okay. And you're talking there about getting the ZeniMax

3 executives' perspective on taking content exclusive; right?

4 **A.** Yeah. Part of the decision to do something like that that

5 Phil would make was get input from those making the games.

6 **Q.** Uh-huh. And Mr. Booty responds and you say "I like that

7 perspective."

8     And then Mr. Booty says (as read):

9         "The only wrinkle in that plan" --

10    **MR. GOSTAN:** James, that part has been redacted.

11    **MR. WEINGARTEN:** Oh.

12    **MR. GOSTAN:** You can just not say the number.

13    **MR. WEINGARTEN:** Okay. Thank you for letting me know.

14 **BY MR. WEINGARTEN:**

15 **Q.** (as read):

16        "The only wrinkle in that plan is that we have

17    blank" -- you see the number -- "units each on the

18    PlayStation for some titles there."

19    Do you see that?

20 **A.** I do see that.

21 **Q.** Okay. And then Mr. Booty continues (as read):

22        "But the upside to XGP and console sales might offset

23    that."

24    Do you see that?

25 **A.** I do see that.

---

1 **Q.** So you understood Mr. Booty to be saying that taking some

2 content exclusive has a wrinkle because you lose sales on the

3 PlayStation platform; right?

4 **A.** That's right.

5 **Q.** But there's an upside to offset that loss and the upside

6 has two components, a component that benefits Game Pass; right?

7 **A.** That's right.

8 **Q.** And a component that benefits console sales; right?

9 **A.** I see his comment there about that. In our deal models we

10 don't reflect console sale change.

11 **Q.** I understand. In your response, though, to Mr. Booty was

12 (as read):

13        "Right. That's the concern on valuation; but if we

14    can paint a higher XGP subgrowth, more Xbox units, and

15    more share could be an offset."

16    So you said, Right," those three things -- Xbox Game Pass

17 subscriber growth, more Xbox units, and more share -- could

18 offset the loss from taking some games exclusive; right?

19 **A.** Yes. My team and I do various scenario analysis of how to

20 think about valuation. These are some of the options you could

21 pick. I obviously don't pick all of them, but those are some

22 of the options.

23 **Q.** Okay. And actually you tell him some more good news. You

24 say (as read):

25        "Due to cash flow discounting, we don't need to make

---

1     up that full AM in today's dollars."

2 And that "AM," that's a Microsoft term for accountability

3 margin; right?

4 **A.** That's right.

5 **Q.** That's like profit?

6 **A.** Yes.

7 **Q.** So the gaming business makes AM or profit?

8 **A.** That's right.

9 **Q.** Okay. And so you're telling Mr. Booty that because the

10 valuation goes out, as you've told us now in court a few times,

11 ten years, you actually need fewer dollars today to make up for

12 some of those effects that are ten years in the future if you

13 take titles off; right?

14 **A.** Potentially, but pulling things out of the model early in

15 the years has a much bigger impact on your cash flow discount.

16 **Q.** Okay. But according to what you told Mr. Booty is "Due to

17 cash flow discounting, we don't need to make up that full AM

18 with today's dollars"; right?

19 **A.** That's right. It's discounted over time.

20 **Q.** And you're talking about the concern on valuation. The

21 valuation you're referring to there, that's the commitment to

22 the board; right?

23 **A.** That's right. That's the number we have to hit.

24 **Q.** And so even if you take an action or Microsoft Gaming

25 takes an action that could impact that valuation to the board,

---

1 there are other actions and strategies that Microsoft can

2 deploy to try to continue to hit that number; right?

3 **A.** Yeah, there are various scenarios you can do to hit the

4 commitments over ten years.

5 **Q.** Okay. You can put that aside.

6     I have a couple more questions for you about hitting the

7 numbers.

8     Now, you're familiar with a Project Neutrino model?

9 **A.** Yes.

10 **Q.** And Neutrino was an analysis of scenarios around different

11 ZeniMax titles and options for exclusivity; right?

12 **A.** I believe so, yes.

13 **Q.** And Neutrino involved five different scenarios for ZeniMax

14 content; right?

15 **A.** Yes.

16 **Q.** Okay. Let's please turn in your binder to PX1966.

17 **A.** (Witness examines document.) Yes, I'm here.

18 **Q.** I'm sorry. The type is small, but PX1966, you can see

19 it's a chat transcript; right?

20 **A.** That's right.

21 **Q.** And you can see it's dated February 9th, 2021; right?

22 **A.** Correct.

23 **Q.** And if you look at the initial participants, you can look

24 through there and you're one of them; right?

25 **A.** That's right.

970

1  Q.  And Mr. Spencer is a participant; right?  Third line there
2  it says "Phil SP at Microsoft"?
3  A.  Yep, I see it.
4  Q.  Okay.  And the next e-mail over, Ms. Bond --
5  A.  Yep.
6  Q.  -- is a participant?
7      And several of the other leaders of the Microsoft Gaming
8  business; right?
9  A.  That's right.
10  Q.  Okay.  At some point in the chat there is a figure
11  attached; and if you look at page 008, it's a figure that says
12  five scenarios.  Do you see that?
13  A.  I do.
14  Q.  Okay.  And is this a summary of five potential scenarios
15  with respect to ZeniMax content after Microsoft completes its
16  acquisition of ZeniMax?
17  A.  That's right.  The marketing team had put together a few
18  scenarios of options to deal with the ZeniMax business.
19  Q.  And if you look, please, at PX1966-003, if you look at
20  the -- one, two, three, four, five -- sixth chat, it's got a
21  bold "Edited."  So I guess you edited it.  After you wrote it,
22  you kind of made a correction or something; right?
23  A.  Likely, yes.
24  Q.  If you look at the bold one that says "Edited," and you'll
25  say (as read):

971

1      "Will want to paint the picture of what we need to
2      believe to make number five work within the deal model
3      constraints.
4      "Example:  We are committed to X.  We're making a
5      change to the road map and still going to hit X through
6      these strategies."
7      Do you see that?
8  A.  That's right.  If we're going to hit the valuation, we
9  have to -- and there's a change to the road map, we still have
10  to make sure we make up for it.
11  Q.  So if one of the strategies that's presented in the
12  Neutrino -- well, strike that.  Let me ask you.
13      The five scenarios that we looked at at the back, those
14  are the Neutrino scenarios; right?
15  A.  I believe that's right.
16  Q.  So depending on what Neutrino scenario Microsoft Gaming
17  considers, that will have an impact on meeting the commitments
18  in the valuation for ZeniMax; right?
19  A.  That's right.
20  Q.  And you get a gap, a number that tells you, okay, here's
21  the commitment and if we do this strategy, here's the
22  shortfall; right?
23  A.  In a scenario analysis that's right.  Again, this was a
24  marketing team that put this together; but you're right on
25  the -- if there's a gap, you have to make up for it.

972

1  Q.  Right.  And if there's a gap, then one of your
2  responsibilities is to help the team think about, if they
3  implement the strategy, how to fill back up the gap, other ways
4  to get back to the valuation number; right?
5  A.  That's right.  That's a core part of my job.
6  Q.  Okay.  And in your chat you reference number five, and
7  that's number five of the five scenarios presented on page 008?
8  A.  That's right.
9  Q.  And the scenarios run from one to five.  One is fully
10  cross platform; right?
11  A.  Correct.
12  Q.  And it runs through various degrees of exclusivity to
13  five, Xbox focused; right?
14  A.  That's right.
15  Q.  So you're talking in this chat about what do we do if we
16  choose number five; right?
17  A.  Yes.  I'm reminding the team that if we choose any of the
18  scenarios and it has an impact on anything, we need to make
19  sure we hit the valuation.
20  Q.  Right.  And the picture here of the five scenarios, it
21  says -- it use the word "Adam."  Was "Adam" a code name for
22  ZeniMax?
23  A.  That's right.
24  Q.  Okay.  So when we see "Adam" there, we can understand that
25  to mean ZeniMax?

973

1  A.  Correct.
2  Q.  Okay.  Now, going back to the chat, there's quite a bit of
3  response to your chat about number five and still trying to hit
4  the valuation with other strategies; right?
5  A.  I can read through it if you'd like me to.
6  Q.  Well, there's just other chats that are -- take your --
7  take a minute, if you like, but those other chats down below,
8  they're responsive?
9  A.  Yeah, that's right.
10  Q.  Okay.  For example, Mr. West writes at 8:38 and 15 seconds
11  (as read):
12      "I think combining Tim and Sarah's point would be a
13      good way to respond to Phil's intuition.  There is
14      significant upside to number five.  We might see a huge AC
15      number on Game Pass for these tentpole releases."
16      Do you see that?
17  A.  I do.
18  Q.  That was one of the senior executive's responses to your
19  reminder about the valuation model and the commitments; right?
20  A.  Yeah.  It looks like he was giving his opinion on possible
21  scenarios there.
22  Q.  And was there a conversation about how some of the folks
23  at ZeniMax would respond to this idea if number five were
24  implemented?
25  A.  I don't know about directly.  We just talked about we

974

1 wanted to get perspective from the team. I don't recall a
2 specific conversation about that.
3 Q. Okay. Take a look -- turn to page 004, same document,
4 please. Take a look at the bottom two chats, please.
5 A. (Witness examines document.)
6 Q. So at 8:52 and 27 seconds you wrote (as read):
7       "How does Zeni LT feel about these scenarios?  I
8     think we know Todd's thoughts, but we have run into some
9     leaders that don't want their IP cut from the potential
10     biggest base.  Not that this is a blocker but a
11     consideration."
12     Do you see that?
13 A. I do.
14 Q. And "Todd" there is referring to Todd Howard, the head of
15 Bethesda?
16 A. That's right.
17 Q. And the "potential biggest base" is referring to the
18 PlayStation?
19 A. Yes.  They're the biggest base.
20 Q. Okay.  And so you're asking in this chat, you're saying:
21 Let's figure out what the ZeniMax leadership team thinks about
22 these scenarios; right?
23 A. That's what I'm saying, yeah.
24 Q. And you're saying some folks might be on board, but you
25 have run into some leaders at ZeniMax who don't want their

975

1 games, their IP cut from Sony; right?
2 A. That's right.
3 Q. But your comment on that is their feelings about that are
4 not a blocker but a consideration?
5 A. Yes, we should consider those that are making the games in
6 the decision that makes -- again, Phil makes the final call,
7 but he weighs many considerations for that.
8 Q. Okay.  And then Mr. Booty writes to you at Tim Stuart, the
9 next e-mail -- the message down (as read):
10       "The meetings we have scheduled with Phil and plan to
11     have been with Robert are meant to start this discussion."
12     And "Robert" refers to the former head of ZeniMax who
13 passed away; right?
14 A. That's correct.
15 Q. And Mr. Booty says (as read):
16       "We have avoided talking about it to date to avoid
17     gun-jumping issues."
18     So do you have an understanding of what "gun-jumping
19 issues" means?
20 A. Yes.
21 Q. And that means that even though the deal is announced,
22 Microsoft executives aren't going to be talking to ZeniMax
23 executives about plans for ZeniMax content yet; right?
24 A. Depending on timing, yes.  Until the deal closes, we are
25 not able to make changes to road map or business.

976

1 Q. Okay.  And so you can't talk to the Zeni executives, or
2 Mr. Booty is saying "Let's be careful.  Let's not talk to the
3 ZeniMax executives yet, but we've got the meetings on the books
4 for when it's appropriate to talk to them."  Is that your
5 understanding of that?
6 A. Yeah.  It appears Matt says "We have a meeting scheduled
7 with Phil."
8 Q. And you are not -- this chat is not with the ZeniMax
9 people.  This is an internal Microsoft chat planning for the
10 ZeniMax meetings and what to do with ZeniMax; right?
11 A. I believe that's right.  I don't believe I saw any ZeniMax
12 people on the invite.
13 Q. I want you to look at -- please turn to page 006, please.
14 It's another message from you.  It's the second one from the
15 top.
16     Ms. Bond has an enthusiastic reaction to something.  She
17 says "Yes," and then you write at 9:01 and 47 seconds (as
18 read):
19       "Minecraft being on all platforms enabled its mass,
20     mass, mass market in my opinion, but" --
21       (Official Reporter clarification.)
22 BY MR. WEINGARTEN:
23 Q. Your chat, Mr. Stuart, was, your message (as read):
24       "Minecraft being on all platforms enables its mass,
25     mass, mass market in my opinion, but that's the Minecraft

977

1     world.  I think it's different for these games."
2     Right?
3 A. Correct.
4 Q. And "these games" there means the ZeniMax titles; right?
5 A. That's right.
6 Q. And just to pull us back to where we started, you're
7 talking here about -- with the Gaming Leadership Team members
8 and senior executives about changes to ZeniMax's existing
9 multiplatform business; right?
10 A. I don't believe it's about existing.  It looks like it's
11 about future titles.
12 Q. Okay.  So you're talking about changes to what had been
13 projected in the deal model for future titles; right?
14 A. If there's decisions that come out of this that impact the
15 deal model, that's correct.
16 Q. And the deal model assumed that, while ZeniMax is
17 generally multiplatform, it's going to be multiplatform; right?
18 A. The deal model assumed existing business goes forward.
19 Q. And if existing business was multiplatform, it will go
20 forward multiplatform; right?
21 A. Yeah, that's right.
22 Q. Okay.  Now, these chats we're looking at, this is
23 February 9th, 2021.  Let's take a look please at PX1116.
24     MR. WEINGARTEN:  Oh, I'm sorry.  And can we please
25 move to admit PX1966.

978

1    THE COURT: Admitted.

2    (Trial Exhibit 1966 received in evidence.)

3    BY MR. WEINGARTEN:

4    Q.  Now, let's look at PX1116.

5    A.  Yes.

6    Q.  Okay.  This is two weeks later; right?  The chat was

7    February 9th, 2021, and now we're looking at an e-mail from

8    February 23rd, 2021; right?

9    A.  That's right.

10   Q.  And it's an e-mail from you to Ms. Lawver and someone

11   named Kelly Huschka, H-U-S-C-H-K-A?

12   A.  Kelsey, that's right.

13   Q.  Oh, I'm sorry.  Kelsey.  My apologies.

14       MR. WEINGARTEN:  Please move to admit PX1116.

15       THE COURT:  Admitted.

16   (Trial Exhibit 1116 received in evidence.)

17       MR. GOSTAN:  This is marked confidential.

18       MR. WEINGARTEN:  I have numbers.  The numbers are the

19   problem; right?  Or is the whole thing?

20       MR. GOSTAN:  I think we have the whole thing marked as

21   confidential.

22       MR. WEINGARTEN:  Okay.  Okay.  Thank you for the

23   reminder.

24       Okay.  I will try to talk around it.

25   \\\

---

979

1    BY MR. WEINGARTEN:

2    Q.  Go to -- go to the second page of this e-mail chain,

3    please.  And do you see the bottom e-mail that starts off this

4    chain is from Mr. West?

5    A.  Yes.

6    Q.  And you're not on it, but the sentiment is expressed that

7    this was an excellent session.  Do you see that?

8    A.  I do.

9    Q.  Do you understand that to be a reference to at least part

10   of the session, the chat that we were looking at, whatever

11   meeting that was?

12   A.  I'm not sure if it's directly related to that, but I think

13   we could assume that.

14   Q.  Okay.  Mr. Booty says "Great work"; right?

15   A.  That's right.

16   Q.  And then you get added by a Mr. Murphy at the top e-mail

17   on page 2, and he's asking you -- he's telling you, he says (as

18   read):

19       "I added Tim to the thread because I want to recap

20       what I heard as the next steps."

21       Do you see that?

22   A.  Yes.

23   Q.  Okay.  And those next steps involve working with finance

24   to do some things; right?

25   A.  That's right.

---

980

1    Q.  So look at the first bullet, work with finance to do those

2    things; right?

3    A.  Yes.

4    Q.  Okay.  And he wants to work with finance to expand a

5    timeline on the next bullet; right?

6    A.  That's right.

7    Q.  And he wants to understand the next step is providing more

8    clarity around an impact to something.  Do you see that third

9    bullet?

10   A.  That's right.

11   Q.  Okay.  So then at the bottom of his e-mail he asks you (as

12   read):

13       "Well, in the past I've worked with Kelsey and Jamie

14       L on this.  Does that work?"

15       So he's asking your permission there to reach out to

16   Ms. Huschka and Ms. Lawver; right?

17   A.  That's right.

18   Q.  Okay.  And if you go back to page 1, Mr. West confirms he

19   thinks Mr. Murphy got the right idea.  He says "Those were the

20   top lines for me"; right?

21   A.  Yeah, that's right.

22   Q.  He says there was a small thread of discussion on option

23   four as a hybrid, and he explains what option four could be;

24   right?

25   A.  That's right.

---

981

1        MR. WEINGARTEN:  Can I read that one, Karen, "Taking

2    all"?

3        MR. GOSTAN:  Yeah.

4    BY MR. WEINGARTEN:

5    Q.  Okay.  So Mr. West says (as read):

6        "Well, option four we discussed a little bit was

7        taking all the new IP exclusive and delaying porting to

8        the PS version for established IP linear games like a

9        Fallout."

10       Do you see that?

11   A.  Yes.

12   Q.  Okay.  And then you write back (as read):

13       "Adding Jamie and Kelsey to run through the model" --

14       strike that.

15       Let me be very clear about that one.  (as read):

16       "Adding Jamie and Kelsey to run this through the

17       acquisition model."

18       So did you understand that there that you were adding

19   Ms. Lawver and Ms. Huschka because they were going to help work

20   on taking these scenarios and using the ZeniMax deal model as a

21   base to sort of run the scenarios and see what happens to the

22   valuation?

23   A.  That's right.  We have to start with our baseline

24   commitment.

25   Q.  So you start with the baseline model, alter it based on

---

982

1  the conversations about the scenarios here for exclusivity, and
2  see what happens; right?
3  A.  Yeah.  I'd say it's a scenario analysis from the baseline
4  model.
5  Q.  Okay.  And you write (as read):
6      "What we will need to prove out over the ten-year
7      life of the model..."
8      And you list some items there about what's going to
9  change; right?  There's a decrease -- do you see that? -- in
10  something?
11  A.  That's right.
12  Q.  And then there's an increase in Game Pass.  Do you see
13  that?
14  A.  That's right.
15  Q.  And then there's going to be some margin impact, and you
16  write "Need to ensure we keep the model at," and there's that
17  number, don't say it; right?
18  A.  Correct.
19  Q.  Now, Ms. Lawer writes back to you on the 23rd.  She says
20  (as read):
21      "Kelsey has run the numbers.  Looks like we drop well
22      below blank but we're still reviewing."
23      Right?
24  A.  That's right.
25  Q.  That number there that we're not reading, that's your

983

1  understanding of the commitment; right?
2  A.  Correct.
3  Q.  From the ZeniMax model?
4  A.  Correct.
5  Q.  And so she says (as read):
6      "Once Kelsey and I have reviewed, do you want me to
7      find time to meet to discuss or would you prefer to handle
8      via e-mail?"
9      And you write back (as read):
10      "If it's material, yes, we should meet up to review."
11      And you offer to read through some things ahead of time;
12  right?
13  A.  That's correct.
14  Q.  And so the idea is they've run the scenario and there's a
15  material drop from the commitment; right?  Well, at least a
16  drop from the commitment?
17  A.  In this scenario analysis, it looks like they drop below
18  that commitment, yeah.
19  Q.  And so there's going to have to be some work done to
20  figure out ways that if that scenario is the scenario, to get
21  back to the commitment; right?
22  A.  That's right.  We always have to land the commitment to
23  the company.
24  Q.  And you believe -- and you believed at this time that
25  gaming could plan and work hard and be creative and figure out

984

1  ways to fill the gap to the commitment; right?
2  A.  In my job we run lots of scenarios, what it would take to
3  believe to fill gaps, that's right.
4  Q.  And ultimately the decision on whether to make a decision
5  that might bring the business below the commitment and a
6  decision about how to fill to get back to the commitment,
7  that's Mr. Spencer's decision; right?
8  A.  It's ultimately his call and the decision to make title
9  recommendations or changes.
10  Q.  Okay.  And do you recall that you discussed at the Gaming
11  Leadership Team this gap that this scenario could create to the
12  number we're not allowed to say; right?
13  A.  Yeah.  I mean, in my prior chat, we talked about keeping
14  that in mind as the core commitment.
15  Q.  Right.  And Starfield is planned to launch as an
16  exclusive; right?
17  A.  That's correct.
18  Q.  Starfield is a ZeniMax game; right?
19  A.  Yes.
20  Q.  But despite launching Starfield as an exclusive, you
21  believe that Microsoft Gaming can still meet its commitment to
22  the board that was set in the final ZeniMax model; right?
23  A.  Yeah.  The type of game that Starfield is gives me that
24  confidence, that's right.
25  Q.  And part of that is because the model is a ten-year model

985

1  and you have time to create some value over the ten years to
2  help get back to the number from the model; right?
3  A.  It's a true statement.  Changes we make to the model early
4  in a discounted cash flow are always more meaningful; but,
5  correct, we owe the total valuation of the model.
6  Q.  Right.  Because the valuation the board is told is a
7  ten-year plan?
8  A.  Plus terminal value, that's right.
9  Q.  I'm sorry, sir.  Go ahead.
10  A.  It's ten-year plus terminal value so it has existing value
11  past the life of the asset such as brand and IP.
12  Q.  Now, we've talked a little bit about some conversations
13  about making up this gap, but you don't remember specifically
14  discussing any of this modeling or the gap with Mr. Spencer;
15  right?
16  A.  Not specifically, no.
17  Q.  Okay.  And, again, we discussed this.  Part of your role,
18  and it's a fiduciary responsibility I think you said in the
19  past, is to remind Mr. Spencer about the commitments to the
20  board but he owns the decision; right?
21  A.  That's correct, and I don't need to remind him of the
22  commitment nor the number.
23  Q.  Understood.
24      And whatever decision-making process Mr. Spencer employs,
25  that's his process for making these kinds of decisions after he

986

1  gets all the inputs from you about the commitment and the
2  planning, et cetera; right?
3  A.  Yes.  He weighs all the factors of consumers and GLT
4  opinion and various other elements.
5  Q.  And you don't recall any conversations with Mr. Spencer
6  about taking titles exclusive from ZeniMax; right?
7  A.  I don't recall any specifically.
8  Q.  Let's take a look at some of the timing around maybe those
9  decisions.  So please turn in your binder to PX4308.
10      MR. WEINGARTEN:  I apologize if I did not move to
11 admit PX1116.  I would move to admit it.
12      THE COURT:  You did.
13      MR. WEINGARTEN:  Oh, very good.  Thank you,
14 Your Honor.
15      THE COURT:  Do you want to admit 4308?
16      MR. WEINGARTEN:  Yes, please.
17      THE COURT:  Admitted.
18      (Trial Exhibit 4308 received in evidence.)
19      MR. WEINGARTEN:  Thank you.
20      THE WITNESS:  So we're at 14308?
21 BY MR. WEINGARTEN:
22 Q.  4308.
23 A.  Okay.  Thank you.
24 Q.  Thank you, sir.
25      Let me ask you this question, sir:  Do you remember that

987

1  there was a -- before you look at the document, do you remember
2  that there were periodic MBR meetings between ZeniMax and Xbox?
3  A.  That's right.
4  Q.  Okay.  And what does MBR mean?
5  A.  Monthly business review.
6  Q.  Okay.  And I recognize you're not on this e-mail, but do
7  you recall that there were regular MBR meetings between ZeniMax
8  and Xbox in 2021?
9  A.  That's likely.  I'm not in all of them, but I would assume
10 so.
11 Q.  Okay.  And do you remember that in November of 2021, the
12 Gaming Leadership Team or members from the leadership team
13 talked to ZeniMax leadership about the exclusivity of future
14 ZeniMax titles?
15 A.  That's correct.
16 Q.  And you don't remember a specific meeting, but you do
17 remember that Mr. Spencer did talk about some exclusivity
18 guidance to the ZeniMax folks; right?
19 A.  I believe at the time he gave some guidance in MBR, that's
20 right.
21 Q.  You don't remember the specifics of what Mr. Spencer
22 guided anyone about; right?
23 A.  I don't recall that I was in the meeting.  I may have been
24 watching chat.  So I don't recall the specifics of what the
25 words were.

988

1  Q.  Okay.  So to the extent there's an agenda and there was a
2  meeting about Phil's top of mind and it included guidance on
3  exclusivity of future titles, you do remember that there was
4  that kind of a meeting with Mr. Spencer, gaming leadership
5  folks, ZeniMax folks to talk about that; right?
6  A.  I assume they had a meeting.  I'm not on this mail and I
7  don't know that I was in the meeting.
8  Q.  But you do remember that in November of 2021, gaming
9  leadership did talk to ZeniMax leadership about exclusivity;
10 right?
11 A.  Yes.
12 Q.  Yeah.  Let's take a look, please, at PX4334.
13 A.  (Witness examines document.)
14 Q.  This is another chat transcript.  This is between you and
15 Ms. Jamie Lawver; right?
16 A.  That's right.
17 Q.  And this one is dated around the same time.  We're still
18 in November of 2021; right?
19 A.  Correct.
20      MR. WEINGARTEN:  Move to admit PX4334, please.
21      THE COURT:  Admitted.
22      (Trial Exhibit 4334 received in evidence.)
23 BY MR. WEINGARTEN:
24 Q.  Now, the chat starts off and you say (as read):
25      "Did we make an official decision on something going

989

1  exclusive?"
2      That's your question to Ms. Lawver; right?
3  A.  That's correct.
4  Q.  She says in response (as read):
5      "Not that I'm aware of.  I thought that they" -- "I
6  thought they were going to talk about..."
7      And then she has a title there; right?
8  A.  That's right.
9  Q.  Let's not say the name of the title.
10      And you write (as read):
11      "They must have made the call."
12      Now, by "made the call," that means you were asking
13 Ms. Lawver about whether Mr. Spencer made a decision about
14 ZeniMax going exclusive; right?
15 A.  I was asking about specific titles, that's right.
16 Q.  So you were asking about whether Mr. Spencer had made a
17 decision about ZeniMax titles going exclusive; right?
18 A.  Correct.
19 Q.  And Ms. Lawver says (as read):
20      "I sent Jill a note."
21      Do you understand that to be Jill Braff?
22 A.  That's right.
23 Q.  And she was in charge of leading the project to integrate
24 ZeniMax and Microsoft Gaming; right?
25 A.  That's correct.

990

1  Q.  Now, Ms. Lawver writes back (as read):
2      "Per Jill, Phil did... to Jamie."
3  Jamie is Jamie Leder?
4  A.  Yes.
5  Q.  Jamie Leder is the head of ZeniMax at this time?
6  A.  Correct.
7  Q.  She writes (as read):
8      "Per Jill, Phil did... to Jamie but it wasn't widely
9  known so we wanted to talk about it here to clarify."
10  And you ask (as read):
11      "All games going forward?"
12  And she writes back (as read):
13      "Yes."
14  And you ask to clarify it again (as read):
15      "Not just new IP but All" -- all caps, A-L-L -- "ALL
16  games going forward?  Wow."
17  And Ms. Lawver writes (as read):
18      "Yes."
19  Do you see that?
20  A.  I do.
21  Q.  And you wrote "Wow" because that would be a very big
22  decision that was being communicated to you that Mr. Spencer
23  had made; right?
24  A.  I suppose so.
25  Q.  And then you note further down, you keep talking about

991

1  some more titles.  And look at -- look at the timestamp that is
2  21:36.  One, two, three, four, five, six chats up from the
3  bottom.  It starts with "I'm putting a few."  Do you see that?
4  A.  I do.
5  Q.  So you write to Ms. Lawver (as read):
6      "I'm putting a few of these things in chat just to
7  make sure they don't get too fixated on a specific number.
8  We will have AM issues in the deal model as we pull a huge
9  amount of PS units out of the model."
10  Do you see that?
11  A.  I do.
12  Q.  "PS" means PlayStation?
13  A.  That's right.
14  Q.  "AM" means accountability margin or profit?
15  A.  That's right.
16  Q.  And the "deal model" is the ZeniMax deal model; right?
17  A.  The board commitment, yes.
18  Q.  The board commitment.
19      So if this decision that's being communicated to you goes
20  through, your understanding is that that will create profit
21  issues in the board commitments because it entails pulling a
22  huge amount of PlayStation units out of the model; right?
23  A.  Yes.  Anytime you make a change to a model, you have to
24  have an offset somewhere.
25  Q.  Okay.  And then let's look, please, at PX4375.  Same day,

992

1  same time almost.  PX4375.
2  A.  (Witness examines document.)  Yes.
3  Q.  Okay.  This is another chat, and now this one is you to
4  Mr. Matt Booty; right?
5  A.  That's right.
6  Q.  Same day, November 10, 2021; right?
7  A.  Correct.
8  Q.  Right about the same time 21:00 and 12 hours?
9  A.  Yes.
10  Q.  Okay.  You write to Mr. Booty to start the chat (as read):
11      "Did we make an official decision on something going
12  exclusive?"
13  Do you see that?
14  A.  Yes.
15  Q.  This is basically at the same time you're chatting with
16  Ms. Lawver; right?
17  A.  That's right.
18  Q.  You're trying to understand what's going on; right?
19  A.  Correct.
20  Q.  Mr. Booty writes back (as read):
21      "Phil told them all titles going forward Xbox
22  exclusive."
23      And then a few conversations about Steam and an e-mail,
24  and then you write (as read):
25      "This is new IP I assume, not ALL games."

993

1      And then you put "all" in caps again; right?
2  A.  That's right.
3  Q.  And Mr. Booty says (as read):
4      "Nope.  All games."
5  And Mr. Booty says (as read):
6      "I wasn't in any of the discussions or on the
7  e-mails."
8  And you write (as read):
9      "Hmm, okay.  Thanks."
10  And Mr. Booty writes (as read):
11      "As I was saying, different from the deal model."
12  Do you see that?
13  A.  I do.
14  Q.  So Mr. Booty is confirming that he thinks Mr. Spencer has
15  made a big decision about all the ZeniMax titles; right?
16  A.  Yeah.  There's a few people saying they heard certain
17  things.  We've obviously, since the meeting, gone back and
18  clarified with Jill and Phil what the actual decision is.  So
19  this is me trying to understand what was discussed in this MBR.
20  Q.  Okay.  And Mr. Booty writes to you (as read):
21      "Has there been any official word on Redfall?"
22  And you write (as read):
23      "Phil hints to me that it's, quote/unquote, official,
24  but I haven't heard anything from them.  We need to have
25  that."

