**No. 23-15992**

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

FEDERAL TRADE COMMISSION

*Plaintiff-Appellant,*

*v.*

MICROSOFT CORP., and ACTIVISION BLIZZARD, INC.,

*Defendants-Appellees.*

On Appeal from the United States District Court
For the Northern District of California
No. 3:23-cv-2880
Hon. Jacqueline Scott Corley, District Judge

_____

## BRIEF OF FORMER STATE ATTORNEYS GENERAL AS *AMICI CURIAE* IN SUPPORT OF AFFIRMANCE IN PART

_____

Jeane A. Thomas
Ann L. Rives
Crowell & Moring LLP
1001 Pennsylvania Ave. NW
Washington D.C. 20004
Tel.: (202) 624-2500
jthomas@crowell.com
arives@crowell.com

*Counsel for Amici Curiae*

September 13, 2023

## <u>TABLE OF CONTENTS</u>

INTEREST OF *AMICI CURIAE* ........................................................... 1

ARGUMENT ........................................................................................ 3

I.    STATE ATTORNEYS GENERAL KEENLY UNDERSTAND THE NEED TO PROPERLY EVALUATE COMPETITIVE EFFECTS IN MERGER CASES. ............................................... 4

    A.    States Provide a Critical Perspective on Merger Review. ................ 4

    B.    States Benefit from Merging Parties' Willingness to Proactively Address a Transaction's Potential Competitive Issues. .......................................................... 8

II.    PROHIBITING THE CONSIDERATION OF THE PARTIES' EFFORTS TO RESOLVE COMPETITIVE CONCERNS DURING PRELIMINARY INJUNCTION PROCEEDINGS WEAKENS THE PARTIES' INCENTIVES TO MAKE SUCH EFFORTS. ................................................................... 10

    A.    Adopting the FTC's Position Would Waste Time and Resources Through Unnecessary Piecemeal Adjudication. .................................................................. 11

    B.    Adopting the FTC's Position Would Reduce Parties' Incentives to Proactively Resolve Enforcers' Concerns. ................ 14

CONCLUSION .................................................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*F.T.C. v. Arch Coal, Inc.,*
Nos. 04-0534, 04-0535, slip op. (D.D.C. July 7, 2004) ....................................12

*F.T.C. v. Atl. Richfield Co.,*
549 F.2d 289 (4th Cir. 1977) ....................................................................11

*F.T.C. v. Warner Commc'ns., Inc.,*
742 F.2d 1156 (9th Cir. 1984) ..................................................................13

*Illumina, Inc. and GRAIL, Inc.,*
No. 9041 (F.T.C. Mar. 31, 2023) ..............................................................13

*Kansas v. Nebraska,*
574 U.S. 445 (2015) ..................................................................................14

*United States v. Aetna Inc.,*
240 F. Supp. 3d 1 (D.D.C. 2017) .............................................................12

*United States v. AT&T, Inc.,*
916 F.3d 1029 (D.C. Cir. 2019) ...............................................................12

*United States v. Booker,*
543 U.S. 220 (2005) ..................................................................................14

*United States v. UnitedHealth Grp. Inc.,*
630 F. Supp. 3d 118 (D.D.C. 2022) .........................................................12

**Statutes**

15 U.S.C. § 53(b)(2) ....................................................................................11

**Rules**

Fed. R. App. P. 29(a)(2) ................................................................................2

**Other Authorities**

Brief of 12 States as Amici Curiae Supporting Petitioners, *Illumina Inc. v. FTC*,
No. 23-60167 (5th Cir. June 12, 2023) .................................................. 8

Brief of 9 States as Amici Curiae Supporting Appellees, *United States v. AT&T Inc.*,
No. 18-5214  (9th Cir. Sept. 29, 2018) ................................................. 8

Consent Judgment, *Colorado v. UnitedHealth Group Inc.*,
(Colo. Dist. Ct., El Paso Cty. filed June 18, 2019) ............................... 7

Daniel P Ducore, *Negotiating Remedies: A Perspective from the Agencies*, Merger Remedies Guide (Glob. Competition Rev., 4th ed.) ....................................................................................................... 15

Decision and Order, *In re Amgen Inc. and Horizon Therapeutics plc*,
No. 9414 (Sept. 1, 2023) ....................................................................... 7

