No. 23-15992

# 𝕴𝖓 𝕿𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘 𝖋𝖔𝖗 𝖙𝖍𝖊 𝕹𝖎𝖓𝖙𝖍 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellant*,

v.

MICROSOFT CORP.; ACTIVISION BLIZZARD, INC.,

*Defendants-Appellees.*

On Appeal from the U.S. District Court
for the Northern District of California
No. 3:23-cv-2880
Hon. Jacqueline Scott Corley

———————————

**BRIEF FOR THE CHAMBER OF COMMERCE
OF THE UNITED STATES OF AMERICA AS
AMICUS CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE**

———————————

Tyler S. Badgley
Maria C. Monaghan
U.S. CHAMBER LITIGATION CENTER
1615 H. Street, NW
Washington, DC 20062
(202) 463-5337

Jeffrey M. Harris
Frank H. Chang
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22201
(703) 243-9423
jeff@consovoymccarthy.com

*Counsel for Amicus Curiae
The Chamber of Commerce
 of the United States of America*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the Chamber of Commerce of the United States of America certifies that it has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

Dated: September 13, 2023 _/s/ Jeffrey M. Harris_

# **TABLE OF CONTENTS**

Table of Authorities ........................................................................................iii

Interest of Amicus Curiae ...............................................................................1

Summary of the Argument .............................................................................3

Argument ...........................................................................................................5

    I.    Vertical mergers are presumptively procompetitive and beneficial to consumers, and thus lawful. ...........................................................5

    II.    The government must present real-world evidence of harm and cannot use shortcuts or mere possibilities to establish the *prima facie* case in vertical merger cases. ............................................................ 10

        A.    The government cannot use "shortcuts" in vertical merger cases. ... 12

        B.    The government cannot use mere possibilities of harm to block a vertical merger. ............................................................................ 16

        C.    The government must present real-world evidence of harm to establish its *prima facie* case. ................................................... 19

    III.    The government will fail to carry its burden in most vertical merger cases. .......................................................................................... 22

Conclusion ...................................................................................................... 25

Certificate of Service ...................................................................................... 26

# TABLE OF AUTHORITIES

## Cases

*Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours & Co.*,
    826 F.2d 1235 (3d Cir. 1987) ..................................................................7

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) ................................................................... 6, 15

*Comcast Cable Comm'cns, LLC v. FCC*,
    717 F.3d 982 (D.C. Cir. 2013) ...............................................................8

*Freuhauf Corp. v. FTC*,
    603 F.2d 345 (2d Cir. 1979) ........................................ 6, 7, 8, 13, 18

*FTC v. Elders Grain, Inc.*,
    868 F.2d 901 (7th Cir. 1989) ...................................................... 10, 17

*FTC v. Exxon Corp.*,
    636 F.2d 1336 (D.C. Cir. 1980) ............................................................3

*FTC v. Freeman Hosp.*,
    69 F.3d 260 (8th Cir. 1995) ................................................................ 22

*FTC v. HJ Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ........................................................... 12

*FTC v. Microsoft*,
    2023 WL 4443412 (N.D. Cal. July 10) ...... 4, 5, 6, 8, 12, 13, 14, 15, 16, 17, 19, 20, 21

*FTC v. Univ. Health, Inc.*,
    938 F.2d 1206 (11th Cir. 1991) ......................................................... 22

*FTC v. Warner Commc'ns Inc.*,
    742 F.2d 1156 (9th Cir. 1984) ..................................................... 4, 18

*FTC v. Whole Foods Mkt., Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008) ......................................................... 22

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) ........................................................ 9, 24

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 887 (2007) ........................................................................... 15

*Mercantile Tex. Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*,
    638 F.2d 1255 (5th Cir. 1981) ..................................................... 18, 19

*St. Alphonsus Med. Ctr.–Nampa, Inc. v. St. Luke's Health Sys., Ltd.,*
778 F.3d 775 (9th Cir. 2015) ..................................................................... 11

*Tenneco, Inc. v. FTC,*
689 F.2d 346 (2d Cir. 1982) ...................................................................... 18

*United States v. AT&T, Inc.,*
310 F. Supp. 3d 161 (D.D.C. 2018) ............................. 4, 10, 11, 13, 17, 19, 20, 21, 24

*United States v. AT&T, Inc.,*
916 F.3d 1032 (D.C. Cir. 2019) ........................... 4, 10, 11, 12, 13, 14, 16, 17, 20, 23

*United States v. Baker Hughes, Inc.,*
908 F.2d 981 (D.C. Cir. 1990) ........................................................ 11, 12, 13, 24

*United States v. Phila. Nat'l Bank,*
374 U.S. 321 (1963) .............................................................................. 24, 25

*United States v. UnitedHealth Grp., Inc.,*
630 F. Supp. 3d 118 (D.D.C. 2022) .......................................... 8, 10, 11, 14, 16, 17, 19

*Winter v. NRDC,*
555 U.S. 7 (2008) ...................................................................................... 3

*Yamaha Motor Co., Ltd. v. FTC,*
657 F.2d 971 (8th Cir. 1981) ..................................................................... 18

**Statutes**

15 U.S.C. § 18 ..................................................................................... 4, 10

15 U.S.C. § 53(b) ..................................................................................... 4

**Other Authorities**

Areeda & Hovenkamp, *Antitrust Law* ............................................................... 13

Blair et al., *Analyzing Vertical Mergers: Accounting for the Unilateral Effects Tradeoff and Thinking Holistically About Efficiencies,*
27 Geo. Mason L. Rev. 761 (2020) ....................................... 7, 8, 11, 15, 16, 20, 22, 23

Bork, *The Antitrust Paradox: A Policy at War With Itself*
(Bork Publishing 2021) ....................................................................... 6, 7, 15, 16

