**Case No. 23-15992**

### In the United States Court of Appeals for the Ninth Circuit

FEDERAL TRADE COMMISSION,

*Appellant,*

v.

MICROSOFT CORPORATION, ET AL.,

*Appellees.*

On Appeal from The United States District Court
For the Northern District of California
Case No. 3:23-cv-02880-JSC
The Honorable Judge Jacqueline Scott Corley

# AMICI CURIAE BRIEF OF COMMUNICATIONS WORKERS OF AMERICA AND THE AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS IN SUPPORT OF APPELLEES

ALLEN P. GRUNES
DAVID B. MESCHKE
ROSA L. BAUM
BROWNSTEIN HYATT
FARBER SCHRECK, LLP
1155 F Street NW, Suite 1200
Washington, DC 20004
(202) 296-7353
agrunes@bhfs.com
dmeschke@bhfs.com
rbaum@bhfs.com

*Counsel for the Communications Workers of America*

MATTHEW J. GINSBURG
815 Black Lives Matter Plaza, N.W.
Washington, D.C. 20006
(202) 637-5397
mginsburg@aflcio.org

*Counsel for the American Federation of Labor and Congress of Industrial Organizations*

## <u>CORPORATE DISCLOSURE STATEMENTS</u>

Communications Workers of America is an unincorporated association and a labor organization. It has no stock, and therefore no publicly held company owns 10% or more of its stock.

The American Federation of Labor and Congress of Industrial Organizations is an unincorporated association and a labor organization. It has no stock, and therefore no publicly held company owns 10% or more of its stock.

## **TABLE OF CONTENTS**

I.     STATEMENT OF IDENTIFICATION ...........................................1

II.    INTRODUCTION & SUMMARY OF ARGUMENT ...................................3

III.   ARGUMENT.........................................................................6

      A.    Antitrust agencies, under both Republican and Democratic leadership, have responded to the empirical economic literature and growing economic inequality by increasingly focusing on competitive effects in labor markets. ....................................................................6

      B.    Collective bargaining agreements with unions offer countervailing power for workers and can mitigate employer market power. ...........10

      C.    The Labor Neutrality Agreement between Microsoft and CWA is a legally enforceable agreement that offers a blueprint for labor relations in the industry. ...................................................................12

            1.   The parties' agreement is lawful and enforceable...........................12

            2.   The Labor Neutrality Agreement is a worthy blueprint for future mergers involving labor market concerns. .........................................15

IV.    CONCLUSION..........................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adcock v. Freightliner LLC*,
550 F.3d 369 (4th Cir. 2008) ................................................................13

*United States v. Bertelsmann Se & Co. Kgaa*,
No. 21-2886, 2022 WL 16949715 (D.D.C. Nov. 15, 2022) ...............9

*Dana Corp. and Int'l Union*,
356 NLRB 256 (2010) ......................................................................13

*NLRB v. Gissel Packing Co.*,
395 U.S. 575 (1969) .........................................................................12

*Hotel & Rest. Emps. Local 217 v. J.P. Morgan Hotel*,
996 F.2d 561 (2d Cir. 1993) ...........................................................13

*Hotel Emps. & Rest. Emps., Local 57 v. Sage Hosp. Res., LLC*,
390 F.3d 206 (3d Cir. 2004) ...........................................................13

*Hotel Emps., Rest. Emps. Union, Local 2 v. Marriott Corp.*,
961 F.2d 1464 (9th Cir. 1992) ........................................................13

*Int'l Union, UAW v. Dana Corp.*,
278 F.3d 548 (6th Cir. 2002) ..........................................................13

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*,
334 U.S. 219 (1948)...........................................................................6

*Montague v. NLRB*,
698 F.3d 307 (6th Cir. 2012) ..........................................................13

*NCAA v. Alston*,
141 S.Ct. 2141 (2021)..................................................................6, 10

*California v. Safeway, Inc.*,
651 F.3d 1118 (9th Cir. 2011) ..........................................................6

*Snow & Sons*,
134 NLRB 709 (1961) *enforced*, 308 F.2d 687 (9th Cir. 1962).......14

**Statutes**

29 U.S.C. § 151 ............................................................................11

29 U.S.C. § 185 ....................................................................12, 13

**Regulations**

29 C.F.R. § 103.21(a)(5) .............................................................12

Fed. R. App. P. 29(a)(2) ...............................................................2

