23-15992

IN THE

# United States Court of Appeals

## FOR THE NINTH CIRCUIT

◆◆

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellant,*

—v.—

MICROSOFT CORPORATION; ACTIVISION BLIZZARD, INC.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

**BRIEF OF VENTURE CAPITAL FIRMS AS *AMICI CURIAE*
IN SUPPORT OF APPELLEES MICROSOFT CORP.
AND ACTIVISION BLIZZARD, INC.**

EDWARD D. HASSI
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
  Suite 500
Washington, DC 20004
(202) 383-8095

J. ROBERT ABRAHAM
JAIME M. FREILICH-FRIED
ISABEL FELDMAN
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

In compliance with Federal Rule of Appellate Procedure 26.1 and Ninth Circuit Rule 29(a)(4)(A), *amici curiae* are privately owned venture capital funds that do not have parent corporations. No publicly held corporation owns 10 percent or more of any stake or stock in any of *amici*.


/s/ Edward D. Hassi

Edward D. Hassi

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

IDENTITY AND INTEREST OF *AMICI CURIAE* ............................................. viii

SUMMARY OF THE ARGUMENT ..................................................................1

ARGUMENT ..................................................................................................4

I.   The Partnership between Venture Capital and Entrepreneurs is
     Essential to Innovation, Competition, and Economic Growth.......................4

     A.   Entrepreneurs and Startup Businesses Drive Innovation. .......................5

     B.   Venture Capital Fuels the Innovative Efforts of Entrepreneurs
          and Startup Businesses...................................................................6

     C.   Exit Through Acquisition Is Essential to Maintain the Innovation
          Ecosystem. ...................................................................................8

II.  The FTC's Arguments on Appeal Seek to Alter the Legal Standards
     Applicable to Merger Challenges and Would Have a Chilling Effect
     on Innovation and Entrepreneurship. ...........................................11

     A.   The Legal Standards Urged by the FTC on Appeal Would Enable
          the FTC to Easily Win a Preliminary Injunction and Subject Most
          if Not All Challenged Transactions to Lengthy Administrative
          Review. ...................................................................................14

     B.   The FTC's Positions on Appeal Would Limit Exit Options,
          Damage the Innovation Ecosystem, and Harm Competition. ...............20

CONCLUSION ...........................................................................................24

APPENDIX ................................................................................................25

CERTIFICATE OF COMPLIANCE................................................................26

CERTIFICATE OF SERVICE .......................................................................27

## TABLE OF AUTHORITIES

**CASES**

*F.T.C. v. Atlantic Richfield Co.*,
   549 F.2d 289 (4th Cir. 1977) ...............................................................12

*F.T.C. v. Exxon Corp.*,
   636 F.2d 1336 (D.C. Cir. 1980) ...........................................................15

*F.T.C. v. Libbey Inc.*,
   211 F. Supp. 2d 34 (D.D.C. 2002) ......................................................12

*F.T.C. v. Meta Platforms Inc.*,
   No. 5:22-cv-04325-EJD, 2022 WL 16637996 (N.D. Ca. Nov. 2, 2022) ...........12

*F.T.C. v. Meta Platforms, Inc.*,
   No. 5:22-cv-04325-EJD, 2023 WL 2346238 (N.D. Cal. Feb. 3, 2023) .............15

*F.T.C. v. Microsoft Corp. et al.*,
   No. 23-cv-02880-JSC, 2023 WL 4443412 (N.D. Cal. July 10, 2023) ..............13

*F.T.C. v. RAG-Stiftung*,
   436 F. Supp. 3d 278 (D.D.C. 2020) .....................................................15

*F.T.C. v. Simeon Management Corp.*,
   532 F.2d 708 (9th Cir. 1976) ...............................................................12

*F.T.C. v. Thomas Jefferson University*,
   505 F. Supp. 3d 522 (E.D. Pa. 2020) ...................................................15

*In the Matter of Illumina, Inc.*,
   Federal Trade Commission, No. 201 0144, Dkt. 9401 ................................15, 17

*In the Matter of Intercontinental Exchange Inc.*,
   Federal Trade Commission, No. 221 0142, Dkt. 9413 ......................................18

*In the Matter of Tronox Limited*,
   Federal Trade Commission, No. 171 0085, Dkt. 9377 ......................................15

*Mo. Portland Cement Co. v. Cargill, Inc.*,
   498 F.2d 851 (2d Cir. 1974) ...............................................................15

iv

STATUTES

15 U.S.C. § 18 ................................................................................11

15 U.S.C. § 53(b)(2) .......................................................................11

OTHER AUTHORITIES

Ana Paula Faria & Natália Barbosa, *Does Venture Capital Really Foster Innovation?* (NIPE, Working Paper 2013), http://www3.eeg.uminho.pt/economia/nipe/docs/2013/NIPE_WP_03_2013.pdf ...........................................................................................8

Arti Raman, *Look Past Today's Metrics to Celebrate the Growth of Female Founders*, FORBES (Dec. 13, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/12/13/look-past-todays-metrics-to-celebrate-the-growth-of-female-founders/?sh=187d984773f3 ...............................................................22

Bob Zider, *How Venture Capital Works*, HARVARD BUS. REV., Nov.–Dec. 1998, https://hbr.org/1998/11/how-venture-capital-works .........................*passim*

D. Daniel Sokol, *Vertical Mergers and Entrepreneurial Exit*, 70 FLA. L. REV. 1357 (2018) ..................................................................9, 10, 20

