## No. 23-15992

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

―――――――――

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellant*,

v.

MICROSOFT CORP., and
ACTIVISION BLIZZARD, INC.,

*Defendants-Appellees.*

―――――――――

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-cv-2880; Hon. Jacqueline Scott Corley

―――――――――

# BRIEF OF FORMER ANTITRUST ENFORCERS AS AMICI CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE

―――――――――

Aaron M. Panner
Derek C. Reinbold
KELLOGG, HANSEN, TODD, FIGEL
    & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
dreinbold@kellogghansen.com

*Counsel for Amici Curiae*

September 13, 2023

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................ii

INTERESTS OF AMICI .............................................................................. 1

ARGUMENT ................................................................................................ 3

     I.     Antitrust Law Reflects A Basic Distinction Between
            The Competitive Consequences Of Horizontal And
            Non-Horizontal Mergers ......................................................... 3

     II.    The FTC Offered No Sound Economic Analysis
            Showing The Transaction Probably Would Be
            Anticompetitive .................................................................... 15

CONCLUSION ........................................................................................... 24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

Page

## CASES

*Alberta Gas Chems. Ltd. v. E.I. Du Pont De nemours & Co.*,
  826 F.2d 1235 (3d Cir. 1987)............................................................. 7

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ................................................ 4, 8, 14, 20, 22

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ................................................................................ 8

*Continental T.V., Inc. v. GTE Sylvania, Inc.*,
  433 U.S. 36 (1977) ................................................................................ 8

*Fruehauf Corp. v. FTC*,
  603 F.2d 345 (2d Cir. 1979)................................................ 9, 11, 21

*FTC v. Advocate Health Care Network*,
  841 F.3d 460 (7th Cir. 2016) ......................................................... 18

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) .................................................. 13, 18

*FTC v. Whole Foods Mkt., Inc.*,
  548 F.3d 1028 (D.C. Cir. 2008) ...................................................... 18

*Grappone, Inc. v. Subaru of New England, Inc.*,
  858 F.2d 792 (1st Cir. 1988)............................................................. 8

*Hospital Corp. of Am. v. FTC*,
  807 F.2d 1381 (7th Cir. 1986) ......................................................... 8

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ............................................................................. 8

*Mississippi River Corp. v. FTC*,
  454 F.2d 1083 (8th Cir. 1972) ......................................................... 5

ii

*Republic Tobacco Co. v. North Atl. Trading Co.*,
   381 F.3d 717 (7th Cir. 2004) ........................................................ 13

*U.S. Steel Corp. v. FTC*,
   426 F.2d 592 (6th Cir. 1970) ......................................................5, 6

*United States v. Aluminum Co. of Am.*,
   148 F.2d 416 (2d Cir. 1945) ............................................................ 6

*United States v. Anthem, Inc.*,
   855 F.3d 345 (D.C. Cir. 2017) ................................................14, 16

*United States v. AT&T Inc.*,
   310 F. Supp. 3d 161 (D.D.C. 2018) ............................................... 7

*United States v. AT&T, Inc.*,
   916 F.3d 1029 (D.C. Cir. 2019) .............................. 13, 14, 18, 21, 22

*United States v. Baker Hughes Inc.*,
   908 F.2d 981 (D.C. Cir. 1990) ..................................................... 14

*United States v. Kennecott Copper Corp.*,
   231 F. Supp. 95 (S.D.N.Y. 1964) ................................................... 5

*United States v. Philadelphia Nat'l Bank*,
   374 U.S. 321 (1963) ....................................................................... 13

## STATUTES

Celler-Kefauver Act (Anti-Merger Act), Pub. L. No. 81-899,
   ch. 1184, 64 Stat. 1125 (1950) ....................................................... 4

Clayton Act (Antitrust Act), Pub. L. No. 63-212, § 7,
   38 Stat. 730 (1914) .....................................................................3, 4

15 U.S.C. § 18 ................................................................................... 14

15 U.S.C. § 18 (1950) ......................................................................4, 5

iii

## OTHER AUTHORITIES

10 Phillip E. Areeda & Herbert Hovenkamp,
*Antitrust Law* (4th ed.)..........................................................3, 10, 11

Ward S. Bowman, Jr.:

*The Prerequisites and Effects of Resale Price Maintenance*,
22 U. Chi. L. Rev. 825 (1955)..........................................................7

*Tying Arrangements and the Leverage Problem*,
67 Yale L.J. 19 (1957)..........................................................7

