No. 23-15992

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

FEDERAL TRADE COMMISSION,
*Plaintiff-Appellant*,

v.

MICROSOFT CORP. and ACTIVISION BLIZZARD, INC.
*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-cv-2880
(Hon. Jacqueline Scott Corley)

**BRIEF FOR ECONOMISTS AND ANTITRUST SCHOLARS
AS *AMICI CURIAE* IN SUPPORT OF APPELLEE AND AFFIRMANCE**

Dana Foster
Soraya Todd
**WHITE & CASE**
701 Thirteenth Street N.W.
Washington, D.C. 20003
(202) 626-3600

Jack E. Pace III
**WHITE & CASE**
1221 Avenue of the Americas
New York, NY 10020-1095
(212) 819-8200

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

                                                                                                                        **Page**

TABLE OF CONTENTS ...................................................................................... ii

TABLE OF AUTHORITIES ............................................................................... iv

INTEREST OF AMICUS CURIAE ..................................................................... 1

SUMMARY OF THE ARGUMENT ................................................................... 2

ARGUMENT ....................................................................................................... 4

I.     THE FTC'S THEORY FAILED TO SHOW THAT MICROSOFT HAD AN INCENTIVE TO FORECLOSE RIVALS FROM *CALL OF DUTY*, AND IT DID NOT SHOW THE MERGER WOULD HAVE AN ANTICOMPETITIVE EFFECT ............................................................... 4

        A.     The FTC's Theory Did Not Provide Evidence Of Microsoft's Incentive To Foreclose Rivals, A Necessary Element Of Anticompetitive Harm ................................................................... 4

        B.     The FTC's Economic Model Did Not Properly Account For The Merger's Procompetitive Benefits Or Economic Realities Of The Industry ................................................................................ 6

        C.     Rather Than Viewing Microsoft's Efforts To Expand *Call of Duty*'s Availability As "Remedial," The FTC's Theory Should Have Accounted For Them As Evidence Of A (Lack Of) Incentive To Foreclose ............................................................................................. 7

        D.     Even If The FTC's Model Showed An Actual Incentive To Foreclose, The Merger's Effect Was Not Substantially To Lessen Competition .. 9

II.    THE DISTRICT COURT'S ANALYSIS OF THE LIBRARY SUBSCRIPTION SERVICES MARKET ACCURATELY REFLECTED BOTH THE BUT-FOR WORLD AND MICROSOFT'S CONDUCT POST-MERGER ............................................................................................................ 9

<4>
<5>
<6>
<7>

<9>

<10>
<11>

<13>
<14>
<15>

<17>
<18>

<20>
<21>
<22>

    A.    Foreclosure Theory Rests On The Premise That Either Inputs Or Customers—Accessible To Rivals Pre-Merger—Would Be *Otherwise* Foreclosed To Rivals Post-Merger ..................................................... 10

    B.    The FTC's Foreclosure Theory Did Not Consider The Output-Expanding Nature Of The Merger ..................................................... 10

CONCLUSION ............................................................................................... 13

## TABLE OF AUTHORITIES

Page(s)

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed. 2023) ........................... 12

European Commission Press Release IP/23/2705, Mergers: Commission Clears Acquisition of Activision Blizzard by Microsoft, Subject to Conditions (May 15, 2023) ........................................................................................ 6

Patrick Rey & Jean Tirole, A Primer on Foreclosure, 3 Handbook of Industrial Organization 2145 (2006) ............................................................... 10

Steven C. Salop, *Invigorating Vertical Merger Enforcement*, 127 Yale L.J. 1962, 1975 (2018) ..................................................................... 10

Steven S. Salop & Daniel P. Culley, *Revising the US Vertical Merger Guidelines: Policy Issues and an Interim Guide for Practitioners*, in, *Corporate Acquisitions and Mergers,* § 9.08 (Matthew Bender, ed., 2023) ........................ 12

U.K. Competition & Markets Authority, Anticipated Acquisition by Microsoft of Activision Blizzard, Inc. Final Report, at 4 (Apr. 26, 2023) ......................... 6

## INTEREST OF AMICUS CURIAE

*Amici curiae* are economists and antitrust scholars who write to share their perspective with the Court.[1] The names of the signatories appear in the attached Addendum.

