# EXHIBIT B

**Undertakings given by Microsoft Corporation and Activision Blizzard, Inc. to the Competition and Markets Authority pursuant to section 73 of the Enterprise Act 2002**

Whereas

(a)     Microsoft Corporation (**Microsoft**) entered into an agreement and plan of merger with Activision Blizzard, Inc. (**Activision**) and Anchorage Merger Sub Inc. (**Merger Sub**) on 18 January 2022 pursuant to which Microsoft intends to acquire all of the common stock of Activision through a merger of Microsoft's wholly owned subsidiary, Merger Sub, with and into Activision such that Activision will survive as a wholly owned subsidiary solely controlled by Microsoft and will cease to be distinct for the purposes of the Enterprise Act 2002 (the **Act**) (**Merger**);

(b)     Activision and its affiliates entered into legally binding agreements as of 21 August 2023 (the **Divestment Agreements**) to divest the cloud streaming rights in relation to certain current and future Activision console and PC games (**Activision Games**) worldwide excluding the EEA (the **Cloud Streaming Rights**), which will be transferred by Activision to PJSC, LLC (**Cloud Newco**).  Cloud Newco will be acquired by Ubisoft Entertainment SA (**Purchaser**);

(c)     In its decision of 22 September 2023 (the **Decision**), the Competition and Markets Authority (**CMA**) decided under section 33(1) of the Act that Microsoft's acquisition of Activision, excluding Cloud Newco, amounts to a relevant merger situation for the purposes of the Act, and that it may be the case that the acquisition may result in a substantial lessening of competition in the supply of cloud gaming in the UK;

(d)     Under section 33(1) of the Act the CMA has a duty to refer a relevant merger situation for a Phase 2 investigation where it believes that it is or may be the case that the creation of that merger situation has resulted or may be expected to result in a substantial lessening of competition within any market or markets in the UK for goods or services;

(e)     Under section 73 of the Act the CMA may, instead of making such a reference and for the purpose of remedying, mitigating or preventing the substantial lessening of competition concerned or any adverse effect which has or may have resulted from it or may be expected to result from it, accept undertakings to take such action as it considers appropriate from such of the parties concerned as it considers appropriate.  In particular, the CMA shall have regard to the need to achieve as comprehensive a solution as is reasonable and practicable to the substantial lessening of competition and any adverse effects resulting from it;

(f)     As set out in the Decision, the CMA believes that, in the absence of appropriate undertakings, it would be under a duty to refer the acquisition for a Phase 2 investigation;

(g)     Microsoft and Activision (the **Parties**) give the undertakings below in order to provide the CMA with the right to appoint a trustee and the ability to ensure compliance with the undertakings set out in paragraph 2; and

(h)     The CMA considers that the undertakings given below by the Parties are appropriate to remedy, mitigate or prevent the substantial lessening of competition, or any adverse effect which has or may have resulted from it, or may be expected to result from it, as specified in the Decision.

**NOW THEREFORE** the Parties hereby give to the CMA the following undertakings for the purpose of remedying, mitigating or preventing the substantial lessening of competition, or any adverse effect which has or may have resulted from it or may be expected to result from it.

## 1.     EFFECTIVE DATE OF THE UNDERTAKINGS

1.1     These undertakings shall take effect from the date that, having been signed by the Parties, they are accepted by the CMA.

## 2.     UNDERTAKINGS

2.1     The Parties undertake to comply with the terms of the Divestment Agreements set out in Schedule 4 as may be amended from time to time (where such amendments do not undermine the purpose of these undertakings of remedying, mitigating or preventing the substantial lessening of competition concerned or any adverse effect which has or may have resulted from it or may be expected to result from it) with the prior written consent of the CMA.  In particular, under the terms of the Divestment Agreements, the Parties undertake during the Term[1]:

(a)     **Delivery of Activision Games**: To deliver to Purchaser and, as applicable, any sublicensee of Purchaser (**Sublicensee**), (i) a cloud streaming version of the Activision Games in a standard executable format which includes any platform work for use in Purchaser's and, if applicable, a Sublicensee's Cloud Streaming Gameplay Service, localized in the same languages and in the same manner (i.e., voiceovers, subtitles, text translations) as the respective non-cloud streaming version of the same Activision Game; and (ii) all other technical materials and documentation that are reasonably necessary for Purchaser and Sublicensees to exercise the Cloud Streaming Rights.  The Parties will ensure that the quality, content, features and performance (except for differences caused by the means

---

[1]     For the avoidance of doubt, it is the wording of the clauses themselves (rather than the wording of the summaries of clauses in paragraphs 2.1(a) to 2.1(l)) with which the Parties undertake to comply.

of streaming) of any Activision Game cloud streaming version, as delivered to Purchaser and as applicable, to any Sublicensees, will be the same in all material respects to the non-streaming version of such Activision Game. The Parties will not design or develop PC versions of Activision Games or any other versions which are or are planned to be available on multiple Cloud Streaming Gameplay Services to be solely optimized for Cloud Streaming Gameplay on Microsoft's own Cloud Streaming Gameplay Service.

