# EXHIBIT C



# Anticipated acquisition by Microsoft Corporation of Activision Blizzard (excluding Activision Blizzard's non-EEA cloud streaming rights)

## DECISION ON ACCEPTANCE OF UNDERTAKINGS IN LIEU OF REFERENCE

**ME/7068/23**

The CMA's decision to accept undertakings in lieu of reference under section 73(2) of the Enterprise Act 2002 given on 13 October 2023. Full text of the decision published on 13 October 2023.

Please note that [✂] indicates figures or text which have been deleted or replaced in ranges at the request of the parties for reasons of commercial confidentiality.

## Introduction

1. Microsoft Corporation (**Microsoft**) has agreed to acquire Activision Blizzard, Inc (**Activision**) (the **Parties**), excluding Activision's cloud streaming rights outside of the European Economic Area (**EEA**) (the **Merger**). Immediately prior to the Merger, pursuant to a divestiture agreement between Activision and Ubisoft Entertainment SA (**Ubisoft**) (the **Ubisoft Divestment Agreement**), Activision's global cloud streaming rights (excluding the EEA) for current and future Activision PC and console games (the **Activision Games**), including current and future Activision Games released during the next 15 years (the **Activision Streaming Rights**), will be sold to Ubisoft.[1]

2. On 22 September 2023, the CMA decided under section 33(1) of the Enterprise Act 2002 (the **Act**) that it is or may be the case that the Merger consists of

[1] Ubisoft will also receive a non-exclusive licence to sell, distribute, and sublicense entitlements to play cloud streaming versions of Activision's games in the EEA. At the same time, Microsoft will receive a non-exclusive licence from Ubisoft for cloud streaming rights to the extent necessary for Microsoft to fulfil its obligations under its commitments to the European Commission and certain existing third-party cloud streaming agreements.



arrangements that are in progress or in contemplation which, if carried into effect, will result in the creation of a relevant merger situation, and that this may be expected to result in a substantial lessening of competition (**SLC**) within a market or markets in the United Kingdom (the **SLC Decision**).

3. On 21 September 2023, the Parties offered undertakings in lieu of reference (**UILs**) to the CMA for the purposes of section 73(2) of the Act. The CMA gave notice to the Parties on 22 September 2023, pursuant to section 73A(2)(b) of the Act, that it considered that there were reasonable grounds for believing that the undertakings offered, or a modified version of them, might be accepted by the CMA under section 73(2) of the Act and that it was considering the Parties' offer (the **UIL Provisional Acceptance Decision**).

4. The text of the SLC Decision and the UIL Provisional Acceptance Decision are available on the CMA webpages.[2]

## The undertakings offered

5. By divesting the Activision Streaming Rights to Ubisoft, the Merger aims to establish Ubisoft as a key supplier of content to cloud gaming services, to replicate the role that Activision would have played in the market absent the Merger. Notwithstanding the largely self-standing nature of the assets being transferred to Ubisoft, the SLC Decision found residual concerns that competition could be substantially lessened as a result of Microsoft's ongoing relationship with Ubisoft. The SLC Decision found residual concerns that Microsoft could still engage in strategies in order to foreclose cloud gaming rivals after the Merger, and that it is or may be the case that the Merger may be expected to result in an SLC as a result of vertical effects in cloud gaming services in the UK.

6. As set out in the UIL Provisional Acceptance Decision, the Parties have offered to give UILs to the CMA (the **Proposed Undertakings**). The UILs aim to ensure that the Ubisoft Divestment Agreement is fully implemented, including in relation to the following aspects:[3]

[2] See Microsoft / Activision Blizzard (ex-cloud streaming rights) merger inquiry.
[3] As part of the Merger, Microsoft will acquire Activision and be in a position to cause it to perform its obligations under the Ubisoft Divestment Agreement. Accordingly, this section refers to Microsoft's obligations to Ubisoft under the Ubisoft Divestment Agreement, regardless of whether these are incurred by Microsoft or Activision.



