No. 23-15992

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

FEDERAL TRADE COMMISSION,
*Plaintiff-Appellant,*

v.

MICROSOFT CORP., and
ACTIVISION BLIZZARD, INC.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-cv-2880
(Hon. Jacqueline Scott Corley, U.S. Distr. J.)

## REPLY BRIEF OF THE FEDERAL TRADE COMMISSION [REDACTED]

HENRY LIU
*Director*

JOHN NEWMAN
*Deputy Director*

SHAOUL SUSSMAN
*Associate Director for Litigation*

JAMES H. WEINGARTEN
PEGGY BAYER FEMENELLA
JAMES ABELL
CEM AKLEMAN
MEREDITH R. LEVERT
JENNIFER FLEURY
*Attorneys*

BUREAU OF COMPETITION

ANISHA S. DASGUPTA
*General Counsel*

MARIEL GOETZ
*Acting Director of Litigation*

IMAD D. ABYAD
MARK S. HEGEDUS
*Attorneys*

FEDERAL TRADE COMMISSION
Office of the General Counsel
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2115
mhegedus@ftc.gov

# TABLE OF CONTENTS

Introduction ........................................................................................ 1

Argument .......................................................................................... 3

I. The FTC Raised Serious Questions About The Merger's
Harm to Competition. ................................................................ 3

    A. The District Court Misapplied Section 13(b) of the
FTC Act By Requiring the FTC to Prove the
Ultimate Merits in a Preliminary Proceeding. ........................ 5

    B. Placing Activision Content Exclusively on Game
Pass is Neither Procompetitive nor an Efficiency ................... 17

    C. Appellees Fail to Defend the District Court's
Mishandling of Their Proposed Remedies ............................... 20

        1. The District Court Erred As a Matter of Law
and Logic in Considering Appellees' Proposed
Remedies at the Preliminary Injunction Stage ................. 20

        2. In Any Event, Appellees Have Not Shown That
Their Proposed Remedies Are Adequate. ......................... 25

II. The District Court Erred in its Treatment of Partial
Foreclosure and the *Brown Shoe* Liability Framework ................ 27

    A. The FTC Consistently Demonstrated that the
Merger is Likely to Lead to Harmful Partial
Foreclosure .......................................................................... 27

    B. The FTC Convincingly Showed that the Merger May
Harm Competition Under the *Brown Shoe*
Framework ........................................................................... 29

III. The Equities Strongly Favor a Preliminary Injunction. ............. 32

Conclusion ....................................................................................... 37

# TABLE OF AUTHORITIES

## CASES

*Brown Shoe Co. v. U.S.*,
370 U.S. 294 (1962) ................................................................ 17, 30, 31

*Cal. v. Am. Stores Co.*,
495 U.S. 271 (1990) ............................................................................ 24

*FTC v. Arch Coal, Inc.*,
329 F. Supp. 2d 109 (D.D.C. 2004) ................................................... 23

*FTC v. Arch Coal, Inc.,* Memorandum Opinion,
No. 1:04-cv-00534 (ECF_67) (D.D.C. 2004) ....................................... 24

*FTC v. Dean Foods Co.*,
384 U.S. 597 (1966) ............................................................................ 32

*FTC v. Elders Grain, Inc.*,
868 F.2d 901 (7th Cir. 1989) ............................................................... 7

*FTC v. Exxon Corp.*,
636 F.2d 1336 (D.C. Cir. 1980) ........................................................... 7

*FTC v. H.J. Heinz*,
246 F.3d 708 (D.C. Cir. 2001) .................................................. passim

*FTC v. Libbey, Inc.*,
211 F. Supp. 2d 34 (D.D.C. 2002) ......................................... 23, 24, 25

*FTC v. Penn State Hershey Med. Ctr.*,
838 F.3d 327 (3d Cir. 2016) .................................................. 5, 7, 21, 29

*FTC v. Procter & Gamble Co.*,
386 U.S. 568 (1967) ............................................................................ 32

*FTC v. RAG-Stiftung*,
436 F. Supp. 3d 278 (D.D.C. 2020) ................................................... 23

*FTC v. Sysco Corp.*,
113 F. Supp. 3d 1 (D.D.C. 2015) ................................................. 23, 25

*FTC v. Warner Commc'ns Inc.*,
742 F.2d 1156 (9th Cir. 1984) .................................................. passim

*FTC v. Whole Foods Mkt. Inc.*,
548 F.3d 1028 (D.C. Cir. 2008) ................................................ 7, 21, 32

ii

*FTC. v. Beatrice Foods Co.,*
  587 F.2d 1225 (D.C. Cir. 1978) ............................................................5

*Hosp. Corp. of Am. v. FTC,*
  807 F.2d 1381 (7th Cir. 1986) ............................................................21

*Medical Society v. Toia,*
  560 F.2d 535 (2d Cir. 1977) ................................................................7

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St.*
  *Luke's Health Sys., Ltd.,*
  778 F.3d 775 (9th Cir. 2015) .............................................. 14, 19, 23, 26

*Steves & Sons v. JELD-WEN, Inc.,*
  988 F.3d 690 (4th Cir. 2021) ............................................................24

*United States v. E.I. du Pont de Nemours & Co.,*
  366 U.S. 316 (1961) ...................................................................23, 25

*United States v. Greater Buffalo Press, Inc.,*
  402 U.S. 549 (1971) ..........................................................................21

## STATUTES

15 U.S.C. § 18 ....................................................................................4, 20

15 U.S.C. § 53(b) ..................................................................................4, 5

iii

## INTRODUCTION

Microsoft, a dominant firm in multiple gaming markets, seeks to acquire the games and creative assets of Activision, a leading independent game developer. The $69 billion acquisition would restructure the industry and will likely give Microsoft the ability and incentive to deny, delay, degrade, or otherwise foreclose rivals from accessing Activision's games, limit new entry and expansion, reduce consumer choice, and stymie innovation: in other words, to harm competition. If Microsoft is given free rein to weaponize Activision's content, emerging markets for content library subscriptions and cloud gaming will be walled off and dominated by just a few large companies—rather than flourishing as open, competitive landscapes with platform-agnostic content, new platforms emerging to challenge established incumbents, and consumers free to choose where and how to access their games.