994

1    Do you see that?
2  **A.**  I do.
3  **Q.**  And that's -- when you say it's "quote/unquote, official,"
4    that's because if Mr. Spencer decides it's official even if it
5    hasn't gone out yet in a, quote/unquote, official manner;
6    right?
7  **A.**  I assume when Phil makes the call, that's the call and
8    there's various ways to communicate.
9  **Q.**  Okay.  You can put that aside, please, sir.
10    **MR. WEINGARTEN:**  I think I need to move to admit
11  PX4375.
12    **THE COURT:**  Yes, admitted.
13    (Trial Exhibit 4375 received in evidence.)
14    **MR. WEINGARTEN:**  Thank you.
15  **BY MR. WEINGARTEN:**
16  **Q.**  Let's talk a little bit about the Denali model.  We've
17    talked about ZeniMax.  Let's talk about Denali.
18    The Denali model includes some assumptions about platform
19    mix for Activision games; right?
20  **A.**  It does.
21  **Q.**  Platform mix, it's got assumptions about the revenue mix
22    for Activision from having games played on different consoles;
23    right?
24  **A.**  Yeah.  It includes mobile, PC, Nintendo, PlayStation.
25  **Q.**  So if X percent of Activision revenues come from playing

995

1    on -- playing Activision games on Xbox, the model says, great,
2    that's the X percent of Activision revenues that will play on
3    Xbox going forward; right?
4  **A.**  In the model, yes, we make assumptions about platform mix.
5  **Q.**  And if the model -- well, if Activision gets Y percent of
6    its revenues from having Activision games played on
7    PlayStation, the model assumes, okay, that Y percent to play
8    from PlayStation platform is going to carry forward; right?
9  **A.**  The model makes assumptions about platform mix, and we
10    keep an existing business line that reflects that going
11    forward.
12  **Q.**  Right.  So the share -- the mix of Activision revenues
13    between Xbox and PlayStation, the model holds that, whatever it
14    is, for the existing business and carries it forward?
15  **A.**  Yes, among other things.  Models have many assumptions
16    that go into them.
17  **Q.**  Sure.  Sure.
18    And the model, I think we've heard, does not model any
19    changes in console share as a result of Microsoft's Activision
20    acquisition; right?
21  **A.**  That's correct.
22  **Q.**  And because we buy it, our share of the console market is
23    going to jump up or go down or whatever; right?
24  **A.**  That's correct, no change.
25  **Q.**  Okay.  Now I'd like to introduce PX4341, please.  If you

996

1    can turn in your binder to PX4341.
2  **A.**  (Witness examines document.)  Yes, I'm here.
3  **Q.**  Okay.  The cover e-mail is less exciting, but read it if
4    you need to, but PX4341-005, that's a copy of the Activision
5    Blizzard presentation that went to Microsoft's Board of
6    Directors on January 16th, 2022; right?
7  **A.**  That's correct.
8  **Q.**  This is one of the final, if not the final, board
9    presentations about this deal; right?
10  **A.**  That's right.
11  **Q.**  Let's just take -- I want you to hold in mind what we were
12    talking about with revenue shares, but let's just take a quick
13    look through some of the document if we could, please.
14    Can you, please, turn to page 024 of PX4341?  Do you see
15    that?
16  **A.**  Yes.
17  **Q.**  And that's a slide titled "Activision Blizzard Value
18    Drivers."  Do you see that?
19  **A.**  I do.
20  **Q.**  Okay.  And you're telling the board here, no change to the
21    framework since your last review; but for our purposes, this is
22    a description to the board of what drives the valuation that
23    the model computes for Activision; right?
24  **A.**  That's correct.
25  **Q.**  The valuation has an existing business component and then

997

1    it has a net synergies component; right?
2  **A.**  Correct.
3  **Q.**  The net synergies component has three subcomponents about
4    accelerating Game Pass, about extending the Xbox store into a
5    universal store, and some expansion of a Microsoft advertising
6    network; right?
7  **A.**  That's right.
8  **Q.**  And then at the bottom it says "Other" -- let me ask you
9    this:  And the existing business and the net synergies, those
10    got modeled and calculated; right?
11  **A.**  Correct.
12  **Q.**  And if you look at the next page, 025, that's the
13    calculations for those; right?
14  **A.**  Yes.
15  **Q.**  The categories line up existing, Game Pass, universal
16    store, advertising; right?
17  **A.**  That's right.
18  **Q.**  Now, back on the 024, at the bottom there's a little box
19    that says "Other Strategic Benefits," and that one says "Xbox
20    Console Ecosystem"; right?
21  **A.**  That's right.
22  **Q.**  And the strategic benefit to the console -- the Xbox
23    console ecosystem does include a shift among console revenue
24    mix; right?
25  **A.**  We didn't model any of those activities if that was one.

998

1 It could also be brand, customer enjoyments, many things that
2 go into the ecosystem, safety, security.
3 **Q.** You didn't model it, but when you're telling the board and
4 the board is told that another strategic benefit is the Xbox
5 console ecosystem, that includes a shift among console revenues
6 for Activision; right?
7 **A.** We didn't lay it out specifically to the board, no.
8 **Q.** So let's take a look in your deposition, please, at
9 page 93. I think that's PX7040, deposition page 93.
10 **A.** Just a second.
11 **Q.** Sorry. I know it's a big binder.
12 **A.** (Witness examines document.) Okay. I'm here.
13 **Q.** So look on page 93 of the transcript at page 17 --
14 line 17, please (as read):
15 **"QUESTION:** Does a strategic benefit to the Xbox console
16 ecosystem include any shift among console revenue mix?
17 **"ANSWER:** By definition that is the console ecosystem. So
18 I'm going to agree with your definition that that could be
19 one example."
20 Do you see that.
21 **A.** I do.
22 **Q.** That testimony was truthful and accurate when you gave it;
23 right?
24 **A.** Correct.
25 **Q.** And I also asked you (as read):

999

1 **"QUESTION:** Does the strategic benefit of the deal to the
2 Xbox" -- it says "conceal" but I think we can agree it
3 means "console" -- "ecosystem include a shift in the mix
4 in terms of how many Xbox consoles are sold versus
5 non-Xbox consoles sold?
6 **"ANSWER:** If you're asking about the console ecosystem,
7 there's a lot of things that go into that. The console
8 ecosystem includes share. In the model, we don't include
9 any assumptions around shift. But if you're asking about
10 the Xbox console ecosystem and what is included in that,
11 it's share, yes."
12 That testimony was truthful and accurate; right?
13 **A.** That's right.
14 **Q.** Okay. Now, let's take a look at the actual numbers that
15 were modeled. I understand the console piece was not, but
16 let's look at this next page, PX4341-025.
17 **A.** (Witness examines document.) Okay. I'm here.
18 **Q.** That page discuss -- calculates all the values to
19 Microsoft that you modeled for the deal; right?
20 **A.** That's correct.
21 **Q.** Please do not say any of these numbers out loud, but the
22 first row is, again, that existing business row; right?
23 **A.** Right.
24 **Q.** And that is the continued sale of Activision Blizzard
25 portfolio on all the platforms: Console, PC, mobile; right?

1000

1 **A.** Correct.
2 **Q.** And there's a value; right?
3 **A.** That's right.
4 **Q.** And that's half or so of the total value?
5 **A.** Yes.
6 **Q.** Okay. The next one is the Game Pass. Well, the next
7 three are the synergies; right? Game Pass, store, advertising;
8 right?
9 **A.** That's right.
10 **Q.** And they make up the other half of the value to Microsoft;
11 right?
12 **A.** Correct.
13 **Q.** And Game Pass is that number on the far right in the
14 second row; right?
15 **A.** That's right.
16 **Q.** And that number -- I'm trying to do this -- well, that is
17 a majority or more of the total synergy number; right?
18 **A.** Yes, that's fair.
19 **Q.** But if you add up all this, there's two pieces. There's
20 existing business and there's synergies; right?
21 **A.** That's right.
22 **Q.** And if you look at the synergies piece, the Game Pass
23 piece is a big majority of it; right?
24 **A.** Within the synergies --
25 **Q.** I'm sorry.

1001

1 **A.** -- right.
2 **Q.** And within the synergies, the mobile store and the margin
3 and even if we throw in the PC store, that's a much smaller
4 piece of the synergies; right?
5 **A.** As a percentage, yeah.
6 **Q.** If we were just focusing on mobile synergies, we would
7 look at mobile store and maybe some of that margin piece;
8 right?
9 **A.** That's right. Just a reminder, it doesn't include the
10 mobile -- part of their business in the existing business line.
11 **Q.** Right. That's the existing business. But the synergies
12 are about what new value is created from having these two
13 companies come together; right?
14 **A.** That's correct.
15 **Q.** And so a synergy is something that didn't exist before as
16 a value that thanks to these two companies coming together,
17 that's the new value that's created; right?
18 **A.** Yeah, that's right.
19 **Q.** Okay. And so if we look at the mobile value, it's -- one
20 two, three -- the fourth and the fifth rows on that table;
21 right?
22 **A.** That's right.
23 **Q.** Okay. And if you add those up, that is a relatively small
24 percentage compared to Game Pass of the total synergies; right?
25 **A.** I would say it's a very large number but a small

1002

1 percentage relative to Game Pass.

2 **Q.** Right. So the driver of the synergies is Game Pass;
3 right?

4 **A.** The majority of synergies is Game Pass.

5 **Q.** More than -- more than two-thirds; right?

6 **A.** That's fair.

7 **Q.** Now, I understand from your previous testimony these
8 values are commitments to the board; right?

9 **A.** The lower right-hand number is the commitment to the
10 board.

11 **Q.** Okay. So the very bottom lower right-hand number is the
12 commitment.

13 And how the gaming business operates within this framework
14 is a decision of the gaming business; correct?

15 **A.** Knowing that things change over time, that's correct.

16 **Q.** Okay. And so the commitment is that -- that big number on
17 the bottom right; but with any acquisition, things can change,
18 strategies change, and your job is to help make sure they hit
19 that commitment even if all the details inside of it move
20 around; right?

21 **A.** Yeah, but I wouldn't be so loose with that. Any
22 acquisition is inherently risky, but fundamentally that's the
23 number we're committed to.

24 **THE COURT:** Should we take a morning break or do you
25 want to finish?

1003

1 **MR. WEINGARTEN:** I have not much longer, but maybe a
2 break, Your Honor.

3 **THE COURT:** Okay. All right. Why don't we take our
4 15-minute morning break.

5 **MR. WEINGARTEN:** Thank you.

6 (Recess taken at 10:04 a.m.)

7 (Proceedings resumed at 10:20 a.m.)

8 **THE CLERK:** Court is in session.

9 **THE COURT:** All right. We are resuming the testimony
10 of Mr. Stuart.

11 **MR. WEINGARTEN:** Thank you.

12 Lest I forget, move to admit, please, PX4341.

13 **THE COURT:** Admitted.

14 (Trial Exhibit 4341 received in evidence.)

15 **MR. WEINGARTEN:** Thank you, Your Honor.

16 **BY MR. WEINGARTEN:**

17 **Q.** We're looking at, sir, PX4341 and we're on page 025;
18 right?

19 **A.** Correct.

20 **Q.** Okay. We've been talking about the value to Microsoft
21 that the deal model calculated; right?

22 **A.** That's correct.

23 **Q.** Just a couple of quick questions to fill in some of these
24 synergies.

25 Now, the Game Pass synergy is described as accelerating

1004

1 Game Pass subscriptions across console and PC; right?

2 **A.** That's correct.

3 **Q.** And the drivers of that acceleration are bringing
4 Activision content into Game Pass which pushes on certain
5 assumptions about users and engagement and hours, and that
6 drives the synergy?

7 **A.** Correct.

8 **Q.** Okay. And the content that's put into the model to talk
9 about accelerating Game Pass, you and your team divide up the
10 Activision content into different tiers?

11 **A.** That's right.

12 **Q.** And so you categorize the content tier 1, tier 2, tier 3;
13 right?

14 **A.** That's right.

15 **Q.** And the tier 1 content is the kind of content that you and
16 your team estimate will generate the most hours of engagement
17 on Game Pass; is that fair?

18 **A.** That's right.

19 **Q.** And then if it generates the most hours, that will
20 generate revenues and profits and the synergy; right?

21 **A.** That's right. Hours played is highly correlated to
22 overall subscribers.

23 **Q.** So you and your team divide up the future -- strike
24 that -- you divide up the titles and you categorize them by
25 tiers; right.

1005

1 **A.** That's right.

2 **Q.** Call of Duty is a tier 1 title in that model?

3 **A.** That's right.

4 **Q.** Is that the highest tier?

5 **A.** I believe so.

6 **Q.** Okay. If there were a tier 1 plus, Call of Duty would be
7 in it; right?

8 **A.** Yes.

9 **Q.** Okay. And when you talk about accelerating Game Pass,
10 that includes all the tiers of Game Pass?

11 **A.** That's right.

12 **Q.** So it includes Game Pass Ultimate, the cloud component, as
13 well?

14 **A.** It includes Game Pass Ultimate, which includes PC and
15 console and access to cloud.

16 **Q.** Okay. Now, the mobile store synergy that we talked about,
17 that's the -- one, two, he three -- fourth row. And the bold
18 number is the fourth one down there; right?

19 **A.** That's correct.

20 **Q.** That one says (as read):

21 "By building upon Activision Blizzard player
22 engagement to provide the foundation needed to scale our
23 Xbox store to mobile."

24 Now, does that calculation include an assumption about
25 breaking or getting past the Apple and Google app store

1 duopoly?

2 **A.** It assumes we're able to monetize a store on IOS and

3 Android.

4 **Q.** Okay. And there's certainly no guarantee that will

5 happen; right?

6 **A.** I would say there's no guarantee.

7 **Q.** Yeah. And so the synergy there assumes that somehow

8 through regulation or through contractor something the Xbox

9 store is able to join the Apple store and the Google Play store

10 on the iPhone and the Android; right?

11 **A.** It's important to note that what you're referencing is

12 called direct transactions through the store. There's

13 scenarios where entitlements are purchased outside of IOS and

14 Android and we can access mobile content through our app.

15 **Q.** So to the extent some of this may depend on make breaking

16 the duopoly, some of it may not, this number?

17 **A.** This model didn't explicitly call that out. It's a

18 scenario; but in the end, it's about entitlements and where

19 they're played.

20 **Q.** Okay. I want to talk to you some more about this idea of

21 shifting Activision revenues.

22 Now, on January 15th, 2022 -- that's just a few days

23 before the deal announcement; right?

24 **A.** Yes.

25 **Q.** That's a day or so before the final Microsoft Board

---

1 meeting; right?

2 **A.** I believe that's right.

3 **Q.** There was a meeting on January 15th, 2022, to prepare for

4 the final board discussion? Yes?

5 **A.** That seems likely.

6 **Q.** And Mr. Nadella attended that review?

7 **A.** I don't know of a specific review.

8 **Q.** Can you please turn -- do you think it would help you to

9 remember if we looked at some prior testimony?

10 **A.** Yes.

11 **Q.** Okay. Let's please look at your deposition, page 201.

12 **A.** 7040-201?

13 **Q.** Yes, sir. The little numbers for the transcript page 201.

14 It's really page 200 to 201.

15 **A.** Okay.

16 (Witness examines document.) Okay. I'm on 201.

17 **Q.** Okay. And take a look, read to yourself page 200, you

18 know, line 12, through 201:10 -- 201:17. Just take a look

19 there. Let me know when you've had a chance.

20 **A.** (Witness examines document.) Yes, I see it.

21 **Q.** So having looked at that, does that refresh your

22 recollection about a January 15th meeting?

23 **A.** I'm not doubting that there was a meeting. I don't see

24 that it's January 15th and those -- but I don't doubt that a

25 meeting occurred.

---

1 **Q.** Okay. Well, let's -- let's do it this way: Do you recall

2 that there was a meeting in early January to do final prep for

3 the board presentation; right?

4 **A.** I have no reason to doubt that. I'm just not recalling a

5 specific meeting back then.

6 **Q.** And you do recall that coming out of that meeting, there

7 was an ask for some analysis related to Activision revenues;

8 right?

9 **A.** Yes.

10 **Q.** Okay. And the particular ask for you and your team was to

11 do an outline of what would happen if there were a change in

12 the revenues that Activision earns on Sony; right?

13 **A.** Correct.

14 **Q.** So I'm not going to read the numbers out loud, but if you

15 look at page 200 of the transcript, lines 12 to 16, do you see

16 the change that's discussed in those lines there?

17 **A.** I do.

18 **Q.** And yes or no, that is the change that you were asked to

19 investigate and model; right?

20 **A.** I believe that's right, yes.

21 **Q.** Okay. And so you were asked to take a look at and model

22 what would it mean if the revenue that Activision titles earned

23 on Sony PlayStation's declined in that way; right?

24 **A.** I believe that's right, yes.

25 **Q.** Okay. And that presents a type of revenue risk to the

---

1 model; right?

2 **A.** That's correct.

3 **Q.** And it's a revenue risk because if Activision's share of

4 money it gets from games played on PlayStation goes down, all

5 else equal, Activision revenues go down?

6 **A.** All else equal, that's right.

7 **Q.** Okay. And so this exercise that you were asked to do was

8 about assuming Activision revenues from PlayStation decrease?

9 Yes?

10 **A.** I believe it was an ask on a scenario to be prepared for

11 an eventuality if we had a question from the board.

12 **Q.** Okay. So you were wondering if some -- let me start over.

13 So the idea was the board might be interested in knowing

14 what would happen if revenue on Sony that Activision earns went

15 down, and the goal was let's outline and prepare and see the

16 answer; right?

17 **A.** Yes, among other things. We want to be prepared when we

18 go talk to the board about questions they may ask.

19 **Q.** Okay. And this work to investigate what happens if

20 Activision's revenues on Sony decrease, that's not part of the

21 Denali model; right?

22 **A.** Correct. This was an ask for a prep for the board.

23 **Q.** So outside of the model process, there was a separate ask

24 and a separate modeling process to look at what would happen if

25 Activision revenue on Sony went down?

1  **A.**  I see the ask. I don't recall the model output from that;

2  but, yes, that's correct.

3  **Q.**  We'll get there.

4  Could you please open your binder to PX1190?

5  **A.**  (Witness examines document.) Yes, I'm here.

6  **Q.**  Okay. So this is a chat transcript between you and

7  Ms. Lawver; right?

8  **A.**  That's correct.

9  **Q.**  It's dated January 15th, 2022; right?

10  **A.**  Correct.

11  **MR. WEINGARTEN:** Move to admit PX1190, please.

12  **THE COURT:** Admitted.

13  (Trial Exhibit 1190 received in evidence.)

14  **BY MR. WEINGARTEN:**

15  **Q.**  Ms. Lawver starts the chat with something about she will

16  check tonight, and then you inform her about two asks from the

17  Satya/Amy review just now, and you wrote (as read):

18  "Denali has sent over a new forecast based on lower

19  expectations. Will need to put it into our FY and compare

20  against both their prior management forecast and our

21  current final model. Will need a slide for the board

22  review on Sunday."

23  Do you see that ask?

24  **A.**  I do.

25  **Q.**  That actually relates to something you and I discussed, I

---

1  think towards the beginning of the exam, about new numbers that

2  came over from Activision; right?

3  **A.**  I believe those are related, yeah.

4  **Q.**  Yeah. So then the next ask is, you write to Ms. Lawver

5  (as read):

6  "An outline of what happens" -- don't read these

7  numbers -- "should Sony cancel any of their deals."

8  And then you presume a royalty split with Sony; right?

9  **A.**  Correct.

10  **Q.**  And then you say (as read):

11  "What happens if that split goes down to another kind

12  of split?"

13  Right?

14  **A.**  Yes.

15  **Q.**  And you tell Ms. Lawver how much revenue risk that is (as

16  read):

17  "... and how many XGP subs/Xbox mix would we need to

18  make up that gap?"

19  Do you see that?

20  **A.**  I do.

21  **Q.**  So you're telling Ms. Lawver here about the ask, and the

22  ask is: What happens if revenue that Activision earns on Sony

23  declines; right?

24  **A.**  That's right.

25  **Q.**  A part -- the other -- so one part of the ask is: Let's

---

1  calculate that; right?

2  **A.**  Correct.

3  **Q.**  That's the risk; right?

4  **A.**  This ask here is about the risk here, yes.

5  **Q.**  Right. And then the second part of the calculation is:

6  Let's calculate how many Game Pass subs and how much revenue

7  would have to move over to Xbox to make up that gap; is that

8  right?

9  **A.**  That's right. I wanted to make sure we kept the variables

10  of the offset within the deal model construct so we didn't

11  introduce other variables.

12  **Q.**  Okay. Could you please turn in your binder to PX4319?

13  **A.**  (Witness examines document.) Yes, I'm here.

14  **Q.**  Okay. This is another chat between you and Ms. Lawver.

15  This one is dated January 14th. So it's a day prior to the one

16  we just looked at; right?

17  **A.**  That's right.

18  **MR. WEINGARTEN:** Move to admit PX4319, please.

19  **THE COURT:** Admitted.

20  (Trial Exhibit 4319 received in evidence.)

21  **BY MR. WEINGARTEN:**

22  **Q.**  So I apologize for taking it out of order, but one is

23  January 14th, the other is January 15th. But if you look at

24  this chat, this is all about preparing for that revenue mix

25  shift ask; right?

---

1  **A.**  It's a scenario analysis to go look at the impact of that,

2  that's right.

3  **Q.**  Okay. Now you write in the third line down (as read):

4  "How should we think through" -- and you give the

5  split -- "if Call of Duty switches out of their

6  PlayStation deal? Risk to the model?"

7  And Ms. Lawver is trying to get some clarity. She writes

8  (as read):

9  "Meaning not launching or no marketing support?

10  Either one puts risk to the model, but I think we have

11  areas of opportunity not captured for other games."

12  Do you see that?

13  **A.**  I do.

14  **Q.**  And then you write your assumptions about how the revenues

15  might get risked; right? It might -- the share might change;

16  right?

17  **A.**  That's right.

18  **Q.**  And Ms. Lawver writes (as read):

19  "Yes, risk to model unless we think there are

20  opportunities to push a larger percentage of customers to

21  other platforms to make up for the delta."

22  Do you see that?

23  **A.**  I do.

24  **Q.**  And then you pick up on her point about pushing customers

25  to other platforms; right?

1    A.   I see that.

2    Q.   You wrote (as read):

3              "Got it.  Do we think I can say that there is margin

4         risk there but it can be offset with shift to Xbox in the

5         overall platform mix?"

6         Do you see that?

7    A.   I do.

8    Q.   Okay.  And Ms. Lawver writes back (as read):

9              "Yes, I think so.  That would be part of our goal

10        anyways I assume."

11        Right?

12   A.   Yes.  This is about revenue mix of Call of Duty, that's

13   right.

14   Q.   That's right.

15        So the idea is, if you assume that revenues that Call of

16   Duty earns on PlayStation go down, is there a way to make up

17   for that; right?

18   A.   Yeah.  That's our scenario, that's right.

19   Q.   Okay.

20        MR. WEINGARTEN:  If I haven't, PX1190, move to admit,

21   please.

22        THE COURT:  Yes, 4319 is admitted.

23        MR. WEINGARTEN:  Sorry, no.  1190.  I apologize,

24   Your Honor.

25        THE COURT:  Oh, 11 -- no, that's also admitted.

1         MR. WEINGARTEN:  Thank you.  Sorry, Your Honor.

2    BY MR. WEINGARTEN:

3    Q.   Okay.  Let's take a look at what happened.  PX4358,

4    please.

5    A.   (Witness examines document.)

6    Q.   This is an e-mail from Ms. Lawver to you, and it includes

7    some folks from the Microsoft corporate development team who

8    were working on the Activision deal; right?

9    A.   That's correct.

10   Q.   We're back to January 15th and 4:42 p.m.; right?

11   A.   That's right.

12        MR. WEINGARTEN:  Move to admit PX4358, please.

13        THE COURT:  Admitted.

14        (Trial Exhibit 4358 received in evidence.)

15   BY MR. WEINGARTEN:

16   Q.   Okay.  Now, Ms. Lawver did the work; right?  She ran the

17   numbers?

18   A.   Yes.

19   Q.   Okay.  And she created a table that would help show how

20   many incremental subscribers Microsoft would need to get into

21   Game Pass or how much Activision revenue would need to shift to

22   Xbox console to make up for the assumed loss in Activision

23   revenue on Sony; right?

24   A.   Yeah.  This is an Excel goal seek to back into what you

25   need to believe to offset the questions being asked.

1    Q.   Okay.  And so Ms. Lawver writes (as read):

2              "This is based on prior board numbers.  Essentially

3         we would need either" --

4         MR. WEINGARTEN:  Can I read that, Karen, those

5    numbers?  The second sentence there, "Essentially we would need

6    either"?

7         MR. GOSTIN:  No.

8         MR. WEINGARTEN:  Okay. okay.

9    BY MR. WEINGARTEN:

10   Q.   "So essentially we would need either," and she gives a

11   number for additional engaged subscribers to Game Pass; right?

12   A.   Correct.

13   Q.   She gives a range; right?

14   A.   Yes.

15   Q.   Yes?

16   A.   Yes.

17   Q.   Okay.  Or a platform mix, and she writes "a percentage

18   from Microsoft to a percentage from Microsoft," but she -- do

19   you understand her to mean a percentage from Microsoft to a

20   percentage for Sony -- a percentage from Sony to a percentage

21   to Microsoft?

22   A.   This is the baseline model assumption of that number --

23   ah -- of that number to a new number on the Xbox platform.

24   Q.   I apologize.

25        So what she's saying in the second part of that sentence

1    is:  To make up for this lost revenue, we can do it if the

2    amount of Activision revenues goes from -- on Microsoft goes

3    from that first number to that second number?

4    A.   She's not making a claim if we can do it.  She's

5    highlighting what Excel reports that as the Goal Seek.

6    Q.   Right.  But mathematically --

7    A.   Just a math exercise, that's right.

8    Q.   Right.  But she's -- and the point of the math is, if you

9    assume the revenue that we earn off of Sony from Activision

10   goes down, then mathematically we can make it up if the amount

11   of revenue that we earn from Activision on Xbox goes up in this

12   manner?

13   A.   Yes.  I mean, you're saying we can make it up.  I would

14   just say we can decrease by one number and then Excel Goal Seek

15   and have an inverse of that number, yes.

16   Q.   Okay.  I mean, the point of the project was for her and

17   you to create scenarios to explain how to make up that

18   declining number of revenue; right?

19   A.   That was the point of the exercise, right.

20   Q.   Okay.  And I just want to be clear.

21        Do you see the part of her table -- it's one, two, three,

22   four, five, six, seven -- eight rows down, it says "Total

23   engaged subs needed"?

24   A.   Yes.

25   Q.   She calculates out this total number of engaged subs, and

1018

1 then two up it says "Number incremental subs needed" -- strike
2 that -- "Number incremental subs to cover GM gap." Do you see
3 that?
4 A. That's right.
5 Q. And so that number, "Number incremental subs needed to
6 cover GM gap," that's one way of covering the gap that the
7 assumption about losing revenue share on Sony causes; right?
8 A. That's one of the ways and that's the number that she
9 reflects in her sentence above the chart.
10 Q. Right. Just to be clear, I think you had to explain this
11 to me before, this -- the numbers in that row going across,
12 that's not millions you need each year; right? It's like
13 growing; is that right? It's not incremental to each year?
14 A. You don't sum those across. They are an individual number
15 in that year.
16 Q. Okay. So I'll use fake numbers so we don't violate
17 confidentiality.
18     So if I said in the first column 2 and the next column is
19 8, it's not saying, therefore, we needed to get 10 more people;
20 right?
21 A. That's correct. You need 8, yeah.
22 Q. So by the end, to Goal Seek it out and win, you need that
23 number at the far right three rows up, that one?
24 A. Did you say "win"?
25 Q. No, I'm sorry. To Goal Seek it out and make it up --

1019

1 A. That's correct.
2 Q. -- you need that number at the far; right?
3     Okay. So it's not incremental each year. You've got to
4 go find that number of people?
5 A. You have to -- well, fundamentally you have to acquire new
6 people. You'll have churn out at the bottom of that, but
7 that's the number that has to exist every single year.
8 Q. Okay. Now, that's one view, right, using the subscribers?
9 Or she says, and then this is the platform mix table at the
10 bottom (as read):
11     "We can do it if we can shift Activision revenues to
12     be greater on Microsoft console."
13     Right?
14 A. That's right. Again, I wanted to keep the variables in
15 this question to the variables that are in the model.
16 Q. Okay. And so she's doing -- I'm looking at the platform
17 mix box there on her e-mail, and so she calculates out (as
18 read):
19     "Okay. Let's" -- first row -- "revise Sony revenue."
20     So that means there's been a drop in revenue because of
21 this assumption that you've been asked to think about; right?
22 A. That's right.
23 Q. And then she says (as read):
24     "Okay. If we drop it by that much, here's how much
25     Microsoft revenue we'd need to close the gap"; right?

1020

1 A. Correct.
2 Q. And that adds up to some total Activision console revenue;
3 right?
4 A. That's right.
5 Q. And then it says (as read):
6     "Here's the platform mix we'd need."
7     So the percentage of Activision revenues that come from
8 the Sony platform and the percentage that come from the
9 Microsoft platform; right?
10 A. That's right.
11 Q. And that actually is the same straight across? It doesn't
12 really change; right?
13 A. I believe in this one you'd add those across. They have
14 to be yearly numbers.
15 Q. Right. But the percentages don't change? It's the same?
16 A. That's correct, yeah.
17 Q. Yeah. And then she says -- and then she has a column
18 explaining what that change would be; right? So if we can
19 increase Microsoft's share of the Activision revenues by that
20 number at the very bottom, we'll fill the gap?
21 A. Yes, that's -- yeah, put in the Excel.
22 Q. Let's please take a look at PX4359, please.
23 A. (Witness examines document.) Yes, I'm here.
24 Q. Okay. This is just more e-mails on the chain, and I'm
25 looking at your e-mail -- well, it's a chain between you and

1021

1 Ms. Lawer and the corporate development people again; right?
2 A. Yes.
3 Q. And it's a little bit later in time on the 15th of
4 January 2022; right?
5 A. That's right.
6     MR. WEINGARTEN: Move to admit PX4359.
7     THE COURT: Admitted.
8     (Trial Exhibit 4359 received in evidence.)
9 BY MR. WEINGARTEN:
10 Q. So everybody's working hard because it's just an hour or
11 so later, and there is an update from Ms. Lawer with new
12 numbers; right?
13 A. That's what it looks like, yes.
14 Q. Second e-mail down you write (as read):
15     "This is great. Should we make the model update for
16     the new board numbers and then run the below?"
17     And then you ask if people need to circle back with
18 Ms. Hood, and you say you'll circle back with Phil and Sarah.
19 Is that Mr. Spencer and Ms. Bond?
20 A. That's right.
21 Q. Okay. There's another updated table from Ms. Lawer, but
22 the update hasn't changed the revenue platform mix shift;
23 right? That hasn't changed?
24 A. That's correct.
25 Q. She sort of changed the subscriber numbers you'd need;

1022

1 right?