H. Rep. No. 93-624 (1973), *as reprinted in* 119 Cong. Rec. H36241 (daily ed. Nov. 7, 1973) ....................................................................... 13

Letter from NAAG re: Enhanced State Antitrust Enforcement Sent to Congressional Subcommittee on Antitrust Subcommittee on Antitrust, Commercial and Administrative Commercial and Administrative Law (May 10, 2021) ..................................................... 9

Margaret Lemos, *State Enforcement of Federal Law*, 86 N.Y. Univ. L. Rev. 698 (2011) ...................................................................................... 6

Michael Murray, *Deputy Assistant Attorney General Delivers Remarks at Antonin Scalia Law School* (Aug. 31, 2020) ...................... 5

Patricia A. Conners, *Current Trends and Issues in State Antitrust Enforcement*, 16 Loyola Consumer L. Rev. 37 (2003) ........................ 9

Public Comments of 23 State Attorneys General, Request for Information on Merger Enforcement at 6 (April 21, 2022) ................... 4

Remarks of Sens. Hart and Scott, 122 Cong. Rec. 15977 (May 28, 1976) ...................................................................................................... 6

Renata Hesse, Acting Assistant Attorney General, Antitrust Division, U.S. Dept. of Justice, *Protecting Competition Across 50 United States: Advocacy and Cooperation in Antitrust Enforcement*, Address Before the American Bar Association Fall Forum (Nov. 17, 2016) ................................................................................................5

Stephen D. Houck, *The State of State Antitrust Enforcement*, National State Attorneys General Program, Columbia Law School (Oct. 2009) ....................................................................................................4

U.S. Dep't of Justice, Antitrust Division, ANTITRUST DIVISION MANUAL III-22 (5th ed.) ...................................................................15

Wallis, Richard J. *et al.*, *Roundtable Conference with Enforcement Officials* ................................................................................................6

iv

# INTEREST OF *AMICI CURIAE*[1]

*Amici* are former state attorneys general who during their tenure had responsibility for enforcing federal and state antitrust laws, including with respect to corporate mergers.

Jahna Lindemuth served as Alaska Attorney General from 2016 to 2018.

Doug Peterson served as Nebraska Attorney General from 2015 to 2023.

Herbert H. Slatery III served as Tennessee Attorney General from 2014 to 2022.

John Suthers served as Colorado Attorney General from 2005 to 2015.

Along with the U.S. Department of Justice ("DOJ") and the Federal Trade Commission ("FTC"), state attorneys general are the primary enforcers of federal antitrust laws, in addition to bringing cases under their own states' antitrust statutes. As such, state attorneys general have an interest in the fair, just, and efficient resolution of antitrust challenges to proposed mergers, and in the standards and procedures that courts apply under federal and state antitrust laws. The FTC's appeal in this case raises issues concerning the standards and

---

[1] No party or its counsel authored this brief in whole or in part, or contributed money intended to fund preparing or submitting this brief. No person contributed money intended to fund preparing or submitting this brief other than *amici* and their counsel.

procedures courts apply in such cases that will affect the efficient antitrust enforcement activities of state attorneys general.

All parties have consented to the filing of this brief of *amici curiae*, which is filed under Federal Rule of Appellate Procedure 29(a)(2).  *See also* Circuit Advisory Committee Note to Rule 29-3 (permitting filing without leave of Court or the need to consider a motion).

## **ARGUMENT**

One issue raised by the FTC in this appeal is whether it was proper for the District Court to consider Microsoft's agreements and offers to make Activision's games available on third-party platforms post-merger in determining whether the FTC met its statutory burden to obtain a preliminary injunction. The FTC characterizes these agreements as "[p]roposed remedies [that] should not be considered at the preliminary injunction stage," but "only after a finding of liability, at the remedy stage of the subsequent merits proceeding." Opening Br. of FTC 46, 48. In practice, that means that such agreements not only would be ignored by the court in a preliminary injunction action, but they would not be considered until the later stages of a trial before the administrative law judge, whose recommendations are subject to lengthy appeals often lasting years. Yet, the agreements involved here are an immutable part of the competitive landscape and thus go to the heart of the issue before the district court below and every adjudicator that will follow—whether the post-merger markets are likely to operate in a substantially less competitive way. To consider how competitive those markets will be without factoring in all the marketplace facts would be to ignore reality. Moreover, and of great importance to state antitrust enforcers, the FTC's position, if adopted, would discourage merging parties from proactively addressing

3

competitive concerns early in the investigative and litigation process—efforts that have the potential to bring enormous benefits more quickly to the public.