Carl Shapiro, *Antitrust in a Time of Populism,*
61 Int'l J. Indus. Org. 714 (2018) .................................................................. 23

Chen & Hylton, *Procompetitive Theories of Vertical Control,*
50 Hastings L.J. 573 (1999) ......................................................................... 7

iv

DOJ & FTC, *Merger Guidelines Draft for Public Comment* (July 19, 2023) ......................... 22

DOJ, 1984 Merger Guidelines ....................................................................................... 9, 13

FTC & DOJ, 2020 Vertical Merger Guidelines ............................................................. 6, 9

Ginsburg et al., *The Federal Trade Commission's Hearings on Competition and Consumer Protection in the 21st Century, Vertical Mergers,* Geo. Mason Univ. (Sept. 6, 2018) ........................................................................... 19, 23

Ginsburg, *Vertical Restraints: De Facto Legality Under the Rule of Reason,* 60 Antitrust L.J. 67 (1991) ...................................................................................... 8

Hoffman, *Vertical Merger Enforcement at the FTC* (Jan. 10, 2018) ................................. 9, 17

Hovenkamp, *Competitive Harm from Vertical Mergers* (2020) ..................................... 6, 7, 15

Ossorio, Note, *Drawing the Line: Refining the Baker Hughes Burden-Shifting Framework for Vertical Mergers,* 73 Fla. L. Rev. 199 (2021) ............................................................ 23

Roundtable on Vertical Mergers, *Note by the Delegation of the United States to the OECD* (Feb. 15, 2007) ....................................................................................... 9, 24

Sokol*, Vertical Mergers and Entrepreneurial Exit,* 70 Fla. L. Rev. 1357 (2018) ...................................................................................... 23

Wrobel, *Spotlight on U.S. Vertical Merger Enforcement: Burden of Proof and Revised Enforcement Guidelines,* 33 Antitrust 3 (2019) .................................................... 23

## INTEREST OF AMICUS CURIAE[1]

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus curiae briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Chamber has a significant interest in preventing the government from adopting a novel and unlawfully aggressive approach to vertical mergers, which—if embraced by this Court—would greatly undermine countless transactions that benefit consumers. The Chamber is very familiar with the issues in this case. The Chamber has repeatedly called attention to the Federal Trade Commission's legally dubious approach to vertical mergers, including the Microsoft-Activision merger at issue in this appeal. *See, e.g.*, Heather, *The FTC's Objection to Microsoft-Activision Merger: A Bridge Too Far, Even for Europe*, Chamber of Com. (June 13, 2023), www.uschamber.com/finance/antitrust/the-ftcs-objection-to-microsoft-activision-merger-a-bridge-too-far-even-for-

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), the Chamber certifies that no counsel for any party authored this brief in whole or in part and no entity or person, aside from amicus curiae, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this amicus brief.

europe; Heather, *The FTC's Latest Merger Misadventure*, Chamber of Com. (May 30, 2023) (the Amgen-Horizon Therapeutics merger), www.uschamber.com/finance/antitrust/the-ftcs-latest-merger-misadventure; Heather, *Inside the FTC's Ploy to Quash a Bio-Tech Merger*, Chamber of Com. (Sept. 10, 2021) (the Illumina-Grail merger), www.uschamber.com/international/inside-the-ftc-s-ploy-quash-biotech-merger.

The Chamber has similarly submitted amicus briefs in federal court cases involving the FTC's efforts to block vertical mergers. *See, e.g.*, Amicus Curiae Br. (Doc. 118), *Illumina, Inc. v. FTC*, No. 23-60167 (5th Cir. June 12, 2023); Amicus Curiae Br. (Doc. 148-1), *FTC v. Amgen, Inc.*, No. 1:23-cv-3053 (N.D. Ill. Aug. 28, 2023). The Chamber's effort also includes the submission of Freedom of Information Act requests to uncover the FTC's early coordination with the European Commission and other foreign governments to block the Microsoft-Activision and Illumina-Grail mergers. *See Chamber of Com. of the U.S.A. v. FTC*, No. 1:22-cv-2070 (D.D.C.) (concerning the Illumina-Grail merger FOIA request); *see also* Lt'r to FTC (Mar. 1, 2023) (the Microsoft-Activision FOIA request), www.uschamber.com/assets/documents/March-2023-FOIA-Request.pdf. The Chamber thus has a significant interest in the proper resolution of this case.

## SUMMARY OF THE ARGUMENT

The FTC should not be allowed to construct and knock down straw men when seeking to block a procompetitive economic activity that benefits consumers. Nor should it be allowed to completely disregard the real-world circumstances of a merger and real-life agreements that further benefit consumers. Instead, the FTC must produce real-world evidence of competitive harm whenever it seeks to stop vertical mergers, like the Microsoft-Activision merger, that are presumptively procompetitive and thus lawful. The need for real-world evidence applies regardless of whether the case is before a court from a petition for review *or* a motion for preliminary injunction. But such evidence is especially necessary to obtain a preliminary injunction, "an extraordinary remedy" which is "never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). The "'drastic'" nature of a preliminary injunction is "particularly" acute "in the acquisition and merger context," because, "as a result of the short life-span of most tender offers, the issuance of a preliminary injunction blocking an acquisition or merger may prevent the transaction from ever being consummated." *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980).