**Other Authorities**

A. Douglas Melamed & Steven C. Salop, *An Antitrust Exemption for Workers: And Why Worker Bargaining Power Benefits Consumers, Too* 17 (Stanford Law School Working Paper No. 579, 2023) .........................15

Brad Smith, *Microsoft Adopts Principles for Employee Organizing and Engagement with Labor Organizations*, Microsoft on the Issues (June 2, 2022)...............................................................4, 16, 17

Claude Cummings Jr., *A Merger That's Good for Workers and Consumers*, TechCrunch (Aug. 14, 2023) ..................................16

*Draft Merger Guidelines*, U.S. DOJ and the FTC (2023) https://www.ftc.gov/system/files/ftc_gov/pdf/p859910draftmerger-guidelines2023.pdf........................................................................9, 10

Efraim Benmelech, Nittai K. Bergman, & Hyunseob Kim, *Strong Employers and Weak Employees How Does Employer Concentration Affect Wages?* 57 J. of Human Resources S201 (2020) ...................................................................................11

Eric Posner, *Why the FTC Should Focus on Labor Monopsony*, ProMarket (Nov. 5, 2018)............................................................8, 10

Herbert Hovenkamp, *Worker Welfare and Antitrust,* 90 Univ. of Chi. L. Rev. 511 (2023) ........................................................................6

Hiba Hafiz, *Structural Labor Rights*, 119 Mich. L. Rev. 651 (2021) ..............10, 12

Joseph Simons, Chairman, FTC, Keynote Address at American University (March 8, 2019) ............................................................8, 9

Kate Bahn & Carmen Sanchez Cumming, *Unions and the Enforcement of Labor Rights: How Organized Labor Protects U.S. Workers Against Unfair and Illegal Employment Practices*, Washington Center for Equitable Growth (Apr. 2022) ................................11

Letter from FTC Chair Lina Khan to Senator Elizabeth Warren (June 9, 2022) ...............................................................................................3

Letter from Senator Sherrod Brown to FTC Chair Lina Khan (July 13, 2023) ...................................................................................................3

Mark Stelzner and Mark Paul, *How Does Market Power Affect Wages? Monopsony and Collective Action in an Institutional Context*, Washington Center for Equitable Growth (Dec. 2018) ........................8

Pascale Déchamps, et al., *Labour Markets: A Blind Spot for Competition Authorities?*, Competition Law Journal (forthcoming) ..............................................6

Press Release, CWA, *CWA, Microsoft Announce Labor Neutrality Agreement* (June 13, 2022), ..............................................................4, 5

Press Release, CWA, *Quality Assurance Workers at Microsoft's ZeniMax Studios Establish Company's First Union with CWA, Become Largest Certified Video Game Studio in U.S.* (Jan. 3, 2023) ................................................................................................14

Samuel Dodini, Kjell G. Salvanes, and Alexander Willén, *The Dynamics of Power in Labor Markets: Monopolistic Unions Versus Monopsonistic Employers* (CESifo Working Paper No. 9495, 2021) ...........................................................................7, 11

Sean Ennis, Pedro Gonzaga, and Chris Pike, *Inequality: A Hidden Cost of Market Power* 15, Oxford Rev. of Economic Policy (Apr. 25, 2019) ...................................................................................8

Suresh Naidu, Eric Posner, & E. Glen Weyl, *Antitrust Remedies for Labor Market Power*, 132 Harv. L. Rev. 537 (2018) ......................................6, 7

## I.     STATEMENT OF IDENTIFICATION[1]

***Communications Workers of America***. The Communications Workers of America ("CWA") is the largest communications and media labor union in the United States. Its membership consists of workers in the communications and information industries, as well as the news media, the airlines, broadcast and cable television, public service, higher education, health care, manufacturing, and high tech. CWA takes an active role advocating for its members, which includes participating in litigation as a party or amicus.

Prior to the date on which the Federal Trade Commission ("FTC") issued an administrative complaint in this matter, Microsoft Corp. ("Microsoft") and CWA entered into a landmark labor neutrality agreement which, if the transaction is consummated, would allow workers at Activision Blizzard, Inc. ("Activision") to freely make a choice about union representation (the "Labor Neutrality Agreement" or the "Agreement"). Labor neutrality agreements are voluntary agreements whereby an employer agrees to recognize a union once a majority of workers authorize a union to represent them. These agreements also prohibit employers from taking any action or stating or implying, directly or indirectly, any support for or opposition to employees choosing a union.