Devin Reilly et al., *The Importance of Exit via Acquisition to Venture Capital, Entrepreneurship, and Innovation*, 32 MINN. J. INT'L L. 159 (2022), https://ssrn.com/abstract=3981970 ..................................*passim*

Diane Bartz, *Big Tech's Little Mergers Draw More U.S. Antitrust Scrutiny*, REUTERS (Sept. 15, 2021) .................................................................18

F.T.C., Prepared Remarks on Disparate Impact: Winners and Losers From the New M&A Policy (Apr. 27, 2022), https://www.ftc.gov/news-events/news/speeches/disparate-impact-winners-losers-new-ma-policy ..........17

F.T.C., Prepared Statement: S. 2102, The Standard Merger and Acquisition Reviews Through Equal Rules Act of 2015 (Oct. 7, 2015), https://www.ftc.gov/system/files/documents/public_statements/810871/151007smarteracttestimony.pdf ...........................................................15

Gary Dushnitsky & D. Daniel Sokol, *Mergers, Antitrust, and the Interplay of Entrepreneurial Activity and the Investments that Fund It*, 24 VAND. J. ENT. & TECH. L. 255 (2022) ................................................................. 9

Jessica Matthews, *The War on Deals: Why the Biden Administration is Battling Big Business—and Putting All Sorts of Deals under the Microscope*, FORTUNE (July 19, 2023), https://protect-us.mimecast.com/s/Mm9ICgJ9RvUYWAB6CNxXO8?domain=fortune.com/ .................................................................................................... 17

Jian Jia et al., *The Short-Run Effects of GDPR on Technology Venture Investment*, (May 22, 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3278912 ........................ 19

Josh Sisco & Mark Scott, *Global Regulators Bear Down on Big Tech Deals*, POLITICO (May 10, 2023) .................................................................... 18

Lisa Schenker, *Northshore, Advocate Drop Merger Plan After Judge's Ruling*, CHI. TRIB. (Mar. 7, 2017), https://www.chicagotribune.com/business/ct-advocate-northshore-merger-decision-0308-biz-20170307-story.html .................................................. 15

Mark Flickinger, *Venture Capital Fundamentals: Why VC Is A Driving Force of Innovation*, FORBES (Mar. 29, 2023), https://www.forbes.com/sites/markflickinger/2023/03/29/venture-capital-fundamentals-why-vc-is-a-driving-force-of-innovation/?sh=2e52cbb84128 ...................................................... 7, 8

Matthew Perlman, *5th Circ. Presses Illumina on Cancer Test Competition*, LAW360 (Sept. 12, 2023), https://www.law360.com/texas/articles/1720623/5th-circ-presses-illumina-on-cancer-test-competition ....................................................... 17

Michel Ferrary & Mark Granovetter, *The Role of Venture Capital Firms in Silicon Valley's Complex Innovation Network*, 38 ECON. & SOC'Y 326 (2009) ......................................................................................... 6, 7

Nawab Khan et al., *Does Venture Capital Investment Spur Innovation? A Cross-Countries Analysis*, SAGE OPEN, Jan.–Mar. 2021, https://doi.org/10.1177/21582440211003087. ...................................................... 4

Rules of Practice, 88 Fed. Reg. 42,872 (July 5, 2023),
https://www.federalregister.gov/documents/2023/07/05/2023-
12630/rules-of-practice. ..................................................................16

Samuel Kortum & Josh Lerner, *Assessing the Contribution of Venture
Capital on Innovation*, 31 RAND J. ECON. 674 (2000) ........................8

Shae Bernstein et al., *The Impact of Venture Capital Monitoring*, 71 J. FIN.
1591 (2016), http://www.columbia.edu/~xg2285/VC.pdf. .................8

SILICON VALLEY BANK, 2020 GLOBAL STARTUP OUTLOOK,
https://www.svb.com/globalassets/library/uploadedfiles/content/trends_a
nd_insights/reports/startup_outlook_report/suo_global_report_2020-
final.pdf. ..............................................................................................21

Talal Rafi, *Effects of Innovation on Fiscal Policies and Economic Growth*,
IMF PFM BLOG (Nov. 28, 2022), https://blog-
pfm.imf.org/en/pfmblog/2022/11/effects-of-innovation-on-fiscal-
policies-and-economic-growth ...........................................................4

U.S. DEP'T OF JUSTICE AND F.T.C., MERGER GUIDELINES, DRAFT – FOR
PUBLIC COMMENT (July 19, 2023) ......................................................18

VASANTH GANESAN ET. AL, UNDERESTIMATED START-UP FOUNDERS: THE
UNTAPPED OPPORTUNITY, MCKINSEY (June 23, 2023),
https://www.mckinsey.com/featured-insights/diversity-and-
inclusion/underestimated-start-up-founders-the-untapped-opportunity............22

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are venture capital firms that play an integral part in the ecosystem that supports entrepreneurship and innovation. *Amici* partner with entrepreneurs by investing in startup businesses in their earliest stages, providing seed capital to support innovation and the formation and development of new businesses, products, and services. Exit – most often through acquisition – is critical to the venture capital model, by providing a return on investment to both venture capital firms and to the entrepreneurs they support and by incentivizing the risk-taking necessary to foster innovation. As such, *amici* have an interest in ensuring that exit options for venture capital firms and founders are not unduly limited by regulatory burdens that will impede or stifle the ecosystem that fosters innovation and growth. *Amici* write to share their perspective on the issues raised in this appeal, including the negative impacts on the innovation ecosystem that would follow if the legal standards urged by the Federal Trade Commission ("FTC" or "Commission") were adopted. *Amici* are identified in the Appendix hereto.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(D), counsel for *amici curiae* certifies that all parties have consented to the filing of this brief. Pursuant to Fed. R. App. P. 29(a)(4)(e), counsel for *amici curiae* states that no counsel for a party authored this brief in whole or in part, and no person other than *amici curiae*, their members, or their counsel has or is expected to contribute money intended to fund the preparation or submission of this brief.