Complaint, *United States v. Visa Inc.*, No. 20-cv-7810
(N.D. Cal. Nov. 5, 2020), ECF No. 1 ................................................20

Aaron Director & Edward H. Levi, *Law and the Future:*
*Trade Regulation*, 51 N.W. U. L. Rev. 281......................................7

Guidelines on the Assessment of Non-Horizontal Mergers
Under the Council Regulation on the Control of
Concentrations Between Undertakings, 2008 O.J.
(C 265) 7, https://perma.cc/HF79-ECLN .......................................10

D. Bruce Hoffman, Acting Dir., Bureau of Competition, Fed.
Trade Comm'n, *Vertical Merger Enforcement at the*
*FTC* (Jan. 10, 2018), https://perma.cc/6AXA-QJDY .....................12

Herbert Hovenkamp, *Competitive Harm from Vertical*
*Mergers*, 59 Rev. of Indus. Org. 139 (2021) ..................................13

Jon Sallet, Deputy Assistant Att'y Gen., U.S. Dep't of
Justice, *The Interesting Case of the Vertical Merger*
(Nov. 17, 2016), https://perma.cc/DL7D-4SLJ ..............................12

Lester G. Telser, *Why Should Manufacturers Want Fair*
*Trade?*, 3 J.L. & Econ. 86 (1960).....................................................7

U.S. Dep't of Justice:

    *Merger Guidelines* (1968),
    https://perma.cc/ZNE3-VYGB .......................................................5, 9

    *Merger Guidelines* (1982),
    https://perma.cc/9VKM-9795 ...............................................9, 11, 13

    *Non-Horizontal Merger Guidelines* (1984),
    https://perma.cc/C2QY-CS5T ......................................................9, 10

U.S. Dep't of Justice & Fed. Trade Comm'n:

    *Horizontal Merger Guidelines* (2010),
    https://perma.cc/76D4-NUHJ .........................................................10

    *Merger Guidelines* (Draft July 19, 2023),
    https://perma.cc/9Z59-BP7M..........................................................14

Christine A. Varney, Comm'r, Fed. Trade Comm'n, *Vertical
    Merger Enforcement Challenges at the FTC* (July 17,
    1995), https://perma.cc/Z6QN-AUKY .............................................12

Christine S. Wilson, Comm'r, Fed. Trade Comm'n,
    *Reflections on the 2020 Draft Vertical Merger
    Guidelines and Comments from Stakeholders*
    (Mar. 11, 2020), https://perma.cc/7XQZ-LTDW .............................12

## INTERESTS OF AMICI[1]

Amici are former antitrust enforcers who have devoted substantial portions of their careers to promoting vigorous enforcement of the antitrust laws for the benefit of competition and consumers. Amici have served in the U.S. Department of Justice and the Federal Trade Commission, in both Republican and Democratic administrations, where they were responsible for – among other matters – the evaluation of proposed mergers and acquisitions across industries.

Amici believe that, over the last several decades, antitrust enforcement has benefited from a bipartisan consensus that applying rigorous economic analysis to enforcement decisions advances sound antitrust policy and the goal of promoting economic welfare. To be sure, economic science is inexact, predictions are necessarily uncertain, and so there is room for disagreement about the likely impact of a proposed transaction and the weight to give potentially competing considerations.

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting this brief; and no person other than amici or their counsel contributed money intended to fund preparing or submitting this brief. Fed. R. App. P. 29(a)(4)(E). All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2). Amici are listed in an addendum bound with this brief.

Amici might disagree about hard cases. But amici agree on the need to base antitrust-enforcement decisions on the best available tools of economic analysis (along with other informative evidence) and the overarching goal of promoting increased output and higher quality.

Given this shared perspective, amici have viewed with concern the FTC's decision to pursue a challenge to the proposed merger here and believe the district court decision, denying the FTC's motion for a preliminary injunction, should be affirmed. Amici elaborate on two points below. *First*, the merger is a combination of complementary assets – Activision's games are a complement to Microsoft's gaming products. There is a consensus that non-horizontal transactions like this one, unlike those between competitors, generally pose less risk – and may offer benefits – to competition. *Second*, the district court correctly concluded that the collapse of the FTC's economic model, which was the principal basis for its claim of likely harm, left the Commission without any sound reason to prevent the transaction from proceeding. The FTC's failure to defend that economic model on appeal is reason enough to affirm.