We have an interest in ensuring the proper application of antitrust doctrine and that it reflects current economic principles.[2]

We think that the District Court followed the law and sound economic principles in reviewing the FTC's challenge to the vertical merger between a platform provider (Microsoft) and a content creator (Activision).

---

[1] Under Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, *amici* certify that (i) no party's counsel authored the brief in-whole or in-part; (ii) no party or a party's counsel contributed money that was intended to fund preparing or submitting the brief; and (iii) no person, other than *amici* or its counsel, contributed money that was intended to fund preparing or submitting the brief.

[2] All parties have consented to the filing of this brief.

## SUMMARY OF THE ARGUMENT

The FTC proceeded against the proposed Microsoft-Activision merger with a prospective theory based on the FTC's predicted economic incentives of Microsoft to foreclose Activision's first-person shooter video game, *Call of Duty*—a 20-year, multi-platform franchise—from all rivals in three proposed markets: high performance consoles, cloud streaming, and library subscription services. After the parties submitted extensive factual and expert evidence, the District Court concluded that the FTC had not shown a likelihood that it would prevail on its claim that this vertical merger may substantially lessen competition.

The District Court followed the proper framework for reviewing the merger given the FTC's vertical theory of harm. First, a court must consider whether the combination has the ability and the incentive to foreclose the input from rivals. If the court determines both ability and incentive exist, the court must decide what effect, if any, such a foreclosure will have on competition.

Accepting the FTC's narrow high-performance-console market for Rule 13(b) purposes, the District Court concluded that Microsoft lacked an economic incentive to foreclose *Call of Duty* from Sony, the dominant player in the FTC's market. In so doing, the District Court rejected the FTC's theory that Microsoft's commitment to Sony to continue offering *Call of Duty* on PlayStation was a "proposed remedy" unworthy of consideration under Rule 13(b).

The District Court also concluded that the merger would expand access to *Call of Duty* to the benefit of gamers. With respect to the nascent cloud-streaming market, the District Court found that, pre-merger, Activision had not made *Call of Duty* available to any cloud-streaming providers and was unlikely to do so based on a long-held view that doing it was not in its interest. Microsoft's plan to add *Call of Duty* to its streaming service represented an output-expanding product of the merger. Moreover, Microsoft had reached agreements with five (5) cloud-streaming providers to allow them to stream the game as well, which the District Court concluded would result in the merger creating more (not less) *Call of Duty* availability. And the District Court's consideration of these agreements—including with sophisticated providers like Nvidia—countered the FTC's central theory that Microsoft would limit the availability of *Call of Duty* to its own platform.

Regarding the proposed library subscription market, the District Court found that, pre-merger, *Call of Duty* was not currently available to gamers via subscriptions, and that Activision had no plans to offer it to gaming platforms. Moreover, based on current market conditions and Activision's actions before the merger, the District Court found that, even accepting for preliminary injunction purposes that Microsoft would offer *Call of Duty* exclusively on its own subscription service, the merger would not represent input foreclosure because the

3

alternative was no access to the game by subscription at all. The District Court rejected the FTC's economic theory that *more* availability of an input, even if only via Xbox's library subscription service, could result in *less* competition.

Finally, the critical element in the analysis of the effects of the merger is the impact that potential foreclosure would have on competition. The District Court did not reach this ultimate step, having found no incentive to withhold *Call of Duty*. But the fact that the FTC's expert economist concluded that, at worst, the transaction would result in a 5.5% share shift from the dominant platform (Sony PlayStation) to the much smaller platform (Xbox), suggests that the transaction is unlikely to harm competition. And it belies the FTC's other argument that the transaction would increase a trend toward concentration, which in any event is not a proxy for showing harm to competition.