(b) **Licences to Microsoft**: Purchaser will not be authorised to license Cloud Streaming Rights to Microsoft or its affiliates on an exclusive basis. Any such purported licence would be null and void. Other than in order to comply with the Existing Agreements, where Purchaser makes available or offers certain Cloud Streaming Rights to third parties (including Microsoft), Purchaser will not (i) license Cloud Streaming Rights to Microsoft at preferential pricing not made available to third parties (other than Microsoft), or (ii) provide Microsoft with material preferential treatment with respect to Cloud Streaming Rights that Purchaser does not make available to third parties (other than Microsoft).

(c) **No Interference with Purchaser's Cloud Streaming Rights**: Except as required to comply with Microsoft's commitments to the European Commission (**EC Commitments**), the Parties will not take any actions or omissions or otherwise fail to act, in each case in any manner that would reduce, limit, interfere, frustrate or impact Purchaser's Cloud Streaming Rights and the exercise of such rights as contemplated under the Divestment Agreements.

(d) **Trademark Licence**: To grant Purchaser a non-exclusive, royalty-free, fully paid-up, sub-licensable (in accordance with the terms of the Divestment Agreements), non-transferable (except as provided under the terms of the Divestment Agreements) licence to use the Activision Game marks, as identified in the Divestment Agreements, solely for use in relation to the Cloud Streaming Rights.

(e) **Game Technical Support, Game Ports and Technical Work, and Platform Work**: To provide reasonable technical support for the Activision Games (i) to the Purchaser and (ii) to any Sublicensees, provided that, in the case of Sublicensees, the Parties' reasonable costs are covered. To port individual PC versions of Activision Games to a non-Windows PC platform for cloud streaming gameplay use at the written request of Purchaser. To perform certain technical modifications of the Activision Games including to support emulators, such as Proton, which allow Activision Games to run on non-Windows operating systems at the request of Purchaser. For game ports and technical work, the Parties shall be permitted to charge Purchaser for the reasonable costs incurred. Porting and technical work will be done at the Parties' regular pace for

3

those categories of work and at a quality and standard which is customary in the gaming industry. The Parties are also required to provide Ubisoft with development and porting plans for the Activision Games reasonably in advance.

(f)     **Development and Release Date Parity**: To provide Purchaser with the cloud streaming version of the Activision Games and applicable DLC sufficiently in advance of their commercial launch, to permit Purchaser to release any such game and applicable DLC on the same date as the date they are commercially released on PC and console platforms respectively and on a country per country basis.

(g)     **Sale of Purchaser's Cloud Streaming Rights for Activision Games and Related DLC by Purchaser**: To provide Purchaser purchasing terms based on industry standard wholesale pricing, including an option that supports pricing based on usage, to enable Purchaser to sell streaming entitlements for accessing Activision Games or related DLC solely for Cloud Streaming Gameplay. Wholesale pricing will be no higher than the Parties' wholesale price for digital download and retail sales of PC and console versions of the same content (whichever is lower). To grant Purchaser full discretion over monetization of the Activision Games in connection with Purchaser's Cloud Streaming Rights. Purchaser shall have freedom to determine the actual retail price and business models for its sales, licences or sublicences of the Cloud Streaming Rights. For the sake of clarity, Purchaser may, at its discretion, monetize the Cloud Streaming Rights for Activision Games by individual game titles, as part of multi-game subscriptions, or via any other business model currently existing or developed in the future (including without limitation, as part of bundles, crossovers and compilations).

(h)     **Audit Rights**: To allow Purchaser to audit the Parties up to one time in any twelve month period in order to verify its records and compliance with the terms of the Divestment Agreements.

(i)     **Marketing**: To the extent that the Parties have the right, to provide Purchaser and, as applicable, any Sublicensee with all promotional and marketing assets related to the Activision Games that Activision uses for its own marketing or promotion of the Activision Games (**Activision Marketing Materials**) for the purpose of advertising, marketing or promoting cloud streaming gameplay of the Activision Games and/or the Cloud Streaming Rights. When obtaining licences or rights from third parties for content used or depicted in the Activision Marketing Materials, the Parties shall make commercially reasonable efforts to ensure such licences or rights cover the use of such Activision Marketing Materials by Purchaser and as applicable, any Sublicensee. Purchaser shall have the right to modify or create derivatives of the Activision Marketing Materials

4

provided that they comply with the Parties' trademark usage guidelines and quality standards.