(a) Ubisoft may not grant Microsoft an exclusive license to the Activision Games, and any such purported licence would be null and void.

(b) Ubisoft may not offer Microsoft preferential pricing nor material preferential treatment with respect to Cloud Streaming Rights not made available to third parties.

(c) Microsoft must offer the Activision Games to Ubisoft at a price that is no higher than the wholesale price for digital download and retail sales of PC and console versions of the same content (whichever is lower); [✂].

(d) Microsoft must provide Ubisoft with the Activision Games in a standard executable format sufficiently in advance to allow Ubisoft to release them on the same date as they are released on console and PC.

(e) Microsoft will ensure that the quality, content, features and performance of any Activision Game delivered to Ubisoft will be materially similar to the non-streaming version of that Activision Game. Microsoft will not design PC versions of Activision Games, or any other versions which are or are planned to be available on multiple cloud streaming services, to be solely optimised for its own cloud streaming service.

(f) Microsoft must port Activision Games to non-Windows OS following a request from Ubisoft. Ubisoft may also request that Microsoft perform technical modifications, including to ensure that the Activision Games support emulators like Proton. Microsoft must carry out this work at its regular pace and at a quality and standard which is customary in the gaming industry. Microsoft can only charge Ubisoft for the reasonable costs incurred for this work. Microsoft is also required to provide Ubisoft with development and porting plans for Activision Games reasonably in advance.

(g) Ubisoft will compensate Microsoft for the Activision Streaming Rights through a one-off payment and through a market-based wholesale pricing mechanism, including an option that supports pricing based on usage. This will allow Ubisoft to license out the Activision Streaming Rights under any business model of its choosing, including buy-to-play, multi-game subscription services, or any other model that may arise.

(h) Microsoft will offer technical support to Ubisoft for Activision Games [✂]. It will also offer reasonable technical support for Ubisoft's sublicensees, provided these cover Microsoft's reasonable costs.



7. The Proposed Undertakings enable the CMA to monitor and, if necessary, enforce the Parties' compliance with the Proposed Undertakings. This includes allowing for the appointment of a Monitoring Trustee to oversee the Parties' compliance with the Proposed Undertakings, if required by the CMA. The Parties will also be required to provide annual compliance reports to the CMA setting out the steps taken to ensure compliance with the undertakings. The Proposed Undertakings require the Parties to comply with the dispute resolution provisions included in the Ubisoft Divestment Agreement, encompassing a fast-track escalation process and arbitration, and require the Parties to keep the CMA informed of any dispute referred to the fast-track escalation process.[4]

8. The text of the Proposed Undertakings is available on the CMA webpages.[5]

## Consultation

9. On 22 September 2023, pursuant to paragraph 2(1) of Schedule 10 to the Act, the CMA published the UILs, inviting interested parties to give their views on the UILs. The relevant text from the consultation is set out at Annex 1 of this decision.[6]  For the reasons set out in the consultation, the CMA's preliminary view was that the UILs would resolve the SLC identified in the SLC Decision in a clear-cut manner, ie without giving rise to material doubts about the overall effectiveness of the UILs or concerns about their implementation.[7]

10. In response to the consultation, one third party submitted that the UILs only refer to Ubisoft paying an ongoing wholesale price for the Activision Streaming Rights and not, in addition, a one-off payment for what it is acquiring. According to this third party, if Ubisoft will be paying a higher ongoing wholesale price rather than a combination of a one-off payment plus the ongoing wholesale price, this would increase Ubisoft's ongoing marginal costs and potentially dampen its incentives to