The district court acknowledged that the preliminary injunction record contained conflicting evidence on the anticompetitive effects of the merger, but it nonetheless declined to temporarily pause the deal to allow the Federal Trade Commission (FTC or Commission) to determine

whether the merger may substantially lessen competition. As the FTC's opening brief explained, the court erred as a matter of law in denying preliminary relief under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). The FTC raised serious questions about the merger's competitive effects that the Commission should have been permitted to resolve after a full merits hearing. Instead, the court usurped the Commission's statutory role and endeavored to decide the antitrust merits itself; contrary to Appellees' arguments, this was reversible error.

The court likewise determined that the merging parties' proposed remedies were sufficient to address the merger's harm to competition, even though the court had before it only a preliminary evidentiary record and the extent of the harm had not yet been determined. In defending the district court's decision, Appellees Microsoft and Activision characterize the proposed remedies—post-complaint side deals with third parties—as the "factual reality" of the post-merger world. Important elements of that reality, however, are unknown and shifting. And in any event, whether the side deals adequately remedy likely harms to competition should be considered in the administrative proceeding where the harms will be thoroughly evaluated, not in a

preliminary 13(b) action with a limited scope. This Court should reverse and order a preliminary injunction to ensure the Commission has a full and fair opportunity to consider the merger—and its impact on the future of gaming—in an administrative proceeding.

## ARGUMENT

## I.     THE FTC RAISED SERIOUS QUESTIONS ABOUT THE MERGER'S HARM TO COMPETITION.

The FTC made a legally sufficient showing below that Microsoft's proposed acquisition of Activision will likely provide Microsoft with the ability and incentive to foreclose its gaming platform rivals from competitive access to a leading input provider—resulting in reasonably probable harm to competition in the markets for content subscriptions, cloud gaming services, and consoles.[1] Microsoft recognized that markets like these represent the probable future of gaming, *see* 6/28/23 Hr'g Tr. Nadella (Microsoft) 839:3-840:1, 841:23:-842:3 [1-SER-215-216], which

---

[1] Although Appellees criticize the FTC for waiting to file a 13(b) action while other enforcers' reviews were ongoing, M/A Br. 17, Microsoft previously argued that challenges to the merger were unripe while the merger was "undergoing review by the U.K., European, and other worldwide regulators." Defendant Microsoft Corporation's Reply in Support of Motion to Dismiss, *DeMartini, et al. v. Microsoft Corp.*, No. 3:22-cv-08991-JSC, ECF_62 at 14 (N.D. Cal. Feb. 24, 2023). Microsoft cannot have it both ways.

increases incentives, post-merger, to withhold Activision content from rivals that otherwise would be available. Contrary to Appellees' assertions (M/A Br. 37), the FTC has consistently advanced arguments about all three markets from its first pleadings through its last,[2] as well as throughout trial.[3]

The district court's denial of a preliminary injunction rested on an application of the wrong legal standard. To obtain preliminary relief, the FTC needed to show serious questions going to the merits of its Clayton Act Section 7 claim that the acquisition may substantially lessen competition in any line of commerce. 15 U.S.C. §§ 18, 53(b); *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984). The FTC made that showing and Appellees have not demonstrated otherwise.

---

[2] *See, e.g.*, ECF_1 at 18-22 [2-FER-77-81]; ECF_7 at 13-16 [2-FER-67-70]; ECF_309 at 69-82 [2-FER-5-18].

[3] *See, e.g.*, 6/28/23 Hr'g Tr. Nadella (Microsoft) 833:22-848:11 [1-SER-214-217]; 6/23/23 Hr'g Tr. Spencer (Microsoft) 269:19-22, 305:25-308:20, 393:11-398:23, 465:13-466:5 [1-SER-72, 1-SER-81-82, 1-SER-103-104, 1-SER-121]; 6/28/23 Hr'g Tr. Kotick (Activision) 733:2-734:5, 753:10-758:1 [1-SER-189, 1-SER-194-195].

4

**A.    The District Court Misapplied Section 13(b) of the FTC Act By Requiring the FTC to Prove the Ultimate Merits in a Preliminary Proceeding.**

Under Section 13(b) of the FTC Act, the FTC may obtain a preliminary injunction if it shows a likelihood of success on the ultimate merits to be decided in the administrative proceeding, and that the equities favor relief. 15 U.S.C. § 53(b); *Warner Commc'ns*, 742 F.2d at 1159. The FTC satisfies the likelihood of success standard if it "raises questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance." *Warner Commc'ns*, 742 F.2d at 1162 (quoting *FTC. v. Beatrice Foods Co.*, 587 F.2d 1225, 1229 (D.C. Cir. 1978)).

At the preliminary injunction stage, "'[t]he FTC is not required to establish that the proposed merger would in fact violate section 7 of the Clayton Act.'"[4] *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337

---

[4] Appellees are simply wrong in asserting otherwise. *See* M/A Br. 56.

5

(3d Cir. 2016) (cleaned up).[5] That is for the Commission proceeding.[6] Moreover, when "presented with conflicting evidence" on a "merger's probable effect on competition," the district court in a 13(b) case should not "make a final determination," but should undertake "only a preliminary assessment" of the merits. *Warner Commc'ns*, 742 F.2d at 1162.[7] Put another way, the court should not "resolve the conflicts in the evidence, compare . . . effects on competition in other cases, or undertake an extensive analysis of antitrust issues." *Warner Commc'ns*, 742 F.2d at 1164.

---

[5] Appellees are mistaken in arguing that this standard is contrary to a prior FTC statement to Congress that Section 13(b) requires the FTC "to make a robust evidentiary and legal showing that the transaction would likely be anticompetitive in order to obtain a preliminary injunction." M/A Br.36 (quoting Prepared Statement of the FTC Before the U.S. Sen. Comm. On the Judiciary 14 (Oct. 7, 2015)). There is no inconsistency. Here, for example, the many pages of testimony and documents in the record below demonstrate that the FTC made a robust evidentiary showing.

[6] The Commission has returned the merits case to adjudication, having "determined that the public interest warrants that this matter be resolved fully and expeditiously." *See* https://www.ftc.gov/system/files /ftc_gov/pdf/608644.2023.09.25-d09412-order-returning-matter-to-adjudication.pdf.

[7] Thus, Appellees are incorrect in claiming that precedent does not "circumscribe[] a district court's review of the evidence" at this stage. *See* M/A Br. 36.