2 A.   It looks like the ramp on subscribers has changed, yes.

3 Q.   They actually -- she revised it and updated it and you

4 need slightly fewer incremental Game Pass subscribers to fill

5 the gap; right?

6 A.   These numbers are lower than the last chart, that's right.

7 Q.   And the interesting thing is -- well, strike that.

8      The Goal Seek here shows that you can do either of these

9 two things; right?  It's if you do this with Game Pass

10 subscribers or this with getting more Activision revenues on

11 the Microsoft platform; right?

12 A.   That's right.  This is just Goal Seek.

13 Q.   Right.  But in reality, you could do a combination of the

14 two; right?

15 A.   Sure.

16 Q.   So the more Game Pass subscribers to help fill the gap,

17 then the less console revenue mix shift you would need; right?

18 A.   Yes.  It's just Excel.  We can model very different

19 scenarios.

20 Q.   Right.  And, conversely, more revenue to Microsoft from

21 the Activision titles than fewer incremental Game Pass

22 subscribers are needed; right?

23 A.   That's right.

24 Q.   Now, fair to say that you were very busy during this time

25 period getting ready for this board meeting?

1023

1 A.   Yes, fair.

2 Q.   And, yet, despite that, I believe when we talked about

3 this, you and I, previously, you remember talking about these

4 potential variables in the board meeting and talking about the

5 variance of potentially between the deal model assumptions and

6 this scenario of revenue risk; right?

7 A.   I believe my prior testimony if that's what I said, yes.

8 Q.   Okay.  And you remember something like that because it's

9 quite special to present to the board about something; right?

10 A.   I take the presentations of the board very seriously of

11 course.

12 Q.   Okay.  And so, again, this model, this work product that

13 came out of the Satya/Amy meeting, the goal of it that you

14 understood to be was if revenues that Activision earns from the

15 Sony platform go down, tell us what the numbers would have to

16 be on subscribers and on our own console revenues to make up

17 for it; right?

18 A.   Yeah, but I'd be specific and call it royalties not just

19 revenue.

20 Q.   Understood.

21      But it's about a revenue -- the impact is a revenue risk

22 from Activision games on Sony; right?

23 A.   That's correct.

24 Q.   Let's please look at PX4367.

25 A.   (Witness examines document.)  Yes, I'm here.

1024

1 Q.   Okay.  You're in this chat with, again, it's Ms. Lawrer

2 and some of the same corporate development folks who have been

3 on these e-mails; right?

4 A.   That's right.

5 Q.   You guys are working all the channels?  The e-mails?  The

6 chats?  It's busy?  Yes?

7 A.   Very busy.

8 Q.   Okay.  So this is dated January 15th as well.

9      MR. WEINGARTEN:  Move to admit PX4367.

10      THE COURT:  Admitted.

11      (Trial Exhibit 4367 received in evidence.)

12 BY MR. WEINGARTEN:

13 Q.   Now, start at the top.  You write (as read):

14      "I think we need the following:  I'll take a look at

15      the Q4 commentary and slide in the board review.  Jamie

16      will update the FY '22 and FY '23 model, put it as final

17      into the appendix of the deck.  We need to ensure we have

18      the final accretion/dilution with" -- and then you have

19      some numbers you're talking about.

20      And you're saying (as read):

21      "Let's update some things and put it into the

22      appendix."

23      Do you see that?

24 A.   Yes.

25 Q.   At the bottom of the chat you sent at 17:14 and 39

1025

1 seconds, it's like the last or second-to-last sentence, it says

2 (as read):

3      "This will be included in the appendix of the board

4      deck.  Risk to financials on platform royalties.  Waiting

5      on confirmation of redacted materials but assume the Call

6      of Duty royalty rate moves from" -- and we have that

7      amount -- "the scenario highlights where we would net out

8      our model to offset that change, mix shift to Xbox

9      Game Pass subscribers of approximately 2 million per

10      year" -- (vocal indication.)

11      MR. GOSTAN:  Don't say the numbers.

12      MR. WEINGARTEN:  Sorry.  My bad.

13 BY MR. WEINGARTEN:

14 Q.   (as read):

15      -- "or blank unit mix."

16      My apologies.  I don't know if anyone understood my

17      gobbledygook anyway.  I apologize for that.

18 A.   I see that.

19 Q.   Mix shift of users, and I apologize.

20      So at that point in time, as you're making the final board

21 deck, the number of mix shift to Xbox had actually declined to

22 that -- see where it says the number PT?

23 A.   I see that, yeah.

24 Q.   Okay.  So that number is even less than the one that

25 Ms. Lawrer had calculated previously on some of the tables

1 we've seen; right?

2 **A.** I believe that number is lower than the other number.

3 **Q.** So even with a mix shift of just that number, that would

4 be enough in the Goal Seek to make up for the lost Activision

5 revenue; right?

6 **A.** Related to this royalty discussion we're having.

7 **Q.** Right.

8 **A.** Yes.

9 **Q.** And then you point out, as you and I were just discussing,

10 and actually, quote, "likely a combination of Xbox Game Pass

11 subscribers and mix shift"; right?

12 **A.** Correct.

13 **Q.** Okay. Now, let's take -- did you believe that -- well,

14 strike that.

15 You believed that these numbers that we just talked about

16 represented reasonable numbers; right?

17 **A.** What does "reasonable" mean?

18 **Q.** Let me -- let's go to PX4472, please.

19 **MR. WEINGARTEN:** And if I didn't admit it, move to

20 admit PX4467, please.

21 **THE COURT:** It's already in evidence.

22 BY MR. WEINGARTEN:

23 **Q.** PX4472, please. This is an e-mail from you to Ms. Hood,

24 Mr. Spencer, Ms. Bond, other folks. We're still on the 15th of

25 January, still the early evening; right?

---

1 **A.** Correct.

2 **Q.** Okay.

3 **MR. WEINGARTEN:** Move to admit PX4427.

4 **THE COURT:** Admitted.

5 (Trial Exhibit 4472 received in evidence.)

6 BY MR. WEINGARTEN:

7 **Q.** Okay. And you're saying -- I think this is you giving the

8 update to the question that generated all this work; right?

9 **A.** Yes, that's correct.

10 **Q.** You're telling Ms. Hood and the others "Updating on the

11 key items from our SLT discussion yesterday"; right?

12 **A.** That's right.

13 **Q.** Okay. A couple of different items there. The third item,

14 risk to financials on platform royalties; right?

15 **A.** Yes.

16 **Q.** And you say (as read):

17 "Waiting on confirmation of redacted materials, but

18 this scenario assumes the Call of Duty royalty rate moves

19 from" --

20 And then you give the number; right?

21 **A.** Correct.

22 **Q.** And then it says (as read):

23 -- "scenario highlights where we would net out our

24 model to offset that change of" --

25 And that's a negative -- that's a number there, right, of

---

1028

1 dollars?

2 **A.** That's correct.

3 **Q.** And so what that's saying is: If we assume the revenues

4 earned on Activision -- strike that -- if we assume the

5 Activision royalty revenues on PlayStation go down because of

6 that revenue split changing, it will hurt the model by that

7 much per year; right?

8 **A.** That's right.

9 **Q.** And if it hurts the model by that much per year, we

10 calculate that a mix shift to more Game Pass subscribers of

11 blank or a blank point mix shift towards Xbox and likely a

12 combination of the two would make up for it; right?

13 **A.** That's correct.

14 **Q.** And you write that both of those figures are reasonable;

15 right?

16 **A.** That's right. And in this context, I can believe the

17 outcome of that. Whether it's likely or not or realistic is

18 different. I'm saying they're within the range that I would

19 expect.

20 **Q.** And you understood when you wrote "reasonable,"

21 "reasonable" means achievable?

22 **A.** It means I could believe that as an outcome, my choices

23 would be unreasonable or reasonable and I chose reasonable.

24 **Q.** But you understood "reasonable" to mean achievable in that

25 e-mail; right?

---

1029

1 **A.** Yes. They're in the realm of achievability.

2 **MR. WEINGARTEN:** Okay. I have nothing further at this

3 time, Your Honor.

4 **THE COURT:** Okay.

5 **MR. WEINGARTEN:** I'm very sorry about that slip.

6 <u>CROSS-EXAMINATION</u>

7 BY MR. GOSTAN:

8 **Q.** Good morning, Mr. Stuart.

9 **A.** Good morning.

10 **Q.** How long have you worked at Xbox for?

11 **A.** 21 years.

12 **Q.** Is that most of your career?

13 **A.** That is the entirety of my adult working career.

14 **Q.** And you're the Xbox CFO; correct?

15 **A.** That's correct.

16 **Q.** How long have you been in that role for?

17 **A.** About nine years.

18 **Q.** And I think you testified to this, but you report

19 ultimately to Amy Hood and not to Phil Spencer?

20 **A.** That's correct.

21 **Q.** And why is that?

22 **A.** Yeah, Microsoft we have a fiduciary responsibility as the

23 finance team to represent shareholders, represent the business,

24 and the finance team does not work for the business leader of

25 the various divisions.

1   Q.  So as part of your responsibility in providing that
2   information, do you look at the pricing of different Xbox
3   products?
4   A.  We do.
5   Q.  And I believe there's some testimony about the price of
6   Xbox Series X and Xbox Series S?
7   A.  That's correct.
8   Q.  And what are the prices of those?
9   A.  Series S is $299 and Series X is $499.
10  Q.  And of the different consoles up here, just focusing on
11  Series S, is the Series S most closely priced compared to any
12  of these up here?
13  A.  The series --
14  Q.  There's the Nintendo Switch.  Just -- you may not be able
15  to see that.
16  A.  Oh, I did not see that down there.
17  Q.  We've got the Nintendo Switch.  We've got the X and S, and
18  we've got the PlayStation 5.  And I'm asking for Series S,
19  which one is it most closely to?
20  A.  Thank you.  I didn't see the Switch.
21      It's most closely to Switch.
22  Q.  And do you look at Switch pricing when you're considering
23  the pricing of Xbox Series S?
24  A.  Yes.
25  Q.  And is that one of the reasons you set the price where you

1   guys did?
2   A.  Yes.  At that price point when you're considering playing
3   FIFA or Minecraft or many of the games across consoles, you
4   have to make sure you're priced relative to the competition in
5   the market.
6       MR. GOSTAN:  One second.  I forgot to give you your
7   documents.  Hold on.
8       May I approach, Your Honor?
9       THE COURT:  Yes.
10              (Pause in proceedings.)
11  BY MR. GOSTAN:
12  Q.  Could you turn to RX1066, please?
13  A.  (Witness examines document.)
14      MR. GOSTAN:  Sorry about that, Your Honor.  I promise
15  I'm not going to waste any more time getting binders.
16      THE COURT:  That's okay.
17  BY MR. GOSTAN:
18  Q.  So can you turn to RX1066?
19  A.  Yes, I'm here.
20  Q.  And there was some questions about mobile and the
21  valuation and the strategy for the deal.
22      So can you just describe, just at a very high level, what
23  this e-mail is?
24  A.  Yeah.  This e-mail is referencing Activision Blizzard's
25  earnings from their Q1 in March of 2020, and it proceeds -- I

1032

1   sent an e-mail out to the Gaming Leadership Team highlighting a
2   few of the key drivers, and then Matt Booty and myself had a
3   discussion after that.
4       MR. GOSTAN:  Move to admit RX1066.
5       THE COURT:  Admitted.
6       (Trial Exhibit 1066 received in evidence.)
7   BY MR. GOSTAN:
8   Q.  So taking a look at that e-mail at the bottom --
9       MR. GOSTAN:  And we can publish it, please.
10              (Pause in proceedings.)
11  BY MR. GOSTAN:
12  Q.  If you take a look at the e-mail on the bottom, you said
13  that's an earnings summary of Activision Blizzard?
14  A.  That's right.
15  Q.  And is this before you started negotiating with Activision
16  Blizzard about a potential acquisition?
17  A.  That's correct.
18  Q.  I'd like you to take a look at the first couple of
19  sentences.  It says (as read):
20          "Activision Blizzard ATVI announced its FY '21 Q1
21          financial results on May 4th.  ATVI beat analysts
22          expectation across revenue.  MAU" --
23      What did you understand "MAU" to mean?
24  A.  That's monthly active users.
25  Q.  (as read):

1033

1       -- "and earnings citing strong performance across Call
2       of Duty Modern Warfare and War Zone."
3       Then it says (as read):
4          "CEO Bobby Kotick free-to-play in mobile as new entry
5          points to the franchise have helped triple monthly active
6          users to 150 million."
7       Do you see that?
8   A.  Yes.
9   Q.  Did you think that was a significant thing?
10  A.  Significant and very notable about how they're growing
11  their business.
12  Q.  And then you sent that around to the gaming leadership,
13  and Matt Booty sent you an e-mail back.  Can you remind us who
14  Matt Booty is?
15  A.  He's the head of Xbox Game Studios.
16  Q.  Is he in charge of developing games at Xbox?
17  A.  That's right.
18  Q.  And he wrote back to you (as read):
19          "The talk track about taking the big franchises to
20          mobile makes me feel way out of position.  Have to get
21          going there.  COD on mobile is going to dwarf console."
22      What did you understand him to mean there?
23  A.  Yeah, when we looked at Activision Blizzard's earnings in
24  this context, mobile was the primary growth of their monthly
25  active users.  We had tried a few times on our side to make

1034

1 effort into mobile, but really to no success. And what he's
2 referencing here is really the outlook of Call of Duty on
3 mobile, and that's going to be far bigger than what's on the
4 console.
5 Q. And you write back (as read):
6      "Hundred percent right. We'll get out of position on
7 this one if we keep our eyes on the console game only.
8 Don't want to be the oil company when the world shifts to
9 a hundred percent electric cars."
10      And what were you trying to say there?
11 A. Yeah, back in May of 2021, I'm effectively agreeing with
12 him; and if we keep our eyes and our focus on the console space
13 only, we'll lack growth, we won't expand into more users like
14 its highlighted here, and we don't -- my point about the oil
15 company, when the world shifts to electric cars, is you just
16 don't want to be on a business model that's not going to exist
17 in the future.
18 Q. We've heard a little bit about native mobile games for
19 streaming to mobile devices. Can you just describe the
20 difference briefly?
21 A. Yeah. Native games are ones that are downloaded, you
22 know, directly to your phone. Typically the IOS or Android app
23 stores would be examples of that.
24      Streaming would be used through a browser, streamed from
25 some cloud somewhere to a mobile endpoint.

1035

1 Q. And here, are you discussing native mobile games or
2 streaming to mobile devices?
3 A. This is all native. This is referencing the work they're
4 doing specifically on Call of Duty, but they've done it with
5 others. This is all native download.
6 Q. And is it fair to say that one of the reasons you were
7 interested in acquiring Activision Blizzard is because of that
8 capability?
9 A. Yeah. One of the most important reasons and focus for our
10 growth is mobile users and mobile market.
11 Q. And -- but Xbox does have streaming to mobile devices
12 right now; right?
13 A. We do have something called Project xCloud, which streams
14 to mobile devices.
15 Q. And in your view, has that been a successful business?
16 A. We're still early. I would say not successful to where we
17 want it to be. It's not growing users and economics are still
18 not yet where we want them to be.
19 Q. Does it generate a profit for Xbox?
20 A. xCloud does not generate profit.
21 Q. Is your understanding that the native mobile games that
22 Activision have do generate significant profits?
23 A. They generate significant profit.
24 Q. Okay. You can put that document aside.
25      I want to move to Activision now, and I just want to ask

1036

1 you a few brief questions about what's going to happen if this
2 deal goes through and Activision is acquired by Microsoft.
3      Are you involved in the planning for integration of
4 Activision into Xbox if the deal goes through?
5 A. Yes, I am.
6 Q. And are you familiar with the term "limited integration"?
7 A. I am.
8 Q. What does that mean at Microsoft?
9 A. Yeah, limited integration reflects how we think about an
10 acquired company. The prior, you know, four or five
11 acquisitions we've done, ZeniMax included, are all limited
12 integration, which means we don't bring their org into our org,
13 in terms of org charts. They typically stay on their own.
14 Healthcare. They have their own compensation plan. They stay
15 with their own real estate and facilities and operates
16 effectively like a separate entity.
17 Q. And do they retain their own game developer talent as
18 well?
19 A. That's right, they retain their own talent and development
20 scenarios.
21 Q. And is the plan if you acquire Activision, to have it be a
22 limited integrated company?
23 A. It is. We would keep them limited integration.
24 Q. So can you -- there was some discussion of -- there's been
25 a lot of discussion about Minecraft and there was also some

1037

1 discussion of your comments at the Jefferies meeting.
2      Can you pull up PX9192?
3 A. From the big binder?
4 Q. Yes, from the big binder.
5      (Pause in proceedings.)
6      THE COURT: All right. We'll have to proceed this
7 way.
8      MR. GOSTAN: That's fine. I'll just read slowly.
9 BY MR. GOSTAN:
10 Q. So can you pull up 9192 in your binder?
11 A. Yes, I'm here.
12 Q. And if you go to page 14014.
13 A. (Witness examines document.) Yes.
14 Q. And you were asked some questions about some of your
15 quotes on there, but FTC's Counsel didn't read the quote at the
16 top. I'm going -- I'd just like to read that to you and ask
17 what you're talking about there.
18      So at the top you say (as read):
19      "Yes, the goal hit here is, what I'll say, from a
20 cross-platform perspective. Microsoft is a platform.
21 We're one of the first to really support Minecraft,
22 Roblox, Fortnite across platforms. So we highly encourage
23 cross-platform play simply from this landscape of if it's
24 a good for the gaming ecosystem, it's good for us.
25 Classic rising tide lifts all boats."

1038

1     What were you referring to there?

2  **A.**   Yeah, Microsoft in its DNA is a platform company. Some of

3 the biggest games in the world -- I reference Minecraft,

4 Roblox, Fortnite, Call of Duty -- are strong across all

5 platforms, and those are the ones that have the biggest

6 communities of players, typically generate the most money and

7 most profit, and have the biggest impact across gaming.

8     In this case, around Minecraft, Roblox, or Fortnite, we

9 were the first -- one of the first ones to allow cross-platform

10 play. So PlayStation users could play against Xbox users and

11 Switch users there as well.

12     And we allowed entitlements to roam, we allowed log-ins to

13 roam, which allows users to roam across the device they choose

14 to play on.

15  **Q.**   And at the end you said (as read):

16        "It's good for the gaming ecosystem. It's good for

17     us. Classic riding tide lifts all boats."

18     What did you mean by that?

19  **A.**   Yeah, we operate in the gaming market and the gaming

20 market has many platforms, many devices, many users. If the

21 gaming industry is growing and we are a player in that

22 industry, that's good for us.

23     So there are some decisions that we may make that are

24 potentially impactful to us; but if we believe that is good for

25 the gaming industry, we'll also make those calls.

---

1039

1  **Q.**   And is it also profitable for Xbox to continue to have

2 games like Minecraft be multiplatform and cross platform?

3  **A.**   Absolutely. The strength of a game like Minecraft comes

4 from that cross-network play. If you, you know, removed one of

5 those platforms and one of those big user bases, not only --

6 not only would you have a massive brand impact, you would lose

7 a significant revenue stream that you just couldn't make up

8 for.

9  **Q.**   And Microsoft acquired Mojang, the studio that created

10 Minecraft; correct?

11  **A.**   That's right.

12  **Q.**   And you've kept Minecraft on multiple platforms; is that

13 right?

14  **A.**   That's right.

15  **Q.**   I'd like to take a look at another document. This is a

16 confidential document so we'll have to talk a little bit around

17 it, but can you take a look at RX1137?

18  **A.**   (Witness examines document.) Yes, I'm here.

19  **Q.**   And not really divulging the details of the e-mail, but

20 can you just say what this document is?

21  **A.**   This is an e-mail from myself to the Gaming leadership

22 team. It's our financial results through the first seven

23 months of the year. This happens to be January of FY '21.

24     **MR. GOSTAN:** Move to put RX1137 into evidence, please.

25     **THE COURT:** Admitted.

---

1040

1     (Trial Exhibit 1137 received in evidence.)

2     **MR. GOSTAN:** Thank you.

3 **BY MR. GOSTAN:**

4  **Q.**   And if you take a look at the second line of your e-mail,

5 the second paragraph starts with "Favorability." Can you just

6 read that to yourself?

7  **A.**   (Witness examines document.) Yes.

8  **Q.**   And can you just describe at a high level what you were

9 discussing there?

10  **A.**   Yeah. This is us exiting the holiday period, which is one

11 of our biggest sales periods of the year, and particularly

12 noteworthy that Minecraft had a very good holiday and

13 specifically on PC and Nintendo. We saw a lot of new user

14 growth. We saw solid monetization, and it was worth me calling

15 out to the Gaming Leadership Team that PC and Nintendo were

16 particularly strong coming out of the holiday.

17  **Q.**   Is Minecraft a significant revenue driver for Xbox?

18  **A.**   Yes.

19  **Q.**   Can you turn to page 67?

20  **A.**   (Witness examines document.)

21  **Q.**   And this is a slide deck that's attached to the e-mail.

22 Can you just explain what this slide deck is?

23  **A.**   Yeah. This is a close deck that I put together with my

24 team every month, and it includes various summaries of revenue,

25 various key metrics in the business, and it walks through the

---

1041

1 majority of our overall revenue streams.

2  **Q.**   Let me know when you're on the right page.

3  **A.**   Yes, I'm here.

4  **Q.**   Okay. And what is this slide?

5  **A.**   This is a Minecraft-specific slide. It's now a few years

6 old, but in FY '21 it reflects where Minecraft is generating

7 its revenue from and ultimately its gross margin.

8  **Q.**   And this is revenue you said for the first seven months of

9 the year?

10  **A.**   That's right.

11  **Q.**   Is there a place on this chart, without revealing the

12 numbers, where we can see the revenues that Minecraft generates

13 across different platforms?

14  **A.**   Yeah. If you go to the -- it says "FY '21 year to date,"

15 the column that's in the middle, and then if you look at the

16 actual column, that's our year-to-date actuals.

17  **Q.**   And is Xbox one of the platforms that revenues reported

18 for?

19  **A.**   It is.

20  **Q.**   And how does that compare to some of the other platforms

21 on there?

22  **A.**   It is the smallest.

23  **Q.**   Okay. And is PlayStation also on there?

24  **A.**   It is.

25  **Q.**   And how just at a high level, without giving the numbers,

1042

1 how did the PlayStation revenues compare to Xbox?
2 A. Roughly twice as big.
3 Q. And Nintendo, is Nintendo on there as well?
4 A. Correct.
5 Q. And how does Nintendo compare to the other platforms?
6 A. Roughly twice as big as PlayStation.
7 Q. And so that would be four times as big as Xbox?
8 A. Correct.
9 Q. You're the CFO, not me, so I'll trust your math.
10 A. It's four times as big as Xbox.
11 Q. And also sales on mobile and PC as well?
12 A. Yeah. We highlight IOS and Android as well as our PC
13 platform sales.
14 Q. Okay. And if you go down to the bottom, there's net
15 revenue and gross margin. Do you see that --
16 A. Yes.
17 Q. -- in the same column?
18 A. Yep.
19 Q. And what is gross margin?
20 A. Gross margin is when we call -- when we think about taking
21 out, like, billing costs, you think about cost to serve, you
22 think about royalties that we would pay out for various
23 platforms and other things. It's effectively the profit of
24 that revenue stream.
25 Q. And if you compare the net revenue to the gross margin or

1043

1 the profit number, what does that tell you about how profitable
2 Minecraft is?
3 A. Minecraft is one of the most profitable, if not the most
4 profitable, IP that we have.
5 Q. And is that consistent with -- generally when you're
6 looking at the profitability of first-party games, do they
7 generally have high-profitability margins?
8 A. Generally speaking, that's right. First-party games are
9 one of our highest profit revenue streams that we have.
10 Q. And just comparing Minecraft to Activision Blizzard, are
11 they similar at all in sort of their financial breakdown?
12 A. I would assume -- yes, I would assume they're similar,
13 both very large revenue streams and actively engaged.
14 Q. So there's high revenue on PlayStation, for example, for
15 Activision games like Call of Duty?
16 A. Yes, and as I would assume, much bigger than these
17 numbers.
18 Q. And there's also Nintendo numbers on here, and isn't it --
19 is Call of Duty on Nintendo right now?
20 A. No.
21 Q. And -- but has Xbox entered into a contract to make Call
22 of Duty available on Nintendo?
23 A. We have.
24 Q. And you discussed previously with FTC's Counsel what would
25 happen if there was a shift in the revenue share from

1044

1 PlayStation, if it went from one revenue split to another
2 revenue split for Call of Duty and how you'd have to make up
3 that. Do you remember that?
4 A. Yes.
5 Q. And one of the things you talked about was a shift in
6 platforms?
7 A. Yes.
8 Q. Is it also possible that you could make up some of that
9 gap by putting Call of Duty on additional platforms?
10 A. That's right.
11 Q. And could one of those platforms be Nintendo?
12 A. Yes.
13 Q. A few final questions for you.
14 If this acquisition goes through, will Call of Duty be a
15 first-party game for Xbox?
16 A. It will.
17 Q. And when selling an Xbox first-party game, is it more
18 profitable to sell that game on Xbox or PlayStation?
19 A. It can vary. As we know, in our business we have a
20 console subsidy so we lose money when we sell a console on day
21 one; and depending on what that consumer does after that
22 console is bought, it can be, I'll say, profitable or not in
23 terms of different types of speed of profitability.
24 So the example here would be if someone is a Call of Duty
25 player and they buy just one copy of Call of Duty or even just

1045

1 a couple copies of Call of Duty and they buy an Xbox with a
2 console subsidy, you may not be profitable on that user. It
3 would take time to make that gap up. So more game sales, many
4 years in some cases.
5 If a PlayStation user was a Call of Duty player only and
6 they bought one game on PlayStation, you are more profitable in
7 that scenario than it would be trying to sell a console subsidy
8 out of the gate in a few games.
9 Q. Just to clarify, though, if it's more profitable to sell
10 games on PlayStation, why do you ever take games exclusive?
11 A. Exclusivity is a part of our industry. It's something we
12 need to support our brand and sell Xbox, and that's one of the
13 levers that we can pull to make that happen.
14 Q. But does it make financial sense to make all games
15 exclusive?
16 A. No. For games, like you can see with Minecraft, if you
17 made that exclusive, for example, you'd have nowhere near the
18 success of that. For games specifically like Call of Duty that
19 are highly multiplayer-based games, large communities, that
20 would not make sense to make it single platform.
21 Q. So from a financial -- just so we have a clear record,
22 from a financial perspective, as Xbox CFO, do you think it
23 would make sense to take Call of Duty exclusive?
24 A. No.
25 Q. And Ms. Hood didn't ultimately get to testify today, but

1046

1 if you tried to explain to Ms. Hood that it made financial
2 sense to take Call of Duty exclusive, how do you think she
3 would react to that?
4 A. She would say probably that doesn't make sense and you
5 need to keep the existing business model running.
6    MR. GOSTAN: No further questions.
7    THE COURT: I have a couple questions.
8    You said the Nintendo, if Call of Duty goes there, that
9 will make some money; but I believe from earlier testimony, you
10 didn't run a model on that.
11    THE WITNESS: No. We did not run a financial model
12 specifically, no.
13    THE COURT: Why not?
14    THE WITNESS: In this example what we think about is
15 some of the Switch users that are there are brand new
16 customers, customers that wouldn't be on Xbox or PlayStation
17 but it represents an opportunity for us. We didn't run it
18 specifically because it just wasn't one of the scenarios that
19 we looked at.
20         (Pause in proceedings.)
21    THE COURT: We didn't run it because we didn't look at
22 that scenario. Okay. So you didn't run it?
23    THE WITNESS: We didn't run it, that's right. We
24 didn't run that model, that's correct.
25    THE COURT: So there isn't any -- you can't quantify

1047

1 it because you didn't look at it?
2    THE WITNESS: That's correct, yeah.
3    THE COURT: And then with respect to X Pass [sic], the
4 day and date, what is the policy? Like, what games go on
5 there? What games go on X Pass [sic]?
6    THE WITNESS: So Xbox Game Pass, when we say "day and
7 date," is usually our first-party games, so games that are in,
8 you know, the Xbox umbrella. When they launch to the public,
9 they'll launch at retail. So think Best Buy, Wal-Mart, Target.
10 We'll launch them in our digital stores for sale 60 or $70, and
11 we'll also put them on that same day in the Game Pass
12 subscription service.
13    So a customer can decide if they want to buy if for 60 or
14 $70; or if they're a subscriber to Game Pass, they can play the
15 game that way on the same day it's released.
16    THE COURT: And do you do that with all first-party
17 games?
18    THE WITNESS: We do, that's correct, yeah.
19    THE COURT: Okay.
20    MR. GOSTAN: Nothing further. Thank you.
21    THE COURT: Mr. Weingarten?
22    MR. WEINGARTEN: Nothing further, Your Honor. Thank
23 you.
24    THE COURT: Okay. Thank you. You are excused.
25         (Witness excused.)

1048

1    THE COURT: Okay? Do we have any further witnesses.
2    MR. WEINGARTEN: I don't believe so, Your Honor.
3    THE COURT: That was a rhetorical question.
4         (Laughter)
5    THE COURT: Okay. All right. Great.
6    So we are going to, then, take a break until 2:30 where
7 we'll do closing arguments. I assume the FTC will go first.
8    However, I'd like you to take it sort of anticompetitive
9 harm by anticompetitive harm. You sort of identified three
10 markets. I mean, there's been overlap on things, but I guess
11 what I'm saying is I want someone from Microsoft up here too;
12 right? So that we can have an engagement.
13    The other thing is, and it's wonderful that many people
14 have taken witnesses in this case, you do not -- if somebody
15 wants to get up and say something or take something back that
16 someone else says, that's all fine. All right? You guys have
17 been teams, and it's all right to have a team do the argument
18 as long as it doesn't get too chaotic.
19    MR. WEINGARTEN: That's a great relief for someone
20 doing the argument. Thank you.
21    THE COURT: Yeah. Okay. Absolutely. I just want to
22 get it right --
23    MS. WILKINSON: We appreciate it, Your Honor.
24    THE COURT: -- and so whatever helps me the most is
25 the best.