## I. STATE ATTORNEYS GENERAL KEENLY UNDERSTAND THE NEED TO PROPERLY EVALUATE COMPETITIVE EFFECTS IN MERGER CASES.

As former state attorneys general, *amici* are well positioned to aid the Court in weighing the relevant and value of merging parties' efforts to proactively address potential antitrust concerns, as well as the incentives created when these efforts are considered as part of the competitive effects analysis, including at the preliminary injunction stage. When efforts to mitigate competitive concerns are brought forward and taken into account early in the process, they not only serve the states' interests in enforcement efficiency, but also promote procompetitive outcomes that ultimately benefit consumers.

### A. States Provide a Critical Perspective on Merger Review.

As "co-enforcers of the nation's antitrust laws," states play a crucial and unique role in U.S. antitrust law's federalist framework. Public Comments of 23 State Attorneys General, Request for Information on Merger Enforcement at 6 (April 21, 2022), https://www.naag.org/wp-content/uploads/2022/08/Public-Comments-of-23-State-Attorneys-General-.pdf; *see also* Stephen D. Houck, *The State of State Antitrust Enforcement*, National State Attorneys General Program, Columbia Law School (Oct. 2009) ("Dual antitrust enforcement by the states and

the federal government is inherent in our federal system.") Indeed, as federal agency leaders acknowledge, "protecting competition is not a job the federal government can or should do alone" as states "are essential component parts of the worthy effort to protect and promote competition throughout the American economy." Renata Hesse, Acting Assistant Attorney General, Antitrust Division, U.S. Dept. of Justice, *Protecting Competition Across 50 United States: Advocacy and Cooperation in Antitrust Enforcement*, Address Before the American Bar Association Fall Forum (Nov. 17, 2016), https://www.justice.gov/opa/speech/acting-assistant-attorney-general-renata-hesse-antitrust-division-delivers-remarks-0; Michael Murray, *Deputy Assistant Attorney General Delivers Remarks at Antonin Scalia Law School* (Aug. 31, 2020) ("The involvement of state attorneys general often can be a significant asset to the sound development of antitrust law, as the states' knowledge and sensitivity to local effects enhances our analysis."), https://www.justice.gov/opa/speech/deputy-assistant-attorney-general-michael-murray-delivers-remarks-antonin-scalia-law.

In the context of merger review specifically, state attorneys general have played a significant role, both in litigated resolutions as well as in obtaining merger conditions that benefit their state's residents. State enforcers can be "closer to the ground" in terms of understanding local market conditions and the practical implications of a proposed merger. Their expert knowledge of local economic

conditions makes state enforcers uniquely situated to address competitive concerns at the local market level, and their position as the states' top law enforcement officials gives them a strong incentive to serve their constituencies—both businesses and consumers—to the best of their abilities. *See* Remarks of Sens. Hart and Scott, 122 Cong. Rec. 15977 (May 28, 1976) (noting that a "primary duty of the State is to protect the health and welfare of its citizens; and a State attorney general is normally an elected and accountable and responsible public officer whose duty it is to promote the public interest"); Hesse, *supra*, at 1 ("Even as concentration has increased by certain metrics, our economy remains relatively disaggregated, and threats to competition come in all shapes and sizes across our country."); Margaret Lemos, *State Enforcement of Federal Law*, 86 N.Y. Univ. L. Rev. 698, 721-23 (2011). State enforcers respond to issues with significant local impact on consumers and businesses that might be overlooked by the federal government's broader focus. *See* Wallis, Richard J. *et al.*, *Roundtable Conference with Enforcement Officials*, 73 Antitrust L.J. 269, 296 (2005) (statement of Patricia Conners, Chair of National Association of Attorneys General Multistate Antitrust Task Force) (state attorneys general "typically focus on enforcement cases that have significant specific local or regional impact upon their states, their consumers, and their public institutions"). In doing so, states' expertise regarding local markets and consumers makes them a valuable participant in negotiating and evaluating

merger remedies. Public Comments of 23 State Attorneys General, Request for Information on Merger Enforcement at 90 (acknowledging state attorneys' general "unique perspectives, experiences, and interests in protecting their citizens from anticompetitive harms").