The FTC seeks to rewrite the FTC Act, creating a statute that would allow the agency to obtain an injunction based on mere possibilities, hypothetical harms, or shortcuts, with no real-world evidence. *See* FTC-Br. (Doc. 47) 23-28. But the FTC Act demands evidence—the FTC must make "a *proper showing* that, weighing the equities and considering the Commission's likelihood of ultimate success, [an injunction] would

be in the public interest." 15 U.S.C. § 53(b) (emphasis added). Only then "a preliminary injunction may be granted." *Id.*

The Clayton Act prohibits mergers "where in any line of commerce … the effect of such acquisition may be substantially to lessen competition," 15 U.S.C. § 18, but Congress never authorized the government or courts to block mergers based on a "'mere possibility'" of harm to competition, *United States v. AT&T, Inc.*, 916 F.3d 1032, 1032 (D.C. Cir. 2019) (cleaned up). It is indisputable that the government "'has the ultimate burden of proving a Clayton Act violation by a preponderance of the evidence.'" *United States v. AT&T, Inc.*, 310 F. Supp. 3d 161, 189 (D.D.C. 2018). "[T]he Government's 'failure of proof in any respect will mean the transaction should not be enjoined.'" *Id.* In short, "'antitrust theory and speculation cannot trump facts,'" and real-world evidence of competitive harm is required. *Id.* at 190.

The FTC must show "the likelihood that [it] will ultimately succeed on the merits." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984). Despite explicitly having this burden, *id.* at 1162, the FTC has not even attempted to meet it in this case, and instead relied on shortcuts, multifactor balancing, or mere possibilities in asking for a preliminary injunction. *See FTC v. Microsoft*, 2023 WL 4443412, at *14 (N.D. Cal. July 10) (observing there are "no internal documents, emails, or chats contradicting Microsoft's stated intent not to make *Call of Duty* exclusive to Xbox consoles"); *id.* at *15 ("the FTC has not identified any instance in which an established multiplayer, multi-platform game … has been withdrawn … and made exclusive"); *id.* at *16 (the FTC's

4

expert "[did] not dispute the evidence of Microsoft's lack of an economic incentive" to foreclose competitors); *id.* (the FTC's expert's "conversion rate assumption" was unsupported); *id.* at *18 ("the record does not include any evidence" of even partial foreclosure); *id.* at *20 (the FTC "offer[ed] no quantitative evidence" regarding what "an independent Activision" would do differently).

The Chamber urges this Court to affirm. Indeed, there is no shortage of reasons to do so. *See* Appellees Br. (Doc. 55) 25-31. But rather than rehash the factual issues or the other independent reasons ably explained in the district court's opinion and Appellees' brief, the Chamber focuses on the broader principles at stake. Requiring real-world evidence of competitive harm to block a vertical merger is consistent with both the overwhelming consensus among courts, government officials, and scholars that vertical mergers are presumptively procompetitive and thus lawful and caselaw rejecting the government's attempts to use shortcuts and mere possibilities to block vertical mergers.

## ARGUMENT

### I. Vertical mergers are presumptively procompetitive and beneficial to consumers, and thus lawful.

As the district court's opinion correctly explains, antitrust law distinguishes between vertical and horizontal mergers. *Microsoft*, 2023 WL 4443412, at *8. Indeed, courts and enforcement agencies—including the FTC until its recent, abrupt about-face—have long taken a skeptical approach toward arguments that vertical mergers harm competition based on an extensive body of research and scholarship showing that vertical mergers generally increase efficiency and benefit consumers. Vertical mergers "combine

firms or assets at different stages of the same supply chain"—for instance, an upstream supplier and a downstream customer. FTC & DOJ, 2020 Vertical Merger Guidelines 2, perma.cc/7RC9-EADZ. Horizontal mergers, on the other hand, combine firms generally at the same stages of the supply chain that may directly compete against each other.

Courts initially adopted what many have described as a "draconian" approach toward vertical mergers. Bork, *The Antitrust Paradox: A Policy at War With Itself* 231 (Bork Publishing 2021). Early on, courts "embarked on a substantial expansion of merger law, often on rationales that did more harm than good to competition," including "exaggerated theories of harm as well as the perverse idea that mergers should be condemned because of efficiencies that served to harm rivals." Hovenkamp, *Competitive Harm from Vertical Mergers* 4 (2020), perma.cc/9LA2-YNP3; *but see Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) ("The antitrust laws were enacted for 'the protection of *competition*, not *competitors*.'"); *Microsoft*, 2023 WL 4443412, at *15 (observing the Microsoft-Activision vertical merger is "[p]erhaps bad for Sony[,] [b]ut good for *Call of Duty* gamers and future gamers").

This approach was based on the view that "[t]he primary vice of a vertical merger" was "foreclosing the competitors of either party from a segment of the market." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323-24 (1962). The theory goes that, for example, if a car manufacturer combines with a tire manufacturer, the tire manufacturer could disadvantage the car manufacturer's rivals by refusing to sell to them or raising the prices charged to them. *See Freuhauf Corp. v. FTC*, 603 F.2d 345, 349 (2d Cir. 1979).

Or the car manufacturer could disadvantage the tire manufacturer's rivals by refusing to purchase tires from them. *See id.*

To be sure, courts and scholars now recognize the presumptively procompetitive nature of vertical mergers. Hovenkamp, *Vertical Mergers*, at 5; *see also Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours & Co.*, 826 F.2d 1235, 1244 (3d Cir. 1987) ("respected scholars question the anticompetitive effects of vertical mergers in general"); Bork, *The Antitrust Paradox*, at 232 (explaining why "[a]ntitrust's concern with vertical mergers is mistaken"); *see also id.* at 245 ("[I]n the absence of a most unlikely proved predatory power and purpose, antitrust should never object to the verticality of any merger."); Chen & Hylton, *Procompetitive Theories of Vertical Control*, 50 Hastings L.J. 573, 576 (1999) (discussing "changed conventional judicial thinking" about vertical mergers).