---

[1] No party's counsel authored this brief in whole or in part, and no person or entity other than amici curiae, their counsel, or their members made a monetary contribution intended to fund the brief's preparation or submission.

The Labor Neutrality Agreement in this case represents an effective solution for any concerns about the merger's impact on the labor market. It assures that Microsoft will not impede Activision workers' efforts to unionize if they so choose and will facilitate a streamlined election process to verify workers' majority support. It also includes dispute resolution procedures should they be necessary. Because the outcome of this appeal is likely to have a direct and potentially dispositive impact on the Agreement between Microsoft and CWA, CWA has a substantial interest in the resolution of this action.

**_American Federation of Labor and Congress of Industrial Organizations_**. The American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO") is a federation of 60 national and international labor organizations, including CWA, with a total membership of over 12 million working people. The AFL-CIO's affiliate unions represent employees in virtually every sector of the economy. The AFL-CIO thus has a strong interest in ensuring that the federal government's antitrust review of corporate mergers and acquisitions takes full account of the interests of workers impacted by the relevant transactions.

In compliance with Federal Rule Appellate Procedure 29(a)(2), all parties have consented to this filing, and therefore no Motion for Leave will be submitted.

## II.  INTRODUCTION & SUMMARY OF ARGUMENT

The Chair of the FTC, Lina M. Khan, has highlighted the importance of labor market impact in the antitrust review of mergers and acquisitions, including the transaction now before the Court. In a June 9, 2022 letter to Senator Elizabeth Warren about the Microsoft-Activision transaction, Chair Khan stated: "Although antitrust law in recent decades generally has neglected monopsony concerns and harms to workers, I strongly believe that merger investigations must scrutinize the impact on labor markets." Letter from FTC Chair Lina Khan to Senator Elizabeth Warren (June 9, 2022), https://www.warren.senate.gov/imo/media/doc/Response%20Letter%20to%20FTC%20Chair%20Lina%20M.%20Khan%20to%20Sen.%20Warren%20re%20Microsoft%20Activision.pdf; *see also* Letter from Senator Sherrod Brown to FTC Chair Lina Khan (July 13, 2023), https://www.brown.senate.gov/imo/media/doc/letter_to_ftc.pdf.

Merger analysis at the federal agencies, as Chair Khan suggests, historically has focused on downstream product markets, and has analyzed price, quality, and innovation. By contrast, the impact of mergers on labor markets has been a historical "blind spot" in agency enforcement. This has been changing in recent years due to a growing body of empirical work documenting the impact of mergers on labor markets, including on wages and employment.

At about the same time that Chair Khan was acknowledging the importance of labor markets in merger review, Microsoft publicly announced four principles for employee organizing and engagement with labor organizations. The four principles are: (1) "belie[f] in the importance of listening to [Microsoft] employees' concerns"; (2) "recogni[tion] that employees have a legal right to choose whether to form or join a union"; (3) "commit[ment] to creative and collaborative approaches with unions when employees wish to exercise their rights and Microsoft is presented with a specific unionization proposal"; and (4) "dedicat[ion] to maintaining a close relationship and shared partnership with all employees, including those represented by a union." Brad Smith, *Microsoft Adopts Principles for Employee Organizing and Engagement with Labor Organizations*, Microsoft on the Issues (June 2, 2022), https://blogs.microsoft.com/on-the-issues/2022/06/02/employee-organizing-engagement-labor-economy/ (hereafter "Microsoft's Labor Principles" or "Labor Principles"). A few weeks later, Microsoft acted on these principles by entering into the Labor Neutrality Agreement with CWA. It then voluntarily applied its Labor Principles (including the processes in the Labor Neutrality Agreement) to its own employees at one of its video game studios.