## SUMMARY OF THE ARGUMENT

Together with the entrepreneurial founders they fund and support, venture capital firms play an essential role in the innovation ecosystem that has been a core driver of technological development, economic dynamism and growth, and competition broadly. This innovation ecosystem is particularly important to the technology industry rooted in Silicon Valley, and ultimately benefits consumers through the introduction of new and better services, increased efficiency, and reduced costs as a result of startup businesses disrupting established markets or creating new products and markets entirely. Without this innovation ecosphere, entrepreneurs and the promising startups they found would lack the incentives, financial resources, and practical support needed to form, develop, and scale their businesses successfully.

The viability of the innovation ecosystem in which *amici* participate depends in large part on the ability of venture capital funds and entrepreneurs to obtain a return on their investments, most often through acquisition. The potential for a compensated exit is critical to incentivizing risk-taking and investment. If exit through acquisition were not a realistic possibility, venture capital firms (and their investors) would have less incentive to invest their time and money in entrepreneurs with a great idea that may take years to build into a viable business (if at all). Similarly, if potential exit opportunities are limited, individual

1

entrepreneurs will have less incentive to invest intensive efforts and take on significant personal risk to develop new technologies and products.

In recent years, the Commission has expressed open hostility to mergers and acquisitions occurring in the technology industry. The positions taken by the FTC in this appeal – including that a preliminary injunction should be granted upon the mere presentation of *some* evidence that a transaction may lessen competition and that only the FTC, and not Article III courts, may properly consider the effect of proposed solutions to competitive concerns – are part and parcel of the Commission's stated objective of reducing mergers and acquisitions generally, and in the technology industry in particular. The Commission's positions are not only inconsistent with long-standing legal precedent, but also pose a direct threat to the innovation ecosystem in which *amici* participate.

Indeed, if this Court were to endorse the Commission's positions, the practical result would be that any proposed transaction that *could* impact competition would be subject to preliminary injunction and months – if not years – of regulatory proceedings in the FTC's administrative court and related appeals. This new regime would have a substantial chilling effect on mergers and acquisitions and delay, if not eliminate, the possibility of a compensated exit critical to the innovation ecosystem.

These negative effects would be felt widely. Venture capital firms would be less inclined to invest in startup businesses and would either decline to fund entrepreneurs or seek terms less generous to founders. Entrepreneurs would be less inclined to take a risk on a potentially game-changing idea and start a new business from scratch. These impacts would be felt acutely by the current (and future) generation of entrepreneurs who are more diverse than those who came before them and more broadly reflective of the entire American mosaic. This new generation would be denied the opportunity to participate in the same innovation ecosystem as entrepreneurs who came before them. And consumers, competition, and the broader U.S. economy will suffer as a result of less innovation and investment.

Accordingly, *amici* urge the Court to affirm the decision of the District Court and reject the FTC's efforts to fundamentally lower the bar by altering the legal standards federal courts apply in merger challenges. Doing so would be destructive to the innovation ecosystem that plays such a critical role in the U.S. economy and ultimately harm – not protect – competition.

**ARGUMENT**

I.  **The Partnership between Venture Capital and Entrepreneurs is Essential to Innovation, Competition, and Economic Growth.**

Venture capital funding has played a critical role in the development of technological innovations that have fueled U.S. economic growth over the past century.  In particular, venture capital-backed entrepreneurs and startups brought to market mainframe computing in the 1960s; personal computing in the 1970s; biotechnology in the 1980s; internet and e-commerce in the 1990s; "smart" mobile communications technologies and cloud computing in the 2000s; and mobile apps, fintech, and "sharing economy" platforms in the 2010s.[2]  These technological innovations are associated with positive macroeconomic impacts, including increased productivity and competitiveness at every level of the economy (by firm, sector, and as a whole).[3]  Indeed, it is well recognized that "[i]nnovation is the main driver of sustained economic growth and product competitiveness."[4]  The broader economic and societal benefits generated by innovation depend upon the

---

[2]   Devin Reilly et al., *The Importance of Exit via Acquisition to Venture Capital, Entrepreneurship, and Innovation*, 32 MINN. J. INT'L L. 159, 164 (2022), https://ssrn.com/abstract=3981970.

[3]   Talal Rafi, *Effects of Innovation on Fiscal Policies and Economic Growth*, IMF PFM BLOG (Nov. 28, 2022), https://blog-pfm.imf.org/en/pfmblog/2022/11/effects-of-innovation-on-fiscal-policies-and-economic-growth.

[4]   Nawab Khan et al., *Does Venture Capital Investment Spur Innovation? A Cross-Countries Analysis*, SAGE OPEN, Jan.–Mar. 2021, at 1 https://doi.org/10.1177/21582440211003087.

health and vitality of a fragile ecosystem that includes venture capital funds and the visionary entrepreneurs they support.