2

# ARGUMENT

## I. Antitrust Law Reflects A Basic Distinction Between The Competitive Consequences Of Horizontal And Non-Horizontal Mergers

For a few decades after the Clayton Act was amended to apply to non-horizontal mergers, enforcers aggressively policed vertical mergers based on broad suspicion that such mergers could unfairly disadvantage competitors of the merged firm. But over time, both courts and enforcers came to recognize that this "severe approach to vertical mergers" was in fact "much more severe than was warranted by any acceptable economic theory of competitive harm." 10 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1000a (4th ed.). Today, enforcers challenging vertical mergers must make a case-specific showing – informed by sound economic analysis – that the merger will harm competition and consumers.

**A.** Section 7 of the Clayton Act originally focused on stock transactions that allowed horizontal competitors to form large trusts. The act barred acquisitions "where the effect of such acquisition may be to substantially lessen competition *between the corporation whose stock is so acquired and the corporation making the acquisition*," among other

3

effects. Clayton Act (Antitrust Act), Pub. L. No. 63-212, § 7, 38 Stat. 730, 731 (1914) (emphasis added). The acquired-acquiring language meant the original act did not "appear to preclude the acquisition of stock in any corporation other than a direct competitor." *Brown Shoe Co. v. United States*, 370 U.S. 294, 313 (1962); *see also id.* at 313 n.21.

In 1950, Congress granted enforcers broader authority, amending the Clayton Act to cover vertical transactions. *See* Celler-Kefauver Act (Anti-Merger Act), Pub. L. No. 81-899, ch. 1184, 64 Stat. 1125, 1126 (1950) (codified at 15 U.S.C. § 18 (1950)); *Brown Shoe*, 370 U.S. at 317 n.30 (describing the legislative history). Through this amendment, Congress "hoped to make plain that § 7 applied not only to mergers between actual competitors, but also to vertical and conglomerate mergers whose effect may tend to lessen competition in any line of commerce in any section of the country." *Brown Shoe*, 370 U.S. at 317.

Midcentury enforcers aggressively employed their new enforcement authority. In 1964, the U.S. Department of Justice successfully challenged a merger between a copper producer and a copper fabricator, on the basis that, although vertical mergers "often lead to economic and efficient operation" and so are "desirable from an

economic standpoint," they are "undesirable from a social standpoint." *United States v. Kennecott Copper Corp.*, 231 F. Supp. 95, 103 (S.D.N.Y. 1964). In its 1968 merger guidelines, DOJ asserted that almost any "large vertical merger" would likely violate § 7 because the procompetitive efficiencies would rarely, if ever, offset the anticompetitive harms.[2] And in the early 1970s, the FTC prevailed in two cases challenging transactions because of likely harm to less efficient local rivals. *See Mississippi River Corp. v. FTC*, 454 F.2d 1083, 1091-92 (8th Cir. 1972); *U.S. Steel Corp. v. FTC*, 426 F.2d 592, 593, 601-03, 609-10 (6th Cir. 1970).

Courts and enforcers thus pointed to the very efficiencies of vertical mergers as evidence of anticompetitive harm. In the FTC's challenge to a merger between an upstream cement supplier and a downstream distributor, for example, the court was particularly

---

[2] *See* U.S. Dep't of Justice, *Merger Guidelines* 9-10 (1968) ("While it is true that in some instances vertical integration may raise barriers to entry or disadvantage existing competitors only as the result of the achievement of significant economies of production or distribution . . . , integration accomplished by a large vertical merger will usually raise entry barriers or disadvantage competitors to an extent not accounted for by, and wholly disproportionate to, such economies as may result from the merger."), https://perma.cc/ZNE3-VYGB.

concerned that the merged firm would "ha[ve] decisive cost advantages over non-integrated competitors." *U.S. Steel*, 426 F.2d at 603. The court explained that "[v]ertical integration creates a more assured level of plant utilization, an elimination of any significant sales and marketing expenses to ones' own ready-mix subsidiary, and the ability to integrate the storage and distribution facilities of the cement and ready-mix company into a single urban terminal." *Id.* But the court did not list those cost-saving benefits as a reason to find the transaction lawful; those benefits instead supplied, according to the court, "very substantial evidence" of illegality. *Id.* at 604.

This skepticism towards vertical mergers reflected a belief that antitrust policy should serve the interests of small competitors. As Judge Learned Hand put it, antitrust law at the time advanced a regime of small business "for its own sake and in spite of possible cost." *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 429 (2d Cir. 1945).