## ARGUMENT

**I. THE FTC'S THEORY FAILED TO SHOW THAT MICROSOFT HAD AN INCENTIVE TO FORECLOSE RIVALS FROM *CALL OF DUTY*, AND IT DID NOT SHOW THE MERGER WOULD HAVE AN ANTICOMPETITIVE EFFECT**

### A. The FTC's Theory Did Not Provide Evidence Of Microsoft's Incentive To Foreclose Rivals, A Necessary Element Of Anticompetitive Harm

The District Court found that the FTC's foreclosure theory in the high-performance console market—under which Microsoft would have the economic incentive to completely foreclose Sony from *Call of Duty*—did not include

4

empirical evidence of that incentive. 1 ER-41-45. To show an economic incentive to foreclose, an economist must assess whether the benefits of foreclosure outweigh the costs in lost sales. As the District Court explained, the FTC's economic expert *assumed* that there would be significant diversion to Xbox in the event PlayStation gamers could no longer play *Call of Duty*,[3] which effectively assumes the critical question in a vertical analysis. 1-ER-42. If the District Court was correct, simply assuming a certain percentage of diversion—which, in turn, assumed an incentive to foreclose—is not a reliable way in which economists show foreclosure.

The District Court noted that the parties provided empirical evidence that such an incentive did not exist due to the substantial losses Microsoft would incur if it were to no longer generate *Call of Duty* revenues from gamers on the dominant platform. And due to the popularity of cross-platform play among *Call of Duty* players, withholding the game from Sony would also degrade the value of the game to Xbox players as well. 1-ER-37-38. Failure to consider this evidence would also be unreliable as a matter of economics.

---

[3] The FTC's expert *assumed* his outcome-determinative 20% conversion rate; it was not based on evidence. "The conversion rate is the fraction of remaining purchasers—'affected users'—that would purchase an Xbox console to play *Call of Duty 2025* if it was not available on PlayStation." 1-ER-42.

Like the District Court, the United Kingdom's Competition & Markets Authority and the European Commission, among other regulators, also found that Microsoft has no incentive to foreclose Sony's access to *Call of Duty*. *See* U.K. Competition & Markets Authority, Anticipated Acquisition by Microsoft of Activision Blizzard, Inc. Final Report, at 4 (Apr. 26, 2023); European Commission Press Release IP/23/2705, Mergers: Commission Clears Acquisition of Activision Blizzard by Microsoft, Subject to Conditions (May 15, 2023). This global consensus that console foreclosure is implausible is consistent with the conclusion that the proposed merger is unlikely to substantially lessen competition.

### B. The FTC's Economic Model Did Not Properly Account For The Merger's Procompetitive Benefits Or Economic Realities Of The Industry

To assess ability and incentive to foreclose, an economic model must account for the realities of the industry.

***The FTC's model did not account for evidence of Microsoft's lack of an incentive to foreclose***. As the District Court found, there is no evidence in the record that Microsoft has a plan to foreclose *Call of Duty* from Sony. 1-ER-34. While the absence of such evidence is not necessarily dispositive of the likelihood of foreclosure, it would reinforce the economic conclusion that Microsoft's incentives point in that direction. Here, the economics based on the facts found by the District Court suggest that: (1) the cost of losing the sales to Sony gamers is

likely quite significant; (2) recoupment in the form of diversion to Xbox by foreclosed Sony gamers would therefore have to be significant; and (3) multiplayer games like *Call of Duty* benefit from network effects; that is, the more users play, the more valuable the game is to the users, which incentivizes Microsoft to expand, not restrict, availability. Failure to account for these considerations would undermine the reliability of the FTC's foreclosure analysis.

*The FTC does not account for Sony's response to the foreclosure of Call of Duty*. The District Court found that there are far more exclusive games on PlayStation than Xbox, and that Sony uses its market power to extract "other preferential treatment from third-party game developers," that partially foreclose Microsoft. 1-ER-10-11. This power suggests that if Microsoft refused to offer *Call of Duty* on Sony's PlayStation, Sony has the means to respond. And Sony's response could benefit consumers in several ways, including increasing its investment in its own exclusive content, either first-party or third-party. A static model that does not account for Sony's likely responses to foreclosure would not fully ascertain Microsoft's incentives to foreclose in the first place.

### C. Rather Than Viewing Microsoft's Efforts To Expand *Call of Duty*'s Availability As "Remedial," The FTC's Theory Should Have Accounted For Them As Evidence Of A (Lack Of) Incentive To Foreclose

In considering Microsoft's post-merger economic incentives to block access to the game, the District Court took note of Microsoft's (1) offer to continue to

7

make *Call of Duty* available to Sony users,[4] (2) agreement to make *Call of Duty* available on Nintendo, and (3) agreements with five cloud-streaming providers as evidence that it would not foreclose rivals. 1-ER-34-35; 1-ER-50.