(j) **Term and Termination**: The Parties may not terminate the Divestment Agreements due to any breach by Purchaser.

(k) **Assignment**: To allow Purchaser to assign the Divestment Agreements to its parents and majority-owned subsidiaries and affiliates, including as part of a company restructuring, without the Parties' consent. Assignment to any other person or entity will require the Parties' consent in certain circumstances, such consent not to be unreasonably withheld, delayed, or conditioned.

(l) **Fast-Track Escalation Process, Binding Arbitration**: To resolve disputes arising in respect of the Divestment Agreements through a fast-track escalation process (**Fast-Track Escalation Process**) and arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules.

## 3. APPOINTMENT OF A TRUSTEE

3.1 Within 5 Working Days of the CMA notifying the Parties in writing that they must do so, the Parties shall propose to the CMA for approval:

(a) the names of at least two individuals to exercise the Trustee Functions; and

(b) the full terms of a mandate in accordance with which the Trustee shall carry out the Trustee Functions.

3.2 The Parties and/or any individuals nominated pursuant to paragraph 3.1 shall satisfy the CMA that, save as required or permitted by the CMA:

(a) such nominated individuals have the necessary qualifications to carry out their mandates, and are employees or partners of an investment bank, retail bank, commercial property agent, building society or law firm or accountancy firm with an established reputation either nationwide or in a substantial part of the UK or in an EU member state;

(b) such nominated individuals are each independent of the Parties and Purchaser and of the Group of Interconnected Bodies Corporate to which the Parties or Purchaser belong and of any Associated Person or Affiliate of the Parties or Purchaser, and, in the reasonable opinion of the Parties, are appropriate to be appointed as Trustee; and

(c) such nominated individuals neither are, nor are likely to become, exposed, either directly or indirectly, to a conflict of interest that impairs or may be likely to impair their objectivity or independence in discharging the Trustee Functions.

3.3    Within 2 Working Days of the CMA approving, at its discretion, one or more of the persons nominated by the Parties and their proposed mandates pursuant to paragraph 3.1 above, and subject to any modifications the CMA deems necessary for the Trustee to carry out the Trustee Functions, the Parties shall use their best endeavours to appoint from the persons so approved one person to carry out the Trustee Functions in accordance with the mandate approved by the CMA pursuant to paragraph 3.1 above.

3.4    In the event that:

(a)    the Parties fail to propose any person or persons in accordance with paragraph 3.1 above; or

(b)    none of the persons proposed by the Parties pursuant to paragraph 3.1 is approved by the CMA; or

(c)    the Parties are unable for any reason to appoint within the time limit stipulated in paragraph 3.3 above any such person following approval by the CMA,

the Parties shall use their best endeavours to appoint from persons nominated by the CMA one person to carry out the Trustee Functions on the terms of a mandate approved by the CMA. The Parties shall use their best endeavours to make such appointment within 5 Working Days of receiving the nominations from the CMA.

3.5    The appointment of the Trustee pursuant to paragraph 3.3 or paragraph 3.4 above shall be irrevocable unless:

(a)    a conflict of interest that impairs or may be likely to impair the objectivity or independence of the Trustee in discharging the Trustee Functions arises;

(b)    the Trustee ceases to perform the Trustee Functions; or

(c)    the CMA is otherwise satisfied that there is good cause for the appointment to be terminated in advance of the satisfactory fulfilment of the Trustee Functions.

3.6    In the event that the appointment of the Trustee is terminated in accordance with paragraph 3.5 above, the Parties shall, if requested to do so in writing by the CMA, use their best endeavours to appoint from persons nominated by the CMA one person to carry out the Trustee Functions in accordance with such mandate as is approved by the CMA. The Parties shall use its best endeavours to make such appointment within seven Working Days of receiving the nominations from the CMA. Where required by the CMA, the outgoing Trustee shall continue as Trustee until a new Trustee is in place and a full handover of all relevant information has taken place.