---

[4] In addition, the Proposed Undertakings enable the CMA to be involved in any arbitration proceedings arising in relation to assignment of the Ubisoft Divestment Agreement to a third party. Under the terms of the Ubisoft Divestment Agreement, assignment of the Ubisoft Divestment Agreement by Ubisoft to a third party requires the Parties' consent in certain circumstances, which cannot be unreasonably withheld, delayed, or conditioned. In the event of any dispute in relation to the granting of the Parties' consent being referred to arbitration, the Proposed Undertakings require the Parties to promptly notify the CMA of the dispute and provide the CMA with the opportunity to provide representations on the proposed assignment.
[5] See Microsoft / Activision Blizzard (ex-cloud streaming rights) merger inquiry.
[6] The full consultation text was published on Microsoft / Activision Blizzard (ex-cloud streaming rights) merger inquiry.
[7] Merger remedies, (CMA87), December 2018, Chapter 3, in particular paragraphs 3.27, 3.28 and 3.30.



exploit the rights and its ability to replicate the presence, absent the Merger, of an independent Activision in cloud streaming.

11. The CMA notes that Ubisoft will be paying a one-off amount for the acquisition of the Activision Streaming Rights, in addition to the ongoing wholesale price. Ubisoft will pay this on completion of its acquisition of the Activision Streaming Rights from Activision. The one-off payment is not separately covered in the UILs, however, as it will occur immediately prior to completion of the Merger, whereas the UILs are aimed at addressing the CMA's residual concerns in relation to the ongoing relationship between the Parties and Ubisoft post-Merger.

12. The same third party also submitted that paragraph 8.1 of the Proposed Undertakings, which prohibits the Parties from re-acquiring any interest in the Activision Streaming Rights without the prior written consent of the CMA for a 10-year period, should be amended so that the prohibition applies indefinitely. This third party suggested it was essential to ensure there is no provision for the Activision Streaming Rights to revert to Microsoft. The CMA's usual practice is to adopt 10-year prohibition periods in relation to UIL divestments at phase 1 and for divestments and prohibitions at phase 2,[8] and the CMA considers that no basis has been established to depart from this approach in this case. The CMA also notes there is no provision in the Ubisoft Divestment Agreement providing for the Activision Streaming Rights to revert to Microsoft.

13. In addition, the CMA received several comments from members of the public. Some comments raised concerns about the UIL proposal, including the following:

    (a) Microsoft could foreclose rivals' access to Activision Games by providing degraded versions of, and/or delayed access to, the Activision Games, including in particular for versions of the games made available on non-Windows OS.

    (b) The UILs could restrict Microsoft from streaming Activision games on Game Pass, which would reduce the choice available to consumers.

    (c) Microsoft could circumvent the UILs by moving production of Activision Games to studios outside of the Activision group.

---

[8] See CMA87, at paragraph 5.10. This includes, eg, the final order prohibiting Microsoft's proposed acquisition of the whole of Activision (see The Microsoft and Activision Merger Inquiry Order 2023, paragraph 11).

14. Regarding the concerns of degraded or delayed access, the Ubisoft Divestment Agreement includes provisions requiring parity in the quality, content, features and release date between the Activision Games delivered to Ubisoft and non-streaming versions of the games. It also includes provisions concerning the quality and timeliness at which Microsoft (when requested by Ubisoft) ports Activision Games to non-Windows OSs or performs technical modifications to enable the games to support emulators like Proton. As set out in the UIL Provisional Acceptance Decision, the CMA considered that these and other provisions in the Ubisoft Divestment Agreement, provided they are fully implemented and enforced pursuant to the UILs, prevent Microsoft from having the ability to foreclose rival could gaming providers. The CMA therefore does not consider the consultation responses received change that assessment.

15. Regarding access to the Activision Games on Game Pass, the UILs do not prevent this, as Microsoft will remain free, post-Merger, to negotiate a licence from Ubisoft to the Cloud Streaming Rights just like any other cloud streaming provider.

16. Regarding possible circumvention of the UILs by the release of future Activision content via other studios, the CMA considers that this is already addressed by the definition of 'Activision Games' in the UILs. In particular, 'Activision Games' are defined by reference to whether they are (i) developed, in whole or in part, by any of the Activision Studios or (ii) based, in full or in substantial part, on intellectual property rights in any Activision developed games that were previously commercially released by the Activision Studios (see further Schedule 1 of the UILs).