Contrary to Appellees' contention, a Section 13(b) preliminary injunction is not "'an extraordinary and drastic remedy,'" M/A Br. 32 (quoting *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980) (cleaned up)).[8] Rather, "13(b) places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard." *Warner Commc'ns*, 742 F.2d at 1159. A 13(b) preliminary injunction is "meant to be readily available to preserve the status quo while the FTC develops its ultimate case." *FTC v. Whole Foods Mkt. Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008) (Tatel, J., concurring). To that end, "any 'doubts are to be resolved against the transaction.'" *Penn State Hershey*, 838 F.3d at 337 (quoting *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989)).

Appellees miss the mark in insisting that the district court correctly considered cases addressing permanent relief under Section 7

---

[8] *Exxon* itself explained that Congress intended "injunctive relief be broadly available to the FTC by incorporating a unique 'public interest' standard in [Section13(b)], rather than the more stringent, traditional 'equity' standard." 636 F.2d at 1343; *accord Whole Foods*, 548 F.3d at 1042 (Tatel, J., concurring). Appellees rely on a passage of *Exxon* that quotes *Medical Society v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977), a case applying the traditional preliminary injunction standard, not the Section 13(b) standard.

of the Clayton Act, M/A Br. 34-35. As the FTC's opening brief explained, Section 7 supplies the applicable antitrust framework for evaluating whether the FTC has raised a serious merits question, *see* FTC Br. 23-24, but the district court erred by holding certain of the FTC's showings to the burden of proof that would apply in the ultimate merits case, *see id.* at 25-27.

The district court's overstepping is particularly evident in its handling of Appellees' proposed remedies. The court acknowledged that it lacked a developed factual record on whether Appellees' post-complaint side agreements were sufficient to address the acquisition's anticompetitive effects. 6/29/23 Hr'g Tr. 1134:13-23; 1150:16-1151:13 [1-SER-290, 1-SER-294]. Nonetheless, it proceeded to decide that the side agreements addressed the FTC's concerns. Op. 52 [1-ER-53].[9] That ruling was legal error in a 13(b) action, when the record was both

---

[9] Appellees misread the record in claiming the FTC said the Sony agreement "would address its concerns in the console market." M/A Br. 44 (citing 1-SER-207). FTC counsel said no such thing, instead stating that the FTC would "need to evaluate that agreement" [1-SER-270].

incomplete and contested.[10] The Commission should have been given the opportunity to rule on the merits based on a fully developed record.[11]

Besides making improper merits rulings on a preliminary record, the district court erroneously undertook to resolve evidentiary conflicts in that record, contrary to *Warner Communications*. On product market definition, the court correctly recognized that, against a backdrop of conflicting evidence, the FTC had made a "tenable showing" that high performance consoles constitute a relevant market, Op. 27 [1-ER-28] (quoting *Warner Commc'ns*, 742 F.2d at 1164). In contrast, after finding

---

[10] *See* ECF_175 at 88-93, 118-119 [2-FER-46-51, 2-FER-60-61]; ECF_309 at 152-155, 190-193 [2-FER-21-24, 2-FER-34-37]; 6/29/23 Hr'g Tr. 1134:13-23; 1150:16-1151:13 [1-SER-290, 1-SER-294].

[11] The proceedings below were expedited following Appellees' representation that Microsoft faced a July 18, 2023, deadline to close the merger; Appellees further told the court that a preliminary injunction would "kill the deal." ECF_108 at 24 [2-FER-65]. But after prevailing in the district court and after this Court denied an injunction pending appeal, Microsoft and Activision agreed to extend their contractual closing date by three months. And an interim injunction entered by the U.K. Competition & Markets Authority did not end the deal. Rather, the parties renewed their engagement with the U.K. regulator to try to address its concerns, including through an agreement affecting the cloud market that post-dated the preliminary injunction hearing and was not considered by the district court.

"conflicting evidence" on anticompetitive effects, Op. 52 [1-ER-53], the court ignored *Warner Communications* and proceeded to resolve key evidentiary conflicts. The FTC is not merely disputing factual findings, *see* M/A Br. 45-46. Rather, it seeks reversal based on legal error that infected the district court's entire decision.

For example, the FTC raised a serious question whether, absent the merger, an independent Activision would make its content available through subscription or cloud-gaming services. Citing the district court's decision, Appellees maintain that Activision would not do so due to cannibalization and game-performance concerns. M/A Br. 38-39. But Activision previously offered its content on subscription services and admitted it would consider offering its titles on subscription and cloud-gaming services under acceptable commercial terms. PX7006 (Kotick (Activision) IH) at 202:9-203:4 [2-FER-115-116] (Activision CEO, identifying "roughly ███████ as an acceptable figure); 6/28/23 Hr'g Tr. Kotick (Activision) 748:9-16, 749:4-19, 755:18-22 [1-SER-192-194]; PX2396 (Activision) at 001 [2-FER-121]; PX2406 (Activision) at 001 [2-FER-117]; PX2138 (Activision) at 001 [2-FER-127]. Moreover, at the time of the merger announcement, ███████████████████

10

███████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

6/28/23 Hr'g Tr. Kotick (Activision) 755:1-22 [1-SER-194]; PX8000

(Eisler (Nvidia) Decl.) ¶¶ 43, 44 [3-ER-321-322]; *see* also FTC Br. 31-34.

The district court failed to grapple with this evidence and

erroneously resolved conflicts about Activision's plans as an

independent company in Appellees' favor. As the D.C. Circuit has held,

it is error to uncritically accept a merging party's argument that, absent

the merger, "no amount of money" could achieve a purported benefit of

the deal. *FTC v. H.J. Heinz*, 246 F.3d 708, 722 (D.C. Cir. 2001). So too

here. The district court failed to recognize that the FTC's evidence

raised at least a serious question as to whether, but for the merger,

Activision would make content available on cloud-gaming services.

The court also erroneously resolved conflicting evidence about

Microsoft's conduct with past acquisitions and whether that predicted

what Microsoft would do with Activision titles after the merger. *See*

*Warner Commc'ns*, 742 F.2d at 1162-64. At issue were Microsoft's

acquisition of two game developers, Mojang, the developer of *Minecraft*,

11

and ZeniMax, the developer of several leading games. The court found that Microsoft's keeping *Minecraft* on multiple platforms and not making it exclusive to Xbox predicted that Microsoft would not use *Call of Duty* to foreclose, while Microsoft's decision ▮▮▮▮▮▮▮▮▮ ZeniMax titles exclusive—thereby foreclosing rivals from that content—was not predictive. Op. 37-38, 44, 51 [1-ER-38-39, 1-ER-45, 1-ER-52]; PX4309 (Microsoft) at 001 [3-ER-393] ▮▮▮▮▮▮▮▮▮▮▮ games will be Xbox exclusive); *see also* FTC Br. 67-68.