1049

1    All right. We'll see you at 2:30 then.
2         (Luncheon recess was taken at 11:18 a.m.)
3 AFTERNOON SESSION                    2:28 p.m.
4    THE CLERK: Remain seated. Come to order. Court is
5 now in session.
6    THE COURT: Okay. Good afternoon.
7    MS. WILKINSON: Your Honor, may I correct one of my
8 mistakes? I entered RX4033, and it's not part of Ms. Hood's
9 declaration. So I'd like to withdraw that. And then there
10 were several I should have entered and I did not.
11    THE COURT: Okay.
12    MS. WILKINSON: RX1186, RX1187, RX1128, RX1133,
13 RX1120, RX1119, RX1140, RX1154, RX1156, and RX3166.
14    THE COURT: All right. Admitted.
15 (Trial Exhibit 4033 withdrawn.)
16 (Trial Exhibits 1186, 1187, 1128, 1133, 1120, 1119,
17    1140, 1154, 1156, and 3166 received in evidence.)
18    THE COURT: Okay. Are we ready to proceed?
19    MR. WEINGARTEN: Yes, Your Honor.
20    THE COURT: All right. Whoever wants to come up
21 first, but both sides at the same time, but we'll start with
22 the FTC.
23    MR. WEINGARTEN: If Your Honor would like, I have
24 prepared remarks, but I'm happy to jump right into --
25    THE COURT: Why don't you start with your prepared

1050

1 then. I'm sure I'll have some questions.

2     MR. WEINGARTEN: Okay. Certainly.

3                 __CLOSING ARGUMENT__

4     MR. WEINGARTEN: Well, thank you, Your Honor, to you

5 and the staff for your time and attention this past week as we

6 have put on our evidence.

7     Last Thursday, we promised the Court that the evidence in

8 this hearing would show that the Federal Trade Commission has

9 raised substantial questions about this proposed transaction,

10 substantial questions about whether this transaction would

11 cause anticompetitive effects in multiple relevant markets.

12     And we promised Your Honor and the Court evidence that

13 would be sufficient to raise those questions; and although I

14 never want to take on a higher burden than I have to, I think

15 we've brought Your Honor evidence that shows the answer to even

16 those questions. That's not what we're required to do here,

17 but we have brought Your Honor significant evidence about the

18 relevant markets that are at play, about the nature of

19 competition in those markets, the role of content in each of

20 those markets and, critically, about Microsoft's ability and

21 incentive to cause competitive harm in each of those markets if

22 this acquisition is completed.

23     Now, all the evidence has shown, Your Honor, that Call of

24 Duty and AAA games in particular and even some of the other

25 Activision franchises drive gamers. That is the nature of this

1051

1 transaction. It is the nature of the vast majority of the

2 synergies that Microsoft projects coming out of this

3 transaction.

4     THE COURT: You mean the content is critical?

5     MR. WEINGARTEN: Content is critical, Judge. Content

6 is critical.

7     We looked this morning at the synergies figures and

8 there's an existing business line and there's the synergies

9 lines, and the majority driver by far of the synergies from

10 Microsoft comes from driving users to engage and join Game Pass

11 because they understand the value of this content.

12     Now, we've also heard, Your Honor, quite a bit about

13 decisions involving ZeniMax. Why do we bring all of that

14 evidence about ZeniMax to Your Honor?

15     That evidence, Your Honor, is evidence of Microsoft's

16 incentives when it comes to valuable content.

17     THE COURT: Well, so let's talk about ZeniMax. So

18 which ZeniMax title is comparable to Call of Duty in that when

19 it was acquired by Microsoft, it was a multiplatform

20 multiplayer game?

21     MR. WEINGARTEN: The best example of the three or four

22 that they've talked about bringing exclusive I think is the

23 Elder Scrolls franchise. They'll tell you it's not comparable

24 because it's an expansion pack or it's a different kind of a

25 title, but that one, we think, is one of the most like Call of

1052

1 Duty.

2     Now, I will say --

3     THE COURT: Well, so then -- so that was ZeniMax, and

4 it's currently -- there's Elder Scrolls 6 I think we heard is

5 coming out?

6     MR. WEINGARTEN: It is to come. It has not yet

7 launched. Mr. Spencer testified on our examination that they

8 have announced that it will be exclusive.

9     But I want to be very clear. Trying to find analogies

10 and categories of which game is like the other is not going to be

11 the issue before this Court. One can always create a category

12 of one. I think lawyers are exceptional at distinguishing.

13     The issue is: If there is a category of one, it's because

14 Call of Duty is so exceptionally valuable and it's so unique

15 because it's every year and it drives so much revenue.

16     And whether a title from ZeniMax is exactly like it or not

17 on some dimension, what the ZeniMax experience shows is that if

18 Microsoft, as a platform owner, controls the content, it will

19 use that content to the benefit of its own platforms.

20     THE COURT: Well, it will use that content in the way

21 to make the most money.

22     MR. WEINGARTEN: Correct.

23     THE COURT: Yes.

24     MR. WEINGARTEN: Yes. And our case does not require

25 any more complicated theory of behavior than that.

1053

1     If Your Honor concludes that Microsoft is a

2 profit-maximizing corporation and will use valuable content to

3 aid its shareholders, which it's right insofar as that goes,

4 then the evidence that we have shown is, the incentives are to

5 use that content to benefit its platforms and in doing so, it

6 will harm competition because it will take that content and

7 make it day and date on --

8     THE COURT: How does that -- how does that harm

9 consumers?

10     MR. WEINGARTEN: So the consumer, Your Honor, instead

11 of having Mr. Kotick at an independent Activision and deploy

12 his platform-agnostic philosophy that he talked about on the

13 stand on direct, Mr. Kotick would bring his content everywhere

14 gamers can be found. He wants them playing all of his content

15 wherever.

16     Now the consumer, if the deal goes through, has to find at

17 least some content, some of it, only on the Game Pass.

18     THE COURT: Oh, you don't mean just day and date. You

19 mean day and date and exclusive.

20     MR. WEINGARTEN: We mean day and date and exclusive --

21     THE COURT: Right.

22     MR. WEINGARTEN: -- but also even day and date is a

23 type of exclusivity because they won't give it day and date

24 necessarily to anyone else; right? So having the ability to

25 say "We've launched the game, it's come out on the console, and

1054

1 on the same day it's come to Game Pass," I don't think there's
2 any guarantee, nor can there be, of a day and date to every
3 other possible --
4     THE COURT: Like Sony does with Activision; right? I
5 think we heard testimony as to that --
6     MR. WEINGARTEN: Yes.
7     THE COURT: -- that Activision releases games not
8 equally, not in parity.
9     MR. WEINGARTEN: Right.
10     THE COURT: They take money --
11     MR. WEINGARTEN: Yes.
12     THE COURT: -- from other platforms and delay.
13     MR. WEINGARTEN: That's right.
14     THE COURT: Yes.
15     MR. WEINGARTEN: And there is -- again, there is a
16 difference between exclusivities that are pro-competitive and
17 exclusivities that are not pro-competitive, that are
18 anticompetitive. So this case is not about saying all
19 exclusivities are bad. That is also a red herring and not the
20 FTC's theory.
21     If Sony says to Activision "Here's money and we'll help
22 you develop a game or use this money to make something
23 interesting or neat and the cost of us giving you the money,
24 the *quid pro quo* is let us have first access for a period of
25 time or exclusive access to the neat new thing you've created

1055

1 for gamers," that's pro-competitive. That money was used to
2 make something that the consumer or the gamer wants to play and
3 enjoy.
4     The difference, Your Honor, is if you acquire the content,
5 you're not necessarily doing any new investment and you're
6 cutting off that entire process of competition and saying: Now
7 the game is available only on our platform or certain aspects
8 of it are only available.
9     THE COURT: Why don't we start, why don't you sort of
10 be a little bit more precise and tell me exactly what is the
11 harm to consumer? Like, what they are. Maybe tell me what
12 they are, and then let's evaluate each one.
13     MR. WEINGARTEN: Okay. So the harms to consumers are
14 very similar across all of the markets that we've alleged.
15     On the one hand, there's a reduction of choice.
16     THE COURT: No, no, no. So let's start with -- let's
17 start with the platform market then; right? That you have --
18 Professor Lee has the Generation 9 --
19     MR. WEINGARTEN: Yes.
20     THE COURT: -- console market.
21     Okay. So if the merger goes forward, what is the -- how
22 may that substantially lessen competition in a way that harms
23 consumers?
24     MR. WEINGARTEN: Right. So if the merger goes forward
25 and if you believe that Microsoft has the incentive to use the

1056

1 content to advantage its own platform, then there will be
2 content, there will be timing issues, there will be
3 exclusivities that benefit only the Xbox and not the
4 PlayStation.
5     THE COURT: Okay. So now let's break that down. What
6 is the evidence -- aren't we just talking about Call of Duty?
7 I mean, otherwise, then why -- then Sony just acquired another
8 publisher. They've shown they make a lot of stuff exclusive;
9 right? So it -- you're saying -- and you told me Call of Duty
10 is a one, different. This case has really always been about
11 Call of Duty and how that's going to drive. So just play that
12 out precisely.
13     MR. WEINGARTEN: Well, I'm -- I am slightly hesitant
14 only because they do have some other pretty exceptional
15 franchises at Activision, like the Diablo franchise we heard
16 about, and Professor Lee models some of the harms that come
17 from the Diablo franchise as well in his report, but there is
18 no question Call of Duty is an exceptional asset.
19     THE COURT: Let me ask you this: If Sony actually had
20 an agreement with Microsoft, the ten-year, to keep Call of Duty
21 and future versions of Call of Duty on PlayStation and future
22 versions of PlayStation, would we be here?
23     MR. WEINGARTEN: Well, we might be here because we
24 would need to evaluate that agreement and understand all of the
25 facts.

1057

1     THE COURT: Let's say it's an agreement and they're
2 going to abide by it and, therefore, Call of Duty will be on
3 PlayStation, all the iterations, from now for ten years, would
4 we be here?
5     MR. WEINGARTEN: I think we would still be -- we would
6 still have had an investigation.
7     THE COURT: Well, that's --
8     MR. WEINGARTEN: We would still have had --
9     THE COURT: Good. That's good. You should do that,
10 but here on a preliminary injunction motion --
11     MR. WEINGARTEN: I think -- well, it -- I don't want
12 to evade the hypothetical, Judge, but we would be here because
13 of concerns about the other markets. That's what my colleague
14 is telling me.
15                (Laughter)
16     THE COURT: Okay. Outside the platform market.
17     MR. WEINGARTEN: Outside of the platform market.
18     THE COURT: Okay. All right. That's fair. That's
19 fair. I understand that. But that -- okay.
20     So the console market, then, it really comes down to Call
21 of Duty and the concern that Microsoft will leverage it, will
22 foreclose it, or partially foreclose it in a way that will --
23 that people who played it on PlayStation will now have to play
24 it on Microsoft.
25     MR. WEINGARTEN: Or get -- I don't want to just give

1-SER-270

1058

1 into the full foreclosure theory. That's another artificially
2 high burden that the Defendants have tried to put on the
3 government.
4     Yes, one theory is they might have to -- the PlayStation
5 user just has to go get an Xbox. That's one theory.
6     The other types of harm, though, arise from all the myriad
7 ways in which platform holders or owners contract to use the
8 content to push their platforms.
9     THE COURT: Okay. So let's stop. Let's start with
10 full foreclosure -- right? -- which is what one of the things
11 that Professor Lee focused on. So what is the actual -- and we
12 heard a lot about his input into his model and the 20 percent
13 shift, I guess.
14     What data was he looking at? And I have in front of me
15 all of -- his declaration. What data was he looking at that he
16 came up with that 20 percent figure?
17     MR. WEINGARTEN: I'm going to phone a friend,
18 Your Honor.
19     THE COURT: Yes, you may phone a friend, absolutely,
20 and the friend can even speak.
21         (Pause in proceedings.)
22     MR. WEINGARTEN: This is my colleague Merrick Pastore,
23 Your Honor.
24     THE COURT: Yes.
25     MR. PASTORE: Sorry. Could you please repeat the

1059

1 question?
2     THE COURT: Well, I want to know what data, actual
3 data, was he looking at. And I'll just tell you, Dr. Bailey
4 actually looked at real-world, this is what is happening data.
5 Did he analyze that data?
6     MR. PASTORE: Sure. Well, Dr. Lee also analyzed
7 real-world data, Your Honor.
8     To look at the share shift, Dr. Lee had to look backwards
9 to see in Generation 8, which you have a lot of data for, how
10 various Call of Duty games may have affected that competition
11 if they had been taken away.
12     The reason you do that is because that analysis is
13 backward looking. You know, there's not much data for
14 Generation 9, especially because of the supply shortages that
15 happened.
16     THE COURT: Okay. So what is the generation data that
17 he looked at? What is it that he looked at?
18     MR. PASTORE: He looked at both generations so --
19     THE COURT: No, no, no. Yeah, but what about -- what
20 is the data, the generation data, what is it that it shows?
21     MR. PASTORE: Sales data.
22     THE COURT: Sales data.
23     MR. PASTORE: Sales data for Generation 8.
24     THE COURT: Sales data of just the number of
25 PlayStations and Xboxes sold?

1060

1     MR. PASTORE: Per-unit sales data for games.
2     THE COURT: Okay. But -- and how from that did he
3 extract the people -- the players that would leave PlayStation
4 or maybe they'd keep their PlayStation but the next iteration
5 that came out, they would buy an Xbox? That's what he's
6 saying; right?
7     MR. PASTORE: Well, he also used the same telemetry
8 data that Dr. Bailey looked at; but in addition, you know, he
9 used the per-unit game sales. And I think, you know --
10     THE COURT: Where in his report do I see how he used
11 that same data that Dr. Bailey looked at?
12     MR. PASTORE: I don't have the report in front of me.
13 If one of my colleagues could give it to me.
14         (Pause in proceedings.)
15     MR. PASTORE: Could you repeat the question one more
16 time?
17     THE COURT: Well, I'll just say Dr. Bailey writes
18 62 percent of all PlayStation owners don't play Call of Duty at
19 all so they're not going to move. They're not -- the
20 foreclosure won't affect them; right?
21     MR. PASTORE: 62 percent of all PlayStation users do
22 not play Call of Duty at all?
23     THE COURT: Right.
24     And then of those that do, most don't play very often.
25 Let's see if I can find it.

1061

1     Can you direct me to -- do you know what slide I'm
2 referring to?
3     MS. WILKINSON: I do, Your Honor, in theory, but let
4 me take a moment to look for that.
5         (Pause in proceedings.)
6     THE COURT: I think it was Slide 15. I'm not going to
7 give you numbers, I guess. Maybe we talked about that
8 62 percent before.
9     But it would be -- well, if you look at Slide 15, it's not
10 that many PlayStation players who play a lot of Call of Duty a
11 year.
12     MR. PASTORE: I'm sorry, Your Honor. I do not have
13 the slides in front of me.
14     MS. WILKINSON: Here you go.
15     THE COURT: I'm sure that somebody does there.
16     And so I'm trying to get how you get to that those people
17 will buy an Xbox because Call of Duty is so important to them.
18     MR. PASTORE: Yes, Your Honor.
19     THE COURT: How do you decide that Call of Duty is so
20 important to them? It is to some people.
21     MR. PASTORE: Yes.
22     THE COURT: Some.
23     MR. PASTORE: Some.
24     THE COURT: But how does he figure out that that -- to
25 get to that percentage number that they would actually do the

1062

1 Xbox? What data is he relying on?

2     **MR. PASTORE:** Well, I'd encourage Your Honor to look

3 at the declaration of Mr. Jim Ryan in his testimony where he's

4 very clear about the financial impact that Call of Duty has on

5 the PlayStation platform.

6     **THE COURT:** That's not my question. My question is

7 how your expert, Dr. Lee -- he did a foreclosure model --

8     **MR. PASTORE:** Yes.

9     **THE COURT:** -- right? And the foreclosure model

10 inputted that 20 percent number.

11     **MR. PASTORE:** Yes.

12     **THE COURT:** -- which represented the share -- another

13 number. Not all PlayStation users; right?

14     **MR. PASTORE:** Yes.

15     **THE COURT:** Yeah.

16     **MR. PASTORE:** Sorry. Sorry if I misunderstood your

17 question. I think I get it now.

18     So that 20 percent number -- I'm sorry -- that 20 percent

19 comes from two main inputs. The first is the LUV, the

20 five-year expected lifetime revenue of a new Xbox owner. And

21 as we presented to Your Honor, you know, that LUV is for the

22 average Xbox user. I'm being careful with the numbers here.

23     And as we showed, Your Honor, through, I think, a

24 demonstrative, if you remember, with the different colors, Call

25 of Duty games compared to the average AAA title, they sell

1063

1 quite a lot. They come out every year around October or

2 November, and they're at the top of the charts. Even Call of

3 Duty Vanguard, which Activision has time and time again said it

4 was a disappointment, that was the number one selling game the

5 year it came out. That's a disappointment for them. That's --

6 still for every other company that's a huge win.

7     **THE COURT:** I'm just saying people who only play Call

8 of Duty, let's say 20 hours a year, are they included in that

9 20 percent figure? You can point me to where in his report I

10 should look.

11     **MR. AKLEMAN:** Jim Akleman on behalf of the Government.

12     So his report is quite long and it's actually helpful if

13 Dr. Lee can explain it himself, but we'll try to do our best to

14 explain economic evidence to you.

15     So if you look at Footnote 806 of his report, which is --

16 it's on page 210 of PX5000, Dr. Lee explains some of the -- how

17 he has sort of got to this rate of people that start using --

18 that might switch; right?

19     So he looks at the universe of people that play Call of

20 Duty and used a variety of data from, my understanding is, both

21 from the Gen 8 share model -- remember, Dr. Lee went back and

22 looked at how gamers actually behaved in response to changes

23 under whole generation --

24     **THE COURT:** Correct me if I'm wrong, that Footnote 806

25 assumes the 20 percent number. I'm trying to figure out how

1064

1 you get to the 20 percent number.

2     **MR. AKLEMAN:** So I don't think it's -- respectfully, I

3 don't think it's correct to say he assumed that it was

4 20 percent. The 20 percent is based on the inferences that

5 were drawn both from the prior generation, the share model,

6 which looked at how people behaved in Gen 8, and then you

7 applied that behavior to Gen 9 to try to predict what people

8 would do in Gen 9.

9     And the reason is because we don't have a ton of data of

10 Gen 9 today; right? So the 20 percent conversion rate, that's

11 actually applied in his second model, which his foreclosure

12 model.

13     **THE COURT:** Right.

14     **MR. AKLEMAN:** And that's intended to predict whether

15 Microsoft would actually have the incentive to withhold -- and

16 I apologize, I hope I'm not saying anything confidential.

17     The idea is that would be intended to predict whether

18 Microsoft would actually withhold data. So, again, he used the

19 modeling of what happened in the past to help predict what

20 would happen in the future.

21     **THE COURT:** I understand that.

22     **MR. AKLEMAN:** It's not just based on, for example,

23 just guessing what the number is.

24     **THE COURT:** No, I understand. I'm just trying to

25 figure out what was the data that was in that -- that model;

1065

1 right?

2     Because, for example, Dr. Bailey showed evidence that the

3 number of PlayStation Call of Duty users that play a lot is

4 actually a pretty small number versus all PlayStation users;

5 right? So --

6     **MR. AKLEMAN:** Right. So --

7     **THE COURT:** And also in terms of revenue, it's not the

8 biggest revenue driver for PlayStation.

9     **MR. AKLEMAN:** You're saying Call of Duty is not the

10 biggest revenue driver on PlayStation?

11     **THE COURT:** Right.

12     **MR. AKLEMAN:** So I think this is what's tricky about

13 this case, is that you have to look at the specific data for

14 each game. You can't just say "I need either the largest game

15 or" -- like, you actually have to calculate, which is what

16 we've tried to present, you have to actually calculate what the

17 effect of withholding that game would be. That's -- that's

18 really -- we can't just say this is the largest game or --

19     **THE COURT:** No. I guess maybe you can just tell me in

20 sort of plain English why would those -- that particular

21 20 percent number buy the Xbox? Like, what is it about Call of

22 Duty that they would abandon their console of choice and buy

23 the Xbox?

24     **MR. AKLEMAN:** So the way to think about this --

25 right? -- is that a consumer -- and, again, I'm not an

1066

1 economist, but I'll do my best here -- a consumer, let's say
2 they spend $70 on Call of Duty; right? There is a surplus
3 that's associated with that. Like, if someone is spending $70
4 on Call of Duty, they likely value it a much more than $70, and
5 so that value that they ascribe to having the ability to play
6 Call of Duty or another Activision game, to be clear, like
7 Diablo as we heard testimony about yesterday is quite vague,
8 that loss surplus, the benefit that they would get from having
9 a game that they really like, so once they lose that because
10 they no longer have access to the game on the platform, they
11 then have to make a choice; right?
12     And so one of their choices is they can just forego that
13 benefit that they would have kept and they just lose that, and
14 so that's actually harm that would result from the transaction.
15     Another possibility that it can do is maybe they already
16 own another console, in which case they might just go buy, if
17 they -- if they're, for example, the rare number of people who
18 are multihomers on Xbox and PlayStation, they can just go and
19 buy on the other console. So there's not as much harm there.
20     And then, finally, the other option is -- well, there are
21 a few more, but just for simplification -- finally, they could
22 go and they could spend $500 on an Xbox if they really, really
23 value Call of Duty, and they -- then they get access to Call of
24 Duty again on the platform that they didn't sort of intend to
25 choose.

1067

1     And just to sort of bring it back, that results in a share
2 shift from -- we heard a bunch of numbers. I don't know which
3 ones are confidential and which ones are not -- that results in
4 a share shift from PlayStation to Xbox.
5     And then this one is a little bit out of my depth, but my
6 understanding is that you can then use that share shift to
7 impute a -- a price change -- an implied price change.
8     THE COURT: I understand that. How do you figure out
9 between -- you say, well, those who don't switch, who don't --
10 who forego buying the Xbox and playing Call of Duty are harmed.
11 True. True. But you're using that to get to the foreclosure
12 incentive; right?
13     So what I need to know is: How do you calculate the
14 number of people that were -- because it has to be enough
15 people, you have to show enough people would switch to Xbox
16 such that Microsoft would have the economic incentive to
17 foreclose. If everyone would just give up on Call of Duty,
18 then they don't have the economic incentive to foreclose --
19 right? -- because it would actually cost them money.
20     So how do you figure out how many people would just give
21 up and how many people would then actually buy the Xbox?
22     MR. AKLEMAN: So that's based on -- and I'm not an
23 economist, again, but that's based on looking at the behavior
24 of players based on, for example, past exclusivity and looking
25 also at the sales behavior of Call of Duty, looking -- trying

1068

1 to figure out that -- remember that surplus that I was talking
2 about earlier? -- trying to figure out exactly how much they
3 value that. Because once you understand how much sort of the
4 average -- it's not really the average, but how much that
5 certain set of consumers?
6     THE COURT: It's not the average; right? It's the
7 exceptional consumer.
8     MR. AKLEMAN: Exactly, right.
9     So the people that are actually going to switch, that's
10 sort of the top end of the people that play Call of Duty. So
11 it's people that value it exceptionally highly; right?
12     But some people that are sort of on the lower end, they're
13 just -- they may not do anything; right? They may just stop
14 playing it because they don't sort of value it enough to
15 switch, and that's sort of -- that's the math exercise that's
16 going on here and that's what Dr. Lee, who I'm sure could
17 explain this much more ably than I could, has calculated.
18     THE COURT: So you're saying that was based, then --
19 for example, Dr. Bailey showed us data as to the number of
20 hours of played on Call of Duty; right? You would expect that
21 someone only plays 10 hours a year less likely to switch than
22 someone who plays 200 hours a year.
23     MR. AKLEMAN: Right. The -- I think the data that --
24 as I understand it, the data that Dr. Bailey was presenting are
25 more along the lines of inputs into the actual modeling that

1069

1 Dr. Lee did; right? So I don't -- I don't know what the exact
2 number is, but I guess I don't personally dispute whatever the
3 telemetry data shows about how much people play Call of Duty.
4     But you can't just stop there. Then you have to go and
5 figure out: What does that tell me about the actual behavior
6 of people that are playing the game? How many of them --
7 remember -- I apologize -- it's how many of those people are
8 actually going to switch --
9     THE COURT: Yes.
10     MR. AKLEMAN: -- because they value it exceptionally
11 highly?
12     So, for example, the people -- I haven't looked at them --
13 this calculation myself, but I would imagine that the people
14 that play a lot more are far more likely to switch than those
15 people that don't -- that don't play very often. So that's --
16 that's telemetry data, that's an input into the foreclosure
17 calculation, but it's not -- you can't just look at that data
18 and kind of --
19     THE COURT: No, no, no. That's what I'm trying to
20 confirm, that it was, in fact, input into Dr. Lee's foreclosure
21 model.
22     (Pause in proceedings.)
23     MR. AKLEMAN: That's correct, yes. He used telemetry
24 data. I apologize. Was that just the question?
25     THE COURT: Well, no, that's okay.

1070

1     Did you want to say something, Ms. Wilkinson?

2     **MS. WILKINSON:** I do, Your Honor. I'm not an

3 economist, but I think I can explain it.

4     This 20 percent is an input, as you're suggesting. It

5 doesn't come out of the model like the 5.5 percent share shift

6 does. That 20 percent he came up with as an estimate. There

7 is no basis, he doesn't calculate it from another model or

8 another --

9     **THE COURT:** I thought it came from the share/demand

10 model.

11     **MS. WILKINSON:** No. He used that model first.

12 Dr. Carlton told him what was wrong, and he explained in his

13 rebuttal report, no, they're separate. They're just kind of a

14 check on the outputs, not on the inputs.

15     And he doesn't have any basis to show --

16     **MR. PASTORE:** I want --

17     **THE COURT:** It was a check on the output because it

18 was higher. It was 8.9 percent so, therefore, the 5.5 percent

19 share shift is conservative.

20     **MS. WILKINSON:** Right, but not the input of the

21 20 percent. That goes to exactly your question, which is: How

22 many people convert? Not how many people want Call of Duty

23 but, to your point, how many people would actually go buy the

24 Xbox? And he makes that number up.

25     And you -- I think I tried to point out during my

1071

1 examination, but if you look at PX5001 on page 76, he shows a

2 chart, because that is an input, of how if you change that

3 input, you get a totally different answer.

4     **THE COURT:** No, I remember that. I'm just --

5     **MS. WILKINSON:** But that's what I'm saying, is he's

6 not -- he doesn't say that he can point to a calculation that

7 he did to get the 20 percent. I thought that's what you were

8 asking.

9     **THE COURT:** That is what I'm asking. So maybe you can

10 show me where --

11     **MR. PASTORE:** Sorry. I'm sorry for --

12     **THE COURT:** -- you calculate -- no, that's okay --

13 how you calculate that. I know you probably didn't even expect

14 to be up here, and you're doing great.

15     **MR. PASTORE:** I appreciate that.

16     (Laughter)

17     **MR. PASTORE:** Your Honor, I really appreciate that.

18 Thank you.

19     No, I didn't expect to be up here, but I also can try to

20 help you understand --

21     **THE COURT:** Yeah, no, I'm glad.

22     **MR. PASTORE:** -- how we get here.

23     I just -- the reason I jumped in is because Dr. Lee did

24 not just make up the 20 percent.

25     **THE COURT:** Okay. So show me in the report where I

1072

1 can read where it came from.

2     **MR. PASTORE:** Given that it's a very long report, I'm

3 looking to my colleagues for a little bit of help on the exact

4 page number, but --

5     **THE COURT:** Okay. Well, maybe -- so why don't we look

6 at. So that's a question that I have because that 20 percent

7 figure is sort of critical -- right? -- to your argument, which

8 is notwithstanding everything Microsoft said, notwithstanding

9 the agreement that they offered, notwithstanding their

10 agreement with Nintendo, they have an economic incentive to

11 make Call of Duty exclusive.

12     **MR. PASTORE:** Yes.

13     **THE COURT:** And as we all agree, that's what they want

14 to do, make money, and, therefore, they -- there's a likelihood

15 that they would do that. So that's why I'm honing in on that.

16     **MR. PASTORE:** Yes, no, I totally appreciate that. I

17 think I'll go back and get the exact answer; but from my --

18 and, again, I'm not an economist. I try my best. I did my

19 undergraduate in economics so I have a little bit of an

20 understanding.

21     **THE COURT:** Well, you're ahead of me then.

22     **MR. PASTORE:** But I'm not near -- I'm nowhere close to

23 Dr. Lee -- to Professor Lee.

24     But the 20 percent -- first of all, you know, we found a

25 range, 15 to 25 percent. So the 20 percent is in the middle of

1073

1 that range.

2     **THE COURT:** Right. But --

3     **MR. PASTORE:** Sorry.

4     **THE COURT:** -- we saw that if it's 15 percent, the

5 same incentive is not there --

6     **MR. PASTORE:** Let me explain that very quickly.

7     **THE COURT:** -- potentially. Potentially.

8     **MR. PASTORE:** So two main inputs go into finding this

9 20 percent. The first I think I mentioned a bit earlier, which

10 was the LIV, the five-year calculation of your average Xbox

11 user, which Microsoft uses in the ordinary course. This is

12 their numbers. They calculate this.

13     And the other main input is the share shift. Sorry. I'm

14 so sorry. The other main input is the share shift, that we use

15 Generation 8 data to approximate.

16     Now, economics is, unfortunately -- you know, it's -- we

17 do the best with the data we have. And in this case to try to

18 look at what exclusivity might do, looking for this point, the

19 share shift point, looking back on Generation 8 data, you have

20 a much larger set. You have about seven years of data from

21 last generation where Call of Duty, as you saw in the graph,

22 was a very, very popular game.

23     So understanding that it might -- at first blush, it might

24 be, "Oh, why are you looking at Generation 8 data here and

25 Generation 9 data here," for this one input, this expected

1  potential share shift, that's where we look at data.
2      **THE COURT:** And when you're looking at the generation
3  day data, are you looking at how many hours people play Call of
4  Duty in a year to come up with that share shift?
5      **MR. PASTORE:** Well, I believe it's unit sales data,
6  which, you know, if you buy Call of Duty, that's $70, $60.
7      **THE COURT:** Yeah, but we know that some people play
8  5 hours a year and some people play 200 hours a year, and
9  you're not going to tell me that someone that plays 5 hours a
10 year is likely to buy that Xbox just because Call of Duty is
11 exclusive to Xbox; right?
12     **MR. PASTORE:** Yeah, that's fair enough.
13     And I do want to emphasize that the 8.9 I think -- I
14 don't -- sorry.
15     **THE COURT:** No, that was --
16     **MR. PASTORE:** Is that public? I'm sorry.
17 That number --
18     **THE COURT:** It's all hypothetical.
19     **MR. PASTORE:** Yeah, see, this is only one
20 consideration. And just to -- I'm sorry to zoom out for a
21 second, but Dr. Lee, you know, these are -- Professor Lee,
22 these are very big reports. These quantitative models are one
23 of the things that he's looking at along with qualitative
24 evidence, along with other, you know, Microsoft normal course
25 documents that they look at for share shift.