In recent years, states have increasingly played a key role in antitrust merger proceedings—both alongside the federal agencies, and also individually or as a group of states—when the proposed transaction has significant local and regional competitive implications. In just one recent example, UnitedHealthcare's acquisition of DaVita Inc.'s Medical Group, the Colorado Attorney General challenged the merger and obtained a decree requiring UnitedHealthcare to exit certain exclusive provider contracts and continue to honor DaVita's existing contract with a competing insurance firm. Consent Judgment, *Colorado v. UnitedHealth Group Inc.*, (Colo. Dist. Ct., El Paso Cty. filed June 18, 2019). Very recently, in a case involving non-horizontal foreclosure theories like those raised by the FTC here, attorneys general from six states joined the FTC in reaching a proposed consent agreement with Amgen Inc. in its proposed acquisition of Horizon Therapeutics that will prohibit Amgen from bundling its products with certain Horizon medications. *See* Decision and Order, *In re Amgen Inc. and Horizon Therapeutics plc*, No. 9414 (Sept. 1, 2023),

https://www.ftc.gov/system/files/ftc_gov/pdf/d09414amgenhorizondecisionandord erpublic.pdf.

State attorneys general have also raised concerns as to federal agencies' treatment of transactions with national or global significance, such as the pending Fifth Circuit appeal related to the FTC's challenge of Illumina Inc.'s proposed acquisition of cancer diagnostic test manufacturer Grail, as well as the DOJ's 2018 challenge to the AT&T Inc.-Time Warner merger. Brief of 9 States as Amici Curiae Supporting Appellees, *United States v. AT&T Inc.*, No. 18-5214 (9th Cir. Sept. 29, 2018); Brief of 12 States as Amici Curiae Supporting Petitioners, *Illumina Inc. v. FTC*, No. 23-60167 (5th Cir. June 12, 2023). Of note, similar to the AT&T-Time Warner transaction, no state attorneys general chose to join the FTC's complaint against Microsoft and Activision. Brief of 9 States at 1-2.

### B. States Benefit from Merging Parties' Willingness to Proactively Address a Transaction's Potential Competitive Issues.

Despite the importance of merger enforcement at the state level, state enforcers have a wider range of responsibilities beyond antitrust, and must carefully assess the resources required to investigate and litigate challenges to proposed transactions that raise competitive concerns. The decision whether to initiate or join a particular challenge depends on a variety of factors. Although foremost are the transaction's impact on competition and the state's particular interests therein, state enforcers must also consider competing law enforcement

priorities, the potential allocation of finite resources, as well as the opportunity costs of pursing one investigation or lawsuit over another. *See* Letter from NAAG re: Enhanced State Antitrust Enforcement Sent to Congressional Subcommittee on Antitrust Subcommittee on Antitrust, Commercial and Administrative Commercial and Administrative Law (May 10, 2021), https://www.naag.org/policy-letter/antitrust/ ("Allocating and optimizing funding for antitrust enforcement is a perennial challenge at the state level."); Patricia A. Conners, *Current Trends and Issues in State Antitrust Enforcement*, 16 Loyola Consumer L. Rev. 37, 58-59 (2003).

As state enforcers assess the proper allocation of their resources, the number of reportable transactions has continued to grow significantly in recent years, making those allocation decisions more difficult. Of the over 3,500 transactions notified from October 2020 to September 2021, for example, even at the federal level, the agencies only sought "clearance," i.e., indicated their interest in investigating, in about 270 transactions. Federal Trade Commission & Department of Justice, Hart-Scott-Rodino Annual Report Fiscal Year 2021 at Appendix A, https://www.ftc.gov/system/files/ftc_gov/pdf/p110014fy2021hsrannualreport.pdf. Given the increase in merger filings, the states' interests in both efficiency and procompetitive outcomes can be greatly served when merging parties develop solutions early on to mitigate competitive concerns. Particularly in cases raising

access issues, encouraging private agreements (and where appropriate incorporating then into agency orders) not only can reduce costs and allow states to more efficiently allocate resources, but also avoids the risk of negative litigation outcomes in favor of a greater realization of procompetitive benefits. The parties themselves, with their intimate knowledge of market and business realities, are often best positioned to address anticompetitive risks. Ultimately, when parties enter into such agreements, states can more readily ensure that competitive concerns are assuaged while still allowing transactions to proceed that will deliver benefits to their constituents.