"Profit-maximizing firms, regardless of whether they are vertically integrated, will sell to unintegrated rivals if the price paid by those rivals exceeds marginal cost and will purchase inputs from unintegrated rivals if the cost is lower than that of alternatives, including self-supply." Blair et al., *Analyzing Vertical Mergers: Accounting for the Unilateral Effects Tradeoff and Thinking Holistically About Efficiencies*, 27 Geo. Mason L. Rev. 761, 788 (2020); Bork, *The Antitrust Paradox*, at 248 ("To the extent that the ingot monopolist integrates vertically for the purpose of blocking entry, he will incur diseconomies."). In other words, the car manufacturer is generally incentivized to purchase tires from the tire manufacturer's rivals if it is cheaper to do so. And the tire manufacturer is incentivized to sell to the car manufacturer's rivals if it is profitable to do so. Moreover, merging

firms are often keenly aware of the significant "'financial and reputational costs'" should they attempt to manipulate the market by using the advantages gained from vertical integration. *United States v. UnitedHealth Grp., Inc.*, 630 F. Supp. 3d 118, 141 (D.D.C. 2022); *see also Microsoft*, 2023 WL 4443412, at *14 (finding that "Microsoft anticipates irreparable reputational harm if it forecloses *Call of Duty* from [Sony's] PlayStation"). And the economic theory underlying the aggressive approach toward vertical mergers failed to account for the creation of other procompetitive effects, such as the reduction of transaction and inventory costs, and the increase in knowledge transfers. *See* Blair, et al., *Analyzing Vertical Mergers*, at 768-78; *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 840 (D.C. Cir. 2006) ("vertical integration creates efficiencies for consumers").

"[V]ertical integration and vertical contracts are *procompetitive*" also because they "encourage product innovation, lower costs for businesses, and create efficiencies—and thus reduce prices and lead to better goods and services for consumers." *Comcast Cable Comm'cns, LLC v. FCC*, 717 F.3d 982, 991 (D.C. Cir. 2013) (Kavanaugh, J, concurring) (citing Ginsburg, *Vertical Restraints: De Facto Legality Under the Rule of Reason*, 60 Antitrust L.J. 67, 76 (1991)). Vertical mergers are less likely than horizontal mergers to cause competitive harm because "[a] vertical merger, unlike a horizontal one, does not eliminate a competing buyer or seller from the market." *Fruehauf*, 603 F.2d at 351. Instead, vertical mergers involve mergers of companies in a supplier-customer relationship, and by definition, "involve 'firms that do not operate in the same market.'" *AT&T*, 310 F. Supp. 3d at 192 (quoting DOJ, 1984 Merger Guidelines 24,

8

perma.cc/QUA9-MWZK). "A single firm incorporating separate but closely related production processes can often be far more efficient than various independent entities transacting to produce the same good or bundle of goods." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 689 (4th Cir. 2016). Given this increase in efficiency, "it is no surprise that vertical integration has generally been permitted[.]" *Id.* at 689.

Enforcement agencies, too, have consistently taken the view that "non-horizontal mergers" are "less likely than horizontal mergers to create competitive problems." DOJ, 1984 Merger Guidelines 24. Indeed, the FTC's own staff have observed that "the overwhelming majority of vertical mergers increase efficiency." Roundtable on Vertical Mergers, *Note by the Delegation of the United States to the OECD* 7, ¶26 (Feb. 15, 2007), perma.cc/2DAM-D43P. The FTC even embraced the "broad consensus in competition policy and economic theory that the majority of vertical mergers … reduce costs and increase the intensity of Interbrand competition." Hoffman, *Vertical Merger Enforcement at the FTC* 4 (Jan. 10, 2018), perma.cc/ET32-SFVK. In 2020, the FTC and the DOJ jointly issued the Vertical Merger Guidelines, in which they acknowledged that "vertical mergers often benefit consumers through elimination of double marginalization, which tends to lessen the risks of competitive harm." FTC & DOJ, 2020 Vertical Merger Guidelines 2, perma.cc/7RC9-EADZ.[2]

---

[2] In 2021, with the addition of newly appointed Commissioners, the FTC (by a 3-2 vote) pulled the rug out from under businesses by withdrawing the 2020 Vertical Merger Guidelines without any sound explanations. Because the 2020 Vertical Merger

II. **The government must present real-world evidence of harm and cannot use shortcuts or mere possibilities to establish the *prima facie* case in vertical merger cases.**

Due in no small part to the exhaustive research and scholarship showing that vertical mergers are typically procompetitive, the government rightly bears a heavy burden in any case challenging such a merger.

Section 7 of the Clayton Act prohibits mergers "where in any line of commerce or in any activity affecting commerce …, the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18. Section 7 "applies a more stringent test than does the rule-of-reason analysis under … the Sherman Act" and thus sweeps more broadly to cover "'incipient monopolies and trade restraints outside the scope of the Sherman Act.'" *AT&T*, 916 F.3d at 1032. But despite the broad language, "the word 'may' [in § 7 of the Clayton Act] should not be taken literally, for if it were, every acquisition would be unlawful." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989). And courts have recognized that § 7 of the Clayton Act does not authorize courts and enforcement agencies to block a merger based solely on theories and speculation. *See, e.g.*, *UnitedHealth*, 630 F. Supp. 3d at 129. Courts further recognize that "[o]nly examination of the particular market—its structure, history[,] and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger." *AT&T*, 310 F. Supp. 3d at 190. Thus, a § 7 violation can be found only if there is

---

Guidelines still remain in place for the DOJ, *see* DOJ, *Justice Department Issues Statement on Vertical Mergers Guidelines* (Sept. 15, 2021), the FTC's unilateral withdrawal has created a schism—and great confusion—in antitrust law.

"real-world evidence that the specific merger under review is likely to substantially lessen competition." *UnitedHealth*, 630 F. Supp. 3d at 129.