The Labor Neutrality Agreement represents a groundbreaking and speedy path for Activision employees to choose whether to form a union without fear of intimidation or retaliation. The agreement rests on five basic provisions. Press

Release, CWA, *CWA, Microsoft Announce Labor Neutrality Agreement* (June 13, 2022), https://cwa-union.org/news/releases/cwa-microsoft-announce-labor-neutrality-agreement.[2] First, Microsoft has committed to noninterference when employees covered by the Agreement express interest in a union vote. Second, Microsoft has assured that covered Activision employees will have open communication channels both with other Microsoft employees and with union representatives. Third, voting employees would be able to use innovative technology-supported and streamlined processes for voting on union membership. Fourth, worker confidentiality and privacy will be maintained. And fifth, Microsoft and CWA pledged to work together to promptly resolve any disputes and turn to an expedited arbitration process if necessary. *Id.*

CWA's and the AFL-CIO's amicus brief makes three main points. First, the antitrust agencies, under both Republican and Democratic leadership, have responded to the empirical economic literature and growing economic inequality by increasingly focusing on competitive effects in labor markets. Second, unions, through collective bargaining agreements, offer countervailing power for workers and therefore can address problems of employer market power. Third, if the proposed merger closes, the Labor Neutrality Agreement between Microsoft and CWA will become legally enforceable, will benefit both the workers and the employer, and

---

[2] The exact terms of the Labor Neutrality Agreement remain confidential.

will offer a blueprint for labor relations in the industry. Microsoft has taken a positive, proactive approach to labor market issues here, and has done so in a meaningful, effective way.

## III.   ARGUMENT

**A.    Antitrust agencies, under both Republican and Democratic leadership, have responded to the empirical economic literature and growing economic inequality by increasingly focusing on competitive effects in labor markets.**

The impact of mergers on labor markets has been a historical "blind spot" in agency enforcement practice.[3] This blind spot developed notwithstanding the fact that antitrust laws reach conduct aimed at not only consumers but also suppliers (including workers, who supply labor). *See, e.g.*, *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235–36 (1948); *NCAA v. Alston*, 141 S.Ct. 2141 (2021); *California v. Safeway, Inc.*, 651 F.3d 1118, 1132 (9th Cir. 2011); Suresh Naidu, Eric Posner, & E. Glen Weyl, *Antitrust Remedies for Labor Market Power*, 132 Harv. L. Rev. 537, 539–540 (2018) ("Although product market concentration and labor market concentration are both covered by antitrust law, product market concentration has historically received a significant amount of attention from

---

[3] Herbert Hovenkamp, *Worker Welfare and Antitrust*, 90 Univ. of Chi. L. Rev. 511, 529 (2023); *see also* Pascale Déchamps, et al., *Labour Markets: A Blind Spot for Competition Authorities?*, Competition Law Journal (forthcoming), https://www.researchgate.net/publication/338910244_Labour_markets_a_blind_spot_for_competition_authorities.

researchers and government officials, while labor market concentration has received hardly any attention at all.").

Scholars have suggested various reasons for the past failure of antitrust to focus on labor markets:

> First, while *economic* theory treats product markets and labor markets similarly, *legal* theory has placed more emphasis on product markets. . . . Second, postwar economists assumed labor markets are reasonably competitive, and thus that labor market power was not an important social problem. . . . Third, the traditional legal approach to protecting workers, which took place "outside" antitrust law, may have seemed sufficient. . . . Fourth, antitrust litigation against employers is more difficult than antitrust litigation based on product market concentration, perhaps giving the illusion that the latter problem is more significant than the former.

Naidu, et. al., *Antitrust Remedies for Labor Market Power*, 132 Harv. L. Rev. at 541–43 (emphasis in original).

The tendency to overlook labor market competition has been changing in recent years largely due to a growing body of empirical literature that has studied the impact of mergers on labor markets, including wages and employment.[4] As Professor Eric Posner has written: "Recent studies have shown that many labor markets are concentrated, and that wages, as one would predict, are lower in concentrated labor markets than in competitive labor markets. Moreover, concentration is far

---

[4] *See, e.g.*, Samuel Dodini, Kjell G. Salvanes, and Alexander Willén, *The Dynamics of Power in Labor Markets: Monopolistic Unions Versus Monopsonistic Employers* (CESifo Working Paper No. 9495, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3998033.

more serious in labor markets than in product markets; wage suppression is much more significant than price inflation." Eric Posner, *Why the FTC Should Focus on Labor Monopsony*, ProMarket (Nov. 5, 2018), https://www.promarket.org/2018/11/05/ftc-should-focus-labor-monopsony/. Economic research has also suggested that market power may be a meaningful contributor to wealth inequality. *See* Sean Ennis, Pedro Gonzaga, and Chris Pike, *Inequality: A Hidden Cost of Market Power* 15, Oxford Rev. of Economic Policy (Apr. 25, 2019), https://ssrn.com/abstract=2942791. This transfer of wealth to the top ten percent of individuals harms those in the zero to 80th percentile, and particularly appears to negatively impact those in the middle class. *Id.*; *see also* Mark Stelzner and Mark Paul, *How Does Market Power Affect Wages? Monopsony and Collective Action in an Institutional Context*, Washington Center for Equitable Growth (Dec. 2018) (concluding that "to achieve more socially efficient outcomes and for pay to be commensurate with productivity, we must increase institutional support for workers' collective activity.").