    A.    <u>Entrepreneurs and Startup Businesses Drive Innovation.</u>

Entrepreneurs and the startup businesses they found are essential vehicles for innovation, technological development, and economic growth. In developing and bringing to market new ideas, technologies, and products, they take risks that established firms are often reluctant, unwilling, or unable to undertake for a variety of reasons. For example, larger, more established businesses are subject to increased scrutiny compared to startups; they face pressure from their varied stakeholders to generate reliable and near-term returns on invested capital, and a decision to invest in or bring an innovative but unproven idea to life is often disfavored if not impossible.[5] In addition, established market players may have less business incentive to invest in innovation as opposed to maintaining or building upon their current position. Rather than undertake a risky bet on an innovative but unproven idea, established firms often leave the essential work of innovation to visionary entrepreneurs and preserve their resources to incorporate new innovations once they have demonstrated viability and a high likelihood of success.[6] At that point, established firms often use their resources to acquire,

---

[5]    Reilly et al., *supra* note 2, at 166–67.

[6]    *Id.*

develop, and scale those innovations and distribute their benefits more broadly, acting as an accelerant to adoption of the most promising innovations developed in the startup context.

The innovation cycle driven by entrepreneurs ultimately benefits consumers and the economy as a whole and is a key driver of economic growth. It fosters the development of new products and processes that expand consumer choice and reduce costs and enables the entry of new market participants who increase competition and create a more dynamic and diverse economy.[7]

B. Venture Capital Fuels the Innovative Efforts of Entrepreneurs and Startup Businesses.

Venture capital plays a unique and indispensable role in the innovation ecosystem given the structure and limitations of traditional capital markets. Entrepreneurs and the startups they found face significant obstacles when attempting to access traditional financing options. For example, because startup businesses are risky, banks and other traditional lenders often refuse to lend to them or may provide financing only to the extent the startup has hard assets against which they may secure debt (which most startups lack).[8] As a result, in many

---

[7]  *Id.* at 170.

[8]  Bob Zider, *How Venture Capital Works*, HARVARD BUS. REV., Nov.–Dec. 1998, https://hbr.org/1998/11/how-venture-capital-works; Michel Ferrary & Mark Granovetter, *The Role of Venture Capital Firms in Silicon Valley's Complex Innovation Network*, 38 ECON. & SOC'Y 326, 341–44 (2009).

cases, an entrepreneur may be unable to obtain traditional financing at all or the terms of such financing may be so onerous as to make financing unfeasible. Because startups are typically shut out from traditional capital sources, entrepreneurs depend on venture capital funding to transform their innovative ideas into business reality.[9]

Venture capital firms not only supply essential funding to startup businesses, but also support entrepreneurs by providing extensive business acumen. This may take many forms but often includes advice and support as to business strategy, corporate governance, financial management, and other areas where entrepreneurs may have less practical experience or expertise. Venture capital firms often provide startups with teams of performance advisors to help bridge gaps, establish fit within a market, hire key employees, build and prioritize key performance indicators ("KPIs"), and measure business performance and progress.[10] This expertise and breadth of business experience helps new founders avoid pitfalls that may jeopardize the startup's viability and the innovations it may bring to market.[11] Empirical research in both the U.S. and abroad confirms that venture capital

---

[9]  Zider, *supra* note 8;  Ferrary & Granovetter, *supra* note 8, at 341–44.

[10]  Mark Flickinger, *Venture Capital Fundamentals: Why VC Is A Driving Force of Innovation*, FORBES (Mar. 29, 2023), https://www.forbes.com/sites/markflickinger/2023/03/29/venture-capital-fundamentals-why-vc-is-a-driving-force-of-innovation/?sh=2e52cbb84128.

[11]  *Id.*

involvement in startups promotes innovation and leads to better business outcomes.[12]

Venture capital thus plays an essential role in the innovation ecosystem because it provides the funding and expertise that entrepreneurs need to transform an innovative idea into a workable business model that can ultimately be scaled, often by a more established acquirer.[13]

C.     Exit Through Acquisition Is Essential to Maintain the Innovation Ecosystem.

Venture capital investment is not intended to sustain a business throughout its lifecycle, from startup to maturity. Rather, the goal of venture capital is to invest in a startup company at its infancy and support it until the company reaches a sufficient size, performance level, and credibility state that a successful exit is possible. Typically that exit is through a merger or acquisition (or, less frequently, through an initial public offering or "IPO").[14] Stated simply, a venture capital firm

---

[12]   *See, e.g.*, Ana Paula Faria & Natália Barbosa, *Does Venture Capital Really Foster Innovation?* 4 (NIPE, Working Paper 2013), http://www3.eeg.uminho.pt/economia/nipe/docs/2013/NIPE_WP_03_2013.pdf; Samuel Kortum & Josh Lerner, *Assessing the Contribution of Venture Capital on Innovation*, 31 RAND J. ECON. 674, 691–92 (2000); Shae Bernstein et al., *The Impact of Venture Capital Monitoring*, 71 J. FIN. 1591, 1619–1620 (2016), http://www.columbia.edu/~xg2285/VC.pdf.

[13]   Reilly et al., *supra* note 2, at 164–67.

[14]   Flickinger, *supra* note 10; Zider, *supra* note 8; Reilly et al., *supra* note 2, at 166.

"buys a stake in an entrepreneur's idea, nurtures it for a short period of time, and then exits . . . ."[15]

The ability to exit the startup investment is a "critical driver[] of entrepreneurship and innovation."[16] The innovation ecosystem and the benefits it generates depend on the ability to exit a startup investment; exit is the vehicle through which both founders and venture capital firms are compensated for their entrepreneurial efforts and risk-taking.[17] Absent the potential for a compensated exit, prospective founders would not be incentivized to endure the stress, sleepless nights, low or non-existent pay, and economic insecurity that accompany the tireless work of innovation.[18] Likewise, without a clear exit path, venture capital firms would not be incentivized to deploy their capital and business acumen to

---

[15] Zider, *supra* note 8.