**B.** The cost soon became clear, though, as economic evidence showed that many non-horizontal mergers increase, rather than harm,

6

competition for consumers' benefit.[3]  Such transactions can benefit

consumers by offering "cost advantages," such as those listed in *U.S.*

*Steel*.  They can also align incentives within the merged firm to

encourage product innovation or eliminate a problem known as "double

marginalization":  "the situation in which two different firms in the

same industry, but at different levels in the supply chain, each apply

their own markups (reflecting their own margins) in pricing their

products."  *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 197

(D.D.C. 2018).  When integration eliminates those "'stacked' margins,"

it can "lead[] to lower prices for consumers."  *Id.*[4]

Courts in response began shifting the focus of merger analysis

towards protecting competition and consumers, not small competitors.

---

[3] *See*, *e.g.*, Ward S. Bowman, Jr., *Tying Arrangements and the Leverage Problem*, 67 Yale L.J. 19, 33-34 (1957); Ward S. Bowman, Jr., *The Prerequisites and Effects of Resale Price Maintenance*, 22 U. Chi. L. Rev. 825, 855-58 (1955); Aaron Director & Edward H. Levi, *Law and the Future:  Trade Regulation*, 51 N.W. U. L. Rev. 281, 290 (1956); Lester G. Telser, *Why Should Manufacturers Want Fair Trade?*, 3 J.L. & Econ. 86, 104-05 (1960).

[4] *See also*, *e.g.*, *Alberta Gas Chems. Ltd. v. E.I. Du Pont De nemours & Co.*, 826 F.2d 1235, 1245 (3d Cir. 1987) ("Because of post-merger efficiencies allowing it to purchase the acquiring company's output at a better price than in the marketplace, the acquired company's purchasing costs would fall – a procompetitive benefit capable of being passed on via lower prices for its products.").

In 1977, the Supreme Court emphasized that the antitrust laws were designed for "the protection of competition, not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe*, 370 U.S. at 320); *see also Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986) ("[T]he Supreme Court, echoed by the lower courts, has said repeatedly that the economic concept of competition, rather than any desire to preserve rivals as such, is the lodestar that shall guide the contemporary application of the antitrust laws, not excluding the Clayton Act . . . ."). As then-Judge Breyer later noted, "the antitrust laws protect the competitive process in order to help individual consumers by bringing them the benefits of low, economically efficient prices, efficient production methods, and innovation." *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 794 (1st Cir. 1988) (Breyer, J.). And because vertical integration could help advance that project, the Supreme Court adopted "a common-law approach" and worked "to temper, limit, or overrule once strict prohibitions on vertical restraints." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 901 (2007) (citing *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 57-59 (1977)).

As the Supreme Court honed its approach to vertical restraints, lower courts began incorporating that approach in deciding vertical-merger challenges.  In an influential case, *Fruehauf Corp. v. FTC*, the Second Circuit concluded that for such a challenge to succeed, "[a] showing of some probable anticompetitive impact is . . . essential." 603 F.2d 345, 353 (2d Cir. 1979).  That requirement doomed the FTC's case, which rested on evidence "too ephemeral to sustain" the challenge. *Id.* at 360.

Enforcers likewise began rethinking challenges to vertical mergers, reflecting both economic learning and renewed emphasis on the interests of consumers over the interests of less-efficient competitors.  DOJ replaced its 1968 merger guidelines, recognizing in new guidelines that "non-horizontal mergers are less likely than horizontal mergers to create competitive problems."  U.S. Dep't of Justice, *Merger Guidelines* § IV, at 20 (1982) ("1982 Guidelines"), https://perma.cc/9VKM-9795; *see also* U.S. Dep't of Justice, *Non-Horizontal Merger Guidelines* § 4 (1984) ("1984 Guidelines"), https://perma.cc/C2QY-CS5T.  It also made clear that it no longer subscribed to the old *U.S. Steel* view that efficiencies produced by

9

vertical integration are necessarily anticompetitive because they harm competitors, which improperly subordinated the interests of consumers. *See* Areeda & Hovenkamp ¶ 1000a ("Today it is almost a commonplace that these historical results cannot stand close scrutiny.").  Instead, according to DOJ, mergers have "efficiency-enhancing potential . . . [that] can increase the competitiveness of firms and result in lower prices to consumers."  1984 Guidelines §§ 3.5, 4.24.[5]  So for decades the enforcement agencies sought to "avoid[] unnecessary interference with mergers that are either competitively beneficial or neutral."  U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 1 (2010), https://perma.cc/76D4-NUHJ.

Consistent with these insights, enforcers rarely litigated vertical merger challenges over the next four decades.  The last such case the FTC litigated to conclusion was *Fruehauf*, in 1979.