While in many cases behavioral remedies to anticompetitive mergers are usually disfavored partial solutions, Microsoft's agreements appear to go to the heart of the core issue of whether Microsoft has the ability and incentive to foreclose competitors. There appears to be no dispute that the contracts are legally binding on private parties who stand to gain from Microsoft's adherence to them. Also, to the extent that the contracts provide long-term price protection, they would preclude Microsoft from raising its rival's costs, to the extent that could impact Sony's competitiveness, which is often a key concern in vertical cases.

This evidence was relevant to the FTC's central argument, *i.e.*, that Microsoft's financial incentives were so overwhelming that they would foreclose *Call of Duty* from Sony. 1-ER-32-33. Failure to account for this evidence would also diminish the reliability of the FTC's economic model.

---

[4] According to Microsoft, Sony has now accepted this offer. Appellee Br. 24.

### D. Even If The FTC's Model Showed An Actual Incentive To Foreclose, The Merger's Effect Was Not Substantially To Lessen Competition

Once the ability and incentive to foreclose is determined, the final step in vertical merger analysis is to determine the impact of such foreclosure on competition. Here, the FTC showed only that the merger would result in a 5.5% share shift in the console market from the dominant firm (Sony) to the lesser firm (Microsoft).[5] The District Court found that this calculation was "flawed" (1-ER-42), but even if accepted, such a market-share shift could indicate that Microsoft is a more effective competitor to Sony, which would mean that the effect would be competition-enhancing.

## II. THE DISTRICT COURT'S ANALYSIS OF THE LIBRARY SUBSCRIPTION SERVICES MARKET ACCURATELY REFLECTED BOTH THE BUT-FOR WORLD AND MICROSOFT'S CONDUCT POST-MERGER

For there to be post-merger input foreclosure, the input needs to be available to rivals without the merger. Put another way, if the input—here, *Call of Duty*—is not available to Microsoft's rivals in the library subscription services market pre-merger, the same potential unavailability post-merger cannot result in harm that a court should consider.

---

[5] The FTC's expert calculated a 5.5% increase "in Xbox's share of the Gen 9 console market." 1-ER-41.

9

### A. Foreclosure Theory Rests On The Premise That Either Inputs Or Customers—Accessible To Rivals Pre-Merger—Would Be *Otherwise* Foreclosed To Rivals Post-Merger

Denying downstream rivals access to a critical upstream input can increase rivals' costs and decrease the quality and innovation of products in the downstream market as compared to a market in which rivals have access to the input. *See* Steven C. Salop, Invigorating Vertical Merger Enforcement, 127 Yale L.J. 1962, 1975 (2018). "Vertical foreclosure may arise when a firm controls an input that is essential for a potentially competitive industry. The bottleneck owner can then alter competition by denying or limiting access to its input." Patrick Rey & Jean Tirole, A Primer on Foreclosure, 3 Handbook of Industrial Organization 2145 at 8 (2006).

It is this theory—that Microsoft's acquisition of Activision would provide Microsoft with the incentive to withhold *Call of Duty* from, *inter alia*, subscription service providers and substantially lessen competition in price, quality, and innovation—upon which the FTC sought to block the merger. Appellant's Br. 13. Essential to this theory is that the essential input—here, *Call of Duty*—is available to the rivals of the combination before the merger.

### B. The FTC's Foreclosure Theory Did Not Consider The Output-Expanding Nature Of The Merger

Here, according to the District Court, Activision has eschewed the library subscription model because it undermines Activision's traditional buy-to-play

10

business model, and Activision has no vested interest in the growth of subscription services. 1-ER-17. Microsoft, in contrast, does have an interest in seeing its subscription offering grow. The FTC fails to consider this output expansion relative to the but-for world. Although the FTC's expert concluded that Microsoft would offer *Call of Duty* exclusively on Microsoft's Game Pass, the alternative was the absence of access to the game on any subscription service; this is an output expansion which is generally pro-competitive.