6

4.      **THE MANDATE**

4.1     The terms of the mandate proposed by the Parties pursuant to paragraph 3.1 above shall, as a minimum, contain all provisions necessary to enable the Trustee to carry out the Trustee Functions including, without limitation to the generality of this paragraph:

      (a)     to monitor the satisfactory discharge by the Parties of the obligations entered into in these undertakings and with any orders and/or directions given to the Parties by the CMA in relation to the Parties' obligations under these undertakings;

      (b)     a mandate to take any other steps necessary for, or incidental to, the Trustee's mandate under sub-paragraphs (a) above;

      (c)     to comply with any orders and/or directions given by the CMA to give effect to the undertakings;

      (d)     to appoint at Microsoft's expense such advisers as the CMA and/or the Trustee reasonably consider necessary or appropriate in connection with the performance of the Trustee Functions;

      (e)     at any time, to provide to the CMA, at its request, a written or oral report on matters falling within the scope of these undertakings, which may include, but is not limited to, the subject matter and merits of any disputes arising under the Divestment Agreements which have been referred for arbitration under the provisions of such agreements.

5.      **FUNCTIONS OF A TRUSTEE**

5.1     The Trustee shall monitor the Parties' compliance with their obligations under paragraph 6.1 and paragraph 6.2 below and shall promptly take such measures as it considers necessary to ensure such compliance, as well as reporting in writing to the CMA, if the Trustee concludes on reasonable grounds that the Parties are failing or will fail to comply with such obligations.

5.2     The Trustee may give written directions to the Parties to take such steps as may be specified or described in the directions for the purpose of securing the Parties' compliance with their obligations under these undertakings or enabling the Trustee to carry out the Trustee Functions.

5.3     The Trustee shall, as soon as reasonably practicable, comply at all times with any reasonable instructions or written directions made by the CMA for the purposes of carrying out or securing compliance with the undertakings (or any matter incidental thereto) and shall provide to the CMA such information and reports in relation to the carrying out of the Trustee Functions as the CMA may require. The Trustee shall

promptly report in writing to the CMA if the Trustee concludes on reasonable grounds that the Parties are failing or will fail to comply with any of its obligations under these undertakings.

5.4    The Trustee shall have access to the Parties' books, records, documents, management or other personnel facilities, sites, technical information and electronic information necessary to fulfil its duties under these undertakings.

5.5    At Microsoft's expense, the Trustee may appoint advisors, subject to the CMA's prior approval, if the Trustee reasonably considers the appointment of such advisors necessary for the performance of its duties under the mandate, provided that any fees incurred are reasonable and Microsoft has been consulted on the appointment.

5.6    For the purpose of fulfilling the Trustee Functions, the Trustee shall not be bound by instructions of the Parties, nor shall the Trustee Functions be extended or varied in any way by the Parties save with the prior express written consent of the CMA.

## 6. OBLIGATIONS OF THE PARTIES FOLLOWING APPOINTMENT OF TRUSTEE

6.1    The Parties shall not give any instruction or request to the Trustee which conflicts with the Trustee Functions.

6.2    The Parties shall take all such steps as are reasonably necessary to enable the Trustee to carry out the Trustee Functions, including but not limited to:

   (a)    complying with such written directions as the Trustee may from time to time give pursuant to paragraph 5.2 above; and

   (b)    providing the Trustee with all such assistance and information as it may reasonably require in carrying out the Trustee Functions.

## 7. REMUNERATION OF TRUSTEE

7.1    The Parties shall pay the Trustee a reasonable remuneration for the services it provides in carrying out the Trustee Functions, and shall pay the Trustee in a way that does not impede the independent and effective fulfilment of the Trustee Functions, which shall be set out in the Trustee's mandate referred to in paragraph 4.1 above.

## 8. CONTINUED SEPARATION

8.1    Except with the prior written consent of the CMA, for a period of 10 years following the divestment of the Divestment Business, the Parties, or any member of the Group of Interconnected Bodies Corporate to which the Parties belong:

   (a)    shall not, directly or indirectly, hold, acquire, re-acquire or use

8

(i)     an Interest in the Divestment Business; or

(ii)    any Interest in any company carrying on or having Control of the Divestment Business (other than any investments made in the ordinary course of the operation of any of the employee benefit and pension schemes of the Parties or of any members of the Group of Interconnected Bodies Corporate to which the Parties belong of not more than three per cent in aggregate of the issued equity share capital in any such company, whose shares are listed or dealt with on any recognised investment exchange, which carries no more than three per cent of the voting rights exercisable at meetings of such company); or

(iii)   other than in the normal course of business, any of the assets of the Divestment Business;

(b)     shall procure that no employee or director of the Parties or any member of the Group of Interconnected Bodies Corporate to which the Parties belong for as long as they are an employee or director of the Parties or any member of the Group of Interconnected Bodies Corporate to which the Parties belong, holds or is nominated to any directorship or managerial position in the Divestment Business or directorship or managerial position in any company or other undertaking carrying on or having control of the Divestment Business without the CMA's prior written consent;