17. Other members of the public responding to the consultation either expressed support for the Merger, considered that the Merger should be referred to a phase 2 investigation (but without providing reasons or referencing the UIL proposal), or made comments unrelated to the matters at issue to the CMA's investigation.[9]

18. On this basis, the CMA does not consider that the third-party submissions received cause it to change its preliminary view that the UILs would be acceptable.

19. The CMA therefore considers that the UILs offered by the Parties are clear-cut and appropriate to remedy, mitigate or prevent the competition concerns identified in the SLC Decision.

[9] Some comments were also made in relation to console gaming, PC gaming, or mobile gaming markets. As noted in the SLC Decision (paragraph 97), the CMA has not reconsidered concerns in these areas as part of its investigation.



## Decision

20. For the reasons set out above, the CMA considers that the UILs provided by the Parties are as comprehensive a solution as is reasonable and practicable and remedy, mitigate or prevent the SLC identified in the SLC Decision and any adverse effects resulting from it. The CMA has therefore decided to accept the UILs offered by the Parties pursuant to section 73 of the Act. The Merger will therefore not be referred for a phase 2 investigation.

21. The undertakings, which have been signed by the Parties and will be published on the CMA webpages, will come into effect from the date of this decision.

**Colin Raftery**
**Senior Director, Mergers**
**Competition and Markets Authority**
**13 October 2023**



# ANNEX 1

# Anticipated acquisition by Microsoft Corporation of Activision Blizzard (excluding Activision Blizzard's non-EEA cloud streaming rights)

## Notice of consultation on UILs

Notice under paragraph 2(1) of Schedule 10 to the Enterprise Act 2002 (the **Act**) – consultation on proposed undertakings in lieu of reference pursuant to section 73 of the Act.

Please note that [✂] indicates figures or text which have been deleted or replaced in ranges at the request of the parties for reasons of commercial confidentiality.

## INTRODUCTION

1. Microsoft Corporation (**Microsoft**) has agreed to acquire the whole of Activision Blizzard, Inc (**Activision**) (the **Parties**), excluding Activision's cloud streaming rights outside of the European Economic Area (**EEA**) (the **Merger**). Immediately prior to the Merger, pursuant to a divestiture agreement between Activision and Ubisoft Entertainment SA (**Ubisoft**) (the **Ubisoft Divestment Agreement**), Activision's global cloud streaming rights (excluding the EEA) for current and future Activision PC and console games (the **Activision Games**), including current and future Activision Games released during the next 15 years (the **Activision Streaming Rights**), will be sold to Ubisoft.[10]

2. The Competition and Markets Authority (**CMA**) has decided under section 33(1) of the Act that it is or may be the case that the Merger consists of arrangements that

[10] Ubisoft will also receive a non-exclusive licence to sell, distribute, and sublicense entitlements to play cloud streaming versions of Activision's games in the EEA. At the same time, Microsoft will receive a non-exclusive licence from Ubisoft for cloud streaming rights to the extent necessary for Microsoft to fulfil its obligations under its commitments to the European Commission and certain existing third-party cloud streaming agreements.



are in progress or in contemplation which, if carried into effect, will result in the creation of a relevant merger situation, and that this may be expected to result in a substantial lessening of competition (**SLC**) within a market or markets in the United Kingdom (the **SLC Decision**). The text of the SLC Decision is available on the CMA webpages.[11]

3. On 21 September 2023, the Parties offered undertakings in lieu of reference (**UILs**) to the CMA for the purposes of section 73(2) of the Act.[12]

4. The CMA has now given notice to the Parties, pursuant to section 73A(2)(b) of the Act, that it considers that there are reasonable grounds for believing that the undertakings offered, or a modified version of them, might be accepted by the CMA under section 73(2) of the Act and that it is considering the Parties' offer (the **UIL Provisional Acceptance Decision**).