What the court should have focused on was that Microsoft's conduct with ZeniMax, which occurred less than two years before this deal, raises at least a serious question as to whether Microsoft will foreclose rivals from Activision content after this merger. Like Activision's games, ZeniMax's titles represented the blockbuster content that platforms employ to attract users and gain a competitive advantage over rivals, and ZeniMax titles were largely multiplatform. 6/22/23 Hr'g Tr. (Hines) at 90:12-21, 91:2-13 [1-SER-27]. Moreover, during the ZeniMax merger review, Microsoft told antitrust enforcers that it had no plan or incentive to foreclose ZeniMax content from rivals. PX0070 RFA 9 [3-ER-459]. After that deal closed, however,

Microsoft decided ███████████████ titles exclusive. *See*
PX4309 (Microsoft) at 001 [3-ER-393]. As one ZeniMax executive noted,
there is no reason why Microsoft will treat Activision titles differently
from those of ZeniMax. 6/22/23 Hr'g Tr. (Hines) at 101:7-102:3 [1-SER-
30]. The district court did not mention—much less grapple with—this
key evidence.

A third example of the district court's error is its treatment of
competing models predicting Microsoft's incentives to engage in
foreclosure. The court misunderstood Professor Lee's model when it
stated that he "simply assumed a [conversion] rate" from other consoles
to XBox "that would make exclusivity profitable." Op. 45 [1-ER-46].
Appellees similarly misunderstand the model in asserting that
Professor Lee substituted "assumptions for evidence" and proffered an
economic model that did not hold up at trial M/A Br.49.

To measure when foreclosure would be profitable, Professor Lee
analyzed a range of possible conversion rates, chose a baseline scenario
from the range, and tested the reasonableness of the baseline scenario's

inputs against econometric and documentary evidence.[12] *See* PX5000 (Opening Report) at ¶¶ 445–446, 567, 573 [2-FER-93, 2-FER-95, 2-FER-97]; PX5001 (Reply Report) ¶¶ 208-212 [2-FER-83-85]. Based on this review, he concluded that a baseline 20% conversion rate (which corresponds to a 5.5% share shift) was not just reasonable but likely conservative. PX5000 (Opening Report) at ¶572-3 [2-FER-96-97]. His analysis also showed that at even a 17.5% conversion rate, Microsoft would turn a profit notwithstanding any losses from lost Activision profits. PX5000 (Opening Report) at ¶ 573, Figure 49 [2-FER-97]. The district court plainly misunderstood this analysis. Op. 41 [3-SER-366] (erroneously concluding ▇▇▇▇ recoupment is "not…profitable").

In any event, in addition to Professor Lee's analyses, the FTC produced cognizable evidence of likely foreclosure from Microsoft's own documents, including deal plan evaluation models, and Microsoft executives' testimony about the models. *See Saint Alphonsus Med. Ctr.-*

---

[12] The court faulted Professor Lee for using an internal Microsoft memorandum without verifying whether Microsoft had support for the figures it used. Op. 41-42 & n.6 [1-ER-42-43]. But that was not required where the FTC needed only to raise "serious questions" on the merits and where the purported fault lies in Microsoft's own course-of-business documents.

*Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788 (9th Cir. 2015) (relying in part on parties' prior "statements and [] actions" as evidence of anticompetitive effects). Appellees thus misdescribe the record in contending that Professor Lee's expert report and testimony was the "lynchpin" of the FTC's showing on foreclosure, M/A Br. 48-49.

The district court based its conclusion that Microsoft had no incentive to foreclose on a "deal plan evaluation model presented to the Microsoft Board of Directors to justify the Activision purchase price." Op. 34-35 [1-ER-35-36]. That model showed Activision titles continuing to be available on other platforms and no anticipated increase in Microsoft's share of the console market, but it was not the whole picture.

As the evidence showed, Microsoft's usual practice in modeling the financial effects of acquisitions was to assume ██████████████ so that if an independent publisher like Activision ██████████ ████████████████████████████████████████████████ ████████████████████████████████. 6/22/23 Hr'g Tr. (Lawver) at 234:19-235:1 [2-FER-39-40]. Consistent with that practice, Microsoft's deal plan valuation model for ZeniMax similarly assumed ████████

█████████████████████████████████████ 6/22/23 Hr'g Tr.

(Lawver) at 235:9-16 [2-FER-40]. But as discussed above,

notwithstanding the model, Microsoft took ZeniMax titles exclusive

shortly after it closed the transaction.

Moreover, the district court ignored another component of the

*same* Board of Directors presentation that undercut its conclusion. That

part of the presentation identified, as a "strategic benefit" of the merger,

shifting gamers from PlayStation to Xbox consoles, resulting in

increased sales of Xbox consoles. PX4341 at 024 [2-FER-118]; 6/29/23

Hr'g Tr. 999:1-13 [1-SER-256]. But if Microsoft maintained full and

equal access to Activision content, there would be no reason for the

acquisition to cause gamers to shift from rival consoles to Xbox. PX5000

(Lee's Report) ¶ 378 [2-FER-90] (citing PX7031, Greenberg Depo. Tr. at

75:24-76:22 [2-FER-104]); *see also* PX1070 at 002 [2-FER-125]. The

strategic benefits described in the Board presentation thus *support* a

finding of incentive to foreclose. Yet the court failed to address this

evidence at all, instead finding no such incentive.

**B.     Placing Activision Content Exclusively on Game Pass is Neither Procompetitive nor an Efficiency**

As the FTC's opening brief explained (at 32, 44-45), Microsoft's gaining control of Activision likely would extinguish any probability that Activision titles will be offered on subscription services other than Microsoft's already dominant subscription service, Game Pass. Referencing the relevant evidence, the court "accept[ed] for preliminary injunction purposes it is likely *Call of Duty* will be offered exclusively on Game Pass, and not on rival subscription services." Op. 47 [1-ER-48]. The court wrongly considered that offering procompetitive, *id.*, but excluding all rivals is quintessential foreclosure and a competitive harm. The primary competitive threat posed by vertical mergers like this one is that they may "foreclose[] the competitors of either party from a segment of the market otherwise open to them." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 324 (1962) (cleaned up). Evidence that a dominant acquirer will withhold a substantial source of supply from all rivals, actual and potential, is sufficient to find a violation even in a full merits proceeding, *e.g.*, *Brown Shoe*, 370 U.S. at 328, let alone at this preliminary stage.