1      **THE COURT:** We'll get that, but my question is about
2  this foreclosure --
3      **MR. PASTORE:** Yes.
4      **THE COURT:** -- model; right? Right? Because that's
5  important to Microsoft having the economic incentive.
6      **MR. PASTORE:** Of course.
7      **THE COURT:** That's a mathematical calculation.
8      **MR. PASTORE:** Yes.
9      **THE COURT:** It makes more sense to take Call of Duty
10 exclusive than it does to leave it on all the platforms; right?
11     **MR. PASTORE:** Yes.
12     **THE COURT:** I mean, that's -- that's the nub of it.
13     **MR. PASTORE:** Yes. And just what I'm trying to get
14 across is, even though we have this 8.9 percent, that's just
15 one of the percentages he looks at. You know, we see other
16 share shift figures from Microsoft documents that are
17 consistent with this number. They're a little lower but, you
18 know, with -- with the impact of Call of Duty, you know, its
19 sales, its popularity, I know that --
20     **THE COURT:** It is very popular?
21     **MR. PASTORE:** Yes.
22     **THE COURT:** It's sold a lot. A lot of people buy
23 games and they play them once or twice, and then they never
24 play them again; right? They play them with their friend and
25 then they never play them again.

1      So I guess I'm trying to figure out -- maybe I'm wrong
2  about that, but I'm looking at the data that Dr. Bailey said,
3  that a lot of people don't buy it and don't play it very much.
4      **MR. PASTORE:** Yes. Yeah, and just, again, to consider
5  back to Mr. Jim Ryan's declaration where he discusses, you
6  know, how big Call of Duty is on the PlayStation -- is this
7  public?
8      No. So sorry. So I would want to turn Your Honor's
9  attention to paragraph 28 of Mr. Ryan's declaration about the
10 fourth sentence where it starts "In 2021." I won't say
11 anything below -- after that.
12     (Pause in proceedings.)
13     **THE COURT:** What's the FX number?
14     **MR. PASTORE:** Do you know? It's FX8001, Your Honor.
15     **THE COURT:** Oh, it's not in this one.
16     **MR. WEINGARTEN:** So, Your Honor, I think --
17     **THE COURT:** Is what he's saying based on the number of
18 hours played? That's all I'm asking. I'm just wondering.
19     **MR. WEINGARTEN:** Paragraph 28 looks -- are you asking
20 about -- when you say "he," Your Honor, do you mean Mr. Ryan or
21 Dr. Lee?
22     **THE COURT:** You're relying on Mr. Ryan now. He's
23 telling me to look at paragraph 28 of Mr. Ryan.
24     **MR. WEINGARTEN:** Mr. Ryan paragraph 28 is about hours.
25     **MR. PASTORE:** It's about --

1      **THE COURT:** Okay.
2      **MR. WEINGARTEN:** And then I just want to direct your
3  attention --
4      **THE COURT:** But can I -- can I ask you, then, about
5  Dr. Bailey's demonstrative? I didn't hear any dispute with
6  that. Is that accurate?
7      **MR. ANSALDO:** Which demonstrative, Your Honor?
8  Alex Ansaldo for the Federal Trade Commission.
9      **THE COURT:** Number --
10     **MS. WILKINSON:** I think you said 15, Your Honor.
11     **MR. ANSALDO:** Number 15?
12     **MS. WILKINSON:** Uh-huh.
13     **MR. ANSALDO:** I don't think we have a specific dispute
14 with the information in this demonstrative.
15     **THE COURT:** Okay.
16     **MR. ANSALDO:** I think Dr. Bailey acknowledged, as
17 Professor Lee showed, that the more that the gamers spent --
18 more time gamers spend on a game, so that people that are to
19 the right of that chart spend a lot more money than the people
20 that are in the middle or to the left of that chart --
21     **THE COURT:** Right. No, but --
22     **MR. ANSALDO:** -- in that game.
23     **THE COURT:** Yeah.
24     **MR. ANSALDO:** And there was one other thing I wanted
25 to address. This is in this next -- it's on Demonstrative 17,

1078

1    which is confidential.

2        **THE COURT:**  Yes.

3        **MR. ANSALDO:**  This demonstrative shows -- or purports

4    to show the average spend per gamer, not the total value of

5    that whole population of gamers to the platform.

6        **THE COURT:**  Yes.

7        **MR. ANSALDO:**  So there are many more Call of Duty

8    gamers than there are of the games that are to the left of it

9    in this chart.  So this chart doesn't accurately reflect the

10   total value of the franchise to a platform.

11       **THE COURT:**  That's the money spend?  Oh, but it

12   doesn't include the platform purchase.

13       **MR. ANSALDO:**  Well, it doesn't tell you how many --

14   how many gamers there are playing that game.  So this chart was

15   based on Dr. Bailey's cutoff of 50 hours per year as a

16   franchise gamer and it's the average of those gamers.

17       **MS. WILKINSON:**  Your Honor, to be clear, it's the

18   money spent, though, as you're pointing out.  It's not the

19   hours spent.  There's a minimum, but that can't tell you how

20   many hours the Call of Duty players play and it doesn't fold

21   into what you're asking, which is:  How do you determine which

22   of those people who play more will actually switch?

23       And I don't -- I mean, we've asked Doctor -- or

24   Professor Lee in his deposition.  We've read his reports.  We

25   don't see any calculations there.

1079

1        **THE COURT:**  Do you have something in his deposition

2    that you -- you're not going to do that, but why don't you look

3    while you're there.  Everybody has big teams.  Find me where in

4    his deposition you say I can look to see that there is --

5        **MS. WILKINSON:**  Yes.  It might not surprise you --

6        **THE COURT:**  You say --

7        **MS. WILKINSON:**  -- that he was not -- he gave long

8    answers and it was sometimes hard to --

9        **THE COURT:**  You just told me --

10       **MS. WILKINSON:**  Yes.

11       **THE COURT:**  -- that in his deposition you asked.

12       **MS. WILKINSON:**  No.  I said we don't have any answers

13   for that.  We tried.  We don't have any answers.

14       **THE COURT:**  You can even point to me to where you

15   tried.

16       **MR. WEINGARTEN:**  If I may, Your Honor.

17       **THE COURT:**  Yes.

18       **MR. WEINGARTEN:**  I apologize.  It took some time.

19   Dr. Lee's reply report, paragraph 207, Dr. Lee in the reply

20   report says:  Professor Carlton's first critique is that the

21   Xbox conversion rate that I use is too high.  I believe that is

22   directly responsive.  The Xbox conversion rate is the

23   20 percent, and he says the first critique is that it is too

24   high but this critique is flawed and rests upon the incorrect

25   assumptions as follows:

1080

1        Paragraph 208 and Footnote 233, I believe, are where

2    Dr. Lee shows the support for the 20 percent.  What I suspect

3    is tripping everybody, potentially, respectfully, up is that

4    the 20 percent conversion rate seems to be calculated and

5    converted into an equivalent percentage points of people who

6    are new to the Xbox.

7        So he says (as read):

8        "The 20 percent conversion rate that I used by

9        showing the foreclosure of Call of Duty '25 from

10       PlayStation results in an increase of NIX users that's new

11       to Xbox users equivalent to 5.5 percentage points of the

12       sales."

13       So I think --

14       **MS. WILKINSON:**  That is --

15       **MR. WEINGARTEN:**  Well, I don't -- the scoffing --

16       **MS. WILKINSON:**  I think, Mr. Weingarten, he's saying

17   "I put 20 percent into the model" --

18       **MR. WEINGARTEN:**  No.

19       **MS. WILKINSON:**  -- "and it produced 5.5 percentage

20   share change."  He's not saying the model produced 20 percent.

21       **MR. WEINGARTEN:**  I --

22       **THE COURT:**  Okay.  All right.  I see.  You're

23   directing me to those paragraphs and to --

24       **MR. WEINGARTEN:**  Footnote 233.

25       **THE COURT:**  Footnote 233.  Thank you.  That's what I

1081

1    wanted to know.

2        **MR. WEINGARTEN:**  Thank you.

3        **THE COURT:**  Great.

4        **MR. PASTORE:**  Thank you.

5        **THE COURT:**  Okay.  So I think I under -- so then let's

6    also talk about the relevant market, then, for the Gen 9.

7        And I guess where I'm struggling there is because you can

8    play a lot of these games on the PC and the Nintendo console,

9    and so can you give me a case in which a relevant market didn't

10   include something like an input -- I guess we call the game an

11   input here, I don't know -- that they're playing?  Like, I can

12   play, not yet, on -- maybe never you would say, on the

13   Nintendo, but I can play on my PlayStation, my PC, and my Xbox

14   simultaneously anywhere in the world against each other but,

15   yet, you say that PC is not part of the market.

16       **MR. WEINGARTEN:**  Very -- this one is pretty

17   straightforward, although my colleagues will jump up if I screw

18   this one up.

19       The question is the consumer's choice and the set of

20   products that the consumer can reasonably substitute.  The

21   consumer in this example is looking for a video game console in

22   our hypothetical monopolist test; right?

23       The hypothetical monopolist owns the Switch and the

24   PlayStation and the Xbox, and our consumer goes to buy one of

25   those things.  We're talking about the broader video game

1082

1 market here. It doesn't include PCs, and I'll explain why.

2 The hypothetical monopolist says: I'm going to take the
3 price up 5 percent from $500 to whatever 5 percent of that,
4 10 percent, 550. Our hypothetical consumer does not say:
5 Fine. I'm not going to pay your 550 by going off to buy a
6 $1500 PC.

7 THE COURT: What if they already have the PC?

8 MR. WEINGARTEN: If they already have a PC?

9 THE COURT: Yeah. They don't have to buy it. In
10 other words -- in other words, why isn't -- everybody,
11 particularly in 2023, and I would also guess that particularly
12 with people who play Call of Duty, are likely to already own a
13 PC; right? I mean --

14 MR. WEINGARTEN: Right, although I -- yes. Yes,
15 and --

16 THE COURT: So they don't have to buy one.

17 MR. WEINGARTEN: Right. So the question, though, is
18 twofold on that. One is, the gaming PC is a special kind of
19 PC. It is not a run-of-the-mill PC. A run-of-the-mill that
20 you go and you get the bargain-basement $200, $400, $500 PC is
21 not a gaming PC.

22 THE COURT: I get that, but -- and maybe I'm biased in
23 the world that I live in -- right? -- and the world we've all
24 lived in during the pandemic where everybody went home,
25 everybody did their work from home, and nobody did it on a

1083

1 bargain-basement PC. Everybody had a 1000, $1500 PC.

2 Do we have --

3 MR. WEINGARTEN: The test is asking about the purchase
4 decision. So we're assuming someone is looking to buy this
5 console, and will they be able to defeat the price of the
6 console by making an alternate purchase. It's not defeat the
7 price because you don't really need the product because you
8 already have something.

9 THE COURT: So I understand that. I'm just in real
10 world I'm trying to figure out how that works. Like, why
11 doesn't the existence of being able to play on the PC, which
12 you already have, maybe not quite the same quality I think you
13 would say, but you already have, why wouldn't that have some
14 sort of influence and downward pressure on the price of the
15 Xbox?

16 Because you raise it to -- I know the snip is a low
17 number, but you raise it to a thousand dollars, "Hey, forget
18 it. I'm going to play on the PC that I already have."

19 MR. WEINGARTEN: Right. So for any given market, if
20 we assume that the price increase is vast, almost anything can
21 be added in as a substitute, and so that's why the test focuses
22 more narrowly. You could say: Why aren't, you know, $500
23 Italian shoes a substitute for $20 Tevas?

24 THE COURT: Right. It's the significantly small.

25 MR. WEINGARTEN: That's why we do that, because

1084

1 everything eventually becomes a substitute if the price goes
2 through the roof. I think my colleagues will nod if I say
3 "Cellophane Fallacy." Are some of them nodding? Maybe some of
4 them are nodding.

5 But there's a case about this where if you take the price
6 so high that airline tickets -- or instead of competing among
7 airlines, you said, actually, buses are in the market because
8 if I took the prices of buses up to 500 bucks a ticket, they'd
9 compete with airlines.

10 THE COURT: So we'll stick to the small percentage.
11 I guess are you saying that as a matter of economics, you can't
12 take into account the fact that somebody may already own the
13 particular platform that they need?

14 MR. WEINGARTEN: I think as a matter of economics,
15 again, the point is the purchasing decision and whether, for
16 the purposes of the hypothetical monopolist test, can a product
17 outside our proposed market constrain this hypothetical
18 monopolist. That's -- it's a construct, but that's the
19 construct.

20 THE COURT: Right.

21 MR. WEINGARTEN: And so the hypothetical monopolist
22 who owns all three consoles in the broader console market, is
23 that hypothetical monopolist going to be unable to raise prices
24 in a small but significantly significant way for a period of
25 time because there's a PC that costs $1500? No.

1085

1 THE COURT: No, not if they have to buy the PC. But
2 what if -- again, I'm sorry to go back, and that's what I'm
3 struggling with. I get it --

4 MR. WEINGARTEN: I understand, Your Honor.

5 THE COURT: -- if you had to buy it, that makes
6 perfectly good sense, if it was a different high-end console up
7 there, but we're talking about something that, maybe we're just
8 in unique land, that people own.

9 MR. WEINGARTEN: I think the question here is: It's
10 not about an actual purchase decision; right? Of course,
11 Your Honor, if someone owns a PC already, they can do the game.
12 They don't even need the console in theory.

13 But I'm being told if they already own a PC and a
14 console... So if they already own it, but that's not -- the
15 question is not what is the actual purchase decision for
16 someone who owns it. The question is: How can we tell if some
17 products are reasonable substitutes for each other? And the
18 way we can tell is we start drawing circles around the
19 products; and when we get to a circle where the price of those
20 products can be increased and something outside the circle
21 won't constrain it, we've got a circle that's a good relative
22 market to think about effects.

23 THE COURT: No, I understand that. I guess I'm just
24 trying to say but why? Why can we not consider the fact
25 somebody -- are you just telling me just -- and I'm not the

1086

```
1  economic expert so I -- I'm sorry, if I come across as dense.
2       I'm -- just as a practical matter, it just seems to me,
3  that if you have a PC and you can play the games on the PC,
4  that's going to have some constraint on the console prices
5  because the people making the console knows as soon as we go up
6  a little bit, that may make some people just say "Forget it.
7  I'm not going to buy that new console.  I'm just going to play
8  on the PC that I already own."
9       MR. WEINGARTEN:  I have two answers; one law, one
10  fact.  The law answer is:  I think the way the test has been
11  defined is the way I've been trying to state it under the law
12  of how the courts think about a hypothetical monopolist test.
13  So I'm comfortable about that, although that may be a copout.
14  But I'm not an economist either.  I just do what the Courts of
15  Appeals and the District Courts tell me.
16       On the facts, the way I'm confident that the example
17  Your Honor is putting forward is not how we should think about
18  is that we have seen no evidence that Microsoft is benchmarking
19  the Xbox against a gaming PC in terms of price or even
20  performance.
21       There was no evidence by the Defense that Microsoft when
22  it was launching the X and S said, "How much do high-end gaming
23  PCs cost?  1500?  We can price at 1499."  There is no evidence
24  of that whatsoever, and so we feel confident that the close
25  competition that matters is among the Xbox and the PlayStation.
```

1087

```
1       THE COURT:  So that, I agree.  We haven't seen it.
2  And I'm -- I'm confident what you say as to the law, but can
3  you give me a case in which the law has said that in facts
4  similar to this?  In other words, I think we're in a very
5  unique industry here and situation, and that's why maybe the
6  law hasn't addressed it.
7       MR. WEINGARTEN:  Respectfully, I agree we're in a
8  unique situation; but, on the other hand, I'm fairly confident
9  this is not the first time that there's been a series of
10  products and then there's sort of an ultra-luxury version that
11  someone has claimed competes and, therefore, should be in the
12  market, and I will find you --
13       THE COURT:  An ultra-luxury version that most people
14  already -- most people that play the game or do whatever
15  already own so they don't have to purchase it.
16       MR. WEINGARTEN:  Right.  I am told, Your Honor, that I
17  should mention the Whole Foods case.
18       THE COURT:  Okay.
19       MR. WEINGARTEN:  So that is D.C. Circuit 2008.
20       THE COURT:  The whole paycheck.
21       MR. WEINGARTEN:  I'll get you -- can we get an F.2nd
22  cite on there?
23       The Whole Foods case, Your Honor.  It's in our reply in
24  support of the preliminary injunction motion.
25       THE COURT:  Okay.  I can look there.
```

1088

```
1       MS. WILKINSON:  Your Honor, may I dress that when
2  you're ready?
3       THE COURT:  Of course.
4       MS. WILKINSON:  First of all, the reason you're asking
5  your question is because you're right, we're not a horizontal
6  merger case.  That's what that test is designed for.
7       Think of it, if you had all of these consoles in the same
8  market and Sony and Nintendo were merging.  You want to see is
9  it going to get more concentrated or less and you're going to
10  see if they actually are competitors to see if they would
11  substitute.
12       Here, because it's a vertical merger, you're looking to
13  see where would they play the game if they lose the game.  Not
14  the console.  The game.  So it is relevant to what you're
15  asking is:  Would they go play it somewhere else and can they
16  get access to it elsewhere?
17       So they're trying to use a horizontal merger test to have
18  you calculate something in a vertical merger.  If you look at
19  the cases, you'll see that they will mention that test and say
20  "But that's not really applicable in a vertical merger test,"
21  because that's not the question being asked.
22       THE COURT:  We don't even have very many vertical
23  merger cases.
24       MS. WILKINSON:  Right.
25       THE COURT:  All right.  Okay.  I'll go back and look
```

1089

```
1  at that case.
2       MR. WEINGARTEN:  We'll just respectfully say if
3  Your Honor looks to our conclusions of law, I feel very
4  confident that there is no categorical distinction in the law
5  of the kind that counsel is drawing; that this test is only
6  applicable in a horizontal context.
7       THE COURT:  The test actually, though, for product
8  markets, I do think there's case law that says it's sort of
9  very fact specific, detailed and there is no one test
10  necessarily of that.
11       MR. WEINGARTEN:  Correct, but I just want to put a pin
12  in counsel's assertion that the HMT is not applicable in a
13  vertical merger.  That is not the law as we understand it --
14       THE COURT:  Okay.
15       MR. WEINGARTEN:  -- and I direct Your Honor
16  respectfully to our conclusions.
17       THE COURT:  Let me, then, ask you about Nintendo, and
18  I'm trying to figure out why Xbox offered that Xbox S at that
19  price point --
20       MR. WEINGARTEN:  So --
21       THE COURT:  -- but for the Switch.
22       MR. WEINGARTEN:  So, Your Honor, that's what I was
23  driving at, respectfully, with my questions to Mr. Stuart this
24  morning.
25       This one is 299, the X -- or S, the Switch is 299, and I
```

1090

1 think Your Honor asked a question: Seems like they're aimed at
2 each other.
3     Now the questions and the testimony, in particular from
4 Mr. Stuart, demonstrated that at launch and even two years
5 later the price benchmark for the S was other Generation 9
6 consoles, and the strategy was: Let's get people into the
7 Gen 9 console market in an entry-point level. Not let's steal
8 share from Switch.
9     No documents about that and nothing from the defense on
10 cross of Mr. Stuart. They asked him about it, but no
11 documentary evidence; whereas --
12     **THE COURT:** Why are those two things inconsistent?
13     **MR. WEINGARTEN:** It doesn't necessarily have to be
14 inconsistent, Your Honor, but the strategy for the S in terms
15 of pricing was about getting an entry-level Gen 9 console.
16     **THE COURT:** That's because when they go to Best Buy
17 and it's on the shelf --
18     **MR. WEINGARTEN:** Right.
19     **THE COURT:** -- and we have got the PlayStation, the X,
20 the S, and the Nintendo Switch, probably -- I don't know, we
21 didn't hear any testimony about where it would be in
22 Best Buy -- and I'm looking at the Switch, but, look, I can get
23 this entry into the Gen 9; right?
24     **MR. WEINGARTEN:** Yeah, I hear you on that one,
25 Your Honor.

1091

1     **THE COURT:** Yeah.
2     **MR. WEINGARTEN:** Again, it's noteworthy that when they
3 were pricing it, in their own documents you didn't see that.
4 So in November of 2020 when Microsoft is pricing it, I believe
5 the only evidence in the case on this is the evidence that we
6 put in this morning, that they didn't say "Let's triangulate
7 along the Switch." They said, "How do we get people into our
8 Gen 9 console world? And we'll do that with this entry-level
9 price point."
10     Like even if, Your Honor, there is some substitution
11 between the Switch at 299 and the S on the margins, we don't
12 think that's enough to defeat the market we've put forward
13 because of both the HMT, which we talked about, and all the
14 qualitative evidence about the competition and the Gen 9
15 console world X Switch.
16     And even if Your Honor was compelled to think, well,
17 because of that pricing, all of these are in a market, we're
18 still okay because --
19     **THE COURT:** I understand that argument. Okay.
20     Did you want to respond on the Nintendo?
21     **MS. WILKINSON:** I mean, Your Honor has it. People do
22 go into the store and they make one choice, and it is a
23 competitor. They have -- obviously Nintendo has some different
24 features, as you heard Mr. Kotick admit that he didn't quite
25 see as benefits, but the price is one of the most important

1092

1 things that consumers look at so it doesn't --
2     **THE COURT:** One thing.
3     **MS. WILKINSON:** One thing, but it is, as you say,
4 important to say, "Oh, I could get this newer console for 299."
5 And the fact that they're also priced off of the other devices
6 doesn't mean they're not a competitor for Nintendo. Both can
7 be true.
8     **MR. WEINGARTEN:** If I might add, one of the tricky
9 things, and I think it's something that Defense Counsel is
10 seizing upon here, is that competition is a pretty amorphous
11 concept. Lots of things compete and the function of the test
12 that the Courts of Appeals and the District Courts have derived
13 is to try and get down to what competition matters.
14     So in some sense, lots of things are competing all the
15 time in this space. You can play video games on your phone.
16 You can play a video game on the console. You can play -- what
17 matters is: Where is the locus of competition that the effects
18 of this deal will be felt?
19     That's why we do all these tests and look at *Brown Shoe*
20 factors, to try and figure out. So it is not sufficient to say
21 in a lay term or in a sort of casual term, there's competition,
22 people can walk into a store and see it. We're trying to get
23 to something a little bit more precise -- understanding that
24 these are complex questions and neither the economics nor the
25 law is clear -- trying to get to something so we can understand

1093

1 the effects of this transaction.
2     So I would just -- the casual idea that someone can walk
3 around and pick up one or the other, we can do better than
4 that, and the evidence that we've brought forward is better
5 than that, both on the HMT and all of the qualitative evidence
6 from pretty much from every witness in the case, that the
7 Switch is not the same as the Gen 9 consoles.
8     **THE COURT:** It is not the same. In many ways it's
9 better; right? Because you can actually still hook it up to
10 your TV and take it on the airplane.
11     **MR. WEINGARTEN:** So that's another point. It's a 299
12 price point, and I think Your Honor got at this. Nobody is
13 going to confuse paying 299 for a box that has no screen with
14 paying 299 for the portable screen.
15     So to say that they're competitors because of the price,
16 they don't do the same thing. That's -- the price is one
17 dimension of their competition; but among critical other
18 dimensions, including Mr. Spencer's testimony that they are
19 radically different form factors, the price is one piece. But
20 I would hate to say because they have a similar price, the box
21 that needs a TV is going to be someone's choice when they go to
22 the store and they have a portable device.
23     **THE COURT:** Well, which also can use a TV and play the
24 same games, many of the same games.
25     **MR. WEINGARTEN:** I would direct -- respectfully on

1094

1 that point, I would direct Your Honor to the charts. There's
2 bar charts in Dr. Lee's report. The content is quite
3 dissimilar between the Switch and the others.
4     Nintendo's whole strategy is about having Mario and Zelda
5 and the Family Friendly. Are there overlaps? Of course, but
6 very different content and consumer profile.
7     And I'll just -- not to be labor it, probably too late,
8 rather than taking our word for it, the best people who would
9 know what consumers think about and are looking to buy are
10 probably the folks at Microsoft who were setting the price when
11 the thing launched, and they didn't look at the Switch. So
12 that's, in our view, extremely probative.
13     THE COURT: What do you say to that, that there isn't
14 any evidence with respect to the S and the Switch pricing?
15     MS. WILKINSON: That is both, Your Honor, that they --
16 it can do -- or you can look at it either way. They both can
17 do the same thing, and there's a lot of overlapping games,
18 which I'm talking about -- I mean, which are on this chart I
19 want to refer you to; and as you point out, the Nintendo can do
20 more because you can take it with you. But there are also
21 pricing offputs in the market to look like it's an alternative
22 to these more expensive devices. So it's doing both.
23     THE COURT: Well, no, I understand that argument.
24 What Mr. Weingarten is saying is that there isn't any evidence
25 to support that argument.

1095

1     MS. WILKINSON: I don't think -- I don't think the
2 fact that they are pricing it off of this and they're not
3 saying there's actually a price comparison to these. You heard
4 that testimony. When you look at the documents from the
5 internal documents, it's not true that they don't compare
6 those. They do compare them.
7     THE COURT: Well, good. You can point those out in
8 your --
9     MS. WILKINSON: And most importantly I think,
10 Your Honor, on Dr. Bailey's charts on paragraph 88, which come
11 from her report at 71 and 72, it shows all the similar games
12 available on Xbox and Nintendo, and counsel's just wrong. The
13 most popular games are on both.
14     You heard many people, including Mr. Kotick, say the
15 free-to-play games are the most popular games: Fortnite, then
16 one of the popular games that's pay-to-play is FIFA, Minecraft,
17 Apex Legends, NBA 2K22, Rocket League, Overwatch 2. You can go
18 down this list and you can see that there are -- these are on
19 both devices.
20     So your point that, you know, can people play most of
21 these games, they can. Do they also have another set of
22 choices on Nintendo? Of course they do just like they do on
23 PlayStation.
24     THE COURT: I think there was evidence that -- I won't
25 say the numbers, I don't know -- from Dr. Lee, though, that a

1096

1 lot of Nintendos were exclusive to Nintendo.
2     MS. WILKINSON: Like PlayStation. Like PlayStation.
3 They have many more -- both products have many more exclusives
4 than the Xbox.
5     THE COURT: But they weren't similar to PlayStation.
6     MR. WEINGARTEN: Yes. I mean, it has clearly been a
7 part -- I don't know if there's evidence on this in this
8 case -- but a part of the Nintendo strategy that you go for
9 Zelda and Mario, there's only one place to find Zelda and
10 Mario. The Nintendo.
11     I just want to add, Your Honor, if we're talking about
12 locus of competition and what matters, even if you look at
13 Dr. Bailey demonstrative, for the purposes of this case there's
14 no dispute that Call of Duty, Modern Warfare 2, and even the
15 Sony God of War Ragnarök, the games that are driving the
16 competition that we care about because of the merger and why
17 we're here, those don't get played on Switch. That just can't
18 be, and that was pretty indisputable testimony as well.
19     MS. WILKINSON: If he's referring to Call of Duty,
20 Your Honor, we know that it was on the Nintendo devices
21 previously.
22     MR. WEINGARTEN: Many moons ago and many generations
23 of all Call of Duty ago.
24     THE COURT: Okay. All right.
25     MS. WILKINSON: Your Honor, can I clarify one issue

1097

1 that counsel raised with you?
2     THE COURT: Yes.
3     MS. WILKINSON: When you were asking about ZeniMax and
4 asked him to find a game that was most similar to Xbox, he
5 mentioned Elder Scrolls. That is incorrect. There are two
6 Elder Scrolls games. One is online. It's called Elder Scrolls
7 online. That is a multiplayer game. It is on PlayStation
8 today. Microsoft has published new add-ons and separate games.
9 That is available.
10     The game he's talking about, Elder Scrolls 16 that's
11 coming out right now that, you know, projected release is 2026,
12 that's a single-player game. So it is not anywhere similar to
13 Call of Duty, which, as you know, is multiplayer and
14 multiplatform. So the one version of Elder Scrolls that is
15 similar is on PlayStation and always has been, at least for
16 these recent games.
17     MR. WEINGARTEN: There, I just want to -- I think this
18 is going to be a major point, it has been throughout the
19 briefing, which games are like Call of Duty, which games are
20 not like Call of Duty, and the briefing I thought joined the
21 issue quite well.
22     There are only a handful of titles in the history of the
23 gaming, as far as I understand it, that are multiplayer, cross
24 play, existing, and this might be the only one that's been the
25 subject of an acquisition in the last 20 years.