## II.    PROHIBITING THE CONSIDERATION OF THE PARTIES' EFFORTS TO RESOLVE COMPETITIVE CONCERNS DURING PRELIMINARY INJUNCTION PROCEEDINGS WEAKENS THE PARTIES' INCENTIVES TO MAKE SUCH EFFORTS.

The benefits described above depend on a process that encourages the efficient, proactive resolution of antitrust concerns as early as possible, as an alternative to protracted litigation.  However, rather than recognize there can be such benefits in some circumstances, the FTC argues that agreements to address competitive concerns should be viewed solely as proposed remedies that should *never* be considered during preliminary injunction proceedings under Section 13(b) of the FTC Act.  *See* Opening Br. of FTC 45-46, 48-50, 55-58.  The District Court considered and rejected this argument below.  *See* Op. 39 [1-ER-39].  The FTC

now argues that result was reversible error. *See* Opening Br. of FTC 46-50, 55-58.
We disagree as a matter of law and effective enforcement policy.

As a matter of law, Congress required that courts considering FTC requests
for preliminary injunctions, find that the FTC has shown a "likelihood of ultimate
success" on the merits. 15 U.S.C. § 53(b)(2). *See, e.g., F.T.C. v. Atl. Richfield
Co.*, 549 F.2d 289, 298 (4th Cir. 1977) (denying preliminary injunction pursuant to
§ 13(b) because FTC did not show "there was not a substantial likelihood that [the]
FTC would be able to establish a violation of § 7"). That showing of "ultimate
success" on the merits must allow the court to consider the full scope of real-world
competitive effects of the merger.

As a matter of policy, a rule that categorically prohibits the consideration of
actual, arms-length agreements that go directly to the claimed foreclosure in
preliminary injunction proceedings would waste the resources of courts, parties
and enforcers through unnecessarily protracted litigation and would discourage
parties from seeking to address competitive concerns proactively.

## A. Adopting the FTC's Position Would Waste Time and Resources Through Unnecessary Piecemeal Adjudication.

The FTC argues that courts deciding preliminary injunction proceedings
should ignore the merging parties' contracts that will be a marketplace fact post-
merger. But as numerous courts and commentators have explained, it is the
transaction *as it will actually exist* that represents the real post-transaction world in

which competitive effects must be evaluated. *See, e.g., United States v. AT&T, Inc.*, 916 F.3d 1029, 1038, 1041 (D.C. Cir. 2019) (district court properly assessed theory of harm by considering remedial agreements it found would have "real-world effect[s]"); *United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 133 (D.D.C. 2022) (evidence ignoring agreed divestiture has "no connection to the post-acquisition world"). Enforcers and courts often inquire into the definitiveness and efficacy of the parties' efforts to resolve competitive concerns—as part of an analysis of the real-world competitive effects of the entire transaction. *See F.T.C. v. Arch Coal, Inc.*, Nos. 04-0534, 04-0535, slip op. at 5 (D.D.C. July 7, 2004) ("[T]he transaction that is the subject of the FTC's challenge is properly viewed as the set of two transactions involving the acquisition … and the immediate divestiture."); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 59-74 (D.D.C. 2017). To be clear, we are not suggesting this Court adopt a bright-line rule that would require evaluation of all such efforts at this stage, no matter how nebulous. But where those efforts have clear, definitive parameters—such as the signed contracts here, or the immediate divestiture in *Arch Coal*—they are part of the post-merger marketplace and courts should be allowed to consider them as relevant to the post-transaction effects.

Further, deciding preliminary injunctions on facts fundamentally different from a transaction's real-world effects runs contrary to the legislative intent and

purpose of Section 13(b).  Congress specifically intended that, under Section 13(b), courts must "exercise independent judgment," H. Rep. No. 93-624 (1973), *as reprinted in* 119 Cong. Rec. H36241, H36250 (daily ed. Nov. 7, 1973), regarding whether the "questions *going to the merits*" are such "as to make them fair ground for thorough investigation, study, deliberation, and determination," *F.T.C. v. Warner Commc'ns., Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984) (emphasis supplied). By ignoring the true impact of all relevant agreements on competition, a court would not be exercising "independent judgment" regarding "the merits" or the "thorough investigation" thereof.  Instead, the court would be evaluating competition in a future marketplace that will not exist because the parties' contracts have changed the competitive dynamics therein.