It is undisputed that the government bears the "ultimate burden of proving a Section 7 violation." *AT&T*, 310 F. Supp. 3d at 189. This Court has used the burden-shifting framework as articulated in *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990). *See St. Alphonsus Med. Ctr.–Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015). Although this framework was developed in the horizontal merger context, it has been also used by courts in vertical merger cases. *See, e.g.*, *AT&T*, 916 F.3d at 1032; *UnitedHealth*, 630 F. Supp. 3d at 129-30.[3]

Under this framework, the government bears the initial burden to "establish a *prima facie* case that the merger is likely to substantially lessen competition in the relevant market." *AT&T*, 916 F.3d at 1032. In *AT&T*, the D.C. Circuit applied this burden-shifting framework, but "stopped at the first step after finding the [government] had failed to prove that the transaction would allow the merging parties to raise rivals' costs," thus resulting in anticompetitive harms. Blair et al., *Analyzing Vertical Mergers*, at 821.

Once the *prima facie* case is established, "[t]he burden then shifts to the defendant to rebut the prima facie case." *St. Alphonsus*, 778 F.3d at 783; *see also AT&T*, 916 F.3d at 1032. Upon such rebuttal, "'the burden of producing additional evidence of

---

[3] This Court has not yet held whether the burden-shifting framework applies to vertical mergers.

anticompetitive effects shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times.'" *AT&T*, 916 F.3d 1029 (quoting *Baker Hughes*, 908 F.2d at 983).

This analytical framework applies with equal force in the preliminary-injunction posture. As the D.C. Circuit observed, "[a]lthough *Baker Hughes* was decided at the merits stage as opposed to the preliminary injunctive relief stage, [courts] can nonetheless use its analytical approach in evaluating the Commission's showing of likelihood of success." *FTC v. HJ Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001). And the FTC argued that the burden-shifting framework applies in this case. *See* FTC Proposed Conclusions of Law (D. Ct. Doc. 175) ¶¶ 27-28.

The district court's opinion and Appellees' brief cogently explain why the FTC failed to show a likelihood of success or a serious question as to the merits. Appellees Br. 44-55; *Microsoft*, 2023 WL 4443412, at *12-21. Those explanations need not be repeated here; instead, amicus urges this Court to apply the following overarching principles as it reviews the FTC's decision.

### A.    The government cannot use "shortcuts" in vertical merger cases.

The government cannot use horizontal-merger-specific shortcuts to make a *prima facie* case in vertical merger cases. In horizontal merger cases, the government often uses a "short cut," *AT&T*, 916 F.3d at 1032, by "putting forward statistics to show that the proposed 'merger would produce a firm controlling an undue percentage share of the relevant market, and would result in a significant increase in the concentration of firms

in that market.'" *AT&T*, 310 F. Supp. 3d at 192. Once it does so, this "triggers a 'presumption that the merger will substantially lessen competition.'" *Id.*; *see also Baker Hughes*, 908 F.2d at 982.

In vertical merger cases, however, it is well established that this "'familiar' horizontal merger playbook is of little use." *AT&T*, 310 Supp. 3d at 192. The government cannot use "statistics about the change in market concentration" as a "short cut" to trigger a presumption of harm because "vertical mergers produce no immediate change in the relevant market share." *AT&T*, 916 F.3d at 1032 (citing DOJ, 1984 Merger Guidelines 24); *see also Fruehauf*, 603 F.2d at 351. Courts have held that "the government must make a 'fact-specific' showing that the proposed merger is 'likely to be anticompetitive.'" *AT&T*, 916 F.3d at 1032; *UnitedHealth*, 630 F. Supp. 3d at 130 ("the government meets its *prima facie* burden in vertical merger cases by making a 'fact-specific showing that the proposed merger is likely to be anticompetitive'"). This principle is so well established that the DOJ in *AT&T* conceded the point without much controversy. *See AT&T*, 310 F. Supp. 3d at 192 ("The parties … agree that in this case 'there is no short-cut way to establish anticompetitive effects, as there is with horizontal mergers.'"). Scholars also agree. *See, e.g.*, Areeda & Hovenkamp, *Antitrust Law* ¶1000a ("[T]he basic economic reason for limiting horizontal mergers is … generally accepted: horizontal mergers increase market concentration…. Unfortunately, there is no comparable theoretical basis for dealing with vertical mergers."). Here, the FTC's own expert likewise conceded this point. *See Microsoft*, 2023 WL 4443412, at *11 (quoting the FTC's expert

who said: "Unlike in an analysis of a horizontal merger, there is no established screen or presumption of harm based on market shares or concentration for the purposes of evaluating the competitive effects of a vertical merger.").

Nevertheless, the FTC seeks to circumvent the "no-shortcuts" principle by mis-applying *Brown Shoe*'s multifactor test. *See* FTC-Br. 58-62. In addition to the ability-and-incentive test, the FTC purportedly raised, as an alternative argument, that it can show a likelihood of success "under 'the *Brown Shoe* functional liability factors.'" *Microsoft*, 2023 WL 4443412, at *21. According to the FTC, this test consists of considering the following: "the size of the share of the market foreclosed"; "the nature and economic purpose of the transaction"; "any trends toward concentration in the industry"; and "barriers to entry." FTC-Br. 59. But, as a threshold matter, it is not at all clear that this argument is meaningfully preserved or sufficiently developed. *See* Appellees Br. 61-62. As the district court observed, "the FTC made no reference to this theory in its opening statement or closing arguments." *Microsoft*, 2023 WL 4443412, at *21. "Nor [was] it discussed by [the FTC's] expert report" which "addressed only Microsoft's ability and incentive to foreclose." *Id.* That the FTC is seeking to use this multifactor test to make up for the lack of real-world evidence (expert or otherwise) is thus obvious.