The antitrust agencies, under both Republican and Democratic leadership, have begun to focus on competition in labor markets as a part of their merger review. The former Republican Chair of the FTC, Joseph Simons, noted that "both agencies are now devoting more attention to competition in labor markets and how certain conduct, including mergers, may impact competition in those markets." Joseph

Simons, Chairman, FTC, Keynote Address at American University (March 8, 2019), https://www.ftc.gov/system/files/documents/public_statements/1515179/simons_-_jon_baker_speech_3-8-19.pdf. In 2021, the Department of Justice ("DOJ") successfully sued to block Penguin Random House's proposed acquisition of Simon & Schuster. The complaint alleged, among other things, that the acquisition would likely depress author pay.[5] Most recently, the agencies released a draft update to their merger guidelines that, for the first time, expressly discusses labor markets. *See Draft Merger Guidelines*, U.S. DOJ and the FTC (2023) https://www.ftc.gov/system/files/ftc_gov/pdf/p859910draftmergerguidelines2023.pdf. After noting that "[a] merger between competing buyers may harm sellers just as a merger between competing sellers may harm buyers," the draft guidelines continue:

> Labor markets are important buyer markets. The same general concerns as in other markets apply to labor markets where employers are the buyers of labor and workers are the sellers. The Agencies will consider whether workers face a risk that the merger may substantially lessen competition for their labor. Where a merger between employers may substantially lessen competition for workers, that reduction in labor market competition may lower wages or slow wage growth, worsen benefits or working conditions, or result in other degradations of workplace quality. When assessing the degree to which the merging firms compete for labor, any one or more of these effects may demonstrate that substantial competition exists between the merging firms.

---

[5] Complaint at 17–21, *United States v. Bertelsmann Se & Co. Kgaa*, No. 21-2886, 2022 WL 16949715 (D.D.C. Nov. 15, 2022) ("By eliminating the head-to-head competition between Penguin Random House and Simon & Schuster, the proposed merger would likely result in authors earning less for their books.").

*Id.* at 26 (citing *Alston*, 141 S.Ct. at 2158–60).

Despite the recent attention to labor markets in merger review, litigated mergers asserting labor market harm remain rare, notwithstanding the empirical evidence and agency statements. Application of merger remedies to labor markets is rarer still. Yet,

> economic theory tells us . . . that firms are more likely to exploit labor market power than product market power in the United States today because the expected sanctions are so much lower in the first case than in the second. And it tells us that the government should enforce antitrust laws in product markets *and* labor markets.

Posner, *Why the FTC Should Focus on Labor Monopsony* (emphasis in original). The Labor Neutrality Agreement in this matter offers a blueprint to the FTC and DOJ in future merger cases.

### B. Collective bargaining agreements with unions offer countervailing power for workers and can mitigate employer market power.

Evaluating workers' relative bargaining power and leverage against employers is not only consistent with antitrust law's efficiency goals in ensuring labor market competition, but is also consistent with the National Labor Relations Act's ("NLRA") federal labor policy of ensuring equal bargaining power between workers and employers. *See* 29 U.S.C. § 151 (promoting collective bargaining practices to eliminate and mitigate the inequality of bargaining power between employers and employees); *see also* Hiba Hafiz, *Structural Labor Rights*, 119 Mich. L. Rev. 651, 664–73 (2021) (discussing the origins of NLRA's goal of equal bargaining power).

Economic analysis suggests that collective bargaining through unionization offers an important countervailing power for workers to employer market power. *See* Kate Bahn & Carmen Sanchez Cumming, *Unions and the Enforcement of Labor Rights: How Organized Labor Protects U.S. Workers Against Unfair and Illegal Employment Practices*, Washington Center for Equitable Growth (Apr. 2022); *see also* Samuel Dodini, Kjell G. Salvanes, and Alexander Willén, *The Dynamics of Power in Labor Markets: Monopolistic Unions Versus Monopsonistic Employers* (CESifo Working Paper No. 9495, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3998033.