[16] Reilly et al, *supra* note 2, at 162.

[17] Gary Dushnitsky & D. Daniel Sokol, *Mergers, Antitrust, and the Interplay of Entrepreneurial Activity and the Investments that Fund It*, 24 VAND. J. ENT. & TECH. L. 255, 262 (2022). *See also* D. Daniel Sokol, *Vertical Mergers and Entrepreneurial Exit*, 70 FLA. L. REV. 1357, 1362 (2018) ("Entrepreneurial exit is critical to a well-functioning entrepreneurial ecosystem, as the possibility of . . . exit via vertical merger is now the most usual form of liquidity event/exit for founders and venture capitalists. . . . Increased difficulty in the exit for founders and venture capitalists makes investment in such ventures less likely, since the purpose of such investment is to reap the rewards of scaling a venture to exit.").

[18] Dushnitsky & Sokol, *supra* note 17, at 262.

support innovative but ultimately high-risk startups.[19] It is no secret that startup businesses often fail and that venture capital firms depend on the profits earned on a small number of successful exits to fuel investments in other startups that may or may not succeed. In some cases, exit via acquisition is the only means by which a startup that has developed a useful and beneficial product but lacks a viable, independent path to monetization can generate *any* return for the efforts and risk-taking of its founder(s) and venture capital backers.[20]

Exits through acquisition also have multiplier effects that further innovation beyond the exiting startup. A successful exit will provide an entrepreneur with the confidence, ability, and freedom to focus on other new business ideas and bring them to life.[21] These beneficial impacts extend beyond the serial entrepreneur; employees of an acquired startup often utilize their experience to go on and found their own businesses.[22] Likewise, a successful exit provides a venture capital firm with additional capital to deploy in support of other startup ventures and enhanced business acumen – generated through experience – to support those investments. Exits through acquisition play a critical role in fostering a self-sustaining cycle of innovation and venture capital investment.

---

[19]   Reilly et al., *supra* note 2, at 162–64; Sokol, *supra* note 17, at 1362.

[20]   Reilly et al., *supra* note 2, at 164.

[21]   *Id.* at 168.

[22]   *Id*. at 169.

Finally, as noted above, exit through acquisition is often the means by which an innovation that has been proven viable is scaled and quickly delivered to consumers on a wide basis.[23] Exit through acquisition is therefore critical in ensuring that the benefits of innovation are quickly realized, shared broadly, and ultimately benefit consumers and the economy as a whole.[24]

In short, exit through acquisition is an essential component of the innovation ecosystem and necessary to ensure that entrepreneurs and venture capitalists are incentivized to invest their time and money in innovative activity and that the fruits of those efforts are enjoyed by all consumers.

## II. The FTC's Arguments on Appeal Seek to Alter the Legal Standards Applicable to Merger Challenges and Would Have a Chilling Effect on Innovation and Entrepreneurship.

Section 7 of the Clayton Act prohibits mergers or acquisitions "the effect of" which "may be substantially to lessen competition." 15 U.S.C. § 18. Section 13(b) of the Federal Trade Commission Act provides that the FTC may obtain a preliminary injunction in federal district court to block a planned transaction if it makes "a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b)(2). Courts have long held that an analysis pursuant to

---

[23] *Id.* at 166–67.

[24] *Id.*

11

Section 13(b) requires a court to predict the FTC's likelihood of success on a Section 7 claim following an administrative proceeding on the merits. *See, e.g., F.T.C. v. Simeon Management Corp.*, 532 F.2d 708, 713–14 (9th Cir. 1976) (concluding that the standard for granting a preliminary injunction under § 53(b) requires the court to determine "the likelihood that the FTC will succeed on the merits" in administrative proceedings on its complaint); *F.T.C. v. Meta Platforms Inc.*, No. 5:22-cv-04325-EJD, 2022 WL 16637996, at *6 (N.D. Ca. Nov. 2, 2022) ("[T]he Court considers Section 13(b)'s 'likelihood of ultimate success' inquiry to mean the likelihood of the FTC's success on the merits in the underlying administrative proceedings . . . ."). Further, in evaluating the likelihood of success, courts assess the transaction based on the market reality at the time – including potential solutions to areas of competitive concern (e.g. divestitures or agreements as to conduct). *See, e.g., F.T.C. v. Atlantic Richfield Co.*, 549 F.2d 289, 299 (4th Cir. 1977) ("Divestiture prior to merger is an acceptable technique to avoid an antitrust violation."); *F.T.C. v. Libbey Inc.*, 211 F. Supp. 2d 34, 46 (D.D.C. 2002) (when parties propose a new agreement to address the government's concerns, "the Court must evaluate [the new agreement] in deciding whether an injunction should be issued.").

Here, the District Court determined that the FTC has not met its burden to show that it was entitled to a preliminary injunction blocking the planned merger

of Activision Blizzard Inc. ("Activision") and Microsoft Corp. ("Microsoft"). *F.T.C. v. Microsoft Corp. et al.*, No. 23-cv-02880-JSC, 2023 WL 4443412, at *20–*21 (N.D. Cal. July 10, 2023) (holding FTC failed to show that the merger will probably substantially lessen competition and thus was not likely to succeed on the merits). On appeal, the FTC challenges the District Court's legal analysis and urges this Court to alter the legal standards applicable to merger challenges in numerous ways. For example, the FTC stresses that it met its burden to win preliminary injunctive relief because it presented *some* evidence suggesting a possibility that the proposed transaction would result in less competition. Opening Brief of Plaintiff-Appellant at 23–28, *F.T.C. v. Microsoft Corp., et al.*, No. 23-15992 (9th Cir. Aug. 28, 2023), ECF No. 47. As another example, the Commission suggests that the District Court erred by considering the full scope of market realties – including potential solutions to areas of competitive concern – in its assessment of the FTC's likelihood of success. The Commission posits that only the FTC's administrative court is fit to assess the impact of those solutions and whether a proposed transaction is likely to substantially lessen competition in light of that critical evidence. *Id.* at 45–58.