---

[5] This view now represents international consensus.  *See*, *e.g.*, Guidelines on the Assessment of Non-Horizontal Mergers Under the Council Regulation on the Control of Concentrations Between Undertakings, 2008 O.J. (C 265) 7, 7 ("Non-horizontal mergers are generally less likely to significantly impede effective competition than horizontal mergers."), https://perma.cc/HF79-ECLN.

**C.**     Modern antitrust law recognizes the consensus that vertical and horizontal mergers are different.  A horizontal merger eliminates a competitor from the market, and so, by definition, increases concentration.  *See Fruehauf*, 603 F.2d at 351.  "[T]he basic economic reason for limiting horizontal mergers is well-founded and rather generally accepted:  horizontal mergers increase market concentration, and high market concentration can substantially lessen competition among rivals, particularly with respect to price."  Areeda & Hovenkamp ¶ 1000a.

Vertical mergers, by contrast, generally pose less risk to competition and are more likely to offer procompetitive benefits.  A vertical merger does not eliminate a competitor, and "does not, therefore, automatically have an anticompetitive effect . . . or reduce competition."  *Fruehauf*, 603 F.2d at 351; *see* 1982 Guidelines § IV, at 20 (a vertical merger "produce[s] no immediate change in the level of concentration in any relevant market").  Vertical integration "may even operate to increase competition."  *Fruehauf*, 603 F.2d at 352.  Enforcers

for decades and across administrations have recognized these potential procompetitive benefits and reduced risk of anticompetitive effects.[6]

Because vertical and horizontal mergers are different, they get different treatment. An enforcer challenging a horizontal merger gets the benefit of a "'presumption' that the merger will substantially lessen competition" when it "would produce a firm controlling an undue percentage share of the relevant market, and would result in a significant increase in the concentration of firms in that market." *FTC*

---

[6] *See*, *e.g.*, Christine S. Wilson, Comm'r, Fed. Trade Comm'n, *Reflections on the 2020 Draft Vertical Merger Guidelines and Comments from Stakeholders* at 14 (Mar. 11, 2020) ("The vast weight of economic scholarship continues to find that most vertical mergers benefit consumers."), https://perma.cc/7XQZ-LTDW; D. Bruce Hoffman, Acting Dir., Bureau of Competition, Fed. Trade Comm'n, *Vertical Merger Enforcement at the FTC* at 3 (Jan. 10, 2018) ("[O]verall there is a broad consensus in competition policy and economic theory that the majority of vertical mergers are beneficial because they reduce costs and increase the intensity of interbrand competition."), https://perma.cc/6AXA-QJDY; Jon Sallet, Deputy Assistant Att'y Gen., U.S. Dep't of Justice, *The Interesting Case of the Vertical Merger* at 4 (Nov. 17, 2016) ("And here it's worth emphasizing that vertical integration can create significant efficiencies that benefit suppliers, distributors, and consumers alike."), https://perma.cc/DL7D-4SLJ; Christine A. Varney, Comm'r, Fed. Trade Comm'n, *Vertical Merger Enforcement Challenges at the FTC* (July 17, 1995) ("Vertical integration can lower transaction costs, lead to synergistic improvements in design, production and distribution of the final output product and thus enhance competition. Consequently, most vertical arrangements raise few competitive concerns."), https://perma.cc/Z6QN-AUKY.

*v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001) (cleaned up)
(quoting *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363
(1963)).  But courts have "cautio[ned] about importing relaxed
standards of proof from horizontal agreement cases into vertical
agreement cases.  To do so might harm competition and frustrate the
very goals that antitrust law seeks to achieve." *Republic Tobacco Co. v.*
*North Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004).

This is not to say that vertical mergers never raise competitive
concerns.  *See* 1982 Guidelines § IV, at 20 ("[T]hey are not invariably
innocuous.").  Enforcers view them "with less suspicion overall than . . .
horizontal mergers," but still examine them for "competitive threats."
Herbert Hovenkamp, *Competitive Harm from Vertical Mergers*, 59 Rev.
of Indus. Org. 139, 142 (2021).  But because vertical mergers are more
likely to enhance, not harm, competition, enforcers challenging them
"cannot use a short cut to establish a presumption of anticompetitive
effect." *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir.