*Output expansion is commonly understood by economists to be a benefit to the extent that it is a product of a merger, as the District Court found to be the case here*. The District Court understood the differences in incentives pre-merger, and therefore concluded that but-for the merger, *Call of Duty* would not be available in any subscription service libraries. 1-ER-48. But, with the merger, Microsoft's interest in growing its subscription service makes it more likely that it will add *Call of Duty* to Game Pass—a decision that was baked into the deal model. That predictable result is an output-enhancing benefit to customers that the District Court properly included as a procompetitive aspect of the merger. 1-ER-47-48.

*Even if Call of Duty was offered exclusively on Game Pass, output would have expanded*. And not only would this result in expanded output to Game Pass users, but also it could both increase Microsoft's incentive to invest in other games

11

and increase the incentives of Microsoft's rivals to improve their offerings to better compete with Game Pass. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, at ¶¶1021, 1024 (4th ed. 2023); Steven S. Salop & Daniel P. Culley, *Revising the US Vertical Merger Guidelines: Policy Issues and an Interim Guide for Practitioners*, *in*, *Corporate Acquisitions and Mergers* § 9.08 (Matthew Bender, ed., 2023) ("A vertical merger potentially can generate a variety of efficiency benefits from vertical cooperation that improves communication flows and harmonizes the incentives of the merging firms. The benefits can include cost reductions and improved product design that can lead to lower prices, higher quality products, and increased investment."). An analysis that does not account for these potential benefits would be incomplete.

**The FTC's theory cannot be correct given the District Court's finding that Call of Duty would not be in any subscription absent the merger**. The District Court concluded that "Activision does not allow, and has no plans to allow, its games in multigame subscription libraries upon release." 1-ER-17 (citing Dkt. No. 285, 6/28/23 Tr. (Kotick), at 731:12- 14 ("In our current long-range plan, we don't have any revenues that are being generated from a multigame subscription service")). The District Court also found that Activision withheld its content from library subscription services for fear that participating in such libraries would

cannibalize its console game sales. 1-ER-49; *see also* 2-ER-83:5-11. If these findings are true, then the economic conclusion follows that the merger would have the pro-competitive effect of expanding access to Activision games.

## CONCLUSION

For these reasons, this Court should affirm the District Court's decision denying the FTC's motion.

Date: September 13, 2023            Respectfully submitted,

*/s/ Dana Foster*
Dana Foster
Soraya Todd
**WHITE & CASE**
701 Thirteenth Street N.W.
Washington, D.C. 20003
(202) 626-3600

Jack E. Pace III.
**WHITE & CASE**
1221 Avenue of the Americas
New York, NY 10020-1095
(212) 819-8200

*Attorneys for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** <u>23-15992</u>

I am the attorney or self-represented party.

**This brief contains** __**2693**__ **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** <u>/s/ Dana Foster</u> **Date** <u>September 13, 2023</u>
*(use "s/[typed name]" to sign electronically filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 13, 2023. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

                                                 /s/ Dana Foster
                                                   Dana Foster

# ADDENDUM[*]

Matthew Backus, Assistant Professor, Economic Analysis & Policy, Haas School of Business, University of California, Berkeley

Donald J. Boudreaux, Professor of Economics, former Chair of the Department of Economics, George Mason University

Vivek Ghosal, Professor and Department Head of Economics, and Virginia and Lloyd W. Rittenhouse Chaired Professor of Humanities and Social Sciences, Rensselaer Polytechnic Institute

Justin (Gus) Hurwitz, Senior Fellow, Academic Director of the Center for Technology, Innovation & Competition, University of Pennsylvania Carey Law School

Ginger Jin, Professor of Economics, University of Maryland

Geoffrey A. Manne, President and Founder, International Center for Law and Economics, Distinguished Fellow, Northwestern University Center on Law, Business & Economics

Michael Sykuta, Associate Professor of Economics, Executive Director, The Financial Research Institute, University of Missouri

Steven Tadelis, Professor of Economics, Sarin Chair in Leadership and Strategy, Haas School of Business, University of California, Berkeley

Guofu Tan, Professor of Economics, University of Southern California

---

[*] The brief presents the views of the individual signers. Institutions are listed for identification purposes only.