(c)     shall not participate in the formulation of, or (other than in the ordinary course of business) influence or attempt to influence, the policy of the Divestment Business or any company or other undertaking carrying on or having control of that Divestment Business; and

(d)     shall not enter into or carry out any agreement or arrangement with any person, if the carrying out of the agreement or arrangement is intended to result or will result in any Associated Person or Affiliate of the Parties or of any member of the Group of Interconnected Bodies Corporate to which the Parties belong directly or indirectly acquiring the Divestment Business or doing any of the things listed in sub-paragraphs 8.1(a), 8.1(b) and 8.1(c) above.

## 9.     COMPLIANCE

9.1     The Parties shall comply promptly with such written directions as the CMA may from time to time give:

(a)     to take such steps as may be specified or described in the directions for the purpose of carrying out or securing compliance with these undertakings; or

9

      (b)     to do or refrain from doing anything so specified or described which it might be required by these undertakings to do or to refrain from doing.

9.2     The Parties shall co-operate fully with the CMA when the CMA is:

      (a)     monitoring compliance with the provisions of these undertakings; and

      (b)     investigating potential breaches of the provisions of these undertakings.

9.3     Should a dispute arise in respect of the Divestment Agreements which is referred to first-level executives in accordance with the Fast-Track Escalation Process, the Parties shall promptly notify the CMA of the dispute and keep the CMA informed about the dispute's resolution (if applicable) or its procession through the different stages of the Fast-Track Escalation Process.

9.4     Should a dispute in relation to a proposed assignment by Purchaser under section 15 of the Divestiture Agreement be referred for arbitration under section 17 of the Divestiture Agreement, the Parties shall (i) promptly notify the CMA of the dispute, and (ii) provide the CMA with an opportunity to provide representations on the proposed assignment, should the CMA wish.

9.5     The Parties shall procure that any member of the same Group of Interconnected Bodies Corporate as the Parties complies with these undertakings as if it had given them, and actions and omissions of the members of the same Group of Interconnected Bodies Corporate as the Parties shall be attributed to the Parties for the purposes of these undertakings.

9.6     Where any Affiliate of the Parties is not a member of the same Group of Interconnected Bodies Corporate as the Parties, the Parties shall use their best endeavours to procure that any such Affiliate shall comply with these undertakings as if it had given them.

9.7     The Parties shall deliver an annual report to the CMA (the **Compliance Report**) by 31 March during each year in which these undertakings remain in force (or, where 31 March in a given year is not a Working Day, the next Working Day), with the first annual report to be delivered by 31 March 2024. Each such report shall have been approved by the Parties' Board of Directors and shall include a detailed and accurate account of:

      (a)     the steps taken to ensure compliance with these undertakings;

      (b)     instances where a breach or potential breach of these undertakings has been identified and any steps taken to rectify it; and

      (c)     how the report was compiled.

## 10. VARIATIONS

10.1 The terms of these undertakings may be varied with the prior written consent of the CMA in accordance with sections 73(5) and 73(7) of the Act.

10.2 Where a request for consent to vary these undertakings is made to the CMA, the CMA will consider any such request and will respond in writing as soon as is reasonably practicable having regard to the nature of Decision, the request and to its statutory duties.

10.3 The consent of the CMA shall not be unreasonably withheld.

## 11. PROVISION OF INFORMATION

11.1 The Parties shall furnish promptly to the CMA such information as the CMA considers necessary in relation to or in connection with the implementation and/or enforcement of and/or the compliance with these undertakings, including for the avoidance of doubt, any Confidential Information.

## 12. EXTENSION OF TIME LIMITS

12.1 The CMA may, in response to a written request from the Parties, or otherwise at its own discretion, grant an extension to any time period referred to in these undertakings.

## 13. SERVICE

13.1 Microsoft hereby authorises Weil, Gotshal & Manges (London) LLP (**Weil**) c/o Jenine Hulsmann, whose address for service is 110 Fetter Lane, London, EC4A 1AY, UK, to accept service on its behalf of all documents connected with these undertakings (including any document of any kind which falls to be served on or sent to Microsoft, or any of its Subsidiaries in connection with any proceedings in Courts in the UK, orders, requests, notifications or other communications connected with these undertakings).