## THE UNDERTAKINGS OFFERED

5. By divesting the Activision Streaming Rights to Ubisoft, the Merger aims to establish Ubisoft as a key supplier of content to cloud gaming services, to replicate the role that Activision would have played in the market absent the Merger. Notwithstanding the largely self-standing nature of the assets being transferred to Ubisoft, the SLC Decision found residual concerns that competition could be substantially lessened as a result of Microsoft's ongoing relationship with Ubisoft. The SLC Decision found residual concerns that Microsoft could still engage in strategies in order to foreclose cloud gaming rivals after the Merger, and that it is or may be the case that the Merger may be expected to result in an SLC as a result of vertical effects in cloud gaming services in the UK.

6. As set out in the UIL Provisional Acceptance Decision, the Parties have offered to give UILs to the CMA (the **Proposed Undertakings**). The UILs aim to ensure that

[11] See Microsoft / Activision Blizzard (ex-cloud streaming rights) merger inquiry.
[12] The final UILs offer was provided by the Parties in advance of the SLC Decision, intended to address concerns relayed to the Parties during the 'state of play' discussion. It was provided on the basis that, if the CMA did find a realistic prospect of an SLC, the CMA could treat this as the Parties' final UILs offer to the CMA for a decision to be taken under section 73A(2)(b) of the Act whether there are reasonable grounds for believing that the undertaking or a modified version of it might be accepted.



the Ubisoft Divestment Agreement is fully implemented, including in relation to the following aspects:[13]

(a) Ubisoft may not grant Microsoft an exclusive license to the Activision Games, and any such purported licence would be null and void.

(b) Ubisoft may not offer Microsoft preferential pricing nor material preferential treatment with respect to Cloud Streaming Rights not made available to third parties.

(c) Microsoft must offer the Activision Games to Ubisoft at a price that is no higher than the wholesale price for digital download and retail sales of PC and console versions of the same content (whichever is lower).

(d) Microsoft must provide Ubisoft with the Activision Games in a standard executable format sufficiently in advance to allow Ubisoft to release them on the same date as they are released on console and PC.

(e) Microsoft will ensure that the quality, content, features and performance of any Activision Game delivered to Ubisoft will be materially similar to the non-streaming version of that Activision Game. Microsoft will not design PC versions of Activision Games, or any other versions which are or are planned to be available on multiple cloud streaming services, to be solely optimised for its own cloud streaming service.

(f) Microsoft must port Activision Games to non-Windows OS following a request from Ubisoft. Ubisoft may also request that Microsoft perform technical modifications, including to ensure that the Activision Games support emulators like Proton. Microsoft must carry out this work at its regular pace and at a quality and standard which is customary in the gaming industry. Microsoft can only charge Ubisoft for the reasonable costs incurred for this work. Microsoft is also required to provide Ubisoft with development and porting plans for Activision Games reasonably in advance.

(g) Ubisoft will compensate Microsoft for the Activision Streaming Rights through a one-off payment and through a market-based wholesale pricing mechanism, including an option that supports pricing based on usage. This will allow

[13] As part of the Merger, Microsoft will acquire Activision and be in a position to cause it to perform its obligations under the Ubisoft Divestment Agreement. Accordingly, this section refers to Microsoft's obligations to Ubisoft under the Ubisoft Divestment Agreement, regardless of whether these are incurred by Microsoft or Activision.



        Ubisoft to license out the Activision Streaming Rights under any business model of its choosing, including buy-to-play, multi-game subscription services, or any other model that may arise.

(h) Microsoft will offer technical support to Ubisoft for Activision Games. It will also offer reasonable technical support for Ubisoft's sublicensees, provided these cover Microsoft's reasonable costs.