17

Appellees' claim that offering Activision content exclusively on Game Pass is output expanding and therefore a procompetitive efficiency rests on their assertion that, absent the merger, no gaming platform subscription service would offer Activision content. M/A Br. 41-42; *see also id.* at 38. As discussed herein (*supra* pp. 10-11), the FTC has raised serious questions about that key issue, which the Commission should determine. *Warner Commc'ns*, 742 F.2d at 1162. The FTC presented significant evidence that Activision would remain independent and platform-agnostic absent the merger—meaning that other subscription services would have a greater chance of entering and gaining the scale necessary to compete meaningfully against Microsoft's Game Pass. *See* FTC Br. 32. Eliminating those opportunities for access and entry would substantially lessen competition for years to come. *See* FTC Br. 31-32.[13]

In any event, making Game Pass a more "valuable draw for potential new subscribers" to Game Pass (Independent Game Publishers and Developers Amicus Br. at 10) is not enough. To be

---

[13] The evidentiary showing summarized in the FTC's opening brief illustrates these harms, which Appellees ignore in contending that there no such evidence. M/A Br. 43.

procompetitive, efficiencies must "create a more efficient combined entity and thus increase competition," not simply provide "better service" to Appellees' customers or "improve[] operations." *Saint Alphonsus*, 778 F.3d at 790, 792 ("[T]he language of the Clayton Act must be the linchpin of any efficiencies defense," thus the proposed efficiency must "*increase competition*." (emphasis added)).[14]

In disputing that Game Pass is already dominant, M/A Br. 43, Appellees misleadingly reference figures from outside of the content library subscription market where Game Pass competes. Compare PX8001 (Ryan (Sony) Decl.) ¶9 [3-ER-294-295] with PX0003 at 18 [3-ER-468]. Comparing library subscription figures, Xbox Game Pass had over 25 million subscribers in early 2022, compared to ▮▮▮▮▮▮ ▮▮▮▮▮ PS Plus Extra and Premium subscribers. PX8001 (Ryan (Sony) Decl.) ¶ 9 [3-ER-297-298]; PX9003 at 003 [1-FER-2]; PX1516 (Microsoft) at 039 [3-ER-443]. In short, Microsoft is already more than ▮▮▮▮▮▮▮▮▮▮▮ its next-nearest rival in a nascent and highly

---

[14] Tellingly, Appellees' brief omits any reference to *Saint Alphonsus*.

concentrated market where scale and the ability to attract a critical

mass of gamers are especially important for competitive success.[15]

### C. Appellees Fail to Defend the District Court's Mishandling of Their Proposed Remedies

#### 1. The District Court Erred As a Matter of Law and Logic in Considering Appellees' Proposed Remedies at the Preliminary Injunction Stage

The FTC's opening brief (at 48-52) demonstrated that binding

precedent required the district court to leave "questions going to the

merits" of the antitrust claims for "determination by the FTC in the

first instance." *Warner Commc'ns*, 742 F.2d at 1162. As a matter of both

law and logic, purported remedies should be considered only at the

merits stage of the antitrust analysis, when the full scope of

anticompetitive harm can be determined. Appellees erroneously claim

that the district court was merely following precedent when it relied on

Microsoft's side deals to deny preliminary relief. M/A Br. 56-59. In fact,

no precedent permits the district court, in a Section 13(b) preliminary

---

[15] Appellees' contention that the FTC did not raise monopoly concerns below is baseless. M/A Br. 43. The FTC has alleged that the merger violates Section 7, which condemns mergers "the effect of [which] may be substantially to lessen competition, or to *tend to create a monopoly*. 15 U.S.C. § 18 (emphasis added).

injunction proceeding, to deny otherwise warranted relief on the ground that the merging parties' proposed remedies would negate the merger's competitive harm. Even at the merits stage, the Commission is "not required to take account of a post-acquisition transaction that may have been made to improve [a] litigating position." *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986) (Posner, J.).

As a matter of simple logic, Appellees fail to explain how a court can determine that a proposed remedy is sufficient to negate a merger's anticompetitive effects when those effects have yet to be ascertained or quantified.[16]  Preliminary relief under Section 13(b) is warranted if serious questions are raised about a merger's anticompetitive impact, but determination of the exact nature, scope, and magnitude of the impact is left to the merits proceedings. *Warner Commc'ns*, 742 F. 2d at 1162; *Penn State Hershey*, 838 F.3d at 352; *Whole Foods*, 548 F.3d at 1042 (Tatel, J., concurring). Absent full adjudication on the merits, competitive harm simply cannot be ascertained, let alone putatively remedied. Until the Commission is able to evaluate the merger's

---

[16] *United States v. Greater Buffalo Press, Inc.*, 402 U.S. 549, 556 (1971), and *Whole Foods*, 548 F.3d at 1033-34, rely on this logic: consideration of remedy follows the finding of liability.

potential impact on cloud gaming, for example, it is difficult to determine whether Microsoft's self-interested offers and deals alleviate those concerns.

The district court's approach also defied binding precedent. *See* FTC Br. 48-50. The only appellate decisions the district court referenced and that Appellees cite are inapposite. *See* Op. 39 [1-ER-40]; M/A Br. 57-58. Both *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961), and *United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019), were *merits* adjudications of the challenged mergers, where consideration of proposed remedies was appropriate because the harms from those mergers had already been determined in full.[17] That is not the case here, where the entire purpose of the preliminary injunction proceeding below was to allow full consideration on merits to take place later and in another forum.[18]

---

[17] The district court recognized this aspect of *du Pont* but inexplicably concluded the FTC still needed to address the agreements in its *prima facie* case. Op. 39 [1-ER-40]. The court cited *AT&T* as support, *id.*, but as discussed, *AT&T* was a full merits adjudication, not a 13(b) action.

[18] Likewise inapposite is *United States v. UnitedHealth Grp., Inc.*, 630 F. Supp. 3d 118 (D.D.C. 2022), which did not involve 13(b).