1098

1     So what we can show you is incentives and what the
2 incentives look like, and what we can show you is all the
3 evidence we brought about what Microsoft as a platform owner
4 will do, but the game -- the case, respectfully, is not going
5 to be decided on comparing multiplayer/non-multiplayer. The
6 case is going to be decided on understanding the economic
7 incentives.
8     **THE COURT:** Well, but we don't know have -- there's
9 economic incentives. Those economic incentives include your
10 brand; right?
11     **MR. WEINGARTEN:** Yes.
12     **THE COURT:** And if I recall when I asked Dr. Lee as to
13 whether his foreclosure model took into account the potential,
14 I think we all -- reputational harm; right? You've talked
15 about how -- and you point to Mr. Ryan and the loyalty of this
16 Call of Duty gamers, if their platform, preferred platform, is
17 taken away from them, there's going to be harm.
18     Like, we have whole trademark cases that are just about
19 reputational harm. So how does that factor in there into your
20 argument that Microsoft will, nonetheless, take it or is likely
21 to I should -- or has the incentive to take it exclusive?
22     **MR. WEINGARTEN:** So three things on that, Your Honor.
23 One is, it's a limitation of the model that you can't quantify
24 that kind of brand harm, and I think Dr. Lee also testified
25 that there are unquantifiable benefits as well. So the model

1099

1 misses some costs that are hard to quantify and misses some
2 benefits that are hard to quantify.
3     Number two, we saw what Microsoft did faced with
4 reputational harm in the ZeniMax case, and the Court heard
5 Mr. Hines' apologies.
6     **THE COURT:** No. I'm sorry, you just told me you can't
7 think of another multiplayer, multiplatform game --
8     **MR. WEINGARTEN:** Right.
9     **THE COURT:** -- that was acquired, so actually we just
10 don't have anything to compare to.
11     **MR. WEINGARTEN:** So then I'll go to number three,
12 which is: Would there be incredibly damaging reputational harm
13 if the game were yanked from PlayStation; right?
14     So two thoughts on that. One is, harm to whom? If people
15 really want to play the game, they will still go to Xbox to
16 play it. They might grumble and be mad; but, you know, it's --
17 no one has proposed a theory that they'll just throw down their
18 controllers and stop playing altogether.
19     **THE COURT:** You don't think a boycott is possible?
20     **MR. WEINGARTEN:** I don't know.
21     **THE COURT:** You certainly see now I'm going way beyond
22 the evidence, but we certainly see consumers doing that; right?
23     **MR. WEINGARTEN:** I don't -- I don't know and it's
24 beyond the evidence.
25     But, more realistically, that's some sort of full

1100

1 foreclosure world that the defense keeps wanting to paint us
2 into. But what about a world where Microsoft offers the best
3 new Christmas character to play on Christmas in Call of Duty
4 but it's only on Xbox? Or --
5     **THE COURT:** Okay. And where is the analysis that I
6 can say that that financial incentive enough would be -- would
7 be enough to make them do that; right? That's just not there.
8     And what players? Like, who? Like, what percentage of
9 the players that are out there would actually buy the Xbox so
10 they can get this Christmas character; right?
11     **MR. WEINGARTEN:** Right. So a couple of thoughts
12 there, Your Honor, respectfully.
13     One is, my least favorite answer in this venue is that's
14 part of what part three administrative proceeding may be
15 forced, that we have a chance to figure this out because it is
16 super-complicated.
17     My next better answer, given the venue we're in, is: It's
18 impossible and not really -- I don't think we could model
19 partial foreclosure because the methods of competition are so
20 myriad. It's infinite, as I think what we heard from
21 Mr. Kotick and from Sony, the co-promotion, the co-marketing,
22 there are infinite ways to make your content or your platform
23 seem valuable by investing in unique content.
24     But I respectfully don't think the answer can be to say:
25 Well, we'll throw up our hands and we can't figure it out. I

1101

1 think the answer is: Given all this behavior that we see in
2 the marketplace with competition for co-promotes and
3 co-marketing and Christmas players and all these things, will
4 Microsoft have an incentive to change the rules of the game or
5 slant those agreements or slant the promotions that matter
6 towards itself?
7     And all one has to believe to believe that is that they
8 are a profit-maximizing company; and if that's true, then have
9 we demonstrated a probability, we don't have to demonstrate a
10 certainty, but a probability that there's going to be a
11 lessening of competition?
12     That's -- that's the best answer I can give you because
13 there is no way to model, in a purely quantitative form, all
14 the myriad methods of competition and, on the flip side of
15 that, harm to competition.
16     **THE COURT:** Okay. And we're talking about Call of
17 Duty.
18     **MR. WEINGARTEN:** We are, Your Honor.
19     **THE COURT:** Right? We're talking about -- I mean,
20 it's -- okay. We'll get to that *Illumina* case, which is so
21 different in so many ways. We're talking about a video game, a
22 shooter. I think we saw an exhibit where it was the genre is a
23 shooter video game; that all this is for a shooter video game,
24 that we're concerned about the competition for this one shooter
25 video game.

1102

1    MR. WEINGARTEN: I will -- in all candor, I completely
2 understand where Your Honor is coming from. On the other hand,
3 our responsibility over on this side of the room -- and the
4 government is not to make a value judgment about the market,
5 it's to protect competition in the market and --
6    THE COURT: How big is the market? I guess --
7    MR. WEINGARTEN: Billions, billions of dollars.
8    THE COURT: Of the game. But of the people that care
9 so much that they would actually switch, buy an Xbox that they
10 wouldn't otherwise buy.
11    MR. WEINGARTEN: So we're back to -- I don't want to
12 go back to --
13    THE COURT: That's okay. I understand. I understand
14 what you're saying.
15    MR. WEINGARTEN: -- but --
16    THE COURT: I appreciate your candor. I do.
17    MR. WEINGARTEN: -- it's not about just switching.
18 The harm to the PlayStation person -- right? -- who has Call of
19 Duty and they wake up after this deal closes and there's some
20 new character that's only on Xbox, it's not: Is that person
21 going to switch? It's: Has that person's experience, has the
22 value that they paid for been degraded in some way? They paid
23 499 for a PlayStation. Now because of this loss of ability to
24 have this cool thing, is it worth 488.50?
25    THE COURT: What do you say, though, to Mr. Ryan --

1103

1    MR. WEINGARTEN: Yes.
2    THE COURT: -- who said that -- what is it? -- Star
3 whatever --
4    MS. WILKINSON: Starfield.
5    THE COURT: -- that there was nothing anticompetitive
6 about Microsoft making that exclusive? Under what you just
7 said to me, that is anticompetitive?
8    MR. WEINGARTEN: So there's a distinction between
9 making an investment and figuring out how to make that
10 investment and helping a game develop and not, but I don't know
11 the basis for why Mr. Ryan was less upset about that one than
12 Call of Duty because --
13    THE COURT: Because he does the same thing.
14    MR. WEINGARTEN: They do. They do.
15    (Laughter)
16    MR. WEINGARTEN: And it is part of the -- Mr. Nadella
17 came, and Mr. Nadella said that's how the market is here;
18 right? It's all about exclusives. Everybody's doing it.
19 Microsoft may be more made because, despite $70 billion, they
20 claim they don't have enough money to sort of compete with Sony
21 on these exclusives.
22    That's the market. It has benefits for players. I assume
23 if you're a video game player, ultimately if everybody's in a
24 kind of arms race with each other to get the content and make
25 it neat for their platform or their console, gamers benefit

1104

1 because now there's more neat things to play.
2    The concern here is, if you take away that competition and
3 now instead of people competing for the neat things to play, if
4 you want at least some of these neat things, you got to go to
5 the Xbox.
6    THE COURT: Okay. So then I think -- did you want to
7 say something?
8    MS. WILKINSON: No.
9    THE COURT: I think, then, that brings us right smack
10 into the agreements then or at least the Nintendo and the offer
11 to Sony; right?
12    MR. WEINGARTEN: Yes, although I got a note, if I may.
13 I apologize.
14    THE COURT: Of course.
15    MR. WEINGARTEN: I am reminded a good real-world
16 example, more extreme than my example of all the myriad
17 competition, Stadia. Google is a very large and successful
18 technology company. Mr. Zimring came. He testified they spent
19 a lot of money. They thought they got it right. They just
20 didn't have the content; and so because they didn't have the
21 content, that service died.
22    And then a consumer is deprived of that choice. That will
23 never be a choice for a consumer now to say "I want to play
24 video game X on Stadia." And that is another kind of concern
25 or harm that can happen. It's about innovation even the future

1105

1 products we haven't even thought about yet.
2    I just want to make sure I got that in. Thank you.
3    MS. WILKINSON: Can I address that, Your Honor?
4    THE COURT: Okay.
5    MS. WILKINSON: That was before this transaction and
6 Activision decided not to put its content on Stadia or allow
7 it. So now that, even when Activision is independent and they
8 make a decision not to put their content on certain platforms,
9 that's an answer to --
10    THE COURT: No, no, he's making a different point,
11 which is what he's saying is the concern -- the concern here is
12 that there will be less incentive for innovation. That's what
13 he's saying.
14    MR. WEINGARTEN: I'm not suggesting that there was --
15 I'm not suggesting that there was a violation. I'm just
16 suggesting it's an example of how content and making sure that
17 content is available across platforms is important and gives
18 choice.
19    MS. WILKINSON: I don't think anyone feels sorry for
20 Google because they decided not to put more money into Stadia.
21 That's their decision.
22    THE COURT: No, yeah, that's not what he's saying.
23 He's talking about the --
24    MS. WILKINSON: That doesn't mean there's lots of
25 incentives for people to develop content. And you heard about

1106

1 Game Pass, which is another incentive to --

2     THE COURT: We'll get there. I want to -- like, I'm

3 trying to divide it into two actually, the two markets. And

4 now we're on the console market and then we'll get to the --

5 because they've been joined together by the FTC -- the cloud

6 and the subscription market.

7     But with respect to the console market, we have proposed

8 agreements; right? We have --

9     MR. WEINGARTEN: We have Nintendo.

10     THE COURT: And a proposed agreement to Sony.

11     MR. WEINGARTEN: That's right.

12     THE COURT: And those were not evaluated by Dr. Lee.

13     MR. WEINGARTEN: No. No, and quite properly, in fact,

14 I think. And you saw what happened when Dr. Carlton tried to

15 attempt to evaluate them; right? We saw that it ran quickly

16 into some sort of legal analysis and his --

17     THE COURT: No. I guess more I'm saying I'm thinking

18 about the AT&T case --

19     MR. WEINGARTEN: Okay.

20     THE COURT: -- from the D.C. Circuit --

21     MR. WEINGARTEN: Yeah.

22     THE COURT: -- in which that's the closest thing I

23 think we have to a Court of Appeals case addressing the impact

24 of proposed agreements to address concerns raised by

25 regulators.

1107

1     And there I actually do think it was Dr. Carlton who was

2 in that case, another -- anyway, the district court discounted

3 the FTC's expert's opinion because the expert did not take into

4 account the agreement.

5     MR. WEINGARTEN: Right. There's a myriad of ways that

6 this agreement do not save this deal. One --

7     THE COURT: Okay. But so can we just, from a legal

8 point of view, because your brief in support of preliminary

9 injunction I think was a little broad and that it claimed they

10 essentially couldn't be considered or relevant, and I'm not

11 prepared to go there based on the law; but if you want to try

12 to persuade me, that's fine.

13     MR. WEINGARTEN: Well, I may try with your patience,

14 Your Honor.

15     So a couple of things. One, who bears the burden of

16 persuasion and production as to these agreements? Clearly the

17 Defendants have to. I can't come forward and poke holes in

18 things that I didn't create. It's up to them to explain why

19 these deals should save the bigger deal. Okay?

20     At this phase in a 13(b) proceeding we're really only

21 evaluating the government's prima facie case, and so that's the

22 basis for us saying that's irrelevant then. We're here to see

23 if we raise substantial questions. We don't even get to these

24 other kinds of issues about remedies. That's one answer.

25     THE COURT: Well, so, I read the Illumina case, and

1108

1 there the Commission relied on a Supreme Court case to call

2 what Illumina was proposing a proposed remedy, but that Supreme

3 Court case was a case that was a remedy case after a finding of

4 a Section 7 violation.

5     So it actually didn't answer the question of when you're

6 trying to decide even a 13(b), whether there's a likelihood of

7 showing substantial competitive harm where the agreement goes.

8     But I understand that the Commission decided not that you

9 couldn't consider it -- although that was not a preliminary

10 injunction, that was a permanent injunction case -- but that it

11 didn't factor into the prima facie case and that the Defendant

12 would have the burden. Is that your position, that it --

13     MR. WEINGARTEN: Yes.

14     THE COURT: -- can be considered but the Defendant

15 raises it after you meet your burden?

16     MR. WEINGARTEN: Yeah. It is in the nature of the

17 evidence, like many other civil case context, that it has to be

18 the Defendants' burden of production and persuasion and,

19 therefore, it shouldn't be part of our prima facie case. We

20 come with our burden and they come with theirs.

21     And then when you overlay the 13(b), why we're all here

22 and the special standards that apply, that's when that part,

23 the Defendants' burden should, frankly, drop away because we're

24 not here to make that decision.

25     I will also add, to the extent that the Defendants have

1109

1 brought these agreements forward, and Your Honor is inclined to

2 consider them, we have heard zero evidence that they remedy

3 these deals, they remedy the bigger picture here.

4     We heard from Ms. Bond that she negotiated and signed one.

5 We heard from the Defendants that a person at Microsoft named

6 Lori Wright signed another or two. She never came. We heard

7 that these deals will be important and will matter.

8     We never heard any analysis of the competitive effects of

9 these deals. We never heard anyone from a third party with

10 whom they signed these deals come and say this deal is

11 magnificent and here's --

12     THE COURT: Well, Nvidia, Mr. Eisler said that he was

13 satisfied with it.

14     MR. WEINGARTEN: He was satisfied. He was also

15 satisfied with the side agreement to the side agreement that

16 they got.

17     THE COURT: Well, he was because he actually said it

18 would reduce his costs.

19     MR. WEINGARTEN: Yes.

20     THE COURT: Won't that enable them to better compete

21 with Microsoft's xCloud?

22     MR. WEINGARTEN: It might indeed, and --

23     THE COURT: That's pro-competitive; right?

24     MR. WEINGARTEN: Well, one wonders why that second

25 deal was added to the pot. And we heard about a series of

1110

1 concerns of Nvidia about signing the deal, but they signed it
2 nonetheless.
3     And there is a deal for Windows servers, I won't get into
4 it, but there is testimony about the role of that deal in sort
5 of sweetening the pot there.
6     **THE COURT:** It definitely sweetened the pot. I think
7 there's an inference to be drawn without it, it wouldn't have
8 happened; right?
9     **MR. WEINGARTEN:** Right.
10     **THE COURT:** Sure.
11     **MR. WEINGARTEN:** We have not heard sufficient evidence
12 about whether -- I'll take that. Thanks.
13     **THE COURT:** Let me turn first to Ms. Wilkinson.
14     Do you agree or accept there is some logic to it that the
15 agreements don't go into the prima facie case but they go
16 into -- I know, Mr. Sunshine. You haven't spoken this entire
17 hearing.
18     **MS. WILKINSON:** They can both speak, Your Honor. I
19 will step aside so they can both speak, but I would like
20 Mr. Kilaru --
21     **THE COURT:** Okay. It's a legal question, sure.
22     **MR. KILARU:** Your Honor, we don't agree with that,
23 that it just goes into the prima facie -- that it's not part of
24 the prima facie case.
25     I think in addition to *AT&T*, there's two very recent

1111

1 decisions that speak to this. So the first -- and we'll make
2 sure these are in the conclusions of law -- but one of them is
3 the *FTC* vs. -- and I'm not going to be able to pronounce this,
4 but I think it's *RAG*, R-A-G, *Stiftung* case where divestiture was
5 considered as part of the FTC's prima facie case.
6     **THE COURT:** Well, where divestiture was offered by the
7 Defendant?
8     **MR. KILARU:** Yes.
9     **THE COURT:** I see.
10     **MR. KILARU:** And then there's also the very recent
11 *United Health Group* case, which was both a horizontal and a
12 vertical case, that there were structural guarantees,
13 firewalls, consumer contracts, that kind of thing, that the
14 Defendants offered up. And the Court considered those in terms
15 of deciding whether the transaction was anticompetitive on I
16 think the very logical theory that you shouldn't evaluate
17 competitive effects in a world that will never exist.
18     **THE COURT:** They considered them in the first step on
19 the prime fascia case?
20     **MR. KILARU:** Yes.
21     **THE COURT:** The AL -- were those Commission cases or
22 ALJ cases?
23     **MR. KILARU:** The first was a Commission case. The
24 second was a DOJ case.
25     **THE COURT:** Do you want to -- are you familiar with

1112

1 those, Mr. Weingarten?
2     **MR. WEINGARTEN:** I'm familiar with *RAG-Stiftung*? I
3 litigated it.
4     **THE COURT:** Oh.
5     **MR. WEINGARTEN:** So in that case, it's a bit
6 different. This was a fully proposed divestiture. This is two
7 chemical companies that want to merge, and they said: We can
8 solve the FTC's concern by selling one of our factories. Fully
9 vetted. Fully discussed. We rejected the idea, and we
10 litigated on a full record of analysis and evidence about
11 whether it would solve the problem.
12     That is not the situation that is in front of, Your Honor,
13 with --
14     **THE COURT:** Well, so that's different, though, than
15 the legal question. That's sort of saying: Okay. Fine. You
16 can put it in your prime fascia case, but the evidence isn't
17 sufficient to defeat us making our prima facie case. That's
18 separate from saying it can't be considered.
19     **MR. WEINGARTEN:** And I don't want to concede. I want
20 to go back and check on whether that was not in the prima facie
21 case.
22     **THE COURT:** You'll have your chance.
23     **MR. WEINGARTEN:** Thank you.
24     **THE COURT:** Did you want to say something,
25 Mr. Sunshine?

1113

1     **MR. SUNSHINE:** Thank you. It's great, five days in
2 and finally I'm up here.
3     No, I agree with Mr. Kilaru of course, but I would add to
4 two cases to Your Honor's consideration. One is the *Arch Coal*
5 case and the other is the *Libby* case. Both deal directly with
6 this question, Your Honor, about how the modifications to a
7 transaction affect the ability of how a Court should analyze
8 it.
9     And basically what both those courts say, that if there is
10 a deal that's already present that has modified the world going
11 forward, that's the job of the -- of the government to prove
12 that in that world, competition will be lessened. It's not --
13 you know, I know the FTC would like the standard to be that
14 there's a burden on remedy, but that's not what the law is.
15     And here, what I think is even better than in the *AT&T
16 Time Warner* case, which were just agreements that we would
17 arbitrate, here we have a signed agreement with Nintendo and we
18 have, you know, the offer of an agreement, which precisely
19 solves the harm that's alleged by the FTC. It's access to Call
20 of Duty after 2025.
21     And these contracts deal precisely with that question, and
22 so the job, I think, for the FTC is to try to prove to
23 Your Honor that in that modified world that's going to go
24 forward in the but-for transaction, that they can satisfy their
25 burden.

1     MR. WEINGARTEN: I want to make a very critical
2 factual distinction on those cases, Judge.
3     THE COURT: Yes.
4     MR. WEINGARTEN: As I mentioned with *RAG-Stiftung*, and
5 as I want to raise with respect to Arch Coal and the others,
6 there is a very big difference between a remedy that is a full
7 divestiture selling a factory, selling -- if they want to sell
8 Activision and keep King, they can put that on the table in a
9 proper proceeding, but a full divestiture and what we call a
10 behavioral remedy; that is, a contractual agreement of some
11 kind that is designed to address that harm.
12     And I will say I don't -- the burden in the circumstance
13 of a full divesture is probably, for all practical purposes, in
14 the wash a little bit because the factory is either sold or
15 it's not and you analyze it.
16     Here, we have incredibly complex agreements. Defendants
17 entered them into evidence. They have complicated provisions.
18 Some are proposals. Some are agreed. We have testimony,
19 including from Nintendo, that they don't even really understand
20 the meaning of some of these provisions.
21     We have testimony from Nvidia that there are provisions in
22 there that make them nervous, including 7.4 in the Nvidia
23 agreement.
24     And the burden cannot be on the government to do a
25 complete legal analysis, offer up a legal expert, which would

1 tread on the Court's province anyway, to complain why these are
2 not guarantees.
3     Now, that seems to me a burden that's properly on the
4 defense to show why they are, in Dr. Carlton's word, a quote,
5 "guarantee." They have not done that. The evidence is just
6 not in the record at all.
7     MR. SUNSHINE: Your Honor, where I part from my
8 colleague from the FTC, in the talk about a complete
9 divestiture, if this was a horizontal deal where we were
10 worried about direct competition between two products, I
11 understand the argument about a divestiture.
12     This is a vertical case where the harm that's alleged is
13 denial of access to Call of Duty, and so the remedy that's
14 being proposed, granted there are kind of factual questions
15 that you could argue about some of these terms, but at core,
16 it's a question about access to Call of Duty and that
17 completely solves the problems in this market as alleged by the
18 FTC.
19     MR. WEINGARTEN: I'm just going to take issue once
20 more with the words "completely solves," "guarantee." We saw
21 what happened. Dr. Carlton came and said "guarantee" and could
22 not --
23     THE COURT: Dr. -- I agreed with the cross was very
24 good. It's stricken. It has no -- no evidentiary value in
25 terms of whether it's guaranteed. I agree, the agreements are

1 there and we have the testimony from the third parties and from
2 Microsoft.
3     MR. WEINGARTEN: And I think that, Your Honor, it is
4 not appropriate, I don't mean that in any sort of bad way, but
5 for the defense to foist the agreements on the Court and say:
6 Here are these very complicated agreements. Take our word for
7 it, they're guarantees. And you at one point, Your Honor,
8 said: That's really a question for me about a legal issue of
9 the agreements.
10     But this case does not require and should not require
11 Your Honor to parse all the agreements, figure out what the
12 loopholes are, figure out if they're still worth doing. That,
13 with respect, should have come in the form of a full-remedy
14 proposal to the Commission and could have been evaluated and
15 worked on, et cetera.
16     THE COURT: Well, that's a different matter. If you
17 guys want to sit down and do that, more power to you.
18     MR. WEINGARTEN: I also want to add the issue here is
19 not just about Call of Duty comes to Nintendo or you, know,
20 we've reached agreements. It's about the quality of the
21 access. I think we've made that point in spades with the
22 Nintendo agreement.
23     THE COURT: Well, okay.
24     MS. WILKINSON: Can I address the partial foreclosure,
25 which I think is what he's talking about?

1     THE COURT: Yes.
2     MS. WILKINSON: And, first, I think it's very
3 inappropriate to suggest that if you -- this went back to part
4 three, they could develop the case more. Discovery is closed
5 and counsel knows that. We developed this whole case so we
6 could be lucky enough to get here, Your Honor, in front of you
7 and have a federal court decide this; and one of the agreements
8 we had with the FTC --
9     THE COURT: I know you actually didn't want to be in
10 front of me.
11     MS. WILKINSON: No, that's not true, Your Honor. We
12 wanted to be.
13     THE COURT: I saw those e-mails.
14     (Laughter)
15     MS. WILKINSON: I think we wrote them very self -- you
16 know --
17     THE COURT: It's okay.
18     MS. WILKINSON: -- we thought you would read them. We
19 said she's fantastic.
20     THE COURT: It's quite all right.
21     MS. WILKINSON: We wanted a quick hearing and you gave
22 it to us.
23     But it is really unfair for the FTC, who had an agreement
24 with us and knows that there will be no more discovery, there
25 will be no more analysis if we have to go in front of

1118

1  Judge Chapel.

2      But the real question is, they do have the burden of doing

3  a partial foreclosure analysis if that's their claim and it's

4  an easy but wrong answer to see they can't do it.  There are

5  examples out there.  They could have looked what happened when

6  we took Ghost Loop exclusive.  They could have -- or they think

7  they got a lesser game.

8      Final Fantasy 6, we just lost part of that game because

9  this year it didn't go on Xbox.  It did last year.  They could

10  look at Minecraft, as they pointed out, where we didn't have an

11  update for the PlayStation 5.

12      So there are many ways.  I'm not, as everyone has been

13  saying, an economist but that is their job to figure that out

14  and to say:  You want to stop a $69 billion transaction, but

15  you can't figure out what the harm will be?

16      I think that answers the question.  I mean, if they can't

17  figure out what the harm is, what they're turning to you or to

18  us to say, "You should figure it out.  It's too hard"?

19      I mean, no witness said there was going to be partial

20  foreclosure.  No one said that.  No one had any examples of it.

21  And if it's a partial exclusivity, as you said and as

22  Mr. Nadella said, "I thought the best," that's the world we

23  live in because Sony is the market leader and that's what they

24  do.

25      So there are partial -- if that's what they want to call

1119

1  partial foreclosures, that's happening all the time with these

2  partial exclusivity or timed exclusivity arrangements, and that

3  is part of competition.  It's not part of anticompetitive

4  behavior.

5      MR. WEINGARTEN:  On the partial foreclosure, in terms

6  of evidence, I would respectfully point Your Honor to

7  Mr. Stuart's testimony this morning.  He had some words to say

8  about partial foreclosure, I believe, and I believe Mr. Ryan

9  had some words to say about that in his testimony.

10      So the idea that we have not put forward evidence of

11  partial foreclosure I think is incorrect.  We are not

12  suggesting that we have shirked our burden, not suggesting that

13  the Court or the Defendants are supposed to show that burden

14  for us.

15      We think we have adequately put in -- more than adequately

16  put in enough evidence to raise a substantial question about

17  whether there would be partial foreclosure given the

18  incentives.

19      And, again, Defendants always want to conflate this to:

20  Has the government shown that X will happen, that X is a

21  guarantee to happen?  We are talking about the future.

22      The Supreme Court in *Philadelphia National* said, "We're

23  talking about probabilities here, not certainties."  So we will

24  not accept a burden that we must and will show -- we are going

25  to talk about probabilities and show Your Honor there's a

1120

1  probability of a substantial lessening of competition.

2      I'm getting some notes.  One is, the merger is permanent,

3  Judge.  I don't want -- we know Your Honor won't be scared off

4  because of the size of the deal from making the right ruling,

5  but the merger is permanent.  Once they decide to merge and

6  they come together, we've heard about the harms, for example,

7  to Sony in terms of optimization.

8      THE COURT:  Well, it's not the harm to Sony we care

9  about.  It's the harm to the consumers.

10      But let me -- Ms. Knox, do you need a break?

11      THE OFFICIAL REPORTER:  Yes.

12      THE COURT:  Ms. Knox needs to take a break so why

13  don't we resume at -- I didn't mean to cut you off but --

14      MR. WEINGARTEN:  No, I understand.

15      THE COURT:  And, actually, when we come back just so

16  you can prepare, let's start talking about that Xbox cloud

17  market.  I think it's different there.

18      Okay.  Thank you.  We'll resume at 4:00 o'clock.

19      THE CLERK:  No.  4:00?  That would only be four

20  minutes.

21      THE COURT:  Okay.  4:05.

22      THE CLERK:  4:05.

23          (Recess taken at 3:57 p.m.)

24          (Proceedings resumed at 4:09 p.m.)

25      THE CLERK:  Remain seated.  Come to order.

1121

1      THE COURT:  Okay.  We're going to resume.

2      MR. WEINGARTEN:  One procedural and one substantive

3  housekeeping, Your Honor.

4      THE COURT:  Yes.

5      MR. WEINGARTEN:  One procedural, we did have slides in

6  anticipation of a more traditional closing.  May I hand those

7  up?

8      THE COURT:  Please.

9      MR. WEINGARTEN:  Okay.  Thank you.  There's a copy for

10  the Defendants.

11      One substantive housekeeping.  We are not here to protect

12  Sony.  We are here to protect consumers.  And so when I

13  mentioned the dev kits, the development kits -- right? -- if

14  this deal goes forward and Sony delays shipping development

15  kits to an Activision that is owned by Microsoft, I don't care

16  that it hurts Sony so much as I care that then Sony is delayed

17  in developing a game that the consumers can play.

18      THE COURT:  Yes, but Sony currently has Microsoft's --

19  I mean, they ship dev kits to Microsoft.

20      MR. WEINGARTEN:  They do.  I understand they delay a

21  little bit because of --

22      THE COURT:  All of them?  I know there was testimony

23  with respect to ZeniMax.  There was no testimony as to the

24  other titles.

25      MR. WEINGARTEN:  Right.  That one I don't know.  I'm

1122

1    making an inference based on the testimony we heard, but I
2    don't know.  But the testimony I think we did hear was there is
3    a hesitancy to share.
4        No, go ahead.  My colleague Meredith Levert.
5        **MS. LEVERT:**  Good afternoon, Your Honor.  Meredith
6    Levert for the FTC.
7        We can put this in the findings of fact for you, but there
8    is some testimony in Mr. Ryan's deposition that talks about
9    their delay in giving development kits also for Minecraft, and
10   the reason for that being their concern about sharing extremely
11   sensitive information with their primary competitor.  So we'll
12   point you to that in the findings of fact.
13       **THE COURT:**  Okay.  So there's testimony that it's all
14   titles they delay?
15       **MS. LEVERT:**  That is my understanding, titles from
16   Mojang, which was acquired by Microsoft in 2014, and that would
17   be Minecraft and the more recent titles that are from ZeniMax.
18       **THE COURT:**  No, I know, he -- I remember his testimony
19   as to the ZeniMax, or maybe it actually was Mr. Spencer's
20   testimony as to the ZeniMax actually.
21       **MS. LEVERT:**  I think it was, yes.
22       **THE COURT:**  Yeah.
23       **MR. WEINGARTEN:**  So --
24       **THE COURT:**  Okay.  Actually, so that's a point.
25       And so let me ask Ms. Wilkinson about that.

1123

1        **MS. WILKINSON:**  I believe, but I haven't looked back,
2    that it is only by Minecraft, Your Honor.  I don't think it's
3    about others.
4        And as you know, that the original Minecraft game has
5    not -- there's not a new PS5 version, but the other Minecraft
6    games are on Minecraft Legends and Minecraft Dungeons.  Excuse
7    me.
8        But the withholding of the dev kits is their decision.  I
9    mean, that is -- this is not because they're getting harmed.
10   What they don't want to share, which they're perfectly allowed
11   to, they think that that's some kind of information that Xbox
12   can use against them so they gave them to them later, but that
13   is their decision.  That is not a harm we are causing.
14       **THE COURT:**  I mean, Microsoft provides dev kits to
15   Sony and we didn't have any testimony that they delay giving it
16   to them.  I guess you would say PlayStation is the more popular
17   game because it's the better console, and so that's why they
18   don't delay, because they have nothing to hide.
19       **MR. WEINGARTEN:**  Well, Your Honor, I was going to say
20   actually I don't think we have testimony either way on the
21   issue with respect to how Microsoft understands its dev kits.
22   So I just don't know on the record, Your Honor.
23       **MS. WILKINSON:**  But it was -- Mr. Ryan was clear.  It
24   was his choice, Your Honor, and that is, again, a business
25   strategy he can pursue; but as the market leader, to say that

1124

1    somehow because he doesn't want to get those games onto his
2    platform at the same time because he's making a strategic
3    judgment that Xbox should not see those dev kits too early,
4    that's fine, but he's making the decision for those consumers,
5    not Xbox.
6        And that's why we say they are protecting Sony and not the
7    consumers because Sony is making that decision for their own
8    consumers, and maybe that's one of the reasons that, you know,
9    they have twice as many players, I don't know, but that's not a
10   behavior that is caused by us --
11       **MR. WEINGARTEN:**  Well --
12       **MS. WILKINSON:**  -- and certainly not a competitive
13   harm.
14       **MR. WEINGARTEN:**  Well, I think that the standard that
15   Ms. Wilkinson is applying is more like the sort of causal chain
16   that applies for traditional tort; right?  You stepped in and
17   you caused this harm yourself.
18       We're talking about harms to the marketplace, and a
19   competitive or strategic response does not nullify the harm.
20   If the fact that Microsoft qua platform owns Activision means
21   that a rational competitive response is "I can't give you my
22   dev kits for Activision games," that doesn't excuse or mitigate
23   the competitive harm like it would if we were in a tort case
24   talking about --
25       **THE COURT:**  How do I know that's a rational

1125

1    competitive response as opposed to a response that delays
2    Microsoft's ability to have the games and so it gives
3    PlayStation the opportunity to have them on their platform
4    first?
5        **MR. WEINGARTEN:**  Well, because in the hypothetical
6    where the merger has taken place, Xbox has the games.  They own
7    Activision.  So Sony's only hurting itself --
8        **THE COURT:**  Its own self.
9        **MR. WEINGARTEN:**  -- because it's not giving the dev
10   kits.  So the only reason it would hurt itself by not getting
11   the dev kits out there and getting the games developed is
12   because it's worried about what would happen if it gave up the
13   secret sauce on console.
14       And, again, the point is not the harm to Sony; it's that
15   the consuming public who loves these games, if you have a
16   PlayStation, now your game's later all else equal.
17       And I also -- I just want to point to Your Honor, we
18   were -- Ms. Wilkinson said no evidence of partial foreclosure,
19   two pieces of evidence.
20       One, Mr. Stuart this morning, I ticked with him a list of
21   partial foreclosure possibilities:  Resolution, securities,
22   optimization.
23       The second piece of evidence, paragraph 35, PX8001,
24   Mr. Ryan's declaration (as read):
25       "Even making Call of Duty partially exclusive could

1126

1 cause substantial switching from PlayStation to Xbox."