Moreover, a categorical rule that courts can never consider such agreements would mean years of potentially wasted effort by the parties and the courts.   As the ongoing *Illumina/GRAIL* proceedings demonstrate, this process can take more than two years from administrative complaint to final Commission decision. *Illumina, Inc. and GRAIL, Inc.*, No. 9041, slip op. at 19 (F.T.C. Mar. 31, 2023) (Complaint filed March 30, 2021).   Only thereafter would an Article III court for the first time on appeal exercise its independent judgment regarding the full competitive effects of the transaction actually at issue.  Not only would such a timeline be at odds with legislative intent, but many mergers (including those that

13

would provide procompetitive benefits) would die on the vine due to the length of delay.

Allowing federal courts to consider the merits of the case based on the real-world effects of the transaction promotes the efficient enforcement of the antitrust laws. For reasons discussed above this issue is of particular concern to state antitrust enforcers.

**B.** **Adopting the FTC's Position Would Reduce Parties' Incentives to Proactively Resolve Enforcers' Concerns.**

Enforcers and parties to a transaction consider potential negotiated resolutions in the shadow of litigation, and the procedures and standards of that litigation obviously shape the negotiation. *See Kansas v. Nebraska*, 574 U.S. 445, 455 (2015); *United States v. Booker*, 543 U.S. 220, 255 (2005). Here, the FTC argues that all agreements seeking to resolve competitive concerns should be irrelevant when it seeks a preliminary injunction. Such a categorical rule significantly alters merging parties' incentives when negotiating with merger enforcers in the investigative stages. Perversely, it *reduces* merging parties' incentives to seek to address competitive concerns proactively and completely, for two related reasons.

First, if courts prior to administrative litigation are forbidden from considering efforts that address competitive concerns, the parties to a transaction have less to gain from developing and entering into them at that point.

14

Second, although parties to a transaction have an interest in persuading enforcers during the investigation that their proposed solutions have merit and litigation is unnecessary, those enforcers must divide their efforts between evaluating those proposals and preparing for the injunction proceedings in which they must prevail to continue challenging the remedied transaction. *See*, *e.g.*, U.S. Dep't of Justice, Antitrust Division, ANTITRUST DIVISION MANUAL III-22 (5th ed.) (currently undergoing revisions) ("When investigating a transaction…, staff should always keep in mind its dual role" as objective analyst and litigator preparing a case.). Normally these efforts overlap, as an evaluation of the proposals would be part of court preparation, but the FTC's position would silo the *real-world* transaction under investigation from the *original* transaction subject to injunction proceedings—the consequence of which is the proposed solution may not be thoroughly assessed as a means to resolve competitive concerns even outside the litigation process. As a former FTC Assistant Director advises merging parties, when enforcers perceive the need to preserve their ability to litigate, "[a]s a practical matter, staff cannot simultaneously focus on the underlying case (and, especially, prepare for a court challenge) and negotiate a settlement. Preparing for court will be the staff's priority." Daniel P Ducore, *Negotiating Remedies: A Perspective from the Agencies*, Merger Remedies Guide Part V at 3 (Glob. Competition Rev., 4th ed.). As a result, the merger review process may be less

15

collaborative and efficient, compared to a world in which the parties and the enforcer engage on what the real world will look like after the transaction and whether the proposals effectively address competitive concerns and preclude the need for litigation. This outcome would be counterproductive by undermining efficient and effective merger enforcement.

## CONCLUSION

For the foregoing reasons, the Court should affirm the decision below that it is appropriate for the District Court to consider parties' efforts to address regulatory concerns in the context of preliminary injunction proceedings under Section 13(b) of the FTC Act.

Respectfully submitted,

*/s/ Jeane A. Thomas*
Jeane A. Thomas
Ann M. Rives
Crowell & Moring LLP
1001 Pennsylvania Ave. NW
Washington D.C. 20004
Tel: (202) 624-2500
jthomas@crowell.com
arives@crowell.com

*Counsel for Amici Curiae*

September 13, 2023

16

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-15992

I am the attorney or self-represented party.

**This brief contains** 3,205 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Jeane A. Thomas **Date** 09/13/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*