In any event, preserved or not, the FTC's arguments based on *Brown Shoe* over-state the usefulness of market shares and trends in predicting anticompetitive effects in the absence of real-world evidence of foreclosure or other anticompetitive effects. *See, e.g.*, *AT&T*, 916 F.3d at 1032; *UnitedHealth*, 630 F. Supp. 3d at 129. At bottom, the

14

FTC's approach relies on the outdated notion that market concentration is nearly dispositive. *See, e.g.*, *Atl. Richfield*, 495 U.S. at 338; Hovenkamp, *Vertical Mergers*, at 5 ("[B]oth Harvard and Chicago School thinking pushed back at the aggressive attitudes about industrial concentration, as well as the idea that merger-induced efficiency was an affirmative harm."); Bork, *The Antitrust Paradox*, at 245 ("[I]n the absence of a *most unlikely* proved predatory power and purpose, antitrust should never object to the verticality of any merger." (emphasis added)); Blair et al., *Analyzing Vertical Mergers*, at 810 ("Although the Second Circuit [in *Fruehauf*] believed … *Brown Shoe* occasionally 'appear[ed] to encourage' a legal rule proscribing 'any vertical foreclosure,' it concluded that '[t]he Supreme Court's insistence that the Clayton Act protects '*competition*, not *competitors*,' contravenes the notion that a significant level of foreclosure itself is the proscribed effect.'").

Indeed, as a threshold matter, the FTC loses under *Brown Shoe* because it cannot show any foreclosure. The FTC merely assumes, again without evidence, that foreclosure of a rival is likely to occur following a vertical merger. *See, e.g.*, *Microsoft*, 2023 WL 4443412, at *21 (observing that the FTC did not raise "any new arguments" not considered as part of the incentive-and-ability test); Appellees Br. 62. This unsupported assumption in the vertical merger context has been widely discredited. Blair et al., *Analyzing Vertical Mergers*, at 788 (observing that the "logic of foreclosure as an antitrust theory of harm" rests on assumptions for which "[t]here is little support"); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 887, 892 (2007) (observing that "vertical

agreements setting minimum resale prices can have procompetitive justifications"); Bork, *The Antitrust Paradox*, at 239 ("The Clayton § 7 theory of automatic foreclosure is here, as in all contexts, completely improper."). And the FTC assumes (at 59-60)—again without evidence—that the "more than *de minimis*" "potential foreclosure" automatically results in anticompetitive harm. *But see* Appellees Br. 41-42. Again, courts and scholars have long repudiated such a view. *See* Blair et al., *Analyzing Vertical Mergers*, at 809.

Most importantly, the FTC's reliance on market shares and trends alone (without any other real-world evidence of competitive harm) effectively results in using a shortcut to establish a *prima facie* case. *See AT&T*, 916 F.3d at 1032; *UnitedHealth*, 630 F. Supp. 3d at 129-30. In the vertical merger context, it is simply insufficient for the government to rely on statistical data regarding the "share of the market foreclosed" and "trends toward concentration" that have potentially no bearing on the real-world impact of the challenged transaction. FTC-Br. 59. Again, even its own expert conceded that there are no shortcuts based on market shares. *See Microsoft*, 2023 WL 4443412, at *11. Yet this is precisely what the FTC's misapplication of the *Brown Shoe* factors would allow the FTC to do. *See, e.g.*, Blair et al., *Analyzing Vertical Mergers*, at 809.

### B. The government cannot use mere possibilities of harm to block a vertical merger.

The government also cannot establish a *prima facie* case with mere possibilities of competitive harm. This principle is also well established. *See, e.g., AT&T*, 916 F.3d at 1032 ("Section 7 requires more than a 'mere possibility' of competitive harm."). Courts

have recognized that "the word 'may' [in § 7 of the Clayton Act] should not be taken literally, for if it were, every acquisition would be unlawful." *Elders Grain*, 868 F.2d at 906.

Rather, courts have interpreted the Clayton Act to deal with probabilities of future competitive harm. Courts have also recognized that § 7 effectively requires "weighing the parties' competing visions of the future of the relevant market and the challenged merger's place within it." *AT&T*, 310 F. Supp. 3d at 165. This "'uncertain task'" necessarily requires courts to engage in "a comprehensive inquiry into the future competitive conditions in that market.'" *Id.* Because courts must reject mere possibilities of anticompetitive harm, they are also rightly skeptical of enforcement efforts based on speculation, conjecture, or theoretical harms. "'[A]ntitrust theory and speculation cannot trump facts.'" *Id.* at 190. "[T]hose theories don't generally predict harm from vertical mergers; they simply show that harm is possible under certain conditions." Hoffman, *Vertical Merger Enforcement at the FTC* 3. Instead, "prediction must be based on real-world evidence related to the 'structure, history[,] and probable future' of the relevant markets." *UnitedHealth*, 630 F. Supp. 3d at 150.

Here, the district court properly demanded that the FTC "make a fact-specific showing that the proposed merger is likely to be anticompetitive." *Microsoft*, 2023 WL 4443412, at *8. And it properly demanded "'case-specific evidence'" that the Microsoft-Activision merger "'is likely to substantially lessen competition in the manner [the FTC] predicts.'" *Id.* (quoting *AT&T*, 916 F.3d at 1037). Critically, it properly rejected the

FTC's theory of anticompetitive effects based on speculation rather than fact. *Id.* at *20 (citing *Tenneco, Inc. v. FTC*, 689 F.2d 346, 354 (2d Cir. 1982); *Fruehauf*, 603 F.2d at 355).

Courts have also observed that "[a] probability signifies that an event has a better than fifty percent chance of occurring," and "[a] 'reasonable' probability"—the threshold for finding anticompetitive effect—"represents an even greater likelihood of the event's occurrence." *Mercantile Tex. Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 638 F.2d 1255, 1258 (5th Cir. 1981); *see also Yamaha Motor Co., Ltd. v. FTC*, 657 F.2d 971, 977 (8th Cir. 1981). The "'reasonable' probability standard" also requires the government to "specif[y] subsidiary findings that must be compared before the ultimate finding of a reasonable probability is made." *Mercantile Tex.*, 638 F.2d at 1268-69. When the FTC brings an action under the FTC Act, the FTC could obtain a preliminary injunction if it can "rais[e] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination." *Warner*, 742 F.2d at 1162 (cleaned up). But the FTC Act—like the Clayton Act—still requires evidence.