Collective bargaining acts as a countervailing power by structurally changing the labor market, enabling workers to achieve needed improvements to their wages and working conditions. "[U]nionization strengthens labor's bargaining position and may enable employees to diminish employers' monopsony power." Efraim Benmelech, Nittai K. Bergman, & Hyunseob Kim, *Strong Employers and Weak Employees How Does Employer Concentration Affect Wages?*, 57 J. of Human Resources S201, S232 (2020). Through a democratic process, union collective bargaining provides workers a means to negotiate legally binding agreements covering wages; working conditions; guardrails for layoffs; and processes for workplace governance, such as grievance procedures or workplace health and safety councils. Additionally, because they are better protected, unionized workers are better poised to combat

11

anticompetitive and exploitative processes through striking, contesting wrongful firings or discipline, opposing vertical restraints such as noncompetes or mandatory arbitration, and negotiating better working conditions. Indeed, research shows that higher union density mitigates the negative effects monopsony has on wages. "Modern labor-market regulation emerged from a congressional recognition that, to enable workers to lift their wages and secure a more equal share of their contributions to economic growth, it would need to restrain firms' ability to consolidate economic power under the antitrust laws while exempting and protecting workers' collective coordination under the [NLRA]." Hafiz, 119 Mich. L. Rev. at 664.

### C.    The Labor Neutrality Agreement between Microsoft and CWA is a legally enforceable agreement that offers a blueprint for labor relations in the industry.

#### 1.    *The parties' agreement is lawful and enforceable.*

The Labor Neutrality Agreement is undisputedly lawful. *See, e.g.*, *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 595–600 (1969); 29 C.F.R. § 103.21(a)(5) (voluntary recognition procedures and notice, which states "[a]n employer may lawfully recognize a union based on evidence (such as signed authorization cards) indicating that a majority of employees in an appropriate bargaining unit desire its representation, without an election supervised by the National Labor Relations Board."). Courts routinely enforce these contracts, which are often referred to as card-check neutrality agreements, under section 301 of the Labor Management Relations Act.

*See* 29 U.S.C. § 185; *see also Dana Corp. and Int'l Union*, 356 NLRB 256, 266 (2010), aff'd sub nom. *Montague v. NLRB*, 698 F.3d 307 (6th Cir. 2012); *Hotel Emps., Rest. Emps. Union, Local 2 v. Marriott Corp.*, 961 F.2d 1464, 1470 (9th Cir. 1992); *Adcock v. Freightliner LLC*, 550 F.3d 369, 374–76 (4th Cir. 2008); *Hotel Emps. & Rest. Emps., Local 57 v. Sage Hosp. Res., LLC*, 390 F.3d 206, 219 (3d Cir. 2004); *Int'l Union, UAW v. Dana Corp.*, 278 F.3d 548, 558–59 (6th Cir. 2002); *Hotel & Rest. Emps. Local 217 v. J.P. Morgan Hotel*, 996 F.2d 561, 566–67 (2d Cir. 1993). And "the [National Labor Relations Board] and courts have also considered and enforced agreements between employers and unrecognized unions." *Dana Corp.*, 356 NLRB at 260 ("[A]n employer may agree that it will voluntarily recognize a union in the future if the union demonstrates majority support by means other than an election, including signed authorization cards."); *see also Snow & Sons*, 134 NLRB 709, 710 (1961) *enforced*, 308 F.2d 687 (9th Cir. 1962) (employer bound by agreement to honor results of card check). Consistent with national labor policy requiring the National Labor Relations Board ("NLRB") to respect labor-management bargains, the NLRB will give full effect to the parties' contractual commitments so long as there is a valid process to determine the union's majority status that protects employees' right to self-determination.

The Labor Neutrality Agreement has all the characteristics of a strong, enforceable agreement. It provides for: (1) an explicit employer commitment to remain

neutral during the union's organizing drive; (2) a method of determining whether the union has majority status, such as through a card check or a non-NLRB election; (3) provision of avenues for union organizers to communicate with employees, such as by providing employee contact information similar to what the union would receive under the NLRB election process; and (4) a dispute-resolution process to address issues of interpretation and compliance with the agreement.