*Amici curiae* agree with Appellees that the legal arguments put forth by the FTC on appeal are incorrect, inconsistent with long-standing precedent, and should be rejected, Defendants'-Appellees' Answering Brief at 33–37, *F.T.C. v. Microsoft*

*Corp., et al.*, No. 23-15992 (9th Cir. Sept. 6, 2023), ECF No. 55, but do not reiterate those legal arguments here. Instead, *amici* highlight the negative impact the FTC's position – if adopted on appeal – would have on the innovation ecosystem, competition, and the U.S. economy as a whole in light of the Commission's expressed hostility toward mergers and acquisitions in the technology industry. *Amici* respectfully submit that the District Court's well-reasoned and correct application of well-established legal standards should be affirmed and that the Commission's efforts to dilute those standards in a way that would ultimately harm innovation, competition, and the economy more broadly should be rejected.

A.     <u>The Legal Standards Urged by the FTC on Appeal Would Enable the FTC to Easily Win a Preliminary Injunction and Subject Most if Not All Challenged Transactions to Lengthy Administrative Review.</u>

On appeal, the FTC argues that the standard it must meet to win preliminary injunctive relief should be lowered and the ability of district courts to consider the whole scope of the transaction before it – including identified solutions to issues of potential competitive concern – should be limited. If adopted, the practical effect of these diminished standards would be significant, particularly for the technology industry and the innovation ecosystem that is so critical to its continued success.

Parallel challenges to mergers and acquisitions by the FTC are typically filed in the FTC's administrative court but are almost always resolved on a motion for

preliminary injunction in federal district court.[25]  If the FTC makes a proper

showing and demonstrates it is entitled to preliminary injunctive relief, the

proposed transaction is almost always abandoned.[26]  Likewise, if the FTC fails to

win a preliminary injunction, the transaction closes and the FTC in most cases

drops its administrative challenge.[27]  This system has provided a relatively efficient

---

[25]  In fact, only two merger challenges brought by the FTC have actually proceeded to a hearing on the merits before the FTC's administrative court in recent years. *In the Matter of Tronox Limited*, Federal Trade Commission, No. 171 0085, Dkt. 9377; *In the Matter of Illumina, Inc.*, Federal Trade Commission, No. 201 0144, Dkt. 9401.  This is in contrast to the number of preliminary injunctions sought – and denied – by federal courts. *See, e.g.*, *F.T.C. v. Meta Platforms, Inc.*, No. 5:22-cv-04325-EJD, 2023 WL 2346238 (N.D. Cal. Feb. 3, 2023); *F.T.C. v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020); *F.T.C. v. Thomas Jefferson University*, 505 F. Supp. 3d 522 (E.D. Pa. 2020).

[26]  *Cf.*, *F.T.C. v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980) (noting that "the issuance of a preliminary injunction . . . is an extraordinary and drastic remedy" because it "may prevent the transaction from ever being consummated.") (quotations omitted); *Mo. Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 870 (2d Cir. 1974) (an injunction likely "[spells] the doom of an agreed merger . . . ."). *See also, e.g.*, Lisa Schenker, *Northshore, Advocate Drop Merger Plan After Judge's Ruling*, CHI. TRIB. (Mar. 7, 2017), https://www.chicagotribune.com/business/ct-advocate-northshore-merger-decision-0308-biz-20170307-story.html (Advocate Health Care and NorthShore University HealthSystem abandoned their merger plans after the FTC obtained a preliminary injunction).

[27]  F.T.C., Prepared Statement: S. 2102, The Standard Merger and Acquisition Reviews Through Equal Rules Act of 2015 14 (Oct. 7, 2015), https://www.ftc.gov/system/files/documents/public_statements/810871/151007 smarteracttestimony.pdf ("[I]n the last 20 years, the Commission has not proceeded administratively following a loss at the preliminary injunction stage.").

process to timely litigate and resolve FTC challenges to proposed mergers and acquisitions in a neutral forum (indeed, as it has in this case).[28]

If the Court were to endorse the Commission's positions on appeal, district courts would effectively be prohibited from evaluating key evidence presented at the preliminary injunction stage that may weigh heavily against the FTC's ultimate likelihood of success on the merits. Instead, district courts would be required to issue a preliminary injunction if the FTC merely presented some evidence that the proposed transaction – independent of any solutions identified to address areas of potential competitive concern – might lessen competition. Mergers requiring some remedial action could be enjoined by the FTC as a matter of law. This would make it far easier for the FTC to win a preliminary injunction and require the participants to a proposed transaction to endure a lengthy hearing before the FTC's administrative court, then an automatic appeal to the Commission,[29] and finally an

---

[28] For example, in *F.T.C. v. Meta Platforms Inc.*, No. 5:22-cv-04325-EJD (N.D. Cal.), the FTC filed its complaint in late July 2022, the parties conducted extensive fact and expert discovery between July and December 2022, the court held a hearing on the preliminary injunction in December 2022, and the court issued its decision denying the preliminary injunction in late January 2023.