13

2019). Instead, "the government must make a 'fact-specific' showing that the proposed merger is 'likely to be anticompetitive.'" *Id.*[7]

Because a vertical merger may be procompetitive, the key evidence in a vertical-merger challenge often is sound economic analysis. Section 7 proscribes "[m]ergers with a *probable* anticompetitive effect," *Brown Shoe*, 370 U.S. at 323 (emphasis added), so § 7 cases involve the "uncertain task" of making a prediction about the future, *United States v. Baker Hughes Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990) (Thomas, J.); *see* 15 U.S.C. § 18. Economic modeling can assist in that task by supplying analytical rigor to "the probabilistic Section 7 world." *AT&T*, 916 F.3d at 1038. Enforcers routinely employ such rigorous quantitative analysis. And courts have become increasingly familiar with assessing such evidence for "reliability and factual credibility" in a variety of antitrust cases. *United States v. Anthem, Inc.*, 855 F.3d 345, 363 (D.C. Cir. 2017).

---

[7] The government now contests this premise, expressing renewed skepticism of vertical mergers in recently published draft merger guidelines. The draft guidelines presume anticompetitive effect from a vertical merger when the merged firm will control more than 50 percent of a related market. U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* § II.6(A), at 17 (Draft July 19, 2023), https://perma.cc/9Z59-BP7M.

## II.     The FTC Offered No Sound Economic Analysis Showing The Transaction Probably Would Be Anticompetitive

This case involves a merger between Microsoft and Activision, two companies that sell complementary products.  Microsoft sells Xbox gaming consoles and Activision sells popular videogames, such as *Call of Duty*.  The FTC offered an economic model in the district court purporting to show that, after the merger, Microsoft would have a financial incentive to withhold *Call of Duty* from Sony, which sells competing PlayStation gaming consoles.  But the district court rejected that model because it rested on unproven assumptions, and on appeal the FTC has simply abandoned it rather than suggest that the court erred.  Instead, the agency argues (at 65) that "structural" factors in the market support its claim that Microsoft will withhold games.  But those arguments lack a sound economic foundation, and the Commission's decision to proceed without quantitative support strongly supports affirmance.

A.      Below, the FTC tried to support its case with quantitative analysis by offering a model from Professor Robin Lee, an economist.  This model, according to the FTC, showed that "removing *Call of Duty* from PlayStation would result in a 5.5% increase in Xbox's share of the

15

Gen 9 console market." 1-ER-41. If Microsoft could achieve that share increase, Professor Lee contended, it would be profitable to withhold *Call of Duty* from Sony because the benefits of higher Xbox console sales would outweigh the costs in lost PlayStation *Call of Duty* sales. *Id.*

The FTC put great weight on this model. It was the "lynchpin" of its merger challenge. *Id.* The district court properly considered whether the model could bear that weight. *See Anthem*, 855 F.3d at 363 (affirming district court preliminary injunction order when court reviewed expert's calculations for "reliability and factual credibility"). Professor Lee's analysis depended largely on one quantitative input: the "conversion rate," or the number of affected users who would buy an Xbox console to play *Call of Duty* if the game were unavailable on PlayStation. 1-ER-41-42. At a 20% conversion rate – meaning 1 in 5 PlayStation *Call of Duty* players would switch to Xbox if they could not play on PlayStation – the model predicted that withholding *Call of Duty* from PlayStation would be profitable. 1-ER-42. But reduce the rate

slightly to 17.5% and the "model estimate[d] it would *not* be profitable" to withhold. *Id.*[8]

A model that is so sensitive to input assumptions is only as reliable as the assumptions themselves. And here, the district court found that the assumptions were unreliable: "there [wa]s no evidence to support" them. 1-ER-43-45. Professor Lee "simply assumed a con[version] rate for his model that would make exclusivity profitable." 1-ER-45. Given that unreliable, conclusion-driven input, the district court appropriately concluded that the model's outputs – predicted incentives – were also unreliable.

The FTC's quantitative-analysis-backed case ended there. As the district court noted, the Commission's other foreclosure theories lacked any economic support. "Prof. Lee did not engage in any quantitative analysis of partial foreclosure." 1-ER-46. He "did not perform any quantitative analysis to estimate whether adding *Call of Duty* to Game Pass, and not other subscription services, will injure competition." 1-ER-49. And he "did not model the cloud gaming market." 1-ER-51.

---

[8] Perhaps more fundamentally, he did not explain how a share shift that is "[p]erhaps bad for Sony," but "good for *Call of Duty* gamers and future gamers" would harm competition. 1-ER-40.

**B.** The FTC's appeal includes no defense of the economic model that was the centerpiece of its case. That omission represents a stark departure from past appeals, in which the Commission has successfully defended its economic analysis. And the omission is glaring here given the district court's other factual findings in Microsoft's favor.