13.2 Activision hereby authorises Slaughter & May c/o Claire Jeffs, whose address for service is One Bunhill Row, London, EC1Y 8YY, UK, to accept service on its behalf of all documents connected with these undertakings (including any document of any kind which falls to be served on or sent to Activision, or any of its Subsidiaries in connection with any proceedings in Courts in the UK, orders, requests, notifications or other communications connected with these undertakings).

13.3 Unless any of the Parties inform the CMA in writing that Weil or Slaughter & May respectively has ceased to have authority to accept and acknowledge service on its or any of its Subsidiaries' behalf, any document, order, request, notification or other communication shall be validly served on the Parties if it is served on Weil and

11

Slaughter & May respectively; and service shall be deemed to have been acknowledged by the Parties if it is acknowledged by Weil, Slaughter & May (together the **Nominees**) or such other nominee.

13.4 Unless any of the Parties informs the CMA in writing otherwise, paragraph 13.3 above has effect irrespective of whether, as between the Parties and their respective Nominees, the Nominees have or continue to have any authority to accept and acknowledge service on any of the Parties or any of their respective Subsidiaries' behalf.

13.5 No failure or mistake by the Nominees or any other nominees (including a failure to notify the Parties of the service of any document, order, request, notification or other communication) shall invalidate any action taken in respect of these undertakings including any proceedings or judgment.

13.6 Any communication from the Parties to the CMA under these undertakings shall be addressed to Manager, Market and Mergers Remedies Monitoring, Competition and Markets Authority, The Cabot, 25 Cabot Square, London, E14 4QZ, United Kingdom, or such other person or address as the CMA may direct in writing.

## 14. EFFECT OF INVALIDILITY

14.1 Should any provision of these undertakings be contrary to law or invalid for any reason, the Parties undertake to continue to observe the remaining provisions.

## 15. GOVERNING LAW

15.1 The Parties recognise and acknowledge that these undertakings shall be governed and construed in all respects in accordance with English law.

15.2 In the event that a dispute arises concerning these undertakings, the Parties undertake to submit to the courts of England and Wales.

## 16. TERMINATION

16.1 The Parties recognise and acknowledge that these undertakings shall be in force until such time as they are varied, released or superseded under the Act.

16.2 The Parties recognise and acknowledge that the variation, release or supersession of these undertakings shall not affect the validity and enforceability of any rights or obligations that arose prior to such variation, release or supersession.

## 17. INTERPRETATION

17.1 The Interpretation Act 1978 shall apply to these undertakings as it does to Acts of Parliament.

12

17.2    References in these undertakings to any English law term for any legal status, interest, concept or thing shall in respect of any jurisdiction other than England and Wales be deemed to include what most nearly approximates in that jurisdiction to the English law term.

17.3    In these undertakings the word "including" shall mean including without limitation or prejudice to the generality of any description, definition, term or phrase preceding that word and the word "include" and its derivatives shall be construed accordingly.

17.4    For the purposes of these undertakings:

**the Act** means the Enterprise Act 2002;

**Activision** means Activision Blizzard, Inc., incorporated in Delaware with file number 3179148, including any Subsidiaries;

**Activision Games** means the Activision PC and console games as defined in the Divestment Agreements;

**Activision Marketing Materials** means promotional and marketing assets related to the Activision Games that Activision uses for its own marketing or promotion of the games as defined in the Divestment Agreements;

**Affiliate** a person is an affiliate of another person if they or their respective enterprises would be regarded as being under common control for the purposes of section 26 of the Act;

**Associated Person** means a person or persons associated with Microsoft within the meaning of section 127(4) of the Act and includes any Subsidiary of such a person or persons;

**business** has the meaning given by section 129(1) and (3) of the Act;

**Closing Date** means the date of the closing of the Merger;

**Cloud Newco** means PJSC, LLC, a Delaware limited liability company with file number 7607437;

**Cloud Streaming Gameplay** means a remote access that allows end users to play games solely from cloud-based servers via gameplay data (e.g., game audio and video, and gameplay control data) streamed to/from the end users' personal devices, in each case, as is customary in the industry as defined in the Divestment Agreements;

**Cloud Streaming Gameplay Services** means the services as defined in the Divestment Agreements;

13

**Cloud Streaming Rights** means the cloud streaming rights in relation to the Activision Games as defined in the Divestment Agreements;

**CMA** means the Competition and Markets Authority or any successor body;

**Commencement Date** means the date on which these undertakings are accepted by the CMA;

**Compliance Report** means the annual report to be delivered to the CMA pursuant to paragraph 9.7:

**Confidential Information** means any business secrets, know-how, commercially sensitive information, intellectual property or any other information of a confidential or proprietary nature;