7. The Proposed Undertakings enable the CMA to monitor and, if necessary, enforce the Parties' compliance with the Proposed Undertakings. This includes allowing for the appointment of a Monitoring Trustee to oversee the Parties' compliance with the Proposed Undertakings, if required by the CMA. The Parties will also be required to provide annual compliance reports to the CMA setting out the steps taken to ensure compliance with the undertakings. The Proposed Undertakings require the Parties to comply with the dispute resolution provisions included in the Ubisoft Divestment Agreement, encompassing a fast-track escalation process and arbitration, and require the Parties to keep the CMA informed of any dispute referred to the fast-track escalation process.[14]

8. The text of the Proposed Undertakings is available on the CMA webpages.[15]

## CMA ASSESSMENT

9. The CMA currently considers that, subject to responses to the consultation required by Schedule 10 of the Act, the Proposed Undertakings will resolve the SLC identified in the SLC Decision in a clear-cut manner, ie the CMA currently does not have material doubts about the overall effectiveness of the Proposed Undertakings or concerns about their implementation.[16]

10. As set out in the UIL Provisional Acceptance Decision, in this case, the CMA believes that the divestment of the Activision Streaming Rights, placing those important rights in the hands of an independent third party (with the freedom to

[14] In addition, the Proposed Undertakings enable the CMA to be involved in any arbitration proceedings arising in relation to assignment of the Ubisoft Divestment Agreement to a third party. Under the terms of the Ubisoft Divestment Agreement, assignment of the Ubisoft Divestment Agreement by Ubisoft to a third party requires the Parties' consent in certain circumstances, which cannot be unreasonably withheld, delayed, or conditioned. In the event of any dispute in relation to the granting of the Parties' consent being referred to arbitration, the Proposed Undertakings require the Parties to promptly notify the CMA of the dispute and provide the CMA with the opportunity to provide representations on the proposed assignment.
[15] See Microsoft / Activision Blizzard (ex-cloud streaming rights) merger inquiry.
[16] Merger remedies (**CMA87**), December 2018, Chapter 3, paragraph 3.28.

deploy those assets as it wishes), would – if executed effectively and in full – prevent Microsoft from having the ability to foreclose rival could gaming providers. However, as set out in the SLC decision, the CMA has residual concerns (which the CMA considers give rise to the realistic prospect of an SLC in relation to the supply of cloud gaming services in the UK) relating to the possibility for certain provisions within the Ubisoft Divestment Agreement to be circumvented, terminated, or not enforced. As the Proposed Undertakings substantially reduce these residual risks, the CMA believes that the Proposed Undertakings, or a modified version of them, might be acceptable as a suitable remedy to the SLC identified by the CMA.

11. The CMA also considers that the Proposed Undertakings would be capable of ready implementation. As set out in the UIL Provisional Acceptance Decision, the Proposed Undertakings would take effect from completion of the Merger. The key parameters of the sale of the Activision Streaming Rights to Ubisoft would be set up-front, and Ubisoft's ongoing interactions with Microsoft would be limited to the implementation of the transaction, rather than requiring ongoing negotiations to take place. If required by the CMA, the Parties also propose to appoint a Monitoring Trustee for the duration of the Proposed Undertakings to help monitor ongoing compliance with the Proposed Undertakings.

## Proposed decision and next steps

12. For the reasons set out above, the CMA currently considers that the Proposed Undertakings are, in the circumstances of this case, appropriate to remedy, mitigate or prevent the competition concerns identified in the SLC Decision and form as comprehensive a solution to these concerns as is reasonable and practicable.

13. The CMA therefore gives notice that it proposes to accept the Proposed Undertakings in lieu of a reference of the Merger for a phase 2 investigation. The text of the proposed undertaking is available on the CMA web pages.[17]

14. Before reaching a decision as to whether to accept the Proposed Undertakings, the CMA invites interested parties to make their views known to it. The CMA will have regard to any representations made in response to this consultation and may make modifications to the Proposed Undertakings as a result. If the CMA considers that any representation necessitates any material change to the Proposed Undertakings,

---

[17] See Microsoft / Activision Blizzard (ex-cloud streaming rights) merger inquiry.



the CMA will give notice of the proposed modifications and publish a further consultation.[18]

15. Representations should be made in writing to the CMA and be addressed to: Microsoft.Activision.P1@cma.gov.uk

**Deadline for comments: Friday 6 October 2023**

[18] Under paragraph 2(4) of Schedule 10 to the Act.