The other decisions that Appellees cite are non-binding district court rulings that are also distinguishable from this case. *See FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 304-08 (D.D.C. 2020); *FTC v. Sysco Corp.,* 113 F. Supp. 3d 1, 72-78 (D.D.C. 2015); *FTC v. Arch Coal, Inc.,* 329 F. Supp. 2d 109, 114 (D.D.C. 2004); *FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 55 (D.D.C. 2002). *First*, all of those cases dealt with the structural remedy of asset divestiture, not with behavioral remedies like the terminable and changeable contracts that Microsoft claims will limit its ability to engage in foreclosure.[19] Putting aside the impropriety of considering remedial measures at the preliminary relief stage, the sufficiency of a structural remedy like divestiture is much easier to ascertain than the sufficiency of the conduct remedies Microsoft proposed. *See du Pont*, 366 U.S. at 333-34 (noting burdens of monitoring compliance with a conduct remedy); *St. Alphonsus*, 778 F.3d at 792

---

[19] ███████████████████████████████████ PX1781 at 10 [3-ER-423], ██████████████████████████████ The agreements' terminable and changeable nature refutes the Former Attorneys Generals' assertion that they "are an immutable part of the competitive landscape." AG Br. at 3. Moreover, contrary to the Former AGs' view (AG Br. at 11), the FTC's position *avoids* piecemeal adjudication. Evaluating contracts entered to avoid antitrust scrutiny requires constant consideration of a shifting set of agreements.

(divestiture is "customary form of relief in § 7 cases," especially with government plaintiff). Indeed, "in Government actions divestiture is the preferred remedy for an illegal merger or acquisition." *Cal. v. Am. Stores Co.*, 495 U.S. 271, 280-81 (1990). Conduct remedies like Microsoft's contracts are generally "disfavored." *Steves & Sons v. JELD-WEN, Inc.*, 988 F.3d 690, 720 (4th Cir. 2021) (rejecting contract remedy as insufficient to address harm to competition). Appellees have not attempted to explain why their conduct remedies should be preferred over structural relief.

*Second*, the proposed remedies in those cases had been offered or incorporated into the merger agreements, enabling the FTC and district court to subject the proposals to careful scrutiny, including after full discovery. Memorandum Opinion, *FTC v. Arch Coal, Inc.*, No. 1:04-cv-00534 (ECF_67) (D.D.C. July 7, 2004), at 4-5 (cleaned up); *Libbey*, 211 F. Supp. 2d at 45-46. By contrast, in this case, the FTC was denied meaningful discovery to vet many of Microsoft's post-complaint side deals. Microsoft claimed privilege over any real-world analyses of these deals, *see* ECF_309 at 156-159 [2-FER-25-28], and, except Nvidia's, the side-deals either came in after close of discovery, involved foreign

24

companies not subject to U.S. discovery, 6/28/23 Hr'g Tr. (Carlton (Defendants' Expert)) at 893:16-896:19 [1-SER-229], or both.

*Third,* in both *Sysco* and *Libbey*, the courts *granted* preliminary relief. *Sysco*, 113 F. Supp. 3d at 72-78; *Libbey*, 211 F. Supp. 2d at 55. Far from demonstrating that courts may deny preliminary relief based on eleventh-hour promises not to engage in foreclosure, those cases show the high burden that merging parties bear to substantiate the sufficiency of even structural remedies.

> ### 2. In Any Event, Appellees Have Not Shown That Their Proposed Remedies Are Adequate.

Even if Appellees' proposed remedies—that is, their post-complaint side-deals—could be considered at the preliminary injunction stage, those still would need to effectively eliminate the merger's competitive harm. *See* FTC Br. 50-55. The "crucial question" regarding remedies in a Section 7 case is whether the record supports a conclusion that the remedy "reasonably assures the elimination" of the merger's competitive harms. *du Pont*, 366 U.S. at 325-26. The district court did not undertake any such analysis—in large part because Microsoft failed to offer evidence about the deals' potential market impact. *See* FTC Br.

25

50-55. But it was Appellees' burden to show that the deals would in fact negate the merger's harmful effects. *St. Alphonsus*, 778 F.3d at 788.

The district court's reliance on the side deals to deny relief, without adequate evidence or analysis of their impact on competition, was plainly wrong. That is especially true in light of the court's acknowledgement that the availability of Activision's content outside of Microsoft's platforms and devices was "not guaranteed." 6/28/23 Hr'g Tr. 1115:19-1116:2 [1-SER-285].

On appeal, Appellees make no effort to address the *sufficiency* of their contracts. M/A Br. 59-60. Appellees instead highlight conflicting evidence about the *terms* of the contracts. M/A Br. 59-60. But that conflicting evidence should have led the court to grant the preliminary injunction so that the Commission could undertake a full examination of the contracts in the merits proceeding. *Warner Commc'ns*, 742 F.2d at 1162.

Appellees proceed from two incorrect premises in arguing that the district court's erroneous handling of remedies was harmless. First, regardless of whether the court relied on one of the proposed remedies— the Sony offer—in finding no incentive for foreclosure in the console

26

market (M/A Br. 61), the court did rely on the Sony offer in denying the

preliminary injunction, Op. 52 [1-ER-53]. Second, contrary to Appellees'

assertion that Activision games putatively would not have been

available to subscription and cloud customers absent the merger (M/A

Br. 61), the record evidence of Activision's past conduct and future

economic incentives raised serious questions on that issue that the

Commission should be permitted to examine. *See* pp. 10-11 *supra.*

## II.   THE DISTRICT COURT ERRED IN ITS TREATMENT OF PARTIAL FORECLOSURE AND THE *BROWN SHOE* LIABILITY FRAMEWORK

### A.   The FTC Consistently Demonstrated that the Merger is Likely to Lead to Harmful Partial Foreclosure

Echoing the district court and ignoring the record, Appellees

assert that the "FTC did not raise [partial foreclosure] until the eve of

trial" and had no expert testimony on the issue. M/A Br. 54. They are

wrong on both counts.