2 And then he has quantitative evidence cited.

3 **MS. WILKINSON:** Your Honor, first of all, we're, I

4 think, using the terms the wrong way. There's "withholding"

5 and then there's "foreclosure."

6 And if we're talking about the dev kits, we have an

7 example before the transaction. We have Minecraft, as

8 I believe Mr. Ryan said, and I'm double-checking his

9 deposition, and I know it was his choice, and so he did not say

10 this was a competitive harm.

11 If that's a partial withholding, I will call it, that

12 would be another easy thing for them to have measured to see.

13 You certainly can see the market, and Xbox has not gained any

14 market share on Sony since that happened with Minecraft. They

15 have been behind and been third in the marketplace for years.

16 So by suggesting what they are what I would call a

17 possibility, anyone can dream up possibilities, and that's

18 literally what they're doing. They're giving you a list of

19 possibilities.

20 You don't have to find certainty but you have to find

21 probabilities, and that's when they need to provide evidence to

22 you; and just dreaming up what could happen when there isn't

23 evidence that that happened -- by Mr. Weingarten calling the

24 list with Mr. Stuart today foreclosure, he didn't say that was

25 foreclosure.

1127

1 **THE COURT:** No, I understand. I remember the

2 testimony.

3 Okay. Let's move on to Game Pass and cloud. So sort of

4 just spell out your theory there.

5 **MR. WEINGARTEN:** Okay. Quite simply, Your Honor, the

6 traditional market is consoles. The next big things that have

7 developed are a multigame library subscription market and

8 cloud. Subscription is more developed than cloud at this

9 point. The subscription service, I hesitate with analogies,

10 but like Netflix is the idea: You pay a monthly fee, you get

11 access to a library of games. The some services are just the

12 library.

13 I'll point you to -- I think we reproduced it in the

14 slides I gave you, but probably you've seen it many times --

15 Figure 22 -- oh, Slide 14 that I gave you, Your Honor.

16 Thank you.

17 This is reproduced from Dr. Lee's report. Some services

18 or products are just a library. Some of them are a library and

19 a cloud like Xbox Ultimate; right? You get the library and you

20 get to stream the library over the cloud. And some are just a

21 cloud.

22 These markets are emergent against subscription is more

23 established. The locus of competition is fierce in both. The

24 axis of competition is price and its content. And we've seen

25 from Microsoft documents their emphasis on cloud, the emphasis

1128

1 on subscription. Game Pass is a strategic driver for

2 Microsoft's gaming business. I think the evidence has been

3 very clear about that.

4 The evidence is also clear that the effect of this

5 transaction on Microsoft's ability to turbocharge Game Pass and

6 leave -- I think there's a document from Mr. Spencer -- leave

7 Google, leave Amazon -- right? -- everybody in the dust and

8 build the content moat around Microsoft's Game Pass is in the

9 record and compelling.

10 And there is a concern that if you take this content, you

11 use it to advantage your own platform, the consumer is harmed

12 because then the consumer doesn't have the benefit of

13 Mr. Kotick's platform agnosticism. The consumer says "If I

14 want Call of Duty, now I have to get the Game Pass; and if I

15 want this one, I have to get the other service." And maybe the

16 titles come out at different times, as opposed to Mr. Kotick's

17 world currently, I'll put the content wherever I can so players

18 can play it.

19 **THE COURT:** But he's not putting it on PlayStation,

20 Sony's, or Microsoft's subscription services.

21 **MR. WEINGARTEN:** He is on PlayStation Plus. He is on

22 PlayStation Plus, at least in some titles. And he was on

23 GeForce NOW for two and a half years. I'm sure we're going to

24 join issue on the future and what it holds for Activision

25 standalone.

1129

1 I will go back to the theme, Your Honor, of to believe

2 that Activision will put its content on more subscription

3 services and other cloud services is simply to believe they

4 will follow the money and act in their shareholders' best

5 interests.

6 To believe the defense world that Activision on its own

7 will never, ever go into any of these other services is to

8 believe that Mr. Kotick's, respectfully, idiosyncratic view

9 will prevail over his need to maximize value for his

10 shareholders.

11 And, by the way, in testimony he explained very clearly he

12 will maximize value for shareholders. And in response to

13 Your Honor's questions, he couldn't prevaricate. If that's

14 where the users are, he's going there.

15 So the harm here, we think, is substantial in locking up

16 Activision content. I'm using terms like "locking up," but

17 there's also partial foreclosures and all of this area too.

18 But the harm is we end up in a world where instead of

19 having content available and new cloud services join and they

20 figure out a better way and they get Activision content or they

21 figure out how to share economics, it's all just with that,

22 it's all just Game Pass. And maybe Sony has PlayStation Plus

23 and we live in a world where those two suck up all the content

24 and that's it.

25 **THE COURT:** Well, what happens to Nvidia?

1130

1     **MR. WEINGARTEN:** So we hope Nvidia can survive. We
2 want the competition to be robust; but in a world where -- I'm
3 not here to predict the future about Nvidia's ultimate
4 survival, but in a world where we have a content arms race and
5 everybody starts buying up all the content and you end up with
6 one or two or three dominant platforms in cloud or
7 subscription, that is a less pro-competitive world than let a
8 thousand flowers bloom and let the content flow and let people
9 figure out arrangements that will bring consumers more of the
10 content in more ways.
11     That's a little highfalutin, but the evidence has, I
12 think, established the concern and has raised substantial
13 questions about the concern.
14     I will point Your Honor to pages 59 and 60 of the slides.
15 Mr. Spencer -- we have documents in the case that Mr. Spencer
16 was worried about a domino effect; that if somebody buys this
17 content, the next person has to buy the next content, and the
18 arms race or the domino effect continues and we end up in a
19 world that is less pro consumer with less choice.
20     I will dial it back from the highfalutin a little bit, and
21 I will say we have seen the evidence in Microsoft's own
22 documents. The emphasis on Game Pass, the value of content,
23 the fact that content leads to subscribers, leads to scale,
24 that's over and over again we saw in the documents and the
25 testimony from Microsoft's executives.

---

1131

1     And I will prebut a little by saying we've heard a lot
2 from Defendants "It's just a feature. It's not a market. You
3 know, subscription is another way just to buy the same old
4 game. Cloud is just a feature." Ms. Bond testified you use it
5 because you don't want to wait for, like, a load-up time on
6 your computer or on your Xbox.
7     I think we have heard more than ample evidence to rebut
8 that. They price it like its own product. They price it
9 against other competitors like a product. Microsoft offers the
10 cloud, totally apart from the console, on Samsung TVs.
11     We heard from Mr. Nadella. His testimony was robust in
12 favor of the idea that the cloud is the future and not just
13 some feature.
14     I'll pause there.
15     **MS. WILKINSON:** Your Honor, I'm going to start with
16 Ms. Bond's evidence. She gave evidence about what the cloud is
17 used for, and I want to call it cloud streaming because, as
18 Mr. Nadella pointed out yesterday, "cloud" to him a much
19 broader category and that includes all kinds of gaming. And
20 when you think about that when someone's playing a multiplayer
21 game, kind of the backroom -- right? -- work that is done so
22 they can communicate in the cloud generally, that's very
23 different than what you're asking about, which is cloud
24 streaming.
25     Just that service of taking that game that's on the

---

1132

1 console and for Xbox in Game Pass and streaming it either to
2 the console again, as Ms. Bond told you, or onto another
3 device. That -- everyone said that that was not an
4 economically viable model right now. Everyone, including
5 Mr. Ryan.
6     **THE COURT:** Maybe right now, but growing. And, I
7 mean, I think -- I don't know. I'm not an expert on this.
8 But, you know, we don't have DVDs anymore; right?
9     **MS. WILKINSON:** Right.
10     **THE COURT:** And that's the way it's going, and those
11 consoles are going to disappear eventually; right? And so the
12 cloud -- and so what the FTC's concern is about the future. It
13 may not be here right now.
14     **MS. WILKINSON:** But many startups have folded when
15 they thought there was a market when there wasn't yet. The
16 fact that it may someday develop, I think Mr. Kotick made the
17 argument that it may not at all because it's going to be easier
18 to develop the native games for mobile because they're going to
19 be so powerful.
20     So people have different opinions. To speculate when it's
21 going to happen, I don't think any of us are qualified to say
22 when some new technical, you know, way to stream games will
23 actually be economically successful and attractive to
24 consumers.
25     **THE COURT:** Okay. But so what's -- and I have to --

---

1133

1 we all have to remember to slow down for Ms. Knox.
2     **MR. WEINGARTEN:** Apologies.
3     **THE COURT:** I think we nearly killed her before.
4     (Laughter)
5     **THE COURT:** But so what are you saying with respect to
6 their cloud argument, is that nothing -- that the merger is
7 pro-competitive? That -- just what is it? Other than to say
8 you're not saying it's a -- like, yeah, what is it that you're
9 saying?
10     **MS. WILKINSON:** It is a feature and in Xbox, which is
11 what's at issue, it is only offered with the Game Pass, that
12 you can't buy it as a separate product.
13     But we only have three charts, Your Honor, but one is the
14 one I made yesterday -- the other day with Mr. Lee, which is
15 you can just look at this picture and the entire merger is
16 pro-competitive because it's expanding output.
17     He didn't -- he couldn't answer the key question you and I
18 asked him, which is: Is it likely that PlayStation will or
19 will not have Xbox?
20     But if you look down the rest, today you have Call of Duty
21 on Xbox, PlayStation, and PC. With the merger, you're going to
22 have it with all these other streaming services. So if that is
23 a market, they're all going to have the ability to stream the
24 game, which they don't have today, which is the test.
25     **THE COURT:** Okay. So that's what I -- so I get when

1 you brought the case, that wasn't there; right? In substance
2 you won and you got what you wanted and you forced them to go
3 out and enter into these agreements. And maybe it also helped
4 that they at least seemed to be less bullish on cloud, but they
5 went out and they signed these agreements now with Nvidia to
6 give them Activision's content. How is that not good for
7 consumers?
8    MR. WEINGARTEN: So a couple of points. We have
9 testimony from Mr. Zimring and from Nvidia about the
10 profitability and the future of cloud so I want to point
11 Your Honor there. If there's any concern about the future,
12 this is not a dream state.
13    On the agreements point, we, again, have evidence that
14 there are agreements. We do not have any evidence from
15 Defendants of anything beyond the fact that there are
16 agreements.
17    We learned, if we can make the negative inference,
18 I guess, from Dr. Carlton, he doesn't know where Ubitus is
19 headquartered. It's Hong Kong. Boosteroid is in Eastern
20 Europe.
21    So the Defendants have not even shown Your Honor that
22 entering these agreements will have any pro-competitive effect
23 in the United States of America.
24    THE COURT: Can I stop you for a second?
25    MR. WEINGARTEN: Yes.

1    THE COURT: Why would Nvidia --
2    MR. WEINGARTEN: Yes.
3    THE COURT: -- do what they did and say what they
4 said? Because they're a competitor to Microsoft in cloud --
5    MR. WEINGARTEN: Yes.
6    THE COURT: -- gaming. So why did they do it then?
7    MR. WEINGARTEN: Do it meaning switch to support the
8 merger?
9    THE COURT: Yes.
10    MR. WEINGARTEN: Yes, okay. A couple of reasons.
11 One, they got a deal that they had been wanting for a long time
12 on Microsoft's own content. Now, that doesn't count under the
13 law because it's not merger specific. That's a deal that could
14 have been achieved any day whether we were here or not, whether
15 Microsoft were buying Activision or not, but it was a
16 sweetener. They got that deal.
17    They got the Windows addendum. Another sweetener.
18    They also testified, Mr. Eisler, that they have concerns
19 about their deal on the Activision content. Okay? They have
20 concerns about that part of the deal, and this goes back to
21 what we were talking about before about whose burden is it to
22 bring forward persuasion and production on what these
23 agreements actually mean.
24    And I want to be very clear with Nvidia. Whether the
25 Activision deal goes through or not, they get the Microsoft

1 content that they've coveted for quite a while. That means
2 it's not merger specific, so it's not part of the competitive
3 analysis, but it sure does mean that Nvidia had a healthy
4 incentive to sign the agreement they signed and support the
5 deal because whatever happens, they now have that Microsoft
6 content.
7    I will also note part of the problem with having the
8 Defendants run around signing deals in this fashion is they are
9 picking -- let's assume the deals are fantastic for a moment --
10 they are picking the winners and the losers. There's no deal
11 between Microsoft and Google for cloud. There's no deal
12 between Microsoft and Amazon for Amazon's cloud multigame
13 library service. So now we're saying, according to Defendants:
14 Don't worry, we've picked some competitors inside the U.S. and
15 out. Bracket, outside the U.S. shouldn't even count. We'll
16 pick the winners and the losers and then we'll come to court
17 and say, "Well, we picked some winners and, therefore, we're
18 being pro-competitive.
19    And the fact is there is no evidentiary record for
20 Your Honor to even begin to weigh their claims that they have
21 remedied the concerns.
22    THE COURT: Well, but in the but-for world there's no
23 agreements. There's no agreement with Amazon. There's no
24 agreement with Google. There's no agreement with Nvidia, and
25 maybe Nvidia then doesn't survive.

1    MR. WEINGARTEN: I would submit --
2    THE COURT: Well, no, we're not going to go there.
3 That's not a failing company.
4    MR. WEINGARTEN: No, no, and I don't mean to imply
5 anything about Nvidia's abilities or anything like that.
6    So I would submit, at best, when Ms. Wilkinson did her
7 chart with Dr. Lee -- Professor Lee, question marks at best
8 about how this content may or may not get to Ubitus,
9 Boosteroid, Nvidia.
10    I would submit in the but-for world, because of the
11 testimony we heard from Mr. Kotick and what we know about
12 incentives to put content on platforms, question marks as well.
13    So we are dealing with a world of future. It's
14 probabilities as Ms. Wilkinson properly said. Question marks
15 all around; but the question is: Have we raised enough
16 questions to merit further inspection of this deal and have we
17 raised further questions, given all the documentary evidence
18 and testimony about the role of AAA content in driving scale,
19 subscribers, and a moat -- Microsoft's executive's word -- a
20 moat around Game Pass?
21    So I think that's where we land on that. Even if I can
22 see at best, I think it's question marks everywhere and we
23 still carry our burden.
24    MS. WILKINSON: Well, Your Honor, he may want to
25 testify again for his expert, but the expert said these things.

1138

1 That's who they presented. He didn't like what he had to say,
2 but I gave him every chance to answer those questions as did
3 you.
4     MR. WEINGARTEN: I can say --
5     MS. WILKINSON: You asked him -- excuse me.
6     You asked him three different times to try and get him to
7 answer on Call of Duty whether he even did the analysis. He
8 said no. When he knows he wants a question mark, we put it
9 there.
10     He did not say it was uncertain and, therefore, couldn't
11 be probable. He agreed that in every one -- that with every
12 one of those other organizations, that it would be likely with
13 the merger that that would -- that content would be distributed
14 by those folks.
15     THE COURT: Well, respectfully, Professor Lee is not
16 an expert on that; right? He doesn't read contracts and those
17 things. Same thing goes with Dr. Carlton. So I don't -- I
18 mean, I look at his economic analysis, but with respect to -- I
19 mean --
20     MS. WILKINSON: I think that's a different issue,
21 Your Honor, you're right, but he was in the business of saying
22 what's going to happen in the but-for world and what's going to
23 happen with the merger -- again, not certainty but
24 probabilities -- and he couldn't say. That's why he was called
25 as an expert, to say exactly that.

1139

1     Now, when you put the contracts down, these are
2 sophisticated parties. Nvidia is a trillion-dollar company.
3 They had lawyers on the other side. These are not complicated
4 agreements. In fact, you heard Mr. Spencer say and Mr. Ryan,
5 that normally with publishing, they have general publishing
6 agreements. They don't even come to a different agreement for
7 a specific game.
8     The only reason there are specific agreements here is
9 because the regulator complained. And so now because the
10 regulator raises issues, they're basically saying "You did what
11 we wanted but we don't like the way you did it, and you have to
12 prove to us somehow that a contract" -- which should be
13 presumed to be in the best interests of both parties, which
14 whether it's sweetened or not, that's how competition and
15 capitalism is supposed to work.
16     If that's how we get them to distribute Call of Duty, so
17 what? People and companies come to those agreements all the
18 time. The question is: What is the output through those
19 agreements? And there's no dispute that these games are
20 going -- that Call of Duty is going to be on these services if
21 the transaction goes through.
22     So you asked and I asked every one of our executives
23 whether they would honor these contracts. They said it in open
24 court, they said it to you under oath, and they've said it for
25 the last year.

1140

1     Do we honestly -- are they honestly suggesting that they
2 weren't credible? That they're going to get up in a public
3 courtroom in front of you and lie about whether they would
4 honor these contracts? I mean it's absolutely absurd, it
5 really is, to suggest that Satya Nadella got up in your
6 courtroom and said he would honor -- in fact, he doesn't even
7 like exclusives. He would like his content to be everywhere,
8 by the way, which has been incredibly successful.
9     THE COURT: He was clear that it was Mr. Spencer's
10 domain.
11     MS. WILKINSON: And Mr. Spencer said the same thing.
12 It's in his interest. Again, it's not because everyone is a
13 saint. It's because it makes economic sense and reputational
14 sense to put that content on these different platforms.
15     And why does it? You -- remember, they offered this to
16 Sony the day after the deal. So it's not just for the
17 regulators. It was easy for Xbox and Microsoft to do because
18 it was consistent with their business strategy.
19     So it wasn't asking them to do something that they hadn't
20 thought about. In fact, they didn't own the content. I
21 thought Ms. Bond was pretty clear, it made a lot of sense to
22 say: Why don't you usually -- why did you -- you didn't do
23 this before. Well, we didn't own the content. Most people
24 don't contract for things they don't own.
25     They had told these folks they would do it; and then when

1141

1 the regulators raised issues, they did it. There's nothing
2 that was pointed out about these contracts. They're ten --
3 some of them, as you know, with the Sony offer, ten-year
4 contracts. And we heard undisputed evidence that there's
5 nothing like that in this industry. It was unusual so there
6 would be no dispute here that that content would stay on
7 PlayStation.
8     And you heard through Ms. Hood's declaration and everyone
9 else they need those revenues. It makes sense.
10     THE COURT: On the console.
11     MS. WILKINSON: Yes.
12     THE COURT: It would stay on PlayStation on the
13 console.
14     MS. WILKINSON: Right. And it makes sense for them to
15 distribute as many ways as they can because if people play
16 their games, they make money.
17     MR. WEINGARTEN: I have a couple of points there,
18 Your Honor.
19     So one is, I have no idea what Ms. Wilkinson is talking
20 about when she says we told them to go make these deals and now
21 we're complaining about the deals. That is not how the process
22 has unfolded.
23     THE COURT: It's not evidence in the hearing.
24     MR. WEINGARTEN: We want to make very clear what we
25 are not alleging. I'm not alleging that Microsoft or the

1 theory of the case is not that Microsoft will breach or that
2 Mr. Nadella is committing perjury. That is not our theory of
3 the case.
4     However, if one is going to propose, like Defendants have,
5 a complicated set of remedial contracts, behavioral remedies in
6 antitrust parlance, those contracts are only as good as their
7 terms. And we have had undisputed testimony in this case from
8 at least two of the third parties who signed those contracts
9 about their concerns with the terms, Mr. Singer and Mr. Eisler.
10 Both gave undisputed testimony that they had concerns about the
11 terms.
12     THE COURT: Mr. -- I read through -- I read
13 Mr. Singer's whole deposition. I -- he just didn't know the
14 terms.
15     MR. WEINGARTEN: He's the primary negotiator for
16 Nintendo, and there you have it.
17     THE COURT: Well, what I read in the -- in the
18 transcript was that there was a representation by a lawyer that
19 he was, but he didn't say anything in that -- in that -- I
20 can't -- I can't -- I think that's over-arguing to say that he
21 said he had concerns with the terms. He didn't know the terms.
22     MR. WEINGARTEN: I will --
23     THE COURT: Or he couldn't -- no, I don't -- I don't
24 think so. They did sign it, and it is Nintendo. It's not some
25 little --

1     MR. WEINGARTEN: They did sign it, Your Honor.
2     THE COURT: -- startup.
3     MR. WEINGARTEN: They did sign it, Your Honor.
4     THE COURT: Yes.
5     MR. WEINGARTEN: I will also say that's -- Dr. Carlton
6 made the argument in his report that if you sign it, it must be
7 because you think it's ironclad and the greatest deal on earth.
8     I will also submit you sign it because it's an option;
9 right? This is fantastic, from Nintendo's perspective, to have
10 at least this option now, and that's great for them; but does
11 that mean, again, that it's a guarantee and that it remedies
12 all of the harms?
13     THE COURT: Well, why does it have to be a guarantee?
14     MR. WEINGARTEN: Well, if it's not a guarantee, then
15 it's not offsetting the anticompetitive concerns.
16     And we have no evidence about where they do anyway. I
17 thought Defendants would come, frankly, and bring Your Honor
18 and say "We've run the numbers. If we sign these deals, X
19 million more people will get the game." We were told, in fact,
20 they ran no numbers. Okay?
21     We were told that there was no analysis for these
22 apparently amazing deals that -- we were either told it's easy
23 to get to and there's a standard agreement, but these are pages
24 and pages long and outside the standard agreement depending on
25 what day we heard from the Defendants, but we have no analysis

1 and no record for Your Honor to assess the alleged
2 pro-competitive benefits.
3     And the concern also is that Microsoft in going around and
4 signing these deals, they're setting the terms of market
5 competition on their own; right? They're off saying "Now
6 assume we've got this content. Here are these terms."
7     And I'll note again, no terms with Google. No terms with
8 Amazon. So they're picking and choosing, and then they're
9 putting the agreements in and saying "Just the bear fact of the
10 agreement with no analysis suffices." That cannot be correct.
11 It cannot be correct.
12     MS. WILKINSON: Your Honor, we know these parties know
13 how to say no because Sony has refused thus far to say no.
14     THE COURT: Can you address -- the point that was made
15 throughout the hearing was that no financial analysis was done,
16 which seems odd; right?
17     MS. WILKINSON: It does, I think, if you don't
18 understand the business, with all respect. They put games on
19 other people's platforms and on their own all the time. That's
20 why they have that general publishing agreement. They don't do
21 a big financial analysis because they know what the split will
22 be in the revenue; and if the game is a game that they want,
23 they don't -- they don't sign a new contract for every single
24 game that comes up. So they don't do a financial analysis
25 every time they put a game on. If you were to look through

1 their files beyond for other games, they don't produce a
2 financial analysis every time.
3     THE COURT: Right, but this is Call of Duty and
4 they've signed an agreement to put it on Nintendo; right? And
5 that will --
6     MS. WILKINSON: There's no downside, Your Honor. How
7 could it be anything but beneficial to them when they can get
8 the game on one of the biggest and most successful platforms
9 there is?
10     So they know from what they've done in the past for these
11 big popular games how successful they are, and they already
12 know how Call of Duty does on other platforms. So they --
13     THE COURT: But how do they know that the people that
14 then -- when Call of Duty is available on the Switch, that they
15 won't then leave Xbox?
16     See, when Xbox -- when you buy your Call of Duty on Xbox,
17 Microsoft gets a hundred percent; but when you buy it on
18 Nintendo, they get less because they have to share it with
19 Nintendo.
20     MS. WILKINSON: Right.
21     THE COURT: So --
22     MS. WILKINSON: That's true.
23     THE COURT: -- to the extent that it extends to new
24 people, that's true, but there was no analysis done --
25 right? -- with respect to the de-val and all that and whether

1146

1 it would create a gap and all that to extend that to Nintendo
2 because if your argument's correct and Nintendo is a substitute
3 and should be part of the market, it's going to take some of
4 those sales away from the Xbox.

5     **MS. WILKINSON:** Right, but it's also gaining one, the
6 people who have Nintendo and aren't playing Call of Duty right
7 now because they don't have it.

8     And you heard Mr. Kotick, Mr. Spencer, Mr. Nadella tell
9 you they're more successful when they put it on more platforms.
10 This is why they can't find an example of another existing
11 multiplatform, multiplayer game that anyone would take off the
12 platforms. It doesn't make sense. It makes more sense, like
13 Minecraft. Look what they do. They have it on 20 different
14 platforms. Under what you're suggesting, they should have a
15 financial analysis every time to see whether they lose gamers
16 or not.

17     **THE COURT:** That's not my suggestion. It was the
18 FTC's. I'm just asking you to respond.

19     **MS. WILKINSON:** Right. There's -- there's not that
20 kind of financial analysis done when there's upside for them by
21 getting as many gamers to play and play with each other as
22 possible. And they believe that's successful not because
23 they've just seen it; but I think as Microsoft, as you heard,
24 that's kind of in their culture, that they've been quite
25 successful with their other software products by putting them

1147

1 on as many platforms as possible. Minecraft is one of the most
2 successful games, and you've seen the data in the sealed
3 documents, because it's on so many platforms.

4     So there was no need to figure out whether -- they've
5 already figured out that staying on the PS5 is you, know, very
6 positive when they did the entire valuation and they figured
7 out how much revenue they would get and would get for the next
8 five to ten years depending on the outlook from those revenues.

9     So why would they think they're not going to -- and maybe
10 they'd lose some gamers. As you say, some of these people own
11 multiple devices already, but why would they think they need to
12 do an in-depth analysis to say if they make it available to
13 140 million more gamers, they won't get additional revenue?
14 Plus they get the endgame spend; right.

15     **MR. WEINGARTEN:** I hear a lot of argument and a lot of
16 pivot to Minecraft but no evidence, and I'm not suggesting --
17 put it this way: I think Mr. Stuart was credible in the sense
18 that he does a lot of analysis and a lot of scenario planning.
19 And to suggest that there is no analysis or scenario planning
20 because this is just putting a title on another platform is
21 directly at odds with defense's other argument that these are
22 world-creating amazing agreements that are unprecedentedly
23 large.

24     **THE COURT:** So then what is the inference that you're
25 asking me to draw.

1148

1     **MR. WEINGARTEN:** The inference I'm asking you to draw
2 is that there is no evidence that these have any
3 pro-competitive effect whatsoever in the marketplace.

4     **THE COURT:** Wait a minute. How can putting
5 Activision's content on Nvidia's cloud -- how is that not a
6 positive for consumers?

7     **MR. WEINGARTEN:** It could be and it would be, but we
8 don't know because we also have not had any evidence that that
9 is what will result from this agreement. In fact, we've had
10 evidence from Nvidia they have concerns about the agreement.

11     But I also want to point out, Judge, this was an issue we
12 briefed, we sought discovery about all these agreements and we
13 were shielded. The discovery was shielded under privilege.

14     **THE COURT:** I'm just going to stop you there because,
15 I mean, again, now we're in unique land and the problem is that
16 we are on this compressed; right? If this had been brought to
17 me or some other judge closer in time to when you filed your
18 complaint and you filed your preliminary injunction motion,
19 then we would have had time to do that.

20     I would never have said, "You're held to what happens in
21 this administrative proceeding." I would have adjudicated all
22 those things; but because -- I'm sure you had good reasons --
23 it was done this late, we didn't have that opportunity.

24     So I don't know what happened in there, and don't tell me
25 because it's not going to make any difference in my decision.

1149

1 I have the evidence that's in front of me, and I -- and that's
2 it, and I can draw an inference from the lack of evidence.
3 That's why I asked you what it is, but --

4     **MR. WEINGARTEN:** I will say it is not about wishing we
5 had a motion to compel process that had been seen through. I'm
6 actually not challenging the assertion of the privilege. If
7 they told us, which they did, "We did a lot -- if we did any
8 analyses, they were with lawyers, they were about understanding
9 legal implications of the agreements," fine. That sounds like
10 a plausible privilege claim.

11     But I can't then also have a Defendant show up and give
12 half the poker cards over and say "Actually, we think they're
13 really super pro-competitive" while withholding the actual
14 analysis I need to understand it or contest it.

15     **THE COURT:** Well, I think they're saying they're not
16 withholding anything.

17     **MR. WEINGARTEN:** There's just nothing. Okay. Well,
18 then --

19     **THE COURT:** That's what Mr. Stuart says, there's just
20 nothing.

21     **MR. WEINGARTEN:** So I would take from the inference
22 that there's just nothing, that there's no great effect to
23 these agreements because if there were any material effect,
24 there must have been a model or a discussion. The evidence in
25 the record is that some of these were hastily agreed to:

1150

1 Ubitus, Boosteroid.

2 Some other evidence in the record -- Mr. Eisler's
3 deposition Mr. Fisher's -- is that they were hastily agreed to
4 on the eve of other regulatory proceedings for a press
5 conference.

6 I think the inference that can be drawn is they were
7 hastily agreed to and that there can be no inference of
8 pro-competitive effect from that circumstance.

9 THE COURT: Well, why? I mean, they were hastily
10 agreed to in response to regulatory concerns, no question;
11 right?

12 MR. WEINGARTEN: Correct.

13 THE COURT: No question. They're not arguing anything
14 different. They agree.

15 MR. WEINGARTEN: Right.

16 THE COURT: That's why I say in many ways you won
17 because you and the other regulators have forced them. Now,
18 whether it's sufficient or not is a different matter, but you
19 did get them to -- at least they say they were committed all
20 along, but you got them to do something earlier.