Enabling the government to prove anticompetitive harms with mere theories or possibilities—even in the absence of real-world data or evidence—would mean a return to the era of over-aggressive and over-expansive interpretation of the Clayton Act (made worse by the FTC's equally expansive reading of the FTC Act). For instance, "[w]hile vertical integration can certainly foreclose rivals in theory, there is only limited empirical evidence supporting that finding in real markets." Ginsburg et al., *The Federal*

18

*Trade Commission's Hearings on Competition and Consumer Protection in the 21st Century, Vertical Mergers* 8-9, Geo. Mason Univ. (Sept. 6, 2018). And allowing mere possibilities to establish anticompetitive harm would eschew this Court's articulation of the burden on the government to "specif[y] subsidiary findings" that would support a greater-than-fifty-percent chance of the anticompetitive harm occurring. *Mercantile Tex.*, 638 F.2d at 1268.

**C.    The government must present real-world evidence of harm to establish its *prima facie* case.**

The government must present real-world evidence that reflects more than mere possibilities to make a *prima facie* case in vertical merger cases. This proposition is also well established. *See, e.g.*, *AT&T*, 310 F. Supp. 3d at 192 ("[T]he Government concedes that … it must make a 'fact-specific' showing that the effect of the proposed merger 'is likely to be anticompetitive'"); *UnitedHealth*, F. Supp. 3d at 150 (requiring "real-world evidence" to make a "'predictive judgment'" about the competitive effect of a merger).

In demanding real-world evidence from the FTC, this Court could draw from previous vertical merger cases. In particular, this Court should scrutinize whether the FTC provided sufficient, real-world evidence to show that Microsoft would have the ability *and* incentive to withhold *Call of Duty* and foreclose other subscription and cloud-streaming services from its rivals and that competition would substantially decrease as a result. *See Microsoft*, 2023 WL 4443412, at *13, *18. And it should affirm to the extent that the FTC has failed to present such evidence. *See id.*, at *18, *20, *21.

In *AT&T*, the government argued that a vertical merger between AT&T (downstream content distributor) and Time Warner (upstream content programmer) would

19

enable AT&T to use Time Warner's content to disadvantage its rivals, including by raising the rivals' video programming costs or driving those same rivals' customers to its subsidiary, DirecTV. 310 F. Supp. 3d at 164. The district court rejected that argument for multiple reasons, including: "unrebutted findings that similar past vertical mergers did not result in price increases"; "disbelief that the improvement to AT&T's bargaining leverage would be substantial"; "failure to account for AT&T's long-term contract offers"; and "poor quality inputs to the DOJ's expert model." Blair et al., *Analyzing Vertical Mergers*, at 786 & n.12 (citing *AT&T*, 310 F. Supp. 3d at 216, 224, 226, 239-40). In the district court's view, these flaws undermined the value of the purportedly real-world evidence presented by the government. The D.C. Circuit agreed. *See* 916 F.3d at 1040-41. These evidentiary considerations are highly relevant to assessing the FTC's request to block the Microsoft-Activision merger.

In particular, this Court should hold that the district court properly assessed Microsoft's actual or promised contractual commitments to make their content and services available to Microsoft's rivals. *See Microsoft*, 2023 WL 4443412, at *13, *17 (factoring in Microsoft's "commitment to enter a new agreement to extend Activision's obligation to ship *Call of Duty* at parity on PlayStation" and to make it available "on Steam" and Nintendo's "Switch"); *id.* at *21 ("The Court cannot ignore this factual reality [regarding "the cloud-streaming agreements."]); *cf. id.* at *22 ("By pre-existing contract, *Call of Duty* will remain on [Sony's] PlayStation's through the end of 2024. There will be no foreclosure of *Call of Duty* pending the ALJ's decision."); *see also* Appellees Br. 56-

61. Appellees explain why such an approach is well grounded in case law. *See id.* at 56-58.

Severe practical difficulties would arise if courts ignored such real-life contractual commitments while assessing the potential anticompetitive effects of a merger (as the FTC asks this Court to do). Here, again, the *AT&T* decision serves as benchmark. *See* 310 F. Supp. 3d at 239-41 & n.51. In that case, DOJ's expert had built a predictive model that quantified estimated anticompetitive effects *without* accounting for Turner's "long-term affiliate agreements." *Id.* at 239. DOJ's case unraveled when it became evident that "the real-world effect of Turner's present affiliate agreements [would] be rather 'significant' [for another three years]." *Id.* at 240. For instance, DOJ's expert's estimated price increase dropped "by 'about one-third'" simply by "factoring in the presence of one such affiliate agreement." *Id.* In fact, factoring in "all … affiliate agreements" resulted in "net *benefit* to consumers rather than a net harm." *Id.* In other words, DOJ was asking the court to "'overestimat[e]'" the competitive harm (and "'how quickly'" such harm would occur) by ignoring Turner's contractual commitments. *Id.*

Again, the Clayton Act requires courts to make a predictive judgment about "'the probable anticompetitive effect of the merger'" by examining "'the particular market,'" "'its structure, history, and probable future.'" *Id.* at 190. Consistent with this mandate, the district court here properly considered the real-world evidence regarding Microsoft's contractual commitments and their (procompetitive) effect on the console and subscription markets. *See Microsoft*, 2023 WL 4443412, at *13, *17, *20-21.