Furthermore, the Labor Neutrality Agreement will be workable because it has already been tested. In 2021, Microsoft purchased ZeniMax Studios ("ZeniMax"), a video game production company with offices in Maryland and Texas. Prior to the purchase, ZeniMax employees had attempted to negotiate with management and human resources, but their efforts were unsuccessful. Following Microsoft's acquisition and its announcement of its Labor Principles, Microsoft remained neutral during ZeniMax employees' efforts to unionize. Further, although the specific terms of the Labor Neutrality Agreement only apply to Activision employees after Microsoft closes the transaction, Microsoft voluntarily applied the procedures in the Agreement to employees at ZeniMax. With supermajority support, ZeniMax employees joined ZeniMax Workers United/CWA. *See* Press Release, CWA, *Quality Assurance Workers at Microsoft's ZeniMax Studios Establish Company's First Union with CWA, Become Largest Certified Video Game Studio in U.S.* (Jan. 3, 2023), https://cwa-union.org/news/releases/quality-assurance-workers-microsofts-

zenimax-studios-establish-companys-first-union. The new union is now the largest union of its type in the U.S. video game industry, with over 300 members.

**2.    *The Labor Neutrality Agreement is a worthy blueprint for future mergers involving labor market concerns.***

Enforceable agreements under which an employer commits to labor neutrality offer a blueprint for future merger cases. Microsoft's binding commitments will give employees a seat at the table and ensure that the acquisition of Activision benefits the company's workers and the broader video game labor market. Additionally, consumers and the public as a whole stand to benefit when companies voluntarily seek to ameliorate competitive concerns through agreements such as the Labor Neutrality Agreement. Higher employment—as a potential result of unionization following the Agreement—begets increased output, measured by quantity or quality of product or lower market prices. *See, e.g.*, A. Douglas Melamed & Steven C. Salop, *An Antitrust Exemption for Workers: And Why Worker Bargaining Power Benefits Consumers, Too* 17 (Stanford Law School Working Paper No. 579, 2023), http://ssrn.com/abstract=4336770. Absent such agreements, monopsony tends to distort the market by lowering wages and employment, and thus reducing output. The fact that workers' concerns entered the merger conversation is in no small part thanks to the new antitrust emphasis on labor markets championed by, among others, the FTC.

Microsoft stands alone among major U.S. video game and technology companies. At this year's Game Developers Conference, a group of video game workers

15

delivered a letter to Sony's management asking the company to agree to allow its workers to organize free from retaliation and interference. Sony chose not to respond. *See* Claude Cummings Jr., *A Merger That's Good for Workers and Consumers*, TechCrunch (Aug. 14, 2023), https://techcrunch.com/2023/08/14/a-merger-thats-good-for-workers-and-consumers/. In stark contrast, as Microsoft has publicly recognized, its "continued leadership and success will require that [it] continue to learn and adapt to a changing environment for labor relations in the years ahead." *Microsoft's Labor Principles*. The Labor Neutrality Agreement will become a beacon in labor relations once the Microsoft-Activision merger is finalized.

## IV. CONCLUSION

Labor neutrality agreements are not only acceptable remedies in the merger context, but should be viewed as preferred remedies in transactions in which there are labor market concerns. The Labor Neutrality Agreement in this case represents an important precedent at the intersection of antitrust and labor. For these reasons, CWA and the AFL-CIO support the Appellees and respectfully request that this Court affirm the decision below.

16

Respectfully submitted this 13th day of September, 2023.


BROWNSTEIN HYATT FARBER SCHRECK, LLP

By: *s/ Allen P. Grunes*
Allen P. Grunes
1155 F Street NW, Suite 1200
Washington, DC 20004
(202) 296-7353
agrunes@bhfs.com

David B. Meschke
Rosa L. Baum
675 15th Street, Suite 2900
Denver, CO 80202
(303) 223-1100
dmeschke@bhfs.com
rbaum@bhfs.com

*Counsel for the Communications Workers of America*


*s/ Matthew J. Ginsburg*
Matthew J. Ginsburg
815 Black Lives Matter Plaza, N.W.
Washington, D.C. 20006
(202) 637-5397
mginsburg@aflcio.org

*Counsel for the American Federation of Labor and Congress of Industrial Organizations*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-15992

I am the attorney or self-represented party.

**This brief contains** | 3,527 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [                ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Allen P. Grunes | **Date** | September 13, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*