[29] Effective July 5, 2023, the Commission changed the rules applicable to its in-house adjudicative proceedings. Under these new rules, an administrative law judge presiding over an administrative hearing only can issue "recommended" decisions that are reviewed automatically by the FTC Commissioners. Rules of Practice, 88 Fed. Reg. 42,872 (July 5, 2023),

appeal to a federal appellate court. The process of fully litigating an administrative merger challenge through the merits and potential appeals would take *years*.[30] Few, if any, mergers can withstand such a significant delay; the expense and length of this administrative review process results in the vast majority of transactions enjoined under Section 13(b) being abandoned. Accordingly, adoption of the FTC's arguments on appeal will not simply make it easier for the FTC to win a preliminary injunction and allow for lengthy administrative review; it will lead to many challenged transactions being abandoned altogether (or not pursued in the first place).

This practical impact is particularly concerning for technology industry participants. The current Commission has openly expressed its hostility to mergers and acquisitions.[31] And it has done so specifically in the technology space,

---

https://www.federalregister.gov/documents/2023/07/05/2023-12630/rules-of-practice.

[30] For example, on September 12, 2023, the Fifth Circuit heard oral argument in the FTC's challenge of the merger of Illumina and Grail, which the FTC first filed *30 months* earlier in March 2021. *In the Matter of Illumina, Inc.*, Federal Trade Commission, No. 201 0144, Dkt. 9401; Matthew Perlman, *5th Circ. Presses Illumina on Cancer Test Competition*, LAW360 (Sept. 12, 2023), https://www.law360.com/texas/articles/1720623/5th-circ-presses-illumina-on-cancer-test-competition.

[31] *See* Jessica Matthews, *The War on Deals: Why the Biden Administration is Battling Big Business—and Putting All Sorts of Deals under the Microscope*, FORTUNE (July 19, 2023), https://protect-us.mimecast.com/s/Mm9ICgJ9RvUYWAB6CNxXO8?domain=fortune.com/ ("As of mid-July [2023], the FTC has sued to block nine mergers and led

including through public comments, challenges to past and proposed acquisitions, and revisions to the merger guidelines.[32]  Indeed, the Commission has indicated it will scrutinize and challenge acquisitions in the technology space that involve nascent competition, including acquisitions of innovative startup businesses that operate on a relatively small scale.[33]  Put another way, in the technology industry, the Commission appears inclined to "treat almost any acquisition as a nascent competitor, rather than as a potential complementor . . . ."[34]

---

interested parties to abandon 13 more in an 18-month period . . . ."); F.T.C., Prepared Remarks on Disparate Impact: Winners and Losers From the New M&A Policy 1 (Apr. 27, 2022), https://www.ftc.gov/news-events/news/speeches/disparate-impact-winners-losers-new-ma-policy, (Former Commissioner Noah Joshua Phillips declared that the Biden administration is "as hostile to mergers and acquisitions . . . as any in my lifetime.").

[32]  *See, e.g.*, U.S. DEP'T OF JUSTICE AND F.T.C., MERGER GUIDELINES, DRAFT – FOR PUBLIC COMMENT 11  (July 19, 2023) ("The antitrust laws reflect a preference for internal growth over acquisition."); *In the Matter of Intercontinental Exchange Inc.*, Federal Trade Commission, No. 221 0142, Dkt. 9413 (FTC sued to block mortgage technology deal).

[33]  Diane Bartz, *Big Tech's Little Mergers Draw More U.S. Antitrust Scrutiny*, REUTERS (Sept. 15, 2021) (quoting Commissioner Rebecca Slaughter, who stated, "'I think of serial acquisitions as a Pac-Man strategy.  Each individual merger viewed independently may not seem to have significant impact.  But the collective impact of hundreds of smaller acquisitions, can lead to a monopolistic behavior . . . .'"); Josh Sisco & Mark Scott, *Global Regulators Bear Down on Big Tech Deals*, POLITICO (May 10, 2023) (quoting FTC Chair Lina Khan, who stated, "'[D]igital markets may be characterized by certain features that actually caution earlier action or greater action . . . .'").

[34]  Reilly et al., *supra* note 2, at 166.

If the FTC were armed with the lightened burdens it now seeks on appeal, it could win preliminary injunctive relief barring acquisitions of innovative businesses it considers nascent competitors by simply presenting *some* evidence that the proposed transaction might reduce competition. That would potentially subject planned acquisitions of innovative businesses to a lengthy and expensive period of administrative review and lead to many such acquisitions being abandoned or not pursued at all.[35] While Microsoft and Activision are large companies with the resources and capacity to contest an FTC challenge, the diminished legal standards urged by the FTC in this case would be applicable to all future litigants if adopted. This is particularly concerning for small, venture capital-funded startup businesses that lack the resources (both financial and personnel) to withstand a years-long process of regulatory investigation, litigation, and appeals, and who, due to the rapid evolution of innovative technology, may miss important business opportunities during a lengthy regulatory review process.

---

[35] It is well-documented that regulatory burdens can significantly reduce venture capital investment. *See, e.g.*, Jian Jia et al., *The Short-Run Effects of GDPR on Technology Venture Investment*, at 30 (May 22, 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3278912 (empirical study of short-term effects of GDPR on investment in technology ventures found evidence suggesting "negative and pronounced effects following the rollout of GDPR on the number of venture [capital] deals . . . and particularly for newer, data-related and consumer facing ventures.").