The FTC has prevailed on earlier challenges to unfavorable district court decisions by showing they rested on errors of economic logic. In *H.J. Heinz*, the Commission persuaded the D.C. Circuit that an "inherent inconsistency" in the district court's economic analysis constituted clear error. 246 F.3d at 718. In *FTC v. Advocate Health Care Network*, the Commission showed the Seventh Circuit that the district court had incorrectly treated its expert's analysis "as if its logic were circular." 841 F.3d 460, 464 (7th Cir. 2016). And in *FTC v. Whole Foods Market, Inc.*, the Commission persuaded the D.C. Circuit that its "economic evidence" had been "ignored" by the district court. 548 F.3d 1028, 1041 (D.C. Cir. 2008).[9]

---

[9] DOJ tried the same approach in its challenge to AT&T's merger with Time Warner, arguing to the D.C. Circuit "that the district court misunderstood and misapplied economic principles and clearly erred in rejecting the [government's] quantitative model." 916 F.3d at 1032. But the appellate court found those arguments "unpersuasive." *Id.*

This case is a remarkable contrast. The district court concluded that Professor Lee had selected the inputs for his model essentially at random. And below, the FTC at least attempted to rebut that conclusion. (Of course, the district court rejected that attempt. *See* 1-ER-42-44.) But those arguments appear nowhere in its brief on appeal.

The FTC's failure to defend its model is striking because this is a case in which economic analysis should drive an enforcer's – and a court's – evaluation of a proposed merger. Speaking generally, this is a vertical-merger challenge, and case-specific evidence of anticompetitive harm is required, not presumed. *See supra* pp.12-14. And speaking specifically, here, the district court credited evidence that the transaction would have possible benefits to competition. The court concluded it would "enhance, not lessen, competition" in certain markets. 1-ER-50. While the FTC disputes (at 38) that this evidence is relevant at this stage, the possible competitive benefits here underscore why the district court correctly demanded particularized evidence of competitive harm. Because the transaction is plausibly procompetitive, there may be significant costs to blocking it.

Not every case depends on economic models, and courts may appropriately consider other evidence to establish likely harm, but in this case, without the model, the FTC's case falls apart. This is not a case with damning internal documents, which may inform predictions about probable anticompetitive harm. *See*, *e.g.*, Complaint ¶ 10, *United States v. Visa Inc.*, No. 20-cv-7810 (N.D. Cal. Nov. 5, 2020), ECF No. 1 (document showed Visa CEO viewed acquisition of a nascent competitor as an "insurance policy"). Instead, the district court concluded that no internal documents contradicted Microsoft's stated intent not to make *Call of Duty* exclusive to Xbox consoles. 1-ER-37. And the court found that the other evidence was "overwhelming" in Microsoft's favor. 1-ER-41. The Commission does not challenge this conclusion either.

**C.** The FTC's broad arguments here, unsupported by sound economic evidence, only confirm that its challenge lacks substance. The Commission invokes (at 58) "the Supreme Court's *Brown Shoe* framework." Under that framework, courts consider six factors meant to outline the "probable effects of the merger upon the economics of the particular markets affected." 370 U.S. at 333.

20

The FTC discusses (at 58-89) three of those factors, arguing that the merger's nature and purpose is anticompetitive, that there is a trend toward concentration in the industry, and that the merger would increase barriers to entry. But in its check-the-box march through those points, the Commission sidesteps the key issue of whether it can raise serious questions about whether the transaction would probably harm competition. *See AT&T*, 916 F.3d at 1032. The FTC should not be permitted to avoid modern antitrust principles just by invoking *Brown Shoe*. *See Fruehauf*, 603 F.2d at 352 & n.9 (*Brown Shoe* does not excuse the FTC from showing what a challenged merger's "anticompetitive effect on the market, if any, is likely to be").

*First*, the Commission argues (at 59-60) that the "nature and purpose" of the transaction is "anticompetitive" because Microsoft will offer *Call of Duty* on its Game Pass subscription service, but not competing services. This argument rests on a factual claim (at 32) that Microsoft gaining control of Activision "would extinguish any chance that Activision titles will be offered on subscription services other than" Game Pass. But the district court disagreed, finding that Activision rarely, if ever, makes its games available on subscription services, and

21

crediting testimony that Activision's "long-held stance on subscription services" would not change. 1-ER-50. So while the FTC claims it is *possible* that Activision would change its mind, the Commission fails to raise serious questions about whether it is *probable*. And as *Brown Shoe* made clear, the Clayton Act is not concerned with "ephemeral possibilities" of harm. 370 U.S. at 323. Rather, it requires examining the "probable effects of the merger upon the economics of the particular markets affected." *Id.* at 333.