**control** shall be construed in accordance with section 26 of the Act, and in the case of a body corporate, a person shall be deemed to Control it if he holds, or has an interest in, shares of that body corporate amounting to 10 per cent or more of its issued share capital or carrying an entitlement to vote at meetings of that body corporate of 10 per cent or more of the total number of votes which may be cast at such meetings;

**Decision** means the CMA's decision under section 33 of the Act dated 22 September 2023 in connection with the Merger;

**Divestiture Agreement** means the legally binding divestiture agreement of 21 August 2023 (as amended) entered into by Activision to transfer the Cloud Streaming Rights to Cloud Newco;

**Divestment Agreements** means the agreements attached as Schedule 4;

**Divestment Business** means the business as defined in Schedule 1;

**DLC** means any additional or downloadable digital content, features or services intended for use in conjunction with an Activision Game and not playable as a standalone game as defined in the Divestment Agreements;

**EC Commitments** means the commitments by Microsoft to the European Commission dated 15 May 2023 in case M.10646;

**enterprise** has the meaning given in section 129(1) of the Act;

**Equity Purchase Agreement** means the legally binding equity purchase agreement of 21 August 2023 (as amended) entered into by Activision Publishing, Inc. to divest Cloud Newco to Purchaser;

**Existing Agreements** means the agreements defined in Schedule 2;

14

**Fast-Track Escalation Process** means the fast-track escalation process set out in the Divestment Agreements;

**Group of Interconnected Bodies Corporate** has the meaning given in section 129(2) of the Act; references to a Group of Interconnected Bodies Corporate shall be to the Group of Interconnected Bodies Corporate as constituted from time to time;

**Interest** includes shares, an interest in shares and any other interest carrying an entitlement to vote at shareholders' meetings but does not include a contract to acquire shares in the future; and for this purpose "an interest in shares" includes an entitlement by a person other than the registered holder, to exercise any right conferred by the holding of these shares or an entitlement to Control the exercise of such right;

**Merger** means the merger of Merger Sub with and into Activision pursuant the agreement and plan of merger entered in by Microsoft with Activision and Merger Sub on 18 January 2022;

**Merger Sub** means Anchorage Merger Sub Inc., incorporated in Delaware with file number 6543014;

**Microsoft** means Microsoft Corporation, incorporated in Washington with unified business identifier number 600 413 485, including any Subsidiaries;

**Parties** means Microsoft and Activision;

**Purchaser** means Ubisoft Entertainment SA;

**Subsidiary** shall be construed in accordance with section 1159 of the Companies Act 2006 (as amended), unless otherwise stated;

**Sublicensee** means a person or entity to whom Purchaser has licensed or sublicensed the Cloud Streaming Rights as defined in the Divestment Agreements;

**Term** means the period which begins on the Closing Date and continues for fifteen (15) years thereafter;

**Trustee** means the person appointed pursuant to paragraph 3.3, paragraph 3.4 or paragraph 3.6 to carry out the Trustee Functions;

**Trustee Functions** means the functions set out in paragraph 5;

**UK** means the United Kingdom of Great Britain and Northern Ireland;

**Working Day** means any day of the week other than a Saturday or a Sunday or any day that is a public holiday in England and Wales;

unless the context requires otherwise, the singular shall include the plural and vice versa.

**SIGNED BY MICROSOFT AND ACTIVISION AND ACCEPTED BY THE CMA ON 13 OCTOBER 2023**

**SCHEDULE 1**

**DESCRIPTION OF DIVESTMENT BUSINESS**

1.  The **Divestment Business** consists of the Cloud Streaming Rights in relation to the Activision Games worldwide excluding the European Economic Area (**EEA**).

2.  **Cloud Streaming Rights** means the perpetual, exclusive (subject to paragraph 8 below), irrevocable, sublicensable, transferable rights (subject to the Existing Agreements, as defined in Schedule 2) to, directly or indirectly: (i) distribute Activision Games via Cloud Streaming Gameplay to end users (where such distribution of entitlements can be outside of a Cloud Streaming Gameplay Service, but all access and use is only via Cloud Streaming Gameplay Services); and (ii) market, advertise, promote, sell, license, commercially exploit Cloud Streaming Gameplay for such Activision Games, including via making such Activision Games available via Cloud Streaming Gameplay Service. The Cloud Streaming Rights are Purchaser's exclusive rights worldwide excluding the EEA. During the Term, if certain member countries exit or enter the EEA, the definition of EEA shall be deemed amended accordingly.

3.  **Cloud Streaming Gameplay** means a remote access that allows end users to play games solely from cloud-based servers via gameplay data (e.g., game audio and video, and gameplay control data) streamed to/from the end users' personal devices, in each case, as is customary in the industry.