The FTC argued partial foreclosure harms in all its pre-trial

pleadings, including its complaint, ECF_1 at 28-30 [3-ER-554-556],

original motion for relief, ECF_7 at 20-22 [3-ER-544-546], and reply

brief in support of its preliminary injunction motion, ECF_131 at 10 [2-

FER-63]. The FTC's proposed findings of fact and conclusions of law

addressed partial foreclosure as well. ECF_309 at 99-100, 179-180 [2-FER-19-20, 2-FER-29-30]. Moreover, the FTC supported those arguments with both expert and non-expert evidence. *See* FTC Br. 66-68; PX5000 at ¶ 381 [2-FER-91]; PX5001 at ¶ 267 & n.299 [2-FER-86]; ECF_309 at 99-100 [2-FER-19-20]; 6/27/23 Hr'g Tr. 609:23-25, 622 [1-SER-157, 1-SER-160]. For example, Professor Lee addressed partial foreclosure in his opening report, PX5000 at ¶ 381 [2-FER-91], rebuttal report, PX5001 at ¶ 267 & n.299 [2-FER-86], written direct testimony, ECF_224 at ¶ 89 [2-FER-43-44], and trial testimony. 6/27/23 Hr'g Tr. 609:23-25, 621:5-622:24 [1-SER-157, 1-SER-160]. Appellees are thus wrong in asserting that partial foreclosure is a "later-added … theory" unsupported by evidence, including expert testimony. M/A Br. 54.

The district court made a core analytical error when it reasoned that "[i]f the FTC has not shown a financial incentive to engage in full foreclosure, then it has not shown a financial incentive to engage in partial foreclosure." Op. 45 [1-ER-46]; *see* FTC Br. 66-67; Amici Law Professors Br. 6-8. Firms can still have an incentive to partially foreclose rivals even if they lack incentives for full foreclosure. *See* 6/27/23 Hr'g Tr. 609:23-25, 621:5-622:24 [1-SER-157, 1-SER-160]. The

28

court's application of an erroneous economic theory was legal error. *See Penn State Hershey*, 838 F.3d at 336.  Further, the court failed to recognize that Microsoft can pursue profitable partial foreclosure by giving competitors inferior access to Activision offerings: for example, delayed or lower quality content, or increased licensing charges. Law Professors Br. 8; PX5000 at ¶ 477 n.718 [2-FER-94]. Those approaches would lower the cost of foreclosure by allowing Microsoft to continue receiving licensing fees for partial access to the merged firm's games while at the same time garnering profits from increased sales of Xbox consoles. Law Professors Br. 7. The court also overlooked a significant source of offsetting revenue: ██████████████████████████

████████ *See* PX4007 at 006 [2-FER-126]; PX1110 at 012 [3-ER-452]; PX5000 ¶¶ 312, 420, 582 [2-FER-88-89, 2-FER-92, 2-FER-98-99].

### B.    The FTC Convincingly Showed that the Merger May Harm Competition Under the *Brown Shoe* Framework

In its opening brief (at 58-62), the FTC established that the district court did not consider the merger's harms to competition under the *Brown Shoe* liability framework. Appellees characterize the FTC's arguments as "late-raised," M/A Br. 62, but those arguments were part

of this case from the outset—including the FTC's TRO motion and its pre- and post-trial conclusions of law—and were not waived (M/A Br. 64). *See* ECF_7 at 17-18 [2-FER-71-72]; ECF_175 at 109-112 [2-FER-52-55]; ECF_309 at 180-183 [2-FER-30-33].

Among other things, the FTC demonstrated below that this merger reflected and would exacerbate a trend towards concentration. *See Brown Shoe*, 370 U.S. at 332-33. For example, during closing arguments, the FTC explained that the merger could cause Microsoft's competitors to purchase other large content developers, which would be an "aggravating, not a mitigating factor" under *Brown Shoe*. 6/29/23 Hr'g Tr. 1156:1-7 [1-SER-295]. Appellees wrongly conclude that because the FTC did not bring a horizontal challenge, the FTC's evidence of a trend toward concentration is irrelevant. *Id.* at 63-64. Not so. *Brown Shoe* included a vertical merger challenge and clearly instructs that any "trend toward concentration" or "vertical integration" is an "important factor to consider." 370 U.S. at 332-33.

More generally, Appellees fail to engage with the *Brown Shoe* factors. M/A Br. 62-66.[20] The FTC, however, presented compelling evidence that the "nature and purpose" of the acquisition is anticompetitive because it would "transform an independent, 'platform-agnostic' source of supply into a captive one controlled exclusively by Microsoft." ECF_309 at 181-82 [2-FER-31-32]; *see also* 6/28/23 Hr'g Tr. Kotick (Activision) 742:5-13 [1-SER-191]; PX3378 (Sony) at 11-12 [2-FER-101-102]. The FTC also showed a trend towards further concentration within the industry, which "may accelerate as future entrants" vertically integrate in response. ECF_309 at 182 [2-FER-32]; *see also* 6/23/23 Hr'g Tr. Zimring (Google) 479:14-16 [1-SER-124]. In addition, the FTC showed that the acquisition would increase already high entry barriers in all three markets. ECF_309 at 182 [2-FER-32]; 6/23/23 Hr'g Tr. Spencer (Microsoft) 361:12 [1-SER-95]. *Brown Shoe* thus provides another basis for preliminary relief.

---

[20] These factors include: "the size of the share of the market foreclosed," the "nature and purpose of the arrangement," any "trend toward concentration in the industry," and entry barriers, among others. *Brown Shoe*, 370 U.S. at 328-34.

31

## III.   THE EQUITIES STRONGLY FAVOR A PRELIMINARY INJUNCTION.

Preliminary relief is necessary to ensure that, if the Commission

concludes Appellees' merger violates the Clayton Act, "premerger

competition" can be recreated. *Heinz*, 246 F.3d at 726. In enacting

Section 13(b), Congress determined that allowing a merger to be

consummated and then directing divestiture at a later point "is an

inadequate and unsatisfactory remedy in a merger case, a point that

has been emphasized by the United States Supreme Court." *Id.* (citing

*FTC v. Dean Foods Co.*, 384 U.S. 597, 606 n.5 (1966)). A core premise of

Section 13(b) is that divestiture after consummation often is not

adequate to restore the competition that would have existed but-for the

merger. *See, e.g.*, *Heinz*, 246 F.3d at 726; *Whole Foods*, 548 F.3d at 1034

(Tatel, J., concurring). Appellees assert that Congress's concerns are not

implicated by a vertical merger (M/A Br. 66), but Congress created no

vertical merger exception to Section 13(b) of the FTC Act or Section 7 of

the Clayton Act, both of which apply to all mergers, "horizontal,

vertical, conglomerate, [or other]." *FTC v. Procter & Gamble Co.*, 386

U.S. 568, 577 (1967).