21 MR. WEINGARTEN: And I'm not being facetious in saying
22 this. If we had felt like we had won, I would declare victory
23 and go home. I don't think we won because that is not, first
24 of all, how the process is supposed to unfold.

25 Second of all, we have no evidence of what the effects of

1151

1 these agreements will be so I cannot declare victory on behalf
2 of consumers.

3 I have the same thing that you have, Your Honor, evidence
4 that there are agreements. Nothing more. That's it. And if
5 Ms. Wilkinson were right, that this was Microsoft's master
6 plan -- and I agree it's not, it's regulatory -- it's not in
7 the deal model. The deal model is all about Microsoft's
8 products and services so that's what I have to look at.

9 And I have no evidence -- and, respectfully, neither does
10 the Court -- that these agreements are going to engage in any
11 pro-competitive benefit for anyone. Reminder, some of them
12 involve companies in Hong Kong, Eastern Europe. They're not
13 even in the market, so it is --

14 THE COURT: Well, it depends on the market. I mean,
15 and we didn't even get into that.

16 And I don't know for cloud, is someone sitting in the
17 United States can't download or can't use those services?

18 MR. WEINGARTEN: I don't know; right? As a
19 theoretical matter, can someone go on the internet? Maybe but,
20 again, there's no evidence from the Defendants.

21 THE COURT: Well, no, no, no, but you initially have
22 to tell me the relevant market.

23 MR. WEINGARTEN: Yes.

24 THE COURT: So tell me why the cloud gaming company in
25 Hong Kong is not part of the relevant market.

1152

1 MR. WEINGARTEN: Two reasons. One is a lack of
2 evidence. I don't know if their terms allow people in the
3 United States to download this and no one in this case does.
4 There's -- I don't think there's anything in the record that
5 they even do business here. Literally, I don't think Ms. Bond
6 was asked. I don't think she knew. Nobody knows. So that's
7 one.

8 Two is, latency. I would posit I don't know where their
9 servers are and, for goodness sake, if they're in Hong Kong
10 with a server, I would argue that a product in Hong Kong is not
11 a reasonable substitute for a cloud service in the United
12 States.

13 THE COURT: That's probably true. With respect to
14 cloud streaming, I think that's true.

15 MR. WEINGARTEN: One more on this, Judge. The
16 antitrust law requires verification of the benefits.

17 I apologize. I'm supposed to slow down. Okay.

18 One of the requirements if you're going to present as a
19 Defendant a pro-competitive benefit, is that it has to be
20 verified. We have to verify what these benefits will be.
21 Quantification, something. That's not an FTC thing. That's a
22 legal test. It's in the horizontal merger guidelines, which is
23 an FTC thing, but also in the court -- in the case law,
24 I believe.

25 No one from the defense evidence has verified them.

1153

1 Dr. Carlton, we talked to him, did not verify very clearly.
2 Dr. Bailey testified she didn't know about the consumer welfare
3 effects of any of these terms.

4 So I don't -- there is no verification. It's another more
5 doctrinal version of the argument I've been making. Absent
6 verification, they are a nothing, respectfully.

7 THE COURT: All right.

8 MS. WILKINSON: Your Honor, they are part of the deal
9 and part of the output; but if you -- I'm going to take what
10 counsel just said. He now said the deal model is the only
11 thing that shows. Yes, it shows an analysis of keeping COD on
12 PlayStation. So we already have that that's going to happen.

13 And he said, "Well, why don't you have more financial
14 analysis or way of measuring it?" We have a way of measuring
15 it. We also have Minecraft that's on Play -- which we heard
16 from Mr. Stuart this morning is more successful or generates
17 more revenue on the other platforms than it does on Xbox.

18 So there is a base analysis, and the fact that this is
19 increasing output further and wasn't part of the model, it was
20 part of the plan, and the fact that it is going to generate
21 more gamers, there's no question that it's pro-competitive.

22 I don't even understand. You said it yourself: How could
23 it be that if more consumers are going to get access to it,
24 it's not beneficial? I mean, it's -- what do you call it? --
25 the benefits are just increasing output as, you know, as part

1154

1 of the deal? Either way, more consumers are going to get the
2 game and that's good for gamers, but it's also good for
3 Microsoft.
4     THE COURT: Can I ask you about the X -- the X Pass?
5     MR. WEINGARTEN: The Game Pass?
6     THE COURT: Game Pass. Game Pass.
7     MR. WEINGARTEN: Yes, ma'am.
8     THE COURT: I do think that is not clear that Call of
9 Duty may be on Game Pass and not on PlayStation Plus.
10    MR. WEINGARTEN: Correct. And Mr. Ryan had testimony
11 that the terms --
12    THE COURT: That I read and --
13    MR. WEINGARTEN: -- and the offer are --
14    THE COURT: -- that I understand. That I understand.
15 But explain to me why. Let's say, because as I understood
16 Mr. Ryan, for example -- I keep calling it the Thor game
17 because I can't remember.
18    MS. WILKINSON: God of War.
19    THE COURT: God of War. Is that on PlayStation Plus?
20    MR. WEINGARTEN: Yes. I actually don't know.
21 Is God of War -- I'm getting head nods. Yes.
22    THE COURT: Yes? Yes.
23    MS. WILKINSON: Not day and date.
24    MR. WEINGARTEN: Okay.
25    THE COURT: Not day and date.

1155

1     MS. WILKINSON: I don't know if it's an older catalog
2 game, but not day and date.
3     THE COURT: But anyway, he testified they see it a
4 little differently and it's more like a catalog. And if Call
5 of Duty were on Game Pass but not on PlayStation Plus, wouldn't
6 that just incentivize Sony to up their game, so to speak, on
7 the PlayStation Plus? To improve the content? To maybe make
8 stuff available more immediately? In other words, it would
9 increase competition as opposed to decrease competition.
10    MR. WEINGARTEN: Well --
11    THE COURT: Because it's not available on
12 PlayStation Plus right now. So unlike the console, it's not
13 taking anything away from anybody. Nobody has the ability
14 right now to pay just a subscription and get Call of Duty.
15    MR. WEINGARTEN: So I guess a couple of things. One,
16 they might. There might be agreements; right? This is the
17 likelihood of Mr. Kotick bringing his content to other places.
18 There are possible future agreements so Sony could say to
19 Activision "We've got to have it. Here is the offer," and they
20 reach terms.
21    If this deal goes through that Microsoft proposes, that
22 terminates for all time -- right? -- the ability of an
23 independent Activision to ever reach an agreement with Sony.
24 So I just want to be clear about the but-for world and the
25 world we are in if this deal goes through.

1156

1     Another point I'll make to Your Honor is, if the response
2 from Sony -- if this deal goes through, hypothetically, Sony's
3 response is "We got to go buy another big developer of content
4 and keep adding content," and it's the domino effect from
5 Mr. Spencer's e-mail.
6     We will have in our conclusions of law the case law that
7 that is an aggravating, not a mitigating factor.
8     THE COURT: No, no, no. I'm not saying -- I'm just
9 saying with their own content that they already have --
10    MR. WEINGARTEN: Yes.
11    THE COURT: -- to make it available at the same time
12 that they release the games.
13    MR. WEINGARTEN: Possible, but a non-problematic or a
14 less problematic, from the antitrust law perspective way to
15 achieve that, would be if Game Pass loves Activision content,
16 reach a deal short of a merger, and pay them. And if they work
17 out that deal and Sony says in response, "Gosh, we need our own
18 deal or we need to change how we operate," that's good
19 competition.
20    But taking Activision content 100 percent in-house and
21 foreclosing for all time a future deal between Activision and
22 PlayStation, or who knows what as to be invented subscription
23 service, that is anticompetitive.
24    THE COURT: But how -- how -- again, and play that out
25 how the consumer is harmed. Because I still don't understand

1157

1 why Sony, then, just won't make their PlayStation Plus better.
2     And, again, how many people -- you're only going to pay
3 for the subscription to Call of Duty, the $15 a month or the $8
4 a month, if you like the other mix on the games because
5 otherwise it's cheaper to just pay -- right? This is why I
6 actually am trying to figure out the market.
7     MS. WILKINSON: Your Honor, that isn't quite right
8 because, remember, to -- unless they're playing by themselves,
9 they still have to subscribe for the multiplayer monthly fee.
10 So it's not like you either buy it for $70 and you have no more
11 fees. You still have to pay monthly to play it either on
12 PlayStation or Xbox.
13    There -- we showed you, we didn't spend much time on it,
14 there's four subscriptions --
15    THE COURT: Yes.
16    MS. WILKINSON: -- and the first one is just for
17 multiplayer.
18    THE COURT: So you can't do multiplayer without a
19 subscription?
20    MS. WILKINSON: Without a monthly subscription.
21    THE COURT: Both? Both?
22    MS. WILKINSON: Yes.
23    MR. WEINGARTEN: So turning back to your question, why
24 doesn't Sony just do it, I don't know.
25    THE COURT: Can I just stop one second?

1158

1    MR. WEINGARTEN:  Sorry, Your Honor.  Yes.

2    THE COURT:  But in terms of if you have a PlayStation

3  to play multiplayer, is that in the agreement that was offered?

4  Does that agreement include that the people on PlayStation will

5  still always be able to have that option to do the multiplayer?

6    MS. WILKINSON:  That's up to them because it's the

7  consumer who buys that.  It wouldn't -- Xbox would not stop

8  PlayStation 5 players from being multiplayer because that's

9  what you purchase on the PlayStation website.

10    THE COURT:  Okay.

11    MR. WEINGARTEN:  Reminder about Mr. Ryan's concerns

12  about the whole offer on PlayStation Plus in response to that.

13    THE COURT:  No, no, I understand that.

14    MR. WEINGARTEN:  Okay.

15    THE COURT:  That's a different -- that's a different

16  issue.

17    MR. WEINGARTEN:  On why doesn't Sony put their games

18  day and date, I don't know.  I don't think we have a lot of

19  record evidence about why.

20    I'll get a snort from the defense bar; but as a regulator,

21  a law enforcer, I am agnostic if they have a competitive

22  strategy that they think helps them invest and make good

23  competition in various markets, but it is not an adequate

24  response by Defendants to buying this content to say, "Good.

25  Now Sony will do the same thing we want to do and build a

1159

1  walled garden of their own."  There's case law that's not the

2  right thing to do.

3    Also, again, there's no evidence that that is a benefit.

4  We don't know.  The Defendants, if they were to posit that as a

5  benefit, good, everybody builds walled gardens and we all buy

6  content and day and date is better.  We have no evidence that's

7  true so we just don't want to interrupt the flow of how the

8  competition is currently working.

9    THE COURT:  And it all comes down, again, to Call of

10  Duty.

11    MR. WEINGARTEN:  I keep hesitating slightly.

12    THE COURT:  Yeah, but, I mean, that's where the

13  evidence is; right?  That's the driver because there are

14  acquisitions that happen, there are games that happen, and

15  we're here because of Call of Duty.  I just want to be clear so

16  I know what to focus on.

17    MR. WEINGARTEN:  No question, it is critically

18  important and it's the driver of the revenues.  I only hesitate

19  because they just have some really other great franchises that

20  are huge.

21    THE COURT:  As do -- you know, as does Warner Brothers

22  have the number one game, at least it was, earlier this year --

23  right? -- of Hogwarts.  Like, you just don't know.  And there

24  are lots of other games.

25    I mean, the other thing I'm just struggling a little bit

1160

1  with -- and you can help me -- is this industry is very

2  different in that it's amorphous and it changes all the time

3  and it's completely dynamic, and what video game -- I know Call

4  of Duty has had enduring but other games have -- come and go

5  just like MySpace or TV shows or whatever, and I'm trying to

6  figure out why --

7    MR. WEINGARTEN:  So --

8    THE COURT:  -- why the emphasis is just so much on

9  Call of Duty.  I mean, isn't there an argument that that will

10  force someone to come up with another good annual game or some

11  other thing?  I mean, after all, Mr. Kotick started from

12  essentially nothing, but he was able to do it; right?

13    MR. WEINGARTEN:  So taking your last point first, I'm

14  sure that Call of Duty being great inspires people to try to be

15  the next Call of Duty.  We don't need this merger to do that.

16  So Call of Duty existing in the universe on its own already

17  accomplishes that.

18    THE COURT:  No, no.  Yeah, I'm getting more whether

19  there is an anticompetitive effect.

20    MR. WEINGARTEN:  Right.  So Microsoft buys the Call of

21  Duty.  Why do we care?  Yes, because it is unique in so many

22  ways.  It is every day.  A lot of these games, they don't do

23  every year a title.  Not only is it every year, it's number one

24  every year.  And the one disappointment Mr. Kotick pointed to

25  was still number one.  It's a heck of a disappointment.

1161

1    So it is unique.  And the modeling that we saw from

2  Microsoft shows how unique it is.  Now, that model is not just

3  Call of Duty; right?  They modeled all the content.  But it is

4  a huge number.  It is a hugely popular game.  It has revenue

5  generation that is off the charts year after year.

6    So that's why -- that is part of why we're here, for sure,

7  Your Honor.  If they were buying a much smaller game, we

8  probably would have made a regulatory law enforcement judgment

9  to spend resources elsewhere, but here we are because it is

10  incredibly powerful.

11    And I'll take it back down from the 50,000-foot to the

12  evidence.  We have seen from the testimony, the documents about

13  Microsoft strategy, about the role of AAA, the role of content

14  in every single one of these markets how essential content is,

15  and it's something that I believe Your Honor and I were talking

16  about way at the beginning of session that content is key.

17    And this is key content and it is a game that gamers want

18  to play.  And that incentive, once you own the game that gamers

19  want to play, means you're going to put it where you can drive

20  users to play it with you.

21    THE COURT:  Some gamers want to play.

22    MR. WEINGARTEN:  Sure.  Sure.

23    THE COURT:  Right?

24    MR. WEINGARTEN:  Enough to make --

25    THE COURT:  It's a minority.

1162

1    MR. WEINGARTEN: But enough to make billions of
2 dollars in revenue. So almost any product, I'm -- not
3 everybody drinks Coca Cola, but if Coke and Pepsi merged, we'd
4 be here; right? So not everybody --
5    THE COURT: Hopefully not here.
6    (Laughter)
7    MR. WEINGARTEN: Apologies.
8    But if not everybody uses it, but our concern is with the
9 consumers who do and may one day want to use it.
10    MS. WILKINSON: Your Honor, it's not an essential
11 input. There's a big difference between it being necessary,
12 which is what the case law says, and being the popular, you
13 know, enduring, wonderfully successful game. No one disputes
14 that.
15    It's one piece of content. There's no case that says one
16 piece of content will tip a market; or if one competitor gets
17 it, you know, there won't -- there will be harm to competition.
18    And you can think about it. If we go back to the old days
19 when some of us only watched three networks, there's much more
20 content now -- right? -- because there's these subscription
21 services. More content has been generated, to your point, to
22 go back and forth. There are enduring franchises. Everyone
23 would like to own the Bond franchise, I'm sure, in the
24 streaming world but only one company owns it now. It doesn't
25 mean all these other competitors aren't successful.

1163

1    The same with *Seinfeld*. Name your favorite show. There
2 are certain types of content or individual pieces of content
3 that are extraordinarily popular, but Sony has many of those
4 too, like God of War, my favorite.
5    THE COURT: But did Sony develop God of War itself?
6    MS. WILKINSON: Yes, as far as I understand it.
7    THE COURT: I think that's their point.
8    MS. WILKINSON: Here is?
9    THE COURT: We wouldn't be here if Microsoft had
10 created Call of Duty. It's the purchasing it; right? That the
11 argument is and the theory behind the antitrust laws and the
12 whole case is that -- and, yeah, the whole theory behind
13 Section 7 is that we don't benefit from just buying up each
14 other. We benefit from keeping things separate and, therefore,
15 incentivizing people to create themselves.
16    MS. WILKINSON: That's not true. We want smaller
17 folks to create content; right? And the fact that someone
18 purchases -- and they're not small anymore, Activision, but, as
19 you say they were originally.
20    The fact that they produced popular content and someone
21 else wants to buy to distribute it and then someone else wants
22 to make more content, I mean, that's the art that's going on
23 whether it's movies, gaming, or television. And no one says if
24 you don't have this one game or this one television program or
25 movie, you can't compete.

1164

1    I mean it's kind of -- it's an odd suggestion. It's not
2 the type of essential input, you know, that you need a widget
3 and the widget seller -- you're buying the widget seller so
4 nobody else can purchase those widgets.
5    Whether PlayStation created its games, it also contracts
6 for them. Final Fantasy XVI, as someone pointed out to me,
7 it's called XVI for a reason. It's been out there for a long
8 time and it's been very successful. You don't have to have an
9 exact replacement. No consumer is entitled to have the exact
10 piece of content they want.
11    But in this case there's lots of competitors. As you
12 said, this is a small part of the market. It's incredibly, you
13 know, successful. I don't think that -- I know that doesn't
14 equate to being essential and something that one party cannot
15 own, especially in light of the promises and contracts that
16 they're going to distribute far and wide, and that all of the
17 documents, Your Honor, every piece of evidence, everyone who
18 came here, whether it was from Microsoft and Activision or from
19 Mr. Kotick, said it makes sense to keep it on multiple
20 platforms.
21    And counsel has not pointed to one piece of evidence, one
22 document, that says Microsoft was thinking about holding it
23 back. Nobody did that analysis. Nobody asked for that. And,
24 again, why didn't they do that financial analysis? Because it
25 doesn't make any sense to them economically and based on their

1165

1 good business judgment.
2    MR. WEINGARTEN: All right. I have quite a bit there.
3 If I may, Your Honor, just very briefly.
4    THE COURT: Okay.
5    MR. WEINGARTEN: If we had that document, Judge, I
6 don't think we would have had to file the case at all if the
7 document was "We're going to hold it back and exclude and be
8 anticompetitive."
9    I also think we have not had full access to whatever they
10 may have claimed privilege over in their very --
11    THE COURT: I'm not --
12    MR. WEINGARTEN: No, but I think it's unfair for
13 counsel to point to evidence of absence as saying, "Oh, well
14 that means it didn't exist or didn't happen." But I'll move
15 on.
16    The case law does not require that we show something as a
17 must have. The scarcity and the need for this content is why
18 they shelled out 8 billion or 7 and a half billion for ZeniMax
19 and $70 billion now.
20    THE COURT: But not -- not just for Call of Duty.
21    MR. WEINGARTEN: No. But we seem to be going back and
22 forth on they're getting some other things, but I think
23 Microsoft's model has been very clear and the documents about
24 using the Call of Duty franchise to drive subscribers and
25 scale.

1166

1    I also want to say, when Defense Counsel says "It's just
2    like *Seinfeld* or a TV show being on one subscription service or
3    another," Mr. Kotick came and he had a warning about that
4    world.  His testimony was he hates that world.  He said he came
5    from Los Angeles and that world has been death for creators.
6        **THE COURT:**  Which is why he won't put the games on
7    Game Pass or up in the cloud?
8        **MR. WEINGARTEN:**  Right.
9        **THE COURT:**  Right?  So I don't --
10       **MR. WEINGARTEN:**  But --
11       **THE COURT:**  I mean, you point that out and that
12   suggests --
13       **MR. WEINGARTEN:**  No, but I --
14       **THE COURT:**  -- without the merger, then people aren't
15   going to have it available to get it by subscription.
16       **MR. WEINGARTEN:**  Or -- I have the nuance, if I may,
17   Your Honor -- or he reaches deals with everybody and gets paid
18   by everybody instead of just getting in one subscription
19   service.  So instead of *Seinfeld* just being on Netflix, or
20   wherever it is, the people who own *Seinfeld* reach their deal
21   with Netflix and Peacock and Disney Plus and we have more
22   access instead of the walled garden.
23       So Mr. Kotick is, I think, savvy about his own business.
24   He said he hates the world that Ms. Wilkinson just said is
25   where they're going.

1167

1        **THE COURT:**  Okay.  Can we go to the balance of the
2    equities, which we get to if there's showing of a likelihood of
3    success?
4        And Warner is the Ninth Circuit case -- right? -- that I
5    look at and sense that.  And we know that private equities,
6    while they can be considered, they can't alone counter-show --
7    or justify denial of a preliminary injunction.
8        (Pause in proceedings.)
9        **THE COURT:**  Warner then said if the record is
10   conflicting on the anticompetitive effects, the public
11   entity -- the public equities there, including beneficial
12   economic effects and -- or if -- sorry -- you know what Warner
13   says.
14       But what I want to get to is Warner then said there, even
15   though we have conflicting evidence so we can't say that the
16   public equities include these beneficial economic effects or
17   advantages for a consumer if we stop the merger now because
18   there's conflicting evidence, there was a different public
19   equity there which was if the merger happened, it was going to
20   be very difficult to divest.
21       **MR. WEINGARTEN:**  Uh-huh.
22       **THE COURT:**  Right?  It was going to be very -- and
23   here, my understanding is it's going to be a parent-sub
24   relationship.  And so really the only question here is, as you
25   said, is to stop the merger.

1168

1        We know there are some private equities.  They've been
2    publicly stated.  That's why we're here in such a rush.  And so
3    then what is the countervailing public equity that you would
4    point to?
5        **MR. WEINGARTEN:**  Sure.  The fact that Defendants say
6    they will keep Activision as one of their limited enterprises
7    and somewhat at or removed from Microsoft is not the same as a
8    hold separate.  So the harm will start the day the deal closes
9    and it will start that day because that is the day Mr. Ryan,
10   and anyone else who makes content for platforms, will start
11   looking a different way at Activision and sharing proprietary
12   information about their platform.
13       So it's not just about Sony, although we have the evidence
14   from Sony, who's going to contact Activision and say, "Great.
15   Here is my new platform.  Can we optimize Call of Duty for this
16   new platform that's going to do six new things?  That would be
17   great if we worked together" the day after the merger because
18   that info goes to Microsoft.
19       The harms do start, Your Honor, immediately.  This is not
20   coal factories.  This is intellectual work and it's about
21   partnerships.  And so there is one public equity that starts
22   right away.
23       I would also say -- we'll put it in our conclusions of
24   law -- the private equity, their interest in simply doing their
25   deal, which I know is very important to the Defendants, cannot

1169

1    outweigh the public's interests in ensuring a full
2    adjudication.
3        **THE COURT:**  No, no.  That's what I said.
4        **MR. WEINGARTEN:**  Yeah.
5        **THE COURT:**  However, Warner recognized that there's
6    still -- that they're not irrelevant.  They're not irrelevant
7    and you still have to identify some public equity.
8        **MR. WEINGARTEN:**  Yes.
9        **THE COURT:**  I know you have, but I'm just looking
10   right at Warner; right?
11       **MR. WEINGARTEN:**  Yes.
12       **THE COURT:**  Yeah.
13       **MR. WEINGARTEN:**  So the public equity, Judge, is that
14   the harms in this case start immediately.
15       **THE COURT:**  Okay.
16       **MS. WILKINSON:**  I want to address that.  That's just
17   not true with Call of Duty.
18       As you know, there is a contract that's going through the
19   end of 2024, that came into evidence, to ensure that Call of
20   Duty stays on PlayStation till at least then.
21       **THE COURT:**  Yeah.  So that's --
22       **MS. WILKINSON:**  Even if Sony doesn't accept our
23   offer -- and, again, I just want to say, Your Honor, how can it
24   be withholding when they don't want to agree with us?
25       **THE COURT:**  Okay.

1170

1	MS. WILKINSON: But regardless of what Microsoft
2	wants, there's indisputable evidence that they follow their
3	contracts when they acquire studios. The government proved
4	that for us.
5	THE COURT: Yeah, what about that? I mean --
6	MR. WEINGARTEN: I'm not sure I follow the point even.
7	MS. WILKINSON: They made a big deal -- I'm sorry,
8	Your Honor.
9	THE COURT: No dev needs to be sent over to Microsoft.
10	Call of Duty that's being released in November will be released
11	on PlayStation.
12	MR. WEINGARTEN: Yes.
13	THE COURT: So your August 2nd hearing can go forward.
14	Nothing is going to happen, at least that I -- I mean, I guess
15	what I'm saying is, you guys should address it in your
16	submissions to tomorrow.
17	MR. WEINGARTEN: I would also -- there is -- it is not
18	static. This is not just about, "Oh, let's wait for the next
19	contract negotiation." Microsoft is hard at work on its next
20	console. PlayStation is hard at work on its next console. And
21	the record evidence is that these conversations about
22	optimizing for a new generation take place years before.
23	THE COURT: I don't know. That's why I'm saying just
24	point it out in your -- in your submissions.
25	Okay. So appreciate the argument.

1171

1	So tomorrow, as I said, I've given you this time deadline
2	because I want to save your holiday weekend; but by 5:00 p.m.
3	tomorrow, your proposed findings of fact and conclusions of
4	law, which may be submitted under seal, along with a Word
5	version e-mailed to Ms. Means.
6	And then if you could by Monday at noon, just submit a
7	joint appendix of exhibits that were admitted into evidence.
8	And, if possible, as well as a new share file with just those
9	exhibits. That way I know I have them all that way. I don't
10	think that should be too much work there. I'm sure you could
11	use ChatGPT to create your appendix.
12	(Laughter)
13	MR. WEINGARTEN: We will not --
14	THE COURT: You, Microsoft.
15	MS. WILKINSON: I'm not going to say anything,
16	Your Honor.
17	MR. WEINGARTEN: We will not be doing that.
18	My colleague has a quick logistical question, please.
19	MS. FLEURY: Thank you, Your Honor.
20	I just have a quick question about when the actual date to
21	file the public version of the filings that we'll be submitting
22	to Your Honor next Friday? We had talked to Defendants and a
23	date to offer --
24	THE COURT: By next Friday, you mean tomorrow?
25	MS. FLEURY: Right. So we're submitting --

1172

1	THE COURT: Oh, the non --
2	MS. FLEURY: -- the nonpublic versions --
3	THE COURT: Yes.
4	MS. FLEURY: -- of our findings of fact and
5	conclusions of law by tomorrow.
6	THE COURT: What would you like? When do you think
7	you can get your -- knowing that we have a holiday.
8	MS. FLEURY: We discussed and floated July 12th as a
9	potential date, assuming that works for Your Honor's schedule.
10	THE COURT: Could you do the 7th? No? Is that too
11	hard?
12	MR. WEINGARTEN: This is the lifting of just doing all
13	the redacting and the sealings.
14	MS. FLEURY: Right, and reaching out to the third
15	parties.
16	THE COURT: And no Sharpies.
17	MS. FLEURY: All the evidence -- yes. In light of the
18	holiday next week, we were floating that idea. We could get it
19	done earlier, but that was what we were discussing with Defense
20	counsel.
21	THE COURT: I don't know. What do you think?
22	MS. WILKINSON: Your Honor, if we --
23	THE COURT: So the findings of fact and conclusions of
24	law that you initially submitted, redacted versions are on the
25	docket?

1173

1	MS. WILKINSON: Yes.
2	THE COURT: Okay. The 12th is fine.
3	MS. FLEURY: Thank you, Your Honor.
4	MS. WILKINSON: We just don't want that to slow down
5	your opinion, and you've been generous with your time and we
6	realize that, but --
7	THE COURT: No, that won't -- let me tell you, what I
8	decide, I don't know when I'm going to get it out, but
9	obviously I'm mindful. So don't expect, you know, for the
10	judges that take two or three months on these to get the same
11	work product. I'm sorry.
12	MS. WILKINSON: Appreciate it.
13	THE COURT: I'll file my order under seal, and then
14	I'll ask you to provide me jointly with your proposed
15	redactions. Also try to write it in a way that we don't need
16	so many redactions.
17	Frankly, and someone -- someone may very well appeal. I
18	leave it on you to tell the Ninth Circuit where in the record
19	those kinds of things. That will help speed things up quite a
20	bit.
21	Lastly, I do want to congratulate the parties on your
22	presentation and your civility. It was pretty extraordinary.
23	I don't get to see this level of advocacy very well. You were
24	on tight deadlines. I was pretty, you know, demanding in terms
25	of documents and things. You all met them.

1    Everyone -- I especially want to -- the FTC, because I'm a
2    government employee, you don't have quite the same resources
3    they do and yet your team was able to keep up with that in
4    terms of that presentation, and I'm very much appreciative of
5    both sides.
6          Yeah, I'm going to do my best.  It's hard, that's all I
7    can say, but I very much appreciate the presentation that
8    everyone did and I also appreciate how both sides gave many
9    attorneys the opportunities to take witnesses.  I think that
10   was to your benefit and to your clients' benefits because it
11   enabled the presentations, I think, to be better because you
12   were sharing that.  So spread that word.
13         Okay.  All right.
14         MS. WILKINSON:  Thank you very much, Your Honor.
15         THE COURT:  Yes?
16         MS. FLEURY:  I do have one housekeeping matter.
17         THE COURT:  Of course.
18         MS. FLEURY:  I'm sorry to end on that note.
19         THE COURT:  That's all right.
20         MS. FLEURY:  We had several sealed portions of videos
21   that I wanted to make sure both that Your Honor has them and
22   has access to them, and I also wanted to move to admit the clip
23   reports for some of those videos and the underlying material.
24   It's really just the actual clip reports that we thought would
25   be helpful to have numbers admitted into the record.

1          THE COURT:  Okay.  I did read the transcripts in full.
2    So I read them all of Mr. Singer, Mr. Eisler, Mr. Fisher.
3          MS. FLEURY:  And it's Mr. Fisher and Mr. Eisler as
4    well as the Ryan -- Mr. Ryan's sealed clip report that we were
5    hoping to just admit into evidence quickly.
6          THE COURT:  Sure.
7          MS. FLEURY:  So the -- Mr. Ryan's sealed clip report
8    is PX3378.
9          Mr. Fisher's sealed clip report is PX3379.
10         Then Mr. Fisher's public clip report is PX3380.
11         Then Mr. Eisler's sealed clip report is PX3381.
12         And then Mr's. Eisler public clip report is PX3382.
13         And the Mr. Fisher full deposition transcript is PX7062.
14         THE COURT:  All of those exhibits are admitted.
15   (Trial Exhibits 3378, 3379, 3380, 3381, 3382, and 7062
16   received in evidence.)
17         MS. FLEURY:  Thank you, Your Honor.
18         MR. WEINGARTEN:  Thank you, Your Honor.
19         THE COURT:  All right.  Thank you.
20         (Proceedings adjourned at 5:19 p.m.)
21                    ---oOo---
22
23
24
25

1
2
3                    **CERTIFICATE OF REPORTER**
4          I certify that the foregoing is a correct transcript
5    from the record of proceedings in the above-entitled matter.
6
7    DATE:  Thursday, June 29, 2023
8
9
10
11   _____
12   Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
     United States District Court - Official Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25