The FTC is also incorrect as a matter of law when it suggests (at 45-55) that courts cannot consider defendants' real-world evidence to assess the anticompetitive harm. *See, e.g.*, *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1035 (D.C. Cir. 2008) (observing that courts do not "rubber stamp an injunction whenever the FTC provides some threshold evidence" but that they must "'exercise independent judgment' about the questions [the FTC Act] commits to [them]"); *FTC v. Freeman Hosp.*, 69 F.3d 260, 265 (8th Cir. 1995) (observing that the FTC must show more than a "'fair or tenable chance of ultimate success'" to avoid "reduc[ing] the judicial function to a mere 'rubber stamp' of the FTC's decisions"); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1222 (11th Cir. 1991) ("whether an acquisition would yield significant efficiencies in the relevant market is an important consideration in predicting whether the acquisition would substantially lessen competition"). Even the FTC's and DOJ's recent draft merger guidelines continue to recognize that procompetitive efficiencies should be considered when evaluating a merger. *See* DOJ & FTC, *Merger Guidelines Draft for Public Comment* 33-34 (July 19, 2023), perma.cc/8NW4-RQF5.

## III. The government will fail to carry its burden in most vertical merger cases.

As explained above, there is a broad scholarly and judicial consensus that vertical mergers are generally procompetitive, and thus lawful. Moreover, starting with "[t]he FTC's loss in *Fruehauf*, … vertical merger litigation became more difficult" as the government has become "burdened by the requirement to demonstrate that a vertical merger would cause anticompetitive effects." Blair et al., *Analyzing Vertical Mergers*, at 810.

The recent cases in *AT&T* and *UnitedHealth* further prove this point. *See, e.g.*, Sokol, *Vertical Mergers and Entrepreneurial Exit*, 70 Fla. L. Rev. 1357, 1377-78 (2018) ("Vertical mergers should be presumed … to be competitively beneficial or neutral. In terms of the burden of proof, … the government[t] should bear the burden of demonstrating a net harm to consumers."); Carl Shapiro, *Antitrust in a Time of Populism*, 61 Int'l J. Indus. Org. 714, 740 (2018) (explaining the difficulty of proving how a vertical merger "would significantly increase concentration in a well-defined market, which is normally a key element of the government's case").

The widespread view that vertical mergers are unlikely to harm consumers or competition explains the paucity of government enforcement seeking to block vertical mergers. The D.C. Circuit's 2019 decision in *AT&T*, 916 F.3d at 1031-32, "[was] the first litigated vertical merger case [brought by the government] in 40 years." Wrobel, *Spotlight on U.S. Vertical Merger Enforcement: Burden of Proof and Revised Enforcement Guide-lines*, 33 Antitrust 3, 3 (2019); *accord* Blair et al., *Analyzing Vertical Mergers*, at 813 (noting the same). And even where a challenge is brought, "[i]n the majority of challenged mer-ger cases, courts have approved vertical mergers because their 'anticompetitive effects are outweighed by potential efficiencies or because there are no anticompetitive ef-fects.'" Ossorio, Note, *Drawing the Line: Refining the Baker Hughes Burden-Shifting Frame-work for Vertical Mergers*, 73 Fla. L. Rev. 199, 201 (2021); *see also* Ginsburg, *Hearing on Vertical Mergers*, at 8-9.

Evaluating real-world evidence regarding anticompetitive harm—which will not exist in most circumstances—and the merging parties' contractual commitment is consistent not only with economic and legal realities, but also with desirable policy outcomes. "[A]llocation of the burdens of proof assumes particular importance." *Baker Hughes*, 908 F.2d at 991. Leaving courts with "complex and elusive" economic data to make "a prediction [of a merger's] impact upon competitive conditions in the future" sets those courts up for failure, especially when courts are asked to act quickly in a preliminary-injunction posture. *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963). Such uncertainties would also make it difficult for companies to commit to investments required for vertical mergers. "An overly aggressive enforcement posture towards vertical mergers would run the risk of hindering the ongoing realignment of firm boundaries that is necessary to maintaining an efficient allocation of resources in a dynamic economy." OECD Note at 10, ¶37. "With advances in modern technology comes even greater potential for efficient integration…. It would be unfortunate if an overly aggressive tying doctrine were to impede that innovation." *It's My Party*, 811 F.3d at 689.

Moreover, merger enforcement should be more reliable and predictable than the enforcers' ability to cherry-pick *speculative* harm that may or may not happen to purported competitors—which often carry only "marginal probative value." *AT&T*, 310 F. Supp. 3d at 204. Allowing the government to use a framework based on shortcuts and possibilities, unmoored from real-world evidence, would chill vertical mergers that

are widely considered to be procompetitive. *See Phila. Nat'l Bank*, 374 U.S. at 362 ("unless business[es] can assess the legal consequences of a merger with some confidence, sound business planning is retarded").

## CONCLUSION

This Court should affirm the district court's denial of the FTC's motion for preliminary injunction.

Dated: September 13, 2023                          Respectfully Submitted,

                                                    */s/ Jeffrey M. Harris*

Tyler S. Badgley                                    Jeffrey M. Harris
Maria C. Monaghan                                   Frank H. Chang
U.S. CHAMBER LITIGATION CENTER                      CONSOVOY MCCARTHY PLLC
1615 H. Street, NW                                  1600 Wilson Boulevard, Suite 700
Washington, DC 20062                                Arlington, VA 22201
(202) 463-5337                                      (703) 243-9423
                                                    jeff@consovoymccarthy.com
                                                    frank@consovoymccarthy.com

                                                    *Counsel for Amicus Curiae*
                                                    *The Chamber of Commerce*
                                                    *  of the United States of America*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-15992

I am the attorney or self-represented party.

**This brief contains** | 6,315 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated | | .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | Jeffrey M. Harris | **Date** | 9/13/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I e-filed this brief with the Court, which will email everyone requiring notice.

Dated: September 13, 2023                    */s/ Jeffrey M. Harris*