B.   The FTC's Positions on Appeal Would Limit Exit Options, Damage
the Innovation Ecosystem, and Harm Competition.

If adopted, the FTC's positions on appeal would have a chilling effect on

mergers and acquisitions generally, thereby reducing the exit options available to

venture capital firms and the entrepreneurs they fund.  This, in turn, would

discourage entrepreneurship and investment, and ultimately undermine the

innovation ecosystem.  Accordingly, the FTC's proposals would "lead[] to direct

contravention of antitrust's role in promoting competition and innovation."[36]

If startup investment exits through acquisition are likely to entail a lengthy

and expensive review period before the FTC's internal court, venture capital funds

will be less incentivized to provide seed capital to fund innovative ideas that have

not yet demonstrated the ability to become a viable business.  Indeed, if a startup

business lacks a clear path to a successful IPO (a process that does not entail FTC

review), venture capital funds will be hesitant to invest in such a business.  Why

accept the additional risk if the only possibility for a return on capital is through an

acquisition that is likely to be challenged by the FTC and subject to years of

regulatory review (if not abandoned)?  Accordingly, venture capital funds will be

less willing to fulfill the key role they currently play funding innovative ideas that

have not yet demonstrated business viability.  In addition, venture capital funds are

---

[36]   Sokol, *supra* note 17, at 1363.

20

only able to invest in innovative startups so long as they can attract and retain their own investors by providing a sufficient return on capital.[37] Limits on exit by acquisition – including by lengthening the time period in which startup investments must be held – will negatively impact the returns generated by venture capital funds and reduce the capital available to venture capital funds to deploy in support of innovation.

Venture capital funded entrepreneurs will likewise have less incentive to engage in the hard work of innovation if the prospect of exit through acquisition is artificially limited or too lengthy and burdensome. They too will face the challenge of not being able to achieve a return on their tireless efforts to develop new ideas, new technologies, and new products through a compensated exit. As a result, they may decide to simply remain in their position at an established player rather than strike out on their own. Indeed, a 2020 sample of startup founders in the United States found that approximately 58% of them hoped to be acquired, whereas 17% planned to go public via IPO, and 14% wished to remain private.[38] That more than half of startup founders hoped to be acquired demonstrates the importance of exit through acquisition as an incentive to entrepreneurs and the

---

[37]  Zider, *supra* note 8; Reilly et al., *supra* note 2, at 162–63.

[38]  Silicon Valley Bank, 2020 Global Startup Outlook 7, https://www.svb.com/globalassets/library/uploadedfiles/content/trends_and_insights/reports/startup_outlook_report/suo_global_report_2020-final.pdf.

dangers inherent in adopting a legal standard that enables the FTC to unduly restrain or limit those exit opportunities.

This is a particularly acute concern to the current generation of entrepreneurs, one that is far more diverse than the generation that came before them. It is well-recognized that participation in the innovation economy is not reflective of society as a whole and considerable efforts have been made – including by many of the undersigned *amici* – to foster diversity in the innovation ecosystem and ensure that any person of any background with a new and innovative idea has an opportunity to pursue that vision, seek venture capital funding, and transform that idea into an innovative business that delivers new and better products and services to consumers. [39] Damaging the innovation ecosystem would thus not only disincentivize entrepreneurs generally and chill innovation, but also stymy efforts to increase diversity and ensure that today's diverse community of entrepreneurs has the same opportunities to found, develop, and ultimately exit a startup business as the generations that came before them.

---

[39] VASANTH GANESAN ET. AL, UNDERESTIMATED START-UP FOUNDERS: THE UNTAPPED OPPORTUNITY, MCKINSEY (June 23, 2023), https://www.mckinsey.com/featured-insights/diversity-and-inclusion/underestimated-start-up-founders-the-untapped-opportunity; Arti Raman, *Look Past Today's Metrics to Celebrate the Growth of Female Founders*, FORBES (Dec. 13, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/12/13/look-past-todays-metrics-to-celebrate-the-growth-of-female-founders/?sh=187d984773f3.

Finally, reducing the incentives that are essential to the innovation ecosystem will have negative impacts for the economy as a whole. Less innovation necessarily means less development, fewer options for consumers, less opportunity for workers and investors, less economic growth, and less competition in the marketplace.

## CONCLUSION

For the foregoing reasons, *amici curiae* respectfully submit that the Court

should affirm the decision of the District Court below.

Dated: Washington, D.C.
          September 13, 2023

Respectfully submitted,

By:  /s/   Edward D. Hassi

Edward D. Hassi
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue N.W.
Suite 500
Washington, DC 20004
(202) 383-8000
thassi@debevoise.com

J. Robert Abraham
Jaime M. Freilich-Fried
Isabel Feldman
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
(212) 909-6000
jrabraham@debevoise.com
jmfried@debevoise.com
ifeldman@debevoise.com

*Attorneys for Amici Curiae*

24

## APPENDIX

List of *Amici Curiae*

Launchbay Capital

Madrona Venture Group

Marque Venture Capital

Origins Fund

Spice Capital

Symphonic Capital

Trilogy Equity Partners, LLC

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned counsel certifies that this motion:

(i) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2007 and is set in Times New Roman font in a size equivalent to 14 points or larger and,

(ii) complies with the length requirement of Rule 29(a)(5) because it is 5,249 words.

Dated: September 13, 2023

/s/ Edward D. Hassi

## CERTIFICATE OF SERVICE

I certify that on this 13th day of September 2023, I served the foregoing Brief of Venture Capital Firms as *Amici Curiae* in Support of Appellees Microsoft Corp. and Activision Blizzard, Inc. via the Court's ECF system upon all counsel.

Dated: September 13, 2023


/s/ Edward D. Hassi