*Second*, the FTC's claim (at 61) that there is a "trend toward concentration" is question begging at best. The FTC does not argue that the transaction would increase concentration in any relevant market such that consumers will suffer from restricted output and higher prices – nor could it. *See AT&T*, 916 F.3d at 1032 ("[V]ertical mergers produce no immediate change in the relevant market share."). Indeed, the FTC's theory rests on the console market becoming *less concentrated*, by shifting customers towards Microsoft and away from Sony, "[t]he dominant player." 1-ER-10; *see* Answering Br. 63-64.

*Third*, the FTC's arguments about increasing barriers to entry merely rehash its claims about Microsoft's incentives to foreclose. The

Commission highlights (at 59) that the merged firm would control Activision's popular AAA games, particularly *Call of Duty*, which the FTC alleges are significant complements to gaming consoles and services. But it never explains why Microsoft would use that control to foreclose rivals. The district court concluded that there was no evidence that it would be profitable for Microsoft to do so. 1-ER-45.

The FTC's *Brown Shoe* analysis shows the importance of grounding antitrust arguments in sound economic analysis. To answer whether a transaction's "nature and purpose" is "anticompetitive" first requires some evidence about the transaction's economic effects. If economic analysis shows that a merger will not harm competition, then the "nature and purpose" of that merger is not "anticompetitive." The same goes for claims about barriers to entry. If the merged firm has no incentive to impose those barriers, then its theoretical ability to impose them does not create any significant risk of competitive harm.

At bottom, listing potentially relevant considerations like the *Brown Shoe* factors gives no guidance about the weight each consideration deserves. The best answers available to these questions typically come from rigorous economic analysis, which is absent here.

## CONCLUSION

The Court should affirm the district court's denial of the Federal

Trade Commission's motion for a preliminary injunction.


Date: September 13, 2023         Respectfully submitted,


*/s/ Aaron M. Panner*

Aaron M. Panner
Derek C. Reinbold
KELLOGG, HANSEN, TODD, FIGEL
   & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
dreinbold@kellogghansen.com

*Counsel for Amici Curiae*

24

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 23-15992

I am the attorney or self-represented party.

**This brief contains** | 4,510 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [               ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Aaron M. Panner | **Date** | September 13, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that, on September 13, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Aaron M. Panner*

Aaron M. Panner

# ADDENDUM

### **List of Amici**[*]

1.    **Alden Abbott** served as General Counsel of the Federal Trade Commission from 2011 to 2018.

2.    **Deborah Garza** served as Deputy Assistant Attorney General and Acting Assistant Attorney General, in charge of the Antitrust Division, from 2007 to 2009.  She previously served in the Antitrust Division as Chief of Staff and Counselor from 1988 to 1989, and as a Special Assistant to the Assistant Attorney General from 1984 to 1985.

3.    **Renata Hesse** served as Acting Assistant Attorney General in the Antitrust Division from 2012 to 2013 and 2016 to 2017.  She previously served as Principal Deputy Assistant Attorney General in the Antitrust Division from 2012 to 2017, and as Section Chief from 2002 to 2006.

4.    **Abbott B. "Tad" Lipsky, Jr.** served as the Acting Director of the Federal Trade Commission's Bureau of Competition in 2017.  He

---

[*] Institutional affiliations and government service provided for informational purposes only.  The views expressed in this brief are the views of amici only.

previously served as Deputy Assistant Attorney General in the Antitrust Division from 1981 to 1983.

5. **Terrell McSweeny** served as a Commissioner of the Federal Trade Commission from 2014 to 2018. She previously served as Chief Counsel for Competition Policy and Intergovernmental Relations for the Antitrust Division from 2012 to 2014.

6. **Charles F. "Rick" Rule** served as Assistant Attorney General, in charge of the Antitrust Division, from 1986 to 1989. He previously served as Principal Deputy Assistant Attorney General from 1985 to 1986, as Acting Assistant Attorney General in 1985, as Deputy Assistant Attorney General from 1984 to 1985, and as Special Assistant from 1982 to 1984.

7. **Jeffrey Schmidt** served as Director of the Federal Trade Commission's Bureau of Competition from 2005 to 2008.

8. **Mark Whitener** served at the Federal Trade Commission from 1991 to 1997, including as Deputy Director of the Bureau of Competition from 1993 to 1997.