4.  **Cloud Streaming Gameplay Service** means a service that allows Cloud Streaming Gameplay.

5.  **Activision Games** means Activision console or PC games and related additional or downloadable digital content that: (i) are commercially available as of the Closing Date and were developed, in whole or in part, by any Activision Studio; or (ii) are commercially released by or on behalf Activision or its controlled affiliates or the Activision Studios during the Term that either (a) are developed, in whole or in part, by any of the Activision Studios, or (b) are based, in full or in substantial part, on intellectual property rights in any Activision developed games that were previously commercially released by the Activision Studios. Remastered, special or collector editions of an Activision Game will be considered the same version of such Activision Game. Schedule 3 sets out the current list of Activision Games as at the Commencement Date.

6.  **Activision Studios** means High Moon Studios, LLC, Infinity Ward, Inc., Sledgehammer Games, Inc., Toys for Bob, Inc., Treyarch Corporation, Beenox, Inc., Digital Legends Entertainment, SLU, Raven Software, Solid State Studios; Blizzard Entertainment. Activision Studios also includes, as of such acquisition or creation date, any studios (and any of its successors) later acquired or created by Activision during the Term.

7.  The Divestment Business will be held by Cloud Newco. The Cloud Streaming Rights will be transferred to Cloud Newco pursuant to the Divestiture Agreement. The divestment will be implemented through a sale of all of the equity interests in Cloud Newco to Purchaser.

18

8.  Purchaser will grant Microsoft a non-exclusive licence of the Cloud Streaming Rights outside of the EEA to the extent that those Cloud Streaming Rights are necessary to honour Microsoft's commitments under the Existing Agreements.

9.  To the extent of any conflict between the description in this Schedule 1 and the defined terms in the Divestment Agreements, the latter shall take precedent.

**SCHEDULE 2**

**EXISTING AGREEMENTS**

1.  The GeForce NOW Listing Agreement between Microsoft and NVIDIA, dated [✂] February 2023.

2.  The Cloud Gaming License Agreement between Microsoft and Boosteroid, dated [✂] March 2023.

3.  The Cloud Gaming License Agreement between Microsoft and Ubitus, dated [✂] March 2023.

4.  The Cloud Gaming License Agreement between Microsoft and Cloudware S.L., dated [✂] April 2023 [✂].

5.  PlayStation Global Provisional Publishing Agreement between Sony Interactive Entertainment, Inc., Sony Interactive Entertainment LLC, and Sony Interactive Entertainment Europe Ltd., on the one hand and Microsoft Corporation on the other, dated July [✂], 2023 [✂].

**SCHEDULE 3**

**ACTIVISION GAMES**

**<u>Activision Games as of Commencement Date</u>**

3D Ultra Minigolf Adventures
Aces of the Galaxy
Blizzard Arcade Collection
Call of Duty
Call of Duty 2
Call of Duty: Advanced Warfare
Call of Duty: Black Ops
Call of Duty: Black Ops 4
Call of Duty: Black Ops Cold War
Call of Duty: Black Ops 2
Call of Duty: Black Ops 3
Call of Duty: Ghosts
Call of Duty: Infinite Warfare
Call of Duty 4: Modern Warfare
Call of Duty: Modern Warfare 2
Call of Duty: Modern Warfare 3
Call of Duty: Modern Warfare Remastered
Call of Duty: Modern Warfare (2019)
Call of Duty: Modern Warfare II (2022)
Call of Duty: Vanguard
Call of Duty: World at War
Call of Duty: WWII
Call of Duty: Modern Warfare II (2022)
Call of Duty: Warzone
Crash Team Rumble
Crash Bandicoot 4: It's About Time
Crash Bandicoot N Sane Trilogy
Dark Reign
Dark Reign 2
Diablo
Diablo 3
Diablo II: Resurrected
Diablo IV
Geometry Wars 3: Dimensions
GUN
Hearthstone
Heroes of the Storm
King's Quest
Overwatch 2
Prototype
Prototype 2
Singularity
Spyro Reignited Trilogy

21

Starcraft Remastered
Starcraft II
Timeshift
Warcraft
Warcraft II
Warcraft III (Reforged)
World of Warcraft

**SCHEDULE 4**

**DIVESTMENT AGREEMENTS**

SCHEDULE 4.A

DIVESTITURE OF ACTIVISION BLIZZARD CLOUD GAME STREAMING RIGHTS

[✂]

SCHEDULE 4.B

LICENSE AGREEMENT FOR EEA

[✂]