Further, there is no evidence here that divestiture after a merits proceeding could "recreate pre-merger competition." *Heinz*, 246 F.3d at 726; *see also Warner Commc'ns*, 742 F.2d at 1165. Upon consummation, Appellees' relationships with the entire gaming ecosystem will change, given the size of the transaction and Activision's role as a leading AAA content developer. The FTC's evidence showed that hardware manufacturers now collaborate with Activision to ensure a high-quality gaming experience for consumers, sharing competitively sensitive information. FTC Br. 35 (citing record evidence). Post-acquisition, such information sharing likely would cease, eliminating this source of innovation competition. *Id.* At the same time, Microsoft and Activision will be free to share confidential, strategic information between themselves—a bell the Commission cannot un-ring later. FTC Br. 71-72.

Appellees' argument that preliminary relief is unnecessary to preserve the status quo fails to account for the new entanglements created between the merged firm and competitors as a result of the remedial contracts they have executed. Appellees provide no explanation, let alone evidence, for how these complex arrangements—

33

which may implicate the rights of non-parties—will be unwound if the Commission finds the merger unlawful. Thus, Congress's concern with the difficulties of "unscrambling the egg" apply equally to this vertical deal as to horizontal mergers.

Appellees' other arguments regarding the equities are likewise readily disposed of. Appellees continue to assert, contrary to all evidence, that a preliminary injunction will prompt them to abandon the deal. M/A Br. 69. As noted, the UKCMA's prohibition on closing had no such effect. *See* n.11 *supra.* Microsoft and Activision have shown themselves willing and able to extend their closing deadline, and they identify no reason why they are unable to do that again if this Court reverses. Further, Appellees have not shown why, if the deal is paused, Microsoft and Activision will be unwilling or unable to proceed should the merger be found lawful in the administrative proceeding. Both companies are profitable, well-capitalized, and leaders in their industries. Neither is at risk of failing if the merger is paused. In any event, the merging parties' own interests, such as financial benefits to shareholders (*see* M/A Br. 69), are private equities which receive little

34

weight under Section 13(b). *See Warner Commc'ns*, 742 F.2d at 1165; *Heinz*, 246 F.3d at 727 n.25.

Appellees provide no proof that consumers would benefit from agreements conditionally expanding availability of *Call of Duty*. M/A Br. 67. The FTC repeatedly asked Appellees' lead witnesses whether they had examined the economic or competitive effects of these agreements, and without exception they replied that they had not. *See, e.g.*, 6/29/23 Hr'g Tr. Stuart (Microsoft) 934:5-20 [1-SER-240]; 6/23/23 Hr'g Tr. Spencer (Microsoft) 336:16-338:5 [1-SER-89]; 6/28/23 Hr'g Tr. Carlton (Microsoft) 886:5-890-9 [1-SER-227-228].

Finally, Activision's contracts to provide *Call of Duty* to other platforms fail as an equity, public or private. *See* M/A Br. 67. First, as discussed above, those contracts do not remedy the harm to the competitive process associated with Microsoft's acquisition. *See* pp. 17-20 *supra*. Second, contrary to Appellees' contention, *id.* at 68, the FTC's concerns about this merger involve Microsoft's acquiring the leading independent AAA game developer, not just access to *Call of Duty*.[21]

---

[21] *See* PX7007 (Stuart (Microsoft) IH) at 98:11-99:17 [2-FER-111-112]; PX7006 (Kotick (Activision) IH) 49:9-49:15 [2-FER-114]; PX1741

████████████████████████████. *E.g.*, PX3378 Ryan (Sony) Hr'g Tr. 64:10-15 [3-ER-407].

As this Court has found, in weighing equities, "public equities receive far greater weight" and "private equities alone do[] not justify denial of a preliminary injunction." *Warner Commuc'ns*, 724 F.2d at 1165. Here, the FTC has shown a likelihood of success by raising serious questions going to the merits. *Id.* at 1162. Accordingly, this Court should give great weight to the public equity in effective enforcement of the antitrust laws and in preserving the Commission's ability to order meaningful relief in its merits proceeding. *See id.* at 1165; *Heinz*, 246 F.3d at 726.

---

(Microsoft) at 011 [2-FER-122]: PX2113 (Activision) at 010 [2-FER-119]; PX4743 (Microsoft) at 014 [2-FER-121]; PX7011 (Spencer (Microsoft) IH Vol. I) at 118:14:119:10 [2-FER-106]; PX7008 (Schnakenberg (Activision) IH) at 174:21-175:15 [2-FER-108-109]; PX2115 (Activision) at 001 [2-FER-120]; PX2406 (Activision) at 001 [2-FER-117].

# CONCLUSION

The Court should reverse and enjoin the proposed acquisition pending the outcome of the administrative adjudication.

Respectfully submitted,

HENRY LIU
*Director*
JOHN NEWMAN
*Deputy Director*
SHAOUL SUSSMAN
*Associate Director for Litigation*
JAMES H. WEINGARTEN
PEGGY BAYER FEMENELLA
JAMES ABELL
CEM AKLEMAN
MEREDITH R. LEVERT
JENNIFER FLEURY
*Attorneys*

BUREAU OF COMPETITION

ANISHA S. DASGUPTA
*General Counsel*
MARIEL GOETZ
*Acting Director of Litigation*

 /s/ *Mark S. Hegedus*
IMAD D. ABYAD
MARK S. HEGEDUS

*Attorneys*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-2115
mhegedus@ftc.gov

*Counsel for*
*Federal Trade Commission*

37

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 8 – CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____ 23-15992 _____

I am the attorney or self-represented party.

**This brief contains 6871 words,** including -0- words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[**X**] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____ */s/ Mark S. Hegedus* _____ **Date** _ September 27, 2023 _
(*use "*s/[typed name]*" to sign electronically-filed documents*)

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I certify that on November 13, 2023, I filed the foregoing with the Court's appellate CM/ECF system. Counsel for defendants-appellees are registered users of the Court's appellate CM/ECF system.

Date: November 13, 2023

/s/ Mark S. Hegedus
MARK S. HEGEDUS
*Attorney*
FEDERAL TRADE COMMISSION